IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No: 1:15-CV-274

SYNGENTA CROP PROTECTION, LLC,

    Plaintiff,

    v.

WILLOWOOD, LLC, WILLOWOOD USA,
LLC, WILLOWOOD AZOXYSTROBIN,
LLC, and WILLOWOOD LIMITED,

    Defendants.

**DEFENDANTS' BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

Alan W. Duncan
N.C. State Bar No. 8736
L. Cooper Harrell
N.C. State Bar No. 27875
MULLINS DUNCAN HARRELL &
RUSSELL PLLC
300 N. Greene Street, Suite 2000
Greensboro, NC 27401
Telephone: (336) 645-3320
Facsimile: (336)645-3330
aduncan@mullinsduncan.com
charrell@mullinsduncan.com


OF COUNSEL:
Peter J. Davis
WHITEFORD TAYLOR PRESTON LLP
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202-1626
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
pdavis@wtplaw.com

Barry S. Neuman
WHITEFORD TAYLOR PRESTON LLP
1800 M Street, NW Suite 450N
Washington, DC 20036
Telephone: (202) 659-6761
Facsimile: (202) 327-6151
bneuman@wtplaw.com


Steven E. Tiller
WHITEFORD TAYLOR PRESTON LLP
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202-1626
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
stiller@wtplaw.com

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ........................................................................ 1

II.    NATURE OF THE MATTER BEFORE THE COURT ...................... 2

III.    STATEMENT OF RELEVANT FACTS ......................................... 2

      a.     The Parties ........................................................................ 2

      b.     Allegations of Infringement of the '761 Patent ........................ 3

      c.     Allegations of Copyright Infringement ..................................... 6

IV.    QUESTIONS PRESENTED ...................................................... 8

V.     STANDARD OF REVIEW ........................................................ 8

VI.    ARGUMENT ......................................................................... 9

      A.     Summary Judgment as to Count IV Is Appropriate ................. 9

           i.      Syngenta's Evidence that Willowood Infringes the '761 Patent is Pure Speculation and Conjecture ................................................................. 9

           ii.     Syngenta has Failed to Establish the Necessary Factors to Invoke Section 295 of the Patent Act to Shift the Burden of Proof to Willowood ................... 14

      B.     Summary Judgment as to Counts VI and VII Is Appropriate ........................................................................ 19

           i.      FIFRA § 3(c)(7)(A) authorizes registration if labels are identical or substantially similar to the labels for any current registered pesticide products ........................................................................ 19

           ii.     Syngenta's labels are uncopyrightable instructional documents ............................................... 20

i

iii.    Syngenta's labels comprise facts and compilations
not subject to copyright protection .................................. 24

iv.    Fair use ........................................................... 26

VII.   CONCLUSION ...................................................................... 29

Case 1:15-cv-00274-CCE-JEP    Document 88    Filed 10/31/16    Page 3 of 38

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................... 9

*ATC Distribution v. What Ever It Takes Transmission Parts, Inc.*,
402 F.3d 700 (6th Cir. 2005) ............................................................ 21

*Aventis Pharm., Inc. v. Barr Labs., Inc.*,
411 F. Supp. 2d 490 (D.N.J. 2006) ................................................. 15, 16

*BASF Agrochemical Prods. B.V. v. Makhteshim Agan of
N. Am., Inc.*, US District Court for the
Middle District of North Carolina, Case No. 06-cv-536 ............................... 20

*Bond v. Blum*, 317 F.3d 385 (4th Cir. 2003) .................................................. 28

*Borges Colón v. Román-Abreu*, 438 F.3d 1 (1st Cir. 2006) ........................... 13

*Bragdon v. Abbott*, 524 U.S. 624 (1998) ........................................................ 14

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................... 9

*Consumers Union of the United States, Inc. v.
General Signal Corp.*, 724 F.2d 1044 (2d Cir. 1983) .................................... 27

*Cray Commc'ns Inc. v. Novatel Computer Sys., Inc.*,
33 F.3d 390 (4th Cir. 1994) ............................................................. 9

*Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156 (4th Cir. 1988) ........................ 13

*Feist Publications, Inc. v. Rural Tel. Service Co., Inc.*,
499 U.S. 340 (1991) ..................................................................... 21, 24, 25, 26

*FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539
(E.D. PA 2005) ............................................................................ 20

*Gowan Co., LLC et al v. Aceto Agric. Chems., Corp*,
filed in the US District Court for the District of Arizona,
Case No. 09-1124, ........................................................................ 20

iii

*Harper & Row Publishers, Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ...................................................................... 28

*Hinz v. Neuroscience, Inc.*, 538 F.3d 979 (8th Cir. 2008).............................. 13

*Huss v. Gayden*, 571 F.3d 442 (5th Cir. 2009)............................................... 14

*Janssen Products, L.P. v. Lupin Ltd.*,
2014 U.S. Dist. LEXIS 155248 (D. N.J. 2014)............................... 17, 18

*LG Display Co. Ltd. v. AU Optronics Corp.*,
709 F. Supp. 2d 311 (D. Del. 2010) ................................................ 16, 17

*Maltby v. Winston*, 36 F.3d 548 (7th Cir. 1994)............................................ 14

*Myrick v. Prime Ins. Syndicate, Inc.*,
395 F.3d 485 (4th Cir. 2005) ......................................................... 13

*Narell v. Freeman*, 872, F.2d 907 (9th Cir. 1999) ......................................... 28

*Neutrinova Nutrition Specialties and Food Ingredients*
*GMBH v. Int'l. Trade Comm'n*, 224 F.3d 1356
(Fed. Cir. 2000) .............................................................................. 15

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984)...................................... 6

*Sassafras Enters., Inc. v. Rosh Co., Inc.*, 889 F. Supp. 343
(N.D. Ill. 1995) .............................................................................. 21

*Sega Enters. Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)............... 27, 28

*Smithkline Beecham Consumer Healthcare, L.P. v.*
*Watson Pharmaceuticals, Inc.*, 211 F. 3d 21 (2d Cir. 2000)........................... 19

*Sony Corp. v. Universal City Studios, Inc.*,
464 U.S. 417 (1984) ..................................................................26, 27, 28

*Southco, Inc. v. Canebridge Corp.*, 390 F.3d 276
(3d Cir. 2004) ................................................................................. 23

*Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*,
2004 U.S. Dist. LEXIS 32299 (D. Md. 2004)................................. 18

iv

*Thomas v. Union Carbide Agric. Prods. Co.*,
473 U.S. 568 (1985) ....................................................................................... 7

*West v. Jewelry Innovations, Inc.*,
2007 U.S. Dist. LEXIS 54720 (N.D. Cal. 2007) ............................................. 15

## Statutes and Regulations

40 C.F.R. § 152.5 .............................................................................................. 8

40 C.F.R. § 156 .............................................................................................. 7, 21

7 U.S.C. § 136 ............................................................................................. 6, 7, 8

17 U.S.C. § 102 ................................................................................................. 24

17 U.S.C. § 107 ................................................................................................. 26

35 U.S.C. § 271 ................................................................................................... 3

35 U.S.C. § 295 ................................................................................................. 14

Fed. R. Civ. P. 56 ................................................................................................ 8

FIFRA § 3 .................................................................................... 7, 19, 20, 28

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

Civil Action No:  1:15-CV-274

SYNGENTA CROP PROTECTION, LLC,

Plaintiff,

v.

WILLOWOOD, LLC, WILLOWOOD USA, LLC, WILLOWOOD AZOXYSTROBIN, LLC, and WILLOWOOD LIMITED,

Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendants, Willowood, LLC, Willowood USA, LLC, Willowood Azoxystrobin, LLC and Willowood Limited (collectively, "Defendants" or "Willowood"), by their undersigned counsel, respectfully submit this brief in support of their motion for summary judgment as to Counts IV (Infringement of US Pat. No. 8,124,761 ("the '761 patent)), V (Copyright Infringement of QUADRIS Flowable Fungicide Label), and VI (Copyright Infringement of QUILT XCEL Fungicide Label) asserted in the complaint filed by Plaintiff, Syngenta Crop Protection LLC ("Plaintiff" or "Syngenta").

I.  **INTRODUCTION**

Relevant to the instant motion are Syngenta's allegations that Willowood infringed (1) the '761 patent by importing into the United States a chemical compound incorporated into fungicide products used to treat certain crops against disease, and (2) the copyrights of the labels for those products.  Syngenta, however, has failed to offer

1

sufficient evidence to warrant these claims proceeding to trial, and thus, judgment should be entered against it.

## II.    NATURE OF THE MATTER BEFORE THE COURT

Syngenta initiated this litigation on March 27, 2015 asserting claims for infringement of four United States patents (including the '761 patent), copyright infringement, and unfair trade practices pursuant to N.C. Gen. Stat. § 75-1.1.[1] (*See* Dkt. 1.)  The discovery period closed on October 10, 2016.  Willowood provided notice of its intent to file a dispositive motion on October 13, 2016.  (*See* Dkt. 83.)  Willowood's motion for summary judgment is, therefore, timely and ready for decision.

## III.   STATEMENT OF RELEVANT FACTS

### a.  *The Parties*

Syngenta is an agribusiness involved in the development, manufacture and sale of fungicides, herbicides, and other crop protection products.  (*See* Dkt. 1 at ¶2.)  Important to this matter is its sale of a particular fungicide compound known as azoxystrobin, which purports to control certain fungal growth in a variety of crops, including wheat, barley, corn, and soybeans, among others.  (*Id*. at ¶20.)  Since its commercial introduction in 1997, Syngenta has manufactured, marketed and sold azoxystrobin products under several brands, including Quilt, Quilt Xcel, and Quadris.  (*Id*.)  Syngenta filed for, and was issued, certain US patents for the azoxystrobin compound itself (US Pat. Nos.

---

[1] The unfair trade practices claim was dismissed on August 5, 2016.  (*See* Dkt. 73.)

5,602,076 and 5,633,256) and for certain methods to manufacture azoxystrobin (US Pat. No. 5,847,138 and the '761patent).  (*Id*. at ¶21.)

Willowood is a supplier of generic crop protection products, including fungicides. In anticipation of the February 2014 expiration of Syngenta's azoxystrobin patents, Willowood filed applications with the EPA for approval of its generic azoxystrobin products, Azoxy 2SC and AzoxyProp Xtra.  The applications included proposed labels for those products, which also required approval.  Willowood's products and labels ultimately were approved, with the final approval coming in May 2014.

### b. *Allegations of Infringement of the '761 Patent*

Count IV of Syngenta's complaint asserts that Willowood has infringed, and continues to infringe, the '761 patent under 35 U.S.C. § 271(g) by importing into the United States azoxystrobin for formulation into Azoxy 2SC and AzoxyProp Xtra.  In particular, Syngenta asserts that the process by which Willowood's azoxystrobin is manufactured by Willowood's supplier in China infringes the '761 patent.

The '761 patent, entitled *Processes for the Preparation of azoxystrobin using DABCO as a Catalyst and Novel Intermediaries used in the Processes*, claims:

1.  A process for preparing a compound of formula (I):



which comprises either (a) reacting a compound of formula (II):

3

with 2-cyanophenol, or a salt thereof, in the presence of *between 0.1 and 2 mol % of 1,4-diazabicyclo[2.2.2] octane (a/k/a DABCO)*, or

(b) reacting a compound of the formula (III):



with a compound of the formula (IV):



in the presence of *between 0.1 and 2 mol % of 1,4-diazabicyclo[2.2.2] octane*;

where W is the methyl (E)-2-(3-methoxy)acrylate group $C(CO_2CH_3)=CHOCH_3$ or the methyl 2-(3,3-dimethoxy)propanoate group $C(CO_2CH_3)CH(OCH_3)_2$ or a mixture of the two groups. (Emphasis added).

A copy of the '761 patent is attached as ***Exhibit A***.[2] Since each of the other asserted claims (claims 3-5, 9-10) is dependent from Claim 1, each includes the limitation that the process be conducted in the presence of "between 0.1 and 2 mol %" DABCO.[3]

---

[2] 1,4-diazabicyclo[2.2.2] octane is an organic compound commonly known as DABCO. DABCO acts as a catalyst for the chemical reaction claimed in the '761 patent. '761 patent at 1:20-25. This same chemical reaction for the production of azoxystrobin, referred to by the parties as the condensation reaction, was disclosed and claimed without using DABCO as a catalyst years before the filing of the '761 patent in US Pat. No. 5,847,138, also being asserted by Syngenta in this matter. (*See* Dkt. 1. at Ex. 10.)

4

As set forth below, Syngenta's sole support for its allegation that Willowood infringes the '761 patent is the testimony of its expert, Dr. Joseph Fortunak. Dr. Fortunak relies on two so-called "facts" to support his opinion: (i) certain testing indicates that Willowood's azoxystrobin technical was manufactured in the presence of an unknown amount of DABCO; and (ii) if one were to use DABCO in the manufacturing process, "it's only logical to run it in a commercially reasonable manner," – *i.e.*, between 0.1 and 2.0 mol %. *See* Fortunak Tr. p. 99, ln. 13 – p. 101, ln. 15.[4]

Dr. Fortunak concedes, however, that manufacturing azoxystrobin using concentrations of DABCO outside the claimed range is equally plausible. In particular, he admits that manufacturing azoxystrobin in a non-infringing manner is likely to produce yields nearly identical to, or in some cases even higher than, what would result from using DABCO within the claimed range. *Id.* at p. 106, ln. 6 – p. 108, ln. 13 ("█████

---

[3] It is important to note that a certain prior art reference – US Patent App. Pub. No. 2003/0092723 ("Weintritt") – discloses and claims the exact same chemical reaction claimed by the '761 patent to manufacture azoxystrobin, except that it claims that this reaction be conducted in the presence of "from 2 to 40 mol % of 1,4-diazabicyclo[2.2.2] octane (DABCO)...." *See* Fortunak Tr. p. 159, ln.16-19; p. 163, ln. 1-9 ("Q: [W]e...agreed that Weintritt claimed a process for preparing compounds of the general formula one and we agreed that general formula one includes...azoxystrobin, correct? A: That's correct"); p. 164, ln. 12-20 ("Q: Weintritt is claiming the synthesis of azoxystrobin in the presence of 2 to 40 molar percent of DABCO, correct. A: Looking at the scope of Weintritt's claims...one could say that this is contemplated."); p. 165, ln. 10-20 ("A: [S]o using 2 molar percent of DABCO and using a condensation [reaction] to make azoxystrobin in that way [as claimed by the '761 patent] would fall under the claims of Weintritt.").

[4] Cited portions from Dr. Fortunak's deposition transcript are attached collectively as ***Exhibit B***.

5

███████████████████████████████████████

███████████████████████████ "); p. 109, ln. 13-20 ("████████

██████████████████████████████████ "); p. 110, ln. 16 – p.

111, ln. 2 ("████████████████████████████████████████

|████████████ ██████████████████████████████████████

███████████████████████████████████████

████ ").  Dr. Fortunak further concedes that he is unaware whether manufacturing

azoxystrobin in such a non-infringing manner would result in any unwanted toxic effects

or add any significant cost to the overall cost of manufacturing.  *Id.* at p. 127, ln. 17-21

("Q: [H]ow much [DABCO] would have to be in [azoxystrobin] in order for it to be

toxic.  A: I do not know that that has been determined."); p. 119, ln. 15 – p. 120, ln. 5

("Q: What does [DABCO] cost?  A: Not [terribly] expensive. Q: So [if a manufacturer

were to use an amount of DABCO above 2.0 mol %], do you know how much that would

increase the cost of manufacturing…azoxystrobin….? A: [I]t won't be a large

contribution.").[5]

### c. Allegations of Copyright Infringement

The Federal Insecticide, Fungicide and Rodenticide Act, 7 U.S.C. §136a *et seq.*

("FIFRA"), requires registration with the EPA of all fungicide products distributed in the

---

[5] Dr. Fortunak further admits that any reasonable manufacturer would attempt to avoid, or "design around," a known patent.  *Id.* at p. 113, ln. 8-12 ("Q: But commercially reasonable companies do engage in [patent] design-around efforts, to the best of your knowledge, correct? A: That's correct?").

United States.  Among other purposes, FIFRA's registration scheme is intended to promote the entry of generic competition.  *See, e.g.*, *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 571 (1985) ("Congress intended to "streamline pesticide registration procedures, increase competition."); *Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1014 (1984) ("Congress believed that [FIFRA] would eliminate costly duplication of research and streamline the registration process, making new end-use products available to consumers more quickly.").

At the time a supplier seeks to register its generic pesticide product, it must submit a proposed label for the EPA's review and approval.  7 U.S.C. § 136a(c)(1)(C).  Significant portions of the language on these labels are mandated by the EPA.  40 C.F.R. § 156.[6]  Most generic pesticides – including Willowood's Azoxy 2SC and AzoxyProp Xtra products – are approved under FIFRA § 3(c)(7)(A), which authorizes registration if "the pesticide and proposed use are *identical* or *substantially similar* to any currently registered pesticide product…."  (Emphasis added).[7]  The EPA has defined a "pesticide

---

[6] These regulations list numerous categories of information that a pesticide label must contain.  These include, for example, precautionary and first aid statements, directions for use, and warnings.  *See* Declaration of Janelle Kay, attached as **Exhibit C**.  For many of these categories, EPA's regulations prescribe the exact language that must be used.  *Id*. at ¶¶7 & 10.  EPA also has issued a number of "PR Notices" available at http://www.epa.gov/PR_Notices/ where the EPA either requires or recommends specific language for inclusion in pesticide labels.  *Id*.  EPA also has published a "Label Review Manual" available at http://www.epa.gov/oppfeadl/labeling;lrm, which is a compilation of many of its labeling policies and regulations and includes label language authored and required by EPA.  *Id*.

[7] The entirety of the provision provides that "the Agency will not approve the conditional registration of any pesticide under FIFRA sec. 3(c)(7)(A) unless the Agency has

product" to mean "a pesticide in the particular form (including composition, packaging and *labeling*) in which the pesticide is, or is intended to be, distributed or sold." 40 C.F.R. § 152.5 (emphasis added); *see also* 7 U.S.C. § 136a(c)(3)(B)(i)(I) (directing the EPA to act as expeditiously as possible on any pesticide application that "proposes the initial…registration of an end-use product that, if registered, would be *identical or substantially similar in composition and labeling* to a currently-registered pesticide product….") (emphasis added). Accordingly, it has long been common for generic pesticide distributors to propose, and for the EPA to approve, labels that are substantially similar, if not identical, to labels used by brand name manufacturers. *See* Exhibit C at ¶8; *see also* Rossi Declaration, *infra* at fn. 14.

## IV.    QUESTIONS PRESENTED

1.  Is summary judgment in Willowood's favor warranted with respect to Syngenta's claim asserting infringement of the '761 patent?

2.  Is summary judgment in Willowood's favor warranted with respect to Syngenta's claim asserting infringement of copyrights associated with Syngenta's Quadris Flowable and Quilt Excel Flowable Fungicide labels?

## V.    STANDARD OF REVIEW

Summary judgment is warranted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" only if it affects the outcome, and a factual dispute is "genuine" only if

---

determined that the applicant's product and its proposed use are identical or substantially similar to a currently registered pesticide and use, or that the pesticide and its proposed use differ only in ways that would not significantly increase the risk of unreasonable adverse effects on the environment."

8

the evidence is such that a reasonable fact-finder could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where, as here, the non-moving party has the burden of proof, the movant is entitled to summary judgment if it shows the absence of necessary evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Cray Commc'ns Inc. v. Novatel Computer Sys., Inc.*, 33 F.3d 390, 393-94 (4th Cir. 1994) (holding that the absence of necessary evidence entitles the movant to summary judgment). Indeed, "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims...." *Celotex Corp.*, 477 U.S. at 323-24. As set forth below, summary judgment in favor of Willowood is appropriate as to Counts IV, V, and VI.

## VI.  ARGUMENT

### A.  *Summary Judgment as to Count IV Is Appropriate.*

#### i. *Syngenta's Evidence that Willowood Infringes the '761 Patent Is Pure Speculation and Conjecture.*

Each of the asserted claims of the '761 patent claims a process for the preparation of azoxystrobin requiring that the claimed chemical reactions be conducted in the presence of "between 0.1 and 2 mol %" DABCO. Syngenta's *sole* support for its allegation that Willowood infringes the '761 patent is the testimony of its expert, Dr. Joseph Fortunak. Dr. Fortunak relies on two facts to support his opinion: (i) certain testing indicates the presence of an *unknown* amount of DABCO in Willowood's azoxystrobin; and (ii) if one were to use DABCO in this process, "it's only logical to run

9

it in a commercially reasonable manner," – *i.e.*, between 0.1 and 2.0 mol %. *See* Fortunak Tr. p. 99, ln. 13 – p. 101, ln. 15.

Dr. Fortunak repeatedly conceded, however, that it is *not* possible to quantify the amount of DABCO used in the manufacture of Willowood's azoxystrobin based on this testing.[8] *See, e.g.*, Fortunak Tr. p.78, ln. 2 – p. 80, ln. 3; p. 86, ln. 12-19; p. 93, ln. 1-7; p. 246, ln. 12-20 ("Q: [Y]ou cannot conclusively say how much DABCO was used during the manufacture of the azoxystrobin technical included in…Azoxy 2SC, correct. A: So the best information you can get [from the testing performed by Syngenta and others and relied on by Dr. Fortunak] is to measure the presence of DABCO, the byproducts derived from it, and *that doesn't allow you to quantify how much DABCO was used*.") (emphasis added). Because Dr. Fortunak has no testing, documents, or other evidence on which to rely to establish that Willowood's azoxystrobin is manufactured in an infringing manner, he can only speculate that Willowood's azoxystrobin is infringing because "it's only logical to" do so. *See* Fortunak Tr. p. 99, ln. 13 – p. 101, ln. 15.

---

[8] Willowood has denied repeatedly that the azoxystrobin obtained from its supplier is manufactured in the presence of any DABCO, much less in the presence of DABCO as claimed by the '761 patent. Indeed, Willowood has produced testing by an independent laboratory confirming the absence of DABCO in its azoxystrobin. *See* PSL Testing attached as ***Exhibit D***. Further, its supplier's president testified that DABCO is not used *in any amount* in the manufacture of the azoxystrobin supplied to Willowood. *See* Wu Xialonong Tr. p. 37, ln. 12 – p. 38., ln. 13; p. 40, ln. 20 – p. 41, ln. 2, attached as ***Exhibit E***. Nonetheless, since all facts must be presumed in favor of the non-moving party, Willowood assumes for purposes of this motion that the testing on which Dr. Fortunak relies shows the presence of DABCO in its imported azoxystrobin. Summary judgment is warranted regardless, as Syngenta is unable to prove that the amount of DABCO used falls within the claims of the '761 patent.

10

Dr. Fortunak supports his opinion that it's only logical to conclude that Willowood's azoxystrobin infringes with three assumptions: if azoxystrobin is manufactured in the presence of DABCO outside the claimed range, (i) yield will be adversely affected, (ii) costs may be increased, and (iii) toxicity may be increased. Like his overall opinion, these assumptions are based only on speculation and conjecture.

***Yield is Not Adversely Affected***. Dr. Fortunak conceded that he does not know the concentration of DABCO at which yields will decrease. *See, e.g.*, Fortunak Tr. p. 106, ln. 3 – p. 108, ln. 3 (Q: "████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████"); p. 109, ln. 3 – p. 111, ln. 6 ("████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████") (emphasis added).

In addition, the '761 patent itself discloses testing establishing that the yields recovered when manufacturing azoxystrobin in the presence of DABCO outside the claimed range are equal, or nearly equal, to yields recovered when manufacturing azoxystrobin in the presence of DABCO within the claimed range. *See* '761 patent, 8:12-20 (Indicating in Table 1 that processing azoxystrobin in the presence of 0.1 mol % DABCO (outside the claimed range) yields 93.4% azoxystrobin while processing in the presence of 0.2 mol % (inside the claimed range) yields 93.1% azoxystrobin. Similarly,

11

processing azoxystrobin in the presence of 2.0 mol % (outside of the claimed range) yields 97.5% azoxystrobin while processing in the presence of 1.0 mol % (inside the claimed range) yields 98.7% azoxystrobin). Dr. Fortunak further testified that it was his understanding that at 0.1 mol % (again, outside of the claimed range), the catalytic effect of DABCO becomes "close to…optimal." Fortunak Tr. p. 110, ln. 16-18. Given the miniscule differences in yields when manufacturing in the presence of concentrations of DABCO both inside and outside the scope of the asserted claims, it can only be described as speculation to opine that Willowood's azoxystrobin is logically manufactured in an infringing manner.

*Cost is Not Significantly Increased*. While arguing that Willowood must infringe because DABCO would add to the manufacturing costs, Dr. Fortunak concedes that DABCO is "not [terribly] expensive." Fortunak Tr. p. 119, ln. 6 – p. 120, ln. 5 ("Q: So increasing DABCO from, for example, 1.9 mol % to 2.1 mol %, do you know how much that would increase the cost of manufacturing the azoxystrobin…sold to Willowood? A: …[I]t won't be a large contribution."). Given that DABCO will not add much to the costs of the raw materials of azoxystrobin production, it is makes no sense to assume that the cost of DABCO would materially affect a manufacturer's decision whether to use DABCO inside the scope of the asserted claims or outside of their scope.[9]

---

[9] Further, the use of DABCO in concentrations below the claimed range would necessarily reduce the costs of the raw materials needed to manufacture azoxystrobin.

***Toxicity is Not Increased***.  Finally, Dr. Fortunak's suspicion that the use of DABCO above the claimed range will increase toxicity provides no support for his opinion, as he does not know the concentration at which toxicity would become a concern.  Fortunak Tr. p. 127, ln. 6-21 ("Q: ... how much [DABCO] would have to be in that product in order for it to be toxic?  A:  I do not know that that has been determined.").[10]

In short, none of the three assumptions on which Dr. Fortunak relies to support his conclusion that Willowood's azoxystrobin must be manufactured in the presence of between 0.1 and 2.0 mol % DABCO is supported by any evidence.  Accordingly, Dr. Fortunak's opinion, which is the *sole* basis for Syngenta's allegation of infringement, is nothing but speculation and conjecture.  Judgment as a matter of law must be entered in favor of a party if a verdict in favor of the opposing party necessarily would be based on speculation and conjecture.  *See, e.g.*, *Myrick v. Prime Ins. Syndicate, Inc.*, 395 F.3d 485, 489 (4th Cir. 2005); *Crinkley v. Holiday Inns, Inc.*, 844 F.2d 156, 160 (4th Cir. 1988); *Hinz v. Neuroscience, Inc.*, 538 F.3d 979, 984 (8th Cir. 2008) ("When the record contains no proof beyond speculation…, then judgment as a matter of law is appropriate."); *Borges Colón v. Román-Abreu*, 438 F.3d 1, 14 (1st Cir. 2006) ("The plaintiff is not entitled to inferences based on speculation and conjecture.  The party who bears the burden of proof must present more than a mere scintilla of evidence in its favor to

---

[10] The use of DABCO in concentrations below the claimed range would reduce the potential toxicity of azoxystrobin.

13

withstand a motion for judgment….”); *Maltby v. Winston*, 36 F.3d 548, 559 (7th Cir. 1994) (Where a verdict “would have been based on pure speculation…, [t]he district court did not err in entering judgment as a matter of law”); *Huss v. Gayden*, 571 F.3d 442, 460 (5th Cir. 2009) (“The say-so of an expert is not necessarily grounds to deny judgment as a matter of law.”); *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998) (“Expert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment.”).[11]

### ii. Syngenta has Failed to Establish the Necessary Factors to Invoke Section 295 of the Patent Act to Shift the Burden of Proof to Willowood.

Syngenta may seek to rely on Section 295 of the Patent Act (35 U.S.C. § 295) in its attempt to avoid the entry of summary judgment. That section provides that in an action alleging infringement of a process patent based on the importation of a product that is made according to a process patented in the United States, the burden of proof shall shift to the defendant if the court finds that (i) a substantial likelihood exists that the product was made by the patented process, and (ii) the plaintiff made a reasonable effort

---

[11] Dr. Fortunak further concedes that any commercially reasonable manufacturer of a product will “design around” a patent where possible. *See* Fortunak Tr. p.113, ln. 8-12. Given his concession that the use of DABCO concentrations outside of the claimed range are as equally efficient as concentrations within the claimed range, and that he is unaware of the concentrations at which DABCO becomes toxic, combined with its very small costs, it is as equally plausible, if not more plausible, that Willowood’s supplier of azoxystrobin designed around the ‘761 patent by manufacturing azoxystrobin in the presence of DABCO outside the claimed range. Where a non-infringing alternative is equally, if not more, plausible than an infringing alternative, it simply is not appropriate to speculate and assume, without conclusive evidence, that the infringing alternative is being undertaken.

14

to determine the process actually used in the production of the product but was unable to do so.

Any such reliance on Section 295 here, however, must fail as Syngenta cannot satisfy either test. "Whether each of the two prongs of Section 295 has been met is not determined subjectively by the plaintiff…but is determined objectively by the court." *Neutrinova Nutrition Specialties and Food Ingredients GMBH v. Int'l. Trade Comm'n*, 224 F.3d 1356, 1360 (Fed. Cir. 2000). "This rebuttable presumption …cannot be easily established.... The plaintiff is expected to set forth facts...which form the basis for a reasonable belief that the product was made using the patented process." H.R. Rep. No. 100-60 at 16-17. *See also West v. Jewelry Innovations, Inc.*, 2007 U.S. Dist. LEXIS 54720, at *11 (N.D. Cal. 2007); *Aventis Pharm., Inc. v. Barr Labs., Inc.*, 411 F. Supp. 2d 490 (D.N.J. 2006).

In *Aventis Pharmaceuticals*, the plaintiff argued that the defendant did not manufacture its fexofenadine product by the process claimed in the application submitted to the FDA, but instead used the plaintiff's patented process. Similar to this case, the plaintiff's experts in *Aventis* detected a specific chemical – CPKEE – in the defendant's fexofenadine samples and argued that this was consistent with the patented process, and therefore, it was only reasonable to conclude that the defendant used the patented process. *Aventis,* 411 F. Supp. 2d at 509-10. The court found, however, that these experts made "unwarranted leaps of inference." Because the presence of CPKEE could have been the result of the use of a non-patented process (as argued by defendant), there

15

was no basis for concluding that the defendant used the patented process. *Id.* "The most [plaintiff has] shown is that there is evidence consistent with use of the "patented" process. *Id.* This is insufficient to establish a reasonable inference of a substantial likelihood of infringement, or a likelihood of establishing that substantial likelihood at trial." *Id.* The Court therefore denied the plaintiff's request to invoke Section 295 and shift the burden of proof to the defendant.

In another case bearing a very close resemblance to the facts here, *LG Display Co. Ltd. v. AU Optronics Corp.*, 709 F. Supp. 2d 311 (D. Del. 2010), the plaintiff's expert concluded that the accused product infringed the asserted process patent because tests of the product detected an auxiliary sealant consistent with the patented process. The expert conceded, however, that he could not definitively conclude whether the product was made by the claimed process. *Id.* at 336-37. He further conceded that there would be no infringement unless the defendant's witness – who testified that the claimed process was not followed – was untruthful as he had no personal knowledge of the defendant's manufacturing process.[12] *Id.* As a result, the court was not persuaded by the plaintiff's expert and held that the plaintiff had not met the first prong of Section 295. *Id.* at 337.

As discussed above, Dr. Fortunak's opinion is based entirely on testing identifying the presence of an *unknown* amount of DABCO in Willowood's azoxystrobin products

---

[12] Here, in order for Dr. Fortunak to be correct, the testimony of the president of Willowood's supplier that the azoxystrobin his company supplies to Willowood is not manufactured in the presence of DABCO would have to be a complete fabrication. Dr. Fortunak, like the plaintiff's experts in *LG Display*, has absolutely no personal knowledge of the manufacturing process at issue here. *See* Fortunak Tr. at p. 159, ln. 12 – p. 160, ln. 9.

and his conclusion that such products must be manufactured according to the '761 patent as it would be commercially unreasonable to do otherwise. He asserts this opinion despite his own concessions that the production of azoxystrobin in the presence of DABCO in concentrations outside the claimed range would result in substantially similar, if not equal, manufacturing yields while insignificantly affecting costs or toxicity. This is a nearly identical fact pattern to those confronted by the courts in both *Pharmaceuticals* and *LG Display*. This Court should reject Syngenta's efforts to shift the burden here since, as in those cases, Dr. Fortunak has established, at most, that infringement of the asserted patent is *possible*, but has failed to establish that such infringement is *likely*.

Shifting the burden of proof to Willowood also is improper here because Syngenta has failed to meet the second prong of Section 295. This prong requires courts to "examine the patentee's discovery efforts and consider whether [it] followed all the avenues of discovery likely to uncover the [defendant's] process, including written discovery requests, *facility inspections*, *first hand observations of the process*, *independent testing of processed samples*, the use of experts, and depositions…." *LG Display*, 709 F. Supp. 2d at 335 (emphasis added). Syngenta has failed to even attempt to engage in many of these discovery options.

In *Janssen Products, L.P. v. Lupin Ltd.*, 2014 U.S. Dist. LEXIS 155248, at *116 (D. N.J. 2014), the plaintiffs had difficulty obtaining discovery regarding the defendants' process because their manufacturers were overseas. The defendants, however, complied with all discovery requests. The court accordingly found that the plaintiff was not

17

entitled to the benefit of Section 295. "To allow such a shift where the accused infringers cooperate and comply with discovery requests, but happen to not be in custody or control of the documents sought, is not just or logical, nor does it comport with the aim and purpose of the statute." 2014 U.S. Dist. LEXIS at *119. *See also Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 2004 U.S. Dist. LEXIS 32299 (D. Md. 2004) (plaintiff not entitled to benefits of Section 295 where defendant responded to all discovery and the discovery deadline was approaching).

Syngenta has not established, and cannot establish, that Willowood hindered its efforts to prove its case such that the second prong of Section 295 has been met. There is simply no allegation that Willowood has failed to produce documents related to the manufacturing of Willowood's azoxystrobin products or to produce samples of such products, nor has Syngenta filed a motion to compel on such subjects. Syngenta has made no effort to obtain product samples or manufacturing documents directly from Willowood's supplier – which Dr. Fortunak testified would be the best source of evidence in this case[13] – yet it now asks the Court to take the extraordinary action of

---

[13] Dr. Fortunak testified that the most effective way to determine whether Willowood's azoxystrobin is manufactured in an infringing manner would be to test samples of the compound obtained during the manufacturing process. *See* Fortunak Tr. p. 159, ln. 12 – p. 160, ln. 9. Syngenta never made such a request. *Id*. Syngenta's only request for information from Willowood's supplier came in a July 26, 2016 email from Syngenta's counsel to Willowood's counsel, a copy of which is attached as ***Exhibit F***. This request asked Willowood to try to obtain certain documents from Willowood's supplier but did not request the production of any samples from its manufacturing process. *Id*. Willowood's counsel forwarded this request to Willowood's supplier two days later on July 28, 2016. A copy of both the English and Chinese versions of the letter sent is

Case 1:15-cv-00274-CCE-JEP    Document 88    Filed 10/31/16    Page 24 of 38

shifting the burden of proof in this case due to some alleged impropriety on Willowood's part. Such unprecedented relief should not be granted.

**B.      Summary Judgment as to Counts VI and VII Is Appropriate.**

> ### i. FIFRA § 3(c)(7)(A) authorizes registration if labels are identical or substantially similar to the labels for any currently registered pesticide product.

As discussed above, most generic pesticides – including Willowood's Azoxy 2SC and AzoxyProp Xtra products – are approved under FIFRA § 3(c)(7)(A), which authorizes registration if the labels are "identical or substantially similar" to the label of a currently registered product. Exhibit C at ¶7. Accordingly, it has long been common for generic pesticide registrants to propose, and for the EPA to approve, labels that are substantially similar, if not identical, to labels used by branded product manufacturers. *Id.* at ¶8.

In a similar matter, the Second Circuit held in *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc*., 211 F. 3d 21 (2d Cir. 2000) that copyright law did not prohibit generic drug manufacturers from copying the user guides developed for previously approved branded drugs. Because the Hatch-Waxman Act governing drug approval gave generic manufacturers "very little leeway to deviate from the previously approved user guide," the court found that application of copyright protection to those guides would severely undermine Congress' purpose to increase competition by facilitating the approval of generic drugs. *Id*. at 26 and 28. The public policy underlying

---

attached as ***Exhibit G***. This nominal effort by Syngenta to obtain information does not rise to the level required to invoke Section 295.

FIFRA's requirement that products and their labels be "identical or substantially similar" is the same – increasing competition by facilitating the approval of generic pesticide products – and thus, the *Smithkline* court's rationale should apply.[14]

### ii. *Syngenta's labels are uncopyrightable instructional documents.*

Syngenta's labels are instructional documents that serve the sole function of describing how to use the accompanying azoxystrobin products in a safe and efficient manner. As discussed above, much of the textual language is mandated by the EPA. *See*

---

[14] In *FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539 (E.D. Pa. 2005), the court held on a motion for preliminary injunction that plaintiff was likely to prevail on its claim that its pesticide label was protectable under copyright law In that case, however, Judge Pratter prominently noted that the EPA did not comment on the issue. *Id*. at 570. Since *FMC*, however, the EPA has twice made its position known. In *BASF Agrochemical Products B.V. v. Makhteshim Agan of N. Am., Inc.*, Case No. 06-cv-536 (filed in this Court), the Director of EPA's Pesticide Registration Division, Lois Rossi, submitted a declaration voicing the EPA's strong disagreement with the *FMC* decision and confirming that many components of pesticide labels are mandated by EPA regulations. A copy of Ms. Rossi's Declaration is attached as ***Exhibit H***. Ms. Rossi goes on in her Declaration to clarify that crafting the actual language included on labels "is largely a mechanistic process of modifying similar language already found on hundreds of existing pesticide labels to fit the particular conditions of use for the particular pesticide." *Id*. at ¶7. Ms. Rossi further makes clear that the EPA has read FIFRA §§ 3(c)(7)(A) and 3(c)(3) as a congressional endorsement of the use and approval of labeling that is identical to labeling found on currently registered pesticides and that the EPA generally has encouraged generic applicants to use labels that are identical or substantially similar to the previously approved labels. *Id*. at ¶10. Ms. Rossi concludes that if applicants are required to modify labels to avoid copyright claims, EPA resources would be extensively taxed with not only new applications requiring significant review, but also with hundreds of amended applications seeking to amend previously approved labels to avoid potential copyright infringement claims. *Id*. at ¶12. These positions were reaffirmed three years later by the Director of the Office of Pesticide Programs at the EPA, Debra Edwards, in *Gowan Co., LLC et al v. Aceto Agricultural Chemicals, Corp*, Case No. 09-1124, US District Court for the District of Arizona. A copy of Ms. Edwards' Declaration is attached as ***Exhibit I***. Both *BASF* and *Gowan* were resolved before disposition on the merits.

20

40 C.F.R. § 156. The remaining language is so basic that it is commonplace in the industry, and thus, merges with the ideas it is meant to convey.

It is well settled that manuals, product labels, and instructional manuals generally are not entitled to copyright protection. *See, e.g.*, *Sassafras Enters., Inc. v. Rosh Co., Inc.*, 889 F. Supp. 343 (N.D. Ill. 1995) ("language describing what a product does and how it is used is generally non-copyrightable; nine times out of ten copyright law will not protect that sort of literature"). This is because "copyright protection extends to the expression of an idea but not to the idea itself." *Sassafras*, 889 F. Supp. at 345-46; *see also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 344-51 (1991).

In the case of descriptive or functional text like the text on Syngenta's labels, there often are very limited ways to express the underlying ideas. Thus, the idea "merges" with the expression, rendering the expression uncopyrightable. *See, e.g.*, *ATC Distribution v. What Ever It Takes Transmission Parts, Inc.*, 402 F.3d 700, 707-08 (6th Cir. 2005). Here, many of Syngenta's textual elements are common expressions, stock phrases and warnings that – even when not expressly required by EPA – are commonly used in pesticide labels to describe how to apply products in a safe and efficient manner. For example, on Syngenta's Quadris label attached to its complaint as Exhibit 12, the following common phrases are used:

- o KEEP OUT OF REACH OF CHILDREN.

- o FIRST AID: If on skin or clothing: [i] Take off contaminated clothing. [ii] Rinse skin immediately with plenty of water for 15-20 minutes. [iii] Call a poison control center or doctor for treatment advice.

21

- o CAUTION: Harmful if absorbed through skin. Avoid contact with skin, eyes, or clothing. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco or using the toilet. Remove and wash contaminated clothing before reuse. Wear long-sleeved shirt and long pants, socks and shoes and chemical-resistant gloves made of any waterproof material such as polyvinyl chloride, nitrile rubber or butyl rubber.

- o DIRECTIONS FOR USE: It is a violation of Federal Law to use this product in a manner inconsistent with its labeling.

- o PRODUCT USE INSTRUCTIONS: Thorough coverage is necessary to provide good disease control. Make no more spray solution than is needed for application. Avoid spray overlap, as crop injury may occur.

While the above provides only limited examples of the language used throughout the label's 53 pages,[15] the entirety of the label consists of similar types of factual statements regarding the application and effectiveness of the product it accompanies.[16]

As a practical matter, the means of expressing the crops on which a particular fungicide may be used, any instructions for how to mix and apply it, and warnings for its

---

[15] Thirty of these pages include a four column chart identifying the crops on which the product may be used as approved by the EPA, the target diseases that the product treats on each crop, the application rate of the product on each crop (lbs/acre), and remarks regarding application, an example of which is below:

| Crop | Target Diseases | Use Rate fl oz product/A (lb ai/A) | Remarks |
|---|---|---|---|
| Artichoke, Globe | Ramularia leaf spot (Ramularia cynarae) | 11.0-15.5 (0.18-0.25) | Begin applications prior to or in the early stages of disease development, and continue as needed throughout the season at a 2- to 3-week interval, up to and including the day of harvest. Do not apply at less than 7-day intervals. Applications may be made by ground, air or chemigation. For ground applications, apply in 50-200 gallons of water per acre to obtain coverage without excessive runoff. For aerial applications apply in a minimum of 5 gallons of water per acre. An adjuvant may be added at specified rates. Do not apply more than one application of Quadris or other Group 11 fungicides before alternation with a fungicide that is not in Group 11. |

[16] The Quilt Xcel label includes very similar language with modifications simply required by the differences in the two products.

22

application and use, are very limited, and thus, providing parties with copyright protection for this language would make subsequent labeling practically impossible. Indeed, the absurdity of Syngenta's copyright claim is obvious when taken to its logical conclusion. Does each potential generic distributor need to come up with different ways of saying such basic phrases as "avoid contact with skin, eyes, or clothing" or "keep out of reach of children"? And then, does each generic manufacturer have exclusive protection for its particular way of "expressing" these basic ideas? Some pesticide compounds have many generic distributors. It would become essentially impossible to create labels conveying important use and safety information if each distributor is provided copyright protection for these basic terms and phrases.

Here, Syngenta's textual instructions and directions are comprised of stock language and standard expressions that one would expect to find in any EPA-approved label. *See, e.g.*, *Southco, Inc. v. Canebridge Corp.*, 390 F.3d 276, 287 (3d Cir. 2004) (recognizing *scénes a fáire* doctrine which provides that elements dictated by common settings or circumstances may not be monopolized by a single author). Accordingly, Syngenta's basic informational and instructional language regarding the use and application of its products contained on its Quadris and Quilt Xcel labels, as well as any warnings for such use, are based on legal and product requirements, customer demand, and industry standards, rather than any exercise of originality, and therefore, are not subject to copyright protection. *See id.* at 288.

23

### iii. Syngenta's labels comprise facts and compilations not subject to copyright protection.

Syngenta's labels consist largely of textual language setting out raw factual data pertaining to the use and application of azoxystrobin. By way of example only, the following facts that Syngenta seeks to protect are included in Syngenta's Quadris label:

*Active Ingredient:*
Azoxystrobin: methyl (*E*)-2-[2-[6-(2-cyanophenoxy)
pyrimidin-4-yloxy]phenyl]-3-methoxyacrylate* . . . . . . . . . . . . . . . . . . . . 22.9%

| *Other Ingredients:* | 77.1% |
|---|---|
| *Total:* | 100.0% |

Contains 2.08 lb of active ingredient per gallon

**Crop Rotational Interval**

| | Plant back interval |
|---|---|
| Buckwheat and millet | 12 months |
| All other crops with Azoxystrobin registered uses | 0 days |

**IN-FURROW APPLICATION RATES**

| Rate per 1000 row-feet | | Row Spacing (inches) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| fl oz product | oz ai | 22 | 30 | 32 | 34 | 36 | 38 | 40 | 48 | 60 | 72 | 80 |
| | | Product per Acre (fl oz) | | | | | | | | | | |
| 0.40 | 0.10 | 9.5 | 7.0 | 6.5 | 6.1 | 5.8 | 5.5 | 5.2 | 4.4 | 3.5 | 2.9 | 2.6 |
| 0.60 | 0.15 | 14.3 | 10.5 | 9.8 | 9.2 | 8.7 | 8.3 | 7.8 | 6.5 | 5.2 | 4.4 | 3.9 |
| 0.80 | 0.20 | | 13.9 | 13.1 | 12.3 | 11.6 | 11.0 | 10.5 | 8.7 | 7.0 | 5.8 | 5.2 |
| 1.00 | 0.25 | | | | | 14.5 | 13.8 | 13.1 | 10.9 | 8.7 | 7.3 | 6.5 |
| 1.20 | 0.30 | | | | | | | | 13.1 | 10.5 | 8.7 | 7.8 |
| 1.38 | 0.36 | | | | | | | | 15.0 | 12.0 | 10.0 | 9.0 |
| 1.50 | 0.40 | | | | | | | | | 13.1 | 10.9 | 9.8 |
| 1.72 | 0.45 | | | | | | | | | 15.0 | 12.5 | 11.2 |
| 2.00 | 0.50 | | | | | | | | | | 14.5 | 13.1 |
| 2.07 | 0.54 | | | | | | | | | | 15.0 | 13.5 |
| 2.30 | 0.60 | | | | | | | | | | | 15.0 |

Do not apply more than 15 fl oz/A.

Facts and information contained about the application and use of azoxystrobin, however, simply are not copyrightable. *See, e.g.*, *Feist*, 499 U.S. at 344-45 ("no author may copyright his ideas or the facts he narrates."). "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C. § 102(b).

24

Syngenta's effort to compile these facts and figures into its labels also does not afford it any exclusive rights. *See Feist*, 499 U.S. at 345 ("common sense tells us that 100 uncopyrightable facts do not magically change their status when gathered together in one place."). Although Syngenta may seek to place great emphasis on its efforts in developing its labels, the Supreme Court has soundly rejected the "sweat of the brow" doctrine under which courts previously justified copyright protection for compilations based on the expenditure of significant time and resources. *Id.* at 349. Indeed, the millions of dollars that Syngenta claims to have spent developing the information for these labels, as well as promoting and testing these products, is irrelevant as copyright protects only the expression of those facts and ideas, and not the ideas themselves, nor does it protect Syngenta's labor and effort to create its labels.

Moreover, FIFRA and the EPA's implementing regulations require fungicide manufacturers to compile all of this information, regardless of how the ideas are expressed. Thus, at most, only the selection and arrangement of this information is eligible for protection. The Supreme Court has made clear, however, that any such selection and arrangement must still be sufficiently original and creative to be copyrightable. *Id.* at 363. Syngenta's labels plainly do not meet this standard as they are comprised of unoriginal and banal charts setting forth the directions for use of Syngenta's products, as well as certain text regarding the handling and application of these products. *See* Exhibits 2 & 3 to Exhibit C.

Thus, Syngenta's labels simply are not copyrightable. To hold otherwise would unjustly reward Syngenta and would be an unconstitutional extension of copyright to an unoriginal and uncreative display of factual information. *Feist*, 499 U.S. at 354. The purpose of the Constitution's copyright clause is to encourage the creation of writings by authors. Yet, Syngenta generated its product labels – and will no doubt continue to generate product labels – because it is required to do so by law in order to sell its crop protection products. No additional incentive is needed.

### iv. *Fair use.*

Even if some limited elements of Syngenta's labels are protectable by copyright law, Willowood's use is nonetheless a permissible "fair use." In this regard, Section 107 of the Copyright Act provides:

> In determining whether the use made of a work in any particular case is a fair use, the factors to be considered shall include – (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for, or value of, the copyrighted work.

17 U.S.C. § 107. An analysis of these factors leads to the conclusion that Willowood's use is fair within the context of § 107.

**Purpose and character of Willowood's use.** "Although not conclusive, the first factor requires that 'the commercial or non-profit character of an activity' be weighed in any fair use decision." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 425 (1984). Here, even if substantial similarity is found, Willowood has, at best, used

26

Syngenta's labels as models for creating new labels with instructions for the safe and effective use of azoxystrobin fungicide products, consistent with federal law and policy, as well as industry practice. *See Consumers Union of the United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir. 1983) (need to ensure accuracy is an important consideration for a fair use analysis). There are significant public benefits in allowing generic manufacturers of pesticide products to model their labels after branded manufacturers' previously approved labels for the same products, whether or not the generic manufacturer incidentally benefits commercially as a result. Consistency of pesticide product labeling is critical to avoid confusion or misunderstandings that could result in injury, or even death, if these products are mishandled or misapplied. *See, e.g.*, *Sega Enters., Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1523 (9th Cir. 1992) (holding that defendant's use of plaintiff's computer code to produce competitive video games was a public benefit and permissible despite commercial benefit); *see also Sony*, 464 U.S. at 425 (access to television programming an important factor in analyzing copyright liability). *See also* Rossi Declaration at ¶¶5-14; Schatzow Report at ¶¶6-18, attached as **Exhibit J**. Moreover, because neither party creates its product labels in order to sell labels, but rather to sell fungicide products, any commercial exploitation is minimal. *Sega Enters. Ltd.*, 977 F.2d at 1523.

 **Nature of Syngenta's labels.** "The second statutory factor, the nature of the copyrighted work, reflects the fact that not all copyrighted works are entitled to the same level of protection." *Id*. at 1524. In particular, factual and functional works are entitled

27

to far less protection than are works of fiction. *Id.* As discussed above, Syngenta's labels are undeniably factual and functional. Thus, the scope of permissible fair use is great. *See Narell v. Freeman*, 872, F.2d 907, 914 (9th Cir. 1999) ("the scope of permissible fair use is greater with an informational work than a creative work") (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 563 (1985)).

*Amount and substantiality of the work.* There is a significant public interest in creating substantially similar labels consistent with FIFRA § 3(c)(7)(A) authorizing registration of labels "identical or substantially similar" to a previously approved branded product label so as to avoid confusion or misunderstandings that could result in injury, or even death, if these products are mishandled or misapplied. *See Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003) (despite the defendants' copying of the plaintiff's entire work, this factor was neutral because the defendants' use "serves an important societal interest."). Indeed, where an important societal interest is present, fair use may be found even in cases of wholesale copying. *See, e.g.*, *Sony*, *supra*.

*Effect on the market for, or value of, the work.* This factor reflects the underlying purpose of copyright to encourage creative endeavors. *Id.* at 450. Accordingly, "a use that has no demonstrable effect upon the potential market for, or the value of, a copyrighted work need not be prohibited in order to protect the author's incentive to create." *Id.* at 451. Such is the case with Syngenta's labels. Syngenta does not need copyright exclusivity as an incentive to create its product labels. Syngenta receives ample incentive from the fact that it has generated billions of dollars of revenue

28

from its sales of crop protection products and that product labels are mandated to accompany products sold to users by EPA regulations. Although the parties' pesticide products are competitive, the parties' labels are not.

There simply is no market for pesticide labels independent of the market for the associated products. Syngenta is not in the label making business; rather, it is in the business of developing, manufacturing, and selling fungicide and other crop protection products. Thus, Willowood's alleged copying of Syngenta's labels does not – and cannot – adversely affect the market for, or value of, Syngenta's labels. Consumers are not less likely to purchase Syngenta's products because Willowood's labels are modeled after, or even copy, Syngenta's labels. Indeed, there is no evidence that the parties' customers make purchasing decisions based in any way upon the expression of ideas in each party's labels. *See* Declaration of Gerald Simmons attached hereto as ***Exhibit K***. Accordingly, this factor too weighs heavily in favor of a finding of fair use.

**VII. <u>CONCLUSION</u>**

For all the foregoing reasons, Defendants respectfully request that judgment in their favor be entered as a matter of law as to Counts IV, V, and VI.

29

This the 31st day of October, 2016.

/s/ L. Cooper Harrell
Alan W. Duncan
N.C. State Bar No. 8736
L. Cooper Harrell
N.C. State Bar No. 27875
MULLINS DUNCAN HARRELL &
RUSSELL PLLC
300 N. Greene Street, Suite 2000
Greensboro, NC 27401
Telephone:  336-645-3320
Facsimile:  336-645-3330
aduncan@mullinsduncan.com
charrell@mullinsduncan.com

/s/ Barry S. Neuman
Barry S. Neuman
WHITEFORD TAYLOR PRESTON LLP
1800 M Street NW, Suite 450N
Washington, DC 20036
Telephone:  202.659.6761
Facsimile:   202.327.6151
bneuman@wtplaw.com

/s/ Steven E. Tiller
Steven E. Tiller
WHITEFORD TAYLOR PRESTON LLP
7 Saint Paul Street
Baltimore, MD 21202
Telephone:  410.347.8738
Facsimile:  410.223.4304
stiller@wtplaw.com

*Counsel for Defendants*

OF COUNSEL:

Peter J. Davis
WHITEFORD TAYLOR PRESTON LLP
7 Saint Paul Street
Baltimore, MD 21202
Telephone:  410.347.8738
Facsimile:  410.223.4304
pdavis@wtplaw.com

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing document has been filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this action.

This the 31st day of October, 2016.

/s/ L. Cooper Harrell
L. Cooper Harrell

32