# EXHIBIT 10

Page 1

1

2                UNITED STATES DISTRICT COURT

3         FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

4

5     _____

6     SYNGENTA CROP                    )Civil Action No.

      PROTECTION, LLC                  )

7        Plaintiff                     )1:15-cv-274

      vs.                              )

8     WILLOWOOD, LLC,                  )

      WILLOWOOD USA, LLC,              )

9     WILLOWOOD AZOXYSTROBIN, LLC      )

      and WILLOWOOD LIMITED            )

10       Defendants                    )

      _____

11

12

13              ** ATTORNEYS' EYES ONLY **

14        Videotaped Deposition of Brian Heinze

15                  Washington, D.C.

16                  August 4, 2016

17                   9:30 a.m.

18

19

20

21     Reported by:  Bonnie L. Russo

22     Job No. 2346611

1      instant messages, correct?

2          A.     No, there is not.

3          Q.     At some point in this -- in

4      connection with this litigation, I assume you

5      were instructed to start preserving documents;

6      is that right?

7          A.     Yes.

8          Q.     Do you remember when that was?

9          A.     Not specifically.

10         Q.     Was it in 2014?

11         A.     No.  It was -- it was shortly after

12     the lawsuit was filed.

13         Q.     So sometime after March 2015 when

14     the lawsuit was filed; is that right?

15         A.     That is correct.

16         Q.     Did Willowood send a notice to its

17     employees instructing them to preserve

18     documents?

19         A.     Yes.

20         Q.     Okay.  Did the notice apply to

21     e-mails, do you know?

22         A.     Yes, it did.

1          Q.    Did the notice apply to Internet

2     chat or instant messages?

3          A.    No, it did not.

4          Q.    Do you know if --

5          A.    Let me restate that.  I don't

6     recall.  I don't believe it did.

7          Q.    So you are not aware sitting here

8     today of any instructions given to Willowood

9     employees regarding saving Internet chat or

10     instant messages?

11          A.    I do not.

12          Q.    Let's -- we jumped into some

13     questions but I wanted to get a little

14     background on yourself.

15               Can you tell me what post-high

16     school educational experience you have?

17          A.    I hold a Bachelor of Science degree

18     in agriculture from California State

19     University, Chico.

20          Q.    Okay.  And do you have any, I guess

21     certifications that you obtained in addition to

22     the bachelor's degree?

Case 1:15-cv-00274-CCE-JEP    Document 96-10    Filed 10/31/16    Page 4 of 39

1          A.     I had -- I've let them all lapse.

2          Q.     What were the certifications in?

3          A.     Pest control advisors license for

4     the State of California, qualified applicators

5     license for the State of California.

6          Q.     Before, you know, before Willowood,

7     where were you employed?

8          A.     How far back would you like me to

9     go?

10          Q.     Let's start five years before

11     Willowood USA.

12          A.     I had formed my own post-patent crop

13     protection chemical company in 2000 called Ag

14     Value and Ag Value operated from 2000 to 2004

15     when it was sold to the publicly-traded Indian

16     company, United Phosphorus Mumbai in November

17     2004, and I agreed to serve a five-year

18     noncompete out of the industry prior to forming

19     Willowood in November of 2009.

20          Q.     Okay.  And Willowood, when you say,

21     "Willowood," there, you are referring to

22     Willowood USA that was formed in 2009; is that

1    right?

2         A.    Yes, I am.

3         Q.    Willowood USA was formed not only by

4    yourself but by Vijay Mundra; is that right?

5         A.    Correct.

6         Q.    How did you first get introduced to

7    Mr. Mundra?

8         A.    Mr. Mundra and I made acquaintances

9    when I was operating Ag Value.

10        Q.    Okay.  Did -- when you were

11   operating Ag Value, were you doing business

12   with Willowood Limited or did Willowood Limited

13   exist at that time?

14        A.    Yes, we were, and yes, we did.

15        Q.    And it was through those business

16   relationships that you were introduced to Mr.

17   Mundra; is that right?

18        A.    Correct.

19        Q.    Let's start with your current

20   position at Willowood.

21             My understanding is that you are the

22   president and CEO of Willowood USA, LLC; is

1    right?

2         A.    Yes, it is.

3         Q.    Willowood, LLC, is the entity that

4    obtained and owned the end use registration for

5    Willowood AzoxyProp Xtra; is that right?

6         A.    AzoxyProp Xtra, that is correct.

7         Q.    Willowood, LLC, is the entity that

8    obtained and owns the end use registration for

9    Willowood Tebustrobin SC; is that right?

10        A.    Yes, it is.

11        Q.    Now in some instances -- well,

12   stepping back, for each of those end use

13   registrations, you understand that there was an

14   application process before the EPA, correct?

15        A.    Correct.

16        Q.    And in some instances, chemical

17   analyses were done on the products and

18   information was submitted to the EPA to acquire

19   those end use registrations, correct?

20        A.    Correct.

21        Q.    In particular, an entity called

22   Analytical Regulatory Chemistry performed some

1    analyses on Azoxy 2SC and AzoxyProp Xtra before

2    the EPA applications for those registrations

3    were submitted.

4            Do you recall that?

5        A.    Yes, I do.

6        Q.    Willowood, LLC, was the entity that

7    was responsible for and commissioned those

8    analyses by Analytical Regulatory Chemistry; is

9    that right?

10        A.    That's correct.

11        Q.    Aside from obtaining and owning the

12    EPA registrations, what else does Willowood,

13    LLC, do?

14        A.    It's a holding company for our end

15    use registrations, that's all it does.

16        Q.    Does Willowood, LLC, sell or offer

17    for sale any products?

18        A.    It does not.

19        Q.    Does Willowood, LLC, generate any

20    revenue?

21        A.    No.

22        Q.    Since the end use registrations for

1     Q.    Includes -- an SDS includes or lists

2  the supplier of material that is the subject of

3  that SDS, correct?

4     A.    I can't say that with any certainty.

5     Q.    You understand that Willowood, LLC,

6  has identified itself as a supplier of Azoxy

7  2SC and AzoxyProp Xtra on SDSs, correct?

8     A.    Correct.

9     Q.    And in particular, Willowood, LLC,

10  is currently listed as the supplier of Azoxy

11  2SC and AzoxyProp Xtra at least on the SDSs for

12  those products, correct?

13     A.    Correct.

14     Q.    You also understand that Willowood,

15  LLC, has been identified on the product labels

16  for Azoxy 2SC and AzoxyProp Xtra, correct?

17     A.    Correct.

18     Q.    And the product label is included

19  with -- as a pamphlet or booklet with the

20  product that is sold to the end user; is that

21  right?

22     A.    That's correct.

Case 1:15-cv-00274-CCE-JEP   Document 96-10   Filed 10/31/16   Page 9 of 39

1    Q.    Mr. Heinze, what I have handed to

2    you is a label for AzoxyProp Xtra, correct?

3    A.    Correct.

4    Q.    And the lower right-hand corner on

5    the first page, you see that the revision date

6    is August 13, 2014?

7    A.    I do.

8    Q.    If you could turn to the very last

9    page of this document, it states -- for the

10   record, it is Page WW 21043.

11        Let me know when you get there.

12   A.    Okay.

13   Q.    On the last page, it is -- of the

14   label, it states:  "Distributed by Willowood

15   Azoxystrobin, LLC."

16        Do you see that?

17   A.    Yes, I do.

18   Q.    So Willowood Azoxystrobin, LLC, has

19   identified itself, at least in some instances

20   on the product label for AzoxyProp Xtra, as the

21   distributor of that product, correct?

22   A.    Correct.

1      Q.   In some instances, Willowood

2 Azoxystrobin, LLC, has actually placed orders

3 for azoxystrobin technical from Willowood

4 Limited; is that right?

5           MR. NEUMAN:  Hold on one second.

6 Could you repeat the question, please.

7           BY MR. SANTHANAM:

8      Q.   In some instances, Willowood

9 Azoxystrobin, LLC, has placed orders for

10 azoxystrobin technical from Willowood Limited;

11 is that right?

12           MR. NEUMAN:  Objection to form.

13           THE WITNESS:  I don't recall.

14           MR. SANTHANAM:  Marking this

15 document as Plaintiff's Exhibit 39, handing to

16 the witness.

17           (Deposition Exhibit 39 was marked

18 for identification.)

19           MR. SANTHANAM:  For the record,

20 Plaintiff's Exhibit 39 is a document Willowood

21 has produced.  It is consecutively

22 Bates-numbered WW 42, WW 53.

1          BY MR. SANTHANAM:

2          Q.     Mr. Heinze, if you could take a look

3      at this document and confirm for me that it is

4      a set of invoices from Willowood Limited.

5          A.     Please restate your question.

6          Q.     So what I've handed to you as

7      Exhibit 39 is a set of invoices from Willowood

8      Limited for the sale of azoxystrobin technical;

9      is that right?

10         A.     That's correct.

11         Q.     Now if you can turn to WW 43.  That

12     page is an invoice dated June 14 -- I'm sorry,

13     June 30, 2014, correct?

14         A.     Correct.

15         Q.     And the invoice is from Willowood

16     Limited to Willowood Azoxystrobin, LLC, for

17     5,000 kilograms of azoxystrobin technical,

18     correct?

19         A.     Correct.

20         Q.     So I will ask my question again:  So

21     in some instances, Willowood Azoxystrobin, LLC,

22     has placed orders for azoxystrobin technical

Case 1:15-cv-00274-CCE-JEP   Document 96-10   Filed 10/31/16   Page 12 of 39

1    from Willowood Limited; is that right?

2          A.    It appears so.

3          Q.    If you can turn to Pages 44 through

4    47, those are also invoices from Willowood

5    Limited to Willowood Azoxystrobin, LLC, for the

6    purchase of azoxystrobin technical; is that

7    right?

8          A.    That's right.

9          Q.    Same is true for -- strike that.

10               If you can turn to Page 49, WW 49.

11               Let me know when you get there.

12         A.    I'm there.

13         Q.    That particular invoice dated March

14    15, 2015 is an invoice from Willowood Limited

15    to Willowood USA, LLC, for the purchase of

16    azoxystrobin technical.

17               Do you see that?

18         A.    Yes, I do.

19         Q.    And if you look at the next set of

20    pages all the way through the end of the

21    document, those are also invoiced from

22    Willowood Limited to Willowood USA for the sale

Case 1:15-cv-00274-CCE-JEP    Document 96-10    Filed 10/31/16    Page 13 of 39

1      sometime in December 2014; is that right?

2           A.    That's correct.

3           Q.    Was there a reason for that?

4           A.    None in particular.

5           Q.    In some instances, Willowood

6      Azoxystrobin, LLC, has imported azoxystrobin

7      into the United States from Willowood Limited;

8      is that right?

9                 MR. NEUMAN:  Objection.  Foundation.

10                THE WITNESS:  I can't say that with

11     certainty.

12                MR. DAVIS:  Can I have that last

13     question and answer read back please.

14                (The record was read as requested.)

15                BY MR. SANTHANAM:

16          Q.    I am handing you a document that I

17     am marking as Plaintiff's Exhibit 40.

18                (Deposition Exhibit 40 was marked

19     for identification.)

20                MR. SANTHANAM:  For the record,

21     Plaintiff's Exhibit 40 is a two-page document

22     produced by Willowood, WW 1996 to 1997.

1          BY MR. SANTHANAM:

2          Q.    Mr. Heinze, if you could look at

3     Page 1996, this appears to be an airway bill

4     for azoxystrobin technical.

5               Do you agree?

6          A.    I agree.

7          Q.    And the shipper on this particular

8     airway bill is listed as Willowood Limited.

9               Do you see that?

10         A.    I do.

11         Q.    The consignee who accepted the

12    shipment is Willowood Azoxystrobin, LLC.

13              Do you see that?

14         A.    I do.

15         Q.    So in some instances, Willowood

16    Azoxystrobin, LLC, had imported azoxystrobin

17    from Willowood Limited; is that right?

18         A.    It appears so.

19         Q.    I'm going to hand you another

20    document I am marking as Plaintiff's Exhibit

21    41.

22              (Deposition Exhibit 41 was marked

1    with respect to azoxystrobin?

2        A.    Primarily the procurement,

3    transportation and financing.

4        Q.    So Willowood USA purchases

5    azoxystrobin technical from Willowood Limited;

6    is that right?

7        A.    That is correct.

8        Q.    In that arrangement, Willowood

9    Limited is the seller of the azoxystrobin

10   technical to Willowood USA; is that right?

11       A.    That is correct.

12       Q.    Willowood USA is the buyer that pays

13   for the azoxystrobin that Willowood Limited

14   supplies; is that right?

15       A.    That is correct.

16       Q.    Willowood Limited -- strike that.

17            Our understanding is that Willowood

18   Limited charges a 2.5 percent commission on the

19   sale of azoxystrobin technical to Willowood

20   USA; is that right?

21       A.    That is correct.

22       Q.    What is that 2.5 percent?  Is that

1      Q.    By air, how long?

2      A.    Depends whether the supplier has

3   stocks at the time or not, but a considerably

4   shorter time.  It can be as long as ten to 14

5   days, as long as 20, 21.

6      Q.    The time frame for shipment is

7   something you take into account in determining

8   how and when to sell azoxystrobin products in

9   the United States; is that right?

10     A.    Yes.

11     Q.    Now after the azoxystrobin technical

12  arrives in the United States, Willowood USA,

13  LLC, then arranges for that azoxystrobin

14  technical to be shipped to the location where

15  it is then formulated; is that right?

16     A.    That is not correct.

17     Q.    Okay.  So who arranges for the

18  azoxystrobin technical to be shipped to the

19  location where it is going to be formulated?

20     A.    I should qualify my previous

21  statement.  Ocean shipments are routed what we

22  term door-to-door, so they go directly to the

1    formulator that will produce the product.  With

2    the air shipments, it is cleared at an airport

3    and then Willowood USA coordinates the

4    transportation to the manufacturer.

5        Q.    And you said that for ocean

6    shipments, Willowood USA is the consignee so

7    Willowood USA would also be arranging the

8    transportation of azoxystrobin technical from

9    the point of import to where it is formulated;

10   is that right?

11       A.    That's not correct.

12             MR. NEUMAN:  Objection.  Foundation.

13             BY MR. SANTHANAM:

14       Q.    Which entity arranges for that

15   transportation?

16       A.    That is coordinated by Willowood

17   Limited.

18       Q.    So Willowood Limited coordinates the

19   transportation of azoxystrobin that comes in

20   through ocean freight from the point of entry

21   in the United States to the point where it is

22   ultimately formulated into end use product; is

1    that right?

2         A.    That's correct.  It is all

3    coordinated at point of origin.

4         Q.    Okay.  When -- and my understanding

5    is that when we are talking about end use

6    products, we are referring to Azoxy 2SC and

7    AzoxyProp Xtra; is that right?

8         A.    That's correct.

9         Q.    The formulation process is carried

10   out by a company called Agraform, LLC, in St.

11   Louis; is that right?

12        A.    That is correct.

13        Q.    How -- and when -- we talked about

14   how it is transported there, is that typically

15   done by rail, by truck or air?

16        A.    All of the above.

17        Q.    It depends on the circumstance?

18        A.    That's correct.

19        Q.    Is there a particular mode of

20   transportation that is used more often than

21   not?

22        A.    For ocean shipments, once it's

1          So you didn't actually search for

2     and identify these four patents, correct?

3          A.    No, I did not.

4          Q.    When did Willowood first become

5     aware of these four patents?

6          A.    The work done by our patent

7     attorney, Chris Hayden.

8          Q.    And Chris Hayden was the one who

9     identified these four patents, Exhibits 6, 12,

10     61 and 62 to Willowood; is that right?

11          A.    These and a number of other patents.

12          Q.    Do you know when Mr. Hayden first

13     identified the four Syngenta patents to

14     Willowood?

15          A.    It would have had to have been early

16     in 2013, early to mid-2013.

17          Q.    That was because Willowood had

18     engaged Mr. Hayden to do opinion work?

19          A.    Yes.

20          Q.    Okay.  Stepping back a little bit,

21     how were you fist introduced to Mr. Hayden?

22          A.    I believe it came via one of our

1      A.    Without having a freedom to operate

2   opinion from a bona fide patent attorney,

3   absolutely.

4      Q.    What was it about the EPA submission

5   process that you thought might potentially

6   infringe?

7      A.    We just are a company of high

8   integrity and want to do the right thing and

9   wanted to have -- I mean, if there was a

10   conflict, if there were patents in force that

11   we could not legally get around, we did not

12   feel comfortable submitting the registration

13   package.

14      Q.    Mr. Heinze, Willowood imported five

15   kilograms of azoxystrobin technical into the

16   United States in the early part of 2013; is

17   that right?

18      A.    That is correct.

19      Q.    Willowood did not have an opinion of

20   counsel from Mr. Hayden or otherwise at the

21   time it imported five kilograms of azoxystrobin

22   technical into the United States, correct?

1          A.    I do.

2          Q.    So as of May 16, 2014, you wanted to

3     make sure that Willowood was arranging to have

4     two to three steps in the manufacturing process

5     resulting in an intermediate done by a third

6     party and that intermediate being supplied to

7     Zenith; is that right?

8          A.    That's correct.

9          Q.    Okay.  And as of May 15, 2014, you

10    were not sure that whether that was even the

11    case?

12         A.    That is correct.

13         Q.    In the top e-mail, Mr. Mundra says:

14    "SSJ can pay a visit and document the whole

15    thing, can even take a video."

16              Do you know if SSJ ever took any

17    videos of the various factories?

18         A.    I know he visited them.  I don't

19    know if he took a video.  It actually is

20    referenced in one of the previous documents

21    that you --

22         Q.    Yes.  Handing you a document that

1          BY MR. SANTHANAM:

2      Q.    Handing you what has previously been

3    marked as Exhibit 17.

4          MR. SANTHANAM:  For the record,

5    Exhibit 17 is consecutively Bates-labeled 26251

6    to 26254.

7          THE WITNESS:  Okay.

8          BY MR. SANTHANAM:

9      Q.    If you look at the second page of

10   Exhibit 17, Page WW 26252, toward the bottom,

11   there is an e-mail from you, Brian Heinze, to

12   Sophia, SSJ and Vijay Mundra at Willowood

13   Limited, correct?

14     A.    That is correct.

15     Q.    Dated April 2, 2015?

16     A.    That's correct.

17     Q.    The same day that Mr. Hayden in

18   Exhibit 15 e-mailed you saying:  "Brian, they

19   still have not answered," correct?

20     A.    That is correct.

21     Q.    In your e-mail, you e-mail Sophia,

22   you ask:  "Where does Zenith play a role here?

Case 1:15-cv-00274-CCE-JEP   Document 96-10   Filed 10/31/16   Page 23 of 39

1    They are our registered technical source of

2    azoxystrobin."

3            Do you see that?

4        A.    I do.

5        Q.    Ms. -- and Sophia, in the e-mail

6    above, provides a response and she e-mails you,

7    SSJ and Vijay Mundra.

8            Do you see that?

9        A.    I do.

10       Q.    And she responds:  "Tai He,

11   manufacturer, below steps."  She specifically

12   lists:  "Cyclization, methylene, etherification

13   and condensation to yield azoxystrobin."

14           Do you see that?

15       A.    I do.

16       Q.    In response to your inquiry in April

17   of 2015, Sophia at Willowood Limited answered:

18   "Tai He performs the etherification step,"

19   correct?

20       A.    You are going by the chemical -- the

21   structures?

22       Q.    The heading.  Right under -- in

1     Sophia's e-mail, she lists:  "Cyclization,

2     methylene, etherification, condensation to

3     yield azoxystrobin."

4          A.    That's what it says, yes.

5          Q.    So Sophia informed you in April of

6     2015 that Tai He performs the etherification

7     step, correct?

8          A.    Yes.

9          Q.    You then forward that e-mail to Mr.

10    Hayden on April 2, 2015.  This is in Exhibit

11    17, and you say:  "Chris, I think this is the

12    missing piece you have been looking for.

13    Please let me know your thoughts."

14               Do you see that?

15         A.    I do.

16         Q.    And Mr. Hayden's response that same

17    day is:  "Peter, here is the followup e-mail.

18    Brian, we need to conference call."

19               Do you see that?

20         A.    I do.

21         Q.    What, if anything, did you discuss

22    with Mr. Hayden regarding the information that

1    Q.    When you say, "patent attorney," you
2    are referring to Mr. Hayden; is that right?
3    A.    Yes.
4    Q.    And as of -- and this e-mail, March
5    27, 2015, was sent after Syngenta filed suit in
6    this litigation, correct?
7    A.    Okay.  I am assuming that was what
8    the press release was; is that correct?
9    Q.    Yes.  I will represent to you that
10   the litigation was filed before March 27, on or
11   before March 27.
12        After speaking with Mr. Hayden, you
13   reached out to other members of Willowood USA
14   and Mr. Mundra at Willowood Limited and you
15   stated, you believed that the first thing that
16   Willowood needed to do was confirm that its
17   manufacturer is making the product the way that
18   Willowood has instructed them to do so,
19   correct?
20   A.    Correct.
21   Q.    And the way you have instructed the
22   manufacturer to make the product is according

1    to the manufacturing process we discussed

2    earlier; is that right?

3              MR. NEUMAN:  Objection to form.

4              THE WITNESS:  With the steps being

5    carried out by various intermediate producers,

6    yes.  We believe that they have been doing that

7    all along.  We just wanted to reconfirm that to

8    be the case going forward.

9              BY MR. SANTHANAM:

10       Q.    You say you "wanted to reconfirm."

11             (Deposition Exhibit 67 was marked

12    for identification.)

13             BY MR. SANTHANAM:

14       Q.    Handing you a document that I am

15    marking as Plaintiff's Exhibit 67.

16             MR. SANTHANAM:  For the record,

17    Plaintiff's Exhibit 67 is a Willowood e-mail

18    chain Bates-labeled WW 26363 to 26369.

19             THE WITNESS:  Okay.

20             BY MR. SANTHANAM:

21       Q.    If you look at the first page, we

22    saw this e-mail earlier from Mr. Hayden to you

1    for identification.)

2            BY MR. SANTHANAM:

3       Q.    Handing you a document that I am

4    marking as Exhibit 69.

5            MR. SANTHANAM:  For the record,

6    Exhibit 69 is Bates-labeled WW 22213 through

7    22221.

8            BY MR. SANTHANAM:

9       Q.    Mr. Heinze, if you could take a look

10   at this for context, I would like to ask you a

11   few questions about this document.

12      A.    Okay.

13   ████     █████████

████         ████████████████

████  ██████████████████████████████████

████  ██████████████████████████████████

17      Q.    If you look at the last page of

18   Exhibit 69, Page 22221, it references CAC

19   Chemical Americas, LLC?

20      A.    Yes.

21      Q.    Is that the CAC that you were

22   referring to?

1      Shanghai's method of detection.

2            Q.    If you turn to the second page

3      there, there is an e-mail there from Joy at JDM

4      Research dated January 11, 2016 to Vijay

5      Mundra, and the second paragraph is:  "CAC

6      method is capable of detecting PPB level using

7      specific column and LC-MS/MS system."

8                  Do you see that?

9            A.    I do.

10           Q.    That is your understanding of the

11     method that CAC was using to detect DABCO in

12     Tai He's azoxystrobin technical; is that right?

13           A.    That's correct.  That was the method

14     that CAC -- CAC Shanghai ran the same test on

15     their material and Tai He's material and for

16     information purposes, JDM is Wholly-owned by

17     Vijay Mundra and Vijay wanted to conduct

18     confirmatory tests to prove that CAC's

19     azoxystrobin did not contain DABCO before we

20     would consider submitting an application for an

21     alternate source from CAC Shanghai.

22           Q.    So if I understand it correctly, CAC

1     developed the method to test for DABCO; is that

2     right?

3          A.     That is correct.

4          Q.     And JDM, a company that's owned by

5     Mr. Mundra, performed the testing using CAC's

6     method, correct?

7          A.     Correct.  CAC ran the test on both

8     materials and JDM ran the material.

9          Q.     CAC's method was capable of

10    detecting DABCO at the parts per billion level;

11    is that right?

12         A.     That is correct.  That is my

13    understanding, yes.

14         Q.     CAC's method was -- used a specific

15    column and a liquid chromatography, mass

16    spectrometry, mass spectrometry system; is that

17    right?

18              MR. NEUMAN:  Objection.  Form.

19              THE WITNESS:  That's what this

20    e-mail suggests, yes.

21              BY MR. SANTHANAM:

22         Q.     If you look at Page 215 to 216 --

1      as follows shows that CAC's samples don't

2      contain DABCO while Willowood samples provided

3      do.

4          A.    That is coming from CAC Shanghai.

5      That is not coming from JDM.

6          Q.    What is -- I'm sorry, I am trying to

7      understand what your testimony is.

8          A.    I don't know what your question is.

9          Q.    Okay.  So when it refers to the

10     samples Willowood provided on Page 22215 -- do

11     you see that?

12         A.    Right.

13         Q.    Is it your --

14         A.    To CAC.

15         Q.    The samples Willowood provided were

16     samples of azoxystrobin technical from Tai He,

17     correct?

18         A.    Yes.

19         Q.    Those samples of azoxystrobin

20     technical from Tai He were tested and confirmed

21     to have DABCO in them; is that right?

22                 MR. NEUMAN:  Objection.

1          THE WITNESS:  By who?

2          BY MR. SANTHANAM:

3     Q.    By CAC.

4     A.    Okay.  That is what I wanted to

5     clarify.  Yes.  That is what this is saying.

6     Q.    In particular, the chart spanning

7     Pages 22215 to 22216 shows the Willowood

8     samples and the amounts of DABCO that were

9     detected in the azoxystrobin technical from Tai

10    He; is that right?

11    A.    Can you please repeat that question.

12    Q.    There is a chart on Pages 22215 to

13    22216.

14          Do you see that?

15    A.    I do.

16    Q.    The chart shows the amount of DABCO

17    that was detected in the Willowood's sample

18    from Tai He of azoxystrobin technical, correct?

19    A.    That's correct.

20    Q.    Has Willowood done any testing that

21    would contradict CAC's results?

22    A.    I do believe that the JDM tests are

1     complete and find DABCO in both the Tai He and

2     the CAC sample.

3          Q.    So JDM, the company that Mr. Mundra

4     owned, tested both CAC samples and azoxystrobin

5     technical samples from Tai He and confirmed

6     that they both contain DABCO; is that right?

7          A.    That's correct.  But I am still not

8     convinced that DABCO -- we have been told time

9     and time again by Tai He that DABCO is not used

10    in their manufacturing procedure because it is

11    still under patent in China.

12         Q.    Mr. Heinze, what would you believe,

13    testing conducted by your own partner in

14    Willowood Limited and his company or statements

15    from Mr. Wu?

16         A.    I don't have any reason to --

17               MR. NEUMAN:  Objection to form.

18               THE WITNESS:  I don't have any

19    reason to believe either.  I --

20               BY MR. SANTHANAM:

21         Q.    You don't have any reason to believe

22    that the testing that Mr. Mundra's company,

1      right?  They manufacture Willowood's

2      azoxystrobin technical?

3           A.    That's correct.

4           Q.    And Willowood Limited purchases the

5      azoxystrobin technical from Tai He, as I

6      understand; is that right?

7           A.    That's correct.

8           Q.    Tai He gets paid for that

9      azoxystrobin technical, I assume, correct?

10          A.    Of course, or -- are you saying by

11     who or --

12          Q.    They get paid by Willowood Limited,

13     I assume?

14          A.    Yes.

15          Q.    How about much would you estimate

16     that Tai He has been paid for manufacturing

17     azoxystrobin technical on behalf of Willowood,

18     any of the Willowood entities?

19          A.    That would be a pure speculation.

20     All -- I think all the financial documents have

21     been provided to you.  If you would like me to

22     give you an estimate, I could take a few

1      minutes and try to give it to you.

2           Q.    Would it be over a million dollars?

3           A.    Oh, absolutely.

4           Q.    Would it be over $2 million?

5           A.    I would believe so.

6           Q.    Five million?

7           A.    That's probably close.

8           Q.    Okay.  You never -- strike that.

9                 Have you ever communicated with LJC?

10          A.    No.

11          Q.    Have you ever communicated with LGC?

12          A.    No.

13          Q.    Have you ever communicated with JYC?

14          A.    No.

15          Q.    Have you ever seen communications

16     between Willowood and any of those entities?

17          A.    Just the one e-mail we saw earlier

18     from SSJ on those site visits.

19          Q.    But that was not a communication

20     with third-party entities.  That was just a

21     communication between Willowood Limited and

22     Willowood USA, correct?

1      A.    Correct.

2      Q.    When did Mr. Mundra's nephew take

3    over Greenfields?

4      A.    I would estimate 12 to 18 months

5    ago.

6      Q.    So 2014?

7      A.    No, no, no.  12 to 18 months ago.

8    So January 1 to June 30, 2015.

9      Q.    And have you ever met Mr. Rakesh

10   Jain?

11     A.    I have.

12     Q.    In what context have you met Mr.

13   Jain?

14     A.    Mr. Jain is in a similar business.

15   I see him twice a year when I'm in China.

16     Q.    What do you mean, "a similar

17   business?"

18     A.    He is in the crop protection

19   chemical business as well.

20     Q.    Did you communicate with Mr. Jain as

21   part of the process of establishing Greenfields

22   as an entity in Dubai?

1      A.     The initial visit, yes.

2      Q.     What discussion did you have with

3   Mr. Jain?

4      A.     That Vijay and I were interested in

5   creating a holding company for active

6   ingredient registrations offshore, and asked

7   Mr. Jain if he would be willing to help

8   facilitate that.

9      Q.     You and Mr. Mundra requested Rakesh

10  Jain to establish a holding company for

11  chemical registration; is that right?

12     A.     That's correct.

13     Q.     Were you involved in the process of

14  establishing Greenfields as an entity in Dubai?

15     A.     No.

16     Q.     Who carried that out?

17     A.     Mr. Mundra and Mr. Jain.

18     Q.     So Mr. Mundra worked with Mr. Jain

19  to establish Greenfields as an entity in Dubai

20  in the United Arab Emirates; is that right?

21     A.     That's correct.

22     Q.     Do you know what Mr. Mundra's

1    understand that?

2        A.    Yes.

3        Q.    Are there any contractual agreements

4    that you know of between Greenfields and Tai

5    He?

6        A.    I do not know.  I do not believe so.

7        Q.    So Greenfields -- so what is the

8    basis for your belief that Tai He is

9    Greenfields's manufacturer of azoxystrobin

10   technical?

11       A.    Greenfields only holds the technical

12   registration.  It is just -- it's a holding

13   company.

14       Q.    Tai He is as much a manufacturer of

15   azoxystrobin technical for Willowood as it is

16   for Greenfields, correct?

17       A.    That's correct, and that is

18   reflected on our confidential statement of

19   formulas for the end use products.

20             (Deposition Exhibit 70 was marked

21   for identification.)

22             BY MR. SANTHANAM:

1    being sold, which in this case was five

2    kilograms which has a value of $300."

3            Do you see that?

4        A.    I do.

5        Q.    You and Mr. Hayden had discussions

6    before physical chemistry studies were done in

7    the United States on samples of azoxystrobin

8    technical that were imported in the early half

9    of 2013, correct?

10       A.    Correct.

11       Q.    And your understanding was that

12    those -- that importation may infringe

13    Syngenta's patents, correct?

14       A.    Correct.

15       Q.    You had that understanding even

16    before you imported and ran the studies in

17    2013, correct?

18       A.    Correct.

19            (Deposition Exhibit 72 was marked

20    for identification.)

21            BY MR. SANTHANAM:

22       Q.    I will hand you a document I am