# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### Civil Action No: 1:15-CV-274

| | |
|---|---|
| SYNGENTA CROP PROTECTION, LLC, ) | |
| ) | |
| Plaintiff, ) | DEFENDANTS' MEMORANDUM IN |
| ) | SUPPORT OF THEIR MOTION TO |
| v. ) | EXCLUDE PLAINTIFF'S |
| ) | DAMAGES EXPERT, BENJAMIN |
| WILLOWOOD, LLC, WILLOWOOD USA, ) | WILNER |
| LLC, WILLOWOOD AZOXYSTROBIN, ) | |
| LLC, and WILLOWOOD LIMITED, ) | |
| ) | |
| Defendants. ) | |

Alan W. Duncan
N.C. State Bar No. 8736
L. Cooper Harrell
N.C. State Bar No. 27875
MULLINS DUNCAN HARRELL &
RUSSELL PLLC
300 N. Greene Street, Suite 2000
Greensboro, NC 27401
Telephone: (336) 645-3320
Facsimile: (336)645-3330
aduncan@mullinsduncan.com
charrell@mullinsduncan.com

Of Counsel:
Peter J. Davis
WHITEFORD TAYLOR PRESTON LLP
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202-1626
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
pdavis@wtplaw.com

Barry S. Neuman
WHITEFORD TAYLOR PRESTON LLP
1800 M Street, NW Suite 450N
Washington, DC 20036
Telephone: (202) 659-6761
Facsimile: (202) 327-6151
bneuman@wtplaw.com

Steven E. Tiller
WHITEFORD TAYLOR PRESTON LLP
Seven Saint Paul Street, Suite 1300
Baltimore, Maryland 21202-1626
Telephone: (410) 347-9425
Facsimile: (410) 223-4325
stiller@wtplaw.com

# TABLE OF CONTENTS

Page

I.    DISCUSSION...................................................................   1

    a.    *Standard of Review*.....................................................   1

    b.    *Dr. Wilner's Opinions are Based on Unreliable Data* .............   2

          i.    *Syngenta Budgets are Inaccurate, and thus, Unreliable*.......................................................   5

          ii.    *Dr. Wilner Failed to Verify Syngenta's Budgets*.........................................................   8

          iii.    *Dr. Wilner Cherry Picked the Budgets on Which He Relied*.......................................................   11

    c.    *Mesotrione is Not an Appropriate Benchmark for Azoxystrobin* ...........................................................   13

    d.    *Dr. Wilner Fails to Offer Any Support for His Use of Crop Protection Fungicide Sales as a Benchmark*............................   15

    e.    *Dr. Wilner's Alleged Damages Concerning the '761 Patent and Copyright Claim Do Not Arise Out of the Alleged Infringement* .........................................................   16

          i.    *Dr. Wilner failed to apportion damages allegedly resulting from Willowood's infringement of the '761 patent*.............................................................   16

          ii.    *Dr. Wilner failed to apportion damages allegedly resulting from Willowood's infringement of Syngenta's copyrights* .................................................   18

    f.    *Dr. Wilner Should be Prohibited from Mentioning  Syngenta's Alleged Violation of the "Formulators Exemption"*.................   20

i

# TABLE OF AUTHORITIES

**Cases**          **Page**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ............................................................ 2

*Ask Chems., LP v. Computer Packages, Inc.*, 59 F. App'x 506
(6th Cir. 2014) ...................................................................... 10, 11

*Auto Indus. Supplier Stock Ownership Plan v. Ford Motors Co.*,
435 F. App'x 430 (6th Cir. 2011) .................................................... 11

*Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F. 3d 514
(4th Cir 2003) ....................................................................... 20

*Bourjaily v. US*, 483 U.S. 171 (1987).............................................. 1

*CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815 (S.D. Ind. 2012).............. 15

*Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169
(S.D.N.Y. 2006).................................................................... 7

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l., Inc.*,
246 F.3d 1336 (Fed. Cir. 2001) ............................................... 13, 14

*Dash v. Mayweather*, 731 F.3d 303 (4th Cir. 2013)................................. 19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ........... 1, 2, 10

*Eleven Line, Inc. v. N. Texas State Soccer Ass'n Inc.*,
213 F.3d 198 (5th Cir. 2000) .......................................................... 14

*Ill. Tool Works, Inc. v. MOC Prod. Co.*,
2012 WL 3561984 (S.D. Cal. Aug. 17, 2012)................................... 10

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465
(S.D. Tex. Oct. 9, 2010) .............................................................. 19

*JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*,
1998 WL 175888 (E.D. Pa. Apr. 15, 1998),
*affirmed*, 178 F.3d 1279 (3d Cir. 1999)........................................... 12

*King-Indiana Forge, Inc. v. Millennium Forge, Inc.*,
209 WL 3187685 (S.D. Ind. Sept. 29, 2009).................................... 9, 11

*Lucent Techs. Inc. v. Gateway Inc*., 580 F. 3d 1337 (Fed. Cir. 2009)............ 18

*Panduit Corp. v. Stahlin Bros. Fiber Works, Inc*.,
575 F.2d 1152 (6th Cir. 1978) ....................................................... 17, 18

*Park v. El Paso Bd. Of Realtors*, 764 F.2d 1053 (5th Cir. 1985)................... 10

*Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004).......... 19

*Rondigo, LLC v. Casco Twp.*, 537 F. Supp. 2d 891 (E.D. Mich. 2008).......... 12-13

*Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000)........................................ 7

*SF Meritor LLC v. Eaton Corp*., 646 F. Supp. 2d 663 (D. Del. 2009) ........... 10

*Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 67448518
(E.D.N.C. Dec. 22, 2011) ................................................................. 7

*State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*,
980 F. Supp. 2d 1031 (N.D. Ind. 2013)............................................... 9

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022
(D. Kan. 2006) ................................................................................ 7

*Uniloc USA Inc. v. Microsoft Corp*., 632 F. 3d 1292 (Fed. Cir. 2011) ........... 18

*Victory Records, Inc. v. Virgin Records America, Inc.*,
2011 W.L. 382743 (N.D. Ill. Feb. 3, 2011)...................................... 9, 10

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 795 F. 3d 416 (7th Cir. 2005) .. 10

**Statutes**

17 U.S.C. § 504 ............................................................................. 19

35 U.S.C. § 284 ............................................................................. 16

Rejecting more traditional methods of determining infringement damages, Syngenta's expert, Dr. Benjamin Wilner, relies on a "benchmark" approach to support his opinion that Syngenta incurred nearly $300 Million in damages as a result of Willowood's allegedly improper conduct. These alleged damages are more than ten times the gross profits this same expert recognizes Willowood made as a result of its allegedly infringing conduct. Dr. Wilner was able to derive such a fantastical sum only through the application of unreliable principles and methods in violation of FRE 702 and Supreme Court precedent. In particular, Dr. Wilner fails to establish that the benchmarks on which he relies are reasonable, reliable, or sufficiently comparable to the products at issue to merit reliance on them or to properly apportion those damages to a particular infringing activity as required by both the U.S. Patent and Copyright Acts. Therefore, his opinions should be barred at the threshold under FRE 702.

## I.     Discussion

### a.  Standard of Review

The admissibility of expert testimony is a preliminary question of law for the trial court. *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993). The proponent bears the burden of demonstrating its admissibility. *Bourjaily v. US*, 483 U.S. 171, 175-76 (1987). In *Daubert*, the Supreme Court explained that the trial judge must perform a "gatekeeping" function to ensure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "When an expert opinion is based on data, methodology, or studies that are simply

1

inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). Thus, "any step that renders the analysis unreliable…renders the expert's testimony inadmissible." *Id.* at 267.

### b. Dr. Wilner's Opinions are Based on Unreliable Data.

As this Court is aware, patent infringement damages are often based on two models: (i) lost profits on lost sales; and/or (ii) price erosion. Under the first method, an expert determines the volume of the patent holder's sales displaced by the infringer's sales. Damages equate to the profits the patent holder would have earned on those sales. Under a price erosion theory, an expert analyzes the market and prices at which the products at issue were sold to determine the nature and extent of any price reductions caused by the infringer's allegedly improper presence in the market. The expert then applies those specific price differences to the patent holder's sales to determine its lost profits. While not mutually exclusive, when applying either of these methods, the nature and extent of the plaintiff's losses bear some relationship to the nature and extent of the alleged infringer's actions – *i.e.*, the more product that is sold by the alleged infringer and the greater its presence in the market, the greater the damages.

Dr. Wilner eschews both of these methods, instead applying what he calls a "benchmark" approach. While such an approach is not unheard of, Dr. Wilner's application of it here is inconsistent with *Daubert*. In particular, under Dr. Wilner's analysis, the volume of Willowood's sales of allegedly infringing product and its market

2

presence are not only not taken into account, but have no effect on the amount of damages calculated by Dr. Wilner. That is, under Dr. Wilner's analysis, Syngenta would have suffered $300 million in damages on account of Willowood's alleged infringement whether Willowood sold fifty thousand or five hundred thousand gallons of infringing product, and whether Willowood's market share of azoxystrobin products were two percent or twenty percent. Instead, Dr. Wilner relies on Syngenta's failures to meet its budgets as the sole basis for his opinions. That is, where Syngenta's sales failed to meet its budgets, Dr. Wilner assumes that virtually the entire shortfall is attributable to Willowood's infringement. Because Syngenta's budgets have been historically inaccurate and because he fails to test, or even verify, the methods used to prepare those budgets, Dr. Wilner's opinions must be excluded.

As can be seen from his report (attached as *Exhibit A*), Dr. Wilner relies on three "benchmarks" to form his opinions: (i) Syngenta's annual *budgets* for the sale of azoxystrobin products; (ii) Syngenta's annual *budgets* compared to its *actual sales* of mesotrione products; and (iii) Syngenta's annual *budgets* compared to its *actual sales* of all fungicide products sold by Syngenta other than azoxystrobin (which Dr. Wilner defines as "Crop Protection Fungicides"). In calculating damages related to the Compound Patents, both of which expired in February 2014, Dr. Wilner starts with Syngenta's budget shortfalls for *all* azoxystrobin products in 2014 through 2017 and then, with little justification, adjusts those shortfalls by the percentage which Syngenta failed to meet its budgets for mesotrione, an entirely different product, for those same

3

years. Using this method, Dr. Wilner calculates that Syngenta suffered damages totaling $85.6 Million. Ex. A at 31-36. With regard to the '138 patent, which expired in December 2015, Dr. Wilner, without *any* support, simply assumes that Syngenta's 2014 and 2015 azoxystrobin sales would have varied year-to-year in the same proportions as its aggregate Crop Protection Fungicide sales because the '138 patent had yet to expire and the group of Crop Protection Fungicides included unnamed products that were also still covered by patents. For 2016 and 2017, Dr. Wilner, with little support, assumes that Syngenta's azoxystrobin sales would have varied year-to-year in the same proportions as they actually did in 2014 and 2015 simply because these were the first two years after expiration of the Compound Patents while 2016 and 2017 were the first two years post expiration of the '138 patent.[1] With these assumptions in hand, Dr. Wilner concludes that Syngenta's damages were $155.3 Million. Ex. A at 36-40. As to the '761 patent, Dr. Wilner simply applied the same method he used to determine Syngenta's damages relating to the '138 patent in 2014 and 2015 to all of Syngenta's sales for the years 2014 through 2017 since the '761 patent had yet to expire to conclude that Syngenta's damages arising from infringement of the '761 Patent total $297.8 Million. Ex. A at 40-42. And finally, with regard to Syngenta's copyright claim, Dr. Wilner simply adopted the exact

---

[1] The disconnect between Dr. Wilner's opinions and Willowood's actions becomes clear when his 2014 and 2015 damages calculation for the Compound Patents is compared to the claimed damages for those same years for the '138 and '761 patents. The damages arising from Willowood's alleged infringement of each of the two method patents is over 50% greater than the damages allegedly incurred in those same years as a result of Willowood's alleged infringement of the Compound Patents despite the fact that Willowood's actions in those years was identical. Ex. A at Exhibit 16.b.

4

same damages analysis he used for the '138 patent (despite the significant difference in the intellectual property asserted) to conclude that Syngenta's actual damages total $155.3 Million. Ex. A at 44-45. Dr. Wilner's reliance on these budgets, however, is improper for several reasons discussed below.[2]

       i.  *Syngenta Budgets are Inaccurate, and thus, Unreliable.*

Syngenta's budgets are simply inaccurate. For example, Syngenta's 2009 azoxystrobin budget (five years before Willowood entered the market) overestimated both gross sales and profits of by 39%.[3] Syngenta's 2010 budget was even farther off target as it overestimated gross sales by 39% and profits by 50%. Syngenta's budget remained wildly inaccurate in 2011 when it underestimated gross sales and profits by 39%. While Syngenta's 2012 budgets were relatively accurate, its budgets in 2013 (overestimates of gross sales and profit by 13% and 17%, respectively) and 2014

---

[2] Dr. Wilner draws a number of other questionable conclusions without any support. For example, on pages 16 and 17 of his report, Dr. Wilner discusses certain supply agreements Syngenta entered into with Gowan and NuFarm *before* Willowood entered the market. He opines that the "pricing of these agreements…likely would have been more favorable to Syngenta but for Willowood's entry" in the market. Dr. Wilner then discusses the EPA approvals of registrations for three additional distributors in 2015 and 2016, concluding that they had no effect on Syngenta's sales "given the recency of [their approvals and] that these firms have not made any sales…." Ex. A at 21. Dr. Wilner offers no explanation why these new distributors had no adverse effect on Syngenta's contractual agreements but Willowood's pending EPA application purportedly did have an adverse effect on Syngenta's contracts with Gowan and NuFarm.

[3] A table identifying Syngenta's azoxystrobin budgets versus actual sales for the years 2009 through 2015 is attached as ***Exhibit B***. Despite Syngenta's introduction of azoxystrobin to the market in 1997, Syngenta did not produce any financial information (budgets or sales data) prior to 2009. Thus, Willowood is unable to test Syngenta's budgeting acumen prior to that year.

(overestimates of gross sales and profit by 24% and 26%, respectively) were, again, grossly inaccurate.

The budgets for each different azoxystrobin-containing product are even less reliable. Syngenta's 2012 budgets for Syngenta's eight azoxystrobin products ranged from overestimates of 42% to underestimates of 72%.[4] Similarly in 2013, Syngenta's budgets for its ten azoxystrobin products ranged from underestimates of 47% to overestimates of 28%. Syngenta's budgets for the azoxystrobin products sold in 2014 and 2015 were no more accurate as they ranged from overestimates of 220% to underestimates of 165%.

Syngenta's non-azoxystrobin products budgets fare no better. For example, Syngenta's mesotrione budget projections for 2012 through 2015 range from overestimates of 100% to underestimates of over 5,000%.[5] Syngenta's budgets for its Crop Protection Fungicide products are similarly unreliable.[6] Syngenta often overestimated the sales of certain fungicide products by as much as 100% while at the same time underestimating sales of others by 300% or even 400%.

---

[4] A table identifying Syngenta's budgets versus actual sales of each azoxystrobin containing product for the years 2012 through 2015 is attached as **Exhibit C**. Syngenta did not produce budgets or other financial information for these products prior to 2012.

[5] A table identifying Syngenta's budgets versus actual sales of each mesotrione containing product for the years 2012 through 2015 is attached as **Exhibit D**. Syngenta did not produce budgets or other financial information for these products prior to 2012.

[6] Tables identifying Syngenta's budgets versus actual sales of each Crop Protection Fungicide containing product and active ingredient for the years 2012 through 2015 are attached as **Exhibit E** and **F**, respectively. Syngenta did not produce budgets or other financial information for these products prior to 2012.

Federal Rule of Evidence 702 makes clear that experts may offer opinions *only if* they are based on sufficient facts or data and are products of reliable principles and methods. Expert opinion based on inaccurate data is not sufficiently reliable to justify admission. For example, in *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022 (D. Kan. 2006), defendants argued that the expert's methodology was flawed because "despite the historical inaccuracy of plaintiff's sales projections, [the expert] based his conclusions on the assumption that plaintiff...accurately projected its sales...." *Id*. at 1030. The Court, after admonishing the expert for failing to independently analyze his client's projections, held that the expert's projections were

> more sleight of hand than consistent with generally accepted economic methodology. No reasonable jury would accept them as valid predictors of actual sales and [the expert's] opinions, which assume that the projections are [accurate], would not assist the trier fact.

*Id*. The Court in *Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169 (S.D.N.Y. 2006), came to a similar conclusion when it excluded two of the plaintiff's damages experts who based their opinions on the projected profits formulated by the plaintiff's management team. The Court noted that the experts' lost profits analyses were flawed as the plaintiff's projections were inaccurate, and thus, unreliable. *Id*. at 184. "The [party's] 'cheerful prognostications' are not enough" to justify admission of expert testimony based on those prognostications, the Court held. *Id*. (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000)). *See also Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 67448518, at *11 (E.D.N.C. Dec. 22, 2011) (holding that the expert's "projections…were based on unreliable and speculative forecasts," and

7

therefore, his "claims for lost profits…were too speculative" to be admitted.). Syngenta's budgets are the very foundation on which every opinion offered by Dr. Wilner (other than his opinion regarding Willowood's unjust enrichment arising from its alleged copyright infringement) is formed, yet those budgets are consistently very inaccurate. Accordingly, his opinions relying on those budgets are too unreliable to be admitted.

### ii. Dr. Wilner Failed to Verify Syngenta's Budgets.

Dr. Wilner's reliance on Syngenta's budgets is further flawed because he failed to verify their accuracy or the methodology by which they were prepared. Ex. A at 29-30.[7] To understand the process by which Syngenta prepares its budgets, Dr. Wilner claims to have spoken to several Syngenta employees. *Id*. He explains that product leads continually investigate market conditions for each product to develop Syngenta's sales and profit projections. *Id*. While acknowledging that each product faces different market conditions "as exclusivity could change, new Syngenta products could be introduced, [competition and crop economics could change], [weather patterns could differ], *etc*." (*Id*.), Dr. Wilner fails to identify what data were gathered by Syngenta in each year for each product or how that data factored into Syngenta's budgets. *Id*. In fact, Dr. Wilner does not appear to know very much about the process by which Syngenta prepares its

---

[7] Dr. Wilner testified that the entirety of his understanding of Syngenta's budgeting process is included on pages 29 and 30 of his report. *See* Excerpts of Dr. Wilner's Deposition Testimony at 232:19-234:12, attached as ***Exhibit G***.

8

budgets or the data on which they rely.[8]  For example, Dr. Wilner concedes that sales of azoxystrobin and other fungicides can be dramatically affected by weather and disease proliferation, yet no information has been provided on how, if at all, Syngenta factored these variables into any of its budgets.  Further, as Dr. Wilner concedes, the introduction of new Syngenta products into the market could affect budgets, yet he fails to explain what that effect may be or how, if at all, it was analyzed.[9]  As Dr. Wilner offers no explanation, Willowood is left to guess how Syngenta takes any information into account in preparing its budgets with no ability to test or validate Syngenta's assumptions.

There is also no evidence that Dr. Wilner tested or validated Syngenta's assumptions.  "When an expert relies on information given to [him] by a party or counsel, [he] must independently verify that information before utilizing it in his calculations." *King-Indiana Forge, Inc. v. Millennium Forge, Inc.*, 209 WL 3187685, at *2 (S.D. Ind. Sept. 29, 2009); *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013).  In *Victory Records, Inc. v. Virgin Records America, Inc.*, 2011 WL 382743 (N.D. Ill. Feb. 3, 2011), plaintiff's expert relied on the benchmark method to calculate his client's alleged damages.  In excluding the expert's opinion, the

---

[8]  Interestingly, in his report, Dr. Wilner does not state that **he** believes that Syngenta's budgets provide the best estimate of Syngenta's revenue and profits.  Rather, he states that "**Syngenta believes** that the budgets…provide the best estimate about what the gross sales, net sales, cost of goods sold, and gross profits will be for each Syngenta product." Ex. A at 30 (emphasis added).

[9]  For example, in 2015, Syngenta began selling products including solatenol, a newly approved active ingredient which Syngenta included as part of its azoxystrobin post patent strategy.  *See* SYN 283442 attached as *Exhibit H*.

9

Court noted that an expert's assumptions and projections must rest on "adequate bases," cannot be the product of mere speculation, and that if the principle assumptions underlying the expert's opinions lack the reliability expected by experts in the field, the opinion must be excluded. *Id*. at *1 (relying on *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1067 (5th Cir. 1985)). The Court went on to hold that the expert's opinions, which were based primarily on the plaintiff's internal budgets, lacked the reliability demanded by Rule 702. *Id*. at *2. *See also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 795 F.3d 416, 420 (7th Cir. 2005) (a party's "internal projections...rest on its say so rather than a statistical analysis," and "represent hopes rather than the results of scientific analysis," and thus, opinions relying on them are inadmissible); *SF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663, 667 (D. Del. 2009) (excluding testimony of expert who "did not apply his own assumptions, based upon his expertise, to any financial data in order to project the party's future performance" but who instead "relied on" the party's own internal financial budgets "without knowing...the validity of the underlying data and assumptions upon which the [budgets] were based.").

The Court in *Victory Records* found the expert's opinions particularly offensive as he offered no basis for his conclusion that the plaintiff's internal projections provided an acceptable foundation for an expert's opinion in his field. *Victory Records*, at *2. *See also Ill. Tool Works, Inc. v. MOC Prod. Co.*, 2012 WL 3561984, at *8 (S.D. Cal. Aug. 17, 2012) (despite expert's testimony that he based his reliance on "discussions" with plaintiff's employee that created the projections, the court refused to accept that "bare

10

reliance on a 'rough estimate' given by [plaintiff's] own director of technology is the type of reliable method based on sufficient facts that *Daubert* envisioned"); *Ask Chems., LP v. Computer Packages, Inc.*, 59 F. App'x 506, 510 (6th Cir. 2014) (holding that expert's "wholesale adoption of plaintiff's estimates, without revealing or…evaluating the bases for these estimates, goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis."); *Auto Indus. Supplier Stock Ownership Plan v. Ford Motors Co.*, 435 F. App'x 430, 454 (6th Cir. 2011) ("[B]ecause [the expert] had no familiarity with the underlying source documents, he was not qualified to testify as an expert under Rule 702, because his expert opinion was not based on 'sufficient facts and data.'"). Similarly, where an expert's proffered opinion merely parrots information provided to him or her by a party, that opinion is generally excluded. *See, e.g.*, *King-Indiana Forge, Inc.*, *supra*; *Ask Chems., LP*, *supra*.

While Dr. Wilner claims to have learned of Syngenta's so-called "exacting" budget process through discussions with Syngenta employees, he offers no explanation or analysis of that process. More importantly, there is no evidence to suggest that Dr. Wilner tested the Syngenta budgets on which he relied. Instead, he simply adopted those budgets without review or analysis, thereby simply parroting Syngenta's beliefs about its future sales. Thus, Dr. Wilner's opinions relying on those budgets should be excluded.

### iii. Dr. Wilner Cherry Picked the Budgets on Which He Relied.

As noted in Dr. Wilner's report, after finalizing its budget for a particular year in the fourth quarter of the preceding year, Syngenta continues to update its projections

monthly as the year progresses.  Ex. A at 30. Syngenta revises its budgets each month (calling them "Latest Projections" or "LPs") based on any additional information obtained during those subsequent months.  *Id.*

Without explanation, Dr. Wilner relies *solely* on the initial budgets for each year to prepare his opinions instead of the LPs which, by his own admission, are derived from updated, and presumably more accurate, information.  The impact of this decision may be seen with a review of ***Exhibit I***.  When analyzing Syngenta's alleged damages of the Compound Patents using Syngenta's original estimate of 2014 gross profits, Dr. Wilner's methodology results in over $75 Million in damages (before prejudgment interest).  If, however, one uses Syngenta's gross profits projected in the April, 2014 LP – one month before Willowood's EPA application for azoxystrobin was approved and over three months before Willowood sells any azoxystrobin in the United States – Syngenta's damages would be *zero*, all else remaining constant.  Again, Dr. Wilner offers no explanation as to why he chose to rely on the original 2014 budget prepared in late 2013 as opposed to the LP prepared in April, 2014; yet, as can be seen by Exhibit I, this decision profoundly affected the damages calculation. *See, e.g.*, *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, 1998 WL 175888, at *8 (E.D. Pa. Apr. 15, 1998), *affirmed*, 178 F.3d 1279 (3d Cir. 1999) (holding that expert testimony that ignored other relevant data without explanation was inadmissible as simply presenting the plaintiff's unrealistic hopes of its sales through the mouth of an expert); *Rondigo, LLC v. Casco Twp.*, 537 F.

Supp. 2d 891 (E.D. Mich. 2008) (expert's opinion ruled inadmissible because other relevant information was accessible to the expert but was ignored without reason).

### c. *Mesotrione is Not an Appropriate Benchmark for Azoxystrobin.*

As even Dr. Wilner noted, "care must be taken to ensure that the patented product is sufficiently comparable to the [benchmarked product]" to justify its use as a benchmark. Ex. A at 23. *See also Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l., Inc.*, 246 F.3d 1336 (Fed. Cir. 2001). Sufficient care was not taken here as Dr. Wilner relies on only two alleged similarities to justify his reliance on mesotrione as a benchmark: (i) azoxystrobin is Syngenta's best-selling *fungicide* while mesotrione is "one of" Syngenta's best-selling *herbicides*; and (ii) Syngenta lost other forms of exclusivity over mesotrione in the same year (2014) as Syngenta's Compound Patents expired. Ex. A at 30-13.[10] This cursory analysis is not sufficient.

Azoxystrobin, like other fungicides, is applied to crops to prevent and treat certain fungal diseases. A comparison of the labels for one of Syngenta's azoxystrobin products with one of Syngenta's mesotrione products shows that none of the diseases treated by azoxystrobin are treated by mesotrione.[11] Copies of the labels for Syngenta's Quadris

---

[10]  In calculating Syngenta's alleged damages arising from Willowood's infringement of the Compound Patents, Dr. Wilner assumes that "but for" Willowood's activities, Syngenta would have achieved its budgeted amount of gross profits for azoxystrobin to the extent that Syngenta achieved its budget for its mesotrione products. Ex. A at 32.

[11] Azoxystrobin belongs to a class of fungicide compounds known as strobilurins. Dr. Wilner attempts to downplay the effects of competitive products comprised of other strobulirin compounds on Syngenta's azoxystrobin sales by claiming that strobilurin-containing products sold by some of Syngenta's competitors are not registered for

product containing azoxystrobin and its Callisto product containing mesotrione are attached as **Exhibits J** and **K**, respectively. This should come as no surprise as herbicides do not treat disease, but rather prevent weed proliferation. Because mesotrione can be applied on *some* of the same crops as azoxystrobin, Dr. Wilner claims that his use of mesotrione as a benchmark is justified. Absent from Dr. Wilner's report, however, is any analysis of the differing market conditions confronting each of these products.

Further, while it is true that Syngenta was able to maintain certain forms of exclusivity over mesotrione through June, 2014 while the Compound Patents expired in February of that same year, Syngenta retained "effective" exclusivity over mesotrione for several more years beyond 2014. As can be seen from page 8 of the Syngenta document attached as **Exhibit L**, 88% of Syngenta's mesotrione sales are made as part of mixtures which remained on patent into 2015, 2017 and 2020. Thus, Syngenta retained exclusivity for at least 88% of the mesotrione market through 2015, and through 2017 and 2020 on some other percentage.

In *Crystal Semiconductor Corp.*, *supra*, the Federal Circuit affirmed the trial court's exclusion of the expert's use of a product sold in the Apple computer market as a benchmark when the product at issue was sold in the PC market. The Court agreed that the market conditions were simply too different to justify use of the benchmark. *Id.* at

---

application on all of the same crops as azoxystrobin. Ex. A at 17. Yet, without explanation, Dr. Wilner contends that mesotrione, which is not even a fungicide and is an entirely separate category of compounds, may be properly used as a benchmark. Since Dr. Wilner has no organic chemistry experience, it is presumed this assumption was blindly taken from Syngenta.

1358.  Similarly, in *Eleven Line, Inc. v. N. Texas State Soccer Ass'n. Inc.*, 213 F.3d 198

(5th Cir. 2000), the Court excluded an expert's testimony where he attempted to establish

lost profits for an indoor soccer facility by comparing the facility at issue with other

similar facilities owned by the plaintiff.   Because the plaintiff owned each of these

facilities, the expert argued that they could each act as an appropriate benchmark.  *Id*. at

208-09.   Noting that the party utilizing the benchmark approach bears the burden to

demonstrate the reasonable similarity of the business or product whose earning

experience is to be borrowed, the Court held that the expert failed to establish similarities

such as geographical location, size, attractiveness, or demand of the facilities being

compared, the relative costs of their operation, and other market conditions, and therefore

exclusion was proper.  *Id. See also CDW LLC v. NETech Corp.*, 906 F. Supp. 2d 815

(S.D. Ind. 2012) (excluding expert's testimony as being unreliable because it provided no

detail as to the market forces that affected the chosen benchmarks).   As Dr. Wilner

concedes, each product sold by Syngenta faces different market conditions, yet he fails to

analyze these different market conditions.   Consequently, Dr. Wilner's reliance on

mesotrione as a benchmark for azoxystrobin is improper.

### d. Dr. Wilner Fails to Offer Any Support for His Use of Crop Protection Fungicide Sales as a Benchmark.

Syngenta sells 19 active ingredients other than azoxystrobin that act as fungicides

which are sold under 63 different brand names.  Dr. Wilner, without any analysis, lumps

all of these products together into one category, contending that Syngenta's azoxystrobin

sales would annually increase (or decrease) in the exact same proportion as this diverse

15

group of products but for Willowood's alleged infringement of the method patents. Ex. A at 37-38; 40-42.[12] This assumption, however, is entirely speculative. As noted above, Dr. Wilner concedes that each Syngenta product faces different market conditions yet he offers no analysis of these market conditions as to each of Syngenta's 63 products. Accordingly, use of all Crop Protection Fungicides as a benchmark is impermissible.

### e. Dr. Wilner's Alleged Damages Concerning the '761 Patent and Copyright Claims Do Not Arise Out of the Alleged Infringement.

#### i. Dr. Wilner failed to apportion damages allegedly resulting from Willowood's infringement of the '761 patent.

The U.S. Patent Act makes clear that only damages adequate to compensate the claimant *for the infringement* may be awarded. 35 U.S.C. § 284. When calculating damages allegedly arising from Willowood's infringement of the '761 patent, Dr. Wilner fails to limit his opinion to damages caused by, or attributable to, that infringement.

As the Court is aware, the '761 patent does not claim azoxystrobin; rather, it claims an allegedly improved method for manufacturing azoxystrobin. Similarly, the '138 patent, issued thirteen years earlier, claims a method of manufacturing azoxystrobin comprising an esterification step followed by a condensation step. Syngenta has used the '138 method to manufacture azoxystrobin sold to customers. Ex. G at 292:4-23. The

---

[12] The thrust of Dr. Wilner's argument is that but for Willowood's infringement of the '138 and '761 patents, Syngenta's azoxystrobin sales would have tracked its Crop Protection Fungicide sales simply because "some" of the Crop Protection Fungicides were covered by enforceable patents. Dr. Wilner fails to identify which of the Crop Protection Fungicides are on patent and which are not or how long those patents are effective, and, once again, fails to analyze the differing market conditions facing each of these products.

16

'761 patent covers the manufacture of azoxystrobin using this same condensation step conducted in the presence of a specific concentration of the catalyst DABCO which purportedly reduces manufacturing costs by 10% to 20% when compared to the '138 patent's method.  *Id*. at 293:11-22.  Even though the '761 patent merely claims an incremental improvement of the manufacturing process, Dr. Wilner applies an identical damages methodology to calculate damages related to the '761 patent as he applied to the pre-patent expiration period of the '138 patent.  By using this same method, Dr. Wilner attributes all damages arising from Willowood's alleged infringement of the '761 patent to the very same factors purportedly giving rise to Syngenta's '138 patent damages. Ex. A at 40. An improvement of a manufacturing method, however, does not justify damages attributable to the allegedly decreased sales of the product manufactured by that method. Instead, only those damages associated with the incremental benefit of the improved method may be awarded.

Dr. Wilner's mistake in this regard can be seen through his analysis of the four-factor test enunciated in *Panduit Corp. v. Stahlin Bros. Fiber Works, Inc*., 575 F.2d 1152 (6th Cir. 1978).  In analyzing the *Panduit* factors, Dr. Wilner simply adopts the exact same analysis he used for the '138 patent.  *Id*.  This is improper as an analysis of the second *Panduit* factor – whether acceptable non-infringing substitutes exist – is very different under the '761 patent.  There is no question that an acceptable non-infringing method of manufacture is available to Willowood to manufacture azoxystrobin after 2015; namely, the method claimed by the '138 patent, which expired in December 2015.

17

Yet, Dr. Wilner attributes damages arising from Willowood's alleged infringement of the '761 method through 2017. Because Dr. Wilner failed to properly analyze this *Panduit* factor, Dr. Wilner's opinion should be excluded.

Dr. Wilner, again without any support, also contends that the "entire market value rule" is satisfied by the '761 patent. *Id*. The "entire market value rule" provides a limited exception to the general rule that damages may only be awarded "to compensate [the patent holder] *for the infringement*" by permitting an award based on sales of an entire product even where the product is comprised of patented and non-patented features. So long as the patented feature "is the basis for consumer demand" of the accused product, application of the rule is appropriate. *Lucent Techs. Inc. v. Gateway Inc*., 580 F. 3d 1337 (Fed. Cir. 2009); *see also Uniloc USA Inc. v. Microsoft Corp*., 632 F. 3d 1292, 1318 (Fed. Cir. 2011) (holding that a patentee "must in every case give evidence tending to separate or apportion the…patentee's damages between the patented feature and the unpatented features"). Dr. Wilner, however, offers no evidence that the method claimed by the '761 method is "the basis" for consumer demand. Indeed, it is hard to imagine that customers have any idea how azoxystrobin is manufactured, much less demand production pursuant to the '761 method. As such, Dr. Wilner's claim that the entire market value rule has been met is speculative and inadmissible.

### ii. Dr. Wilner failed to apportion damages allegedly resulting from Willowood's infringement of Syngenta's copyrights.

Similar to the Patent Act, the U.S. Copyright Act provides that a copyright owner is entitled to recover only those damages suffered *as a result of the infringement* as well

18

as any profits of the infringer *attributable to the infringement* which have not otherwise been taken into account. 17 U.S.C. §504(b). In calculating Syngenta's lost profits resulting from Willowood's alleged copyright infringement, Dr. Wilner simply adopts the *exact* same analysis used for Willowood's alleged infringement of the '138 patent. Ex. A at 44-45. Logic would dictate, however, that not every sale lost arose from Willowood's allegedly infringing label. *Dash v. Mayweather*, 731 F.3d 303, 313 (4th Cir. 2013) (a copyright holder "must prove the existence of a causal connection between the alleged infringement and some loss of anticipated revenue"). This is not a situation where an independent market exists for the copyrighted work, like a book, painting, or musical composition. Quite to the contrary, no evidence exists that the copyrighted material has any value separate from the product. As Dr. Wilner has failed to offer any evidence that Syngenta lost any profits as a result of Willowood's alleged copyright infringement, his testimony must be excluded. *See Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 WL 4065465, at *7 (S.D. Tex. Oct. 9, 2010) ("The Court believes that…Plaintiff is required to do more than simply identify the infringing stores and designate all revenue from those stores as a result of the alleged infringement. Plaintiff must provide some non-speculative evidence that gross revenues from the infringing stores was caused, or in some way affected, by the architectural design" which was the subject of the plaintiff's copyrights.); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 716 (9th Cir. 2004) ("Because Polar Bear failed to demonstrate a nonspeculative causal link between the trade show promotion [which is the subject of the copyright claim] and the increased

19

revenue from Expedition watches, we conclude that the district court erred in allowing the jury to consider the claim of profits…."); *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514 (4th Cir. 2003) (professional football team's revenues from ticket sales, food and drink sales, stadium parking fees, sales of broadcasting rights, video games, and game programs could not be attributed to use of the team logo, which infringed plaintiff's copyrights, and could not be included in calculation of infringement damages).

### f. Dr. Wilner Should be Prohibited from Mentioning Syngenta's Alleged Violation of the "Formulators Exemption."

In his August 19, 2016 report, Dr. Wilner repeatedly mentions Willowood's alleged violations of the so-called "formulators exemption" which formed the sole basis for Count VII of Syngenta's complaint. Ex. A at 9, 10 and 14. By mentioning this alleged violation, Dr. Wilner appears to attempt to buttress his assertions that Willowood impermissibly gained early entry into the market. *Id.* A week before he issued his report, however, the Court granted Willowood's motion to dismiss Count VII holding that the issue belongs before the EPA, where it is now pending. *See* Dkt. 74. Dr. Wilner should therefore be prohibited from mentioning Syngenta's allegations in this regard at trial as such testimony is not relevant to any issue in dispute and would only prejudice the jury.

WHEREFORE, for the reasons set forth herein, Willowood respectfully requests that Syngenta's damages expert, Dr. Benjamin Wilner, be excluded from testifying at the trial of this matter.

This is the 10th day of April, 2017

By:    /s/ L. Cooper Harrell
         Alan W. Duncan
         N.C. State Bar No. 8736
         L. Cooper Harrell
         N.C. State Bar No. 27875
         MULLINS DUNCAN HARRELL &
         RUSSELL PLLC
         300 N. Greene Street, Suite 2000
         Greensboro, NC 27401
         Telephone:  (336) 645-3320
         Facsimile:  (336)645-3330
         aduncan@mullinsduncan.com
         charrell@mullinsduncan.com

         Barry S. Neuman
         WHITEFORD TAYLOR PRESTON
         LLP
         1800 M Street, NW Suite 450N
         Washington, DC 20036
         Telephone: (202) 659-6761
         Facsimile: (202) 327-6151
         bneuman@wtplaw.com

         Steven E. Tiller
         WHITEFORD TAYLOR PRESTON
         LLP
         Seven Saint Paul Street, Suite 1300
         Baltimore, Maryland 21202-1626
         Telephone:  (410) 347-9425
         Facsimile:   (410) 223-4325
         stiller@wtplaw.com

Of Counsel:
         Peter J. Davis
         WHITEFORD TAYLOR
         PRESTON LLP
         Seven Saint Paul Street, Suite 1300
         Baltimore, Maryland 21202-1626
         Telephone:  (410) 347-9425
         Facsimile:   (410) 223-4325
         pdavis@wtplaw.com
         *Attorneys for Defendants*

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this action.

This the 10th day of April, 2017.

/s/ L. Cooper Harrell
L. Cooper Harrell