# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SYNGENTA CROP PROTECTION, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 1:15-CV-274 |
| | ) | |
| v. | ) | CONTAINS INFORMATION |
| | ) | DESIGNATED BY WILLOWOOD |
| WILLOWOOD, LLC, WILLOWOOD USA, | ) | ███████████ AS |
| LLC, WILLOWWOOD AZOYSTROBIN, | ) | ATTORNEYS' EYES ONLY, |
| LLC, and WILLOWOOD LIMITED, | ) | SUBJECT TO |
| | ) | PROTECTIVE ORDER |
| Defendants. | ) | |
| | ) | |

## EXPERT REPORT OF BENJAMIN S. WILNER, Ph.D.

The Plaintiff, Syngenta Crop Protection, LLC ("Syngenta"), retained Alvarez & Marsal Disputes and Investigations, LLC ("A&M DI") in the above captioned matter. In particular, I, Benjamin S. Wilner, Ph.D., was asked to quantify damages Syngenta suffered as a result of the multiple allegedly improper actions of Willowood, LLC, Willowood USA, LLC, Willowood Azoystrobin, LLC, and Willowood Limited (collectively, "Willowood" or the "Defendants") relating to Syngenta's azoystrobin products.

Assuming the Finder of Fact determines the Defendants' actions are improper,[1] I find that Syngenta's damages are between $75.7 million and $273.4 million. With prejudgment interest, damages are between $85.7 million and $297.9 million. If it is determined that the Defendants infringed on Syngenta's patents, I find that Syngenta's lost profit damages are between $75.7 million and $273.4 million ($85.7 million to $297.9 million, with prejudgment interest). If the Finder of Fact determines that the Defendants infringed on Syngenta's copyrights, the damages would be $135.5 million ($155.3 million with prejudgment interest).

The opinions in this Report are preliminary and are based on the documents in **_Exhibit 1_** in addition to conversations with Syngenta personnel, and my experience and training. I reserve the right to modify and/or expand my opinions as I obtain additional information or perform any additional work or analysis I may be asked to perform prior to or at trial.

---

[1] This Report assumes that the Finder of Fact makes such a determination. As an economist and statistician, I have no opinion about whether the actions were improper. As a result, this Report does not refer to the Defendants' actions as being improper; only that they are alleged to be improper. Nonetheless, I understand that Willowood concedes that at least Willowood USA, LLC infringed Syngenta's U.S. Patent Nos. 5,602,076 and 5,633,256 by importing azoystrobin into the United States in 2013 and using that azoystrobin technical by having it 1) formulated into end-use products and 2) tested in 2013. (Defendants' Second Supplemental Non-Infringement and Invalidity Contentions, dated June 27, 2016, pp. 2, 7-8; Willowood's Responses to Syngenta's Requests for Admission, dated July 29, 2016, pp 1-21).

*Subject to Protective Order*
*Attorneys' Eyes Only*

A&M DI is compensated for its services on an hourly basis and is being reimbursed for out-of-pocket expenses. A&M DI is compensated at a rate of $595 per hour for my time. Other individuals from A&M DI also provided assistance in this matter; their hourly rates range from $185 to $450. No one who has contributed to this engagement has any known financial interest in any party to the matter. A&M DI's compensation is neither based nor contingent on the results of this analysis.

This report is provided solely for use in the matter described in the caption at the top of this report. This report is not to be used with, circulated, quoted or otherwise referred to in whole or in part for any other purpose, or in any other document without my expressed written consent.

# I.    Qualifications

My qualifications are stated in my curriculum vita, which is attached as ***Exhibit 2***. That exhibit details my education, credentials, testimony, and publications.

In particular, I am a Managing Director at Alvarez & Marsal Disputes and Investigations, LLC. I have performed economic analyses in a great variety of engagements, including financial analysis, contract losses, a wide range of class action matters, employment discrimination, and intellectual property matters. I am the author of an annual report analyzing the crop insurance industry as well.

I have a Bachelor of Arts degree, Magna cum Laude with Distinction in Major in Mathematics and Economics from the University of Pennsylvania as well as a General Course Degree in Mathematics and Statistics from the London School of Economics. I was awarded a Ph.D. in Managerial Economics and Decision Science from the Kellogg Graduate School of Management at Northwestern University.

I have served as a professor of economics, finance and statistics in the business schools at the University of Michigan, the University of Iowa, Northwestern University and the Helsinki School of Economics.

My research has been published in the *Journal of Finance*, the leading academic journal in finance, which covers topics in subfields such as corporate finance, asset valuations and forensic economics. I have been awarded research grants from multiple universities as well as from the United States Government's National Science Foundation. My research has been extensively cited. For example, the former President of the University of Chicago relied on my undergraduate thesis as the theoretical basis for one of his published research papers. I also served as a referee for multiple academic journals and textbooks.

As an undergraduate, I spent three years as a research assistant to the 1980 Nobel Prize winner Lawrence R. Klein. Dr. Klein was awarded the Nobel Prize in Economics for economic and statistical forecasting. As a graduate student, I studied under Roger Myerson, who won the 2007 Nobel Prize in Economics for game theory, and Dale Mortensen, who won the 2010 Nobel Prize in Economics for his study of labor markets.

*Subject to Protective Order*
*Attorneys' Eyes Only*

I was also involved in the trading of corn and soybean futures while interning in the grain pits at the Chicago Board of Trade.

# II.  Case Background

## A. Syngenta Crop Protection, LLC

The Plaintiff, Syngenta Crop Protection, LLC, is a limited liability company organized and existing under the laws of the State of Delaware,[2] and a United States subsidiary of Syngenta AG,[3] a world-leading agribusiness producing products for crop protection, seeds, and lawn & garden applications.[4]  Syngenta is involved in the research, development, manufacture, and sale of crop protection chemicals, including fungicides, herbicides, insecticides, and seed treatments to control weeds, insects, and diseases in agricultural crops such as corn, wheat, soybeans, sugar beets, and cotton.[5]  Sister companies to Syngenta sell products for use in seed and lawn & garden applications in the United States.[6]

One of the world's best-selling proprietary fungicides and Syngenta's largest selling product worldwide is azoxystrobin.[7,8]  Azoxystrobin is registered for use in approximately 100 countries and for approximately 120 crops, including row crops such as corn, soybeans, and wheat.[9] ████████████████████████████.[10]

Azoxystrobin prevents and/or cures the major groups of pathogenic plant fungi, which cause soil-borne and foliar diseases such as rusts, powdery mildew, downy mildew, black rot, scab, anthracnose, white mold, *Rhizoctonia* limb, peg rot, early and late leaf spot, black sigatoka, botrytis, web blotch, and rice blast.[11]  Preventing and/or curing these fungal diseases through azoxystrobin:

---

[2] Complaint, dated March 27, 2015, ("Complaint"),  p. 2.

[3] www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=2732461.

[4] Syngenta AG Form 20-F, dated February 11, 2016, p. 44 (www4.syngenta.com/~/media/Files/S/Syngenta/media-releases/2015-form-20-f.pdf) ("Syngenta AG Form 20-F").

[5] www.syngentacropprotection.com; Complaint, p. 2.

[6] www.syngenta-us.com/crops;  www.syngentaprofessionalproducts.com/ppmain.aspx.

[7] Nigel Uttley, Product Profile: Azoxystrobin (www.agribusinessglobal.com/agrichemicals/fungicides/product-profile-azoxystrobin) ("Azoxystrobin Product Profile").

[8] Syngenta AG Form 20-F, p. 17.

[9] Ibid; Deposition of Rex Wichert, dated July 15, 2016, p. 31.

[10] Amount excludes fungicides for use in lawn & garden, seed treatment, and wallboard applications (Gross to Net June LP.xlsx (SYN 287760).

[11] Azoxystrobin Product Profile.

*Subject to Protective Order*
*Attorneys' Eyes Only*

- Improves plant growth and average yields ("up to two to three times return on investment for corn");[12]

- Provides long-lasting preventative and curative disease control to combat existing diseases; and,

- Provides movement throughout entire plant to provide uniform coverage.[13]

Azoxystrobin is sold in two forms: technical and end-use. Azoxystrobin technical refers to azoxystrobin in a relatively pure form that is then used as an active ingredient in end-use azoxystrobin products. Syngenta uses azoxystrobin technical in its own end-use products and sells it to select third-party suppliers, who either manufacture their own end-use azoxystrobin product or repackage Syngenta's product.



Syngenta's end-use azoxystrobin is sold under several different brand names such as Quilt, Quadris, Abound, and Trivapro.[16] There are four general applications for end-use azoxystrobin.[17] First, end-use azoxystrobin is primarily used as a crop protection product. Growers apply end-use azoxystrobin (sometimes in combination with other insecticides and herbicides) to planted agricultural crops like corn, wheat, and soybeans to protect them from various fungi. Second, end-use azoxystrobin has seed care uses, where the chemical is applied to seeds prior to planting. Third, end-use azoxystrobin can be applied to lawn & garden products.[18] Fourth, end-use azoxystrobin is used as an ingredient in paper, wallboard, and paperboard products.

---

[12] QUILT XCEL Competitor Sheet (www.syngentacropprotection.com/quilt-xcel-fungicide?tab=details) ("QUILT XCEL Competitor Sheet").

[13] QUILT XCEL Competitor Sheet and QUADRIS Early Info Sheet (www.syngentacropprotection.com/quadris-fungicide?tab=details).

[14] Deposition of Jeff Cecil, dated July 13, 2016, p. 127.

[15] Exhibits B and C to ███████████████████████████████████ (SYN 284185-86).

[16] www.syngenta-us.com/labels/quilt; www.syngenta-us.com/labels/quadris; www.syngenta-us.com/labels/abound-flowable; and www.syngenta-us.com/labels/trivapro.

[17] See *Exhibit 3*.

[18] I understand Willowood considers the first three applications to be part of the crop protection portion of its company. Deposition of Brian Heinze, dated August 4, 2016, pp. 133-134.

*Subject to Protective Order*
*Attorneys' Eyes Only*

I understand that the United States Environmental Protection Agency ("EPA") has to approve each application of end-use products. As discussed below, I conservatively limit my analysis in this Report to azoxystrobin crop protection products, which I call the "AZ Products-at-Issue."

The AZ Products-at-Issue typically are sold through a two-step or three-step distribution chain. In the two-step chain, Syngenta sells its products to cooperatives or independent distributors, who then sell to growers. In the three-step system, Syngenta sells to distributors or cooperative unions who act as wholesalers. These wholesalers then sell the product to independent dealers or primary cooperatives before on-selling to growers.[19]

I understand that a Syngenta predecessor first sold its azoxystrobin technical and end-use products in 1997. As shown in **Exhibit 3**, between 2012 and June 2016, Syngenta marketed the AZ Products-at-Issue under several brands. ██████████████████████████
████████████████████████.[20]

I would like to highlight two types of new brands that Syngenta introduced in the past 18 months. First, in 2015, Syngenta introduced Aframe and Aframe Plus end-use azoxystrobin products.[21] Aframe includes azoxystrobin as the active ingredient. Aframe Plus includes azoxystrobin and propiconazole as active ingredients.[22] ████████████████████████
████████████████████████████████████████████████████
███████████ ████████████████████████████████████."[25]

Second, in 2016, Syngenta introduced their latest generation fungicides to the United States, under the brand names Trivapro and Elatus.[26] Not only do these products contain azoxystrobin, but they also contain other active ingredients that augment the benefits of azoxystrobin and help address different crop and disease profiles.[27] For example, Trivapro includes azoxystrobin, benzovindiflupyr, and propiconazole as active ingredients.[28] Syngenta

---

[19] Syngenta AG Form 20-F, p. 26; Deposition of Jeff Cecil, dated July 13, 2016, p. 102.

[20] █████████████████ (SYN 287760); ██████████████████ (SYN 287759). ███████████
████████████████████████████████████

[21] █████████████████ (SYN 287760).

[22] EPA Registration Nos. 100-1098 (SYN 290830-73) and 100-1324 (SYN 290696-748).

[23] ████████████████████████████████ (SYN 283435-36); ███████████████
███████████ (SYN 283733-98).

[24] Deposition of Jeff Cecil, dated July 13, 2016, Exhibit 1, p. 3.

[25] Deposition of Jeff Cecil, dated July 13, 2016, p. 37.

[26] █████████████████ (SYN 287760).

[27] Deposition of Andrew Fisher, dated July 22, 2016, pp. 49-52.

[28] EPA Registration Nos. 100-1324 (SYN 290696-748).and 100-1471 (SYN 290896-935).

Page 5

*Subject to Protective Order*
*Attorneys' Eyes Only*

registered benzovindiflupyr under the trademark Solatenol in the United States in January 2015.[29]  According to Syngenta:

> Trivapro™, the next generation corn fungicide from Syngenta, is the hardest-working, longest-lasting fungicide on the market.  In fact, Trivapro works ten times harder than competitive brands.  What sets Trivapro apart from the competition?  Trivapro contains Solatenol® fungicide, a breakthrough SDHI that is ten times more powerful than any other SDHI on the market.  Combined with proven performers azoxystrobin and propiconazole, Trivapro gives growers the powerhouse fungicide they need to help shut down existing disease and prevent future infections.[30]

Syngenta indicates that Trivapro provides excellent, long-lasting residual disease control, binds the waxy layer of the plant for extended stay put protection, offers preventative and curative disease control, and average yield increases.[31]  Solatenol-based products were first introduced outside of the United States in 2013 and were considered a blockbuster performer.[32]

Elatus was also introduced in 2016 and includes azoxystrobin and Solatenol/benzovindiflupyr.  According to Syngenta, Elatus is the next generation fungicide for peanut and potato growers looking to improve disease control, maximize yield, and protect quality.[33]



Azoxystrobin is part of the strobilurin family, which are a class of agricultural broad spectrum fungicides.[36]  Other companies including Bayer, DuPont, and BASF sell brand-name

---

[29] U.S Trademark Serial Number 85373576.

[30] www.syngentacropprotection.com/trivapro-fungicide.

[31] Ibid.

[32] Syngenta AG Form 20F, p. 22; www.prnewswire.com/news-releases/syngenta-receives-epa-registration-for-breakthrough-fungicide-solatenol-300151791.html.

[33] www.syngentacropprotection.com/elatus?tab=details-(solatenol-fungicide-+-azo)-fungicide.

[34] Deposition of Jeff Cecil, dated July 13, 2016, Exhibit 20, p. 3 (SYN 056120-41); Exhibit 1, p. 18 (SYN 283441-62)

[35] Deposition of Jeff Cecil, dated July 13, 2016, Exhibit 1, p. 18 (SYN 283441-62).

[36] Deposition of Jeff Cecil, dated July 13, 2016, pp. 84 –85.

*Subject to Protective Order*
*Attorneys' Eyes Only*

strobilurin products. ***Exhibit 4*** shows █████████████████████████
████████████████████████████████████████████████████████████████████████
███████████████████████████

Given the importance of azoxystrobin, Syngenta and its predecessor companies applied for and obtained patents directed to its azoxystrobin products. In 1997, United States Patent and Trademark Office ("USPTO") awarded Syngenta U.S. Patent Nos. 5,602,076 ("the '076 Patent")[37] and 5,633,256 ("the '256 Patent"),[38] which I understand expired together on February 11, 2014. I also understand that the '076 and the '256 Patents each cover groups of chemical compounds that include technical azoxystrobin.[39]

Syngenta also invested significant resources developing processes for manufacturing azoxystrobin technical, including the processes set forth in U.S. Patent No. 5,847,138 ("the '138 Patent") and U.S. Patent No. 8,124,761 ("the '761 Patent"). The USPTO issued the '138 Patent on December 8, 1998, and I understand the '138 Patent expired on December 8, 2015.[40] The USPTO issued the '761 Patent on February 28, 2012, and I understand the '761 Patent does not expire until at least April 15, 2029.[41] It is my understanding that it is significantly more expensive to produce azoxystrobin without utilizing the processes claimed in the '138 Patent and the '761 Patent. I understand that Syngenta alleges that Willowood willfully infringed on these patents. This further supports my opinion about the uneconomic nature of alternative processes to manufacture azoxystrobin without infringing the '138 Patent and the '761 Patent.

In addition to Syngenta's patent protection, I understand that under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), the EPA requires companies to place labels on their fungicides that describe the product, its use, directions for use, storage & disposal, precautionary statements, and other product-related items. The EPA places such high importance on the labels that they often require companies to edit their labels before FIFRA approval is granted.[42] Companies also place great care and time in the creation of these labels. Not only do these labels instruct the consumer regarding how to use the products, but also the labels serve as a marketing tool that sets forth the company's vision for the product.[43] As Dr. Adora Clark, Fungicide Team Lead – Azoxystrobin Regulatory Manager at Syngenta, testified, the labels tell Syngenta's story to the grower about how to utilize the fungicide and how the product fits the grower's needs.[44] The label also sets forth the manufacturer's warranties and ways in which the manufacturer might be liable if the product is considered defective.

---

[37] U.S. Patent No. 5,602,076.

[38] U.S. Patent No. 5,633,256.

[39] Plaintiff Syngenta Crop Protection, LLC's Second Supplemental Infringement Contentions, dated July 29, 2016.

[40] U.S. Patent No. 5,847,138.

[41] U.S. Patent No. 8,124,761.

[42] For example, see page 1 of EPA Registration Nos. 10182-415 (SYN 290635-50), 100-1161 (SYN 290656-95), and 279-3442 (SYN 289973-94).

[43] Deposition of Adora Clark, dated July 22, 2016, p. 38.

[44] Deposition of Adora Clark, dated July 22, 2016, p. 20.

***Subject to Protective Order***
***Attorneys' Eyes Only***

I am informed that Syngenta's labels are entitled to copyright protection from the time they were created. Syngenta submitted its copyrighted azoxystrobin labels for registration with the United States Copyright Office ("UCO") before the filing of this lawsuit. For example, Syngenta registered the Quadris Flowable Fungicide label with the UCO on March 25, 2015 under UCO Registration No. TX0007992684. The Quilt Xcel label was registered with the UCO on March 25, 2015 under UCO Registration No. TX0007994113. UCO Registration No. TX0007992684 and UCO Registration No. TX0007994113 were published on July 31, 2013 and July 18, 2013, respectively.

As discussed above, Syngenta sells crop protection products including fungicides, herbicides, and insecticides, which many growers utilize in conjunction with one another. For example, growers sometimes request combinations of a fungicide, herbicide, and/or insecticide so that they could obtain the benefits of all three in one application. It is my understanding that growers sometimes request that the fungicide, herbicide, and/or insecticide in such combinations are manufactured by the same company. That is because growers sometimes receive volume discounts if they purchase from the same manufacturer. In addition, if a grower has a crop failure, the claims process could be more difficult when multiple chemical providers are used.

## B. Willowood (the Defendants)

The Defendants are part of the Willowood group of companies that, among other things, import, develop, formulate, market, sell, and offer for sale generic crop protection products. Willowood Limited is a Hong Kong based company, whom I understand sells azoxystrobin technical to Willowood USA, LLC and ships the azoxystrobin technical into the United States.[45] Willowood USA, LLC, a Delaware-based company, arranges for the azoxystrobin technical to be formulated into end-use azoxystrobin products that it then markets, sells, and offers for sale in the United States.[46] Beyond azoxystrobin, Willowood USA, LLC generally sells and offers for sale herbicides, fungicides, insecticides, and other crop protection products for grass seeds, sugar beets, corn, rice, tree fruits, nuts, grapes, and soybeans to the United States agriculture industry.[47] Willowood Azoxystrobin, LLC and Willowood, LLC are Oregon-based companies that are wholly owned by Willowood USA, LLC.[48] In some instances, Willowood Azoxystrobin, LLC has purchased and imported azoxystrobin technical from Willowood Limited and has represented itself as a distributor of end-use azoxystrobin products in the United States.[49] Willowood, LLC applied for, obtained, and holds the EPA registrations on the end-use azoxystrobin products sold by the Defendants, and Willowood, LLC was responsible for and commissioned the testing work conducted in connection with those EPA registrations.[50] Willowood, LLC also markets end-use

---

[45] Deposition of Brian Heinze, dated August 4, 2016, pp. 64, 67-68, and 71-72.

[46] Deposition of Brian Heinze, dated August 4, 2016, pp. 67-68; Defendants' Answers and Objections to Plaintiff's Fourth Set of Interrogatories, dated July 14, 2016, pp. 2 and 4-7.

[47] www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=117472488.

[48] Deposition of Brian Heinze, dated August 4, 2016, p. 39.

[49] Deposition of Brian Heinze, dated August 4, 2016, pp. 49-50, 55, 57-58, and 60-61.

[50] Deposition of Brian Heinze, dated August 4, 2016, pp. 40-42.

Page 8

*Subject to Protective Order*
*Attorneys' Eyes Only*

azoxystrobin products and has represented itself as a distributor of end-use azoxystrobin products in the United States.[51]

Syngenta alleges that the Defendants performed several improper actions to aid the latter's azoxystrobin sales.

The EPA requires manufacturers to file an end-use product application when they desire to sell fungicides. Manufacturers are required to submit comprehensive data showing that the fungicide meets FIFRA's requirements, including a demonstration that the product is safe. However, the data requirements ordinarily applicable to manufacturers are relaxed if the pesticide they seek to register utilizes a pre-approved product. In particular, the Formulator's Exemption "excuses an applicant from the requirement to submit or cite data pertaining to any pesticide contained in his product that is derived solely from one or more EPA-registered products with the applicant purchases from another person."[52]

Willowood utilized the Formulator's Exemption in its August 13, 2013 EPA end-use product application for its azoxystrobin product Azoxy 2SC, known as Azoxystrobin 2.08SC at the time.[53] In particular, Willowood's application stated that it was using Syngenta's pre-approved registration for azoxystrobin. I understand Willowood also utilized the Formulator's Exemption in its EPA end-use product application for its AzoxyProp Xtra product, another end-use azoxystrobin product.[54]

However, contrary to its application, Willowood did not utilize Syngenta's azoxystrobin in its Azoxy 2SC or AzoxyProp Xtra products. In fact, Syngenta has never supplied Willowood with azoxystrobin technical or end-use azoxystrobin products.[55] Furthermore, Willowood concedes that it never sought to obtain azoxystrobin from Syngenta.[56] Based on Willowood's allegedly false statements in the Formulator's Exemptions accompanying Willowood's end-use registrations, the EPA approved Willowood's Azoxy 2SC and AzoxyProp Xtra end-use product applications on January 6, 2014 and June 11, 2014, respectively.[57]

Without use of the Formulator's Exemption, Willowood would not have been able to obtain EPA approval and sell its azoxystrobin products, as early as it did. Not only does a company submitting an EPA end-use application with a Formulator's Exemption avoid the time consuming process of obtaining data demonstrating the efficacy of a fungicide,[58] the EPA approves applications that cite to a Formulator's Exemption more rapidly than other

---

[51] Deposition of Brian Heinze, dated August 4, 2016, pp. 44-46.

[52] 40 C.F.R. § 152.85 as cited in Complaint, paragraph 40.

[53] EPA Registration No. 87290-44 (SYN 291061-125); Compliant, Exhibit 16, p. 4.

[54] EPA Registration No. 87290-56 (SYN 291185-217).

[55] Deposition of Rex Wichert, dated July 15, 2016, Exhibit 2.

[56] Answer, paragraphs 46-50; Answer.

[57] EPA Registration Nos. 87290-44 (SYN 291061-125) and 87290-56 (SYN 291185-217). I understand Syngenta has requested that the EPA reverse its decision (Deposition of Jeff Cecil, dated July 13, 2016, p. 83).

[58] Deposition of Adora Clark, dated July 22, 2016, p. 42.

Page 9

*Subject to Protective Order*
*Attorneys' Eyes Only*

applications.[59]  As a result, the Formulator's Exemption enabled Willowood to speed up the time to market for its azoxystrobin products.[60]  In fact, Willowood itself describes its registration process as "unique and the fastest in the industry," and has explained to investors that its process takes approximately 12 months whereas other competitors take significantly longer.[61]

Similarly, Willowood obtained early EPA approval by infringing on the '076 and '256 Patents.  In particular, because Syngenta's azoxystrobin is covered by the '076 and '256 Patents, which had not expired when Willowood filed its EPA end-use product applications, Syngenta alleges that Willowood infringed on its patents by importing azoxystrobin technical into the United States and using the azoxystrobin technical to apply for and obtain its EPA registrations and further by inducing others such as Adjuvants Unlimited and Analytical & Regulatory Chemistry to use the azoxystrobin technical in formulation and testing activities before the expiration of these patents.[62]  These infringing activities enabled Willowood to support its early registration applications.  Moreover, azoxystrobin sales peak in the fourth quarter of the year as well as in the spring.[63]  Thus, Willowood was able to leverage its early EPA submissions and registrations to make sales of end-use azoxystrobin products in Q4 2014 and Q1 2015.  Willowood likely would have missed making azoxystrobin sales for all or most of the 2015 growing season if it had waited to submit its end-use application until the expiry of the '076 and '256 Patents.

Willowood manufactures its azoxystrobin technical via its manufacturer in China, Yancheng Tai He Chemicals Co., Ltd. ("TaiHe"), and Willowood has imported and continues to import this azoxystrobin technical from TaiHe into the United States for use in its end-use products.[64]  Syngenta alleges that Willowood's azoxystrobin technical is manufactured using the patented process of the '138 and '761 Patents.  To the extent that these patents were and currently are utilized, Willowood has further infringed on Syngenta's '138 and '761 Patents.

Willowood began marketing its azoxystrobin products in 2013.  For example, as early as March 2013, Matt Heinze, a Regional Account Manager at Willowood USA, began emailing potential customers regarding Willowood's upcoming azoxystrobin products that he compared to Syngenta's products (e.g., Quadris, Abound).[65]  In December 2013, Brian Heinze, President and CEO of Willowood USA, emailed colleagues stating they needed to start getting partners lined up early in 2014 to sell its azoxystrobin.[66]  This appears to have occurred because, for example, Joe Middione and Brian Heinze corresponded with Tim Zech of United Turf Alliance regarding

---

[59] Deposition of Adora Clark, dated July 22, 2016, p. 150.

[60] Deposition of Rex Wichert, dated July 15, 2016, pp. 41-44.

[61] Deposition of Brian Heinze, dated August 4, 2016, pp. 119-122; Willowood Management Presentation (WW026466).

[62] Plaintiff Syngenta Crop Protection, LLC's Second Supplemental Infringement Contentions, dated July 29, 2016, pp. 1-2; Complaint, paragraphs 90-91 and 95-96.

[63] Deposition of Rex Wichert, dated July 15, 2016, p. 183.

[64] Defendants' Responses to Plaintiff's First Set of Requests for Admission, dated July 29, 2016, p. 7 ("Yancheng Tai He Chemicals Co., Ltd. is the only source of azoxystrobin technical imported by Willowood USA, LLC:").

[65] Deposition of Brian Heinze, dated August 4, 2016, pp. 154-157.

[66] Email from Brian Heinze to Joe Middione, et al, on December 23, 2013 (WW025053).

*Subject to Protective Order*
*Attorneys' Eyes Only*

a potential azoxystrobin supply agreement in February 2014 and March 2014.[67]  By June 2014, Willowood had provided indications to customers regarding the pricing of its products.[68]  Willowood also periodically emailed potential customers regarding its azoxystrobin products and informed them of Willowood's price reductions.[69]  Willowood was persistent with its marketing as Syngenta personnel noted that growers were being inundated with information about Willowood's AzoxyProp Xtra by July 2015.[70]

*Exhibit 5* displays Willowood's azoxystrobin sales, including sales of azoxystrobin technical, Azoxy 2SC, and AzoxyProp Xtra from 2014 through June 13, 2016 based on information provided by Willowood.[71]  Willowood recently began selling Tebustrobin SC (as of July 2016), a product that contains azoxystrobin.[72]  July 2016 sales of Tebustrobin SC are also displayed in *Exhibit 5*.

The Defendants not only sold their azoxystrobin end-use products directly to the distributors, but they also sold azoxystrobin technical and azoxystrobin end-use products to other companies who placed their own private labels on the products.  For example, I understand Pinnacle Agriculture Holdings, LLC ("Pinnacle") purchased the Defendants' azoxystrobin and sold it through one or more of its subsidiaries such as Innvictis.[73,74]  In fact, Willowood states that it supplies azoxystrobin technical to Innvictis that is used to formulate a product called "Liberty 3 Way."[75]  Mr. Brian Heinze, Willowood's corporate witness, also testified that Willowood supplies Innvictis with azoxystrobin-containing private-label products called Trevo and TrevoProp as well as certain wholesale products that he could not immediately name.[76]  Based on Mr. Heinze's testimony, I further understand that Willowood supplies azoxystrobin-containing private-label products to United Turf Alliance called ArmorTech Zoxy 2SC and ArmorTech Zoxy-T.[77]

---

[67] Email from Joseph Middione to Brian Heinze on March 26, 2014 (WW020109-17); Willowood Azoxy 2SC, United Turf Alliance (UTA) Proposal (WW012046).

[68] Deposition of Brian Heinze, dated August 4, 2016, pp. 157-158, Exhibit 61 (WW012693).

[69] Deposition of Brian Heinze, dated August 4, 2016, pp. 150-153, Exhibits 43-44.

[70] Email from Mary Johnson to Bob Kacvinsky on July 20, 2015 (SYN 056311-12).

[71] WW000057-60, WW000126-33, WW0026277-79, WW0026280-82, WW026687-88, and WW026690-91 (collectively "Willowood Sales Data").  Willowood provided July sales data for only Tebustrobin SC (WW026690-91).

[72] Deposition of Brian Heinze, dated August 4, 2016, pp. 137-138.

[73] www.pinnacleagholdings.com/company/about; Willowood Sales Data.

[74] The aforementioned sales were recorded as "Pinnacle Ag," "Innvictis Crop Care, LLC," "Performance AG, LLC," and "Sanders" (Willowood Sales Data).

[75] Innvictis Liberty 3 Way Label (SYN 289322-39); Defendants' Responses to Syngenta Crop Protection, LLC's Third Set of Interrogatories, dated June 2, 2016, p. 2; Deposition of Brian Heinze, dated August 4, 2016, p. 108.

[76] Deposition of Brian Heinze, dated August 4, 2016, pp. 108-111; Innvictis Trevo Label (SYN 289334-69); Innvictis TrevoProp Label (SYN 289375-94).

[77] United Turf Alliance ArmorTech Zoxy 2SC Label (SYN 289278-94); United Turf Alliance ArmorTech Zoxy-T Label (SYN 289295-304); Deposition of Brian Heinze, dated August 4, 2016, pp. 113-114.

*Subject to Protective Order*
*Attorneys' Eyes Only*

Upon introducing azoxystrobin products, the Defendants also sold their azoxystrobin products at low prices and continued to lower their prices. For example, Brad Reichman of Reichman Sales testified:

> Willowood is just notorious just to – everything they bring in is that product usually goes way down in value when Willowood brings it. So how they price it I don't know, but it – usually, when Willowood comes in with a product, you know that product is going to the basement on floor pricing.[78]

In fact, Willowood discounted prices to such a degree that Mr. Reichman testified that he was aware of even lower prices Willowood was providing to others in the industry that he could not profitably sell Willowood's end-use azoxystrobin.[79]

The available pricing data reflects Willowood's low pricing. For example, Mr. Heinze testified that as early as October 2014, Willowood was offering Azoxy 2SC at $125 per gallon, well below Syngenta's prices on Quadris.[80] As Mr. Reichman testified, Willowood also apparently offered a rebate of $25 on sales of Azoxy 2SC going back to October 2014 that resulted in a net price of $100 per gallon on Azoxy 2SC for Reichman Sales.[81] As of January 2016, Willowood was also offering Azoxy 2SC to Innvictis at $100 per gallon.[82]

Similarly, Willowood began offering AzoxyProp Xtra at $90 per gallon as early as October 2014.[83] According to Mr. Reichman, as early as February 2015, Willowood offered Reichman Sales product rebates that brought their net price on AzoxyProp Xtra down to around $78-79.[84] On July 8, 2015, despite internal disagreement on price reductions, Willowood reduced its price on AzoxyProp Xtra to $80 per gallon, making the price reduction retroactive to July 1, 2015 and communicating the price reduction to all of its customers.[85] Less than ten days later, on July 17, 2016, Willowood offered AzoxyProp Xtra to a customer (Innvictis) at $76 per gallon.[86] As of January 2016, Willowood was offering Innvictis AzoxyProp Xtra at $75 per gallon.[87]

As discussed in the prior section, the product label is an important marketing tool in selling fungicides. The Defendants are alleged to have copied substantial portions of Syngenta's copyrighted Quadris Flowable Fungicide label in their own Azoxy 2SC label. The Defendants

---

[78] Deposition of Brad Reichman, dated July 25, 2016, p. 56.

[79] Deposition of Brad Reichman, dated July 25, 2016, pp. 32-33.

[80] Deposition of Brian Heinze, dated August 4, 2016, pp. 160 and 169-170.

[81] Deposition of Brad Reichman, dated July 25, 2016, p. 68.

[82] Deposition of Brian Heinze, dated August 4, 2016, p. 189, Exhibit 58.

[83] Deposition of Brian Heinze, dated August 4, 2016, pp. 160 and 169-170; Deposition of Brad Reichman, dated July 25, 2016, p. 68.

[84] Deposition of Brad Reichman, dated July 25, 2016, p. 71.

[85] Deposition of Brian Heinze, dated August 4, 2016, pp. 152-153, 174-175, and 181-183.

[86] Deposition of Brian Heinze, dated August 4, 2016, pp. 184-185.

[87] Deposition of Brian Heinze, dated August 4, 2016, p. 189, Exhibit 58.

*Subject to Protective Order*
*Attorneys' Eyes Only*

also allegedly copied substantial portions of Syngenta's copyrighted Quilt Xcel Fungicide label for use in their own AzoxyProp Extra label. In both instances, Willowood primarily utilized the language from Syngenta's label, but substituted Willowood and its product name for Syngenta and Syngenta's product name. Willowood did not even replace the name Syngenta with its own in every instance. For example, Willowood's Azoxy 2SC label stated that "Willowood Azoxystrobin 2.08SC (azoxystrobin) is a Group 11 fungicide… **Syngenta** encourages responsible resistance management to ensure effective long-term control of the fungal diseases on this label."[88] Furthermore, Willowood stated to the EPA that it "incorporated label language from both EPA Reg. No. 100-1222 and EPA Reg. No. 100-1098 [which correspond to Syngenta's copyrighted Quadris Flowable Fungicide label] into the Willowood Azoxystrobin 2.08SC label."[89]

At his deposition, Brian Heinze, Willowood's corporate witness, conceded that Willowood's Azoxy 2SC and AzoxyProp Xtra labels copied the language in Syngenta's Quadris and Quilt Xcel labels.[90] Mr. Heinze also testified that Willowood sent emails to customers marketing its Azoxy 2SC and AzoxyProp Xtra products as alternatives to Syngenta's Quadris, Quilt Xcel, and Abound products.[91] Similarly, Mr. Reichman testified that Willowood, in its communications with Reichman Sales, compared Azoxy2SC to Syngenta's Quadris product and characterized it as an equivalent for Quadris, and Willowood compared AzoxyProp Xtra to Quilt Xcel and characterized it as an equivalent to Syngenta's Quilt Xcel.[92] Likewise, Dr. Rex Wichert, Manager of Customer Marketing for Syngenta, testified that Willowood copied Syngenta's label and then competed on price with a substitution-type approach.[93]

Because I understand Syngenta's Quadris Flowable Fungicide and Quilt Xcel Fungicide labels are copyrighted and entitled to protection, the Finder of Fact could determine that key portions of the Defendants' marketing and sales were based on copyright infringement. Given that the Defendants' products contained azoxystrobin, the infringement conservatively affected only the AZ Products-at-Issue.[94]

---

[88] Complaint, Exhibit 25, p. 5

[89] Complaint, Exhibit 16, p. 2.

[90] Deposition of Brian Heinze, dated August 4, 2016, pp. 315-316.

[91] Deposition of Brian Heinze, dated August 4, 2016, pp. 153 and 155-156.

[92] Deposition of Brad Reichman, dated July 25, 2016, pp. 88-89.

[93] Deposition of Rex Wichert, dated July 15, 2016, p. 176.

[94] Because Willowood sold approximately $662,000 worth of azoxystrobin for lawn & garden applications (approximately less than 3% of its total azoxystrobin sales) (Willowood Sales Data), I conservatively ignore Willowood's effect on Syngenta's lawn & garden azoxystrobin sales from my lost profits calculations. As discussed above, the AZ Products-at-Issue exclude Syngenta's lawn & garden azoxystrobin products.

*Subject to Protective Order*
*Attorneys' Eyes Only*

## C. Reactions to Willowood's Actions

### 1. Syngenta's Reactions

Syngenta did not expect significant generic azoxystrobin entry in 2014, particularly because only certain patents directed to the azoxystrobin compound itself expired in that year while several other patents directed to methods of making azoxystrobin were still in effect through at least 2015 and beyond. ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████ █████████████████████████████████████████
████████████████████████████████████████████.[96]

However, as discussed in the prior section, the Defendants were able to market generic azoxystrobin in 2014 because they filed their EPA end-use application in 2013.

Faced with unexpected competition from lower-priced generic azoxystrobin offerings from Willowood, Syngenta's existing azoxystrobin products were no longer viewed as a premium product by purchasers. Because Syngenta could not react by quickly altering its pricing, it was selling azoxystrobin in 2014 that the market viewed as being "overpriced."

Syngenta's 2014 sales decline is reflected in industry publications. For example in **Exhibit 4**, the AgroTrak data shows that ████████████████████████████████
████████████████████████████.

By late 2014 and 2015, Syngenta recognized the effect Willowood was having on the market and responded by significantly lowering its overall prices.[97] ████████████████
████████████████."[98]

To provide context for the price decline Syngenta experience, in 2014, Willowood sold its Azoxy 2SC for $125 per gallon with rebates that brought the net price down to as low as $100 per gallon,[99] which was well below the $191.80 average per gallon price for Syngenta's comparable Quadris (a $66 price premium without the rebate and more than $90 with the rebate).[100] ████████████████████████████████████████████████████

---

[95] Deposition of Rex Wichert, dated July 15, 2016, p. 35.

[96] **Exhibit 4** ████████████████████████████████ (SYN 291271).

[97] Willowood personnel noted that companies could alter their azoxystrobin prices based on "the absolute lowest number we hear to sell," even if that price is unattainable. (Email between Brian Heinze and Joe Middione, dated July 8, 2015 (WW010306-07).

[98] ████████████████████████████████████████████.

[99] Deposition of Brian Heinze, dated August 4, 2016, pp. 160 and 169-170; Deposition of Brad Reichman, dated July 25, 2016, p. 68.

[100] ████████████████████ (SYN 287760).

*Subject to Protective Order*
*Attorneys' Eyes Only*



[REDACTED][101]

In addition, Willowood's 2014 price for AzoxyProp Xtra was $90 per gallon,[102] while Syngenta charged [REDACTED] for the comparable Quilt Xcel.[103] Although Syngenta reduced the price of Quilt Xcel [REDACTED] in 2015,[104] it was not able to reduce the relative price premium of Quilt Xcel over AzoxyProp Xtra because Willowood continued to reduce the price of its AzoxyProp Xtra to as low as $76 per gallon.[105]

Syngenta also had to lower the prices it charged to its private label suppliers. [REDACTED]

[REDACTED].[110] This was further confirmed by Mr. Brian Heinze's testimony that Willowood offered Loveland azoxystrobin technical in October 2015 at $40.90 per kg and was considering prices as low as $38.50 per kg.[111] In a similar fashion, Syngenta's prices to [REDACTED] another third-party provider, declined.[112]

Syngenta entered into new contracts with third party suppliers after Willowood announced its market entry. [REDACTED]

---

[101] [REDACTED] (SYN 287760).

[102] Deposition of Brian Heinze, dated August 4, 2016, pp. 160 and 169-170; Deposition of Brad Reichman, dated July 25, 2016, p. 68.

[103] [REDACTED] (SYN 287760).

[104] [REDACTED] (SYN 287760).

[105] Deposition of Brian Heinze, dated August 4, 2016, pp. 152-153, 174-175, and 181-185.

[106] S[REDACTED] (SYN 284237)[REDACTED]

[107] [REDACTED] (SYN 284226).

[108] [REDACTED] SYN 134640-42).

[109] [REDACTED] (SYN 058305-06).

[110] Deposition of Rex Wichert, dated July 15, 2016, pp. 250-254.

[111] Deposition of Brian Heinze, dated August 4, 2016, pp. 191-192.

[112] [REDACTED] (SYN 284149).

[113] [REDACTED] (SYN 284208-28) and [REDACTED] (SYN 284202-7).

Page 15

*Subject to Protective Order*
*Attorneys' Eyes Only*



Even though Syngenta's post-Willowood entry agreements with ████ ████████ ████████ were at pre-Willowood entry Market Minus prices, the timing and pricing of these agreements (and ████████) likely would have been more favorable to Syngenta but for Willowood's entry.[118]  It is my understanding that Syngenta entered into these agreements to minimize Willowood's market impact and stem Syngenta's 2014 azoxystrobin sales decline.

AgroTrak shows that ██████████████████████████████████ ████████████.[119]

██████.[120]

## 2.  Reactions of Other Market Participants

Established brand-name companies like BASF, despite being much larger than Willowood, had little impact on the sales and pricing of Syngenta's azoxystrobin products.  If anything, Willowood's sales and pricing affected the brand-name companies like Syngenta and BASF.

Significantly, Willowood directed its actions at Syngenta, not the other brand-name companies.  In fact, in a September 2015 presentation to investors, Willowood identified Syngenta as its only branded competitor in the sale of azoxystrobin products.[121]  As discussed above, Willowood's azoxystrobin products utilize the same active ingredient as Syngenta.  They also used the same label as Syngenta's azoxystrobin products and continue to target the same crops and diseases as Syngenta's azoxystrobin products.  In addition, Willowood's advertising is directed against Syngenta's products.  For example, Willowood's website states that its Azoxyprop Xtra "contains the same active ingredient as Quilt Xcel," and that its Azoxy 2SC



---

[114] ████████████████████████████████████████████████████████ (SYN 284273-83).

[115] EPA Registration Nos. 228-720 (SYN 290373-423), 228-721 (SYN 290424-94), 228-722 (SYN 290495-529), 228-724 (SYN 290530-55), 55146-147 (SYN 290556-72), 55146-149 (SYN 290573-78), 55146-150 (SYN 290579-84), and 35935-101 (SYN 290367-72).

[116] ████████████████████████████████████████████████████████ (SYN 284238-58).

[117] ██████████████████████████████████████████████████ (SYN 284188-201).

[118] Syngenta also signed post-Willowood entry supply agreements with ████████████████████████, which sold azoxystrobin for lawn & garden and wallboard applications, respectively.

[119] See *Exhibit 4* ████████████████████████████ (SYN 291271).

[120] ██████████████████████████.

[121] Deposition of Brian Heinze, dated August 4, 2016, p. 99.

Page 16

*Subject to Protective Order*
*Attorneys' Eyes Only*

"contains the same active as Quadris." [122]   Furthermore, industry participants knew that Willowood's products were targeting Syngenta's products.  For example, Norder Supply Inc., an independent retailer of crop protection and agricultural products, [123] observed that growers were obtaining Willowood's AzoxyProp Xtra, which was an "exact look alike to [Syngenta's] Quilt Xcel." [124]   As noted above, Willowood also emailed customers indicating that its products were substitutes for Syngenta's Quadris, Quilt Xcel, and Abound products. [125]

Even though both Willowood and Syngenta participate in the larger strobilurin industry, other brand-name strobilurin products are focused differently than azoxystrobin.  For example,



. [129]   Given these different focuses, Willowood's actions appear to have had a greater effect on Syngenta than other strobilurin manufacturers.

However, Willowood's actions did have a chain reaction effect on the other strobilurin manufacturers.  As discussed above, in reaction to Willowood's actions, Syngenta's azoxystrobin prices were lowered.  Because azoxystrobin was also a part of the larger strobilurin industry, Syngenta's price reduction also affected other strobilurin manufacturers. [130]

[133]

---

[122] Azoxy 2SC Product Profile (www.willowoodusa.com/products/fungicides/azoxy-2sc/);  AzoxyProp Xtra Product Profile (www.willowoodusa.com/products/fungicides/azoxyprop-xtra/)**.**

[123] www.nordersupply.com/images/e0187101/about.htm.

[124] Email from Eric Larson to Rusty Harder, et al on January 14, 2015 (SYN 038212-13).

[125] Deposition of Brian Heinze, dated August 4, 2016, pp. 153 and 155-156.

[126] Deposition of Jeff Cecil dated July 13, 2016, p. 174.

[127] Deposition of Jeff Cecil dated July 13, 2016, pp. 174-175.

[128] Deposition of Jeff Cecil, dated July 13, 2016, p. 87.

[129] Ibid., pp. 86-87.

[130] Other brand-name strobilurin manufacturers did not have generic competition (Deposition of Jeff Cecil, dated July 13, 2016, p. 198).

[131] Deposition of Jeff Cecil, dated July 13, 2016, pp. 71-72.

[132] (SYN 037161).

[133] (SYN 037471-73).

*Subject to Protective Order*
*Attorneys' Eyes Only*

As Syngenta further noted, its experience was that Willowood's actions had a more profound effect on the strobilurin industry than brand-name manufacturers ever had historically. For example, Dr. Wichert testified:

> At the time this was written, which would have been somewhere prior to November [20]14, I'm not aware at that point that [the other branded products] had had an impact on our azoxystrobin sales.[134]

> We've been in the fungicide market a long time with BASF and competed, and we've always considered them in our pricing in the fungicide market because they hold a large position in that. And then I believe I said that in all those years, we've never experienced the decline as we have with the early entry by Willowood and the way they've priced and compared their products in terms of labels, products to Syngenta with our azoxystrobin products in the market.[135]

> The impact (if any) of generic companies other than Willowood was also limited.

Albaugh, LLC received EPA approval for generic azoxystrobin products only after Willowood's entry.[136] Thus, as an initial matter, Albaugh's fungicide strategy could have been different had Willowood not prematurely entered the azoxystrobin industry. Moreover, it does not appear that Albaugh had much of a presence. For example, Dr. Wichert testified:



[137]

."[138]  While Albaugh may have

<hr />

[134] Deposition of Rex Wichert, dated July 15, 2016, p. 196.

[135] Deposition of Rex Wichert, dated July 15, 2016, p. 242.

[136] EPA Registration Nos. 42750-261 (SYN 289530-86), 42750-262 (SYN 289587-92), 42750-284 (SYN 289593-611), 42750-285 (SYN 289612-36), 42750-289 (SYN 289637-72), 42750-290 (SYN 289673-707), 42750-291 (SYN 289708-21), 42750-292 (SYN 289722-34), and 42750-297 (SYN 289735-40).

[137] Deposition of Rex Wichert, dated July 15, 2016, pp. 67, 75, and 262 – 263.  While Albaugh produced sales data, the data does not provide customer details.  Albaugh, LLC, Sales by Item, February 16, 2015 through March 23, 2016 (ALB 000001-5).

[138] Deposition of Jeff Cecil, dated July 13, 2016, p. 81.

Page 18

*Subject to Protective Order*
*Attorneys' Eyes Only*

potentially offered crop protection products that competed with the AZ Products-at-Issue beginning in early 2015,[139] ████████████████████████████████████████████████████ ████████████████████████████████████████████████████[140] As discussed above, the AZ Products-at-Issue include Syngenta brands in the crop protection industry and exclude Syngenta brands in the seed care industry. Consequently, one could question Albaugh's ability to affect the crop protection azoxystrobin industry, especially before early 2015.

Moreover, the available evidence indicates that Albaugh was not the lowest-cost generic provider. As an example, in November 2015, Albaugh's quoted price was almost 30% greater than Willowood's.[141] Thus, to the extent that Albaugh participated in the crop protection azoxystrobin industry, they were not a major driver.

Cheminova A/S also sold crop protection azoxystrobin products, but Cheminova's impact (if any) on Syngenta's azoxystrobin sales and pricing was also limited. For example, Cheminova's EPA end-use product applications were approved after Willowood began marketing its azoxystrobin products and announced its entrance into the azoxystrobin industry.[142] Thus, Cheminova could have altered its entry strategy if Willowood had not achieved the premature success that it did.

Despite Cheminova's EPA approval, Syngenta did not find Cheminova to be a significant player in the azoxystrobin industry. As Jeff Cecil testified, the "[v]olumes actually of Cheminova were quite low at the time as well and therefore, we were responding to a Willowood offer in the end.[143] He went on to say that even if Cheminova was a participant, "Willowood was the primary concern."[144] Dr. Wichert similarly explained that "[w]e didn't have a lot feedback or couldn't find much Cheminova product in the marketplace, so we never considered it to be of concern."[145]

Part of the reason for the minimal competitive impact of Cheminova on Syngenta was that Cheminova approached the industry differently than Syngenta. For example, ███████████



---

[139] ██████████████████████████ (Albaugh 000001-50).

[140] Deposition of Robert Andrew Fisher, dated July 22, 2016, p. 90.

[141] Deposition of Jeff Cecil, dated July 13, 2016, pp. 154-155.

[142] EPA Registration Nos. 67760-124 (SYN 290002-62), 67760-129 (SYN 29155-70), and 67760-130 (SYN 290063-97).

[143] Deposition of Jeff Cecil, dated July 13, 2016, p. 38.

[144] Deposition of Jeff Cecil, dated July 13, 2016, p. 69.

[145] Deposition of Rex Wichert, dated July 15, 2016, p. 173.

[146] Deposition of Rex Wichert, dated July 15, 2016, pp. 260-261.

*Subject to Protective Order*
*Attorneys' Eyes Only*

██████████████████ ██████████████████

██████████████ .

In fact, whereas Willowood's azoxystrobin labels targeted the entire gamut of crops addressed by Syngenta's products, Cheminova's EPA approvals were limited and did not include key crops such as corn or tobacco.[147] As Dr. Wichert testified, these limitations made Cheminova's products less appealing to growers and, in turn, limited Cheminova's impact:

> Willowood had all crops on their label from what I recall where Cheminova missed a few crops on their label, and one of those crops was corn. And why that has an impact is it's not a hundred percent, but a large number of the corn growers also grow soybeans, and most of the retailers are customers that service those growers, sell products for both crops, many crops. And so it's advantageous for them to have a product that can be used crows [sic] all the crops. And in this situation, there's actually risk, since our products are labeled on all crops and theirs aren't, that they could have an unlabeled application with, say, the Cheminova product, and so that would be a disadvantage for them. And given that, we actually weren't overly concerned about the impact of Cheminova's product.[148]

Dr. Wichert went on to say that a key customer might not want to purchase from Cheminova because of these label restrictions.

> When they bring in a product [they want] to have flexibility on the crops and markets they can sell into; makes it simpler for them and easier for them. And also if they sell a product or even in the worst case would happen to recommend that product on a crop in which it wasn't on the label, which is a risk given it's a generic of one of our products, there could be EPA fines and other issues associated with that.[149]

Andrew Fisher echoed these thoughts when he testified:

> Cheminova, they didn't have plant performance, and we talked earlier how important plant performance was. They didn't have that on their label. They also didn't have corn or tobacco on their label, and as you said earlier, corn, soy, and wheat, majority of the farmers throughout the U.S. will farm corn, soybeans, and wheat. And if you don't have a product that really carries all those labels, you can imagine the inventory issues, the concern that you would get into if you were spraying soybeans and it drifted on corn, it doesn't have a corn label, you can't sell that corn crop anymore. So Cheminova just didn't have the crops on their label to really be an issue in the market.[150]

---

[147] Deposition of Rex Wichert, dated July 15, 2016, p. 257.

[148] Deposition of Rex Wichert, dated July 15, 2016, p. 74-75.

[149] Deposition of Rex Wichert, dated July 15, 2016, p. 257.

[150] Deposition of Robert Andrew Fisher, dated July 22, 2016, p. 64.

Page 20

*Subject to Protective Order*
*Attorneys' Eyes Only*

Dr. Wichert also noted the similarities between the azoxystrobin labels of Willowood and Syngenta and contrasted it with Cheminova's label. For example, he testified that "Cheminova was a bit different. Willowood was directly competitive, same ratio, same product. It was just sold as a substitute, which is a damaging proposition to a company like ours."[151] Additionally, Jeff Cecil found that Cheminova's azoxystrobin contained more impurities than Willowood's product.[152] Industry officials also noted that Cheminova's azoxystrobin was more expensive than Willowood's,[153] making the latter more of a market influence. These factors further limited any impact Cheminova may have had.

Although the EPA later approved Cheminova's azoxystrobin to treat corn in March 2015, Cheminova's industry participation also fell dramatically at the same time. Notably, in September 2014, FMC announced its intent to purchase Cheminova,[154] which was consummated in April 2015.[155] Brad Reichman testified that during this period of time, Cheminova became diverted with the merger and stopped selling azoxystrobin.[156] After the merger, and by June 2015, FMC/Cheminova stopped importing azoxystrobin into the United States.[157] In fact, Mr. Reichman explained that, by July 2015, FMC/Cheminova was "getting out of the business completely."[158]

I understand there have been three recent entrants into the azoxystrobin industry. For example, on October 1, 2015, LG Life Sciences, Ltd. received EPA approval to sell a crop protection azoxystrobin fungicide.[159] However, LG has not imported any azoxystrobin or otherwise made any sales of this fungicide,[160] and its website does not even show that it sells azoxystrobin fungicides.[161] Sharda USA LLC received EPA approval to sell an azoxystrobin fungicide on March 17, 2016.[162] Agro USA, Inc., also known as Sipcam, received approval three months later.[163] Given the recency of these entries, that these firms have not made any sales to date and that Sipcam primarily services the specialty agriculture and lawn & garden sectors,[164] it would be speculative to draw conclusions about the future effects of these three

---

[151] Deposition of Rex Wichert, dated July 15, 2016, p. 172.

[152] Deposition of Jeff Cecil dated July 13, 2016, p. 114.

[153] Deposition of Brad Reichman, Dated July 25, 2016, p. 83.

[154] www.bloomberg.com/news/articles/2014-09-08/fmc-to-buy-cheminova-for-1-8-billion-as-ceo-modifies-strategy.

[155] phx.corporate-ir.net/phoenix.zhtml?c=117919&p=irol-homeProfile&t=&id=&.

[156] Deposition of Brad Reichman, dated July 25, 2016, p. 26.

[157] Deposition of Rex Wichert, dated July 15, 2016, p. 258, Exhibit 19.

[158] Deposition of Brad Reichman, dated July 25, 2016, pp. 50-52.

[159] EPA Registration No. 71532-35 (SYN 290200-70). It also received EPA approval to sell a lawn & garden azoxystrobin product (EPA Registration No. 71532-34 (SYN 290191-99)).

[160] Deposition of Rex Wichert, dated July 15, 2016, p. 263.

[161] www.lgls.com/chemistry/prod/product_view.jsp?ke_gubun=EN&group_code=10&mcategory_seq=18.

[162] EPA Registration No. 83529-49 (SYN 290585-614).

[163] EPA Registration No. 60063-57 (SYN 290615-34).

[164] Ibid.

*Subject to Protective Order*
*Attorneys' Eyes Only*

companies on the sale of crop production fungicides. Furthermore, LG, Sharda, and Sipcam could have altered their entry strategies if Willowood had not achieved the premature success that it did.

# III.    Damages Models

In this matter, Syngenta has alleged that the Defendants engaged in two different types of improper behavior: A) patent infringement and B) copyright infringement. The available remedies and the economic models used to calculate damages for each claim type slightly vary. I discuss these models in Sections A – B below.

## A. Patent Infringement Damages

Under patent laws, a patent holder or plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[165] A patent holder may seek to recover lost profits damages as well as reasonable royalty damages, so long as the losses are not double-counted. In this case, Syngenta has never considered licensing its patents relating to azoxystrobin.[166] In fact, Dr. Wichert testified that "[i]f Willowood would have approached us and asked us for a license, we would not have even entertained that option."[167] Therefore, although Syngenta is entitled to at least reasonable royalty damages, I have focused my analysis on Syngenta's lost profits damages.

In determining the amount of lost profit damages to which a plaintiff patent holder is entitled, economists often look to the four-factor test from *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*[168] *Panduit* sets forth the following four factors that a patent holder must demonstrate to establish lost profits:

1.  Demand existed for the infringed product during the period of infringement.

2.  Acceptable non-infringing substitute products were not available to satisfy demand during the period of infringement.

3.  The patent owner possessed the manufacturing and marketing capability to have supplied the patented product to the customers who bought the infringing product.

4.  The amount of profit the patent holder would have made.[169]

---

[165] 35 U.S.C. §284.

[166] Deposition of Rex Wichert, dated July 15, 2016, p. 22.

[167] Deposition of Rex Wichert, dated July 15, 2016, pp. 245-246.

[168] 575 F.2d 1152 (6th Cir. 1978).

[169] Ibid.

Page 22

*Subject to Protective Order*
*Attorneys' Eyes Only*

In discussing the Second *Panduit* factor, the American Institute of Certified Public Accountants ("AICPA") wrote:

> [A] patent holder need not negate each and every possibility that the purchaser would not have purchased a product other than its own, absent the infringement. Rather, the patent holder need only show that there was a 'reasonable probability' that the sales would have been made by it "but for" the infringement. If the patent holder establishes the reasonableness of this inference by satisfying all four prongs of the *Panduit* test, the burden of proving entitlement to lost profits due to the infringing sales has been sustained.[170]

The Fourth *Panduit* factor requires the calculation of what economists call the "but for" profits: the profits the patent holder would have made "but for" the defendant's alleged infringement. Lost profit damages equal the difference between these "but for" profits and the profits the patent holder actually made. In other words, damages equals "but for" minus "actual."

One commonly accepted method of calculating a patent holder's "but for" profits (or sales) is the "yardstick" or "benchmark" method. In this method, the profits (or sales) the patent holder would have made "but for" the defendant's alleged infringement are estimated based on the profits (or sales) of a benchmark. Possible benchmarks include:

- The performance of the patent holder at a different location;

- The patent holder's actual experience versus past budgeted results;

- The actual experience of a similar business unaffected by the alleged infringement;

- Comparable experience and projections by nonparties;

- Industry averages; and,

- Pre-litigation projections[171]

In this approach, care must be taken to ensure that the patented product is sufficiently comparable to the benchmark.

In addition to "but for" profits on the patented products, the patent holder could be awarded profits on other products the patent holder would have sold "but for" the alleged infringement. These latter products are called convoyed products. For example, as discussed above in Section II.A., agriculture distributors, retailers, and growers sometimes simultaneously purchase, mix and apply herbicides, insecticides, and fungicides from a single supplier. Consequently, in this case, Syngenta could have lost profits on sales of herbicides and

---

[170] Jackson, Daniel L. and Kedrowski, Kathleen M. "Calculating Intellectual Property Infringement Damages," AICPA, 2013, p. 31 (SYN 289748-897) ("AICPA IP Damages").

[171] Pollack, Richard A., Scott M. Bouchner, Craig M. Enos, Colin A. Johns and John D. Moyl "Calculating Lost Profits" AICPA, 2006, paragraph 67 (SYN 289898-972).

*Subject to Protective Order*
*Attorneys' Eyes Only*

insecticides if the Finder of Fact determines that the Defendants infringed on Syngenta's azoxystrobin fungicide patents.

Because lost profit damages equal "but for" profits minus "actual" profits, the costs the plaintiff incurred or would have incurred are included in the calculations. Costs generally can be categorized in two ways: fixed and incremental. For example, as discussed below, Syngenta would have made additional sales "but for" the Defendants' infringement, and it had the manufacturing capacity in place to produce the additional product. Consequently, Syngenta would not have had to incur additional rent costs if it made additional sales. Economists call such costs that are unchanged in the "but for" and "actual" scenarios fixed. On the other hand, costs that vary between scenarios such as chemical ingredient costs are considered incremental. Incremental profits equal sales minus incremental costs. Basic math then implies that lost profit damages equal "but for" incremental profits minus "actual" incremental profits.

After calculating damages, economists must consider whether an award of *all* damages is an appropriate remedy. Under the "entire market value rule," a patent holder may recover damages based on the value of an entire apparatus or composition containing several features, even when only one feature is covered by the patents-at-issue, if 1) the patented and non-patented components are physically part of the same apparatus or composition, and 2) the patented feature drives demand for the entire apparatus or composition.[172] If the entire market value rule is not met, the economic expert must apportion damages between the patented and unpatented features of the product.

A patent holder's lost profits damages are not always limited to the infringement period; sometimes infringement can have a lingering effect that leads to future lost profits for the patent holder even after patent expiration. In this regard, the AICPA notes:

> An issue that may affect damages is whether a defendant's infringement resulted in a market entry advantage that would not have existed but for the infringement. If the defendant, after issuance of an injunction, can enter the market again with a competing product sooner than would have been possible without the infringement, the plaintiff may suffer additional future lost sales and profits. This is most likely to occur if the patent is at or near expiration.[173]

The lingering effects of head starts are especially important in the agriculture industry. For example, Everett Rogers, a leading expert on innovations, noted that the diffusion and adoption of innovation takes time:

> Many technologists believe that advantageous innovations will sell themselves, the obvious benefits of a new idea will be widely realized by potential adopters, and that the innovation will diffuse rapidly. Seldom is this the case. Most innovations, in fact, diffuse at a disappointingly slow rate, at least in the eyes of

---

[172] AICPA IP Damages, p. 52 (SYN 289748-897); *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).

[173] AICPA IP Damages, p. 45 (SYN 289748-897).

Page 24

*Subject to Protective Order*
*Attorneys' Eyes Only*

the inventors and technologists who create the innovations and promote them to others.[174]

Providing an example of hybrid corn in the agricultural industry, Dr. Rogers observed:

Administrators of the Iowa Agricultural Experiment Station … were puzzled as to why such an obviously advantageous innovation as hybrid corn was not adopted more rapidly….Today we understand that the uncertainty and risk associated with hybrid seed was one reason Iowa farmers were deliberate in adopting.[175]

Based on his research, Dr. Rogers found that farmers, in particular, spend time gaining knowledge about a new product before adopting the product.

Knowledge proceeds at a more rapid rate than does adoption, which suggests that relatively later adopters have a longer average innovation-decision period than do earlier adopters. For example, a study of the diffusion of a new weed spray among Iowa farmers by Beal and Rogers (1960) found 1.7 years between 10 percent awareness-knowledge and 10 percent adoption but 3.1 years between 92 percent awareness-knowledge and 92 percent adoption….

None of Beal and Rogers's 148 respondents reported adopting immediately after becoming aware of a new weed spray. And 63 percent of the adopters of a new livestock feed reported a different year at which they acquired knowledge from the year in which they decided to adopt. Most individuals seemed to require a period of time that could be measured in years to pass through the innovation-decision process. So adoption behavior is a process that contains stages, and these stages occur over time.[176]

## B. Copyright Infringement Damages

As compensation for copyright infringement, the copyright holder or plaintiff is entitled to not only lost profit damages and reasonable royalty damages, but also the profits the defendant unjustly earned because of the infringement, so long as no one sale is double-counted. In particular, the Copyright Act allows for the recovery of "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."[177] Consequently, as long as there is no double recovery, the copyright holder may recover both (1) its actual damages and (2) the infringer's profits.

In my analysis, I focus on Syngenta's lost profits in calculating its actual damages for the alleged copyright infringement. I understand that the calculation of lost profit damages for copyright infringement follows the same principles as patent infringement, which I discuss in the

---

[174] Rogers, Everett M. *Diffusion of Innovations*, 5th Edition, 2003, p. 7 (SYN 290147-55).

[175] Ibid., p. 55 (SYN 290147-55).

[176] Ibid., pp. 197 and 214 (SYN 290147-55).

[177] 17 USC § 504 (b).

*Subject to Protective Order*
*Attorneys' Eyes Only*

previous section.  Although a plaintiff is not required to follow the specific steps prescribed in the *Panduit*, it can still be applied.

With regard to the disgorgement of the defendant's unjust earnings, I understand the plaintiff must show that the infringement affected the defendant's profits.[178]  The plaintiff must identify the sales the defendant made that related to the alleged infringement, and the burden then shifts to the defendant who must then identify the costs associated with those sales and/or other deductions.[179]

# IV.  Calculation of Damages in this Matter

Because Syngenta asserts several claims in this matter, I separately calculate damages associated with each claim:

Section A below calculates lost profit damages assuming the Finder of Fact determines that the Defendants infringed Syngenta's'076 Patent and the '256 Patent.

Section B calculates lost profit damages assuming the Finder of Fact determines that the Defendants infringed Syngenta's '138 Patent.

Section C calculates lost profit damages assuming the Finder of Fact determines that the Defendants infringed Syngenta's '761 Patent.

The Finder of Fact could also determine that the Defendants infringed on Syngenta's copyrights.  The profits the Defendants unfairly garnered because of such infringement are calculated in Section D.  The profits Syngenta lost relating to such infringement are calculated in Section E.

In the aforementioned sections, I assume that it is determined that only the patent/copyright being analyzed in that section is being infringed.  For example, in Section B, I assume that Syngenta's '138 Patent was infringed, while the '761 Patent was not infringed. Section F summarizes the results from Section A – E and calculates damages if the Finder of Fact determines that multiple patents/copyrights were infringed.

## A. Lost Profits from the Defendants' Infringement of the '076 and '256 Patents

The damages calculated in this section are applicable if the Finder of Fact determines that the Defendants infringed Syngenta's '076 Patent and '256 Patent.[180]  In fact, I understand that Willowood has admitted that at least Willowood USA, LLC infringed the '076 and '256 Patents

---

[178] AICPA IP Damages, p. 93 (SYN 289748-897).

[179] Ibid., p. 94 (SYN 289748-897); 17 USC § 504 (b).

[180] I understand that the '076 and '256 Patents both cover the azoxystrobin compound, and for purposes of my analysis, the Defendants need only infringe one of these patents.

*Subject to Protective Order*
*Attorneys' Eyes Only*

before their expiration on February 11, 2014.[181]  The damages calculated in this section are applicable regardless of whether the Defendants are found to infringe or have infringed Syngenta's '138 or '761 Patents.

To determine whether or not Syngenta is entitled to lost profits, I have applied the four-factor *Panduit* test (discussed above).  Based on my analysis detailed below, I find that Syngenta's lost profits resulting from the Defendants' infringement of the '076 and '256 Patents are reasonably calculable.

## 1.  Demand existed for the azoxystrobin which was covered by the '076 and '256 Patents

It is my understanding that the '076 Patent and the '256 Patent both cover the azoxystrobin compound, including all azoxystrobin technical.[182]

As I set forth below, several factors demonstrate the demand for azoxystrobin.

First, the Defendants sold $24.4 million of infringing azoxystrobin technical, Azoxy 2SC, AzoxyProp Xtra, and Tebustrobin SC products between July 2014 and July 2016.[183]  Refer to **Exhibit 5.**

Second, demand for the patented product is also demonstrated by Syngenta's historical sales experience.  As shown in **Exhibit 6**, ███████████████████████████████████████████████████████████████.[184]  I conservatively exclude Syngenta's azoxystrobin sales for non-crop protection products from **Exhibit 6**.  In particular, I exclude the sales of azoxystrobin used for wallboards, lawn & garden, and seed care from the lost profits calculation in this section.

Third, industry publications and Syngenta's product marketing demonstrate the demand for and importance of the patented products.  According to the February 28, 2011 AgriBusiness Global product profile article on azoxystrobin, Syngenta's "broad-spectrum fungicide azoxystrobin has become the best-selling fungicide [active substance] in the world with sales of more than $1 billion."[185]  Syngenta's product marketing demonstrates the importance of the patents-at-issue by touting that Syngenta's end-use azoxystrobin products 1) improve plant growth and average yields, 2) provide long-lasting preventative and curative disease control to

---

[181] Defendants' Second Supplemental Non-Infringement and Invalidity Contentions, dated June 27, 2016, pp. 2 and 7-8; Defendants' Responses to Plaintiff's First Set of Requests for Admission, dated July 29, 2016, pp. 1-12.

[182] Plaintiff Syngenta Crop Protection, LLC's Second Supplemental Infringement Contentions, dated July 29, 2016, pp. 1-14.

[183] Willowood Sales Data.  Willowood provided July sales data for only Tebustrobin SC (WW026690-91).

[184] Gross to Net June LP.xlsx (SYN 287760) and Gross to Net June YTD 2016.xlsx (SYN 287759).

[185] Azoxystrobin Product Profile (www.agribusinessglobal.com/agrichemicals/fungicides/product-profile-azoxystrobin/).

*Subject to Protective Order*
*Attorneys' Eyes Only*

combat existing diseases, and 3) provide movement throughout the entire plant to provide uniform coverage.[186]

## 2. Customers who purchased azoxystrobin from the Defendants likely would have purchased from Syngenta in absence of the Defendants' product

As I discuss above in Section II.C.2, customers who purchased Willowood azoxystrobin likely would have purchased from Syngenta "but for" Willowood's infringement of the '076 Patent and '256 Patents. In fact, Willowood's products decidedly targeted and competed against Syngenta's azoxystrobin products, rather than other brand-name strobilurin products. Other companies were approved to sell azoxystrobin after Willowood's entry, which they might not have done if Willowood had not achieved the premature success that it did. Even if they continued to enter, most of these companies have not made any sales. Additional azoxystrobin providers sell Syngenta-based private label azoxystrobin. Moreover, as Syngenta personnel concluded that Cheminova and Albaugh were not active market participants; and they participated in different sectors of the industry. Albaugh was in the seed care sector and had a limited presence to the extent that Syngenta was unable to locate Albaugh products. Cheminova targeted different customers, geographies, and crop types, and after its corporate buy-out, FMC/Cheminova ceased selling azoxystrobin products.

Therefore, "but for" Willowood's infringement, I conclude that Syngenta would have been the only company able to provide this patented technology. Because Willowood's customers chose to purchase the infringing products, despite the existence of the other branded strobilurin crop protection fungicides, I have assumed that these customers would seek the AZ Products-at-Issue.

## 3. DESIGNATED AS ATTORNEYS' EYES ONLY BY SYNGENTA - Syngenta had the manufacturing and marketing capacity to make additional sales



---

[186] QUILT XCEL Competitor Sheet (www.syngentacropprotection.com/quilt-xcel-fungicide?tab=details); QUADRIS Early Info Sheet (www.syngentacropprotection.com/quadris-fungicide?tab=details).

*Subject to Protective Order*
*Attorneys' Eyes Only*



Therefore, Syngenta had, and would have had, sufficient manufacturing and marketing capacity to make the additional azoxystrobin sales implied in the analyses below.

## 4. The profits Syngenta would have made "but for" the Defendants' infringement of the '076 Patent and the '256 Patent.

As I discuss above, one commonly accepted method of calculating a patent holder's "but for" sales and profits is to utilize benchmarks. I conclude, based on discussions with Syngenta personnel and my own analysis that a combination of Syngenta's 1) budgets for azoxystrobin and 2) budgets and actual sales of herbicides with the active ingredient mesotrione provide the proper benchmarks for estimating Syngenta's azoxystrobin sales "but for" the Defendants' infringement of the '076 and '256 Patents.

### a. Budgets as a Benchmark

I have discussed Syngenta's exacting budgeting process for its products with several Syngenta employees, including Dr. Rex Wichert, Andrew Fisher, and Victoria Bublyk. I summarize below my understanding based on these discussions.



*Subject to Protective Order*
*Attorneys' Eyes Only*



However, given the exacting process employed to create the budgets and LPs, Syngenta believes that the budgets and LPs provide the best estimate about what the gross sales, net sales, cost of goods sold, and gross profits will be for each Syngenta product.

### b. Mesotrione as a Benchmark

I find that mesotrione provides another benchmark for Syngenta's azoxystrobin. Whereas azoxystrobin is Syngenta's best-selling fungicide, mesotrione is one of Syngenta's best-selling herbicides. Mesotrione is available in more than 50 countries and posted more than $400 million in annual revenue between 2012 and 2015.[187] As I discuss below, and as confirmed by Dr. Wichert at his deposition, mesotrione and azoxystrobin have a number of product lifecycle similarities.[188]

In addition to azoxystrobin and mesotrione both being well-established products, mesotrione is approved to be applied on the major crops on which azoxystrobin is applied, including corn and soybeans.[189] Thus, as I discuss above, growers sometimes simultaneously purchase, mix and apply fungicides and herbicides like azoxystrobin and mesotrione.

Moreover, generic companies faced similar barriers to entry with respect to azoxystrobin and mesotrione. For example, I understand that Syngenta's '076 and '256 Patents, which covered the azoxystrobin compound, expired on February 11, 2014.[190] I understand that during the lifetime of the '076 and '256 Patents, Syngenta possessed the right to exclude others from importing, making, using, selling, or offering for sale the azoxystrobin compound in the United States. Similarly, although Syngenta had patents relating to the mesotrione compound that began to expire in 2012, I understand that, under FIFRA, Syngenta had data exclusivity over

---

[187] www.agribusinessglobal.com/uncategorized/product-profile-mesotrione/; Gross to Net June LP.xlsx. (SYN 287760).

[188] Deposition of Rex Wichert, dated July 15, 2016, pp. 265-267.

[189] Syngenta AG Form 20-F, p. 17; Syngenta Quilt Xcel Label (SYN 279541-69); Syngenta Calisto Label (SYN 289395-31); Syngenta Zemax Label (SYN 289432-59).

[190] Syngenta holds other patents relating to azoxystrobin, including the asserted '138 and '761 Patents, which I understand are directed to processes for manufacturing azoxystrobin.

Page 30

*Subject to Protective Order*
*Attorneys' Eyes Only*

mesotrione through June 4, 2014 in the United States.[191]  I understand that this data exclusivity barred generic companies from relying on data Syngenta had previously submitted to the EPA so that the generic companies could support their own mesotrione registration applications before June 4, 2014.  Thus, with respect to both azoxystrobin and mesotrione, generic companies faced significant barriers to entry until the first half of 2014.

Further, with respect to both azoxystrobin and mesotrione, Syngenta introduced new combination products that contained other active ingredients.  As I discuss in Section II.A. above, Syngenta introduced Trivapro, which is a combination fungicide that contains azoxystrobin, Solatenol, and propiconazole as active ingredients.[192]  I understand Trivapro received EPA approval on August 28, 2015, about 16 months after the '076 and '256 Patents expired.[193],[194] Similarly, Syngenta introduced Acuron, which is a combination herbicide that contains mesotrione, and bicyclopyrone as active ingredients ██████████████████████████████[195]  Syngenta received EPA approval to sell Acuron on April 24, 2015,[196] which was about 10.5 months after Syngenta lost data exclusivity over mesotrione.

### c.  Calculating "But For" and Lost Profits

As a result of the Defendants' infringement of the '076 and '256 Patents, Syngenta suffered lost profits in the form of price erosion and lost quantity sales.  To quantify these damages, I begin by calculating Syngenta's "but for" gross profits.

As shown in *Exhibit 7*, ██████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ conservatively exclude azoxystrobin used for seed care, lawn & garden, and wallboard applications from these figures because the Defendants' azoxystrobin was not used in these applications except in very limited quantities.[197]  If anything, consideration of seed care, lawn & garden, and wallboard applications would reflect even greater lost profits.

In determining Syngenta's "but for" gross profit, I have considered Syngenta's AZ Products-at-Issue.  I understand that the AZ Products-at-Issue contain not only azoxystrobin,

---

[191] EPA's response re: Petition for Extension of the Exclusive Use Data Protection Period for Mesotrione (EPA Reg. No. 100-1140) to June 4, 2014, Under FIFRA section 3(c)(1)(F)(ii) (www.epa.gov/sites/production/files/2014-04/documents/mesotrione-response.pdf).

[192] ██████████████████ (SYN 287760); ██████████████████████████ (SYN 287759).

[193] Based on discussions with Syngenta, Trivapro is a mixture of Trivapro A and Trivapro B (Quilt Xcel; EPA approval was obtained March 25, 2009).

[194] EPA Registrations Nos. 100-1471 (SYN 290896-935) and 100-1324 (SYN 290696-748).

[195] EPA Registration Nos. 100-1466 (SYN 290749-90).

[196] EPA Registration Nos. 100-1466 (SYN 290749-90).

[197] EPA Registration No. 87290-44 (SYN 291126-84); Deposition of Brian Heinze, dated August 4, 2016, pp. 134-135.  Because Willowood sold approximately $662,000 worth of azoxystrobin for lawn & garden applications (approximately less than 3% of its total azoxystrobin sales; refer to Willowood Sales data), I conservatively ignore Willowood's effect on Syngenta's lawn & garden azoxystrobin sales from my lost profits calculations.  As discussed above, the AZ Products-at-Issue exclude Syngenta's lawn & garden azoxystrobin products.

*Subject to Protective Order*
*Attorneys' Eyes Only*

which is covered by the '076 and '256 Patents, but also other components. I find that the use of the AZ Products-at-Issue as the basis for my lost profits analysis appropriate because, as discussed above in Section IV.A.1, azoxystrobin drove demand for the products directly or through the Brand Ladder. Further, in each of the AZ Products-at-Issue, the azoxystrobin and other components are physically part of the same apparatus or composition. Thus, to the extent necessary, the entire market value rule is satisfied.

### 2014 "But For" Gross Profits

As I discuss above, the Defendants began marketing their end-use of azoxystrobin products as early as 2013 and began selling end-use azoxystrobin products in 2014. Thus, to estimate Syngenta's "but for" profits for 2014, I have assumed that "but for" the Defendants' actions, Syngenta would have achieved its budgeted amount of gross profits for azoxystrobin to the extent that Syngenta achieved its budget for its *comparable* mesotrione product. As shown in *Exhibit 9.d*, Syngenta's actual 2014 gross profits of mesotrione products for crop protection were ▮▮▮▮ ▮▮▮▮ than 2014 budgeted gross profits. Actual 2014 gross profits for all Syngenta crop protection fungicides (less gross profits of the AZ Products-at-Issue) ("Crop Protection Fungicides") were ▮▮▮▮ ▮▮▮▮ than the 2014 budget. Actual 2014 gross profits for all Syngenta products were ▮▮▮▮ ▮▮▮▮ than the 2014 budget.[198]

At the same time, Syngenta's actual 2014 azoxystrobin gross profits for the AZ Products-at-Issue were ▮▮▮▮ ▮▮▮▮ than 2014 budget.[199]

Because azoxystrobin and mesotrione face similar market conditions, I have used mesotrione as a benchmark to account for any potential impact of market conditions. For example, *Exhibit 8* shows that farm incomes declined from 2012 through 2014 as corn, soybean, and wheat commodity prices fell. Under these conditions, mesotrione achieved ▮▮▮▮▮▮ ▮▮▮▮ of its 2014 gross profit budget.

Thus, I have conservatively assumed that Syngenta would have made ▮▮▮▮ of its 2014 gross profit budget on the AZ Products-at-Issue "but for" the Defendants' infringement of the '076 and '256 Patents. This assumption is conservative because Syngenta achieved ▮▮▮▮ ▮▮▮▮ of its 2014 budgets for Crop Protection Fungicides and all products, respectively.[200] Additionally, the Producer Price Index for Agricultural and Commercial Pesticides and Chemicals increased from 2013 to 2014,[201] which implies that prices of similar products economy-wide increased in 2014. Thus, if other benchmarks were used, they would likely reflect even greater lost profits.

---

[198] ▮▮▮▮▮▮ (SYN 287760); ▮▮▮▮▮▮ (SYN 283412).

[199] Based on *Exhibits 6 and 7*, the actual gross profits of the AZ Products-at-Issue were ▮▮▮▮▮▮, and the budgeted gross profits of the AZ Products-at-Issue were ▮▮▮▮▮▮, which results in a ▮▮▮▮ compared to budget.

[200] ▮▮▮▮▮▮ (SYN 287760); ▮▮▮▮▮▮ (SYN 283412).

[201] Producer Price Index by Industry: Pesticide and Other Agricultural Chemical Manufacturing: Agricultural and Commercial Pesticides and Chemicals (fred.stlouisfed.org/series/PCU3253203253201).

*Subject to Protective Order*
*Attorneys' Eyes Only*

Against this backdrop, as shown in ***Exhibit 9.c,*** I conservatively conclude that "but for" the Defendants' infringement of the '076 and '256 Patents, Syngenta should have anticipated a gross profit of ████ ████ on its AZ Products-at-Issue in 2014. Because Syngenta actually earned gross profits of ████ ████ on its AZ Products-at-Issue in 2014, I conclude that its gross profits would have been $20.0 million or ████████████████████ higher "but for" the Defendants' infringement.

### 2015 "But –For" Gross Profits

In 2015, Syngenta budgeted that it would generate ████ million in gross profits on the AZ Product-at-Issue. This budget was generated utilizing Syngenta's experiences in 2014. Because Syngenta's 2014 gross profits on the AZ Products-at-Issue would have been ████ ████ than what it actually experienced "but for" the Defendants' infringement, I conclude that Syngenta would have developed a 2015 budget that generated at least ████████ in gross profits than its actual 2015 budget. Consequently, I estimate that Syngenta would have created a 2015 budget where it estimated that it would earn ████ ████ ████████████ in gross profits on the AZ Products-at-Issue. Again, Syngenta's 2015 budget for the AZ Products-at-Issue would have been even greater had crop protection fungicides or all products been used as a benchmark.

Similar to 2014, I assume that "but for" the Defendants' alleged actions, Syngenta would have created a 2015 budget where it estimated that it would earn ████ ████ on the AZ Products-at-Issue to the extent that Syngenta's mesotrione products achieved their 2015 budgets. As Syngenta actually earned ████ ████ gross profits on mesotrione than it had originally budgeted, I assume that Syngenta would have generated ████ gross profits on its AZ Products-at-Issue in 2015 than it had budgeted. As shown in ***Exhibit 9.c***, ████ million is ████ higher than Syngenta's estimated 2015 budget of ████ million. Because Syngenta actually earned gross profits of ████ ████ on its AZ Products-at-Issue in 2015, I conclude that its gross profits would have been $24.9 million ████████████████ higher "but for" the Defendants' infringement.

### 2016 "But-For" Gross Profits

By similar logic, Syngenta's 2016 budget for the AZ Products-at-Issue "but for" the Defendants' alleged actions would have been at least ████ greater than its actual 2016 budget given that Syngenta's "but for" 2015 gross profits on the AZ Products-at-Issue were ████ than Syngenta's actual 2015 AZ Products-at-Issue gross profits. Because Syngenta earned ████ ████ gross profits than it had budgeted on its mesotrione products, I assume that Syngenta would have expected to earn ████ ████ gross profits than it had budgeted on the AZ Products-at-Issue. As shown in ***Exhibit 9.c***, these calculations imply that Syngenta expected to earn ████ ████ in gross profits on the AZ Products-at-Issue. As of June 2016, Syngenta projects that it will actually generate ████████ in gross profits on the AZ Products-at-Issue, leading to losses of $15.5 million.

### 2017 "But-For" Gross Profits

To estimate 2017 "but for" lost profits, I have applied a similar methodology as I did for 2016 detailed in ***Exhibit 9.c***, which indicates that Syngenta should have earned ████ ████ in

***Subject to Protective Order***
***Attorneys' Eyes Only***

gross profits on the AZ Products-at-Issue. As of June 2016, Syngenta projects that it will actually generate ██████ ██████ in gross profits in 2017 on the AZ Products-at-Issue, leading to losses of $15.3 million.

## Convoyed Sales

As discussed above, Trivapro is a mixture of Trivapro A and Trivapro B. I understand these products are packaged together and are used in combination to obtain the benefits marketed under the Trivapro brand. Additionally, one could separately purchase Trivapro A. Because Trivapro A does not contain azoxystrobin, it is not included in the AZ Products-at-Issue. However, if Syngenta's sales of the AZ Products-at-Issue were greater, so would its sales of Trivapro A, even though it does not contain chemicals related to the patents at issue. The lost sales of Trivapro A would be called convoyed sales. I have conservatively excluded Syngenta's losses from Trivapro A from my damages calculations.

In addition, growers sometimes mix azoxystrobin with other products like insecticides and herbicides. Consequently, if Syngenta lost azoxystrobin sales because of the Defendants' infringement of the '076 Patent and the '256 Patent, it also lost sales on other insecticide and herbicide products. These losses would also be convoyed sales. Although Syngenta is entitled to regain the profits it lost on these convoyed sales, I have conservatively excluded these sales from my lost profits analysis as well. However, I reserve the right to update this report to reflect Syngenta's lost profit damages related to convoyed sales of Trivapro A as well as its insecticide and herbicide products.

## Incremental Costs

Gross profits are calculated by deducting the cost of manufacturing the products from the revenue earned on those products. Syngenta bore other costs associated with the AZ Products-at-Issue. Some of these costs are incremental, while some are fixed. Based upon my own analysis and conversations with Syngenta personnel, I classified these costs as either incremental (i.e., variable) or fixed. Because Syngenta does not allocate the additional incremental costs to each product sold, I have calculated these costs as a percentage of gross profits. For example, a Syngenta document indicates it bore additional incremental costs of ████ of gross profits related to sales in 2015.[202] As shown in **Exhibit 9.b**, I have assumed the same level of incremental expenses for all historical and for all future years.

## Lost Profits

Syngenta's lost profits are calculated by deducting the additional incremental costs from Syngenta's "but for" lost gross profits. **Exhibit 9.b** shows that after these deductions, Syngenta's "but for" lost profits from the Defendants' infringement of the '076 and '256 Patents in years 2014 – 2017 was $20.0 million, $24.9 million, $15.4 million, and $15.3 million, respectively.

I have calculated and provided lost profits even after the expiration of the '076 and '256 Patents because, as mentioned above, lost profits damages are not always limited to the infringement period and Willowood's infringement had a lingering effect that led to future lost

---

[202] ███████████████████████████████████ (SYN 287820).

*Subject to Protective Order*
*Attorneys' Eyes Only*

profits for Syngenta after patent expiration. I understand that Willowood admits that at least Willowood USA, LLC infringed the '076 and '256 Patents before these patents expired by importing azoxystrobin into the United States in early 2013 and using that azoxystrobin technical by having it formulated and tested to support its end-use registrations of Azoxy 2SC and AzoxyProp Xtra.[203] These infringing actions allowed Willowood to gain early access to the azoxystrobin market by as much as a year, such that Willowood was offering for sale and selling Azoxy 2SC and AzoxyProp Xtra by July 2014. An assumption of a one-year "head start" is conservative for several reasons. For example, Willowood itself characterizes its registration process as "unique" and touts that it can register a product and bring it to market in about 12 months, whereas other competitors take significantly longer.[204] Thus, had Willowood waited until the '076 and '256 Patents expired before importing azoxystrobin technical and carrying out its formulation and testing activities, it would have likely taken Willowood until 2015 or later to introduce its end-use azoxystrobin products (assuming Willowood did not infringe on any other Syngenta patents). I also understand it takes a significant amount of time to gain individual state approvals to sell azoxystrobin products. Additionally, as I discuss above in Section II.B, Willowood likely would have missed the peak selling season for the 2015 crop year had it not infringed on Syngenta's '076 and '256 Patents.

Exhibit 9.e graphs Syngenta's "but for" and actual incremental profits for the AZ Products-at-Issue for 2012 through 2017, assuming infringement of the '076 and '256 Patents. This Exhibit shows that Syngenta's "but for" incremental profits in a given year are roughly similar to Syngenta's actual profits in the preceding year. That is consistent with the Defendants having received approximately a one year "head start" in marketing and selling azoxystrobin and indicates that the effect of this "head start" continues to linger.

Exhibit 9.a displays the losses Syngenta faced due to the Defendants' infringement of the '076 and '256 Patents by year and cumulatively.

For the reasons I discuss above, I believe to a reasonable degree of economic certainty that the Defendants caused the losses displayed in Exhibit 9.a. Moreover, as I set forth in Section II.C.2, I do not believe Cheminova, Albaugh, or any other generic had an effect on Syngenta's damages. However, to be conservative, I recognize that the Finder of Fact could conclude that Cheminova could have had an effect on Syngenta's damages. Exhibit 10.a displays Syngenta's "but for" losses due to the Defendants if the Finder of Fact draws such a conclusion. The calculations in Exhibit 10.a are identical to those in Exhibit 9.a, except that I have proportionally allocated Syngenta's lost gross profits based upon the relative import shares of kilograms of azoxystrobin of Cheminova and Willowood.[205] This assumption is conservative given Cheminova's limited competitive effects as discussed in Section II.C.2.

---

[203] Defendants' Second Supplemental Non-Infringement Noninfringment and Invalidity Contentions, dated June 27, 2016, pp. 2 and 7-8; Defendants' Responses to Plaintiff's First Set of Requests for Admission, dated July 29, 2016, pp. 4-5.

[204] Deposition of Brian Heinze, dated August 4, 2016, pp. 119-122; Willowood Management Presentation (WW026466).

[205] This methodology is akin to the proportional allocation of the infringer's sales methodology detailed in State Industries, Inc. v. Mor-flo Industries, Inc. and American Appliance Mfg. Corp., 883 F.2d 1573 (Fed. Cir. 1989).

Subject to Protective Order
Attorneys' Eyes Only

Some of the lost profits shown in **Exhibit 9.a** and **Exhibit 10.a** occurred in the past and some will occur in the future. Thus, in **Exhibit 9.a** and **Exhibit 10.a**, I have separately calculated and adjusted Syngenta's lost profits to include prejudgment interest,[206] utilizing North Carolina's statutory prejudgment interest rate of 8.0% simple interest.[207] For ease of analysis, I have calculated prejudgment interest through July 1, 2017 and December 31, 2017. I reserve the right to update these interest calculations as trial approaches.

## B. Lost Profits from the Defendants' Alleged Infringement of the '138 Patent

This section calculates damages assuming the Finder of Fact determines that the Defendants infringed Syngenta's '138 Patent by importing, using, selling, or offering for sale azoxystrobin that was made using the claimed process before the '138 Patent expired on December 8, 2015. This section calculates damages in such an instance. The damages calculated in this section are applicable regardless of whether the Defendants are found to have infringed any of Syngenta's '076, '256, and '761 Patents.

### *Panduit* Factors 1 - 3

As with my analysis of the '076 and '256 Patents, I have applied the four-factor *Panduit* test (discussed above) to determine the damages stemming from the infringement of the '138 Patent. For the same reasons as in Sections IV.A.1 – 3, I conclude:

- Demand existed for the azoxystrobin manufactured using the method of the '138 Patent, which I understand is the most commercially reasonable method. I understand that it might be possible to manufacture azoxystrobin without the claimed method of the '138 Patent; however, it would be more expensive and inefficient to do so.[208] I understand that Syngenta alleges that Willowood willfully infringed on '138 Patent. This further supports my opinion about the uneconomic nature of alternative processes to manufacture azoxystrobin without infringing the '138 Patent;

- Customers who purchased azoxystrobin from the Defendants likely would have purchased from Syngenta in absence of the Defendants' product; and

- Syngenta had the manufacturing and marketing capacity to make additional sales.

---

[206] Prejudgment interest is a rate of interest applied to an award to compensate the injured party, here Syngenta, for the use of its monies between the infringement date and the judgment date.

[207] North Carolina General Assembly, Enacted Legislation, Chapter 24 – Interest. (www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

[208] Even if a generic was able to manufacture azoxystrobin without the '138 Patent, lost profit damages would be no less than the amounts calculated in the prior section for infringement of the '076 and '256 Patents.

Page 36

*Subject to Protective Order*
*Attorneys' Eyes Only*

## Calculating "But-For" and Lost Profits

Consequently, only the profits Syngenta would have made "but for" the Defendant's alleged infringement of the '138 Patent need to be calculated under the *Panduit* factors. Utilizing the benchmark method, I conclude, based on discussions with Syngenta personnel and my own analysis that a combination of Syngenta's 1) actual gross profits for AZ Products-at-Issue and 2) budgets and actual sales of Crop Protection Fungicides provides a proper benchmark for estimating Syngenta's sales of AZ Products-at-Issue "but for" the Defendants' alleged infringement of the '138 Patent.

For the same reasons I discuss in Section IV.A.4.a, Syngenta's budgets are an informative benchmark for what sales and profits would have been for Syngenta's AZ Products-at-Issue had the '138 Patent not been infringed. However, I understand that Syngenta developed its budgets for the AZ Products-at-Issue under the belief that there might be some amount of azoxystrobin generic entry the industry in 2014. The results of this budgeting process would be incorrect if the Finder of Fact determines that the Defendants infringed on the '138 Patent, in which case Syngenta would have been entitled to exclude the Defendants from importing, using, selling, or offering for sale technical and end-use azoxystrobin through the expiration of the '138 Patent on December 8, 2015. Consequently, in this section, I estimate what budgets Syngenta would have developed for the AZ Products-at-Issue in years 2014 – 2017 assuming it had known that it would have been able to exclude Willowood from using the claimed process until December 8, 2015.

Again, as with my analysis of damages due to infringement of the '076 and '256 Patents, the AZ Products-at-Issue contain azoxystrobin made by the patented process of the '138 Patent as well as other compounds. I have not seen any way in which the AZ Products-at-Issue could have been economically manufactured without the method of the '138 Patent. Willowood's alleged willful infringement further supports my opinion about the uneconomic nature of alternative processes to manufacture azoxystrobin without infringing the '138 Patent. As a result, the entire market value rule is satisfied. I reserve the right to update this conclusion if I am presented with additional evidence.

Unlike in my analysis of lost profits due to the alleged infringement of the '076 and '256 Patents, I find that mesotrione is likely an over-conservative benchmark in calculating lost profits due to infringement of the '138 Patent. Notably, Syngenta's data exclusivity over mesotrione ended on June 4, 2014, whereas Syngenta was entitled to exclude others from using the claimed process of the '138 Patent until December 8, 2015, eighteen months later. Thus, my analysis of the damages due to infringement of the '138 Patent is based on Syngenta's gross profits on sales of Crop Protection Fungicides, which contain products for which Syngenta maintained exclusivity through 2015.[209] As a result, lost profit damages would be no less than the amounts calculated in the prior section for infringement of the '076 and '256 Patents, which used a mesotrione benchmark.

---

[209] As discussed above, my definition of Syngenta's Crop Protection Fungicides excludes products with azoxystrobin.

*Subject to Protective Order*
*Attorneys' Eyes Only*

### 2014 "But-For" Gross Profits

Syngenta's 2014 actual gross profits on its Crop Protection Fungicides were ███████ ███████ than its 2013 actual gross profits of those chemicals. Consequently, I have assumed that Syngenta's 2014 gross profits on the AZ Products-at-Issue would have been ███████ ███████ than its actual 2013 gross profits on the AZ Products-at-Issue, as shown in ***Exhibit 11.c***, "but for" the Defendants' alleged infringement of the '138 Patent.

### 2015 "But-For" Gross Profits

Similarly, because Syngenta's 2015 gross profits on its Crop Protection Fungicides were ███████ than its 2014 actual gross profits of those chemicals, I have calculated in ***Exhibit 11.c*** that Syngenta's 2015 gross profits on the AZ Products-at-Issue would have been ███ ███ than its expected 2014 gross profit budget on the AZ Products-at-Issue.

### 2016 "But-For" Gross Profits

Assuming the Finder of Fact determines that the Defendants infringed the '138 Patent, Syngenta would have lost its ability to exclude others from practicing the claimed process of the '138 Patent in December 2015. Because 2016 would have been the first year that Syngenta would not have had such exclusivity, I assume that Syngenta's 2016 experiences with the AZ Products-at-Issue in the "but for" scenario would have been similar to Syngenta's actual experience in the first year it did not effectively have exclusivity over the azoxystrobin compound. As discussed above, in the actual scenario, the Defendants' actions caused Syngenta to lose effective exclusivity over the azoxystrobin compound in 2014. Because Syngenta's gross profits on the AZ Products-at-Issue actually ██████ by ██████ in 2014 from 2013, I have assumed that in the "but for" scenario, Syngenta's 2016 gross profits would have ██████ by ██████ to a level of ███████.[210] As set forth in ***Exhibit 11.c,*** I understand there was a general decline in the agricultural economy in 2014. Consequently, my estimate of Syngenta's "but for" 2016 gross profits is conservative because the agricultural economy is not expected to contract in 2016 as it did in 2014. If anything, to the extent the economic decline in 2014 had any impact on Syngenta's azoxystrobin sales that year, it would make my estimate of Syngenta's "but-for" 2016 gross profits all the more conservative.

### 2017 "But-For" Gross Profit

Because 2017 would be the second year Syngenta would not have had exclusivity over the azoxystrobin compound in the "but for" scenario and Syngenta's gross profits on the AZ Products-at-Issue actually ██████ by ██████ in 2015, the second year Syngenta effectively did not have exclusivity over the azoxystrobin compound, I have assumed that Syngenta's expected gross profits would have ██████ by ██████ in 2017 to ███ ███ in the "but for" scenario.

### Convoyed Sales

Syngenta is entitled to lost profit damages related to its convoyed sales of Trivapro A as well as its insecticides and herbicides that are often mixed with the AZ Products-at-Issue.

---

[210] This assumption is conservative as the agricultural economy is not expected to contract as much in 2016 as it did in 2014.

*Subject to Protective Order*
*Attorneys' Eyes Only*

However, I conservatively excluded these sales from my lost profits analysis. I reserve the right to update this report to reflect Syngenta's lost profit damages related to convoyed sales of Trivapro A as well as its insecticide and herbicide products.

### Incremental Costs

As discussed above in Section IV.A.4.c, Syngenta bore additional incremental costs of ███ of gross profits on its sales in 2015; I have assumed these costs will continue into 2016 and 2017, and I conservatively include these costs in all years prior to 2015.

### Lost Profits

*Exhibit 11.b* shows that after deducting the additional incremental costs, Syngenta's lost profits from the Defendants' infringement of the '138 Patent in 2014 – 2017 was $33.2 million, $55.8 million, $36.0 million, and $10.5 million, respectively.

I have calculated and provided lost profits even after the expiration of the '138 Patent because, as mentioned above, lost profits damages are not always limited to the infringement period and Willowood's infringement had a lingering effect that led to future lost profits of Syngenta after patent expiration. If the Finder of Fact determines Willowood infringed the '138 Patent, Willowood's infringing actions enabled it to gain premature access to the azoxystrobin market of over two years (covering the period between August 13, 2013 EPA application to the expiration of the '138 Patent on December 8, 2015 and conservatively excluding the time it takes to obtain individual state approval).

*Exhibit 11.e* graphs Syngenta's "but for" and actual incremental profits for the AZ Products-at-Issue for 2012 through 2017 assuming infringement of the '138 Patent. This Exhibit shows that Syngenta's "but for" incremental profits in a given year are roughly similar to the Syngenta's actual profits two years before given the two years of growth Syngenta would have achieved in 2014 and 2015. This result is consistent with the Defendants receiving an approximately two year "head start" in marketing and selling azoxystrobin and that the effect of this "head start" continues to linger.

*Exhibit 11.*a displays the resulting losses Syngenta faced due to the Defendants' infringement of the '138 Patent by year and cumulatively.[211]

For the reasons I discuss above, I believe to a reasonable degree of economic certainty that the Defendants are the cause of the losses displayed in *Exhibit 11.a*. However, I recognize that the Finder of Fact could conclude that Cheminova could have had an effect on Syngenta's damages. *Exhibit 12.a* displays Syngenta's losses due to the Defendants if the Finder of Fact draws such a conclusion. The calculations in *Exhibit 12.a* are identical to those in *Exhibit 11.a*, except that I have proportionally allocated Syngenta's lost gross profits based upon the relative import shares of kilograms of active ingredient of Cheminova and Willowood.[212] This

---

[211] As shown in *Exhibit 11.a*, the lost profits are calculated from 2014 through 2017 and total $135.5 million. Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages are equal to the 2014 damages plus 93.7% of the 2015 damages shown in *Exhibit 11.a*.

[212] This methodology is akin to the proportional allocation of the infringer's sales methodology detailed in State Industries, Inc. v. Mor-flo Industries, Inc. and American Appliance Mfg. Corp., 883 F.2d 1573 (Fed. Cir. 1989).

Page 39

*Subject to Protective Order*
*Attorneys' Eyes Only*

assumption is conservative given Cheminova's limited competitive effects as discussed in Section II.C.2. Additionally, I have conservatively excluded 2017 damages from this calculation.

Some of the lost profits shown in **Exhibit 11.a** and **Exhibit 12.a** occurred in the past and some will occur in the future. Thus, in **Exhibit 11.a** and **Exhibit 12.a**, I have separately calculated and adjusted Syngenta's lost profits to include prejudgment interest,[213] utilizing North Carolina's statutory prejudgment interest rate of 8.0% simple interest.[214] For ease of analysis, I have calculated prejudgment interest through July 1, 2017 and December 31, 2017. I reserve the right to update these interest calculations as trial approaches.

## C. Lost Profits from the Defendants' Infringement of the '761 Patent

This section calculates damages assuming the Finder of Fact determines that the Defendants infringe on the '761 Patent by importing, using, selling, or offering for sale azoxystrobin that was made using the claimed process of the '761 Patent.[215] This section calculates damages in such an instance. This calculated damages in this section are applicable regardless of whether the Defendants are found to have infringed any of Syngenta's '076, '256, and '138 Patents.

### *Panduit* Factors 1 - 3

As discussed in Sections IV.A.1 – 3 and III.B, Syngenta meets the first three *Panduit* factors for the '761 Patent. I then calculate Syngenta's lost profits assuming infringement of the '761 Patent in a similar manner to my calculation of lost profits assuming infringement of the '138 Patent and the entire market value rule is satisfied.

### Calculating "But-for" and Lost Profits

Section IV.B discusses and **Exhibit 11.c** shows that I utilize a different calculation methodology for calculating damages for infringement of the '138 Patent in different time periods. I used one methodology for 2014 and 2015 when the '138 Patent entitled Syngenta to exclude others from using the claimed process; I used another methodology for 2016 through 2017 when '138 Patent had expired and Syngenta no longer possessed such exclusivity.

Because the '761 Patent remains in effect for the entire 2014 – 2017 period and beyond, I have utilized the same methodology as I did in calculating Syngenta's 2014 and 2015 lost profits for infringement of the '138 Patent to calculate Syngenta's 2014 – 2017 lost profits for the infringement of the '761 Patent.

---

[213] Prejudgment interest is a rate of interest applied to an award to compensate the injured party, here Syngenta, for the use of its monies between the infringement date and the judgment date.

[214] North Carolina General Assembly, Enacted Legislation, Chapter 24 – Interest. (www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

[215] Even if a generic was able to manufacture azoxystrobin without the '761 Patent, lost profit damages would be no less than the amounts calculated in the prior section for infringement of the '076 and '256 Patents.

Page 40

*Subject to Protective Order*
*Attorneys' Eyes Only*

### 2014 & 2015 "But-For" Gross Profits

*Exhibit 13.c* shows that using the same methodology discussed in Section IV.B for 2014 and 2015, Syngenta suffered lost gross profits of $33.2 million and $55.9 million in 2014 and 2015, respectively from the Defendants' infringement of the '761 Patent.

### 2016 "But-For" Gross Profits

For 2016, I assume that Syngenta would have developed a gross profit for the AZ Products-at-Issue of ███████ ███████ had it realized that it was entitled to exclude Willowood in 2016. As set forth in *Exhibits 13.c and 13.d*, this amount is ██████ ██████ than Syngenta's expected 2015 budget for the AZ Products-at-Issue because Syngenta's latest projection in June 2016 of actual gross profits for all Crop Protection Fungicides was ██████ ██████ than 2015 actual gross profits of those chemicals.

### 2017 "But-for" Gross Profits

As set forth in *Exhibit 13.c*, for 2017, I have assumed that Syngenta would have developed a 2017 expected gross profit budget for the AZ Products-at-Issue of ████████ had it realized that it was entitled to exclude Willowood in 2017. This amount is ████ ████ than Syngenta's expected 2016 gross profits budget for the AZ Products-at-issue because Syngenta's latest June projection in June 2016 of gross profit actuals for all Crop Protection Fungicides ██████ by ████ over actual the 2016 June latest projection.

### Convoyed Sales

Moreover, as discussed above, Syngenta is entitled to lost profit damages related to its convoyed sales of Trivapro A as well as its insecticides and herbicides that are sometimes mixed with the AZ Products-at-Issue. However, I have conservatively excluded these sales from my lost profits analysis. I reserve the right to update this report to reflect Syngenta's lost profit damages related to convoyed sales of Trivapro A as well as its insecticide and herbicide products.

### Incremental Costs

Also, as I discuss above in Section IV.A.4.c, *Exhibit 13.b* shows that Syngenta bore additional incremental costs of ████ of gross profits on sales in 2015. I have conservatively assumed that Syngenta will bear these additional incremental costs in future years, and I also included these costs in all historical years.

### Lost Profits

*Exhibit 13.b* shows that after deducting the additional incremental costs, Syngenta's lost profits from the Defendants' infringement of the '761 Patent in 2014 – 2017 was $33.2 million, $55.8 million, $94.6 million, and $89.8 million, respectively.

As discussed previously, a plaintiff's lost profits damages are not always limited to the infringement period. Assuming the Finder of Fact determines Willowood infringed the '761 Patent, Willowood's infringing actions enabled it to gain access to the azoxystrobin market over 15 years in advance of all other generic manufacturers (given that the '761 patent expires in April 2029) allowing Willowood to obtain significant sales during key months. Although

*Subject to Protective Order*
*Attorneys' Eyes Only*

Willowood obtained a sizeable head start over its generic competitors, I have conservatively limited my damage calculations to the period between 2014 and 2017.

*Exhibit 13.a* displays the losses Syngenta faced due to the Defendants' infringement of the '761 Patent by year and cumulatively.

For the reasons I discuss above, I believe to a reasonable degree of economic certainty that the Defendants caused the losses displayed in *Exhibit 13.a*. However, I recognize that the Finder of Fact may conclude that Cheminova caused some of these losses. *Exhibit 14.a* displays Syngenta's losses due to the Defendants if the Finder of Fact draws such a conclusion. The calculations in *Exhibit 14.a* are identical to those in *Exhibit 13.a*, except that I have proportionally allocated Syngenta's lost gross profits based upon the relative import shares of kilograms of active ingredient of Cheminova and Willowood.[216] This assumption is conservative given Cheminova's limited competitive effects as discussed in Section II.C.2.

Some of the lost profits shown in *Exhibit 13.a* and *Exhibit 14.a* occurred in the past and some will occur in the future. Thus, in *Exhibit 13.a* and *Exhibit 14.a*, I have separately calculated and adjusted Syngenta's lost profits to include prejudgment interest,[217] utilizing North Carolina's statutory prejudgment interest rate of 8.0% simple interest.[218] For ease of analysis, I have calculated prejudgment interest through July 1, 2017 and December 31, 2017. I reserve the right to update these interest calculations as trial approaches.

## D. The Defendants' Unjust Enrichment Arising from their Alleged Copyright Infringement

In this matter, Syngenta alleges that the Defendants copied portions of Syngenta's Quadris Flowable Fungicide label and Syngenta's Quilt Xcel label. These allegedly copied labels were placed on the Defendants' Azoxy 2SC and AzoxyProp Xtra products. As discussed above and confirmed by Dr. Wichert, portions of the labels the Defendants allegedly copied are vital to the underlying product; it is difficult to make product sales without such an effective label.[219] Similarly, Dr. Clark explained that the labels tell Syngenta's story to the grower about how to utilize the fungicide and how the product fits the grower's needs.[220] Using a label that has been copied from another manufacturer also could provide an improper quality assurance to fungicide purchasers. As noted above, Dr. Rogers wrote that "diffusion scholars have found relative advantage to be one of the strongest predictors of an innovation's rate of adoption."[221]

---

[216] This methodology is akin to the proportional allocation of the infringer's sales methodology detailed in State Industries, Inc. v. Mor-flo Industries, Inc. and American Appliance Mfg. Corp., 883 F.2d 1573 (Fed. Cir. 1989).

[217] Prejudgment interest is a rate of interest applied to an award to compensate the injured party, here Syngenta, for the use of its monies between the infringement date and the judgment date.

[218] North Carolina General Assembly, Enacted Legislation, Chapter 24 – Interest. (www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

[219] Deposition of Rex Wichert, dated July 15, 2016, pp. 74-75, 116-117, 197-198, and 257.

[220] Deposition of Adora Clark, dated July 22, 2016, p. 20.

[221] Rogers, Everett M. *Diffusion of Innovations*, 5th Edition, 2003, p. 233 (SYN 290147-55).

Page 42

*Subject to Protective Order*
*Attorneys' Eyes Only*

Drafting a label that indicates to the public that generic products, like the Defendants', have the same characteristics as the branded company's product lessens the relative advantage gap faced by the generic.

It is my understanding that the copying of the labels occurred prior to the Defendants' first sale of Azoxy 2SC on July 12, 2014 and AzoxyProp Xtra on December 29, 2014.[222] I also understand that since the filing of this lawsuit, the Defendants edited their Azoxy 2SC label, which the EPA approved on February 8, 2016, and Defendants also edited their AzoxyProp Xtra label, which the EPA approved on December 10, 2015.[223] I understand that Defendants made these edits in an attempt to avoid infringing on the copyrights of Syngenta's labels and that Syngenta disputes that the edits resolve Defendants' copyright infringement.[224] Regardless, the copyright infringement likely continued after the edited labels were approved because I am not aware of the Defendants recalling products with the infringing labels. Further, the EPA allowed Willowood to distribute the allegedly infringing labels on the Azoxy 2SC product and the AzoxyProp Xtra product in the market for up to 18 months after February 8, 2016 and December 10, 2015, respectively.[225] Consequently, the alleged infringement could cease only when the Defendants' products with the infringing labels are no longer available for sale. For the purpose my analysis, I have conservatively assumed that the copyright infringement will cease on August 8, 2017 for the Azoxy 2SC product labels and on June 10, 2017 for the AzoxyProp Xtra product labels (including the 18-month grace period the Defendants had to remove the allegedly infringing content). I reserve the right to update this assumption upon receipt of new information.

Alternatively, the Finder of Fact could determine that the Defendants garnered all of their technical azoxystrobin, Azoxy 2SC, AzoxyProp Xtra, and Tebustrobin SC sales because of the copyrighted material they copied from Syngenta. *Exhibit 15* displays the Defendants' actual sales of these products through June 13, 2016 as well as the sales of these products I project to make in the second half of 2016 and 2017.[226] As shown in *Exhibit 5*, Willowood produced monthly sales data for Azoxy 2SC and AzoxyProp Xtra through June 13, 2016. To project the sales shown in *Exhibit 15* in 2016, I annualized the 2016 monthly product sales. For 2017, I applied the percentage sales decline projected between 2016 and 2017 as shown in the Willowood USA Management Presentation.[227] I conservatively do not project sales of technical azoxystrobin and Tebustrobin SC. Willowood's sales (and profits) would be larger in *Exhibit 15* if I considered future technical azoxystrobin and Tebustrobin SC sales.

---

[222] Willowood Sales Data.

[223] EPA Approval of Azoxy 2SC Label Amendment, dated February 8, 2016 (SYN 289460-524); EPA Approval of AzoxyProp Xtra Label Amendment, dated December 10, 2015 (WW021447).

[224] Submission of AzoxyProp Xtra Label Amendment, dated May 21, 2015 (WW018540).

[225] EPA Approval of Azoxy 2SC Label Amendment, dated February 8, 2016 (SYN 289460-524); EPA Approval of AzoxyProp Xtra Label Amendment, dated December 10, 2015 (WW021447); 40 C.F.R. §152.130(c) (permitting registrants to use previously approved labeling for a period of 18 months after approval of voluntarily amended label); Existing Stocks Policy, 56 Fed. Reg. 29362.

[226] Tebustrobin sales go through July 20, 2016.

[227] Willowood USA Management Presentation (WW026503).

*Subject to Protective Order*
*Attorneys' Eyes Only*

Similar to Syngenta, Willowood sells herbicides and insecticides that growers can mix with its azoxystrobin products.[228] Therefore, if Willowood unjustly obtained azoxystrobin sales, it likely also unjustly obtained sales of other insecticide and herbicide products. I have conservatively excluded these convoyed sales from my damage analysis. However, I reserve the right to update this report to incorporate such sales.

*Exhibit 15* shows the technical azoxystrobin, Azoxy 2SC, AzoxyProp Xtra, and Tebustrobin SC sales that the Defendants unjustly received, by year and cumulatively, because of their alleged copyright infringement for 2014 through 2017. I reserve the right to update these calculations upon receipt of new information and for the passage of time.

Even though the Defendants have the burden of proof, I have estimated the costs that the Defendants incurred to make the sales listed in *Exhibit 15*. In particular, I have applied Willowood's net direct income margin to its Azoxy 2SC and AzoxyProp Xtra infringing sales for 2014 through 2017 to estimate the net profits the Defendants garnered because of their alleged copyright infringement. To estimate profits on technical azoxystrobin and Tebustrobin SC, I have applied Willowood's average annual direct income margin of its Azoxy 2SC and AzoxyProp Xtra products. I reserve the right to update this assumption upon receipt of new information and for the passage of time. *Exhibit 15* displays an estimate of the Defendants' unjust enrichment by year and cumulative.

As set forth in *Exhibit 15*, I have separately calculated and adjusted Willowood's unjust enrichment sales and net profits to include prejudgment interest,[229] utilizing North Carolina's statutory prejudgment interest rate of 8.0% simple interest.[230] For ease of analysis, I have calculated prejudgment interest through July 1, 2017 and December 31, 2017. I reserve the right to update these interest calculations as trial approaches.

## E. Lost Profits from the Defendants' Alleged Copyright Infringement

As I discuss above, the Defendants' alleged copyright infringement commenced before the Defendants' first sale of Azoxy 2SC on July 12, 2014 and AzoxyProp Xtra on December 29, 2014.[231] I have assumed that the alleged infringement ceased on August 8, 2017 for Azoxy 2SC and on June 10, 2017 for AzoxyProp Xtra (18 months after the Defendants modified their labels for these products).[232] Because the alleged infringement ceased over a year after

---

[228] www.willowoodusa.com/products/by-category/.

[229] Prejudgment interest is a rate of interest applied to an award to compensate the injured party, here Syngenta, for the use of its monies between the infringement date and the judgment date.

[230] North Carolina General Assembly, Enacted Legislation, Chapter 24 – Interest. (www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

[231] Willowood Sales Data.

[232] EPA Approval of Azoxy 2SC Label Amendment, dated February 8, 2016 (SYN 289460-524); EPA Approval of AzoxyProp Xtra Label Amendment, dated December 10, 2015 (WW021447); 40 C.F.R. §152.130(c) (permitting registrants to use previously approved labeling for a period of 18 months after approval of voluntarily amended label); Existing Stocks Policy, 56 Fed. Reg. 29362.

Page 44

*Subject to Protective Order*
*Attorneys' Eyes Only*

Syngenta's '138 Patent expired (December 8, 2015), I have conservatively assumed that the profits Syngenta lost from the Defendants' alleged copyright infringement equals the profits Syngenta lost from the Defendants' alleged infringement of Syngenta's '138 Patent, which I calculated in Section B above.

## F. Summary

*Exhibit 16.a* summarizes the damages results for the infringement claims discussed in Sections A – E above and in *Exhibits 9 – 15.  Exhibit 16.b* displays these damages by year. *Exhibits 16.c and 16.d* display the damages results, after accounting for prejudgment interest through July 1, 2017 and December 31, 2017.

*Exhibits 17.a - 17.d* are similar to *16.a - 16.d* except they conservatively allocate some of Syngenta's losses to Cheminova's actions.

If the Finder of Fact determines that the Defendant is liable for multiple actions, the resulting damages would be the maximum of the losses for the actions deemed to be infringing.

# V.  Conclusion

Syngenta alleges that the Defendants infringed on four of their patents and two of their copyrighted labels.  These alleged actions allowed the Defendants to enter the industry prematurely.  Syngenta, other branded strobilurin manufacturers, and other generic azoxystrobin manufacturers reacted to the Defendants' actions, which lowered Syngenta's profits and enriched the Defendants.

As detailed in this Report, if the Finder of Fact determines the Defendants' actions are improper, I find that Syngenta's damages are between $75.7 million and $273.4 million, with prejudgment interest, damages are between $85.7 million and $297.9 million.  If it is determined that the Defendants infringed on Syngenta's patents, I find that Syngenta's lost profit damages are between $75.7 million and $273.4.2 million ($85.7 million to $297.9 million, with prejudgment interest).  If the Finder of Fact determines that the Defendants infringed on Syngenta's copyrights, the damages would be $135.5 million ($155.3 million with prejudgment interest).

August 19, 2016

_Benjamin S. Wilner, Ph.D._

Benjamin S. Wilner, Ph.D.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**I. Pleadings, Legal Filings**

| Beginning Bates | Ending Bates | Document Description |
| --- | --- | --- |
| - | - | Complaint, dated March 27, 2015 (including exhibits) |
| - | - | Answer of Defendants Willowood, LLC, Willowood USA, LLC and Willowood Azoxystrobin, LLC to the Complaint, dated June 16, 2015 |
| - | - | Answer of Defendant Willowood Limited to the Complaint, dated October 28, 2015 |
| - | - | Defendants' Answers and Objections to Plaintiff's Fourth Set of Interrogatories, dated July 14, 2016 |
| - | - | Defendants' Responses to Syngenta Crop Protection's Third Set of Interrogatories, dated June 2, 2016 |
| - | - | Defendant's Second Supplemental Non-Infringement and Invalidity Contentions, dated June 27, 2016 |
| - | - | Defendant's Responses to Plaintiff's First Set of Requests for Admission (Nos. 1-34), dated July 29, 2016 |
| - | - | Plaintiff Syngenta Crop Protection, LLC's Second Supplemental Infringement Contentions, dated July 2016 |
| - | - | Expert Report of Dr. Joseph M. D. Fortunak, August 19, 2016 |

**II. Deposition Transcripts**

| Beginning Bates | Ending Bates | Document Description |
| --- | --- | --- |
| - | - | Deposition of Rex Wichert, dated July 15, 2016 (including exhibits) |
| - | - | Deposition of Jeff Cecil, dated July 13, 2016 (including exhibits) |
| - | - | Deposition of Brian Heinze, dated August 4, 2016  (including exhibits) |
| - | - | Deposition of Adora Clark, dated July 22, 2016 (including exhibits) |
| - | - | Deposition of Brad Reichman, dated July 25, 2016  (including exhibits) |
| - | - | Deposition of Robert Andrew Fisher, dated July 22, 2016 (including exhibits) |
| - | - | Deposition of Joseph Middione, dated July 26, 2016 (including exhibits) |

**III. Documents Produced by Willowood**

| Beginning Bates | Ending Bates | Document Description |
| --- | --- | --- |
| WW000057 | WW000060 | Willowood AzoxyProp Xtra Sales Summary, January 1, 2014 through December 7, 2015 |
| WW000061 | WW000096 | Willowood Sales Invoices of AzoxyProp Xtra, December 29, 2014 through June 19, 2015 |
| WW000097 | WW000125 | Willowood Sales Invoices of AzoxyProp Xtra, June 19, 2015 through July 27, 2015 |
| WW000126 | WW000133 | Willowood Azoxy 2SC Sales Summary, January 1, 2014 through December 7, 2015 |
| WW000134 | WW000166 | Willowood Sales Invoices of Azoxy 2SC, June 2, 2015 through July 16, 2015 |
| WW000167 | WW000210 | Willowood Sales Invoices of Azoxy 2SC, July 17, 2015 through November 18, 2015 |
| WW010305 | WW010309 | Email between Brian Heinze and Joe Middione on July 8, 2015 |
| WW012046 | WW012046 | Willowood Azoxy 2SC - United Turf Alliance (UTA) Proposal |
| WW018540 | WW018623 | Pyxis Regulatory Consulting Letter to EPA re: Willowood AzoxyProp Xtra Submission of a Non-PRIA Fast Track Label Amendment, dated May 21, 2015 |
| WW020109 | WW020117 | Email from Joseph Middione to Brian Heinze on March 26, 2014 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

## III. Documents Produced by Willowood (Continued)

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| WW021447 | WW021483 | EPA Letter to Pyxis Regulatory Consulting re: Label Amendment for Willowood AzoxyProp Xtra, dated December 10, 2015 |
| WW025053 | WW025053 | Email from Brian Heinze to Joe Middione, et al, on December 23, 2013 |
| WW026223 | WW026237 | |
| WW026255 | WW026273 | |
| WW026277 | WW026279 | Willowood Azoxy 2SC Sales Summary, December 8, 2015 through June 21, 2016 |
| WW026280 | WW026282 | Willowood AzoxyProp Xtra Sales Summary, December 8, 2015 through June 21, 2016 |
| WW026381 | WW026397 | |
| WW026430 | WW026508 | Willowood USA Management Presentation |
| WW026509 | WW026553 | Willowood Sales Invoices of Azoxy 2SC, April 4, 2014 through June 13, 2016 |
| WW026554 | WW026597 | Willowood Sales Invoices of Azoxy 2SC, December 17, 2015 through April 13, 2016 |
| WW026598 | WW026623 | Willowood Sales Invoices of Azoxy 2SC, December 18, 2015 through March 31, 2016 |
| WW026624 | WW026653 | Willowood Sales Invoices of AzoxyProp Xtra, April 5, 2016 through April 29, 2016 |
| WW026654 | WW026686 | Willowood Sales Invoices of AzoxyProp Xtra, May 2, 2016 through June 13, 2016 |
| WW026687 | WW026688 | Willowood Sales Invoices of Azoxy Technical to Invictus, dated April 24, 2015 and December 25, 2015 |
| WW026689 | WW026691 | Willowood Sales Summary & Invoices of Tebustrobin SC to AgXplore II, dated July 18, 2016 and July 20, 2016 |
| WW026692 | WW026692 | Willowood Paid Rebates Summary by Year and Customer, 2014-2016 |

## IV. Documents Produced by Syngenta Crop Protection, LLC

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| SYN 026718 | SYN 026740 | █████████████████████████████ |
| SYN 036816 | SYN 036816 | ████████ ███ ██ ████████ |
| SYN 037154 | SYN 037174 | ████████ ███ ████ |
| SYN 037471 | SYN 037473 | ████████ ███ ██ ██ ██████ |
| SYN 038212 | SYN 038213 | ████████ ███ ██ ██████ |
| SYN 038709 | SYN 038709 | ████████ ██ ██ ███████ |
| SYN 056311 | SYN 056312 | ████████ ███ ██ █████ |
| SYN 058305 | SYN 058306 | █████████████████████████████████ |
| SYN 058805 | SYN 058805 | ████████ ██ ██ ██████ |
| SYN 059143 | SYN 059144 | Email from Matt Heinze to Bret Horner on July 08, 2015 |
| SYN 061003 | SYN 061003 | ████████████ |
| SYN 061668 | SYN 061677 | ███████████████████ |
| SYN 062113 | SYN 062122 | ████████████████████ |
| SYN 134640 | SYN 134642 | ████████ ███ ████ ██████ |
| SYN 279541 | SYN 279569 | Syngenta Quilt Xcel EPA Label |
| SYN 283371 | SYN 283381 | ████████████ |
| SYN 283391 | SYN 283411 | █████████████ |
| SYN 283412 | SYN 283412 | ██████████ |
| SYN 283413 | SYN 283413 | █████████ |

**IV. Documents Produced by Syngenta Crop Protection, LLC (Continued)**

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| SYN 283414 | SYN 283414 | |
| SYN 283415 | SYN 283415 | |
| SYN 283416 | SYN 283416 | |
| SYN 283417 | SYN 283417 | |
| SYN 283425 | SYN 283425 | |
| SYN 283426 | SYN 283426 | |
| SYN 283427 | SYN 283427 | |
| SYN 283428 | SYN 283428 | |
| SYN 283429 | SYN 283429 | |
| SYN 283430 | SYN 283430 | |
| SYN 283431 | SYN 283431 | |
| SYN 283434 | SYN 283434 | |
| SYN 283435 | SYN 283436 | |
| SYN 283437 | SYN 283437 | |
| SYN 283438 | SYN 283438 | |
| SYN 283440 | SYN 283440 | |
| SYN 283441 | SYN 283462 | |
| SYN 283463 | SYN 283463 | |
| SYN 283464 | SYN 283490 | |
| SYN 283492 | SYN 283495 | |
| SYN 283496 | SYN 283496 | |
| SYN 283497 | SYN 283497 | |
| SYN 283498 | SYN 283498 | |
| SYN 283499 | SYN 283499 | |
| SYN 283500 | SYN 283500 | |
| SYN 283501 | SYN 283501 | |
| SYN 283502 | SYN 283502 | |
| SYN 283512 | SYN 283573 | |
| SYN 283574 | SYN 283574 | |
| SYN 283575 | SYN 283586 | |
| SYN 283587 | SYN 283629 | |
| SYN 283674 | SYN 283731 | |
| SYN 283733 | SYN 283798 | |
| SYN 283800 | SYN 283800 | |
| SYN 283802 | SYN 283802 | |
| SYN 283803 | SYN 283803 | |
| SYN 283804 | SYN 283804 | |
| SYN 283805 | SYN 283805 | |
| SYN 284136 | SYN 284173 | |



*Subject to Protective Order*
*Attorneys' Eyes Only*

**IV. Documents Produced by Syngenta Crop Protection, LLC (Continued)**

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| SYN 284174 | SYN 284187 | ███████████████████████████ |
| SYN 284188 | SYN 284201 | ███████████████████████████ |
| SYN 284202 | SYN 284207 | █████████████████████████████ |
| SYN 284208 | SYN 284221 | █████████████████████████ |
| SYN 284222 | SYN 284223 | ██████████████████████████████ |
| SYN 284224 | SYN 284227 | ███████████████████████████████ |
| SYN 284228 | SYN 284237 | ███████████████████████████ |
| SYN 284238 | SYN 284258 | █████████████████████████ |
| SYN 284273 | SYN 284283 | ██████████████████████████ |
| SYN 287740 | SYN 287755 | ████████████████████████ |
| SYN 287756 | SYN 287757 | █████████████████████████████ |
| SYN 287759 | SYN 287759 | ██████████ |
| SYN 287760 | SYN 287760 | ██████████ |
| SYN 287817 | SYN 287817 | ██████████████ |
| SYN 287818 | SYN 287818 | ████████ |
| SYN 287820 | SYN 287820 | █████████████ |
| SYN 289305 | SYN 289315 | United Turf Alliance ArmorTech Zoxy 2 SC EPA label |
| SYN 289316 | SYN 289321 | Albaugh ArmorTech Zoxy-T EPA label |
| SYN 289322 | SYN 289333 | Liberty Crop Protection Liberty 3 Way EPA label |
| SYN 289334 | SYN 289369 | Innvictis Crop Care Trevo EPA label |
| SYN 289375 | SYN 289394 | Innvictis Crop Care Trevo Prop EPA label |
| SYN 289395 | SYN 289431 | Syngenta Callisto EPA Label |
| SYN 289432 | SYN 289459 | Syngenta Zemax EPA Label |
| SYN 289460 | SYN 289524 | EPA Approval of Azoxy 2SC Label Amendment, dated February 8, 2016 |
| SYN 289525 | SYN 289529 | Product Label for #: 74054-7 |
| SYN 289530 | SYN 289586 | Product Label for #: 42750-261 |
| SYN 289587 | SYN 289592 | Product Label for #: 42750-262 |
| SYN 289593 | SYN 289611 | Product Label for #: 42750-284 |
| SYN 289612 | SYN 289636 | Product Label for #: 42750-285 |
| SYN 289637 | SYN 289672 | Product Label for #: 42750-289 |
| SYN 289673 | SYN 289707 | Product Label for #: 42750-290 |
| SYN 289708 | SYN 289721 | Product Label for #: 42750-291 |
| SYN 289722 | SYN 289734 | Product Label for #: 42750-292 |
| SYN 289735 | SYN 289740 | Product Label for #: 42750-297 |
| SYN 289741 | SYN 289747 | Product Label for #: 264-770 |
| SYN 289748 | SYN 289897 | Jackson, Daniel L. and Kedrowski, Kathleen M. "Calculating Intellectual Property Infringement Damages," AICPA, 2013 |
| SYN 289898 | SYN 289972 | Pollack, Richard A., Scott M. Bouchner, Craig M. Enos, Colin A. Johns and John D. Moyl "Calculating Lost Profits" AICPA, 2006 |
| SYN 289973 | SYN 289994 | Product Label for #: 279-3442 |
| SYN 289995 | SYN 290001 | Product Label for #: 4787-65 |

**IV. Documents Produced by Syngenta Crop Protection, LLC (Continued)**

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| SYN 290002 | SYN 290062 | Product Label for #: 67760-124 |
| SYN 290063 | SYN 290097 | Product Label for #: 67760-130 |
| SYN 290098 | SYN 290102 | Product Label for #: 81964-5 |
| SYN 290103 | SYN 290133 | Product Label for #: 53883-343 |
| SYN 290134 | SYN 290146 | Product Label for #: 53883-358 |
| SYN 290147 | SYN 290155 | Rogers, Everett M. Diffusion of Innovations, 5th Edition, 2003 |
| SYN 290156 | SYN 290168 | Product Label for #: 352-840 |
| SYN 290169 | SYN 290185 | Product Label for #: 10163-332 |
| SYN 290186 | SYN 290190 | Product Label for #: 89966-2 |
| SYN 290191 | SYN 290199 | Product Label for #: 71532-34 |
| SYN 290200 | SYN 290270 | Product Label for #: 71532-35 |
| SYN 290271 | SYN 290289 | Product Label for #: 34704-934 |
| SYN 290290 | SYN 290340 | Product Label for #: 34704-1068 |
| SYN 290341 | SYN 290366 | Product Label for #: 66222-250 |
| SYN 290367 | SYN 290372 | Product Label for #: 35935-101 |
| SYN 290373 | SYN 290423 | Product Label for #: 228-720 |
| SYN 290424 | SYN 290494 | Product Label for #: 228-721 |
| SYN 290495 | SYN 290529 | Product Label for #: 228-722 |
| SYN 290530 | SYN 290555 | Product Label for #: 228-724 |
| SYN 290556 | SYN 290572 | Product Label for #: 55146-147 |
| SYN 290573 | SYN 290578 | Product Label for #: 55146-149 |
| SYN 290579 | SYN 290584 | Product Label for #: 55146-150 |
| SYN 290585 | SYN 290614 | Product Label for #: 83529-49 |
| SYN 290615 | SYN 290634 | Product Label for #: 60063-57 |
| SYN 290651 | SYN 290655 | Product Label for #: 100-1140 |
| SYN 290656 | SYN 290695 | Product Label for #: 100-1161 |
| SYN 290696 | SYN 290748 | Product Label for #: 100-1324 |
| SYN 290749 | SYN 290790 | Product Label for #: 100-1466 |
| SYN 290791 | SYN 290829 | Product Label for #: 100-1480 |
| SYN 290830 | SYN 290873 | Product Label for #: 100-1008 |
| SYN 290874 | SYN 290895 | Product Label for #: 100-1178 |
| SYN 290896 | SYN 290935 | Product Label for #: 100-1471 |
| SYN 290936 | SYN 290992 | Product Label for #: 33270-32 |
| SYN 290993 | SYN 291060 | Product Label for #: 89118-3 |
| SYN 291126 | SYN 291184 | Product Label for #: 87290-44 |
| SYN 291185 | SYN 291217 | Product Label for #: 87290-56 |
| SYN 291255 | SYN 291270 | Product Label for #: 67760-129 |
| SYN 291271 | SYN 291271 | ████████████████████ |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**V. Documents Produced by Third Party**

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| ALB 000001 | ALB 0000005 | |
| CPS000001 | CPS000001 | |
| FMC00000001 | FMC0000710 | |
| FMC00000713 | FMC0000715 | |
| GOW-000001 | GOW-000004 | |
| LARIAT00003444 | LARIAT00003445 | |
| LARIAT00004282 | LARIAT00004285 | |
| LARIAT00004341 | LARIAT00004343 | |
| LARIAT00011266 | LARIAT00011269 | |
| LARIAT0001160 | LARIAT0001161 | |
| LARIAT00012925 | LARIAT00012925 | |
| LARIAT00013138 | LARIAT00013138 | |
| LARIAT00013374 | LARIAT00013374 | |
| LPI000001 | LPI000001 | |
| PINN 0001 | PINN 0663 | |
| REI00000001 | REI00000122 | |
| TPS00000005 | TPS00000005 | |
| TPS00000820 | TPS00000821 | |
| TPS00001332 | TPS00001332 | |
| TPS00001550 | TPS00001581 | |
| USI00000294 | USI00000360 | |
| WIN 000001 | WIN 000011 | |
| WIN 000012 | WIN 000012 | |

**VI. Other Information Considered**

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| - | - | U.S. Copyright Registration TX0007992684 (http://www.copyright.gov/records/) |
| - | - | U.S. Copyright Registration TX0007994113 (http://www.copyright.gov/records/) |
| - | - | U.S Trademark Serial Number 85373576 (http://www.uspto.gov/trademarks-application-process/search-trademark-database) |
| - | - | U.S. Patent No. 8,124,761B2 (http://www.uspto.gov/patents-application-process/search-patents) |
| - | - | U.S. Patent No. 5,847,138 (http://www.uspto.gov/patents-application-process/search-patents) |
| - | - | U.S. Patent No. 5,602,076 (http://www.uspto.gov/patents-application-process/search-patents) |
| - | - | U.S. Patent No. 5,633,256 (http://www.uspto.gov/patents-application-process/search-patents) |
| - | - | Syngenta AG Form 20-F, dated February 11, 2016 (http://www4.syngenta.com/~/media/Files/S/Syngenta/media-releases/2015-form-20-f.pdf) |
| - | - | Adama Agricultural Solutions Ltd, Periodic Report for the Year 2015 (http://www.adama.com/en/Images/2015_annual_report_english_tcm15-81671.pdf) |
| - | - | NuFarm Annual Report 2015 (http://www.nufarm.com/Assets/31936/1/NufarmAR2015.pdf) |
| - | - | http://www.syngentacropprotection.com |
| - | - | http://www.syngenta-us.com/labels/quilt |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**VI. Other Information Considered (Continued)**

| Beginning Bates | Ending Bates | Document Description |
|---|---|---|
| - | - | http://www.syngenta-us.com/labels/quadris |
| - | - | http://www.syngenta-us.com/labels/abound-flowable |
| - | - | http://www.syngenta-us.com/labels/trivapro |
| - | - | http://www.syngenta-us.com/crops |
| - | - | http://www.syngentaprofessionalproducts.com/ppmain.aspx |
| - | - | http://www4.syngenta.com/investors/investors-faq |
| - | - | http://www.syngentacropprotection.com/quilt-xcel-fungicide?tab=details |
| - | - | http://www.syngentacropprotection.com/quadris-fungicide?tab=details |
| - | - | http://www.syngenta-us.com/labels/zemax |
| - | - | http://www.syngenta-us.com/labels/callisto |
| - | - | http://www.syngentacropprotection.com/trivapro-fungicide |
| - | - | http://www.syngentacropprotection.com/elatus?tab=details-(solatenol-fungicide-+-azo)-fungicide |
| - | - | http://www.willowoodusa.com/products/fungicides/azoxy-2sc/ |
| - | - | http://www.willowoodusa.com/products/fungicides/azoxyprop-xtra/ |
| - | - | http://www.nordersupply.com/images/e0187101/about.htm |
| - | - | http://www.lgls.com/chemistry/prod/product_view.jsp?ke_gubun=EN&group_code=10&mcategory_seq=18 |
| - | - | http://www.helenachemical.com/about-us/ |
| - | - | http://lanxess.us/en/lanxess-in-the-usa/ |
| - | - | http://www.tide-china.com/en/About.aspx?id=1 |
| - | - | http://www.controlsolutionsinc.com/ |
| - | - | http://www.agprofessional.com/news/Cheminova-launches-Azaka-and-Equation-fungicides-for-US--259126991.html |
| - | - | http://www.gfagrochem.com/aboutus-e.html |
| - | - | http://www.shardausa.com/about |
| - | - | http://www.lgls.com/about/company/business/chemistry.jsp |
| - | - | http://www.nufarm.com/US/AboutUs |
| - | - | http://albaughllc.com/company/ |
| - | - | http://www.fmccrop.com/grower/Products/Fungicides.aspx |
| - | - | http://www.mfa-inc.com/AboutUs.aspx |
| - | - | http://ag.wilburellis.com/Products/Pages/Home.aspx |
| - | - | http://vivecrop.com/products/ |
| - | - | http://vivecrop.com/products/ |
| - | - | http://www.agribusinessglobal.com/uncategorized/product-profile-mesotrione/ |
| - | - | http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=2732461 |
| - | - | http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=117472488 |
| - | - | http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=118748243 |
| - | - | http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=4583604 |
| - | - | http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=41315534. |
| - | - | http://www.bloomberg.com/profiles/companies/0132004D:US-gowan-co-llc |
| - | - | http://www.bloomberg.com/news/articles/2014-09-08/fmc-to-buy-cheminova-for-1-8-billion-as-ceo-modifies-strategy |
| - | - | http://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapId=4321020 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**VI. Other Information Considered (Continued)**

| Beginning Bates | Ending Bates | Document Description |
| --- | --- | --- |
| - | - | http://www.agribusinessglobal.com/agrichemicals/fungicides/product-profile-azoxystrobin/ |
| - | - | http://www.prnewswire.com/news-releases/syngenta-receives-epa-registration-for-breakthrough-fungicide-solatenol-300135791.html |
| - | - | http://www.pinnacleagholdings.com/company/about |
| - | - | http://phx.corporate-ir.net/phoenix.zhtml?c=117919&p=irol-homeProfile&t=&id=& |
| - | - | http://news.agropages.com/News/NewsDetail---7112.htm |
| - | - | http://www.prnewswire.com/news-releases/makhteshim-agan-to-re-brand-global-business-as-adama-242342531.html |
| - | - | https://www.nass.usda.gov/Charts_and_Maps/graphics/data/pricecn.txt |
| - | - | https://www.nass.usda.gov/Charts_and_Maps/graphics/data/pricesb.txt |
| - | - | https://www.nass.usda.gov/Charts_and_Maps/graphics/data/pricewh.txt |
| - | - | http://www.ers.usda.gov/data-products/farm-income-and-wealth-statistics/net-cash-income.aspx |
| - | - | http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf |
| - | - | http://npirspublic.ceris.purdue.edu/ppis/Default.aspx |
| - | - | https://iaspub.epa.gov/apex/pesticides/f?p=PPLS:1 |
| - | - | http://researchinformation.Co.Uk/Pest/2001/B106300F.Pdf |
| - | - | http://www.dupont.com/content/dam/assets/industries/agriculture/assets/cp_PSD-95_K-27702-1.pdf |
| - | - | https://www.pwc.com/gx/en/international-transfer-pricing/assets/itp-2013-final.pdf |
| - | - | EPA's response re: Petition for Extension of the Exclusive Use Data Protection Period for Mesotrione (EPA Reg. No. 100-1140) to June 4, 2014 (www.epa.gov/sites/production/files/2014-04/documents/mesotrione-response.pdf) |
| - | - | http://www.copyright.gov/title17/92chap5.html#504 |
| - | - | https://www.dmreztrak.com/default.aspx |
| - | - | Georgia-Pacific Corp. v. United States Plywood Corp., 318 F.Supp 1116 (S.D.N.Y. 1970), modified, 446 F.2d 295 (Second Cir. 1970), cert. denied, 505 U.S. 870 (1971) |
| - | - | Lucent Techs., Inc. v. Gateway Inc., 580 F.3d 1301 (Fed. Cir. 2009) |
| - | - | Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.. 575 F.2d 1152, 1164 n.11 (6th Cir. 1978) |
| - | - | State Industries, Inc. v. Mor-flo Industries, Inc. and American Appliance Mfg. Corp., 883 F.2d 1573 (Fed. Cir. 1989) |
| - | - | 35 U.S.C. §284 |
| - | - | 40 C.F.R. §152.130(c) |
| - | - | Existing Stocks Policy, 56 Fed. Reg. 29362 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Exhibit 2**



Alvarez & Marsal
**Disputes and Investigations, LLC**
540 West Madison Street – Suite 1800
Chicago, IL 60661
Phone: +1 312 601 4220
Fax: +1 312 332 4599

### Benjamin S. Wilner, Ph.D.
Managing Director – Disputes and Investigations
bwilner@alvarezandmarsal.com

540 West Madison St.
Suite 1800
Chicago, IL 60661
Tel: (312) 470-8450

**Education**
Kellogg Graduate School
of Management,
Northwestern University
Ph.D.
Managerial Economics
and Decision Science

University of
Pennsylvania
BA magna cum laude
with distinction in major
Economics &
Mathematics

London School of
Economics
General Course Degree
Mathematics & Statistics

Dr. Benjamin Wilner has more than twenty years of advisory, valuation, and general economic & financial services experience as a consultant, academic & testifier. He is a Ph.D. economist and statistician who regularly serves as a consultant and testifying expert witness on financial damages, economic & statistical issues.

Dr. Wilner's disputes experience encompasses many industries and a broad range of single plaintiff, class action and criminal disputes including antitrust liability & damages, business interruption, business valuations, economic analyses, intellectual property, labor, lost income, product liability, statistical data analyses, and other corporate and litigation related matters.

In his consulting practice, Dr. Wilner advises corporations and governments on economic and statistical issues. For example, in addition to redesigning statistical aspects of an automobile manufacturer's warranty process, Dr. Wilner received a special commendation from the Commissioner of US Customs & Border Protection for building an economic model to restructure a $2.5 billion tariff, which has won praise by a Cabinet member, Congressional officials, and the industry.

Prior to joining Alvarez & Marsal, Dr. Wilner worked at other multinational consulting firms. He also has been a professor in the business schools at the University of Michigan, University of Iowa, Northwestern University, and the Helsinki School of Economics. Dr. Wilner was a research assistant for a Nobel Prize–winning economist and studied under two other Nobel Laureates. His work has been published in leading academic journals, textbooks and the popular press as well as regularly cited in the academic and popular press. Dr. Wilner won several awards for teaching and research including a grant from the National Science Foundation.

Exhibit 2

**Benjamin S. Wilner, Ph.D.**
**Page 2**

**Testimony before a Trier of Fact**

- Trial Testimony in The People of the State of Illinois v. Ronald A. Pieri, State of Illinois, Circuit Court of Lake County, October 2015

- Trial Testimony in Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, May – June 2012 & July 2015

- Trial Testimony in Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, March 2015

- Trial Testimony in Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, March 2014

- Trial Testimony in Sharon P. Clark, Commissioner of the Kentucky Department of Insurance, in her Capacity as Rehabilitator of AIK Comp v. TransAmerica Insurance Company and TIG Insurance Company, Commonwealth of Kentucky, Franklin Circuit Court, Division Two, October 2012

- Trial Testimony in Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, July 2011

- Trial Testimony in Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, April 2010

- Trial Testimony in Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, November 2009

- Trial Testimony in NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, June 2009

- Arbitration Testimony in Global Link Logistics, Inc., GLL Holdings, Inc., and Golden Gate Logistics, Inc., v. Olympus Growth Fund III, L.P., et al., American Arbitration Association, October 2008

- Arbitration Testimony in Sarah Sanford v. Society of Actuaries & Bruce Schobel, American Arbitration Association, August 2008

- Hearing Testimony in Chinitz v. Chinitz, State of Michigan, Circuit Court for the County of Oakland, May 2008

- Arbitration Testimony in BP Products North America, Inc. v. Laidlaw Educational Services, JAMS Arbitration, October 2007



Exhibit 2

**Benjamin S. Wilner, Ph.D.**
**Page 3**

**Deposition Testimony**

- In re: Hardieplank Fiber Cement Siding Litigation, United States District Court, District of Georgia, February 2016

- In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litigation, United States District Court, Northern District of Georgia, December 2015

- Churchill Downs Incorporated v. Illinois Department of Revenue, Brian Hamer, as Director of The Illinois Department of Revenue, and Dan Rutherford as Treasurer of the State of Illinois, State of Illinois, Circuit Court of Cook County, August 2014

- Victor Tracy, Power of Attorney for Anne Tracy and Victor Tracy, Individually v. Robert K. Erickson, M.D., Lake County Neurosurgery, LLC, Advocate Condell Medical Center, State of Illinois, Circuit Court of Cook County, July 2014

- Marylee Arrigo v. Link Stop, Inc., et al., United States District Court, Western District of Wisconsin, October 2013

- Andrew C. Dillon v. Transportation Solutions Group, LLC, Freight Exchange of North America, LLC, 3PLogic, LLC, Transportation Solutions Enterprises, LLC and Todd Berger, United States District Court, Northern District of Illinois, Eastern Division, September 2013

- Grater, Inc., and James T. Zavacki v. Kevin T. Keating and Keating & Shure, Ltd., State of Illinois, Circuit Court of Cook County, September 2013

- Think Tank Software Development Corporation et al. v. Chester Inc., et al., State of Indiana, County of Porter, February 2012 & October 2009

- Continental Datalabel, Inc. v. Avery Dennison Corporation, United States District Court, Northern District of Illinois, Eastern Division, December 2011

- Ross v. Ross, Circuit Court of the Nineteenth Judicial Circuit, Waukegan, Lake County, Illinois, September 2011

- In re: IKO Roofing Shingle Products Liability Litigation, United States District Court, Central District of Illinois, Urbana Division, August 2011

- Jessica Ellen Legens, et al. v. Mark Alan Ikerman and Manheim Services Corporation, d/b/a Manheim Gateway St. Louis, et al., State of Illinois, Circuit Court of Madison County, November 2010

- Ronald Seymour v. Wausau Signature Agency, et al., United States District Court, Northern District of Illinois, Eastern Division, May 2010

- Neil Simon and Clarissa Simon v. Heritage Title Company, State of Illinois, Circuit Court of Cook County, December 2009



Exhibit 2

**Benjamin S. Wilner, Ph.D.**
**Page 4**

- Mario Vara v. Integra Properties, Inc., Abe Polatsek, S&M Corporation and Michael Strick, State of Illinois, Circuit Court of Cook County, December 2009
- Saint-Gobain Autover USA, Inc., et al. v. Xinyi Glass North America, Inc., et al., United States District Court, Northern District of Ohio, Eastern Division, October 2009
- Sleepy's LLC, v. Select Comfort Wholesale Corporation, et al., United States District Court, Eastern District of New York, July 2009
- Indeck Power Equipment Company v. Professional Power Products, et al., State of Illinois, Circuit Court of Cook County, September 2008
- NSM Music Group, Ltd. and NSM Music, Inc. v. Synergy Law Group and Arthur E. Mertes, State of Illinois, Circuit Court of Cook County, May 2008
- Maria Belbis, et al. v. County of Cook, United States District Court, Northern District of Illinois, Eastern Division, January 2008
- Bucyrus International, Inc. v. Price Erecting Company and Kentucky Rebuild Corp., State of Wisconsin, Circuit Court of Milwaukee County, October 2007
- Mark A. Sindecuse, M.D. v. Dean M. Katsaros, Katsaros & Associates, and CIB Marine Bancshares, Inc., United States District Court, Eastern District of Missouri, Eastern Division, June 2007
- Quentin Bullock et al., v. Michael Sheahan and Cook County, United States District Court, Northern District of Illinois, Eastern Division, September 2006

**Publications**
- "The U.S. Federal Crop Insurance Program in 2012 and Beyond," (with Frank Schnapp) Trébol, July 2013
- "Profitability & Effectiveness of the Federal Crop Insurance Program," (with Laura Carolan & Frank Schnapp), Crop Insurance Today, 44(2), pp. 28 – 32, May 2011
- "Economic and Accounting Analyses in Post-Acquisition Disputes," (with Allen Burt and Matthew Paye) The SRR Journal, Spring 2010
- "Statistical Analyses Relation to Reductions In Force," The SRR Journal, Spring 2009
- "Antitrust Analyses in Horizontal Mergers," (with Thomas R. Jackson) The SRR Journal, Fall 2007
- "Options Backdating: The Latest Corporate Imbroglio," (with Idris Raja) The SRR Journal, Spring 2007 (reprinted on mondaq.com)



Exhibit 2

**Benjamin S. Wilner, Ph.D.**
**Page 5**

- "Multi-Unit Auctions: A Comparison of Static and Dynamic Mechanisms" (with Alejandro Manelli and Martin Sefton), Journal of Economic Behavior and Organization, 61(2), pp. 304 – 323, October 2006
- "The Exploitation of Relationships in Financial Distress: The Case of Trade Credit," Journal of Finance, February 2000
- "Everything you always wanted to know about discounting, but were afraid to ask: A Finance 101 Primer," Credit and Financial Management Review, Summer 1999
- "Paying Your Bills: The Effect of Corporate Quality" September 1996
- Refereed for the American Economic Review, American Real Estate Society, Journal of Finance, the Journal of Business, Finance and Accounting, and John Wiley Publishers

### Professional Memberships
- American Bar Association (Associate Status)
- American Statistical Association
- Credit Research Foundation (Research Fellow)
- National Association of Forensic Economists

### Awards
- National Science Foundation Grant, 1998
- Old Gold Research Fellowship, University of Iowa, Summer 1997
- Outstanding Professor, University of Iowa Panhellenic Council, Fall 1996
- Doctoral Teaching Award, Kellogg Graduate School of Management, 1994





*Subject to Protective Order*
*Attorneys' Eyes Only*



*Subject to Protective Order*
*Attorneys' Eyes Only*

Page 1 of 1

Exhibit 5

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Willowood's Monthly Sales Data Summary**

| Month | Line | Azoxy 2SC [1] | AzoxyProp Xtra [1] | Azoxystrobin Technical [2] | Tebustrobin SC [3] | Total by Month |
|---|---|---|---|---|---|---|
| Jul-14 | 1 | $ 1,584,080 | $ - | $ - | $ - | $ 1,584,080 |
| Aug-14 | 2 | 262,488 | - | - | - | 262,488 |
| Sep-14 | 3 | 74,772 | - | - | - | 74,772 |
| Oct-14 | 4 | 32,000 | - | - | - | 32,000 |
| Nov-14 | 5 | 28,800 | - | - | - | 28,800 |
| Dec-14 | 6 | 2,438,224 | 2,508,680 | - | - | 4,946,904 |
| Jan-15 | 7 | 49,000 | - | - | - | 49,000 |
| Feb-15 | 8 | 370,440 | 39,600 | - | - | 410,040 |
| Mar-15 | 9 | 441,212 | 517,550 | - | - | 958,762 |
| Apr-15 | 10 | 236,204 | 32,400 | 405,000 | - | 673,604 |
| May-15 | 11 | 293,634 | 1,241,140 | - | - | 1,534,774 |
| Jun-15 | 12 | (278,530) | (783,220) | - | - | (1,061,750) |
| Jul-15 | 13 | 1,493,100 | 934,110 | - | - | 2,427,210 |
| Aug-15 | 14 | 208,515 | - | - | - | 208,515 |
| Sep-15 | 15 | 97,070 | - | - | - | 97,070 |
| Oct-15 | 16 | 16,800 | - | - | - | 16,800 |
| Nov-15 | 17 | 65,400 | - | - | - | 65,400 |
| Dec-15 | 18 | 493,020 | 1,043,100 | 1,237,500 | - | 2,773,620 |
| Jan-16 | 19 | 129,840 | 84,600 | - | - | 214,440 |
| Feb-16 | 20 | 90,820 | 806,810 | - | - | 897,630 |
| Mar-16 | 21 | 1,594,057 | 613,615 | - | - | 2,207,672 |
| Apr-16 | 22 | 1,043,175 | 3,502,155 | - | - | 4,545,330 |
| May-16 | 23 | 456,725 | 432,810 | - | - | 889,535 |
| Jun-16 (6/1 - 6/13 for Azoxy 2SC & AzoxyProp Xtra) | 24 | 46,640 | 494,440 | - | - | 541,080 |
| Jul-16 (7/18 & 7/20 for Tebustrobin SC) | 25 | n/a | n/a | n/a | 34,560 | 34,560 |
| **Total** | 26 | $ 11,267,486 | $ 11,467,790 | $ 1,642,500 | $ 34,560 | $ 24,412,336 |
| | | | | | | |
| **Subtotals** | | | | | | |
| **2014 (7/12/14 - 12/31/14)** | 27 | $ 4,420,364 | $ 2,508,680 | $ - | $ - | $ 6,929,044 |
| **2015** | 28 | 3,485,865 | 3,024,680 | 1,642,500 | - | 8,153,045 |
| **2016 (1/1/16 - 7/20/16)** | 29 | 3,361,257 | 5,934,430 | - | 34,560 | 9,330,247 |
| | | | | | | |
| **2016 Annualized** | 30 | $ 7,455,879 | $ 13,163,645 | $ - | $ 34,560 | $ 20,654,084 |

**Notes:**

(1) Per Willowood Sales Data (WW000057-60, WW000126-33, WW0026277-79, WW0026280-82 and Defendants' Answers and Objections to Plaintiff's Fourth Set of Interrogatories, dated July 14, 2016). The 2016 sales for Azoxy 2SC and AzoxyProp Xtra were annualized in line 30 by multiplying the daily average of sales from January 1 through June 13, 2016 and multiplying by the 366 days in 2016.

(2) Per two Willowood USA, LLC sales invoices for Azoxystrobin Technical to Innvictis Crop Care, LLC (WW026687-88). Amounts were not included in the Willowood Sales Data for sales of Azoxy 2SC and AzoxyProp Xtra.

(3) Per two Willowood USA, LLC sales invoices in July 2016 for Tebustrobin SC to AgXplore II (WW026690-91). Amounts were not included in the Willowood Sales Data for sales of Azoxy 2SC and AzoxyProp Xtra. In addition, the 2016 sales of Tebustrobin 2SC were not annualized in line 30 beyond the actual supporting documentation received of sales due to limited history.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**                                                      **Exhibit 6**
**Summary of Syngenta's AZ Products-at-Issue Actual Net Sales and Gross Profits**
*Amounts in thousands*



*Subject to Protective Order*
*Attorneys' Eyes Only*

Case 1:15-cv-00274-CCE-JEP     Document 148-1     Filed 04/10/17     Page 63 of 104

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**  
**Summary of Syngenta's AZ Products-at-Issue Budgeted Net Sales and Gross Profits**  
*Amounts in thousands*

**Exhibit 7**



*Subject to Protective Order*  
*Attorneys' Eyes Only*



**Notes:**
(1) Per http://www.nass.usda.gov and http://www.ers.usda.gov/data-products/farm-income-and-wealth-statistics/net-cash-income.aspx.
(2) Farm Income is forecasted for 2015 and 2016.

**Summary of Syngenta's Lost Profit Damages**
**Assuming Infringement of the '076 and '256 Patents**
*$ in thousands*

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue** | | | | | |
| 2014 | 1 | Exh. 9.b - Line 4 | [a] | $ | 20,020 |
| 2015 | 2 | Exh. 9.b - Line 8 | [b] | | 24,920 |
| 2016 | 3 | Exh. 9.b - Line 12 | [c] | | 15,449 |
| 2017 | 4 | Exh. 9.b - Line 16 | [d] | | 15,275 |
| **Total** | **5** | | **[e] = [a] + [b] + [c] + [d]** | **$** | **75,663** |

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Cumulative Lost Profits of AZ Products-at-Issue** | | | | | |
| 2014 | 6 | | [f] = [a] | $ | 20,020 |
| 2015 | 7 | | [g] = [a] + [b] | | 44,940 |
| 2016 | 8 | | [h] = [a] + [b] + [c] | | 60,388 |
| 2017 | 9 | | [i] = [a] + [b] + [c] + [d] | $ | 75,663 |

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | | |
| 2014 | 10 | See Note 1 & 2 | [j] = [a] + ([a] * 8.0% * 3.0) | $ | 24,825 |
| 2015 | 11 | See Note 1 & 2 | [k] = [b] + ([b] 8.0% * 2.0) | | 28,907 |
| 2016 | 12 | See Note 1 & 2 | [l] = [c] + ([c] * 8.0% * 1.0) | | 16,684 |
| 2017 | 13 | See Note 1 & 2 | [m] = [d] | | 15,275 |
| **Total** | **14** | | **[n] = [j] + [k] + [l] + [m]** | **$** | **85,691** |

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | | |
| 2014 | 15 | | [o] = [j] | $ | 24,825 |
| 2015 | 16 | | [p] = [j] + [k] | | 53,732 |
| 2016 | 17 | | [q] = [j] + [k] + [l] | | 70,416 |
| 2017 | 18 | | [r] = [j] + [k] + [l] + [m] | $ | 85,691 |

**Notes:**

(1) Prejudgment Interest is computed for all historical lost profits through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate (8.0%
simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

(2) If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Lost Profits of AZ
Products-at-Issue with Prejudgment Interest for 2014 through 2017 would equal $25,625, $29,904, $17,302, and $15,886, respectively.

*Subject to Protective Order*
*Attorneys' Eyes Only*

Exhibit 9.b

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" Lost Profits for 2014 - 2017, Net of Incremental Expenses**
**Assuming Infringement of the '076 and '256 Patents**
*$ in thousands*



*Subject to Protective Order*
*Attorneys' Eyes Only*

Case 1:15-cv-00274-CCE-JEP    Document 148-1    Filed 04/10/17    Page 67 of 104

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" and Lost Gross Profits for 2014 - 2017**
**Assuming Infringement of the '076 and '256 Patents**
*$ in thousands*

**Exhibit 9.c**



*Subject to Protective Order*
*Attorneys' Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Mesotrione Benchmark Budget vs. Actual Analysis**
**Assuming Infringement of the '076 and '256 Patents**
*$ in thousands*

Exhibit 9.d



*Subject to Protective Order*
*Attorneys' Eyes Only*

Case 1:15-cv-00274-CCE-JEP     Document 148-1     Filed 04/10/17     Page 69 of 104

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**

**Exhibit 9.e**

**AZ Products-at-Issue: "But For" vs. Actual Incremental Profits** [1,2]

**Assuming Infringement of the '076 and '256 Patents**

*$ in thousands*



*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**    **Exhibit 10.a**
**Summary of Syngenta's Lost Profit Damages**
**Assuming Infringement of the '076 and '256 Patents - Excludes Losses Potentially due to Cheminova**
*$ in thousands*

|  |  |  |  | Losses due to Willowood's Actions |
|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue** | | | | |
|  | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 1 | Exh. 10.b - Line 4 | [a] | $ 14,118 |
| 2015 | 2 | Exh. 10.b - Line 8 | [b] | 13,841 |
| 2016 | 3 | Exh. 10.b - Line 12 | [c] | 3,715 |
| 2017 | 4 | Exh. 10.b - Line 16 | [d] | 2,761 |
| **Total** | **5** | | **[e] = [a] + [b] + [c] + [d]** | **$ 34,435** |

| **Cumulative Lost Profits of AZ Products-at-Issue** | | | | |
|---|---|---|---|---|
|  | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 6 | | [f] = [a] | $ 14,118 |
| 2015 | 7 | | [g] = [a] + [b] | 27,959 |
| 2016 | 8 | | [h] = [a] + [b] + [c] | 31,674 |
| 2017 | 9 | | [i] = [a] + [b] + [c] + [d] | $ 34,435 |

| **Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | |
|---|---|---|---|---|
|  | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 10 | See Note 1 & 2 | [j] = [a] + ([a] * 8.0% * 3.0) | $ 17,506 |
| 2015 | 11 | See Note 1 & 2 | [k] = [b] + ([b] * 8.0% * 2.0) | 16,056 |
| 2016 | 12 | See Note 1 & 2 | [l] = [c] + ([c] * 8.0% * 1.0) | 4,012 |
| 2017 | 13 | See Note 1 & 2 | [m] = [d] | 2,761 |
| **Total** | **14** | | **[n] = [j] + [k] + [l] + [m]** | **$ 40,335** |

| **Cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | |
|---|---|---|---|---|
|  | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 15 | | [o] = [j] | $ 17,506 |
| 2015 | 16 | | [p] = [j] + [k] | 33,562 |
| 2016 | 17 | | [q] = [j] + [k] + [l] | 37,574 |
| 2017 | 18 | | [r] = [j] + [k] + [l] + [m] | 40,335 |

**Notes:**

(1) Prejudgment Interest is computed for all historical lost profits through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate (8.0% simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

(2) If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 would equal $18,071, $16,610, $4,160, and $2,872, respectively.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**                                                                                                    **Exhibit 10.b**
**Syngenta's "But For" Lost Profits for 2014 - 2017, Net of Incremental Expenses**
**Assuming Infringement of the '076 and '256 Patents - Excludes Losses Potentially due to Cheminova**
*$ in thousands*



*Subject to Protective Order*
*Attorneys' Eyes Only*

Syngenta Crop Protection, LLC v. Willowood, LLC, et al.
Syngenta's "But For" and Lost Gross Profits for 2014 - 2017
Assuming Infringement of the '076 and '256 Patents - Excludes Losses Potentially due to Cheminova
*$ in thousands*

Exhibit 10.c

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**                                    **Exhibit 11.a**

**Summary of Syngenta's Lost Profit Damages**

**Assuming Infringement of the '138 Patent**

*$ in thousands*

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue** | | | | | |
| 2014 | 1 | Exh. 11.b - Line 4 | [a] | $ | 33,206 |
| 2015 | 2 | Exh. 11.b - Line 8 | [b] | | 55,802 |
| 2016 | 3 | Exh. 11.b - Line 12 | [c] | | 36,010 |
| 2017 | 4 | Exh. 11.b - Line 16 | [d] | | 10,504 |
| **Total** | **5** | | **[e] = [a] + [b] + [c] + [d]** | **$** | **135,522** |

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Cumulative Lost Profits of AZ Products-at-Issue** | | | | | |
| 2014 | 6 | | [f] = [a] | $ | 33,206 |
| 2015 | 7 | | [g] = [a] + [b] | | 89,007 |
| 2016 | 8 | | [h] = [a] + [b] + [c] | | 125,018 |
| 2017 | 9 | | [i] = [a] + [b] + [c] + [d] | $ | 135,522 |

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | | |
| 2014 | 10 | See Note 1 & 2 | [j] = [a] + ([a] * 8.0% * 3.0) | $ | 41,175 |
| 2015 | 11 | See Note 1 & 2 | [k] = [b] + ([b] * 8.0% * 2.0) | | 64,730 |
| 2016 | 12 | See Note 1 & 2 | [l] = [c] + ([c] * 8.0% * 1.0) | | 38,891 |
| 2017 | 13 | See Note 1 & 2 | [m] = [d] | | 10,504 |
| **Total** | **14** | | **[n] = [j] + [k] + [l] + [m]** | **$** | **155,301** |

| | Line | Source | Formula | | Amount |
|---|---|---|---|---|---|
| **Cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | | |
| 2014 | 15 | | [o] = [j] | $ | 41,175 |
| 2015 | 16 | | [p] = [j] + [k] | | 105,905 |
| 2016 | 17 | | [q] = [j] + [k] + [l] | | 144,796 |
| 2017 | 18 | | [r] = [j] + [k] + [l] + [m] | $ | 155,301 |

**Notes:**

(1) Prejudgment Interest is computed for all historical lost profits through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate (8.0% simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

(2) If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 would equal $42,504, $66,962, $40,332, and $10,925 million, respectively.

(3) Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages are equal to the 2014 damages shown in Line 1 plus 93.7% (342 out of 365 days) of the 2015 damages shown in Line 2. For damages with prejudgment interest as of July 1, 2017, the cumulative damages are equal to the 2014 damages shown in Line 10 plus 93.7% (342 out of 365 days) of the 2015 damages shown in Line 11. If the judgment date was December 31, 2017 for this scenario, the cumulative damages would be 103.2% of the 2014 damages shown in Line 10 and 96.9% of the 2015 damages shown in Line 11.

*Subject to Protective Order*

*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" Lost Profits for 2014 - 2017, Net of Incremental Expenses**
**Assuming Infringement of the '138 Patent**
*$ in thousands*

**Exhibit 11.b**



*Subject to Protective Order*
*Attorneys' Eyes Only*

Case 1:15-cv-00274-CCE-JEP    Document 148-1    Filed 04/10/17    Page 75 of 104

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" and Lost Gross Profits for 2014 - 2017**
**Assuming Infringement of the '138 Patent**
*$ in thousands*

Exhibit 11.c



*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Fungicide Benchmark Budget vs. Actual Analysis**
**Assuming Infringement of the '138 Patent**
*$ in thousands*

**Exhibit 11.d**



*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**AZ Products-at-Issue: "But For" vs. Actual Incremental Profits** [1,2]
**Assuming Infringement of the '138 Patent**
*$ in thousands*

**Exhibit 11.e**

*Subject to Protective Order*
*Attorneys' Eyes Only*

Case 1:15-cv-00274-CCE-JEP     Document 148-1     Filed 04/10/17     Page 78 of 104

**Summary of Syngenta's Lost Profit Damages**
**Assuming Infringement of the '138 Patent - Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

| | | | | Losses due to Willowood's Actions |
|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue** | | | | |
| | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 1 | Exh. 12.b - Line 4 | [a] | $ 23,417 |
| 2015 | 2 | Exh. 12.b - Line 8 | [b] | 32,121 |
| 2016 | 3 | Exh. 12.b - Line 12 | [c] | 10,883 |
| **Total** | **4** | | **[d] = [a] + [b] + [c]** | **$ 66,420** |

| | | | | |
|---|---|---|---|---|
| **Cumulative Lost Profits of AZ Products-at-Issue** | | | | |
| | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 5 | | [e] = [a] | $ 23,417 |
| 2015 | 6 | | [f] = [a] + [b] | 55,537 |
| 2016 | 7 | | [g] = [a] + [b] + [c] | $ 66,420 |

| | | | | |
|---|---|---|---|---|
| **Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | |
| | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 8 | See Note 1 & 2 | [h] = [a] + ([a] * 8.0% * 3.0) | $ 29,037 |
| 2015 | 9 | See Note 1 & 2 | [i] = [b] + ([b] * 8.0% * 2.0) | 37,260 |
| 2016 | 10 | See Note 1 & 2 | [j] = [c] + ([c] * 8.0% * 1.0) | 11,753 |
| **Total** | **11** | | **[k] = [h] + [i] + [j]** | **$ 78,050** |

| | | | | |
|---|---|---|---|---|
| **Cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017** | | | | |
| | **Line** | **Source** | **Formula** | **Amount** |
| 2014 | 12 | | [l] = [h] | $ 29,037 |
| 2015 | 13 | | [m] = [h] + [i] | 66,297 |
| 2016 | 14 | | [n] = [h] + [i] + [j] | 78,050 |

Notes:
(1) Prejudgment Interest is computed for all historical lost profits through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate (8.0% simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).
(2) If the judgment date was December 31, 2017, 4% of each line 1-3 would be added to its corresponding lines 8-10, and the Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2016 would equal $29,973, $38,545, and $12,189, respectively.
(3) Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages are equal to the 2014 damages shown in Line 1 plus 93.7% (342 out of 365 days) of the 2015 damages shown in Line 2. For damages with prejudgment interest as of July 1, 2017, the cumulative damages are equal to the 2014 damages shown in Line 8 plus 93.7% (342 out of 365 days) of the 2015 damages shown in Line 9. If the judgement date was December 31, 2017 for this scenario, the cumulative damages would be 103.2% of the 2014 damages shown in Line 8 and 96.9% of the 2015 damages shown in Line 9.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" Lost Profits for 2014 - 2016, Net of Incremental Expenses**
**Assuming Infringement of the '138 Patent - Excluding Losses Potentially Due to Cheminova**
*$ in thousands*



Exhibit 12.b

*Subject to Protective Order*
*Attorneys' Eyes Only*

Exhibit 12.c

Page 1 of 1

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" and Lost Gross Profits for 2014 - 2016**
**Assuming Infringement of the '138 Patent - Excluding Losses Potentially Due to Cheminova**
*$ in thousands*



*Subject to Protective Order*
*Attorneys' Eyes Only*

**Summary of Syngenta's Lost Profit Damages**
**Assuming Infringement of the '761 Patent**
*$ in thousands*

| Lost Profits of AZ Products-at-Issue | | | | | |
|---|---|---|---|---|---|
| | Line | Source | Formula | | Amount |
| 2014 | 1 | Exh. 13.b - Line 4 | [a] | $ | 33,206 |
| 2015 | 2 | Exh. 13.b - Line 8 | [b] | | 55,802 |
| 2016 | 3 | Exh. 13.b - Line 12 | [c] | | 94,620 |
| 2017 | 4 | Exh. 13.b - Line 16 | [d] | | 89,790 |
| **Total** | **5** | | **[e] = [a] + [b] + [c] + [d]** | **$** | **273,418** |

| Cumulative Lost Profits of AZ Products-at-Issue | | | | | |
|---|---|---|---|---|---|
| | Line | Source | Formula | | Amount |
| 2014 | 6 | | [f] = [a] | $ | 33,206 |
| 2015 | 7 | | [g] = [a] + [b] | | 89,007 |
| 2016 | 8 | | [h] = [a] + [b] + [c] | | 183,627 |
| 2017 | 9 | | [i] = [a] + [b] + [c] + [d] | $ | 273,418 |

| Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017 | | | | | |
|---|---|---|---|---|---|
| | Line | Source | Formula | | Amount |
| 2014 | 10 | See Note 1 & 2 | [j] = [a] + ([a] * 8.0% * 3.0) | $ | 41,175 |
| 2015 | 11 | See Note 1 & 2 | [k] = [b] + ([b] * 8.0% * 2.0) | | 64,730 |
| 2016 | 12 | See Note 1 & 2 | [l] = [c] + ([c] * 8.0% * 1.0) | | 102,189 |
| 2017 | 13 | See Note 1 & 2 | [m] = [d] | | 89,790 |
| **Total** | **14** | | **[n] = [j] + [k] + [l] + [m]** | **$** | **297,885** |

| Cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017 | | | | | |
|---|---|---|---|---|---|
| | Line | Source | Formula | | Amount |
| 2014 | 15 | | [o] = [j] | $ | 41,175 |
| 2015 | 16 | | [p] = [j] + [k] | | 105,905 |
| 2016 | 17 | | [q] = [j] + [k] + [l] | | 208,095 |
| 2017 | 18 | | [r] = [j] + [k] + [l] + [m] | $ | 297,885 |

**Notes:**

(1) Prejudgment Interest is computed for all historical lost profits through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate
    (8.0% simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

(2) If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Lost Profits of AZ
    Products-at-Issue with Prejudgment Interest for 2014 through 2017 would equal $42,504, $66,962, $105,974, and $93,382, respectively.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" Lost Profits for 2014 - 2017, Net of Incremental Expenses**
**Assuming Infringement of the '761 Patent**
*$ in thousands*

**Exhibit 13.b**



*Subject to Protective Order*
*Attorneys' Eyes Only*

Exhibit 13.c

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" and Lost Gross Profits for 2014 - 2017**
**Assuming Infringement of the '761 Patent**
*$ in thousands*



*Subject to Protective Order*
*Attorneys' Eyes Only*



**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**        **Exhibit 13.e**

**AZ Products-at-Issue: "But For" vs. Actual Incremental Profits** [1,2]

**Assuming Infringement of the '761 Patent**

*$ in thousands*



*Subject to Protective Order*

*Attorneys' Eyes Only*

Exhibit 14.a

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Summary of Syngenta's Lost Profit Damages**
**Assuming Infringement of the '761 Patent - Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

| Lost Profits AZ Products-at-Issue | | | | Losses due to Willowood's Actions |
|---|---|---|---|---|
| | Line | Source | Formula | Amount |
| 2014 | 1 | Exh. 14.b - Line 4 | [a] | $ 23,417 |
| 2015 | 2 | Exh. 14.b - Line 8 | [b] | 32,121 |
| 2016 | 3 | Exh. 14.b - Line 12 | [c] | 45,362 |
| 2017 | 4 | Exh. 14.b - Line 16 | [d] | 29,887 |
| **Total** | **5** | | **[e] = [a] + [b] + [c] + [d]** | **$ 130,786** |

| Cumulative Lost Profits of AZ Products-at-Issue | | | | |
|---|---|---|---|---|
| | Line | Source | Formula | Amount |
| 2014 | 6 | | [f] = [a] | $ 23,417 |
| 2015 | 7 | | [g] = [a] + [b] | 55,537 |
| 2016 | 8 | | [h] = [a] + [b] + [c] | 100,899 |
| 2017 | 9 | | [i] = [a] + [b] + [c] + [d] | $ 130,786 |

| Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017 | | | | |
|---|---|---|---|---|
| | Line | Source | Formula | Amount |
| 2014 | 10 | See Note 1 & 2 | [j] = [a] + ([a] * 8.0% * 3.0) | $ 29,037 |
| 2015 | 11 | See Note 1 & 2 | [k] = [b] + ([b] * 8.0% * 2.0) | 37,260 |
| 2016 | 12 | See Note 1 & 2 | [l] = [c] + ([c] * 8.0% * 1.0) | 48,991 |
| 2017 | 13 | See Note 1 & 2 | [m] = [d] | 29,887 |
| **Total** | **14** | | **[n] = [j] + [k] + [l] + [m]** | **$ 145,174** |

| Cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest as of July 1, 2017 | | | | |
|---|---|---|---|---|
| | Line | Source | Formula | Amount |
| 2014 | 15 | | [o] = [j] | $ 29,037 |
| 2015 | 16 | | [p] = [j] + [k] | 66,297 |
| 2016 | 17 | | [q] = [j] + [k] + [l] | 115,288 |
| 2017 | 18 | | [r] = [j] + [k] + [l] + [m] | 145,174 |

**Notes:**

(1) Prejudgment Interest is computed for all historical lost profits through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate (8.0% simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

(2) If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 would equal $29,973, $38,545, $50,806, and $31,082, respectively.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" Lost Profits for 2014 - 2017, Net of Incremental Expenses**
**Assuming Infringement of the '761 Patent - Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

**Exhibit 14.b**



*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Syngenta's "But For" and Lost Gross Profits for 2014 - 2017**
**Assuming Infringement of the '761 Patent - Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

Exhibit 14.c



*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Willowood's Unjust Enrichment Damages - Sales and Net Direct Income**

Exhibit 15

| Year | Line | Source | Formula | Willowood Sales — Azoxy 2SC | AzoxyProp Xtra | Azoxystrobin Technical | Tebustrobin SC | Total Azoxystrobin | Net Direct Income % — Azoxy 2SC | AzoxyProp Xtra | Azoxystrobin Technical | Tebustrobin SC | Net Direct Income — Azoxy 2SC | AzoxyProp Xtra | Azoxystrobin Technical | Tebustrobin SC | Total Azoxystrobin |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | **Unjust Enrichment** | | | | | | | | | | | | | |
| 2014 | 1 | Exhibit 5 - Line 27; See Note 1 | [a] | $ 4,420,364 | $ 2,508,680 | $ - | $ - | $ 6,929,044 | 50.7% | 47.3% | 49.5% | 49.5% | $ 2,242,780 | $ 1,185,479 | $ - | $ - | $ 3,428,259 |
| 2015 | 2 | Exhibit 5 - Line 28; See Note 1 | [b] | 3,485,865 | 3,024,680 | 1,642,500 | - | 8,153,045 | 50.7% | 47.3% | 49.1% | 49.1% | 1,768,639 | 1,429,315 | 806,790 | - | 4,004,745 |
| 2016 | 3 | Exhibit 5 - Line 30; See Note 1 | [c] | 7,455,879 | 13,163,645 | - | 34,560 | 20,654,084 | 55.8% | 48.5% | 51.1% | 51.1% | 4,160,554 | 6,383,330 | - | 17,672 | 10,561,556 |
| 2017 | 4 | See Notes 1, 2 & 5 | [d] | 6,272,406 | 11,074,177 | - | - | 17,346,584 | 55.8% | 48.5% | 51.1% | 51.1% | 3,500,149 | 5,370,103 | - | - | 8,870,252 |
| Total | 5 | | [e] = [a] + [b] + [c] + [d] | $ 21,634,515 | $ 29,771,182 | $ 1,642,500 | $ 34,560 | $ 53,082,757 | | | | | $ 11,672,122 | $ 14,368,227 | $ 806,790 | $ 17,672 | $ 26,864,812 |
| | | | | **Cumulative Unjust Enrichment** | | | | | | | | | | | | | |
| 2014 | 6 | | [f] = [a] | $ 4,420,364 | $ 2,508,680 | $ - | $ - | $ 6,929,044 | | | | | $ 2,242,780 | $ 1,185,479 | $ - | $ - | $ 3,428,259 |
| 2015 | 7 | | [g] = [a] + [b] | 7,906,229 | 5,533,360 | 1,642,500 | - | 15,082,089 | | | | | 4,011,420 | 2,614,795 | 806,790 | - | 7,433,004 |
| 2016 | 8 | | [h] = [a] + [b] + [c] | 15,362,108 | 18,697,005 | 1,642,500 | 34,560 | 35,736,173 | | | | | 8,171,974 | 8,998,124 | 806,790 | 17,672 | 17,994,560 |
| 2017 | 9 | | [i] = [a] + [b] + [c] + [d] | 21,634,515 | 29,771,182 | 1,642,500 | 34,560 | 53,082,757 | | | | | 11,672,122 | 14,368,227 | 806,790 | 17,672 | 26,864,812 |
| | | | | **Unjust Enrichment with Prejudgment Interest as of July 1, 2017** | | | | | | | | | | | | | |
| 2014 | 10 | See Note 3 & 4 | [j] = [a] + ([a] * 8.0% * 3.0) | $ 5,481,251 | $ 3,110,763 | $ - | $ - | $ 8,592,015 | | | | | $ 2,781,048 | $ 1,469,994 | $ - | $ - | $ 4,251,042 |
| 2015 | 11 | See Note 3 & 4 | [k] = [b] + ([b] * 8.0% * 2.0) | 4,043,604 | 3,508,629 | 1,905,300 | - | 9,457,533 | | | | | 2,051,622 | 1,658,006 | 935,876 | - | 4,645,504 |
| 2016 | 12 | See Note 3 & 4 | [l] = [c] + ([c] * 8.0% * 1.0) | 8,052,349 | 14,216,736 | - | 37,325 | 22,306,411 | | | | | 4,493,398 | 6,893,996 | - | 19,086 | 11,406,481 |
| 2017 | 13 | See Note 3, 4 & 5 | [m] = [d] | 6,272,406 | 11,074,177 | - | - | 17,346,584 | | | | | 3,500,149 | 5,370,103 | - | - | 8,870,252 |
| Total | 14 | | [n] = [j] + [k] + [l] + [m] | $ 23,849,611 | $ 31,910,306 | $ 1,905,300 | $ 37,325 | $ 57,702,541 | | | | | $ 12,826,216 | $ 15,392,099 | $ 935,876 | $ 19,086 | $ 29,173,278 |
| | | | | **Cumulative Unjust Enrichment with Prejudgment Interest as of July 1, 2017** | | | | | | | | | | | | | |
| 2014 | 15 | | [o] = [j] | $ 5,481,251 | $ 3,110,763 | $ - | $ - | $ 8,592,015 | | | | | $ 2,781,048 | $ 1,469,994 | $ - | $ - | $ 4,251,042 |
| 2015 | 16 | | [p] = [j] + [k] | 9,524,855 | 6,619,392 | 1,905,300 | - | 18,049,547 | | | | | 4,832,669 | 3,128,000 | 935,876 | - | 8,896,545 |
| 2016 | 17 | | [q] = [j] + [k] + [l] | 17,577,205 | 20,836,128 | 1,905,300 | 37,325 | 40,355,958 | | | | | 9,326,068 | 10,021,996 | 935,876 | 19,086 | 20,303,026 |
| 2017 | 18 | | [r] = [j] + [k] + [l] + [m] | 23,849,611 | 31,910,306 | 1,905,300 | 37,325 | 57,702,541 | | | | | 12,826,216 | 15,392,099 | 935,876 | 19,086 | 29,173,278 |

**Notes:**

(1) Per the Azoxystrobin 2SC and AzoxyProp Xtra profit & loss statements for the periods of 'first sale through 2015' and 'Jan 2016-May 2016' included as the Response to Interrogatory No. 21 in the Defendants' Answers and Objections to Plaintiff's Fourth Set of Interrogatories. The Net Direct Income percentage was calculated as the Net Direct Income divided by the gross revenue for Azoxystrobin 2SC and AzoxyProp Xtra. For Azoxystrobin 2SC and AzoxyProp Xtra, the Net Direct Income percentage for the 'first sale through end of 2015' was utilized for 2014 and 2015, and the Net Direct Income percentage for 'Jan 2016-May 2016' was utilized as an estimate for the remainder of 2016 and 2017. For Azoxystrobin Technical and Tebustrobin SC, no product-specific profit & loss statement was provided. Therefore, I estimated the Net Direct Income percentage for Azoxystrobin Technical and Tebustrobin SC by utilizing the weighted average Net Direct Income percentage of Azoxystrobin 2SC and AzoxyProp Xtra for each year.

(2) Per the Willowood USA Management Presentation, Sales and Margins by Product (WW026503), the azoxystrobin sales were projected to decline by 15.9% from 2016 to 2017. Therefore, I applied that same percentage decline to the 2016 sales (line 3 above) to estimate the product sales for 2017. However, I conservatively did not project any 2017 sales for Tebustrobin SC due to limited sales history.

(3) Prejudgment Interest was computed through July 1, 2017 utilizing North Carolina's statutory prejudgment interest rate (8.0% simple interest; mid-year convention) (http://www.ncleg.net/EnactedLegislation/Statutes/PDF/ByChapter/Chapter_24.pdf).

(4) If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Unjust Enrichment with Prejudgment Interest of Total Willowood Azoxystrobin Sales for 2014 through 2017 would equal $8,869,176, $9,783,654, $23,132,574, and $18,040,447, respectively.

If the judgment date was December 31, 2017, 4% of each line 1-4 would be added to its corresponding lines 10-13, and the Unjust Enrichment with Prejudgment Interest of Total Willowood Azoxystrobin Net Direct Income for 2014 through 2017 would equal $4,388,172, $4,805,693, $11,828,943, and $9,225,062, respectively.

(5) Alternatively, if the Finder of Fact determines infringement ceased 18 months after the EPA approved the Defendants' revised labels, the Defendants' cumulative Azoxy 2SC unjust enrichment without prejudgment interest for the period July 12, 2014 through August 8, 2017 is equal to 2014 through 2016 shown in lines 1 through 3, and 60.3% (220 out of 365 days) of 2017 unjust enrichment shown above on line 4. The Defendant's cumulative AzoxyProp Xtra unjust enrichment without prejudgment interest for the period July 12, 2014 through June 10, 2017 is equal to 2014 through 2016 shown in lines 1 through 3, and 44.1% (161 out of 365 days) of 2017 unjust enrichment for 2017 shown above on line 4. The Defendants' cumulative Azoxystrobin Technical and Tebustrobin SC unjust enrichment without prejudgment interest would remain equal to 2014 through 2016 shown in lines 1 through 3. For all four products without prejudgment interest in this scenario, the cumulative unjust enrichment would be 83.7% of total damages on line 5. For all four products with prejudgment interest as of July 1, 2017 in this scenario, the cumulative unjust enrichment would be 85.0% of total damages on line 14. For all four products with prejudgment interest as of December 31, 2017 in this scenario, the cumulative unjust enrichment would be 88.0% of total damages on line 14.

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Damages Summary - Without Prejudgment Interest**
*$ in thousands*

Exhibit 16.a

| Allegation | Line | Source | A | B | C | D = Max(A or C) | E = Max(A or B) |
|---|---|---|---|---|---|---|---|
| | | | **Total Lost Profits** | **Total Unjust Enrichment Sales** | **Total Unjust Enrichment Profits** | **Conclusion** | |
| **Patent Infringement** | | | | | | | |
| Infringement of the '076 Patent | 1 | Exh. 9.a - Line 9 | $ 75,663 | N/A | N/A | $ 75,663 | $ 75,663 |
| Infringement of the '256 Patent | 2 | Exh. 9.a - Line 9 | 75,663 | N/A | N/A | 75,663 | 75,663 |
| Infringement of the '138 Patent | 3 | Exh. 11.a - Line 9 | 135,522 | N/A | N/A | 135,522 | 135,522 |
| Infringement of the '761 Patent | 4 | Exh. 13.a - Line 9 | 273,418 | N/A | N/A | 273,418 | 273,418 |
| **Infringement of All Patents** | 5 | Exh. 13.a - Line 9 | **$ 273,418** | **N/A** | **N/A** | **$ 273,418** | **$ 273,418** |
| **Copyright Infringement** | | | | | | | |
| Infringement of UCO Reg. No. TX0007992684 (Quadris) - Azoxy 2SC | 6 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | $ 135,522 | $ 21,635 | $ 11,672 | $ 135,522 | $ 135,522 |
| Infringement of UCO Reg. No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra | 7 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | 135,522 | 29,771 | 14,368 | 135,522 | 135,522 |
| Azoxystrobin Technical | 8 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | 135,522 | 1,643 | 807 | 135,522 | 135,522 |
| Tebustrobin SC | 9 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | 135,522 | 35 | 18 | 135,522 | 135,522 |
| **Infringement of Both Registrations** | 10 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | **$ 135,522** | **$ 53,083** | **$ 26,865** | **$ 135,522** | **$ 135,522** |

Note: Column header spanning A, B, C, D, E reads "Without Prejudgment Interest". Column group headers: **A**, **B**, **C**, **D = Max(A or C)**, **E = Max(A or B)**

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Damages Summary by Year - Without Prejudgment Interest**
*$ in thousands*

Exhibit 16.b

| | | | Without Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D = Max(A or C) | E = Max(A or B) |
| | | | Cumulative Lost Profits | Cumulative Unjust Enrichment Sales | Cumulative Unjust Enrichment Profits | Conclusion | |
| Allegation | Line | Source | | | | | |
| **Patent Infringement** | | | | | | | |
| **Infringement of the '076 Patent** | | | | | | | |
| 2014 | 1 | Exh. 9.a - Line 6 | $  20,020 | N/A | N/A | $  20,020 | $  20,020 |
| 2015 | 2 | Exh. 9.a - Line 7 | 44,940 | N/A | N/A | 44,940 | 44,940 |
| 2016 | 3 | Exh. 9.a - Line 8 | 60,388 | N/A | N/A | 60,388 | 60,388 |
| 2017 | 4 | Exh. 9.a - Line 9 | $  75,663 | N/A | N/A | $  75,663 | $  75,663 |
| **Infringement of the '256 Patent** | | | | | | | |
| 2014 | 5 | Exh. 9.a - Line 6 | $  20,020 | N/A | N/A | $  20,020 | $  20,020 |
| 2015 | 6 | Exh. 9.a - Line 7 | 44,940 | N/A | N/A | 44,940 | 44,940 |
| 2016 | 7 | Exh. 9.a - Line 8 | 60,388 | N/A | N/A | 60,388 | 60,388 |
| 2017 | 8 | Exh. 9.a - Line 9 | $  75,663 | N/A | N/A | $  75,663 | $  75,663 |
| **Infringement of the '138 Patent** | | | | | | | |
| 2014 | 9 | Exh. 11.a - Line 6 | $  33,206 | N/A | N/A | $  33,206 | $  33,206 |
| 2015 | 10 | Exh. 11.a - Line 7 [1] | 89,007 | N/A | N/A | 89,007 | 89,007 |
| 2016 | 11 | Exh. 11.a - Line 8 [1] | 125,018 | N/A | N/A | 125,018 | 125,018 |
| 2017 | 12 | Exh. 11.a - Line 9 [1] | $  135,522 | N/A | N/A | $  135,522 | $  135,522 |
| **Infringement of the '761 Patent** | | | | | | | |
| 2014 | 13 | Exh. 13.a - Line 6 | $  33,206 | N/A | N/A | $  33,206 | $  33,206 |
| 2015 | 14 | Exh. 13.a - Line 7 | 89,007 | N/A | N/A | 89,007 | 89,007 |
| 2016 | 15 | Exh. 13.a - Line 8 | 183,627 | N/A | N/A | 183,627 | 183,627 |
| 2017 | 16 | Exh. 13.a - Line 9 | $  273,418 | N/A | N/A | $  273,418 | $  273,418 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Damages Summary by Year - Without Prejudgment Interest**
*$ in thousands*

**Exhibit 16.b**

| | | | Without Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D = Max(A or C) | E = Max(A or B) |
| Allegation | Line | Source | Cumulative Lost Profits | Cumulative Unjust Enrichment Sales | Cumulative Unjust Enrichment Profits | Conclusion | |
| **Copyright Infringement** | | | | | | | |
| **Infringement of UCO Registration No. TX0007992684 (Quadris) - Azoxy 2SC** | | | | | | | |
| 2014 | 17 | Exh. 11.a - Line 6; Exh. 15 - Line 6 | $ 33,206 | $ 4,420 | $ 2,243 | $ 33,206 | $ 33,206 |
| 2015 | 18 | Exh. 11.a - Line 7; Exh. 15 - Line 7 | 89,007 | 7,906 | 4,011 | 89,007 | 89,007 |
| 2016 | 19 | Exh. 11.a - Line 8; Exh. 15 - Line 8 | 125,018 | 15,362 | 8,172 | 125,018 | 125,018 |
| 2017 | 20 | Exh. 11.a - Line 9; Exh. 15 - Line 9 [2] | $ 135,522 | $ 21,635 | $ 11,672 | $ 135,522 | $ 135,522 |
| **Infringement of UCO Registration No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra** | | | | | | | |
| 2014 | 21 | Exh. 11.a - Line 6; Exh. 15 - Line 6 | $ 33,206 | $ 2,509 | $ 1,185 | $ 33,206 | $ 33,206 |
| 2015 | 22 | Exh. 11.a - Line 7; Exh. 15 - Line 7 | 89,007 | 5,533 | 2,615 | 89,007 | 89,007 |
| 2016 | 23 | Exh. 11.a - Line 8; Exh. 15 - Line 8 | 125,018 | 18,697 | 8,998 | 125,018 | 125,018 |
| 2017 | 24 | Exh. 11.a - Line 9; Exh. 15 - Line 9 [2] | $ 135,522 | $ 29,771 | $ 14,368 | $ 135,522 | $ 135,522 |
| **Azoxystrobin Technical** | | | | | | | |
| 2014 | 25 | Exh. 11.a - Line 6; Exh. 15 - Line 6 | $ 33,206 | $ - | $ - | $ 33,206 | $ 33,206 |
| 2015 | 26 | Exh. 11.a - Line 7; Exh. 15 - Line 7 | 89,007 | 1,643 | 807 | 89,007 | 89,007 |
| 2016 | 27 | Exh. 11.a - Line 8; Exh. 15 - Line 8 | 125,018 | 1,643 | 807 | 125,018 | 125,018 |
| 2017 | 28 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | $ 135,522 | $ 1,643 | $ 807 | $ 135,522 | $ 135,522 |
| **Tebustrobin SC** | | | | | | | |
| 2014 | 29 | Exh. 11.a - Line 6; Exh. 15 - Line 6 | $ 33,206 | $ - | $ - | $ 33,206 | $ 33,206 |
| 2015 | 30 | Exh. 11.a - Line 7; Exh. 15 - Line 7 | 89,007 | - | - | 89,007 | 89,007 |
| 2016 | 31 | Exh. 11.a - Line 8; Exh. 15 - Line 8 | 125,018 | 35 | 18 | 125,018 | 125,018 |
| 2017 | 32 | Exh. 11.a - Line 9; Exh. 15 - Line 9 | $ 135,522 | $ 35 | $ 18 | $ 135,522 | $ 135,522 |

**Notes:**

(1) Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages are equal to the 2014 damages shown above in Line 9 (or Exhibit 11.a - Line 1) plus 93.7% (342 out of 365 days) of the 2015 damages shown above as the difference between Line 10 and Line 9 (or Exhibit 11.a - Line 2).

(2) Alternatively, if the Finder of Fact determines infringement ceased 18 months after the EPA approved the Defendants' revised labels, the Defendants' Azoxy 2SC unjust enrichment for the period July 12, 2014 through August 8, 2017 is equal to 2014 through 2016 shown in line 19 (or Exhibit 15 - Lines 1-3), and 60.3% of 2017 unjust enrichment shown above as the difference between Line 20 and Line 19 (or Exhibit 15 - Line 4). The Defendant's AzoxyProp Xtra unjust enrichment for the period July 12, 2014 through June 10, 2017 is equal to 2014 through 2016 shown above in line 23 (or Exhibit 15 - Lines 1-3), and 44.1% of 2017 unjust enrichment for 2017 shown above as the difference between Line 24 and Line 23 (or Exhibit 15 - Line 4). The Defendants' cumulative Azoxystrobin Technical and Tebustrobin SC unjust enrichment without prejudgment interest would remain equal to Lines 27 and 31, respectively. For all four products without prejudgment interest in this scenario, the cumulative unjust enrichment would be 83.7% of total damages, which is the sum of Lines 20, 24, 28, and 32 above (or Exhibit 15 - Line 5).

| | | | Including Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D = Max(A or C) | E = Max(A or B) |
| **Allegation** | **Line** | **Source** | **Total Lost Profits** | **Total Unjust Enrichment Sales** | **Total Unjust Enrichment Profits** | **Conclusion** | |
| **Patent Infringement** | | | | | | | |
| Infringement of the '076 Patent | 1 | Exh. 9.a - Line 18 | $ 85,691 | N/A | N/A | $ 85,691 | $ 85,691 |
| Infringement of the '256 Patent | 2 | Exh. 9.a - Line 18 | 85,691 | N/A | N/A | 85,691 | 85,691 |
| Infringement of the '138 Patent | 3 | Exh. 11.a - Line 18 | 155,301 | N/A | N/A | 155,301 | 155,301 |
| Infringement of the '761 Patent | 4 | Exh. 13.a - Line 18 | 297,885 | N/A | N/A | 297,885 | 297,885 |
| **Infringement of All Patents** | 5 | Exh. 13.a - Line 18 | **$ 297,885** | **N/A** | **N/A** | **$ 297,885** | **$ 297,885** |
| **Copyright Infringement** | | | | | | | |
| Infringement of UCO Reg. No. TX0007992684 (Quadris) - Azoxy 2SC | 6 | Exh. 11.a - Line 9; Exh. 15 - Line 18 | $ 155,301 | $ 23,850 | $ 12,826 | $ 155,301 | $ 155,301 |
| Infringement of UCO Reg. No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra | 7 | Exh. 11.a - Line 9; Exh. 15 - Line 18 | 155,301 | 31,910 | 15,392 | 155,301 | 155,301 |
| Azoxystrobin Technical | 8 | Exh. 11.a - Line 9; Exh. 15 - Line 18 | 155,301 | 1,905 | 936 | 155,301 | 155,301 |
| Tebustrobin SC | 9 | Exh. 11.a - Line 9; Exh. 15 - Line 18 | 155,301 | 37 | 19 | 155,301 | 155,301 |
| **Infringement of Both Registrations** | 10 | Exh. 11.a - Line 9; Exh. 15 - Line 18 | **$ 155,301** | **$ 57,703** | **$ 29,173** | **$ 155,301** | **$ 155,301** |

*Subject to Protective Order*

*Attorneys' Eyes Only*

| | | | Including Prejudgment Interest [3] | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | **A** | **B** | **C** | **D = Max(A or C)** | | **E = Max(A or B)** |
| **Allegation** | **Line** | **Source** | **Cumulative Lost Profits** | **Cumulative Unjust Enrichment Sales** | **Cumulative Unjust Enrichment Profits** | **Conclusion** | | |
| **Patent Infringement** | | | | | | | | |
| **Infringement of the '076 Patent** | | | | | | | | |
| 2014 | 1 | Exh. 9.a - Line 15 | $ 24,825 | N/A | N/A | $ 24,825 | $ | 24,825 |
| 2015 | 2 | Exh. 9.a - Line 16 | 53,732 | N/A | N/A | 53,732 | | 53,732 |
| 2016 | 3 | Exh. 9.a - Line 17 | 70,416 | N/A | N/A | 70,416 | | 70,416 |
| 2017 | 4 | Exh. 9.a - Line 18 | $ 85,691 | N/A | N/A | $ 85,691 | $ | 85,691 |
| **Infringement of the '256 Patent** | | | | | | | | |
| 2014 | 5 | Exh. 9.a - Line 15 | $ 24,825 | N/A | N/A | $ 24,825 | $ | 24,825 |
| 2015 | 6 | Exh. 9.a - Line 16 | 53,732 | N/A | N/A | 53,732 | | 53,732 |
| 2016 | 7 | Exh. 9.a - Line 17 | 70,416 | N/A | N/A | 70,416 | | 70,416 |
| 2017 | 8 | Exh. 9.a - Line 18 | $ 85,691 | N/A | N/A | $ 85,691 | $ | 85,691 |
| **Infringement of the '138 Patent** | | | | | | | | |
| 2014 | 9 | Exh. 11.a - Line 15 | $ 41,175 | N/A | N/A | $ 41,175 | $ | 41,175 |
| 2015 | 10 | Exh. 11.a - Line 16 [1] | 105,905 | N/A | N/A | 105,905 | | 105,905 |
| 2016 | 11 | Exh. 11.a - Line 17 [1] | 144,796 | N/A | N/A | 144,796 | | 144,796 |
| 2017 | 12 | Exh. 11.a - Line 18 [1] | $ 155,301 | N/A | N/A | $ 155,301 | $ | 155,301 |
| **Infringement of the '761 Patent** | | | | | | | | |
| 2014 | 13 | Exh. 13.a - Line 15 | $ 41,175 | N/A | N/A | $ 41,175 | $ | 41,175 |
| 2015 | 14 | Exh. 13.a - Line 16 | 105,905 | N/A | N/A | 105,905 | | 105,905 |
| 2016 | 15 | Exh. 13.a - Line 17 | 208,095 | N/A | N/A | 208,095 | | 208,095 |
| 2017 | 16 | Exh. 13.a - Line 18 | $ 297,885 | N/A | N/A | $ 297,885 | $ | 297,885 |

*Subject to Protective Order*

*Attorneys' Eyes Only*

| | | | | A | | B | | C | | D = Max(A or C) | | E = Max(A or B) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Including Prejudgment Interest [3] | | | | | | |
| Allegation | Line | Source | | Cumulative Lost Profits | | Cumulative Unjust Enrichment Sales | | Cumulative Unjust Enrichment Profits | | Conclusion | | |
| **Copyright Infringement** | | | | | | | | | | | | |
| **Infringement of UCO Registration No. TX0007992684 (Quadris) - Azoxy 2SC** | | | | | | | | | | | | |
| 2014 | 17 | Exh. 11.a - Line 15; Exh. 15 - Line 15 | $ | 41,175 | $ | 5,481 | $ | 2,781 | $ | 41,175 | $ | 41,175 |
| 2015 | 18 | Exh. 11.a - Line 16; Exh. 15 - Line 16 | | 105,905 | | 9,525 | | 4,833 | | 105,905 | | 105,905 |
| 2016 | 19 | Exh. 11.a - Line 17; Exh. 15 - Line 17 | | 144,796 | | 17,577 | | 9,326 | | 144,796 | | 144,796 |
| 2017 | 20 | Exh. 11.a - Line 18; Exh. 15 - Line 18 [2] | $ | 155,301 | $ | 23,850 | $ | 12,826 | $ | 155,301 | $ | 155,301 |
| **Infringement of UCO Registration No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra** | | | | | | | | | | | | |
| 2014 | 21 | Exh. 11.a - Line 15; Exh. 15 - Line 15 | $ | 41,175 | $ | 3,111 | $ | 1,470 | $ | 41,175 | $ | 41,175 |
| 2015 | 22 | Exh. 11.a - Line 16; Exh. 15 - Line 16 | | 105,905 | | 6,619 | | 3,128 | | 105,905 | | 105,905 |
| 2016 | 23 | Exh. 11.a - Line 17; Exh. 15 - Line 17 | | 144,796 | | 20,836 | | 10,022 | | 144,796 | | 144,796 |
| 2017 | 24 | Exh. 11.a - Line 18; Exh. 15 - Line 18 [2] | $ | 155,301 | $ | 31,910 | $ | 15,392 | $ | 155,301 | $ | 155,301 |
| **Azoxystrobin Technical** | | | | | | | | | | | | |
| 2014 | 25 | Exh. 11.a - Line 15; Exh. 15 - Line 15 | $ | 41,175 | $ | - | $ | - | $ | 41,175 | $ | 41,175 |
| 2015 | 26 | Exh. 11.a - Line 16; Exh. 15 - Line 16 | | 105,905 | | 1,905 | | 936 | | 105,905 | | 105,905 |
| 2016 | 27 | Exh. 11.a - Line 17; Exh. 15 - Line 17 | | 144,796 | | 1,905 | | 936 | | 144,796 | | 144,796 |
| 2017 | 28 | Exh. 11.a - Line 18; Exh. 15 - Line 18 | $ | 155,301 | $ | 1,905 | $ | 936 | $ | 155,301 | $ | 155,301 |
| **Tebustrobin SC** | | | | | | | | | | | | |
| 2014 | 29 | Exh. 11.a - Line 15; Exh. 15 - Line 15 | $ | 41,175 | $ | - | $ | - | $ | 41,175 | $ | 41,175 |
| 2015 | 30 | Exh. 11.a - Line 16; Exh. 15 - Line 16 | | 105,905 | | - | | - | | 105,905 | | 105,905 |
| 2016 | 31 | Exh. 11.a - Line 17; Exh. 15 - Line 17 | | 144,796 | | 37 | | 19 | | 144,796 | | 144,796 |
| 2017 | 32 | Exh. 11.a - Line 18; Exh. 15 - Line 18 | $ | 155,301 | $ | 37 | $ | 19 | $ | 155,301 | $ | 155,301 |

*Subject to Protective Order*
*Attorneys' Only*

**Notes:**

(1) (a) Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages with prejudgment interest as of July 1, 2017 are equal to the 2014 damages shown above in Line 9 (or Exhibit 11.a - Line 10) plus 93.7% (342 out of 365 days) of the 2015 damages shown above as the difference between Line 10 and Line 9 (or Exhibit 11.a - Line 11).

   (b) If the judgment date was December 31, 2017 for this scenario, the cumulative damages would be 103.2% of the 2014 damages shown in Line 9 (or Exhibit 11.a - Line 10) and 96.9% of the 2015 damages shown above as the difference between Line 10 and Line 9 (or Exhibit 11.a - Line 11).

(2) (a) Alternatively, if the Finder of Fact determines infringement ceased 18 months after the EPA approved the Defendants' revised labels, the Defendants' Azoxy 2SC unjust enrichment with prejudgment interest as of July 1, 2017 for the period July 12, 2014 through August 8, 2017 is equal to 2014 through 2016 shown in line 19 (or Exhibit 15 - Lines 10-12), and 60.3% of 2017 unjust enrichment shown above as the difference between Line 20 and Line 19 (or Exhibit 15 - Line 13). The Defendant's AzoxyProp Xtra unjust enrichment with prejudgment interest as of July 1, 2017 for the period July 12, 2014 through June 10, 2017 is equal to 2014 through 2016 shown above in line 23 (or Exhibit 15 - Lines 10-12), and 44.1% of 2017 unjust enrichment for 2017 shown above as the difference between Line 24 and Line 23 (or Exhibit 15 - Line 13). The Defendants' cumulative Azoxystrobin Technical and Tebustrobin SC unjust enrichment with prejudgment interest as of July 1, 2017 would remain equal to Line 27 and Line 31, respectively (or Exhibit 15 - Lines 10-12).

   (b) For all four products with prejudgment interest as of July 1, 2017 in this scenario, the cumulative unjust enrichment would be 85.0% of total damages, which is the sum of Lines 20, 24, 28, and 32 above (or Exhibit 15 - Line 14).

   (c) For all four products with prejudgment interest as of December 31, 2017 in this scenario, the cumulative unjust enrichment would be 88.0% of total damages, which is the sum of Lines 20, 24, 28, and 32 above (or Exhibit 15 - Line 14).

(3) (a) For the Infringement of the '076 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 1-4) would equal $25,625, $55,529, $72,831, and $88,717, respectively (See Exhibit 9.a).

   (b) For the Infringement of the '256 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 5-8) would equal $25,625, $55,529, $72,831, and $88,717, respectively (See Exhibit 9.a).

   (c) For the Infringement of the '138 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 9-12) would equal $42,504, $109,465, $149,797, and $160,722, respectively (See Exhibit 11.a).

   (d) For the Infringement of the '761 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 13-16) would equal $42,504, $109,465, $215,440, and $308,822, respectively (See Exhibit 13.a).

   (e) For the Infringement of UCO Registration Nos. TX0007992684 and TX0007994113, if the judgment date was December 31, 2017, the cumulative Unjust Enrichment with Prejudgment Interest of Total Sales for 2014 through 2017 (lines 17-20, 21-24, 25-28, and 29-32) would equal $8,869, $18,653, $41,785, and $59,826, respectively (See Exhibit 15).

   (f) For the Infringement of UCO Registration Nos. TX0007992684 and TX0007994113, if the judgment date was December 31, 2017, the cumulative Unjust Enrichment with Prejudgment Interest of Total Profits for 2014 through 2017 (lines 17-20, 21-24, 25-28, and 29-32) would equal $4,388, $9,194, $21,023, and $30,248, respectively (See Exhibit 15).

*Subject to Protective Order*
*Attorneys' Eyes Only*

| | | | Without Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | **A** | **B** | **C** | **D = Max(A or C)** | **E = Max(A or B)** |
| Allegation | Line | Source | **Total Lost Profits** | **Total Unjust Enrichment Sales** | **Total Unjust Enrichment Profits** | **Conclusion** | |
| **Patent Infringement (Excluding Losses Potentially Due to Cheminova)** | | | | | | | |
| Infringement of the '076 Patent | 1 | Exh. 10.a - Line 9 | $ 34,435 | N/A | N/A | $ 34,435 | $ 34,435 |
| Infringement of the '256 Patent | 2 | Exh. 10.a - Line 9 | 34,435 | N/A | N/A | 34,435 | 34,435 |
| Infringement of the '138 Patent | 3 | Exh. 12.a - Line 7 | 66,420 | N/A | N/A | 66,420 | 66,420 |
| Infringement of the '761 Patent | 4 | Exh. 14.a - Line 9 | 130,786 | N/A | N/A | 130,786 | 130,786 |
| **Infringement of All Patents** | 5 | Exh. 14.a - Line 9 | **$ 130,786** | **N/A** | **N/A** | **$ 130,786** | **$ 130,786** |
| **Copyright Infringement** | | | | | | | |
| Infringement of UCO Reg. No. TX0007992684 (Quadris) - Azoxy 2SC | 6 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | $ 66,420 | $ 21,635 | $ 11,672 | $ 66,420 | $ 66,420 |
| Infringement of UCO Reg. No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra | 7 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | 66,420 | 29,771 | 14,368 | 66,420 | 66,420 |
| Azoxystrobin Technical | 8 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | 66,420 | 1,643 | 807 | 66,420 | 66,420 |
| Tebustrobin SC | 9 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | 66,420 | 35 | 18 | 66,420 | 66,420 |
| **Infringement of Both Registrations** | 10 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | **$ 66,420** | **$ 53,083** | **$ 26,865** | **$ 66,420** | **$ 66,420** |

*Subject to Protective Order*
*Attorneys' Eyes Only*

Page 1 of 1

| | | | Without Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D = Max(A or C) | E = Max(A or B) |
| Allegation | Line | Source | Cumulative Lost Profits | Cumulative Unjust Enrichment Sales | Cumulative Unjust Enrichment Profits | Conclusion | |
| **Patent Infringement (Excluding Losses Potentially Due to Cheminova)** | | | | | | | |
| **Infringement of the '076 Patent** | | | | | | | |
| 2014 | 1 | Exh. 10.a - Line 6 | $ 14,118 | N/A | N/A | $ 14,118 | $ 14,118 |
| 2015 | 2 | Exh. 10.a - Line 7 | 27,959 | N/A | N/A | 27,959 | 27,959 |
| 2016 | 3 | Exh. 10.a - Line 8 | 31,674 | N/A | N/A | 31,674 | 31,674 |
| 2017 | 4 | Exh. 10.a - Line 9 | $ 34,435 | N/A | N/A | $ 34,435 | $ 34,435 |
| **Infringement of the '256 Patent** | | | | | | | |
| 2014 | 5 | Exh. 10.a - Line 6 | $ 14,118 | N/A | N/A | $ 14,118 | $ 14,118 |
| 2015 | 6 | Exh. 10.a - Line 7 | 27,959 | N/A | N/A | 27,959 | 27,959 |
| 2016 | 7 | Exh. 10.a - Line 8 | 31,674 | N/A | N/A | 31,674 | 31,674 |
| 2017 | 8 | Exh. 10.a - Line 9 | $ 34,435 | N/A | N/A | $ 34,435 | $ 34,435 |
| **Infringement of the '138 Patent** | | | | | | | |
| 2014 | 9 | Exh. 12.a - Line 5 | $ 23,417 | N/A | N/A | $ 23,417 | $ 23,417 |
| 2015 | 10 | Exh. 12.a - Line 6 [1] | 55,537 | N/A | N/A | 55,537 | 55,537 |
| 2016 | 11 | Exh. 12.a - Line 7 [1] | 66,420 | N/A | N/A | 66,420 | 66,420 |
| 2017 | 12 | Exh. 12.a - Line 7 [1] | $ 66,420 | N/A | N/A | $ 66,420 | $ 66,420 |
| **Infringement of the '761 Patent** | | | | | | | |
| 2014 | 13 | Exh. 14.a - Line 6 | $ 23,417 | N/A | N/A | $ 23,417 | $ 23,417 |
| 2015 | 14 | Exh. 14.a - Line 7 | 55,537 | N/A | N/A | 55,537 | 55,537 |
| 2016 | 15 | Exh. 14.a - Line 8 | 100,899 | N/A | N/A | 100,899 | 100,899 |
| 2017 | 16 | Exh. 14.a - Line 9 | $ 130,786 | N/A | N/A | $ 130,786 | $ 130,786 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

Exhibit 17.b

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**
**Damages Summary by Year - Without Prejudgment Interest and Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

| | | | Without Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D = Max(A or C) | E = Max(A or B) |
| Allegation | Line | Source | Cumulative Lost Profits | Cumulative Unjust Enrichment Sales | Cumulative Unjust Enrichment Profits | Conclusion | |
| **Copyright Infringement** | | | | | | | |
| **Infringement of UCO Registration No. TX0007992684 (Quadris) - Azoxy 2SC** | | | | | | | |
| 2014 | 17 | Exh. 12.a - Line 5; Exh. 15 - Line 6 | $ 23,417 | $ 4,420 | $ 2,243 | $ 23,417 | $ 23,417 |
| 2015 | 18 | Exh. 12.a - Line 6; Exh. 15 - Line 7 | 55,537 | 7,906 | 4,011 | 55,537 | 55,537 |
| 2016 | 19 | Exh. 12.a - Line 7; Exh. 15 - Line 8 | 66,420 | 15,362 | 8,172 | 66,420 | 66,420 |
| 2017 | 20 | Exh. 12.a - Line 7; Exh. 15 - Line 9 [2] | $ 66,420 | $ 21,635 | $ 11,672 | $ 66,420 | $ 66,420 |
| **Infringement of UCO Registration No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra** | | | | | | | |
| 2014 | 21 | Exh. 12.a - Line 5; Exh. 15 - Line 6 | $ 23,417 | $ 2,509 | $ 1,185 | $ 23,417 | $ 23,417 |
| 2015 | 22 | Exh. 12.a - Line 6; Exh. 15 - Line 7 | 55,537 | 5,533 | 2,615 | 55,537 | 55,537 |
| 2016 | 23 | Exh. 12.a - Line 7; Exh. 15 - Line 8 | 66,420 | 18,697 | 8,998 | 66,420 | 66,420 |
| 2017 | 24 | Exh. 12.a - Line 7; Exh. 15 - Line 9 [2] | $ 66,420 | $ 29,771 | $ 14,368 | $ 66,420 | $ 66,420 |
| **Azoxystrobin Technical** | | | | | | | |
| 2014 | 25 | Exh. 12.a - Line 5; Exh. 15 - Line 6 | $ 23,417 | $ - | $ - | $ 23,417 | $ 23,417 |
| 2015 | 26 | Exh. 12.a - Line 6; Exh. 15 - Line 7 | 55,537 | 1,643 | 807 | 55,537 | 55,537 |
| 2016 | 27 | Exh. 12.a - Line 7; Exh. 15 - Line 8 | 66,420 | 1,643 | 807 | 66,420 | 66,420 |
| 2017 | 28 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | $ 66,420 | $ 1,643 | $ 807 | $ 66,420 | $ 66,420 |
| **Tebustrobin SC** | | | | | | | |
| 2014 | 29 | Exh. 12.a - Line 5; Exh. 15 - Line 6 | $ 23,417 | $ - | $ - | $ 23,417 | $ 23,417 |
| 2015 | 30 | Exh. 12.a - Line 6; Exh. 15 - Line 7 | 55,537 | - | - | 55,537 | 55,537 |
| 2016 | 31 | Exh. 12.a - Line 7; Exh. 15 - Line 8 | 66,420 | 35 | 18 | 66,420 | 66,420 |
| 2017 | 32 | Exh. 12.a - Line 7; Exh. 15 - Line 9 | $ 66,420 | $ 35 | $ 18 | $ 66,420 | $ 66,420 |

**Notes:**

(1) Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages are equal to the 2014 damages shown above in Line 9 (or Exhibit 12.a - Line 1) plus 93.7% (342 out of 365 days) of the 2015 damages shown above as the difference between Line 10 and Line 9 (or Exhibit 12.a - Line 2).

(2) Alternatively, if the Finder of Fact determines infringement ceased 18 months after the EPA approved the Defendants' revised labels, the Defendants' Azoxy 2SC unjust enrichment for the period July 12, 2014 through August 8, 2017 is equal to 2014 through 2016 shown in line 19 (or Exhibit 15 - Lines 1-3), and 60.3% of 2017 unjust enrichment shown above as the difference between Line 20 and Line 19 (or Exhibit 15 - Line 4). The Defendant's AzoxyProp Xtra unjust enrichment for the period July 12, 2014 through June 10, 2017 is equal to 2014 through 2016 shown above in line 23 (or Exhibit 15 - Lines 1-3), and 44.1% of 2017 unjust enrichment for 2017 shown above as the difference between Line 24 and Line 23 (or Exhibit 15 - Line 4). The Defendants' cumulative Azoxystrobin Technical and Tebustrobin SC unjust enrichment without prejudgment interest would remain equal to Lines 27 and 31, respectively. For all four products without prejudgment interest in this scenario, the cumulative unjust enrichment would be 83.7% of total damages, which is the sum of Lines 20, 24, 28, and 32 above (or Exhibit 15 - Line 5).

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Syngenta Crop Protection, LLC v. Willowood, LLC, et al.**

**Exhibit 17.c**

**Damages Summary - Including Prejudgment Interest as of July 1, 2017 and Excluding Losses Potentially Due to Cheminova**

*$ in thousands*

| | | | Including Prejudgment Interest | | | | |
|---|---|---|---|---|---|---|---|
| | | | A | B | C | D = Max(A or C) | E = Max(A or B) |
| Allegation | Line | Source | Total Lost Profits | Total Unjust Enrichment Sales | Total Unjust Enrichment Profits | Conclusion | |
| **Patent Infringement (Excluding Losses Potentially Due to Cheminova)** | | | | | | | |
| Infringement of the '076 Patent | 1 | Exh. 10.a - Line 18 | $ 40,335 | N/A | N/A | $ 40,335 | $ 40,335 |
| Infringement of the '256 Patent | 2 | Exh. 10.a - Line 18 | 40,335 | N/A | N/A | 40,335 | 40,335 |
| Infringement of the '138 Patent | 3 | Exh. 12.a - Line 14 | 78,050 | N/A | N/A | 78,050 | 78,050 |
| Infringement of the '761 Patent | 4 | Exh. 14.a - Line 18 | 145,174 | N/A | N/A | 145,174 | 145,174 |
| **Infringement of All Patents** | 5 | Exh. 14.a - Line 18 | **$ 145,174** | **N/A** | **N/A** | **$ 145,174** | **$ 145,174** |
| **Copyright Infringement** | | | | | | | |
| Infringement of UCO Reg. No. TX0007992684 (Quadris) - Azoxy 2SC | 6 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | $ 78,050 | $ 23,850 | $ 12,826 | $ 78,050 | $ 78,050 |
| Infringement of UCO Reg. No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra | 7 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | 78,050 | 31,910 | 15,392 | 78,050 | 78,050 |
| Azoxystrobin Technical | 8 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | 78,050 | 1,905 | 936 | 78,050 | 78,050 |
| Tebustrobin SC | 9 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | 78,050 | 37 | 19 | 78,050 | 78,050 |
| **Infringement of Both Registrations** | 10 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | **$ 78,050** | **$ 57,703** | **$ 29,173** | **$ 78,050** | **$ 78,050** |

*Subject to Protective Order*
*Attorneys' Eyes Only*

Page 1 of 1

**Damages Summary by Year - Including Prejudgment Interest as of July 1, 2017 and Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

| | | | Including Prejudgment Interest [3] | | | | |
|---|---|---|---|---|---|---|---|
| | | | **A** | **B** | **C** | **D = Max(A or C)** | **E = Max(A or B)** |
| **Allegation** | **Line** | **Source** | **Cumulative Lost Profits** | **Cumulative Unjust Enrichment Sales** | **Cumulative Unjust Enrichment Profits** | **Conclusion** | |
| **Patent Infringement (Excluding Losses Potentially Due to Cheminova)** | | | | | | | |
| **Infringement of the '076 Patent** | | | | | | | |
| 2014 | 1 | Exh. 10.a - Line 15 | $ 17,506 | N/A | N/A | $ 17,506 | $ 17,506 |
| 2015 | 2 | Exh. 10.a - Line 16 | 33,562 | N/A | N/A | 33,562 | 33,562 |
| 2016 | 3 | Exh. 10.a - Line 17 | 37,574 | N/A | N/A | 37,574 | 37,574 |
| 2017 | 4 | Exh. 10.a - Line 18 | $ 40,335 | N/A | N/A | $ 40,335 | $ 40,335 |
| **Infringement of the '256 Patent** | | | | | | | |
| 2014 | 5 | Exh. 10.a - Line 15 | $ 17,506 | N/A | N/A | $ 17,506 | $ 17,506 |
| 2015 | 6 | Exh. 10.a - Line 16 | 33,562 | N/A | N/A | 33,562 | 33,562 |
| 2016 | 7 | Exh. 10.a - Line 17 | 37,574 | N/A | N/A | 37,574 | 37,574 |
| 2017 | 8 | Exh. 10.a - Line 18 | $ 40,335 | N/A | N/A | $ 40,335 | $ 40,335 |
| **Infringement of the '138 Patent** | | | | | | | |
| 2014 | 9 | Exh. 12.a - Line 12 | $ 29,037 | N/A | N/A | $ 29,037 | $ 29,037 |
| 2015 | 10 | Exh. 12.a - Line 13 [1] | 66,297 | N/A | N/A | 66,297 | 66,297 |
| 2016 | 11 | Exh. 12.a - Line 14 [1] | 78,050 | N/A | N/A | 78,050 | 78,050 |
| 2017 | 12 | Exh. 12.a - Line 14 [1] | $ 78,050 | N/A | N/A | $ 78,050 | $ 78,050 |
| **Infringement of the '761 Patent** | | | | | | | |
| 2014 | 13 | Exh. 14.a - Line 15 | $ 29,037 | N/A | N/A | $ 29,037 | $ 29,037 |
| 2015 | 14 | Exh. 14.a - Line 16 | 66,297 | N/A | N/A | 66,297 | 66,297 |
| 2016 | 15 | Exh. 14.a - Line 17 | 115,288 | N/A | N/A | 115,288 | 115,288 |
| 2017 | 16 | Exh. 14.a - Line 18 | $ 145,174 | N/A | N/A | $ 145,174 | $ 145,174 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Damages Summary by Year - Including Prejudgment Interest as of July 1, 2017 and Excluding Losses Potentially Due to Cheminova**

*$ in thousands*

| | | Copyright Infringement | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Infringement of UCO Registration No. TX0007992684 (Quadris) - Azoxy 2SC** | | | | | | | | | | | |
| 2014 | 17 | Exh. 12.a - Line 12; Exh. 15 - Line 15 | $ | 29,037 | $ | 5,481 | $ | 2,781 | $ | 29,037 | $ | 29,037 |
| 2015 | 18 | Exh. 12.a - Line 13; Exh. 15 - Line 16 | | 66,297 | | 9,525 | | 4,833 | | 66,297 | 66,297 |
| 2016 | 19 | Exh. 12.a - Line 14; Exh. 15 - Line 17 | | 78,050 | | 17,577 | | 9,326 | | 78,050 | 78,050 |
| 2017 | 20 | Exh. 12.a - Line 14; Exh. 15 - Line 18 [2] | $ | 78,050 | $ | 23,850 | $ | 12,826 | $ | 78,050 | $ | 78,050 |
| **Infringement of UCO Registration No. TX0007994113 (Quilt Xcel) - AzoxyProp Xtra** | | | | | | | | | | | |
| 2014 | 21 | Exh. 12.a - Line 12; Exh. 15 - Line 15 | $ | 29,037 | $ | 3,111 | $ | 1,470 | $ | 29,037 | $ | 29,037 |
| 2015 | 22 | Exh. 12.a - Line 13; Exh. 15 - Line 16 | | 66,297 | | 6,619 | | 3,128 | | 66,297 | 66,297 |
| 2016 | 23 | Exh. 12.a - Line 14; Exh. 15 - Line 17 | | 78,050 | | 20,836 | | 10,022 | | 78,050 | 78,050 |
| 2017 | 24 | Exh. 12.a - Line 14; Exh. 15 - Line 18 [2] | $ | 78,050 | $ | 31,910 | $ | 15,392 | $ | 78,050 | $ | 78,050 |
| **Azoxystrobin Technical** | | | | | | | | | | | |
| 2014 | 25 | Exh. 12.a - Line 12; Exh. 15 - Line 15 | $ | 29,037 | $ | - | $ | - | $ | 29,037 | $ | 29,037 |
| 2015 | 26 | Exh. 12.a - Line 13; Exh. 15 - Line 16 | | 66,297 | | 1,905 | | 936 | | 66,297 | 66,297 |
| 2016 | 27 | Exh. 12.a - Line 14; Exh. 15 - Line 17 | | 78,050 | | 1,905 | | 936 | | 78,050 | 78,050 |
| 2017 | 28 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | $ | 78,050 | $ | 1,905 | $ | 936 | $ | 78,050 | $ | 78,050 |
| **Tebustrobin SC** | | | | | | | | | | | |
| 2014 | 29 | Exh. 12.a - Line 12; Exh. 15 - Line 15 | $ | 29,037 | $ | - | $ | - | $ | 29,037 | $ | 29,037 |
| 2015 | 30 | Exh. 12.a - Line 13; Exh. 15 - Line 16 | | 66,297 | | - | | - | | 66,297 | 66,297 |
| 2016 | 31 | Exh. 12.a - Line 14; Exh. 15 - Line 17 | | 78,050 | | 37 | | 19 | | 78,050 | 78,050 |
| 2017 | 32 | Exh. 12.a - Line 14; Exh. 15 - Line 18 | $ | 78,050 | $ | 37 | $ | 19 | $ | 78,050 | $ | 78,050 |

*Subject to Protective Order*
*Attorneys' Eyes Only*

**Damages Summary by Year - Including Prejudgment Interest as of July 1, 2017 and Excluding Losses Potentially Due to Cheminova**
*$ in thousands*

**Notes:**

(1) (a) Alternatively, if the Finder of Fact determines infringement ceased December 8, 2015 when the '138 patent expired, then the cumulative damages with prejudgment interest as of July 1, 2017 are equal to the 2014 damages shown above in Line 9 (or Exhibit 12.a - Line 8) plus 93.7% (342 out of 365 days) of the 2015 damages shown above as the difference between Line 10 and Line 9 (or Exhibit 12.a - Line 9).

   (b) If the judgment date was December 31, 2017 for this scenario, the cumulative damages would be 103.2% of the 2014 damages shown in Line 9 (or Exhibit 12.a - Line 8) and 96.9% of the 2015 damages shown above as the difference between Line 10 and Line 9 (or Exhibit 12.a - Line 9).

(2) (a) Alternatively, if the Finder of Fact determines infringement ceased 18 months after the EPA approved the Defendants' revised labels, the Defendants' Azoxy 2SC unjust enrichment for the period July 12, 2014 through August 8, 2017 is equal to 2014 through 2016 shown in line 19 (or Exhibit 15 - Lines 10-12), and 60.3% of 2017 unjust enrichment shown above as the difference between Line 20 and Line 19 (or Exhibit 15 - Line 13). The Defendant's AzoxyProp Xtra unjust enrichment for the period July 12, 2014 through June 10, 2017 is equal to 2014 through 2016 shown above in line 23 (or Exhibit 15 - Lines 10-12), and 44.1% of 2017 unjust enrichment for 2017 shown above as the difference between Line 24 and Line 23 (or Exhibit 15 - Line 13). The Defendants' cumulative Azoxystrobin Technical and Tebustrobin SC unjust enrichment with prejudgment interest as of July 1, 2017 would remain equal to Line 27 and Line 31, respectively (or Exhibit 15 - Lines 10-12).

   (b) For all four products with prejudgment interest as of July 1, 2017 in this scenario, the cumulative unjust enrichment would be 85.0% of total damages, which is the sum of Lines 20, 24, 28, and 32 above (or Exhibit 15 - Line 14).

   (c) For all four products with prejudgment interest as of December 31, 2017 in this scenario, the cumulative unjust enrichment would be 88.0% of total damages, which is the sum of Lines 20, 24, 28, and 32 above (or Exhibit 15 - Line 14).

(3) (a) For the Infringement of the '076 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 1-4) would equal $18,071, $34,680, $38,841, and $41,713, respectively (See Exhibit 10.a).

   (b) For the Infringement of the '256 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 5-8) would equal $18,071, $34,680, $38,841, and $41,713, respectively (See Exhibit 10.a).

   (c) For the Infringement of the '138 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 9-12) would equal $29,973, $68,518, $80,707, and $80,707, respectively (See Exhibit 12.a).

   (d) For the Infringement of the '761 Patent, if the judgment date was December 31, 2017, the cumulative Lost Profits of AZ Products-at-Issue with Prejudgment Interest for 2014 through 2017 (lines 13-16) would equal $29,973, $68,518, $119,324, and $150,406, respectively (See Exhibit 14.a).

   (e) For the Infringement of UCO Registration Nos. TX0007992684 and TX0007994113, if the judgment date was December 31, 2017, the cumulative Unjust Enrichment with Prejudgment Interest of Total Sales for 2014 through 2017 (lines 17-20, 21-24, 25-28, and 29-32) would equal $8,869, $18,653, $41,785, and $59,826, respectively (See Exhibit 15).

   (f) For the Infringement of UCO Registration Nos. TX0007992684 and TX0007994113, if the judgment date was December 31, 2017, the cumulative Unjust Enrichment with Prejudgment Interest of Total Profits for 2014 through 2017 (lines 17-20, 21-24, 25-28, and 29-32) would equal $4,388, $9,194, $21,023, and $30,248, respectively (See Exhibit 15).

*Subject to Protective Order*
*Attorneys' Eyes Only*