# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| SYNGENTA CROP PROTECTION, LLC, ) | |
| ) | |
| Plaintiff, ) | Civil Action No: 1:15-CV-274 |
| ) | |
| v. ) | **CONTAINS INFORMATION** |
| ) | **DESIGNATED AS CONFIDENTIAL** |
| WILLOWOOD, LLC, WILLOWOOD USA, ) | **SUBJECT TO PROTECTIVE** |
| LLC, WILLOWOOD AZOXYSTROBIN, ) | **ORDER** |
| LLC, and WILLOWOOD LIMITED, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFF'S DAMAGES EXPERT, BENJAMIN WILNER**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iv

TABLE OF EXHIBITS ............................................................................................... vi

STATEMENT OF FACTS ............................................................................................ 1

I.      Background ......................................................................................................... 1

        A.      Willowood's Efforts to Gain Early Market Entry ....................................... 1

        B.      Willowood's Actions in the Market Place ................................................... 5

        C.      Syngenta Reactions in the Market Place .................................................... 6

        D.      Limited Impact of Other Market Participants ............................................. 9

        E.      Syngenta's Budgeting .............................................................................. 11

II.     Dr. Wilner's Damages Analysis ....................................................................... 12

        A.      Overview .................................................................................................. 12

        B.      Damages from Infringement of '076 and '256 Compound Patents ........... 14

        C.      Damages from Infringement of '138 Patent ............................................. 16

        D.      Damages from Infringement of '761 Patent .............................................. 18

LEGAL STANDARD ................................................................................................ 19

ARGUMENT ............................................................................................................. 20

I.      Dr. Wilner's Use of Benchmarks to Calculate Lost Profits Is Proper ................ 20

II.     Dr. Wilner's Opinions Are Based on Sufficiently Reliable Benchmarks. ............ 22

        A.      Alleged Budget Variations Do Not Undermine Dr. Wilner's
              Analysis. .................................................................................................. 23

        B.      Dr. Wilner Sufficiently Verified Syngenta's Budgets. .............................. 24

        C.      Dr. Wilner Did Not "Cherry Pick" Any Budgets. ..................................... 25

     D.      Intra-Meso Comparisons Present a Proper Benchmark. .............................26

     E.      Intra-Crop-Protection Comparisons Present a Proper Benchmark. ............28

III.    Dr. Wilner's Damages Opinions with Respect to the '761 Patent Are Properly Based on Willowood's Infringement.......................................................29

IV.    Testimony Regarding Willowood's Statements to the EPA Is Proper Because Those Statements Are Integral to, and Reflective of, Willowood's Willfulness and Attempts to Seek an Early Market Entry. ....................................30

CONCLUSION ...........................................................................................................30

Case 1:15-cv-00274-CCE-JEP    Document 164    Filed 05/01/17    Page 3 of 40

# TABLE OF AUTHORITIES

**Cases**

*Celebrity Cruises Inc. v. Essef Corp.*,
    434 F. Supp. 2d 169 (S.D.N.Y 2006) .................................................................. 21, 23, 24

*Daubert v. Merrill Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ......................................................................................................... 19, 22

*Ericsson, Inc. v. Harris Corp.*,
    352 F.3d 1369 (Fed. Cir. 2003) ......................................................................... 1, 20, 22, 27

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137, 141-42 (1999) ......................................................................................... 19

*Lucent Techs., Inc. v. Gateway Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) .................................................................................... 13

*Minn. Mining & Mfg. Co. v. Johnson & Johnson, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992) ............................................................................... 20, 29

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) .............................................................................. 12, 20, 21

*Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd.*,
    No. 1:13-cv-645, 2016 WL 6839394 (M.D.N.C. Nov. 21, 2016) .......................... 19, 22

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1538 (Fed. Cir. 1995) .......................................................................................... 20

*State Indus., Inc. v. Mor-flo Indus., Inc.*,
    883 F.2d 1573 (Fed. Cir 1989) ....................................................................................... 19

*Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*,
    427 F. Supp. 2d 1022 (D. Kan. 2006) ......................................................................... 24

*SynQor, Inc. Artedyn Techs., Inc.*,
    No. 2:07-cv-497, 2011 WL 3624998 (E.D. Tex. Aug. 17, 2011) ................. 1, 20, 21, 26

*United States v. Baller*,
    519 F.2d 463 (4th Cir. 1975) ....................................................................................... 19, 22

*Victory Records, Inc. v. Virgin Records Am., Inc.*,
  No. 08-cv-3977, 2011 WL 382743 (N.D. Ill. Feb. 3, 2011) ...................................... 21, 24

**Statutes**

35 U.S.C. § 271(a) ......................................................................................... 15, 27

7 U.S.C. § 136a(c)(1)(F) ................................................................................ 15, 27

7 U.S.C. § 136a(c)(2)(D) ..................................................................................... 2

**Rules**

FED. R. EVID. 702 ................................................................................................ 19

# TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Excerpts from the July 13, 2016 deposition transcript of Jeff Cecil ("Cecil Tr.") [CONFIDENTIAL] |
| 2 | Excerpts from the July 15, 2016 deposition transcript of Rex Wichert ("Wichert Tr.") [CONFIDENTIAL] |
| 3 | Excerpts from the July 22, 2016 deposition transcript of Andrew Fisher ("Fisher Tr.") [CONFIDENTIAL] |
| 4 | Excerpts from the July 22, 2016 deposition transcript of Adora Clark ("Clark Tr.") [CONFIDENTIAL] |
| 5 | Excerpts from the July 25, 2016 deposition transcript of Brad Reichman ("Reichman Tr.") |
| 6 | Excerpts from the August 4, 2016 deposition transcript of Brian Heinze ("Heinze Tr.") |
| 7 | Excerpts from the August 23, 2016 deposition transcript of Vijay Mundhra ("Mundhra Tr.") |
| 8 | WW026430-508, Willowood Management Presentation (Plaintiff's Deposition Exhibit ("PDX") 42) [CONFIDENTIAL] |
| 9 | Compilation Willowood emails notifying customers of price change (PDX 43) |
| 10 | Compilation Willowood emails notifying customers of price change (PDX 44) |
| 11 | WW012693 (PDX 48) |
| 12 | WW010580-85 (PDX 58) |
| 13 | WW003071-74 (PDX 78) |
| 14 | WW008930-39 (PDX 79) |
| 15 | WW0011039-45 (PDX 81) |
| 16 | WW025053 |
| 17 | SYN056311-12 [CONFIDENTIAL] |
| 18 | SYN287760 [CONFIDENTIAL] |
| 19 | SYN291271 [CONFIDENTIAL] |
| 20 | SYN283441-62 (Cecil Ex. 1) [CONFIDENTIAL] |

Case 1:15-cv-00274-CCE-JEP    Document 164    Filed 05/01/17    Page 6 of 40

| Exhibit | Description |
|---------|-------------|
| 21 | SYN056120-41 (Cecil Ex. 20) [CONFIDENTIAL] |
| 22 | SYN037154-74 (Cecil Ex. 23) [CONFIDENTIAL] |
| 23 | SYN283503-11 (Wichert Ex. 19) [CONFIDENTIAL] |
| 24 | [RESERVED] |
| 25 | Willowood Azoxy 2SC EPA Registration: EPA Reg. No. 87290-44 (SYN291126) |
| 26 | Willowood AzoxyProp Xtra EPA Registration: EPA Reg. No. 87290-56 (SYN291185) |
| 27 | Albaugh EPA Registrations: EPA Registration Nos. 42750-261 (SYN289530), 42750-262 (SYN289587), 42750-284 (SYN289593), 42750-285 (SYN289612), 42750-289 (SYN289637), 42750-290 (SYN289673), 42750-291 (SYN289708), 42750-292 (SYN289722), and 42750-297 (SYN289735) |
| 28 | Cheminova EPA Registrations: EPA Registration Nos. 67760-124 (SYN290002), 67760-129 (SYN291255), and 67760-130 (SYN290063) |
| 29 | [RESERVED] |
| 30 | Andrew Noel & Jack Kaskey, FMC Buys Cheminova for $1.8 Billion and Revises Breakup Bloomberg News (September 8, 2014), https://www.bloomberg.com/news/articles/2014-09-08/fmc-to-buy-cheminova-for-1-8-billion-as-ceo-modifies-strategy (last visited May 1, 2017) |
| 31 | Willowood USA, Azoxy 2SC, http://www.willowoodusa.com/products/fungicides/azoxy-2sc/ (last visited May 1, 2017) |
| 32 | Willowood USA, AzoxyProp Xtra, http://www.willowoodusa.com/products/fungicides/azoxyprop-xtra/ (last visited May 1, 2017) |
| 33 | Christina D. Romer, the Aftermath of Financial Crises: Each Time Really Is Different, Sir John Hicks Lecture in Economic History (Oxford Univ. Apr. 28, 2015), *available at* http://eml.berkeley.edu/~cromer/Lectures/Romer%20Hicks%20Lecture%20Written%20Version.pdf (last visited May 1, 2017) |
| 34 | Excerpt of National Crop Insurance Sevices, 49 CROP INSURANCE TODAY 2 (May 2016), *available at* http://www.brightcopy.net/allen/cint/may2016/index.php#/0 (last visited May 1, 2017) |

With little background or context, Willowood criticizes Dr. Benjamin Wilner's use of benchmarks in calculating Syngenta's damages, and attempts to characterize the benchmark approach as some sort of obscure practice or wild departure from the norm. Far from the case, both the Federal Circuit and district courts alike have recognized the benchmark approach as a valid method of calculating lost profits in patent cases. *See Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1379-79 (Fed. Cir. 2003) (affirming damages award based on expert's benchmark method); *SynQor, Inc. Artedyn Techs., Inc.*, No. 2:07-cv-497, 2011 WL 3624998, *5 (E.D. Tex. Aug. 17, 2011) (same). Ultimately, Willowood's criticisms, which Syngenta disputes and addresses below,[1] lack merit and, at most, go to the weight of Dr. Wilner's opinions, rather than to their admissibility.

## STATEMENT OF FACTS

### I. Background

1. Syngenta asserts that Willowood LLC ("W-LLC"), Willowood USA, LLC ("W-USA"), Willowood Azoxystrobin, LLC, and Willowood Ltd. ("W-Ltd.") (collectively, "Willowood") infringe U.S. Patent Nos. 5,602,076 ("'076 Patent"), 5,633,256 ("'256 Patent"), 5,847,138 ("'138 Patent), and 8,124,761 ("'761 Patent"). (Dkt. 1 ¶¶ 58-77, 89-108.) The '076 and '256 Patents ("Compound Patents") claim the azoxystrobin compound and expired in February 2014. The '138 (expired December 2015) and the '761 Patent (expires April 2029) claim processes for making azoxystrobin.

### A. Willowood's Efforts to Gain Early Market Entry

2. Willowood sought and obtained EPA approval for its end-use Azoxy 2SC and AzoxyProp Xtra products, which are among the accused products in this case. (Dkt. 1 ¶¶ 36, 56.) Willowood received approval for these products under the so-called

---

[1] Syngenta does not address Willowood's arguments relating to copyright damages, which are moot given this Court's order dismissing the copyright claims. (Dkt. 141.)

1

"Formulator's Exemption" (*id.* ¶¶ 36-41), which provides an expedited registration process that relaxes requirements for data submission to the EPA for formulators who purchase regulated active ingredients from existing, registered sources. 7 U.S.C. § 136a(c)(2)(D). In registering Azoxy 2SC and AzoxyProp Xtra, Willowood falsely represented to the EPA that it qualified as a formulator because it was purportedly sourcing the azoxystrobin active ingredient ("azoxystrobin technical") from Syngenta, when in truth Willowood never even sought to source azoxystrobin from Syngenta. (*Compare* Dkts. 53-4, 53-5, 53-6, 53-7 (identifying Syngenta as its source to EPA), *with* Dkts. 12, 33 at ¶¶ 46-50 (admitting Syngenta was not its source).) Based on Willowood's false statements, the EPA approved Azoxy 2SC and AzoxyProp Xtra on January 6, 2014 and June 11, 2014, respectively. (Exs. 25-26.)

3. Without the Formulator's Exemption, Willowood not have been unable to obtain EPA approval and sell its azoxystrobin products as early as it did. Not only does a company relying on the Formulator's Exemption avoid the time-consuming process of generating health/safety data, but also the EPA approves applications under the Formulator's Exemption more rapidly. (Ex. 4, Clark Tr. at 39:8-42:16, 149:23-151:2.) Thus, the Formulator's Exemption enabled Willowood to speed up its time to market. (*Id.*; Ex. 2, Wichert Tr. at 41:9-43:15.)

4. To utilize the Formulator's Exemption, Willowood still needed to develop the formulations for its end-use products in the first instance and have samples of those products prepared and tested so that it could show the EPA that its products were substantially similar to Syngenta's. Willowood did so by knowingly infringing Syngenta's patents. As this Court held, W-USA infringed Syngenta's Compound Patents by importing five kilograms of azoxystrobin technical into the United States in 2013,

before Syngenta's Compound Patents expired, and knew that its actions likely amounted to infringement. (Dkt. 141 at 4.) During this same timeframe, W-LLC further infringed by commissioning Adjuvants Unlimited ("Adjuvants") to develop formulations for Azoxy 2SC and AzoxyProp Xtra using the imported azoxystrobin, and by commissioning Analytical & Regulatory Chemistry ("ARC") to analyze the resulting formulations in support of Willowood's EPA registrations. (*Id.* at 6.) These infringing activities enabled Willowood to submit early azoxystrobin registrations to the EPA in August 2013 and January 2014, before Syngenta's Compound Patents expired in February 2014.[2] Willowood thereby obtained EPA approval for Azoxy 2SC in January 2014 and AzoxyProp Xtra in June 2014 (Exs. 25-26), much earlier than if it had not infringed Syngenta's patents and submitted its registration without a Formulator's Exemption.

5.     Even with this regulatory head start, Willowood barely made it out of the gates in time to make sales in 2014 and 2015. Azoxystrobin sales generally peak in the fourth quarter of the year as well as in the spring. (Ex. 2, Wichert Tr. at 183:4-16; *see also* Ex. 6, Heinze Tr. at 169:21-170:7 (explaining selling season begins on October 1).) Willowood used a toll manufacturer (Agraform) who formulated Willowood's end-use products and had specific tolling deadlines that Willowood needed to make in order to have its products formulated and available for sale. (Ex. 7, Mundhra Tr. at 150:9-153:15.) In fact, Willowood struggled to ship azoxystrobin to Agraform in order to meet a July 2014 tolling deadline and thus be in a position to sell its end-use products in 2014.

---

[2] Willowood's established relationships with Adjuvants and ARC were critical as Willowood itself touts its ██████████████████████████████████ ███████████████████████ underlying a registration process that Willowood characterized ███████ and taking ████████████████████ whereas other competitors take significantly longer to reach market. (Ex. 6, Heinze Tr. at 119:3-122:12 (discussing Ex. 8 at WW026466).)

3

(*Id.* at 153:19-157:4 (discussing Ex. 13 at WW003071).)  Mr. Brian Heinze, CEO of W-USA, explained in an email that Willowood needed to ship its azoxystrobin by July 2, 2014, stating "[w]e cannot afford to have the toll manufacturer not have the technical to continue the campaign.  If that happens, they will clean out the system, and we will not be able to produce the entire quantity needed for the season."  (Ex. 13 at WW003071.)

6.     Willowood faced another tolling deadline in October 2014 that it also struggled to meet in order to be able to sell products in December 2015.  (Ex. 7, Mundhra Tr. at 163:17-165:8 (discussing Ex. 15 at WW0011039).)  And in November-December 2014, Willowood raced to meet yet another tolling deadline in order to formulate product in time for the spring season that began in March 2015.  (*Id.* at 157:13-160:3 (discussing Ex. 14 at WW008930-31).)  In a November 16, 2014 email, Mr. Mundhra of W-Ltd. explained that "[i]f at all Agraform does not formulate this for us, I do not believe that there is no other formulator in all of USA that can not formulate this product when the main season starts from March."  (Ex. 14 at WW008930-31.)

7.     Given Willowood's own contemporaneous assessments, delays by even a few months would substantially impacted ability to sell in 2014-2015.  Had Willowood waited until after Syngenta's Compound Patents expired to (1) import its azoxystrobin, (2) develop its end-use products, and/or (3) conduct testing the testing to support its EPA registrations, Willowood likely would have missed making azoxystrobin sales in 2014 and the first quarter of 2015, missing most or all of the 2015 growing season.  (Dkt. 149-1 at 10.)  Thus, by infringing Syngenta's Compound Patents (expired February 2014), Willowood gained at least a one-year head start in selling azoxystrobin products.  (*Id.* at 35.)  To the extent Willowood is found to infringe Syngenta's '138 Patent (expired December 2015), Willowood gained at least a two-year head start.  (*Id.* at 39.)

4

## B.     Willowood's Actions in the Market Place

8.     Willowood began marketing its azoxystrobin products in 2013.   For example, as early as March 2013 and leading up to Willowood's product launch in July 2014, Matt Heinze, an Account Manager at W-USA, began emailing potential customers regarding Willowood's upcoming azoxystrobin products that he indicated could be substituted for Syngenta's azoxystrobin products.  (Ex. 6, Heinze Tr. at 152:3-158:4.)  In December 2013, Brian Heinze, W-USA's CEO, emailed colleagues stating that Willowood needed to get partners lined up by early 2014 to sell its azoxystrobin products.   (Ex. 16 at WW025053.)   By June 2014, Willowood had marketed its azoxystrobin products to potential customers and had even provided those customers with information concerning the prices that Willowood would be offering upon launch.  (Ex. 6, Heinze Tr. at 157:13-158:4 (discussing Ex. 11 at WW012693).)  Willowood continued to periodically email customers regarding its azoxystrobin products, informing them of Willowood's price reductions and specifically comparing its products to Syngenta's products, including Quadris®, Abound®, and Quilt Xcel®.   (*Id.* at 150:14-156:6 (discussing Exs. 9-10); Exs. 31-32 (touting that Willowood uses same active ingredients as Quadris® and Quilt Xcel®).)   And Willowood was persistent with its marketing to potential customers, including Syngenta's customers.  (Ex. 17 at SYN056311-12.)

9.     Upon entering the market, Willowood sold its azoxystrobin products at prices lower than Syngenta's, and continued to lower its prices.   For example, Brad Reichman, the General Manager of Reichman Sales, an agricultural chemical distributor that sold both Willowood and Syngenta azoxystrobin products, testified:

> Willowood is just notorious just to—everything they bring in is that product usually goes way down in value when Willowood brings it.  So how they price it I don't know, but it—usually, when Willowood comes in with a product, you know that product is going to the basement floor on pricing.

(Ex. 5, Reichman Tr. at 56:7-57:4.) As Mr. Reichman testified, Willowood was not only selling end-use azoxystrobin products to him at lower-than-Syngenta prices, but was also selling to others at *even lower prices* such that he could not profitably sell Willowood's products. (*Id.* at 51:7-18, 69:5-14.)

10. Brian Heinze testified that as early as October 2014, Willowood was offering Azoxy 2SC at $125 per gallon, well below Syngenta's █████ price at the time on the comparable Quadris® product. (Ex. 6, Heinze Tr. at 160:7-11, 169:4-171:5; Ex. 18, SYN287760.) Mr. Reichman indicated that Willowood also offered a rebate of $25 on sales of Azoxy 2SC, going back to October 2014, which resulted in a net price of $100 per gallon of Azoxy 2SC. (Ex. 5, Reichman Tr. at 67:23-68:11.) And as of January 2016, Willowood was also offering Azoxy 2SC to another company, Innvictis, at $100 per gallon. (Ex. 6, Heinze Dep. at 189:9-12 (discussing Ex. 12).)

11. Willowood also began offering AzoxyProp Xtra at $90 per gallon as early as October 2014, while Syngenta charged █████ for its comparable Quilt Xcel® product. (Ex. 6, Heinze Tr. at 160:12-19; Ex. 18, SYN287760.) According to Mr. Reichman, as early as February 2015, Willowood offered product rebates to Reichman Sales that brought their net price on AzoxyProp Xtra down to around $78-79. (Ex. 5, Reichman Tr. at 70:2-71:19.) On July 8, 2015, despite internal disagreement on price reductions, Willowood reduced its price on AzoxyProp Xtra to $80 per gallon (retroactive to July 1) and communicated this price reduction to all of its customers. (Ex. 6, Heinze Tr. at 152:3-153:5, 173:2-175:16, 180:10-183:20.) Less than ten days later, Willowood offered AzoxyProp Xtra to Innvictis at $76 per gallon. (*Id.* at 184:4-186:10.)

### C. Syngenta Reactions in the Market Place

12. Syngenta did not expect significant generic azoxystrobin entry in 2014,

6

particularly because only the Compound Patents expired in that year while the Process Patents were still in effect through at least 2015 and beyond. To the extent that Syngenta expected generic entry before expiration of the Process Patents, Dr. Rex Wichert, Syngenta's former Post-Patent Strategy Manager, testified that ███████████ ████████████████████████████████████████████████████ ████████████████████████████ (Ex. 2, Wichert Tr. at 34:17-35:22; Dkt. 149-1 at 14.) Accordingly, ███████████████████████ (Dkt 149-1 at Ex. 4; Ex. 19 at SYN291271.)

13. Because Willowood entered the market early and priced its products so low, Syngenta was faced with unexpected early competition from Willowood's generic azoxystrobin products. (Ex. 2, Wichert Tr. at 182:10-23, 242:12-24.) And because Syngenta could not react by quickly altering its pricing, it was selling azoxystrobin in 2014 that the market viewed as being "overpriced." Thus, Syngenta suffered a sales decline in 2014. (Dkt 149-1 at Ex. 4; Ex. 19 at SYN291271.) By late 2014 and 2015, Syngenta recognized the effect Willowood was having on the market and responded by significantly lowering its overall prices, █████████████████████████ █████████████████████ (Ex. 2, Wichert Tr. at 182:10-23, 242:12-24; Dkt. 149-1 at 14-15.) Beyond lowering the prices on existing products, Syngenta also introduced ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (Ex. 1, Cecil Tr. at 35:5-37:24, 39:13-19, Ex. 2, Wichert Tr. at 160:11-161:10, 169:10-16, 176:12-177:13; Ex. 3, Fisher Tr. at 54:3-13, 55:24-60:22, 66:8-67:4; Dkt. 149-1 at 6, 14.)

14. Syngenta additionally had to lower the prices at which it charged private-

7

label customers for azoxystrobin technical. For example, in November 2015, ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ (Ex. 2, Wichert Tr. at 145:5-

148:23, 253:9-254:22.) This reduction was a direct response to lower-priced offers

Willowood made to ███ on the order of ███ per kg. (*Id.*)

     15. In 2016, Syngenta introduced its latest generation fungicides to the United

States, under the brand names Trivapro® and Elatus®, which contain azoxystrobin and

other active ingredients including Solatenol® (benzovindiflupyr). (Dkt. 149-1 at 5-6, 29;

Ex. 2, Wichert Tr. at 197:4-198:11, 200:5-23.) Syngenta also introduced Solatenol®-

based products ██████████████████████████████████████████

████████████████████ (Dkt. 149-1 at 5-6; Ex. 2, Wichert Tr. at 56:25-57:18,

197:4-198:11, 200:5-23; Ex. 3, Fisher Tr. at 53:15-24.)

     16. Syngenta's ████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████████████ (Ex. 2, Wichert Tr. at 56:25-57:18;

Ex. 3, Fisher Tr. at 53:15-24; Ex. 21 at SYN283458; Ex. 22 at SYN056132; Dkt. 149-1 at

6.) Syngenta utilizes the ███████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████ (Ex. 2, Wichert Tr. at 56:25-57:18;

Ex. 3, Fisher Tr. at 53:15-24; Dkt. 149-1 at 6.)

     17. The ████████████████████████████████████████████

████████████████████████████████ (Ex. 2, Wichert Tr. at 176:12-

25.)  For example,  ██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ (Ex. 2, Wichert Tr. at 176:12-25, 197:4-198:11, 200:5-23.)  The addition of

██████████████████████████████████████████████████

██████████████████████████ (Ex. 1, Cecil Tr. at 135:19-136:8; Ex. 2,

Wichert Tr. at 56:25-57:18; Ex. 21 at SYN283458.)  At the same time, Willowood's

conduct forced Syngenta ████████████████████████████████████

███████████████████████████████ (Ex. 1, Cecil Tr. at 36:4-

37:24; Ex. 2, Wichert Tr. at 160:11-161:10, 176:12-25.)  That is, ██████████

████████████████████ ██████ ██████████████████████

██████████████████████████████████████████████████

██████████████████████ (Ex. 2, Wichert Tr. at 176:12-25;

Dkt. 149-1 (████████████████████████████).)  Ultimately, against price

pressure from Willowood, ██████████████████████████████████

████████████████████ (Dkt. 149-1 at 14 n.88.)

### D.  Limited Impact of Other Market Participants

18.  Other generic companies had little (if any) impact on Syngenta's

azoxystrobin pricing and sales.  For example, import records show that only two generic

companies, Albaugh and Cheminova, had any azoxystrobin imports.  (Ex. 23 at

SYN283506.)  Albaugh received EPA approval for a generic azoxystrobin product only

after Willowood's market entry.  (Ex. 27.)  Syngenta ███████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████ (Ex. 2, Wichert Tr. at 66:25-67:7, 75:7-12, 262:14-263:2.)  Also, Albaugh's main

9

application for its azoxystrobin products ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████ (Ex. 3, Fisher Tr. at 90:2-8, 129:3-6.) Nor was Albaugh the lowest-priced generic provider of azoxystrobin. For instance, in November 2015, Albaugh's quoted price for azoxystrobin was almost 30% higher than Willowood's quoted price. (Ex. 1, Cecil Tr. at 154:8-155:6.)

19. Cheminova also had little (if any) impact on Syngenta's azoxystrobin sales and pricing. Cheminova's azoxystrobin products were not approved by the EPA until after Willowood began marketing its azoxystrobin products. (Ex. 28.) Initially, Cheminova's products were not even approved for key Syngenta crops such as corn, which limited Cheminova's impact in the market. (Ex. 2, Wichert Tr. at 74:11-75:6.) As Dr. Wichert explained, customers would not want to purchase from Cheminova because of such label restrictions on key crops. (*Id.* at 257:1-23.)

20. Although the EPA approved Cheminova's azoxystrobin for use on corn in March 2015, Cheminova's industry participation had already dramatically fallen by that time. In September 2014, FMC announced its intent to purchase Cheminova, which was completed in April 2015. (Ex. 30.) After the merger, FMC/Cheminova "g[ot] out of t[he] business completely" (Ex. 5, Reichman Tr. at 51:4-52:8) and stopped importing azoxystrobin (Ex. 2, Wichert Tr. at 258:6-12; Ex. 20 at SYN283506). Even while Cheminova was in the market, it did not have a significant presence. Dr. Wichert explained that ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ (Ex. 2, Wichert Tr. at 259:18-261:6; *see also* Ex. 1, Cecil Tr. at 37:25-38:15,

10

69:12-24.) Mr. Reichman also testified that Cheminova's azoxystrobin was sold at a higher price than Willowood's. (Ex. 5, Reichman Tr. at 83:24-88:22.)

**E.  Syngenta's Budgeting**

21.  Every year,



(Dkt. 149-1, Wilner Rep. at 29.)

(*Id.*)

(*Id.*)

22.

(*Id.*)

(*Id.*)

(*Id.*)

(*Id.*)

(*Id.*)

23.

(*Id.* at 30.)

(*Id.*)

11



(*Id.*) . (*Id.*) (*Id.*) (*Id.*) (*Id.*)

## II.     Dr. Wilner's Damages Analysis

24.     On August 19, 2016, Syngenta timely served an expert report by Dr. Benjamin Wilner, setting forth his opinions with respect to Syngenta's damages resulting from Willowood's actions, assuming that Willowood is found liable.  (Dkt. 149-1, Wilner Rep.)   As detailed in his report and his CV, Dr. Wilner has a Ph.D. in Managerial Economics and Decision Science from the Kellogg Graduate School of Management at Northwestern University.  (*Id.* at 2, Ex. 2.)  He is a Managing Director at Alvarez & Marsal Disputes and Investigations, LLC.  (*Id.*)  He has also served as a professor of economics, finance, and statistics in the business schools at the University of Michigan, University of Iowa, Northwestern University, and Helsinki School of Economics.  (*Id.*)

### A.     Overview

25.     In his report, Dr. Wilner reviews the background of the case, including the asserted patents, the accused products, and the actions of Willowood, Syngenta, and other market participants.  (*Id.* at 3-22.)  Then, separately for the Compound Patents (*id.* at 26-36), the '138 Patent (*id.* at 36-40), and the '761 Patent (*id.* at 40-42), Dr. Wilner calculates Syngenta's lost profits resulting from Willowood's infringement, assuming a finding of liability.  As Dr. Wilner explains, under *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), Syngenta's "but for" lost profits equal the profits Syngenta would have made "but for" Willowood's infringement, minus

Syngenta's "actual" profits and minus any additional incremental costs that Syngenta would have incurred to make the additional profit. (Dkt. 149-1, Wilner Rep. at 24.)

26.     In determining Syngenta's lost profits, Dr. Wilner examined what he termed as Syngenta's "AZ Products-at-Issue," which include Syngenta's crop-protection fungicides that contain azoxystrobin as an active ingredient and are applied to planted crops. (*Id.* at 4-5.) Although Syngenta also sold and sells azoxystrobin-containing seed-care products that are used on seeds before planting as well as azoxystrobin-containing lawn/garden products (*id.*), Dr. Wilner conservatively excluded such products from the AZ Products-at-Issue because Defendants' azoxystrobin is not used in these applications except in very limited quantities (*id.* at 19, 27, 31).

27.     Some of the AZ Products-at-Issue are combination products that not only comprise azoxystrobin but also other active ingredients. (*Id.* at 31-32.) As Dr. Wilner explains, he included these combination products in the AZ Products-at-Issue because azoxystrobin drove the demand for the products either directly or through Syngenta's brand ladder. (*Id.*) Moreover, the azoxystrobin and other components in these combination products are part of the same composition and function together as a fungicide. (*Id.*) Thus, Dr. Wilner also found it appropriate to consider such combination products under the "entire market value rule." (*Id.* at 24, 31-32 (citing *Lucent Techs., Inc. v. Gateway Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)).)

28.     Syngenta sometimes sells other products in combination with its AZ Products-at-Issue. For example, Syngenta's Trivapro® is a mixture of Trivapro® A (which does not contain azoxystrobin) and Trivapro® B (which contains azoxystrobin). (*Id.* at 5-6, 31, 34.) Growers also sometimes mix azoxystrobin with other products like insecticides and herbicides. Thus, if Syngenta lost sales on its AZ Products-at-Issue

13

because of Willowood's infringement, Syngenta likely also lost sales on other insecticide and herbicide products. Dr. Wilner, however, conservatively excluded Trivapro A and any insecticides and herbicides from his damages calculations. (*Id.* at 34, 38-39, 41.)

### B.   Damages from Infringement of '076 and '256 Compound Patents

29.    In order to determine Syngenta's "but for" profits absent Willowood's infringement of the Compound Patents, Dr. Wilner applied a benchmarking analysis in which he began with Syngenta's actual and budgeted gross profits for the AZ Products-at-Issue (in the aggregate) to determine how much of its budgeted gross profits Syngenta was able to achieve ("intra-AZ"), while facing Willowood's early market entry and generic price pressure. (*Id.* at 32.) Dr. Wilner similarly examined Syngenta's actual and budgeted gross profits on its mesotrione products (in the aggregate) to determine the extent to which Syngenta was able to achieve its budgeted mesotrione gross profits ("intra-meso"), for which Syngenta did not face early market entry and price pressure from Willowood. (*Id.*) Using this intra-meso benchmark, Dr. Wilner assumed that, "but for" Willowood's infringement, Syngenta would have achieved its budgeted amount of gross profits for the AZ Products-at-Issue to the same extent that Syngenta achieved its budget for its mesotrione products. (*Id.*) Thus, despite Syngenta's exacting budgetary process (*id.* at 29-30), Dr. Wilner tested Syngenta's budgets by using the combination of the actual and budgeted sales from the intra-AZ and intra-meso comparisons along with their interactions to adjust Syngenta's forecasts for the AZ Products-at-Issue (*id.* at 32).

30.    As Dr. Wilner outlines in his report, and as Dr. Wichert explained at his deposition, the intra-AZ and intra-meso comparisons together serve as appropriate benchmarks because mesotrione and azoxystrobin are subject to the same budgetary process (*id.* at 29-30) and have a number of product-lifecycle similarities (*id.* at 30 (citing

Ex. 2, Wichert Tr. at 265-267)). Whereas azoxystrobin is one of Syngenta's best-selling fungicides, mesotrione is one Syngenta's best-selling herbicides. (*Id.* 29-30.) Both are well-established products, with mesotrione being approved to be applied on the same major crops as azoxystrobin, including corn and soybeans. (*Id.*)

31. Until 2014, generic companies also faced significant barriers to entry with respect to both mesotrione and azoxystrobin. (*Id.*) For example, Syngenta's Compound Patents, which covered the azoxystrobin compound, expired in February 2014, before which Syngenta possessed the right to exclude companies from importing, making, using, selling, or offering for sale the azoxystrobin in the United States under 35 U.S.C. § 271(a). (*Id.*) Similarly, Syngenta possessed data exclusivity over mesotrione until June 2014, before which generic companies were barred from relying on the data Syngenta previously submitted to the EPA to apply for a "me-too" mesotrione registration under 7 U.S.C. § 136a(c)(1)(F). (*Id.* at 30-31.) Also, just as Syngenta introduced Trivapro (a new combination fungicide) ███████████████████████ approximately 16 months after the Compound Patents expired, Syngenta introduced Acuron® (a new combination herbicide) ███████████████████████ about 10.5 months after Syngenta lost data exclusivity over mesotrione. (*Id.* at 31.)

32. Using the combination of the intra-AZ and intra-meso benchmarks, Dr. Wilner calculated that Syngenta suffered incremental lost profits in years 2014-2017 of $20.0 million, $24.9 million, $15.4 million, and $15.3 million, respectively. (*Id.* at 32-34.) Exhibit 9.e of Dr. Wilner's report (annotated below) charts Syngenta's "but for" and actual incremental profits from 2012-2017. Notably, Dr. Wilner's analysis shows that Syngenta's actual incremental profits in 2014 were approximately the same as Syngenta's "but for" profits in 2015. (*Id.* at 35.) Thus, Syngenta actually earned in 2014 what Dr.

15

Wilner's benchmarking analysis found that Syngenta would have earned about one year later "but for" Willowood's infringement, reflecting the approximately one-year head start that Willowood obtained by infringing the Compound Patents, with the effects of the head start continuing to linger. (*Id.*) This independent analysis verifies and confirms Dr. Wilner's analysis. (*Id.*) Further, Dr. Wilner examined other benchmarks such as Syngenta's Crop Protection Fungicides, all Syngenta products, and indices such as the Producer Price Index to ensure that his analysis was conservative. (*Id.* at 32-33.)



### C. Damages from Infringement of '138 Patent

33.     Dr. Wilner opines that Syngenta's lost-profits damages resulting from Willowood's infringement of the '138 Patent would be no less than Syngenta's damages resulting from Willowood's infringement of the Compound Patents as calculated using the intra-AZ and intra-meso comparisons. (*Id.* at 37.) Dr. Wilner, however, found that the intra-AZ and intra-meso comparisons (although potentially still applicable) would be an overly conservative benchmark because the '138 Patent did not expire until December 8, 2015, eighteen months after the Compound Patents expired. (*Id.*)

34.     To more appropriately calculate Syngenta's lost profits as to the '138

Patent in 2014-2015, Dr. Wilner used as his benchmark the extent to which Syngenta achieved its budgeted gross profits for its Crop Protection Fungicides (intra-Crop-Protection comparison). (*Id.* at 37.) As defined, Crop Protection Fungicides are the aggregate of all of Syngenta's crop-protection fungicides, excluding the AZ Products-at-Issue. (*Id.* at 32.) Again, the budgets for the Crop Protection Fungicides are developed using the same exacting process as the budgets for the AZ Products-at-Issue. (*Id.* 29-30.) The Crop Protection Fungicides also include products with exclusivity that run through 2015, when the '138 Patent expired. (*Id.* at 37.)

35.     For 2016 (the first year after the '138 Patent expired), Dr. Wilner used as his benchmark the change in Syngenta's actual gross profits in 2014 ████████, which was the first year after Willowood entered the market and Syngenta lost effective exclusivity. (*Id.* at 38.) Similarly, for 2017, Dr. Wilner used as his benchmark the change in Syngenta's actual gross profits in 2015 ██████, which was the second year that Syngenta did not have effective exclusivity. (*Id.*) Notably, for 2016-2017, Dr. Wilner's analysis projected that there would be a decline in Syngenta's profits even if Willowood had not infringed. (*Id.*)

36.     Based on these benchmarks, Dr. Wilner calculated that Syngenta suffered incremental lost profits in years 2014-2017 of $33.2 million, $55.8 million, $36.0 million, and $10.5 million, respectively. (*Id.* at 39.) Exhibit 11.e of Dr. Wilner's report (annotated below) charts Syngenta's "but for" and actual incremental profits from 2012-2017. Notably, Dr. Wilner's analysis shows that Syngenta's actual incremental profits in 2014 are approximately the same as Syngenta's "but for" profits in 2016. (*Id.* at 35.) Thus, Syngenta actually earned in 2014 about what Dr. Wilner's benchmarking analysis found that Syngenta would have earned two years later "but for" Willowood's

17

infringement, reflecting the approximately two-year head start that Willowood obtained by infringing the '138 Patent, with the effects of the head start continuing to linger. (*Id.*) This independent analysis verifies and confirms Dr. Wilner's analysis. (*Id.*)



### D. Damages from Infringement of '761 Patent

37. Dr. Wilner opines that Syngenta's lost-profits damages resulting from Willowood's infringement of the '761 Patent would be no less than Syngenta's damages resulting from Willowood's infringement of the Compound Patents, but that this estimate (though potentially still applicable) is overly conservative. (*Id.* at 40 n.215.) That is because the '761 Patent does not expire until April 2029, unlike the Compound Patents, which expired in February 2014. (*Id.* at 40.) To more appropriately calculate Syngenta's lost profits as to the '761 Patent, Dr. Wilner used the same methodology that he used to calculate Syngenta's lost profits as to the '138 Patent for 2014-2015—when the '138 Patent was in force—and carried that analysis forward to 2016-2017 because the '761 Patent remains in force. (*Id.*) Based on this analysis, Dr. Wilner calculated that Syngenta suffered incremental lost profits in years 2014-2017 of $33.2 million, $55.8 million, $94.6 million, and $89.8 million, respectively. (*Id.* at 41.)

38.     Further, with respect to each of the Compound Patents, the '138 Patent, and the '761 Patent, Dr. Wilner performed a separate analysis assuming that the finder of fact concludes that Cheminova caused some of Syngenta's losses.  (*Id.* at 35, 39, 42 (citing *State Indus., Inc. v. Mor-flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir 1989)).)  These analyses (set forth in Exhibits 10.a, 12.a, and 14.a of Dr. Wilner's report) proportionally allocate Syngenta's lost gross profits based on the relative import shares of kilograms of active ingredient by Cheminova and Willowood.

## LEGAL STANDARD

Under Federal Rule of Evidence 702, courts serve as gatekeepers tasked with determining whether an expert is qualified and whether the expert's opinions are reliable.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999); *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993).  Courts are given "broad latitude" to perform this "flexible" inquiry.  *Kumho*, 526 U.S. at 150.  But courts must take care not to supplant the role of the jury, as "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596; *see also Precision Fabrics Grp., Inc. v. Tietex Int'l, Ltd.*, No. 1:13-cv-645, 2016 WL 6839394, at *5-8 (M.D.N.C. Nov. 21, 2016) (denying motion to exclude expert testimony in patent case noting that "[a]ssessing the credibility and weight of the testimony is the role of the jury"); *United States v. Baller*, 519 F.2d 463, 466 (4th Cir. 1975) ("[I]t is better to admit relevant scientific evidence in the same manner as other expert testimony and allow its weight to be attacked by cross-examination and refutation.").

A patentee is entitled to "damages adequate to compensate" for patent infringement that can be "in no event less than a reasonable royalty for the use made of the invention by the infringer."  35 U.S.C. § 284.  To recover damages for lost profits,

19

"the patentee must show a reasonable probability that, 'but for' the infringement, it would have made the sales that were made by the infringer." *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995). To make this showing, the patentee must establish "(1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made." *Id.* (citing *Panduit*, 575 F.2d at 1156).

## ARGUMENT

## I.     Dr. Wilner's Use of Benchmarks to Calculate Lost Profits Is Proper.

Contrary to Willowood's suggestion, the Federal Circuit and district courts alike have recognized and accepted the use of benchmarks as a valid method of calculating lost profits in patent cases. *See Ericsson*, 352 F.3d at 1379-79; *SynQor*, 2011 WL 3624998, at *5; *Minn. Mining & Mfg. Co. v. Johnson & Johnson, Inc.*, 976 F.2d 1559, 1578-79 (Fed. Cir. 1992). For example, in *Ericsson*, the patentee sought lost profits, including price-erosion damages, based on the infringement of its patent directed to a subscriber line interface circuit. 352 F.3d at 1378-79. To calculate the damages, the patentee's expert "compared the performance of the patented product . . . in the market affected by infringement with that of a similar [but obsolete] product . . . in a market free of infringement." *Id.* At trial, a jury awarded price-erosion damages to the patentee, and the defendant sought JMOL, challenging the propriety of the benchmark. *Id.* at 1379. But the district court denied JMOL, and the Federal Circuit affirmed, noting that the patentee had offered evidence of the similarities of the two products and further emphasizing that the defendant competed in the market for the patented product but not the market for the benchmark product. *Id.* Moreover, even the cases that Willowood cites acknowledge that benchmarks are a well-accepted methodology and turned on circumstances not present here. *See Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp.

2d 169, 179 (S.D.N.Y 2006); *Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08-cv-3977, 2011 WL 382743, at *1 (N.D. Ill. Feb. 3, 2011) (same).

Willowood misguidedly argues that Dr. Wilner's benchmarking analyses somehow fail to take into account "the volume of Willowood's sales of allegedly infringing product and its market presence."[3] (Dkt. 148 at 3.) As an initial matter, Willowood improperly compares the magnitude of Syngenta's lost profits with the magnitude of Willowood's sales volume and revenue. For example, in *SynQor,* a jury awarded lost profits to the patentee and the defendants challenged that award, arguing that it "d[id] not square with reality" and attempting to compare the "revenue and profits associated with their [own] sale of accused [products]." *SynQor*, 2011 WL 3624998, *5. The court disagreed, explaining that if the patentee's patent rights had been respected, the market would have been fundamentally different and that, as a result of the infringement, "prices had eroded to a point that customers were not fairly compensating suppliers for the value of the technology that was being supplied." *Id.* Likewise, here, Willowood ignores that its actions have significantly eroded Syngenta's azoxystrobin prices to a point that Syngenta has suffered, and continues to suffer, lost profits that are substantially larger than Willowood's sales of accused products.

Nor does Willowood offer any support for its proposition that Dr. Wilner must develop an economic model that uses Willowood's sales volume and revenue as direct input in calculating Syngenta's lost profits. Rather, consistent with *Panduit* and cases applying benchmarking analyses, Dr. Wilner properly began with Syngenta's actual and

---

[3] For example, Willowood claims that Dr. Wilner's opinions do not track Willowood's actions because he calculates greater damages for the '138 and '761 Patents than the Compound Patents although Willowood's conduct purportedly remained the same. (Dkt. 148 at 4 n.1.) But the '138 Patent expired eighteen months after the Compound Patents and that the '761 Patent does not expire until 2029. Thus, by infringing the '138 and '761 Patents, Willowood entered the market much earlier and caused more damage.

budgeted profits—which depended, and varied based, on Willowood's actions including its early market entry and aggressively low pricing—and then applied appropriate benchmarks to filter out extraneous factors and therefore isolate Willowood's impact. Indeed, the benchmark analysis that the Federal Circuit approved in *Ericsson* did not begin with the accused infringer's sales, but rather with the sales of the patentee's embodying product, which were compared to the sales of a product in a different but comparable market. 352 F.3d at 1378-79. To provide an analogy, one can determine how much gasoline a car has used over the course of a trip by directly measuring how much gasoline it has in its tank before and after the trip. Alternatively, one can begin with how far the vehicle has traveled and determine how much fuel it must have used based on its fuel efficiency under similar circumstances. Both methods are equally valid.

## II.    Dr. Wilner's Opinions Are Based on Sufficiently Reliable Benchmarks.

Willowood criticisms of Dr. Wilner's benchmarking analyses lack merit and, at most, go to the weight of Dr. Wilner's opinions, which a jury should evaluate and that Willowood may probe through cross-examination at trial. *See Daubert*, 509 U.S. at 596; *Baller*, 519 F.2d at 466; *Precision*, 2016 WL 6839394, at *5-8.

As a threshold matter, Willowood provides no background or context for Dr. Wilner's opinions and then mischaracterizes his analyses. For example, Willowood improperly dissects Dr. Wilner's analysis and asserts that he relies on three benchmarks:

> (i) Syngenta's annual **budgets** for the sale of azoxystrobin products; (ii) Syngenta's annual **budgets** compared to its **actual sales** of mesotrione products; and (iii) Syngenta's annual **budgets** compared to its **actual sales** of all fungicide products sold by Syngenta other than azoxystrobin (which Dr. Wilner defines as "Crop Protection Fungicides").

(Dkt. 148 at 3 (emphasis in original).) To be clear, Dr. Wilner does not use any budgets in isolation as a benchmark in his analysis. Rather, Dr. Wilner begins by comparing Syngenta's actual and budgeted gross profits for azoxystrobin products (intra-AZ

22

comparison) and then supplements this intra-AZ benchmark with other benchmarks, depending on the patent at issue and whether it was in force in a given year. (Facts ¶¶ 29, 34-35, 37.) These other benchmarks include the extent to which Syngenta achieved its budgeted gross profits on its mesotrione products (intra-meso comparison) and Crop Protection Fungicides (intra-Crop-Protection comparison), as well as Syngenta's actual experience in 2014 and 2015. (*Id.*) The combination of such analyses adds strengthens to Dr. Wilner's opinions, which Willowood ignores. Dr. Wilner also fully explains his rationales for applying each benchmark. (*Id.* ¶¶ 30-31, 33-35, 37.)

### A. Alleged Budget Variations Do Not Undermine Dr. Wilner's Analysis.

Willowood's primary criticism of Dr. Wilner's benchmarking analyses is that they are based on Syngenta's budgets, which Willowood asserts are unreliable. (Dkt. 148 at 5-6.) But although Willowood complains that Syngenta's azoxystrobin budgets from 2009-2011 were inaccurate (Dkt. 148 at 5-6), Dr. Wilner does ***not*** rely on Syngenta's azoxystrobin budgets from 2009-2011 as benchmarks in any of his calculations. Notably, Willowood asserts that Syngenta underestimated its profits in certain years, and thus there is no suggestion that Syngenta's budgets are simply "cheerful prognostications." *See Celebrity*, 434 F. Supp. 2d at 184. Nor is it surprising that Syngenta (or any company) would have had inaccuracies in its budgets from 2009-2011, during the height of an economic recession and a period of widely recognized market volatility that began to stabilize by 2012.[4] For its part, Willowood admits that in 2012, Syngenta's azoxystrobin budgets were "relatively accurate." (Dkt. 148 at 5.)

---

[4] Christina Romer, the Chair of the Counsel of Economic Advisors to the Obama Administration, has explained that "the aftermath of financial crises is highly variable." (Ex. 33.) That is underscored, for example, by the volatility index that the USDA's Risk Management Agency used to determine crop insurance premiums. Notably, the index shows that volatility in crop prices were historically high in 2010 and 2011 but stabilized by 2012, particularly for corn and soybean (the major crops for azoxystrobin). (Ex. 34.)

23

Variations between Syngenta's actual and budgeted gross profits in 2013 and 2014 are also unsurprising. By 2013, Willowood began targeting Syngenta's products, specifically announcing to customers that it would be releasing equivalents of Syngenta's branded products, and filed the first of its EPA applications. (Facts ¶ 8.) It was not until 2014 that Syngenta recognized the effect that Willowood was having on the market and responded by significantly lowering its azoxystrobin prices. (*Id.* ¶ 13.)

Further confusing the issue, Willowood points to variations in the budgets for individual azoxystrobin and mesotrione products. (*Id.* at 6.) But, again, Dr. Wilner does **not** use the budget for any *individual* azoxystrobin or mesotrione product as a benchmark. (Facts ¶ 29.) Rather, Dr. Wilner considers the budgets of *all* of the AZ Products-at Issue and *all* mesotrione products together in the *aggregate*. (*Id.*) And he uses the extent to which Syngenta was able to achieve it budgeted gross profits for the aggregated mesotrione products (i.e., intra-meso comparisons) as a benchmark to determine the extent to which Syngenta would have achieved its budgeted gross profits for the AZ Products-at Issue products absent Willowood's infringement. (*Id.*) Willowood's criticism is essentially akin to making sweeping characterizations of an overall market based on the performance of particular stocks or companies that do not reflect the aggregate whole.

## B. Dr. Wilner Sufficiently Verified Syngenta's Budgets.

Dr. Wilner conducted independent sufficiently tested Syngenta's budgets, which sets his opinions apart from the cases Willowood cites that involved egregious examples of experts who simply adopted sales projections without analysis. *See Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006); *Celebrity*, 434 F. Supp. at 169; *Victory*, 2011 WL 382743, at *1. Here, Dr. Wilner discussed with Syngenta's employees, and describes in his report, the exacting budgeting process that Syngenta uses. (Facts ¶¶ 21-23.) Willowood complains that Dr. Wilner did not

24

sufficiently analyze the budgeting process but does not describe what analysis he needed to perform. Nor did Dr. Wilner simply adopt Syngenta's azoxystrobin budgets. Rather, he began with a comparison of Syngenta's actual and budgeted gross profits for azoxystrobin products and adjusted those budgets based on actual sales data from other supplementary benchmarks including the intra-meso and intra-Crop-Protection comparisons. (*Id.* ¶ 29, 34-35, 37.) The purpose of these supplementary benchmarks was to address potential market factors such as weather, disease pressure, and introduction of new products (*see id.* ¶¶ 29-31) that Willowood claims Dr. Wilner did not consider (Dkt. 148 at 9). Dr. Wilner also examined alternative benchmarks and market indices to ensure that the benchmarks that he applied were conservative. (*Id.* ¶ 32.)

Further, Dr. Wilner performed supplemental analyses to independently confirm his damages opinions. For example, Dr. Wilner's calculations as to the Compound Patents reflect, and are corroborated by, the fact that Willowood received an approximately one-year head start in selling azoxystrobin by infringing the Compound Patents. (*Id.* ¶¶ 7, 32.) Similarly, Dr. Wilner's calculations as to the '138 Patent reflect, and are corroborated by, the fact that Willowood received an approximately two-year head start in selling azoxystrobin by infringing the '138 Patent. (*Id.* ¶ 7, 36.)

### C. Dr. Wilner Did Not "Cherry Pick" Any Budgets.

Willowood's claim that Dr. Wilner "cherry picked" the budgets on which he relies similarly fails. Specifically, Willowood asserts that Dr. Wilner improperly used the original 2014 azoxystrobin budget that was prepared in late 2013, instead of the April 2014 Latest Projection (LP) which (according to Willowood) would have generated zero damages for 2014. (Dkt. 148 at 11-12.) Willowood, however, had already applied to register its Azoxy 2SC product with EPA in 2013. Thus, the initial budget for 2014 (prepared in late 2013) represents the ideal budget and reflects the market shortly after

Willowood announced itself in the market. (Facts ¶ 4.) Subsequent LPs from 2014 are more likely to reflect Syngenta's reactions to Willowood's activities, rather than helping to isolate Willowood's impact. *Cf. SynQor* at * 6 (cautioning against improper focus on actual world which may be fundamentally unlike the world that would have existed but for infringement). If anything, the April 2014 LP demonstrates that Syngenta's budgeting process is accurate and that within about six months after Willowood applied for its first azoxystrobin registration and announced itself in the market, Syngenta was able to understand Willowood's actions (to that point), react accordingly, and generate a budget that incorporated the profits Syngenta lost due to Willowood's actions. (*Id.* ¶ 23.)

### D. Intra-Meso Comparisons Present a Proper Benchmark.

Willowood oversimplifies and mischaracterizes Dr. Wilner's use of mesotrione in his analysis. To be clear, Dr. Wilner does not make a product-to-product comparison between azoxystrobin and mesotrione, or use the intra-meso benchmark in isolation. Rather, he began with Syngenta's actual and budgeted gross profits for its azoxystrobin products (intra-AZ comparison). (*Id.* ¶ 29.) Dr. Wilner then assumed that, "but for" Willowood's infringement, Syngenta would have achieved its budgeted amount of gross profits for its azoxystrobin products to the extent that Syngenta achieved its budget for its mesotrione products (intra-meso comparison), for which Syngenta did not face early market entry or price pressure from Willowood. (*Id.*) Thus, using the combination of the intra-AZ and the intra-meso comparison and the interaction between them, Dr. Wilner was able to recreate the "but for" world without Willowood's infringing sales. (*Id.*)

As Dr. Wilner explains, the underlying budgets are prepared using the same exacting budgeting process. (*Id.* ¶¶ 21-23, 29.) Azoxystrobin and mesotrione also share a number of product-lifecycle similarities that make the intra-meso comparison a useful benchmark. (*Id.* ¶ 30.) To be sure, as Willowood notes, azoxystrobin is a fungicide,

whereas mesotrione is an herbicide. (Dkt. 148 at 13-14.) But Willowood cites no authority that requires Dr. Wilner to use another fungicide as a supplementary benchmark. *See Ericsson*, 352 F.3d 1378-79 (reasoning even obsolete product could serve as benchmark). As Willowood tacitly acknowledges, both azoxystrobin and mesotrione are well-established products, with mesotrione being approved for the same major crops as azoxystrobin, including corn and soybeans. (*Id.*; Facts ¶ 30.) That fact is significant and makes it likely that azoxystrobin and mesotrione will be similarly affected by commodity prices and market factors affecting corn and soybeans. By using the intra-meso comparison as a supplementary benchmark, Dr. Wilner accounted for such market factors that similarly affected both azoxystrobin and mesotrione.

Further, until 2014, generic companies faced significant barriers to entry as to both mesotrione and azoxystrobin. (*Id.* ¶ 31.) Whereas Syngenta's Compound Patents expired in February 2014, Syngenta lost data exclusivity over mesotrione in June 2014. (*Id.*) Before these events, Syngenta possessed the right to exclude companies from importing, making, using, selling, or offering for sale azoxystrobin, 35 U.S.C. § 271(a), and generic companies were barred from relying on the Syngenta's data to apply for "me-too" EPA registrations for mesotrione, 7 U.S.C. § 136a(c)(1)(F). (*Id.*) Importantly, the loss of data exclusivity opened the door for generic competition in the mesotrione market, and the intra-meso comparison helps filter out such normal levels of generic competition and conservatively focuses on Willowood's impact in the market place.

Willowood notes that Syngenta had patents directed to certain mesotrione mixtures and incorrectly asserts that Syngenta continued to maintain exclusivity for at least 88% of the mesotrione *market* into 2015, 2017, and 2020. (Dkt. 148 at 14.) By mid-2014, absent exclusivity over mesotrione, generic companies could seek to register and bring to market solo mesotrione products. Moreover, Syngenta's patents, which

were directed to *certain* mesotrione mixtures, did not preclude generics from bringing to market *other* mixtures. Generic price pressure for mesotrione in any of these forms would impact the pricing of products on Syngenta's brand ladder.

### E. Intra-Crop-Protection Comparisons Present a Proper Benchmark.

Dr. Wilner's use of Crop Protection Fungicides in his benchmarking analysis was similarly justified. As an initial matter, as Dr. Wilner explains, the damages calculated with respect to the Compound Patents using the intra-meso supplementary benchmark serves as a conservative estimate for Syngenta's damages with respect to the '138 and '761 Patents. (Facts ¶ 33.) But given that the '138 patent expired eighteen months after the Compound Patents and that the '761 Patent does not expire until 2029, the intra-meso benchmark provides too conservative an estimate. (*Id*.) For a variety of reasons, the extent to which Syngenta achieved its budgeted gross sales on its Crop Protection Fungicides (intra-Crop-Protection comparison) serves as a proper benchmark in calculating the damages with respect to the '138 Patent in 2014-2015 and with respect to the '761 Patent. As Dr. Wilner explains, the budgets underlying the Crop Protection Fungicides similarly developed using Syngenta's exacting budgeting process. Moreover, Willowood itself acknowledges that azoxystrobin, like other fungicides, is applied to crops to prevent and treat fungal diseases (Dkt. 148 at 13), and Dr. Wilner limited his analysis to only those azoxystrobin products used as crop-protection fungicides, similar to the Crop Protection Fungicides (Facts ¶ 26). Further, as Dr. Wilner explains that the Crop Protection Fungicides include products with patent protection that extend beyond 2015. (Facts ¶ 34.) Thus, the aggregate of the Crop Protection Fungicides is not as overly conservative as a benchmark based on mesotrione, which lost data exclusivity in 2014, and is more conservative than any comparable product that would lose exclusivity in 2029, when the '761 Patent is set to expire.

**III.    Dr. Wilner's Damages Opinions with Respect to the '761 Patent Are Properly Based on Willowood's Infringement.**

Willowood incorrectly claims that Dr. Wilner failed to apportion the damages resulting from infringement of '761 Patent. (Dkt. 148 at 16.) The thrust of Willowood's argument is that the claimed method of the '761 Patent is an "incremental improvement" over the claimed method of the '138 Patent, which Willowood asserts is a noninfringing alternative that Willowood could have used. (*Id.* at 17.) It is not necessary, however, for Dr. Wilner to have negated all possible alternatives that Willowood might have pursued. *See Minn. Mining*, 976 F.2d at 1577. Importantly, Willowood has presented no evidence to suggest that it had the ability to obtain azoxystrobin manufactured using the method of the '138 Patent and that this method was still commercially viable. *See id.* at 1578. For example, to the extent Willowood is found to infringe the '761 Patent, there is no evidence in the record of a source from which Willowood could have obtained azoxystrobin that is manufactured without DABCO as claimed in the '761 Patent. In fact, testing has confirmed that DABCO is found in azoxystrobin provided to Willowood by at least TaiHe and CAC Shanghai. (*E.g.,* Dkt. 96-10, Heinze Tr. at 275:3-7.)

Nor has Willowood established that '138 Patent's method remains a commercially viable method. To be sure, Syngenta previously used the method of the '138 Patent to manufacture azoxystrobin before it switched to the DABCO-catalyzed method of the '761 Patent. As Willowood's own technical expert admits, however, the DABCO-catalyzed process allows for the manufacture of azoxystrobin at significantly lower temperatures and results in fewer impurities. (Dkt. 152-3, Lipton Tr. at 151:12-154:3.) Thus, it is unclear whether Willowood would be able to secure an EPA registration for azoxystrobin using a process without DABCO and with increased impurities. Therefore, Dr. Wilner properly analyzed the '761 Patent based on Willowood's infringement.

29

**IV.    Testimony Regarding Willowood's Statements to the EPA Is Proper Because Those Statements Are Integral to, and Reflective of, Willowood's Willfulness and Attempts to Seek an Early Market Entry.**

Willowood's use of the "Formulator's Exemption" and related statements to the EPA are inextricably intertwined with Willowood's efforts to gain early entry into the market for azoxystrobin, which inform the issues of Willowood's patent infringement, willfulness, and damages.    For example, Willowood's statements to the EPA in connection with the Formulator's Exemption underscore the urgency with which Willowood sought to enter the market and the lengths to which Willowood went to obtain early market entry.  (Facts ¶¶ 2-4.)  To take advantage of the Formulator's Exemption, at least W-USA and W-LLC knowingly infringed Syngenta's Compound Patents by importing azoxystrobin technical into the United States, inducing Adjuvants to use this azoxystrobin to develop formulations for end-use products, and inducing ARC to test samples of those formulations in support of Willowood's registrations.  (*Id.* ¶ 4.)  Further, even with its regulatory head start, Willowood struggled to make various tolling deadlines, such that even small delays would have prevented Willowood from entering the market when it did and causing the damage that it did.  (*Id.* ¶¶ 5-6.)  Therefore, this Court should permit testimony with respect to Willowood's use of the "Formulator's Exemption" and related statements to the EPA which is necessary to tell the full story of Willowood's market entry as it relates to the pending claims.

**CONCLUSION**

For the foregoing reasons, this Court should deny Willowood's motion in limine to exclude the expert opinions of Dr. Wilner.

Dated: May 1, 2017                    By:    /s/ Richard A. Coughlin
                                             Richard A Coughlin
                                             North Carolina State Bar No. 19894
                                             C. Bailey King
                                             North Carolina State Bar No. 34043
                                             Whit D. Pierce
                                             North Carolina State Bar No. 46327
                                             SMITH MOORE LEATHERWOOD LLP
                                             300 N. Greene Street, Suite 1400
                                             Greensboro, North Carolina 27401
                                             Telephone: (336) 378-5200
                                             Facsimile: (336) 378-5400
                                             rick.coughlin@smithmoorelaw.com
                                             bailey.king@smithmoorelaw.com
                                             whit.pierce@smithmoorelaw.com

                                             OF COUNSEL:
                                             Russell E. Levine, P.C.
                                             Hari Santhanam
                                             Kourtney Baltzer
                                             KIRKLAND & ELLIS LLP
                                             300 North LaSalle Street
                                             Chicago, Illinois 60654
                                             Telephone: (312) 862-2000
                                             Facsimile: (312) 862-2200
                                             russell.levine@kirkland.com
                                             hari.santhanam@kirkland.com
                                             kourtney.baltzer@kirkland.com

                                             *Attorneys for Plaintiff Syngenta Crop
                                             Protection, LLC*

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies that the foregoing document complies with the word count limitation contained in L.R. 7.3(d)(1) and contains 8,966 words.

This the 1st day of May, 2017.

/s/ *Richard A. Coughlin*
Richard A. Coughlin

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing document has been filed electronically with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this action.

This the 1st day of May, 2017.

/s/ _Richard A. Coughlin_____
Richard A. Coughlin