```
                   IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF NORTH CAROLINA


SYNGENTA CROP PROTECTION,          Civil Action
INC.,                              No. 1:15V274

        Plaintiff,

vs.                                Greensboro, North Carolina
                                   June 6, 2017
WILLOWOOD, LLC, WILLOWOOD          9:45 A.M.
USA, LLC., WILLOWOOD
AZOXYSTROBIN, LLC, and
WILLOWOOD LIMITED,

        Defendants.
_____/


                  TRANSCRIPT OF MOTIONS PROCEEDINGS
            BEFORE THE HONORABLE CATHERINE C. EAGLES,
                   UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:   HARI SANTHANAM, ESQUIRE
                     RUSSELL E. LEVINE, ESQUIRE
                     Kirkland & Ellis, LLP
                     300 N. LaSalle
                     Chicago, Illinois 60654

                     RICHARD A. COUGHLIN, ESQUIRE
                     WHIT PIERCE, ESQUIRE
                     Smith Moore, LLP
                     POB 21927
                     Greensboro, North Carolina 27420


For the Defendants:  ALAN W. DUNCAN, ESQUIRE
                     Mullins Duncan Harrell & Russell
                     L. COOPER HARRELL, ESQUIRE
                     300 N. Greene Street, Suite 2000
                     Greensboro, North Carolina 27401


APPEARANCES CONTINUED:
```

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 1 of 109

```
1   APPEARANCES:

2   For the Defendants:    STEVEN E. TILLER, ESQUIRE
                           Whitefield Taylor & Preston
3                          Seven St. Paul Street, Suite 1300
                           Baltimore, Maryland 21202-1626
4

5

6

7
    Court Reporter:        J. Calhoun, RPR
8                          Room 122, U.S. Courthouse Building
                           324 West Market Street
9                          Greensboro, North Carolina 27401
                           (336) 332-6033
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Syngenta vs. Willowood, et al        1:15CV274

## PROCEEDINGS

1

2          (THEREUPON, the following proceedings were had:)

3          THE COURT:  Good morning.  We're here on Syngenta

4    versus Willowood, 15CV274 for first, two pretrial conferences.

5    I believe counsel have been given my rough agenda for what I

6    hope to accomplish today.  It is kind of a long list, but most

7    of it is things I anticipate we'll deal with in July.

8          I have read everything in connection with Willowood's

9    motion to exclude Dr. Wilner's testimony and Syngenta's motion

10   on expert testimony related to commercial reasonableness.  So

11   those are the primary things I believe we'll be dealing with

12   today.

13         Since both of those motions -- well, one of them

14   exclusively deals with damages and the other one at least

15   partly, perhaps largely deals with damages, I thought it would

16   be helpful to me to have each side give me an overview of how

17   they see the damages issues playing out and what their

18   perspective positions are going to be at trial.

19         So if we could take about ten minutes to do that, it

20   would be helpful to me to give me a little broader context

21   before we move directly into those motions.

22         Let me just have everybody identify themselves for

23   the court reporter before we get started.

24         MR. COUGHLIN:  Richard Coughlin on behalf of

25   Syngenta.  Along with me is Mr. Levin, Mr. Santhanam and

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 3 of 109

1  Mr. Pierce.

2          THE COURT:  All right.  Good.  Thank you.

3          MR. DUNCAN:  Your Honor, Alan Duncan with Steve

4  Tiller on behalf of Willowood.

5          MR. SANTHANAM:  Your Honor, we provided to the Court

6  a slide deck and we'll be referring to some of the slides and

7  be jumping around.  For purposes of our discussion at the

8  moment, if we can go to slide four.

9          In terms of the damages case and the roles of experts

10 in patent cases, nearly every case that is decided that has a

11 damages position report is going to get back the damages

12 position report by an expert.  So the case law essentially that

13 sets out what the damages law is, is a culmination of what

14 experts have done in past cases.

15         Where we would start off is with the statute, Section

16 35 U.S.C. 284.  That statute defines what a patentee, patent

17 holder such as Syngenta is entitled to.  It sets the floor on

18 damages to be a reasonable royalty.  But what is important for

19 this case is, that the damages should be adequate to compensate

20 for the infringement.

21         To jump in really quickly to what that means and to

22 provide a quick overview, adequate compensation has been very

23 broadly interpreted and it also has been interpreted such that

24 it does not depend upon whether or not the accused infringer

25 has gained or lost.

What I would highlight for the Court before we jump into the overview of the damages case is that going back to a couple early Supreme Court cases, *Yale Lock* case, the *Coupe versus Royer* case, they set forth the fundamental principles, which is, in terms of adequate compensation what you are talking about is the difference between what a patent owner -- where the patent owner was in terms of his pecuniary condition after the infringement, and where he would have been but for the infringement, and that's without regard to the question of whether or not the defendant gained or lost.

I would also highlight the last case that is cited here on slide five, which is the *King Instruments* case which indicates that there is no limitation on the types of damages or the types of harm that can be compensated for.

If Your Honor will humor me for one more minute. In terms of what can be supported for a damages case, the law is clear that lost profits is a recognized form of damages and it can fall within a couple of different categories. It can be diverted sales, price erosion, but for purposes of an expert, the case law sets out what the patentee must prove is, that the patentee has to establish a reasonable probability that but for the infringement, that they would have made the sales or that their prices would have been higher, et cetera. So what the standard is, is that it is the reasonable probability.

With that in mind, how have, you know, courts

1   established that reasonable probability.  Well, one of the

2   methods that's used by experts in terms of establishing damages

3   is what we call the benchmarking or yardstick method.  I'm now

4   on slide ten of the slide packet.

5        The benchmarking in the yardstick method, contrary to

6   the story that Willowood might put forward is a well-accepted

7   theory under Federal Circuit Law.  There are several decisions

8   which the Federal Circuit has issued in which the Court has

9   upheld damages that were determined using a benchmark method.

10  We can give you the primary example, which is the damages

11  theory in this case.

12       If Your Honor can turn to slide 24.  In terms of

13  Syngenta's damages in this case, our expert is Dr. Benjamin

14  Wilner.  He has a Ph.D. in managerial economics and decision

15  science from the Kellogg Graduate School of Management at

16  Northwestern.  He has served not only as a damages expert in a

17  number of cases, but also has served as a professor of

18  economics, finance and statistics at a wide-range of business

19  schools, not only at Northwestern, not only in the United

20  States, but also abroad at Helsinki School of Economics.

21       The analysis that he has put forward in this case to

22  calculate, to provide that reasonable probability of the

23  damages and the harm that Syngenta has suffered, what he has

24  done is, for each of the patents at issue -- we got the

25  compound patents which is the '256 and the '076 Patent.  Then

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 6 of 109

 1    we've got the '138 Patent, which is a process patent.  And the

 2    '761 Patent, which is the DABCO Patent.

 3              THE COURT:  The what?

 4              MR. SANTHANAM:  The DABCO Patent.

 5              For each of those patents, and in the case of the

 6    compound group of patents, what he has done is, he has

 7    calculated the profits that Syngenta lost as a result of

 8    Willowood's early market entry into the azoxystrobin market.

 9    And he has taken into account Willowood's actions and also

10    taken into account the actions of other potential market

11    participants to create a but for scenario; that is, where would

12    Syngenta have been but for Willowood's infringement.

13              Before we get into the specific analysis, what I

14    would like to highlight for the Court is what he focused on.

15    In terms of the actual products that he focused on, he calls

16    them the AZ products-at-issue.  Those are Syngenta's

17    azoxystrobin products, but a subset.  Now azoxystrobin can have

18    crop protections which are uses for, you know, for crops after

19    they are -- the seeds after they have been planted.  But there

20    are other uses for azoxystrobin as well.  He has taken that out

21    of the picture.

22              What he has focused on is just crop protection use of

23    azoxystrobin, while excluding things such as seed care, lawn

24    and garden products, et cetera.  The reason for that is, he has

25    taken an analysis of what Willowood's participation in the

                  Syngenta vs. Willowood, et al       1:15CV274

market was, saw that Willowood's participation in these other

areas, such as lawn and garden, seed care was some what

limited, so to be conservative, he's excluded lawn and garden

and seed care products from his analysis.

Then in order to calculate that but for scenario,

Dr. Wilner has used what -- the benchmarking analysis or the

benchmarking approach that the Federal Circuit has openly

approved in several instances. What he has done is, he's used

a combination of benchmarks, not only Syngenta's budgets, but

also Syngenta's actual sales and other benchmarks from other

products, and we'll go through that analysis.

If we go to slide 25, with respect to the compound

patents, in order to calculate where Syngenta would have been

but for Willowood's infringement, Dr. Wilner began with

Syngenta's budgets for these azoxystrobin crop protection

products. He looked at the gross profits that Syngenta had

budgeted for each year and he compared them to the actual

products that Syngenta -- what it made in each of those years

and that was the starting point of his analysis.

What I would emphasize here is, that Syngenta's

budgets are prepared through a very well-organized process.

They are prepared --

THE COURT: I know we're going to get into all of

this in more detail so, you know, looking for the overview

here.

1          MR. SANTHANAM:   Sure.   He took the budgets that were

2  prepared and used by industry experts in this area, and he

3  figured out -- he calculated, well, how much of that, you know,

4  the budgeted gross profits of Syngenta did they actually make.

5  And then in order to compensate or adjust for other factors, he

6  used other benchmarks to adjust his analysis.

7          The main benchmark for the compound patents that he

8  used was what we call the intra-meso comparison.   He took a

9  related product, mesotrione, which is a herbicide.   It is used

10  on the same main crops; corn and soybeans.   He compared

11  Syngenta's budget for mesotrione with their actual experience

12  at the same time.

13          The reason why he's making this comparison is, if you

14  look at azoxystrobin, that was a market in which Willowood was

15  participating.   They entered the market early in 2013 and he

16  compared it to an experience of mesotrione, where Willowood was

17  not present.

18          The whole purpose of that was to adjust for

19  extraneous factors like market factors, the potential of normal

20  levels of generic competition, variations in Syngenta's budget,

21  et cetera.   The idea was -- and what he achieved was, that he

22  factored out these extraneous factors.

23          I will jump to -- if we can go to slide 29.   The

24  ultimate -- the result of this analysis was, he created all

25  output that would show you where Syngenta was while Willowood

1  was in the marketplace.  What we have here on slide 29 is a

2  chart with the red bars identifying the but for world that

3  Dr. Wilner had calculated.  That is what would have happened if

4  Willowood would not have breached.  The yellow bars or golden

5  bars represent Syngenta's actual experience.  And he used the

6  mesotrione experience to factor out various extraneous efforts.

7          THE COURT:  Okay.  So I was hoping for about ten

8  minutes, which you are still on compound patents and you have

9  been talking for ten minutes.

10         MR. SANTHANAM:  Yes, Your Honor.  After this slide, I

11 think for other patents we'll get through them relatively

12 quickly.

13         THE COURT:  All right.  Go ahead.

14         MR. SANTHANAM:  The idea was to show where Syngenta

15 would have been but for the Willowood differential, which is

16 represented by the red bars.

17         One thing I would note here is that, you know,

18 Dr. Wilner calculated that Syngenta's profits would actually go

19 down.  And then he compared it to the actual experience and the

20 difference between the red bars and the gold bars are the lost

21 profits that Syngenta suffered.

22         If we go to the '138 Process Patent, what Dr. Wilner

23 says is, well, the damages I calculated for the compound

24 patents, that can serve as a conservative floor for the damages

25 that Syngenta suffered as a result of the '138 Patent.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 10 of 109

 1              The reason is, that the damages are based on
 2     Willowood's head start.  So for the compound patents they got
 3     approximately one year head start.  For the '138 Patent, which
 4     expired in 2015, approximately 18 months later they got a-two
 5     year head start.  So he said, well, if you just stick with the
 6     damages for the compound patents, that would be a conservative
 7     floor.  He recognized that, maybe, that is overly conservative.
 8              So he applied an analysis of another benchmark, two
 9     sets of benchmarks to identify what Syngenta's lost profits
10     were.   Again, he started with comparing their actual and
11     budgeted azoxystrobin gross profits.  For 2014 and 2015, while
12     the '138 Patent was in force, he used the crop protection
13     fungicides.  This is the aggregate of all of Syngenta's crop
14     protection fungicides to determine -- to basically adjust for
15     his analysis.
16              Syngenta didn't make their budgets in some years.
17     Syngenta made their budgets in other years.  And in order to
18     account for extraneous factors, he used the crop protection
19     fungicides, that experience, to filter out those factors.  But
20     for 2017, that was a different scenario, because the compound
21     patent had expired that year.  So what he did was, instead of
22     using the crop protection fungicides benchmark, he went to
23     Syngenta's actual experience in 2014.  That was the first year
24     in which Syngenta lost effective exclusivity on its
25     azoxystrobin products, due to Willowood's early market entry.

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 11 of 109

1    That served as an actual experience, an effective benchmark to

2    calculate the lost profits as a result of Willowood's

3    infringement in Syngenta.

4         For 2017 he used Syngenta's actual experience in 2015

5    as a benchmark and that was because that was the second year

6    after Syngenta lost effective exclusivity as a result of

7    Willowood's early market entry.

8         If we go to the '761, which is the slide 24 -- 34,

9    excuse me, in terms of the '761 DABCO Patent, Dr. Wilner says

10   in order to calculate Syngenta's lost profits for that patent,

11   he again opines that the damages for the compound patents is a

12   floor and that, again, is because whereas for the compound

13   patent Willowood got a one-year head start.  For the DABCO

14   patent if they are found to be infringing, that patent is still

15   in force and so their head start is significantly longer.  So

16   he says that's a bottom line floor for the damages for the '761

17   Patent.

18        In order to provide a more reasonable damages

19   estimate, one that is not overly conservative, he applied the

20   crop protection fungicides comparison for all years in order to

21   filter out, again, those extraneous market factors that I'm

22   sure Willowood will talk about.

23        So in sum, for the compound patents, Dr. Wilner used

24   the intra-meso comparison as a benchmark.  For the compound

25   patent, the '138 Process Patent, Dr. Wilner used a combination

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 12 of 109

of benchmarks.  He used the intra-crop protection benchmark as

well as Syngenta's actual experience.  And then for the '761

Patent, he used the crop protection fungicides as a benchmark

to calculate a damages position that was not overly

conservative.

THE COURT:  I want to be sure I understand that.

When you say, "benchmark," he didn't, in the cases that I read,

and we can talk about this later, it did not appear that

experts were starting with budgets and adjusting them with

benchmarks.  They were just using this benchmark theory.  That

may not be right, but you can address that as we're talking a

little bit later on, because I didn't actually see -- and I'm

not saying this is required -- but I did not see a case where

somebody had done exactly what Dr. Wilner is doing in this

case, which is, take the budget and then adjust the budget

using benchmarks, when in the cases that talked about

benchmarks they did not appear to be doing that.  They appeared

to be doing other things with the benchmarks using the

benchmark really as the measure, without consideration of

budgets.

If I'm not right about that, or if that's an

inadequate explanation -- if I'm right but that's not the whole

story, I'm going to look for you to clear that up for me when

we get to it.

MR. SANTHANAM:  Yes, Your Honor.

```
 1            THE COURT:  All right.  For Willowood, your overview.
 2            MR. TILLER:  Your Honor, two preliminary questions
 3   and one comment.  One question before I start my overview.  I
 4   want to apologize to everybody in the room if I cough a little
 5   bit.  It's allergies.
 6            THE COURT:  Tis the season.
 7            MR. TILLER:  But I will gasp for breaths a couple
 8   times here.
 9            Two, since this is our motion, do you want me to do
10   my overview and then just start to roll into --
11            THE COURT:  No.  I would like an a view not so much
12   about Dr. Wilner, because we're going to talk about Dr. Wilner.
13   I know they've talked about him a bunch, but I'm more
14   interested at this moment about how your client sees the
15   damages.  And, you know, I want you to just assume liability
16   for purposes of this discussion.
17            I know Mr. Jarosz calculated a royalty.  I assume
18   that's your view about it, but if you can, tell me how -- I
19   mean, I don't mind you addressing weaknesses in their theory --
20            MR. TILLER:  And I'm really here prepared to address
21   weaknesses in their theory,  because Mr. Jarosz wrote a very
22   lengthy report.  To be candid, Your Honor, the vast majority of
23   it was focused on the deficiencies and inaccuracies of
24   Dr. Wilner's report, which I think is summarized in our
25   pleadings.
```

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 14 of 109

 1          With regard to what we believe damages can and should

 2   be, as you noted, Mr. Jarosz identified a reasonable royalty

 3   analysis, which is permitted under Section 284 of the Patent

 4   Act.  In fact, it is expressly set forth in that section where

 5   it says that damages should be sufficient to adequately

 6   compensate the patent holder for the damages that they have

 7   incurred, but in no event less than a reasonable royalty.  And

 8   because there is such a -- to be quite candid, deficiency of

 9   data to determine what are the more common theories, which I

10   think Your Honor has already picked up on based on your

11   comments a second ago, Mr. Jarosz did a reasonable royalty

12   analysis.

13          So, for example, with the compound patents, there is

14   no dispute that the compound -- that 5-kilograms of

15   azoxystrobin technical was imported into the United States

16   before the expiration of the compound patents.  There is no

17   dispute that that 5-kilograms was not sold.  It had no effect

18   on the marketplace.  It occurred in 2013, and it was used

19   purely to do formulation and EPA testing, phys chem test.

20          THE COURT:  What kind of testing?

21          MR. TILLER:  Physical testing.  Because it was not

22   sold.

23          THE COURT:  In 2013?

24          MR. TILLER:  Correct.  We don't attribute any damages

25   to that and at best, would apply a reasonable royalty.  The

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 15 of 109

1  total sale price, if that azoxystrobin were to be sold.  It

2  wasn't.  It was provided to do the testing, but if it were to

3  be sold, it would have a market value of roughly of 2,000,

4  $2,500.  So to the extent that a reasonable royalty could be

5  applied to that, so be it.  We're talking about hundreds or

6  maybe even a thousand dollars.

7       With regard to the method patents, remembering that

8  the damages must be for infringement, not necessarily for the

9  product that results from the infringement.  Here, for the

10  method patents, the infringement -- the methods are methods of

11  manufacturing.  The parties certainly do debate as to whether

12  there are other manufacturing methods.  Those methods represent

13  incremental improvements to the method of manufacturing.

14       Let me take them in -- I guess what I'll call reverse

15  order.  I'll take the DABCO Patent first.  The DABCO Patent is

16  the one that is still in effect.  The DABCO Patent, method of

17  manufacture that is claimed in that patent is an improvement to

18  the method that's claimed in the '138 Patent.  As Your Honor is

19  aware, the '138 Patent covers two steps etherification and

20  condensation.

21       The DABCO Patent, the '761 Patent covers using DABCO

22  to catalyze the condensation reaction.  There is evidence that

23  by using the DABCO Patent efficiencies -- or that the

24  production is made more efficient by somewhere between ten to

25  20-percent.  So Mr. Jarosz used that 10 to 20-percent number,

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 16 of 109

calculated a reasonable royalty off of that and came up with
damages roughly in the range of two to $2.5 million. So that
is what we believe is the -- and by the way, that 2.5, you
know, assuming that we've been doing this the whole time, which
is the allegation, that 2.5 would also cover the '138. That
$2.5 million would also cover the '138 Patent, because it is
the actions. It is the same allegedly infringing conduct. It
is the same sales. It is the same production going to both,
and obviously --

     THE COURT: But the '138 Patent is not an improvement
patent. Your improvement argument, how does it work with the
'138 Patent?

     MR. TILLER: We argue there are other commercially
viable alternatives and that it actually does represent an
improvement. For example, there is another company to which
Syngenta sent a cease and desist letter that says you infringe
the '138 Patent and the other company came back and said, no,
we don't, here is what we do. So, again, he bases his
reasonable royalty analysis for the '138 Patent based on
testimony from Dr. Wilner himself talking about the
improvements, the efficiency improvements that the '138 Patent
brought to bear on some of the known earlier methods.

     Again, remembering that in 2014 -- that the '138
Patent expired in December of 2015, and at that point
importation was -- I'm not saying it didn't happen, it did, but

1  it was ramped up at that point, to be quite honest. So there

2  was just less stuff that was brought into the United States and

3  thus less infringing activity from July of 2014 to December of

4  2015.

5          So we believe and Mr. Jarosz will testify that

6  damages are more in the range of somewhere around $2.5 million

7  based on a reasonable royalty analysis.

8          Your Honor, I can stop here.

9          THE COURT:  That's good.  That's very helpful.  Thank

10 you.  Okay.

11         So we'll start with the motion to exclude Dr. Wilner.

12 Let me just tell you my general -- I won't call it my first

13 impression.  I think I'll call it my third impression, but you

14 all are here to help me form a fourth impression.  I didn't

15 have a lot of trouble with his testimony on the compound

16 patents or the '138 Patent.  I'm not trying to prevent anybody

17 from talking about that.  You know, the defendant may want to

18 talk about that more specifically.  I didn't have a lot of

19 trouble about that because here we are.  It just seemed pretty

20 straightforward to me, but when I got to the '761 Patent, I had

21 a good bit of trouble with Dr. Wilner's testimony, because he

22 did not -- he just assumed -- he made the same assumption about

23 the first, as I recall, I don't have it right in front of me,

24 but I think it was the first three *Panduit* factors for the '761

25 as he did for the other, which means he assumed the absence of

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 18 of 109

acceptable non-infringing substitutes, but by the time you get

to the '761 Patent after 2015, the '138 Patent has expired.

I do not understand Syngenta's argument that there is

no non-infringing alternative after that point. That seems to

not make sense to me. Well, it doesn't make any sense to me.

So perhaps it makes sense -- so Syngenta may want to address

that point. But Dr. Wilner just glossed over that and that

seems to me to be a pretty big problem for Syngenta.

So there we are. The whole non-infringing

alternatives, you know, kind of bleeds over into Syngenta's

motion a bit, but I don't understand how Syngenta can say after

the '138 Patent expired there were no non-infringing

alternatives, you know, whether somebody was making it or not.

I just have trouble with that.

I'll let everybody address those issues. But it did

seem -- I also have trouble from Willowood's point of view with

the argument with understanding how Willowood can say, oh, it's

just a royalty question, when clearly Willowood got advanced --

I say clearly. Clearly Syngenta has evidence that Willowood

got early entry because of its infringement. And so -- you

know, you all can address that, too.

As I indicated -- I think my case manager mentioned

to you all before, I did want you to help me with the cases

because, you know, Dr. Wilner's evaluation seems -- certainly

the cases make it clear that you do not have to do it any

1 particular way, as long as it meets Rule 702 in terms of lost

2 profits, price erosion. Syngenta has done it a slightly

3 different way here that sort of takes into account both of

4 those things without separately calculating them, I think, if I

5 understand correctly. But as I have said to you all before, I

6 am not a patent lawyer and will appreciate your help on that.

7 Let me hear from Willowood on their motion to exclude

8 Dr. Wilner's testimony.

9 MR. TILLER: Thank you, Your Honor. You mentioned

10 something just a second ago that I wanted to focus on, which

11 was that Syngenta has -- or Dr. Wilner has at least,

12 apparently, I think that may have been your words, apparently

13 taken into consideration both price erosion and lost sales. We

14 don't know that. That's the point. We don't know that.

15 So let me step back to the compound patents briefly,

16 Your Honor. As Syngenta's counsel set forth what Dr. Wilner

17 did was, he started with the Syngenta budgets and then modified

18 the analysis or used the mesotrione as a benchmark to allegedly

19 take into account other factors.

20 So let's start with the budgets. The simple fact of

21 the matter, Your Honor, is, Syngenta is not very good at

22 budgeting. Your Honor, these were attachments. These were

23 exhibits to our motion, but you'll see that -- and this is all

24 the data we have. This is all the data that was provided to

25 us, despite the fact that azoxystrobin was on sale at the

1   beginning of 1998.

2          In 2009, Syngenta overestimated sales by roughly

3   39-percent.  2010, again, similarly off.  2011, similarly off,

4   although admittedly, this time they underestimated sales.

5   2012, like we said in our paper, not bad, not great, but not

6   bad.  2013, again, off.  2014, again.  This is the universe of

7   data.

8          The Federal Circuit has said if the data is

9   unreliable, then the opinion is unreliable and they said that

10  in -- and I read a lot of cases over the weekend, Your Honor.

11  *Power Integrations versus Fairchild*.  They said that the source

12  and the reliability of the data is material.  You can't rely on

13  bad data.  Everything that we know, and that is the universe of

14  what we do know right now.  Again, maybe from 1998 to 2008 they

15  were much, much better at it and these are anomalies, but we

16  don't know that.  When the data is bad, the opinion is

17  unreliable.  And it is not as if they were just off with

18  azoxystrobin.  Again, these were all exhibits that were

19  attached to our pleadings.

20          If you look at the analysis, their budgets for each

21  azoxystrobin product, they have what they call -- Syngenta has

22  a brand ladder; more expensive products, less expensive

23  products.  And as you can see, the budgets are wildly, wildly

24  off.  It is not --

25          THE COURT:  Maybe Syngenta can answer this when they

Syngenta vs. Willowood, et al        1:15CV274

get to it, but do you have the budget for -- I'm going to call

them meso products?  Do you have their budgets for --

        MR. TILLER:  There is the mesotrione budgets.

        THE COURT:  What I understand Dr. Wilner did is, he

took the budgets and then he adjusted them using what happened

with the meso actual sales.  One of my questions is:  Did they

track from 2009 to 2013 before you started seeing arguably

effects on --

        MR. TILLER:  Before we started importing.

        THE COURT:  Yes.  Do you understand my question?

        MR. TILLER:  I'm not sure I do.

        THE COURT:  Well, he's adjusting the azoxystrobin

budgets based on what happened with the meso sales.

        MR. TILLER:  Correct.

        THE COURT:  Well, if that would have tracked for

2009, then that's reasonable.

        MR. TILLER:  I think I do understand what you are

saying.

        THE COURT:  I'm not a numbers person, either.

        MR. TILLER:  This is going to be a theme not just for

the meso budgets but for the crop protection fungicide analysis

that he did for '138 and '761.

        I think what you are saying is, hey, if azoxystrobin

sales versus budgets sort of tracked in the same way that

mesotrione sales versus budgets year over year, they are

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 22 of 109

1　consistently --

2　　　　　THE COURT:  Up or down, whatever.  Roughly the same

3　percentages.

4　　　　　MR. TILLER:  Up or down and roughly the same

5　percentages.  The short answer is, we have no idea.  The short

6　answer is -- and you have had a chance to read Dr. Wilner's

7　opinion.  Nowhere, nowhere does he do that.

8　　　　　THE COURT:  I knew he didn't do it, or I didn't see

9　it.

10　　　　　MR. TILLER:  He did not do it and we're not aware,

11　and we certainly don't have -- you know, that data has not been

12　calculated and, again, I think -- so we start with the

13　fundamental premise that Syngenta is not good at budgeting.

14　　　　　Again, *Power Integrations versus Fairchild*, if the

15　data is unreliable, the opinion is unreliable.  We cited to a

16　number of cases.  The *Sunlight* case.  Other cases where

17　budgets -- the *Celebrity Cruise* case out of the Southern

18　District of New York.

19　　　　　I know you wanted us to focus on the Federal Circuit,

20　but a lot of those cases analyzed the propriety of using

21　budgets as a benchmark.  I can't claim to say universally, but

22　many of those cases have not.  Obviously all the cases we cited

23　point to the fact that you can't just rely on the budgets,

24　particularly if there is a history of those budgets being

25　wrong.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 23 of 109

         1          THE COURT:  Well, of course he didn't.

         2          MR. TILLER:  He didn't.  That is absolutely true.

         3    Well, let's stick with the compound patents first.  With the

         4    compound patents, he does.  What he does is, he says mesotrione

         5    in any particular year our budget said X.  In 2014 we estimated

         6    this.  In 2014 our actual sales was this.  The difference was

         7    -- let's just make up a number.  The difference was 10-percent.

         8    I'm going to go back to the azoxystrobin budgets and say, well,

         9    using mesotrione as a benchmark, Syngenta sales would have been

        10    90-percent of their budgeted sales and because they were

        11    70-percent, I'm giving that as the difference.

        12          So for the compound patents he's using budgets on

        13    both as his starting point and as his benchmark adjustment.

        14    There is two problems with that, Your Honor, in addition to the

        15    fact that the budgets are just -- there is a history of

        16    inaccuracy.

        17          THE COURT:  For the meso, though, he's using the

        18    difference between the budget and actual sales.

        19          MR. TILLER:  Correct.

        20          THE COURT:  Okay.

        21          MR. TILLER:  Then he is saying whatever that

        22    percentage is, I'm going to apply it over here to azoxystrobin.

        23    So we start with the budgets are back.  And this is a problem,

        24    because we don't know how the budgets are done.  And to be

        25    perfectly candid, Your Honor, neither does Dr. Wilner.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 24 of 109

    1            You focused earlier on page 30 of his report.  His

    2    analysis of using budgets as a benchmark and mesotrione as a

    3    benchmark is all encompassed on pages 29 to 30 of his report.

    4            He testified -- my partner specifically asked him, is

    5    there anything else that is important, anything else that you

    6    relied on?  He said, no, it's all right there.  So while in

    7    talking about using budgets as a benchmark while he talks about

    8    this is an exacting process and the product leads and sales

    9    managers taking copious amounts of data and review that data

   10    and then are constantly analyzing that data to figure out the

   11    budgets.  We don't know what that data is, and I think -- we

   12    have no clue what -- I'm going to give you a couple of

   13    examples.  I'm going to show you quickly on the screen.  They

   14    are just kind of random examples, but for example --

   15            THE COURT:  So if I can back away a bit from what you

   16    are saying.  Nobody has been identified by Syngenta as a

   17    witness who is going to come in and testify about the budget

   18    process?

   19            MR. TILLER:  I will tell you this, Your Honor, I

   20    don't know.  I mean, nobody has been specifically identified as

   21    a budgeting person.  But the fact of the matter is, I think --

   22    you know, we're -- he is supposed to -- he concedes, and the

   23    law is very clear, that he has the obligation to make sure that

   24    the data is reliable, to make sure that the data makes sense.

   25    Very conspicuous in his report, and it is on page 30, I think

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 25 of 109

1   it's on page 30, he says, "given the exacting process employed

2   to create the budgets, Syngenta believes that the budgets

3   provide the best estimate about what the gross sales, net

4   sales, cost of goods sold and gross profits will be for each

5   Syngenta product."  He doesn't say, I have confirmed or I have

6   run the numbers or anything like that.  He says, I'm just going

7   to take them at their word.  What we don't know, we don't know

8   anything, quite frankly about the budgeting process.  So for

9   example, I'm sure you heard, you know, there is the concept --

10          THE COURT:  Well, see, that's why I am asking you,

11  because experts -- it depends.  Mr. Jarosz doesn't know

12  anything, for example, about whether there are non-infringing

13  alternatives.

14          MR. TILLER:  That is true.

15          THE COURT:  He cannot possibly know that and yet, if

16  you have other evidence of non-infringing alternatives that is

17  in front of -- this is what I understand the law to be.  I'm

18  asking you to correct me if I'm wrong.  If you have other

19  evidence of non-infringing alternatives, then his opinion,

20  based on the existence of those non-infringing alternatives,

21  may well be admissible.

22          MR. TILLER:  Yes.

23          THE COURT:  If, however, you do not have any such

24  evidence, then his opinion is not going to be admissible.

25          MR. TILLER:  Fair point, Your Honor.

Syngenta vs. Willowood, et al          1:15CV274

1           THE COURT:  As to Dr. Wilner -- that's why I asked

2    you about their other witnesses because if they had other

3    evidence about these budgets, I don't know that they do or not,

4    then maybe he could base his opinion, you know, in the -- I'm

5    old.  What we used to call hypothetical questions.

6           MR. TILLER:  Understood.

7           THE COURT:  You know, so that's why I asked you that

8    question.

9           MR. TILLER:  Here is the difference, Your Honor.  In

10   his report, Mr. Jarosz said here is the evidence I'm relying

11   on.  Dr. Wilner hasn't told us.  Again, it is all on pages 29

12   and 30.  He doesn't tell us anything other than it is an

13   exacting budgeting process, they look at everything.  We don't

14   know what they had.  We don't know how they analyzed it.  We

15   don't know how it changes.

16          There is also something interesting in the report

17   that he says over and over again.  They have consistency in the

18   budgeting process, you know, they use -- the budgeting process

19   is the same.  That's a really interesting fact, because he also

20   concedes that every product is different, every product faces

21   different market conditions.

22          In fact to quote him he says, "Each product faces

23   different marketing conditions as exclusivity could change, new

24   Syngenta products could be introduced, competition could

25   change.  The crops on which the product is used have different

```
 1   economics.  The geographies in which the products are primarily
 2   sold --
 3             THE COURT:  When you read, you need to slow down or
 4   the court reporter --
 5             MR. TILLER:  Do you need me to say that again?
 6             THE COURT:  No.  She followed you.
 7             MR. TILLER:  He finishes the sentence with, et
 8   cetera.  It's an interesting use of the word, "et cetera."  I'm
 9   not sure what that et cetera is supposed to analyze there,
10   particularly when it is his obligation to tell us what he has
11   done.
12             So, for example, these are just some different
13   documents from Syngenta.  These first two talk about
14   essentially price elasticity.  I'm sure you're well-aware of
15   that one, Your Honor, as prices go down, sales tend to go up
16   and vice versa.  So this data that Syngenta has says a
17   20-percent reduction in price would increase volume by
18   84-percent and increase revenue by 46-percent.  Did they take
19   that into account?  How did they take that into account?  What
20   did they do with that data?  We don't know.
21             THE COURT:  I guess I don't really -- what's wrong
22   with this approach?  You know, they -- yes, the budgets are not
23   always accurate, but that's the point of the benchmarks is, to
24   correct the budgets to show inline with actual experience of a
25   some what similar product.  You know, when you look at the
```

Syngenta vs. Willowood, et al        1:15CV274

cases that talk about damages other than reasonable royalty,
you don't have to show for sure, because what you are talking
about is a hypothetical universe where infringement did not
happen, so you have to make some assumptions. You have to make
some adjustments. You have to make -- I don't want to use the
word guesses exactly, but you have to say, okay, well, what
would have happened. You cannot say, well, this absolutely
would have happened, because nobody can do that. That's
impossible. So what they have to do is come up with a
reasonable probability, and why is this not a reasonable
probability? Let's just stick with the compound patents and
the '138.

            MR. TILLER: Let me get to that, Your Honor. I
agree. There has to be some level of speculation to determine
this but for world, but the courts have said and the Federal
Circuit in particular is getting pretty strict on this point,
that if you're going to use comparisons -- and while I think
Your Honor sort of put aside the reasonable royalty cases, I
think those cases are very interesting. I'll get to that in a
minute. But you have to -- it is your burden as the expert
to -- it is your burden as the proponent of that testimony to
show why that but for world is reasonable. I don't think there
would be a debate about that.

            And so looking -- let's stick with the budgets for
half a second, then I'll move onto the mesotrione.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 29 of 109

1            There is all this data.  He says that, you know,
2    whether competition could change, whether Syngenta offers new
3    products can be taken into account.  Here, they say "Syngenta
4    will launch three new fungicide active ingredients over the
5    next --
6            THE COURT:  Slow down.  I'm sorry, I couldn't follow
7    you.
8            MR. TILLER:  "Syngenta will launch three new
9    fungicide active ingredients over the next four years."  Did
10   they take that into account in their budgeting?
11           There is an interesting one here, Your Honor, where
12   they say "generics gained minimum volumes in 2015."  So
13   remember now we're already a year into our alleged
14   infringement.  "Generics gained minimum volumes in 2015.  A
15   generic volume represents about 2-percent of the total market."
16           THE COURT:  Well, that's because you lowered the
17   price and they had to match the price and, therefore -- I mean,
18   at least arguably, I'm sure that's what they are going to say.
19   They are nodding yes.
20           MR. TILLER:  Of course that's what they are going to
21   say, but the question is, how do they take into account in
22   their budgeting?  We don't know.  We don't know, they don't
23   know.  They haven't told us.
24           Part of the reason we have expert reports is so that
25   we're not getting blindsided at the trial.  You know, another

1  example which is very interesting right here, they say in 2016

2  that there is a risk that commodity prices could deteriorate

3  reducing farm economics further and that that could have a 10

4  million-dollar effect on sales in 2016.  Did they take that

5  into account?  We don't know.  If they did, how did they take

6  that into account?  We don't know.  And unquestionably,

7  Dr. Wilner doesn't know.

8        Now let me go to mesotrione, because I think Your

9  Honor is making the point that Syngenta will make.  Did they

10  have to come up with -- there has to be a way to do this, but

11  the courts have said over and over and over again, that because

12  it is hard, because there might be -- it might not be easy, you

13  still have to prove that the but for world is reasonable in

14  light of the world that you are in.

15        So the courts have over and over again said you can't

16  use that as a benchmark.  You can't use this as a benchmark, so

17  let's --

18        THE COURT:  But they also said several times you can

19  use things as benchmarks and meso does have some similarities

20  to the azoxystrobin.

21        MR. TILLER:  I'm not sure it does.

22        THE COURT:  Isn't that a question for

23  cross-examination?

24        MR. TILLER:  No, Your Honor, it's not.  For example,

25  let's look at the *Crystal Semiconductor* case, Federal Circuit.

Syngenta vs. Willowood, et al      1:15CV274

1   This involved technology, which seems so old these days despite

2   the fact that it was less than 20 years ago, technology to

3   convert analogue converters, to take an analogue signal and

4   make it a digital signal.  What the expert tried to do was use

5   the PC market -- or to use the Apple market as a benchmark for

6   the PC market.  Both computers.  Both have huge sales.  Both

7   use very similar -- both face similar market conditions.  The

8   Federal Circuit said, no, you cannot use that as a benchmark.

9   You cannot use that as a benchmark because you have not

10  shown -- it is your burden to prove -- you have not shown that

11  there is enough similarities in the market conditions to

12  justify use of the -- to justify use of that as a benchmark.

13          I defy Syngenta to tell us this.  There is nothing in

14  Dr. Wilner's analysis that talks about how the market

15  conditions facing mesotrione are similar to the market

16  conditions facing azoxystrobin.

17          Here is what they say are the similarities:  They're

18  both big sellers.  Okay.  They are both big sellers.  They both

19  came off -- we lost exclusivity; one through patent expiration

20  and one through FDA data compensation exclusivity at about the

21  same time.  And they both are sold as mixtures.  But there is

22  nothing to tell us as to why the markets are similar.  It would

23  be easy for them to do that, Your Honor, because both of these

24  compounds have been on sale for a long period of time, and as

25  you I think correctly pointed out a second ago, it could have

  1  been pretty easy to show that they track each other, but

  2  Dr. Wilner didn't do that.  Here is what we know.  We know

  3  mesotrione fights weeds, fights the proliferation of weeds.  We

  4  know that azoxystrobin fights certain fungal diseases.  We've

  5  given you the labels for both.  There is literally nothing that

  6  is similar.

  7          They say, well, they're both used on the same crops,

  8  or they are both used on some, I emphasize some, some of the

  9  same crops, but that's like saying, you know, gasoline and

 10  windshield wiper fluid are subject to the same market

 11  conditions because they are both used on cars.  Shampoo and

 12  hair dye faces the same market conditions because they are both

 13  used in hair.  It is as preposterous as saying aspirin and

 14  chemo drugs, well, they are both used on the human body so

 15  thereafter they face the same market conditions.  You can't

 16  make conclusory statements like that, and the federal circuit

 17  has been saying over and over again you can't just make

 18  conclusory statements.

 19          THE COURT:  Which cases are you talking about where

 20  they say that over and over again?

 21          MR. TILLER:  I will concede that they are in a lot of

 22  reasonable royalty cases but, again, reasonable royalties, they

 23  use benchmarks in reasonable royalties.

 24          THE COURT:  Right.

 25          MR. TILLER:  They use other licenses.  For example,

1  in *Birnetx*, *767 F 3d. 1308, 2014 case*.  "We have held in

2  attempting to establish a reasonable royalty --

3        THE COURT:  When you read, read slowly.

4        MR. TILLER:  "We have held that in attempting to

5  establish a reasonable royalty, the licenses relied on by the

6  patentee in proving damages must be sufficiently comparable to

7  the hypothetical license at issue.  When relying on licenses to

8  prove a reasonable royalty alleging a loose or vague

9  comparability between different technology or different

10  licenses does not suffice."  And that Court was quoting the

11  *Laser Dynamics* Federal Circuit decision.

12        This court, the Birnetx court goes on to say that

13  "the expert must account for differences in the technologies

14  and economic circumstances of the products."  That was not done

15  by Dr. Wilner here.

16        In the *Whitser versus Computer Packages* case, *694 F.*

17  *3d. 10*, Federal Circuit 2012, in talking about the analysis of

18  the *Georgia Pacific* factors and, Your Honor, I think you know

19  that *Georgia Pacific* are certain factors that an expert may or

20  may not examine in determining a reasonable royalty.  The Court

21  said, listen, the expert doesn't have to analyze every single

22  factor, but when you do look at a factor, you cannot just -- or

23  the expert cannot just make a conclusory remark about its

24  impact on the damages calculation.  It requires some basis for

25  comparison so that the jury can make that analysis.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 34 of 109

1          Another case is the *Lucent versus Gateway* case.  In

2    that case, again, concededly, a reasonable royalty case, but in

3    looking at the licenses that were being used, the court said,

4    many of the -- "some of the licenses are radically different

5    from a hypothetical agreement under consideration for this

6    particular patent."  And they also criticized the expert

7    saying, "we are simply unable to ascertain from the evidence

8    presented the subject matter of the agreements and the market

9    conditions applicable to those agreements."  The court went on

10   to say the party's expert never explained to the jury whether

11   the patented technology is essential, what market conditions

12   were in effect, and so --

13          THE COURT:  You've been talking for 30 minutes so I

14   do need you to move on at some point to the '761 Patent because

15   I am hoping we'll get done before lunch.

16          MR. TILLER:  Yes.  As I am.  '138 and '761 both --

17   let me talk about what they have in common in the analysis.

18   The analysis is -- Dr. Wilner says here are the actual sales

19   for azoxystrobin in each year, and I'm going to increase them

20   or decrease them by sales of crop protection fungicides.  So

21   the first thing he does is, he says, well, had they had -- had

22   there not been an infringement, their sales would have actually

23   started up higher, and then I'm going to move them based on

24   crop protection fungicide.  This is the same problem, Your

25   Honor.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 35 of 109

1     First of all, theoretically, there should be a lot of
2  data that says azoxystrobin sales tend to move up and down in a
3  similar way to the crop protection fungicide sales.  Dr. Wilner
4  does not do that analysis.  And then there is the same problem
5  that we saw with mesotrione, but here it is amplified by ten,
6  and the reason for that is, Dr. Wilner just says, well, crop
7  protection fungicide sales, azoxystrobin is a fungicide, of
8  course their sales are going to move up and down together.  He
9  does not identify one iota of evidence to establish the
10 similarity of the market condition of the products.  They are
11 in this group of crop protection fungicides.  I think there is
12 19 different ingredients that fall into that designation.  They
13 are obviously -- they are different active ingredients.  They
14 do different things, presumably based on Dr. Wilner's own
15 statement that the market conditions facing each product are
16 different.  He just assumes, without -- he doesn't even attempt
17 to make some facial remark that the market conditions are
18 similar.  He just blows by it.  I presume the assumption is,
19 well, crop protection fungicides are fungicides, azoxystrobin
20 is a fungicide, of course the market conditions facing each one
21 are the same.
22     As we saw in the *Crystal Semiconductor* case out of
23 the Federal Circuit, as we saw in Eleven Line case out of the
24 Sixth Circuit, you can't just say, well, two things are the
25 same, therefore, you can use them as a benchmark.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 36 of 109

1        So for example, in Eleven Line, which I think is a

2   spot-on case, the expert was using -- the plaintiff's owned a

3   facility, and claimed that certain things had happened.

4        THE COURT:  Keep your voice up.

5        MR. TILLER:  In Eleven Line, the expert said, I'm

6   evaluating the but for world for this facility located in a

7   particular city and I'm going to use as a benchmark the

8   plaintiff's own facilities in other locations, all owned by the

9   plaintiff, all running under the same name brand, all doing the

10  same business.  The Court said, no, that's not good enough

11  because you are just assuming that they are all the same.  You

12  haven't analyzed.  They are in different cities.  What are the

13  market conditions facing those cities?  Maybe in some of those

14  cities the service that is offered is more needed, less needed.

15  Maybe in some of the cities the facilities are kept cleaner,

16  the employees are nicer, whatever it may be.  There was no

17  analysis of the market conditions and the court said just

18  because you say it, doesn't make it so.

19        There is not one sentence in Dr. Wilner's report

20  justifying his use of crop protection fungicide as a benchmark.

21        Now I want to point to something Mr. Santhanam said

22  during his initial overview, which is, the case law has shown

23  benchmarks are used all the time.  But I think, Your Honor, you

24  very correctly pointed out that there doesn't seem to be a case

25  where benchmarks are used in this way.  I think you're exactly

1  right.  There isn't a case where benchmarks are used in exactly
2  this way.

3      The case that Syngenta really focuses hard on is the
4  *Erickson* case.  There is a lot of discussion about the *Erickson*
5  case.  The *Erickson* case is a price erosion case.  That's not
6  what Dr. Wilner did here.  In *Erickson* there was -- and I'll
7  quote the court, "substantial evidence" of the similarities of
8  the market between the benchmark product and the product which
9  was being infringed upon.  Substantial evidence.  The Court
10 went on to say -- because what was going on was, the expert was
11 trying to show what the price should have been but for the
12 infringement.  The Court said, despite the fact that the
13 product, the benchmark product was obsolete, some new
14 technology had come in to make one aspect of the product
15 better.  The expert did a significant analysis to show that
16 that factor, that improvement to the technology did not effect
17 the price.  So, therefore, because the price -- here is what
18 the price would have been, the differences in the two
19 technologies wouldn't have effected that price.  The Court
20 said, okay, we can let you use that as a benchmark to establish
21 what the price should have been in this case.  That's a far cry
22 from what is going on here.

23      Here, particularly when you talk about -- at least
24 with mesotrione he tried to do some comparison of the product.
25 He didn't do a comparison of the market, not a lick, but he at

Syngenta vs. Willowood, et al        1:15CV274

1    least tried to compare the products.

2             When he uses crop protection fungicides as a

3    benchmark, Your Honor, he doesn't even attempt -- he does no

4    attempts to compare the markets.  He does no attempt to compare

5    the products and, presumably, this is data that would -- that

6    should be out there and it hasn't been provided and he

7    certainly hasn't analyzed it.

8             So in effect what he has become, he's just become the

9    mouthpiece for Syngenta.  They think these sales go up and down

10   together.  He thinks they go up and down together.  They think

11   mesotrione sales go up and down with azoxystrobin, they think

12   it, he thinks it.  They think their budgets are right, he

13   thinks their budgets are right.  That's what we have going on

14   here and that is not permitted.

15            THE COURT:  I mean, he doesn't think their budgets

16   are right, because obviously they aren't.  That's the whole

17   point of what follows after the budgets is to correct -- as I

18   understand it, he takes the budget as the starting point, but

19   he knows that they don't reflect reality, so you have to adjust

20   them for what actually happens, which is what I think as I

21   understand it he's trying to do.  So, I mean, it's not really

22   enough to say, well, the budgets are inaccurate.  All budgets

23   are inaccurate that's why you adjust them for reality.

24            MR. TILLER:  He starts with the premise -- when he

25   does his analysis he starts with the premise that but for the

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 39 of 109

1  infringement the budgets were accurate.  That's what he starts

2  with.  He says the budget -- they would have, but for the

3  infringement, the budgets -- they would have met the budgets or

4  at least been closer to the budgets.  What he uses mesotrione

5  for, remember, is to account for what other market conditions

6  may have been in play, or why he believes mesotrione is

7  indicative of those market conditions when it is a completely

8  different product in a completely different area of

9  agricultural chemicals.  We don't know, but he says whatever

10 that difference is in mesotrione budgets for sales --

11           THE COURT:  I understand --

12           MR. TILLER:  -- the same thing would have happened.

13 But he starts with the fundamental premise that the budgets are

14 the place to start.  And when they are inaccurate, when they

15 are wildly historically woefully inadequate, you can't start

16 with that fundamental premise that they are right, or at least

17 close to right, because that's what he is starting with.  He's

18 starting with the premise of, they are pretty close, then he

19 adjusts them --

20           THE COURT:  I'm going to give you five minutes to

21 finish up.

22           MR. TILLER:  Your Honor, I'm done, other than the one

23 sort of extraneous point of our motion, which is, the testimony

24 about the formulator's exemption.  As you know, Your Honor

25 dismissed that count.  That count would have led to --

1    THE COURT:  So there is two parts of that.  One is

2    the evidence that you went to the EPA and you got this

3    approval, which allowed you to enter the market early.  Are you

4    saying that that's inadmissible, as opposed to the evidence

5    that you -- I'll just call it the 404(b), the bad conduct

6    aspect of that evidence.  There is two parts of it.

7    It seems to me that Syngenta is allowed to come in

8    and say they went in -- they used our stuff, they got this

9    formulator's exemption and that allowed them early entry and

10   that is why we started getting damages sooner rather than

11   later.  There is that.  I have trouble understanding why that's

12   not admissible.

13   The second part is a little different.  If they want

14   to, you know, call you a bad actor for misrepresentations that

15   were made in those applications and such, I'm going to let them

16   tell me why that's relevant.

17   Do you see what I'm saying?

18   MR. TILLER:  I do.  I think in that first -- so first

19   of all, I agree with you on that second part, that's not

20   relevant.  On that first stuff, I think there is actually two

21   things in there.  One, the fact that we applied for EPA

22   registration in 2013, the fact that we were approved in 2014,

23   all before their patents expired, and the fact that we used the

24   results of testing done in the United States that may have been

25   in violation of the patents, that all comes in, of course.

Syngenta vs. Willowood, et al          1:15CV274

1        The fact that we used their data, the fact that we

2   made a statement to the EPA that we were going to use them as

3   our supplier, that shouldn't come in, because the only reason

4   that comes in is to show that we somehow violated the

5   formulator's exemption or the 404(b), for bad conduct.

6        THE COURT:  Doesn't it show infringement?

7        MR. TILLER:  No.  That has nothing to do with

8   infringement.  Infringement is the importation of the

9   azoxystrobin into the United States.  That they can offer

10  evidence of, absolutely.  We can't get around that fact.  The

11  fact that the results of the testing was submitted to the EPA,

12  that can come in, too.  No dispute about that.  It is our

13  allegedly improper statements to the EPA about the source of

14  our azoxystrobin, about the data that we're relying on for our

15  azoxystrobin, that was the basis of the forward 404 claim which

16  has now been dismissed.

17       The problem comes if you -- if the Court allows that

18  to come in, then we have to start putting on evidence about why

19  there was nothing wrong with what we did.  They're bringing it

20  in to show we did something wrong, let's face it.  That's the

21  purpose behind it.  And then we have to come in and say, well,

22  no there is reasons we did it, we're allowed to do it.  The EPA

23  has said we can do it.  Whatever is the countervailing evidence

24  and all of a sudden we're having a trial about the 404 issues,

25  and I will tell you, that trial of the 404 issues, will --

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 42 of 109

```
 1              THE COURT:  When you say 404, you're talking about
 2    the --
 3              MR. TILLER:  Formulator's exemption, statements to
 4    the EPA.
 5              THE COURT:  Are you talking about the copyright
 6    claim?
 7              MR. TILLER:  No.  Unfair and deceptive trade
 8    practices.
 9              THE COURT:  All right.  Sorry.  I hear 404 and I'm
10    like, evidence rule.  You're talking about unfair and deceptive
11    trade practices.
12              MR. TILLER:  I'm talking to unfair and deceptive
13    trade practices and the basis of that is, you violated the
14    formulator's exemption.  I just want -- you know, the
15    statements that we did something wrong as a result of those,
16    the allegations that we did something wrong, those have all
17    been thrown out and should be excluded.
18              Thank you, Your Honor.
19              THE COURT:  I'm going to let you get started and
20    we'll take a break wherever you get to a reasonable stopping
21    point.
22              MR. SANTHANAM:  Your Honor, I'm going to start on
23    slide nine of the slide deck that we have prepared.  Just
24    briefly to touch upon this argument about reasonable royalties
25    that counsel for Willowood raised.  What they came in and told
```

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 43 of 109

1  the Court was, our expert has calculated a reasonable royalty,

2  that's a better estimate of damages, therefore, the Court

3  should go with it.  And, quite frankly, that's not the law.

4          The case that we would direct the Court to in that

5  respect is the *Delmar Avionics* case, *836 F 2d. 1320*.  In that

6  case, the defendant made the exact same argument.  They said,

7  well, trying to figure out lost profits is going to be too

8  complicated, the Court should just adopt this reasonable

9  royalty analysis that our expert has calculated, and the Court

10  adopted it.  The district court said, okay, I'm going to adopt

11  a reasonable royalty analysis.

12          What Federal Circuit said was, no, it's not -- in

13  order to prove damages you don't have to prove it with

14  precision, and what the Court needs to do is, measure -- you

15  know, the Court is required to approximate the lost profits, so

16  we can't just adopt a reasonable royalty as just an

17  alternative.  The lost profits analysis has to be addressed.

18          Now if we can turn to the discussion of the budgeting

19  and benchmarking analyses.  One thing -- I want to go back and

20  start with a brief overview of how the damages analysis has

21  been -- there has been a lot of talk about how Syngenta

22  struggled with the budgets, and that's not entirely accurate.

23  The way that Dr. Wilner calculated his damages analysis was, he

24  started, number one, with Syngenta's actual experience with

25  azoxystrobin products and said, okay, well, this is how much

Syngenta made year after year by selling their azoxystrobin
products, and in order to get to the but for world of where
would they have been without Willowood's infringement, you
first start -- he adjusted the actuals with the budgets so the
budgets are the first benchmark that he used.  The reason he
started with the budgets is, because he had discussions with
Syngenta's employees.  He had discussions about how that
budgeting process goes.

What we have here up on the screen is an excerpt from
his deposition transcript.  Your Honor, we're happy to provide
the Court with the full deposition transcript if needed, but
the reason we highlight this is, that Willowood's counsel had
every opportunity to question him about that budgeting process
and why he felt that it was exacting and, in fact if
you -- we're in Dr. Wilner's deposition transcript starting on
page 231.  Willowood's counsel says -- asks, you know:

"As I understand it, you had discussions with
Syngenta personnel about how they do their budgeting."

His answer is:  "I'm happy to talk about it."  And
then he asks about:

"Is it your opinion that the budgeting process is
exacting?"

And he says:  "No, it's not just what Syngenta told
me, it is my opinion that they go through an exacting budgeting
process."

1          If we go over to page 232 Willowood asked:

2          "Who did you talk to?"

3          And Dr. Wilner explained, I spoke with Mr. Cecil,

4    Jeff Cecil who is head of the business.  He said he spoke with

5    Andrew Fisher, who is the projected lead for azoxystrobin who

6    was involved in the initial preparation of the budgeting

7    process.  He spoke with Dr. Wichert, who is involved in

8    shepherding the azoxystrobin business.  He also talked with the

9    Victoria Bublyk, who is the controller, and he explained, I

10   talked with all of these individuals, I'm happy to talk about,

11   you know, what they told me.  And rather then going over the

12   alleged budgeting inaccuracies, if they really believed that

13   that was such a big factor that undermines the analysis, they

14   would have asked him questions about it.  All he said was -- if

15   you go to the next page is:  What you see on pages 29 and 30,

16   is that sufficient?  And his answer I think is very

17   important -- I'm sorry, Your Honor --

18          THE COURT:  Isn't that the answer right there, As you

19   sit here today -- well, that's where the question is at the

20   very bottom of 233, but the answer is on 234, right?

21          MR. SANTHANAM:  It is on 234, Your Honor.  He says,

22   "As I sit here today, I believe that everything of great import

23   is here.  There are other facts that I determined that I

24   learned from and which might be relevant if a certain topic

25   gets raised by you, Mr. Jarosz or someone else, but in overall

Syngenta vs. Willowood, et al        1:15CV274

 1  generalities, I'm comfortable with Pages 29 and 30."  And

 2  that's when they stopped it.  They didn't ask him about the

 3  budget variations or what happens when you go within, you know,

 4  individual products or any of these issues that they say we

 5  don't know about the budget process.  They didn't ask him about

 6  them.  So that's number one.  But they also had the ability --

 7  they did depose Mr. Cecil.

 8          THE COURT:  Of course they don't have to ask

 9  questions to make your expert's testimony admissible.  Right?

10          MR. SANTHANAM:  That is correct, Your Honor.  But

11  what the expert report serves as is to provide our expert's

12  opinions and the basis of their report.  It is not there to

13  predict every possible argument that Willowood could possibly

14  make and insert all of those arguments into the report.  If

15  they had questions or attacks that they wanted to pursue about

16  the budgeting, they had ample opportunity to do so.

17          THE COURT:  I have an opinion coming out that says

18  something sort of like that.  Watch your advance sheets.  It

19  doesn't say exactly that, but it does say an expert is not

20  required to anticipate objections to his report in his initial

21  report, but once those objections are made, you do sort of

22  anticipate some response to it.

23          Did you all do rebuttal reports?  I can't remember.

24          MR. SANTHANAM:  It was not built into the schedule,

25  Your Honor, but I do believe Willowood served one supplemental

1  report in this case.

2         THE COURT:  Okay.  So what is your intention when you

3  get to trial?

4         MR. SANTHANAM:  Exactly.  So Your Honor asked who is

5  Syngenta going to call for the underlying information.  Well,

6  they've deposed a few of them.  Andrew Fisher, Rick Wichert,

7  Jeffrey Cecil.  Those witnesses are all on our trial witness

8  list that we submitted last week.  Victoria Bublyk, who is the

9  financial controller who is listed on our witness list as well.

10 And so these --

11        THE COURT:  They were disclosed early on in

12 connection with -- I always have to go back and look at the

13 rules -- but something to give some hint that they would be

14 talking about budgets and sales and lost profits and --

15        MR. SANTHANAM:  Yes.  They wanted discovery with our

16 initial disclosures.  Each of these individuals were

17 identified.  If Willowood wanted to believe that this was an

18 area that they wanted to explore, the point is, that they had

19 ample opportunity to explore.

20        Now the next issue I want to talk about is, we heard

21 a lot about what Dr. Wilner specifically didn't do.  There is

22 so many variations that he didn't account for, market factors

23 that he didn't account for.

24        If we can turn back to the slide deck and we go to

25 slide 28.  One thing we didn't hear about from Willowood in

their papers, conspicuously it wasn't in their papers and we
didn't hear about it just a moment ago, are all of the
confirmatory first story analyses that Dr. Wilner did in order
to verify that his analyses were sufficient, that there was a
reasonable probability for his damages.

With respect to, for example, the compound patents,
Dr. Wilner used the intra-meso, that is a comparison between
what Syngenta made with -- what Syngenta budgeted for
mesotrione products versus what they actually made.  But he
then also looked at, well, how all of Syngenta's products
perform.  And he looked at how did all the crop protection
products perform.  He looked at the price impacts as a way to
gauge, is my calculation sufficiently conservative?  Am I way
off base here?  And none of that appears in their papers.  They
don't talk about his confirmatory analysis.

One other point that we would like to make, and this
is, perhaps, one of the more important confirmatory analysis is
at the bottom of slide 28.

THE COURT:  Does somebody have a telephone on?

Go ahead.

MR. SANTHANAM:  At the bottom of slide 28, Dr. Wilner
additionally corroborated his analysis based on reality, actual
experience, because the results that he gets through his
damages calculations reflect the one year head start that
Willowood got by infringing the compound patents, the two year

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 49 of 109

1   head start that they got by infringing the '138 Patent.

2           Can we go to the next slide, which is slide 29.  We

3   saw this slide a little bit earlier.  I would like to explain

4   why this slide -- this analysis confirms Dr. Wilner's analysis.

5   On slide 29 we have his analysis of the but for world versus

6   the actual world for the compound patents, and for each year he

7   calculated a yellow bar or golden bar that says this is how

8   much Syngenta -- you know, gross profits that they actually

9   realized and then he calculated through his model what Syngenta

10  would have obtained or would have garnered if it were not for

11  Willowood's infringement.

12          What is interesting is, if you look at years 2014 and

13  2015, again, this data is for the compound patents.  If you

14  look at the year 2014, what Syngenta actually made -- this

15  yellow bar, and you look at 2015, what Syngenta would have made

16  the next year but for Willowood's infringement, they're about

17  the same.  What that reflects is that Willowood had

18  approximately a one-year head start into the market.  So his

19  damages analysis is confirmed by actual experience in the

20  marketplace.

21          THE COURT:  It doesn't look like it continues out.

22          MR. SANTHANAM:  Pardon me, Your Honor.

23          THE COURT:  Do you not have the same match-up for the

24  future years?

25          MR. SANTHANAM:  That's correct, Your Honor.  That is

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 50 of 109

actually an important point.  As part of his damages analysis
if you look at just the red bars, that's in the but for world,
imagine that Willowood is not in the marketplace.  He didn't
assume that Syngenta's profits would keep going up and up and
up.  He actually took into account that Syngenta's profits
would decline and so that's why you see the decline from years
2014 to 2015 and so forth.  And what does that decline account
for?  Well, it accounts for potentially the presence of the
generics, normal generic competition in the marketplace.  It
accounts for market factors such as, you know, fluctuations in
commodities prices.  All these things that Willowood says he
didn't account for, it actually is reflected in the data.

        He is not saying that Syngenta's profits would keep
increasing.  He's accounted for and said, I expect it to go
down and I'm adjusting for it.  At the end of the day what his
data shows is that Willowood got -- is confirmed by the fact
that Willowood got approximately a one-year head start for the
compound patents.

        If we can turn to slide 33.  This is the data for the
'138 Patent.  And for the '138 Patent, we have a similar
confirmation of Dr. Wilner's damages calculations.  So you look
at the year 2014, and what Syngenta actually made, that's the
golden bar in 2014.  It approximately lines up with his data in
the but for world in 2016.  Admittedly, they are not even and
what that indicates is, that the head start that Willowood had

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 51 of 109

 1   was probably a little bit more than two years and so the data

 2   shows that the damages that Dr. Wilner calculated are not only

 3   consistent with reality, but they are confirmed by the fact

 4   that Willowood was able to get into the market, you know, more

 5   than two years earlier than they otherwise would have.

 6          We don't hear any of this in their papers.  We didn't

 7   hear any of this when counsel for Willowood was up here, but it

 8   is not just that he relied on budgets, he relied on budgets,

 9   adjusted them with other budgets and then confirmed his

10   calculations were conservative by looking at actual experience

11   and reality.

12          Now if we can turn to slide 26.  What we have here

13   are the various comparabilities between the intra-meso bench

14   marker he used and why it is appropriate in this instance to

15   calculate the damages, at least for the compound patents, and

16   why it will serve as a floor for the damages for the '138 and

17   '761 Patents.

18          What Willowood writes in their brief and what we

19   heard just a moment ago is, that Dr. Wilner just compared

20   mesotrione because, you know, they are both well-established

21   products.  And they said that they have, you know, similar

22   barriers to entry, but there is actually a range of

23   comparabilities.  This is the type of comparabilities, the

24   evidence that the Federal Circuit talked about in the *Erickson*

25   case, that if significant evidence of comparabilities between

the benchmark market and the market you are trying to
extrapolate.  What Willowood leaves out is, both of them are
prepared using the same budgetary process.

So to extent they are saying Syngenta is wildly off,
what they don't understand or what they don't appreciate or
don't want to put into their papers is, that Syngenta has taken
into account that those same market factors for mesotrione as
they do for azoxystrobin.  And why is that?  Well, they are
both not only an established product, but they are approved for
the same major crops, which are corn on soybean.  So what does
that mean?  It means they are going to be subject to the same
type of market fluctuations as corn and soybean.  They are
going to be subject to the relatively same customer base that
Syngenta uses and so that is why it offers a way of filtering
out, you know, effects such as commodity prices, effects such
as economic declines, et cetera, that Syngenta factors into the
budgets, and on top has adjusted for them in order to make his
analysis more conservative.

One other thing I would point out here is, that both
mesotrione and azoxystrobin lost what we can generally call
exclusivity around the same time.  And why is that important?
Well, the compound patents lost exclusivity -- well, they
expired February 2014.  Mesotrione lost data exclusivity in
June of 2014.  So what that means is, before that -- that sort
of what Dr. Wilner calls almost a cataclasmic event.  Before

that event there were significant barriers to entry for generic

companies to get in.  Come 2014, those barriers start getting

broken down.

    With respect to mesotrione, where Willowood was not

present in the market, you can expect, perhaps, a normal level

of generic activity, whereas for the compound, for

azoxystrobin, Willowood was present in the market and so one of

the advantages of using this intra-meso comparison is, it

filters out what you would expect as sort of normal levels of

generic competition to focus on what Willowood did in the

marketplace.

    Then finally, one of the -- the last comparison we

have here on slide 26 is that both mesotrione and azoxystrobin

were essentially on similar product life-cycle stages and at

the same -- and for each of these products, Syngenta -- what

they did as part of their well-planned post-patent strategy,

post-exclusivity strategy is, they started introducing the next

wrung on their brands ladder.  So for azoxystrobin they

introduced products that contained Solatenol as an active

ingredient for mesotrione.  They introduced the next wrung.  So

these are products that are going along around the same product

life-cycle they have comparing in terms of the major crops that

they are approved for.  They interact very similarly.  What

Willowood tells in their papers is a very narrow view of

comparisons between azoxystrobin and mesotrione.

1          At trial, we will be prepared to test -- to put on

2   testimony that will explain all of these comparisons that fit

3   within the framework of the *Erickson* decision that we cited in

4   our briefs.

5          If we could --

6          THE COURT:  Is this a good point to take the morning

7   break?

8          MR. SANTHANAM:  Yes, Your Honor, it is.

9          THE COURT:  Let's take a ten minute recess.

10          (Recess taken from 11:20 a.m. to 11:32 a.m.)

11          THE COURT:  Go ahead.

12          MR. SANTHANAM:  I would like to start with one of the

13   first issues that you mentioned that you wanted to hear from us

14   about, which was the '761 Patent.  With regard to that patent,

15   I understand the issue the Court wants to hear about is

16   what -- why there aren't non-infringing alternatives to the

17   '761 Patent.

18          One point I wanted to clarify is, that the issue

19   isn't whether or not there are non-infringing alternatives.

20   The issue is whether or not or there are alternatives that

21   Willowood could have switched to in time to get into the

22   marketplace and obtain the same head start that they obtained

23   through infringement, and that is a very important distinction.

24   They may very well be able to spend years developing new

25   processes.

1      THE COURT:  They don't have to develop new ones, they
2  can use '138.
3      MR. SANTHANAM:  I'll get to that in a bit, Your
4  Honor.  But changing processes takes time.  And when you change
5  the process and you introduce that delay into the process such
6  as -- and as an example I can reflect Your Honor to slide 20 of
7  the slide deck that we provided.
8      Leading up to their attempt to get into the
9  azoxystrobin market, Willowood had tried to investigate
10 potential non-infringing alternatives; can we tweak the process
11 this way?  Can we tweak the process that way?  Do we have to do
12 an etherification process?  They had discussions with their
13 regulatory consultant, Pyxis Regulatory Consultant.  The
14 question was posed, well, if they could do this alternative, if
15 it's viable, can we just go ahead and get it done?  And the
16 response that they got back from their consultant, which is a
17 reasonable response is, changing -- proposing any change to a
18 manufacturing process might be easy to agree to on paper, but
19 in reality, a manufacturer would want to verify any change by
20 running first on a small scale and then on a large scale --
21     THE COURT:  Can you help me understand something?
22 Just talking about the '761 Patent, how far out are you asking
23 for -- what are you asking for damages for, through 2017?
24     MR. SANTHANAM:  Dr. Wilner calculates damages through
25 2017.

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 56 of 109

  1          THE COURT:  So it's your position, that even though
  2    the patent expired in 2015, nobody could have gotten up and
  3    running by 2017?  Isn't that completely inconsistent with the
  4    chart that you just showed me which reflects that Syngenta
  5    planned on generics entering the market at the expiration of
  6    these patents?
  7          MR. SANTHANAM:  The response to that, Your Honor, is,
  8    if they were delayed sufficiently by a month or as the
  9    circumstances actually showed and witnesses testified by weeks,
 10    they wouldn't have made it into the market in 2014, possibly
 11    not even a good portion of 2015.  And so what that -- that
 12    setback essentially pushes out Willowood's impact in the
 13    market.  So they'll lose their head start and as result of that
 14    head start, the effects of that head start are going to
 15    continue to linger on into the market.
 16          I guess a way to explain it would be, if Willowood
 17    got into the market, say, a year-and-a-half, two years ahead of
 18    what they should have, it is not just those first two years in
 19    which Syngenta suffers damages.  The impact of their head start
 20    will continue to linger for a certain amount of time, and
 21    Dr. Wilner calculates that out through 2017, and that's -- you
 22    know, you can see that, for example, in the example under the
 23    chart that we saw which was, I believe on -- if we go to slide
 24    33.  If you look at what he calculates in terms of his actuals,
 25    you can see that after -- and this is for '138, for example,

that his data shows is an approximate two year head start, but
the actuals continue to -- that impact continues to linger on
for an additional year. And if you sort of -- you push the
data out and you crunch the numbers, it would linger on even
further until the impact of Willowood's early market entry
diminishes entirely.

What Dr. Wilner has done is, he's calculated just for
2014 through 2017 the effect of that lingering impact.

THE COURT: I'm just reading what he says. He says,
"There are no acceptable non-infringing substitutes in 2016 and
2017." I just don't understand how that holds water. That
seems contrary to Syngenta's own planning. You have to look at
what non-infringing folks would have done had there not been
the infringement, you know, so you have to imagine that
Willowood didn't get the early entry, so surely by 2016
Willowood or somebody else, including the two people who did
get into the market, Cheminova, whatever its name was, and the
other one I am forgetting right this second, you know, you have
to imagine what they would have done, too. So I'm having a
little trouble with that. He says there are none and that
seems obviously wrong to me.

MR. SANTHANAM: Perhaps that statement needs
clarification. The lack of non-infringing alternatives refers
to the ability of Willowood to pick up right at, you know,
switch immediately and jump to a new process, and they can't do

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 58 of 109

that.  And part of the reason is, for example, when you run the
process using DABCO verses without DABCO, one of the benefits
of DABCO is, it allows you to run the reaction at a much lower
temperature.  That has implications about safety, the side
reactions.

            THE COURT:  Syngenta made it without DABCO for years.
Correct?

            MR. SANTHANAM:  That's correct, Your Honor.

            THE COURT:  And the use of DABCO did not give the
consumer any benefits, correct?  So isn't it just incremental?
I mean, that gets us to a separate issue.

            MR. SANTHANAM:  Well, Your Honor, it's -- what it
impacts is the time that it will take for Willowood to find a
manufacturer --

            THE COURT:  To find?

            MR. SANTHANAM:  A manufacturer who has a process
that -- if we prove our case, we'll prove that Willowood's
manufacturer uses DABCO.  The time that it will take for them
to go from that process, which is operating at a very high
temperature --

            THE COURT:  No, no.  You assume non-infringement for
your hypothetical world of damages.  I don't understand what
you just said to me.

            MR. SANTHANAM:  Okay.

            THE COURT:  I apologize.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 59 of 109

 1          MR. SANTHANAM:  Your Honor, the crux of the analysis

 2    is, that what would be the amount of time that it would take

 3    Willowood's manufacturer to go from a process that uses the

 4    DABCO in an infringing manner and switching to a process that

 5    doesn't use DABCO in an infringing manner.

 6          THE COURT:  Why is that the issue?  I thought that

 7    you -- okay.  Let me find the case.  Hold on.  There is a case

 8    out there that says --

 9          MR. SANTHANAM:  Probably the *Minnesota Mining 3M*

10    case.

11          THE COURT:  It talks about what you would do -- you

12    calculate the damages in the hypothetical world where Willowood

13    did not infringe.  Right?

14          MR. SANTHANAM:  Correct.  And so --

15          THE COURT:  But you're calculating them based on your

16    lost profits based on the fact they did infringe.  Is that not

17    right?

18          MR. SANTHANAM:  In the hypothetical world in order to

19    determine whether or not what would happen without Willowood

20    infringing, the argument that Willowood, I presume is making

21    is, well, we could have pursued a non-infringing alternative.

22          THE COURT:  Here it is.  *Grain Processing*, "a fair

23    and accurate reconstruction of the but for market also must

24    take into account, where relevant, alternative action the

25    infringer foreseeably would have undertaken had he not

                Syngenta vs. Willowood, et al        1:15CV274

1    infringed."

2              MR. SANTHANAM:  Correct.

3              THE COURT:  And so not just Willowood, but if

4    Willowood had not infringed, you would be looking at a totally

5    different matter and you would have other people, other

6    generics coming into compete.

7              MR. SANTHANAM:  Right.

8              THE COURT:  But he is not taking that into account

9    with his '761 damages.  Am I mistaken about that?

10             MR. SANTHANAM:  I think to sort of get us back into

11   the analysis, I think the case that is relevant to this issue

12   is the *Minnesota Mining 3M* case that is cited in our brief.

13             In that case, the accused infringer made a similar

14   argument.  He said, well, the damages should be limited or

15   there shouldn't be any damages because we had a non-infringing

16   alternative.  And what the Court said was, it's not just the

17   existence of non-infringing, it has to be accessible to you and

18   it has to be commercially viable.

19             In the case of the '761 Patent, if we go back to

20   before -- right before Willowood came into the market, if they

21   wanted to use an alternative process without DABCO, where are

22   they going to go?  They are saying they could get their

23   manufacturer to do that, but what we know from the evidence is,

24   their manufacturer uses DABCO, so it is going to take some

25   amount of time for them to find somebody who is:  A, willing to

Syngenta vs. Willowood, et al        1:15CV274

 1  manufacture without DABCO or in a non-infringing manner.  And
 2  as their own regulatory consultant says, if you want to change
 3  the process, it is going -- you are going to have to start off
 4  on a small scale and build it up to a large scale and set up
 5  that manufacturing process.  Well, all of that takes time.  And
 6  the time is critical, as we saw through the circumstances,
 7  because in a matter of a week, matter of months would have
 8  gotten Willowood out of the market in 2014 and possibly a good
 9  portion of 2015.
10          THE COURT:  Yes.  I guess what I am really talking
11  about is 2016 and 2017.
12          MR. SANTHANAM:  Okay.
13          THE COURT:  Maybe that's why we seem to be talking
14  past each other.
15          MR. SANTHANAM:  So depending on when Willowood gets
16  into the market, the impact of Willowood coming into the market
17  is going to have -- you know, it's not going to be just in one
18  year.  It is going to have an impact across a number of years,
19  and if they got into the market in 2014, that impact might
20  trail off, let's say in 2020.  If they got into the market in
21  2015, that impact may go on even further than that and so
22  that's --
23          THE COURT:  But he hasn't calculated it that way.  I
24  mean, I keep -- you know, do you know the -- let me see if I
25  can locate exactly where he says it.  He says as *Panduit*

factors one and three, this is on page 40, "As discussed in

Sections 4A-1 through three and 3B, Syngenta meets the first

three *Panduit* factors." So the second *Panduit* factor is a

non -- an available non-infringing alternative.

MR. SANTHANAM: Lack of non-infringing --

THE COURT REPORTER: I'm sorry --

THE COURT: So the absence of an acceptable

non-infringing substitute. After 2015, that assumption is -- I

mean, your own client was planning to have generic competition,

presumably non-infringing at that point, so how is

that -- that's my problem. That's my problem.

I'm not hearing you explain -- he has a bad

assumption in there. There is no evidence. Your own client

assumes competition from generics by that point. So I'm just

not really getting it for the '761 for 2016 and '17.

MR. SANTHANAM: It is the distinction between what we

would call expected generic competition or normal level generic

competition and what Willowood did in this instance in this

case.

In terms of what Dr. Wilner puts forward, if they

respected the patent rights -- and let's take the compound

patents, for example, they wouldn't have been able to come

in -- or, I'm sorry, the '138 Patent, they wouldn't have been

able to come in until after the end of 2015.

What we do know is, they came in as early as 2013

Syngenta vs. Willowood, et al       1:15CV274

1  doing things in the marketplace, introducing products in 2014,

2  and they came in and aggressively marketed their products,

3  dropped the prices in the marketplace.

4         THE COURT:  How did he calculate it?  Did he

5  calculate it that way, because it doesn't look like that to me.

6  I hear what you are saying, but is that what he did?  Because

7  it sounds like he didn't assume that.  He assumed no

8  competition from generics.

9         MR. SANTHANAM:  No.  That's not true, Your Honor.  He

10 did assume there would be competition from generics.  And that

11 is actually set forth in his deposition transcript.  I'm happy

12 to pull that portion of the transcript out.

13        Willowood actually asked him the exact same question.

14 Well, Dr. Wilner, you're assuming that everything is related to

15 Willowood, there wouldn't be other generics.  And his answer

16 was, No.  He factors in normal levels of generic competition.

17 And one of the ways he does that, at least for the compound

18 patents and the '138 Patent is, he looks at the mesotrione for

19 a comparison, and another scenario where the product went off

20 exclusivity, experienced what would be normal levels of generic

21 competition and used that to filter out what happened in the

22 marketplace in the actual world with Willowood dropping the

23 prices and engaging in the activities that they did.  And so he

24 does account for normal levels of generic competition.

25        We would be happy to point that out, Your Honor -- it

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 64 of 109

1    is within the transcript -- once we get an opportunity to take

2    a break, we can inform the Court of where that portion of the

3    transcript is.

4              THE COURT:  Okay.  Go ahead.

5              MR. SANTHANAM:  In terms of why it matters to change

6    the process.  If you change the process from using DABCO to not

7    using DABCO, for example, you're going to have to run the

8    reaction at a much higher temperature.  Their own expert

9    acknowledges that.  Their own expert also acknowledges that

10   when you do that, you're going to -- when you do that -- we

11   asked the question to Dr. Lipton:  Is Azoxystrobin manufactured

12   using the schemes one and two as opposed to using the method of

13   the '138 Patent and one --

14             THE COURT:  If you can slow down.

15             MR. SANTHANAM:  -- can have a different

16   (indecipherable) and he says, yes.

17             THE COURT:  I don't understand.  Are you saying you

18   can't make it?  Your client made it for years this way.  I

19   don't understand why this is important.

20             MR. SANTHANAM:  It's not that they can't make it,

21   Your Honor.  It is how long would it take them to get that

22   process up and running after running small scale tests, large

23   scale tests and then also, how long it would get them to get

24   their product through the EPA.

25             Now if we go to the next slide --

Syngenta vs. Willowood, et al          1:15CV274

1        THE COURT:  Your client assumed that would start

2   happening.  Right?  Your client assumed that somebody would do

3   that.

4        MR. SANTHANAM:  Whether or not they respect the

5   patent or not, they expected that people would come in, not

6   necessarily that they were respecting the patent.  So the

7   assumption there is that the other folks that are coming in

8   have these non-infringing alternatives, and that's not

9   necessarily true.

10       THE COURT:  Exactly.

11       MR. SANTHANAM:  People may come in just like

12  Willowood did.  There is no evidence that the process that

13  these other companies that actually did come in, that these

14  companies used a non-infringing alternative, and that's one of

15  the arguments that Willowood would make, they said, well,

16  Syngenta hasn't sued Albaugh.  Syngenta hasn't sued Cheminova.

17  So they must have a non-infringing alternative.  But there is

18  no evidence in the record of any Albaugh products being tested,

19  that their process has been looked at, et cetera.  And just

20  because Syngenta expected that perhaps generics would come in,

21  doesn't mean that they automatically and presumably have

22  non-infringing alternatives.

23       THE COURT:  You're just arguing against yourself.

24  You are just saying -- I don't know.  I don't get -- I'm having

25  a lot of trouble with that passing the -- well, that may be a

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 66 of 109

little bit of an exaggeration.  Your own client was planning
for this.  They expected it to happen.  They were making a lot
of money.  I mean, that's part of your case, right, you were
making a lot of money on this product.  You have expected
generic competitors to enter the market, so you were going to
have to drop your price and create these ladders and add these
other things in order to deal with that competition.  What you
are telling me now is, oh, well, that wasn't really going to
happen.

        MR. SANTHANAM:  Well, it was not that it wasn't going
to happen.  They did predict or take into account that generics
might come in.  What they didn't necessarily assume from that
is, that they would be coming in with non-infringing
alternatives.  That's an assumption Willowood makes.  They are
saying these generics must be using non-infringing
alternatives, but we haven't seen a shred of evidence from
experts' testimony or otherwise from Willowood saying they used
a non-infringing alternative.  But beyond just the time to
entry, it is also a cost proposition.

        THE COURT REPORTER:  I'm sorry, a what?  Counsel, I
didn't hear you.

        MR. SANTHANAM:  A cost proposition.  If they are
going to switch to another alternative, they are going to have
to expend the money and resources to test it out on small
scale, test it out on large scale, use different equipment if

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 67 of 109

you are running the process at a higher temperature, that's
going to require different manufacturing vessels.  It is going
to require a process that is going to be more expensive.  So at
the end of the day, Willowood hasn't identified a single
manufacturer that they could have gone to that they would have
used.  And they may dispute that, but the record evidence shows
that the two generic -- two options that Willowood might have
had was Tai He and CAC Shang Hi.

          The testimony that we've seen from their 30(b)(6)
witness on testing, Mr. Brian Heinz said that samples of
azoxystrobin from both of those entities have been tested and
have been confirmed to have DABCO in them.  There is not a
single entity in the record that Willowood can point to and say
we could have used this other entity.  It is a matter of, well,
how long would it have taken?  Would they have been interested?
All of these things need to be taken into account.  We haven't
seen any of that.

          The *Minnesota Mining 3M* case goes to the proposition
that you can't just point to alternatives, you have to show
that they were available to you and that they were commercially
acceptable.

          So for those reasons, the '761 Patent, in calculating
the damages, Dr. Wilner reasonably assumed and reasonably found
that they wouldn't have been able to switch to an alternative
that would have avoided the head start that Willowood got

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 68 of 109

1    otherwise.

2         If Your Honor will permit, the last issue I wanted to

3    touch on was the formulator's exemption.  In terms of the

4    formulator's exemption, as we set out in our briefing, the

5    factual circumstances are extremely intertwined between what

6    Willowood did in seeking the formulator's exemption and the

7    patent infringement claims that are going to trial.  Among

8    other things, the record shows that they were trying to get a

9    head start in the marketplace, that they were racing to get

10   into the market in 2014, and in seeking the formulator's

11   exemption, the statements that they made to the EPA reflect

12   their effort to get into the marketplace early and to be able

13   to sell it.  It reflects the fact that they were willing to go

14   to great lengths to get into the marketplace in order to be

15   able to sell within 2014.

16        All of that goes to not only the early market entry

17   that Willowood obtained, but also the issue of wilfulness.  The

18   lengths they would go to in order to get the product into the

19   market.  And for those reasons, Willowood --

20        THE COURT:  Now, is wilfulness -- let me see -- I got

21   the verdict sheet you all submitted yesterday.  You are asking

22   for wilfulness on the compound patent, the '138 Patent and

23   the -- all four of them.  Go ahead.

24        MR. SANTHANAM:  What the background on the

25   formulator's exemption shows is, they needed to get into --

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 69 of 109

1  they believed they needed to get into the marketplace by a

2  certain time frame and they were willing to go to lengths to

3  get their product in the marketplace.

4          You know, they could have gone through alternative

5  routes to get it in the marketplace, but they chose to import

6  products -- azoxystrobin in 2014.  They tested that product by

7  inducing other companies to use that azoxystrobin in 2013, and

8  they submitted all of this as part of their formulator's

9  exemption and told the EPA that we are using Syngenta's

10  azoxystrobin as our source.

11          All of those circumstances underlie and are

12  intertwined with the patent infringement claims in the case

13  because it goes to show, you know, what Willowood's efforts

14  were and how they obtained the head start that they obtained in

15  the case.

16          So for those reasons, this is not a 404(b) situation.

17  It is a situation that explains precisely why, you know, the

18  reason why Syngenta suffered damages in this case, the ability

19  of Willowood to obtain that head start.

20          THE COURT:  Okay.  You've used up all your time, but

21  I have a question before we turn back, and this is something I

22  would like Willowood to address, too, on rebuttal, and that's

23  the Entire Market Value Rule and the '761 Patent, because it

24  seems like it is an incremental improvement, and yet you are

25  trying to get damages for as if it were not.  Tell me why

Syngenta vs. Willowood, et al          1:15CV274

1  that's wrong or what I misunderstand.

2        MR. SANTHANAM:  And it is not necessarily an

3  application of the entire market value.  Under that rule if you

4  have multiple components of a product and they function

5  together and, you know, they are being sold as a single

6  product, the damages can and should be calculated based on the

7  entire product.

8        There is no dispute here that -- Willowood may

9  dispute it -- but Dr. Wilner has put forth in his opinion and

10 in his analysis, that the product that is being sold, these

11 azoxystrobin products, what is in demand for these azoxystrobin

12 products is the azoxystrobin.

13       THE COURT:  Exactly.

14       MR. SANTHANAM:  The azoxystrobin is being

15 manufactured by using the DABCO Patent, the '761 Patent.

16       THE COURT:  By what?

17       MR. SANTHANAM:  The '761 Patent.  And those are the

18 allegations that Syngenta has put forth.  And it is not a --

19 again, it goes to the head start.  Well, what would it have

20 taken them to find an alternative.  They had an alternative.

21 Those circumstances aren't there in the record.

22       All we know is, they reached out to one other

23 manufacturer.  Their own 30(b)(6) witness says, you know, their

24 product has been tested and has DABCO in it.

25       So in this instance we're not presented with, you

Syngenta vs. Willowood, et al      1:15CV274

know, any alternative to what Willowood has done or that we
intend to prove Willowood has done. And so as part of that,
the damages are calculated based on the head start that
Willowood obtained and it is that head start that is driving
Dr. Wilner's calculation.

THE COURT: Okay. Thank you. All right, go ahead.

MR. TILLER: Your Honor, a couple quick points.
First of all, you asked about whether these witnesses -- there
was some discussions with Mr. Santhanam about whether they were
going to put on evidence at trial about the budgeting process,
and Mr. Santhanam said, yes; Mr. Cecil, Dr. Wichert, two other
people whose names are escaping me at this exact moment. You
asked Mr. Santhanam were they identified and, yeah, they were
identified.

I think you made an interesting statement about an
opinion that is going to be coming out very shortly from Your
Honor saying an expert doesn't have to anticipate every
objection that may be made in his report.

Two points to that. First of all, he does have an
obligation to prove his point. He does have an obligation to
adhere to the law that says here is what you have to do in
order for your point to be heard.

Second, a party need not have to try to anticipate
every damages theory that another party may make, particularly
when that party asks the question.

1          So let me get to that point.  In the interrogatories
2    we asked the pretty typical damages question:  What are your
3    damages going to be?  How did you get to them?  While I concede
4    that in answers to interrogatories you don't have to have
5    chapter and verse of every single little detail, there were no
6    details in Syngenta's answers to interrogatories.  I apologize,
7    I don't have them with me.  I was frantically looking for them
8    on my system.

9          In response to that question, Syngenta strung off a
10   long citation of documents, we intend to rely on Bates label
11   this to this and this to this and this to this, and our expert
12   will disclose our theories and our numbers.  So nowhere in that
13   answer to interrogatory was a number or whatever.  No where in
14   that answer to interrogatory was there a basic skeletal
15   framework for the theory.

16         So I'll be candid.  We went into those depositions,
17   Mr. Cecil, Dr. Wichert and others thinking, okay, they could
18   use a lost profit on lost sales analysis, which he didn't.
19   They could use a price erosion analysis, which he didn't.  They
20   could use a reasonable royalty analysis, which he didn't.

21         We asked questions about profit margins and cost of
22   goods sold and prices -- you know, why did you do -- all of the
23   questions that would go to those theories, because at that
24   point we had no information one way or the other.

25         Fact discovery closes, expert report comes out and we

1  get this report.  That isn't a price erosion theory.  That

2  isn't a lost profit and lost sales, isn't reasonable royalty.

3  Isn't any of the theories, as I think Your Honor even pointed

4  out earlier today, this isn't the sort of normal way that

5  benchmarks are used.

6        So honestly, while we will have the opportunity to

7  cross-examine him and while theoretically we had the

8  opportunity to cross-examine him at that depositions on these

9  issues, we didn't know this was coming.  I'm going to be very

10 honest.  Maybe I should take some of the blame for that, but I

11 did not -- this was not one of the theories that I was thinking

12 of for damages.  So we did not ask the questions about how do

13 you do your budgets, what --

14       THE COURT:  Because you are saying you had no idea

15 they were going to use budgets in calculating damages.

16       MR. TILLER:  All we got was a string cite of, here

17 are the Bates numbers for the documents on which we are going

18 to rely on.  And looking back on that now, some of the

19 spreadsheets that were identified in Dr. Wilner's reports

20 regarding the budgets were identified, but the fact that that

21 was going to be the basis, the fact that that was going to be

22 the theory, didn't know it, to be quite candid.

23       So we will be going into the trial not having heard

24 any testimony about their budgeting process and, quite frankly,

25 not really having been tipped off that the budgeting process

was going to be such a major component of the later offered
Wilner report. So I just wanted you to understand that timing.

When Mr. Santhanam pointed you to page 26 of their
Power Point presentation which they offered, Mr. Santhanam
talked about the intra-meso comparisons as an appropriate
benchmark. There was a lot of discussion about how mesotrione
factors in all of the different market conditions, but that was
Mr. Santhanam telling you that. That wasn't Dr. Wilner telling
you that. Dr. Wilner does not offer anything in that regard in
his report.

Again, when asked at his deposition, and I think Your
Honor pointed it out, my colleague said:

"As you sit here today and you look at pages 29 to
30, is there anything else they told you," meaning Syngenta,
"about their budgeting process that you regard as important to
your determination that their budgeting process could be used
in this case, anything other than what appears in pages 29 and
30?

"Answer: As I sit here today, I believe that
everything of great import is here. There are other facts that
I determined and I learned from that which might be relevant if
a certain topic gets raised by you, Mr. Jarosz or someone else,
but in overall generalities, I am comfortable with pages 29 and
30."

"Question: Did you conduct any analysis on your own

1  as to the accuracy of Syngenta's budget process?"

2       "I did," was the answer.

3       "Question:  And does that appear in your report?

4       "Answer:  I think I talk about it, but I did not do

5  any quantification."

6       So he -- I think that excerpt is telling in that Dr.

7  Wilner is saying, listen, what I need to come up with my

8  analysis is laid out in pages 29 and 30.

9       Your Honor, we would submit, again, that what is laid

10 out in pages 29 and 30 is not enough.  You cannot make

11 conclusionary allegations.  The Federal Circuit has said that

12 time and time again and those -- I understand Your Honor may

13 disagree, but I see all of those statements on pages 29 and 30

14 as being nothing but conclusory statements.

15      There were -- some emails were shown to you by

16 Mr. Santhanam talking about how even Willowood recognized that

17 it would be difficult to go to a new process, when you were

18 talking about the incremental benefit of '761, and whether

19 there was a non-infringing alternative.  I just want Your Honor

20 to be aware that this email that is on slides 19 and 20 of

21 their presentation, were not talking about the differences

22 between '761 and '138.  They were talking about the

23 different -- about the potentiality of going from '138 to

24 something else.  So these emails are taken entirely out of the

25 context for what the discussion was.  You asked about the

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 76 of 109

1  entire market rule.

2        Your Honor, one thing Mr. Santhanam and I agree on

3  is, that this is not a perfect application of the Entire

4  Markets Rule.  We've all read the cases.  But I think your

5  question raises the important point.  The Section 284 of the

6  Act makes it clear that for the infringement, the infringement

7  has to be -- or the damages must be to compensate for the

8  infringement of whatever patent is at issue.  You hit it on the

9  head, Your Honor, when you said and you questioned

10 Mr. Santhanam about it is, that Dr. Wilner's analysis is based

11 on the sale of the azoxystrobin, the product, not the

12 incremental benefit of the, whatever, the fact that the '761

13 allows you to do it faster or that you get a better yield.

14        There is evidence in the record that -- and

15 Dr. Wilner testified to it.  He said something along the lines

16 of using '761 versus '138, makes things about ten to 20-percent

17 more efficient.  If that's the evidence, then that efficiency

18 should be what you are provided damages for, not for the sale

19 of the product that results.

20        Lastly, Your Honor, just going back to the

21 formulator's exemption issue.  What Mr. Santhanam -- what

22 Syngenta is doing is really mixing apples and oranges here.

23 They are trying to circumvent your ruling getting rid of the

24 formulator's exemption cause of action and back-dooring it and

25 saying, well, it is relevant to wilfulness.  Again, it is not

1  relevant to wilfulness.  It is relevant to whether Willowood
2  violated the formulator's exemption.  That claim has been
3  thrown out.
4         What will happen, what I am positive is going to
5  happen is, they will make statements that, well, you did
6  something illegal by making this statement and that statement.
7  Then we have to come in and say, no, that's perfectly proper,
8  it is perfectly customary.  What they are trying to do is to
9  get damages under a theory of wilfulness for violating the
10 formulator's exemption.  That's not permitted.  Wilfulness is
11 whether we wilfully infringed the patent.  We don't think we
12 did.
13        We understand that they've made that allegation.  We
14 understand that there may be evidence in that regard.  We
15 disagree with it.  We're ready to fight it and what have you,
16 but whether we infringed the patent wilfully, has nothing to do
17 with the statements we made to the EPA.  The statements we made
18 to the EPA are not evidence of infringement.  And, it is not
19 evidence of our mindset with regards to infringement of the
20 patent.  It might be relevant to our mindset with regard to the
21 formulator's exemption and EPA regulations, but those claims
22 have been dismissed.
23        Thank you, Your Honor.
24        THE COURT:  Let me look through my questions here to
25 see if you all covered everything I wanted to know.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 78 of 109

```
 1          Let me ask Syngenta.  Am I correct or am I not, that
 2   you do not intend to compare the way that azoxystrobin and
 3   mesotrione sales related to budget figures in the patent?  In
 4   other words, you do not intend to say mesotrione is an
 5   appropriate benchmark because in the past our budget -- the
 6   variation between actual sales and budget varied the same for
 7   mesotrione as it did for azoxystrobin.  Did I ask that clearly?
 8          MR. SANTHANAM:  I think I understand your question,
 9   Your Honor.  So for purposes of damages that Dr. Wilner did,
10   we'll focus on the years in which he did the analysis.  So
11   2013, 2014, 2015, '16, '17.  To the extent that he gets
12   cross-examined on earlier budgets, we may introduce testimony,
13   but the analysis was based on the budgeted data, the actual
14   data for 2014 to 2017.
15          THE COURT:  Okay.  I guess it just seems --
16          MR. SANTHANAM:  The answer is, if Willowood brings it
17   it up, we will of course address it.  If they bring it up as an
18   attack on his damages analysis, we will respond to it.
19          THE COURT:  I guess I'm trying to be sure that I
20   understand.  Isn't the best way to show that you ought to
21   modify your client's budget figures by the mesotrione
22   variation, to say, well, in the past it was -- they say they
23   were in tandem.  And by not doing that, it just seems like a
24   really big gap to me.  I don't know.  I'm not an economist.
25   I'm not a numbers person.  I'm just like those people who are
```

Syngenta vs. Willowood, et al          1:15CV274

1  going to be sitting over there saying you're telling me they're

2  the same and yet you didn't look to see if they were the same,

3  and he didn't look.

4          MR. SANTHANAM:  I believe he did look.  He testified

5  that he did look, but admittedly, that was not set out in his

6  report.  To the extent that that's an attack that Willowood

7  makes, Dr. Wilner -- we will introduce his testimony to respond

8  to it, but in terms of addressing past budgets, you know, as we

9  pointed out in our briefing, there are explanations.  There are

10 reasons for the budget variations that Willowood complains

11 about.

12          The one other point I want to make is, we're not

13 dealing here with, you know, product-to-product comparisons.

14 What Dr. Wilner did wasn't saying, well, mesotrione sold at X

15 price, therefore, azoxystrobin should have sold at something

16 within the vicinity.

17          THE COURT:  Right.

18          MR. SANTHANAM:  He was using what Syngenta

19 experienced between their budget and actuals as a way of

20 filtering out a potential variation in budgets, other market

21 factors, et cetera, on top of the analysis that he did.

22          THE COURT:  In order to show that's a good benchmark,

23 the best way to show it is the patent.

24          MR. SANTHANAM:  That is one way of showing it, Your

25 Honor.  The other way of showing it is, well, where does the

 1  data lead us.  And all the confirmatory analysis that he's

 2  done -- and in terms of confirmatory analysis we went through,

 3  he looked at other benchmarks, a variety of other benchmarks,

 4  all products, crop protection fungicides, the price index and

 5  then he also looked at where his data fell and he showed that,

 6  well, for the compound patents, we see a one-year head start.

 7          THE COURT:  I remember all of that part.  Okay.

 8          MR. TILLER:  Mr. Santhanam, you hit on that is a

 9  great way to prove the mesotrione benchmark makes sense and

10  that's a great way to prove that the crop protection benchmark

11  makes sense, that they sort of track each other on a

12  year-by-year.  Mr. Santhanam says, well, if Willowood

13  cross-examines Dr. Wilner on that point, then they'll deal with

14  it.  Here is the problem with that:  We haven't been given the

15  data.  As evidenced by what we gave you for crop protection

16  fungicide sales, for mesotrione budget and sales we've been

17  provided from 2012 forward.  We have no ability to go back and

18  say, well, in 2011 they were this different and 2010 they were

19  this different and in this 2009, they were this different.  We

20  don't have that ability, and I think Your Honor is picking up

21  on that.

22          THE COURT:  You could have asked for that.

23          MR. TILLER:  We did.  We asked for everything on

24  which -- I mean, let me step back for a minute.  We asked for

25  everything that was relevant to their data, you know, for their

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 81 of 109

1    damages analysis.  We didn't know mesotrione budgeting was

2    going to be part of their analysis.  We didn't know crop

3    protection fungicide sales was going to be part of their

4    analysis.  They have provided us this limited window of data on

5    which they are relying, but to test that data we --

6              THE COURT:  But once you got Dr. Wilner's report, I

7    mean -- I don't know, you could have asked then, right?  I

8    mean, you could have --

9              MR. TILLER:  I mean, fact discovery was closed, was

10   the problem.  I mean, I can't go back -- I guess I could have

11   come in and asked you to reopen fact discovery.  I guess maybe

12   I could have.  But fact discovery was closed and the fact of

13   the matter is, Judge, what I think is going on here is that up

14   and down that you are saying, well, wouldn't that be a good way

15   to show it.  I bet there is a reason they don't want us to have

16   that data, and it hasn't been provided.

17             I just wanted Your Honor -- so when Mr. Santhanam

18   says we can cross-examine Dr. Wilner on that, we can't, because

19   we don't have the data.

20             MR. SANTHANAM:  If I may briefly respond to that.

21   Mr. Tiller  had raised the point of interrogatories, well, we

22   had asked.  They served an interrogatory asking for the

23   evidence -- the evidence that we will be relying on for our

24   damages.  We gave them a very detailed interrogatory response.

25   It wasn't simply a list of Bates numbers as Willowood's counsel

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 82 of 109

makes it seem.  There were parentheticals saying these are what

the products are, these are what the budgets are, and at no

point did we hear any complaint that that was insufficient.

They didn't have the information, et cetera.  At no point have

they asked for budgets beyond a certain year.

         The implication that Syngenta may be hiding something

as a result of not providing something is just completely

unfounded.  Had the request been made, the information would

have been provided.  And they had ample opportunity to do it

through fact discovery and in expert discovery.

         One point I will mention is, they deposed Dr. Rex

Wichert during fact discovery.  As part of his testimony, he

discussed mesotrione and the comparability between mesotrione

and azoxystrobin.  This is well in advance of Dr. Wilner's

report.

         At no point did we hear anything about interrogatory

responses being deficient.  They didn't even send a discovery

letter.  They certainly didn't file a motion to compel.  But

the suggestion that Syngenta is perhaps hiding something is

grossly unfounded.

         THE COURT:  Okay.  Well, I'll let the defendants

submit the interrogatory answer that you are talking about.  I

assume you can do that in 48 hours?

         MR. TILLER:  Absolutely, Your Honor.

         THE COURT:  And if there is any context that is

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 83 of 109

1    needed, why don't you all consult.

2            MR. TILLER:  How would you like us to do that?

3    Through ECF?

4            THE COURT:  Yes.  Call it a supplemental exhibit or

5    something like that.  Just share it in case -- if the plaintiff

6    wants, you know, the page before or page after.

7            MR. TILLER:  We'll put in the whole thing.

8            THE COURT:  If you put in the whole thing --

9            MR. TILLER:  I'll point you in the notice as to which

10   answer to interrogatory it is.  I don't want to get accused of

11   anything.

12           THE COURT:  Let's turn to the second motion.  Let's

13   see.  How long are you all thinking this might take?  It's

14   Syngenta's motion so, Mr. Santhanam, how long do you think you

15   might take on this?

16           MR. SANTHANAM:  I think, Your Honor, since we touched

17   upon most the damages principles, probably would need about 20

18   minutes.

19           THE COURT:  Okay.  Does that sound about like what

20   you would need?

21           MR. TILLER:  I'll do it in less.

22           THE COURT:  Let me just look through my questions.

23   One thing I would like to understand better -- the brief and

24   the motion is phrased in terms of commercial reasonableness, so

25   I go to Lexus.  Actually, I went to Westlaw, but same thing.  I

put in commercial reasonableness, Fed Circuit.  I get no patent

cases.  There is some federal claims cases.  I put in

commercially reasonable, no patent cases.  I try, you know,

everything I could think of -- and I read your briefs and

nobody -- the law doesn't talk about commercial reasonableness.

So I need a little context here for this.  And that

is your phrase, Syngenta's phrase, so I don't know -- I mean, I

assume it has something to do with non-infringing alternatives.

I'm not really clear about that.  I want to know why did you

use this phrase and what -- give me some context for that.

The other thing I want to know, it seems to me that

to the extent we are talking about whether there are acceptable

substitutes to particularly '761, but maybe '138 as well.  This

is relevant not only to damages but also to infringement.  I

just want to be sure that I'm correct about that.

It also seems like you all kind of were talking about

something maybe that we're going to get in motions in limine,

because there is very little expert testimony, so I don't know

what you're trying to exclude.  I'm a little unsure.

I understand there is a big dispute throughout about

non-infringing alternatives, but this motion is directed

exclusively to this very narrow thing.  They have said in their

papers, well, all we're going to offer is what came out in

discovery, these very limited opinions of Dr. Lipton and when

you get to damages Mr. Jarosz, but that's going to be based on

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 85 of 109

1   this other evidence, nonexpert evidence of non-infringing

2   alternatives.  Okay.

3          Mr. Tiller is nodding up and down, so I'm

4   understanding his position correctly.  So that's sort of my big

5   picture question here.

6          Further, I have one other point about that.  Beyond

7   what they have to prove, you have to prove non-infringing

8   alternatives before you can get lost profits.  So they are

9   entitled to contest and challenge your evidence in the same way

10  you were just arguing a few minutes ago about how they don't

11  have any real proof that they could buy this on the market or

12  could have bought it in the relevant time frame.  You know,

13  they get to contest your evidence, too.  So I guess I'm trying

14  to figure out exactly what you want me to do here.

15         MR. SANTHANAM:  Yes, Your Honor.  I'll give you an

16  overview.  So we're here on slide 13.  Part of the phrase

17  commercial reasonableness, we use that to sort of capture a

18  number of things.

19         THE COURT:  I'm sorry, what?

20         MR. SANTHANAM:  To capture a number of things.  The

21  thrust of Syngenta's motion is, they haven't offered any

22  opinions on this, so it's not that they've offered an opinion

23  and we're trying to say it is unreasonable that the person --

24  you know, that it's not -- they don't have a basis for it, et

25  cetera.  There is no disagreement here that they haven't

Syngenta vs. Willowood, et al        1:15CV274

offered opinions.  There are no opinions in the record about

commercial reasonableness -- of the commercial reasonableness

of various processes for the making of azoxystrobin.  Why is

that relevant?  Well, we believe that the reason Willowood

wants to introduce opinions on commercial reasonableness -- and

perhaps a better way of phrasing it might be commercial

acceptableness.

          If you look at the case law -- we have two cases here

on slide 13.  This is the *Minnesota Mining* case, or the *3M* case

that I've been referring to.  It is 976 F 2d 1559.  Also the

*Datascope Corp* case.

          What those cases stand for is the proposition that,

yes, under the *Panduit* factors, *Panduit* factor number two, you

know, Syngenta needs to demonstrate lack of non-infringing

alternatives.  The cases also say, well, it's not to go out and

overturn every single possibility that Willowood might throw at

us.  And in particular in the *Minnesota Mining* case, the *3M*

case, the Federal Circuit said, well, the alternatives that you

are pointing to were not commercially viable.  Nobody would

have used them.  So it is one thing for Willowood to say there

might have been alternatives that on paper, you know, if use

these chemical reactions you might end up with azoxystrobin.

What they haven't put forth evidence of is why would that be

commercially reasonable?  Why would it be commercially

acceptable?  Why wouldn't a manufacturer or supplier of

azoxystrobin switch to that alternative?  Would they have done

that?  What would the consequences be?  How much more expensive

would it be?  Are there obstacles such as the materials you

need, the vessels that you need, the temperature, safety

considerations?  All of these things go into whether or not

that particular process is commercially reasonable,

commercially acceptable, et cetera.

What we've heard from Willowood is, well, you could

have done it with a two process -- you know -- let me step

back.

So with regard to the '138 and '761 Patents they have

asserted that, well, you could practice these alternative

schemes, schemes one and two that are set forth in the compound

patents and those would have been a non-infringing alternative

for Willowood.

What they haven't demonstrated or put forth in this

case is any expert opinion that says, well, you could have

actually manufactured it on a commercial scale, that anyone has

done it, that it would be feasible or how long it would take

for them to do it.  Those factors are important, because what

we're talking about in this case is a head start.

Now perhaps Willowood could spend -- or, you know,

find somebody who is willing to spend years, you know,

developing these small-scale processes and turning them into a

commercially manufacturable process, but there has been no

1  evidence of that in the record.  So that's one component.

2          THE COURT:  Okay.  So the only thing I saw that

3  they -- in terms of expert opinion -- you know, they rely on

4  your expert, is it Dr. Fortonak?

5          MR. SANTHANAM:  Fortonak.

6          THE COURT:  That it is possible to make azoxystrobin

7  using schemes one and two.  They rely on some things that

8  Dr. Witten said.  I assume there was at least a way in which

9  he's an expert.  You know, you don't really get to complain

10  about that.  Okay.

11          MR. SANTHANAM:  Sure.

12          THE COURT:  Then the only other thing

13  experts -- well, maybe -- I mean, Mr. Woo testified, but he's a

14  fact witness.  Is Dr. Lipton's opinion that Tai He's process

15  could be conducted in a reasonable time and with a reasonable

16  yield of azoxystrobin without the use of DABCO.  Okay.  That's

17  in his report.  So I don't understand --

18          MR. SANTHANAM:  It isn't in his report, Your Honor.

19  The phrase, "it could be done in a reasonable time and a

20  reasonable manner," that comes from Willowood's counsel.  What

21  Dr. Lipton actually says in his report, he says, if I look at

22  the reaction on paper and look at how fast one reaction runs

23  and how fast another reaction runs, Willowood's supplier could

24  manufacture azoxystrobin within a certain speed.  He doesn't

25  say anything about, well, what would it entail for Willowood to

 1   manufacture.  What would be the changes that they would need to

 2   make it in the manufacturing process.

 3            THE COURT:  So can't he testify about those things?

 4            MR. SANTHANAM:  That's precisely what we're asking.

 5   We're not saying that Dr. Lipton can't take the stand and say

 6   I've done this calculation and on paper the reaction would go

 7   at this speed.  What they shouldn't be allowed to do is come in

 8   and say, I've investigated this progression, or based on my

 9   experience I know it is going to be commercially reasonable

10   that suppliers would take this process and carry it out to a

11   point where they could supply azoxystrobin to Willowood using

12   that process.  That is the leep that Willowood should not be

13   allowed to take.

14            In this case to this point they pointed to potential

15   alternatives.  And we're not saying they can't identify those

16   potential alternatives.  What they shouldn't be allowed to say

17   is, it is commercially reasonable that a manufacturer would

18   have taken it, that they would have developed it and that they

19   would have been able to do it as efficiently or nearly as

20   efficiently and would have been able to do it within the time

21   frame.

22            THE COURT:  When I read their briefs in response to

23   your motion, I didn't see that they said they were going to try

24   to do those things so --

25            MR. SANTHANAM:  In footnote one, I believe of their

1  brief, Your Honor, they do make that suggestion.

2          THE COURT:  Okay.

3          MR. SANTHANAM:  Actually, it is at the end of their

4  brief.  If you will give me a moment, I'll pull up the brief.

5  If you look to the last footnote -- this is page ten of their

6  opposition brief.  You know, they indicate that they are going

7  to try to use non-infringing alternatives to show that, for

8  example, it was an incremental benefit of -- these process

9  patents were incremental improvements.  Part of that analysis,

10 Your Honor, is, well, it is only incremental if somebody can

11 pick it up and use it and use it to make azoxystrobin.

12         In this case there has been no evidence put forth in

13 the record that says they could pick up an alternative

14 manufacturing process, do all of the development work that is

15 necessary to ramp it up and use it on a commercial scale to

16 make azoxystrobin, and that goes to the heart of whether or not

17 this is an incremental improvement.

18         In terms of --

19         THE COURT:  I continue to just be completely and

20 totally flummoxed by this argument that you are making.  Your

21 client made azoxystrobin for years under the '138 Patent, and

22 you want to come in here and say it is impossible for Willowood

23 or somebody else to do it, even though your client did it for

24 years.  I apologize.  That just seems crazy to me.

25         MR. SANTHANAM:  Your Honor, the analogy that

Syngenta vs. Willowood, et al        1:15CV274

1  Dr. Wilner put forth at his deposition was, one can always go

2  back in the horse and buggy instead of an automobile.  What

3  matters here is, if the most efficient way, the most reasonable

4  way of manufacturing azoxystrobin is with DABCO, why would

5  somebody go back to a process that didn't use --

6         THE COURT:  Because your client was making a whole

7  lot of money selling it, and if they could undercut the price

8  by 50-percent using a process that was only 20-percent more

9  expensive than your process, then they get to make a lot of

10 money.  I'm not an economist but, I mean, is that not so?  And,

11 I mean, I don't know the numbers, obviously.

12        I don't have the whole case in front of me, but it

13 just seems kind of -- I mean, you are asking for millions and

14 millions of dollars, so when you come in here and say, oh, it's

15 not worth the investment, well, your own evidence disproves

16 that.

17        MR. SANTHANAM:  Your Honor, in that regard, they

18 pointed to, as you mentioned, testimony from Dr. Fortonak our

19 expert, or pointed to statements made by Dr. Witten, and of

20 course they are more than welcome to question them about it.

21        THE COURT:  Exactly.

22        MR. SANTHANAM:  If they have an opportunity to do it.

23 What they shouldn't be allowed to do is come in with new expert

24 opinions at trial from Dr. Lipton or other witnesses that say,

25 I know for a fact that this process is going to be X percent

1   more expensive or X percent more efficient.  They haven't put

2   those opinions on the record.

3            THE COURT:  Are you directing me to footnote 12?

4   That's the paragraph in their brief that's giving you some

5   concerns?

6            MR. SANTHANAM:  Footnote ten, Your Honor, at the end

7   of their brief -- I'm sorry, page ten, footnote 12.

8            THE COURT:  I was looking at footnote 12.  So direct

9   me again.  "Syngenta's damages expert bases his opinions on the

10  projected versus actual sales not the incremental benefits."

11  Is that the sentence that you are worried about or the last

12  sentence?

13           MR. SANTHANAM:  Right.

14           THE COURT:  How can I rule on that now?  I mean,

15  we're going to have to get -- I believe Mr. Tiller agreed with

16  me earlier when I said Mr. Jarosz cannot testify about this

17  unless there is evidence from somebody who is not an economist.

18  You know, that kind of begs the question about your evidence,

19  too.  You got to have testimony from people who actually know

20  something about the science of it, and that's what you are

21  saying.  Well, I don't disagree with that, but I don't

22  understand how I can make that decision now, when they have at

23  least put forward some evidence from which the jury, not the

24  least of which is your own client's manufacturing of this

25  product for years, which could give rise to the reasonable

assumption that therefore it could be done, at least as to the '761 Patent. You got an easy alternative. I say easy, in parentheses. Easy to somebody who knew what they were doing alternative.

So, I mean, what are you -- I already said Mr. Jarosz's opinion can come in, as I believe I said, subject to foundational evidence, which is what we're talking about here.

I'm not sure -- I'm trying to figure out what it is you want me to do, what it is you think they are going to do --

MR. SANTHANAM: Correct. And, Your Honor, to the extent that they want to put in Syngenta's evidence, cross-examine Syngenta's witnesses, we're not contesting that.

THE COURT: All right. Okay.

MR. SANTHANAM: That's not the purpose of the motion. What we don't want is for Dr. Lipton to come in, or another witness of Willowood's to come in at trial and say, I've analyzed the commercial reasonableness of process A, process B, process C, and it is commercially reasonable and acceptable and, therefore, you know, it impacts the damages analysis. That is what we are moving to exclude.

The point of the motion is, they haven't offered any of those opinions to date. We believe that they will attempt to do so, and we understand from their opposition brief that they seek to do so. In fact, they point to Dr. Lipton's

testimony -- his report, and they say he has opined on the

manufacturing process, speed of the manufacturing process

saying that it could be done, you know, in a reasonable manner

within a reasonable speed, et cetera.  That hints to us that

they are going to come in and try to tell the jury that various

processes are sufficiently efficient, are sufficiently

acceptable in order to amount to a commercially acceptable

process that would fit within the framework of *Minnesota*

*Mining.*

So that is -- we've been talking about from the

damages side.  I know Your Honor mentioned that there is also

the infringement side to all of these alternatives.  Where this

comes in is with regard to the '761 Patent.  Willowood's

position in this case has been their manufacturer does not use

DABCO.  We put forth testing --

THE COURT:  I know.  I've already been through all of

this.  The jury is going to decide this.

MR. SANTHANAM:  Correct.  And they will move to show

that with regard to the DABCO Patent, it is now their burden to

show that their manufacturer did not use DABCO and that this

was not the most commercially reasonable way of doing it.

THE COURT:  You keep saying, "commercially

reasonable."  Where is that in the cases?

MR. SANTHANAM:  It comes from the foundation for

Section 295 presumption, Your Honor, which is for purposes of

establishing that presumption, we put forth expert opinions

from Dr. Fortonak, who will opine that the most commercially

reasonable way of carrying out this manufacturing process is

within the confines of the '761 Patent. If they want to come

back and challenge that, they have not put forth any opinions

on the commercial reasonableness of using that particular

process.

THE COURT: Well, they can attack it. There are

other ways for them to attack it, as I recall from the summary

judgment briefing. Is that not the part that I said it is a

little thin?

MR. SANTHANAM: If they want to cross-examine our

witnesses, if they want --

THE COURT: You are telling me that commercially

reasonable language is used in the cases discussing the 295

presumption?

MR. SANTHANAM: Not necessarily in the cases, Your

Honor. It is within the analysis that was put forth by

Syngenta in this case on the 295 presumption.

THE COURT: All right. Well --

MR. SANTHANAM: Then the last item, Your Honor, is,

we referenced Dr. Wilner's transcript a bunch of times. We

have copies available, if Your Honor would like.

THE COURT: I made you give me his report, I think

the last time we were here. I still have it. It is right

 1   there.  I've read it.  You can give me a hard copy and file it
 2   under seal without filing a motion to seal.

 3        Go ahead for Willowood.

 4        MR. TILLER:  I don't think I need to say too much.
 5   If our expert did not offer an opinion, if either of our
 6   experts did not offer an opinion in their reports and it wasn't
 7   culled out during their depositions, then they can't offer it.
 8   If we violate that, then you'll have the opportunity to exclude
 9   that evidence.  Presumably there will be an objection to that.

10        What was concerning about the motion was the fact
11   that despite it being captioned as a motion to exclude certain
12   expert testimony, the relief that was requested, at least the
13   way I read it and maybe I read it wrong now that I've heard
14   Mr. Santhanam argue, was that they were also seeking to exclude
15   nonexpert evidence.  The nonexpert evidence that we're going to
16   offer and to cross-examine their witnesses on about
17   non-infringing alternatives are as you already pointed out,
18   Dr. Witten's own statements, the fact that they themselves made
19   azoxystrobin without DABCO for a significant period of time.
20   Other statements that were made and one that -- just so you
21   know that wasn't mentioned in the briefing, but there was some
22   back and forth, there was a letter writing campaign between
23   Syngenta and another manufacturer of azoxystrobin.  Those
24   letters we have here, if you really want to see them, but it
25   was, hey, you infringed the '138 Patent.  The other seller came

1    back and said, no, our azoxystrobin is made pursuant to another

2    patent that you don't own, that somebody else owns and that --

3             THE COURT:  You know, which raises sort of another --

4    I guess maybe this will raise its head in some other way, but

5    it was referenced in the brief.  There appears to be a

6    difference of opinions.  If somebody out there in the universe

7    is selling azoxystrobin, which at least has happened at some

8    point, who has to show what about that?

9             The plaintiff seems to think that the defendant has

10   to come in here and prove that it's non-infringing and, you

11   know, that really doesn't make a lot of sense to me.  Willowood

12   seems to say, well, it is not so much that it was being sold,

13   it is the fact that Syngenta didn't sue them.  I don't really

14   know.  I mean, that gets into a lot of other stuff.  But the

15   fact that it is being sold seems to me, to kind of give rise to

16   a presumption that it's available.

17            MR. TILLER:  I would agree.

18            THE COURT:  I don't really even have to talk about

19   who sued them or didn't sue them.

20            MR. TILLER:  Your Honor, I agree with you.  I agree

21   with you completely.  I was just making the point that they

22   sent a letter saying, hey, you infringe.  The other side came

23   back and said, no, we don't, and that was basically the end of

24   it.

25            THE COURT:  How are you planning to put that into

Syngenta vs. Willowood, et al          1:15CV274

1  evidence?  Who is going to testify to that?

2         MR. TILLER:  I agree we may have issues in that

3  regard, but I think it is allowed that we could at least

4  explore it, given the evidence, again, their own letters.

5         So again, I just want to emphasize, we're not -- I'm

6  not sure where it came from because I thought we said it

7  extremely clearly, we don't intend to offer expert opinion that

8  is beyond what we have disclosed.  And if we do, you will have

9  the opportunity to nip that in the bud.

10        What we want to make sure we can do is offer

11  nonexpert evidence and allow the jury to make the reasonable

12  inferences from that evidence, just like any other bit of

13  evidence.

14        THE COURT:  Let me make one thing clear.  You know, I

15  talk a lot during these hearings because I have a lot of

16  questions and I say stuff, but I'm not ruling on anything.

17  When I say things like, I don't understand how X could be done,

18  I'm not ruling that X not be done.  I'm just giving you the

19  benefit of my thinking for whatever it is worth, but I'm not

20  ruling --

21        MR. TILLER:  Understood.

22        THE COURT:  -- either way.  Sometimes people think

23  I'm going a little bit further than I actually mean to do, but

24  I like the back and forth and for you all to point out when I

25  am mistaken about things, or at least to give you the

1    opportunity to do that.  Thank you.

2         Any rebuttal?

3         MR. SANTHANAM:  Just briefly, Your Honor.  So I

4    directed the Court back to the *Minnesota Mining* case, *976 F.*

5    *2d. 1559*.  In that case, you know, the Court goes through the

6    *Panduit* factors.  This is on page 1577.  And says:  "To recover

7    lost profits, the patent holder must demonstrate there is a

8    reasonable probability that but for the infringement it would

9    have made --

10        THE COURT:  But what?

11        MR. SANTHANAM:  That but for the infringement it

12   would have made the infinger's sales.  And it goes through the

13   *Panduit* factors, but it emphasizes, "however, it is not

14   necessary for the patent holder to negate all possibilities

15   that a purchaser might have bought a different product or might

16   have foregone the purchase all together."

17        In that case, as I had mentioned, the accused

18   infringer said that they had a potential non-infringing

19   alternative and the court came down and said the accused

20   infringer -- this is on page 1578, "the accused infringer had

21   the opportunity to proffer convincing rebuttal evidence on

22   non-infringing substitutes and failed to do so.  Therefore,

23   based on the record before us, we conclude that the accused

24   infringer failed to establish that the master's findings that

25   there were no acceptable non-infringing alternatives with

Syngenta vs. Willowood, et al          1:15CV274

1   respect to the patent were clearly erroneous."

2           In the case law before the Federal Circuit -- the

3   Federal Circuit has recognized, okay, if there are -- you know,

4   it is the burden of the patentor seeking damages to generally

5   establish the lack of non-infringing alternatives.  If they

6   come up with alternatives that they say that they could use,

7   they need to show that it is viable.

8           As part of the opinion -- this is between 1577 and

9   1578, it says, basically it's -- "the master's findings

10  indicate that although Beyer might have been entitled to

11  manufacturing casting tapes," that was the product at issue

12  under a different set of patents, "it was unable to manufacture

13  commercially acceptable casting tapes."  And the Court noted in

14  the footnote, "there is no evidence in the record suggesting

15  that the accusing infringer could have actually purchased a

16  competitive casting tape from this other provider during the

17  infringement period."

18          THE COURT:  So commercially acceptable, doesn't

19  that -- I don't know.  It sounds to me like what that means is,

20  something that works.  So whatever casting tape is, tape that

21  casts, I don't know what it is, but whatever it is, you know,

22  it is something that people would buy because it would work,

23  not something that -- it doesn't sound like it is exactly the

24  same as this commercially reasonable phrase you've been using,

25  which sounds like it means something different to me, and which

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 101 of 109

1   you, I believe, had been using in a different way.

2           You're not equating those two things, or are you?

3           MR. SANTHANAM:  No, Your Honor.  There are two

4   components of it.  One is whether it was available to Willowood

5   and the other is, would it have been a commercially acceptable

6   way of doing it.

7           THE COURT:  Okay.  All right.  Well, I'll do a

8   written order on this one, but my expectation is to say, well,

9   you can't offer expert opinion that wasn't disclosed.  Doesn't

10  really sound like you are intending to, but if and when

11  Willowood does, all you have to do is object.  I'm not going to

12  let them do that, but that seems like a pretty far narrow

13  motion.  I should be able to deal with that one pretty

14  straightforwardly without a huge amount of discussion.

15          Let's see.  You all submitted verdict sheets

16  yesterday.  They're not as far apart as I suppose they might

17  be.  We'll have a more detailed discussion about that in July.

18  Let's see, I just printed them this morning because they hadn't

19  been filed when I left yesterday.

20          You all have conferred, right, and that's why they

21  are as similar as they are?

22          MR. TILLER:  Your Honor, we have conferred, and part

23  of the issue was all of us were traveling yesterday so we

24  didn't get like sort of the next opportunity to talk again.  So

25  I think the parties were going to talk to each other to see if

Case 1:15-cv-00274-CCE-JEP  Document 221  Filed 07/07/17  Page 102 of 109

1   we could work that out.

2          MR. LEVIN:  We'll try to narrow the disputes in

3   advance of July the best that we can.

4          THE COURT:  That's great.  Thank you.  Briefly, do

5   you have -- I assume you have another mediation scheduled

6   before trial.

7          MR. LEVIN:  Formally scheduled, no.  When we had the

8   last session in February, the mediator knew there was briefing,

9   summary judgment briefing, the motions we've been talking about

10  today.  He basically said, let me know once rulings have come

11  out on all the various motions and presumably at that point

12  he'll ask us to schedule another session.

13         THE COURT:  So obviously summary judgment is done.

14  So are you all thinking you need the rulings on today before

15  you go back to mediation?  If you all don't want to settle the

16  case, that's totally fine with me.  But if you are going to

17  settle, I would rather you do it sooner rather than later, as

18  I'm sure clients would.

19         I'm thinking if I get the current motion, the one on

20  Dr. Wilner resolved, that might be a good time for you -- that

21  you don't really need to wait on all of this stuff that we're

22  going to take care of in July.  I don't know what your motions

23  in limine are going to be, but bound to be largely details.

24         MR. LEVIN:  I think that's fair.

25         THE COURT:  Does that seem fair?

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 103 of 109

1    MR. TILLER:  Yes.

2    THE COURT:  If I tell you that I will have something

3  out at least in result, I'm not promising you a opinion, but I

4  should be able to get you a result by the 19th, or possibly the

5  morning of the 20th, because then I'm going to be gone for a

6  little bit and nothing is going to happen.  I should be able to

7  get you a result by then, so if you all could, I would suggest

8  you go ahead and talk to the mediator, get something scheduled

9  for July.  Then if you don't settle it, we will go forward.

10    Is your mediator somebody local?

11    MR. LEVIN:  We hired retired Judge Tevrizian from the

12  Central District of California.

13    THE COURT:  I see.  Somebody that actually knows

14  something about patent law.  I encourage you all to do that

15  before our next conference.  I will try to do my part to the

16  extent the motion on Dr. Wilner helps, though you all are going

17  to be talking to the jury about a lot of this stuff, obviously,

18  whatever I do, about Dr. Wilner.

19    Another thing is motions to seal.  Let me just say,

20  you know, our clerk is working on trying to improve logistics

21  of that in terms of dealing with ECF, but we are limited by the

22  system.  I did see that Syngenta had asked me to seal some

23  things that were filed by Willowood and I did get that

24  accomplished, I believe, last night.  Ms. Thornton may be able

25  to assist.

Syngenta vs. Willowood, et al          1:15CV274

1    I just would encourage you all to give -- to the

2 extent things are still going to be filed, please try to give

3 each other plenty of notice that we are going to be using this

4 in this motion and give people time to respond to that so that

5 if folks withdraw -- I know there was at least one episode

6 where Willowood didn't really have a time to say, no, no we're

7 withdrawing that.  It is awful for all of us and I appreciate

8 that, but I just ask you to really work with each other to

9 limit the motions to seal and be sure we don't have mixups

10 where stuff isn't filed under seal that maybe should be and

11 then where somebody is withdrawing a claim of confidentiality

12 and then it has to be cleaned up.  I would just appreciate

13 that.  I know it is awful for everybody but, you know,

14 employment for associates, I assume.

15    We will have to deal with at trial the question about

16 what is going to be made publicly available.  The test is

17 different at trial.  It will have to be re-evaluated, all of

18 these rulings I have made sealing stuff.  I do want to talk to

19 you about that at in July, because once we hit the trial, there

20 is a pretty significant public interest in open courts.  I'm

21 not saying I won't do something appropriate.  I'm just saying

22 it is higher test and I'll need you all to be prepared to talk

23 to me about that.

24    Is there anything else?  I listed the Rule 54(b)

25 motion on the copyright claims as a potential topic for July,

Syngenta vs. Willowood, et al       1:15CV274

1  but I'm just telling you, I may deal with that without oral

2  argument.  The briefing is not complete.  I'm not promising you

3  argument on that.  I may not.  We'll see in July.

4         Have I forgotten anything that we need to talk about

5  in July that you know about now for the plaintiff?

6         MR. LEVIN:  Nothing for July now, but I do have one

7  other issue when we're done, if Willowood has anything else for

8  July.

9         THE COURT:  Anything else for July?

10        MR. TILLER:  No.

11        MR. LEVIN:  The last time you had asked us to give

12  some thought to this motion to seal issue with ECF and the

13  difficulty with trying to determine where is the sealed version

14  on the docket and the unsealed version.  We spoke with the

15  experts within our firm who handle a lot of ECF filings.  I

16  spoke to a number of paralegals who facilitate the major cases

17  that we handle.  Unfortunately, the limitations of ECF are what

18  they are.  The conclusion that we reached was, that the

19  suggestion and the practice that you asked us to follow of

20  submitting an index that correlates the confidential version

21  and nonconfidential version is something that ought to be

22  required in every case in order to minimize the impact of the

23  problems created by the limitations of ECF.  Ideally, it would

24  be a modification to the local rule to require that index to be

25  filed within, say, seven days of the filing of your brief.

Case 1:15-cv-00274-CCE-JEP   Document 221   Filed 07/07/17   Page 106 of 109

Recognizing the time constraints that sometimes can come into play to modify the local rule, the suggestion was that at the very least an individual judge could make it a standing order or part of that judge's rules of practice, but we believe based on all of the input from the people that we spoke to that the index is the best solution until ECF is modified accordingly.

THE COURT: Thank you. That's very helpful. Any concerns about doing that in this case? I know we don't have a lot of briefing left to go.

MR. TILLER: As long as I don't have to do it retroactively.

THE COURT: No. I think I've dealt with the worst of it and --

MR. TILLER: There shouldn't be much left.

THE COURT: It is fairly limited in terms of these two motions that are pending in front of me now. I suppose it could still come up in the motions in limine.

Let me ask you then in this case if you do have in the future briefing that requires motions to seal, seven days after that if you would file an index correlating the redacted and unredacted, sealed and unsealed version, just so I can -- that will facilitate my review.

I will take Mr. Levin's suggestion to our Local Rules Committee. They keep promising us a new ECF. I walked in the door and they were talking about it, that was

1  six-and-a-half-years ago.

2          All right.  Anything else we can talk about

3  productively today?  I'm so sorry to keep you all late, but I

4  suspect all of us would prefer to finish before lunch rather

5  than coming back.

6          No.  All right.  Thank you so much.  We're adjourned.

7          (Court was adjourned at 1:05 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Syngenta vs. Willowood, et al        1:15CV274

1                    C E R T I F I C A T E

2

3           I, J. CALHOUN, RPR, United States District Court

4    Reporter for the Middle District of North Carolina, DO HEREBY

5    CERTIFY

6

7           That the foregoing is a true and correct transcript of

8    the proceedings had in the within-entitled action; that  I

9    reported the same to typewriting through the use of

10   Computer-Aided Transcription.

11          THIS TRANSCRIPT CERTIFICATION IS VOID, IF THE

12   SIGNATURE IS NOT ORIGINALLY SIGNED BY THE COURT

13   REPORTER WHO REPORTED THIS MATTER.

14

15

16

17                                    _J. Calhoun_

18

19   Date:    6-16-17          J. Calhoun, RPR
                               United States Court Reporter
20                             324 W. Market Street
                               Greensboro, NC  27401
21

22

23

24

25

Syngenta vs. Willowood, et al        1:15CV274