```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
   SYNGENTA CROP PROTECTION, LLC.,  ) Civil Action
 3                                   ) No. 1:15CV274
        Plaintiff,                   )
 4                                   )
     vs.                             ) Greensboro, North Carolina
 5                                   )
   WILLOWOOD, LLC, WILLOWOOD         ) September 5, 2017
 6 USA, LLC., WILLOWOOD              )
   AZOXYSTROBIN, LLC, and            )
 7 WILLOWOOD LIMITED,                )
                                     )
 8      Defendants.                  )
   _____  )
 9

10                 TRANSCRIPT OF JURY TRIAL
           BEFORE THE HONORABLE CATHERINE C. EAGLES
11               UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13 For the Plaintiff:    HARI SANTHANAM, ESQUIRE
                         RUSSELL E. LEVINE, ESQUIRE
14                       KOURTNEY BALTZER, ESQUIRE
                         Kirkland & Ellis, LLP
15
                         RICHARD A. COUGHLIN, ESQUIRE
16                       Smith Moore, LLP

17 For the Defendants:   STEVEN E. TILLER, ESQUIRE
                         Whitefield Taylor & Preston
18
                         BARRY S. NEUMAN, ESQUIRE
19                       PETER J. DAVIS, ESQUIRE
                         Whitefield Taylor & Preston
20
                         ALAN W. DUNCAN, ESQUIRE
21                       Mullins Duncan Harrell & Russell

22
   Court Reporter:       J. Calhoun, RPR
23                       Room 122, U.S. Courthouse Building
                         324 West Market Street
24                       Greensboro, North Carolina 27401
                         (336) 332-6033
25
```

```
 1              I N D E X

 2    WITNESSES FOR THE PLAINTIFF:                    PAGE

 3    ALAN WHITTON
          Direct Examination By Ms. Baltzer            46
 4        Cross-Examination By Mr. Tiller              81

 5    BRIAN D. HEINZE
          Direct Examination By Mr. Levine             98
 6
      EXHIBITS:                                       RCVD
 7
      PX-1    Patent 5,602,076                         57
 8    PX-2    US Patent 5,633,256                      59
      PX-3    US Patent No. 5,847,138                  62
 9    PX-4    Patent No. 8,124,761                     73
      PX-9    Process Description                     144
10    PX-15   Exclusivity and Supply Agreement between 104
              TAIHE and Willowood Limited
11    PX-17A  Willowood Limited website News Update     99
              page
12    PX-17C  Willowood Limited website About Us page   99
      PX-17E  Willowood Limited website Worldwide       99
13            Offices page
      PX-17G  Willowood Limited website Willowood USA   99
14            page
      PX-17I  Willowood USA website About Us page       99
15    PX-17K  Willowood USA website Meet the Team page  99
      PX-18   Pressroom section on Willowwod USA       103
16            website
      PX-24   May 2014 e-mail chain                   145
17    PX-25   E-mail chain                            146
      PX-31   Email chain                             147
18    DX 35   Lab work copies - DABCO process          87
      PX-41   E-Mail                                  139
19    PX-45   Letter                                  133
      PX-46   Response to Letter                      136
20    PX-52   Original Label for Azoxy 2SC            124
      PX-54   E-mail                                  122
21    PX-167  3/22/13, Email chain between Matt Heinze 110
              and Mike James, Green Valley Farm Supply
22    PX-168  4/15/2013 Email chain between Matt       110
              Heinze and Clay Houchin, Buttonwillow
23            Warehouse
      PX-175  E-Mail Chain                            131
24    PX-176  E-mail Chain 7-8-15                     129

25
```

P R O C E E D I N G S

(Jury voir dire and preliminary instructions reported but not transcribed.)

THE COURT:  Looks like we've got a good jury. Everybody ready?  You can bring the jury in.

(Jury panel is present at 11:38 a.m.)

THE COURT:  All right.  I think that we are ready for the opening statements.

As I mentioned to you, the lawyers are allowed to give you an overview of what they believe the evidence will be and kind of give you a roadmap.  The Plaintiff gets to go first and the Defendant second, so the jury is with the Plaintiff.

MR. LEVINE:  May it please the Court, counsel, ladies and gentlemen of the jury, my name is Russell Levine, and I'm one of the attorneys representing Syngenta.

Syngenta is a leading agriculture company with its North American headquarters located here in Greensboro, just off I-40 on Swing Road.  Syngenta researches, develops, makes and sells crop protection products.  Fungicides are one of those crop protection products, and this case is about one particular fungicide, azoxystrobin.  Azoxystrobin, or azoxy for short, is the best-selling fungicide in the world.  It's used to treat fungal diseases on a variety of plants, like corn and soybeans.

I'd like to begin by thanking each of you for serving

1   as jurors in this case.  Jury service is an important part of

2   our legal system.  Patents are an important part of our

3   society, and this is an important patent case for Syngenta.

4   It's also a very important case for Dr. Alan Whitton.  He's

5   sitting at the end of the counsel's table.  He's the inventor

6   of one of the patents that we'll be talking about during this

7   trial, the one we'll refer as to the DABCO patent.  He'll be

8   our first witness, and you'll hear from him right after the

9   lunch break.

10          Sitting next to him is Kourtney Baltzer, one of the

11  attorneys on our team, and next to her is my partner, Hari

12  Santhanam.  Next to him is Rick Coughlin, who is a partner at

13  the Smith Moore Law Firm here in Greensboro.  I'd also like to

14  introduce you to David Schlaefer, sitting at the end here.

15  He's going to be helping us with the technology here in the

16  courtroom to put things up on the monitor that you have in

17  front of you.

18          Over the past 30 years, Syngenta has invested

19  millions and millions of dollars researching, developing, and

20  ultimately commercializing azoxystrobin products.  The United

21  States Patent and Trademark Office has awarded Syngenta

22  numerous patents relating to azoxystrobin, including the four

23  patents that are asserted against Willowood in this case.

24          Using the inventions of those patents, Syngenta makes

25  and sells a number of different azoxystrobin products,

1   including Quilt Xcel, which we've identified or will identify

2   as Plaintiff's Demonstrative Exhibit 2, and this is just an

3   empty container, but this is what it looks like when it is

4   sold; also, Quadris, which we will identify as Plaintiff's

5   Demonstrative Exhibit 1.

6         As Judge Eagles explained, patents granted by the

7   United States Patent and Trademark Office give their owner the

8   right to exclude others from making, using, selling, offering

9   to sell, or importing the inventions of those patents during

10   their term, which is 20 years.  The bargain is that, in

11   exchange for disclosing your invention to the public, the owner

12   gets 20 years to exclude others.  The right to exclude others

13   is so fundamental that it's actually printed on the cover of

14   the patent, along with the gold seal and red ribbon of the

15   United States Patent and Trademark Office.

16         After the patents expire, the public can use those

17   inventions; but before the patents expire, the public can't

18   make, use, sell, offer to sell, or import.

19         The evidence will show that Willowood didn't wait for

20   the patents to expire.  Willowood jumped the gun and got an

21   early entry into the market.  By entering the market early,

22   Willowood got a head start, and that head start caused Syngenta

23   significant damages.  That's why we're here today.

24         So how did Willowood get a head start?  To see what

25   Willowood did, let's go back to March of 2013.  In March 2013,

1  none of the Syngenta patents had expired.  The compound patents

2  had about a year to go before they'd expire in February of

3  2014.  The '138 patent had about 2 years to go before it would

4  expire in December of 2015, and the DABCO patent had about 16

5  years remaining.

6      The evidence will show that by March 2013, Willowood

7  had already decided that it would sell azoxy products in the

8  US, but before it could sell azoxy products in the US,

9  Willowood had to get approval from the EPA, the Environmental

10  Protection Agency, for both its products as well as for what's

11  known as azoxy technical.  Azoxy technical is a highly

12  concentrated form of azoxystrobin that is used as the

13  biologically active ingredient in the end-use products.  So,

14  for example, Quadris and Quilt Xcel, these are end-use

15  products.  So, in simple terms, azoxy technical is used in

16  lower concentrations to make azoxy end-use products.

17      But you can't just fill out a form to get EPA

18  approval for these azoxy technical or these azoxy end-use

19  products.  There's a lot of work that has to be done before you

20  can ask the EPA for approval, and it takes time to get all that

21  work done.  That's why in early 2013, Willowood Limited sold

22  5 kilograms, which is about 11 pounds, of azoxy technical to

23  Willowood USA.

24      The evidence will show that at the time this azoxy

25  technical was imported, Willowood knew of Syngenta's patents,

and Willowood's understanding was that importing that azoxy technical would infringe Syngenta's patents.

Willowood then used that imported azoxy technical to develop formulations for its end-use products. Willowood had samples made of those products, and Willowood had those samples tested so that it could show the EPA that its products were substantially similar to Syngenta's.

Over the course of several months, from early 2013 through the summer of 2013, the evidence will show that Willowood did all of that. They imported azoxy technical. They formulated the end-use products. They had samples made. They had those samples tested, all for the purpose of supporting their EPA application.

At the end of July 2013, an application was filed with the EPA seeking approval for the azoxy technical; and about two weeks later, Willowood filed an application with the EPA seeking approval for its product, the one that would be called Azoxy 2SC. This was six months before the compound patents expired.

Getting approval from the EPA can be a lengthy process, but if you expedite the process, you can get approval in less than a year; and the evidence will show that's what Willowood did. To speed up the approval process at the EPA, Willowood sought and obtained EPA approval for its Azoxy 2SC product using the so-called "formulator's exemption," which

1   provides an expedited approval process for products that are
2   substantially similar to already registered products.
3   Willowood expedited the approval process because Willowood
4   wanted to be in the market, selling products during the 2014
5   growing season.  That's when the farmers would be growing their
6   crops.

7           The evidence will show that expediting the approval
8   process worked.  In January 2014, about five months after
9   Willowood filed its application, the EPA approved the first of
10  Willowood's registrations for the -- and this, again, was for
11  the Azoxy 2SC product.  About a week later, Willowood filed
12  another application, this one to register a product it would
13  call AzoxyProp Xtra.  This, too, was before the compound
14  patents expired; and just as it had for the Azoxy 2SC
15  registration, Willowood used the formulator's exemption to
16  expedite the approval process for its AzoxyProp Xtra
17  application.  The EPA approved Willowood's AzoxyProp Xtra
18  registration in June 2014, just a few days after the EPA had
19  approved the registration for azoxy technical.

20          With both products and azoxy technical now
21  registered, Willowood could start selling azoxy products, but
22  Willowood first had to make those products because Willowood
23  doesn't have the ability to actually make the products itself.
24  Willowood uses a third party known as a toll manufacturer, sort
25  of like a rent an assembly line manufacturer, where you reserve

1  your spot on their assembly line to have your products made.

2      The toll manufacturer gave Willowood specific

3  deadlines by which Willowood had to get the azoxy technical to

4  the toll manufacturer so that it wouldn't miss its spot in

5  line.  If Willowood missed the deadline, it would miss its spot

6  in line, and its products would not have been formulated and

7  produced in time for the entire quantity to be available for

8  the 2014 growing season.  Delays by even a few weeks would have

9  substantially impacted Willowood's ability to sell in 2014.

10      The evidence will show that Willowood didn't miss the

11  deadline.  Willowood wasn't delayed.  All of Willowood's

12  efforts to get into the market for the 2014 season paid off.

13  Willowood started selling end-uses azoxy products in July of

14  2014.

15      The evidence will show that in its rush to get into

16  the market, Willowood didn't even check to see if all the

17  references to Syngenta had been changed in the label that it

18  told the EPA, the Environmental Protection Agency, it would use

19  on its products.

20      For example -- and, David, if I could ask you to

21  please display page 1 of PX-52.

22      This is the label, the first page of -- the labels

23  are multi, multi pages.  This is the first page of the label

24  that was submitted to the EPA for Willowood's Azoxystrobin

25  2.08SC product, which we'll refer to as 2SC.

1    David, if you can please now turn to page 5 and zoom
2    in on the section that states "Resistance Management."
3    In the first sentence of this Resistance Management
4    Section, it states, Willowood's azoxystrobin, 2.08SC
5    Azoxystrobin, is a group 11 fungicide.
6    David, if you can now highlight the last sentence,
7    which states, "Syngenta encourages responsible resistance
8    management to ensure effective long-term control of the fungal
9    diseases on this label." Thank you, David.
10    The evidence will show that if Willowood hadn't
11    jumped the gun and but, instead, had waited until after the
12    compound patents had expired before importing the azoxy
13    technical it needed to support its EPA applications, Willowood
14    would have missed the 2014 growing season.
15    It is true that Willowood did not start selling its
16    end-use azoxy products until after the compound patents had
17    expired; but before those compound patents expired, Willowood
18    imported azoxy technical, used that imported azoxy technical to
19    develop formulations, had samples made of its products, had
20    those samples tested and applied for the EPA registrations.
21    All of that allowed Willowood to get a head start in the
22    market.
23    A timeline illustrates what the evidence will show.
24    David, if you could please pull up what we'll refer
25    to as PDX, Plaintiff's Demonstrative Exhibit 3.

1          This timeline shows the dates when the compound
2     patents expired, when the '138 patent expired, and when the
3     DABCO patent will expire.  It also shows the date when
4     Willowood imported the azoxy technical and when Willowood first
5     started selling the azoxy end-use products.  The time period
6     between when Willowood imported and when Willowood first sold
7     is about 14 months.  If Willowood had waited until after the
8     compound patents expired before importing, 14 months later
9     would have been April 2015; and as you can see, Willowood would
10    have missed the entire 2014 growing season.
11         If Willowood had waited until after the '138 patent
12    expired before it imported, 14 months later would have been
13    February 2017, and Willowood would have missed the entire 2015
14    and '16 growing seasons as well.
15         Let's look now at what the evidence will show
16    regarding infringement.  With respect to the compound patents,
17    as Judge Eagles explained, it has already been established that
18    the patents are valid and that two of the Defendants, Willowood
19    USA and Willowood, LLC, infringed these patents.  The only
20    infringement issue remaining is whether or not another
21    Defendant, Willowood Limited -- whether that Defendant's sale
22    of azoxystrobin to Willowood USA in 2013 took place within the
23    United States.
24         The evidence will show that Willowood Limited
25    intended to and did sell that azoxy technical in the United

States.  The azoxystrobin was sold to support the EPA
application process and all the work that was needed to be done
for the EPA registration.

Willowood Limited established Willowood USA in the US
as its US affiliate.  They wanted to develop demand for and to
sell azoxy products in the US, and that's why they wanted to
import and to apply for EPA registrations.

With respect to the '138 patent, the only
infringement issue remaining is whether a single entity
performs two of the steps in the manufacturing process or, if
not, whether Willowood directs or controls the entities that
do.  One of these steps is called the etherification reaction,
and that's a step that makes an intermediate that is then
combined in the final step of the reaction to make azoxy
technical.  The final step, the one that does the combining, is
called the condensation reaction.

The evidence will show that before the EPA
application for azoxy technical was filed, Willowood looked
into whether different companies could do the etherification
and condensation steps of the process.

David, if you will please pull up PX-41, and zoom in
at the top of this e-mail, and this is an e-mail from Willowood
Limited.  The e-mail address is WillowoodHK, and as you'll
hear, that's a reference to Willowood Limited.

If we can now look at the body of the e-mail, we see

1  that, after looking into this question, Willowood Limited

2  reported back that it seems -- and, David, if you'll highlight:

3  "It seems all of the manufacturers in China for this product

4  are using the same process and steps for the

5  etherification/condensation. Each step has to be used in

6  sequence and is very difficult to avoid."

7         The evidence also will show that Willowood exercises

8  control over and directs Tai He. Tai He is the manufacturer of

9  the azoxy technical that Willowood uses to make its azoxy

10 products. You'll hear that Willowood was arranging for the

11 manufacture of the azoxy, was recommending how to set up the

12 manufacture, and was providing instructions to the

13 manufacturer.

14        You'll see the e-mail that Mr. Heinze, the CEO of

15 Willowood USA, sent to senior executives at Willowood USA and

16 Willowood Limited days after this very lawsuit was filed.

17        David, if you'll please display PX-26 and zoom in on

18 the e-mail at the top -- further down, please, the body of the

19 e-mail.

20        We see what Mr. Heinze said: "The first thing we

21 need to do is confirm that our manufacturer is making the

22 product the way we have instructed them to do so."

23        With respect to the DABCO patent, the issue is

24 whether the azoxystrobin used by Willowood to make its end-use

25 products is made using a particular amount of a catalyst called

1    DABCO.  Willowood will present testimony that it doesn't use

2    any DABCO at all, but Willowood's own testing shows the

3    presence of DABCO.  Syngenta's testing shows the presence of

4    DABCO.  Syngenta's expert, Dr. Joe Fortunak, a professor of

5    chemistry and pharmaceutical sciences at Howard University,

6    will tell you that in his opinion it is highly likely that

7    Willowood uses the particular amount of DABCO, which, by the

8    way, is an amount between 0.1 and 2.0 mol percent.

9            As a part of its defense, Willowood will present

10   testimony that the DABCO patent is invalid because before

11   Dr. Whitton filed his patent application, it was known that

12   other molecules could be made utilizing a condensation step in

13   the presence of between 2 and 40 mol percent DABCO.  It was

14   known because that 2 to 40 percent range is in another patent,

15   one that we'll refer to as the Weintritt patent.

16           The evidence will show that the Weintritt patent

17   represented the conventional thinking at the time.  It showed

18   what people of ordinary skill in the art, ordinary people in

19   the industry thought at time.  When Dr. Whitton filed his

20   patent application, he gave the Patent Office a copy of the

21   Weintritt patent.  He discussed the Weintritt patent in his

22   patent application, and he explained to the Patent Office and

23   described in his patent the benefits he discovered from using

24   DABCO to make azoxy and from using DABCO in even smaller

25   amounts than what was disclosed in the Weintritt patent.

1          Dr. Whitton discovered that using a lower

2    concentration of DABCO unexpectedly resulted in more

3    azoxystrobin being made in the process and at a faster rate.

4    This saved money.  It saved energy.  It also allowed Syngenta

5    to operate the manufacturing process at a lower temperature,

6    which made it safer within the manufacturing facility.

7          The evidence will show that Dr. Whitton's discovery,

8    his invention, wasn't obvious.

9          So what will the evidence show are damages to

10   Syngenta caused by Willowood?  The damages are significant.

11   They are about 20 million a year for each of 2014, 2015, 2016,

12   and 2017.  They total 75.6 million, and the evidence paints a

13   clear picture as to why the damages are so significant.

14          Upon entering the market, Willowood sold its azoxy

15   products at prices lower than Syngenta's, and that was just the

16   starting point because Willowood continuously lowered and

17   lowered and lowered its prices.  Mr. Heinze made decisions to

18   lower prices even when others on his own team disagreed and

19   didn't think that Willowood should lower the prices at that

20   point in time.

21          You'll hear from a third-party distributor, a person

22   by the name of Mr. Reichman.  He'll tell you that when

23   Willowood comes into the market with a product, Willowood's

24   pricing for that product goes to the basement floor.  The

25   evidence will show that's what happened in this case.  The

1  evidence also will show that in 2014, Syngenta did not expect

2  to see significant competition from generics for two primary

3  reasons.  First, only the compound patent expired in February

4  of 2014.  The '138 patent and the DABCO patent were still in

5  effect.  Their terms had not yet expired.  Second, generics

6  typically only have a minimal impact in year one and two after

7  a compound patent for the active ingredient, like the compound

8  patents here, expire.

9          But because Willowood entered the market early and

10  priced its products so low, Syngenta was faced with unexpected

11  early competition from Willowood's azoxy products.  This meant

12  that Syngenta was in the market in 2014 trying to sell products

13  that the market viewed as overpriced, and sales accordingly

14  declined.

15          Recognizing the effect that Willowood was having on

16  the market, in late 2014, Syngenta significantly lowered its

17  overall prices, for example, on Quadris, by approximately

18  40 percent.  Jeff Cecil, the head of marketing for Syngenta's

19  crop protection business, will be here.  He will testify before

20  you, and he'll explain the things that Syngenta did in response

21  to Willowood's early market entry and how Syngenta tried,

22  without much real success because of the price pressures from

23  Willowood, to minimize the damages being caused by Willowood's

24  early market entry.

25          The evidence will show that other generic companies

1    weren't responsible for Syngenta's damages.  Even now in 2017,

2    other generic companies had little, if any, impact on

3    azoxystrobin sales and prices.  For example, other than

4    Willowood, only two generic companies, one called Albaugh and

5    Cheminova, have had any azoxystrobin imports.  Albaugh's

6    products were mostly for seed care and lawn and garden

7    applications, which are different applications than crop

8    protection.

9           The evidence will show that Albaugh did not and does

10   not have much of a presence in the azoxystrobin market.

11   Cheminova also had little, if any, impact on Syngenta's

12   azoxystrobin sales and pricing.  Initially, Cheminova's

13   products weren't even approved for use on key crops, like corn,

14   which minimized Cheminova's impact.  Again, the evidence will

15   show that Cheminova wasn't a factor in the market.

16          You'll hear testimony regarding how the damages

17   caused by Willowood's early market entry were calculated.

18   Dr. Benjamin Wilner will tell you.  He's a damages expert.  He

19   has a Ph.D. in managerial economics and decision science, and

20   he calculated Syngenta's damages resulting from Willowood's

21   actions.  For each year from 2014 through 2017, he used

22   benchmarks to determine what Syngenta's profits would have been

23   for azoxy products in a hypothetical market that takes

24   Willowood out so that the market's unaffected by Willowood's

25   early market entry.

1          He looked at what Syngenta's profits actually were.

2    Syngenta's damages, its lost profits, are the difference

3    between what Syngenta actually made and what Syngenta would

4    have made.

5          I mentioned that Dr. Wilner used benchmarks.  In

6    fact, he used two.  The first benchmark he used and will

7    explain to you was Syngenta's budgeted profits for its azoxy

8    products.  He'll explain to you that as an economist and

9    someone with experience in calculating damages, he found

10   Syngenta's budgeted profit -- budgeted azoxy products to be

11   exacting and reliable.  He believes that because he spoke to

12   the people who created those budgets, and he learned what they

13   did and how they prepared those budgets.

14         You'll hear from those people, too, including Jeff

15   Cecil, who I mentioned earlier, and Andrew Fisher, who is the

16   product lead for azoxy products at Syngenta.  Mr. Cecil will

17   tell you about the budgeting process Syngenta used.  Mr. Fisher

18   will tell you how he develops projections of what sales and

19   profits will be for each product and how he refines those

20   projections throughout the course of the year.  Dr. Wilner will

21   then explain to you how he used Syngenta's budgets as a

22   benchmark in calculating damages.

23         Now, budgets are budgets.  We all know that.  They're

24   trying to predict the future, and they're not always perfect.

25   Dr. Wilner will explain to you how he accounted for

1  imperfections in Syngenta's azoxy budgets.

2          The second benchmark that Dr. Wilner used and will

3  explain to you was the actual performance of another Syngenta

4  product, a product called mesotrione.  It's a herbicide.

5  Dr. Wilner calculated the extent to which Syngenta met its

6  actual profits for mesotrione, how far did we meet those

7  budgeted expectations, and compared it to what happened in the

8  azoxy products.  He assumed that but for Willowood's

9  infringement, Syngenta would have met its budgeted profits for

10 azoxy to the same extent as it had for mesotrione.  Dr. Wilner

11 will explain to you why he believes mesotrione was an

12 appropriate benchmark to use.

13          THE COURT:  You have about four minutes left.

14          MR. LEVINE:  Thank you, Your Honor.

15          Both are subject to the same exacting detailed

16 budgeting process.  Azoxy is one of Syngenta's best-selling

17 fungicides.  Meso is one of Syngenta's best-selling herbicides.

18 Both are well-established products and approved for use on key

19 crops, like corn.

20          Dr. Wilner will tell you that he used these two

21 benchmarks in calculating Syngenta's damages.  He'll tell you

22 what he found.

23          David, if you can please pull up PDX-4.

24          He found that Syngenta's lost profits were 20 million

25 in 2014, 24.9 million in 2015, 20 -- excuse me, in 2016, 15.4,

1    15.3 in 2017, for a total of 75.6 million.  These lost profits

2    resulted -- thank you, David -- from price erosion and lost

3    sales.  Price erosion refers to the fact that Syngenta had to

4    lower its overall prices because of Willowood's early market

5    entry.  For the most part, Syngenta still made the sale, but it

6    lowered eroded prices, which reduced Syngenta's profits during

7    each of these years and likely in the future years as well.

8         The evidence will show that 75.6 million is the

9    amount of damages that places Syngenta in the same financial

10   position it would have been in if Willowood's infringement had

11   not occurred.

12        I said at the beginning of my opening that this is an

13   important case to Dr. Whitton.  Dr. Whitton kept his end of the

14   bargain.  He disclosed his invention to the public.  He was

15   awarded a patent for that invention, and that patent, the DABCO

16   patent, along with the compound patents and the '138 patent,

17   gives Syngenta the right to exclude Willowood from making,

18   using, selling, offering to sell, or importing the inventions

19   of those patents before they expire.

20        At the end of this case, after you've heard all the

21   evidence, we will ask you to enforce the rights provided to

22   Syngenta by those patents, the 20-year right to exclude.  We

23   will ask you to award Syngenta lost profits, to put it back in

24   the position it would have been in if Willowood hadn't jumped

25   the gun and gotten an early entry into the market.

1           Thank you.  Thank you, Your Honor.

2           THE COURT:  All right.  For Willowood.

3           MR. TILLER:  Thank you, Your Honor.  May it please

4    the Court, counsel.  Ladies and gentlemen, first, let me again

5    introduce some of the folks on our team that you met a little

6    earlier.  My name, again, is Steve Tiller.  This is my

7    colleague Barry Neuman, Peter Davis, Cooper Harrell, Alan

8    Duncan, and then the real brains behind the operation here,

9    Alicia Young, Chris Gillespie and Bonnie Ruffin, and also

10   Willowood USA's president, Mr. Brian Heinze.  You'll get a

11   chance to hear from him later.

12           And I, too, like Mr. Levine, want to thank you for

13   the time, the time that you've already put in this morning, the

14   time that you are going to put in with us over the next few

15   days and week, maybe, hopefully not too bad.  We realize that

16   this is a big inconvenience.  We're taking you away from your

17   family, your jobs, the things you like to do on a daily basis,

18   and that is not easy, and for that we thank you.

19           Let me tell you a little bit about Willowood USA

20   Willowood USA has several founders, of which Mr. Heinze is one,

21   and a number -- all of the founders have extensive experience

22   in the agricultural chemical business.  They've all been in

23   this business a long time.  A couple of them were farmers, or

24   ranchers, including Mr. Heinze.  He was a rancher, so they

25   understand the business from that side, too.

1          And over a decade ago they saw a business

2     opportunity.  Yes, they wanted to create a new business.  They

3     wanted to make some money.  They saw a business opportunity to

4     provide growers lower cost alternatives to the agrichemicals,

5     the fungicides, the herbicides, the insecticides that they were

6     using.

7          So what Willowood is, is a distributor of post-patent

8     crop protection products, or said another way, Willowood is a

9     generic.  You've heard that term.  You've heard it at your

10    local pharmacy.  You've heard it at the grocery store.

11    Willowood distributes generic agrichemical products, which

12    farmers use on their crops to combat fungus, disease, weeds,

13    insects, what have you.

14         Willowood does not shy away from the characterization

15    that it's a generic.  It is.  It is one of several generic

16    companies that offer -- you heard Mr. Levine mention a couple.

17    There's many of them out there in this industry.  When products

18    come off patent, Willowood, and potentially others, enter the

19    market.  And what happens when you have more competition?

20    Prices go down.  And, yes, sometimes Willowood is the lowest

21    price; sometimes other generics are the lowest price.

22         Now, the product at issue, as Mr. Levine said, is

23    what's known as azoxystrobin.  Very successful fungicide that

24    Syngenta has been selling for a long time, almost two decades

25    now, and it treats many diseases, some of which can be

1  devastating, some of which, many of which, never affect a
2  particular crop.  It's if the conditions are right that the
3  disease becomes -- becomes a problem.

4          Now you're also going to hear about another
5  agrichemical product here that is also sold by Syngenta and is
6  also very well-known and Syngenta has been selling for many
7  years called mesotrione.  Mesotrione is what's known as a
8  herbicide; azoxystrobin is a fungicide, treats disease.
9  Mesotrione is a herbicide, treats weeds, kills weeds, and I'm
10 sure you can all appreciate from your gardens, your lawns,
11 public parks, wherever you go, weeds just find a way.  There's
12 a reason there's that old phrase, "you're growing like a weed".
13 It's because weeds grow everywhere, and weeds can be
14 catastrophic to a farm.  Because what they do is, if they're
15 allowed to proliferate, they combat with the crop.  They fight
16 for the food and the water that's in the soil ultimately
17 starving the crop, and without treatment, weeds can overrun a
18 farm.  Herbicides are a critical component of most farmers'
19 plan for their growing seasons.

20          Now, as you've heard many times from the judge and
21 Mr. Levine, there are four patents at issue in this case.  And
22 they do, they provide Syngenta with the exclusive right to
23 make, use, sell, offer for sale and import the invention that's
24 disclosed in that -- or that's claimed in that patent.  Two of
25 the patents expired in February of '14.  You've heard that.

1  The third patent, the '138, expired in December of '15, and the

2  '761 patent, the DABCO patent, still in effect as of this day.

3        Now, there are four Defendants in this case.  You

4  heard the judge mention all four of them, and they all have the

5  name Willowood, so there'll be times when we will just say

6  Willowood, and we'll be referring to everybody.  But there is

7  one, Willowood Limited, that stands in a little bit of a

8  different setting, and I wanted to mention Willowood Limited

9  first.  Willowood Limited is a Hong Kong company.

10        What Willowood Limited does with its contacts in

11  Asia, and in this particular case in China, Willowood purchases

12  azoxystrobin from a manufacturer, and in this case, that

13  manufacturer is known as Tai He.  So Willowood Limited

14  purchases from Tai He and then turns around and sells it to

15  Willowood USA, and it makes a couple bucks and it makes some

16  money on that.

17        Now, Willowood Limited does make the arrangements.

18  It goes and talks to typically the Chinese office of a large

19  international shipping company.  Willowood USA says, hey, we

20  want it -- we want this stuff -- we want the azoxystrobin

21  shipped to X in the United States.  It might be Los Angeles.

22  It might be somewhere else in the United States.  We want it

23  shipped here.  Willowood Limited goes and -- to the Chinese

24  company, the Chinese office of the shipping company, and says,

25  we need to get this shipped to the US, consistent with what we

1  were told by our customer.

2         Willowood USA takes possession of the azoxystrobin in

3  China.  You'll hear the term "FOB China" or "free on board,"

4  and what that means is that the purchaser, in this case

5  Willowood USA, takes possession in China and also takes the

6  risk of if something goes wrong while it's shipping it's on

7  Willowood USA.

8         Willowood USA ultimately pays the shipping cost.

9  Willowood USA makes all the arrangements with the US custom

10 officials.  As such, we contend that Willowood Limited does not

11 engage in any activity in the United States.  It buys in China.

12 It sells in China.  Willowood USA takes it in China and deals

13 with everything in the United States.  And as the judge said

14 earlier, if you do not engage in any activity in the United

15 States, you cannot be held liable for infringing the patent.

16        Now, let's talk about the compound patents.  You've

17 heard that two of the Defendants have been already found to

18 have infringed.  They admitted -- very early on in this case,

19 they admitted they infringed.  Mr. Heinze admitted.  He will

20 tell you that it happened.  They did import approximately

21 11 pounds of azoxystrobin, you know, think of the bags of sugar

22 at your grocery store.  They're 5-pound bags that you buy, this

23 big, think about two of them.  And they did, in the summer of

24 2013, approximately seven to eight months before the compound

25 patents were set to expire, import this amount into the US to

1   do the formulation and then to do the testing.

2           What is amazing about this and what, quite frankly,

3   is baffling in some regard, is that all of this testing, all of

4   this formulation, could have been done outside of the United

5   States.  It could have been done in a number of different labs

6   outside of the US., and had it been done in any of those labs

7   outside of the US, the results of that testing, the results of

8   that formulation package could have been included in the

9   application to the EPA.

10          The EPA takes data, takes information that is

11  prepared by labs overseas, and there's no evidence to suggest

12  that the EPA looks at the application any different than if the

13  application was done in the US or application done outside of

14  the US -- or the testing, I should say.  There's no evidence to

15  suggest that anything different happens.  So this is not a

16  situation where Willowood had to infringe in order to get this

17  jump-start, this early head start.

18          They simply could have had the testing and

19  formulation done outside the US and then submitted that

20  information to the EPA.  And, in fact, Brian Heinze will tell

21  you that he knew it could have been done outside of the United

22  States.  In fact, he'll tell you they do sometimes do it

23  outside of the United States in situations, and for reasons

24  that he still is not sure of, he just messed up.  He messed up.

25  We've used some other terms when we describe that, but he made

1   a mistake.  He -- whatever it was, he wasn't thinking.  He

2   wanted -- it was time to do the testing, send it to our lab in

3   the US., send it to our formulator in the US.

4           And once he realized, once he had sort of his "oh"

5   moment, "oh no," moment, the azoxystrobin was already here in

6   the United States, things were starting to -- things were

7   starting to happen already, and the importation had occurred.

8   It happened.  It was done.  Again, we did it, not trying to

9   hide behind it.

10          Importantly, however, and as Mr. Levine already told

11  you, Willowood never imported any azoxystrobin for sale into

12  the US until months after the compound patents expired and,

13  most importantly, never sold any azoxystrobin in the US prior

14  to expiration of the compound patents.  In fact, further,

15  Willowood was not the only generic company in the market at

16  about this time.  In fact, you heard Mr. Levine say that we

17  started sales in July of 2014, so that is roughly five months

18  after the compound patents have expired.

19          Cheminova, another generic company, started in June

20  of 2014.  Cheminova was in the market first.  As a result of

21  that activity, importing 11 pounds, or 5 kilograms, into the

22  US, an activity that could have, and certainly should have,

23  been done outside of the US, which would have allowed Willowood

24  to get into the market at the exact same time, had it been done

25  outside of the US as a result of that mistake, that oops

1    moment, whatever you want to call it, again, we've called it
2    some other things, as you can imagine.  As a result of that
3    activity, Syngenta's claiming $75 million in damages.
4         As you already heard, Syngenta is claiming
5    $20 million in damages just for 2014.  There is talk about the
6    growing season, the 2014 growing season.  The 2014 growing
7    season for most crops ends by the -- in the spring of 2014.
8    Syngenta did not get into the market until after that growing
9    season.
10        THE COURT:  Willowood.
11        MR. TILLER:  I'm sorry, Willowood.  Thank you, Judge.
12   Willowood did not get into the market until after that growing
13   season.  Now, there is, for some crops, particularly rice, the
14   season goes a little bit later, and the importation that
15   Willowood engaged in in the summer of 2014 in the sales, did --
16   and were sold for the late primarily rice growing season.  But
17   Syngenta claims $20 million in damages for 2014, despite the
18   fact that Willowood did not begin selling until after most of
19   the 2014 growing season was done.
20        Syngenta claims this $20 million in damages, despite
21   the fact that Willowood's importation for the entire 2014 year,
22   and what you will hear is there was a relatively limited amount
23   in the summer, and then in December of '14 there was more
24   importation done in anticipation of the '15 growing season.
25        All of its importation was about 4 percent of the

total amount of azoxystrobin imported into the United States by
everybody, including Syngenta.  You can imagine, Syngenta also
imports its azoxystrobin from its manufacturing plant outside
of the United States.  And Syngenta imports the vast, vast,
vast majority of azoxystrobin into the US, including in 2014.
Remember, all of this importation is done after the compound
patents expired.

        Syngenta claims $20 million in damages for 2014,
despite the fact that there is no evidence, none, that Syngenta
lowered its prices in 2014 as a result of Willowood's entry
into the market.  Syngenta claims $20 million in damages in
2014, despite the fact that there's no evidence that any
customer who would have purchased from Syngenta instead
purchased from Willowood.

        Now in this regard, you will hear a couple of terms.
First is called untreated acres; the second is called price
elasticity.  Untreated acres, you can probably guess what that
is.  It means exactly what you think.  The number of acres of
corn or soy or wheat or other crops that are not treated with
fungicide.  The simple fact is, the vast majority of crops on
which azoxystrobin can work are not treated with fungicides,
because diseases are not always present.  For the most part,
most farmers don't use fungicide unless it is needed.

        This is particularly true when commodity prices are
down.  When the price at which the growers can sell their crops

1   has shrunk, which it has in the last few years, that squeezes

2   their revenue, and like good businessmen do, and most farmers

3   are really good businessmen, they try to see where they can cut

4   cost; revenue's down, cut your cost, and one way to do that is

5   to not -- not do fungicide applications.

6          Now, price elasticity, and pardon me if you already

7   know what price elasticity is.  It's a bit of a -- it was

8   something new I've learned over the last year plus being

9   involved in this case, but it's actually a pretty simple

10  concept; as prices go down, demand goes up.  We -- most of us

11  know that certain products become more desirable, we're more

12  likely to buy certain products as the price goes down.

13         Fungicides are no different.  As the price goes down,

14  farmers become more likely to buy that product and go ahead and

15  spray or use it in a preventative way, even when the conditions

16  for the disease might not be there because the price is low

17  enough.  It makes sense.  Go ahead and do it.  I'm applying

18  other things anyway, let me go ahead and apply my fungicide.

19         So when you have untreated acres, when you have

20  literally tens of millions of acres of farmland all over the

21  country that is going without fungicide, and then as the price

22  comes down, more farmers are likely to use it, it's not -- the

23  damages that -- the loss that Syngenta wants you to believe it

24  incurred is not as a result of sales it would have made but

25  really Willowood stole them.  These are sales that Syngenta

1  would have never made in the first place, because their prices

2  were too high or because the farmers just decided they didn't

3  want to buy fungicides.

4        Now, it's not just Syngenta's claim for $20 million

5  in the first year that Willowood will contend is inappropriate.

6  Willowood believes that the entire damages claim is

7  inappropriate.  And in that regard, we want you to pay really

8  close attention to what Syngenta's damages expert is going to

9  tell you.  As Mr. Levine said, he relies almost exclusively on

10  Syngenta's budgets, projections, as they tend to call them, and

11  the differences between "here is what we actually did, here is

12  what we thought we were going to do."

13        But Syngenta, as you will hear, is not good at doing

14  budgeting.  They're not accurate in their projections; and

15  honestly, I don't mean that as a slight.  Projections, by

16  definition, are trying to predict the future and it's hard to

17  predict the future.  But Syngenta is regularly 20 percent, 30

18  percent or even more off in their budgets, but then Syngenta

19  wants you to use those budgets and essentially use those

20  budgets as being reliable to then turn around and award

21  $75 million in damages.  We will contend -- Willowood will

22  contend that's not appropriate.

23        You will also hear Syngenta's expert talk to you

24  about how he primarily relies on one particular projection at

25  the expense of other projections.  Syngenta is constantly

updating its budgets.  Syngenta's damages expert uses one
particular budget that leads to this $75 million damage figure,
but if you use other projections that Syngenta also did, that
figure goes way down and goes way down again.  If you use
certain projections, the damages number is actually zero.  So
Syngenta's damages expert chose the projection that led to the
highest number, Willowood will contend.

Mr. Levine talked to you that Syngenta's expert does
some -- he makes some adjustments.  He makes some adjustments
by using mesotrione.  I mentioned mesotrione at the beginning.
Mesotrione is a herbicide.  Herbicides are a much higher
priority for farmers.  Mesotrione, you will hear, has -- most
of Syngenta's sales in mesotrione remained under patent for
years after the azoxystrobin compound patents expired.

The expert uses mesotrione as essentially a magic
wand, a magic wand to kind of say:  Well, we understand that it
can't just be the difference between our projections and
actuals because we understand weather may have an effect.  We
understand lack of disease.  We understand disease resistance
may have an effect.  We understand that there's other
competitors out there.  But somehow mesotrione cures all of
that.

Mesotrione is a completely different product.
Herbicides are a much higher priority, much less price elastic;
and thus, the products, mesotrione and azoxystrobin, and the

market for their sales are entirely different.  All of this,
all of this together leads to an incredibly unreliable
analysis, Willowood will contend; and if that analysis is
unreliable, if that analysis is speculative, Willowood will
contend that those damages are not appropriate.

Now, let's talk about the two process patents, the
'138 patent.  Mr. Levine said essentially, at its core, the
'138 patent covers an etherification step followed by a
condensation step; and you will see evidence that Willowood
submitted -- well, let me step back.  And as the judge said, if
the same entity performs both steps or if Willowood was the
puppetmaster and kind of controlled everything that was going
on, even if there's two entities, then Willowood should be held
liable.

And you will see evidence that Willowood submitted in
an application to the EPA saying the same entity did both
steps.  You will see e-mails that are confusing, where it's
clear there's confusion going on about who was doing what.  I'm
going to be very candid with you.  When I first saw that
application, when I first saw these e-mails, I said, Of course
the same entity is the doing both steps.  What are we talking
about?

Once you pull apart the evidence, you'll see that
it -- actually two entities.  There is a company called
Guosheng, also in China, that performs the etherification step,

gets an intermediary or chemical compound called
methoxyacrylate, sells that in an arm's length transaction, you
know, just a normal "Here, I'm selling you my stuff"
transaction to Tai He.  Tai He then, through a plant that it
manages, using the methoxyacrylate and then another
intermediary that it buys from somebody else, mixes it
together, makes the azoxystrobin.

It is true, Willowood wanted to -- Willowood hired a
patent attorney to make sure it understood what it could and
could not do.  It did not want to be in a lawsuit.  It respects
the intellectual property rights.  It's a generic company.
It's dealing with patents of other companies all the time.  It
knows it can't jump the gun and Willowood did not want to be
where -- in fact, where we are right now.  What you will hear
is that the manufacturer in China consistently was telling
Willowood:  We perform the last step.  We buy the stuff from
somebody else and, in fact, we do it the same way for you that
we do it for others.  We have other customers.

Yes, Willowood wanted to make sure it was being done
separately and what was being done separately was consistent
with the way it was being done for other customers.  Willowood
checked and checked and checked and checked.  In fact, sending
one of its general managers in China to the two plants to make
sure.  That general manager has a chemistry background,
generally knows what he is looking at.  He went and saw, yes,

1  this plant is doing etherification; yes, this plant is doing

2  condensation.  So consistent.  While there was undoubtedly some

3  confusion, some e-mails that were -- I'm not sure all of the

4  non chemists on the e-mails knew what was going on.  The fact

5  of the matter is what was being discussed, what was being told,

6  and what was being done in China was two different

7  manufacturers were involved and this was not under the

8  manipulation of Willowood.

9        Now, as to the '761 patent, as Mr. Levine said, in

10  order to infringe, you have to be doing the condensation step,

11  the exact same condensation step that was being done in the

12  '138 patent, which has been done for years, in the presence of

13  DABCO in a range of .1 to 2 molar percent; and the use of DABCO

14  does make the reaction a little quicker, a little more

15  efficient.

16        You will hear about the Weintritt patent, as

17  Mr. Levine called it.  The Weintritt patent is actually owned

18  by Bayer.  Bayer is another agrichemical company that competes

19  with Syngenta.  That Weintritt patent says that one can make

20  azoxystrobin using a condensation reaction in the presence of

21  2 molar percent to 40 percent.  So it was known that

22  azoxystrobin could be synthesized, could be made using a

23  condensation reaction using 2 molar percent.

24        Now, under the patent laws, even a patent, even a

25  granted patent, even an issued patent is invalid if the

1   invention claimed in that patent would have been obvious to a

2   person of ordinary skill in the art.  That person of ordinary

3   skill in the art is not sort of the ordinary person in this

4   room.  It is not the ordinary person walking down the street.

5   It is somebody who has some chemistry background, a bachelor's

6   degree, master's degree in chemistry, chemical engineering, and

7   some period of time, some experience.

8          Now, Syngenta will contend that the patent is not

9   obvious because the Weintritt patent was made well-known to the

10  Patent Office and because all Willowood is doing is

11  regurgitating the same failed argument that happened at the

12  Patent Office, but you will hear evidence that the difference

13  between 2 molar percent, which is what's disclosed in the

14  Weintritt patent, and below 2 percent, which is what is claimed

15  in the '761 patent -- so literally the difference could be at

16  2.0 you've got the Weintritt patent and at 1.9999 molar percent

17  you have the '761 patent.  You will hear evidence from an

18  expert who says that difference is so trivial that it would

19  have been obvious.  So Willowood will ask you to find that the

20  '761 patent is invalid.

21         Lastly, we're talking about the evidence of

22  infringement.  Syngenta will claim that Willowood infringes the

23  '761 patent because it, not its expert, not an independent lab,

24  because it conducted one test of Willowood's end-use product,

25  Azoxy 2SC, and found that it had DABCO in it.  It found DABCO

in the Azoxy 2SC well, well, well below the range required to
be infringing, but it will tell you that because the DABCO is
purified out after the condensation reaction is done that
Willowood must be using DABCO, even though we can't calculate
it, but Willowood must be using DABCO within the range between
0.1 and 2.0 molar percent because that's the way Syngenta does
it; and that's the way Syngenta does it, that's the reasonable
way do it.  As I said, Syngenta will concede that its testing
cannot determine how much DABCO is being used during the
manufacture.

　　　　　Syngenta will also concede, or at least evidence will
show, that it is possible to synthesize azoxystrobin or
manufacture azoxystrobin using an amount of DABCO outside the
range.  In fact, this '761 patent itself talks about using
DABCO outside of the claimed range.  Syngenta for many years
manufactured azoxystrobin using DABCO outside the claimed range
because for many years it did not use DABCO.

　　　　　You will hear evidence that Tai He repeatedly told
Willowood that it does not use DABCO.  You will hear evidence
that a representative, the same representative I mentioned a
while ago who went to make sure that the '138 patent was not
being infringed, went to the plant, literally walked around the
plant and made sure DABCO wasn't being used.  You'll also hear
evidence that two labs -- one completely independent lab, one
that does have an association with Willowood -- performed

1  multiple tests finding no DABCO.

2        With regards -- as you heard from Mr. Levine already,

3  with regards to the damages that Syngenta is claiming as a

4  result of infringement of the '138 and '761 patents, it is the

5  same theories that we talked about with the compound patents

6  and those theories fail for the same reasons I mentioned

7  earlier.

8        So again I would like to thank you.  I would like to

9  thank you for the time you spent listening and thank you again

10 for the opportunity to talk to you again today.

11        THE COURT:  All right.  Ladies and gentlemen, we'll

12 take our lunch recess.  I'll remind you not to talk about the

13 case among yourselves or with anyone else.  Don't have any

14 contact with the lawyers, parties or witnesses and don't

15 conduct any independent investigation or read or listen to

16 anything about the case.  I'm kind of giving you the shorthand

17 version there.  Leave your notes in your chair.

18        We will start back at ten minutes after 2:00.  All

19 right.  So that gives you about an hour and 20 minutes to get

20 some lunch, and I'll ask you to be back in this jury room at

21 ten minutes after 2:00.  We'll start with the evidence then.

22 All right.  The jurors are excused.

23        If every one else will remain seated while they step

24 out.

25        (The jury left the courtroom.)

1          THE COURT:  All right.  So I believe I heard

2    Mr. Levine say Dr. Whitton would be the first expert?

3          MR. LEVINE:  Correct.

4          THE COURT:  Are you anticipating getting done with

5    him and moving on to someone else this afternoon?

6          MR. LEVINE:  Most certainly.  Perhaps two or three

7    others.

8          THE COURT:  All right.  Who are you expecting next?

9          MR. LEVINE:  After Dr. Whitton, we will call

10   Mr. Heinze as an adverse witness and then after that will be

11   Mr. Cecil.

12         THE COURT:  Okay.  Thank you.  Just so I have an idea

13   of who is coming.

14         Now, I gave you all -- we got the orders on the

15   deposition testimony.  I'm delaying any ruling on the trial

16   exhibits.  I think I can put that off until after trial because

17   those are not disclosed.  Did you want to be heard about that?

18         MR. LEVINE:  Correct.  No.  But you had mentioned the

19   deposition designations, and we did get your order this

20   morning.

21         THE COURT:  Right.

22         MR. LEVINE:  Technically, between Mr. Heinze and Jeff

23   Cecil, we will play the short SSJ deposition clip.

24         THE COURT:  SSJ?

25         MR. LEVINE:  Shen Shaojun.

1          THE COURT:  Okay.  All right.  Thank you.

2          MR. LEVINE:  That would be very short.  I read them

3   all, so it was a really fun Labor Day.  But I know you all were

4   working just as hard as I was.

5          So, now, I have worked a little bit on the verdict

6   sheet.  I'm just going give you all this draft, and we don't

7   need to talk about it right now.

8          I will say, I went through -- I thought they are

9   kind of clunky because they had the burden of proof in them, so

10  I took that out and made them simpler.  But then, I read the

11  case that, no doubt, you all were familiar with, this *RR*

12  *Dynamics* case, which talked about putting the burden of proof

13  in the issue.  So I'm going to continue to think about that.

14         This is just a -- just so you all know, kind of,

15  where I am right now.  We really don't need to talk about it.

16  I also had a question, though.  Issue No. 10 is the obviousness

17  issue, so -- but if they find no infringement on the '761

18  patent, why do they have to decide validity?  I didn't see a

19  declaratory judgment.  I didn't see a counterclaim.

20         If you have an answer for me, you can tell me now.

21  If you don't, we can talk about it later.  But that's my

22  question about Issue 10, which it's Issue 10 in you all's draft

23  as well.

24         As we get started with the evidence, I invite and

25  encourage you, if you have an objection and I have said

1   something about it previously, I hope you will remind me.  I

2   have spent a good bit of time going back over all of my orders

3   in this case.  I have them -- I'm hoping I'll remember, but

4   this is -- there's lot of water under the bridge.  I left a lot

5   of things open.  You know, I hope you will help me remember

6   what I have said about things before, so I invite that as we

7   get to -- to that point.

8              MR. LEVINE:  Your Honor?

9              THE COURT:  Yes.

10             MR. LEVINE:  What would your preference be?  What I

11  was planning on doing with the witness is asking the witness to

12  turn to a particular exhibit, turn to Exhibit 27.  And the next

13  thing would be to offer that into evidence so that if they had

14  a relevance objection, which is most of what I think still

15  remains, they can either say, no objection, or if there is

16  still a relevancy objection, we can deal with it.  Is that the

17  way you --

18             THE COURT:  That's fine.  I'm agreeable.

19             MR. LEVINE:  Okay.

20             THE COURT:  If there's been no objection pretrial to

21  the exhibit, you know, it can be shown to the jury immediately.

22  I assume there are at least some of those.  But it might be the

23  better course to just do it as you suggest for every single

24  exhibit, just so we don't have a mistake and to give everybody

25  a chance.  That's certainly fine.

1          I would propose to talk about closing the courtroom

2    and the motion for -- I'm just going to call it the motion for

3    clarification, that we talk about that at the end of day so we

4    all have time to kind of eat without indigestion, and talk

5    about those at the end of the day.

6          So, the other thing I might want to talk to you all

7    about at the end of day, I'll just give you a heads-up on this.

8    So, as I understand it, I did not go back and look at the

9    complaint to see if the Plaintiffs asked for attorney's fees

10   under -- you did?

11         MR. LEVINE:  Well, we asked to declare the case

12   exceptional, yes.

13         THE COURT:  Right.  So any time -- it's been my

14   historical practice any time somebody is going to be asking for

15   attorney's fees, I usually like to be absolutely sure we're all

16   on the same page about settlement, you know, at this point.

17         I do not know if, in patent cases, an unreasonable

18   refusal to settle is something that plays into the exceptional

19   decision.  I didn't look.  But in lots of attorney's fees

20   issues, under lots of statutes, it is.  So what I would just

21   ask you all to do is make sure everybody's on the same page

22   about, you know, the last demand, the last offer, if anything's

23   still on the table, repeat that, and write it down for me, and

24   I think I probably -- I'm probably not going to look at it.

25         I don't care if you don't settle.  But I don't want

1   any problems or disagreements about this down the road.  If

2   unreasonable settlement -- refusal to settle, if you all tell

3   me that absolutely has nothing do with whether something's

4   exceptional, then we don't have do this part.  I just don't

5   know the answer to that.

6         MR. LEVINE:  We're not planning now, and I'll discuss

7   it over lunch, but I'm pretty sure we can come back in and tell

8   you that we will not argue as a part of why the case is

9   exceptional an unreasonable refusal to settle.

10        THE COURT:  I just want to be real clear about that,

11   because I've been on at bench a very long time.  I've had

12   people disagree after the trial was over about how much was

13   offered, and you know, I just don't want any problems like

14   that, so, if you all will confer.

15        Okay.  Is there anything anyone wants to take up

16   before we go to lunch?

17        MR. LEVINE:  Quick question.

18        THE COURT:  Yes.

19        MR. LEVINE:  Did you want us to still consider the

20   stipulation of less than six jurors, since we have nine?

21        THE COURT:  I'm sorry.  Oh, this must be something I

22   don't know about.  What is it?  It's a standard form,

23   apparently, the Court gives you?

24        MR. LEVINE:  Yes.  It's just something we can discuss

25   at lunch if you wanted us to consider it.

```
 1          THE COURT:  Okay.  I mean, I'm happy for you all to
 2   talk about that.  We have nine.  It seems unlikely we would get
 3   below six.  If we do, if anything happens that reaches that
 4   point, I would certainly hope you'd -- we wouldn't have to
 5   start over again.  But I'd appreciate you all at least having
 6   some discussion about it now.  Seems unlikely since we have
 7   nine, but thank you.  I was unaware that we did that.  I've
 8   only been here seven years.  You would think I would know.  All
 9   right.  Anything else?  I'll see you all at 10 minutes after
10   two.
11          (At 1:00 p.m., break taken.)
12          (At 2:10 p.m., break concluded.)
13          THE COURT:  Is there anything that we need to take up
14   before the jury comes back in?
15          MR. LEVINE:  Your Honor, I'll just confirm, as I said
16   before lunch, we will not argue in the context of exceptional
17   case, that one reason the case is exceptional is unreasonable
18   refusal to settle.
19          THE COURT:  Okay.  Well, in that case, I don't need
20   to know anything about settlement unless you think otherwise --
21          MR. TILLER:  To be honest, judge, we've never been
22   confronted with this question.  We were going to do a little
23   research tonight to see if it's an issue.  That's all.
24          THE COURT:  Well, if they're not going to seek it, I
25   can't imagine -- well, I don't know.
```

 1          MR. TILLER:  It can working the other way, too.

 2          THE COURT:  I guess that's true.  All right.  Yes?

 3          MR. NEUMAN:  Your Honor, if I may, to hopefully clear

 4   up confusion before we get into examination, there is a

 5   question about Plaintiff's 41, which was shown this morning

 6   during opening statement, and I assume that Mr. Levine intends

 7   to use it with Mr. -- maybe use it with Mr. Heinze --

 8          THE COURT:  I can't really hear you when you aren't

 9   speaking into the mic.

10          MR. NEUMAN:  Plaintiff's 41, the description of

11   document in the exhibit list and the Bates pages associated

12   with that exhibit on their exhibit list is not the same as

13   what -- at least what we have in terms of their electronic

14   production, and I just want to be sure that the record is clear

15   as to the document and the Bates pages that comprise

16   Plaintiff's 41.

17          THE COURT:  Okay.  Well, the description seems

18   accurate, but these PYX numbers are a little different.  Is

19   there -- the one in my notebook is a June 13, 2013, 12:29 a.m.

20   e-mail at the top.

21          MR. LEVINE:  Right, Bates No. 6398 through 6402.

22          THE COURT:  Well, excerpts.  Oh, no, you're right.

23   Sorry.  But what the exhibit list says is, 6426 through 30,

24   right?  That's the problem you are identifying?

25          MR. NEUMAN:  Yes, that's what I just want to clarify

1  if we can.

2          THE COURT:  Okay.  But the one that you're going to

3  be using is 6398.

4          MR. LEVINE:  Right.  We'll clarify that before we use

5  it with him.

6          THE COURT:  Okay.  And you have both -- this is not a

7  surprise.

8          MR. NEUMAN:  Right.

9          THE COURT:  Okay.  Thank you.  You can bring the jury

10 in.

11         (At 2:15 p.m., jury panel present.)

12         THE COURT:  Good afternoon.  We're ready to proceed.

13 As I mentioned this morning, Syngenta, as the plaintiff, goes

14 first, so Syngenta can call its first witness.

15         MS. BALTZER:  We would like to call Dr. Alan Whitton

16 to the stand.

17         (Witness sworn by the clerk.)

18         MS. BALTZER:  Your Honor, we have courtesy copies

19 prepared for the witness and opposing counsel.

20         THE COURT:  Go ahead.

21                        ALAN WHITTON,

22           PLAINTIFF'S WITNESS, SWORN AT 2:17 P.M.

23                    DIRECT EXAMINATION

24 BY MS. BALTZER:

25 Q.   Good afternoon, Dr. Whitton.  Could you please introduce

1  yourself to the court.

2  A.   Good afternoon.  My name's Alan Whitton.  I work at

3  Syngenta at Grangemouth in Scotland.

4  Q.   And Dr. Whitton, could you explain a bit about your

5  educational background.

6  A.   Yes.  I was born in New Zealand.  I started studying

7  chemistry in -- when I was 18, and I did two degrees in New

8  Zealand, a bachelor of science and masters of science.

9  Q.   What did you do after that?

10  A.   I won a scholarship to go to study in Cambridge, England,

11  and did my Ph.D in Cambridge, England.

12  Q.   After that, did you do more educational studies?

13  A.   Yes, I won a fellowship to do post-doctoral study in

14  Munich in Germany and spent a year there doing more chemical

15  research.

16  Q.   What did you do after completing post doctoral studies in

17  Germany?

18  A.   After my post doc, I joined a predecessor company of

19  Syngenta, ICI, at the site in Grangemouth.

20  Q.   And what year was that?

21  A.   1990.

22  Q.   And how long have you been at Syngenta now?

23  A.   Twenty-seven and a half years I've worked at Syngenta?

24  Q.   What was your role when you first started at Syngenta 27

25  and half years ago?

1  A.    I was a chemist working on development of crop-protection

2  products.

3  Q.    You mentioned crop-protection products.  What are those?

4  A.    A crop-protection product is like a pharmaceutical for

5  plants.

6  Q.    And has your work at Syngenta over the past 27 and a half

7  years continued to involve crop-protection products?

8  A.    Yes, for the most part.  I spent a short time doing water

9  treatment for the site.

10          THE COURT:  Doing what?

11          THE WITNESS:  Waste water treatment, effluent

12  treatment.

13          THE COURT:  Okay.

14  BY MS. BALTZER:

15  Q.    And how does a crop-protection product work as a

16  pharmaceutical, as you mentioned?

17  A.    Well, a farmer will purchase the crop-protection product.

18  They'll mix it in a spray tank, and they'll spray it on the

19  field.  What that means is that depending on the sort of

20  crop-protection chemical, fungicide, herbicide, or insecticide,

21  it will protect against fungal diseases, weeds, or insects.

22  Q.    What is your current role at Syngenta?

23  A.    My current role is to lead the process technology

24  department in Grangemouth.  I have 30 people working for me,

25  chemists, chemical engineers, and analysts.  And our role is,

1 as an organization, to support the manufacture of

2 crop-protection products at Grangemouth, to develop

3 improvements to those processes, and to bring in new products

4 on to the site and put them into the plant and start them up

5 and make them commercial sale.

6 Q.   What crop-protection products do you work with in

7 particular?

8 A.   There are two crop-protection products we work with at

9 Grangemouth.

10          THE REPORTER:  I'm sorry, Grange?

11          THE WITNESS:  G-R-A-N-G-E-M-O-U-T-H.  Sorry for my

12 accent.

13          THE COURT:  That's okay.  An unfamiliar place.  Go

14 ahead.

15 BY MS. BALTZER:

16 Q.   What crop-protection products do you work with in

17 particular?

18 A.   Yes, there are two of them.  There's pinoxaden, which is a

19 herbicide, and we make azoxystrobin, which is Syngenta's

20 largest selling chemical -- crop-protection chemical, and

21 that's a fungicide.

22 Q.   Could you explain a little more what azoxystrobin is?

23 A.   Yes, it's a fungicide that's -- that improves the --

24 sorry.  It is used to treat fungal diseases on plants.  It's

25 used to treat fungal disease on many, many plants.  It's called

1  broad spectrum, and we -- and it is effective on lots of crops

2  in lots of places around the world.

3  Q.    What are some examples of azoxystrobin products that

4  Syngenta sells in particular?

5  A.    We make quite a few end-use products.  One of the -- or

6  two of the end-use products that we sell -- they can sell for

7  the United States is Quilt Xcel and Quadris.

8          MS. BALTZER:  Your Honor, we have marked as

9  Plaintiff's Demonstrative Exhibits 1 and 2 examples of these

10  azoxystrobin products that Syngenta sells.  May I show that to

11  the witness?

12          THE COURT:  All right.

13  BY MS. BALTZER:

14  Q.    Dr. Whitton, you mentioned Syngenta's Quilt Xcel product.

15  Is this an example of the Quilt Xcel product that Syngenta

16  sells?

17  A.    Yes, that's an example of the bottle you would see on the

18  shelf.

19  Q.    And you also mentioned Syngenta's Quadris product.  Is

20  this an example of the Quadris product that Syngenta sells?

21  A.    Yes, it is.

22  Q.    You mentioned before that these products are referred to

23  as end-use products.  What do you mean by that?

24  A.    Well, there's a big difference between having a technical

25  material and having an end-use material.

1  Q.   Dr. Whitton, would it help you to see a picture to explain

2  what azoxystrobin technical is?

3  A.   Yes, it would.

4        MS. BALTZER:  Your Honor, may I show the jury and the

5  witness Plaintiff's Demonstrative Exhibit No. 5?

6        THE COURT:  All right.

7  BY MS. BALTZER:

8  Q.   Dr. Whitton, what do we see in this picture?

9  A.   This is picture of the compound azoxystrobin technical.

10 What it is, that's the product -- the active ingredient for the

11 fungicide that is produced in the manufacturing facility at

12 Grangemouth.

13 Q.   And what's the difference between this and an end-use

14 azoxystrobin product?

15 A.   If I put this into water, it just sits there and doesn't

16 mix.  It also does not have a -- it can't sit on the plant and

17 do what it needs to do.  Its particle size is wrong.  It

18 doesn't work as fungicide.  It's just a chemical.

19 Q.   Would it help you to see a picture to explain what an

20 end-use azoxystrobin product is?

21 A.   That would be helpful, yes.

22        MS. BALTZER:  Your Honor, may I show the witness and

23 the jury Plaintiff's Demonstrative Exhibit No. 6?

24        THE COURT:  You may.

25        THE WITNESS:  So if you look in the vessel there,

that's all in large scale, but this is an example of Quadris, one of ones that we saw in the bottle; and then this, you can see, is very different from the powder that we had.  It's being milled to the right size so that's biologically effective. It's had additives added to it to make sure that it stays suspended in the bottle so when it's sitting on the shelf waiting for someone to buy it, it doesn't settle.  And it also has chemicals added into there that allow it to get through the leaves and into the plants so it can kill the fungi.

Q.   And is the example we see in this picture here, is that the same as what's sold in this container of Quadris?

A.   Yes, it.

Q.   Dr. Whitton, how does a farmer take what's in these containers and apply it to the crops that are in their field?

A.   Right, you pick -- the farmer will purchase a bottle of that -- of Quadris or Quilt Xcel.  They will pour it into a lot of water in their spray tanks, and they will then spray it on to the field.

Q.   Dr. Whitton, are you familiar with how azoxystrobin was first discovered and developed?

A.   Yes, I am.

Q.   Did that discovery and development of azoxystrobin occur at Syngenta?

A.   Yes, it did.

Q.   Let's talk a bit about how Syngenta discovered and

1  developed azoxystrobin.  Could you tell me a bit about what led

2  to Syngenta to discover azoxystrobin?

3  A.    Yes.  The story of azoxystrobin started in 1977.  There

4  was some researchers in Germany from a German university who

5  noticed that a particular fungus in the forest of Germany did

6  not have any other fungi around it, and they postulated -- they

7  made a hypothesis that there was an active fungicide that was

8  being produced by that particular fungus that kept other fungi

9  away.

10 Q.    And what was the name of that fungus?

11 A.    The researchers took the fungi, and they extracted a

12 compound from it they called strobilurin A.

13 Q.    Did Syngenta do any research on strobilurin A?

14 A.    We picked up a few years later -- in the early 1980's, we

15 picked up that there were lot of compounds with similar

16 activity that these researchers had identified, and they were

17 all fungicides of some description, and they all had a certain

18 function that could then be used to control fungi.

19 Q.    Did Syngenta discover anything in particular about

20 brobilurin A?

21 A.    We hoped it would be a good product that we could make and

22 then use as a crop-protection product.  However, when -- once

23 it killed fungi in a small petri dish in the lab, when it was

24 sprayed on any sort of plant at all it did nothing; and what we

25 discovered was that it was light sensitive.  It broke down in

1  the presence of light.  So whilst the fungi that was producing

2  it all the time could just keep pumping it out, if you made it

3  as a crop-protection product and put it anywhere near light,

4  then it died and was no longer any good and didn't do the job

5  on the plant.

6  Q.   What did Syngenta do after determining that?

7  A.   Once we new that was the problem -- we knew it was a

8  fungicide, but we needed to identify whether there was a better

9  product that would do the job that it was -- so we started a

10  4-to-5 year research project to try and understand if we could

11  make with that same function a good fungicide.

12  Q.   Were there particular things that you were looking for in

13  seeing whether something would make a good fungicide?

14  A.   Yes.  I mean, the -- I guess one of the most important is

15  that it has to kill fungi.  It has to be highly effective on

16  the fungi itself.

17  Q.   Dr. Whitton, would it help if I listed out these

18  properties that you were looking for?

19  A.   That would help, yes.

20         MS. BALTZER:  Your Honor, may I use the flip chart

21  and use the flip chart throughout Dr. Whitton's testimony?

22         THE COURT:  All right.  I mean, generally, you may.

23  We'll see about the specifics.  Go ahead.

24  BY MS. BALTZER:

25  Q.   Dr. Whitton, what was that first property you mentioned

1  you were looking for?

2  A.   The first one, it has to be highly effective against

3  fungi.  Just needs to kill them, basically.

4  Q.   Any other properties you were looking for?

5  A.   Yeah, it's really, really good if it's effective against

6  lots of different fungi, different species.

7  Q.   Anything else?

8  A.   Yes.  We wanted to protect the whole plant, not just where

9  the spray drops land.  So we wanted to, as I say, protect the

10  whole plant.

11  Q.   Any other properties?

12  A.   Yes.  Strobilurin A suffered from being unstable.  What we

13  needed was a molecule which, A, could be made; B, could be

14  stored and transported; C, was stable for use on the plant so

15  it did everything you needed it to do.

16  Q.   Any other properties?

17  A.   Yeah, it needs to be safe for the farmer and for the

18  environment.

19  Q.   Anything else?

20  A.   Those are the key points that we look for.

21       MS. BALTZER:  Your Honor, may I mark this for

22  identification purposes as Plaintiff's Demonstrative

23  Exhibit 11?

24       THE COURT:  You may.

25  BY MS. BALTZER:

1    Q.    So, Dr. Whitton, what did Syngenta do to test against each
2    of these properties to find a commercial fungicide?
3    A.    Well, starting from strobilurin A, we had to decide what
4    molecules we wanted to make.  We then needed to invent
5    processes in order to make those chemicals --
6    Q.    Dr. Whitton, when you say Syngenta had "to make," did
7    these chemicals or these molecules exist in nature before
8    Syngenta designed them?
9    A.    No, these are all synthetic molecules.  They're all
10   man-made.  They didn't have an equivalent in nature.  So we had
11   to make -- we had to decide what chemicals to make that we
12   thought might improve the properties against all of those
13   aspects.  So we had to design the molecule, work at how to make
14   it, make the molecule, and then test the molecule at very small
15   scale.  If it passed through a very small scale, you go to the
16   next scale, which is spraying on a plant in a greenhouse.  If
17   it passed that, then when the growing season came around, we
18   would try it in the fields.
19   Q.    And how many molecules did Syngenta test against these
20   five properties that we've listed here?
21   A.    We made 1,453 molecules.
22   Q.    And how long did it take to design and test each of those
23   1,453 molecules?
24   A.    In total, in order for us to find azoxystrobin, we were
25   working for five years with a group of people.

```
1    Q.   And what year was that that Syngenta --

2    A.   1987 was when we discovered azoxystrobin, the molecule.

3    Q.   Has Syngenta been awarded any patents relating to the

4    azoxystrobin molecule?

5    A.   Yes, we have.

6    Q.   I'd like you to turn in your witness binder to Plaintiff's

7    Exhibit No. 1.  Do you recognize this document?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   It's United States -- it's a United States patent.  "To

11   all to whom these presents shall come, United States Department

12   of Commerce, United States Patent and Trademark Office.  This

13   is to certify that hereto --

14   Q.   What's the patent number on it?

15   A.   The patent number, U.S. Patent 5,602,076.

16        MS. BALTZER:  Your Honor, may I move Plaintiff's

17   Exhibit 1 into evidence and publish to the jury?

18        THE COURT:  It will be admitted.

19        MS. BALTZER:  David, could we publish -- yes, the

20   front cover there.

21   BY MS. BALTZER:

22   Q.   Dr. Whitton, could you read the front cover of this patent

23   to the jury.

24   A.   Sorry, yes.  It's:  To all whom these present shall come,

25   the United States Department of Commerce, United States Patent
```

1 and Trademark Office, it says 24th of April, 2017.  This is to

2 certify that annexed hereto is a true copy from the records of

3 the office of U.S. Patent 5,602,076, issued on the date

4 February 11, 1997.

5 Q.   And turning to the next page, Dr. Whitton, could you

6 please tell us who the inventors are on this patent?

7 A.   The inventors are people who worked for Syngenta or worked

8 for a legacy company of Syngenta and have now retired.

9 Q.   Who owns this patent?

10 A.   Syngenta.

11 Q.   Do you have any abbreviations for referring to this

12 patent?

13 A.   Yes, we call the this the '076 patent or the compound

14 patent.

15 Q.   And what does this patent relate to?

16 A.   This patent covers the molecule azoxystrobin.

17 Q.   Dr. Whitton, I would like you to turn to Plaintiff's

18 Exhibit No. 2 in your witness binder.  Do you recognize this

19 document?

20 A.   Yes, I do.

21 Q.   What is it?

22 A.   It's another US patent.

23 Q.   And what is the patent number?

24 A.   Patent number 5,633,256.

25        MS. BALTZER:  Your Honor, may I move Plaintiff's

1  Exhibit No. 2 into evidence and publish to the jury?

2          THE COURT:  It will be admitted.

3  Q.    Dr. Whitton what was patent number on this again?

4  A.    It says 5,633,256.

5  Q.    And turning to the second page of this patent, who are the

6  inventors on the patent?

7  A.    The inventors or the same people who invented the previous

8  patent.  So they are former or current employees of Syngenta.

9  Q.    Who owns this patent?

10 A.    Syngenta.

11 Q.    What does this patent relate to?

12 A.    This patent also relates to covering the molecule

13 azoxystrobin.

14 Q.    And do you have -- and do you have any abbreviations for

15 referring to this patent?

16 A.    Yes.  We call this one the '256 patent or a compound

17 patent, and together the '076 and the '256 patent we call the

18 compound patents.

19 Q.    Dr. Whitton, I'd like to talk a bit about what made

20 azoxystrobin so beneficial compared to what existed before it.

21 Could you explain a bit about what made azoxystrobin so

22 beneficial.

23 A.    Yes.  Azoxystrobin, it attacks the fungi in a completely

24 new way, so --

25 Q.    What do you mean by that?

1  A.    In this case, what it does is it attacks the battery packs

2  of the fungi so that it's like taking a battery out of your

3  phone, your thing just dies; it has no power, no energy.

4  Q.    Anything else that was beneficial about azoxystrobin?

5  A.    Yes.  It's -- because these battery packs are pretty

6  general throughout the whole of the fungi area, a lot of fungus

7  had the same battery packs, so it kills a lot of fungi.  It

8  gets a lot of species.

9  Q.    Anything else?

10 A.    Yes.  It gets into the flower and protects the whole

11 plant.  It's what we call systemic.  It gets through the leaves

12 and then protects the whole plant, including new growth, so

13 once it's sprayed, it can protect the plant during its growth

14 phase.

15 Q.    Any other benefits of azoxystrobin?

16 A.    Yeah, it's stable, whereas strobilurin A broke down in

17 light, we manufacture azoxystrobin on the thousands of ton

18 scale.  We ship it around the world, we store it in bottles

19 like those on the shelves.  They sit -- they can sit for ages

20 like that, and when we spray it on the plant it's stable and

21 does the job.

22 Q.    Anything else that was beneficial about azoxystrobin?

23 A.    Yeah, it's pretty safe for the farmer and the environment.

24        MS. BALTZER:  I would like to mark this for

25 identification purposes as Plaintiff's Demonstrative Exhibit

1   12.

2           THE COURT:  That's your list.  It'll be admitted.

3   You just asked to mark it, didn't you?

4           MS. BALTZER:  Sorry?

5           THE COURT:  You just asked to mark it?

6           MS. BALTZER:  Yes.

7           THE COURT:  Yeah, sorry; so not admitted, just

8   marked.  Go ahead.

9           MS. BALTZER:  Thank you.

10  BY MS. BALTZER:

11  Q.   So after Syngenta first developed azoxystrobin in 1987,

12  did Syngenta start selling azoxystrobin right away?

13  A.   No, we could not.

14  Q.   Why not?

15  A.    In order to sell a crop protection product, you need to

16  have a number of things in place, but the key ones are you have

17  to be able to make it in commercial quantities.  You have to be

18  able to -- you have to have permission to sell, the approval to

19  sell, and you have to have products, end-use products, that

20  have been developed and proven and tested on plants.

21  Q.   Did Syngenta eventually develop a process that could be

22  used at a commercial scale?

23  A.   Yes, we did.

24  Q.   And when was that?

25  A.   We had the process developed in 1991.

1   Q.   Did Syngenta receive a patent for the process it developed
2   and could manufacture commercially?
3   A.   Yes, we did.
4   Q.   Dr. Whitton, I'd like you to turn to Plaintiff's Exhibit
5   No. 3.
6   A.   Yes.
7   Q.   Do you recognize this document?
8   A.   Yes, I do.
9   Q.   What is it?
10  A.   It's a United States Patent No. 5,847,138.
11       MS. BALTZER:  Your Honor, may I -- I would like to
12  move Plaintiff's Exhibit No. 3 into evidence and publish to the
13  jury.
14       THE COURT:  It will be admitted.
15  BY MS. BALTZER:
16  Q.   Dr. Whitton, what was the patent number on this patent
17  again?
18  A.   5,847,138.
19  Q.   And turning to the second page of this patent, who were
20  the inventors on the patent?
21  A.   These are all people who used to work for Syngenta but
22  have now -- have since retired.
23  Q.   Who owns this patent?
24  A.   Syngenta.
25  Q.   Do you have any abbreviations for referring to this

1  patent?

2  A.    We call this patent the '138 patent or the process patent.

3  Q.    And what does this patent relate to?

4  A.    This patent relates to a process for manufacturing

5  azoxystrobin at a commercial scale, which entails two steps;

6  the first step is the etherification step, and the second step

7  is the condensation step, and we'll refer to those later.

8  Q.    You said the first step was the condensation step?

9  A.    Etherification.

10  Q.    And what was the second step again?

11  A.    Condensation.  The etherification step is used to

12  manufacture an intermediate on the weight of azoxystrobin.  The

13  condensation is the final step in our manufacturing process

14  from which we get the azoxystrobin technical that you saw the

15  picture of.

16  Q.    Are there any specific examples of making azoxystrobin

17  that are contained within this patent?

18  A.    Yes, there are.

19  Q.    Could you point us to that.

20  A.    If you go to Column 14, and if you look at the bottom

21  right, Example 6, this is the start of an example that explains

22  how the etherification step is operated.

23  Q.    And is there also an example of the condensation step used

24  in making the azoxystrobin?

25  A.    Yes, if you move to Column 15, and look at Example 7, it

1  takes a product that was produced in Example 6 and turns it

2  into the final product, the azoxystrobin technical.

3  Q.   Was there anything special about this process that made it

4  suitable for commercial use?

5  A.   It worked.  There were many things that we tried that

6  didn't work, but this one worked.

7  Q.   Anything else about this process?

8  A.   Yeah, compared with some of the other potential routes we

9  looked at, this was made with fewer steps, which was good for

10  commercial manufacture; the fewer steps, the better.

11  Q.   Anything else about this process?

12  A.   Yeah.  It used safer raw materials.  Some of our materials

13  that were made, or some of the materials that could be used in

14  some of the other routes, had explosive properties or very

15  toxic properties, whereas this one avoided -- avoided those.

16  Q.   Anything else about this process?

17  A.   It could be done safely at scale.  So we took the initial

18  process safety testing so that we -- there's a lot of energy

19  tied up in chemicals.  If you get it wrong, you get an

20  explosion so, therefore, you have to make sure that whenever

21  you're doing something at a full commercial scale, you are in

22  control of what you're doing.

23  Q.   Anything else about this process that made it suitable for

24  commercial use?

25  A.   It was less waste than some of the earlier other

processes. The yields, the output from the process, was better so you generated less waste.

Q. Anything else about this process?

A. It made high quality product, and that's also something we need to make, so the combination of all of those made it the most -- the route that we said we could produce on a commercial scale.

Q. Anything else about this product?

A. No. Those are -- those are the key points that this particular process gave us.

MS. BALTZER: I'm going to mark this for identification purposes as Plaintiff's Demonstrative Exhibit 13.

BY MS. BALTZER:

Q. You mentioned earlier that Syngenta first developed this process in 1991. At what scale was azoxystrobin made at that time?

A. At that time, all this development work was done in something about the size of a jam jar. You could hold the floss in your hand. We'd make a few grams of compound from a batch, but we could not make it at the commercial scale at that time.

Q. Did Syngenta eventually start using this process to manufacture the azoxystrobin it sells commercially?

A. Yes, we did. In 1996 was when we started up our first

1  commercial plant.

2  Q.    Were you involved in Syngenta's implementation of this

3  process to manufacture the azoxystrobin it sells?

4  A.    Yes, I was.  I was part of the team of chemists involved

5  in the development and initiation.

6  Q.    So you said it took five years to implement that process.

7  Why was that?

8  A.    Well, three things you need to get right; you have to be

9  able to make the product; you have to be able to sell the

10  product; and you have to be able to have an end-use product

11  that can be sprayed on the field.

12  Q.    And what was involved in going through those three things

13  that you needed to obtain before selling azoxystrobin?

14  A.    So in order to make the product, you had to have a process

15  that could make ton quantities of azoxystrobin safely.  And by

16  that means you take your jam jar and you scale it up 50,000

17  times so you're doing your chemistry in a vessel the size of a

18  small room, so we have to do the scale up.

19          We had to decide what the exact processes would be,

20  how the reagents would go together, the reactants would go

21  together, what the -- how many purifications we needed to get

22  the final product quality that was required, and it

23  was -- those are some of the key ones.  There are lots of them.

24  We had to recycle the solvents to reduce waste.  We had to

25  prove that by doing multiple recycles so that we didn't get new

1  impurities.

2  Q.    So did you have to optimize the process?

3  A.    There was a lot of optimization involved just in getting

4  to the process that we decided to build a platform.

5  Q.    Anything else that you knew to do to implement this

6  process?

7  A.    Yeah, we -- once we had our final processes we needed to

8  confirm that it was safe to manufacture at a full-scale.  So we

9  had to make samples for hundreds of gram scale in the

10 laboratory, send them to our testing facility in England and

11 have them tested for where they -- where they -- if you got out

12 of control with temperature, where they would go off and

13 explode or give off toxic acids, so we needed to understand the

14 limits of our process before we could design the full plant.

15 Q.    Anything else that you did to implement this process?

16 A.    We didn't have a manufacturing facility at all.

17 Q.    Did you have to build a manufacturing facility from

18 scratch?

19 A.    Yes.  We needed to design, build and then start up and

20 commission the manufacturing facility to make thousands of tons

21 of product.  It had never been done before.  The processes had

22 never been run on a scale more than -- well, we -- I'll get to

23 it later.  We did have to run kilogram scale, but this is

24 running on the ton scale.  It's an order of magnitude bigger

25 than we'd ever done before.

1  Q.   Anything else that was involved in implementing?

2  A.   Yes.  Once you've built that facility you need to start it

3  up, and that required scores of people working 24/7 shifts

4  around the clock to insure that the plant, all the elements of

5  the plant worked, the software, the equipment, and that's

6  called commissioning.  And then we had to do the chemical

7  start-up, so we had to put chemicals in there.  We had to make

8  sure the chemicals did what we expected to do in the plant.  We

9  had to resolve the problems when they didn't do exactly what we

10  had to do, and this required the chemists, the chemical

11  engineers, the operations team to be working for months on 24/7

12  shifts in order to make this happen.

13  Q.   Anything else you had do to implement this process?

14  A.   We had to ensure that the quality was right, because it's

15  the quality that we then need to use in the formulated product

16  and then for regulating, so our process had to make the

17  quality.

18       The next thing we had to do whilst we were doing this

19  was to make sure we were allowed to sell the compound.  In

20  order to sell it, we need to go through the steps to get

21  regulatory approval, and the steps for regulatory approval

22  required us to make kilograms of this material in the very

23  early 90's.  We then need to send that away for the testing on

24  the various species.

25       Some of the tests are multigenerational, take three

1  years to do, so that starts setting the time limits of when you
2  can start producing.  And then at the end of all that, we've
3  got all the data.  It has to be pulled together, submitted to
4  the regulatory authorities and then get the approvals from the
5  EPA, the regulatory authorities around the world.
6  Q.    Anything else you had to do to implement this process?
7  A.    Yeah, as I said a little while ago, there's no point in
8  having a chemical in a beaker, a solid enough beaker, if you
9  can't actually use it on the plant, so we had to develop the
10  end-use products, the formulated products, so there was a lot
11  of formulation testing we had to do.
12        We had to scale this up further.  We had to make
13  1.3 tons of material in very inefficient equipment but using
14  the same process so that our formulation development chemists
15  could make the final products, they could then spray them on
16  the fields to test that they worked as expected.  They could
17  use that information and the field trials to show the farmers
18  how good these -- this product was, and that meant that when we
19  had the commercial quantities we could sell our product with
20  those three elements in place.
21  Q.    Anything else you had to do to implement this process?
22  A.    Very key part of it was all of these things coming
23  together at the same time.  There's no point having all the
24  product if you're not allowed to sell it.  There's no point
25  having approvals if you don't have a product to use, so we had

1    to get everything coming together at the same time.

2              MS. BALTZER:  I'm going to mark this for

3    identification purposes as Plaintiff's Demonstrative Exhibit

4    14.

5    BY MS. BALTZER:

6    Q.   Dr. Whitton, after going through each of these steps over

7    five years, was Syngenta finally able to sell azoxystrobin to

8    customers using the method of the process patent?

9    A.   Yes, we were.

10   Q.   Did Syngenta use any other process before making -- before

11   this to make azoxystrobin that it sells to farmers?

12   A.   No.  We always used the two steps of etherification and

13   condensation.

14   Q.   And what year was this when Syngenta first started selling

15   azoxystrobin commercially?

16   A.   1996.

17   Q.   And what year was that originally that Syngenta discovered

18   azoxystrobin?

19   A.   1987.

20   Q.   Has Syngenta ever not used this process to manufacture the

21   azoxystrobin it sells to farmers?

22   A.   We've always used the etherification and condensation

23   steps, but we have made improvements to our processes to make

24   them more efficient.

25   Q.   Are you aware of anyone that makes azoxystrobin

1    commercially using a process other than what's in the process
2    patent?
3              MR. TILLER:  Objection.
4              THE WITNESS:  I'm not aware of anyone who's made --
5              THE COURT:  I'm sorry?
6              MR. TILLER:  Objection.
7              THE COURT:  Your objection is?
8              MR. TILLER:  To foundation.
9              THE COURT:  Overruled.  You may answer.
10             THE WITNESS:  I am not aware of any other -- any
11   company who makes azoxystrobin by any other method.
12   BY MS. BALTZER:
13   Q.   From the time Syngenta started working on developing
14   azoxystrobin in the 1980s, until Syngenta finally started
15   selling azoxystrobin in 1996, how much money did Syngenta
16   invest over that time frame?
17   A.   More than $300 million before we'd sold anything.
18   Q.   After developing the process of this patent, has Syngenta
19   worked on improving the way it manufactures azoxystrobin?
20   A.   Yes, because azoxystrobin is such a major product for us.
21   We've had a team or teams of people working on improving the
22   process ever since.  We spend one and a half to $2 million a
23   year improving the process so that we can make it more
24   efficiently, make it more effectively and make less waste and
25   cheaper.

1  Q.   As a result of that research, has Syngenta implemented any

2  improvements to this process for making its azoxystrobin?

3  A.   Yeah.  We have implemented a number of improvements but

4  the one improvement that really stands out was an improvement

5  to the process in the condensation step, the final step in the

6  process.

7  Q.   And what's the improvement that Syngenta made in the

8  condensation step of the process?

9  A.   The improvement we've made is we add a very small amount

10 of a catalyst into the final step reaction.

11 Q.   And could you explain what a catalyst is.

12 A.   A catalyst is a chemical that's added to a chemical

13 reaction, which is -- which speeds up the reaction but is not

14 consumed in the reaction.

15 Q.   Do you have any examples of a common catalyst in everyday

16 life?

17 A.   It's a little bit difficult, but yeast in bread making is

18 a bit like having a catalyst.  You add a small amount of the

19 yeast to the bread mix.  The yeast feeds on the flour, but the

20 enzymes in the yeast convert the flour to carbon dioxide which

21 gives the gas which makes the bread rise, so it's not consumed

22 in there, but the enzymes in there generate the carbon dioxide.

23 Q.   And what is the catalyst that Syngenta uses that led to

24 this improvement in the condensation step of the reaction.

25 A.   We use a compound called DABCO.

1   Q.   Dr. Whitton, I'd like you to turn to Plaintiff's Exhibit

2   No. 4.   Do you recognize this document?

3   A.   Yes, I do.

4   Q.   What is it?

5   A.   It is United States Patent, Patent No. 8,124,761.

6         MS. BALTZER:   Your Honor, I'd like to move exhibit --

7   Plaintiff's Exhibit 4 into evidence and publish to the jury.

8         THE COURT:   It'll be admitted.

9   BY MS. BALTZER:

10   Q.   Dr. Whitton, could you read what that patent number is for

11   us again?

12   A.   Yes, it's 8,124,761.

13   Q.   And turning to the second page, who are the inventors on

14   this patent?

15   A.   I am one of the inventors.   I'm the lead inventor on this

16   patent, and the other two work with me, or used to work for me

17   in Syngenta in Grangemouth in Scotland.

18   Q.   Who owns this patent?

19   A.   Syngenta.

20   Q.   Do you have any abbreviations for referring to this

21   patent?

22   A.   Yes.   We call this the '761 patent or the DABCO patent.

23   Q.   What does this patent that you helped to invent relate to?

24   A.   It relates to an improvement in the process for

25   manufacturing azoxystrobin by adding a small amount of catalyst

1  into the first -- I'm sorry, into the condensation step.

2  Q.   Dr. Whitton, does Syngenta use the process of the DABCO

3  patent to manufacture the azoxystrobin that it sells to

4  farmers?

5  A.   Yes, we do.

6  Q.   What are the benefits that can be gained from using this

7  process of the DABCO patent to manufacture the azoxystrobin

8  that Syngenta sells?

9  A.   Compared with the previous process, the benefits are

10 dramatic.  We get a much bigger output from the same raw

11 material input.

12 Q.   What do you mean by that?

13 A.   Well, it is called a yield.  So for 100 kilograms of

14 material going in, we get -- instead of 80 kilograms coming

15 out, we get 88 kilograms coming out.

16 Q.   Any other benefits of this process?

17 A.   Yes.  It's faster.  It's faster, so we can do it at a

18 lower temperature.  The chemistry happens faster, so we can do

19 it at a lower temperature.

20 Q.   And is there any benefit about doing this at a lower

21 temperature?

22 A.   If we do it at a lower temperature, then we get fewer

23 impurities and it's safer because it's further away from an

24 area where it can go bang.

25

1    THE COURT:  Where it can go bang?  Is that what you

2  said?

3    THE WITNESS:  Yes.  Sorry.

4    THE COURT:  That's okay.  Just making sure I

5  understood the word.

6  BY MS. BALTZER:

7  Q.   What do you mean by that, Dr. Whitton, make it go bang?

8  A.   All chemical -- a lot of chemical reactions have the

9  potential.  They store a lot of energy up; and if things get

10  out of hand, if you're not controlling the conditions, then you

11  can lose control of the conditions and it's -- as was seen in

12  the news, it is possible for chemicals to go bang if you don't

13  control them.

14  Q.   Any other benefits of using this process?

15  A.   Because we get much improved output from it we get -- we

16  generate much less waste.  So if we get 10, 12 percent more

17  output, we make 10 or 12 percent less waste.

18  Q.   Any other benefits?

19  A.   Last one is it makes a better quality product.  Because

20  we're using lower temperatures, because the yield -- the output

21  is higher, there is fewer impurities in the process, so we get

22  a better quality product at the end.

23  Q.   And when --

24    MS. BALTZER:  I'm going to mark this for

25  identification purposes as Plaintiff's Demonstrative Exhibit

1   15.

2   Q.   When did Syngenta start using this process of the DABCO

3   patent to produce the azoxystrobin that it sells to farmers?

4   A.   2006.

5   Q.   Were you involved in implementing this process?

6   A.   Yes, I was.

7   Q.   What was involved in implementing this process of the

8   DABCO patent to manufacture the azoxystrobin Syngenta sells

9   commercially?

10  A.   Similar to starting up a full new process, we have to make

11  sure we can still manufacture it safely.  We need to make sure

12  we're still allowed to sell it and we need to make sure our

13  end-use product still work.

14  Q.   So what was the first thing that you did to meet all of

15  those?

16  A.   The first thing we had to do was to actually develop a

17  process that would use the invention and be able to use that on

18  the full plant scale.  We needed to know how to put the

19  compound -- the catalyst in the batch, when to do it, how to do

20  it, what temperature to control it at, what temperature not to

21  control it at.  So there were a number of steps that needed to

22  happen.

23  Q.   Is there anything else that was involved or the next step

24  for implementing this process?

25  A.   Once again, we had to make samples at the lab scale that

1  we could send away for hazards testing for finding out where

2  the limits of the product material stability was.  So we had to

3  send it down to -- for hazards testing, so this tells us where

4  our safe limits are for the plant.

5  Q.   Anything else that you had to do to implement this

6  process?

7  A.   We had -- in order to prove that we could make product of

8  the right quality, we had to do a full plant scale.  So we had

9  to find a way of getting the process to operate in a nonoptimal

10 plant so that we could --

11 Q.   Was that similar to a test run, doing that at full plant

12 scale?

13 A.   Yes, sort of a pilot test of the full process.

14 Q.   What was involved in that?

15 A.   Once we -- we had to find out, as I said, how to get the

16 chemical into the plant and what the process would do, but it

17 was one of the most impressive trials that I've ever run, that

18 I've ever seen.

19 Q.   Why was it?

20 A.   When we were running the previous process, what we were

21 seeing was that the yield we were getting was coming out at a

22 constant level.  We then started the trial and immediately we

23 saw a step up of 10 to 12 percent yield.  We went along for

24 four batches for that 10 to 12 percent higher and then we came

25 out from our trial and the yields dropped down to where they

1  had been before.  There were two step changes that we saw in

2  the process, one when we started it and one when we stopped it,

3  and I had never seen a process trial that had been that

4  dramatic.

5  Q.   Anything else that was involved in implementing this

6  process?

7  A.   We had to make sure after we made the material, especially

8  from the pilot material, that the product was good quality.

9  Q.   Did you have to do testing for that?

10  A.   We had to test that with our facilities.  We had to send

11  samples to Switzerland to have them tested by our analytical

12  champion.

13  Q.   Anything else that was involved in implementing this

14  process?

15  A.   Yes.  The testing gave us the information we needed.  That

16  was the process change, the process description, the recipe we

17  had to submit to the regulatory authorities to ensure that we

18  had approval to sell the product.

19  Q.   How much time was involved in that?

20  A.   That can take several months.  By the time you do the

21  analysis and then get the approval, it is several months.

22        MS. BALTZER:  I'm going to mark this as Plaintiff's

23  Demonstrative Exhibit 16 for identification purposes.

24  Q.   Dr. Whitton, over the past three years, how much

25  azoxystrobin has Syngenta manufactured on a yearly basis?

1  A.   We make several thousand tons of azoxystrobin a year.

2  Q.   If Syngenta needed to produce an additional 75 tons of

3  azoxystrobin, could it do that?

4  A.   Yes.   That's in our safety stock.

5  Q.   What do you mean by that, in your safety stock?

6  A.   That's the stock we hold.   That's for our benefit.   If we

7  have a bigger call, then we have that sort of stock sitting

8  around.

9  Q.   How about five times that amount?   Could Syngenta

10 manufacture that?

11 A.   We have the capability and the facilities to manufacture

12 five times only.

13 Q.   What about ten times 75 tons?   Could Syngenta manufacture

14 that?

15 A.   We have the capability again.   We'd have to plan it in,

16 but making 750 tons of anything needs to be planned in.

17          MS. BALTZER:   Your Honor, I would like to hand to the

18 witness what's been marked as Plaintiff's Exhibit 4B, which is

19 an original copy of a document.

20 BY MS. BALTZER:

21 Q.   What is that document?

22 A.   This is the original of a granted patent.

23 Q.   And what patent is that?

24 A.   This is US Patent 8,124,761.   It is the DABCO patent.

25 Q.   And is this the patent that you're an inventor on?

1  A.    This is the patent which I am the lead inventor on, yes.

2            MS. BALTZER:  Could you show that patent to the jury?

3  BY MS. BALTZER:

4  Q.  Dr. Whitton, could you please read for us what is written

5  on the front cover of the patent?

6  A.    "Therefore, this United States Patent grants the person or

7  persons having title to this patent the right to exclude others

8  from making, using, offering for sale or selling the invention

9  throughout the United States of America or importing the

10  invention into the United States of America.  If the invention

11  is a process of the right to exclude others from using,

12  offering for sale or selling throughout the United States of

13  America or importing into the United States of America products

14  made by that process for the term set forth in" US -- I'm

15  sorry -- "35 U.S.C. 135(a)(2) or (c)(1), subject to the payment

16  of the maintenance fees as provided by 35 U.S.C. 41(b)."

17  Q.  Dr. Whitton, how do you feel about that patent that you

18  are holding in your hand?

19  A.    I'm very, very proud to have done this work.  I know the

20  work that we put into inventing the process that we did and

21  then in taking it through from an invention at the jam jar

22  scale and smaller up to something where we're now making

23  thousands of tons a year by this.  I know the work -- the

24  people of my team put in the work that -- that everyone put in

25  the work I put in.  It is very important to me and it's very

1  important to Syngenta.  Syngenta earns this patent.  I'm over

2  here -- come across here from Scotland because I'm here to help

3  ensure that the intellectual property that this represents is

4  respected.

5          MS. BALTZER:  Thank you, Dr. Whitton.

6          No further questions, Your Honor.

7          THE COURT:  Questions for Willowood?

8          MR. TILLER:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10 BY MR. TILLER:

11 Q.  Good afternoon, Dr. Whitton.

12 A.  Good afternoon.

13 Q.  So from 1996 to 2006, Syngenta used the method that is

14 disclosed and claimed in the '138 patent to manufacture

15 azoxystrobin, correct?

16 A.  Yes.

17 Q.  And that method claimed in that patent does not require

18 the use of DABCO, does it?

19 A.  That's correct.  We wouldn't go back to it now.

20 Q.  And, in fact, Syngenta did not use DABCO from 1996 to

21 2006, correct?

22 A.  We did not use it, but that's because we didn't know to

23 use it.

24 Q.  Do you know how much azoxystrobin -- well, strike that.

25          I presume that all of the azoxystrobin that was being

1  made that Syngenta sold during those years was made at that

2  plant, correct?

3  A.    That is correct.

4  Q.    Using the '138 method, which does not use DABCO, correct?

5  A.    Using the '138 method we would not use now, probably could

6  not use now.

7  Q.    Do you know how much was sold during that time?

8  A.    Thousands of tons.

9  Q.    You mentioned that before Syngenta could start selling

10 azoxystrobin it had to gain approvals, correct?

11 A.    Correct.

12 Q.    I'm trying to make sure I speak into the microphone.

13 Sorry.  To get -- to garner those approvals, certain testing

14 had to be conducted and then submitted to the regulatory

15 agencies, correct?

16 A.    That is true.

17 Q.    Where was that testing done?

18 A.    The testing was done, I believe, in the UK.

19 Q.    And the formulation work that was done -- you talked

20 extensively when Ms. Baltzer was questioning you about

21 formulation having to be done.  That was done in the UK as

22 well, correct?

23 A.    We did formulation testing in various places.  There was

24 some done in the UK.  There was some done in the US.  For the

25 US markets, we did the development of Quadris and Quadris --

1  Quilt Xcel and the forerunners of that in the US.

2  Q.   If I may, could we show Plaintiff's Exhibit 4, which you

3  have in your binder?  It is the '761 patent.

4  A.   Uh-huh.  Yes.

5  Q.   I'd like to specifically take you to Column 6.  You

6  realize the numbers at the top are column numbers?

7  A.   Yes, I do.

8  Q.   I know you are well aware of the patent.  Column 6 under

9  Example 1, would you agree with me that under Example 1 there

10 is numerous examples of using different amounts of DABCO to

11 produce azoxystrobin?

12 A.   Yes.

13 Q.   And under Example 1A and 1B --

14      MR. TILLER:  If you could you bring those up next to

15 each other, so that hopefully we can see them.

16 BY MR. TILLER:

17 Q.   You can look at it on your screen or in the patent itself,

18 Doctor.  Do you have that?

19 A.   Yes.

20 Q.   So 1A, which is on the left-hand side, calls for the use

21 of --

22      MR. TILLER:  Chris, I think we have to go up just

23 slightly higher on the left-hand side.

24 BY MR. TILLER:

25 Q.   While Mr. Gillespie is getting that up on the screen,

1  Example 1A shows the use of 2 molar percent of DABCO, correct?

2  A.   It shows that in the laboratory we could use 2 mol

3  percent.

4  Q.   And 2 molar percent is not within the scope of this

5  patent, correct?

6  A.   The patent is between 0.1 and 2 percent, yes.

7  Q.   So you would agree with me that using 2 molar percent

8  would not infringe this patent?

9  A.   That is correct.

10 Q.   Okay.  In using 2 molar percent, this example shows that

11 azoxystrobin could be heated to 80 degrees Celsius, held at

12 that temperature for 60 minutes, and reach a yield of

13 97.5 percent.  Do you see that?

14 A.   Yes.

15 Q.   And then looking at the right, 1B, that is an example of

16 making azoxystrobin using 1 molar percent, correct, 1 molar

17 percent DABCO?

18 A.   Yes, it is.

19 Q.   And 1 molar percent is within the claim of this patent,

20 correct?

21 A.   Yes, it is.

22 Q.   And at 1 molar percent -- sorry, need my glasses -- the

23 mixture is heated to 60 degrees -- or 80 degrees Celsius, so

24 the same as in Experiment 1A, and held at that temperature for

25 60 minutes, the same as 1A, correct?

1  A.    Yes.

2  Q.    And the yield recovered was 98.7 percent, correct?

3  A.    Yes, it does, which demonstrates that's a more

4  commercially viable process.

5  Q.    Well, is the difference -- this was just one experiment.

6  Is the difference in 1.3 percent -- can you state with

7  certainty that it is always 1.3 percent greater yield when

8  using 1 molar percent DABCO versus 2 molar percent DABCO?

9  A.    I think it's the same yield, but it's less -- you're

10  putting less ingredient in there, so you're having -- you're

11  putting in half the catalyst so therefore it is commercially

12  more viable.

13  Q.    Because you are spending less money on DABCO?

14  A.    Because you're spending less money on DABCO because

15  you're -- when you add DABCO, it's another impurity in the

16  system.  The moral of anything new you put into a process, the

17  more likely you are to form new impurities.

18  Q.    Let's look at Column 7, Example C.

19         MR. TILLER:  Chris, if you could put C and B next to

20  each other.  Thank you.

21  BY MR. TILLER:

22  Q.    Example C, Doctor, is showing the use of DABCO working

23  or -- sorry.  The use of DABCO at .2 molar percent, being

24  heated to 80 degrees Celsius and yielding -- for 300 minutes,

25  yielding 93 percent recovery, correct?

1  A.   Yes.

2  Q.   And .1 percent at 80 degrees Celsius for 300 minutes

3  using -- getting to 93.4 percent?

4  A.   Yes.

5  Q.   Okay.  And you would agree with me since this -- the DABCO

6  patent covers between .1 molar percent and 2 molar percent that

7  .1 molar percent does not fall within the scope of the patent,

8  correct?

9  A.   That is true done on a lab scale and the yield I would say

10 is the same for this.

11 Q.   Okay.

12         MR. TILLER:  Your Honor, I'm going to ask you a quick

13 logistical objection.  I want to show Dr. Whitton an exhibit

14 that is fat.  I only need him look at a couple pages of it.

15         THE COURT:  Are you going to hand it to him?

16         MR. TILLER:  Do you want me to hand it to him or do

17 you want to just show it up on the screen?  That was my

18 question.

19         MS. BALTZER:  Your Honor, I would like to see what

20 the exhibit is, too.

21         MR. TILLER:  It is Exhibit 5 -- document Defendant

22 Exhibit 5.  It's lab notebooks produced by Syngenta.  I'm

23 sorry.  35.

24         MS. BALTZER:  I'd like to see what the document is.

25         THE COURT:  Okay.  Well, just hand him the exhibit

1  and proceed with your questions.  You've got a copy of

2  Defendant's 35; don't you?  The exhibits have been exchanged

3  previously.  Okay.  Go ahead.  Hand it to the witness.

4            MR. TILLER:  Okay.

5  BY MR. TILLER:

6  Q.   Doctor, these were produced by Syngenta and have been

7  represented to us --

8            THE COURT:  Okay.  Well, ask him if he knows what it

9  is rather than you testifying.

10           MR. TILLER:  Fair enough.

11 BY MR. TILLER:

12 Q.   Do you know what this is, Dr. Whitton?

13 A.   These are copies of laboratory work where we were

14 investigating, for the most part, the DABCO process.

15           MR. TILLER:  Okay.  Your Honor, I'd move for the

16 admission of Defendant 35.

17           MS. BALTZER:  No objection, Your Honor.

18           THE COURT:  It will be admitted.

19 BY MR. TILLER:

20 Q.   I'd like you to look -- if I can get to the right page --

21 at the page 291880.  Doctor, do you see what are called Bates

22 numbers in the lower right-hand corner that say SYN and then

23 have a number?

24 A.   Yes.

25 Q.   That's the number I'm referring to.

1  A.    Twenty-nine -- sorry.  Could you repeat the number?

2  Q.    It's 291880.

3  A.    Yes.

4  Q.    And would you agree with me, looking at the very top --

5  Chris, just blow up the first two underlined lines -- that this

6  appears to be experiment regarding the production of

7  azoxystrobin using 5 molar percent DABCO?

8  A.    Yes.  As I said, it's a laboratory experiment that was

9  carried out.

10 Q.    Understood.

11       Then --

12       THE COURT:  So, before we go any further, what's this

13 word, since none of us are chemistry people, "mole" or "molar"

14 that you're saying?  Can you explain what that is?

15       THE WITNESS:  Yes.  A mol is a standard measure of a

16 number of molecules, which, when you -- you have a standard

17 amount, it gives a standard weight.  So if you have a mol of

18 carbon, it has a weight of 12.  A mol of azoxystrobin has a

19 weight of 403.  So it's -- add all the carbon, hydrogen,

20 oxygen, so it's a standard -- it's a standard number of

21 molecules, rather than a standard weight.

22       THE COURT:  All right.  And you spell it M-O-L?

23       THE WITNESS:  M-O-L-E.

24       THE COURT:  M-O-L-E.  All right.  Thank you.

25       THE WITNESS:  It's normally, by chemists, put to MOL

1  just as an abbreviation.

2           THE COURT:  Thank you.  Go ahead.

3           MR. TILLER:  Sorry, Judge.

4           THE COURT:  That's all right.

5  BY MR. TILLER:

6  Q.   Chris -- or Dr. Whitton, I'm sorry, if you could please

7  take a look at 291884.  Do you have that page, sir?  And,

8  again, just the top.

9  A.   Yes.

10 Q.   And it appears that on this page, this lab notebook is,

11 again, talking about a particular laboratory experiment using

12 DABCO at 5 molar percent.

13          THE COURT:  Are you asking a question?

14 BY MR. TILLER:

15 Q.   Would you agree with me that that's what's being shown

16 here?

17 A.   I'm sorry.  I think that's .5 mol percent.  I'd have to

18 check the numbers, but I think that's 0.5 mol percent.

19 Q.   I will agree with you that it is not easy to read.  Let me

20 show you, then, if we could take a look at 291896.  This is --

21 do you have that page, sir?

22 A.   Just about.  Yes.

23 Q.   This appears to be a summary of experiments 67, 71, and

24 74, of which we've just looked at two of them.  Would you agree

25 with that?

1   A.   Yes, I do.

2   Q.   Okay.  And at the bottom of this page, under -- not quite

3   that far, Chris, under conclusion, last sentence -- you might

4   be able to read it easier on the screen, but feel free to look

5   at the hard copy.  Yes.  Could you call that out, Chris?

6         It appears to say, "subsequent to this work, 5 molar

7   percent DABCO infringes upon Bayer patent and cannot be used.

8   Hence, we need to report experiments" -- or I'm sorry, "we need

9   to repeat experiments at 1 molar percent."

10        MS. BALTZER:  Objection, relevance.

11        THE COURT:  Overruled.

12  BY MR. TILLER:

13  Q.   Do you see that?

14  A.   Yes, I do.

15  Q.   Okay.  So, this person who was conducting this experiment

16  appears to be a person by the name of Denise Wallace.  Do you

17  know her?

18  A.   It was not Denise who carried out the experiment.  It was

19  carried out by Neil Wallace.

20  Q.   Oh, you're right.

21  A.   Not related.  Denise was the one who read and understood

22  and signed it.

23  Q.   You're right.  Neil Wallace conducted the experiments,

24  correct?

25  A.   Correct.

1  Q.    And Neil worked at Syngenta?

2  A.    Yes.

3  Q.    Neil worked in the lab?

4  A.    He worked in the lab, yes.

5  Q.    Okay.  And Denise Wallace worked at Syngenta, I presume?

6  A.    Yes.

7  Q.    And worked in the lab?

8  A.    Yes.

9  Q.    And Mr. Wallace says here:  Subsequent to this work, 5

10 molar percent DABCO infringes upon Bayer patent and cannot be

11 used.  Hence, we need to repeat experiments at 1 molar percent

12 DABCO, and I think that says 90 degrees Celsius, but I'm not

13 sure.

14 A.    I think it might be 90.

15 Q.    Okay.

16           THE COURT:  What's your question?

17 BY MR. TILLER:

18 Q.    That's what that says, correct?

19 A.    I believe that's what it says, yes.

20 Q.    And the Bayer patent was a patent owned by -- strike that.

21 Do you know who Bayer is?

22 A.    Yes, I do.

23 Q.    It's a competitor of Syngenta, correct?

24 A.    Yes, it is.

25 Q.    They produce agra chemicals, correct?

1  A.   Yes, they do.

2  Q.   Okay.  And they have a patent that covered the making of

3  azoxystrobin using 2 molar percent to 40 molar percent,

4  correct?

5  A.   No, actually, they don't have a patent that covers the

6  making of azoxystrobin.  They have a patent that demonstrates

7  and shows how the -- their product is made.

8  Q.   How their product is made?

9  A.   Sorry.  Could you repeat the question?

10  Q.   The patent that Bayer has covers, among other things --

11  and let me just ask you.  The Bayer patent is also something

12  that we've referred in this trial already as the Weintritt?

13  A.   The Weintritt patent, yes.

14  Q.   Okay.  It's the Weintritt patent.  Because somebody by the

15  name of Weintritt was the lead inventor on it, correct?

16  A.   Yes.

17  Q.   But that patent is owned by Bayer, correct?

18  A.   Yes.

19  Q.   Who is competitor of Syngenta?

20  A.   Yes.

21  Q.   And who makes its own strobilurin type fungicide, correct?

22  A.   It does, yes.

23  Q.   Okay.  And the Bayer patent, or the Weintritt patent,

24  covers the production of multiple -- covers the synthesis of

25  multiple compounds, among which azoxystrobin is included,

1 correct?

2          MS. BALTZER:  Objection, foundation.

3          THE COURT:  Are you saying -- are you objecting

4 because he hasn't asked this witness if the witness is familiar

5 with the Weintritt patent?  Is that your objection?

6          MS. BALTZER:  The Weintritt patent hasn't been put in

7 front of the witness or --

8          THE COURT:  Okay.  Well --

9          MS. BALTZER:  -- he's asking him to speculate at this

10 point.

11          THE COURT:  Overruled.  If he doesn't know the

12 answer, he can say.

13          THE WITNESS:  Sorry.  Could you repeat the question

14 again?  Sorry.

15 BY MR. TILLER:

16 Q.   Are you aware that the Weintritt patent, the Bayer patent,

17 shows or claims the synthesis of azoxystrobin, or the synthesis

18 of certain compounds, among which is included azoxystrobin,

19 using from 2 molar percent DABCO to 40 molar percent DABCO?

20 A.   I am aware that it covers some several billion products --

21 compounds that it could be.  Azoxystrobin might be one of them,

22 but I'm aware also that it is not demonstrated as azoxystrobin

23 in that patent.

24 Q.   It hasn't been demonstrated that it's azoxystrobin in that

25 patent?

1  A.   It hasn't been demonstrated that azoxystrobin can be made

2  by that process in that patent.

3  Q.   I just want to make sure I understand.  Are you saying it

4  doesn't talk about azoxystrobin, or are you saying there's no

5  proof that it can work at a production level?

6  A.   It doesn't actually mention azoxystrobin, but it doesn't

7  say -- the compound itself could be one of billions.

8  Azoxystrobin could be one of billions that is in that one.  But

9  they have not demonstrated that they could make it at a lab

10 scale using that process.

11 Q.   Okay.  So, again, I think you answered my question, but I

12 want to make sure.  So you're not --

13           THE COURT:  If you can ask rather than state.

14 BY MR. TILLER:

15 Q.   Are you testifying that azoxystrobin is not disclosed in

16 the Weintritt patent?

17 A.   I am saying that azoxystrobin is one of the billions of

18 compounds that could be covered in that.

19 Q.   Okay.  That's all I needed to know.  And, again, it

20 covers -- I realize that you are saying that it hasn't been

21 shown that it can work in a production state.  But it does, at

22 least, disclose a way to make certain molecules, among which

23 azoxystrobin is one, using DABCO from 2 molar percent to 40

24 molar percent, correct?

25 A.   It does not disclose that azoxystrobin can be made by that

1  process.  It does not teach you that -- that azoxystrobin can

2  be made by that process, even in the lab scale.  It tells

3  you -- it writes down that it might be able to be, but it does

4  not actually teach you that it can be.

5  Q.   Okay.  So your critique of it is that it doesn't show you

6  an actual way do it in the lab, but you do agree that it shows

7  azoxystrobin being made by using 2 percent DABCO?

8  A.   It doesn't show azoxystrobin.  It writes -- sorry, is

9  written down that of the compounds that you could make using

10  this process, there are several billion of those.  One of them

11  could be azoxystrobin.

12  Q.   Okay.  If that's true, do you know why Mr. Wallace said,

13  subsequent to the score of 5 molar percent DABCO infringes upon

14  Bayer patent and cannot be used, hence, we need to repeat

15  experiments at 1 molar percent DABCO?

16  A.   I would like to just spend a little bit more time just

17  having a look at the observations, if that's acceptable.

18          THE COURT:  Take your time.

19          THE WITNESS:  Thank you.  When we were doing this

20  work, our original assessment of the Weintritt patent, as you

21  call it, was that it did not -- that at any level we operate,

22  it would not infringe that patent.  This is on the basis that

23  they do not use an etherification and condensation process as

24  used in the process that we operate.

25  Q.   The -- are you done?  I'm sorry.  The '761 patent does not

1  include the etherification step within the scope of its claim,

2  correct?

3  A.    That is correct.  But the Weintritt patent, it includes

4  the two steps in order to make these molecules on either side

5  of the pyrimidines.  It's step 1 was without DABCO, and then

6  step 2 was with DABCO.

7  Q.    And in what is covered by the '761 patent, there still is,

8  theoretically, an etherification step that has to occur, it's

9  just not claimed in the patent, correct?

10 A.    That etherification step is not claimed in the '761

11 patent.

12 Q.    Right.  The patent simply covers the condensation step

13 using between .1 molar percent and 2 molar percent?

14 A.    The '761 patent does --

15 Q.    Okay.

16 A.    -- but the Weintritt patent includes the etherification

17 step from a phenol, which is not the etherification step that

18 we do.  So it includes a step from the phenol.

19        MR. TILLER:  Thank you, Dr. Whitton.  I have nothing

20 further.

21        THE COURT:  Redirect?

22        MS. BALTZER:  No further questions, Your Honor.

23        THE COURT:  All right.  If you'll just -- no, go

24 ahead and step down, I think.  Thank you.

25        (Witness excused.)

 1          THE COURT:  All right.  Ladies and gentlemen, we'll

 2     take our afternoon recess at this point.  You can just leave

 3     the exhibit right there.  And I'll give you a 15-minute break.

 4     When we come back, we'll move on to the next witness.  And,

 5     again, we'll stop around 5:00 or so.  Please remember not to

 6     talk about the case among yourselves or with anyone else, and

 7     don't have any contact with anyone involved in the case or

 8     anyone else about the matter.

 9          Come back to the jury room in 15 minutes.  The jury

10     is excused.  If everyone else will remain seated which they

11     step out.

12          (Jury excused.)

13          THE COURT:  Anything we need to take up before we

14     take our afternoon break?  No?  We'll take a 15-minute recess.

15          (At 3:30 p.m., break taken.)

16          (At 3:45. p.m., break concluded.)

17          THE COURT:  Anything before we bring the jury in?

18     No?  Okay.  Bring the jury in.

19          Since all the exhibits have been exchanged pretrial,

20     you don't have to hand an exhibit to the other side.  Just

21     state the exhibit number and give opposing counsel a moment to

22     find it, since there's lots of notebooks.

23          (Jury panel is present at 3:47 p.m.)

24          THE COURT:  Okay.  Welcome back.  We're ready to

25     proceed, and Syngenta can call their next witness.

```
 1              MR. LEVINE:  Syngenta calls Mr. Brian Heinze.

 2              THE COURT:  Come around, Mr. Heinze.

 3                       BRIAN D. HEINZE,

 4              PLAINTIFF'S WITNESS, SWORN AT 3:48 P.M.

 5                       DIRECT EXAMINATION

 6  BY MR. LEVINE:

 7  Q.    Please introduce yourself to the jury.

 8  A.    My name is Brian David Heinze.

 9  Q.    Who do you work for, Mr. Heinze?

10  A.    Willowood USA.

11  Q.    What is your current position?

12  A.    I'm the president and CEO of Willowood USA.

13              MR. LEVINE:  Your Honor, I ask for permission to ask

14  leading questions pursuant to Federal Rule of Evidence 611(c).

15              THE COURT:  Within reason, yes.

16              MR. LEVINE:  May I approach the witness to hand him a

17  notebook with the exhibits we'll use?

18              THE COURT:  You may.  Do the Defendants have one?

19              THE CLERK:  You can give them this one.

20              THE COURT:  I think one of them was for them.  Go

21  ahead.

22  BY MR. LEVINE:

23  Q.   Mr. Heinze, let's start by talking about some issues

24  relating to the compound patents and, in particular, some of

25  the factors relating to where the sale took place of the azoxy
```

1   in 2013.

2           Willowood USA is based in Rosboro, Oregon; is that

3   correct?

4   A.   Yes.

5   Q.   And you formed the company with a person by the name of

6   Vijay Mundhra?

7   A.   That's correct.

8   Q.   Vijay Mundhra is the majority owner of Willowood Limited;

9   is that correct?

10  A.   He's the sole owner of Willowood Limited.

11  Q.   Willowood Limited is based in Hong Kong; correct?

12  A.   Yes, that's correct.

13  Q.   Will you please turn to Exhibit 17K in the notebook in

14  front of you.

15          MR. LEVINE:  Move for the admission of 17K, and to

16  make this easier, I'll also move for admission of 17A, C, E --

17          THE COURT:  Which ones again?

18          MR. LEVINE:  17K, 17A, 17C, 17E, 17G, and 17I.

19          THE COURT:  I'm just giving the Defendant a moment to

20  look at each one of them.

21          MR. NEUMAN:  No objection.

22          THE COURT:  They'll be admitted.

23  BY MR. LEVINE:

24  Q.   Mr. Heinze, please turn to 17K.  Do you have that in front

25  you now?

1   A.   Yes, I do.

2   Q.   This is a screenshot, is it not, of the "Meet the Team"

3   page on the Willowood USA website?

4   A.   Yes, it is.

5        MR. LEVINE:  David, can you please display 17K.

6   BY MR. LEVINE:

7   Q.   At the bottom of the first page, Mr. Mundhra is listed as

8   a part of the Willowood USA team, correct?

9   A.   Yes, he is.

10  Q.   His title is described as Managing Director, Willowood

11  Limited, is that correct?

12  A.   That is correct.

13  Q.   Please turn to 17A.  This is a screenshot, is it not, of

14  the "News Update" page from the Willowood Limited website?

15  A.   It appears so, yes.

16  Q.   And it states, does it not, in the first sentence of the

17  news update -- and, David, if you can please enlarge that

18  paragraph.  Thank you.

19        It states, does it not, "Willowood Limited launches

20  its US business, Willowood USA, based out of Oregon USA,"

21  correct?

22  A.   That's what it does say, yes.

23  Q.   Willowood USA was launched in November of 2009?

24  A.   That is correct.

25  Q.   And you've been president and CEO of Willowood USA since

1  it was formed in 2009, correct?

2  A.   Yes.

3  Q.   Please turn to 17E.

4         MR. LEVINE:  And, David, if you could please display

5  it for the jury.

6         THE WITNESS:  I'm sorry.  E as in Edward?

7  BY MR. LEVINE:

8  Q.   E as in Edward, yes.

9         This is a screenshot, is it not, of the "Worldwide

10 Offices" page of the Willowood Limited website?

11 A.   Appears to be so, yes.

12        MR. LEVINE:  And, David, if we could please blow up

13 the last office on the page.

14 BY MR. LEVINE:

15 Q.   The Willowood Limited website lists Willowood USA, LLC, as

16 an affiliate office, does it not?

17 A.   Yes, it does.

18 Q.   Please turn to 17G.

19 A.   Okay.

20 Q.   This is the Willowood USA page that is on the Willowood

21 Limited website, correct?

22 A.   Appears to be so, yes.

23 Q.   And at the bottom of page -- David, if you can highlight

24 that last paragraph -- there is a link and that link goes to

25 the Willowood USA website, is that correct, the "click here"

1  link?

2  A.    Yes, it does.

3  Q.    Please turn to Exhibit 17I.

4  A.    Okay.

5  Q.    This is the "About Us" page on the Willowood USA website,

6  isn't it?

7  A.    Yes, it is.

8  Q.    And the dropdown menu underneath "About Us" includes

9  Willowood Limited, does it not?

10  A.    Yes, it does.

11  Q.    And then within the text of this page, underneath the

12  title "Manufacturer of Post Patent Crop Projection Products,"

13  it states that the "Willowood Limited global operations are

14  coordinated by a Hong Kong based management team."  Is that

15  correct?

16  A.    Yes, it does.

17  Q.    And do you see a link there as well, "Read More"?  That is

18  a link that takes one from the Willowood USA website page to

19  the Willowood Limited website page, correct?

20  A.    Correct.

21  Q.    Please turn to Exhibit 17C.  This is the "About Us" page

22  on the Willowood Limited website, is that correct?

23  A.    Appears to be so, yes.

24  Q.    And the one, two, three, fourth paragraph down begins by

25  stating, "We have established our affiliate offices in USA,

1  China, and India."  Is that correct?

2  A.    Yes, it does.

3  Q.    Please turn to Exhibit 18 in your binder.

4          MR. LEVINE:  I move for admission of Exhibit 18.

5          THE COURT:  Plaintiff's 18 will be admitted.

6  BY MR. LEVINE:

7  Q.    Exhibit 18, Mr. Heinze, is the -- from the pressroom

8  section on the Willowood USA website, is that correct?

9  A.    Yes.

10 Q.    And if you'll turn to page 5 of 7 within Exhibit 18, there

11 is a press release, the title of which is "Willowood Limited of

12 Hong Kong and Brian Heinze, former President and CEO of

13 AGValue, Reach an Agreement to Form Willowood USA."  Do you see

14 that?

15 A.    Yes, I do.

16 Q.    The second paragraph of this press release states that

17 "Vijay Mundhra, Director of Willowood Limited, states," and

18 then the last sentence of what he states is "We are very

19 excited about this new opportunity to expand and grow our

20 company in the United States."  Is that correct?

21 A.    Yes, it does.

22          MR. LEVINE:  Thank you, David.

23 BY MR. LEVINE:

24 Q.    The intent in launching Willowood USA and having it as the

25 affiliate office of Willowood Limited was to sell products to

1  the customers in the US, isn't that correct?

2  A.   Yes, it was.

3  Q.   Willowood Limited sells azoxystrobin to Willowood USA,

4  does it not?

5  A.   It does.

6  Q.   Willowood Limited obtains that azoxy technical from a

7  supplier, a Chinese company that we'll refer to as Tai He?

8  A.   That is correct.

9  Q.   There is an agreement between Willowood Limited and Tai He

10 relating to azoxy, isn't there?

11 A.   Yes, there.

12 Q.   Please turn to Exhibit 15.

13          MR. LEVINE:  I move for admission of Exhibit 15.

14          THE COURT:  It will be admitted.

15          MR. LEVINE:  Thank you.

16 BY MR. LEVINE:

17 Q.   This Exhibit 15 is the exclusivity and supply agreement

18 between Tai He and Willowood Limited, is it not?

19 A.   Yes, it is.

20 Q.   As you can see in the first line, it was made and entered

21 into on March 26th, 2013, correct?

22 A.   Correct.

23 Q.   Let's refer, please, to Section 1.05(a).

24          MR. LEVINE:  David, if you can please highlight that.

25 Maybe make it a little bit larger, David, if you can.

1  BY MR. LEVINE:

2  Q.   Mr. Heinze, the first sentence of Section 1.05(a) of

3  Exhibit 15 states, does it not, that "Willowood," referring to

4  Willowood Limited, "represents that it will apply for a

5  registration with the United States Environmental Protection

6  Agency for azoxystrobin technical 98 percent manufactured by

7  Tai He"?  Is that correct?

8  A.   No, it's not.  Willowood Limited never applies for

9  registration with the US Environmental Protection Agency.  It's

10 always Willowood USA.

11 Q.   But Willowood Limited was representing to Tai He that

12 Willowood -- a Willowood entity would apply for registration

13 with the US EPA for azoxystrobin technical, correct?

14 A.   The way I would read this is a Willowood affiliate.  It

15 doesn't clearly state Willowood Limited, but, yes, I would

16 agree with that.

17 Q.   But Willowood Limited is the party to this agreement,

18 correct?

19 A.   Yes, it is.

20 Q.   Now, the second representation that Willowood Limited made

21 in Section 1.05(a) is "that it anticipates such registration

22 will be submitted by 4th quarter 2013 and obtained by December

23 of 2015," correct?

24 A.   Correct.

25 Q.   The third representation that Willowood Limited made in

1  Section 1.05(a) of Exhibit 15 is that Willowood Limited

2  "possesses the ability to promote the sale and use of

3  azoxystrobin technical 98 percent manufactured by Tai He,"

4  correct?

5  A.   Again, it does not have a reference specific to Willowood

6  Limited.  It has Willowood, which could be construed as any of

7  the affiliate companies as well, but I do agree with Willowood.

8  Q.   The last representation in Section 1.05(a) is that

9  Willowood is desirous, and, again, Willowood or referring --

10 excuse me -- it says "it is desirous," and "it" refers to

11 Willowood, Willowood Limited, the party to the agreement,

12 correct?

13 A.   Again, it does not specifically say Willowood Limited.  I

14 would agree that it was designed as a Willowood affiliate

15 company.  For clarification, it should have said Willowood USA

16 because those are the things that we do in the US.

17 Q.   But if we look back up at the very first paragraph, the

18 one that states "Exclusivity and Supply Agreement made on 26

19 March, 2013," the second to last line identifies the party to

20 whom this is an agreement with is Willowood Limited, Hong Kong,

21 correct?

22 A.   I do agree with that, yes.

23 Q.   And if we turn to the very last page of the document, the

24 signature page, the signature page or signature line is for

25 Willowood Limited, correct?

1  A.   Yes, it is.

2  Q.   And it indicates that it was signed by Mr. Vijay Mundhra,

3  the director of Willowood Limited, correct?

4  A.   Correct.

5  Q.   So going back to Section 1.05(a), the last representation

6  made in this agreement is that it is desirous of developing

7  demand for and selling such product on an exclusive basis in

8  the USA and Canada, correct?

9  A.   That is correct.

10 Q.   Please look to Section 1.05(c), as in Charlie.  In this

11 section, "Tai He agrees to provide the 5-Batch and

12 Phys-Chem" -- that's referring the physical chemistry, is that

13 correct?

14 A.   Physical chemical.

15 Q.   "The 5-Batch and Physical-Chemical studies and all

16 information regarding the manufacturing process and inert

17 ingredients of azoxystrobin technical 98 percent as required by

18 US EPA for registration of the product," correct?

19 A.   Correct.

20 Q.   And Tai He agreed to provide that information, did it not,

21 to Willowood's registration agent and testing facility as

22 required, correct?

23 A.   Yes, it does, correct.

24 Q.   And Willowood's registration agent was Pyxis?

25 A.   That is correct.

1  Q.    Please refer to Section 2.01 of Exhibit 15.  In section

2  2.01, it states, does it not, that "Willowood shall be the

3  exclusive seller of Tai He's azoxystrobin technical 98 percent

4  in USA and Canada"?  Is that what it states?

5  A.    Yes, that's what it states.

6  Q.    Please refer to Section 3.01.  The second and last

7  paragraph of Section 3.01 states, does it not, that "Tai He

8  agrees that it will not sell its product azoxystrobin technical

9  98 percent to any other company or agent other than Willowood

10  USA for USA and Canada market"?  Is that what it states?

11  A.    Yes, it does.

12  Q.    Please refer to Section 4.01.  Section 4.01 states, does

13  it not, that "Willowood shall be the sole distributor of Tai

14  He's product described herein within the Territory during the

15  term of this agreement"?

16  A.    Yes, it does.

17  Q.    And the territory is USA and Canada, correct?

18  A.    That is correct.

19  Q.    And now please look up at Section 3.06 of Exhibit 15, and

20  this section has a title of "Title," and it states, does it

21  not, "Title to the product" -- and that's referring to the

22  azoxy technical?  That's the product, is that correct?

23  A.    That is correct.

24  Q.    So title to the azoxy technical shall pass to Willowood

25  upon delivery to Willowood's designated port in the USA.  Is

1  that what it states?

2  A.   That's what it says.

3  Q.   Let's go back to 2013 and talk about some of the things

4  that occurred during 2013 and thereafter.

5       In 2013, Willowood knew that some of Syngenta's

6  azoxystrobin patents were approaching their expiration dates,

7  is that correct?

8  A.   That is correct.

9  Q.   As early as March 2013, Willowood was planning on

10 launching an azoxystrobin product in 2014, correct?

11 A.   That is correct.

12 Q.   In fact, in March of 2013, Matt Heinze -- and, by the way,

13 Matt Heinze, is that your son?

14 A.   It is my son, yes.

15 Q.   In March 2013, Matt Heinze informed customers and

16 potential customers that Willowood was expecting to launch an

17 azoxystrobin product in 2014, correct?

18 A.   I don't have that in front of me, but I believe that to be

19 true, yes.

20 Q.   Let me ask, by the way, just so that it's clear for the

21 ladies and gentlemen of the jury.  You said Matt Heinze is your

22 son.  Did he work at Willowood as well?

23 A.   He did up until a couple of months ago, but, yes.

24 Q.   In 2013, what was his position at Willowood?

25 A.   He was our western regional account manager, covering

1  California and Arizona.

2  Q.    Let's look at Exhibit 167 in your notebook.

3         MR. LEVINE:  And move for admission of Exhibit 167.

4         THE COURT:  It will be admitted.

5  BY MR. LEVINE:

6  Q.    Now, Mr. Heinze, this is an e-mail chain between Matt

7  Heinze and a distributor, a distributor by the name of Mike

8  James at Green Valley Farm Supply, and this e-mail chain is

9  dated March 22nd, 2013.  Is all of that correct?

10 A.    Yes, it is.

11 Q.    And in his March 22nd, 2013, e-mail, Matt Heinze states to

12 Mr. James that for our future products -- excuse me -- "For our

13 future product line, we will be bringing the following

14 products," and one of the products that he identifies is

15 azoxystrobin (Quadris), is that correct?

16 A.    That is correct.

17 Q.    Quadris is a Syngenta azoxy product, correct?

18 A.    Correct.

19 Q.    So by referencing Quadris in this e-mail to the

20 distributor, Matt Heinze was indicating to the distributor that

21 Willowood's azoxystrobin product would be an alternative to

22 Syngenta's Quadris product, is that correct?

23 A.    That is correct.

24 Q.    Please turn to Exhibit 168.

25         MR. LEVINE:  I move for admission of Exhibit 168.

1    THE COURT:  It will be admitted.

2  BY MR. LEVINE:

3  Q.   Mr. Heinze, Exhibit 168 is an April 15th, 2013, e-mail

4  chain between Matt Heinze and another distributor, this

5  distributor being Clay Houchin at Buttonwillow Warehouse

6  Company, is that correct?

7  A.   That is correct.

8  Q.   In his April 15, 2013, e-mail, Matt Heinze tells

9  Mr. Houchin that Willowood's upcoming products for the 2014

10  market will include azoxystrobin, correct?

11  A.   Correct.

12  Q.   And he again refers to Quadris, correct?

13  A.   Correct.

14  Q.   He also this time refers to Abound, correct?

15  A.   Yes.

16  Q.   Abound is another Syngenta product, correct?

17  A.   Correct.

18  Q.   So having seen these e-mails, is it correct that in

19  March 2013 and April 2013, Matt Heinze was informing customers

20  and potential customers that Willowood was expecting to launch

21  an azoxystrobin product in 2014?

22  A.   That's correct.

23  Q.   Let's talk about the things that Willowood did to enter

24  the market in 2014.

25        The first thing Willowood did was to import

1  5 kilograms of azoxy technical in the early part of 2013,
2  correct?
3  A.    That is correct.
4  Q.    It was sold to Willowood USA by Willowood Limited,
5  correct?
6  A.    That is not correct.  It was provided by Willowood USA
7  from Tai He to Willowood Limited and shipped to us at no cost.
8  It was not sold to us.
9  Q.    It was shipped by Willowood Limited to Willowood USA,
10  correct?
11  A.    You asked if they had sold it to us, and I said that is
12  incorrect.
13  Q.    Right.  And I'm asking you now, just to make sure we've
14  all got it right, what you are saying is that Willowood Limited
15  shipped the 5 kilograms of azoxy to the United States, is that
16  correct?
17  A.    That is correct.
18  Q.    Where did they ship it to?
19  A.    That I can't say with any certainty.  I believe it to be
20  Adjuvants Unlimited.
21  Q.    And we'll talk in a moment about Adjuvants, but they were
22  the company that developed the formulations for you for your
23  end-uses azoxy products?
24  A.    Yes.
25  Q.    So Willowood, if they shipped it to Adjuvants, would have

1   done so on your instructions, correct?

2   A.    That is correct.

3   Q.    And if they didn't send it to Adjuvants, they might have

4   sent it directly to Willowood USA in Oregon, correct?  So it's

5   either one or the other; they either shipped it to Oregon or

6   they shipped it to Adjuvants, which I believe is located in

7   Tulsa?

8   A.    In Memphis or Collierville, Tennessee.

9   Q.    Now, your understanding at the time that the 5 kilograms

10  of azoxy technical was imported was that it may infringe

11  Syngenta's patents, correct?

12  A.    I was basically aware of that fact, yes.

13  Q.    You were -- it was your understanding that importation may

14  infringe Syngenta's patents, correct?

15  A.    May infringe, yes.

16  Q.    The second thing Willowood did was to use the azoxy

17  technical that had been imported to develop formulations for

18  your Azoxy 2SC and AzoxyProp Xtra products, correct?

19  A.    Can you please repeat the question?

20  Q.    Sure.  The first thing you did was to import the

21  5 kilograms?

22  A.    That is correct.

23  Q.    The next thing you did was to use that imported azoxy

24  technical to develop formulations for your two end-use

25  products, is that correct?

1    A.    That is correct.

2    Q.    And you hired a company to develop the process for

3    formulating those products, correct?

4    A.    We did not hire them, no.

5    Q.    What was the relationship between them?

6    A.    Who are you referring to?

7    Q.    The company that developed the formulation, so Adjuvants

8    and Willowood USA.  You're saying you didn't hire Adjuvants?

9    A.    They provide formulation development free of charge.

10   Q.    But you utilized them?  You went to them and you said, we

11   want you to do this for us, correct?

12   A.    That's correct, but that's not what you asked me.

13   Q.    I'm just trying to make sure that it's clear what

14   happened.

15   A.    I'm just trying to clarify.

16   Q.    So Adjuvants got the azoxy technical that had been

17   imported, and they then developed the formulations for the

18   azoxy end-use products, correct?

19   A.    That is correct.

20   Q.    Had you previously worked with Adjuvants before?

21   A.    Yes.

22   Q.    You had an established relationship with them?

23   A.    We did.

24   Q.    The next thing that happened was that after these

25   formulations had been developed, you actually created samples

1  of your azoxy end-use products, correct?

2  A.    I did not.  Adjuvants Unlimited did, yes.

3  Q.    Willowood USA had those samples made, correct?

4  A.    Correct.

5  Q.    Again, this was something that was done for Willowood USA

6  by Adjuvants, correct?

7  A.    Correct.

8  Q.    And this was done in approximately the May/June 2013 time

9  frame?

10  A.    It would be a fair assessment, yes.

11  Q.    The fourth thing that occurred was that Willowood needed

12  to conduct testing on those samples to support Willowood's EPA

13  application, correct?

14  A.    Correct.

15  Q.    The testing was done for Willowood by a company called

16  Analytical & Regulatory Chemistry, correct?

17  A.    That is correct.

18  Q.    And they performed an analysis on the Azoxy 2SC and

19  AzoxyProp Xtra samples that had been created for Willowood USA

20  by Adjuvants, correct?

21  A.    Correct.

22  Q.    And that testing was designed to show that Willowood's

23  end-use azoxy products were substantially similar to an already

24  approved EPA-approved azoxy product, namely Syngenta's,

25  correct?

1    A.    That is correct.

2    Q.    Now, same with Adjuvants.  Willowood had previously worked

3    with Analytical & Regulatory Chemistry, correct?

4    A.    Correct.

5    Q.    And they're oftentimes referred to as ARC for short?

6    A.    That is correct.

7    Q.    Willowood also had an established relationship with ARC,

8    correct?

9    A.    Correct.

10   Q.    The testing that ARC did for Willowood USA was done in the

11   June/July time frame 2013, correct?

12   A.    That is correct.

13   Q.    The next thing that Willowood did was to prepare and file

14   EPA applications, correct?

15   A.    Our consultants did that on our behalf, yes.

16   Q.    And that's because in order to market and sell fungicides

17   in the US a company must obtain registration from the EPA,

18   correct?

19   A.    That is correct.

20   Q.    And there are two types of registration, aren't there?

21   A.    There's more than that.

22   Q.    Well -- all right.  I'll be more specific.

23   A.    Okay.  Please.

24   Q.    There is a technical registration and there is an end-use

25   registration, correct?

1  A.    That's correct.

2  Q.    The technical registration relates to a highly

3  concentrated form of fungicide, since that's what we're talking

4  about here, usually more than 97 percent concentrated, correct?

5  A.    That's correct.

6  Q.    And the technical, in this case the azoxy technical,

7  that's the biologically active ingredient in the end-use

8  product, correct?

9  A.    Correct.

10 Q.    And you use azoxy technical to make azoxy end-use

11 products, correct?

12 A.    Correct.

13 Q.    An end-use registration is for products that will be sold

14 to end users, such as farmers, and it contains the azoxy

15 technical, the active ingredient, in smaller concentrations as

16 a part of the formulation that was developed, correct?

17 A.    That is correct.

18 Q.    You can expedite an end-use registration by using what the

19 EPA calls a formulator's exemption; is that correct?

20 A.    That is correct.

21 Q.    To use the formulator's exemption, you have to show that

22 your product is substantially similar to an already registered

23 product, correct?

24 A.    That is correct.

25 Q.    And that's why you had your product sample -- your sample

1  products tested, correct?

2  A.    That is correct.

3  Q.    And your samples were substantially similar to Syngenta's

4  already registered as azoxy products, correct?

5  A.    That is correct.

6  Q.    By using the formulator's exemption, you were able to get

7  the registrations for your end-use products faster than if you

8  had not used the formulator's exemption, correct?

9  A.    That's correct.

10  Q.    On or about August 13th, 2013, Willowood filed an end-use

11  application with the EPA to register Azoxy 2SC, correct?

12  A.    I don't know the dates specifically, but the timetable

13  seems accurate, yes.  Correct.

14  Q.    Willowood submitted with its EPA application a request and

15  statement for a formulator's exemption, correct?

16  A.    That is correct.

17  Q.    The EPA approved Willowood's Azoxy 2SC application on or

18  about January 6th, 2014, correct?

19  A.    That is correct.

20  Q.    Willowood filed an end-use application with the EPA to

21  register AzoxyProp Xtra in January 2014, correct?

22  A.    Correct.

23  Q.    Willowood submitted with its EPA application for AzoxyProp

24  Xtra a request and statement for formulator's exemption,

25  correct?

1  A.    Correct.

2  Q.    The EPA approved Willowood's AzoxyProp Xtra application in

3  June 2014, correct?

4  A.    That is correct.

5  Q.    Isn't it also true that the application for azoxy

6  technical was approved in June 2014?

7  A.    That is correct.

8  Q.    Once you had EPA approval for the azoxy technical, you

9  could start making end-use products, correct?

10 A.    Importing and manufacturing, yes.

11 Q.    You had to have that EPA registration for technical before

12 you could really take the next step in making your product and

13 having it in the market, correct?

14 A.    That is correct.

15 Q.    Now, Willowood doesn't have the ability to actually make

16 its own products, correct?

17 A.    That is correct.

18 Q.    You use a third party to make the products for you?

19 A.    We do.

20 Q.    It's true, is it not, that the third party is known as a

21 toll manufacturer?

22 A.    That is correct.

23 Q.    And that's sort of like a "rent an assembly line"

24 manufacturer?

25 A.    That's a fair assessment, yes.

1 Q.   You work with them to reserve your spot in their factory

2 and their assembly line so that you can have your products made

3 when the spot is available, correct?

4 A.   That is correct.

5 Q.   The third-party toll manufacturer that you used is a

6 company called AgraForm located in St. Louis, correct?

7 A.   That is correct.

8 Q.   It's true, is it not, that AgraForm gave Willowood

9 specific deadlines by which Willowood had to provide the azoxy

10 technical to Agraform in order to keep your place in line?

11 A.   There were not specific deadlines.  There were windows

12 that, yeah, we had negotiated a time frame to have them

13 contract manufacture our product, yes.

14 Q.   Right.  And you had to get them your product within the

15 windows that they provided in order to make sure that you would

16 keep your place in line, correct?

17 A.   That we had jointly established.

18 Q.   You said "jointly established"?

19 A.   Jointly established.  It was negotiated.  They weren't

20 telling us when they would produce it.  We would say:  This is

21 when I think I can have it in the country.  This is when I

22 think I can have all the other ingredients to you.  This is the

23 window we would -- and we worked together.  But, yes, that is

24 correct.

25 Q.   Right.  So you negotiate with them the particular window

1  and once that window has been agreed upon, you've got to get

2  them that technical within that window.  Otherwise, you're

3  going to lose your spot in line.

4  A.   Well, technical and everything else.

5  Q.   And one of the windows that you negotiated with them was

6  you wanted a window in July of 2014?

7  A.   Probably June or early July, yes.

8  Q.   In the June/July time frame?

9  A.   Correct.

10 Q.   And there were probably -- there were actually several

11 spots in their line in that June/July time frame that you

12 wanted, correct?

13 A.   That time of year contract manufacturers tend to be

14 slowing down, so the pressure wasn't as great as it would have

15 been earlier in the year to negotiate a slot.

16 Q.   But one of the windows that you negotiated with them was

17 an early July window, correct, July 2014 window?

18 A.   That is correct.

19 Q.   And if Willowood missed that early July 2014 window, you

20 would have missed the time that had been allocated to Willowood

21 by AgraForm to manufacture your azoxy end-use products,

22 correct?

23 A.   That's correct.

24 Q.   Delays by even a few weeks would have substantially

25 impacted Willowood's ability to sell what it wanted to sell in

1    2014, correct?

2    A.    That's correct.  The majority of the season was already

3    over at that point anyway, but certainly the tail end of the

4    season.

5    Q.    But people start buying -- distributors and farmers, they

6    start buying in 2014 for the 2015 season, correct?

7    A.    Not until November or December.

8    Q.    That is still in 2014, isn't it?

9    A.    I would have August, September, October, November to

10   produce the product.

11   Q.    Right.  But those are all months in 2014, so sales were

12   being made in 2014 for the 2015 growing season, right?

13   A.    That's correct.

14   Q.    Please turn to Exhibit 54.

15         MR. LEVINE:  I move for admission of Exhibit 54.

16         THE COURT:  It will be admitted.

17         MR. LEVINE:  David, if you can please display it.

18   BY MR. LEVINE:

19   Q.    And let's start with the "To" and "From" information on

20   Exhibit 54.  Mr. Heinze, this is an e-mail, is it not, from you

21   to -- the first person listed has an e-mail address of

22   ssj@willowoodhk.com.  Do you see that?

23   A.    I do.

24   Q.    And this is dated June 24th, 2014?

25   A.    Correct.

1  Q.   Who is SSJ at Willowood Limited?

2  A.   SSJ stands for Shen Shaojun, which is very difficult to

3  pronounce, so we just use his initials.  SSJ is the general

4  manager of our mainland China office based in Hangzhou, China,

5  which is about two hours southwest of Shanghai.  He is one that

6  interfaces with basically all of our factory partners out of

7  mainland China.

8  Q.   Let's look now at the text of the e-mail that you sent to

9  SSJ on June 24th, 2014.  You told him, did you not, that the

10 final 15 MT -- and MT stands for metric tons?

11 A.   That is correct.

12 Q.   And a metric ton is approximately the same as a regular

13 ton, so it's approximately 2,000 pounds?

14 A.   2,200 to be exact.

15 Q.   So 15 metric tons is over 30,000 pounds that you were

16 saying needs to ship by July 2nd?

17 A.   That is correct.

18 Q.   And you were emphasizing to SSJ the importance of meeting

19 this July 2014 ship date, correct?

20 A.   Correct.

21 Q.   You stated to him, did you not, that "we cannot afford to

22 have the toll manufacturer not have the technical to continue

23 the campaign"?  Is that what you said?

24 A.   That's what I said, yes.

25 Q.   And you also said that "if that happens, they will clean

1  out the system and we will not be able to produce the entire

2  quantity needed for this season."  That's what you told SSJ,

3  correct?

4  A.    That is correct.

5  Q.    You didn't miss the deadline, though, did you?

6  A.    No, we did not.

7  Q.    You started selling your azoxy products in July of 2014,

8  correct?

9  A.    We did.

10 Q.    Now, the product has to have a label on it when it is sold

11 to end users, correct?

12 A.    Yes, it does.

13 Q.    Please turn to Exhibit 52.

14        MR. LEVINE:  And move for the admission of Exhibit

15 52.

16        THE COURT:  It will be admitted.

17 BY MR. LEVINE:

18 Q.    Mr. Heinze, Exhibit 52 is the label originally submitted

19 to the EPA for Willowood's Azoxy 2.08SC product, correct?

20 A.    Correct.

21 Q.    And when we refer to Azoxy 2SC, that's the Azoxystrobin

22 2.08SC?

23 A.    Yes, it is.  It is an alternate brand name.

24 Q.    Please turn to page 5 within PX-52 and there's a heading

25 that says "Resistance Management."  Do you see that?

1  A.    I do.

2  Q.    The first sentence of the Resistance Management section

3  states, does it not, that Willowood Azoxystrobin 2.08SC,

4  parentheses, azoxystrobin, closed parentheses, is a Group 11

5  fungicide?  Is that what it states?

6  A.    That's what it states.

7  Q.    And let's now look at the last sentence of that paragraph.

8  It states:  Syngenta encourages responsible resistance

9  management to ensure effective long-term control of the fungal

10  diseases on this label.  Is that correct that's what it states?

11  A.    That's what it states, yes.

12        MR. LEVINE:  David, we can take that down.

13  BY MR. LEVINE:

14  Q.    Mr. Heinze, let's talk now about Willowood's azoxy

15  products and the pricing for those products.  Willowood sells a

16  number of different azoxy products, correct?

17  A.    We do.

18  Q.    One of those products is the one we've referred to as

19  Azoxy 2SC, correct?

20  A.    That is correct.

21  Q.    And another one is the one we've referred to as AzoxyProp

22  Xtra?

23  A.    It's AzoxyProp Xtra.

24  Q.    Prop, okay.  Thank you.

25  A.    You're welcome.

1   Q.   Now, Willowood also sells private label azoxy products,

2   correct?

3   A.   That is correct.

4   Q.   Does Willowood have any other Willowood brand azoxy

5   products besides Azoxy 2SC and AzoxyProp Xtra?

6   A.   We do have one additional.

7   Q.   What is that one?

8   A.   Willowood Tebustrobin, a combination of tebuconazole plus

9   azoxystrobin.

10  Q.   Can you please spell that for the court reporter?

11  A.   T-U-B-U-S-T-R-O-B-I-N (sic), Tebustrobin.

12  Q.   Thank you.

13          THE COURT:  You said that was a combination?

14          THE WITNESS:  Correct, of tebuconazole -- AzoxyProp

15  is a combination of azoxystrobin plus propiconazole and

16  Tebustrobin is a combination of tebuconazole plus azoxystrobin,

17  Your Honor.

18  Q.   Willowood's azoxy products are focused on crop protection,

19  correct?

20  A.   Yes, they are.

21  Q.   They are not focused on seed care or lawn and garden

22  applications, correct?

23  A.   That is not true.

24  Q.   Willowood's products -- azoxy products are focused and the

25  primary application is crop protection, correct?

1  A.    That is not correct.  If you go back to the label that we

2  just looked at, it lists turf and ornamental uses on that

3  label, so we applied for a label with the most comprehensive

4  uses.  Our primary focus is agriculture, but we also private

5  label, as an example, into the turf and ornamental areas.  So

6  we sell into various segments of crop protection, not only

7  agriculture.

8  Q.    But, Mr. Heinze, Willowood does not focus it's azoxy sales

9  on seed care or lawn and garden, does it?

10 A.    We do.  One of the private labels that we sell is azoxy to

11 United Turf Alliance and all they sell that product into is the

12 lawn care market and golf course markets.

13 Q.    Mr. Heinze, do you recall that you were deposed in this

14 case, your deposition was taken?

15 A.    I do.

16 Q.    During that deposition, when it started, you were placed

17 under oath, were you not?

18 A.    I was.

19 Q.    And there was a court reporter who was present taking down

20 the questions and the answers, correct?

21 A.    Correct.

22 Q.    And your counsel was present?

23 A.    They were.

24 Q.    And there was a lawyer for Syngenta who was present and

25 asking the questions, correct?

1  A.   That is correct.

2  Q.   And during that deposition, you -- as we said, you were

3  sworn to tell the truth and you did tell the truth, did you

4  not?

5  A.   I did.

6  Q.   Mr. Heinze, were you asked the following question and did

7  you give the following answer?

8         MR. LEVINE:  Counsel, I'm referring to the deposition

9  at page 135, lines 7 through 12.

10        David, if you could please pull those up.

11        MR. NEUMAN:  Could we have the page again, please,

12  counsel?

13        MR. LEVINE:  Page 35, lines 7 through 12.

14        (Video deposition portion was played.)

15 BY MR. LEVINE:

16 Q.   With respect to azoxy products, Willowood's only branded

17 competitor is Syngenta, correct?

18 A.   Could you please repeat the question?

19 Q.   Sure.  With respect to azoxy products, Willowood's only

20 branded competitor is Syngenta?

21 A.   That is correct.

22 Q.   As president and CEO of Willowood USA, you have final say

23 on pricing, do you not?

24 A.   I do.

25 Q.   You can decide to lower prices on azoxy products even if

1  others on your team disagree?

2  A.   That is correct.

3  Q.   And that's happened, hasn't it?

4  A.   It has.

5  Q.   Yeah.  Please turn to Exhibit 176.

6       MR. LEVINE:  I move for the admission of Exhibit 176.

7       THE COURT:  It will be admitted.

8  BY MR. LEVINE:

9  Q.   This is an e-mail chain dated July 8, 2015, in which you

10 were a copy or recipient of the various e-mails in the chain,

11 correct?

12 A.   That is correct.

13 Q.   Let's look at the very first e-mail in the chain that's on

14 the second page down at the bottom.  It's an e-mail from Joe

15 Middione.  Who is he?

16 A.   Joe is our chief operating officer and a partner of mine

17 at Willowood USA.

18 Q.   And he's sending this e-mail to Andy King, Tom Kemph,

19 K-E-M-P-H, Casey Daniel, and Matt Heinze.  Who are Mr. King,

20 Mr. Kemph, and Mr. Daniel?

21 A.   Andy King, his new title is business development manager.

22 He's also a minority partner in Willowood USA.  Tom Kemph is

23 our pacific northwest regional account manager.  Casey Daniel

24 is our national account manager.

25 Q.   And in this e-mail Mr. Middione is saying to the account

1  managers, and those to whom it was sent, that "Brian,"
2  referring to you, "has decided that the new price for AzoxyProp
3  is $80 a gallon.  Please communicate this to your respective
4  accounts."  Is that correct?
5  A.   That is correct.
6  Q.   And it was Willowood's practice to tell all of its
7  accounts, its customers, about price reductions, correct?
8  A.   Price changes, yes.
9  Q.   Yeah.  And you responded to Mr. Middione's e-mail, and
10 your text is at the very top of the page.  You responded and
11 said, "That was really uncalled for.  Andy and I both supported
12 the decision and you again throw me under the bus."  That's
13 what you said, correct?
14 A.   That's correct.
15 Q.   You didn't like the fact that he started his e-mail off by
16 saying "Brian has decided"?
17 A.   That's correct.
18 Q.   Mr. Middione responded to your e-mail, and this is now on
19 the first page of Exhibit 176, and he said to you, did he not,
20 "You don't listen to what I say.  You do what you want and make
21 all the decisions."  Is that how he started?
22 A.   That's correct.
23 Q.   And he then said, "I don't want to have my name associated
24 with this," referring to the price reduction, correct?
25 A.   Correct.

1  Q.   And he says, "I was dead against the decrease, not at this

2  time."  Is that what he said?

3  A.   That's what he said.

4  Q.   And he wasn't the only one who disagreed with your

5  decision to drop the price at that time, correct?

6  A.   That's correct.

7  Q.   Let's look at Exhibit 175 -- and move for admission of

8  Exhibit 175.

9          MR. NEUMAN:  Relevance, Your Honor.

10          THE COURT:  Did you say no objection?

11          MR. NEUMAN:  Relevance.

12          THE COURT:  Relevance.

13          MR. LEVINE:  This is a continuation, Your Honor, of

14  the same e-mail chain just with a different response.  This one

15  from Mr. Daniel.

16          THE COURT:  All right.  Well, you can go ahead.  Just

17  move along.  Overruled.

18  BY MR. LEVINE:

19  Q.   All right.  So after seeing Mr. Middione's e-mail to your

20  account manager, you responded, and this is on the second

21  page -- or, excuse me, the third page of Exhibit 175, and you

22  explained why you made the decision to drop the price, correct?

23  A.   That is correct.

24  Q.   And you explained that, "The decision was made as we have

25  had repeated calls from our customers over the last week that

1    Quilt Xcel" -- that's a Syngenta product, correct?

2    A.    Correct.

3    Q.    "That Quilt Xcel can be bought on the broker market for as

4    low as $85 a gallon," correct?

5    A.    That's correct.

6    Q.    And you further explained that, "It is obvious that

7    Syngenta is losing market share and offering special deals

8    locally to preserve share."  Is that what you stated?

9    A.    That's what I stated.

10   Q.    And then two paragraphs down you stated, "As a generic

11   alternative, we always have to be priced below the brand to

12   earn market share."  Is that correct?

13   A.    That is correct.

14   Q.    And now let's look at what Mr. Daniel said in response to

15   that explanation.  In his e-mail back to you, he said, did he

16   not, "I respect you as the CEO and a friend, but I have to say

17   this:  I don't appreciate the way this price reduction was

18   handled."  He said that?  This is the second -- second page of

19   Exhibit 175.

20   A.    That is not his response.

21   Q.    This is an e-mail to you from Casey Daniel, correct?

22   A.    That's from Casey to me, yes.

23   Q.    Right.  And what Casey tells you is, "I respect you as the

24   CEO and a friend, but I have to say this," and the first point

25   was, "I don't appreciate the way this price reduction was

1  handled," correct?

2  A.    Can I make a point of clarification?  You said this was

3  his response to me.  This preceded my response to him, if you

4  look at the timetables on these e-mails.

5  Q.    All right.  Let's focus on the fact of what he said.  I

6  understand the explanation you're saying.  You think this was

7  before your explanation?

8  A.    That is correct.

9  Q.    All right.  And in the second paragraph he says, does he

10 not, "We don't always have to go to the absolute lowest number

11 we hear to sell," correct?

12 A.    That's what he says, yes.

13 Q.    Right.  But you then went on and made the decision to

14 lower the price, correct?

15 A.    That is correct.

16 Q.    Please turn to Exhibit 45 -- and I move for admission of

17 Exhibit 45.

18          MR. NEUMAN:  Relevance, Your Honor.

19          MR. LEVINE:  It goes to notice and wilfulness issues.

20          THE COURT:  Overruled.  Go ahead.

21 BY MR. LEVINE:

22 Q.    This is a letter that I sent you, is it not, on

23 January 30th, 2014, is that correct?

24 A.    That is correct.

25 Q.    And I stated that I was sending it to you -- or stated at

1  the top that, Kirkland and Ellis, the law firm at which I am a

2  partner, represents Syngenta, the owner of the '076 and '256

3  patents, correct?

4  A.   That is correct.

5  Q.   And I told you that it had "recently come to Syngenta's

6  attention that Willowood has represented that it has

7  azoxystrobin product formulated, packaged and sitting in a

8  warehouse in Pasco, Washington."  And I then said, "If

9  Willowood has, in fact, made, used, imported, offered to sell

10  or sold such azoxystrobin products, such conduct would

11  constitute an infringement of one or more claims of the

12  patents," correct?

13  A.   That's what that states, but it's factually incorrect.

14  Q.   Right, because you -- and we'll see your response in a

15  moment -- you did not have product sitting in a warehouse in

16  Pasco?

17  A.   That is correct.  That is correct.

18  Q.   But I went on in this letter, and I asked you the

19  question.  I said, "Does Willowood USA, or any other Willowood

20  affiliate, parent or subsidiary, have azoxystrobin product

21  formulated, packaged and/or sitting in a warehouse in Pasco,

22  Washington or any other location in the US".  That was the

23  question that I asked on behalf of Syngenta, correct?

24  A.   Correct.

25  Q.   I also asked you to confirm that "Willowood had not

1    done -- has not done any of the following to date", and I then

2    listed a number of things that I wanted you to confirm.  And

3    the first one was "that you had not made or formulated in the

4    US any azoxystrobin product and/or any product that will be

5    marketed as a generic alternative to Syngenta's azoxystrobin

6    product," correct?

7    A.    That is correct.

8    Q.    Next I asked you to "confirm that Willowood had not used

9    in the US any azoxy product and/or any azoxy product -- or any

10   product that would be marketed as a generic alternative to

11   Syngenta's azoxy products," correct?

12   A.    That is correct.

13   Q.    And the next item I asked you to confirm was that

14   "Willowood had not imported into the US any azoxy product

15   and/or any product that will be marketed as a generic

16   alternative to Syngenta's azoxy products," correct?

17   A.    If I can just read that, please.

18          That is correct.

19   Q.    I then asked you to confirm that "Willowood had not sold

20   in the US any azoxy products or any products that would be

21   marketed as a generic alternative," correct?

22   A.    Correct.

23   Q.    And, lastly, that "Willowood had not offered to sell any

24   azoxy products in the US, even if delivery of such products

25   would not take place until after the expiration of the

1  patents," correct?

2  A.    That is correct.

3  Q.    And I asked you to confirm that "Willowood will not engage

4  in any such activities prior to the patents' respective

5  expiration dates," correct?

6  A.    Correct.

7  Q.    Please turn to Exhibit 46.  I move for admission of

8  Exhibit 46.

9          MR. NEUMAN:  Relevance.

10  BY MR. LEVINE:

11  Q.    Exhibit 46 is --

12          THE COURT:  Did you want me to rule on that?

13          MR. LEVINE:  Oh, I thought I heard that.

14          THE COURT:  All right.  Overruled.  It will be

15  admitted.

16  BY MR. LEVINE:

17  Q.    Exhibit 46 is your February 4th, 2014 response to my

18  letter, is that correct?

19  A.    Yes, it is.

20  Q.    You said you were "in receipt of my letter" and you

21  indicated that "the January 30th, 2014 letter asserted

22  potential infringement of the two compound patents, the '076

23  and '256," correct?

24  A.    That's correct.

25  Q.    You then said you were puzzled by my statements that

1 Willowood has, quote, product formulated, packaged and sitting

2 in a warehouse in Pasco, Washington, close quote, correct?

3 A.    Correct.

4 Q.    You said "Willowood has done no such thing," correct?

5 A.    Correct.

6 Q.    "And has no immediate plans of doing so," correct?

7 A.    Correct.

8 Q.    You didn't tell Syngenta that Willowood had already

9 imported azoxy technical into the US, did you?

10 A.    I did not.  I was focused on the Pasco, Washington

11 warehouse.

12 Q.    Right.  But there were also a number of bullet points in

13 which I asked you to confirm certain things, correct?

14 A.    That's correct, and I did not do so.

15 Q.    Right.  And you did not tell Syngenta that Willowood had

16 used azoxy to develop formulations, did you?

17 A.    Did not.

18 Q.    No.  And you didn't tell Syngenta that Willowood had had

19 samples made of its end-use azoxy products?

20 A.    Each one of your -- if we would go back, each one of

21 your -- was offered for sale.  Did not ask if we had imported

22 for testing or formulation development.  Each one of those, if

23 you go back, the way I read those, was imported product for

24 offer for sale, developed, produced for sale, which we did not.

25 Q.    My question though is narrower, Mr. Heinze.  In your

1   February 4th letter, you didn't tell Syngenta that Willowood

2   had had samples made of its end-use azoxy products, correct?

3   A.   We did not.

4   Q.   And you didn't tell Syngenta that those samples had been

5   tested to support your EPA applications, did you?

6   A.   I did not.

7   Q.   And you didn't tell Syngenta that an application had

8   already been filed with the EPA seeking approval of your azoxy

9   technical, correct?

10  A.   Syngenta was notified.

11  Q.   You didn't tell Syngenta in your February 4th letter, did

12  you?

13  A.   Not in my letter but they were notified, by an offer to

14  pay when we submitted to the EPA, for both end-use

15  formulations, so they were notified.

16  Q.   You didn't admit infringement of the compound patents in

17  the February 4th letter, did you?

18  A.   I did not.

19  Q.   Let's talk now about issues relating to the '138 patent.

20  Please turn to Exhibit 41.  I move for admission of Exhibit 41,

21  and this is the exhibit we need to correct the production

22  numbers and we will do so in the exhibit list.

23          MR. NEUMAN:  No objection.

24          THE COURT:  All right.  It will be admitted.

25

1  BY MR. LEVINE:

2  Q.    This is an e-mail from SSJ to someone named Rajesh.  Who

3  is Rajesh?

4  A.    Rajesh is a registration manager for Willowood Limited out

5  of Hong Kong.

6  Q.    And in the first e-mail in this chain, you tell Rajesh, do

7  you not, "There is one step in the manufacturing process that

8  our patent attorney is concerned about being in violation of

9  the existing patent."  Is that -- that's what you stated,

10 correct?

11 A.    That is correct.

12 Q.    And the existing patent you were referring to was the '138

13 patent, correct?

14 A.    That is correct.

15 Q.    And you asked Rajesh to "Please make contact with Zenith."

16 Zenith is Tai He, correct?  It's just another name for Tai He?

17 A.    Yes, the names are used interchangeably.

18 Q.    Okay.  So you asked Rajesh to "Please make contact with

19 Zenith to see if they feel they can make the product using

20 alternate method.  If so, we can use it and not be in violation

21 of the patent and we will be clear to submit the package to the

22 EPA."  That's what you stated, correct?

23 A.    That is correct.  We were obviously very concerned about

24 the intellectual property around -- and wanted to be absolutely

25 sure that we were not infringing upon anything.

1  Q.    Let's look two e-mails later.  When sending the attachment

2  to him, you told Rajesh that "The patent attorney wants to know

3  if one step can be changed in the manufacturing process that

4  would circumvent the process patent by Syngenta," correct?

5  A.    That's correct.

6  Q.    And Rajesh responded on the first page now and told you

7  that "All the manufacturers in China" -- or, excuse me, this is

8  on page 3 of the exhibit.  He says, "All the manufacturers in

9  China for this product are using the same process and steps for

10 etherification/condensation.  This -- these step has to be used

11 in sequence and is very difficult to avoid.  That's the reason

12 the MNC," multinational corporation, "patented this step,"

13 correct.

14 A.    That's what Rajesh's e-mail says, yes.

15 Q.    Right.  And he also told you that "SSJ is in touch with

16 the factory guys to find some way out of this, but it seems

17 very difficult to avoid this step," correct?

18 A.    That's correct, but I would like to add to the fact, what

19 we were trying to do there was -- I'm not a chemist by trade,

20 but we hire professionals and take matters very seriously, and

21 we were looking to substitute a fluorine with a halogen and

22 none of it -- and that would have -- it would have clearly

23 avoided intellectual property of Syngenta, but it -- it was not

24 possible, and that's what this e-mail string was addressing.

25 Q.    It wasn't possible because it would have created some

1  other impurities, among other problems, correct?

2  A.    That's correct.

3  Q.    Okay.  So the following month in July 2013, an application

4  was filed with the EPA seeking approval for the azoxy technical

5  that would be used to make your azoxy end-use products,

6  correct?

7  A.    Correct.

8  Q.    And you're familiar with a company by the name of

9  Greenfields Marketing Limited?

10  A.    I am.

11  Q.    Greenfields Marketing was established to hold EPA

12  technical registrations, correct?

13  A.    That's correct.

14  Q.    Was established in early 2013?

15  A.    Yes.

16  Q.    It was established by someone by the name of Rajesh Jain,

17  J-A-I-N?

18  A.    Jain, yes, correct.

19  Q.    And you and Mr. Mundhra asked Mr. Jain to establish a

20  holding company for chemical registrations, correct?

21  A.    Yes, we did.

22  Q.    And Mr. Mundhra worked with Mr. Jain to establish

23  Greenfields as an entity in Dubai in the United Arab Emirates,

24  correct?

25  A.    That's correct.

1  Q.    And you and Mr. Mundhra made the decision that you wanted
2  to have an offshore holding company for the active ingredient
3  registrations, correct?
4  A.    Correct.
5  Q.    Greenfields was established in the process by which
6  Willowood was seeking its azoxy end-use registrations, correct?
7          THE COURT:  I'm sorry?
8  BY MR. LEVINE:
9  Q.    Greenfields was established in the process by which
10 Willowood was seeking EPA approval, correct?
11 A.    You've asked that question two different ways.  You said
12 for the technical registration, then you said for the end-use
13 registration.  I'd like you to clarify what you're asking me,
14 please.
15 Q.    In the interest of time, I'll withdraw the question and
16 let me ask you this instead.
17          Mr. Mundhra worked with Mr. Jain to establish
18 Greenfields as an entity knowing that Willowood would be
19 applying for end-use registrations on azoxystrobin and other
20 products, correct?
21 A.    They had no connection.  Greenfields and our end-use
22 products had no -- the holding company was established to hold
23 technical registrations; had no relevance to end-use
24 registrations at all.
25 Q.    And you were involved in the registration of Greenfields

1  azoxystrobin technical with the EPA, were you not?

2  A.    I was.

3  Q.    You actually paid for Greenfields' application for the

4  technical registration with the EPA using your personal credit

5  card, right?

6  A.    Personal credit card that I use for business, yes.

7  Q.    And, in fact, you acted as an authorized agent on behalf

8  of Greenfields with Pyxis, correct?

9  A.    Still do.

10 Q.    And Pyxis, as we said earlier, was Willowood's regulatory

11 agent?

12 A.    That is correct.

13 Q.    And you made decisions on behalf of Greenfields in

14 communicating with Pyxis in securing Greenfields' technical

15 registration for azoxy, correct?

16 A.    I did.

17 Q.    Greenfields doesn't have any employees, does it?

18 A.    Not any longer.

19 Q.    In fact, Willowood USA recently acquired all of the assets

20 of Greenfields Marketing, correct?

21 A.    That is correct.  No longer held in Dubai.  It's held in

22 the US.

23 Q.    Okay.  Please turn to Exhibit 9.  I move for admission of

24 Exhibit 9.

25          MR. NEUMAN:  No objection.

1  THE COURT:  It'll be admitted.

2  BY MR. LEVINE:

3  Q.  This is the process description that was submitted with

4  Greenfields' application for azoxy technical, correct?

5  A.  Appears so, yes.

6  Q.  And you see the study number on the first page of

7  Exhibit 9 that has WW and then a number?  That's a reference to

8  Willowood, correct?

9  A.  That's correct.

10  Q.  And on page 2 of Exhibit 9, it states at the top, or top

11  third, that samples were manufactured at the following plant,

12  and it and refers to Tai He, correct?

13  A.  That's correct.

14  Q.  Okay.  Let me make sure the jury sees that.  The first

15  line of the company there is Tai He.  Okay.

16  Please turn to page 22 within Exhibit 9, and this

17  page has a heading "5, Etherification."  Do you see that?

18  A.  I do.

19  Q.  And the last sentence of that first paragraph states, does

20  it not, that this step is carried out at Tai He, correct?

21  That's what it states?

22  A.  Can you please -- where is this?  The first --

23  Q.  The last sentence of the first paragraph on the 22nd page

24  with the heading "Etherification."

25  A.  That is what this document says, and subsequently then

1  it --

2  Q.    Okay.  Mr. Heinze, thank you.  You've answered my

3  question.

4        THE COURT:  Well, it was a yes or no question.  You

5  can ask him on cross.

6  BY MR. LEVINE:

7  Q.    Please turn to page 27 within PX-9, and this page has a

8  heading "Condensation."  Do you see that?

9  A.    I do.

10 Q.    And at the end of the first paragraph of this section, it

11 states does, it not, "This final step is carried out at Tai

12 He." That's what it states, correct?

13 A.    Yes, it does.

14 Q.    Please turn to be Exhibit 24.

15        MR. LEVINE:  Move for admission of Exhibit 24.

16        MR. NEUMAN:  No objection.

17        THE COURT:  It will be admitted.

18 BY MR. LEVINE:

19 Q.    And this is an e-mail chain from May 2014 on which you

20 were copied, is that correct?

21 A.    That is correct.

22 Q.    And the first e-mail in the chain is an e-mail from Vijay

23 Mundhra to you, and he says, "Do you clearly remember which

24 were the two steps the attorney had advised should not be done

25 in the same premises?"  That was the question he asked you,

1   correct?

2   A.   I'm having a difficult time.  Where is this?

3   Q.   The very first e-mail in the chain, which is the last page

4   within Plaintiff's Exhibit 24.

5   A.   I see it now.  Thank you.

6   Q.   That was the question he asked you, correct?

7   A.   That is correct.

8   Q.   And you responded and said, "As long as all the steps are

9   not done by the same factory, I think we are okay."  That's

10  what you stated, correct?

11  A.   That's correct.

12  Q.   And in the next e-mail in the chain, Mr. Hayden, the

13  attorney, responds and says, "It is not simply performing the

14  work in two locations."  That's what he stated, correct?

15  A.   That's correct.

16  Q.   And you then e-mailed Vijay and said, "We need to get

17  something like this in place with Zenith -- referring to Tai

18  He -- do you think this is possible?"  That's what you stated,

19  correct?

20          MR. LEVINE:  Let's turn now Exhibit 25.  Move for

21  admission of Exhibit 25.

22          THE COURT:  It will be admitted.

23  BY MR. LEVINE:

24  Q.   And within Exhibit 25, Mr. Heinze, SSJ e-mails Vijay

25  Mundhra and states:  "Zenith said they have no share or

1  exclusive agreement with the factory mentioned on the

2  manufacturing process."  Do you see that?

3  A.    I do.

4  Q.    And you then responded and said:  "I cannot overemphasize

5  how important it is for us to make absolutely sure that at

6  least two of the three of the manufacturing steps are done by

7  an intermediate factory."  That's what you stated, correct?

8  A.    That's correct.

9  Q.    You also stated two paragraphs down:  "I know this is a

10  very cumbersome process, but we cannot afford to get caught up

11  in a lawsuit that we would potentially lose because of patent

12  infringement."  Correct?  That's what you stated?

13  A.    That's what I stated.

14  Q.    And then Vijay responded and said, "In this case he can

15  ask SSJ to pay a visit and document the whole thing to verify,

16  can even take a video."  Correct?

17  A.    That's correct.

18  Q.    Okay.  Please turn to Exhibit 31.

19         MR. LEVINE:  Move for admission of Exhibit 31.

20         THE COURT:  It will be admitted.

21  BY MR. LEVINE:

22  Q.    This is an e-mail from SSJ to Mr. Mundhra and to you, and

23  SSJ states that he visited three chemical zones located in

24  China and visited some other plants, too, and he identifies

25  those, correct?

1  A.    That is correct.

2           THE COURT:  I'm sorry.  SSJ is the general manager?

3           THE WITNESS:  Of the mainland China office, yes.

4           THE COURT:  Okay.  Go ahead.

5  BY MR. LEVINE:

6  Q.    And he states that "For Azoxystrobin, they really divided

7  different steps into four factories as the manufacturing

8  process we submitted."  Correct?

9  A.    They only list three factories, but it does say four in

10  the body of the e-mail, yes.

11  Q.    And you also a couple of times a year had face-to-face

12  meetings with Mr. Wu, correct?

13  A.    That's correct.

14  Q.    Could you please tell the jury who Mr. Wu is.

15  A.    Mr. Wu is the owner of Tai He/Zenith, our supplier of

16  azoxystrobin technical.  I speak no Chinese; he speaks no

17  English.  We speak through an interpreter.

18  Q.    And you told Mr. Wu during these face-to-face

19  conversations that you wanted him to follow the recommendations

20  that you had provided that came to you from the patent

21  attorney, correct?

22  A.    He had already been producing azoxystrobin technical.  He

23  had the capabilities.  We just asked him could he purchase

24  intermediates that -- up to through the etherification step and

25  he conduct only the condensation step that would not be in

1   violation of the Syngenta process patent.

2   Q.   Right.  You told him what you wanted him to do, correct?

3   A.   No, we asked him if he had the capabilities.

4   Q.   And he said he did?

5   A.   He did.

6   Q.   All right.  Please turn to Exhibit 26.

7         THE COURT:  I think we might need to stop there for

8   the day since it is after 5:00.

9         MR. LEVINE:  Okay.

10         THE COURT:  So I'll ask the witness to step down.

11   You can just leave the exhibit notebook there.

12         (Witness steps down.)

13         THE COURT:  All right, ladies and gentlemen.  We'll

14   stop there.  It may have been a little bit in the middle; but,

15   particularly on the first day, I know you all came very earlier

16   this morning, so I don't want to keep you late today, in

17   particular.  We will start back tomorrow morning at 9:30.  That

18   should give you plenty of time to get here.  Please arrive a

19   few minutes early just to be sure with travel that you don't

20   run into any holdups.

21         Over the evening recess, you'll remember not to talk

22   about the case among yourselves or with anyone else.

23   Certainly, it's okay to tell your employers I'm on jury duty, I

24   will be there for a while, but remember not to talk about the

25   kind of case it is with anyone, and don't look anything up on

1   the internet.  No tweeting, no Facebook posts, all of that kind

2   of thing.  And should you see any of these folks out and about

3   this evening, don't have any conversations with them, even

4   about the weather.

5          I will see you all tomorrow morning.  Leave your

6   notes in your chair, and you're excused until 9:30.

7          (At 5:03 p.m., jury excused.)

8          THE COURT:  Okay.  I would propose that we give the

9   jury a minute to, you know, get on the elevator and off of this

10  floor, and then take just a few --

11         (Knock on door.)

12         THE COURT:  Can you check and see?  Somebody may have

13  left something in the courtroom or if it was just an accident.

14  Did you leave something?

15         JUROR:  Parking.

16         THE COURT:  Oh, yes.  Thank you.

17         Perhaps we need to take a few minutes so that

18  Ms. Sanders can help the jury with housekeeping matters.  Then

19  we'll come back to take care of the housekeeping matters that

20  we need to do.  So if you all go out into the hall, just be

21  sure you avoid the jurors.  We'll take about a 5-minute recess.

22         (At 5:05 p.m., break taken.)

23         (At 5:10 p.m., break concluded.)

24         THE COURT:  While it's on my mind, it has not been a

25  problem so far to just refer to all these exhibits as

1    Exhibit 45.  But once exhibits start coming in on both sides,
2    it very important to say "plaintiff's exhibit" or "defendant's
3    exhibit".  If I can just -- I didn't stop anybody today because
4    you were going -- they're clearly plaintiff's exhibits, all of
5    these things that you've been going through with Mr. Heinze,
6    but I don't want to have any confusion about that going
7    forward.  So to the extent you can say that, both sides, that's
8    very helpful to me and to the record being clear.

9         All right.  Let's see.  So this is a long-term issue,
10   but when we get to the point where we're going to submit the
11   issues to the jury, and they will want a notebook for that
12   purpose, I'm going to be relying on you all to get the -- you
13   know, that together of just the admitted exhibits.  I've kind
14   of lost track of how many copies of all these exhibits there
15   are and how many trees have died, but we will want a set of the
16   admitted exhibits to go back in with the jury, and we tend to
17   rely on you all, working with Marlene, to get that
18   accomplished, so I'm looking for that.

19        All right.  Now, the two things I have to talk about
20   are closing the courtroom and the motion for clarification and
21   the whole -- I'm just calling it the new exhibit problem.  So I
22   don't know which one to do first.  We'll just do the new
23   exhibit problem first.

24        And I think I asked you all yesterday to please
25   confer.  I've gotten a bit turned around about all of this

1  because of the way it all came in.  So certainly -- you know, I

2  don't have any problem with people narrowing.  So if what

3  Willowood did -- if it said, you know, Mr. Jarosz identified

4  all of his attachments, and now you just want to pull them out

5  and give them separate numbers, that seems to simplify things

6  to me.  But, you know, I'm not really sure I understood

7  correctly, and I got a second brief from Willowood that made

8  totally new arguments, it appeared to me, which I got -- had to

9  go back and see what I had missed, and it didn't appear that I

10  really had missed, so I'm just a little turned around about all

11  of this stuff.  So I hope you all talked and perhaps narrowed

12  things for me today.

13          MR. TILLER:  Well, Mr. Santhanam and I did talk, and

14  we were able to narrow the issues as to what I'll call

15  paragraph 4 in our request for clarification.  We were able to

16  come up on some agreements with regard to documents --

17  Defendant's Exhibit 209, 211, 213 and 214, is that right?

18          MR. SANTHANAM:  I have 209, 213 and 214.

19          MR. TILLER:  Fair enough.

20          MR. SANTHANAM:  And then there was a fourth one

21  that --

22          MR. TILLER:  There's a fourth one that --

23          THE COURT:  I couldn't hear.  I'm sorry.  You were

24  talking at the same time.

25          MR. TILLER:  So, Judge, 209, 211, 213 and 214, the

1  parties have agreed can come in under Plaintiff's 110A, 123A --

2         THE COURT:  Under what?

3         MR. TILLER:  So 209 --

4         THE COURT:  Defendant's 209 --

5         MR. TILLER:  -- is broader -- is an -- these are all

6  spreadsheets.

7         THE COURT:  Okay.

8         MR. TILLER:  They were produced by Syngenta that talk

9  about every product they have.

10         THE COURT:  Okay.

11         MR. TILLER:  And we put those on our list.  Syngenta

12  put on its list a condensed version of that spreadsheet in PDF

13  that only deals with azoxystrobin, Solatenol, and mesotrione,

14  thus getting rid of sort of all the extraneous stuff, and we're

15  good with that because obviously the only stuff we needed in

16  there was about azoxystrobin, Solatenol, and mesotrione.

17         THE COURT:  Okay.

18         MR. TILLER:  So the parties have agreed that what was

19  Defendant's 209 will come in or can be offered as Plaintiff's

20  110A, and that both parties can use it.

21         THE COURT:  Okay.  Are you all anticipating putting

22  that in as part of your case?

23         MR. SANTHANAM:  Yes, Your Honor.

24         THE COURT:  Okay.  So that obviates the need for you

25  to put it in separately?

1          MR. TILLER:  Yes.  Same for what -- Defendant's 213
2     they will be using as Plaintiff's 123A.  And that's all -- that
3     is all we need of that spreadsheet.
4          THE COURT:  Okay.
5          MR. TILLER:  And 214, Defendant's 214, will come in
6     as Plaintiff's 140A.
7          THE COURT:  These are all exhibits the Plaintiff was
8     planning on putting in anyway?
9          MR. SANTHANAM:  That's correct, Your Honor, and we
10    had discussed, along with these three exhibits, 148A,
11    Plaintiff's 148A, and that all of these exhibits would come in
12    together.
13         THE COURT:  Okay.  All right.  So you all have worked
14    that part out, okay.  Good.
15         So when I gave Willowood the opportunity to identify
16    five exhibits from what I called, you know, the flipped
17    exhibits, just sort of as a shorthand, and I said two
18    witnesses, you know, my thinking there is what I'm trying to do
19    is to balance prejudice against importance and, you know, to be
20    fair to everybody about this.  So some notice of what witnesses
21    would be used, I thought two witnesses was plenty, and I did
22    not mean to distinguish between fact or expert.  You get to
23    talk to those -- about those exhibits with two witnesses.  So
24    to the extent you need clarification on that, that's the
25    clarification.

1      And then -- all right.  What about Mr. Jarosz and
2 these exhibits related to that?  Did you all work that out?
3           MR. TILLER:  No, we have not, Your Honor.
4           THE COURT:  Okay.  So if I -- first, do I understand
5 correctly that Willowood identified as a trial exhibit
6 Mr. Jarosz's expert report and its documents referenced and
7 exhibited thereto, is that right?
8           MR. SANTHANAM:  That's correct, Your Honor.  It was a
9 broad reference to all documents referenced.
10          THE COURT:  Right.  Okay.  Well, that seems
11 sufficient to me, and so I -- certainly nobody really actually
12 wants to look at all of the exhibits that he attached.  I
13 looked at it because you all submitted it, but if they were
14 identified, I'm not really seeing the harm in pulling them out
15 and giving them separate numbers.
16          I wish you had told me this in your first response so
17 I could have dealt with it the first time around rather than
18 requiring a second rounds of briefs, but, nonetheless,
19 if -- nobody wants to see all of those exhibits, I don't think.
20 Just -- I don't think, right?
21          MR. SANTHANAM:  Right, Your Honor, and if we may be
22 heard?
23          THE COURT:  Yes.
24          MR. SANTHANAM:  As we noted in our response, the
25 issue for us is that Mr. Jarosz's report has a very large

1  number of documents that are cited in there, along with a
2  documents-considered list that has an even larger number of
3  documents.  So our position was that Willowood needed to
4  identify if it had in mind certain documents it wanted to use.
5  It should have identified it in the list and not placed the
6  burden on Syngenta to go through every single document and cull
7  through them.

8         MR. COUGHLIN:  And if I can clarify, Your Honor?  I'm
9  sorry.  The documents are not listed.  There's a little
10 confusion there.  Tab 2 of his report has a long list of Bates
11 ranges, five or ten different groups of long Bates ranges.
12 It's not like the documents are identified.  It's just -- we
13 have it and can get to Tab 2, but it's not like he's listed any
14 particular documents.

15        THE COURT:  Okay.

16        MR. TILLER:  Your Honor, can I -- I think I can
17 clarify this issue really quick.

18        THE COURT:  Okay.

19        MR. TILLER:  When we said documents referenced in his
20 report, we meant documents on which he actually referenced to
21 support his opinions.  In Tab 2, like most experts do, they
22 just throw in a laundry list of every document they looked at.
23 Within the body of the report and within what he calls the
24 tabs, which are really exhibits, where he does his
25 calculations, he puts in specific document numbers, which says

```
 1   I'm relying on --
 2              THE COURT:  I'm sorry.  Speak up.
 3              MR. TILLER:  He puts in -- in his report, he cites,
 4   not just what he looked at in Tab 2, which, I agree, is a
 5   laundry list of documents -- that's -- I agree, if that's what
 6   we were talking about, I wouldn't rule in our favor, but what
 7   we're talking about are documents he specifically and expressly
 8   relied on for his opinions.  He puts them in the body of his
 9   report.
10              So, for example, Defendant's Exhibit No. 203,
11   Mr. Jarosz cites that document 9 times in the body of his
12   report.  Defendant's Exhibit 204, Mr. Jarosz cites 20 times.
13   It's not just that he looked at it --
14              THE COURT:  So you're saying that these -- I'm
15   looking at the document you all filed on Sunday, and it lists
16   one, two, three, four, five, six, seven, eight, nine,
17   ten -- fourteen documents.
18              MR. TILLER:  I can give you the number right now.
19              THE COURT:  203, 204, 209, 211, 212, 213, 214, 215,
20   216, 222, 223, 247, 248 and 252.  And you're saying all of
21   those he specifically referenced in his report?
22              MR. TILLER:  252 we put on as one of our flip
23   documents.  So that's sort of a different number.  211, no.  I
24   will take that one off the list.
25              THE COURT:  All right.
```

1          MR. TILLER:  The others, I understand, he
2    specifically referenced in support of a specific proposition.
3    And we -- again, we just -- and we'll limit it to these
4    exhibits right now.
5          THE COURT:  So what are these?
6          MR. TILLER:  Excuse me?
7          THE COURT:  What kind --
8          MR. TILLER:  They are all Syngenta documents.
9    They're spreadsheets.  They're sales documents.  They're
10   presentations, which you'll see a lot of, which he relied on --
11   Mr. Jarosz relied on in support of his opinions and support of
12   his critique of their expert's report.  Again, he specifically
13   cites to them.  It's not just one mention of this is one of the
14   5,000 documents that I looked at.
15         THE COURT:  Okay.  And so why is it that you didn't
16   tell me about this in your first response to their motion to
17   exclude these new exhibits?
18         MR. TILLER:  It is buried.  It is in Exhibit A.  It
19   wasn't specifically culled out.  You'd have to read Exhibit A,
20   and it's sort of in there.
21         THE COURT:  Because I didn't see it in your brief.
22         MR. TILLER:  It's not.  It's in Exhibit A, which is
23   the attachment to the brief, and it is, candidly, Your Honor,
24   not as clear as it should have been; but, again, what we were
25   trying to do is cull out -- quite frankly, trying to cull out

1  the documents we intend to use.

2          THE COURT:  Well, I have no problem with that.  I

3  mean, that's why I am trying to figure out what exactly is

4  going on here.

5          I'm sorry.  I keep getting my pieces of paper mixed

6  up here.

7          So why does he need the documents in order to give

8  his opinions?

9          MR. TILLER:  Well, he would -- there's two things

10  going on here.  One, he relies on those documents.  I mean, if

11  questioned about where did this come from, he needs to be able

12  to say it came from this or it came from that.

13          THE COURT:  Right.

14          MR. TILLER:  Second of all -- and, again, we're

15  willing to limit it right now to 11 documents, 11.  We would

16  like to be able to use those documents with their expert and

17  with their witnesses to ask questions about the propositions

18  that -- for which Mr. Jarosz cited them.

19          MR. SANTHANAM:  Your Honor, if we may be heard?

20          THE COURT:  Uh-huh.

21          MR. SANTHANAM:  We would note that Mr. Jarosz's

22  report, including the 40 tabs that he includes with the report,

23  is about 260-plus pages.  It has 561 footnotes, and he

24  references a very large number of exhibits -- or, excuse me,

25  documents in his report.

1          And the objection that we have is it shouldn't be

2   Syngenta's burden to sift through every single document that

3   he's relied upon in order to judge which document Willowood

4   might use.  If these were -- if these documents were important

5   and significant, it was incumbent on Willowood to identify them

6   specifically on their exhibit list, much as Syngenta did.

7          THE COURT:  Anything else from the Plaintiff -- from

8   the Defendant on that?

9          MR. TILLER:  And, again, Your Honor, these 11

10  documents are the ones that --

11         MR. SANTHANAM:  Well --

12         THE COURT:  Okay.  Stop.  I actually want to -- would

13  like to sleep tonight, and I suspect that you all do, too.  So

14  that's enough on that.  I will rule in a minute.

15         On No. 3, is that the one you all worked out?

16         MR. TILLER:  No, four is the one we worked out.  This

17  is just documents that Dr. Wilner relied on, can we use them

18  with Dr. Wilner.  He relied on them, so it obviously shouldn't

19  come as a surprise that he might get cross-examined using those

20  documents.

21         THE COURT:  Okay.  Your objection there?

22         MR. SANTHANAM:  Again, there are a large number of

23  documents that are listed in these reports.

24         First of all, there's a foundation issue in terms of

25  these documents are not going to come in through fact witnesses

1  leading up to Dr. Wilner, and so there wouldn't have been a

2  witness who can testify about these documents.

3          Second of all, again, it's a very large number of

4  documents.  If they felt that this was an important document

5  that they wanted to question Dr. Wilner about, it should have

6  been set out in their pretrial disclosures under Rule 26(a)(3).

7          THE COURT:  Anything else in response?

8          MR. TILLER:  No, Your Honor.

9          THE COURT:  All right.  I just think all of this

10 comes too late.  I've given Willowood some extra documents and

11 a little leeway, understanding, you know, here as you get close

12 to trial, maybe there's some last-minute things that you didn't

13 specifically identify.  So I've given you that opportunity, but

14 I'm not going to let all of this other stuff in as exhibits.

15         You can certainly ask whatever questions you want to

16 ask about what he relied on and, I mean -- but in terms of

17 handing him things and admitting documents that weren't

18 identified until very, very recently, we're not going to do

19 that.  So it just seems like too much.

20         All right.  So have I now addressed everything in the

21 request for clarification?

22         MR. TILLER:  Yes, Your Honor.

23         MR. SANTHANAM:  Yes, Your Honor.

24         THE COURT:  Now let's turn to the closure.  I am

25 not -- as I think I have said at least twice before in pretrial

1   conferences, trial is different, and I'm not really sure that

2   the brief in support of the motion to seal the courtroom really

3   adequately addressed the public interest here, which -- I know

4   I cited these cases to you all in July, and they weren't

5   discussed in the briefs, but, you know, the courthouse is not a

6   private secret chamber, as the *Barr* court said back in 2005,

7   and as Judge Cogburn said in the *Garlock* case, the public right

8   of access has two components.  The right of access protects the

9   public's ability to oversee and monitor the workings of the

10  courts, and, second, it promotes institutional integrity of the

11  judiciary.  So that's at least two reasons there.

12          I'm -- I guess I have a number of other concerns, and

13  I'll just use exhibit -- what was the lab notebook?  45?  35?

14          MR. SANTHANAM:  Thirty-five.

15          THE COURT:  Defendant's 35.  It's -- I'm just

16  wondering -- it seems to me that, in large part, this can be

17  dealt with by dealing with the exhibits, that the -- you know,

18  nobody is going to be reading a, I don't know, 100-page lab

19  notebook, and nobody did read it, but there was a little bit of

20  mention to a couple of pages.  Certainly, as to this lab

21  notebook, at least based on what I know now, I would have no

22  problem sealing that exhibit.  First of all, it's full of

23  irrelevant stuff that is not going to be used in the decision

24  of the case, and it's -- to the extent it is relevant, it's

25  discussed in the testimony.  No particular harm done to

1   Syngenta, and it just seems like a lot of things, in terms of

2   the technical stuff, can be dealt with that way.

3          Now, when we get to the financials, it's pretty

4   different.  It's going to be hard to do it that way, and -- but

5   the financials information, my concerns about that are -- I'm

6   just not really sure that that evidence should be kept from the

7   public.  We're here over a whole lot of money, and this is

8   a -- while it is -- while the damages theory is not totally

9   new, as I think I said in my order on Dr. Wilner's testimony,

10  it is new.  He uses benchmarks, but it's this two benchmark

11  correction theory, and you can't really understand it without

12  the numbers, at least I couldn't back when I was looking at the

13  motion in limine.  I had a lot of trouble understanding it in

14  the abstract.

15         So I just am having a lot of trouble figuring out how

16  to close the courtroom for that testimony when it seems like

17  something that there is a more significant public interest in

18  being open and -- you know, we can still -- the documents,

19  again, are not going to be read.  It's not like every single

20  piece of information in those documents is going to come out,

21  but I appreciate Syngenta doesn't want any of its prices, it

22  doesn't want its sales figures -- it is going to be hard for

23  these witnesses to testify without disclosing that, and I'm not

24  sure that should be done in secret.

25         So I'll let you address those concerns.

1      MR. SANTHANAM:  Yes, Your Honor.  I think you made a

2 good distinction between the documents versus the testimony;

3 and as we've been preparing and going through to identify what

4 we want to present at trial, we do believe that for the vast

5 majority of the witnesses who take the stand the courtroom does

6 not need to be closed.  In terms of the documents, those are --

7 and in particular, there are a lot of financial documents and

8 there are strategy documents in there.  As we outlined in our

9 motion, that is a concern for us, for those documents to be

10 revealed to the public.

11      In terms of the witnesses, we identified a number of

12 witnesses that we thought might testify today.  We had Jeff

13 Cecil, Andrew Fisher, and we expect that tomorrow there will be

14 Rex Wichert and our damages expert, Ben Wilner, as well.  There

15 may be only a very small portion of one or two of those

16 witnesses that we believe when we're actually getting into the

17 substance of the documents, perhaps putting it up on the screen

18 for the jury to see, where that portion potentially could be

19 sealed.  By and large, at least from our perspective in the

20 case in chief, we can keep the courtroom open for the vast

21 majority.  The wild card that we don't know about, of course,

22 is what would come on -- come in during cross-examination.

23      THE COURT:  Right.  But the Defendant is entitled to,

24 you know, a cross-examination so -- and to fully explore, at

25 least to the extent their documents have been appropriately

1    identified, you know, all of these issues with the witnesses

2    so -- and I don't feel like I can put unreasonable restraints

3    or constraints on them.  You know, I mean, to some extent it's

4    a trial management issue, but it's really kind of a larger

5    issue which I didn't hear you address.

6            MR. LEVINE:  Can I ask a clarification question, Your

7    Honor?  When you talk about sealing the exhibits so that the

8    public can't come to the clerk and say, Can I get a copy of

9    DX-35 --

10           THE COURT:  Correct.

11           MR. LEVINE:  -- will that apply to the transcript as

12   well?  So, for example, if the courtroom stayed open and the

13   witnesses are all testifying, there's a transcript made.  When

14   the transcript is then put onto the docket, will we have an

15   opportunity to redact out certain portions of the transcript

16   that we consider to be highly confidential?  Because that might

17   solve it.  Then the courtroom itself stays open.

18           THE COURT:  You know, I know that in North

19   Carolina -- I'll just look at my North Carolina lawyers.  Once

20   something is public, you can't unpublic it.  *Virmani versus*

21   *Presbyterian Hospital,* down there -- that case in Charlotte.

22           Now, I don't know the rule here.  I will say that in

23   that case you all cited to me, that unpublished Fourth Circuit

24   case from 1991 that I can remember all about, except I can't

25   remember the name -- anybody want to -- nobody else remembers

1  the name either.  We all know what I'm talking about.  In that

2  one, they had the trial and it was open and the court -- the

3  Fourth Circuit sent it back to seal the transcript, as I read

4  it.  That was kind of the remedy that the Court imposed, so at

5  least in that case it was considered.

6          I don't know if anybody has been in the courtroom

7  who's not part of the case because I don't know, you know --

8          MR. LEVINE:  I haven't seen anybody.

9          THE COURT:  Okay.  I mean, that's usually the case,

10 there is nobody here but us chickens, but that doesn't

11 necessarily still mean that we can't have somebody later on

12 want a copy of the transcript.  Of course, you know, even if I

13 seal it, somebody comes in and asks for a copy of it, we have

14 got to look at it all over again.

15         MR. LEVINE:  But aren't we better off crossing that

16 bridge when we get to it?

17         THE COURT:  I don't really have any problem with that

18 if you all want to try it that way.  I just am not making any

19 promises to you that that's, you know, going to work because I

20 just don't know.

21         To some extent, with the technical stuff, you know,

22 the testimony doesn't make any sense if you don't have the

23 document in front of you; and if we seal the documents -- and

24 your technical documents, I have no real reason to think they

25 shouldn't be sealed; but for the financial stuff, I think the

 1  testimony is probably going to contain a lot of itself that

 2  will make sense without reference to the documents and that you

 3  want to seal as well and even more so their cross-examination,

 4  perhaps.

 5          You know, I'm hoping we can certainly avoid -- you

 6  all have limited time, so I don't think anybody is going to be

 7  asking questions about stuff that doesn't matter just to put

 8  financial information on the public record.  I mean, nobody has

 9  got really enough time to be messing with the system to do

10  that, but I'm also -- I mean, I don't mind dealing with it

11  later.  It might be easier to deal with it later.  If we don't

12  have anybody in the courtroom, then maybe we can deal with it

13  that way.  We don't have to stop.

14          I'm also a little concerned about the jury.  I mean,

15  what am I supposed to tell the jury?  You can't talk about

16  these exhibits and this money?  How are they supposed to keep

17  it straight as to what they can and cannot talk about?  I'm not

18  too keen on giving them any instructions like that.

19          So, you know, I'm okay with going forward and you

20  all -- I mean, somebody has to pay for the transcript.  First

21  of all, somebody has to order it for appeal.  So if nobody

22  appeals, hey, not a problem.  I assume nobody is willing to

23  commit to that at this point and I wouldn't try to get you to.

24  It's really a joke.

25          MR. LEVINE:  I think that will work.

1        THE COURT:  Okay.  All right.  Let's just proceed.

2   Nobody -- everybody apparently -- you may -- I will say you may

3   see some law clerks who work in the courthouse pop in and out.

4   They're professionally instructed to keep their mouths shut, so

5   you know, that shouldn't be a problem, but I know I did see

6   three law clerks from elsewhere in the courthouse here for the

7   opening statements, for example.

8        I just -- and I am going to repeat.  If we ever do

9   come down to what parts of the transcript need to sealed,

10  it's -- you know, I just -- it is going to have to be a much

11  more detailed showing I guess would be the way to say it

12  because I was really not -- I didn't feel like what I got was

13  sufficient.  There was a lot of old data.  I don't know why the

14  prices in 2014 needs to be -- you know, that was a long time

15  ago.  Even though it seems like it was just yesterday to me, it

16  was not just yesterday; and five-year-old pricing data,

17  four-year-old pricing data by the time the transcript gets

18  typed, it's hard for me to understand that, but, you know, I'm

19  willing to put it off if you all are willing to put that off.

20  I just kind of want to give you a heads up it is not

21  necessarily going to be smooth sailing even when we get to the

22  transcript.

23       MR. SANTHANAM:  Understand.

24       THE COURT:  Okay.  All right.

25       Now, your witnesses tomorrow, you told me, but I

1  neglected to write it down.  Who are they?

2      MR. LEVINE:  After Mr. Heinze is done, we are going

3  to play the short video deposition of SSJ.  Then we will call

4  Jeff Cecil and after Mr. Cecil will be Mr. Fisher, Andrew

5  Fisher.  We may be able, depending on timing, to get through

6  Mr. Wichert, as well as Dr. Wilner, and we've also got the

7  deposition --

8      THE COURT:  Well, I don't think we're going to get

9  through all of that tomorrow.  I mean, where would you --

10 Mr. Heinze, SSJ, Mr. Cecil, Mr. Fisher, and Mr. Wichert?

11     MR. LEVINE:  Probably.  And then maybe, depending on

12 timing, some of the deposition transcripts as well.

13     THE COURT:  That sounds fine.  I just kind of like

14 the Defendants to know and I like to know who is coming next.

15 And you all are anticipating your case will go -- let's see,

16 today is Tuesday -- maybe through Thursday or you think --

17     MR. LEVINE:  We were hoping to try and finish it up

18 tomorrow, but I think in light of the timing it is probably

19 going to be Thursday morning.

20     THE COURT:  You all will be ready to go?

21     MR. TILLER:  We're working on that.  We have people

22 flying in on short notice.

23     THE COURT:  Good.  Well, it went a little slower

24 today than I think the Plaintiffs expected.  I'm not trying to

25 slow things down by any means, but we'll do that.

1          It did remind me, though, when you showed during

2    cross-examination of Mr. Heinze part of his video deposition --

3    and I just need to -- but you didn't actually read it into the

4    record, I don't know if the court reporter was able to take

5    that down off the video playing.  You all might need to just

6    check with her about that --

7          MR. LEVINE:  Provide the clip to her or provide a

8    hard copy?

9          THE COURT:  -- because usually the court reporter

10   does not take down the deposition testimony that's, you know,

11   read to the jury.  If a witness is cross-examined, we just have

12   to figure out how to be sure that's made part of the record.

13         For the final depositions that are read to the jury,

14   I will ask you to make a copy of only what is presented to the

15   jury and we'll mark it as an exhibit.  I won't send it back to

16   them during their deliberations, but that way the appellate

17   court will know and the court reporter doesn't have to -- she's

18   already got a hard enough job.

19         MR. LEVINE:  Your Honor, would it make it easiest for

20   the jury if before we play the video clip one of us stands up

21   and provides two sentences:  You are now going to hear from the

22   video deposition of SSJ, who is -- something -- just to

23   identify who the witness is before the clip is played?

24         THE COURT:  If you all are in agreement.  Most of the

25   witnesses said that, maybe not everybody.

1          MR. TILLER:  That's typically just part of the

2     questioning.  I mean, we don't do that for any other witness.

3          THE COURT:  We'll just let the witness testify.

4     Usually people stand up and say, We call Vijay Mundhra, or

5     whoever, and then I'll explain to them about a deposition and

6     tell them to consider it just like the witness was present in

7     the courtroom.

8          MR. LEVINE:  Two quick housekeeping matters.  The

9     first is since the examination of Mr. Heinze is still going on

10    I just would like to ask and verify that there is to be no

11    communications between counsel and the witness regarding the

12    examination during this recess in the examination.

13         MR. NEUMAN:  Of course.

14         MR. LEVINE:  Secondly, we were going to do a sidebar

15    shortly, so the break came at a good time.  In your order

16    regarding the motions in limine, you stated that Syngenta may

17    offer evidence on Willowood's use of the formulator's exemption

18    because it's relevant to damages.  This is Docket 272.  And, in

19    fact, we did bring out that Willowood used the formulator's

20    exemption.

21         You further stated in this order that subject to

22    developments at trial the Court will exclude evidence that

23    Willowood misused the exemption because of its minimal

24    probative value and the risk of undue confusion.  The sidebar

25    was to determine whether or not I could ask the following

1    questions to the witness, which I think are within the

2    permitted use of the formulator's exemption questions and does

3    not violate the order, but I want to ask before asking.

4              THE COURT:  All right.

5              MR. LEVINE:  So what I wanted to ask him is to go

6    back to:  You used the formulator's exemption.  To use the

7    formulator's exemption, Willowood had to identify a registered

8    source of the azoxy technical that was used to make the end-use

9    samples.  At the time Willowood filed the formulator's

10   exemption, Syngenta was the only entity that had an EPA

11   registration for azoxy technical.  Therefore, Willowood

12   identified Syngenta as the source.  If Willowood didn't

13   identify Syngenta as the source, Willowood couldn't have used

14   the formulator's exemption.  That's the extent of it, those

15   questions.

16             THE COURT:  I'm looking at Willowood.

17             MR. NEUMAN:  From our perspective, Your Honor, this

18   is precisely heading in -- this is heading straight into the

19   territory that we objected to back in July and which we

20   understood Your Honor's order to preclude, the reason being

21   that what Mr. Levine just outlined in his intended questioning

22   gets directly to the issue of misuse.  There is no way, in

23   fact, that Willowood could have gained any expedited time frame

24   for EPA approval without citing Syngenta as the source at the

25   time it filed the application when it was not the source and

1  that is precisely the issue of misuse.  The misuse issue is

2  inextricably linked to the expedited time frame.

3          Now, when we were here in July, Mr. Levine said, I

4  want to ask Mr. Heinze just a few questions:  Did you use the

5  formulator's exemption?  What is it?  Did it let you get into

6  the market quicker?  Were you able to do that?  That's what he

7  said he wanted to ask.  We understand that that goes to the

8  issue that they claim in terms of haste and jumping the gun.

9          What he is asking -- what he is proposing now to ask

10 goes directly to sort of misstating things to the EPA, making

11 statements that are not true, according to them, which we then

12 would have to explain we corrected and revised before we

13 started selling.  It would open up the entire sideshow and

14 create all the prejudice, risk of confusion.

15         THE COURT:  Well, why would it do that if -- I mean,

16 if he's just explaining the formulator's exemption and how it

17 works?

18         MR. NEUMAN:  Because if I heard the question

19 correctly, he wants to establish that we cited Syngenta as a

20 source at a time when we did not have it as a source.

21         THE COURT:  I didn't hear a question about that.

22         MR. LEVINE:  The question was:  At the time to use

23 the formulator's exemption, Willowood had to identify a

24 registered source of the azoxy technical that was used to make

25 its end-use products or end-use samples.  At the time Willowood

1  filed the formulator's exemption, Syngenta was the only entity

2  that had an EPA registration for azoxy technical.  Therefore,

3  Willowood identified Syngenta as the source.  If Willowood

4  didn't identify Syngenta as the source, Willowood couldn't have

5  used the formulator's exemption.

6          MR. NEUMAN:  Your Honor, what is the relevance of

7  that?

8          THE COURT:  That's what I was just asking.

9          MR. LEVINE:  It goes towards the speed because we

10 heard that they got the Tai He technical registration approved

11 in June of '14.  That would have meant that they couldn't have

12 used the formulator's exemption until after June of '14 if they

13 had to say Tai He was the source.

14         So I'm not saying -- I'm not asking him about

15 anything in terms of misuse.  I'm just identifying and

16 establishing that to use the formulator's exemption you had to

17 list a registered source.  The only registered source at the

18 time was Syngenta.  Therefore, you listed Syngenta.

19         THE COURT:  But your purpose is so that you can later

20 argue that if they had listed Tai He they won't have gotten the

21 formulator's exemption?

22         MR. LEVINE:  No.  The purpose is to argue later that

23 they used the formulator's exemption to speed things up and

24 that's -- we've already heard him say that.  The formulator's

25 exemption sped up the process for approval.  You couldn't use

1  the formulator's exemption unless you identified a registered

2  source of azoxy technical on that formulator's exemption.

3  Therefore, you listed Syngenta because that was the only

4  registered source at the time.

5         THE COURT:  Okay.  So, I mean, I don't really have

6  any problem with that.  The problem comes with how it might be

7  used.  The jury is hearing a lot of stuff and they need to

8  understand it, but I don't want -- I mean -- so -- I ask again

9  exactly if you're not going to argue they misused the

10  formulator's exemption, then what do you need especially that

11  last question for?

12         MR. LEVINE:  To show -- well, it's to show that to

13  use the formulator's exemption you had to identify a registered

14  source.  The only registered source was Syngenta, so they

15  identified Syngenta.

16         THE COURT:  All right.  And you need that --

17         MR. LEVINE:  Again, it goes towards the haste, the

18  plan, you know, that they had to get into the market at the

19  time that they wanted to get into the market.  It also goes

20  towards the issue of willfulness too, which is all tied

21  together with this haste and the rush to the market.

22         MR. NEUMAN:  Your Honor, if I may be heard very

23  briefly, one sentence -- two sentences.  He's already

24  established and Mr. Heinze has admitted on the witness stand

25  that they used the formulator's exemption.  By virtue of using

1   the formulator's exemption, they got into the -- they got an

2   approved registration earlier than they otherwise would have.

3   That's already conceded.  How that happened -- the mechanics of

4   it really are not relevant and just veer toward the area of

5   prejudice.

6           THE COURT:  As I recall, it already came in that you

7   can only use it if it is substantially similar.  You all

8   brought that out and that seems reasonable.  I think I'm going

9   to keep that out under Rule 403.

10          One other housekeeping matter.  I know the Plaintiff

11  has these exhibit notebooks with the documents -- the exhibit

12  for each witness, which makes it a little easier.  And you all

13  are not intending to do that for Willowood?  Which is fine.  I

14  just --

15          MR. TILLER:  We may try do it on direct.  It's hard

16  on cross, as you can imagine.

17          THE COURT:  Oh, yeah, you can't really do it on

18  cross.  If you just -- we have to pause longer while the --

19  while Syngenta gets the exhibit notebook or -- and is able to

20  look at it, so I hope I am giving you enough time to object

21  this afternoon.  I try to pause after an exhibit is offered

22  just to be sure.

23          MR. NEUMAN:  I noticed that and appreciated it.  We

24  will do our best to put exhibit books together for our direct

25  testimony.  We'll see if we can do it.

1        THE COURT:  Well, I mean, you don't have to do it,
2  but if you don't do it, we will have to pause longer because
3  there is a lot of notebooks.  I just wanted to identify that as
4  something that takes up time.
5        Okay.  What else today?  Nothing.  All right.  I'll
6  see you all in the morning at 9:30.
7        (Court adjourned at 5:55 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                    C E R T I F I C A T E

2

3          I, J. CALHOUN, RPR, United States District Court

4    Reporter for the Middle District of North Carolina, DO HEREBY

5    CERTIFY:

6

7          That the foregoing is a true and correct transcript of

8    the proceedings had in the above-entitled matter.

9

10

11

12   Date:    9-5-17              J. Calhoun, RPR
                                  United States Court Reporter
13                                324 W. Market Street
                                  Greensboro, NC  27401
14

15

16

17

18

19

20

21

22

23

24

25