```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
   SYNGENTA CROP PROTECTION, LLC.)   Civil Action
 3                                 )   No. 1:15CV274
        Plaintiff,                 )
 4                                 )
     vs.                           )   Greensboro, North Carolina
 5                                 )
   WILLOWOOD, LLC, WILLOWOOD       )   September 6, 2017
 6 USA, LLC., WILLOWOOD            )
   AZOXYSTROBIN, LLC, and          )
 7 WILLOWOOD LIMITED,              )
                                   )
 8        Defendants.              )
   _____)
 9

10                  TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE CATHERINE C. EAGLES
11                 UNITED STATES DISTRICT JUDGE

12 APPEARANCES:

13 For the Plaintiff:    HARI SANTHANAM, ESQUIRE
                         RUSSELL E. LEVINE, ESQUIRE
14                       KOURTNEY BALTZER, ESQUIRE
                         Kirkland & Ellis, LLP
15
                         RICHARD A. COUGHLIN, ESQUIRE
16                       Smith Moore, LLP

17 For the Defendants:   STEVEN E. TILLER, ESQUIRE
                         Whitefield Taylor & Preston
18                       BARRY S. NEUMAN, ESQUIRE
                         PETER J. DAVIS, ESQUIRE
19                       Whitefield Taylor & Preston

20                       ALAN W. DUNCAN, ESQUIRE
                         Mullins Duncan Harrell & Russell
21

22 Court Reporter:       J. Calhoun, RPR
                         Room 122, U.S. Courthouse Building
23                       324 West Market Street
                         Greensboro, North Carolina 27401
24                       (336) 332-6033

25
```

```
 1              I N D E X
   WITNESSES FOR THE PLAINTIFF:              PAGE
 2
   BRIAN HEINZE:
 3    Direct Examination By Mr. Levine        5
      Cross-Examination By Mr. Neuman         8
 4    Redirect Examination By Mr. Levine:    73

 5 SHEN SHAOJUN (BY DEPOSITION                80
   VIJAY MUNDRA (BY DEPOSITION)              81.
 6
   JEFF CECIL:
 7    Direct Examination The Court           87
      Cross-Examination By Mr. Tiller:      167
 8
   EXHIBITS:                                 RCVD
 9  PX-4B   Original Patent                    4
    DX-9    5/30/14 Email chain               42
10  DX-10   Freedom to Operate Opinion, July 18,  39
            2014
11  DX-11   3/30/15 Email                     44
    DX-13   4/1/2015 Email chain              48
12  PX-14   Supply Agreement                  20
    DX-15   Invoice                           24
13  DX-16   Bill of Lading                    29
    DX-17   Manufacturing process of azoxystrobin by  53
14          Yangeheng at Tai He
    PX-21   6/19/2014 Email from V. Mundhra to Chris  84
15          Hayden
    DX-21   2011 to 2015 azoxystrobin imports  180
16  PX-25   May 2014 Email chain              84
    PX-26   E-mail (Heinze) dated 3-27-15      5
17  PX-31   6/19/14 Email from V. Mundhra to Brian  80
            Heinze
18  PX-32   July 2014 Email chain             80
    DX-53   Freedom to Operate Opinion, July 25,  35
19          2013
    PX-54   6/24/14 Email chain               84
20  PX-55   November 2014 Email chain         84
    PX-56   December 2014 Email chain         84
21  PX-57   August 2015 Email chain           84
    DX-82   August 2015 Strategy Plan        200
22  DX-87   11/17/2014 Letter to Syngenta    183
            Distributors
23  PX-110A 2014-01 Gross-to-Net Report      140
    PX-123A 2015-01 Gross-to-Net Report      140
24  PX-140A 2016-01 Gross-to-Net Report      140
    PX-148A Gross-to-Net June LP             140
25  DX-252                                   167
```

```
09    1              P R O C E E D I N G S
09    2         (Proceedings commenced at 9:30 a.m.)
09    3         THE COURT:  I think our last juror came in.  Anything
09    4   we need to take up before the jury comes into the courtroom?
09    5         MR. LEVINE:  Just one quick housekeeping issue, Your
09    6   Honor.
09    7         THE COURT:  Yes.
09    8         MR. LEVINE:  One exhibit was not moved into evidence
09    9   yesterday, Exhibit 4B.  So I move for the admission of
09   10   Plaintiff's Exhibit 4B.  Barry, it's the original.
09   11         THE COURT:  The original patent?
09   12         MR. LEVINE:  Yes.
09   13         THE COURT:  Okay.  It'll be admitted.
09   14         Anything else?  Okay.  We can bring the jury in.
09   15         (Jury panel is present.)
09   16         THE COURT:  All right.  Good morning.  I see you
09   17   people came prepared with sweaters today.  If I ask the
09   18   building people to turn the air down, then it gets hot, and I
09   19   personally would rather be cold.  You all are at least nodding
09   20   with me, so we'll -- I think we are ready to continue.
09   21         We were still on direct examination with Mr. Heinze,
09   22   correct?
09   23         MR. LEVINE:  Correct.
09   24         THE COURT:  All right.  You may proceed, Mr. Levine.
     25
```

                            BRIAN HEINZE,

              PLAINTIFF'S WITNESS, PREVIOUSLY SWORN,

                          DIRECT EXAMINATION

**BY MR. LEVINE**

Q.   Good morning, Mr. Heinze.

A.   Good morning.

Q.   When we stopped yesterday, we were talking about issues
relating to the '138 patent, and in particular, whether
Willowood directed or controlled Tai He, the manufacturer of
Willowood's azoxy technical, so let's continue.

     Please turn to Exhibit 26 -- Plaintiff's Exhibit 26 in
your notebook.

          **MR. LEVINE:**  I move for admission of Plaintiff's
Exhibit 26.

          **MR. NEUMAN:**  May I have a moment, Your Honor?

          **THE COURT:**  You may.

          **THE WITNESS:**  I have it up.

          **MR. NEUMAN:**  No objection.

          **THE COURT:**  It'll be admitted.

**BY MR. LEVINE**

Q.   Mr. Heinze, Plaintiff's Exhibit 26 at the top is an e-mail
from you to a number of people dated March 27th, 2015, correct?

A.   Correct.

Q.   And the people to whom you sent it were Andy King, who is
your national sales manager, correct?

| | |
|---|---|
| 09 | 1 |
| 09 | 2 |
| 09 | 3 |
| 09 | 4 |
| 09 | 5 |
| 09 | 6 |
| 09 | 7 |
| 09 | 8 |
| 09 | 9 |
| 09 | 10 |
| 09 | 11 |
| 09 | 12 |
| 09 | 13 |
| 09 | 14 |
| 09 | 15 |
| 09 | 16 |
| 09 | 17 |
| 09 | 18 |
| 09 | 19 |
| 09 | 20 |
| 09 | 21 |
| 09 | 22 |
| 09 | 23 |
| 09 | 24 |
| 09 | 25 |

A.    His title has since changed, but, yes, he's is still with

the organization.

Q.    Okay.  At the time, he was the national sales manager?

A.    That is correct.

Q.    And it was also sent to Mr. Joe Middione, who, at the

time, was the chief operating officer of Willowood USA?

A.    That's correct.

Q.    It was also sent to Vijay Mundhra, who was the managing

directer of Willowood Limited, correct?

A.    Correct.

Q.    And this e-mail was sent, as we said, March 27, 2015.  Do

you recall that that's the date that the lawsuit that we're

here about today was actually filed with the court?

A.    I do.

Q.    Let's look at what you were telling Mr. King,

Mr. Middione, and Mr. Mundhra.  You said, did you not, that the

first thing we need to confirm is that our manufacturer is

making the product the way we have instructed them to do so.

      That's what you stated, correct?

A.    In this e-mail, yes.

Q.    Okay.  Thank you, David.

      Mr. Heinze, let's talk now about some of the issues

relating to the DABCO patent.  In January 2016, Willowood

utilized a company by the name of JDM, John David Mary,

Research, to test samples of azoxy technical from Tai He,

09    1    correct?

09    2    A.    Best of my knowledge, Tai He and CAC.

09    3    Q.    You said Tai He and CAC, but my question was whether

09    4    Willowood used JDM Research to test samples of azoxy technical

09    5    from Tai He?

09    6    A.    Correct.

09    7    Q.    All right.  And JDM Research is a company that is owned by

09    8    Mr. Mundhra, correct?

09    9    A.    Correct.

09    10    Q.    JDM was provided with samples -- azoxy samples from Tai

09    11    He, correct?

09    12    A.    Correct, and in addition to CAC samples as well.

09    13    Q.    Right.  But I don't want to talk about the CAC samples,

09    14    though.  I just want to -- as you said, they were provided with

09    15    samples from Tai He.  And Tai He is the manufacturer of the

09    16    azoxy technical that Willowood uses, correct?

09    17    A.    That's correct.

09    18    Q.    Okay.  And JDM tested those azoxy samples from Tai He to

09    19    determine whether or not DABCO was present in the Tai He

09    20    samples, correct?

09    21    A.    Correct.

09    22    Q.    The test method that JDM used was the method of detection

09    23    that had been developed by CAC, correct?

09    24    A.    CAC had provided them a method, but it was never carried

09    25    out using that method.

09   1   Q.   Well, your understanding, though, is that the CA -- well,

09   2   let me back up on that, make sure we're clear.

09   3        JDM used CAC's method of detection, correct?

09   4   A.   What I've learned since is that that's not the case.

09   5   Q.   Well, at the time that you were deposed, your

09   6   understanding was that JDM used CAC's method of detection,

09   7   correct?

09   8   A.   Correct.

09   9   Q.   And your understanding was that CAC's method of testing is

09   10  capable of detecting the parts per billion -- at the parts per

09   11  billion level, correct?

09   12  A.   That's what they had indicated, yes.

09   13  Q.   And the JDM tests of Tai He's azoxystrobin found DABCO

09   14  present, correct?

09   15  A.   That's what I was told at the time, yes.

09   16          MR. LEVINE:  Thank you, Mr. Heinze.  No further

09   17  questions.

09   18          THE COURT:  All right.  Questions for Willowood?

09   19          MR. NEUMAN:  Yes.  Thank you, Your Honor.

09   20                      CROSS-EXAMINATION

09   21  BY MR. NEUMAN

09   22  Q.   Mr. Heinze, good morning.

09   23  A.   Good morning.

09   24  Q.   Now, at the outset of Mr. Levine's questioning, he asked

09   25  you to introduce yourself to the jury.  I would like to go back

09  1  to the introduction.

09  2       You are the president and CEO of Willowood USA, I believe

09  3  you testified?

09  4  A.   Yes, I am.

09  5       **THE COURT:**  And just a second.  Can you get that mike

09  6  a little bit closer to you --

09  7       **MR. NEUMAN:**  Absolutely.

09  8       **THE COURT:**  -- so that you don't have to lean over

09  9  and so that we can hear better?

09  10      **MR. NEUMAN:**  Thank you.

09  11      **THE COURT:**  Yes.  All right.  That's good.

09  12 **BY MR. NEUMAN**

09  13 Q.   And when did you form Willowood USA?

09  14 A.   November of 2009.

09  15 Q.   And whom did you form Willowood USA with?

09  16 A.   I co-founded Willowood USA with Vijay Mundhra, still my

09  17 partner, based out of Hong Kong.

09  18 Q.   And why did you form Willowood USA, LLC, in 2009?

09  19 A.   I saw a tremendous business opportunity.  The agrichemical

09  20 market is a very mature industry, and a tremendous amount of

09  21 products are in a post-patent environment, that encouraged

09  22 generics to come to the marketplace.  And we believed that

09  23 there was a great opportunity to provide high-quality products

09  24 to the American farmer at more affordable prices than the

09  25 multinational branded products.

09 1  Q.   And prior to forming Willowood USA, LLC, Mr. Heinze, had

09 2  you had experience and background in agriculture and

09 3  agrichemical products?

09 4  A.   Yes, I have.  I've spent the last close to 30 years in the

09 5  crop protection chemical industry.  I started with a

09 6  multinational company, a French company, Rhone-Poulenc, that

09 7  later merged with a German company, AgrEvo, to form Aventis,

09 8  that was acquired a few years ago that now operates, as we

09 9  talked yesterday, Bayer CropScience.

09 10      In the year 2000, I saw an opportunity in the post-patent

09 11 segment and went out and created my first business, a generic

09 12 company called AgValue.

09 13 Q.   What did you -- for what years did you work at Bayer?

09 14 A.   From 1992 to 2001.

09 15 Q.   What did you do while you worked there?

09 16 A.   Initially, I was a sales representative, and then I moved

09 17 into a western regional account management position.  I also

09 18 managed the horticulture crop team on a national level for

09 19 Aventis.

09 20 Q.   Do you have any post-high school degrees?

09 21 A.   I do.  I hold a bachelors of science degree in agriculture

09 22 from California State University-Chico.

09 23 Q.   And when did you obtain that degree, sir?

09 24 A.   1982.

09 25 Q.   And why did you decide to concentrate in that field, in

09   1   agriculture?

09   2   A.   I'm proud to say I'm a third generation farmer.   My

09   3   grandfather was a German immigrant that farmed.   My father was

09   4   a farmer.   I raised my children on a walnut and orange orchard

09   5   in the Central San Joaquin Valley of California.   I'm proud to

09   6   say, my youngest son, who has worked for us in the past, is a

09   7   fourth generation agriculturist, if you will.   But just fell in

09   8   love with agriculture at a young age and knew that it was

09   9   something I wanted to do for a livelihood.

09   10  Q.   What was your first job after graduating college?

09   11  A.   I served as an agronomist for a large corporate farming

09   12  entity, the JG Boswell.   I was responsible for soil fertility,

09   13  pest control, planting, harvesting on 25,000 acres of primarily

09   14  cotton, but safflower, wheat, seed alfalfa, processing

09   15  tomatoes, garlic, and onions.

09   16  Q.   And for how long did you hold that position -- hold that

09   17  job?

09   18  A.   Five years.

09   19  Q.   Until?

09   20  A.   Until I left to join Rhone-Poulenc in 1992.

09   21  Q.   And how long were you at Rhone-Poulenc?

09   22  A.   Nine years, 1992 through 2001.

09   23  Q.   And what did you do at Rhone-Poulenc?

09   24  A.   Again, I was a sales representative, initially, covering

09   25  just two-county area, and then moved into western regional

| 09 | 1 | account management, where I had headquarter account |
| 09 | 2 | responsibility for California, Arizona, and Hawaii. |
| 09 | 3 | Q.   What was Rhone-Poulenc's business? |
| 09 | 4 | A.   Crop protection.  We manufactured herbicides, |
| 09 | 5 | insecticides, fungicides, plant growth regulators. |
| 09 | 6 | Q.   And when did you leave Rhone-Poulenc, I'm sorry? |
| 09 | 7 | A.   2001. |
| 09 | 8 | Q.   And where did you go then? |
| 09 | 9 | A.   I formed my first post-patent crop protection chemical |
| 09 | 10 | company called AgValue.  That's capital A, lower case G, |
| 09 | 11 | capital V-A-L-U-E.  Was a  similar business to that of |
| 09 | 12 | Willowood USA. |
| 09 | 13 | Q.   And how long did you have that business, sir? |
| 09 | 14 | A.   Four years.  In late -- |
| 09 | 15 | Q.   What happened then? |
| 09 | 16 | A.   Late 2004, we were successful beyond our greatest |
| 09 | 17 | expectations.  And during a period of industry consolidation, |
| 09 | 18 | we sold the business to a large generic company out of India, |
| 09 | 19 | United Phosphorus, that's publicly traded on the Mumbai Stock |
| 09 | 20 | Exchange. |
| 09 | 21 | Q.   What year was that, that you sold the business to UPL? |
| 09 | 22 | A.   November of 2004. |
| 09 | 23 | Q.   Pardon? |
| 09 | 24 | A.   November of 2004. |
| 09 | 25 | Q.   And what did you do then? |

A.   I -- as a result of the sale of that business, I agreed to a five-year non-compete.  My children were all raised.  I had always wanted to own a registered cattle operation, so my wife and I moved to Oregon to raise cattle and sheep.

Q.   And that non-compete ran for five years, you said?

A.   That's correct.

Q.   So that was until 2009?

A.   That's correct.

Q.   And that's when you formed Willowood USA?

A.   That's correct.

Q.   How many people does Willowood USA employ?

A.   It continues to grow.  It's approximately 20 today.

Q.   And how many professionals would you say are employed by Willowood USA?

A.   Over half, so 10 or 12.

Q.   And we've heard about Mr. Mundhra.  What is Mr. Mundhra's background?

A.   Mr. Mundhra holds a degree in chemistry from -- I'm not sure of the university, out of India.

Q.   And how did you meet Mr. Mundhra?

A.   Mr. Mundhra was my sourcing arm for my first company, AgValue, out of mainland China.  At the time, he had a partner. His English name was John Sherman.  And sourcing products out of India, being a form of British Commonwealth, English was spoken as a second language, but when you got to China, the

09  1  language barrier was very significant.  And Mr. Mundhra had a
09  2  partner that was bilingual, spoke both Mandarin, Cantonese, and
09  3  English as well.
09  4  Q.    What business was Mr. Mundhra in?
09  5  A.    The sourcing of agricultural chemicals.
09  6  Q.    And we've heard also about Joe Middione, who is the chief
09  7  operating officer of Willowood USA.  Can you just describe
09  8  briefly his background?
09  9  A.    Mr. Middione started his professional career as a research
09  10  biologist for the FMC Corporation that also continues to
09  11  operate in the crop protection chemical space, later moved to
09  12  American Cyanamid in various roles, and ultimately as a
09  13  district sales manager, regional sales manager.
09  14  Q.    For what kinds of products?
09  15  A.    Crop protection chemicals as well.
09  16  Q.    We've also seen e-mails with the name Andy King.  What is
09  17  Mr. King's background?
09  18  A.    Mr. King also has a degree in agronomy, grew up on a farm.
09  19  Andy and I met at Rhône-Poulenc.  After I left to form AgValue,
09  20  Andy stayed with Rhône-Poulenc through the Bayer acquisition
09  21  and saw the press release that I had formed Willowood USA.  He
09  22  said, "I liked what you did at AgValue; and if there is an
09  23  opportunity for me to join your organization, I would like to
09  24  do so."  So we brought Andy on as part of the team.
09  25  Q.    Does Willowood USA belong to any professional associations

09  1  comprising other companies of the ag chemical industry?

09  2  A.   Yes, we do, quite a few.

09  3  Q.   Can you give a couple of examples?

09  4  A.   Sure.  CropLife; CAPCA, which stands for California

09  5  Agriculture Production Consultants Association; ARA, Ag

09  6  Retailers Association; Midwest Crop Protection Association.

09  7  Then quite a few more.

09  8  Q.   And do Willowood personnel serve on any committees in any

09  9  of those organizations?

09  10 A.   Yes, they do.

09  11 Q.   How many different active pesticide ingredients has

09  12 Willowood registered with the Environmental Protection Agency?

09  13         **MR. LEVINE:**  Objection, relevance.

09  14         **THE COURT:**  Overruled.  He can give some background.

09  15         You can answer.

09  16         **THE WITNESS:**  Thank you.

09  17         In excess of 25 active ingredients and well over 50

09  18 end-use formulated products.

09  19 **BY MR. NEUMAN:**

09  20 Q.   Are there particular types of pesticides that you've

09  21 registered?  We've heard about fungicides, herbicides and so

09  22 on.

09  23 A.   We started initially with herbicides, which have a much

09  24 more predictable use pattern.  They are the first thing a

09  25 farmer will use in a season.  And then once we had established

09   1   a pretty substantial portfolio of herbicides, we began to add

09   2   fungicides, insecticides, and plant growth regulators that have

09   3   a much less predictable use pattern.

09   4   Q.   And where is Willowood USA based, sir?

09   5   A.   Originally, cofounded in Roseburg, Oregon, where I reside.

09   6   We're in the process and almost final relocating of the

09   7   business to Broomfield, Colorado, a suburb of Denver.

09   8   Q.   Where does Willowood USA sell its pesticide products?

09   9   A.   Throughout the US.

09   10   Q.   Let's talk a little about Willowood Limited.   Where are

09   11   its offices located?

09   12   A.   Hong Kong.

09   13   Q.   You said yesterday that Mr. Mundhra owns Willowood

09   14   Limited.   Do you recall that testimony?

09   15   A.   I do.

09   16   Q.   Do you have any ownership stake in Willowood Limited?

09   17   A.   I do not.

09   18   Q.   Do any of the other owners of Willowood USA have any

09   19   ownership stake in Willowood Limited?

09   20   A.   No, they do not.   The only common denominator is Vijay

09   21   Mundhra is an owner of -- one of the four owners of Willowood

09   22   USA, but none of the other owners have ownership in any of the

09   23   other businesses.

09   24   Q.   Do you have any management role in the operations and

09   25   management of Willowood Limited?

09   1  A.   I do not.

09   2  Q.   Do any of the principals of Willowood USA have any role in

09   3  the management of Willowood Limited?

09   4  A.   They do not.

09   5  Q.   Now, you said yesterday that Willowood USA buys its

09   6  azoxystrobin technical from Willowood Limited.  Do you recall

09   7  that testimony?

09   8  A.   I do.

09   9  Q.   Do Willowood USA and Willowood Limited have an agreement

09  10  as to the terms under which Willowood USA will purchase

09  11  azoxystrobin technical from Willowood Limited?

09  12  A.   Yes, we do.

09  13  Q.   Do you have the binder that Mr. Levine handed you

09  14  yesterday?

09  15  A.   I do.

09  16  Q.   Could you please turn to Plaintiff's 14 in that binder?

09  17          **MR. LEVINE:**  Objection, Your Honor.  Both beyond the

09  18  scope and also relevance.  I'm happy to explain too, if you

09  19  would like, in sidebar.

09  20          **THE COURT:**  Well, he can go ahead and ask his

09  21  questions of the witness.  I don't know what he is going to ask

09  22  him, so I don't know how to evaluate the relevance.

09  23          So go ahead with your questions.

09  24          You can object again.

    25

BY MR. NEUMAN:

Q.   Do you have Plaintiff's 14 in front of you?

A.   Yes, I do.

Q.   Do you recognize this document?

A.   I do.

Q.   What is it?

A.   It's a supply agreement between Willowood Limited and
Willowood USA.

          THE COURT:  Was this admitted yesterday?

          MR. NEUMAN:  It is in the binder.

          MR. LEVINE:  No.

          THE COURT:  No.  Okay.

          MR. NEUMAN:  It is in the binder that Mr. Levine --

          THE COURT:  Right.  I was just asking if it was
admitted yesterday.  Okay.  Go ahead.

BY MR. NEUMAN:

Q.   And you signed this agreement on behalf of Willowood USA?

A.   I did.

Q.   And Mr. Mundhra signed it on behalf of Willowood Limited?

A.   Yes, he did.

          MR. NEUMAN:  Your Honor, I move admission of
Plaintiff's 14.

          THE COURT:  Can counsel just approach the bench
briefly?

          (Bench conference as follows:)

```
09   1            THE COURT:  So what's your relevance objection?
09   2            MR. LEVINE:  This is a 2014 agreement.  The only
09   3   issue about the sale from Willowood Limited to Willowood USA
09   4   relates to the compound patents.  That was in 2013.  There is
09   5   no issue in this case --
09   6            THE COURT:  Okay.
09   7            MR. LEVINE:  -- with respect --
09   8            THE COURT:  What is your response on that?
09   9            MR. NEUMAN:  The response is I'm going to ask if
09  10   these were the terms that were in effect between the parties
09  11   prior to that time.
09  12            THE COURT:  But you don't have a written agreement?
09  13            MR. NEUMAN:  I do not.
09  14            THE COURT:  Okay.  All right.  I understand.  I'll --
09  15   you can cross -- well, in effect, cross-examine.  I'll let you
09  16   do it.  I'll overrule the objection.
09  17            MR. LEVINE:  Your Honor, I don't want to interrupt
09  18   continuously, but this is really -- he's doing his direct.
09  19            THE COURT:  Ordinarily I just -- you know, rather
09  20   than having to recall witnesses, I let people, you know, ask
09  21   whatever they want to of the witness.
09  22            Is it going to be long?
09  23            MR. NEUMAN:  If I may, for the record, counsel
09  24   yesterday spent a good deal of time with this witness trying to
09  25   establish that Willowood USA and Willowood Limited effectively
```

| 09 | 1 | were one and the same. His testimony is related to showing |
| 09 | 2 | that there is a distinction between the two. |
| 09 | 3 | THE COURT: Right. I don't think you've gone |
| 09 | 4 | necessarily much farther than what he went on direct. Okay. |
| 09 | 5 | Let's go. |
| 09 | 6 | (Bench conference concluded.) |
| 09 | 7 | THE COURT: All right. Overruled. You may proceed. |
| 09 | 8 | You were asking about the date. |
| 09 | 9 | MR. NEUMAN: Is it admitted, Your Honor? |
| 09 | 10 | THE COURT: Yes, it will be admitted. |
| 09 | 11 | MR. NEUMAN: Permission to publish? |
| 09 | 12 | THE COURT: Yes. |
| 09 | 13 | BY MR. NEUMAN: |
| 09 | 14 | Q. Mr. Heinze, I would like you to look -- first of all, does |
| 09 | 15 | this agreement reflect the terms under which Willowood USA and |
| 09 | 16 | Willowood Limited agreed that these purchase transactions of |
| 09 | 17 | azoxystrobin technical would take place? |
| 09 | 18 | A. Yes, it does. |
| 09 | 19 | Q. Would you look, please, at paragraph 2? |
| 09 | 20 | MR. NEUMAN: Could you bring that up? |
| 09 | 21 | THE COURT: Okay. Can you just go over the dates |
| 09 | 22 | about this? Because it is dated November 2014 so -- |
| 09 | 23 | BY MR. NEUMAN: |
| 09 | 24 | Q. This agreement is signed as of November 2014, |
| 09 | 25 | Mr. -- November 15, 2014, is that right? |

09    1   A.    That is correct.

09    2   Q.    Now, was Willowood USA in fact purchasing azoxystrobin

09    3   technical from Willowood Limited prior to that date?

09    4   A.    Yes, we did.

09    5   Q.    And does this agreement reflect the terms under which

09    6   Willowood USA and Willowood Limited had agreed to enter into

09    7   those transactions dating back to the beginning?

09    8   A.    The beginning of the agreement?  The date of the

09    9   agreement?

09   10   Q.    The beginning of the time when you were purchasing

09   11   azoxystrobin --

09   12   A.    Yes, it does.

09   13   Q.    -- from Willowood Limited.

09   14   A.    There was a preceding agreement that lasted for five years

09   15   and if you look at -- starting in November of 2009, a five-year

09   16   agreement.  This was renewing an agreement, so there was -- we

09   17   had purchased earlier under the other old agreement and then

09   18   subsequently this agreement is still in force today.

09   19   Q.    So, again, if we could please look at paragraph 2.1.  Do

09   20   you see where it says:  The purchase price for each of the

09   21   products shall be 102.5 percent of seller's cost, defined

09   22   below, for the product's purchase price?  Do you see that?

09   23   A.    Yes, I do.

09   24   Q.    Who was the seller?

09   25   A.    Willowood Limited to Willowood USA.

09  1  Q.   And when -- does this agreement accurately -- does this

09  2  provision accurately reflect the terms under which

09  3  Willowood -- the purchase price under which Willowood USA would

09  4  pay Willowood Limited for its azoxy technical?

09  5  A.   Yes.  It's transferred at the same price from the factory.

09  6  The factory sells to Willowood Limited.  Willowood Limited

09  7  sells to Willowood USA at the same price.  The 2 1/2 percent is

09  8  paid to Willowood Limited for all the behind -- working with

09  9  the factories, coordinating the freight, testing of the

09  10 material to ensure quality prior to, but the two -- so, yes, in

09  11 fact, this does reflect accurately the purchase price from

09  12 Willowood Limited to Willowood USA.

09  13         THE COURT:  Okay.  And this is how it was done in

09  14 2013.  Is that what you are saying?

09  15         THE WITNESS:  Yes, it was.  It was just a renewal of

09  16 a five-year agreement, Your Honor.

09  17 BY MR. NEUMAN:

09  18 Q.   Does Willowood Limited receive any separate commission or

09  19 compensation based on sales of azoxystrobin that Willowood USA

09  20 makes in the United States?

09  21 A.   Nothing more than the 2 1/2 percent.

09  22 Q.   Is that on sales or how is the 2 1/2 percent calculated?

09  23 2 1/2 percent on what?

09  24 A.   2 1/2 percent of the total value of the product being

09  25 shipped.  So if it's $100,000, it would -- 2.5 percent would be

```
09    1   $2,500.

09    2   Q.   Could you please take a look at paragraph 3.1 of this

09    3   agreement, Mr. Heinze?

09    4            MR. NEUMAN:   If you could pull that up.

09    5   BY MR. NEUMAN:

09    6   Q.   Do you have that in front of you?

09    7   A.   I do.

09    8   Q.   Do you see that this agreement refers to invoices for

09    9   products purchased?

09   10   A.   I do.

09   11   Q.   Are invoices customarily issued by Willowood Limited to

09   12   Willowood USA when Willowood USA purchases azoxystrobin

09   13   technical?

09   14   A.   Yes, they are.

09   15   Q.   Has that been the practice since Willowood USA began

09   16   purchasing azoxystrobin technical from Willowood Limited?

09   17   A.   Yes, it is.

09   18   Q.   Could you -- I would like to show you Defendant's Exhibit

09   19   15.

10   20            MR. NEUMAN:   May I approach?

10   21            THE COURT:   You may.

10   22   BY MR. NEUMAN:

10   23   Q.   Do you recognize this document?

10   24   A.   I do.

10   25   Q.   What is it?
```

```
10    1   A.    It's an invoice from Willowood Limited to Willowood

10    2   Azoxystrobin LLC.

10    3   Q.    What is the date?

10    4   A.    June 30, 2014.

10    5             MR. NEUMAN:   Your Honor, I move for admission of

10    6   Defendant's 15.

10    7             MR. LEVINE:   No objection.

10    8             THE COURT:   It will be admitted.

10    9             MR. NEUMAN:   Permission to publish?

10   10             THE COURT:   You may.

10   11   BY MR. NEUMAN:

10   12   Q.    Do these invoices -- does this invoice accurately reflect

10   13   the terms under which Willowood USA purchases azoxystrobin

10   14   technical from Willowood Limited?

10   15   A.    It does.

10   16   Q.    And do you see in the right-hand side of the document it

10   17   says "FOB Hong Kong"?

10   18   A.    I do.

10   19   Q.    What does FOB Hong Kong mean?

10   20   A.    Free on board Hong Kong, meaning that -- when we took

10   21   possession of the goods in Hong Kong.

10   22   Q.    And what does FOB mean to you?

10   23   A.    Free on board.

10   24   Q.    Could you describe in more detail the process by which

10   25   azoxystrobin technical is shipped out of Hong Kong to the
```

```
10    1   United States in connection with sales of azoxystrobin?
10    2           THE COURT:  Okay.  Are you talking about back in
10    3   2013?
10    4           MR. NEUMAN:  Yes.
10    5           THE COURT:  Okay.  Go ahead.
10    6           MR. NEUMAN:  And 2014.
10    7           THE WITNESS:  2014, Your Honor.
10    8           THE COURT:  Go ahead.
10    9           MR. NEUMAN:  I'm talking about 2014.
10   10           THE COURT:  2014.  All right.  Go ahead.
10   11           THE WITNESS:  This particular shipment was an air
10   12   shipment was the only reason that it was shipped from Hong
10   13   Kong.  Most shipments leave from Shanghai by sea and arrive
10   14   into Long Beach or Los Angeles and then are moved via truck and
10   15   rail to the final destination, but this particular shipment was
10   16   from Hong Kong.
10   17   BY MR. NEUMAN:
10   18   Q.   How does Willowood Limited know where to send product?
10   19   A.   We provide them that instruction.  They issue initially
10   20   what's called a sales contract and then one of my production
10   21   planners will issue a corresponding purchase order that would
10   22   have the final destination.
10   23        And as we discussed yesterday, all of our azoxystrobin had
10   24   been formulated at a contract manufacturing facility, AgraForm,
10   25   in St. Louis, Missouri, so ultimate destination of this
```

10    1   shipment and all other azoxystrobin shipments would have been

10    2   to AgraForm in St. Louis, Missouri.

10    3   Q.   What are the relevant roles of Willowood USA and Willowood

10    4   Limited in the mechanics of the transportation process?

10    5   A.   The transportation is all coordinated by the mainland

10    6   China team, SSJ's team, and we ship these what we term door to

10    7   door, so they will -- it's very unusual that we would ever ship

10    8   product by air because it is very expensive, but most shipments

10    9   are done by sea.   Once they clear US Customs and clear EPA

10   10   approval, the containers are offloaded, put on a flatbed

10   11   chassis truck, moved to a rail yard.

10   12        In the case of AgraForm in St. Louis, I believe the final

10   13   destination by rail is Memphis, Tennessee, and then from

10   14   Memphis, Tennessee, to St. Louis it's trucked.   The goods are

10   15   offloaded and then the container is returned to the rail yard

10   16   in Memphis.

10   17   Q.   Now, when you say that Willowood Limited makes the

10   18   arrangements, with whom did they make the arrangements?   How do

10   19   they go about making the arrangements?

10   20   A.   With a freight forwarding company and we predominantly use

10   21   a company by the name of Hughes Shipping that has offices both

10   22   in Hong Kong, Shanghai, and in the US in New Jersey.   So they

10   23   help facilitate since they have offices both in Asia and the

10   24   US.

10   25   Q.   Whom does Willowood Limited discuss these mechanics,

10    1  logistics with in terms of whether they are located in Hong

10    2  Kong or the United States?

10    3  A.   That's coordinated --

10    4  Q.   When you talk to Hughes --

10    5  A.   Hughes --

10    6          **THE COURT:**  Wait a second.  If the witness can let

10    7  him finish the question before you start answering him and then

10    8  Mr. Neuman will be sure to let you finish your answer before he

10    9  asks another question.

10   10          **THE WITNESS:**  I'm sorry, Your Honor.

10   11          **THE COURT:**  That's all right.

10   12  **BY MR. NEUMAN:**

10   13  Q.   Let me rephrase.  When Willowood Limited makes these

10   14  arrangements with a third-party contractor like Hughes, where

10   15  are they making those arrangements?

10   16  A.   In the mainland China office.

10   17  Q.   And when these products arrive in the United States, do

10   18  they have to clear customs?

10   19  A.   Yes, they do.

10   20  Q.   Who handles the customs when azoxystrobin technical

10   21  arrives in the US?

10   22  A.   One of my team.

10   23  Q.   I'm sorry.

10   24  A.   One of my team members.

10   25  Q.   Willowood USA?

```
10     1   A.    Yeah.  I have two production planners.  One of the two
10     2   production planners would clear customs and also clear EPA.
10     3   Q.    Who pays the third-party contractor who makes the actual
10     4   logistical arrangements for the transportation of the goods out
10     5   of Hong Kong?
10     6   A.    Initially, the mainland China office, but we reimburse for
10     7   the freight.  It's part of the agreement.
10     8   Q.    The mainland China office of whom?
10     9   A.    It's called Willowood China, I believe.  It would be part
10    10   of Willowood Limited's team.
10    11   Q.    You say they make the initial payment to the third-party
10    12   contractor?
10    13   A.    They make the payment to the third-party contractor.  Then
10    14   Willowood USA reimburses them for the freight.
10    15   Q.    Who -- as between Willowood Limited and Willowood USA, who
10    16   deals with the Environmental Protection Agency concerning any
10    17   regulatory- or registration-related matters that might arise
10    18   with respect to azoxystrobin that is shipped into the United
10    19   States?
10    20   A.    Solely Willowood USA.
10    21   Q.    Who makes the arrangements with formulators of end-use
10    22   products and laboratories once the product is in the United
10    23   States for testing and formulation work?
10    24   A.    Willowood.
10    25          MR. NEUMAN:  May I approach?
```

```
10    1              THE COURT:  Yes.
10    2              MR. NEUMAN:  (Inaudible.)
10    3              THE COURT:  I'm sorry.  Say again.
10    4              MR. NEUMAN:  Defendant's 16.
10    5    BY MR. NEUMAN:
10    6    Q.   Mr. Heinze, you've been handed what's been marked as
10    7    Defendant's Exhibit 16 for identification.  Do you recognize
10    8    it?
10    9    A.   I do.
10   10    Q.   What is it?
10   11    A.   It appears to be a bill of lading for a shipment of
10   12    azoxystrobin technical.
10   13    Q.   Is this type of document typically issued with respect to
10   14    shipments of azoxystrobin technical into the United States that
10   15    Willowood USA purchases from Willowood Limited?
10   16    A.   Yes, it is.
10   17    Q.   Is it typical of the type of bill of lading that was
10   18    issued in 2014?
10   19    A.   Yes, it is.
10   20              MR. NEUMAN:  Move to admit Defendant's 15 -- 16, I
10   21    beg your pardon.
10   22              THE COURT:  It'll be admitted.
10   23              MR. NEUMAN:  Will you please put up Defendant's 16.
10   24    BY MR. NEUMAN:
10   25    Q.   Mr. Heinze, does this -- who issues this bill of lading?
```

```
10    1  A.    Willowood Limited.
10    2  Q.    And does it reflect -- does this bill of lading reflect
10    3  the third party contractor that you were talking about earlier?
10    4  A.    This particular bill of lading reflects T.H. Mason
10    5  Logistics, so another freight forwarding company.
10    6  Q.    It's another -- is that another third party contractor
10    7  whom you use, whom Willowood Limited uses?
10    8  A.    Yes, it is.
10    9  Q.    Let's talk about the events -- thank you.  You can take
10   10  that down.
10   11       Let's talk about the events in mid-2013 concerning the
10   12  importation of 5 kilograms of azoxystrobin technical for
10   13  formulation work chemical testing.
10   14           THE COURT:  Keep your voice up, Mr. Neuman.
10   15  BY MR. NEUMAN:
10   16  Q.    Let's talk about the events in mid-2013 concerning the
10   17  importation of 5 kilograms of azoxystrobin technical for
10   18  purposes of formulation, development and chemical testing.
10   19       Now, do you recall your testimony yesterday that when the
10   20  5 kilogram sample was imported into the United States in 2013,
10   21  you were aware that the importation may infringe Syngenta's
10   22  compound patents?
10   23  A.    Yes.
10   24  Q.    Could you explain further what your awareness was.
10   25  A.    We had a basic understanding that there could be some
```

patents still in place on azoxystrobin, but at that point did
not have a Freedom to Operate Opinion from our patent attorney.
Q.   At some point after the material was imported, that
5 kilograms was imported, did you realize that there may have
been an infringement?
A.   I did.
Q.   When was that in relation to the importation?
A.   Shortly after, within a week or two.
Q.   What did you do when you realized that you had done that?
A.   I immediately contacted our patent attorney, Mr. Chris
Hayden.
Q.   And, at that point, why didn't you just stop the activity?
A.   Well, after discussing with Mr. Hayden, he indicated that
I had made a significant mistake and that the damage was done,
the physical act of importation, if in fact infringed, would be
infringement and packaging it up and shipping the 5 kilograms
out of the country would not change a thing.
Q.   Now, is it your belief that by importing the 5 kilograms
to do the formulation and testing in the United States, that
that enabled Willowood to obtain azoxystrobin registrations and
get into the market quicker than it otherwise could have?
A.   Not at all.
Q.   And why is that?
A.   Because the testing could have been done overseas, the
same testing.

1   Q.   Does Willowood have relationships with laboratories and

2   formulators like Adjuvants Unlimited and ARC Laboratories that

3   operate overseas?

4   A.   Absolutely.

5   Q.   Has it used those laboratories and formulators for

6   formulation work and chemical testing for other compounds

7   overseas in the past?

8   A.   We have.

9   Q.   Is there any reason why you could not have done that

10   formulation work and chemical testing overseas with respect to

11   this particular 5 kilograms of azoxystrobin technical?

12   A.   No, there is not. Quite frankly, it was gross negligence

13   on my behalf, and I don't know that we'd be sitting here today

14   if I had thought through that clearly.

15   Q.   Now you retained Mr. Hayden in 2013?

16   A.   We did.

17   Q.   He's a patent attorney?

18   A.   Yes, he is.

19   Q.   Why did you hire him?

20   A.   Because we respect the intellectual property of others

21   very much so, and we want to avoid situations like this. We

22   checked initially, we double-checked, we triple checked. We

23   respect the intellectual property of others, and especially

24   when you were looking to develop products that are just

25   approaching or have been in a post-patent environment, we want

1  to make absolutely sure that we're not violating anybody else's

2  intellectual property rights.

3  Q.   And how did you become aware of Mr. Hayden?

4  A.   Through one of our regulatory consultants, Jim Wagner.

5  Q.   And prior to hiring Mr. Hayden, did you -- was he the only

6  person you interviewed for that task?

7  A.   We had worked with one other gentleman that was in the

8  process of retiring.  He did some work for us, intellectual

9  property work for us, but once we met Mr. Hayden, we

10 transitioned all of our patent work to his firm, Hayden Stone.

11 Q.   And what made you decide to go with Mr. Hayden?

12 A.   Mr. Hayden is a Ph.D. chemist.  He's a bright, articulate

13 man that went back to law school.  He worked for the patent

14 office, and we felt his credentials were exactly what we were

15 looking for.

16 Q.   And in 2013, did he provide you with an opinion concerning

17 Syngenta's azoxystrobin -- any of Syngenta's azoxystrobin

18 patents?

19 A.   Yes, he did.

20          **MR. NEUMAN:**  May I approach?

21          **THE COURT:**  You may.

22          **MR. LEVINE:**  Your Honor, may we have a sidebar?

23          **THE COURT:**  Okay.

24          (Bench conference as follows:)

25          **THE COURT:**  Get very close.

          MR. LEVINE:  They're not relying on the 2013 opinion
for -- to defend against allegations of wilfulness.  They're
only relying on Mr. Hayden's July 2014 and September 2014
opinions.
          MR. NEUMAN:  This is all about showing lack of
wilfulness and their desire from the outset to get things
right, right from the get-go.
          THE COURT:  Okay.  Well, I don't understand why
that's not relevant.
          MR. LEVINE:  Because they're not relying upon the
July 13 opinion to defend against the allegations of wilfulness
for the compound patents.
          MR. NEUMAN:  I don't understand that.
          MR. COUGHLIN:  The local rules require you to
disclose that, and there's a whole different process for that
opinion.
          THE COURT:  I don't --
          MR. NEUMAN:  They have this -- they have the opinion.
I don't understand.
          MR. LEVINE:  We can argue that.
          THE COURT:  Okay.  Well, I'm going to let you go
ahead.
          (Bench conference concluded.)
          THE COURT:  Go ahead.
          MR. NEUMAN:  May I approach the witness?

```
10    1              THE COURT:  You may.  What's the exhibit number?
10    2              MR. NEUMAN:  It is Defendant's 53.
10    3   BY MR. NEUMAN:
10    4   Q.   Mr. Heinze, you've been handed Defendant's 53 for
10    5   identification.  Do you recognize the document?
10    6   A.   I do.
10    7   Q.   What is it?
10    8   A.   It's the Freedom to Operate Opinion for azoxystrobin from
10    9   Chris Hayden.
10   10   Q.   What's the date?
10   11   A.   July 25th, 2013.
10   12              MR. NEUMAN:  Move to admit Defendant's 53.
10   13              THE COURT:  Subject to your objection?
10   14              MR. LEVINE:  Yes.
10   15              THE COURT:  Yes, okay.  Overruled.  It'll be
10   16   admitted.
10   17              MR. NEUMAN:  Permission to publish?
10   18              THE COURT:  I'm sorry?
10   19              MR. NEUMAN:  I'm sorry, permission to publish?
10   20              THE COURT:  Yes.
10   21   BY MR. NEUMAN:
10   22   Q.   Now, if you could go down, please, to page 4 of the
10   23   document and specifically --
10   24              THE COURT:  I'm sorry, what?
10   25              MR. NEUMAN:  I'm sorry, it's a little fuzzy on the
```

10    1   screen -- and specifically paragraph 11A.  Thank you.

10    2   **BY MR. NEUMAN:**

10    3   Q.  IIA, Roman Numeral IIA.  What is Mr. Hayden discussing

10    4   here?

10    5   A.  The claims associated with, for short, the patent '138.

10    6   Q.  Now, are you a chemist?

10    7   A.  I am not.

10    8   Q.  Do you understand the chemistry he's talking about here?

10    9   A.  No.

10   10   Q.  In July 2013, when Mr. Hayden issues this opinion, are you

10   11   focusing on the details of the opinion?

10   12   A.  I am not.

10   13   Q.  This is around the same time, as we saw yesterday, that

10   14   Pyxis, your consultant, is finalizing and submitting the

10   15   application to EPA for an azoxystrobin technical registration.

10   16   Do you recall that?

10   17   A.  I do.

10   18   Q.  Did you read the application submitted to -- by Pyxis to

10   19   the EPA for the azoxystrobin technical registration?

10   20   A.  I did not.  We employ the services of professionals and

10   21   trust that they are completing everything in compliance with

10   22   EPA regulations and handle the submissions on our behalf.

10   23         **MR. NEUMAN:**  You can take the exhibit down now,

10   24   Chris.  Thank you.

10   25   **BY MR. NEUMAN:**

1 Q.   So is it -- does Willowood USA typically review the

2 application packages submitted by Pyxis or its other

3 consultants before they're submitted to EPA?

4 A.   No.

5 Q.   Do you recall yesterday you were shown by Mr. Levine where

6 in Pyxis's application it said that Tai He carries out the

7 etherification step?

8 A.   I do.

9 Q.   Do you know why the application said that?

10 A.   I don't.

11 Q.   Now, yesterday when Mr. Levine showed you that application

12 and asked if -- asked you to read where it said Tai He performs

13 the etherification step, and you read it, do you remember you

14 wanted to say something else and Mr. Levine --

15          **THE COURT:**  Okay.  Just ask your question.

16 **BY MR. NEUMAN:**

17 Q.   Do you recall that you wanted to say something else?

18 A.   I do.

19 Q.   What was it that you wanted to say?

20 A.   That once we had learned of the discrepancy, the

21 manufacturing procedure was changed and EPA was notified of

22 such change.

23 Q.   And what was the change that was made to EPA, that EPA was

24 notified of?

25 A.   That once we learned that it indicated that Tai He carried

1  out both etherification and condensation, which was incorrect,

2  we had SSJ, our general manager of the mainland China office,

3  revisit the factory of Tai He.  And Mr. Wu, who owns the

4  factory, reconfirmed that he only carries out the condensation

5  step, that he buys an intermediate up through the

6  etherification step from another company, Guosheng.

7       And once we learned of that, we notified the EPA

8  voluntarily that we -- self-policing and being good stewards of

9  our own industry, made a notification to the change of the

10  manufacturing, who handled what in the production of -- who

11  handled what within the azoxystrobin manufacturing process.

12  Q.   Did Tai He ever provide Willowood with a written process

13  description?

14  A.   They did.

15  Q.   After Mr. Hayden provided his July 2013 opinion, did you

16  seek any further opinions from him concerning the azoxystrobin

17  patents?

18  A.   We did.

19  Q.   Did you ask him for further guidance on that issue in

20  2014?

21  A.   We did.

22            **MR. NEUMAN:**  May I approach?

23            **THE COURT:**  You may.

24            **MR. NEUMAN:**  Defendant's Exhibit 10.

25            **THE COURT:**  And if you'd say it loud enough for me to

```
10      1  hear, too.
10      2          MR. NEUMAN:  I'm sorry, Your Honor.
10      3          THE COURT:  That's all right.
10      4  BY MR. NEUMAN:
10      5  Q.   Mr. Heinze, you've been handed what's been marked as
10      6  Defendant's Exhibit 10 for identification.  Do you recognize
10      7  this document?
10      8  A.   I do.
10      9  Q.   What is it?
10     10  A.   It's another Freedom to Operate Opinion from Mr. Hayden to
10     11  Willowood USA.
10     12  Q.   What's the date?
10     13  A.   July 18, 2014.
10     14  Q.   And did you request Mr. Hayden to give you this opinion in
10     15  or about that time frame?
10     16  A.   Yes, I did.
10     17          MR. NEUMAN:  Move to admit Defendant's Exhibit 10?
10     18          MR. LEVINE:  No objection, Your Honor.
10     19          THE COURT:  It'll be admitted.
10     20  BY MR. NEUMAN:
10     21  Q.   Now, Mr. Heinze, if you had already obtained an opinion
10     22  from Mr. Hayden in 2013, at about the time the application was
10     23  submitted to EPA, why were you asking him for another opinion
10     24  in 2014?
10     25  A.   We were about to begin the importation process of
```

1  azoxystrobin technical from China to the US; and, again,

2  respecting the intellectual property of others, we absolutely

3  wanted to make sure that we were in compliance and not

4  violating any of the Syngenta patents and hence why we asked

5  for a confirmatory Freedom to Operate Opinion.

6          **THE COURT:**  You were about to import it for the

7  manufacturing of the end product?  Is that --

8          **THE WITNESS:**  Yes, Your Honor.

9          **THE COURT:**  Go ahead.

10          **MR. NEUMAN:**  Could you please put Exhibit 10 on the

11  screen, and if you scroll down to the second page of the

12  exhibit, please.

13  **BY MR. NEUMAN:**

14  Q.    Is there a discussion there, again, by Mr. Hayden of the

15  '138 patent?

16  A.    Yes, there is.

17  Q.    Now, in addition to obtaining this opinion, second opinion

18  from Mr. Hayden in 2014, in that time frame, did Willowood take

19  any other steps to try and insure that it was not infringing on

20  Syngenta's azoxystrobin patents?

21  A.    Can you please repeat the question.

22  Q.    Yes.  In -- about the same time frame, in the spring of

23  2014, did Willowood do anything else to try and reassure itself

24  that it was not infringing?

25  A.    Yes, we did.

10    1    Q.    What did you do?

10    2    A.    We again sent SSJ, our general manager from the mainland

10    3    China office, to Tai He's factory to confirm again that Tai He

10    4    was only carrying out the condensation step and that they were

10    5    purchasing an intermediate up through the etherification step

10    6    from a third party in an arm's length transaction.

10    7    Q.    I'd like you to look at the binder that Mr. Levine gave

10    8    you yesterday and take a look at Plaintiff's 31, which is in

10    9    evidence.

10    10    A.    Okay.  I have it in front of me.

10    11    Q.    So if we look at the bottom half of the page, there's an

10    12    e-mail there from SSJ to you dated May 30, 2014, that you

10    13    looked at yesterday with Mr. Levine.  Do you recall that?

10    14    A.    I do.

10    15    Q.    And in that e-mail, SSJ is reporting on -- summarizing

10    16    what he found in the field when he went to the plants?

10    17    A.    That is correct.

10    18    Q.    So when you saw this e-mail, what did you think?

10    19    A.    I believed that we were doing things correctly and that

10    20    this confirmed SSJ's visit.  He took pictures of the various

10    21    factories carrying out the various steps of the production of

10    22    intermediates that ultimately led to -- and that we were not

10    23    violating any of the Syngenta patents.

10    24    Q.    And did you send this along to Mr. Hayden?

10    25    A.    I did.

| | |
|---|---|
| 10 | 1 |
| 10 | 2 |
| 10 | 3 |
| 10 | 4 |
| 10 | 5 |
| 10 | 6 |
| 10 | 7 |
| 10 | 8 |
| 10 | 9 |
| 10 | 10 |
| 10 | 11 |
| 10 | 12 |
| 10 | 13 |
| 10 | 14 |
| 10 | 15 |
| 10 | 16 |
| 10 | 17 |
| 10 | 18 |
| 10 | 19 |
| 10 | 20 |
| 10 | 21 |
| 10 | 22 |
| 10 | 23 |
| 10 | 24 |
| 10 | 25 |

**MR. NEUMAN:**  May I approach?

**THE COURT:**  Yes.  With Defendant's what?

**MR. NEUMAN:**  Defendant's 9.

**BY MR. NEUMAN:**

Q.   You've been handed what has been marked as Defendant's 9

for identification.  Do you recognize the document?

A.   I do.

Q.   And what does it consist of?

A.   The last piece is an e-mail from myself to Chris Hayden

with a copy to Vijay Mundhra.

Q.   And I'd like you to turn, please, to the second page of

this document, which is Willowood 26328?

**MR. NEUMAN:**  Could you pull that up, please.

This document is already in evidence.

**THE COURT:**  Defendant's 9?  I don't know.  Is it?

**MR. NEUMAN:**  I beg your pardon.  I move to admit.

**MR. LEVINE:**  No objection.

**THE COURT:**  It will be admitted.

**THE COURT:**  And the page number I think the Court

reporter needed you to repeat.

**MR. NEUMAN:**  Willowood 26328.

**BY MR. NEUMAN:**

Q.   Do you see in the middle of this page -- is that an e-mail

that you sent Chris Hayden on May 30, 2014?

A.   I do.

1  Q.   And in that e-mail, you were forwarding SSJ's report from
2  the field to Mr. Hayden?
3  A.   I do.
4  Q.   And if you'd please look at the second sentence of your
5  e-mail, this should -- could you pull that up, please, Chris.
6       Do you see where you said, "This should give us the
7  confidence that we are not in violation of either one of the
8  two Syngenta patents"?  Do you see that?
9  A.   I do.
10 Q.   And when you say "this should give us the confidence,"
11 what are you referring to there?
12 A.   Well, the fact that we had gone to the extent to send SSJ
13 back to the factory to understand who carried out what steps in
14 the manufacture of azoxystrobin technical, and he came back
15 with -- that it was broke up with various factories, that I
16 felt we were not in violation of any of the Syngenta's
17 azoxystrobin patents, and forwarded that to our patent
18 attorney, Chris Hayden.
19 Q.   So at this time what was your understanding as to whether
20 or not Willowood was infringing any Syngenta patents pertaining
21 to azoxystrobin?
22 A.   As I just stated, I felt that we were not in violation of
23 any of the Syngenta patents.
24             **MR. NEUMAN:**  May I approach?
25             **THE COURT:**  You may.

10    1             **MR. NEUMAN:**  Defendant's 11.

10    2   **BY MR. NEUMAN:**

10    3   Q.   Mr. Heinze, you've been handed what's been marked for

10    4   identification as Defendant's Exhibit 11.  Do you have that in

10    5   front of you?

10    6   A.   Yes, I do.

10    7   Q.   What does the document consist of?

10    8   A.   It's an e-mail from Chris Hayden to myself and Peter

10    9   Davis, one of our attorneys here in the room today.

10   10   Q.   And would you look, please, at 26 -- Bates stamp 26241.

10   11   A.   Where would I --

10   12   Q.   It's the next to the last page of the document.

10   13   A.   Okay.

10   14   Q.   I'm sorry.  It's not the next to the last page.  The

10   15   fourth page of the document.

10   16   A.   I have it open.

10   17   Q.   Do you recognize what this is?

10   18   A.   It's part of Mr. Hayden's opinion, I believe.

10   19   Q.   What's the date?

10   20   A.   March 30th, 2015.

10   21             **MR. NEUMAN:**  Your Honor, move to admit Defendant's

10   22   11.

10   23             **MR. LEVINE:**  No objection.

10   24             **THE COURT:**  It will be admitted.

10   25             **MR. NEUMAN:**  Could you put this exhibit up on the

10  1  screen, please, Defendant's 11.

10  2  **BY MR. NEUMAN:**

10  3  Q.   Specifically, I would like -- if you could, please, go to

10  4  page 26241.

10  5       Now, this is an opinion from Mr. Hayden dated March 30,

10  6  2015, correct?

10  7            **THE COURT:**  It's really blurry on my screen.  Can you

10  8  all see it okay?  No.  Go ahead.

10  9  **BY MR. NEUMAN:**

10  10 Q.   This is an opinion issued by Mr. Hayden in March -- on

10  11 March 30, 2015, concerning the Syngenta patents, a reproduction

10  12 of that opinion?

10  13 A.   Yes, it is.  Yes, it is.

10  14 Q.   Now, did you ask Mr. Hayden for another opinion on these

10  15 patents in March of 2015?

10  16 A.   We did.

10  17 Q.   Why did you do that when you had an opinion in 2013 and an

10  18 opinion in 2014?

10  19 A.   Because this was -- Syngenta had filed suit against

10  20 Willowood USA, and, again, we wanted to make absolutely sure

10  21 that we were not in violation of any of their patents.

10  22 Q.   And if we go, please, to page 26238 and 239 of this

10  23 document.

10  24            **THE COURT:**  Which page?

10  25            **MR. NEUMAN:**  26238 and 26239.

| | |
|---|---|
| 10 | 1 |

**BY MR. NEUMAN:**

Q.   Do you have that in front of you?

          **THE COURT:**   Which page are you asking him about, 38

or 39?

          **MR. NEUMAN:**   26238.

          **THE COURT:**   Carrying over into 39?

          **MR. NEUMAN:**   Yes.

          **THE COURT:**   All right.

**BY MR. NEUMAN:**

Q.   Is this an e-mail that you sent to Chris Hayden?

A.   Yes, it is.

Q.   And do you see at the top of 26239, you say, "Here is the

reconfirmation" -- will you pull that up, please -- "on the

azoxystrobin manufacturing process"?  Do you see that?

A.   I do.

Q.   That's what you were telling Mr. Hayden on April 1st,

2015?

A.   I don't see the date here, but I assume that's correct.

Q.   It's at the bottom of the previous page.

A.   Yes.

Q.   What do you mean -- and you were forwarding at this

point -- what were you forwarding to Mr. Hayden?

A.   Can we enlarge the e-mail below that?

          **THE COURT:**   Below that, the chemistry part?

          **THE WITNESS:**   Yes, ma'am.  I forwarded the e-mail to

Chris Hayden.  This came to me from Sophia, who's an

administrative assistant in the Mainland China Willowood

office.

**BY MR. NEUMAN:**

Q.   And you say -- if you go back up to your e-mail, you say

to him, "Here is the reconfirmation on the azoxystrobin

manufacturing process."  Do you see that?

A.   I do.

Q.   And this was on April 1st, 2015, right after the lawsuit

was filed?

A.   That is correct.

Q.   What do you mean by "here is the reconfirmation"?

A.   Well, again, we very strictly adhered to respecting other

people's intellectual properties.  The fact that we had now

been sued, we wanted to make absolute sure that we were not in

violation of any of these patents.  So I had sought SSJ to

obtain this information.  Sophia obtained it and forwarded it

to us, and I forwarded that on to Chris Hayden.

Q.   So at this point what's your understanding as to whether

Willowood is infringing the '138 patent?

A.   We've never felt, outside of the importation of the 5kgs

of product, that we've infringed upon any Syngenta patents.

Q.   And then what does Chris Hayden say in response at the top

of the document?  What does he say in the first sentence to

Mr. Davis?

1  A.   He says, "Peter, we may have an issue."

2  Q.   And was there then further discussion concerning the

3  possible infringement of Syngenta's azoxystrobin patents with

4  Mr. Hayden?

5  A.   Yeah.  He goes on to a pretty lengthy discussion of

6  chemistry that's way beyond my knowledge level.

7          MR. NEUMAN:  May I approach?

8          THE COURT:  Yes.

9          MR. NEUMAN:  Defendant's 13.

10  BY MR. NEUMAN:

11  Q.   You have been handed Defendant's 13 for identification.

12  Do you recognize this document?

13  A.   I do.

14  Q.   What does it consist of?

15  A.   It's an e-mail, again, from Chris Hayden to myself and

16  Peter Davis.  It indicates, "Peter, here is a follow-up e-mail.

17  Brian, we need to have a conference call, Chris."

18  Q.   Do you recognize the other e-mails on this page as having

19  been sent or received by you on the dates indicated?

20  A.   I do.

21          MR. NEUMAN:  Move to admit Defendant's 13.

22          MR. LEVINE:  No objection.

23          THE COURT:  It will be admitted.

24          I missed the date or time frame.

25          MR. NEUMAN:  April 2nd, 2015 -- April 1st and 2nd,

10    1  2015.

10    2            **THE COURT:**  Go ahead.

10    3  **BY MR. NEUMAN:**

10    4  Q.  If you'd look, please, at the first page of this document.

10    5  Do you see this is -- on April 2nd, 2015, this is an e-mail

10    6  that you sent Mr. Hayden at 11:43 a.m.?

10    7  A.  I do.

10    8  Q.  And do you see where you say, "I think this is the missing

10    9  piece you have been looking for"?

10  10  A.  I do.

10  11            **MR. NEUMAN:**  Could you pull that up, please?

10  12  **BY MR. NEUMAN:**

10  13  Q.  Now, what did you -- what were you referring to when you

10  14  said this is the missing piece that he's been looking for?

10  15  A.  Well, Mr. Hayden is our expert in this area, as a Ph.D.

10  16  chemist and an attorney, and I was fully relying upon his

10  17  freedom to operate opinion for us to make sure that we were not

10  18  violating any of Syngenta's patents, and he had asked for

10  19  additional information to the manufacturing process of

10  20  azoxystrobin.  I had requested that through our Mainland China

10  21  office from Tai He, and this appears to be I'm forwarding

10  22  additional information on the manufacturing of azoxystrobin to

10  23  Mr. Hayden.

10  24  Q.  What did you mean by the missing piece?

10  25  A.  I think he needed some clarification on who was carrying

10    1    out what steps and this, I believe, addresses that, and so I
10    2    was obtaining information through our Mainland China office
10    3    that he had sought.
10    4    Q.    So as of this date, after you received this additional
10    5    information that you are transmitting to Mr. Hayden, as of
10    6    April 2nd, 2015, what's your understanding as to whether or not
10    7    Willowood is infringing the Syngenta azoxystrobin patents?
10    8    A.    At this point, I felt that we were not infringing any of
10    9    Syngenta's patents.
10    10   Q.    Do you see at the very top of the first page of this
10    11   document Mr. Hayden's response?
10    12   A.    I do.
10    13   Q.    Do you see where he says, "Brian, we need to conference
10    14   call"?
10    15   A.    Yes, I do.
10    16   Q.    Did you have a subsequent conversation with Mr. Hayden?
10    17   A.    Yes, I did.
10    18   Q.    What was the upshot of that conversation?
10    19   A.    He was very concerned.  The information that Sophia had
10    20   provided did not clearly spell out who carried out
10    21   etherification and who carried out condensation, and he wanted
10    22   to discuss that with Peter Davis and myself.
10    23   Q.    And as a result of your conversations with Mr. Hayden, did
10    24   you do anything further to investigate whether or not
10    25   Willowood's manufacturing process that was being carried out by

10    1  Tai He infringed Syngenta's patents?

10    2  A.    Yes, I did.

10    3  Q.    And what was done?

10    4  A.    I immediately contacted Mr. Mundhra.  I expressed my

10    5  concern.  He assured me that he would address this personally

10    6  and not leave it even to our general manager out of our

10    7  Mainland China office.  He flew from Hong Kong to Shanghai, met

10    8  with SSJ, and physically visited the factories himself.

10    9  Q.    Now, between the time that Willowood filed its

10   10  application -- thank you.  You can take this down -- that

10   11  Willowood filed its application with the EPA in July 2013 and

10   12  the spring of 2015, did you and other Willowood representatives

10   13  ever meet with principals of Tai He?

10   14  A.    Yes, they did.  Just myself.

10   15  Q.    Whom did you meet with?

10   16  A.    Mr. Wu, the owner of Tai He.

10   17  Q.    Now, do you speak Chinese?

10   18  A.    I do not.

10   19  Q.    Mandarin?

10   20  A.    No.

10   21  Q.    Does Mr. Wu speak English?

10   22  A.    No.

10   23  Q.    So who else was with you?

10   24  A.    Vijay and SSJ.

10   25  Q.    And on any of those occasions, did you ever ask Mr. Wu

10    1  what steps he would carry out?

10    2  A.    Absolutely.

10    3  Q.    How many times?

10    4  A.    Multiple.  I traveled to China twice a year, March and

10    5  October, and I had that conversation with him initially,

10    6  confirmatory in '14 and again in '15.

10    7  Q.    What did he tell you?

10    8  A.    He only carries out the condensation step.

10    9  Q.    Did you ever feel the need to instruct Mr. Wu or anyone

10   10  else at Tai He how to make azoxystrobin?

10   11  A.    No.

10   12  Q.    Why not?

10   13  A.    They were already making it.  What could I tell them?

10   14  Q.    Had they been making azoxystrobin for others to your

10   15  knowledge before you approached Tai He?

10   16  A.    Yes, they had, for both the domestic Chinese market as

10   17  well as export markets.

10   18  Q.    Now, I asked you earlier whether Tai He ever provided

10   19  Willowood with a written process description.  Did they?

10   20  A.    Yes, they did.

10   21            MR. NEUMAN:  May I approach?

10   22            THE COURT:  You may.

10   23            MR. NEUMAN:  Defendant's 17.

10   24  BY MR. NEUMAN:

10   25  Q.    You've been handed Defendant's 17 for identification,

10  1  Mr. Heinze.  Do you recognize this document?

10  2  A.    Yes, I do.

10  3  Q.    What is it?

10  4  A.    It's the manufacturing process of azoxystrobin by

10  5  Yangeheng at Tai He, Mr. Wu's company.

10  6  Q.    And who provided that -- what entity provided that to

10  7  Willowood?

10  8  A.    Tai He.

10  9          **MR. NEUMAN:**  Move for admission of Defendant's 17.

10  10         **MR. LEVINE:**  Objection.  Hearsay, foundation, and

10  11 also authenticity.

10  12         **THE COURT:**  Overruled.  It will be admitted.

10  13         **MR. NEUMAN:**  Permission to publish?

10  14         **THE COURT:**  You may.

10  15 **BY MR. NEUMAN:**

10  16 Q.    Let's go down to the next page on this document, please,

10  17 third page.  Okay.  Stop right there, please.

10  18     In the bottom half of this page, if you could pull up --

10  19 see where it says "etherification"?

10  20 A.    I do.

10  21 Q.    That's the beginning of the discussion of the

10  22 etherification step.  Could you scroll down to the next page,

10  23 please.  And at the bottom of the chemical symbols, right

10  24 there, could you pull up that text?

10  25     What does that say, Mr. Heinze?  What was Tai He saying in

```
10    1   this process description?
10    2   A.    Would you like me to read it?
10    3   Q.    Yes, please.
10    4   A.    "The above two-step was processing in the following
10    5   factory:  Lianyungang Jinyang Chemical Company Limited" and
10    6   then the address.
10    7   Q.    And the above two steps included etherification?
10    8   A.    Can you go back up to that, please?  Yes, it appears
10    9   chlorination and etherification, yes.
10   10   Q.    So that's not Tai He, right?
10   11   A.    It is not.
10   12   Q.    Thank you.  You can take that down.  Do you recall -- I'd
10   13   like to switch topics now, Mr. Heinze, talk about toll
10   14   manufacturing.
10   15            THE COURT:  About what?
10   16            MR. NEUMAN:  Toll manufacturing.
10   17            THE COURT:  Yeah.  Go ahead.
10   18   BY MR. NEUMAN:
10   19   Q.    Mr. Heinze, do you recall being questioned yesterday by
10   20   Mr. Levine concerning a toll manufacturer's slot at AgraForm?
10   21   A.    I do.
10   22   Q.    Do you remember telling Mr. Levine in response to his
10   23   question that that tolling slot in 2014 was in the summer of
10   24   2014, which was the slow season?
10   25   A.    I do.
```

10    1  Q.   So, Mr. Heinze, if Willowood USA had missed that

10    2  particular tolling slot at AgraForm that was scheduled for July

10    3  of 2014, what could Willowood have done?

10    4  A.   Rescheduled, slotted another time period.

10    5  Q.   For when?

10    6  A.   That would have been subject to their availability, but at

10    7  that time of year, they're not very busy.

10    8  Q.   Now, you were asked questions yesterday about Willowood's

10    9  end use product label for Quadris -- I beg your pardon -- for

10   10  azoxy 2SC, do you recall?

10   11  A.   I do.

10   12  Q.   And who wrote the labels for Willowood's azoxystrobin

10   13  products?

10   14  A.   Pyxis Regulatory Consulting.

10   15  Q.   Is that common practice --

10   16  A.   Yes.

10   17  Q.   -- for Willowood?

10   18  A.   Absolutely.

10   19  Q.   To have somebody else write the labels?

10   20  A.   Absolutely.

10   21  Q.   Does Willowood ever write its own product labels?

10   22  A.   No.

10   23  Q.   When you asked Pyxis to write the azoxystrobin end use

10   24  product labels for Willowood, did you give them a deadline?

10   25  A.   No.

1   Q.   Did you ever tell Pyxis to speed up the label writing

2   process, that it was going too slow?

3   A.   No.

4   Q.   Does Willowood play any role in drafting the labels?

5   A.   Not outside of providing the name, picking the color of

6   the front booklet label, no.

7   Q.   Do you or anyone at Willowood review any parts of the

8   labels drafted by Pyxis or other consultants before the

9   consultant submits the labels to EPA for approval?

10   A.   The only thing we double-check is the crops that are

11   listed on the label.  We always want the most comprehensive

12   label available to us, so we do double-check the crops that are

13   listed on the label.  But other than that, any of the text, we

14   do not review.  We leave that to our regulatory consultants.

15   Q.   You don't go over the labels with a fine-toothed comb to

16   inspect all of the language on the labels prepared by your

17   consultants?

18   A.   We do not.

19   Q.   When did Willowood become aware that the label that was

20   prepared by Pyxis in this case with the word "Syngenta" in one

21   place on that label contained the word "Syngenta" rather than

22   "Willowood"?

23   A.   I believe we were contacted by Syngenta.  I can't say

24   emphatically.

25   Q.   Do you recall roughly when that was, how soon after the

1 labels were submitted to EPA?

2 A.   I do not.

3 Q.   Once you learned that the label contained the word

4 "Syngenta" rather than "Willowood," did Willowood take any

5 steps?

6 A.   Absolutely.

7 Q.   What did you do?

8 A.   We immediately contacted Pyxis and asked them to correct

9 it and resubmit it to EPA.

10 Q.   So what was actually done to correct the label?  How does

11 that work?

12 A.   I contacted Mike Kellogg, who does all the labels for

13 Pyxis, and let him know that we were very concerned and that --

14 how an oversight like this could occur.  And he was very

15 apologetic, made the correction, and resubmitted it to EPA for

16 approval.

17         **MR. NEUMAN:**  This might be a good time for a break,

18 obviously at the Court's discretion.

19         **THE COURT:**  All right.  We'll stop here for the

20 morning recess then.  Ladies and gentlemen, I'll excuse you for

21 15 minutes.  Please remember not to talk about the case among

22 yourselves or with anyone else, or don't have any contact with

23 anyone.  If you do step outside the courthouse, be sure you're

24 back in 15 minutes.

25         All right.  The jury is excused for a 15-minute

```
10      1   break.  If everyone will remain seated while they step out.
10      2              (Jury excused.)
10      3              THE COURT:  You can step down.  All right.  How much
10      4   longer do you think you'll be with this witness?
10      5              MR. NEUMAN:  Fifteen minutes.  Less than a half an
10      6   hour.
10      7              THE COURT:  All right.  I think almost all of it has
10      8   been -- has been related to things covered in direct, I think.
10      9   So is that what you're -- are you intending to cover everything
10     10   with him?
10     11              MR. NEUMAN:  Most of the remainder of my examination
10     12   does -- is directly within the scope of his direct.  Some of it
10     13   is not, and -- I think all of it is, actually, and we'll see
10     14   what they say.
10     15              THE COURT:  All right.  Well, I mean, I'm usually --
10     16   if it's just a few questions, usually, it's okay, I think, to
10     17   go ahead and cover it while the witness is on the stand.  If
10     18   it's going to be a lot, in fairness to Syngenta's timing
10     19   issues, you know, I'd ask you to do it later.  But if it's just
10     20   a few questions, that's okay.
10     21              MR. NEUMAN:  Understood.
10     22              THE COURT:  All right?  Anything else we need to take
10     23   up before we take our morning recess?  No?  All right.  We'll
10     24   be in recess for 15 minutes.
10     25              (At 10:55 a.m., break taken.)
```

| | | |
|---|---|---|
| 10 | 1 | (At 11:10 a.m., break concluded.) |
| 11 | 2 | **THE COURT:** Anything we need to take up before the |
| 11 | 3 | jury comes in? |
| 11 | 4 | **MR. SANTHANAM:** Yes, Your Honor. A couple of |
| 11 | 5 | housekeeping matters that I thought we could resolve quickly |
| 11 | 6 | before the jury comes back in. |
| 11 | 7 | **THE COURT:** Give me one second. I'm sorry. |
| 11 | 8 | (Pause in the proceedings.) |
| 11 | 9 | **THE COURT:** Okay. Go ahead. Pardon me. |
| 11 | 10 | **MR. SANTHANAM:** Right after Mr. Heinze we plan to |
| 11 | 11 | play back the video deposition designations of Vijay Mundhra |
| 11 | 12 | and Shen Shaojun, SSJ; and as a part of those designations, |
| 11 | 13 | we've got exhibits that were part of depositions that we'd like |
| 11 | 14 | to show. There are some outstanding objections to those, |
| 11 | 15 | mostly relevance objections, so we would like to clear those |
| 11 | 16 | up. I believe we can do that pretty quickly, but -- if you |
| 11 | 17 | would like, for Vijay Mundhra I can list out the Plaintiff's |
| 11 | 18 | trial exhibits and we have binders prepared with those trial |
| 11 | 19 | exhibits. I would like to just resolve those objections now so |
| 11 | 20 | that we can play back the video when the jury gets in. |
| 11 | 21 | **THE COURT:** All right. Did we -- I hate to -- I |
| 11 | 22 | don't know how long this is going to take. I hate do it while |
| 11 | 23 | the jury is sitting there waiting. |
| 11 | 24 | **MR. SANTHANAM:** For Shen Shaojun, the exhibits, there |
| 11 | 25 | are no objections to them. |

| | |
|---|---|
| 11 | 1 |
| 11 | 2 |
| 11 | 3 |

 

1      **THE COURT:**  There are no?

2      **MR. SANTHANAM:**  There are no objections for SSJ's

3 exhibits, but for Vijay Mundhra, there are outstanding

4 relevance objections.  We would like to get those resolved.

5      **THE COURT:**  All right.  And --

6      **MR. TILLER:**  If you can just hand it to me real

7 quick.

8      We might be able to do this -- I just don't remember

9 what they are.  Give me two seconds.

10      **THE COURT:**  Sure.

11    (Pause in the proceedings.)

12      **THE COURT:**  So how are you going to show the exhibit

13 and the video deposition at the same time?

14      **MR. SANTHANAM:**  We are going to be able to show the

15 exhibit on the screen right next to the video.

16      **THE COURT:**  Like we're going to try to watch two

17 football games at the same time?

18      **MR. SANTHANAM:**  Well, to be honest, most video

19 depositions just have the same picture going so --

20      **THE COURT:**  Right.  Okay.

21      **MR. LEVINE:**  By the way, Your Honor, in one of the

22 video clippings there is a technical glitch, if you will, that

23 we can't technologywise eliminate it.

24      Do you want to explain it in greater detail?

25      **MR. SANTHANAM:**  Absolutely.  It's in the Vijay

Mundhra video where there are a couple of two- or three-second

segments that have feedback in them and so there is no way to

avoid it.

        **THE COURT:**  All right.  I'll try to tell the jury, if

I remember.

        **MR. TILLER:**  We'll withdraw.

        **THE COURT:**  You'll withdraw those as to Mr. Mundhra?

        **MR. TILLER:**  Yes.  We'll make it easy.

        **THE COURT:**  Good.  Thank you.

        We're ready then for the jury?

        **MR. LEVINE:**  Yes.

        **THE COURT:**  You can bring them in.

        (Jury panel is present.)

        **THE COURT:**  Good morning.  Ladies and gentlemen, I

forgot to say yesterday, and then I forgot again this morning,

we take these regular breaks:  One mid-morning, one

midafternoon; but if I am not taking a break when your morning

coffee starts talking to you, you know, just raise your hand

and let me know.  This is not an endurance contest, so if we

need to take an extra break or take the morning or afternoon

break a little early, that is not a problem.  And I apologize

for not making that clear to you earlier.

        I generally ask that you not bring anything into the

courtroom to drink because spills happen.  However, if any of

you have, like, an allergy or something going on that you need

11    1  that, just let Ms. Sanders know and we'll see if we can

11    2  accommodate that.

11    3          I believe we are ready.  We were still in

11    4  cross-examination.  So, Mr. Neuman, you may proceed.

11    5          **MR. NEUMAN:**  Thank you, Your Honor.

11    6  **BY MR. NEUMAN:**

11    7  Q.   Mr. Heinze, I would like to talk to you for a moment about

11    8  DABCO.  Did Willowood representatives ever discuss with Tai He

11    9  whether Tai He used DABCO in the manufacturing process?

11   10  A.   Yes, we did.

11   11  Q.   When was the first time that that issue was discussed, to

11   12  your recollection, between Willowood and Tai He?

11   13  A.   It would have been in 2013.

11   14  Q.   And on approximately how many occasions have you discussed

11   15  that issue with Tai He?

11   16  A.   Eight or more.

11   17  Q.   And what were those discussions?  What did you ask and

11   18  what did they say?

11   19  A.   We had asked Mr. Wu of Tai He if he used DABCO as part of

11   20  the condensation step in the manufacturing of azoxystrobin

11   21  technical and he indicated no and he said that the DABCO patent

11   22  was still in force in China and hence why he did not use DABCO.

11   23  Q.   On how many occasions between 2013 and 2015, after this

11   24  lawsuit was filed, would you say you had that conversation with

11   25  Mr. Wu?

11 1 A.   Each time I traveled to China, so it was twice a year.   So
11 2 I would say six or eight.
11 3 Q.   You testified earlier, in response to Mr. Levine's
11 4 questions, concerning testing done by JDM.  Do you recall that?
11 5 A.   I do.
11 6 Q.   And if I understood your response to Mr. Levine, your
11 7 initial understanding was that JDM had found DABCO in Tai He's
11 8 azoxystrobin?
11 9 A.   That is correct.
11 10 Q.   That was your initial understanding?
11 11 A.   That is correct.
11 12 Q.   Have you come to learn differently since that initial
11 13 understanding?
11 14 A.   Yes, I have.
11 15 Q.   What have you learned?
11 16 A.   That the call on the date needed a purchase for the
11 17 mass spectrometry, the work to be done -- again, I'm not a
11 18 chemist -- but, from my recollection, was never purchased.
11 19 They did do some testing, but none of the samples, whether they
11 20 were CAC and/or Tai He samples, showed the presence of any
11 21 DABCO.
11 22 Q.   I would like to turn to another topic now, Mr. Heinze, and
11 23 that is pricing decisions by Willowood.  Do you recall
11 24 yesterday during your examination by Mr. Levine you were shown
11 25 a number of e-mails back and forth between you and your

11  1  colleagues at Willowood expressing some disagreement about

11  2  pricing for azoxystrobin?  Do you recall?

11  3  A.   I do.

11  4  Q.   Your colleagues and you sometimes voice disagreements with

11  5  each other concerning the appropriate price at which

11  6  azoxystrobin should be set?

11  7  A.   We did.

11  8  Q.   Are those sorts of internal discussions and disagreements

11  9  common?

11  10 A.   Very common.

11  11 Q.   Now, ultimately, as you told Mr. Levine yesterday, you are

11  12 the decider in terms of -- ultimately the decider in terms of

11  13 the price to be charged for Willowood's azoxystrobin products?

11  14 A.   Ultimately, yes, I am.

11  15 Q.   How does Willowood generally -- how do you go about

11  16 determining where to set Willowood's price to charge customers

11  17 for azoxystrobin product?  What factors do you look at?

11  18 A.   We work with our distributors to obtain competitive

11  19 pricing -- current competitive pricing levels not only on the

11  20 brand, in this case Syngenta's Quadris, Abound and/or Quilt

11  21 Xcel; and as a generic equivalent, we typically target to be

11  22 somewhere between 5 and 10 percent below the brand, but that is

11  23 dictated sometimes -- you know, our greatest competitor is

11  24 other generic companies like ourselves and those are the

11  25 companies that we have to be competitive with our pricing.

11    1      So we -- again, we, through competitive intelligence with

11    2  our customers -- and I want to state that we're a for-profit

11    3  business.  We don't do this to intentionally lower the price of

11    4  products, but we certainly have to be competitive in the

11    5  marketplace, so we're sensitive to -- you know, the cost to

11    6  serve in our business is very high.  We have data compensation

11    7  obligations.  We have overheads.  We have legal to cover

11    8  matters like this.  We like to extract as much margin as we can

11    9  out of the marketplace as we possibly can, but we also have to

11    10  be competitive to drive our sales.

11    11  Q.    And Willowood first began importing azoxystrobin into the

11    12  United States for commercial sale in July 2014, correct?

11    13  A.    That is correct.

11    14  Q.    Its first sales of azoxystrobin commercially were in July

11    15  2014, is that right?

11    16  A.    That is correct.

11    17  Q.    What are the primary crops for which azoxystrobin is used?

11    18  A.    A very wide range of crops, but the highest percentage use

11    19  would be on corn, soybeans, rice, cereals, wheat, barley, oats.

11    20  Q.    When is the growing season for corn?

11    21  A.    Most corn is planted in mid-April and harvested in August,

11    22  September, October.

11    23  Q.    And when is the growing season for soybeans?

11    24  A.    Similar --

11    25  Q.    Now, when Willowood first --

```
11   1              THE COURT:  I'm sorry.  Did you finish your answer?
11   2              THE WITNESS:  Similar to that of corn.
11   3   BY MR. NEUMAN:
11   4   Q.   When Willowood first sold its azoxystrobin product in July
11   5   2014, to your knowledge, were any of those sales for corn?
11   6   A.   They were not.
11   7   Q.   What were they for?
11   8   A.   Predominantly rice in northern California.  The corn and
11   9   soybean market was already over or the majority of it was
11  10   over -- already over.
11  11   Q.   Now, you testified a moment ago that in setting prices
11  12   Willowood looks at the branded price and also any generic
11  13   competition that's out there.  When Willowood entered the
11  14   azoxystrobin market in the summer of 2014, were there any other
11  15   generics in the market selling azoxystrobin products?
11  16   A.   Yes, there were.
11  17   Q.   Who was that?
11  18   A.   Cheminova.
11  19   Q.   So when Willowood was deciding what price to set its
11  20   product -- what price to set for selling its azoxystrobin
11  21   products in the summer of 2014, whose pricing was it looking at
11  22   to be competitive in the marketplace?
11  23   A.   Primarily that of Cheminova.
11  24   Q.   And then in the fall of 2014, Willowood sold additional
11  25   azoxystrobin, right?
```

```
11    1   A.    Yes, we did.
11    2   Q.    At that time whose pricing was Willowood primarily looking
11    3   at in determining where to set its price?
11    4   A.    Also Cheminova.
11    5   Q.    And in the spring of 2015 when Willowood was selling
11    6   product, whose generic pricing was it looking at to set its
11    7   price?
11    8   A.    Again Cheminova and another generic competitor, Albaugh,
11    9   had also entered the market.
11   10   Q.    To your knowledge, did Willowood sell any azoxystrobin in
11   11   the summer of 2014 for purposes of the 2014 corn or soybean
11   12   growing season?
11   13   A.    We did not.  As I mentioned, that season had pretty well
11   14   concluded by the time we had received our registration and
11   15   imported and formulated product.
11   16   Q.    You testified -- I would like to switch topics for a
11   17   moment, if I may.  You testified earlier about the relative
11   18   roles of Willowood USA and Willowood Limited in the logistics
11   19   of shipments of azoxystrobin into the United States when
11   20   Willowood USA purchases azoxystrobin from Willowood Limited.  I
11   21   would like to ask you are the arrangements that you described
11   22   and the relevant roles that you described earlier the way it's
11   23   always done with regard to azoxystrobin imports?
11   24   A.    I'm sorry.  I'm not sure I understand the question.
11   25   Q.    Do you recall you testified about the relative roles, who
```

11    1    does what, in terms of the importation of product --

11    2    azoxystrobin product into the United States?  Is that the way

11    3    it's always done with respect to azoxystrobin?

11    4    A.    Yes, it is.

11    5    Q.    And were those -- the arrangements that you talked about

11    6    earlier and the relative roles, did that also apply to the

11    7    importation of the 5 kilograms of azoxystrobin in 2013?

11    8    A.    Yes.  Yes, it did.

11    9    Q.    You mentioned earlier, Mr. Heinze, that Willowood began by

11    10   selling herbicides and then moved -- began adding fungicides to

11    11   its portfolio.  Do you recall that?

11    12   A.    Yes, I do.

11    13   Q.    Now, in your experience, do the markets for fungicides

11    14   like azoxystrobin and herbicides like mesotrione differ in any

11    15   notable ways?

11    16   A.    Absolutely.

11    17   Q.    Could you explain what, in your experience, are the

11    18   differences?

11    19   A.    A product like mesotrione, which is a corn herbicide, is

11    20   applied prophylactically or preventative to a crop.  The first

11    21   thing a grower is going to determine is what crop am I going to

11    22   plant, and the first thing he needs to be concerned about is

11    23   not only the variety of seed that he needs to be planting, but

11    24   the weeds that need to be controlled.

11    25       The reason weeds need to be controlled is that they

1 compete for moisture and nutrients.  Fertilizer is very

2 expensive and you don't want weeds consuming your soil moisture

3 in -- particularly in the Midwest where there is no irrigation

4 and you are dependent upon rainfall for moisture for the crop.

5 So it's a very predictable use pattern.  Growers will almost

6 emphatically apply a pre-emergent or a post-emergent herbicide

7 to a crop.

8            Whereas, a fungicide or insecticide, depending upon

9 the growing conditions, commodity prices, things of that

10 nature, make a determination whether or not it is -- is disease

11 present, are insects present and make a determination if they

12 are going to spray or not spray.

13            So herbicides are very predictable.  Insecticides,

14 fungicides are not near as predictable.

15 Q.   In your experience selling products in the market, do

16 farmers prioritize between herbicides and fungicides?

17 A.   Absolutely.

18 Q.   How so?

19 A.   Again, they are going to control the weeds lock, stock,

20 and barrel.  It's the first thing that -- outside of planting

21 the crop, that has to be addressed is controlling weeds and

22 then your other inputs you take on an as-come basis.  Does

23 insect pressure present itself?  Yes, I need to spray an

24 insecticide.  Does disease present itself?  Yes, I need to

25 control disease in my crop.  So weeds are addressed

```
11    1   preventatively.  Fungicides and insecticides are addressed on
11    2   an as-need basis.
11    3   Q.   In your experience, do farmers' purchasing decisions
11    4   concerning fungicides and herbicides differ in terms of price
11    5   sensitivity?
11    6   A.   Absolutely.
11    7   Q.   Could you explain that to the jury?
11    8   A.   Yes.  I mean, you're going to spend the money for a
11    9   herbicide.  You absolutely have to control the weeds in your
11   10   crop or the -- as it was mentioned yesterday, weeds can overrun
11   11   a crop.  They literally can choke out and kill a crop and out
11   12   compete it, so you're going to spend the money on a herbicide
11   13   or multiple herbicides.
11   14        And then as far as fungicides and insecticides, you make
11   15   an economic determination whether or not you think that you're
11   16   going to get a yield enhancement benefit from controlling
11   17   disease and/or insects, so they're --
11   18   Q.   So -- I'm sorry.
11   19   A.   -- definitely independent of one another.
11   20   Q.   I'm sorry, I didn't mean to step on your answer.
11   21   A.   No problem.
11   22   Q.   So all of this being equal, if prices go up on herbicides
11   23   and fungicides, in your experience, are farmers more likely to
11   24   cut back on the purchase of one rather than the other?
11   25   A.   Yes.
```

1  Q.   Explain, please.

2  A.   They'd be more likely to cut back on a fungicide, because

3  it's not an absolute requirement, unless there's extreme

4  disease pressure, but you cannot afford not to control the

5  weeds in your crop.

6  Q.   And when times are tough for farmers, and they can't get

7  as much for their corn and wheat and other commodities, in your

8  experience in the market, does that have a bigger impact on

9  either their -- on purchasing either fungicides or herbicides?

10  A.   Absolutely.

11  Q.   How so?

12  A.   Again, a farmer -- an input you can't skip is a herbicide.

13  You have to have a herbicide to control your weeds.  Commodity

14  prices are low, you have disease pressure is low, you may very

15  well skip -- and insect pressure is low, you may very well skip

16  a fungicide and/or an insecticide application.

17  Q.   You mentioned earlier that Willowood has to look

18  to -- that you're mainly competing against generics, once

19  generic are in the market.  Why is that?

20  A.   Due to loyalty programs of multinational companies, such

21  as Syngenta, in the marketplace with large distributors.

22  Q.   Could you explain that for the jury so they have a better

23  understanding of what that involves and what kind of an effect

24  that has on a generic like Willowood?

25  A.   Yes.  Multinational companies are companies such as

Syngenta and Bayer and Dow and DuPont, research and development
based companies.  They have strong relationships with national
scope distributors.  I know these names will probably mean
nothing, but Crop Production Services, Helena Chemical, Tenkoz,
Wilbur-Ellis, Simplot are large national scope distributors and
with hundreds of retail outlets.

     And the multinational companies, while they have products
under patent, offer rebates to these companies, substantial
rebates, and when products come into a post-patent environment,
in this case azoxystrobin, multinational companies limit the
amount of market share that they're willing to give to
generics.

     So in the case of Crop Production Services or Helena, they
have to maintain a certain percentage, usually a very high
percentage, 90 percent of their buying purchases from a
company, such as Syngenta, to maintain the rebates that they
had had while the product was under patent protection.  So that
leaves very limited market share access for Willowood and other
generics to participate in.  I hope that explains.

Q.   Thank you.  Mr. Heinze, we've been discussing Willowood's
azoxystrobin products Azoxy 2SC and AzoxyProp Xtra.  What
Syngenta products are those similar to in terms of active
ingredient and concentrations?

A.   They would be identical to -- Azoxy 2SC would be identical
to that of Quadris and Abound, and it would be identical on a

11  1  percentage basis of that of Quilt Xcel.  AzoxyProp Xtra would

11  2  be that of Quilt Xcel.

11  3  Q.   And what does AzoxyProp Xtra contain in terms of active

11  4  ingredients?

11  5  A.   Azoxystrobin and another fungicide called propiconazole.

11  6  Q.   Does Willowood make any product that contains azoxystrobin

11  7  plus an active ingredient known as difenoconazole?

11  8  A.   We do not.

11  9  Q.   Does Willowood make any azoxystrobin product that also

11  10  contains an active ingredient known as Solatenol?

11  11  A.   We do not.

11  12          **MR. NEUMAN:**  May I have a moment, Your Honor?

11  13          **THE COURT:**  Yes.

11  14          **MR. NEUMAN:**   No further questions, pass the witness.

11  15          **THE COURT:**  Redirect.

14  16                    REDIRECT EXAMINATION

11  17  **BY MR. LEVINE:**

11  18  Q.   Couple of quick questions about what you just were talking

11  19  about, these multinational corporations.  Pinnacle is one of

11  20  those multinational corporations, correct?

11  21  A.   They're a distributor.  They're not a manufacturer.

11  22  Q.   And Willowood now sells to a company called Innvictis,

11  23  which is a part of Pinnacle?

11  24  A.   We do.

11  25  Q.   Pinnacle has basically gone generic to the generic for

```
11      1   sources of its products now, correct?
11      2   A.   On some of their products, yes.
11      3   Q.   If you'll turn to Plaintiff's Exhibit 14 in your notebook.
11      4   This was one of the exhibits that Mr. Neuman used with you.
11      5        And, David, if you could please pull up the first page and
11      6   highlight it, the top section.  I just want to make sure we're
11      7   all on the same page, no pun intended.
11      8   BY MR. LEVINE:
11      9   Q.   You see there that Willowood Limited is identified as the
11     10   seller?
11     11   A.   Correct.
11     12          MR. LEVINE:  Can you highlight that, David?
11     13   BY MR. LEVINE:
11     14   Q.   And Willowood USA is identified on the far right -- David,
11     15   it says seller and buyer -- so Willowood USA is the buyer,
11     16   Willowood Limited is the seller, correct?
11     17   A.   Correct.
11     18          MR. LEVINE:  Okay.  Please turn to the third page,
11     19   which is Section 8.  And, David, if you can please blow that up
11     20   for the jury.  Thank you.
11     21   BY MR. LEVINE:
11     22   Q.   It states that, "Seller agrees to deliver the products
11     23   FOB, the place of destination designated by buyer," correct?
11     24   A.   Yes, it does.
11     25   Q.   Right.  And Willowood USA designates the place to where
```

11     1   Willowood Limited should ship the products, correct?

11     2   A.    Correct.

11     3          MR. LEVINE:   David, if you could please pull up what

11     4   the witness was shown as Defendant's Exhibit 16, and if you

11     5   could highlight in the middle of the left column.

11     6   **BY MR. LEVINE:**

11     7   Q.    There is a row that I believe says "airport departure" and

11     8   the location for the departure from where Willowood Limited

11     9   ships the azoxy is Hong Kong, correct?

11   10   A.    That is correct.

11   11   Q.    And then right below that the box states "airport of

11   12   destination" and the airport of destination is Memphis,

11   13   correct?

11   14   A.    Correct.

11   15   Q.    In the United States, correct?

11   16   A.    Correct.

11   17   Q.    Now, Mr. Heinze, in response to some of the questions from

11   18   Mr. Neuman, you testified that you could have done the

11   19   formulation development and the sample creation and the testing

11   20   outside of the US.   Do you recall that testimony?

11   21   A.    I do.

11   22   Q.    Right.   But we all know, of course, that you did not do it

11   23   offshore, you did it here in the US, correct?

11   24   A.    That is correct.

11   25   Q.    And you had testified that once you found out about what

1  you referred to as a mistake, that, well, the damage was done
2  was the essence of your testimony, correct?
3  A.    That's correct.
4  Q.    Now, it's true, isn't it, that you could have withdrawn
5  the EPA applications that you had already submitted, correct?
6  A.    We could have.
7  Q.    And you could have done the testing offshore, correct?
8  A.    We could have.
9  Q.    And you could have created the formulations offshore,
10 correct?
11 A.    Correct.
12 Q.    And you could have done the testing of the samples that
13 were created offshore, correct?
14 A.    Correct.
15 Q.    And you could have then resubmitted your EPA applications,
16 correct?
17 A.    Correct, but that still would not have -- the product was
18 in country.  It would still have been an infringement.
19 Q.    If all of that testing and samples and resubmission to the
20 EPA had been done after the compound patents expired, it would
21 not have infringed the compound patents, correct?
22 A.    It still doesn't mean that the 5 kilograms had not entered
23 the country.
24 Q.    Right.  I realize that.  All right.  Let's move on,
25 Mr. Heinze.

```
11    1            MR. LEVINE:  If you could -- David, if you could
11    2   please pull up Exhibit 53 that -- Defendant's Exhibit 53.
11    3   BY MR. LEVINE:
11    4   Q.   This was the opinion, one of the opinion letters that
11    5   counsel spoke to you about from Mr. Hayden.
11    6            MR. LEVINE:  And, David, if you can please highlight
11    7   the "RE" line, the subject line of this letter.
11    8   BY MR. LEVINE:
11    9   Q.   The "RE" line makes reference to the '138 patent and then
11   10   the two compound patents, the '250 and the '076, correct?
11   11   A.   Correct.
11   12   Q.   So the subject of this letter dealt with the '138 patent
11   13   and the two compound patents, correct?
11   14   A.   Correct.
11   15            MR. NEUMAN:  Objection.
11   16            MR. LEVINE:  David, if you'll --
11   17            THE COURT:  I'm sorry, what?  What?
11   18            MR. NEUMAN:  Objection, foundation.  The "RE" line.
11   19            THE COURT:  Does it say -- I don't understand your
11   20   objection.  Are you saying he's not --
11   21            MR. NEUMAN:  The "RE" line refers to '250, which is
11   22   not a compound patent.
11   23            THE COURT:  Is that right?
11   24            MR. LEVINE:  Yeah.  '256 is the compound --
11   25            THE COURT:  Okay.  So --
```

11    1          **MR. LEVINE:**  -- so I'll rephrase the question.

11    2          **THE COURT:**  Thank you.

11    3    **BY MR. LEVINE:**

11    4    Q.    Mr. Heinze, if you'll turn, or David, to the second page

11    5    with respect to the '076 patent.  Do you see the heading that

11    6    says, the second patent is the '076 patent, one of the compound

11    7    patents?

11    8    A.    I do.

11    9    Q.    And then it's redacted out is the term that we will use.

11    10   The point I want to establish and make sure it's clear is that

11    11   you're not relying on any advice from Mr. Hayden with respect

11    12   to the compound patents, are you?

11    13   A.    We are.

11    14   Q.    Not here in this proceeding, because it's all blacked out,

11    15   correct?

11    16   A.    Evidently so.

11    17   Q.    Right.  And there's nothing in Defendant's Exhibit 53 with

11    18   respect to the DABCO patent, correct?

11    19   A.    I can't say that with any certainty.  Would you like to

11    20   show it to me or --

11    21   Q.    There's nothing to show you, Mr. Heinze, so I can't.

11    22          **THE COURT:**  Well, he's got the letter right there.

11    23          **MR. LEVINE:**  If you want to flip through, we can go

11    24   page by page.

11    25          **THE COURT:**  If you want -- do you still have the

11    1  exhibits there?  You can look at Defendant's 53.  If you don't,
11    2  somebody --
11    3          THE WITNESS:  Well, I'm taking it at face value that
11    4  he's saying that this opinion does not rely on a DABCO.
11    5          MR. LEVINE:  And, David, if you'll please pull up
11    6  Defendant's Exhibit 10.
11    7  BY MR. LEVINE:
11    8  Q.    And, again, the "RE" line in Defendant's Exhibit 10, the
11    9  July 2014 opinion, makes reference only to the '138 patent,
11   10  correct.
11   11  A.    That is correct.
11   12  Q.    And to the best of your knowledge, this July 2014 opinion
11   13  does not address at all the DABCO patent, correct?
11   14  A.    Correct.  And the two compound patents that expired by
11   15  this point, so they weren't relevant.  It.
11   16          MR. LEVINE:  Nothing further, Your Honor.
11   17          THE COURT:  Anything else for the defendant?
11   18          MR. NEUMAN:  Nothing further.
11   19          THE COURT:  All right.  Thank you.  You may step
11   20  down.
11   21          All right.  You can call your next witness.
11   22          MR. SANTHANAM:  Yes, Your Honor.  Plaintiffs call
11   23  Shen Shaojun, also known as SSJ, and it's going to be played
11   24  back through a deposition designation, and at this time we move
11   25  for the admission of Plaintiff's Trial Exhibits 31 and 32.

11    1           THE COURT:  Those are the documents referenced in the

11    2  testimony?

11    3           MR. SANTHANAM:  That is correct.

11    4           THE COURT:  Thirty-one and 32, is that what you said?

11    5           MR. SANTHANAM:  That is correct.

11    6           THE COURT:  Sorry, my hearing's having trouble

11    7  catching up.  No objection to those, correct?

11    8           MR. NEUMAN:  Correct.

11    9           THE COURT:  They'll be admitted.

11   10           All right.  So, ladies and gentlemen, depositions --

11   11  and I think you might have actually seen a little snippet from

11   12  a deposition with one of the other witnesses, but before the

11   13  trial gets started, the lawyers and parties are allowed to take

11   14  testimony under oath from the various witnesses, and sometimes

11   15  witnesses, for whatever reason, don't come to court.  They're

11   16  outside the subpoena power, such as somebody outside the

11   17  country or another reason, so their testimony is offered to you

11   18  by way of a recorded deposition.

11   19           These depositions are given under oath.  Lawyers for

11   20  both parties are there and can ask questions, and so to the

11   21  extent possible, you should receive this testimony just as if

11   22  the witness was sitting in the witness box instead of showing

11   23  up on the video screen.  Okay.

11   24           MR. SANTHANAM:  And, Your Honor, we have courtesy

11   25  binders for the SSJ deposition, if I may approach.

| | |
|---|---|
| 11 | 1 |

        **THE COURT:**  You may.  And just also, we're not --
they're not playing the entire deposition, just the relevant
parts, so if you see any little choppy things, that because
they've cleaned out the things that don't -- you know, that
aren't necessary for your decision.

        **MR. SANTHAHAM:**  One other point, Your Honor, there
is -- there may be some portions that are interpreted, so we
wanted to bring that to the Court's attention.

        **THE COURT:**  Oh, okay.  You had an interpreter for
this deposition?

        **MR. SANTHANAM:**  That's correct.

        **THE COURT:**  Okay.  You'll see how it works.

        (Video of Shen Shaojun was played.)

        **THE COURT:**  All right.

        **MR. SANTHANAM:**  Yes, Your Honor, two clarifications
we would like to make on the record.  There were two documents
referenced.  It was referenced as Defendant's Deposition
Exhibits 74 and 75.  Those have been added into evidence as
Plaintiff's Trial Exhibits 31 and 32 respectively.

        **THE COURT:**  Okay.  So the Deposition Exhibit 74 is
Plaintiff's Exhibit 31, and --

        **MR. SANTHANAM:**  75 is 32.

        **THE COURT:**  All right.

        **MR. SANTHANAM:**  At this point, we call Vijay Mundhra
of Willowood Limited, and, again, this will be through a

1  deposition designation.

2         **THE COURT:**  Okay.  So Mr. Mundhra is also going to

3  testify by deposition, and you should take it -- his testimony

4  as if he were present in the courtroom, to the extent that you

5  can.  You should give that your best shot and every effort.

6         **MR. SANTHANAM:**  And before we do that, Your Honor,

7  two points.  We would like to move for the admission of

8  Plaintiff's Trial Exhibits 21, 25, 54, 55, 56, and 57, and

9  these were discussed earlier today.

10        **THE COURT:**  I think there's no objection?

11        **MR. TILLER:**  As long as they are the same ones that

12 were in the book.

13        **MR. SANTHANAM:**  And to provide clarification, 21 is

14 referred to as Deposition Exhibit 16, 25 is referred to as

15 Deposition Exhibit 65, 54 is referred to as Deposition Exhibit

16 78, 55 is referred to as Deposition Exhibit 79, 56 is referred

17 to as Deposition Exhibit 80, and, lastly, 57 is referred to as

18 Deposition Exhibit 81.

19        And we would like to remind the Court one more time

20 that there is a technical glitch with this video.  We had a

21 little bit of feedback and the volume does go up for a couple

22 of seconds in a couple instances.

23        **THE COURT:**  We'll try to be tolerant.  Go ahead.

24     (Video of Vijay Mundhra was played.)

25        **THE COURT:**  All right.  I think we'll go on to lunch

```
12      1  before we start another witness.
12      2           MR. SANTHANAM:  Yes, Your Honor.
12      3           THE COURT:  So it's just a hair early, but we'll make
12      4  it up this afternoon.  So, ladies and gentlemen, I would
12      5  suggest to you, based on sitting in this place for quite a
12      6  number of years, that if you eat too much at lunch, you might
12      7  get sleepy afterwards, so -- particularly on a rainy day.  So I
12      8  just suggest to you that you eat a light lunch and that
12      9  you -- I know it's raining, but stretch your legs, walk around,
12     10  get a little exercise and a little bit of movement.
12     11           And if, at any time after lunch today or anytime,
12     12  really, you say, uh-oh, I kind of need to stand up, you know,
12     13  just let me know.  It's okay.  And we'd be glad to stand up
12     14  between witnesses or whatever we need to do to be sure that
12     15  we're all staying alert.  I know yesterday, when I told you
12     16  about our court schedule, some of you probably said, well, why
12     17  aren't our days longer, we could probably get done earlier if
12     18  the days were longer.  But I think you're probably appreciating
12     19  now just how much work it is to give the case your attention.
12     20  So just let me know anytime you need to stand up.
12     21           So, over the lunch break, don't talk about the case
12     22  with yourselves or anyone else.  Don't have any contact with
12     23  the lawyers, parties, or witnesses.  Don't look anything up on
12     24  the internet or consult any outside sources, and don't form an
12     25  opinion.  Even though, you know, you've started to hear -- hear
```

```
12    1  the evidence now, a good bit of the evidence, keep an open
12    2  mind.
12    3          We will start back in an hour and 15 minutes, so that
12    4  will be 20 and minutes to two.  The jury is excused.  Leave
12    5  your notes in your chair, and come back at 20 minutes till two.
12    6          (At 12:25 p.m., jury excused.)
12    7      THE COURT:  And I believe the plaintiff did move
12    8  admission of those exhibits used in his deposition, and I meant
12    9  to admit them.  I may have not have said that clearly for the
12   10  clerk.  So that's Plaintiff's 21, 25, 54, 55, 56, and 57.  And
12   11  those are admitted.
12   12          And I meant to do this before the jury left.  There
12   13  was also reference in the testimony of Mr. Mundhra to
12   14  Deposition Exhibit 63, which I think has already been admitted
12   15  as Plaintiff's Exhibit 17.  Is that right?
12   16      MR. SANTHANAM:  Sixty-three, I believe -- I think it
12   17  was admitted as Defendant's.
12   18      THE COURT:  Defendant's?
12   19      MR. NEUMAN:  That's correct.
12   20      THE COURT:  Defendant's Exhibit 17.  Thank you.  I
12   21  saw it had a sticker on it with 17.  All right.  Now, what's
12   22  coming after lunch?
12   23      MR. LEVINE:  Your Honor, we'll be -- Plaintiff's
12   24  calling Jeff Cecil.
12   25      THE COURT:  Okay.  And then, I believe you told me
```

```
12    1   yesterday --
12    2           MR. LEVINE:  After Mr. Cecil will be Mr. Fisher and
12    3   Mr. Wichert.
12    4           THE COURT:  Okay.  And you anticipate them being
12    5   shorter from Mr. Heinze from your end?
12    6           MR. LEVINE:  I'm not sure we'll get all the way
12    7   through Mr. Wichert by the end of the day today.
12    8           THE COURT:  All right.  Okay.  And are you calling
12    9   Dr. Fortunak?  Is he --
12   10           MR. LEVINE:  Not during our case in chief.
12   11           THE COURT:  All right.  Okay.  I'm just trying to get
12   12   organized on how all of that comes in.  All right.  Anything
12   13   else before we take our lunch recess?
12   14           MR. LEVINE:  Briefly.  Yesterday, you had given us
12   15   what you referred to as Draft No. 1 of the verdict sheet.
12   16   We've taken a look at it.  We do have some objections to it but
12   17   we tried to address them.  I've got a red line, which I can
12   18   hand to you and provide to counsel.
12   19           THE COURT:  That's fine.  You know, obviously, we
12   20   need to work through that.
12   21           MR. LEVINE:  I just wanted to --
12   22           THE COURT:  Yeah.  I've looked at it again, and, you
12   23   know, kind of have some second thoughts myself about some of
12   24   the changes, so it's clearly a draft.
12   25           MR. LEVINE:  We took the liberty of watermarking it
```

```
12   1   as Draft No. 2.

12   2            THE COURT:  All right.

12   3            MR. LEVINE:  And you had marked it as Draft No. 1.

12   4   And if you'd like, we can e-mail this to Ms. Sanders.

12   5            THE COURT:  I'll take a look at it and let you know

12   6   if I need that.

12   7            MR. LEVINE:  Thank you.

12   8            THE COURT:  I did double-check.  I have Word copies

12   9   of your jury instructions.  The plaintiff submitted revised

12  10   ones, which I saw, and then Willowood's back, what, six weeks

12  11   ago, something like that?  Yeah.  So I've got that.  Anything

12  12   else before we go to lunch?  No?  All right.  We'll be in

12  13   recess till 1:40.

12  14            (At 12:27 p.m., break taken.)

    15            (At 1:40 p.m., break concluded.)

13  16            THE COURT:  Good afternoon.  I think we are ready.

13  17   Is there anything that we need to take up before the jury comes

13  18   in?  No.

13  19            All right.  You can bring the jury in.

13  20            I'm going to try to remember to have the jury stand

13  21   up between the witnesses.  This rain, very dreary out there.  I

13  22   think that might help us all.  If I forget, somebody can give

13  23   me a clue.

13  24            (Jury panel is he present.)

13  25            THE COURT:  Good afternoon.  We are ready to proceed
```

| 13 | 1 | and the Plaintiff may call its next witness. |

13   1   and the Plaintiff may call its next witness.

13   2            **MR. COUGHLIN:**  Your Honor, Mr. Jeff Cecil.

09   3                      JEFF CECIL,

09   4        PLAINTIFF'S WITNESS, SWORN AT 1:42 p.m.

09   5                 DIRECT EXAMINATION

13   6            **THE COURT:**  Go ahead.

13   7            **MR. COUGHLIN:**  Thank you, Your Honor.

13   8   **BY MR. COUGHLIN:**

13   9   Q.   Mr. Cecil, can you please introduce yourself?

13   10  A.   Yes.  I'm Jeff Cecil.  I'm the head of marketing for

13   11  Syngenta Crop Protection here in North Carolina.

13   12  Q.   Where do you live, sir?

13   13  A.   I live in Greensboro.  Actually Summerfield, just north of

13   14  Greensboro.

13   15  Q.   How long have you lived in Greensboro?

13   16  A.   I moved here in 2005.

13   17  Q.   You indicate your current position with Syngenta is head

13   18  of marketing, is that correct?

13   19  A.   Yes, it is.

13   20  Q.   You mentioned -- you said in North Carolina.  Is that head

13   21  of marketing just in North Carolina?

13   22  A.   No.  It's for North America.

13   23  Q.   Is the crop protection department for North America here

13   24  in Greensboro?

13   25  A.   That's correct.

Q.    We'll talk about that position in a minute.  If you could

let me know or explain how long you've been with the company.

A.    I've been with Syngenta and/or its preceding companies for

22 years.  I joined -- actually, it was Ciba-Geigy when I

joined the company.  It then merged in with Novartis and then

to Syngenta in 2000.  We've been Syngenta ever since.  22 years

total.

Q.    Can you tell us a little bit about your background, what

you did in life before you came to work for Syngenta?

A.    Sure.  I grew up on a family farm in Kentucky.  I was in

western Kentucky, Owensboro area, and we had a small family

farm, about 1,200 acres of corn, soybeans, tobacco, that I grew

up on.  I had the opportunity to farm for myself for a couple

of years after I went to school in a small university, Murray

State University, in Kentucky and had the opportunity to farm

for a few years, decided that wasn't really for me.  I got the

opportunity then to still work with farmers and joined Syngenta

or Ciba-Geigy then.

Q.    What did you study?  You indicated you went to college.

Murray State University?

A.    That's correct.  I went to Murray State to study business

management and got a four-year degree in business management.

Q.    In what year did you graduate?

A.    1993.

Q.    Is that when you then -- did you return to your family

1  farm?

2  A.    I did.   I farmed while I was in school.   I -- actually, my

3  father took a job off the farm when I was a senior in high

4  school and he asked me to run the farm in his absence, so I

5  took it on while I was in school and farmed through school and

6  then two years after actually.

7  Q.    What led you to come to work for Syngenta?

8  A.    Yes.   So I met the local sales representative there in

9  Kentucky when I was farming and got to be pretty good friends

10 with him.   He asked me to interview at one point.   As I said, I

11 wasn't really feeling successful as a farmer at the time, so I

12 decided that I wanted to something a little different for my

13 family and we decided that was the right move for me.

14 Q.    And what position did you start with?

15 A.    I started as a sales representative in southern Ohio.   I

16 had a small sales territory in southern Ohio where I got to

17 work with farmers, which was really appealing to me at the time

18 because I could still stay with my roots and be on the farm

19 every day talking to farmers and doing what I liked do.

20 Q.    Where were you located at that point in time?

21 A.    I lived in Dayton, Ohio.   I had six counties surrounding

22 the city of Dayton, Ohio, so that was my stay there.

23 Q.    What type of products were you selling or representing?

24 A.    I sold crop-protection products, crop protection being the

25 products that are used to protect farm inputs, basically.   Once

13     1    the seed is put into the soil, those products are used to

13     2    protect the crop to make sure that the farmer can get the

13     3    maximum yield out of the seed.

13     4    Q.    Can you briefly go through the various positions you've

13     5    held at Syngenta since you started?   I guess after you were a

13     6    sales representative.

13     7    A.    Sure.   So I started as a sale representative.   I moved

13     8    into a technical sales manager in Minnesota, South Dakota for a

13     9    couple of years and then went to Des Moines, Iowa, where I was

13    10    a district sales manager, had my first team that reported to me

13    11    then in Iowa.   Then I moved -- when we merged to become

13    12    Syngenta, I had the opportunity to move back to Ohio and took

13    13    on the district manager position in Ohio, Michigan.

13    14         After that I had the opportunity to move to

13    15    Greensboro to take on a marketing role as a crop manager for

13    16    citrus and vegetables and where I -- my first marketing role to

13    17    really look at what it meant beyond corn and soybeans, so to

13    18    speak; and then after that I was a brand manager, which we now

13    19    call a product lead in the current environment, which was

13    20    really responsible for specific products, making sure that our

13    21    marketing campaigns were put together properly.   After that

13    22    position, I had the chance to be a global brand manager and a

13    23    lead for our Seedcare business where I was able to lead a

13    24    global business and understand, you know, what it meant to go

13    25    beyond North Carolina, so to speak, and so that was five years

13   1  there.  Then I came back to this position in crop protection
13   2  three years ago.
13   3  Q.   Can you explain, please, or describe your responsibilities
13   4  as head of marketing for crop protection?
13   5  A.   Yeah.  So as the head of marketing, I'm responsible for
13   6  leading the strategy for our overall business with specific
13   7  marketing campaigns, really looking at pricing, looking at the
13   8  strategy of a product, how long it will last, what we can do
13   9  with it, how we position it, and leading a team.  So I have a
13   10 team of people that work with me to do all the things that I
13   11 described that look at how they manage specific products within
13   12 our portfolio.
13   13 Q.   Approximately how many people work with you or for you on
13   14 the team you described?
13   15 A.   Within my team, I have 69 total people.  I have eight
13   16 direct reports that report to me here in Greensboro.
13   17 Q.   And what type of products fall within that in terms of
13   18 crop protection?
13   19 A.   So I'm responsible for all of crop protection, so that
13   20 means that the herbicide products fall within my area,
13   21 fungicide products for disease control, insecticide products
13   22 for insect control, and then seed treatments.
13   23         THE COURT:  What did you say, the last thing?
13   24         THE WITNESS:  Seed treatments.
     25

13          1   **BY MR. COUGHLIN:**

13          2   Q.    Where is most of your team located?

13          3   A.    My team is, all about five, located right here in

13          4   Greensboro.  I have five that are out in the field in different

13          5   capacities.

13          6   Q.    Can you describe generally the management structure or any

13          7   type of committees that are involved with leading crop

13          8   protection?

13          9   A.    Yeah.  So I sit on various committees, as you can imagine,

13         10   being head of marketing, but I guess the biggest ones are our

13         11   Crop Protection Leadership Team that I sit on, which was

13         12   formally -- in some of the documents I know it's referred to as

13         13   our Regional Operating Committee or ROC.  I sit on our Central

13         14   Steering Committee, which is our -- more of our weekly sales

13         15   operations type of meeting.

13         16   Q.    Can you describe the general functions of those two

13         17   committees?

13         18   A.    Yeah.  So the Crop Protection Leadership Team is really

13         19   based on a three- to five-year horizon, so it is really looking

13         20   at our business a little further out, understanding how we need

13         21   to structure the business overall to drive the strategy

13         22   long-term.

13         23        Our Central Steering Committee is really looking at the

13         24   day-to-day, so once a week we get together and we talk about

13         25   what's happening in the field, what we need to be doing

13    1   differently to respond to the specific challenges of the year.

13    2   Q.   How many people serve on these respective committees?

13    3   A.   So on the Crop Protection Leadership Team, there is ten

13    4   people, I think; and that is the regional director, who I

13    5   report to, and his direct reports that are on that team.

13    6         Then the Central Steering Committee is a much larger

13    7   group.  It's about 20 people.  It includes our Commercial Unit,

13    8   so that would be the people that are in the field that are

13    9   managing the day-to-day business out there, that sit on the

13   10  team as well.

13   11  Q.   Do you have any other roles at Syngenta or any additional

13   12  involvement in Syngenta?

13   13  A.   Yeah, I certainly have lots of other roles.  I won't list

13   14  them all, but, you know, in addition to that, I do lots of work

13   15  to get involved in the community at large and there's -- as you

13   16  get higher in the company, obviously you want to be more

13   17  involved in the things going on around you, so things like

13   18  United Way and the Crop Walk that we host here.  All of those

13   19  kind of things we get to serve on -- I get to serve on from

13   20  time to time.

13   21  Q.   I would like to talk about Syngenta Crop Protection as a

13   22  company.  Can you describe the company and what the purpose of

13   23  the company is, the mission?

13   24  A.   Yeah.  So I think, you know, we have a mission of really

13   25  doing more with less, of making sure that we're selling

1  products that benefit the farm; and really we're all about

2  making sure that we're on the farm, understanding the needs of

3  the farm, and answering the needs that the farmer has.

4       What we really strive for is making sure that we're, you

5  know, in touch with the realities of what's going on in

6  agriculture today, so that's really what we are striving to do

7  and we do that through our crop protection line and being able

8  to answer the needs on a daily basis with what the crop is

9  going through, what the different conditions are, and what

10 products they need.

11 Q.   How long has Syngenta been in business?

12 A.   A long time.  So Syngenta was formed in 2000 as a merger

13 of AstraZeneca and Novartis.  They spun off their ag divisions

14 and formed Syngenta.  As I said earlier, though, that was --

15 there was lots that happened before that.  So Novartis was

16 before that.  Ciba-Geigy was before that.  Ciba and Geigy were

17 both before that.  Those were well back into the 1800s, so

18 long-standing business.

19 Q.   How long has it had a presence here or has the facility

20 been here in Greensboro?

21 A.   The facility we're in now was 1972 or '3, if I remember

22 right, so it's quite a long time.

23 Q.   Do you have other offices in North Carolina?

24 A.   Yeah, we have several.  We have about 700 people on site

25 here in Greensboro.  We have maybe 450 or so over in Raleigh at

13    1   our research station over there.  We have a couple of other

13    2   smaller sites around the state that we have people at.

13    3   Q.    Can you describe in perhaps a little more detail the

13    4   products that Syngenta manufactures, develops, and sells?

13    5   A.    All right.  So as I said, we have our herbicide group.

13    6   Herbicides are designed to protect the crop from weeds.  So

13    7   weeds are a major challenge for the farm.  They obviously have

13    8   to treat for weeds and herbicides is what they treat with.

13    9        Fungicides would be the control of diseases.  We look at

13   10   how we can control diseases in different ways.  There is many

13   11   different diseases that attack a crop through the growing

13   12   season and being able to address that through fungicides.

13   13            Insecticides, obviously, as you go across the

13   14   country, you see insecticides more or less depending on where

13   15   you are.  There is a big push for insecticides to control those

13   16   pests.

13   17            And then our seed treatments are really a combination

13   18   of fungicides and insecticides used directly on the seed to

13   19   control things in the very early stages of crop development.

13   20   Q.    Let's talk a little bit about the seed treatment you

13   21   described.  How do your products -- how are they integrated

13   22   with seeds?  The other -- I think the way you described the

13   23   insecticides or the pesticides, et cetera, have been on crops.

13   24   A.    Correct.

13   25   Q.    Seed treatment before crops are planted?

13    1    A.    Right.  So it would be treated on the seed before it

13    2    actually goes into a bag and delivered to the farm so that it

13    3    can be planted in the ground and used that way directly on the

13    4    seed in one application.  The crop-protection products are,

13    5    generally speaking, a foliar application of the product over

13    6    top of a crop.

13    7              **THE COURT:**  Foliar being like leaves, foliage?

13    8              **THE WITNESS:**  Yeah.

13    9              **THE COURT:**  Okay.

13    10             **THE WITNESS:**  Foliar being foliage after the --

13    11   there's lots of different ways, but generally a broadcast

13    12   application across the field.

13    13             **THE COURT:**  I was just making sure I understood the

13    14   word.

13    15             **THE WITNESS:**  Yeah.  I'm sorry.

13    16             **THE COURT:**  That's all right.

13    17   **BY MR. COUGHLIN:**

13    18   Q.    In the Crop Protection Leadership Team and the Central

13    19   Steering Committee you talked about before, are they involved

13    20   with all those lines -- all those product lines?

13    21   A.    Yes, they are.

13    22   Q.    I would like you to talk a little bit about azoxystrobin

13    23   in particular and not necessarily on a chemical level, more on

13    24   a business level, if you could, or your role, your involvement

13    25   with it.  Can you describe what azoxystrobin is and how that

13  1  fits into Syngenta's business?

13  2  A.    Yes.   So azoxystrobin is a fungicide for control of the

13  3  diseases.   The primary crop that we sell into is corn.   There

13  4  is 90 million, plus or minus, acres of corn in the United

13  5  States and we -- that's our primary market for that product to

13  6  control diseases in corn.

13  7  Q.    What are the -- there are a variety of fungicides, I

13  8  assume.   What is unique or different about azoxystrobin?

13  9  A.    So azoxystrobin is a long-lasting residual product,

13  10  meaning that it will control diseases for a long period of

13  11  time.   Once it's treated onto the crop, disease can come in

13  12  later on and it's still there to control it.   So it's generally

13  13  the strength of the product.

13  14  Q.    And what about the types of diseases or the number of

13  15  diseases that it is effective with?

13  16  A.    Yeah, so it's very broad spectrum is the way we refer to

13  17  it, which just means it controls lots of different pests

13  18  throughout the year and that it's, generally speaking, very

13  19  well-suited for the diseases that come into corn.

13  20  Q.    Are there other benefits that azoxystrobin provides or is

13  21  known for?

13  22  A.    Yeah.   So azoxy is -- azoxystrobin is one of the products

13  23  that is very unique in that it gives a crop-enhancement effect.

13  24  What we mean by crop enhancement is this product actually gives

13  25  you a greening effect of the crop so that it is able to produce

13    1    longer in the season so -- being it doesn't dry down.  If you

13    2    look at a late-stage corn plant, right now is a good time,

13    3    August, September, you start to see it die down in the field.

13    4    The longer that plant stays green in the field, the more grain

13    5    it can put on.  Therefore, it has a higher yield for the

13    6    farmer.  That's one of the aspects of this product, whether

13    7    there is a disease present or not, is azoxystrobin gives a

13    8    crop-enhancement effect that allows that plant to stay green

13    9    and put on more grain and therefore have a higher yield.

13   10    Q.   Has that had a connection or impact on the success of the

13   11    product?

13   12    A.   What it's done is it has allowed -- this crop-enhancement

13   13    effect has allowed farmers to use the product with or without

13   14    disease being present and still see a benefit.  So they will

13   15    get a yield benefit from this even if they don't have diseases.

13   16    So it's a very unique product.  There are very few products on

13   17    the market that offer that type of benefit, at least proven

13   18    that benefit, to the farmer.

13   19    Q.   We've been talking about farmers and row crops and the

13   20    like.  Is there also a market for I think seed care you said?

13   21    How does azoxystrobin play into the seed care market or how

13   22    much does it?

13   23    A.   It's a very small market.  We tried to launch azoxystrobin

13   24    into the seed treatment space years ago.  It's not very

13   25    effective that way, and as a result, we haven't seen very many

| 13 | 1 | sales.  It's just not -- it doesn't move in the plant enough to |
| 13 | 2 | put it on the seed and get it to where it needs to be, so it's |
| 13 | 3 | not very effective as a seed treatment.  Therefore, it's a very |
| 13 | 4 | small part of our sales. |
| 13 | 5 | Q.   How about lawn and garden? |
| 13 | 6 | A.   Yeah, there is applications in lawn and garden.  I'm not |
| 13 | 7 | responsible for lawn and garden, so I can't tell you exactly |
| 13 | 8 | what they use there, but it's a very small part of our overall |
| 13 | 9 | sales. |
| 13 | 10 | Q.   I guess, to the extent you have knowledge, what is the |
| 13 | 11 | sort of ratio proportion that lawn and garden would be as it |
| 13 | 12 | relates to azoxy -- a market or a demand for azoxy? |
| 14 | 13 | A.   Yeah, it's probably less than 5 percent.  Three to |
| 14 | 14 | 5 percent overall. |
| 14 | 15 | Q.   How about seed care?  Do you have any sense of seed care? |
| 14 | 16 | A.   Less than 3 percent. |
| 14 | 17 | Q.   You talked about corn, I think.  What are the main crops |
| 14 | 18 | or the driving crops as it relates to azoxystrobin? |
| 14 | 19 | A.   So, obviously, we talk about row crops as being the number |
| 14 | 20 | one -- row crops being corn, soybeans, and wheat -- but there |
| 14 | 21 | is a host of other crops that are on the registration for that |
| 14 | 22 | product.  So the product can be used in lots of different ways, |
| 14 | 23 | but corn is the determining crop, if you will, with the huge |
| 14 | 24 | amount of acreage that's there.  It's the determining crop for |
| 14 | 25 | this product in the market. |

14  1  Q.   Can you describe the registration that you just mentioned?

14  2  What is a registration as it relates to azoxystrobin products

14  3  that are -- do they vary, et cetera?  If you can just walk

14  4  through that.

14  5  A.   So for crop protection, it's a highly regulated industry;

14  6  and what that means is the EPA has requirements for us to bring

14  7  any product to market.  In order to bring a product to market,

14  8  we have to do years of research, prove that the product is safe

14  9  to the environment, safe to the users, and is something that is

14  10  actually efficacious in the field or actually controls what we

14  11  say it controls.  As a result of that, you can only apply

14  12  products that have an EPA registration associated with them and

14  13  so that's what I mean by registration.

14  14  Q.   Labels -- these products have labels.

14  15  A.   Right.

14  16  Q.   Are those labels affiliated with or connected with the

14  17  registrations at all?

14  18  A.   Right.  So the label is a direct relationship with the

14  19  registration; and once it gets a registration through the EPA,

14  20  what they're really registering is that product can be used

14  21  associated with the label that we've written for it.  What we

14  22  do is, based on the research that we have and has been required

14  23  by the EPA, we submit a label, which is basically the

14  24  instructions for use of the product.  Then the EPA approves

14  25  that label as the instructions for use and using the product

14    1   has to be in alignment with the instructions for use for the
14    2   label that you called it.
14    3   Q.    Does the label have to list the crops that product can be
14    4   used on?
14    5   A.    It certainly would, yes.
14    6   Q.    You talked about the EPA.  Do states also have regulations
14    7   as it relates to these products?
14    8   A.    Yeah, each registration has a federal registration under
14    9   the EPA and then each state has to register it, so we have to
14   10   apply the same -- for the same registration in each state.
14   11   Q.    Is that a separate process?
14   12   A.    It is.  It generally takes us another -- it depends on the
14   13   state, but three to six months to get a registration in the
14   14   state.
14   15   Q.    How important has azoxystrobin been as a product to
14   16   Syngenta?
14   17   A.    Well, azoxy is our second largest selling product in the
14   18   United States.  It's our largest selling product globally.
14   19   Q.    Can you explain how azoxystrobin is applied?  And if it
14   20   varies depending on the use of it, explain that as well.
14   21   A.    I'm sorry.  Could you repeat that?
14   22   Q.    Yeah.  How is it -- how does a farmer use azoxystrobin?
14   23   A.    So a farmer would typically take a liquid formulation,
14   24   which most azoxy products are a liquid formulation -- they'll
14   25   take that and mix it with water in a big sprayer, and they'll

14  1  use it in a broadcast application across the field, meaning

14  2  that it's sprayed through some sort of a sprayer that will

14  3  cover many acres at a time.

14  4  Q.   Are you familiar with the term "technical"?

14  5  A.   Yes, I am.

14  6  Q.   What is a technical?

14  7  A.   So technical is a term that we use to refer to the active

14  8  ingredient in its raw form that we use then to formulate into a

14  9  product that can be applied to the field as I just described.

14  10  Q.   In the formulation, can one technical have multiple

14  11  formulations?

14  12  A.   The technical can be turned into multiple different

14  13  formulations, yes.

14  14  Q.   So the active ingredient can be formulated in different

14  15  ways for different uses?

14  16  A.   That's correct.

14  17  Q.   In terms of seed care, is -- is that a liquid application?

14  18  A.   Yes, it is.  It's a liquid application to the seed, so

14  19  it's much different than the broadcast application that I just

14  20  talked about, but it is a liquid that is applied directly to

14  21  the seed.

14  22  Q.   And who does that application to a seed?  Is that

14  23  something a farmer does himself?

14  24  A.   No.  It's typically the seed company that does that, so a

14  25  company that sells seed would take -- buy the product from

14  1   Syngenta.  Then they would take it and apply it to the seed
14  2   before they sell it to the farmer.
14  3   Q.   Is technical -- azoxy, for instance, is azoxy technical
14  4   usable in its own form?
14  5   A.   No, it's not.
14  6   Q.   By a farmer.
14  7   A.   No, it would not be something that you could spray on the
14  8   field unless it was formulated.
14  9   Q.   Where does Syngenta do its formulation work or
14 10   development?
14 11   A.   So our formulation development is largely done here in
14 12   Greensboro.  We have our formulation team that sits on site
14 13   there on Swing Road and we have the group that does all the
14 14   formulation work.  Obviously, the formulations are done at the
14 15   plants themselves, but the research to build the formulation
14 16   would be done here in Greensboro.
14 17   Q.   The Swing Road address you mentioned, is that the one
14 18   that's out on I-40?
14 19   A.   Yeah, on I-40 at Swing Road right off Guilford College.
14 20   Q.   We've talked about how farmers use azoxystrobin.  Does
14 21   Syngenta sell to farmers?
14 22   A.   Nope.  We sell into the channel that then sells to the
14 23   farmers.
14 24   Q.   Okay.  So some terms you may use -- in this trial, we're
14 25   having some technical terms, but that's a marketing term, I

14  1  think, the channel, is that correct?

14  2  A.   Probably.

14  3  Q.   Let's assume that nobody understands anything about a

14  4  channel or a distribution channel.  Can you explain who your

14  5  customers are -- who Syngenta's customers are and how the

14  6  products that you develop get to farmers at the end of the day?

14  7  A.   All right.  So Syngenta doesn't sell to any farmers, as I

14  8  just said.  We sell to a channel, which being a distribution

14  9  network of customers, that then sell to a retail chain that

14  10 will sell to a farmer.  So we have about five or six primary

14  11 distributors that we use and work with that we sell directly

14  12 to.  Then they sell to retail organizations that sell to the

14  13 local farmers.

14  14        The shear reason for this channel, sometimes we have

14  15 to remind ourselves, is that we're not -- as a company, we're

14  16 not suited to logistically serve a customer that is in remote

14  17 areas, so the channel performs that service for us by being

14  18 able to deliver product in a timely way so that the farmer can

14  19 use it.

14  20 Q.   When you say you use distributors -- and you say there are

14  21 five or six?

14  22 A.   There's a lot more than five or six, but there is five or

14  23 six that make up the bulk of our business, yes.

14  24 Q.   Are they affiliated with you, or are they your customers?

14  25 A.   They're our customers.

14  1  Q.   So when you're selling, you're selling to the distributors

14  2  and that's your ultimate -- that's your connection, the sales

14  3  that you're making?

14  4  A.   Yeah, the distributors that we use in this industry are

14  5  basically buying from all of my competitors as well, so they're

14  6  truly customers.

14  7  Q.   They're not exclusive to you.  You are trying to develop

14  8  their business and make sales to the distributors?

14  9  A.   That's correct.

14  10  Q.   How about the retailers?  Are the retailers separate from

14  11  the distributors?

14  12  A.   Sometimes, yes.  The distributors actually -- some of the

14  13  large distributors own retail organizations as well, so if you

14  14  can imagine a Wal-Mart type of a distribution channel, they

14  15  have a distribution network and they have retail outlets.  It's

14  16  the same kind of a deal.  The five or six that we have mostly

14  17  own -- three of them own their own retail organizations and the

14  18  others are independent.

14  19         **MR. COUGHLIN:**  Your Honor, if I may?

14  20  **BY MR. COUGHLIN:**

14  21  Q.   I think Plaintiff's Demonstratives 1 and 2, if I'm not

14  22  mistaken, do you recognize these cartons?

14  23  A.   Yes, I do.

14  24  Q.   Is this the manner in which a retailer would sell to the

14  25  farmer?  Is that the type of container?

14    1   A.    Yes, it is.

14    2   Q.    Okay.  And is this sometimes referred to as an end-use

14    3   product?

14    4   A.    It would be an end-use product, yes.

14    5   Q.    So explain what end-use product is.  And I know I just

14    6   showed you that, but try -- if you could explain what an

14    7   end-use product is as compared to other products that Syngenta

14    8   may sell.

14    9   A.    Yes.  So an end-use product is packaged much like you just

14   10   seen there.  Typically there's those two and a half gallon jugs

14   11   packaged two at a time in a 5-gallon box.  That's the way it's

14   12   sold to the customer as formulated product so they can take it

14   13   right out, pour it into their water, make a solution and spray

14   14   it out.  Probably most everybody in the room has done that in

14   15   their own yard to spray something at one point and that's

14   16   generally the idea.

14   17       The other way that we sell product is through the

14   18   technical product that you mentioned before.  We do sell

14   19   technical to other customers that then formulate their own and

14   20   so, you know, they take this product and they take the raw

14   21   product as I've described before; if you can imagine, like a

14   22   cup of coffee.  The technical that they take is like a coffee

14   23   bean, and then they roast it and grind it and put it into a

14   24   formulation that you can then take as a coffee cup.  That would

14   25   be kind of the process that it goes through in order to get to

14    1    that, so those are the two ways that it's sold.

14    2    Q.    These two containers, these are Syngenta-branded products,

14    3    is that correct?

14    4    A.    Yes, they are.

14    5    Q.    Quadris is a Syngenta brand?

14    6    A.    Quadris is a Syngenta brand.  It is what we call straight

14    7    goods, azoxystrobin, so there's no other active ingredient in

14    8    there other than azoxystrobin.

14    9    Q.    Does Syngenta do any sales that are called or referred to

14    10   as private label?

14    11   A.    Yes, we do.  We sell product to other -- to some of our

14    12   customers who then want to put that product in their own name,

14    13   and use that as a private label to sell.

14    14   Q.    Are you familiar with the term brand ladder?

14    15   A.    Yes, I am.

14    16   Q.    I knew you were, but I need to -- I need you to -- I just

14    17   need to introduce this in a way that you can try and explain

14    18   what a brand ladder is and the way Syngenta uses that in the

14    19   management of its products.

14    20         MR. COUGHLIN:  If we could display Plaintiff's

14    21   Demonstrative 8.

14    22   BY MR. COUGHLIN:

14    23   Q.    Is that a graph of Syngenta's brand ladder as it relates

14    24   to azoxystrobin?

14    25   A.    Yes, it is.  And I guess it'd probably be smart to back up

| | |
|---|---|
| 14 | 1 |
| 14 | 2 |
| 14 | 3 |
| 14 | 4 |
| 14 | 5 |
| 14 | 6 |
| 14 | 7 |
| 14 | 8 |
| 14 | 9 |
| 14 | 10 |
| 14 | 11 |
| 14 | 12 |
| 14 | 13 |
| 14 | 14 |
| 14 | 15 |
| 14 | 16 |
| 14 | 17 |
| 14 | 18 |
| 14 | 19 |
| 14 | 20 |
| 14 | 21 |
| 14 | 22 |
| 14 | 23 |
| 14 | 24 |
| 14 | 25 |

just a little bit.  A brand ladder is not a Syngenta term.  A brand ladder is a marketing term that's used to talk about where a brand portfolio fits together.  So if you have a group of products that fit in a similar class, you would talk about it as a brand ladder and where they fit based on the value that they bring to the customer.  This example that you're using is a Syngenta brand ladder for azoxystrobin.

Q.    So do all of these products here, either themselves or in combination with other active ingredients, contain azoxystrobin?

A.    Yes, they do.

Q.    I believe the two jugs we have here are for Quadris and Quilt Xcel?

A.    Yes.

Q.    Starting with those products, can you explain, in the ladder itself, walk-through that but explain the marketing and why it is that products are developed and sold in this manner.

A.    Right.  So if we look at Quadris and Quilt Xcel on this ladder, it's in the established brands category.  What this -- what this indicates is that we're really talking about products that have been on the marked a while.  They've established what the value for that specific class of brands is, and it's kind of the starting point, if you will, for what the value is.

        And that's really what the brand ladder is about, is what kind of value does it offer to the customer that wants to buy

14  1  the product.  What is it that he is going to get from it as a
14  2  result of using the product, so that's -- that established
14  3  brands group, Quadris and Quilt Xcel, would be the baseline
14  4  starting point for the brand ladder.
14  5  Q.   And so on this one I see Quadris.  Did you say that that's
14  6  a straight product?
14  7  A.   Yes.  That's a straight goods product, so it's
14  8  azoxystrobin alone.
14  9  Q.   It's not technical?  It's been formulated?
14  10  A.   That's correct.  It's ready to be an end-use product.
14  11  Q.   But does it have any other active ingredients in it?
14  12  A.   It does not.
14  13  Q.   Okay.  Then Quilt Xcel is listed.  Is that also a straight
14  14  product?
14  15  A.   No, that's a mixture product.  Quilt Xcel is a mixture of
14  16  azoxystrobin and propiconazole.  Propiconazole is another class
14  17  of chemistry or different type of a fungicide/disease control
14  18  product.
14  19  Q.   Did those products come out at the same time?  Did
14  20  Syngenta introduce those two products at the same time?
14  21  A.   No.  Quadris would have been our first introduction of the
14  22  product as a straight goods.  Generally that is the way we
14  23  bring products to market first is to use straight goods to come
14  24  to the market, establish the value, establish the brand that is
14  25  there, and then we'll bring out a mixture product as it is

14  1  needed.  I talked a little bit about what the farmer need is

14  2  and being in touch with the farmer to understand what his needs

14  3  are.  As we see new needs in the field, we try to bring

14  4  combination products, mixtures of different active ingredients

14  5  to be able to answer those needs.

14  6  Q.    Below Quadris is another brand that's listed, Abound?

14  7  A.    Yes.

14  8  Q.    Is that also a straight product?

14  9  A.    Yes, it is.  Abound is a straight azoxystrobin brand

14  10  that's used outside of corn and soybeans.

14  11  Q.    So are the products, Quadris and Abound, the products

14  12  themselves, are they the same products?

14  13  A.    Yes, they are.

14  14  Q.    So why -- what is different about them, other than their

14  15  name?

14  16  A.    Their -- the label that they're sold under is different so

14  17  they're registered in different crops for use, and the pricing

14  18  structure is different as a result of that.

14  19  Q.    And when you say the label is different and has different

14  20  crops, even though they're the same -- it's the same chemical,

14  21  could you buy Abound and use it on a crop that's on the Quadris

14  22  label?

14  23  A.    Not legally, no.

14  24  Q.    Okay.  So in -- so they're not interchangeable, is that

14  25  correct?

14  1  A.    That's correct.

14  2  Q.    So if somebody was a corn farmer, and assuming that

14  3  they're going to follow the law, would they ever buy Abound,

14  4  even though it's the same product as Quadris?

14  5  A.    No.  It wouldn't be available to them through the

14  6  distribution channel in the markets that grow corn.  It's

14  7  really in the peanut area is where its primary use is.

14  8  Q.    And when you -- when Syngenta went through the

14  9  registration process for Quadris and Abound, it requested

14  10  permission to be able to sell those two products with different

14  11  labels, or they requested different labels for the products?

14  12  A.    Yes.

14  13  Q.    And there's a different market for those two products, is

14  14  that correct?

14  15  A.    That's correct.

14  16  Q.    Now, Quilt Xcel, I think you said, is a mixture.  Is that

14  17  an innovation or trying -- developing a new product from the

14  18  first azoxy product that Syngenta had?

14  19  A.    Yes, it is.  The Quilt Xcel is really an innovation of

14  20  bringing two formulations together, so most people -- we get

14  21  this question a lot.  Most people believe that you can take two

14  22  formulated products, pour them in one jug and all of a sudden

14  23  you have a new product.  The reality is that it won't stay in a

14  24  mix if you do that because it takes different things to keep

14  25  different active ingredients available, and so once you pour

14  1  the two together as the formulations stand, they won't work or
14  2  they won't stay in a formulation and, therefore, you have to go
14  3  back and do quite a bit of work to get that formulation right.
14  4  Q.   So if Quilt Xcel is an improvement or enhancement of
14  5  Quadris with an additional active ingredient, why does it
14  6  appear on the established brand rung of the brand ladder?
14  7  A.   Because it's been in the market for quite some time.  We
14  8  don't know the year actually that we brought it out, but it's
14  9  several years ago.  It's an established brand, and it's
14  10 well-known in the space.
14  11 Q.   In terms of the -- I want to go up in the brand ladder.
14  12 There's a listing of enhanced brand.  Can you describe what
14  13 that is?
14  14 A.   So enhanced brands is very much like I just described with
14  15 Quilt Xcel, that we found something that could be added to the
14  16 product alone that would give an enhanced benefit to the
14  17 customer, and by putting these combinations together, it brings
14  18 a new value proposition to the farmer, so that's what these
14  19 enhanced brands are all about.
14  20      So for instance, Quadris Top, actually Quadris Top, all
14  21 three of these brands are based on different mixtures of
14  22 azoxystrobin and difenoconazole, which is another fungicide
14  23 that's very active on certain pests.
14  24 Q.   And we've heard about azoxystrobin and the development of
14  25 that in Quadris.  Is there formulation and development work

14   1  that goes into each of these new brands?

14   2  A.    Yes.  It takes -- it takes quite a lot to keep products in

14   3  suspension, meaning that they will stay mixed together once you

14   4  put them in, so there's a lot of work that goes into that.

14   5  Q.    The next rung on the ladder is combination of brands.  Can

14   6  you describe the role that that rung plays in the ladder.

14   7  A.    Right.  So what this group is talking about, the

14   8  combination of brands, is when you sell two brands together

14   9  that maybe do something totally different.  In this case, it's

14  10  Quilt Xcel, which we've already talked about,

14  11  azoxystrobin/propiconazole mix; two fungicides mixed with an

14  12  insecticide.

14  13      So Endigo is an insecticide product that we have in our

14  14  portfolio, and by selling those products in a combination

14  15  together to -- as one package to the farmer, he gets a

14  16  different benefit.  The benefit is, generally speaking in this

14  17  case, he gets to go across the field one time instead of two,

14  18  so he's spraying the same products at different times, or he

14  19  can put the two in the tank together and spray them as one, and

14  20  we offer that as an option for the farmer.

14  21      Now, the interesting thing about this is in talking about

14  22  the formulation even more, the -- not just any products will

14  23  mix in a tank either.  You have to have good formulations to be

14  24  able to put in a tank and then add the water and whatever else

14  25  you're putting with them to make sure that they will actually

14   1  spray out or don't clog the sprayer up or anything like that.

14   2  Q.   And the top rung of this ladder is entitled next

14   3  generation premium brands.  Please describe that role.

14   4  A.   So the next generation brands that we're describing here

14   5  are based on a new active ingredient that we just brought to

14   6  market 2016 called Solatenol.  Solatenol is a new fungicide

14   7  class of chemistry that gives a totally different control of

14   8  pests.  It's mixed in this case with azoxystrobin and both

14   9  Trivapro and Elatus.  It's mixed with azoxystrobin to even

14  10  broaden the spectrum of control further than what we saw with

14  11  azoxy before.

14  12  Q.   These products do have azoxystrobin?

14  13  A.   Yes.  So Trivapro is actually a mix, if you will, of Quilt

14  14  Xcel plus Solatenol, so it's three active ingredients in there.

14  15       Elatus is a mix of azoxystrobin and Solatenol together,

14  16  two way.

14  17  Q.   And let's go to the bottom of the brand ladder.  It's

14  18  listed fighting brands.  Can you explain what a fighting brand

14  19  is.

14  20  A.   Sure.  A fighting brand is typically when we are under a

14  21  lot of competition and our customers are finding it very hard

14  22  to compete with another competitive company out there with a

14  23  low price.  They need something to be able to offer to their

14  24  customers that allows them to compete and not bring down their

14  25  market.  So what I mean by that is when the price of Quadris

14  1  gets lowered, everything above it gets lowered as well, and so

14  2  the more that you lower that price, the more the market

14  3  declines, the less value that the -- that our customers can

14  4  take from that market, so there's less opportunity.

14  5  Q.   So back this up a little bit if you would because I think

14  6  it may relate to the channel you're talking about before.  You

14  7  said the customer, you're trying to have your customer compete.

14  8  Who are you referring to?

14  9  A.   Yeah, so the distributor retail channel that you've just

14  10  mentioned, that's the customer I'm referring to.

14  11  Q.   And how is having a fighting brand help the customer?

14  12  A.   So you can -- there's two ways to address competition.

14  13  You either lower the price on your total portfolio, which

14  14  devalues the opportunity for them to make money, or you give

14  15  them a portion of the market opportunity through a different

14  16  brand that doesn't devalue the rest of the portfolio, and so

14  17  that's what you're trying do with a fighting brand.

14  18      We've all seen these in retail stores.  There's a fighting

14  19  brand out there for everything.  What they're really trying to

14  20  do is offer you a similar quality product at a lower price so

14  21  that it doesn't devalue the rest of the overall portfolio.

14  22  Q.   Is this ladder a stagnant ladder?  Is it a fixed ladder?

14  23  Does this change over time?

14  24  A.   It certainly changes over time.  A good example of that

14  25  would be you mentioned Quadris and Quilt Xcel.  At one point,

14  1  Quilt Xcel would have been the top rung of this ladder because
14  2  it was the latest innovation, but once it's been in the market
14  3  a while, we have a new innovation, we move it down, and the new
14  4  product comes in, so Quadris Top may have been the top product
14  5  a couple of years ago and so forth.
14  6  Q.   And the pricing within these products, I think you
14  7  indicated that certain competition, if you moved it down, you
14  8  can devalue the whole ladder.  How is pricing between the
14  9  various rungs in this ladder interconnected?
14 10  A.   So they're all connected really to the established brands
14 11  rung of the ladder.  So really looking at once you've
14 12  established what the brand is worth based on what it perform --
14 13  what it does to perform for the customer, what the customer's
14 14  willing to pay for it based on that, then everything else is
14 15  priced differentially based on that.  So it's a step up, just
14 16  like the ladder indicates.  Everything is a step up in value
14 17  for the customer and for Syngenta.
14 18  Q.   If there's a change in the price on one rung of the
14 19  ladder, does that affect the rungs above it?
14 20  A.   Sure.  If you can imagine a ladder sitting up against your
14 21  house and you cut out the legs underneath it, the ladder's
14 22  going to slide down every time you cut the legs out.  It's the
14 23  same with the price.  Once the price comes down on the bottom,
14 24  the next rung of the ladder drops down and so on and so forth
14 25  so it's that simple.

14    1    Q.    This is Syngenta's current brand ladder for azoxystrobin,

14    2    is that right?

14    3    A.    Yes, it is.

14    4    Q.    What was on this -- what was the brand ladder, what did

14    5    the brand ladder look like in 2014?

14    6    A.    2014 it would have had the center three sections, so it

14    7    would have had the established brands, enhanced brands and

14    8    combination brands only.

14    9    Q.    And in terms of the fighting brand, how does that help

14   10    with Syngenta in terms of its market and its products in

14   11    response to competition?

14   12    A.    So really what it's doing is giving an option to the

14   13    customer to be able to reduce a price on a certain percentage

14   14    of their business without lowering the overall brand ladder

14   15    value for them or for us, because obviously they make a margin

14   16    based on what their value they're offering as well, and if

14   17    their price is lower on the total, then their opportunity is

14   18    lower as well.

14   19    Q.    I'd like to change topics a bit.  Are you involved in or

14   20    familiar with Syngenta's budgeting process?

14   21    A.    Yes, I am.

14   22    Q.    How so?

14   23    A.    As the head of marketing, I lead the budgeting process.

14   24    Q.    Have you been involved in budgeting, the budgeting

14   25    process, at times before you were the head of marketing?

14  1  A.    Yes.   Probably the first interaction with the budget

14  2  process was when I was a district sales manager back in Iowa

14  3  several years ago.   So different times in my career I prepared

14  4  information for the budget.

14  5  Q.    Does Syngenta have an established process that it follows

14  6  in developing its budgets?

14  7  A.    Yes, we do.

14  8  Q.    And what does Syngenta use budgets for?   What is the

14  9  purpose, the business purpose, of developing budgets for

14  10  Syngenta?

14  11  A.    Yeah.   So most people think of budgets and they think, oh,

14  12  I gotta set a budget to save some money and take care of my

14  13  spending.   That's really not what we're talking about with

14  14  budgeting.   No.

14  15       We're talking about setting our targets for the year,

14  16  making sure that we have a process to evaluate the market,

14  17  understand what the market opportunity is, and then we're going

14  18  to deliver so much in sales as a result of that market

14  19  opportunity that's been described through the process.   So

14  20  that's really what the budget is really all about.

14  21  Q.    Does Syngenta use the budget in making its business

14  22  decisions?

14  23  A.    Yes.   The budget is really used to understand what the

14  24  opportunity is, as I've said, and really understand what we can

14  25  invest as a result of that opportunity.   So it's really a

situation where we invest based on what we believe we can

deliver in order to better our business for the future.

In addition to that, we use our budgeting process for

things like sales incentive plans, bonus structures, all those

type things, so it's really important for the employees to make

sure that the right information is fed in to get that well

done.

Q. Does Syngenta use it for making hiring decisions or

investments?

A. Yeah. Investments including hiring decisions, how we will

invest for research and development to bring new technologies

to market, how we're going to invest for simple things like

investing in the community and all of those kind of things here

in Greensboro.

Q. So I would -- you indicated there is a process. I would

like for you to walk us through that process and bring it down

to a level, to the best you can, so everyone can understand

what is involved in that process.

A. Okay.

Q. Let me -- maybe to get some time reference, is there a

certain time each year that Syngenta sets its budget for the

next year?

A. Yes. So the budget is typically finalized and set,

approved in October of each year for the following year.

**THE COURT:** For the following calendar year?

**THE WITNESS:** For the following calendar year, yes. The process really starts a full year plus before that. So what really happens is -- and it's probably best if I just describe the process we're in today.

BY MR. COUGHLIN:

Q. Yes, sir.

A. For the 2018 budget, we really started planning for that budget last June, so 2016, June is when that planning process would have started. And what it really is, is understanding what the market assumptions are. So you take the information going into June. The product leads or product managers for our company would look at each of the individual product lines. They would then make assumptions based on what has happened, what they see is going to happen using market intelligence, using different market research information, to build out what that set of assumptions looks like, to talk about their product plans for each of the different products that they're responsible for. Once that product plan is put together, usually sometime around October that's finalized for the -- for each of the product plans.

Then it goes through a peer-review process. So what that means is each of the different product leads from the different parts of the business, in other words, herbicides, fungicides, insecticides, seed care will all come together in one room and debate the assumptions that are being used for each of the

14  1  product plans.

14  2  Q.   If I can interrupt you for a second to make sure we're

14  3  clear on the timing.   Put into context of, let's say, the 2018

14  4  budget, you said it is finalized in October?

14  5  A.   Correct.

14  6  Q.   But now, you just -- you referenced October.   Are you

14  7  talking about -- this would be October of '16 still --

14  8  A.   Correct.

14  9  Q.   -- the process?

14  10  A.   Yup.

14  11  Q.   Okay.

14  12  A.   So from June '16 to October '16, there is an enormous

14  13  amount of work done on each of the product plans.   That is

14  14  really the kickoff of our budgeting process, so each product

14  15  individually going down to the fine detail for each of the

14  16  products.   And then they go through a peer-review process.

14  17       Once the peer-review process is done, the plans will then

14  18  be presented to the Crop Protection Leadership Team, generally

14  19  in December.   Sometimes it falls into January.   But December,

14  20  they will review those plans in a Crop Protection Leadership

14  21  Team meeting, where they're either signed off or rejected or

14  22  told to go back and work it again, but that's generally when

14  23  it's signed off.

14  24       Then, from the Crop Protection Leadership Team meeting

14  25  where the plans are tied off, then we start to look at the

14  1   following year's pricing.  So for 20 -- excuse me, 2018 budget,

14  2   we started working on the pricing in January of 2017.

14  3   Q.   When you said signed off after it goes to the Crop

14  4   Protection Leadership Team, you're not saying you finalize the

14  5   budget for ---

14  6   A.   No.

14  7   Q.   Okay.

14  8   A.   Nope.  That's just the product plan saying, yes, we agree

14  9   that these assumptions are right, this is what we should plan

14  10  for, now let's start the budget process based on this

14  11  information.

14  12  Q.   Can you describe a little bit more detail the peer review

14  13  that you just went through?  Who are the peers?  Who are the

14  14  people involved?

14  15  A.   Right.  So the peer review with the product leads, so the

14  16  Herbicide Team would review the Fungicide Team's plans, and

14  17  back and forth.  So, in other words, the azoxystrobin manager,

14  18  the mesotrione manager, which is herbicide, those two would get

14  19  in the same room and talk about the products' assumptions, what

14  20  we see happening in the market and corn, is it right, is it

14  21  different, what should we think about, do we need more

14  22  information, that type of thing, and challenge each other.

14  23  Q.   What is the benefit?  Why is that done?  Why that

14  24  peer-review process?

14  25  A.   We have an enormous amount of experience within our

Marketing Team.  Most of the guys that I'm talking about have

15, 20 years in the industry from various different

backgrounds.  So, being able to bring that knowledge together

in one place and all the different ways of thinking gives it a

real grounded effect so that we really feel very confident in

what we're getting at the end.

Q.    And these different product leads, do they share some

customers, or -- you mentioned corn.  But do they share -- is

there overlap in the various assumptions that are being

discussed and made?

A.    Yeah.  So these products are generally all used in the

same market space, same customer base.  There are slight

variations, but in general, they're all the same.  Azoxystrobin

and mesotrione are both sold to corn customers across the

midwest.

Q.    Okay.  So, into the January time where the sign-off

occurred, you said you start building the budget and some of

the pricing assumptions.  If you can take it back from there

and go forward.

A.    Right.  So we start out by building out what our pricing

for the following year would look like.  And then we start to

look at, okay, based on that price, if we take that price, what

kind of volumes can we actually sell in the marketplace.

       And then, what we do with that information is we start

with the commercial units.  So the people that are in the

| | |
|---|---|
| 14 | 1 |
| 14 | 2 |
| 14 | 3 |
| 14 | 4 |
| 14 | 5 |
| 14 | 6 |
| 14 | 7 |
| 14 | 8 |
| 14 | 9 |
| 14 | 10 |
| 14 | 11 |
| 14 | 12 |
| 14 | 13 |
| 14 | 14 |
| 14 | 15 |
| 14 | 16 |
| 14 | 17 |
| 14 | 18 |
| 14 | 19 |
| 14 | 20 |
| 14 | 21 |
| 14 | 22 |
| 14 | 23 |
| 14 | 24 |
| 14 | 25 |

field, we start working with them to talk about, okay, does
this feel realistic, is there good information from your
customers that says this is the right assumption to take, how
much volume could you sell based on these prices and this
assumption base.  That goes on for a series of weeks and
months, actually.

Q.   Let me interrupt you and ask you.  You said "commercial
units."

A.   Yes.

Q.   What is a Commercial Unit?  And if you can explain that --
that role.

A.   So across the United States, we have four commercial
units.  The commercial units are really individual businesses
in crop protection across the United States.  So we really have
one person that's managing a group of salespeople out in the
field.  That's a commercial unit, and we have four of those
across the US.

     So those people are directly involved with the customers
on a day-to-day basis.  They have direct responsibility for the
sales.  So, in the end, they're the ones actually making the
sale.

Q.   And how are the commercial units divided up?  Is it
geographic?

A.   It's mostly geographic.  We have one that's the south and
east coast, so it's everything across southern US up to

14  1  Kentucky and across up to New York.  And then we have one

14  2  that's just to the east of that, that would be Kentucky north

14  3  over to Iowa.  We have another one that's Iowa over to Arizona,

14  4  and then the west coast is the rest.

14  5  Q.   So the commercial units, in terms of their input, their

14  6  review, that occurs in, generally, what period of time?

14  7  A.   I'm sorry.  Repeat the question.

14  8  Q.   The commercial units, you indicated you go out to the

14  9  people in the field, the people who are making the sales to

14  10  your customers.  At what point in time are they doing that

14  11  review and giving that feedback?

14  12  A.   Yeah.  So that generally starts in May of each year.  So

14  13  we really spend from January till May working a pricing and

14  14  there's peer reviews, different things that go on in or

14  15  Marketing Team for that in between.  But then, once we get

14  16  through that, we go into May, where we start to work with the

14  17  teams in the field to understand where we are and do a peer

14  18  review there as well.

14  19  Q.   When you say "we" in that context, are you referring to

14  20  the Crop Protection Leadership Team, or who is the "we" in

14  21  that?

14  22  A.   The "we" would be the Marketing Team and the commercial

14  23  units.

14  24  Q.   So what is the next step in the process?

14  25  A.   So the next step in the process would be that once we have

14  1  general agreement with the commercial units, then we would make
14  2  a presentation to the Crop Protection Leadership Team.  We
14  3  would come together as a -- as a group, including the
14  4  commercial units, to debate, call it a peer review if you want,
14  5  but it's really a debate of can we do this or not, what should
14  6  we be looking for more, how much more or less.  And then at the
14  7  end of the day, we would -- we would sign off on that
14  8  regionally here in -- usually in August.
14  9  Q.   So that's -- the sign-off on that, does that finalize the
14  10 budget?
14  11 A.   No.
14  12 Q.   Okay.
14  13 A.   So that finalizes our review of the budget for
14  14 presentation to our global team.  Our COO would then sign off
14  15 on it in September or October time frame.
14  16 Q.   Is it -- between the time the Regional Team signs off on
14  17 it and it's ultimately approved, is it reviewed again or
14  18 criticized and questioned?
14  19 A.   All the time.  I think by the time we get to that point,
14  20 there is a lot of input back and forth, there is a good
14  21 dialogue with the commercial units, and there's a lot of
14  22 debating that goes on between the August time frame and the
14  23 October time frame.
14  24     We made our first -- for instance, we made our first
14  25 presentation to global on the 2018 budget two weeks ago.  They

14  1  will then take until October, but we'll have a formal
14  2  presentation, and, hopefully, get an approval.
14  3  Q.   Is the process ongoing now -- the beginning of the process
14  4  going on now for the 2019 budget?
14  5  A.   Yes, it is.
14  6  Q.   Do those overlap for a period of time?
14  7  A.   Yes, but not necessarily the same people.  So our product
14  8  leads are somewhat out of it once we get to -- out of the
14  9  process once we get to the regional review that I talked about,
14 10  and they can start for the 2019 season now.  So they started
14 11  about a month or more ago.
14 12  Q.   And the final sign-off, now, is there -- the final
14 13  approval of the budget --
14 14  A.   Right.
14 15  Q.   -- at the end of the company -- or at the end of the
14 16  process, you said, I think, October or November?
14 17  A.   It's October.
14 18  Q.   Okay.  October.  Who actually makes that final -- what
14 19  entity or body makes that final approval?
14 20  A.   Our chief operating officer will sign off on that.
14 21  Q.   In terms of your role and involvement, are you involved
14 22  with this process throughout?
14 23  A.   Yes, I am.
14 24  Q.   And in terms of crop protection in the United States, is
14 25  this one of your main areas of responsibility?

14    1   A.    Yes.

14    2   Q.    And in terms of individuals, who are the other -- some of

14    3   other key individuals who are involved with azoxystrobin

14    4   budgets?

14    5   A.    All right.  So the product lead would be directly

14    6   responsible for the start of the process.

14    7   Q.    And who is that?  I would like some names.

14    8   A.    Yeah.  So Andrew Fisher is the azoxy lead.  Then, from

14    9   there, it would be multiple people taking touch points.  But

14   10   the Crop Protection Leadership Team would be the major one

14   11   after them.

14   12   Q.    And then, your involvement, you're on the Crop Protection

14   13   Leadership Team?

14   14   A.    Yes.

14   15   Q.    Once the budget for the year is finalized, does that

14   16   budget change as the year goes on?

14   17   A.    No, it's an annual process.  You can see it's quite an

14   18   in-depth process.  You couldn't get it done more than once a

14   19   year.  So we have a process that's locked down in October.

14   20   Once that's done, it is the budget for the year.

14   21   Q.    And as of October, is that the company's best estimate and

14   22   belief as to what the performance of the various products are

14   23   going to be during the next calendar year?

14   24   A.    Yes, it is.

14   25   Q.    Are you familiar with the term "LP"?

14    1   A.   Yes, I am.

14    2   Q.   What is, in Syngenta's business, an LP?

14    3   A.   It's a latest plan is what it's referred to.  You'll hear

14    4   "last plan" sometimes, but "latest plan."

14    5   Q.   What is a latest plan?

14    6   A.   It's a forecast.

14    7           THE COURT:  Say again.

14    8           THE WITNESS:  It's a forecast.  So what a last plan

14    9   is, is it's looking at what the current business is doing, how

14  10   we're performing.  So it's -- we're required to do a monthly

14  11   forecast of the business, how are we performing against our

14  12   budget.  And that happens once a month, so that's a last plan.

14  13   BY MR. COUGHLIN:

14  14   Q.   How is that plan or those forecasts reported?

14  15   A.   So the forecast is reported through our demand -- Demand

14  16   Management Team that is ultimately responsible for collecting

14  17   the numbers for the business through our commercial units.  And

14  18   then the -- they're fed into the Finance Team, who loads them

14  19   into our financial system through SAP --

14  20          THE COURT:  Through what?

14  21          THE WITNESS:  SAP Reporting.  It's a data tool.  And

14  22   then that's -- that's where it's housed, in the data tool.

14  23   BY MR. COUGHLIN:

14  24   Q.   So SAP, is that, like, an accounting system?

14  25   A.   It's an accounting software, yes.

14   1  Q.   And how frequently are those LP -- is there a report

14   2  that's generated, like, for an LP?

14   3  A.   Yes, they are.  They're done monthly, and they're

14   4  generally done the sixth day of every month -- sixth working

14   5  day of every month.

14   6  Q.   And the purpose of that report is to project how things

14   7  have developed towards budget or what the latest forecast is

14   8  for the calendar year?

14   9  A.   That's correct.  Obviously, some things change throughout

14  10  the year, and you know, understanding how the different

14  11  products are coming in, customer update, whatever, and so that

14  12  you can adjust on the go.

14  13  Q.   The budgetary process that we've been discussing, is that

14  14  process used -- has that process been used for azoxystrobin

14  15  products?

14  16  A.   Yes.  It is used for all of our products.

14  17  Q.   Is it used for herbicides?

14  18  A.   Yes.

14  19  Q.   And, again, how does Syngenta rely upon this budget in the

14  20  operation of its business?

14  21  A.   So the budget is the book that we live by, so to speak, on

14  22  an annual basis and understanding.  The budget is used as a

14  23  tool to set an expectation for the year.  So, that expectation

14  24  is handed down from our COO that I talked about.  It is what we

14  25  live by.  It's what our -- what our incentive plans are built

on.  It's how we are managed and judged at the end of a year.

Q.  Is it -- is the process one that everyone who is involved

in it is trying to do the very best job to make the most

accurate prediction they can?

A.  I certainly believe that we do our absolute best.  I mean,

the process that I outlined is consuming an enormous amount of

time and resource, so we certainly need to make sure that we're

putting every effort to get that right.

Q.  As head of Crop Protection Marketing, are you -- do you

have any responsibility for mesotrione?

A.  Yes, I do.

Q.  Can you explain what mesotrione is?

A.  Mesotrione is a corn herbicide.  It's used to control

weeds in corn.  It is the largest selling corn herbicide in the

world.

Q.  In terms of its use, how similar is its typical use to

azoxystrobin in terms of the customers or the growers who would

be using it?

A.  So the growers would be the same.  The customers that buy

products from us would be the same as -- azoxystrobin and meso

would both be products that they would use in corn.

Q.  And in terms of corn being the major crop for both

products, does corn and the forecast with regard to corn factor

into the budgeting of both of those products?

A.  Yes, it does.

14    1  Q.    How so?  Can you explain or drill down a little bit, in

14    2  terms of the various assumptions that are considered in making

14    3  your budget and determining your budget, what factors overlap

14    4  between the two products?

14    5  A.    So they would overlap directly in most ways.  So, as I

14    6  mentioned earlier, corn is roughly 90 million acres grown in

14    7  the US annually.  There is -- to put that in perspective,

14    8  there's approximately 87 million acres of soybeans, which is

14    9  second largest crop in the US.  So it is, by far, the

14   10  largest -- corn is, by far, the largest crop.

14   11     We would assume, you know, how many acres are projected by

14   12  the USDA.  We would make assumptions based on what the prices

14   13  are, again, based on USDA estimates.

14   14         **THE COURT:**  When you say "prices," you mean the price

14   15  for the corn?

14   16         **THE WITNESS:**  Yes.  So price -- corn is -- that's a

14   17  great question.  Corn is a commodity product.  So the farmer

14   18  only makes money if he's selling corn for a reasonable price.

14   19  So we obviously have to consider what the price of corn is

14   20  going into the year based on what the USDA is telling us.

14   21       So those are things that we would assume.  We would

14   22  also make assumptions around what weather patterns are, what we

14   23  expect to happen as a result of those weather patterns.  You

14   24  really have to look at things like inventories, understanding

14   25  what were the patterns of use the year before, based on what

14    1  happened in the marketplace and what will they project to use

14    2  in the year coming.

14    3          So all of those things would be very standard for

14    4  both of those products, azoxystrobin and mesotrione.

14    5  BY MR. COUGHLIN:

14    6  Q.   In terms of the people who are involved in those different

14    7  products, are -- in terms of the peer review, going back to the

14    8  peer review, the folks who are involved in setting the budget

14    9  as it relates to azoxystrobin, are they the same, or is there

14   10  overlap of the people who are setting the budget for

14   11  mesotrione?

14   12  A.   Yeah, they are going to be very similar people.  I think

14   13  the -- obviously, the product lead is where it all starts, as I

14   14  described before.  Those people are going to peer review each

14   15  other and challenge each other along the way, and they both

14   16  understand corn.

14   17      I think it's also interesting to understand that the

14   18  people that are in these roles as product leads would have

14   19  backgrounds similar to mine.  So they're not coming in off the

14   20  street.  They're certainly experienced.  They understand the

14   21  market.  They've been in the field.  Andrew Fisher, for

14   22  instance, has a very similar background to mine with district

14   23  manager experience.  He's been in the field.  He understands

14   24  the crops, all those kind of things.  So those are the kind of

14   25  people that we have typically in those roles.

14  1   Q.   You talked a little bit earlier about the plant

14  2   performance or enhanced performance associated with

14  3   mesotrione -- or, excuse me, azoxystrobin.  How does that play

14  4   into the budgeting process, if it does?

14  5   A.   Yeah, so it's a crop-enhancement effect that we referred

14  6   to that really gives a benefit with or without disease.  So

14  7   what it has done over the years, as we've seen this be more and

14  8   more of a use over the last ten-plus years, we've seen that the

14  9   stability of our azoxystrobin business is much, much higher

14  10  because customers are using it with or without the presence of

14  11  disease.  So, in other words, what that means is there is less

14  12  of a factor from weather, less of a factor from disease and how

14  13  they use the product azoxystrobin.

14  14  Q.   Has that been a focus of Syngenta's business development

14  15  or marketing is to talk to farmers about planned buying based

14  16  on performance?

14  17  A.   Yes.  Certainly farmers are more budgeting -- mostly

14  18  across the Midwest corn market, they're budgeting for the use

14  19  of a crop-enhancement-type product.  So it's a product that

14  20  they're looking for at the beginning of the year to say, okay,

14  21  I know I need my herbicides, I know I need my fungicide, and I

14  22  know I'm going to use fertilizer; so, therefore, I put it in

14  23  the budget, and I make sure that I have that money available.

14  24  Q.   In terms of fungicides generally, they are to treat

14  25  disease, is that right?

14  1   A.    Yes.

14  2   Q.    In terms of fungicides generally, do all fungicides have

14  3   this enhancement characteristic or effect with plants?

14  4   A.    No, they do not.  The strobilurin class of chemistry is

14  5   very specific to this.  Strobilurin is azoxystrobin.  That's

14  6   just the class of chemistry that it has --

14  7           **THE COURT:**  Have what?  I'm having a little trouble

14  8   hearing you there, and you're talking a little fast.

14  9           **THE WITNESS:**  Sorry.

14  10          **THE COURT:**  That's okay.

14  11          **THE WITNESS:**  Strobilurin class of chemistry is the

14  12  class that gives a crop-enhancement effect, and that's just a

14  13  technical term for azoxystrobin.  And we've done many, many

14  14  years of research to prove that that product does give you

14  15  something more than just a fungicide or a disease control

14  16  product.  So that's well documented.

14  17  **BY MR. COUGHLIN:**

14  18  Q.    But is that -- I'm trying to distinguish.  Is that unique

14  19  to azoxy-type products as opposed to non-azoxy-based products?

14  20  A.    We have many fungicides in our portfolio.  Azoxystrobin is

14  21  the only one that we have proven has a crop-enhancement effect.

14  22  Q.    In terms of the growers, who I guess drive the initial

14  23  demands, but the growers who use azoxystrobin, are they more in

14  24  the category or has the experience been they are more of the

14  25  planned buyers of a fungicide as opposed to buyers who may buy

14  1  only in the need of a disease?

14  2  A.    Yeah.   So the answer is yes.   Typically, the farmer will

14  3  buy based on the crop-enhancement effect more than disease

14  4  control when he's buying azoxystrobin.

14  5  Q.    In terms of mesotrione as a herbicide and azoxystrobin as

14  6  a fungicide, are they used at the same time of the year?

14  7  A.    No, they're not.

14  8  Q.    Explain that, if you would, please.

14  9  A.    So the herbicide is typically sprayed at the time of

14  10  planting or shortly after planting the crop.  So it's very

14  11  early in the season, somewhere around the April-May time frame,

14  12  depending on when they get to the field.

14  13      Azoxystrobin is used later in the season when the corn

14  14  plant is reaching maturity.  So it's usually a July or August

14  15  application before they get to that application, and that's

14  16  just based on the effect that it has on the plant.  It's very

14  17  important to protect from weeds early in the season when the

14  18  plant is small.  That's when it's most susceptible to a weed

14  19  damaging the yield.  When it's later in the season is when it

14  20  has a disease problem, and that's when you need to spray it.

14  21  So it's usually a July, August application.

14  22  Q.    In terms of the yield increase, is yield increase

14  23  something that all Syngenta's products are designed to try and

14  24  increase?

14  25  A.    Yes.  We would hope that all of our products give you some

14  1  sort of a benefit in yield.  What our crop protection products
14  2  are really designed to do is to maximize the potential of a
14  3  crop.  So when the plant is put into the ground, there is
14  4  immediately biological challenges, weather or weeds or diseases
14  5  or insects or something, that's trying to take that yield away
14  6  from the plant.  What the products are designed to do is to
14  7  make sure that that plant gets the opportunity to develop to
14  8  its full potential and to yield a good crop.
14  9  Q.    And how is yield measured by a farmer's standpoint?
14  10 A.    So a yield in corn crop is measured in bushels.  In the
14  11 end, it's measured in how many dollars he takes home.
14  12 Q.    But explain what a bushel is.  Does it vary by crop?  Dumb
14  13 it down to my level, please.
14  14 A.    I didn't know you were going to ask that.  Sorry.  The
14  15 yield is usually 52 pounds.  A bushel is a 52-pound bushel for
14  16 corn, so if you can imagine a bushel basket.  Most people see a
14  17 bushel basket, it's this big, and that's 52 pounds of corn.
14  18 Q.    Is that per acre?
14  19 A.    Typically, a yield for a corn crop, depending on what
14  20 state you're in and what soil type you have, is somewhere
14  21 around 200 bushels per acre.
14  22 Q.    And so if there's an increase in bushels, that's more that
14  23 the farmer is able to take and sell, is that your translation,
14  24 into the dollars?
14  25 A.    That's correct.  So if you think about the commodity price

of corn, they're going to take that bushel or that 200 bushels

to the local grain elevator where he will sell it for dollars.

Q.   And in terms of the enhancement that you talked about with

azoxystrobin in terms of performance, has there been any

estimates over time in terms of the enhancement, either by

bushels or otherwise, the effect of azoxystrobin?

A.   The enhancement is really based on the yield that it

brings and the return on investment that the farmer gets.

Q.   Are you familiar with the term "gross-to-net reports"?

A.   Yes, I am.

Q.   Can you explain what a gross-to-net report is?

A.   Well, a gross-to-net report is a report within Syngenta

that I get monthly.  It is really a view of what our pricing is

doing in the field.  In other words, we release a gross price,

which is our full visible price, to the customer, our channel,

and then the net price is actually what it sold for at the end

of the day.  So gross to net is just the difference between

what it is priced at versus how we're able to sell it in the

market.

Q.   And is that generated out of that same SAP software system

you described earlier?

A.   Yes, it is.

Q.   That's a system that Syngenta uses in the ordinary course

of its business?

A.   Yes, we do.

14      1   Q.   Does the budget appear in the gross-to-net reports when

14      2   they're published?

14      3   A.   Yes, it would show a view of our budget.

14      4         **THE COURT:**  I'm sorry, what?

14      5         **THE WITNESS:**  It would show a view of the budget

14      6   versus the gross to net.

14      7         **THE COURT:**  You fade off at the end, so you just

14      8   might bring the mic a little closer there.

14      9   **BY MR. COUGHLIN:**

14    10   Q.   Can you repeat what you just said?

14    11   A.   So a gross-to-net report is going to show you the view of

14    12   our annual budget versus the gross-to-net selling price.

14    13   Q.   And it's on a monthly basis?

14    14   A.   It is.

14    15   Q.   Is the LP that you were discussing earlier, does that

14    16   appear on the gross-to-net report?

14    17   A.   Yes, it will.

14    18   Q.   And so that's a number that's a projection, latest plan --

14    19   or last plan, and that's on a monthly basis, is that right?

14    20   A.   Yes.

14    21   Q.   But that same report, does that have the budget for the

14    22   year that you described earlier in terms of being finalized in

14    23   October of the prior year?

14    24   A.   Yes.

14    25   Q.   And does that same budget figure stay static throughout

14    1   the year on all of the gross-to-net reports?

14    2   A.    The budget figure stays static through the year, yes.

14    3   Q.    If you could look at the binder that's in front of you,

14    4   and there are four tabs labeled 10A -- excuse me -- 110A, 123A,

14    5   140A, and 148A.  If you could briefly look at those.

14    6   A.    Okay.

14    7   Q.    All I want you to do is look at them and confirm for me if

14    8   they are gross-to-net reports for 2014, '15, '16 and '17?

14    9   A.    Yes, they are.

14   10   Q.    Take a minute to review them.

14   11         **MR. COUGHLIN:**  For the record, those are Plaintiff's

14   12   Trial Exhibits, 110A, 123A, 140A, and 148A.  Your Honor, we

14   13   move to admit those exhibits.

14   14         **MR. TILLER:**  No objection.

14   15         **THE COURT:**  They'll be admitted.

14   16   **BY MR. COUGHLIN:**

14   17   Q.    Are those budgets -- and those are the gross-to-net

14   18   reports that reflect the actual budget of Syngenta for each of

14   19   those years?

14   20         And let me withdraw that question.  The gross-to-net

14   21   reports in there, are they for all of Syngenta's products, or

14   22   are they for certain of Syngenta's products?

14   23   A.    It looks like they are for azoxystrobin and mesotrione

14   24   products.

14   25   Q.    How about for Solatenol products?

| | | |
|---|---|---|
| 15 | 1 | A.   I don't see Solatenol products. |
| 15 | 2 | Q.   For Solatenol, that product hasn't been on the market |
| 15 | 3 | since 2014.  So for that particular product, you can look at |
| 15 | 4 | 2016, which is Exhibit 148A. |
| 15 | 5 | A.   It is on the later reports, yes. |
| 15 | 6 | **THE COURT:**  I'm sorry, what? |
| 15 | 7 | **THE WITNESS:**  Solatenol is on the later reports. |
| 15 | 8 | **BY MR. COUGHLIN:** |
| 15 | 9 | Q.   My question -- I guess what I'm asking is those budgets |
| 15 | 10 | that are reflected there, are those all the budgets for |
| 15 | 11 | azoxystrobin and mesotrione or 2016 Solatenol that were |
| 15 | 12 | generated by Syngenta through the budget process that you've |
| 15 | 13 | been discussing earlier? |
| 15 | 14 | A.   Yes, they are. |
| 15 | 15 | Q.   I would like to change topics. |
| 15 | 16 | A.   Okay. |
| 15 | 17 | Q.   Are you familiar with the Defendant in this case, |
| 15 | 18 | Willowood? |
| 15 | 19 | A.   Yes, I am. |
| 15 | 20 | Q.   Describe your knowledge of Willowood. |
| 15 | 21 | A.   Willowood is a generic supplier of products that have |
| 15 | 22 | become off patent over the last years. |
| 15 | 23 | Q.   And does Willowood sell azoxystrobin products? |
| 15 | 24 | A.   Yes, they do. |
| 15 | 25 | Q.   Do you know the names of those products? |

15  1  A.    Yes, I do.  Azoxy 2SC, AzoxyProp Xtra, and Tebustrobin.

15  2             **THE COURT:**  I'm sorry.  What was the last one?

15  3  **BY MR. COUGHLIN:**

15  4  Q.    Can you spell that for the court reporter?

15  5  A.    Probably not.  T-E-B-U-S-T-R-O-B-I-N.

15  6  Q.    And do those Willowood products compete with Syngenta's

15  7  azoxystrobin products?

15  8  A.    Yes, they do.

15  9  Q.    How do they compete?

15  10  A.    Directly.  They are look-alike products to our products.

15  11  The first two -- Azoxy 2SC is a duplicate to Quadris.

15  12  AzoxyProp Xtra would be a duplicate to Quilt Xcel.  Tebustrobin

15  13  would actually not be a duplicate product but in the same space

15  14  as Quilt Xcel.

15  15             **MR. COUGHLIN:**  David, if you could pull up

15  16  Plaintiff's Demonstrative 8.

15  17  **BY MR. COUGHLIN:**

15  18  Q.    The brand ladder that we have back up here, the Azoxy 2SC,

15  19  what product in particular -- is that identical or

15  20  substantially the same as a particular Syngenta product?

15  21  A.    Yeah, it would be identical to Quadris.

15  22  Q.    Okay.  And that's the straight product?

15  23  A.    It is.

15  24  Q.    So it's just azoxystrobin in terms of an active

15  25  ingredient?

15   1   A.    Correct.

15   2   Q.    And how about the AzoxyProp Xtra?

15   3   A.    AzoxyProp Xtra would be a duplicate of the Quilt Xcel.  So

15   4   it is a combination product of azoxystrobin and propiconazole.

15   5   Q.    In terms of the brand management that you have and the

15   6   role you have with the company, are you aware that generics

15   7   have a right to the compete in the marketplace?

15   8   A.    Yes, I am.

15   9   Q.    How is it that you've experienced generics and the role

15   10  that they play in the marketplace as it relates to crop

15   11  protection?

15   12  A.    So there's a time of exclusivity within any product life

15   13  cycle.  Under the patent, once you've done all the work, you've

15   14  submitted the data, you've done all the research, it typically

15   15  takes 12 years to bring a new active ingredient to market.  It

15   16  typically takes $260 million to get it through all the

15   17  regulatory process that you have to go through to bring a

15   18  product to market on average.  Then there is an exclusive

15   19  period of time that you can sell those products in the market

15   20  to help to recoup part of that cost.  Once that exclusivity or

15   21  the patent life is over, then companies can enter that space

15   22  with the generic, citing your data to do that.

15   23  Q.    In terms of -- you said the exclusive right to sell.  Does

15   24  Syngenta understand -- or in the course of you managing your

15   25  business, which is what I want to ask you about, does that

1   right to -- that exclusive right also relates to offering to

2   sell and importing products?

3   A.   That's correct.

4   Q.   Are generic companies subject to the same regulatory

5   requirements that you discussed earlier, the process that

6   Syngenta goes through in terms of getting registrations and

7   labels?

8   A.   Yes.  Any company that's going to sell an active

9   ingredient must go through the same type of process in order to

10  get a registration and be legal to sell the product, yes.

11  Q.   To your knowledge, when did Willowood first begin selling

12  azoxystrobin in the United States?

13  A.   To my knowledge -- I started this position in August of

14  2014.  One of the first conversations I had with Andrew Fisher

15  was, who was the product lead at the time -- said that, you

16  know, Willowood had entered the market prematurely in July with

17  their first sale, July of 2014.

18  Q.   In terms of what -- has Syngenta -- or does Syngenta on a

19  regular basis deal with generics entering the market and deal

20  with products that come off of patents?

21  A.   We -- as I indicated earlier, we have been in business

22  since the 1800s.  We have many, many products that are off

23  patent and many generic competitors in the space.  We have many

24  recent off-patent products that we compete with generic

25  competitors.

15    1    Q.    Did Syngenta expect that there would be significant

15    2    generic competition for azoxystrobin in 2014?

15    3    A.    Not in 2014, no.  We did expect that there would be

15    4    interest to have a generic offering in the market, as this is a

15    5    very large selling fungicide.  We assumed there would be lots

15    6    of people that would want to come to market with it, but we did

15    7    not expect, through the normal course of business, that we

15    8    would see that product in 2014.

15    9    Q.    Why is that?

15    10    A.    Because of the process that I talked about earlier on

15    11    regulatory hurdles that have to be overcome.  If a patent

15    12    falls, it takes a fair amount of time to bring a product to

15    13    market in the proper channels.  So we did not expect to see it

15    14    in 2014.

15    15    Q.    And what are those particular hurdles that you're

15    16    referring to in terms of what your expectations were?

15    17    A.    So the regulatory hurdles -- typically, in order to get a

15    18    new product, any new product registered, even if the active

15    19    ingredient is already registered, the new product will

15    20    typically take about 12 months to get a registration through

15    21    the EPA with a formulation that's ready to use.

15    22    Q.    And are you aware of -- you referred to a patent expiring

15    23    for azoxystrobin.  Is that a compound patent?

15    24    A.    That is a compound patent.  We have many patents on all of

15    25    our products that include compound patents, which is obviously

15   1  the big one, but we have lots of other mixture patents, process

15   2  patents that we put in place to ensure that we have the

15   3  opportunity to recoup all the work that goes into bringing a

15   4  product to market.

15   5  Q.   Did Syngenta or did you in your role -- were you aware

15   6  that there was a process patent for azoxystrobin even though in

15   7  February of '14 the compound patent had expired?

15   8  A.   As I said, I was informed of this in August of 2014 soon

15   9  after Willowood brought their product to market in July.

15  10  Q.   In terms of patents that have expired, did Syngenta -- and

15  11  I understand you said there could be multiple patents, but I

15  12  want to just focus on the expiration of a particular patent.

15  13  Does Syngenta develop strategies and plans to address the fact

15  14  that a patent is expiring?

15  15  A.   Yes.   Certainly we have post-patent strategies for all of

15  16  our products that are coming to the end of their life cycle,

15  17  so, yes, we put in strategies to help us to maintain our

15  18  business even after a patent fall.

15  19  Q.   Why does Syngenta do that?

15  20  A.   Well, you know, we invest quite a bit of money to bring

15  21  products to market.   We don't have an endless supply of new

15  22  products to bring to market, so we have to stabilize our

15  23  business.   In order do that, we have to put a plan in place so

15  24  that we don't just collapse the market and lose our

15  25  opportunity.

15    1    Q.    What do you mean by "collapse the market"?

15    2    A.    As I talked about earlier with the brand ladder decision,

15    3    collapsing the market would be a lower-priced product coming

15    4    into the market to offer the same thing that you've been

15    5    offering and same value proposition at a much lower price.

15    6    Therefore, the market deteriorates and the opportunity for

15    7    everybody along the channel is much lower.

15    8         **THE COURT:**  You mean you have to reduce the prices

15    9    and everybody makes less money?  Is that what you're saying?

15    10         **THE WITNESS:**  That's correct.

15    11         **THE COURT:**  Okay.  I'm sorry.

15    12         **THE WITNESS:**  That's a better way to say it.  Thank

15    13    you.

15    14    **BY MR. COUGHLIN:**

15    15    Q.    In terms of your customers -- you talk about the channel.

15    16    Are you referring to your customers, the distributors and the

15    17    like?

15    18    A.    Yes, I am.

15    19    Q.    When a patent is set to expire in the future or is

15    20    approaching, do your customers share concerns with regard to

15    21    the impact on the market?

15    22    A.    Our customers are very concerned because, as I said, as

15    23    the price comes down their opportunity to be able to pay for

15    24    the services that they are providing to their customers is

15    25    lower because they make less money, so they're certainly

challenged to be able to continue to make a margin and stay in
business.

Q.    What about inventory?  Do your customers -- when they buy
from you, do they -- do distributors hold inventory?

A.    Yes, they do.

Q.    So how does that play in in terms of when a patent is
going -- or when generics or going to enter a market, what does
that do in terms of your customer behavior?

A.    So it depends a lot on what the generic entry looks like,
but the -- typically, with a product like azoxystrobin, there
are very high inventories, meaning that the distributors hold a
lot of product to be ready for the market before it comes
because it is packaged like you see there, in the smaller 2 1/2
gallon jugs.  They need to have a lot of product sitting in
their possession to be able to deliver it timely, so they may
hold as much as 50 percent inventory from year to year.
Typically what happens is if some generic comes to market
offering a lower price they will withdraw from that inventory
build.  So they'll sell off the product that they have put into
their inventory as quickly as they can in fear of a price
collapse in the market, and then they'll wait and see what
happens as they enter into the next market conditions.

Q.    If a generic was to enter the market early, would that
have an impact on the distributors and their behavior?

          **MR. TILLER:**  Objection.  Speculative.

15    1          **THE COURT:**  Overruled.  He can answer based on his
15    2    experience.
15    3          **THE WITNESS:**  Based on my experience if there is an
15    4    early entry before they expect, the channel goes into turmoil.
15    5    So you can imagine that the -- typically, if they're used to
15    6    making a decision on a normal procedure and they're expecting
15    7    something to happen one way and then something completely
15    8    different happens, they are going to go into a panic mode and,
15    9    therefore, they will take actions to protect themselves.  So in
15   10    this case, they will take actions to sell off inventories and
15   11    make sure that they're not in a position that will be damaging
15   12    to them.
15   13    Q.    In terms of Syngenta's post-patent strategies, is it sort
15   14    of one size fits all or does it depend on the particular market
15   15    and particular products?
15   16    A.    Yeah.  So we have a guideline that we use for all of our
15   17    post-patent strategies, but certainly we look at each
15   18    individual situation, each market understanding what the
15   19    products do and then build the strategy based on that.  So it's
15   20    not a one size fits all, but it is a guiding principle that we
15   21    use across the business.
15   22    Q.    And are there particular people who are involved or
15   23    responsible for developing or managing post-patent strategies
15   24    within the company?
15   25    A.    Yeah.  So my team is responsible for post-patent

15  1  strategies.  I have a specific team that reports to me that is
15  2  responsible for post-patent activities.  It's a business
15  3  development and third-party team that looks after our
15  4  post-patent strategies.
15  5  Q.    Who was in charge of post-patent or involved in
15  6  post-patent strategies as it relates to -- I'll talk I guess
15  7  first about the compound patent and then the process patent,
15  8  which lasted almost two years longer; and if they are different
15  9  people, different teams, explain that, please.
15  10  A.    Obviously, the product manager has a responsibility for
15  11  that as well.  So in this case, Andrew Fisher would be one of
15  12  the responsible parties, but the person directly responsible
15  13  for it would have been Rex Wichert, who is -- was in our
15  14  third-party business development team at that time, and he's --
15  15  in his previous life, he had been the azoxystrobin brand
15  16  manager as well, so he's quite well-versed in this product.
15  17  Q.    Is post-patent strategy sometimes referred to as life
15  18  cycle management?
15  19  A.    Correct.
15  20  Q.    And that's managing the life cycle of a product
15  21  development through post -- when it is no longer subject to a
15  22  patent?
15  23  A.    Yeah.  So a product life cycle management is a normal part
15  24  of business.  Life cycle management is just referring to the
15  25  product enters when it's discovered.  It goes through all the

1  process for development.  Then it goes into a growth stage.

2  This is normally under patent.  It goes into maturity.  At

3  maturity then it's typically when you start to think about your

4  post-patent activity, so what's going to happen later on and

5  how you protect it in a post-patent environment; and then it

6  goes into a state of decline or into a more stable environment

7  depending on the product and what it delivers.

8          THE COURT:  When we -- tell me when you get to a

9  stopping point since it would normally be break time pretty

10  soon.  A couple more questions?

11          MR. COUGHLIN:  Five minutes, I think.

12          THE COURT:  Okay.

13          MR. COUGHLIN:  Is that okay, Judge?

14          THE COURT:  Yes.

15          MR. COUGHLIN:  I have more than that, but if I

16  can have five minutes on this line of questioning.

17          THE COURT:  That's what I am asking.  I'm inviting

18  you to tell me when to stop in the next few minutes.

19          MR. COUGHLIN:  All right.

20  BY MR. COUGHLIN:

21  Q.   In terms of -- you said stabilize.  The life cycle of

22  humans, you know, it has an absolute end.  With products, the

23  life cycle management -- or you go through the transition and

24  it stabilizes and those products continue to sell and be

25  ongoing active products.

15  1  A.   There is -- different products respond in different ways.

15  2  We have products that are replaced by new technologies that

15  3  then just find their way on the shelf somewhere.  We have

15  4  products that are still very viable that stay in the market for

15  5  a long time, so their life cycle exists for many, many years.

15  6  We have products that have been in our portfolio for 50 years

15  7  that are still delivering a very good value to the market.  So

15  8  there is, you know, differences in the way the products are

15  9  accepted.  A product like azoxystrobin that is as big a

15  10  molecule as it is and as high demand as what it is, it will

15  11  have a useful life of many, many years.

15  12  Q.   In terms of the other times -- when you said that life

15  13  cycle management is not unique to -- it's in every business you

15  14  are referring to.  It's not just a crop protection --

15  15  A.   It a very common marketing term you'll learn in any

15  16  business school.

15  17  Q.   In terms of the experience you've had with other products

15  18  that have come off of patent, typically what has been your

15  19  experience as to how long after product comes off patent that

15  20  generic competition comes into market in any significant way?

15  21          **MR. TILLER:**  Objection.  Relevance.

15  22          **THE COURT:**  Overruled.

15  23          **THE WITNESS:**  So that's dependent on the business.

15  24  Obviously, in a highly regulatory, highly regulated space like

15  25  we're in, there is a very standard process for how long it

15    1  takes to bring a product to market; and as I said earlier, the

15    2  EPA requires about a 13 -- 12- to 13-month process in order to

15    3  get a registration in place for a duplicate product.  So

15    4  typically it takes something like 12 to 13 months to bring a

15    5  product into the space.

15    6  Q.    Has that been your actual experience with other products

15    7  that have come off of patent?

15    8  A.    That has been my experience, yes.

15    9          MR. COUGHLIN:  This is a fine time, Your Honor.

15   10          THE COURT:  All right.  Ladies and gentlemen, we'll

15   11  stop for the afternoon break.  I'll ask you to be back in 15

15   12  minutes.  That's about 3:35.  Please remember not to talk about

15   13  the case among yourselves or with anyone else and avoid contact

15   14  with anyone in the courtroom and I'll see you back in 15

15   15  minutes.  Leave your notes in your chair.

15   16      (At 3:20 p.m., jury excused.)

15   17          THE COURT:  How much longer are you anticipating on

15   18  direct?

15   19          MR. COUGHLIN:  Probably 20 minutes, Your Honor.

15   20          THE COURT:  Okay.  Thank you.

15   21          Is there anything that you all want to take up?

15   22      For some reason, even though the mic is not picking

15   23      Mr. Neuman up very well, something is picking up the folks

15   24      over here.  So if you all can minimize the whispering,

15   25      that would be much appreciated.

15   1              Okay.  We'll take a 15-minute recess.

15   2              (At 3:19 p.m. break taken.)

15   3              (At 3:36 p.m., break concluded.)

15   4         **THE COURT:**  Okay.  Anything we need to do before the

15   5  jury comes in?  No?  All right.  You can bring the jury in.

15   6              (At 3:36 p.m., jury panel present.)

15   7         **THE COURT:**  I think we're ready to continue direct

15   8  examination so, Mr. Coughlin, you may proceed.

15   9         **MR. COUGHLIN:**  Thank you, Your Honor.

15  10  **BY MR. COUGHLIN:**

15  11  Q.   Mr. Cecil, we were discussing life cycle management,

15  12  post-patent strategies that Syngenta has in the management of

15  13  its various products.  Can you talk a little bit about the

15  14  timing in terms of the various things that can be done to

15  15  manage that life cycle and how timing plays into that?

15  16  A.   Sure.  So from a life cycle management point of view, we

15  17  put together a strategy, you know, as early as we can in the

15  18  life cycle of the product, when you start to have a feel for

15  19  how big it is or what the size of the opportunity is.

15  20      The things that are generally in relation to that -- the

15  21  strategy is generally you put together a fighting brand

15  22  opportunity.  So we talked about fighting brands on the brand

15  23  ladder so, you know, what does that look like.  You put

15  24  together pricing strategy for post-patent.  What is it going to

15  25  look like?  You put together the right incentives for your

15  1  customers to make sure that they have an opportunity to see,
15  2  you know, what their opportunity in the life cycle management
15  3  is.
15  4      And those are things that you generally do towards the end
15  5  of the life cycle, and the timing is really critical in not
15  6  devaluing the market that we talked about earlier.  If you
15  7  implement any of these things too early before there's a
15  8  competitor in that space, then you risk deteriorating your own
15  9  market.
15  10 Q.   In terms of timing of implementing these various things,
15  11 how does that match up with or affected by the timing of when a
15  12 generic comes to market?
15  13 A.   Yeah.  So, generally speaking, we try to release most of
15  14 our post-patent tools at the time of the generic entry into the
15  15 marketplace.
15  16 Q.   So in terms of azoxystrobin, I think you indicated that it
15  17 was not an expectation of significant generic competition in
15  18 2014, is that right?
15  19 A.   That's correct.
15  20 Q.   So in the general course, if things went the way they
15  21 normally would, or you expected them to go, when would you have
15  22 expected significant generic competition?
15  23 A.   We would have expected to see the first generic entry in
15  24 early 2015 some time.  The patent for -- the AI patent for
15  25 azoxystrobin would have expired in February of 2014.  We would

have expected that to be about 12 months later we would see
somebody in the marketplace.

Q.   And that's assuming that --

          **THE COURT:**  Pardon me.

**BY MR. COUGHLIN:**

Q.   That's assuming that -- because your process patent was
still in place, that would be assuming somebody could develop a
process to come to market that didn't infringe your process
patent, is that right?

A.   That's correct.

Q.   Okay.  And if somebody wasn't able to develop their own
process that didn't infringe the process patent, when would you
expect the first generic entry of significance in that event?

A.   Some time mid- to late-2015, most likely.

Q.   I'm talking about the process patent that expired in
December of '15.

A.   Right.

Q.   Assuming that that -- assuming somebody else could not
develop their own process to manufacture azoxystrobin
commercially that didn't infringe -- in a way that didn't
infringe the '138 patent, when would Syngenta have expected the
first significant generic competition after that expiration in
December of '15?

A.   I'm sorry, I didn't understand your question.  The
12-month process would have been the same, depending on which

15    1  patent you talked about, so if they were able to actually

15    2  import product under -- without a patent in place, they would

15    3  have had 12 months after that to develop and register a

15    4  product.  So if it -- if the patent was off in December of '15,

15    5  we would have expected it something like 12 months after that.

15    6  Q.   And I think you testified earlier that, to your knowledge,

15    7  the first sale of azoxystrobin by Willowood was in July of

15    8  2015.

15    9  A.   Yes, it was.

15   10  Q.   When did -- when was Syngenta able to come to market with

15   11  its fighting brand?

15   12        THE COURT:  July of what year did you say?

15   13        THE WITNESS:  2014.

15   14        THE COURT:  2014.

15   15  BY MR. COUGHLIN:

15   16  Q.   I may have misspoke.  Yes, July of 2014.

15   17  A.   Yes.

15   18  Q.   So when did Syngenta come to market with its azoxystrobin

15   19  fighting brand?

15   20  A.   That would have been launched in 2015 for the market year,

15   21  so it would have been some time in the April time frame.

15   22  Q.   I'm going to ask you to look at Demonstrative 8, the brand

15   23  ladder we were looking at before.  Does that brand ladder

15   24  reflect Syngenta's fighting brand for azoxystrobin?

15   25  A.   Yes, it does.

1  Q.   And what's the name of that fighting brand?

2  A.   Aframe is our fighting brand for the straight goods

3  azoxystrobin, which would have been the first one that we

4  launched; Aframe Plus is the mixture, which would have been the

5  second one.

6  Q.   And when Syngenta came to market with Aframe and Aframe

7  Plus, its fighting brands, did it have to go through a

8  regulatory approval process to be able to get labels to sell

9  its fighting brand?

10 A.   Yes, it does.

11 Q.   Did it do that?

12 A.   Yes.

13 Q.   According to the regulations?

14 A.   Yes, it did.

15 Q.   Now, in terms of a next generation brand, I think you

16 testified that a next generation's another way to address -- I

17 don't know what the right phrase you used before -- managing

18 the brand in dealing with generic competition, how does --

19 again, without repeating yourself, how does a next generation

20 brand help in managing the brand for a compound like

21 azoxystrobin?

22 A.   So what it does is the Trivapro in this scenario is an

23 addition of another fungicide, which adds value for the disease

24 control that the farmer is trying to accomplish, and so what it

25 does is it moves up the price brand ladder, the value for the

15  1  customer. It moves that up, and so it basically gives a new
15  2  space to compete in. It effectively gives a whole different
15  3  group of grower customers to talk to about products that bring
15  4  a different value creation.
15  5  Q.  When you say "value creation," I know -- I think you're
15  6  talking about price in some way --
15  7  A.  Yeah.
15  8  Q.  -- but you're also talking about added benefit of the
15  9  products themselves, the innovation, is that correct?
15 10  A.  Right. So really value creation in this reference is
15 11  talking about what it adds for the customer, and so does he get
15 12  more disease control? Does he get something in addition to
15 13  what he would have gotten with the established brand?
15 14  Q.  When -- when was Syngenta able to introduce Trivapro, its
15 15  next generation premium brand? When was that? When did that
15 16  happen?
15 17  A.  We launched Trivapro to the market 2016, as soon as we
15 18  received registration.
15 19  Q.  And did that also have to go through the registration
15 20  process that you discussed earlier?
15 21  A.  Yes, it did.
15 22  Q.  If Willowood had not entered the marked -- and when I say
15 23  entered the market, I'm talking about selling into the market,
15 24  not starting to sell, or not starting the process -- but if
15 25  they had not actually entered the market until 2015, what would

have been different in terms of Syngenta's implementation of
these different strategies for its own brands?

A.   So we would have been ready to launch our Aframe fighting
brands to the market at the same time, so we would have been
able to hold value much better for the customer there; but,
more importantly, we would have been able to launch our
Trivapro brand, our Solatenol-based products, in a much higher
position into the marketplace.

     As I talked about earlier, the brand ladder is affected
greatly by the low end pulling the prices down.  That means
that you can't price your top end as high, so there's certainly
an effect that happens by devaluing the market before you
launch that product, you'd launch it at a lower price.

Q.   In terms of the different rungs of the ladder, when
Syngenta did not have a fighting brand in the -- for the 2014
season, what impact did that have on its established brands,
it's Quadrises, in terms of pricing in '14 or '15?

A.   So what it really did was it put us on the defensive
position of having to lower our price on our brands versus
lowering our price on our fighting brands -- or through a
fighting brand.  And so, what that does is it devalues that --
that brand.  So, if a customer bought it at a lower price
because we had to compete with a generic, they're likely not to
spend the same -- you'll never go back to that higher price.
You'll have to stay at the lower price for -- for the duration.

15  1  Q.  You used the word "turmoil" before.

15  2  A.  Yes.

15  3  Q.  And I think you were talking about a time in which you

15  4  assumed your role in August of 2014?

15  5  A.  That's correct.

15  6  Q.  Describe that more.  What were you referring to?  I think

15  7  you mentioned, in speaking with Mr. Fisher, that there was

15  8  turmoil.  What were you referring to?

15  9  A.  So our customers are like anybody else.  When they're

15 10  having to make buying decisions, they're doing it based on

15 11  assumptions.  They're understanding that there is a regulatory

15 12  process.  There is certain things that will happen in the

15 13  market.  There are patents in place that companies will defend

15 14  to protect the value in the market.

15 15       When those things become false assumptions, that they can

15 16  no longer depend on that timeline, that 12 months that we

15 17  talked about, they have to go into a situation of managing an

15 18  unknown situation.  So they don't have an understanding of what

15 19  timelines are, of what's going to happen.  So, therefore, they

15 20  have to protect themselves.  So that's the turmoil that I'm

15 21  talking about.  Customers are dealing with big businesses that

15 22  they can't afford to not understand the assumptions that are

15 23  going to happen to them or with them, and therefore, they go

15 24  into a state of chaos, so to speak.

15 25  Q.  When -- when you talked about coming in in August and this

15　　1　turmoil, what was your understanding of when the turmoil or

15　　2　when or how the turmoil began in the marketplace?

15　　3　A.　So my understanding was that there was a little bit of a

15　　4　heads-up early in the year that -- from Willowood to its

15　　5　customers to say that we are going to launch this product for

15　　6　2014.　Most of the customers said, well, that doesn't fit the

15　　7　timelines, it doesn't make sense.　The patent will come off in

15　　8　February; it'll take longer.　So they felt very comfortable

15　　9　that that's probably not going to happen.

15　　10　　　　And then, when they did start selling product in July,

15　　11　they were very worried about what was going to happen because

15　　12　they certainly didn't expect it at that point.

15　　13　Q.　But was it your understanding that, in fact, the

15　　14　discussion going out, the customers hearing early in the year

15　　15　that Willowood was coming to market for the 2014 season, had an

15　　16　effect on the customers' behavior?

15　　17　A.　Certainly, they were --

15　　18　　　　　　　　**MR. TILLER:**　Objection.

15　　19　　　　　　　　**THE COURT:**　I'm sorry.　Could you just ask the

15　　20　question again?

15　　21　**BY MR. COUGHLIN:**

15　　22　Q.　What was your understanding in terms of the effect of

15　　23　Willowood having gone out into the marketplace, telling

15　　24　distributors, customers that it was coming to market for the

15　　25　2014 season?

15  1      THE COURT:  Okay.  You're asking about something that
15  2  happened before he was involved.
15  3      MR. COUGHLIN:  I'm asking about his understanding of
15  4  when he assumed the role in '14 and he was talking to Andrew
15  5  Fisher about the market.
15  6      THE COURT:  All right.  Sustained.
15  7  BY MR. COUGHLIN:
15  8  Q.   You talked about lowering prices.  Are there other things
15  9  that Syngenta did once you were there to try and deal with the
15  10  fact that Willowood had come to market and actually sold
15  11  product in July of '14?
15  12  A.   So we immediately took actions to ramp up our fighting
15  13  brand activities to make sure that we had those available as
15  14  quickly as we could.  We took actions with our distributors to
15  15  make sure that we had incentive programs in place to help them,
15  16  which is actually lowering price through a different mechanism.
15  17  And then, we had to start thinking about selling to third-party
15  18  customers.
15  19      By third parties, we talked a little bit about technical
15  20  formulations earlier.  Third parties would be somebody that
15  21  would buy the product and formulate it for themselves.  And so,
15  22  we had to do all of those things to try to stabilize our
15  23  situation.
15  24  Q.   When you assumed your role in August of 2014, did you have
15  25  any knowledge or any familiarity as to whether any other

15    1   generics had imported azoxystrobin products into the United

15    2   States?

15    3   A.    There was two other companies at the time that had shown

15    4   imports of product to the US.   Cheminova was one that showed an

15    5   import.   And Albaugh Chemical was another that showed imports.

15    6   Q.    I'd like to break them up if I could --

15    7   A.    Sure.

15    8   Q.    -- and ask about the two of them.   In terms of Cheminova,

15    9   what is your understanding of their import or what their

15   10   products were that they could -- they could offer into the

15   11   marketplace?

15   12   A.    So they were looking to offer similar products into the

15   13   market as well azoxy-based products.   The difference in their

15   14   imports was based on the registration that we talked about

15   15   earlier, and so their registration was based on crops outside

15   16   of corn.   So they would be able to come into the market, but

15   17   not into the corn space.

15   18   Q.    So how does that affect, in terms of the impact on either

15   19   Syngenta or Syngenta's customers, the fact Cheminova may have a

15   20   supply of azoxystrobin, but their label was -- did not allow

15   21   them to sell or their farmers to apply that to a corn crop?

15   22   A.    Yeah.   So the crops outside of corn are typically the

15   23   higher-priced crops, so you have vegetables, you have

15   24   specialties like citrus and fruit crops that are high-value

15   25   crops.   They price those products much higher in those crops.

15    1        So, the reality was, corn is such a big player in the
15    2    market, it is the crop that we base all of our pricing on.  So,
15    3    therefore, if it's not going to be sold into corn, it has much
15    4    lower impact on our overall business.
15    5    Q.    Would it have any impact on your customers?
15    6    A.    And certainly the same impact for customers.  So if the
15    7    price is not impacting corn, it will likely not be a major
15    8    factor for the market for them, either.
15    9    Q.    Based on your experience when you joined that position in
15   10    August of 2017 [sic], and then managing it through today, did
15   11    Cheminova's supply or importation adversely affect Syngenta in
15   12    2014?
15   13    A.    Yeah, so I joined that position in August of 2014, not --
15   14    Q.    I'm sorry.  I apologize.
15   15    A.    If you would ask the question again.
15   16    Q.    Based on your -- you came in in August of 2014, and you've
15   17    held that position to date.  Based on your experience, did
15   18    Cheminova, having a generic product but without label that
15   19    allowed the use of corn, impact Syngenta in its business in
15   20    2014?
15   21    A.    No impact to our business overall, no.
15   22    Q.    How about the second generic you made reference to?
15   23    A.    So Albaugh Chemical was -- it's a very small generic
15   24    company that they got registrations for a seed care
15   25    application.  We talked about seed care earlier being an

15  1  exceptionally small part of the business.

15  2      What I didn't say about that business is it's also an

15  3  exceptionally high-priced part of the business.  So, you know,

15  4  they were going enter into a space that was very small, number

15  5  one.  And number two, it's a much higher price than the corn

15  6  market.  So it's definitely not one that we were overly

15  7  concerned about.

15  8  Q.   Did Albaugh's supply or the ability to supply for seed

15  9  care impact Syngenta in 2014?

15 10  A.   No, they did not.

15 11  Q.   Did Cheminova, at some point, get a registration for a

15 12  label that would allow it to sell for corn?

15 13  A.   Yes, they did, but they have not sold any.  In fact,

15 14  they've withdrawn from the market.

15 15  Q.   Do you know when that registration issued?

15 16  A.   No, I would have to look.  I'm sorry.

15 17  Q.   Do you know when they withdrew from the market?

15 18  A.   I believe 2016.

15 19          MR. COUGHLIN:  That's all I have, Your Honor, at this

15 20  time.

15 21          THE COURT:  All right.  Questions for Willowood?

15 22          MR. TILLER:  Thank you, Your Honor.  Good afternoon,

15 23  Mr. Cecil.

15 24          THE WITNESS:  Good afternoon.

15 25          MR. TILLER:  Good to see you again.  This is not easy

```
15    1   with my computer sitting here.
15    2                        CROSS-EXAMINATION
15    3   BY MR. TILLER:
15    4   Q.    Mr. Cecil, you said you are involved in the budgeting
15    5   process, correct?
15    6   A.    Yes, I am.
15    7   Q.    And you said that Syngenta lives by its budgets, right?
15    8   A.    That's correct.
15    9             MR. TILLER:  Your Honor, may I show the witness
15   10   Defendant's Exhibit 252?
15   11             THE COURT:  All right.
15   12             MR. TILLER:  And I'd like to move for its admission.
15   13             THE COURT:  It'll be admitted.
15   14             MR. TILLER:  May I publish it?
15   15             THE COURT:  You may.
15   16             MR. TILLER:  Do you have the second page, Bonnie?
15   17   Can you blow up that chart to everybody can see it?  Of course,
15   18   I don't have my notes.  Found them.
15   19   BY MR. TILLER:
15   20   Q.    Mr. Cecil, these are the budgeted sales and actual sales
15   21   for azoxystrobin from 2009 to 2016.  Do you see that?
15   22             THE COURT:  Are you asking him or are you telling
15   23   him?
15   24   BY MR. TILLER:
15   25   Q.    The title is "2009 to 2016 Azoxystrobin Sales and Gross
```

| | | |
|---|---|---|
| 15 | 1 | Profit."  Do you see that? |
| 15 | 2 | A.    Yes, I do. |
| 15 | 3 | Q.    Okay.  In two -- and these -- all these numbers are in |
| 15 | 4 | thousands, correct? |
| 15 | 5 | A.    Yes. |
| 15 | 6 | Q.    Okay.  So in 2009, Syngenta's budgeted sales for |
| 15 | 7 | azoxystrobin was $249,812,000, correct? |
| 15 | 8 | A.    It appears so. |
| 15 | 9 | Q.    And its actual sales that year were $151,966.  Do you see |
| 15 | 10 | that? |
| 15 | 11 | **THE COURT:**  Uh, what, say that -- |
| 15 | 12 | **BY MR. TILLER:** |
| 15 | 13 | Q.    151 million -- I'm sorry.  $151,966,000, do you see that? |
| 16 | 14 | A.    Yes. |
| 16 | 15 | Q.    So Syngenta's budget that year was off by approximately |
| 16 | 16 | $98 million.  Do you see that? |
| 16 | 17 | A.    Yes, I do. |
| 16 | 18 | Q.    That is about -- it was about 40 percent off that year in |
| 16 | 19 | 2009, correct? |
| 16 | 20 | A.    Quick math, yes. |
| 16 | 21 | Q.    Okay.  And its budgeted gross profit -- and gross profit |
| 16 | 22 | would be revenue minus cost of goods sold? |
| 16 | 23 | A.    Yes. |
| 16 | 24 | Q.    Okay.  Its budgeted gross profit was $173,865,000 that |
| 16 | 25 | year, correct? |

16    1    A.    Yes.

16    2    Q.    And its actual gross profit was $105,801,000, correct?

16    3    A.    Yes.

16    4    Q.    That, too, is off by about 40 percent, correct?

16    5    A.    Yes.

16    6    Q.    Let's look at 2010.  Let me ask you, do you know why

16    7    Syngenta was off that year?

16    8    A.    I have a pretty good idea, yeah.

16    9    Q.    Okay.  And what was it?

16    10   A.    2009 through 2011, as I remember, was a pretty good

16    11   recession, and it was certainly hard to project anything,

16    12   including gas prices or something as simple as buying your

16    13   groceries.  It was pretty hard to project what the farmer was

16    14   going to buy at that point.

16    15   Q.    So, things like gas prices can affect sales of

16    16   azoxystrobin then?

16    17   A.    No.  I think the general economy can affect things like

16    18   azoxystrobin.

16    19   Q.    Fair enough.  The general economy can affect things like

16    20   azoxystrobin, correct, the sales of azoxystrobin?

16    21   A.    Absolutely.

16    22   Q.    Okay.  2010, similarly, we'll look at -- budgeted sales

16    23   were $198,946,000.  Do you see that?

16    24   A.    Yes.

16    25   Q.    And actual sales were $121,305,000, correct?

16    1    A.    Yes, sir.

16    2    Q.    That is about 39 percent off that year, correct?

16    3    A.    Yes.

16    4    Q.    And in that same year, your profits -- gross profits were

16    5    about 50 percent off.  Do you see that?

16    6    A.    I do.

16    7    Q.    Okay.  In 2011, it looks like -- 2011, budgeted sales were

16    8    137,651,000, and actual sales were 191,697,000.  So, actually,

16    9    your budget was under that year, but, it was still off by

16   10    38 percent, correct?

16   11    A.    That's correct.

16   12    Q.    Sales that year were approximately 40 percent off as well,

16   13    correct?

16   14            **THE COURT:**  You mean -- are you asking about profits

16   15    or --

16   16    **BY MR. TILLER:**

16   17    Q.    I mean, I'm sorry, profits.  Profits were about 40 percent

16   18    off that year, correct?

16   19    A.    Looks like it.

16   20    Q.    Okay.  And the downturn in the economy, I believe, started

16   21    in 2007.

16   22    A.    Okay.

16   23    Q.    Okay.

16   24    A.    You don't have 2007 on the list.

16   25            **THE COURT:**  Okay.  Well, counsel won't testify.  Ask

16    1    questions, please.

16    2    **BY MR. TILLER:**

16    3    Q.    Was the downturn in the economy -- didn't it start in

16    4    2007?

16    5    A.    I don't remember when the downturn was --

16    6    Q.    Okay.

16    7    A.    -- but I would assume that's probably right.

16    8    Q.    Now, in 2012, it looks like for gross profits -- no, I'm

16    9    sorry, sales.  Sales were about 6 percent off, do you see that?

16    10   A.    Yes.

16    11   Q.    Or about $14 million?

16    12   A.    Uh-huh.

16    13   Q.    And profits, actually, were pretty close.  They were about

16    14   $4 million off, do you see that, in 2012?

16    15   A.    I do.

16    16   Q.    2013, which there's still no generic competition in 2013,

16    17   correct?

16    18   A.    No.

16    19   Q.    The actual sales were off by about $33 million?

16    20          **THE COURT:**  Are you asking him?

16    21   **BY MR. TILLER:**

16    22   Q.    Were the actual sales off by about $33 million?

16    23   A.    According to this chart, yes.

16    24   Q.    Okay.  And were the actual profits off by about

16    25   $31 million?

A.    According to this chart, yes.

Q.    Now, I've added it up, and I'm happy if you'd like to -- I have a calculator here if you want to add it up and check my numbers.  But, from 2009 to 2013, Syngenta budgeted sales of 1 million -- $1,081,000,719.  Would you like to check me on that or --

A.    I'll trust you.

Q.    Okay.  And, again, I'm happy to have you check it.  But, for those five years, would you agree that the actual sales were $912,547,000?  Does that look about right?

A.    Yes.

Q.    Okay.  That's a difference in those five years, in the five years leading up to any generic competition -- again, I'm happy to give you a calculator, but the difference is about $170 million that over that five-year period, Syngenta was off in its azoxystrobin budgets.  Would you agree with that?

A.    It looks so.

Q.    Okay.  Looking at gross profits for those five years, the budgeted gross profits, would you agree, are $716,565,000?

            MR. COUGHLIN:  Your Honor, he's not showing him -- I mean --

            MR. TILLER:  I'm happy to show him a calculator.

            THE COURT:  Okay.  Well --

            MR. TILLER:  It's just, I've done the math.

            THE COURT:  Okay.  Well, you don't get to testify.

16    1              **MR. TILLER:**  I understand that.

16    2              **THE COURT:**  So let's -- you can hand him the

16    3    calculator if you want and ask him questions.  You can ask him

16    4    if he agrees.  Just don't testify.

16    5    **BY MR. TILLER:**

16    6    Q.    Would you agree that the budgeted gross profits for 2009

16    7    to 2013 are $716 million?

16    8    A.    I would agree that the sheet that you put in front of me

16    9    before I started in the position in 2014, that the budgets were

16   10    off every year, yes.

16   11    Q.    This is a Syngenta document.  I presume you would -- do

16   12    you agree that it likely accurately reflects the budgeted sales

16   13    versus actual sales?

16   14    A.    I have no reason to disagree with that, but I was not in

16   15    the position at that point.

16   16    Q.    Okay.  Now, the difference -- you agreed with me that the

16   17    difference in budgeted sales versus actual sales for that

16   18    5-year period was $170 million.  Are you aware that -- are you

16   19    aware that Syngenta is asking for $75 million of damages in

16   20    this case?

16   21    A.    Yes, I am.

16   22    Q.    And its calculations are based on the azoxystrobin

16   23    budgets, correct?

16   24    A.    Yes, they are.

16   25    Q.    Okay.  Let's look at some of the mesotrione budgeting.

16  1  And, again, when did you start in the position that you're in
16  2  now?
16  3  A.   2014, about a month after you came to market with your
16  4  product.
16  5          MR. TILLER:  Let's look at -- and these are very hard
16  6  to read, Plaintiff 110A please, Bonnie.  If you could scroll
16  7  down to the one, two, three, fourth, fifth page where it says
16  8  mesotrione.  Right there, you just passed it.
16  9          Okay.  In the third column under Callisto -- you have
16 10  it -- I don't need that.  In the gross sales column, 2014
16 11  budget, $64,986,000.  Right there.  You have it.
16 12          THE COURT:  What's your question?
16 13          MR. TILLER:  I haven't asked the question yet.  I'm
16 14  just trying to get Bonnie to highlight it.  I'm sorry.
16 15  BY MR. TILLER:
16 16  Q.   Mr. Cecil, would you agree with me that Syngenta's 2014
16 17  budget for Callisto -- and Callisto's a mesotrione product,
16 18  right?
16 19  A.   Yes, it is.
16 20  Q.   It's a straight mesotrione product, correct?
16 21  A.   Yes, it is.
16 22  Q.   Okay.  The 2014 budget for Callisto, would you agree with
16 23  me, is $64,986,000?
16 24  A.   It appears so.
16 25          MR. TILLER:  Bonnie, if we could go to Plaintiff's

16  1  123A, please.  And if you could go down to mesotrione again,

16  2  and if you could highlight -- so, first of all, could you go to

16  3  the --

16  4  **BY MR. TILLER:**

16  5  Q.   The third column is 2014 actuals.  Do you see that,

16  6  Mr. Cecil?

16  7  A.   Yes.

16  8  Q.   Okay.  Looking at the third column for gross sales of

16  9  Callisto, actual sales in 2014 were $49,384,000.  Do you see

16  10  that?

16  11  A.   I do.

16  12  Q.   That difference -- and I can have Bonnie show it to you

16  13  again if you want -- the budget was approximately $65 million;

16  14  the actuals were approximately $49 million, so would you agree

16  15  with me that the difference -- that Syngenta was off by about

16  16  $16 million?

16  17  A.   Yes.

16  18  Q.   And $16 million would represent about a 25 percent

16  19  difference, would you agree?

16  20  A.   Yes.

16  21        **MR. TILLER:**  Bonnie, please go down to 110A.  If you

16  22  could go down to Callisto Xtra, please.  It's right there on

16  23  the bottom.

16  24  **BY MR. TILLER:**

16  25  Q.   Again, looking at the third column is the 2014 budget,

16  1  would you agree with me -- and Callisto is also -- Callisto

16  2  Xtra is also a mesotrione product, correct?

16  3  A.   Yes.

16  4  Q.   Okay.  The gross sales budget in 2014 for Callisto Xtra,

16  5  would you agree with me, is $17,911,000?

16  6  A.   Yes.

16  7          MR. TILLER:  Okay.  Bonnie, could we go back to 123A,

16  8  please.  Go down to Callisto Xtra.

16  9  BY MR. TILLER:

16  10  Q.   Would you agree with me -- and, again, looking at the

16  11  third column, would you agree with me that that's 2014 actuals?

16  12  A.   Yes, it is.

16  13  Q.   And would you agree that the actual sales for Callisto

16  14  Xtra in 2014 was $14,130,000?

16  15  A.   Yes.

16  16  Q.   So would you agree with me that the difference between the

16  17  budgeted Callisto Xtra sales and the actual Callisto Xtra sales

16  18  for 2014 was approximately $2.8 million?

16  19  A.   Yes, I would.

16  20          MR. TILLER:  Now, when -- you can close that.  Thank

16  21  you, Bonnie.

16  22  BY MR. TILLER:

16  23  Q.   You talked about the latest plans, the LPs?

16  24  A.   Yes.

16  25  Q.   And, again, I just want to make sure I understood what you

said, that the LPs are done monthly as Syngenta sort of looks
to see how it's doing each month compared to its budgets,
correct?

A.    Correct.

Q.    Okay.  Do you know why the LPs were lowered in 2014 in
January and then in February?  Let's start with in January.
The LP was lowered from the budget, so the total gross profit
budget of azoxystrobins was lowered in January of 2014.  Do you
know why?

A.    Yeah, I mean, it's a bit of speculation because I was not
in the role yet.  I started in August.  However, the first
rumors of Willowood coming to market came, as I said earlier,
in January/February.  That was when the customers first started
hearing it.

      So what typically happens in that scenario is the turmoil
that I discussed goes through our sales organization who puts
in a forecast, and they're going to have a knee-jerk reaction
to pull the sales down.

Q.    So it was simply based on a rumor that Willowood was going
to enter the market?

A.    That's the best speculation I can make, yes.

Q.    Okay.  Do you know what information led to the lowering of
the February LP from the January LP?

A.    I assume it's continued turmoil.  I was not in the role at
that time, so I can't answer.

16  1  Q.   Okay.  I understand.  I'm just trying to understand what

16  2  Syngenta's understanding of this was.  So you don't know why

16  3  each LP in 2014, from January to June, was lowered?

16  4  A.   I'm not even sure that they were, however, I was not

16  5  there.  It's not normally something I would do to go back and

16  6  research every month why before I got into a position so, no, I

16  7  don't really know.

16  8  Q.   But you believe there was a rumor that Willowood would be

16  9  getting into the market?

16  10  A.   Yes.  I know that there was.

16  11  Q.   Okay.  Who did you hear this from?

16  12  A.   I heard it from multiple customers, but Andrew Fisher was

16  13  probably the one that told me first.

16  14  Q.   And what did they tell you?  Did they tell you how -- what

16  15  types of products Willowood would be coming into the market

16  16  with?

16  17  A.   So Andrew told me in one of my first meetings with him

16  18  that there was rumors in the field that in January/February

16  19  time frame that Willowood would be entering the market for the

16  20  2014 season.

16  21  Q.   Willowood did not enter the market for the 2014 season,

16  22  correct?

16  23  A.   They entered the market in July of 2014 for the season,

16  24  yes.

16  25  Q.   You're not aware of any significant sales in 2014, are

16    1    you?

16    2    A.    Well, we talked a little bit about post-patent strategy a

16    3    few minutes ago.  If you were to read all of my post-patent

16    4    strategy documents across the company, one of the statements

16    5    you would find in there multiple times would be generic entries

16    6    rarely affect volume, they mostly affect price.  And what that

16    7    means is the first price to market with a generic entry will

16    8    lower the overall market.  It will pull the brand ladder down,

16    9    and it will make it harder to compete.

16    10        It will not necessarily get big volume.  Because of the

16    11    industry we're in, we have a channel that needs to support the

16    12    logistics to get to the field and, therefore, a generic has a

16    13    hard time finding a path to market, so the volumes may be low,

16    14    the price becomes very low and very difficult.

16    15    Q.    How far down did Willowood lower the price?

16    16    A.    How far down --excuse me?

16    17    Q.    How far below the price of Syngenta's price was

16    18    Willowood's?

16    19    A.    Approximately 15 percent.

16    20    Q.    And how far below Syngenta's price was Cheminova's price?

16    21    A.    I do not know.

16    22    Q.    Okay.

16    23    A.    They were not a factor in the market.

16    24    Q.    They were not a factor in the market.  Let's take a look

16    25    at Defendant's Exhibit 21.

16   1             MR. TILLER:  Can I get 21, please.

16   2             Your Honor, may I approach and show the witness

16   3  Exhibit 21?

16   4             THE COURT:  Yes.  You may.

16   5             MR. TILLER:  I'd like to move for it's admission.

16   6             MR. COUGHLIN:  No objection.

16   7             THE COURT:  It'll be admitted.

16   8             MR. TILLER:  Could you -- it's all on the first page.

16   9  Look at the 2014 -- strike that.

16  10  BY MR. TILLER:

16  11  Q.   Mr. Cecil, do you see that this document represents the

16  12  2011 to 2015 year-to-date azoxystrobin imports?

16  13  A.   Yes, I do.

16  14  Q.   And this is as of February 2016?

16  15  A.   Yes.

16  16  Q.   Looking at the 2014 numbers -- 2014, please, Bonnie.

16  17  Thank you -- you'll see here that Cheminova, with its Equation

16  18  and Azaka products, imported approximately --

16  19             THE COURT:  I don't think anybody can see that.

16  20             MR. TILLER:  Nobody can see that?  Okay.

16  21             THE COURT:  Well, I can't.  I don't know.  Can you

16  22  all see it?

16  23             MR. TILLER:  Can you focus in on the Cheminova --

16  24  just the Cheminova line, please.  Is that better?

16  25             THE COURT:  Yeah.

MR. TILLER:  Is that better?  Sorry.

THE COURT:  Go ahead.

MR. TILLER:  These are really small spreadsheets.

BY MR. TILLER:

Q.  You will see there that Chem -- would you agree with me that Cheminova imported a little over 33 million pounds -- 33,000 pounds of azoxystrobin in June of that year?

A.  No, I cannot.

Q.  Why not?

A.  Because from this import report what I see is Cheminova imported 16,000 gallons of product --

Q.  Okay.

A.  -- formulated product because it's called out in a brand name.  Willowood, for instance, imported technical product, 42,329.  Technical product would probably turn into something much, much higher than 16,000.

MR. TILLER:  Well, can we go to the top, Bonnie.

BY MR. TILLER:

Q.  The exhibit itself says that the numbers are reflected in pounds of AI.  Do you see that?

A.  I see that.

Q.  And below that -- where it's highlighted, Bonnie -- it says sum of pounds of AI.  Do you see that?

A.  Okay.  I do.

Q.  Okay.  But despite the fact that the document itself says

that all of these numbers are in pounds, you believe that this
is in gallons?

A.    I do.

Q.    Okay.  Now, the 2014 -- strike that.

      Let me ask you:  Cheminova you said did not have a
corn -- was not approved for corn in 2014, correct?

A.    No, it was not.

Q.    But it was approved for corn in 2015, correct?

A.    I believe so.

Q.    And while corn is the primary -- or I think you used the
term primary.  While corn is the primary crop on which
azoxystrobin is used, it is also used, as you said, on a number
of others, correct?

A.    That's correct.

Q.    And it's used -- it's sold significantly in the cereals
market, correct?

A.    It is in the cereals space.

Q.    In the soybean space as well, too?

A.    Correct.

Q.    Okay.  And between cereals, soybeans and corn, those are
the largest row crops that are planted in the United States,
correct?

A.    Yes.

Q.    Let me show you 87, please.

            **THE COURT:**  Defendant's 87?

16    1          **MR. TILLER:** Defendant's 87. I'm sorry, Your Honor.

16    2      May I approach, Your Honor?

16    3          **THE COURT:** You may.

16    4          **MR. TILLER:** Move for admission of Defendant's

16    5 Exhibit 87.

16    6          **THE COURT:** It'll be admitted.

16    7      Go ahead.

16    8 **BY MR. TILLER:**

16    9 Q. Thank you. Mr. Cecil, do you know who Charles Flippin is?

16   10 A. Yes, I do.

16   11 Q. And who is he?

16   12 A. He is currently the head of our business development third

16   13 party team.

16   14 Q. Is that KAM national accounts?

16   15 A. No, at that time he would have been our key account

16   16 manager.

16   17 Q. Key account manager?

16   18 A. Uh-huh.

16   19 Q. Okay. And in this letter dated -- do you see that the

16   20 letter's dated November 17, 2014?

16   21 A. Yes, I do.

16   22 Q. Do you agree with me that this is a letter to Syngenta

16   23 distributors stating that, "In response to competitive offers

16   24 in the marketplace, Syngenta is announcing a 3 percent list

16   25 price increase on Quadris, Quilt Xcel and Quilt and Quadris Top

16    1  SB."  Do you see that?

16    2  A.    I do.

16    3  Q.    And, in fact, Syngenta did have a 3 percent list price

16    4  increase in November of 2014, correct?

16    5  A.    Yes, we did.

16    6  Q.    Okay.  Now, the competitive offers in the marketplace, to

16    7  which this is responding, were not any offers by Willowood or

16    8  Albaugh or Cheminova because Syngenta had not seen much, if

16    9  any, sales by that time, correct?

16   10  A.    We had seen sales from Willowood in July 2014.

16   11  Q.    Do you recall being deposed?

16   12  A.    Yes, I do.

16   13  Q.    And you understood that you were there to tell the truth

16   14  and answer the questions as truthfully as you could?

16   15  A.    Yes, I do.

16   16        **MR. TILLER:**  Okay.  If we could please bring up Cecil

16   17  deposition, specifically page 195, Bonnie.

16   18        Your Honor, would you like me to hand him a copy of

16   19  the deposition or can we read it off the screen?  It's up to

16   20  you?

16   21        **THE COURT:**  It's okay.

16   22        **MR. COUGHLIN:**  I prefer him to have the deposition to

16   23  make sure he has the context.

16   24        **THE COURT:**  Okay.  You can hand it to him.

16   25        **MR. TILLER:**  May I approach?

| | |
|---|---|
| 16 | 1 |
| 16 | 2 |
| 16 | 3 |
| 16 | 4 |
| 16 | 5 |
| 16 | 6 |
| 16 | 7 |
| 16 | 8 |
| 16 | 9 |
| 16 | 10 |
| 16 | 11 |
| 16 | 12 |
| 16 | 13 |
| 16 | 14 |
| 16 | 15 |
| 16 | 16 |
| 16 | 17 |
| 16 | 18 |
| 16 | 19 |
| 16 | 20 |
| 16 | 21 |
| 16 | 22 |
| 16 | 23 |
| 16 | 24 |
| 16 | 25 |

                    **THE COURT:**  You may.

**BY MR. TILLER:**

Q.    Here is page 195.  Now, actually, if we go up to -- on
page 197, we are talking about this same exhibit that we were
just looking at, which I believe was Exhibit 87 -- Defendant's
Exhibit 87, the letter from Mr. Flippin raising the price by
3 percent.

       And you will see that I asked a question at page -- at
line 5.  Do you see where the question is:  Looks like in
response to competitive offers in the marketplace Syngenta is
announcing a 3 percent list price increase on our Quadris,
Quilt -- Quilt and Top SB fungicide brands.  Do you see that?

       And you said:  I do.

       Would you agree with that?

A.    I'm sorry.  I was reading your document.

Q.    I'm sorry.  Go ahead if you need to.

A.    No, please ask.

Q.    Do you see on page 195 at page (sic) 5 where I asked you
that question?

A.    Yes, I do.

Q.    Going down, I then asked you:  What were those competitive
offers in the marketplace that Syngenta was reacting to?

       And you said:  I don't know at this time.

       Do you see that?

A.    Correct.

16  1  Q.   Then I asked you:  Well, we saw earlier that Cheminova had

16  2  imported -- had begun importing azoxystrobin in June of 2014,

16  3  that Willowood began importing in July, and that Albaugh had

16  4  begun importing in October.  Do you believe that the sales of

16  5  any of those generics were these competitive offers in the

16  6  marketplace to which this letter is referring?

16  7       Do you see that question?

16  8  A.   I do.

16  9  Q.   And in response, do you see -- and there is actually a

16  10  typo here, so I can show you where it was corrected if you

16  11  want.  But your answer is:  No, because I don't believe we --

16  12  the transcript says "sold."  The errata sheet corrects it to

16  13  say "saw."  And I can show you the errata sheet.  Do you

16  14  remember noting that there were some typos in the deposition?

16  15  A.   Yes, I do.

16  16  Q.   Okay.  I can show you where you made that change.

16  17           **THE COURT:**  Let's move along.

16  18           **MR. TILLER:**  Okay.

16  19  **BY MR. TILLER:**

16  20  Q.   You answered:  No, because I don't believe we saw any

16  21  sales in the marketplace from these companies until late in

16  22  2014, if not early 2015.

16  23       Do you see that?

16  24  A.   I do.

16  25  Q.   And that was correct when you answered the question,

16    1   correct?

16    2   A.   Yes.  It's still correct.  I think you have to add to that

16    3   just a little bit, though.  If you read on down in the

16    4   deposition, what it talks about is that --

16    5   Q.   That --

16    6   A.   You don't want me to answer?

16    7   Q.   No.

16    8   A.   Okay.

16    9   Q.   Thank you.  So you did not -- Syngenta did not lower its

16   10   prices for azoxystrobin in 2015, but in fact raised, raised its

16   11   prices in 2014, correct?

16   12   A.   No, we did not.

16   13               **THE COURT:**  Okay.  I mean --

16   14               **MR. TILLER:**  This is '14.  Did I say --

16   15               **THE COURT:**  Okay.  But you said two different years.

16   16   **BY MR. TILLER:**

16   17   Q.   Syngenta did not lower its prices in 2014, but in fact

16   18   raised it, raised the prices in 2014, correct?

16   19   A.   No.

16   20   Q.   No, it didn't?

16   21   A.   No.

16   22   Q.   So this document is wrong?

16   23   A.   We lowered our overall net prices.  The list price is the

16   24   gross price that we release to our customers.  The net price

16   25   would be including discounts the customers take at the end of

```
16   1   the year.  The net price was lowered in 2014 in response to
16   2   Willowood's offer.
16   3   Q.   But not in response to Cheminova's offers?
16   4   A.   No.
16   5   Q.   Not in response to Albaugh's offers?
16   6   A.   No.  They were not relevant in the corn market.
16   7   Q.   They were not relevant, okay.
16   8        Let me show you what has been marked as Defendant's 68.
16   9           MR. TILLER:  May I approach the witness, Your Honor?
16  10           THE COURT:  You may.
16  11           MR. TILLER:  Your Honor, I would move for admission
16  12   of Defendant's Exhibit 68.
16  13           MR. COUGHLIN:  Your Honor, may I take a quick look?
16  14   It's a thick document.
16  15           THE COURT:  Yes.
16  16        (Pause in the proceedings.)
16  17           MR. COUGHLIN:  May we have a sidebar, Your Honor?
16  18           THE COURT:  All right.
16  19           (Bench conference as follows:)
16  20           MR. COUGHLIN:  There are portions that refer to
16  21   petitions to cancel.  We object to certain pages of this
16  22   document coming in because they're subject to the motions in
16  23   limine.
16  24           THE COURT:  Okay.
16  25           MR. TILLER:  I wasn't asking questions about that
```

16    1   page.  I can tell you we can --

16    2          THE COURT:  We can substitute a copy and you all

16    3   agree on the redactions.

16    4          MR. COUGHLIN:  A related issue on some of these is

16    5   data compensation discussions and demands and is also part of

16    6   our motion in limine, so to the extent they would use data

16    7   compensation, it seems that might need to be redacted.

16    8          MR. TILLER:  If I've going do that, I'm going to have

16    9   to visit with the Court.

16   10          THE COURT:  All right.  So I'm not going to admit it

16   11   at this time.  I'll let you substitute or copy in.  You can go

16   12   ahead and ask him questions about it and publish pages that

16   13   don't include that to the jury.

16   14          MR. COUGHLIN:  Is that the petition to cancel and the

16   15   data comp?

16   16          THE COURT:  Yes.

16   17      (Bench conference concluded.)

16   18          THE COURT:  I think we have a technical problem with

16   19   this one, ladies and gentlemen, so they're going to substitute

16   20   a copy later.  He's going to ask questions about the pages that

16   21   there is no dispute over.

16   22   BY MR. TILLER:

16   23   Q.   Mr. Cecil, do you recognize what has been marked as

16   24   Defendant's Exhibit 68?

16   25   A.   Yes.

16    1   Q.   And when it says on the front cover that you sponsored --

16    2   I'll call it this document or maybe -- would you call this a

16    3   document or a presentation?  I just want to make sure --

16    4   A.   It's a document.

16    5   Q.   Okay.  When you're the sponsor of it, that means you're

16    6   offering it to the company?

16    7   A.   That means I am the representative on the Central Steering

16    8   Committee that is a member that is bringing it forward.

16    9   Q.   Okay.

16   10        **THE COURT:**  So what is this?

16   11        **THE WITNESS:**  This would be a presentation made to

16   12   our Central Steering Committee on azoxystrobin strategy.

16   13        **THE COURT:**  Okay.  Go ahead.

16   14   **BY MR. TILLER:**

16   15   Q.   Now, looking at page -- strike that.  Do you know when

16   16   this was prepared?

16   17   A.   No.  It looks like it would have been early 2015.

16   18   Q.   That was going to be my assumption as well because on the

16   19   third page, which is 283443, it talks about objectives for

16   20   2015.  Do you see that?

16   21   A.   Yes, I do.

16   22   Q.   Is that what -- or at least that's one of the indicia that

16   23   leads you to believe it was early 2015?

16   24   A.   It's the first date on the document, yes.

16   25   Q.   Okay.  Now, there you'll see on page 283433 (sic) --

16   1             **THE COURT:** 2834 what?

16   2             **MR. TILLER:** 443. The third page, Your Honor. I'm

16   3   sorry.

16   4   **BY MR. TILLER:**

16   5   Q. In the left-hand corner, there's a chart there about

16   6   pricing. Do you see that?

16   7   A. Yes.

16   8   Q. And when it says "FB versus Generic Pricing," I presume

16   9   that means fighting brands versus generic pricing. Am I

16   10   correct?

16   11   A. Yes.

16   12   Q. You'll see there it identifies a range of prices for

16   13   generic straight azoxystrobin. Do you see that?

16   14   A. Yes.

16   15             **THE COURT:** I don't think there is any problem with

16   16   this part, so you can show it to the jury.

16   17             **MR. TILLER:** Okay. I'm sorry. That would make

16   18   sense.

16   19   **BY MR. TILLER:**

16   20   Q. So there it looks like Syngenta is monitoring the prices

16   21   of generics in the marketplace, correct?

16   22   A. Willowood.

16   23   Q. Only Willowood?

16   24   A. That's what it says.

16   25   Q. It says generics.

16  1  A.    In 2015 when this document was prepared, there was no

16  2  reason to believe this would show up in a courtroom.  Why would

16  3  I put anything on there other than the company that I see in

16  4  the market?

16  5  Q.    Okay.  We'll see that moving forward.

16  6  A.    Willowood.

16  7  Q.    Looking at the next page, 283444, this is -- would you

16  8  please explain what this is?

16  9  A.    If you give me a minute.

16  10  Q.    Sure.

16  11  A.    It's an attempt to outline what the opportunity for our

16  12  customers to make money on a branded product is.

16  13  Q.    Syngenta has loyalty programs with its customers, correct?

16  14  A.    We have what we call our Key AI program, yes.

16  15          **THE COURT:**  Your what?

16  16          **THE WITNESS:**  Key Active Ingredient incentive.

16  17          **THE COURT:**  So Key AI, active ingredient.  Okay.

16  18          **THE WITNESS:**  Sorry.

16  19          **THE COURT:**  That's all right.

16  20          **THE WITNESS:**  We forget that we have lots of lingo

16  21  that nobody else does.

16  22          **THE COURT:**  Everybody has lingo.

16  23          So go ahead.

16  24  **BY MR. TILLER:**

16  25  Q.    And here, because we talked about this the last time we

16  1  met, this is a chart -- you tell me if I'm wrong.  This is a

16  2  chart that summarizes how a distributor would actually lose

16  3  money if it purchases and sells more than 4 percent of its

16  4  azoxystrobin sales as being generics.  Am I correct?

16  5  A.    That's correct.

16  6  Q.    Okay.  So a distributor -- or let's call them a customer.

16  7  A customer is incentivized to sell 96 percent of its

16  8  azoxystrobin from -- being acquired from Syngenta, correct?

16  9  A.    It was at that time.

16  10  Q.    It was at that time.  So this would allow the distributor

16  11  to sell 4 percent of its azoxystrobin in generic, correct?

16  12  A.    Correct.

16  13  Q.    But in order for it -- in order for that customer to sell

16  14  enough generic to make up the difference of the Key AI

16  15  rebate -- if it went below 4 percent Syngenta or if it bought

16  16  4 percent generic --

16  17       **MR. TILLER:**  Let me ask it better because I see your

16  18  confusion, Judge.

16  19  **BY MR. TILLER:**

16  20  Q.    A retailer would have to transition to a minimum of

16  21  60 percent of its purchases to generic to break even versus

16  22  staying with Syngenta, correct?  That's what this chart shows.

16  23  A.    That's what the chart would show, yes.  The chart would

16  24  also show that a customer is competing with other of his

16  25  competitors in the market that may not be in our loyalty

16    1    program and they would be the ones that would devalue the

16    2    market.

16    3    Q.    Moving to 283448, do you have that page, sir?

16    4         MR. TILLER:  Could you go to that one, Bonnie?  If

16    5    you could, Bonnie, the top left.  Yes.

16    6    BY MR. TILLER:

16    7    Q.    Would you agree with me, Mr. Cecil, that this is a summary

16    8    of Syngenta azoxystrobin pricing versus Willowood generic

16    9    pricing?  That's the title of this page?

16   10    A.    Yes.

16   11         MR. COUGHLIN:  If we could get the whole top?  It

16   12    cuts off the title piece.

16   13         MR. TILLER:  Okay.  I'm sorry.

16   14         You need to show that.  There you go.

16   15    BY MR. TILLER:

16   16    Q.    The first bullet, would you agree --

16   17         MR. TILLER:  Bonnie, could you please

16   18    expand -- Chris, expand the first bullet, please.  The whole

16   19    bullet, please.

16   20    BY MR. TILLER:

16   21    Q.    It says:  Generic Willowood and Cheminova and branded

16   22    competition has led to reduction in 2015 prices versus budget.

16   23    Do you see that?

16   24    A.    Yes.

16   25    Q.    So Syngenta is tracking Cheminova's price, correct?

16  1    A.    Syngenta is tracking generic prices.  That's what it says.

16  2    Q.    And among the generics it's tracking is Cheminova?

16  3    A.    There's nothing on this page that tells me that Cheminova

16  4    had a price in the market at that point.

16  5    Q.    But there is something on the page that tells you that

16  6    Cheminova has led, at least in part, in reduction in 2015

16  7    prices versus budget, correct?

16  8    A.    No.  What it tells me -- the following three bullet points

16  9    would tell me that branded premium to Willowood generic is X,

16  10   fighting brand premium to Willowood generic is X.  So it tells

16  11   me that's the primary one that we're monitoring.

16  12   Q.    So the fact that it identifies Cheminova as leading to

16  13   reduction in 2015 prices versus budget is not accurate?

16  14   A.    What it says is that there is a brand manager --

16  15   Q.    I just want --

16  16   A.    -- putting together a plan that is trying to make sure he

16  17   doesn't leave something out, but what he knows is Willowood is

16  18   in the market and they are currently 23 percent under our

16  19   price.

16  20   Q.    You're the sponsor of this document, Mr. Cecil, so I

16  21   presume you reviewed it.

16  22   A.    So I would presume that I would know what it says being

16  23   the sponsor.

16  24   Q.    And it -- I'm just trying to make sure --

16  25        **THE COURT:**  So let him finish his question before you

16    1  start answering.

16    2          Then if you'll let him finish his answer before you

16    3  ask another question so you don't talk over each other.

16    4          **MR. TILLER:**  Okay.

16    5          **THE COURT:**  Go ahead.

16    6  **BY MR. TILLER:**

16    7  Q.   Let me take you to -- I think we've had a good

16    8  conversation about that page.  Let me take you to 283457.  The

16    9  first -- the title -- would you agree with me that the title of

16   10  that page is "Row crop fungicides will see first entry of

16   11  strobiline generics with basic manufacturers moving to SDHI

16   12  premixes"?  Correct?

16   13  A.   Yes.

16   14  Q.   Okay.  And SDHI is a new type of fungicide, correct?

16   15  A.   It is.

16   16  Q.   And Solatenol is an SDHI, correct?

16   17  A.   Solatenol is an SDHI.

16   18  Q.   And Solatenol was coming to market in 2016, correct?

16   19  A.   Yes, it was.

16   20  Q.   And the idea, as you talked about when Mr. Coughlin was

16   21  questioning you, was to transition certain customers to this

16   22  new type of fungicide called Solatenol, correct?

16   23  A.   Correct.

16   24  Q.   And other competitors also had Solatenol -- also had SDHIs

16   25  on the market, correct?

```
16    1   A.    Yes.
16    2   Q.    And, in fact, BASF had begun offering its SDHI Priaxor by
16    3   2015, correct?
16    4   A.    Yes, it had.
16    5   Q.    So a new product from BASF had come on line in 2015 that
16    6   was competitive with azoxystrobin, correct?
16    7   A.    Yes.
16    8   Q.    And here you will see -- first of all, on the right-hand
16    9   side -- the chart on the right-hand side is titled "Competitive
16   10   pressure increases as generics enter and basics move to SDHI
16   11   mixtures," correct?
16   12   A.    Correct.
16   13   Q.    So there was a competitive pressure coming from basics
16   14   moving to SDHI mixtures, correct?
16   15   A.    There was always competitive pressure with BSF, yes.
16   16   Q.    But, specifically, because it had an SDHI on the market in
16   17   2015 and Syngenta did not?
16   18   A.    Yes.
16   19   Q.    Okay.  And you noted here, under "BASF," that BASF was
16   20   driving volume to -- I have a hard time with this word --
16   21   Pyraclostrobin prior to the Pyraclostrobin patent falling,
16   22   correct?
16   23   A.    That's correct.
16   24   Q.    And the Pyraclostrobin patent was expiring in 2015 --
16   25   summer of 2015, correct?
```

16   1   A.   That's correct.

16   2   Q.   And so, BASF was driving volume to Pyraclostrobin to sell

16   3   as much as it could before its patent expired, correct?

16   4   A.   Yes.

16   5   Q.   And by driving volume, it was lowering its price, correct?

16   6   A.   Not necessarily.

16   7   Q.   How else was it driving volume?

16   8   A.   They have many tactics, just like every company, to drive

16   9   volumes.

16   10  Q.   So they were at least trying to increase sales using

16   11  certain tactics?

16   12  A.   Yeah.  We've been competing with BASF for 40 years.

16   13  They're a very good competitor.

16   14  Q.   But this is something new that was happening in 2015

16   15  because of the imminent expiration of its patent, correct?

16   16  A.   Yes.

16   17  Q.   Okay.  And in the next bullet, BA -- no, no, right there.

16   18  I'm sorry, Chris -- BASF was also aggressively transitioning

16   19  its customers to its new SDHI, correct?

16   20  A.   It appears so.

16   21  Q.   Okay.  Going down to the bottom on the right-hand side, do

16   22  you see where it says, "Third Parties and Generics"?

16   23  A.   I do.

16   24  Q.   And there, among others, you note, since you're the

16   25  sponsor, Willowood USA and Cheminova, correct?

```
16    1  A.    Yes, all of whom had registrations in the market.

16    2  Q.    I understand that.  Let me show you Defendant 88, please.

16    3            THE COURT:  What was the number?

16    4            MR. TILLER:  Eighty-eight.  I'm sorry, Your Honor.

16    5            THE COURT:  That's all right.

16    6            MR. TILLER:  I'm sorry.  I'm throwing Ms. Logan

16    7  curveballs here.

16    8            THE WITNESS:  Excuse me.  Can I get a drink of water?

16    9            THE COURT:  Yeah, he's asking for some water.  Maybe

16   10  somebody can bring him some.

16   11            MR. TILLER:  Do you have 82?  I can go to 82.  May I

16   12  approach the witness, Your Honor?

16   13            THE COURT:  Yes.  Which one are you approaching with?

16   14            MR. TILLER:  I'm sorry.  I'm now to 82.

16   15            THE COURT:  Defendant's --

16   16            MR. TILLER:  Defendant's 82.  I'd move for its

16   17  admission.

16   18            MR. COUGHLIN:  If I can just look at it briefly, Your

16   19  Honor.

16   20            MR. TILLER:  Please.

16   21            THE COURT:  You can go ahead and hand it to the

16   22  witness, so he can be looking at it at the same time.

16   23            MR. COUGHLIN:  No objection.

16   24            THE COURT:  It'll be admitted.

16   25  BY MR. TILLER:
```

16    1  Q.   If we could look at page 56130, please.

16    2           THE COURT:  I'm sorry.  Say again.

16    3           MR. TILLER:  56130.  Do you have it, Your Honor?

16    4           THE COURT:  I'm just going to look on the screen.

16    5  These books are kind of big.

16    6  BY MR. TILLER:

16    7  Q.   Looking at the second note on the left-hand side, do you

16    8  see where it says "Row Crops"?

16    9  A.   I do.

16   10  Q.   Will you agree with me that, under "Row Crops," it says,

16   11  decline in intensity due to commodity prices?

16   12           THE COURT:  I'm sorry.  I don't think I know what

16   13  this document is.  I'm --

16   14           MR. TILLER:  It's one of the --

16   15           THE COURT:  If you could ask the witness.

16   16  BY MR. TILLER:

16   17  Q.   What is this document?

16   18  A.   That's a good question.  I think this is a -- it's an

16   19  extract from -- from some strategy plan, but I can't tell you

16   20  which one.

16   21  Q.   Okay.

16   22  A.   And it's a mismatch of a lot of different stuff, it looks

16   23  like.

16   24           MR. COUGHLIN:  Are you asking about the specific page

16   25  or --

16    1          **THE COURT:** Well, I just don't know what it is that

16    2    he's asking about, so I suspect the jury doesn't know, either.

16    3          **MR. TILLER:** Could you take it to the second page

16    4    there, Bonnie, just scroll it down.

16    5    **BY MR. TILLER:**

16    6    Q.   At least one of the pages of this -- and again, this is

16    7    how it's produced to us -- says this is from August of 2015.

16    8    Do you see that on the second page?

16    9    A.   I do.

16   10    Q.   Okay. Do you have any reason to believe that it's not

16   11    from August of 2015?

16   12    A.   I believe that page is. Like I said, I think this is a

16   13    mismatch of a lot of different documents, so I can't tell you

16   14    when the rest is.

16   15    Q.   Okay. If we could go down to -- but you believe it's a

16   16    strategy plan?

16   17    A.   It's not a strategy plan. It's an extract from some

16   18    strategy plans. I don't know.

16   19    Q.   Well, let's -- let me ask a couple of questions and then

16   20    we might go to another one.

16   21          **MR. TILLER:** Give me just a second, Judge. Prior to

16   22    that page, Bonnie, there's an e-mail.

16   23    **BY MR. TILLER:**

16   24    Q.   Do you see the e-mail from Andrew Fisher to Chip Garman?

16   25    A.   Not yet.

| | | |
|---|---|---|
| 16 | 1 | Q.   On page 056129, I believe.  Can you show the Bates? |
| 16 | 2 | 056122.  Do you see that e-mail? |
| 16 | 3 | A.   No, I don't. |
| 16 | 4 | Q.   056122. |
| 16 | 5 | THE COURT:  You can step up and help him find it. |
| 16 | 6 | BY MR. TILLER: |
| 16 | 7 | Q.   Andrew Fisher is the product lead for azoxystrobin? |
| 16 | 8 | A.   Yes. |
| 16 | 9 | Q.   Who is Chip Garman? |
| 16 | 10 | A.   He's part of our Key Account Management Team. |
| 16 | 11 | Q.   And you see that this is an e-mail from Mr. Fisher to |
| 16 | 12 | Mr. Garman sending some attachment? |
| 16 | 13 | A.   Yes. |
| 16 | 14 | Q.   I believe that what we're looking at is the attachment to |
| 16 | 15 | this e-mail. |
| 16 | 16 | MR. COUGHLIN:  Objection.  I think he needs to |
| 16 | 17 | establish a foundation of whether this witness knows -- |
| 16 | 18 | THE COURT:  Well, I mean, you all have admitted to |
| 16 | 19 | its admission. |
| 16 | 20 | MR. TILLER:  Yeah. |
| 16 | 21 | THE COURT:  So I assume it's a Syngenta document. |
| 16 | 22 | MR. TILLER:  It is a Syngenta document. |
| 16 | 23 | THE COURT:  Well -- |
| 16 | 24 | MR. TILLER:  If I could -- I'm sorry.  You're right. |
| 16 | 25 | THE COURT:  So counsel can't testify. |

16    1              **MR. TILLER:**  You're right.

16    2              **THE COURT:**  Okay?  So it just would be helpful to

16    3   know what it is.  I know it's been admitted.  Syngenta hasn't

16    4   objected to that.  It appears to be Syngenta documents.  We can

16    5   all look at it and see that.  So, you can ask your questions.

16    6              **MR. TILLER:**  Can you please go to 056130.

16    7   BY MR. TILLER:

16    8   Q.   Do you see under "Row Crops," Mr. Cecil, that it says

16    9   there's a decline in intensity due to commodity prices?  Do you

16   10   see that?

16   11   A.   I see the statement, yes.

16   12   Q.   Commodity prices have been low since 2013, am I correct?

16   13   A.   Yes.

16   14   Q.   Okay.  And commodity prices have an effect on the sales of

16   15   azoxystrobin, correct?

16   16   A.   Not necessarily.  They can have.

16   17   Q.   Can you please close that down.  So on the right-hand

16   18   side, under "Macro Environment" at the top, it says C, S, W.

16   19   Would that be corn, soy, and wheat?

16   20   A.   Yes, I believe so.

16   21   Q.   Corn, soy, and wheat price at 10-year low through 2017.

16   22   Do you see where it says that?

16   23   A.   Yes.

16   24   Q.   And it further says:  Corn, soy, wheat commodity price at

16   25   10-year low through 2017 reduce fungicide market.  Is that

16    1    statement accurate?

16    2    A.    That is an accurate statement.  What I would refresh your

16    3    memory on is, is I talked about azoxystrobin giving you a

16    4    crop-enhancement effect; this says the fungicide market.  So

16    5    the use of it as a fungicide would be lower.  The use of it as

16    6    a return on investment tool for the customer would be stable.

16    7    Q.    There is also a statement in the fourth bullet on that

16    8    side that says that there is strobilurin resistance in the

16    9    rice -- or strobilurin resistance in rice, soy, cereals

16   10    expands.  Do you see that statement?

16   11    A.    I do.

16   12    Q.    So there was -- and "resistance" means the fungi, or the

16   13    disease, is not being -- or is not capable of being treated by

16   14    the strobiluron, correct?

16   15    A.    Certain strobiluron fungicides are not effective on that

16   16    disease, that's true.  Azoxy is not one of them.

16   17    Q.    Azoxy is not one of them?

16   18    A.    Not yet.

16   19    Q.    This -- this is a document that says that this is an

16   20    azoxystrobin US product marketing plan, but that statement

16   21    doesn't apply to azoxystrobin?

16   22    A.    The title on the right is a high-level market trend, so

16   23    it's talking about the overall market, which we participate in,

16   24    not azoxy based.

16   25    Q.    Okay.

| | | |
|---|---|---|
| 16 | 1 | **THE COURT:**  Is this a good place to stop? |
| 16 | 2 | **MR. TILLER:**  Can I just ask one or two more questions |
| 16 | 3 | about this document and then we'll -- |
| 16 | 4 | **THE COURT:**  All right. |
| 16 | 5 | **BY MR. TILLER:** |
| 16 | 6 | Q.   If we could look at 056131.  Do you have that page, sir? |
| 17 | 7 | A.   Yes. |
| 17 | 8 | Q.   This is an Azoxystrobin US Product Marketing Plan |
| 17 | 9 | Competitor Overview, correct? |
| 17 | 10 | A.   Yes, it is. |
| 17 | 11 | Q.   And under, "Generics," at the bottom, there is mention of |
| 17 | 12 | Azoxy 2SC, which is Willowood's product, correct? |
| 17 | 13 | A.   Correct. |
| 17 | 14 | Q.   Affiance -- or maybe that's Affiance? |
| 17 | 15 | A.   I have no idea. |
| 17 | 16 | Q.   Equation.  That's Cheminova, correct? |
| 17 | 17 | A.   I believe so. |
| 17 | 18 | Q.   Azaka.  That's also Cheminova, correct? |
| 17 | 19 | A.   I believe so. |
| 17 | 20 | **MR. TILLER:**  This might be a good time to stop now. |
| 17 | 21 | **THE COURT:**  All right.  Ladies and gentlemen, we'll |
| 17 | 22 | stop here for the day and come back in the morning.  Over the |
| 17 | 23 | evening recess, please remember not to talk to anybody about |
| 17 | 24 | the case.  Don't talk to each other as you go back to your |
| 17 | 25 | cars.  Continue not to read or listen to any news reports. |

```
17    1   Don't conduct any independent investigation.  No posting, no
17    2   tweeting.  You'll remember all of that.
17    3           And, of course, keep an open mind as you've started
17    4   to hear the evidence.  Resist any temptation to start forming
17    5   opinions since you haven't heard all of the evidence.  Leave
17    6   your notes in your chair, and I'll see you tomorrow morning at
17    7   9:30.  We'll hope for better weather.
17    8           (At 5:01 p.m., jury excused.)
17    9           THE COURT:  You may step down.  I apologize, I didn't
17   10   mean to create a problem about that last exhibit.  It just --
17   11   nobody said it was a Syngenta document and --
17   12           MR. TILLER:  Oh, okay.
17   13           THE COURT:  -- you know, you start in talking about
17   14   it, and nobody even knows it's a Syngenta document.  So that
17   15   was really all I was trying to do.  I didn't mean to cause a
17   16   problem.
17   17           The plaintiffs had admit -- you know, had no
17   18   objection to it, but it doesn't have a lot of context if you
17   19   don't know what it is or what the date is.
17   20           MR. COUGHLIN:  For the Court's assistance, we did
17   21   produce these documents, but this particular exhibit appears to
17   22   be a collection of a bunch of different documents or portions
17   23   of documents.  So it was produced in discovery.  We're not
17   24   challenging the authenticity.  Whether this particular witness
17   25   has knowledge about anything particular -- so I wasn't trying
```

```
17    1  to argue about it.
17    2          THE COURT:  Okay.  I appreciate you clarifying that.
17    3  It's just, you know, when it comes out of nowhere and we don't
17    4  know what it is --
17    5          MR. TILLER:  That's fair.
17    6          THE COURT:  -- it's a little harder to get the
17    7  context.  So how much longer do you think you'll be on cross
17    8  with this witness?
17    9          MR. TILLER:  Forty.
17   10          THE COURT:  Say again.
17   11          MR. TILLER:  Forty.
17   12          THE COURT:  Forty more minutes?  All right.
17   13          MR. TILLER:  Maybe 30.
17   14          THE COURT:  Okay.
17   15          MR. TILLER:  And, Your Honor, just for clarification,
17   16  the one document, which I --
17   17          THE COURT:  Defendant's 68.
17   18          MR. TILLER:  Defendant's 68, we're just going to
17   19  redact or pull out that one page.
17   20          THE COURT:  You can pull out the page, or just mark
17   21  it up.  Just show it to the plaintiff.
17   22          MR. TILLER:  Okay.
17   23          THE COURT:  And, I mean, redact it or pull it out.
17   24  And as long -- you know, you all agree that it doesn't have the
17   25  stuff I said should stay out.
```

MR. SANTHANAM:  We would prefer for it to be pulled
out, Your Honor, rather than redacted.

THE COURT:  Okay.  Well, you all can work that out.
And once you've got that substitute document, it'll be
admitted, and we can take care of that in the morning.

What other -- let's see.  So we didn't make as much
progress this afternoon as the plaintiff predicted.  So I guess
we're still looking next at -- I've forgotten who you said.

MR. LEVINE:  Mr. Fisher will be next, followed by
Mr. Wichert, followed by two deposition -- one dep video, one
for which there is no video, we'll have a deposition reading,
and then Dr. Wilner.

MR. SANTHANAM:  We may not get to Dr. Wilner.

MR. LEVINE:  We may not, depending upon the length of
the cross-examinations of --

THE COURT:  I don't think you can blame the cross.  I
mean, the direct of Mr. Cecil was very long.  So, you know --
but, yeah, I appreciate it obviously depends on the length of
both the direct and the cross.  But I'm just trying to figure
things out for the schedule going forward.

So my best guess is you're not going to rest your
case tomorrow, unless Mr. Fisher and Mr. Wichert are going to
be really short.

MR. LEVINE:  Probably a fair assumption, you know,
just depending upon -- knowing the length of the directs for

the witnesses.  One of the depositions that will be played is a little on the longer side.  If so, I think it more likely we'll finish with the expert probably Friday.

        **THE COURT:**  Okay.  Even if we get started with him tomorrow, he'd probably finish Friday?

        **MR. LEVINE:**  But because, for example, Mr. Heinze's redirect covered what they were going do in their case in chief, I think we're going to make up some time as we start heading into Friday.

        **THE COURT:**  Yeah, okay.  Well, I mean, we're -- you know, I gave you all a certain amount of time, and you're well -- you're still within it, so --

        **MR. TILLER:**  We have folks ready for Friday.

        **THE COURT:**  All right.  Good.  Anything else we can talk about productively?  No?  All right.  I'll see you all in the morning at 9:30.

        (At 5:05 p.m., proceedings concluded.)

```
 1                    C E R T I F I C A T E

 2

 3        I, J. CALHOUN, RPR, United States District Court

 4  Reporter for the Middle District of North Carolina, DO HEREBY

 5  CERTIFY:

 6

 7        That the foregoing is a true and correct transcript of

 8  the proceedings had in the above-entitled matter.

 9

10

11

12  Date:    9-6-17              J. Calhoun, RPR
                                 United States Court Reporter
13                               324 W. Market Street
                                 Greensboro, NC  27401
14

15

16

17

18

19

20

21

22

23

24

25
```