```
1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3   SYNGENTA CROP PROTECTION, LLC,        Civil Action
                                         No. 1:15CV274
4            Plaintiff,
    vs.
5
    WILLOWOOD, LLC, WILLOWOOD            Greensboro, North Carolina
6   USA, LLC., WILLOWOOD                 September 7, 2017
    AZOXYSTROBIN, LLC,  and
7   WILLOWOOD LIMITED,

8            Defendants.

9   _____


10


11                    TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE CATHERINE C. EAGLES
12                   UNITED STATES DISTRICT JUDGE

13  APPEARANCES:

14  For the Plaintiff:        HARI SANTHANAM, ESQUIRE
                              RUSSELL LEVINE, ESQUIRE
15                            KOURTNEY BALTZER, ESQUIRE
                              Kirkland & Ellis, LLP
16
                              Richard Coughlin, Esquire
17                            Smith Moore, LLP

18

19  For the Defendants:       STEVEN E. TILLER, ESQUIRE
                              BARRY S. NEUMAN, ESQUIRE
20                            PETER J. DAVIS, ESQUIRE
                              Whitefield Taylor & Preston
21
                              ALAN W. DUNCAN, ESQUIRE
22                            Mullins Duncan Harrell & Russell

23

24

25
```

INDEX

WITNESSES FOR THE PLAINTIFF:                    PAGE

JEFF CECIL

    Cross-Examination By Mr. Tiller                          9
    Redirect Examination By Mr. Coughlin                    51
    Voir Dire Examination By Mr. Coughlin                  119

ROBERT ANDREW FISHER

    Direct Examination By Mr. Santhanam                     77
    Cross-Examination By Mr. Tiller                        152
    Redirect Examination By Mr. Santhanam                  189
    Recross-Examination By Mr. Tiller                    199

DR. REX WICHERT

    Direct Examination   By Mr. Santhanam                  201
    Cross-Examination By Mr. Tiller                        241

EXHIBITS:                              RCVD

    DX-68      Syngenta Azoxystrobin Strategy Summary        6
    DX-80      2015 Syngenta Key Active Ingredient          13
               Commentary
    DX-86      2015 ArgoTrak Report                         40
    DX-88      Azoxystrobin Fungicide 2016 Pricing          15
    DX-94      North America 2016 Pricing Strategy          50
    DX-99      Aframe and Aframe Plus Presentation          10
    DX-107     Brand plan                                  176
    DX-108     2016-2021 Azoxystrobin US Marketing Plan     28
    DX-111     August 21 email chain:  Damages Caused      162
               to Syngenta by generic entry
    DX-160     PLFB 2016 PP Update                          49
    DX-211     Presentation Document                        11
    PX-213     Email from A. Fisher enclosing              109
               azoxystrobin generic 2/15 update
    PX-225A    Aframe/Aframe Plus AZT Fighting Brand       109
    PX-235     Row Crop Fungicides Price                   109
    PX-259     Second Amendment to AZ Millbase Supply      132
               Agreement
    PX-265     11/18/15 Email from A. Fisher to J.         186
               Cecil
    PX-276     First Amendment to AZ Millbase Supply       132
               Agreement
    PX-277     AZ Millbase Supply Agreement                132
    PX-500     SSJ Excerpted Deposition Transcript

1  PX-501    Mundhra Excerpted Deposition Transcript                    71

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## P R O C E E D I N G S

1
2       (Proceedings commenced at 9:30 a.m.)
3       THE COURT:  Good morning.
4       So one of the jurors has told Ms. Sanders that his
5 wife's 40th birthday party is tomorrow night and if we could
6 please leave at 4:00, he would be very grateful.  So I
7 thought -- the Folk Festival is this weekend.  I don't know if
8 it's affected -- if you all are driving, the traffic downtown
9 has already started -- they're closing streets and such, so I
10 had actually already thought we might leave about 4:30.  I
11 thought, in view of that request and the stuff going on
12 downtown, we might start at 9:15 and just take an hour for
13 lunch and quit at 4:00 tomorrow.  Is that -- everybody is
14 nodding.  That's okay.  All right.
15       The other thing some of the jurors were asking her
16 about was the hurricane.  We're all hoping, of course, that it
17 just turns back into the Atlantic Ocean and we don't see
18 anything but a little rain from it, but I'll confer with the
19 jury clerk tonight and -- I don't think it should be here by
20 Monday based on what they're saying.  It's looking Tuesday or
21 Wednesday.  Obviously, we will all keep an eye on that and --
22 normally hurricanes just only hit us with rain, but we have had
23 other experiences.  I will -- I'm just going to mention it to
24 them because they -- just so they don't worry about it.  We're
25 obviously not going to have the trial in the middle of a

1  hurricane if it comes through here and everybody's power is

2  out.  We'll treat it kind of like snow.  The people from

3  Chicago are all welcome to laugh.

4          MR. LEVINE:  Your Honor, in that regard, we looked

5  last night at how much time has already been used, how much

6  time we have remaining; and our best estimate is that we would

7  do closings either Tuesday right before lunch or Tuesday

8  immediately after lunch.  So that's kind of where we are in

9  terms of available time.  We'll obviously continue, both sides,

10 to be as efficient and to see --

11         THE COURT:  You all conferred about that, so you both

12 think that?

13         MR. LEVINE:  We haven't conferred about the timing.

14 We certainly will both be efficient, but looking at how much

15 time has already been used and how much time we have, closings

16 would be Tuesday.

17         THE COURT:  I thought Tuesday or maybe Wednesday if

18 your estimates continue to be not quite --

19         MR. LEVINE:  We only have so much time --

20         THE COURT:  You only have so much time.

21         MR. LEVINE:  -- which means it has to be Tuesday.

22         THE COURT:  Anything else that you all want to talk

23 about before we bring the jury in?

24         MR. TILLER:  Real briefly, Your Honor.  Yesterday

25 there was a question about Defendant's Exhibit 68.  If you

```
 1  recall, we had a sidebar and the decision was made just to
 2  remove that one page.  I have that now.
 3            THE COURT:  Right.  Great.
 4            MR. TILLER:  I don't know -- I have multiple copies.
 5  I'm not sure how -- I've given one to opposing counsel.  I
 6  don't know how you want me to deal with it.
 7            THE COURT:  You can -- wherever the originals are, I
 8  think they might be over there on that table --
 9            MR. TILLER:  Okay.
10            THE COURT:  -- just substitute it at the break and
11  I'll admit the new copy of Plaintiff's 68.
12            MR. TILLER:  Thank you, Your Honor.
13            MR. SANTHANAM:  One other item, Your Honor.
14  Yesterday we played back the deposition --
15            THE COURT:  Wait a minute.  Defendant's 68.
16            MR. TILLER:  Defendant's 68, yes.  I'm sorry, Your
17  Honor.
18            THE COURT:  I misspoke.  Defendant's 68.  I
19  apologize.  I did what I told you all not to do.
20            MR. SANTHANAM:  Yesterday we played the designations
21  back from Shen Shaojun and Mundhra, and we have the excerpted
22  transcripts for those designations.  What would you like for us
23  to do with them?
24            THE COURT:  Let's mark the transcript of Mr. SSJ --
25  what's a number at the end?  Plaintiff's 500.  Can we do that?
```

1  Plaintiff's 500.

2      MR. SANTHANAM:  500 should be fine.

3      THE COURT:  Okay.  And Mundhra 501.  They are

4  admitted for purposes of the record.  They will not go back to

5  the jury as an exhibit, but just so if somebody decides to

6  appeal, the appellate court will know what that testimony was.

7  That's why I will admit them as Plaintiff's 500 and Plaintiff's

8  501.  Just give Ms. Sanders copies.

9      MR. SANTHANAM:  Understood, Your Honor.

10     THE COURT:  Is that agreeable now that I've done it?

11 All right.  Anything else?

12     MR. SANTHANAM:  Nothing from us.

13     THE COURT:  All right.  You can bring the jury in.

14     So I'll just repeat we will start at 9:15 tomorrow

15 morning.  If I say anything different, everybody needs to jump

16 up and correct me because 9:30 might just come out of my mouth

17 on automatic pilot.  I might have you all stay a little bit.

18 That might give us a little bit of time to have a preliminary

19 instruction about the verdict sheet, which might be good timing

20 for that.

21     MR. TILLER:  Did you say tomorrow?

22     THE COURT:  Yes.

23     (Jury panel is present.)

24     THE COURT:  Let's touch on a couple of housekeeping

25 matters.  You all may have noticed a lot more traffic this

1   morning coming in.  The National Folk Festival is this weekend

2   just right over there a couple of blocks away.  I expect it to

3   be a little worse tomorrow.  Then somebody, I can't remember

4   who, has a wife with a birthday party tomorrow night

5   Ms. Sanders tells me.

6           So what we're going to do tomorrow is modify the

7   schedule a little bit.  We're going to start at 9:15.  Is that

8   all right?  Everybody can be here?  Okay.  We're going to take

9   just an hour for lunch and then we're going to stop at 4:00 so

10  you all can get in and out and off to avoid the traffic, unless

11  you are going to stay.  It's pretty much fun I'll just tell

12  you.  The music starts I think tomorrow night.  But that will

13  help you get out of town before the traffic really gets serious

14  tomorrow, so tomorrow we will start at 9:15 and we will stop at

15  4:00.

16          Then we'll see how it goes the rest of this week for

17  next week.  I know that there is likely bad weather coming next

18  week with this hurricane.  We will keep an eye out on that.  If

19  something happens and we have a hurricane, you know, nobody

20  expects you to be here in the middle of a hurricane.  We'll

21  treat it kind of like snow in the winter.  We'll keep an eye on

22  that; and as it gets closer to the time and we have a better

23  idea of what might happen, I'll give you some guidance on how

24  to stay in touch with the Court and how the Court will stay in

25  touch with you should we need to adjust the schedule because of

1  the weather.

2        All right.  I think we are ready to continue; and if

3  I remember, we were in cross-examination of Mr. Cecil.  Is that

4  right?

5        MR. TILLER:  Yes, Ma'am.

6        THE COURT:  Yes.  Go ahead.

7        MR. TILLER:  Thank you.

8                CROSS-EXAMINATION

9  BY MR. TILLER:

10  Q.   Good morning, Mr. Cecil.

11  A.   Good morning.

12  Q.   Syngenta has sold azoxystrobin since 1997, is that

13  correct?

14  A.   I think that's right.

15  Q.   I presume it did budgets for its azoxystrobin sales for

16  each year azoxystrobin was sold, correct?

17  A.   Yes.

18  Q.   When was mesotrione first sold?

19  A.   Roughly 2000, 2001.

20  Q.   I presume budgets were done for mesotrione for each year

21  in which it was sold?

22  A.   Yes.

23        MR. TILLER:  Your Honor, I would like to show

24  Defendant's Exhibit 99 to the witness and move for its

25  admission.

1          THE COURT:  You can show it to the witness while

2     Plaintiff's counsel is getting their copy.

3               (Pause in the proceedings.)

4          THE COURT:  No problem?  It will be admitted.

5          MR. TILLER:  Bonnie, if we could go to Bates page

6     37380 at the bottom.  Actually, before you do that, go to the

7     second page, 37376.

8     BY MR. TILLER:

9     Q.   At the top, Mr. Cecil, you will see that you are again the

10    sponsor of this document.

11    A.   Yes, I am.

12    Q.   Again, as we talked about yesterday, that means you

13    were -- what does being a sponsor mean?

14    A.   It means I'm the member of the Steering Committee that

15    represents the document.

16    Q.   And this document was dated January 12th, 2015?

17    A.   Yes, it is.

18    Q.   Do you see that?

19          THE COURT:  I'm sorry.  I just couldn't -- you all

20    were talking over each other.

21          THE WITNESS:  Yes.

22          MR. TILLER:  Bonnie, if we could go to 37380 at the

23    bottom, please.

24    BY MR. TILLER:

25    Q.   Mr. Cecil, you will see there that this is a page entitled

1  "Internal Questions and Answers."  Do you see the question and

2  answer at the bottom that reads:  What generic brands are

3  driving Aframe quantity and pricing?  And the answer being:

4  Equation from Cheminova and Azoxy 2SC from Willowood averaging

5  160 gallons to retail.  Do you see that?

6  A.    I do.

7  Q.    Do you see the next page -- or the next line, I should

8  say, which says:  Import volumes at 4 percent of Syngenta 2014

9  total?  Do you see that?

10  A.    Yes, I do.

11          MR. TILLER:  I would like to show the witness --

12          THE COURT:  So can I just be sure and understand this

13  is a document that was used during one of the Steering

14  Committee meetings?

15          THE WITNESS:  It is.

16          THE COURT:  Okay.  Go ahead.

17          MR. TILLER:  I would like to show the witness

18  Defendant's Exhibit 211 and move for its admission.

19          THE COURT:  It will be admitted.

20          MR. TILLER:  Thank you.

21  BY MR. TILLER:

22  Q.    Mr. Cecil, do you see that this document is entitled "Life

23  Cycle Post-Patent and Key AI Management Presentation"?

24  A.    Yes.

25  Q.    And it is with regards to another entity called Titan Pro.

1  Do you see that?

2  A.   Yes.

3  Q.   Who is Titan Pro?

4  A.   It's a small company I'm really not familiar with.

5           MR. TILLER:  Bonnie, I would like you to go to page

6  283404.

7  BY MR. TILLER:

8  Q.   Mr. Cecil, do you see in the top left that under

9  "Azoxystrobin Generic October 2015 Update" that both Willowood

10 and Cheminova are listed as registrants in October of 2015?

11 A.   Yes, they were both registrants.

12 Q.   And looking at the chart on the right-hand side, Syngenta

13 was tracking the amount of importation of azoxystrobin that was

14 coming into the country in 2015, correct?

15 A.   Yes.

16 Q.   Do you see this chart where Cheminova is represented in

17 I'll call that green?  Do you see that?

18 A.   Yes.

19 Q.   Willowood is represented in orange.  Do you see that?

20 A.   I do.

21 Q.   And Albaugh is represented in blue.  Do you see that?

22 A.   I see that.

23 Q.   And looking at the price monitoring data in the left-hand

24 chart, do you see on the left-hand side there is price

25 monitoring data for generic azoxystrobin?  Do you see that?

```
 1  A.    Yes.
 2  Q.    And there is nothing there that indicates whether that is
 3  Willowood, Cheminova or Albaugh pricing, correct?
 4  A.    No, it does not.
 5           THE COURT:  Mr. Cecil, if you can just keep your
 6  voice up.  When you look down, it's harder for me to hear you.
 7           THE WITNESS:  I'm sorry.
 8           THE COURT:  I expect that's true for the jury.
 9           THE WITNESS:  Okay.  Thank you.
10           MR. TILLER:  Your Honor, I would like to approach the
11  witness and show him Defendant's Exhibit 80.
12           THE COURT:  80?
13           MR. TILLER:  80, 8-0.
14           THE COURT:  You may.  It will be -- did you move it?
15           MR. TILLER:  I move for its admission.  I thought I
16  did, but --
17           THE COURT:  I didn't want to get ahead of you.  It
18  will be admitted.
19           MR. TILLER:  Is it admitted?
20           THE COURT:  Yes.
21           MR. TILLER:  Okay.  Thank you.
22           Bonnie, if you could highlight the top paragraph or
23  enlarge the top paragraph I should say.  Make it maybe a little
24  larger.  It is still a little hard to read.  It looks like
25  that's about -- I hope you can read it, Your Honor.
```

1  BY MR. TILLER:

2  Q.    Mr. Cecil, do you see in this document that it says "Net

3  Farm Income"?

4           THE COURT:   What is this?

5  Q.    Okay.   What is this document, Mr. Cecil?

6  A.    I have no idea.

7  Q.    Okay.  Who is Keith -- it's -- I think -- I hope I'm not

8  mispronouncing the name.  Baioni.

9  A.    Never heard of him.

10  Q.    Okay.  You have no reason to doubt, though, that he's the

11  vice president of chemical procurement?

12  A.    I don't have any reason to believe that he is.  I don't

13  know who he is.

14  Q.    Okay.  Do you see where this document says "net farm

15  income dropped significantly in 2015 and there was significant

16  downward pricing pressure on ag chemical products in all

17  segments across all markets"?  Do you see that?

18  A.    Give me a second.  I'm reading the whole thing.

19  Q.    It's the first sentence.  I'm sorry.

20  A.    I understand, but I don't want to take it out of context,

21  so let me read the document a minute.

22           (Pause in the proceedings.)

23  A.    What I'm drawn to on this page is where it talks about

24  generics lowering the price.

25           THE COURT:  Okay.  He's just asking you about --

1  BY MR. TILLER:

2  Q.    I'm just asking about the first sentence.

3  A.    Okay.  The first sentence says that there is a lower farm

4  economy, yes.

5  Q.    I think we're done with that one.

6        MR. TILLER:  Your Honor, may I approach the witness

7  and show him Defendant's Exhibit 88 and move for its admission?

8        THE COURT:  You may.  You can hand it to him.  Give

9  Plaintiff's counsel a moment to look at it.

10        (Pause in the proceedings.)

11        THE COURT:  It will be admitted.

12        MR. TILLER:  Thank you.

13  BY MR. TILLER:

14  Q.    Mr. Cecil, do you see at the top of this page this refers

15  to AZ fungicide 2016 pricing?  Is that referring to

16  azoxystrobin fungicide 2016 pricing?

17  A.    Yes, it is.

18  Q.    Do you know what this is?

19  A.    No, I don't.  I do not.

20  Q.    You talked -- you testified yesterday about this process

21  of budgeting, where information is collected to prepare the

22  budgets.  Could this be one of those -- could this document

23  represent some of the collection of information in order to

24  prepare the budget?

25  A.    The first page is not a standard piece of the document

1  that we would use, but it could be.

2  Q.    Okay.  Looking at the first bullet at the top, do you see

3  that the document says:  Market remains extremely price

4  elastic, open paren, product and commodity, closed paren?

5  A.    Yes.

6  Q.    And when referring to product price elasticity, that's the

7  concept -- or do you agree that that's the concept of as a

8  product becomes less expensive it may become more in demand?

9  A.    Yeah.  This is a market comment, so it would say that the

10  market will take more azoxystrobin from somebody if they have a

11  lower price, yes.

12  Q.    And when referring to commodity price elasticity, do you

13  agree that that refers to the concept of as the commodity price

14  for the crop goes down that demand for azoxystrobin may also go

15  down?

16  A.    Not necessarily.  That would not be a way you would state

17  that.

18  Q.    How would you state it?

19  A.    I wouldn't state it.  I would say that commodity prices,

20  elasticity doesn't make sense.  Typically an elastic price

21  means that you'll buy more of that commodity at a lower

22  price --

23  Q.    Well, let's --

24  A.    -- that does not say that.

25  Q.    I'm sorry.  I didn't mean to interrupt.  We'll go through

1  some of the documents a little more.  But under -- Bonnie,

2  could you please show under competitive, both those bullets.

3          Do you see in this -- this is the third and fourth

4  bullet at the top, Mr. Cecil, and the second clause, past

5  competitive says, "Aggressive activity by BASF and Bayer."  Do

6  you see that?

7  A.   I do.

8  Q.   And then after that it says, "Aggressive price and volume

9  from generic entrance, Willowood, Cheminova and Albaugh."  Do

10  you see that?

11  A.   Yes, I do.

12  Q.   And then in the last bullet it says, "Willowood, Cheminova

13  and Albaugh all have Quadris and Quilt Xcel-like products in

14  the market."  Do you see that?

15  A.   I do.

16  Q.   Okay.  Looking at -- you'll see underneath there that this

17  is divided up into three, I'll call them charts for lack of a

18  better term; one entitled market, one entitled customer, one

19  entitled competitive.  Do you see that?

20  A.   Yes.

21  Q.   Under market do you see where the first bullet says, "Farm

22  economic stressed highland rent inputs versus low commodity

23  prices."  Do you see that?

24  A.   Yes.

25  Q.   And that is under market conditions, correct?

1  A.    That's correct.

2  Q.    The second bullet says, "Corn -- strike that.

3         Do you see that the second bullet says, "Corn, soy

4  and cereal fungicide market becomes disease dependent?"

5  A.    I do.

6  Q.    Looking at the last three bullets, do you see that this

7  document says, "Soy market challenged due to decreased

8  commodity prices, except in heavy disease area in the south?"

9  A.    Yes.

10  Q.    And do you see that the second to last bullet says, "Soy,

11  strobilurin-resistant frogeye leaf spot spreads slowly,

12  predominantly in the south?"

13  A.    Yes.  That would refer to the fact that we have the only

14  azoxystrobin on the market that is not a resistance problem.

15  Q.    Okay.

16  A.    So that's what it refers to.

17  Q.    Understood.  But that -- you agree with me, at least, that

18  that bullet says that that disease is spreading slowly?

19  A.    It would indicate our market's growing, yes.

20  Q.    And the last bullet, consistent with one of the earlier

21  bullets, says, "Cereal market remains disease dependent"?

22  A.    Correct.

23  Q.    Looking under customer, looking at the fourth -- actually,

24  let's just go to the last bullet.  You will see there that it

25  says, "Retail.  Fertilizer, seed, herbicide higher retail

1  priority."  Do you see that?

2  A.    Yes.

3  Q.    How does Syngenta budget for the fact that herbicide is a

4  higher retail priority than azoxystrobin?

5  A.    I don't understand the question.

6  Q.    Is the -- when doing the mesotrione budgets, is the fact

7  that a herbicide -- and mesotrione is a herbicide, correct?

8  A.    Correct.

9  Q.    And it's, in fact, one of Syngenta's best selling

10  herbicides, correct?

11  A.    It is.

12  Q.    In doing the budgets for mesotrione, how is the fact that

13  herbicide is a higher retail priority accounted for in the

14  budget versus how the azoxystrobin budget is done?

15  A.    Well, again, I'm not sure where this first page of this

16  document comes from.  I think the likelihood is we increased

17  our mesotrione budget based on that.

18  Q.    Okay.  Looking at competitive, the competitive chart, and

19  we may have talked about some of this yesterday, but the first

20  bullet says, "BASF aggressive with SDHI Priaxor pricing to

21  shift Headline share as generic defense."  Do you see it says

22  that?

23  A.    Yeah, it says that they're moving within their own

24  portfolio, yes.

25  Q.    And -- but SDHI Priaxor -- SDHIs do compete with

1  strobilurins, correct?

2  A.   In this case it's saying that it competes with their own

3  strobilurin herbicide -- fungicide called Headline.

4  Q.   Could you please -- I'm just asking, SDHI's do compete

5  with strobilurins, correct?

6  A.   They're in the same market space.

7  Q.   And azoxystrobin is a strobilurin?

8  A.   Yes, it is.

9  Q.   And we spoke about this yesterday.  BASF was the first to

10 market in 2015 with an SDHI product, correct?

11 A.   And they were also the first to market with the

12 strobilurin.

13 Q.   Understood.  So I just want to make sure, the answer was,

14 yes, they were first to market with an SDHI?

15 A.   Yes.

16 Q.   And their Pyraclostrobin, their strobilurin product, was

17 coming off patent in 2015, correct?

18 A.   Yes, it did.

19 Q.   And we spoke yesterday that BASF was getting aggressive

20 with its sales of its strobilurin product, which is Headline,

21 in 2015, in anticipation of that product coming off patent,

22 correct?

23 A.   Yes.  This indicates that they are coming off patent and

24 they're moving their own portfolio to an SDHI as a post-patent

25 defense.

1  Q.    And that is exactly something that was the plan that

2  Syngenta was going to do once its SDHI was approved?

3  A.    Had Willowood not entered the market, that would have

4  worked.

5  Q.    The question, Mr. Cecil, was that was a plan to start to

6  shift its market, Syngenta's market, to its SDHI, once its SDHI

7  product was approved by the EPA, right?

8  A.    Our strategy was to move our portfolio up into a higher

9  value market, yes.

10 Q.    Let's take a look at the third bullet, which -- do you see

11 that that bullet says, "BASF no fighting brand -- oh, no,

12 that's not -- sorry, fourth bullet, I'm sorry, although we can

13 look at that, too.

14        BASF -- strike that.

15        Do you see that that that says, "Bayer is increasing

16 its share through half rate promotion, grower call activity and

17 increased channel discounts?"

18 A.    Yes.

19 Q.    Looking at, I guess it's the sixth bullet, Bonnie, do you

20 see that this bullet says, "DuPont increasing share with

21 Aproach Prima with Pioneer platform aggressive grower

22 discount."

23 A.    Yes, I do.

24 Q.    What was Aproach Prima?

25 A.    Aproach Prima is another fungicide which does not

1   participate in the corn market.

2            THE COURT:  I'm sorry, speak up.

3            THE WITNESS:  It does not participate in the corn

4   market.

5   BY MR. TILLER:

6   Q.   It participates in the soy market?

7   A.   It does.

8   Q.   It participates in the cereal market?

9   A.   I would assume, yeah.  It's a very small player.

10           MR. TILLER:  Bonnie, could we please go to 56240.

11  BY MR. TILLER:

12  Q.   You will see on this page that it is entitled, "2016 top

13  down assumptions for Syngenta fungicide treated acres."  Do you

14  see that?

15  A.   Yes.

16  Q.   Could you please explain -- I think it should be pretty

17  intuitive, but it was a new concept to me -- what is a treated

18  acre versus as untreated acre?

19  A.   A treated acre would be an acre that gets an application

20  of a product.

21  Q.   And conversely, that an untreated acre is one that goes

22  without treatment with a fungicide?

23  A.   That's true.

24  Q.   Okay.  And there's a large segment of the row crop market

25  at each year that is untreated with any fungicide, correct?

1  A.    Sure.

2  Q.    You will see on the third bullet -- just the third bullet,

3  Bonnie -- that one of the 2016 top down assumptions was that

4  generics would represent 4 to 6 percent of the strobilurin

5  market.   Do you see that?

6  A.    I see that.

7              MR. TILLER:   Bonnie, if we could go 56241.

8  BY MR. TILLER:

9  Q.    Do you have that page, Mr. Cecil?

10  A.    Yes.

11  Q.    Okay.   You see that this is a document entitled "Row Crop

12  Fungicide."   I wanted to ask you about the first chart that --

13  would you agree with me that this chart appears to be regarding

14  soybeans?

15  A.    It does.

16  Q.    And I want to make sure that I understand what this is.

17  It appears to me, but I would like you to confirm, does this

18  represent the amount in the first -- in the second and third

19  columns that have 2015 and 2016 at the top?   Does that

20  represent the number of soy acres in each of these respective

21  geographic areas of the country?

22  A.    It doesn't seem to make sense, no.

23  Q.    Why doesn't it make sense?

24  A.    Because off to the other side where it's clearly marked

25  acres it says 1.8 million acres total.   In the first two

1  columns it says 2.5, so I can't imagine how that's acres.

2  Q.    So let me -- let me -- and I was a little confused at this

3  too, and if it is completely confusing, we'll move on.  But

4  you'll see in the last two columns -- let's look at the 2015

5  Syngenta acres column, okay?

6  A.    Okay.

7  Q.    Do you believe that that represents the number of acres,

8  and we can just look at the first row, East Heartland.  Where

9  is the East Heartland?

10  A.    That's one of our business units in the midwest.

11  Q.    Okay.  You testified yesterday that there were, I don't

12  remember -- different business units across the country.

13  There's five of them listed here.  Do those represent the five

14  business units?

15  A.    At that time we had five, yes.

16  Q.    Okay.  Let's just focus on East Heartland.

17  A.    Okay.

18  Q.    If you kind of go 2015.  Would you agree that this chart

19  appears to show in 2015 the number of acres treated -- the

20  number of soybean acres treated with Syngenta fungicides

21  represents one -- is 1.8,021,416 acres?

22  A.    Yes.

23  Q.    Okay.  And I'm happy to give you a calculator if you want,

24  but if you take the 25,872,387 acres represented under 2015,

25  multiply it by the market size of 22 percent and multiply it

1  then --

2           THE COURT:  I'm sorry?

3           MR. TILLER:  I'm trying --

4           THE COURT:  You all need to slow down a little bit on

5  that.  You appear to be bringing some new stuff in.

6           MR. TILLER:  I'm trying to get to the point.

7           THE COURT:  Okay.  Just move on -- or move along.

8  BY MR. TILLER:

9  Q.   If we assume -- let me ask you to make an assumption.

10 Please assume that the number of total acres in East Heartland

11 of soybeans was 25,872,387.  Do you see that in 2015?

12 A.   Yes, I do.

13 Q.   The market size -- would you agree that the market size

14 could represent the number of treated acres in the East

15 Heartland?

16 A.   I would assume so, yes.

17 Q.   Okay.  That's -- I did, too.  And that when it says

18 "share," that represents Syngenta's share of those treated

19 acres?

20 A.   Yes.

21 Q.   Okay.  I think we're in the same place now.

22           So it appears that in soybeans the market -- there

23 were 22 percent of the acres in 2015 and 2016 were treated with

24 fungicides.  Would you agree with that?

25 A.   Yes.  That's what it says.

```
1  Q.   Okay.  And of that, Syngenta had 32 percent?
2  A.   Correct.
3  Q.   Okay.  In the south it appears that 50 percent of the
4  acres were treated.  Do you know why there's a higher
5  percentage of acres treated in the south?
6  A.   Because we do not have a resistance problem, and everybody
7  else does.
8  Q.   Well, that represents -- fair enough.  Okay.
9            Looking at the North Heartland, it appears that the
10 market size is 18 percent so, therefore, would you agree that
11 18 percent of the soybean acres in 2015 and 2016 were treated
12 with some type of fungicide?
13 A.   For which one?  I'm sorry.
14 Q.   The North Heartland, 18 percent?
15 A.   Yes.
16 Q.   Okay.  And of that, Syngenta had 30 percent?
17 A.   That's correct.
18 Q.   All right.  We can -- and would you agree with me that the
19 total number of Syngenta acres, or the total number of acres
20 treated by a Syngenta fungicide in 2015, was 8,949,293?
21            THE COURT:  For soy?
22            MR. TILLER:  For soy, yes, ma'am.
23            THE WITNESS:  That's what it says.
24 BY MR. TILLER:
25 Q.   Okay.  And for 2016, again for soy, the number of acres
```

1  treated by a Syngenta product was 8,792,288?

2  A.   Yeah.   I have a problem with that, and the reason is

3  because if you look at the total treated acres are less than

4  what we're saying Syngenta treated, so there's something

5  fundamentally wrong with that.

6           8.5 million in 2015 versus 8.9 Syngenta treated, so

7  somehow the math doesn't work.   I know it's a Syngenta

8  document, but it doesn't work.

9           THE COURT:   Isn't that 85 million?

10          MR. TILLER:   It's 85 million.

11          THE WITNESS:   It is 85.   There's no comma.   Yep,

12  you're right.   Correct.

13  BY MR. TILLER:

14  Q.   Okay.   Fair enough.   Could we, Bonnie, look at the corn.

15  And, again, I just want to make sure -- so assuming that this

16  chart shows the similar factors, would you agree that in 2015

17  and 2016, the number of acres in the East Heartland, the number

18  of corn acres in the East Heartland, that were treated with any

19  fungicide, was 22 percent?

20  A.   It seems so.

21  Q.   And of that, Syngenta had 30 percent of that market?

22  A.   Yes.

23  Q.   Okay.   So, conversely, I'm sure you would agree with me

24  that that means 78 percent of the acres in 2015 and '16, in the

25  East Heartland area of the country, were not treated with any

1  fungicide?

2  A.    That's true.

3  Q.    Okay.  And then just looking at the bottom, the grand

4  totals, would you agree -- do you see where this chart

5  represents that the total number of Syngenta -- or the total

6  number of corn acres in the country treated with a Syngenta

7  fungicide was 5,313,188?

8  A.    Yes.

9  Q.    And the total number of corn acres in the country treated

10 with a Syngenta fungicide was 5,379,608.

11 A.    For 2016, yes.

12         MR. TILLER:  Could I please get 108.  Your Honor, I'd

13 like to show Defendant's Exhibit 108 and move for its

14 admission.

15         THE COURT:  You can hand it to the witness.

16         MR. COUGHLIN:  This is going to take just a second,

17 Your Honor.  It's a long --

18         THE COURT:  All right.  It will be admitted.

19         MR. TILLER:  Thank you, Your Honor.

20 BY MR. TILLER:

21 Q.    Mr. Cecil, looking at the first page, would you agree that

22 this is a "2016 to 2021 US Product Marketing Plan for

23 Azoxystrobin Technical"?

24 A.    Yes.

25 Q.    It was prepared -- or at least on its face, it is

```
 1  represented that it was prepared by Andrew Fisher.  He's the
 2  product lead for azoxystrobin?
 3  A.   Yes, he is.
 4  Q.   And this appears to be dated November 25th, 2015, do you
 5  agree with that?
 6  A.   Yes.
 7           MR. TILLER:  Bonnie, if we could go to 283741.  And
 8  if you could just cull out the top row.
 9  BY MR. TILLER:
10  Q.   Hopefully, you can see that, Mr. Cecil.  And I apologize,
11  there's a lot of info on this page.
12           Do you see where this document calls out, on the
13  left-hand side, under "Brand and Crops," that this row is
14  talking about Quilt Xcel in the corn, soybean, cereal, rice,
15  and grass seed market?
16  A.   Yes.
17  Q.   And for the -- on the right-hand side, for the
18  competition, it lists --
19           THE COURT:  Far right?
20           MR. TILLER:  Far right, yes, under "Competition."
21  Bonnie is, I think, about to highlight it.
22  BY MR. TILLER:
23  Q.   It identifies Headline.  And Headline is a BASF product,
24  correct?
25  A.   It is.
```

1 Q.   It identifies Stratego.  Stratego is a Bayer product,

2 correct?

3 A.   Yes.

4 Q.   We've talked about Aproach Prima.  Who is the company that

5 sells Aproach Prima?

6 A.   DuPont.

7 Q.   Priaxor, that is BASF's SDHI product, correct?

8 A.   It's a combination with the strobilurin, yes.

9 Q.   And I assume Priaxor D is variation of that that's also

10 sold by BASF, correct?

11 A.   It is.

12 Q.   And FORTIX.  What is FORTIX?

13 A.   I'm not even sure.

14       MR. TILLER:  Okay.  Bonnie, if we could cull out the

15 next row.

16 BY MR. TILLER:

17 Q.   Would you agree that on the left-hand side, that this row

18 is talking about Quadris Top SBX in the soybean market?

19 A.   Yes.

20 Q.   Is that -- I'm sorry.  Yes?

21 A.   Yes.

22 Q.   Okay.  Thank you.  And then, on the right-hand side, under

23 "Competition," it mentions some of the same products that we

24 talked about above.  Do you see that?

25 A.   I do.

1  Q.    And none of those are a Willowood product, correct?

2  A.    No.  They only come on the bottom.

3  Q.    That's what we were going to get to.

4  A.    Um-hum.

5  Q.    At the bottom -- and actually, we'll even mention one

6  before that.  The third -- can you go to the third row, Bonnie?

7  I'm sorry.

8        Would you agree, on the left-hand side, that this row

9  is dealing with Quadris in the sugar beat, potato, and

10 vegetable markets?

11 A.    Yes.  Yes.

12 Q.    And that's a speciality market, correct?

13 A.    It is.

14 Q.    Thank you.  And there, the competitors, again, are

15 Headline, the BASF product, correct?

16 A.    Yes.

17 Q.    Stratego, the Bayer product?

18 A.    Yes.

19 Q.    And then Azoxy 2SC, which is the Willowood product,

20 correct?

21 A.    Correct.

22 Q.    And Equation, which is the Cheminova product, correct?

23 A.    Correct.

24 Q.    And then, at the bottom, as you already pointed out, for

25 Aframe, Aframe Plus, those are the fighting brands that you

1 talked about yesterday, correct?

2 A.    Yes.

3 Q.    And there, the competition is Azoxy 2SC, which is a

4 Willowood product, correct?

5 A.    Yes, it is.

6 Q.    Equation, which is a Cheminova product, correct?

7 A.    Yes.

8 Q.    Azaka, which is also a Cheminova product, correct?

9 A.    Correct.

10 Q.    And I don't know whether that's Affiance or Affiance.

11 A.    Neither do I.

12 Q.    Do you know who sells that product?

13 A.    No, I don't.

14 Q.    It's not Willowood, though, correct?

15 A.    Not to my knowledge, no.

16        MR. TILLER:  Okay.  Bonnie, if we could go to 283755.

17 Actually, you know what, Bonnie?  Could we go to 283748?  I

18 apologize.

19 BY MR. TILLER:

20 Q.    And under, "Objectives By Brand" on the left-hand side, do

21 you see that, Mr. Cecil?

22 A.    Yes.

23 Q.    Okay.  And the heading of this document is, "Azoxystrobin

24 US Product Marketing Plan Brand Strategies and Objectives,"

25 isn't it?

1  A.    It is.

2  Q.    Okay.  And it appears of the "Objectives By Brand" on the

3  left-hand side is discussing objectives for Quilt Xcel.  Do you

4  see that?

5  A.    Yes.

6  Q.    And it looks like in, let's see, under "Corn," the third

7  bullet says:  Drive intensity to 21 percent for early applied

8  market.  What is the early applied market?

9  A.    That's the early applied market.  It's the -- it's a

10 segment of the market that applies the product earlier than --

11 than the rest.

12 Q.    Okay.  And it looks like Syngenta had a goal for Quilt

13 Xcel to drive the intensity, or what we've already talked

14 about, the treated acres to 21 percent, correct?

15 A.    Yes.

16 Q.    So, presumably, at least at this point, the treated acres

17 in the early applied market was somewhere less than 21 percent?

18 A.    Correct.

19 Q.    Okay.  And, again, in the -- there's something for the

20 reproductive market.  Is that maybe the later applied market?

21 A.    Yes.

22 Q.    Okay.  And Syngenta had a goal in -- at least in the

23 reproductive corn market to drive intensity to 23 percent,

24 correct?

25 A.    Correct.

1  Q.  So, presumably, at this point, the treated acres in the

2  reproductive corn market was somewhere less than 23 percent,

3  correct?

4  A.  Yes.

5  Q.  Okay.  And then, it also has similar type of statistics

6  for soy and cereal.  Do you see that?

7  A.  Yes.

8          MR. TILLER:  Okay.  Bonnie, could we go to 283755.

9  And the left-hand side, please, the chart.  You can just do the

10  top.

11 BY MR. TILLER:

12 Q.  Mr. Cecil, this page is entitled, "Azoxystrobin US Product

13 Marketing Plan Five-Year Pricing Strategy."  Do you see that?

14 A.  Yes.

15 Q.  And you will see -- do you agree that in the upper

16 left-hand side, there is a chart that is entitled, "Pricing,

17 Power and Benchmarks."  Do you see that?

18 A.  Yes.

19 Q.  And it -- and do you agree that this document says:  For

20 every dollar we are priced above BASF, we lose three share

21 points?  Do you see that?

22 A.  Yes, I do.  It indicates if we take the price down --

23 Q.  Yeah.

24 A.  -- we will -- we will also have a problem.

25 Q.  Thank you.

1    THE COURT:  I'm sorry.  I couldn't hear your answer.

2    THE WITNESS:  There will be a problem if we take the

3  price up or down; yes.

4    MR. TILLER:  If we could look at 283759, Bonnie.

5  Looking at the key drivers of change on the right-hand side.

6  BY MR. TILLER:

7  Q.   Mr. Cecil, do you agree that the title of this page is,

8  "Azoxystrobin US Product Marketing Plan Five-Year Plan

9  Financials"?

10 A.   Yes.

11 Q.   And on the right-hand side, do you see where it

12 says -- where -- oh.  The third bullet:  Price loss expedited

13 versus prior plan due to generic and BASF price declines in

14 2015.  Do you see that?

15 A.   Yes.  BASF also had to respond to the generic pressure in

16 the market of Willowood.

17 Q.   There was also generic pressure from Cheminova?

18 A.   It doesn't say that in that statement.  It says:

19 Generics.

20 Q.   It says:  Generics.

21 A.   Yes.

22 Q.   There was also generic pressure from the fact that

23 Pyraclostrobin was coming off patent, correct?

24 A.   It hadn't at this time.

25 Q.   2015, it came off patent, correct?

1    A.    At the end of the crop year, yes.

2    Q.    And we actually saw yesterday that BASF was trying to

3    drive its volume up on Pyraclostrobin before that happened,

4    correct?

5    A.    Yes.

6    Q.    And a way of doing that is to decrease prices, correct?

7    A.    That could be a way to do that.

8    Q.    Yes.  Under, "Additional Drivers," you will see that -- or

9    do you agree with me that the first bullet indicates:  Market

10   elasticity is an additional driver?

11   A.    Yes.

12         MR. TILLER:  Okay.  Could we -- Bonnie, could we

13   please go to 283768.

14   BY MR. TILLER:

15   Q.    Mr. Cecil, do you see where this page is titled,

16   "Azoxystrobin Asset Marketing Plan Positioning"?

17   A.    Yes.

18   Q.    And this is positioning for the Quadris product, do you

19   see that?

20   A.    Yes.

21   Q.    And on the right-hand side, under No. 3, it talks about

22   the competitor products for Quadris.  Do you see that?

23   A.    Yes, I do.

24   Q.    And the first one is -- do you see where it says:

25   Untreated acre is the biggest competitor?

1  A.    Yes.  That's no different than ever.

2  Q.    And then, it identifies Stratego, Headline, and Evito,

3  none of which are sold by Willowood, correct?

4  A.    That's correct.

5           MR. TILLER:  Okay.  Bonnie, could we go to 283770?

6  BY MR. TILLER:

7  Q.    Would you agree with me that this is the "Azoxystrobin

8  Asset Marketing Plan Positioning for Quilt Xcel"?

9  A.    Yes.

10 Q.    And on the right-hand side, for "Competitor Products," it,

11 once again, identifies untreated acre as being the biggest

12 competitor for Quilt Xcel?

13 A.    It does.

14 Q.    And then identifies a number of competitors, none of which

15 are sold by Willowood, correct?

16 A.    Yes, because we had, by this time, decided to take our

17 competition versus Willowood to our fighting brand products.

18 Q.    Understood.

19           MR. TILLER:  Bonnie, if we could go to 283788.

20 BY MR. TILLER:

21 Q.    Mr. Cecil, would you agree with me that this is a chart

22 discussing the price sensitivity of Quilt Xcel?

23 A.    It appears so, yes.

24 Q.    And on the left-hand side, it says -- yes, that box,

25 Bonnie.  Thank you.

1    A 20 percent reduction in price would increase volume
2  by 70 percent and revenue by 36 percent.  Do you see that?
3  A.   That's in the absence of any competitor.
4  Q.   It says -- would you agree with me that it says:  A
5  20 percent reduction in price would increase volume by
6  70 percent and revenue by 36 percent?
7  A.   I would agree that it's a market research study that says
8  that if there's no competitors, you can take your price down
9  and gain.
10 Q.   Does it say if there's no competitors?
11 A.   No.
12 Q.   I presume that this market research study was done in the
13 context of whatever the competition was at the time?
14 A.   It was done in the market at that time, yes.
15       MR. TILLER:  And then, Bonnie, moving to 283792.
16 BY MR. TILLER:
17 Q.   And again, would you agree with me that this is a doc -- a
18 document discussing the price sensitivity of Quadris Top?
19 A.   Yes.
20 Q.   And that on the left-hand side, it says that a 20 percent
21 reduction in price would increase volume by 149 percent and
22 revenue by 99 percent?
23 A.   That's true.
24 Q.   Okay.  I apologize, Mr. Cecil.  I'm going to hand you a
25 very large document.

         1           MR. TILLER:  I'd like to show Defendant 8 and move

         2   for its admission.

         3           THE COURT:  Defendant's 8?

         4           MR. TILLER:  Actually, I may have to ask a couple of

         5   questions.

         6           THE COURT:  All right.  Did I get the number correct,

         7   Defendant's 8?

         8           MR. TILLER:  Yes.  I'm sorry.  Sorry about that.

         9           MR. COUGHLIN:  I believe this is hearsay, Your Honor.

        10           MR. TILLER:  I'm going to --

        11           THE COURT:  Okay.  Well --

        12           MR. TILLER:  I realized I had to ask a couple

        13   questions.

        14           THE COURT:  Okay.

        15   BY MR. TILLER:

        16   Q.   Do you know what the Kline -- what Kline & Company is?

        17   A.   I've heard of them.

        18   Q.   It's a large --

        19           THE COURT:  Well, ask a question.

        20           MR. TILLER:  Is it -- you're right.  Is it a --

        21   sorry.

        22   BY MR. TILLER:

        23   Q.   Is it a large marketing research firm that does research

        24   in the agrichemical space?

        25   A.   They do.

1  Q.   Is it -- does Syngenta subscribe to it?

2  A.   No, we do not.

3  Q.   You do not?

4  A.   Nope.

5  Q.   Do you know how Syngenta got this copy of it?

6  A.   Because we subscribe to it for our European markets and

7  they give a global view.

8  Q.   Okay.  So you -- so Syngenta does subscribe to it, just

9  not for the US market?

10  A.   It is not used in the US market.

11  Q.   Is there a reason it's not used in the US market?

12  A.   It's not a credible source.

13  Q.   Not a credible source.  Okay.  We'll move past it then.

14        MR. TILLER:  Could I get 86, please.  I'd like to

15  show the witness Defendant's 86, please, and move for its

16  admission.

17        MR. COUGHLIN:  No objection.

18        THE COURT:  It'll be admitted.

19  BY MR. TILLER:

20  Q.   Do you know what AgroTrak is?

21  A.   Yes, I do.

22  Q.   AgroTrak is a subscription service that does research in

23  the agrichemical industry -- is AgroTrak a market research firm

24  that does research in the agrichemical industry?

25  A.   Yes.

1 Q.   Okay.  And Syngenta subscribes to it?

2 A.   Yes, we do.

3          MR. TILLER:  Okay.  Looking at page 64437, why don't

4 you just go ahead and make that so everybody can see it,

5 Bonnie.  Make it large, the whole thing.  Thank you.

6 BY MR. TILLER:

7 Q.   Do you see on this page -- strike that.  Do you see that

8 this page is entitled, "US Corn Herbicides"?

9 A.   Yes.

10 Q.   Okay.  And this is -- would you agree that this is showing

11 that -- the amount of sales of herbicides for each of these

12 companies?

13 A.   Yes.

14 Q.   Syngenta's sale of herbicides, would you agree, went

15 from -- or that this purports that Syngenta's herbicide sales

16 went from $594 million in 2012 to $608 million in 2013 to

17 $574 million in 2014 to $631 million in 2015?

18 A.   That's what the market research shows, yes.

19          MR. TILLER:  Okay.  Bonnie, could we take a look at

20 64446?

21 BY MR. TILLER:

22 Q.   Would you agree that this shows -- or that this is titled,

23 "US Corn Foliar Fungicides Grower Expenditures"?

24 A.   Yes.

25 Q.   Would you agree that this purports to show the amount of

1  money that farmers spent on foliar fungicides for -- with each
2  of these companies?
3  A.    Yes.
4  Q.    And azoxystrobin, as I believe you testified to yesterday,
5  is foliar fungicide?
6  A.    Yes, it is.
7  Q.    And would you agree with me that this shows that grower
8  expenditures with Syngenta on foliar fungicides in corn were
9  30 million in 2012, 43 million in 2013, 46 million in 2014, and
10 67 million in 2015?
11 A.    Yes.
12 Q.    So it appears that Syngenta's sales for herbicides was far
13 greater than its sale of foliar fungicides?
14 A.    The herbicide market is a much bigger market, yeah, that's
15 true.
16         MR. TILLER:  Your Honor, I would like to show
17 Defendant's Exhibit 92 and move for its admission.
18         MR. COUGHLIN:  Just one second, Your Honor.
19         THE COURT:  You can go ahead with your questions.  We
20 talked about admissibility of the whole thing yesterday.
21         MR. COUGHLIN:  The only issue, Your Honor, is the
22 issue we dealt with yesterday at the sidebar.  I'm just trying
23 to identify whether that is the same issue.
24         THE COURT:  All right.
25         MR. TILLER:  I looked through it, so I hope that

1   that's not an issue.

2           THE COURT:  Just cull out the page number before it's

3   put up and let them look.

4           MR. TILLER:  Fair enough.  Let's look at the front

5   cover page.  I presume that's okay.

6           THE COURT:  All right.

7   BY MR. TILLER:

8   Q.   Would you agree with me that this is a presentation

9   labeled "PPS Product Management Meeting"?

10  A.   Yes.

11  Q.   What is PPS?

12  A.   Post-patent strategy.

13  Q.   And this was -- at least on its face, was this authored by

14  Rex Wichert and Ken Barham?

15  A.   Yes.

16  Q.   Rex Wichert I believe was -- excuse me.  I think his title

17  is manager of post-patent strategy?

18  A.   Correct.

19  Q.   Who is Mr. Barham?

20  A.   He was on the same team.  He's left the company since.

21          MR. TILLER:  I will concede -- I'm not sure exactly

22  of the date here.

23          THE COURT:  Just ask him.

24  BY MR. TILLER:

25  Q.   What was the date?

```
 1   A.   I would assume it's July 20 through 22 of 2015.
 2   Q.   Can we please look at 162696?
 3            THE COURT:  Say again?
 4            MR. TILLER:  162696.
 5   BY MR. TILLER:
 6   Q.   Do you see this page is titled US --
 7            THE COURT:  You can put it up.
 8            MR. TILLER:  You can go ahead and put it up, Bonnie.
 9   BY MR. TILLER:
10   Q.   Would you agree this page is titled "US CP Distribution is
11   Highly Concentrated"?
12   A.   Yes.
13            THE COURT:  CP stands for crop protection?
14            THE WITNESS:  Yes, it does.
15            THE COURT:  All right.  Go ahead.
16   BY MR. TILLER:
17   Q.   On the right-hand side, do you see where it says
18   "87 percent of azoxystrobin sales is through top 5
19   distributors"?
20   A.   Yes.
21   Q.   And under that it says, "High level of generic activity to
22   date.  5 submissions for technical labels," and it lists five
23   companies?
24   A.   That's correct.
25   Q.   Below that, do you see where it identifies "90 percent of
```

1  mesotrione sales are through top 6 distributors"?

2  A.    Yes.

3  Q.    And do you see where it says, "88 percent of mesotrione is

4  sold in SMOC mixtures"?  Do you see that?

5  A.    Yes, I do.

6  Q.    What is an SMOC mixture?

7  A.    It's S-Metolachlor.  It's another active ingredient.

8          THE COURT:  You might need to say that again.  What

9  is it?

10          THE WITNESS:  S-Metolachlor.

11          THE COURT:  Okay.

12 BY MR. TILLER:

13 Q.    Is that also a herbicide?

14 A.    It is also a herbicide.

15 Q.    Am I correct in assuming from this that, at least

16 according to this document, 88 percent of Syngenta's mesotrione

17 sales are sold as part of an -- are sold mixed with an SMOC?

18 A.    Yes.

19 Q.    Do you see that there is a patent, the synergy patent,

20 that doesn't expire to July of 2015?  Do you see that?

21 A.    Yes, I do.

22 Q.    And that was for a particular mesotrione SMOC mixture,

23 correct?

24 A.    Yes.

25 Q.    And there was -- I think that is referring to a copper

1  chelate patent that expired in January of 2017.  Do you see

2  that?

3  A.   Yes.

4  Q.   And that also covered another mesotrione SMOC mixture,

5  correct?

6  A.   No, that's a process patent.

7  Q.   That's a process patent.  Okay.  For how to make the

8  synergy product?

9  A.   Mesotrione.

10  Q.   Just how to make mesotrione?

11  A.   Uh-huh.

12  Q.   And Halex is a Syngenta product that includes mesotrione,

13  correct?

14  A.   Yes.

15  Q.   And it, too, is an SMOC mixture?

16  A.   Yes, it is.

17  Q.   And a patent covering the Halex mixture is not slated to

18  expire until after 2020, correct?

19  A.   Correct.

20  Q.   And do you see where this says that there is limited

21  generic activity to date?

22  A.   Yes.  I also see a date at the top of the page of 2013.

23  So I'm not sure where all of the data is coming from.

24  Q.   There had been no azoxystrobin sales in December of 2013,

25  correct?

A.    No.  The first sales of azoxystrobin generic were from
Willowood in July 2014.

Q.    We established yesterday, Mr. Cecil, just to make clear,
that the first importation was through -- was by Cheminova,
correct?  I can show you that again but --

A.    Okay.  I'll take your word.

Q.    All right.

A.    But this only says that there is a high level of generic
activity to date, meaning that there are submissions for
technical registrations on the books for these companies, no
more.

Q.    Okay.  So if that was known, was that known in 2013 by the
way you're reading this?

A.    Like I said, I don't know where the data was pulled from.
It's the date of 2013 up here, and it has several other dates.
So I can't tell you that.

Q.    Okay.  We might be able to talk about it with Mr. Wichert,
but --

        MR. TILLER:  Let me have 160, please.  Just a couple
more, Judge, and I'll be done.

        THE COURT:  So that's Defendant's 160?

        MR. TILLER:  Defendant's 160, yes.  Again,
Defendant's 160, and I move for its admission.

        MR. COUGHLIN:  We're just checking that same issue,
Your Honor.

1          THE COURT:  All right.  Well, you can go ahead with
2    your questions.
3          MR. TILLER:  Just as a point of clarification, is 92
4    admitted now?
5          THE COURT:  Were there problems with 92?
6          MR. COUGHLIN:  There are problems with that, Your
7    Honor.
8          THE COURT:  Well, we'll talk about that.
9          MR. TILLER:  All right.  Can we show the first page
10   of 160?
11   BY MR. TILLER:
12   Q.   Mr. Cecil, you see where this is entitled "PLFB 2016 PP
13   Update"?
14   A.   Yes.
15   Q.   Do you know what that stands for?
16   A.   Product life cycle, fighting brand 2016, post-patent
17   update.
18          THE COURT:  I'm sorry.  I couldn't hear you.  PLFB
19   was what?
20          THE WITNESS:  I'm assuming it's product life cycle,
21   fighting brands 2016, but I can't be sure.
22          MR. COUGHLIN:  No objection with regard to this
23   document, Your Honor.
24          THE COURT:  All right.  It will be admitted.  Thank
25   you, Mr. Coughlin.

1          MR. TILLER:  Bonnie, we can go to 283342?

2    BY MR. TILLER:

3    Q.    You'll see this is entitled "Mesotrione"?

4    A.    Yes.

5    Q.    And you'll see the first bullet "Rotam has imported

6    4,000 gallons and is looking for a home."  Who is Rotam?

7    A.    They are a generic supplier.

8    Q.    Do you read this to say that Rotam has 4,000 gallons of

9    mesotrione and is looking to try to sell it?

10   A.    Yes.

11   Q.    Is there any indication of any other importations by any

12   other generics on this page?

13   A.    Not on this page, no.

14   Q.    Okay.  You'll see on the second bullet, it says, "Two

15   other generic companies have filed for registration and expect

16   those will be available in late 2016 or 2017."  Do you see

17   that?

18   A.    Yes.

19   Q.    And then the next bullet, do you see where it says,

20   "Mixtures not until 2017, but only if they can overcome

21   significant mixture dynamics."  Do you see that?

22   A.    Correct.

23   Q.    So it's going to be very hard for generics to put together

24   a mixture that could be sold in the market?

25   A.    That's what we believed, yes.

1  Q.    Okay.

2              MR. TILLER:  Alicia, could I please get Defendant's

3  94.

4              Defendant's 94, move for admission, Your Honor.

5              THE COURT:  It will be admitted.

6              MR. TILLER:  I'm sorry.  I missed that.

7              THE COURT:  It will be admitted, yes.

8  BY MR. TILLER:

9  Q.    Looking at the first page, Mr. Cecil, do you see that this

10  is entitled "North America 2016 Pricing Strategy"?

11  A.    Yes, I do.

12  Q.    But it is dated May of 2015?

13  A.    Correct.

14  Q.    And then just looking at one page very quickly, 272634, do

15  you see this page is entitled "Herbicide Portfolio Overview"?

16  A.    Yes, I do.

17  Q.    And, specifically, "US Market Drivers," do you see that?

18  A.    Yes.

19  Q.    And it looks like the first market driver is herbicide use

20  intensity is less elastic to farm profitability than other

21  indications.  Do you see that?

22  A.    Yes.

23  Q.    And we talked a little bit earlier that Syngenta -- well,

24  let me ask.  Does Syngenta in its budgeting process for

25  mesotrione verses azoxystrobin take this herbicide market

1  driver into account?

2  A.   Yes, we do.

3  Q.   Looking at the second bullet, do you see where it says,

4  "Herbicide use intensity increases driven by the spread of

5  resistant weeds"?

6  A.   Yes.

7  Q.   These weeds were not resistant to mesotrione?

8  A.   That's true.

9  Q.   And I presume that Syngenta took this market driver into

10  account when doing its budgets?

11  A.   Of course.

12         MR. TILLER:  Just checking my notes, Your Honor, but

13  I'm done.

14         THE COURT:  Okay.  Redirect.

15                    REDIRECT EXAMINATION

16  BY MR. COUGHLIN:

17  Q.   Mr. Cecil, I'm going to try and walk you through, as

18  organized as I can, some of the exhibits you've seen and ask

19  you some questions about those particular exhibits.

20         MR. COUGHLIN:  These are all, I believe, admitted

21  exhibits, Your Honor.

22         THE COURT:  Okay.

23         MR. COUGHLIN:  If it's all right, I'm just going to

24  work through them.

25         THE COURT:  Yes, that's fine.

BY MR. COUGHLIN:

Q.   On Exhibit 68, if you could turn --

          THE COURT:  Defendant's?  Just be sure to say

Defendant's Exhibit or Plaintiff's.

          MR. COUGHLIN:  Yes, Your Honor.

BY MR. COUGHLIN:

Q.   Defendant's 68, if you could turn to page 448, the last

three digits of the Bates stamps.

          Mr. Cecil, do you recall this document?

A.   Yes.

Q.   All right.  I believe you were asked about whether you

agreed that Cheminova had led or contributed, in part, to a

price reduction.  Do you recall that?

A.   Yes, I do.

Q.   And I believe you said no.  Is that right?

A.   That's correct.

Q.   Can you highlight the title of this document, please?  If

you could read that out, please.

A.   "Summary of Syngenta's azoxy pricing versus Willowood

generic pricing."

Q.   And in the paragraph below it I believe is where Cheminova

is mentioned?

A.   Yes.

Q.   There's also -- if we could take that away.  There's also

an actual pricing chart there, is there not, on the right?

1 A.    Yes, there is.

2 Q.    Can you highlight that, sir?  Do you recognize all of

3 those products that are there?

4 A.    Yes, I do.

5 Q.    And who are the suppliers of those products?

6 A.    Syngenta is the supplier of all the top products and below

7 the black line would be Willowood.

8 Q.    Is Cheminova listed on that chart?

9 A.    No, it's not.

10 Q.    Do you know why Cheminova is not listed on that chart?

11 A.    It wasn't viewed to be a competitor at this stage.

12 Q.    Do you know whether Syngenta was even able to find a

13 Cheminova product in the market or any pricing for Cheminova

14 products at this time?

15 A.    No, it was very difficult to find any product or pricing

16 for quite some time.

17           MR. COUGHLIN:  If I could ask you, David, to switch

18 to or turn to 457, which I think is maybe the prior page.

19 BY MR. COUGHLIN:

20 Q.    Again, this is still with Defendant's Exhibit 68.  You

21 were asked about competition with regard to these various

22 branded products, BASF, Syngenta, Bayer, and DuPont?

23 A.    Correct.

24 Q.    How long has Syngenta been competing with these branded

25 products?

1  A.   Ever since we've been in the fungicide market.  For many

2  years.

3  Q.   I'm not going to go through each one of them.  What's

4  listed there is a strategy, but are all of these strategies

5  with these branded products considered -- or are all of these

6  competitive threats perhaps considered in Syngenta's budgeting

7  process?

8  A.   Yes, they always have been.

9            MR. COUGHLIN:  If I could ask you to go to the

10  bottom, David, that bottom right chart about third parties,

11  generics.

12  BY MR. COUGHLIN:

13  Q.   Sir, on the right-hand side, are those three generic

14  companies listed?

15  A.   Yes.

16  Q.   And that's Willowood, Cheminova, and is Albaugh the

17  AgriStar?

18  A.   I believe so, yes.

19  Q.   On the left-hand side, are those third parties?

20  A.   Yes, they are.

21  Q.   Are those all Syngenta customers on the left-hand side?

22  A.   They would be, yes.

23  Q.   And so they're all selling Syngenta azoxystrobin, is that

24  correct?

25  A.   Yes.  Either through a technical that we would sell them

1  or a formulated product that we make for them.

2  Q.   Where does Syngenta make its azoxystrobin?

3  A.   We make our -- we formulate our azoxy here in the United

4  States.

5  Q.   Where is the technical made?

6  A.   It's made in -- good question.  There's a couple of

7  places, but we make most of it oversees.

8  Q.   Is that in Grangemouth?

9  A.   Grangemouth.  Thank you.

10        THE COURT:  That's in Scotland, right?

11        THE WITNESS:  Yes, it is.

12  BY MR. COUGHLIN:

13  Q.   Does Syngenta make all of its azoxystrobin technical using

14  the DABCO process patent within the claimed range?

15  A.   Yes.

16  Q.   So all of this product that you see here on the

17  marketplace is all that's actually practicing the DABCO patent,

18  correct?

19  A.   That's correct.

20        MR. TILLER:  Objection.

21        THE COURT:  I'm sorry.  Could you just ask that

22  again?  I didn't quite -- and there was an objection.

23        MR. COUGHLIN:  Yes, Your Honor.

24  BY MR. COUGHLIN:

25  Q.   So all of azoxystrobin that's being sold to Syngenta's

1  customers is azoxystrobin technical or made from azoxystrobin

2  technical manufactured using the DABCO patent process, correct?

3          MR. TILLER:  Objection.

4          THE COURT:  Okay.  You're asking him if Syngenta's

5  azoxystrobin technical all is made pursuant to the DABCO that

6  is sold as reflected on this chart?

7          MR. COUGHLIN:  Exactly.

8          THE COURT:  Okay.  Overruled you can answer that.

9          THE WITNESS:  Yes, it is.

10  BY MR. COUGHLIN:

11  Q.   You can take that down.  If you could pull up Defendant's

12  Exhibit 99, and turn to page ending in 380.  And if you could

13  highlight the bottom question, answer.

14          Do you recall being asked this question -- is this a

15  talking point or a question and answer as part of a

16  presentation?

17  A.   Yes, it is.

18  Q.   And you were asked about what generic brands are driving

19  Aframe quantity and pricing, and then it was discussed equation

20  from Cheminova and Azoxy 2SC from Willowood averaging $160 a

21  gallon to retail?

22  A.   Yes.

23  Q.   The last sentence there I don't think you were asked

24  about.  You can take away the highlighting and highlight the

25  last sentence, the Aframe plus.  No, the last sentence starting

1    in the middle.

2            Aframe plus, is that the -- Syngenta's fighting

3    brand?

4    A.    Yes.  This is the mixture of fighting brand, yes.

5    Q.    Okay.  And how is that priced?  Or when it says "pricing

6    benchmarked," what does that mean?

7    A.    That means it is a using AzoyProp Xtra as the starting

8    point.  So if we're pricing 5 to 10 percent above a generic,

9    that's the one we would be pricing above.

10   Q.    Okay.  And is that because that's the only pricing that

11   you were aware of at the time in the marketplace with regard to

12   a generic azoxystrobin product?

13   A.    Yes.  That's what it would indicate, yes.

14   Q.    And does this affect -- this pricing at the fighting brand

15   level affect Syngenta's entire brand ladder or the pricing for

16   all of the products that are in Syngenta's brand ladder?

17   A.    Yes.  As covered yesterday, the price of the bottom rung

18   of the ladder will set the tone for the rest of the brand

19   ladder, meaning it will be lower.

20           MR. COUGHLIN:  Your Honor, I believe I need to have a

21   sidebar briefly.

22           THE COURT:  All right.  Well, why don't I send the

23   jury out for their morning recess?  Ladies and gentlemen, I'll

24   ask you to come back at ten minutes after eleven.  Please don't

25   talk about the case with each other or with anyone else.  Avoid

```
 1   contact with every one.  Keep an open mind, and come back at
 2   ten minutes after eleven.  The jury is excused.  If every one
 3   else will remain seated.  Okay.
 4             (At 10:52 a.m., jury excused.)
 5             THE COURT:  Okay.  What is your issue?
 6             MR. COUGHLIN:  So, Your Honor, Exhibit 211, if I can
 7   display that to the Court.
 8             THE COURT:  Defendant's?
 9             MR. COUGHLIN:  Defendant's Exhibit 211.
10             THE COURT:  Yes.
11             MR. COUGHLIN:  And if we go to page 404, Mr. Cecil
12   was asked about this page, including all the registrations that
13   appear here and import records, and he was cross-examined about
14   that and the other competition, the effect, and what Syngenta
15   was doing in the marketplace with its -- pointing to the fact
16   that all of these other companies were there and these other
17   imports.
18             I would like -- this exhibit is in evidence.  It came
19   in evidence by the Defendant.  But I wanted to go and walk him
20   through page 402, which is two pages earlier, and this is
21   what's actually going on in this presentation, and it talks
22   about generic activity.
23             In the first bullet point, it talks about EPA
24   applications falsely claiming azoxystrobin was sourced from
25   Syngenta, which is Willowood.  The second one talks about
```

companies using azoxystrobin in the US prior to the compound
patent expiring to generate product chemistry data for their
EPA submissions, which is exactly what is in evidence.  And
then received reports in the field that there was azoxystrobin
being offered for sale in the US prior to the expiration of the
compound patent, which is consistent with the testimony before.

            But the first point there, which is all part of this
exhibit, which is going back in the jury room due to them
admitting it, talks about them falsely claiming that Syngenta
was a source.  So, since that was a matter that had been
discussed, I didn't want do that without bringing it to the
Court's attention.

            THE COURT:  All right.  For the Defendant?

            MR. TILLER:  Your Honor, we dealt with this issue
already.  There was already a motion in limine on it.  You've
ruled on it.  This does not say Willowood did this.  This says
how various generic companies worked the edges.  There's no
implication that Willowood did it.  And, more importantly, we
didn't ask any questions about it.  We put the document in in
its entirety because that's the way, I think -- at least I was
under the impression it should be done --

            THE COURT:  Say again.  You faded off on me there.

            MR. TILLER:  I'm sorry.

            THE COURT:  Because that's the way what?

            MR. TILLER:  That's the way the document was produced

```
1   to us.  So we showed it to the witness in that regard.  We have

2   not asked any questions about it.  Right now the jury doesn't

3   have any information about this.  This does not open the door

4   for Willowood having allegedly done this.  This doesn't say

5   Willowood did this.

6             And again, more importantly, we're going to open --

7   for the same reasons we discussed at the motion in limine,

8   we're going to open up Pandora's box, which is that this claim

9   was dismissed by this Court, this claim has been pending in the

10  EPA for three or four years, that this is -- this is not a

11  false assertion, because the, registration documents are

12  amended before sales take place, which is exactly how EPA -- or

13  exactly how these companies, these generic companies, engage in

14  this activity, and we're going to have a whole discussion now

15  about the formulator's exemption and the count that was

16  dismissed and then us coming in and having a lot of testimony

17  about how this is the way it is always done, this is not a

18  false claim.

19            And the mere fact that this discusses how some

20  generic companies might do it, does not open the door that this

21  is how Willowood did it.

22            THE COURT:  All right.  So can you not make your

23  point without mentioning that first point is Willowood, or why

24  is that needed specifically?

25            MR. COUGHLIN:  Well, it's the truth.  That is
```

1   Willowood.  We all know that they did do that, and I don't know

2   that there is anyone else for whom there's -- he would have

3   knowledge of.  I mean, he knows that Willowood did that.  This

4   is not argued formulator -- a misuse of a formulator's

5   exemption.  It simply states that it falsely claimed that its

6   azoxystrobin was sourced from Syngenta.

7           THE COURT:  I'm trying to figure out, though -- I

8   mean, I understand this document is in evidence, okay, but I'm

9   trying to figure out why what is said there in that first

10   paragraph or, for that matter, the other two, is relevant to

11   what was gone into on page 404, which is, I think, the one he

12   was asked about, and -- I mean, I'm trying to figure out what's

13   changed from when I ruled earlier.

14           MR. COUGHLIN:  Right.  Well, first of all, what's

15   changed is they put this document into evidence --

16           THE COURT:  Right, I mean, I'm not really having any

17   problem with you asking him about this page and what it says on

18   this page, but I think the point is then asking more questions

19   to go beyond what's on this page as to which companies did

20   these various things.  That is what I hear the primary

21   objection being made to.  Am I --

22           MR. COUGHLIN:  I didn't know what their position was

23   about whether we could go through this or not go through this.

24   I mean, this is relevant to this case in terms of the speed to

25   the market, the rush to the market, the things they did to get

```
 1   to market, and this is true for them.  And so --
 2           THE COURT:  Okay.  Well, that -- I mean, I've already
 3   ruled on that.  I'm trying to find out -- you know, pretrial.
 4   So I'm trying to find out if anything has changed since I made
 5   my pretrial ruling other than the fact that this one page is in
 6   evidence, which does not mention Willowood.  That's what I'm
 7   trying to understand.
 8           MR. COUGHLIN:  Right.  But we just came from a page
 9   that does mention Willowood and other registrants.  There is no
10   evidence that anyone other than Willowood in this case filed a
11   false application with the EPA with regard to this or
12   submitted -- well, I'm standing corrected, perhaps.  I don't
13   want to misstate things whatsoever.
14           But it's still -- it's true for Willowood and what
15   the -- the purpose of the examination with Mr. Cecil was to say
16   all these other companies are causing all your damages and all
17   of your injuries into the marketplace, not us.  And here, in
18   fact, as to all three of these things in which they've
19   referenced the impact of generics in the market, all these are,
20   in fact, Willowood.  We've heard one generic offered
21   azoxystrobin for sale in the US.  That is Willowood.  He's
22   already testified as to that.  This is corroboration of that.
23   They said that was a rumor.
24           But -- and then, in fact, I don't know if there's
25   any -- and I'll stand corrected -- any evidence that there was
```

1  others who imported into the United States and did -- to do the

2  data testing here -- this is Willowood.  They put into

3  evidence.  I don't know why they -- that is the change.  Had

4  they not put this into evidence, we wouldn't be having this

5  discussion.  But it seems like this is fair, and they opened

6  it.  I don't think that means it opens up everything else for

7  them to come in and say everyone else does this.  That's -- I

8  don't see how it is they can open the door and then go down

9  this long path to try and justify what they did.

10          MR. TILLER:  Your Honor, may I?

11          THE COURT:  Briefly.  Don't repeat yourself.

12          MR. TILLER:  I will try my best not to.

13          Your Honor, there are other documents.  There's many

14  other documents.  I think you've seen some of the documents in

15  pretrial where Syngenta has made accusations of this exact same

16  allegedly false act by other generics.  The simple fact of the

17  matter is that they already have evidence in that we utilized

18  the formulator's exemption, that that expedites ourselves to

19  market.  There is a dispute as to whether what -- as to whether

20  what Willowood did in its application is indeed false, is

21  indeed in violation of EPA rules.  As you well know, Willowood

22  takes the position that what it did was perfectly proper,

23  perfectly within EPA guidelines.  They have filed a petition to

24  cancel --

25          THE COURT:  Okay, okay.  I know.  You've already

1  mentioned all of that.

2          MR. TILLER:  I'm sorry.

3          THE COURT:  Okay.  Well, what would you ask him?

4  Just go ahead.  Do that voir dire.

5          MR. COUGHLIN:  Before I do that, Your Honor, can I

6  offer perhaps a compromise to resolve this, or would you --

7  because there's some things I would add.  If you would allow

8  it, I would go in great detail.  I think if we -- if we were

9  able to go through this and read it, have him just read them,

10  as to two and three, I would like him to be able to say that

11  that's Willowood.  That's evidence, and it has nothing do with

12  the misuse of the formulator's exemption.

13          MR. LEVINE:  In other words, don't ask him who --

14          THE COURT:  Well, one at a -- I have trouble with

15  more than one person speaking from the same side.  I mean,

16  that's just the infringement, right, that's already admitted in

17  the case?

18          MR. TILLER:  We conceded that point.

19          THE COURT:  Yeah, okay.

20          MR. COUGHLIN:  So two and three, I'd be able to say

21  that's Willowood.  One, I will -- I think we're willing to say

22  we won't solicit his testimony that that's Willowood.  If he

23  was asked by them, you know, that's not Willowood or whatever,

24  then I think he can say that he knows that.  But I would like

25  him to be able to say that the EPA application referenced there

1 relates to the formulator's exemption that expedites the

2 process, just that, and don't have to mention Willowood as the

3 being the party that did that.

4         But I would -- that particular EPA application is the

5 formulator's exemption which relates to the source, which

6 requires the source.

7         THE COURT:  I see what you're saying.  Hold on.

8         Well, let me think about it over the break.  I think

9 I told the jury to be back in 5 minutes, but we might need a

10 little longer than that for our break, so let's take a

11 10-minute recess.

12         (At 11:05 a.m., break taken.)

13         (At 11:15 a.m., break concluded.)

14         THE COURT:  All right.  Well, I'm having a little

15 trouble understanding how this is a different situation from

16 where we were before the trial, so what I am going to do at the

17 moment is sustain the objection.  However, I'm going to let

18 Syngenta make an offer of proof over the lunch recess; and

19 after I actually hear the testimony, I'll think about it again

20 when it's a little more concrete.  If Syngenta wants to do

21 that, I'll reconsider when I have it concretely in front of me.

22 Okay.

23         MR. COUGHLIN:  Thank you, Your Honor.

24         THE COURT:  Anything else before we bring the jury

25 in?

 1          MR. COUGHLIN:  I guess that applies to all -- that

 2  entire page, all three bullet points, or is that just the first

 3  bullet point?  If we had to, we could black out that first

 4  bullet point and go through the other two while he's

 5  testifying.

 6          THE COURT:  There is no problem with him looking at

 7  the second and third, right?

 8          MR. TILLER:  Let me look at it again.

 9          THE COURT:  Page 402.

10          MR. TILLER:  I've all of a sudden forgotten what they

11  say, Judge.  Well, two, obviously, we've conceded, we've

12  admitted.  Three I think is hearsay, so it is sort of -- you

13  know, we received reports from the field.

14          THE COURT:  Well, right, but there's been -- a lot of

15  this stuff is hearsay that you --

16          MR. TILLER:  Understood.  But I'm saying it is

17  hearsay and, again, there is no evidence that that's us because

18  there's no evidence that we did offer for sale in the US prior

19  to the expiration of the compound patents.

20          THE COURT:  I don't know.  There's been lots of

21  questions about when -- about Syngenta's understanding of when

22  Willowood started selling in the US.

23          So I think you can go -- you can ask him about two

24  and three.  I mean, one is in evidence.  You know, the document

25  is there so -- but just don't ask him about one.

1          MR. COUGHLIN:  I'm not going to ask any questions.

2          Don't say anything about number one, okay?

3          THE WITNESS:  I promise.

4          MR. COUGHLIN:  I want us to be clear so you

5  understand.

6          THE COURT:  The record will reflect that Mr. Coughlin

7  was talking to the witness and not to the Court.  Okay.

8          MR. COUGHLIN:  Thank you, Judge.

9          THE COURT:  Anything else before we bring the jury

10  in?  No.

11          All right.  Bring the jury in.

12          (Jury is present.)

13          THE COURT:  All right.  Thank you all.  I'm sorry we

14  kept you waiting a few minutes.  We were trying to clear some

15  things up so that we could avoid those whispered conferences

16  during the testimony.

17          Go ahead, Mr. Coughlin.

18          MR. COUGHLIN:  Thank you, Your Honor.

19          If we could turn to Defendant's Exhibit 211 and the

20  pages ending in 404.

21  BY MR. COUGHLIN:

22  Q.   Mr. Cecil, you were shown this page.  Is this part of a

23  larger presentation?

24  A.   Yes, it is.

25  Q.   And you were asked about the various registrants in the

```
 1  top left-hand part of this slide within the presentation?
 2  A.    Yes.
 3  Q.    And then you were -- and that includes Willowood, but
 4  others as well, correct?
 5  A.    Correct.
 6  Q.    And then you were shown the import records on the
 7  right-hand side from Albaugh, Cheminova, and Willowood, is that
 8  right?
 9  A.    That's correct.
10  Q.    And we've already talked previously about Cheminova and
11  their impact on the market and Albaugh and their impact on the
12  market in Syngenta's view of things, but was that still true at
13  the time this presentation was made?
14  A.    Yes, it was still true.  I think the important thing on
15  this slide actually is that's a snapshot of a moment in time.
16  So the generic imports, you would really have to look at that,
17  what was imported in 2014 at the end of year, to understand
18  what effect that could have in the marketplace.
19  Q.    Can you explain that more?
20  A.    I mean, they bring in monthly.  You can see the different
21  times of the year they bring it in.  You see that there's
22  nothing reported in January.  There might have been a huge
23  amount brought in in December that's not reflected here, which
24  was the case for Willowood.
25  Q.    What do you mean that was the case?  What is your
```

1  knowledge with regard to that?

2  A.    If I remember right, there was a big influx of product

3  imported from Willowood, bringing it in from China to the

4  United States, in the last quarter of the year in 2014.

5  Q.    In terms of -- at this point in time, this is October of

6  2015, is that right?

7  A.    Yes, it is.

8  Q.    In terms of Syngenta's azoxystrobin business, was

9  Willowood still, from Syngenta's perspective, the driver of the

10 generic competition?

11 A.    Yes.

12          MR. COUGHLIN:  If I can ask you to turn back or turn

13 to page 402 of this same presentation.

14 BY MR. COUGHLIN:

15 Q.    Can you read the title of this document, please, or this

16 page?

17 A.    "Generic Activity:  How various generic companies work the

18 edges."

19 Q.    Could you go down to bullet point two, review paragraph

20 2 -- numbered paragraph 2 of the presentation?

21 A.    Yes.  So it says:  Some companies used azoxy in the US

22 prior to 2014 to generate product chemistry data for their EPA

23 submission.

24 Q.    And is that referring to Willowood?

25 A.    We believe so.

1  Q.   How about the third paragraph?

2  A.   It says:  We received reports from the field that at least

3  one generic had offered azoxy for sale in the US prior to the

4  expiration of the compound patent.

5  Q.   And what's your understanding of who that was?

6  A.   Our understanding, as I stated yesterday, was that

7  Willowood was that company.

8           MR. COUGHLIN:  If I could have Defendant's Exhibit

9  108 brought up and page ending in 748.  If you could highlight

10 the left part of that chart.

11 BY MR. COUGHLIN:

12 Q.   You were asked, sir, with regard to early application and

13 trying to drive intensity in terms of application of fungicides

14 earlier in the process.

15 A.   Yes.

16 Q.   If you go to the top of that bullet point or the top

17 bullet point there, there's a reference to "reduce impact of

18 disease pressure on treatment decisions"?

19 A.   Yes.

20 Q.   Is that a new effort or focus of Syngenta in terms of

21 fungicides?

22 A.   No.  What it says -- and this is referencing the

23 discussion we had yesterday around crop enhancement.  The

24 bullet says that "there is less and less impact by disease

25 pressure because more and more farmers are applying it in order

1  to get the yield benefit from the crop enhancement effect."  So

2  fungicide -- excuse me -- the disease pressure is a little bit

3  irrelevant to whether it's applied or not.

4  Q.   And has that been a marketing and a -- one of the benefits

5  of azoxystrobin in the marketplace is to have it have the

6  performance benefits so that it is not so dependent upon

7  disease?

8  A.   I think our data goes back to somewhere around 2006 where

9  we started proving that benefit and it's been ramping up ever

10 since.  It's quite a normal treatment now.

11 Q.   So this bullet point here in 2015 isn't reflecting

12 anything about 2015 in particular.  It's more a long-term

13 strategy with regard to the azoxystrobin products?

14 A.   That's correct.

15 Q.   And as to the customers -- the farmers who actually use

16 azoxystrobin, has that proven to be, in fact, a benefit to them

17 or factored in their decision-making in purchasing azoxystrobin

18 over other available fungicide products?

19 A.   Yes.  As a result of crop-enhancement effects with

20 azoxystrobin, our farmers are buying it more consistently and

21 less about disease control.

22 Q.   How does that affect the price elasticity that you were

23 asked about before as it relates to azoxystrobin compared to

24 perhaps other fungicides or agricultural products?

25 A.   So it gives it a more stable situation so that the price

1    didn't fluctuate as much.

2            MR. COUGHLIN:  If we could turn to the same exhibit,

3    this is Defendant's Trial Exhibit 108, and turn to page 755.

4    BY MR. COUGHLIN:

5    Q.    I believe you were asked about this page in your

6    examination and I'd like to highlight the graph on the right

7    hand -- top right-hand side.

8    A.    Okay.

9    Q.    In this -- tell -- explain what this shows, please.

10   A.    So this is a price indexing looking back to 2014 and what

11   the price has done since then for each of these individual

12   brands.

13   Q.    And does it also project into the future where Syngenta

14   believes the price will go?

15   A.    Yes.

16   Q.    And is this a -- the type of movement in pricing that is

17   typically seen in a post-patent environment in which, as a

18   result of generics, there is some impact on the pricing of

19   products?

20   A.    Yes.  We would expect the price to come down once a

21   generic came to market, yes.

22   Q.    And this is what you were expecting with regard to

23   azoxystrobin in particular?

24   A.    After the 2014 season and what we experienced in 2014 with

25   the entry of Willowood, we expected the price decline to

1  accelerate, as it indicates here.

2  Q.   So the question I would like to ask you is:  If you in

3  fact had another 12 months or 24 months before there was

4  generic entry -- if there hadn't been entry when it was, early

5  entry or however you characterize it, but if you had the entry

6  in another year or two, would these -- this graph still look

7  the same in terms of going down the road?

8  A.   It most likely would be pushed out two years, so the zero

9  point on the graph would be pushed out two years and then you

10 would see a deterioration after that.

11 Q.   But I guess in particular -- I'm looking at each

12 year -- if that was to happen, in fact, for 2015 or 2016 or

13 2017, each of those years your prices actually would have been

14 higher than it is on this chart, is that right?

15 A.   That's correct.

16 Q.   So it's not just an impact one year in terms of the price.

17 Each year, because of the slope of the graph, you're going to

18 have a price, as a result of the timing of the entry, that is

19 lower than it would have been had there been a one- or two-year

20 delay from the start?

21 A.   So what will happen, you base your next year's price based

22 on what happened in the market in this year.  Therefore, the

23 market will deteriorate much faster if there is an earlier

24 entry of a generic product.  It also -- one thing that's not

25 represented here is the premium end of the ladder, which is not

1  represented here, which started at a much lower place as a

2  result of a deteriorated price.

3          MR. COUGHLIN:  Nothing further, Your Honor.

4          THE COURT:  All right.  Anything else on the subjects

5  covered by redirect?

6          MR. TILLER:  Yep, a couple questions.

7          If we can go to Document 99, page --

8          THE COURT:  Defendant's?

9          MR. TILLER:  Defendant's exhibit.  I'm sorry.

10  Defendant Exhibit 99 going back to page 37380.

11                    RECROSS-EXAMINATION

12  BY MR. TILLER:

13  Q.   Mr. Cecil, let me ask you a question.  Do you need a

14  second?

15  A.   No.  Go ahead.

16  Q.   While that's coming up, you testified when Mr. Coughlin

17  was asking you questions that Syngenta hadn't really seen any

18  sales of Cheminova in, I think you said, late 2014 and earlier

19  early 2015?

20  A.   That's correct.

21  Q.   Looking at 99 --

22          MR. TILLER:  Can you bring that up, Bonnie?

23          THE COURT:  Can you switch it over?

24          THE CLERK:  Sorry.

25

BY MR. TILLER:

Q.   Can we go to the first page real quick.  I just want to make sure we have a date.  Actually, the second page.

     And, again, this document is dated January 12th, 2015.  Do you see that, Mr. Cecil?

A.   Yes.

Q.   And at 37380, looking at the last Q and A, again -- and Mr. Coughlin asked you about this just a second ago:

     The answer says -- well, the question says:

     What generic brands are driving Aframe quantity and pricing?

     The answer says:  Equation from Cheminova and Azoxy 2SC from Willowood averaging $160 per gallon to retail.

     Do you agree with me that since this says that the average between Cheminova and Willowood was 160, or that these two were averaging 160, that Syngenta had obviously seen some sales from Cheminova by at least January 12th, 2015?

A.   No.

Q.   No, you wouldn't agree with that?

A.   No, I wouldn't.  I would not.

Q.   Okay.  Despite the fact -- okay.

A.   It doesn't list a brand name for Cheminova.  It does for Willowood, so if we'd have had a brand name listed, it would have indicated what --

Q.   It says Equation.  That's a brand name, isn't it?

1  A.   It is a brand name, I apologize.

2  Q.   So that leads you to believe you actually had seen a sale,

3  correct?

4  A.   I would believe that it was offered in the market, yes.  I

5  can't say if it was a sale or not.

6  Q.   And then looking at Defendant's 108 -- Bonnie, going to

7  page 283748 -- Mr. Coughlin was asking you -- he was asking you

8  specifically about the top bullet under objectives by brand.

9  A.   Correct.

10  Q.   Where it says, "Reduce impact of disease pressure on

11  treatment decision," and you answered some questions.  The fact

12  that this was an objective of Syngenta, to reduce the impact of

13  disease pressure on treatment decision, means that there was an

14  impact of disease pressure on treatment decisions for farmers,

15  and that's why Syngenta was attempting to reduce it, correct?

16  A.   It's a fungicide so diseases do play, yes.  But they're

17  less and less, as I stated a few minutes ago, as we have the

18  only data to support a product being a crop enhancement

19  product; so, yes, it is a -- it is a strategy of ours to reduce

20  that impact, yes.

21  Q.   Okay.  Which means there was an impact?

22            THE COURT:  There was what?

23            MR. TILLER:  There was an impact.

24            THE COURT:  Are you asking him?

25            MR. TILLER:  Yes.

1  BY MR. TILLER:

2  Q.   Which means there was an impact, correct?

3  A.   Yes.

4         MR. TILLER:  Okay.  Nothing further.

5         THE COURT:  Anything else?

6         MR. COUGHLIN:  No, Your Honor.

7         THE COURT:  All right.  Thank you.  You can step

8  down.  You can just leave all the exhibits up there.

9         (At 11:32 a.m., witness excused.)

10        THE COURT:  You can call your next witness.

11        MR. SANTHANAM:  Your Honor, at this time we call

12 Andrew Fisher.  We're going bring him into the courtroom

13 shortly and, Your Honor, we have courtesy binders prepared as

14 well.

15        THE COURT:  Come on up, Mr. Fisher.  The clerk will

16 be -- just stand right there in the middle at that lectern and

17 the clerk will be right there.

18        (At 11:34 a.m., witness sworn.)

19        THE COURT:  Go ahead.

20                    ROBERT ANDREW FISHER,

21            PLAINTIFF'S WITNESS, SWORN AT 11:34 a.m.

22                    DIRECT EXAMINATION

23 BY MR. SANTHANAM:

24 Q.   Mr. Fisher, would you please state your full name for the

25 Court.

1  A.    Yeah, it's Robert Andrew Fisher.

2  Q.    Where do you live?

3  A.    I live here in Greensboro, North Carolina, just north of

4  Lake Brandt.

5  Q.    Who do you work for?

6  A.    I work for Syngenta Crop Protection.

7  Q.    Where is your office located?

8  A.    You'll see a glass building off of I-40 just on the exit

9  up from Wendover.  That's my -- that's where my office is.

10  Q.    How long have you been with Syngenta?

11  A.    A little over 19 years.

12  Q.    What's your current role within Syngenta?

13  A.    My current role is digital ag solutions marketing manager.

14        THE COURT:  Digital what?

15        THE WITNESS:  I'm sorry, digital ag solutions

16  marketing manager.  It's a long title.

17  BY MR. SANTHANAM:

18  Q.    And I'll ask you to slow down, Mr. Fisher, just so the

19  court reporter can take down everything.

20  A.    Sorry, I've never -- yeah.

21  Q.    So you said your role is digital ag?

22  A.    Digital agricultural solutions marketing manager.

23  Q.    Do you also have any other interim roles that you're

24  currently serving in?

25  A.    Yeah, I just took this role about nine days ago, so I'm --

1  my prior role was the product lead for azoxystrobin,

2  propiconazole, a few other active ingredient -- fungicide

3  active ingredients, and I'm still interim in that role as well.

4  Q.   Now, you use this term "product lead."  Is that the same

5  thing as a brand manager within Syngenta?

6  A.   Yes.  We used to call it brand manager, too.  And majority

7  of the, you know, not competitors -- well, competitors, I've

8  got friends in banking industries, they still refer to it as a

9  brand manager role.  You know, that's the title they use.

10 Q.   Now, how long have you been or were you a product lead or

11 brand manager?

12 A.   It was about five, five and a half years.

13 Q.   What are your responsibilities as a product lead or brand

14 manager?

15 A.   Well, you manage everything around the brand, from setting

16 the budget, setting pricing, volume, advertising and promotion,

17 you manage that.  You -- life cycle management, so it would be

18 post-patent strategy, you'll manage that.

19 Q.   If you could speak up, Mr. Fisher.

20 A.   Oh, I'm sorry.  So really everything that has to do --

21 pipeline, so new products that are coming down the pipeline.

22 I'll evaluate those with my technical product leads and

23 identify what benefits they will bring to farmers and all of

24 that.  So everything really start to finish on the brand,

25 I'm -- you know, I may not be the expert, but I'm involved in

1  it with experts.

2  Q.    Are you involved in budgeting at all with respect to

3  azoxystrobin?

4  A.    Yes, I am.

5  Q.    Earlier today, right before you took the stand, we heard

6  from Jeff Cecil, Syngenta's head of crop protection marketing.

7  Where does your role as a product lead fall within -- you know,

8  fall in connection with his?

9  A.    So Jeff Cecil's the head of crop protection marketing, and

10 then there's a level of managers underneath Jeff, and so my

11 boss -- he would have been the fungicide and insecticide

12 product manager, and then under him would have been my role and

13 the other product leads, so I would be two roles below Jeff.

14 Q.    Now, you've mentioned you've been with Syngenta for 19

15 plus years?

16 A.    Yes.

17 Q.    Can you briefly tell us what other roles you've had within

18 the company?

19 A.    Yes.  I started as an intern with a legacy, a Syngenta

20 company called Novartis in the panhandle of Texas as a sales

21 intern.  After that, I moved to Billings, Montana where I was a

22 sales representative for crop-protection products.  There for

23 two years, and then I moved to Great Falls, Montana as a sales

24 rep.

25            After that I moved to Des Moines, Iowa, it was

```
 1  actually west Des Moines, Iowa, as a marketing development
 2  manager.  It's kind of a customer marketing role where I worked
 3  across the midwest with our sales reps and retailers and things
 4  of that nature doing marketing, various marketing activities.
 5             After that I was promoted to district manager of crop
 6  protection in Ohio, so I moved to Columbus, Ohio, and I managed
 7  11 sales reps across Ohio and eastern Michigan, and then after
 8  that, I had the opportunity to move to Greensboro, and I
 9  started a product lead role here in Greensboro.
10  Q.   How long have you been in Greensboro?
11  A.   It was the fall of 2011 so is that five -- five and a half
12  years probably.
13  Q.   So over these number of roles that you've had within
14  Syngenta, have you had responsibility for azoxystrobin
15  products?
16  A.   Yeah.  I mean, it's always been in our crop protection
17  pipeline.  I suppose my internship I didn't have azoxystrobin
18  then for those three months as an intern, but after that it was
19  always in my sales territory, or I was representing it as a
20  brand and selling it and promoting it throughout my career.
21  Q.   Have you had any responsibility for herbicide products
22  like mesotrione?
23  A.   Yes.  Yes.
24  Q.   Mr. Fisher, do you have any college degrees?
25  A.   I have one.  I have an undergrad in agricultural economics
```

1    from Oklahoma State University.

2    Q.   Can you tell us what that is in layman's terms.

3    A.   It's more or less a business degree with an agricultural

4    focus.  That's really all it is.

5    Q.   Now, Mr. Fisher, I'd like to talk a little bit about

6    Willowood, the Defendants in this case.  Are you familiar with

7    Willowood?

8    A.   Yes, I am.

9    Q.   Are you familiar with Willowood's products, azoxystrobin

10   products?

11   A.   Yes, I am.

12   Q.   And what are those products, to your knowledge?

13   A.   Well, they had Azoxy 2SC, AzoxyProp Xtra and then a

14   Tebustrobin product.

15            MR. SANTHANAM:  Your Honor, permission to use the

16   flip chart as a demonstrative?

17            THE COURT:  All right.

18   BY MR. SANTHANAM:

19   Q.   Mr. Fisher, are you familiar with the term straight azoxy?

20   A.   Yes, I am.

21   Q.   Can you tell us what a straight azoxy product is?

22   A.   Yeah, it's a formulation that would -- the active

23   ingredient would be azoxystrobin, so it doesn't have --

24            THE COURT:  That is too little for anybody to see.

25   Okay.  Go ahead.  I apologize for interrupting the witness.

1          THE WITNESS:  That's all right.

2          THE COURT:  You might need to repeat your answer.

3          THE WITNESS:  So straight azoxystrobin would be a

4    formulated product that just has -- that the active ingredient

5    in it would be azoxystrobin only.  Other products you would put

6    another fungicide in it so it's got two different modes of

7    action we call it.

8    BY MR. SANTHANAM:

9    Q.    Are you familiar with a product or a category of products

10   that are called mixture products?

11   A.    Yes.

12   Q.    And what are those?

13   A.    So a mixture product in this case would be like we would

14   take azoxystrobin and you would -- in most cases you'd put a

15   triazole, so propiconazole or something like that, so it gives

16   you two different modes of action to help work within the plant

17   and to help protect from disease as well.

18   Q.    Now, Mr. Fisher, does Syngenta sell any straight azoxy

19   products?

20   A.    Oh, yes.

21   Q.    Can you tell us what those are?

22   A.    Yeah, I have Abound.

23   Q.    And please go slowly so I can write these down.  Abound.

24   A.    Quadris and Aframe.

25   Q.    Does Syngenta sell mixture products?

```
 1   A.    Yes.

 2   Q.    What are those?

 3   A.    So we have Trivapro, Elatus, and we have Quilt, Quilt

 4   Xcel.  We had Aframe Plus, and we have some Quadris Top brands

 5   as well.  Those are the main ones.

 6   Q.    Now, you said those are the main ones.  Are there others?

 7   A.    Yes.

 8   Q.    Do you know Willowood -- and these are all Syngenta

 9   products?

10   A.    Yes.

11   Q.    Do you know if Willowood sells any straight azoxy

12   products?

13   A.    Yes.  They have Azoxy 2SC.

14   Q.    Do you know if Willowood sells any mixture products?

15   A.    Yes, they have Azoxy -- AzoxyProp Xtra and another one

16   they call Tebustrobin.

17   Q.    What was that last one?

18   A.    Tebustrobin.  It's azoxystrobin plus tebuconazole.

19         MR. SANTHANAM:  I'm going to mark this as Plaintiff's

20   Demonstrative Exhibit 17.

21   BY MR. SANTHANAM:

22   Q.    Now, Mr. Fisher, do you know if -- based on your role as a

23   product lead, do you know if Willowood's Azoxy 2SC product

24   competes with Syngenta's straight azoxy product?

25   A.    Yes.
```

Q.   Do you know if Willowood's mixture products compete with
Syngenta's mixture products?

A.   Yes.

Q.   Do you know if Willowood's straight azoxy products compete
with Syngenta's mixture products?

A.   Yes.

Q.   And how about the other way, do you know if Willowood's
mixture products compete with Syngenta's straight azoxy
products?

A.   Yes, they would.

Q.   And can you tell us why that is that a mixture product
would compete with a straight azoxy product and vice versa?

A.   They're lab -- they're all labeled in the majority of the
major crops that we're using them on, and so after that,
there's -- they'll work different, but a grower still would
look at it and look at the price points, and in some cases they
can take a, say, a straight azoxy like Azoxy 2SC, and then go
buy the other active ingredient by itself and put them together
themselves in their own tank on the farm, so multiple ways, but
that's how they compete.

Q.   Now, earlier today we heard this term crop enhancement or
plant performance.  Do you know what that means?

A.   Yes.

Q.   Can you tell us what that means with respect to Syngenta.

A.   Yes.  Plant performance was a major marketing benefit to

1  growers as we brought these opportunities forward, and what it
2  is is plant performance refers to the -- well, it's fighting
3  abiotic stresses to the crop, so when the crop is -- it's
4  allowing the crop to yield -- have improved yield when it's too
5  dry outside, it's too hot.  It'll help with stock quality so
6  lodging, if you get wind storms, like we may see with this
7  hurricane but, you know, that kind of stuff.
8  Q.    Does plant performance have a relation to disease?  Is it
9  different from treating or curing disease?
10 A.    Yeah.  It would be different than disease.
11 Q.    And based on your work selling azoxy products for Syngenta
12 or at least being the product lead, what impact has plant
13 performance had on growers and farmers?
14 A.    Well, it's been huge in the major crops.  It -- it was a
15 point in time where 5, 6, 7 percent of, say, the US corn crop
16 was treated with a fungicide, and that's because they were only
17 looking at disease.
18         Today you'll get up to 25 percent pretty
19 consistently, and it's really because they -- growers have come
20 to trust and depend on that yield increase they get, even in
21 low disease environments because of these plant performance
22 benefits that they see.
23 Q.    Now, we also heard earlier today a term elasticity.  Have
24 you heard that before?
25 A.    Yes.

Q.   How does plant performance relate to elasticity?

A.   Well, it really -- it levels out elasticity.  It makes it more non-elastic as far as a market, because what it's doing is allowing these growers to see the yield increases, depend on those yield increases and so then they can see what they're getting from a return on investment.  And as they've seen that in their crops year in and year out it's become more of a planned application versus a scout, see if I have disease and then go spray, you know, like it used to be.

Q.   Now, we've got a lot of products listed up here on Plaintiff's Demonstrative Exhibit 17.  Let's talk a little bit about when these products are sold.  Is there a typical time frame in which Syngenta sells these -- its products?

A.   Yeah, you know, I have a program I've been running four or five years now as a stocking program that'll happen March and -- usually the product actually gets delivered the last half of March and the beginning of April, and that's a portion of our sales.

     The major sales come, actually, July and August and all of it's getting applied in really those -- that May, June, July, August time frame.

Q.   Can you explain why that is.

A.   Well, that's when the crop hits the optimal stages to apply for the major crops.

Q.   Which months, Mr. Fisher, do you sell most of your

1  azoxystrobin products?

2  A.    It would be July and August.

3  Q.    Now, we've talked about the products and we've talked

4  about Willowood.  I'd like to now talk about what types of

5  information that Syngenta has that it relies on to understand

6  what Willowood is doing in the marketplace.  Now, do you know

7  if Syngenta collects or gathers information about Willowood?

8  A.    Yes.

9  Q.    And, Mr. Fisher, would you be able to list those sources

10  of information for us?

11  A.    Yes.

12  Q.    Can you list them for us.

13  A.    Sure.  Well, the first we would see EPA submissions, so

14  for registration, we see EPA submissions.

15  Q.    Anything else?

16  A.    Yeah, I would rely on import records.

17  Q.    Anything else?

18  A.    Well, you can see product, actually product in the field.

19  Q.    Anything else?

20  A.    Product labels.  I purchase and rely on market research,

21  and I would rely on market intelligence and price monitoring.

22  Q.    These are all sources of information that Syngenta relies

23  on to understand what someone like Willowood would be doing?

24  A.    Yes.

25  Q.    Let's start with the top, Mr. Fisher.  What do you mean by

1    EPA submissions?

2    A.    Well the EPA -- so my regulatory department, they watch

3    who is submitting to the Environmental Protection Agency, so

4    the government, to get a registration for the products.

5    Q.    And does an EPA submission necessarily indicate that a

6    company's going to come out with a product?

7    A.    No, it doesn't.  It can -- you know, you'll see that

8    they're getting a technical registration, but it doesn't

9    necessarily -- they don't always come with an actual product.

10   Q.    Can you tell us what you mean by import records?

11   A.    Yeah.  There was two major ones that I know that we

12   purchased.  One was Panjiva.

13   Q.    Can you hold on for a second?  Panjiva, you said?

14   A.    Yes.  P-A -- you want me to spell it or --

15   Q.    Yes.

16   A.    PA-N-J-I-V-A.

17   Q.    What was -- was there another one?

18   A.    Sentinel, and that's S-E-N-T-I-N-E-L.

19   Q.    And can you tell us what these are?

20   A.    So these are actual import records.  The government

21   requires a collection of everything that's imported through our

22   ports in the United States.  It'll tell you what's being

23   imported, what company is doing the imports, and how much, and

24   so you can -- you can see how much is coming into the United

25   States.

1  Q.   Now, Mr. Fisher, are these sources of information import

2  records that Syngenta purchases?

3  A.   Yes.

4  Q.   Are they available to other companies?

5  A.   Yes.

6  Q.   Do you rely on these import records?

7  A.   Yes, I do.

8  Q.   Do you find them reliable?

9  A.   Yes, I do.

10  Q.   What about product in the field?  What do you mean by

11  that?

12  A.   Well, product in the field, you can see product

13  performance, but you can also see the package sizes.  You can

14  often see where it's showing up, so what geographies and things

15  of that nature.

16  Q.   And in terms of product labels, what do you mean by that?

17  A.   Well, these product labels, they'll tell you what crops,

18  what rates, what diseases, or crop-enhancement-type claims.

19  You'll see, also, on the front of the label, you'll see exactly

20  what the AI, active ingredient, loading is, or how power -- how

21  potent the product is, so you can sort of see -- see that on

22  the -- see how much active is actually in it from that

23  standpoint.

24  Q.   Does the product label restrict how you can use an azoxy

25  product?

1  A.    Well, yes.  You have to follow the labeled guidelines or

2  you can't sell your crop.

3  Q.    If a product label has certain crops on it but not other

4  crops, can you use that end product on all crops?

5  A.    No.

6  Q.    And what would be the consequence to a grower or farmer if

7  they were to misuse a product that's labeled for one crop on

8  another crop for which it's not labeled?

9  A.    Well, they have to destroy that crop.  They couldn't sell

10  it.

11  Q.    They'd have to destroy the crop?

12  A.    That's what they would -- if, you know, they get caught,

13  obviously, but yeah, they would have to destroy the crop.

14  Q.    And tell us about what you mean by "market research"?

15  A.    We buy a lot of market research.  The two main ones that I

16  rely on is Doane's AGRI-TRAC, and another one called EZTrak.

17  Q.    The first one was Doane's?

18  A.    Yeah, D-O-A-N-E-S.

19  Q.    What was the second one?

20  A.    EZTrak, E-Z-T-R-A-C-K [sic].

21  Q.    Can you tell us what those are?

22  A.    Well, EZTrak, actually, is right out of the retailers'

23  billing system.  So when they sell to growers, they submit to

24  the company a download of what they've sold, the price at which

25  it was sold.  Now, EZTrak protects the retailer's identity.

1  They wouldn't want their pricing all out there for their

2  competitors to see.  But what it does is it gives a rolled up

3  version of how much is sold this year versus last year of a

4  certain brand, mine and competitors'.

5          And then, you'll see, also, the prices of a high,

6  low, and an average price, so it's pretty good information to

7  have.

8  Q.   Is this information that Syngenta purchases?

9  A.   Yes.

10 Q.   Do you know if it's information that's available to other

11 companies to purchase?

12 A.   Yes, it is.

13 Q.   Do you rely on this information?

14 A.   I do.

15 Q.   What about market intelligence and price monitoring?  You

16 mentioned that.  What does that -- what do you mean by that?

17 A.   So market intelligence, price marketing is really a

18 distributor price list, a retail price list, a key account

19 manager, and price monitoring activities that come in to me.

20 Q.   Are you involved in any price monitoring activities?

21 A.   Yes.

22 Q.   Is there a process that Syngenta has for price monitoring?

23 A.   Yes.

24 Q.   What is your role in that process?

25 A.   So I put the team together and lead the actual price

monitoring for azoxystrobin.  And what that means is I had a
set of sales representatives, key account managers, and some of
the regional customer marketing representatives as well for
Syngenta.  So all the way from Georgia to California.

          And we would get on a call every two weeks.  And, in
that process, they would share with me a retail price list that
they had picked up, distributor price list, and other, you
know, programs and different market intelligence that they had
collected.

Q.    Do you do anything to try to verify the pricing
information you get before you rely on it?

A.    Yes, we would.  We could call back with these major
distributors.  We have about six really large distributors that
sell about 95 percent -- 90, 95 percent of the crop-protection
products in the United States, and we'd go right back to their
procurement manager, and ask them to validate, you know, the
prices.

Q.    How does Syngenta rely on the price monitoring process?

A.    Well, I rely on it to adjust my prices, know where I'm at
in the marketplace, and ultimately, rely on it to make price
changes.

          MR. SANTHANAM:  I'm going to mark this as Plaintiff's
Demonstrative Exhibit 18.

BY MR. SANTHANAM:

Q.    Now, Mr. Fisher, we've talked about sources of information

1  that Syngenta had.  I'd like to talk about when -- you know,

2  the activities and knowledge that you had about Willowood.  Was

3  it -- the first one we have here is EPA submissions.

4         When did you first get any word or intelligence about

5  Willowood's EPA submissions?

6  A.   It would have been late summer of 2013.

7  Q.   And that's when you said you got word of the EPA

8  submissions?

9  A.   Yes.  I got a report that they had submitted.

10 Q.   And did that indicate to you immediately that Willowood

11 was absolutely going to come out with a product?

12 A.   No, it didn't tell me they were going to come with an

13 actual product.

14 Q.   When was -- you know, there did there come a time when you

15 did receive intelligence about Willowood's presence in the

16 market?  And I don't want to get into it just yet, but did

17 there come a time?

18 A.   Yeah.  December of 2013, January of 2014, it became pretty

19 apparent to me.

20 Q.   Mr. Fisher, did you rely on that intelligence at all?

21 A.   Well, yes, I relied on the market intelligence when I

22 picked it up in December and January.

23 Q.   And what, if anything, did you do?

24 A.   Well, first, I updated my managers, so like Mr. Cecil,

25 that everyone met.

1 Q.    Anything else?

2 A.    I started traveling with our key account managers to meet

3 these distributors, head-shed (unintelligible) the managers at

4 these distributors and try to calm them down.  So I traveled

5 around and talked to them.  I was working on getting our

6 fighting brands ready for market.

7 Q.    You said fighting brands --

8 A.    Fighting.

9 Q.    -- you were getting ready to do -- well, what are fighting

10 brands?

11 A.    So fighting brands, it would be, we put these in place --

12 we allocate them, but we put these brands in place so that if a

13 customer of ours, a retailer, is going to lose a farmer to a

14 generic, that they have a low cost, no-service option from

15 Syngenta that they can supply, you know, so they can still do

16 business with Syngenta.  So that's what a fighting brand is

17 kind of intended for.

18 Q.    Were you working on any other brands?

19 A.    Yes.  I was also preparing our Solatenol, which is our new

20 premium brands that we were bringing to market.

21 Q.    Why do you call them premium brands?

22 A.    Well, if you think of a brand ladder, your newest

23 products, again, that I've mentioned earlier, I've been

24 watching these for a few years, you're looking to see what the

25 benefits are.  And, obviously, as they bring -- you wouldn't

1  bring them to market if they didn't have additional benefits.
2  And with these additional benefits, you figure out what the
3  value is worth to a farmer, and you price them at a premium.
4          So you can have a premium at the top of your brand
5  ladder.  You'll have the products you've always kind of been
6  selling in the middle, Quilt and Quilt Xcel and Quadris; and
7  then you'll have these fighting brands on very bottom of your
8  brand ladder.
9          Because all farmers are -- you know, some farmers
10 will want the premium product.  Some will want the service and
11 the product they've been using.  And others will just want the
12 cheapest thing out there, and that's why you have the bottom.
13 Q.   Mr. Fisher, you said you did all of these things, update
14 managers, meeting distributors to try and calm them down,
15 comparing fighting brands and premium brands.  What were you
16 reacting to?
17 A.   Well, at this time, I was -- I was doing one more thing,
18 too.  I mean, I was -- I was having to lower price.  What I was
19 doing was putting in loyalty programs with these distributors
20 so they would, you know, use our fighting brands and be loyal
21 to us, so ultimately, that lowered my price some.  And these
22 were things that I was doing in reaction to the market
23 intelligence that I was getting from --
24 Q.   Okay.  What was that market intelligence?
25 A.   It was market intelligence saying that, you know,

```
 1  Willowood had -- was stockpiling product.  They were holding
 2  meetings with distributors.
 3            MR. TILLER:  Objection.
 4            THE COURT:  Okay.  Overruled.  He can explain why he
 5  did what he did.  Go ahead.
 6            THE WITNESS:  Again, I relied on distributors as they
 7  were having meetings, and, you know, being told that Willowood
 8  would have product in the market, they were ready, you know,
 9  looking for opportunities.
10  BY MR. SANTHANAM:
11  Q.   Okay.  You mentioned import records when we were talking
12  about the sources of information.  Do you recall when you first
13  saw Willowood imports for sale in the United States?
14  A.   It was June, July of 2014.
15  Q.   What did that indicate to you?
16  A.   Well, they -- that there was people going to buy some
17  product from them.  I mean, they had product here now in the
18  market, and they were going to sell it.
19  Q.   Were you expecting Willowood to be out in the market with
20  imports and sales in June, July, 2014?
21  A.   No, I wasn't.
22  Q.   Can you tell us why --
23  A.   Yeah, there was a couple --
24  Q.   -- why not, rather?
25  A.   Yeah, there was -- there was two reasons, the main ones.
```

1  And one was when you submit it to EPA, it takes 12 to 13 months

2  to get your EPA registration.  After that occurs is when you

3  start -- you have to then get registrations for every state you

4  want to sell it in.  So North Carolina would have to approve

5  it, California.  California was probably the worst, the

6  longest.  But -- and what I mean is that takes anywhere from

7  two to three months, upwards to six to eight months in

8  California.

9          And so, when you put that on from the time that they

10  had submitted, and you think about when the corn crops grow in

11  the United States, the soybean crop, the wheat crop, the

12  application time had already -- would already be passed by the

13  time they were in the market.

14          The other thing that I had was a process patent that

15  was running through 2015.  And so, the way you manufacture a

16  product in large quantities, we had a patent still active.

17  Q.   Now, Mr. Fisher, I think you mentioned if you already went

18  past a certain time, it would be too late.  Can you explain

19  what you mean by that?

20  A.   Yeah.  There's optimal times in a crop.  And, obviously,

21  after the crop has turned, it's called senesce, but --

22          THE COURT:  It's called what?

23          THE WITNESS:  Senesce, after it senesces.  But after

24  it turned to brown, and it starts to dry down so that you can

25  harvest the crop, you obviously don't apply too close to that

window.  So there's a time that you put it on, and that time is
July and August.  That's the major window.

There's other crops where you can put it on an little
earlier and things of that nature, but that's the -- that's the
major window.  When you get past September, October, November,
the major crops, it's too late.

BY MR. SANTHANAM:

Q.   Now, Mr. Fisher, and we can call -- we're into September
now.  Would now be too late?

A.   Yes, yeah, now would be too late.

Q.   And you said that you -- you know, you were trying to
prepare fighting brands.  Were you able to get -- well, first
of all, when is the ideal time -- or when is the ideal time for
you to try to launch a -- what's called a fighting brand?

A.   Ideal time would be at the same time you have generic
entry.

Q.   What about premium brands?  What is the ideal time to try
to launch a premium brand?

A.   Ideal time, you have your premium brands in place even
before generics enter, because that way, you can introduce it
with -- well, before the market starts to collapse in value, so
you have better adoption.

Q.   Now, Mr. Fisher, were you able to launch fighting brands
for azoxy products when you saw Willowood in the market in June
or July of 2014?

1 A.    No, I was not.

2 Q.    When were you able to launch fighting brands?

3 A.    It was the beginning of 2015 is when I was able to launch

4 them.

5 Q.    What impact did that have on your azoxystrobin sales

6 strategies and pricing, not being able to launch fighting

7 brands at the time Willowood entered the market?

8 A.    Well, it puts all the pressure -- if you don't have

9 fighting brand in place, then it's -- all the pressure is going

10 on your brand -- the middle part of your brand ladder, and so

11 then, you're having to react with either lost sales or price.

12 Q.    Were you able to launch what you called the premium brands

13 in the June, July 2014 timeframe when Willowood entered the

14 market?

15 A.    No.

16 Q.    When did you launch premium brands?

17 A.    It was 2016 before our major launch of those Solatenol

18 premium brands.

19 Q.    Can you tell us what that impact was on your azoxystrobin

20 sales and strategies and pricing to not be able to launch

21 premium brands around the same time Willowood entered the

22 market?

23 A.    Well, ultimately, you know, you're having to look at where

24 the market has moved to because there's only so much premium

25 you can charge for a premium brand.  And so, you're having to

1  look at where all the market is, and you're not able to price

2  it at the premium you're hoping to because the market's already

3  moved down, and therefore, it impacts your price.

4         It also puts pressure on the adoption, so, you know,

5  how quick farmers -- they've got other options in the market,

6  so how quick they move.

7         MR. SANTHANAM:  I'm going to mark this as Plaintiff's

8  Demonstrative Exhibit 19.

9  BY MR. SANTHANAM:

10 Q.    Now, Mr. Fisher, we talked about Willowood and Syngenta.

11 And a couple of other names have come up, and I'd like to ask

12 you some questions about them.  Have you ever heard of a

13 company by the name Albaugh?

14 A.    Yes.

15 Q.    Do you know if Albaugh has any azoxystrobin products?

16 A.    Yes, they do.

17 Q.    And what are those products that Albaugh -- from Albaugh

18 that you're aware of?

19 A.    The major ones that I'm aware of, they had a straight

20 azoxy, called AzoxyStar, and they had a mixture called Cover

21 XL, and then they had some seed treatment brands and lawn and

22 garden brands.

23 Q.    Well, let me stop you there.  So you mentioned seed

24 treatment.  And what is that?

25 A.    I'm sorry.  So seed treatment is -- when you plant these

1  seeds in the ground, so you buy a bag of corn or a bag of

2  soybeans, they'll come with seed treatment on them or they'll

3  be treated at a retailer or a seed house usually with the

4  fungicides and other insecticide-type product on them.  And the

5  purpose of that is to protect it so the seed doesn't rot, you

6  know, before it emerges.

7         The easiest way to think about it, you know, is,

8  well, if you go to Home Depot and buy grass seed, and you open

9  up a bag of grass seed, and it's got blue or green rather than

10  the brown seed color, that's a seed treatment they put on it is

11  what they've done.

12  Q.   So Albaugh, to your knowledge, was selling in seed care?

13  A.   Yes.

14  Q.   Is that -- now, is that different from crop protection,

15  which is a term we've been hearing?

16  A.   Yeah, it'd be different.

17  Q.   Can you explain what crop protection is?

18  A.   Yeah.  So the major difference, well, back to my Home

19  Depot example of the grass seed.  So, if, you know, you buy

20  that grass seed, and you've got the seed treatment on it, you

21  plant it.  You know, if you go over to the shelf, you know, and

22  you buy some of the chemicals to spray over the top of your

23  lawn or the people you see in pickups that go around and spray,

24  you know, the yard once a month or whatever, that would be more

25  of a crop protection-type analogy.

1           So the seed treatment purchased at the time with the

2  seed and put on then.  And then, once the crop comes up, then

3  you come back over the top with more of your crop

4  protection-type products.

5  Q.   I think you mentioned lawn and garden, too?

6  A.   Yes.  Lawn and garden.

7  Q.   What is lawn and garden?

8  A.   Lawn and garden would be -- well, I guess back to my

9  example there.  Lawn and garden is the golf course

10 superintendents using it on golf courses and different -- you

11 know, different things like that.

12 Q.   You mentioned this term crop protection plan against crop

13 enhancement, et cetera.  Do you know if Albaugh's products had

14 crop enhancement on their labels?

15 A.   I don't recall on Albaugh.  I don't recall.

16 Q.   Do you know -- did you consider Albaugh as part -- in

17 setting your azoxystrobin sales strategies and pricing, can you

18 tell us what impact, if any, Albaugh had on those strategies?

19           THE COURT:  When are you talking about?

20           MR. SANTHANAM:  Pardon me?

21           THE COURT:  When?

22           MR. SANTHANAM:  In 2014.

23           THE WITNESS:  In 2014, it had very little.  Their

24 major focus, again, was really seed care, so the seed treatment

25 market.  They had little imports as well, so it really wasn't

1    my main focus.

2    BY MR. SANTHANAM:

3    Q.    Any other reasons?

4    A.    Well, they had little imports again.  They had, major

5    focus, seed care.  They had lawn and garden as well as a focus.

6    That was really the major thing I was looking at.

7    Q.    I would like to talk about Cheminova, which is another

8    company name we've been hearing.  Are you familiar with

9    Cheminova?

10   A.    Yes.

11   Q.    Do you know if Cheminova offers any azoxystrobin products?

12   A.    Yes.

13   Q.    Can you tell us what those products that you're familiar

14   with are?

15   A.    Yeah.  It's Azaka and Equation were their two brands, and

16   they were both straight azoxystrobin products, as we talked

17   about earlier.

18   Q.    And in the 2014 time frame, did Cheminova impact your

19   sales strategies and pricing strategies?

20   A.    It didn't have a large impact on my strategy.

21   Q.    Why is that?

22   A.    Well, the number one crop that I sell these brands on is

23   corn, and they didn't have corn on their label at all in the

24   2014 time frame.  The other thing is they didn't have plant

25   performance on their label.  They didn't have tobacco either,

1   for that matter, but it wasn't a really big crop for me.

2   Q.   I'll stop you there.  Do you know if Cheminova ultimately

3   did get corn on their label?

4   A.   They did, yes, a year later.

5   Q.   Was that in 2015?

6   A.   Yes.

7   Q.   Mr. Fisher, again, what is the significance of not having

8   corn on a label?

9   A.   Well, I mean, the number -- if you think about it, the

10  number one crop you're applying is on corn, and the other

11  thing, if you think about it, a corn farmer is also a farmer

12  that's growing typically the other two, you know, major crops

13  that you think about, soybeans and wheat, and it's an inventory

14  nightmare for a retailer to bring in a product, stock it on

15  their shelves, and for the farmer, for that matter, to take a

16  product home and it can't be used on all of the crops that

17  they're growing in the major areas.

18  Q.   Did you take into account Cheminova's imports?

19  A.   I did.  They didn't have -- they had little imports early

20  in 2014.

21  Q.   And when you say "little," is that relative to what?

22  A.   Well, relative to Willowood for the calendar year of 2014.

23  Q.   I'm going to mark this Plaintiff's Demonstrative 20.

24         Now, Mr. Fisher, I would like to step away a little

25  bit and start talking about that price monitoring process that

1  you just discussed a moment ago.  There should be a binder in

2  front of you.  If not, I can approach and provide it to you.

3           THE WITNESS:  I don't have a binder, Your Honor.

4           THE COURT:  He doesn't appear to have it.

5           MR. SANTHANAM:  Permission to approach, Your Honor?

6  I have an extra one.

7           THE COURT:  Okay.

8  BY MR. SANTHANAM:

9  Q.   There should be a first tab in there with a number of

10  documents, and I would like for you to confirm that it has

11  Plaintiff's Trial Exhibits 213, 225A, 235, and it also has

12  what's been entered into evidence as Defendant's Trial Exhibit

13  68.

14  A.   Yes.

15  Q.   Now, Mr. Fisher, without getting into the substance of all

16  of these documents, can you tell us if you drafted some or part

17  or all of them?

18  A.   Yes, I drafted these.

19  Q.   Are they presentations?

20  A.   Yes, they are presentations.

21  Q.   Again, without getting into the substance, can you tell us

22  what the purpose of these presentations is?

23  A.   These were -- a majority of these are all internal -- for

24  my internal management, showing the strategy and the data I was

25  collecting from market intelligence, from imports, and things

1   of that nature.

2   Q.   Does Syngenta have a regular practice of creating

3   presentations such as this?

4   A.   Yes.

5   Q.   Were these created as part of that regular practice?

6   A.   Yes.

7   Q.   Were they created, to your knowledge, by individuals who

8   had knowledge of what was in the presentations at the time when

9   they created them?

10  A.   Yes.

11  Q.   And did you rely on the information in these

12  presentations?

13  A.   Yes.

14  Q.   Do these presentations include some of the price

15  monitoring information that we discussed earlier?

16  A.   Yes.  The dashboard from the price monitoring is here.

17  Q.   Do they include any of the import records that you

18  discussed earlier?

19  A.   Yes, they do.

20  Q.   Again, I want to make sure.  Did you rely on these

21  records?

22  A.   I did rely on these, yes.

23          MR. SANTHANAM:  Your Honor, we move for the admission

24  of Plaintiff's Trial Exhibits, 213, 225A, and 235.

25          MR. TILLER:  Which were those numbers?

1          MR. SANTHANAM:  213, 225A, and 235.

2          MR. TILLER:  Your Honor, could we have a quick

3   sidebar?

4          THE COURT:  All right.

5          (Bench conference as follows:)

6          MR. TILLER:  I think some of these may have been

7   admitted, in part, already, but to the extent that they're not,

8   I think we might have a hearsay within hearsay problem with

9   some of these.  So despite the fact that they might be business

10  records that are kept in the ordinary course of business, it

11  appears that there is still some information -- you know,

12  pricing.  We've talked about this in the motion --

13         THE COURT:  But, I mean, it doesn't have to be true

14  or offered for the truth, which I don't think this is, right?

15         MR. SANTHANAM:  The import records we are, and the

16  import records are from, you know, as he said, Panjiva and

17  Sentinel, those records we are, but the pricing information

18  we're not offering for the truth.

19         MR. TILLER:  Could we get a limiting instruction?

20         THE COURT:  About?

21         MR. TILLER:  That the pricing information doesn't

22  necessarily mean that those were the prices at the time.

23  They're just being offered to show what Syngenta thought of the

24  market at the time.

25         MR. SANTHANAM:  One other thing that I would add,

1    Your Honor, they've already admitted several exhibits that had
2    --
3                THE COURT:  Exactly.
4                MR. TILLER:  Some of them are admitted already.  That
5    I'm not -- because we can't admit them, obviously.
6                THE COURT:  Okay.
7                (Bench conference concluded.)
8                THE COURT:  All right.  They'll be admitted.
9                Ladies and gentlemen, some of these documents that
10   you're seeing, these and some of the others, have sort of
11   compilations of information from people who aren't hear to
12   testify, you know, about the person who went out to the store
13   in Montana and looked at how much something cost on the shelf.
14   That person is not here to testify.
15               So this is being offered, as I understand it, largely
16   to help you understand about Syngenta's process and how they
17   used this information, but not necessarily for, you know, the
18   truth of that underlying information in terms of the prices
19   because those folks aren't here to testify to you.
20               So with that limiting instruction, you can certainly
21   consider it to the extent it helps you evaluate how Syngenta
22   was reacting to the market and what they were hearing and such.
23               MR. SANTHANAM:  And with respect to the import
24   records, Your Honor?
25               THE COURT:  Yeah, the import records you can consider

1  for the truth.

2          MR. SANTHANAM:  With Your Honor's permission, we

3  would like to publish that to the jury.

4          THE COURT:  All right.

5          MR. SANTHANAM:  David, can you put up Plaintiff's

6  Trial Exhibit 213 and go the second page.

7  BY MR. SANTHANAM:

8  Q.   Mr. Fisher, do you have that in front of you as well?

9  A.   Yes.

10 Q.   Can you tell us, first of all, approximately when this was

11 created?

12 A.   February of 2015.

13 Q.   Can you explain at a high level what the purpose of this

14 document is?

15 A.   This is a dashboard that I was supplying to our management

16 to -- so they could see the generic imports as well as the

17 results of the price monitoring activities and market

18 intelligence that I was relying on.

19 Q.   Mr. Fisher, what is that chart at the top right?

20 A.   That's the generic imports that are coming from where we

21 subscribe to that Panjiva and Sentinel reporting.

22 Q.   And what time frame is this for?

23 A.   You'll see June of 2014 running through January of 2015.

24 Q.   Can you tell us, based on the information you had, who was

25 the primary -- or the largest importer of generics azoxystrobin

1  in 2014?

2  A.   You'll see the blue.  That's the Willowood.  So they

3  brought some in, like I said earlier, in July, and you'll see

4  in December there, they brought a whole bunch in.

5  Q.   Now, right before you took the stand, Mr. Fisher, we saw a

6  chart that went from January 2015 onward.  Can you tell us what

7  significance, if any, that December imports by Willowood had?

8  A.   Well, so, you know, everybody kind of brought in a little

9  bit here early on, but in December, that was a sizable amount,

10 and I knew that, obviously, unless you're going to spray it on

11 snow, which we don't do, that's all going to be used for next

12 year's crop when it gets planted.  So I knew they had a sizable

13 amount of product in the market, and in 2015, they had a lot of

14 product to compete with me.

15 Q.   And did the fact that -- can you tell us whether the other

16 generics that are on here, Cheminova and Albaugh -- what level

17 of generic import did they have in December compared to

18 Willowood?

19 A.   Cheminova brought a little bit more in, you'll see in that

20 little green, but it wasn't near as much.

21 Q.   And what did that indicate to you regarding Cheminova and

22 Albaugh going into 2015?

23 A.   You know, Cheminova had very little product coming into

24 the '15 year because you can see in that December time frame

25 and Willowood had a lot.  So that's what I was reacting to.

1  Q.    Now, Mr. Fisher, I would like you to turn to another

2  document in your binder.  It's been admitted as Defendant's

3  Trial Exhibit 68.

4  A.    Yes.

5          MR. SANTHANAM:  And, David, if we could go to the

6  third slide.

7  BY MR. SANTHANAM:

8  Q.    We saw this earlier.  Can you tell us generally what the

9  purpose of a slide such as this is?

10  A.    Yeah, the purpose was to go to our Syngenta management and

11  give them my proposal for our fighting brands on positioning,

12  pricing, how much we were going, as I said, allocate earlier,

13  so we don't just put limited out there.  Show how much we were

14  going to put out there, and to show what I was -- my price

15  points I was looking at, and why I was proposing those prices,

16  so you could see, versus the generics.

17          MR. SANTHANAM:  David, can you go to the chart on the

18  lower left?

19  BY MR. SANTHANAM:

20  Q.    Mr. Fisher, can you explain what we're seeing here?

21  A.    Yeah, what you can see here is -- so my fighting brands

22  are the ones on the right here, your Aframe and Aframe Plus,

23  and you'll see my price points I'm proposing to my managers,

24  and then next to it, you'll see the azoxy straight from the

25  generics and nongeneric mixtures, as I mentioned earlier.  And

1    you'll see the price points 120 and 105, and the first bullet

2    will tell you who that was referring to.  It was Willowood.  It

3    was Azoxy 2SC --

4              THE COURT:  Slow down.

5              THE WITNESS:  Sorry.  I'm sorry.

6    BY MR. SANTHANAM:

7    Q.   So can you tell us what that first bullet is about?

8    A.   Yes.  It's the Willowood that I'm reacting to and their

9    brands and their pricing.

10   Q.   Now, Mr. Fisher, as -- and, again, this was -- what was

11   the time frame of this document?

12   A.   It would have been early 2015.  Probably around February,

13   March.

14   Q.   And around February or March of 2015, to whom were you

15   responding in the marketplace and setting your sales strategies

16   and pricing?

17   A.   Willowood.

18   Q.   David, if you could turn -- actually, Mr. Fisher, if you

19   could turn to the next slide.  And for the record, this is

20   SYN-283444.  And we had a chance to look at this slide before,

21   but do you recognize this?

22   A.   Yes.

23   Q.   Can you tell us what it is?

24   A.   Yes, this was a tool that I gave our sales reps to work

25   through.  We have loyalty agreements.  We call them key active

1  ingredient.  We do loyalty agreements with distributors and

2  retailers, but to help our sales force work through exactly --

3  you know, if they miss -- you know, gave up on the loyalty

4  agreement and just chose to run with some generic, it showed

5  the tradeoff of what they would be giving up, you know, on

6  their -- on a program payment, and so it gave the example, and

7  it was so that the sales reps could use this to work through.

8  Q.    Was it to try to address generic competition?

9  A.    Yes, it was.

10  Q.    Was there a particular product that you used in this

11  comparison, a generic product?

12  A.    Yes.  The one here generic is AzoxyProp Xtra.

13  Q.    And whose product is AzoxyProp Xtra?

14  A.    Oh, it's Willowood's.  It's their mixture product from

15  Willowood.

16  Q.    Would you turn to Plaintiff's Trial Exhibit 235.  Can you

17  tell us when this was created approximately?  Again, we're on

18  235.

19  A.    I'm sorry.  I went to 235A.  235 is titled -- oh, here --

20  it's hole-punched here.  February 8th of 2016.

21  Q.    And can you explain what's being shown here on Plaintiff's

22  Trial Exhibit 235?

23  A.    Yeah, this is results of my market intelligence,

24  price-monitoring activities.  It's giving an update of, you

25  know, what I'm reacting to.  You'll see the prices on this page

```
 1  in the -- you know, what prices we were picking up in the
 2  market.  We're also seeing a few comments up here around
 3  imports and things of that nature.
 4  Q.    Now, the chart on left, it says Farmgate price per acre.
 5  Do you see that?
 6  A.    Yes.
 7  Q.    Under there, are there lists of other branded products?
 8  A.    On the right -- my branded products are on there, yes.
 9  Q.    And are there other branded products from different
10  companies on that chart?
11  A.    On the right?
12  Q.    On the left.
13  A.    On the left, yes, those are branded competitors in the
14  market.
15  Q.    And why were you looking at prices of other branded
16  competitors?
17  A.    Well, they -- the management wants to know -- when I bring
18  stuff like this forward, they want to know, you know, not only
19  where our prices are from, you know, the entire market, you
20  know, they're trying to show everything.  So this was kind of
21  the relationship for what we were seeing, you know, from
22  competitive branded companies out there with different
23  fungicides as well as from generics over on the right.
24  Q.    Now, as of 2014 and looking forward, did -- when you were
25  looking at other branded companies, what impact, if any, did
```

1  those other branded companies have in setting your sales
2  strategies and pricing for azoxystrobin products?
3  A.   So 2014 forward, they didn't have a lot.  The reason for
4  that is once I started reacting my prices to generics, I was
5  typically priced below them, which --
6  Q.   I didn't mean to interrupt.  I'm sorry.
7  A.   I didn't used to do that.  Obviously, we used to be --
8  actually, tried to get a little bit more than the BASF's or
9  Bayer's; but after I started reacting, it was good to still
10 note it, but you'll see that my prices are actually cheaper
11 than other branded fungicide people.
12 Q.   Now, Mr. Fisher, you said reacting to generics.  Who
13 specifically were you reacting to?
14 A.   Well, the lowest price points here are the Azoxy 2SC from
15 Willowood and AzoxyProp Xtra.  The other thing, if you look at
16 generic imports, at this time in February of 2016, Willowood
17 was the only importer, if you look at the second bullet.
18 Q.   If you go next slide, and for the record, this is
19 SYN-055583.
20       Mr. Fisher, were you referring to the chart on the
21 top right?
22 A.   Yes.  I had it noted in the bullet earlier, but this is
23 the chart from the import reports.
24 Q.   Stepping back, can you explain for us what this chart is
25 in terms of axis and what you have represented here?

A.   Yeah, so I'm converting this back to where you --
equivalent gallons that you could make, and you'll see August
of 2014 to date, so that's the period between August of 2014
and February 8 of -- February 8 of the 2015.  You can see who
had imported and how much product they could make.  That's on
the left bar.

On the right bar, you'll see what has been imported
between August of 2015 to February 8 of 2016.  And if you're
are sitting here, February 2016, you are looking at this graph.
You're saying, okay, I've got one major generic competitor that
has product in the market here.

Q.   Mr. Fisher, again, going back to 2014 and looking forward,
can you explain who the largest generic azoxystrobin importer
was?

A.   It would have been Willowood.

Q.   And what happened to the imports of azoxystrobin by
generics after about August of 2015?

A.   August of 2015 to February 8, it was only Willowood.  Now
later in the year, much later in the 2016 year, we saw imports
coming from a few of the other generics.

Q.   And how did you react to this information?

A.   Well, at this time I was having to -- I was having to
update my managers again.  I was having to lower my prices and
react to it.

Q.   As of February of 2016, Mr. Fisher, to whom were you

1  responding to in the marketplace in setting your sales

2  strategies and pricing for azoxystrobin products?

3  A.    Willowood.

4          MR. SANTHANAM:  Your Honor, this may be a good time

5  for a break.

6          THE COURT:  Okay.  We'll take the lunch recess for

7  the jury at this point.  So, ladies and gentlemen, let me

8  excuse you for the lunch break, and I'll ask you to come back

9  at quarter of two.  Please remember not to discuss the case

10  among yourselves or with anyone else.  It's a nice day today,

11  so I encourage you to walk around a little bit and get some

12  fresh air and come back at 1:45.  The jury is excused.  Leave

13  your notes in your chair.

14          THE WITNESS:  Oh, I stay here?

15          THE COURT:  Yes.  You just stay there.

16          THE WITNESS:  Sorry, I've never been here before.

17          THE COURT:  That's all right.

18          (At 12:32 p.m., jury excused.)

19          THE COURT:  Okay.  Mr. Fisher, you can step down.  So

20  you can bring Mr. Cecil back in if you want.

21          MR. COUGHLIN:  I think we want to, but I think he may

22  have misunderstood what a proffer was, so I'm trying to figure

23  out if he's still here.  Can we do it just before we start

24  back?

25          THE COURT:  Well, then I don't have quite as much

1  time to think about it.  But, yeah, I guess --

2          MR. COUGHLIN:  Let me see if he is here.  He is still

3  here.

4          THE COURT:  Okay.  Well, as we discussed yesterday,

5  we all have our lingo, so I'm not surprised he didn't know what

6  a proffer was.

7          MR. NEUMAN:  Your Honor, should Mr. Fisher be in the

8  room while this voir dire is being held?

9          THE COURT:  Did I -- was there a -- I can't remember

10  if I excluded the witness.  Did I?

11          MR. NEUMAN:  Yes.

12          THE COURT:  Okay.  Well, Mr. Fisher can step out and

13  wait in the hall.

14          Come on up, Mr. Cecil.  Just return to the witness

15  stand, and you're still under oath.  Go ahead, Mr. Coughlin.

16          MR. COUGHLIN:  Thank you.

17              VOIR DIRE EXAMINATION OF JEFF CECIL

18  BY MR. COUGHLIN:

19  Q.  If we could pull up 211, Defendant's Trial Exhibit 211,

20  and go to page 402.

21          Mr. Cecil, when you were on the stand a little bit

22  ago, you were asked about this slide and bullet points -- or

23  number paragraphs 2 and 3.  I did not ask you any questions

24  about paragraph No. 1, which reads, "EPA application falsely

25  claimed azoxystrobin was sourced from Syngenta."  Do you know

1   what type of EPA application is being referred to here?

2   A.   It would be the application for registration of a product.

3            THE COURT:  You can keep your voice up.  Could you

4   just repeat that?  I couldn't hear.  I'm sorry.

5   BY MR. COUGHLIN:

6   Q.   Move the microphone closer.

7   A.   It would be the application of registration for a new

8   product.

9   Q.   Is that an end-use registration?

10  A.   Yes, it would appear so.

11  Q.   Okay.  Are you familiar with what a formulator's exemption

12  is in terms of an EPA registration?

13  A.   Broadly, yes.

14  Q.   And what's your understanding?

15  A.   That the company can cite data from another company if

16  it's already registered.

17  Q.   In terms of an end-use registration, do you know whether

18  the formulator's exemption allows somebody who's making

19  application to get a response quicker?

20  A.   It would allow a quicker response.

21  Q.   And do you understand that a formulator's exemption

22  requires that the application cite a registered source of the

23  active ingredient?

24  A.   It would require that, a registered source, yes, sir.

25  Q.   And is that why generics would source -- or would identify

1  Syngenta as a source?

2          MR. TILLER:  Objection, Your Honor.

3          THE COURT:  Well, this is a proffer.

4          MR. TILLER:  I understand that.  I'm just --

5          THE COURT:  Well, I might make him do it differently

6  if the jury was in the room, but I also would like to have a

7  little lunch, so you don't need to object while we're going

8  along here because that's why we're here, because you've

9  objected.  Go ahead.

10  BY MR. COUGHLIN:

11  Q.   Is it your understanding that a generic would cite

12  Syngenta as a source on a formulator's exemption so that it

13  could qualify for the formulator's exemption?

14  A.   Yes, it is.

15  Q.   And in 2013, was Syngenta the only registered source of

16  azoxystrobin?

17  A.   To my knowledge, yes.

18  Q.   So is that why a generic that was seeking -- strike that.

19  Would a generic, who is trying to apply or wished to apply

20  using the formulator's exemption in order to get the expedited

21  issuance of the registration for end-use -- would they have to

22  list Syngenta in order to apply as the source?

23  A.   If they wanted an expedited registration, they would have

24  to cite data from somebody that was registered.  At this time

25  it was only Syngenta.

```
 1   Q.   Would they have to cite Syngenta as the source of the
 2   technical that would be used for the end-use registration?
 3   A.   Yes.
 4   Q.   And they would have to do that, whether it was true or
 5   not, in order to apply -- to even apply for that, is that
 6   correct?
 7   A.   Yes, they would have to cite data from a source that was
 8   registered, yes.
 9   Q.   And in 2013, the only source registered was Syngenta?
10   A.   To my knowledge, yes.
11            MR. COUGHLIN:  That's all, Your Honor.
12            THE COURT:  That's it?  Okay.  All right.  You can
13   step down.
14            So I guess, I mean, I don't have any problem with any
15   of that, except the first part where it's -- you asked him
16   about what is said on Defendant's 211, page 402, paragraph 1.
17   If he wants to testify about how the formulator's exemption
18   works, he can do that.  I can't think of any reason he can't do
19   that, because that -- but that doesn't -- you know, what I'm
20   trying to keep out here, because I think it's just going to
21   take us down a rabbit hole, is this false word and attribution
22   to Willowood.  I still have not really heard anything that
23   takes us to where I think that's -- the probative value of that
24   is worth the -- how much time we would end up spending on it.
25            So to the extent you want to ask him questions about
```

1  how the formulator's exemption works, you can do that, just not

2  directed to page 402 of Defendant's Exhibit 211.  Do you

3  understand what I'm saying?

4           MR. COUGHLIN:  I'm trying to make sure I understand

5  because I want to make sure if we do this, I do it exactly

6  right.  Would -- the point there at the end was, the only way

7  to apply for -- to use the formulator's exemption in 2003 would

8  be -- or 2013 would require that the applicant identify

9  Syngenta as the source of the technical to be used for the

10 end-use and that -- I mean, I would like to -- this

11 confirmation that generics, not identifying Willowood, made

12 those applications having to state that Syngenta was the

13 source, regardless of whether that was true or not, and that's

14 the --

15          THE COURT:  Well, I mean, you don't need to say

16 regardless of whether that's true or not.  If you want to

17 explain how the formulator's -- have a witness explain how the

18 formulator's exemption works, I don't have any problem with

19 that.  It's this whole true/false Willowood thing that I'm -- I

20 don't see that the probative value is very high, and it has a

21 big potential to get us just sidetracked.

22          So I was taking notes and really you just asked him a

23 couple of questions there about Defendant's 211, page 402,

24 paragraph 1, you can't do that.  But you can say how does a

25 formulator's exemption work?  I mean, he appeared to be a

 1  knowledgeable witness.  They can cross-examine him about that.

 2  And as long as you don't ask that true or false question.

 3          MR. COUGHLIN:  Can I ask him this?  Could I say in

 4  2013 the only way a generic could --

 5          THE COURT:  Okay.  So you made a proffer, and what

 6  I'm telling you is you can ask him everything that you asked

 7  him, except the questions about Defendant's 211, page 402,

 8  paragraph 1, and the true/false question.  I think everything

 9  else you asked him just had to do with the formulator's

10  exemption.  So you can ask him those questions.  I hope you

11  wrote down what you asked him or somebody took notes.

12          MR. COUGHLIN:  Is it permissible for me to meet with

13  Mr. Cecil to go over this to make sure we ask it exactly the

14  right way?

15          THE COURT:  Well, I think -- I'm inclined to let him

16  to do that because I don't want to unfairly prejudice Willowood

17  in terms of instructing him not to answer -- not to include

18  certain things in his answers.  Does the Defendant want to be

19  heard about that?

20          MR. TILLER:  No, Your Honor.  I tend to agree with

21  you.  I don't want something wrong coming in.  The one thing I

22  would just note, for whatever it's worth, we admitted the use

23  of --

24          THE COURT:  Hmm?

25          MR. TILLER:  We've admitted -- Willowood's already

1 admitted that we used the formulator's exemption. We've
2 admitted that it expedites the process. So I'm not quite sure
3 what this adds on top of it, but understood.
4        THE COURT: Well, you know, you gotta -- this is all
5 new to the jury. Sometimes they need to hear it a couple of
6 times. They don't usually need to hear it five times. But,
7 you know, if you want to do that through this witness or some
8 other witness, you know, that's okay with me. I don't think
9 it's been -- we're not beating a dead horse just yet. But we
10 can go ahead and finish with Mr. Fisher before we turn back to
11 anything else.
12        MR. COUGHLIN: If it's okay with Your Honor, I think
13 that Mr. Wichert can cover that formulator's exemption. We
14 don't have to put Mr. Cecil back up on the stand and disrupt.
15        THE COURT: Okay.
16        MR. COUGHLIN: As long as we are okay to cover that
17 testimony.
18        THE COURT: Yeah, I mean, I don't have -- you can
19 offer -- I believe I said early on you could offer testimony
20 about the formulator's exemption, so I don't have any problem
21 with that.
22        All right. Anything else before we go lunch? No?
23 What time did I tell the jury to come back? 1:45? We'll be in
24 recess until 1:45.
25        (At 12:40 p.m., break taken.)

```
 1              (At 1:45 p.m., break concluded.)

 2              THE COURT:  Okay.  Anything we need to take up before

 3    the jury comes in?  Yes, Mr. Tiller.

 4              MR. TILLER:  Very briefly.  Defendant's 92 was not

 5    admitted.  There were questions asked.  I think there was --

 6    you had an issue with a page or two, I think.

 7              MR. SANTHANAM:  That's correct.

 8              THE COURT:  Okay.  Well, can you all work that out?

 9    I mean, just look at it together during the recess and -- if

10    it's the same problem?

11              MR. SANTHANAM:  Yes, it is, Your Honor.

12              THE COURT:  I assume you all will be able to work it

13    out.

14              MR. TILLER:  Okay.

15              THE COURT:  If that's not true, let me know but --

16              MR. SANTHANAM:  I think we can just remove a page

17    from it and it will be fine.

18              THE COURT:  Great.  I'll let -- I have it written

19    down here on my list of outstanding issues, so that marginally

20    increases the likelihood it won't get forgotten.

21              Okay.  Anything else?

22              MR. SANTHANAM:  Nothing from us, Your Honor.

23              THE COURT:  All right.  You can bring the jury in.

24              (Jury panel is present.)

25              THE COURT:  Good afternoon.  I hope everybody got
```

outside to enjoy the weather for a little bit.  We're ready to

continue with the direct examination of Mr. Fisher.

So, Mr. Santhanam, you may continue.

MR. SANTHANAM:  Thank you, Your Honor.

BY MR. SANTHANAM:

Q.   Mr. Fisher --

MR. SANTHANAM:  Before we begin, I neglected to mark

one of the flip chart exhibits relating to Albaugh.  I'm going

to mark it now as Plaintiff's Demonstrative Exhibit 21, PDX-21.

BY MR. SANTHANAM:

Q.   Mr. Fisher, before we move on, I wanted to clarify two

things.  Stepping back to 2014, can you tell us whether Albaugh

had any impact on your azoxystrobin sales and pricing

strategies?

A.   They had very little impact.  Their main focus was seed

care, lawn and garden, and they also had a little import.  So

they weren't the optimal person I was really reacting to.

Q.   What about in 2015?

A.   No, even in 2015 they were, you know, still -- you can see

they were out with a few prices trying to find somebody to buy,

but their main focus was still seed care and lawn and garden.

Q.   What about in 2016?

A.   It was still that way.  They were still focused heavily in

seed care and lawn and garden.

Q.   We're in 2017 now.  I'll ask you about 2017.  What about

1  2017?

2  A.    Still, even in 2017, very little, you know, market intel

3  and they're still heavily focused in the seed care and lawn and

4  garden area.

5  Q.    I'm going to ask you the same set of questions about

6  Cheminova.  Going back to 2014, can you tell us what impact, if

7  any, Cheminova had on your sales strategies and pricing

8  strategies?

9  A.    In 2014?

10  Q.    Correct.

11  A.    Very little.  Again, the number one crop that I was in,

12  which is corn, they had no label for it.  They didn't have

13  plant performance, which was really what had built this market

14  number so much above what it used to be, and, you know, they

15  had little import as well.

16  Q.    What about 2015?

17  A.    2015 they continued to have little imports until about

18  midway through the year and then they brought more product in.

19  They did get corn on the label, but they -- it seemed like they

20  continued to focus heavily in, like, some of my smallest

21  markets:  Rice, sugar beets, things like that.  You know, you

22  could see pricing on these products, but it wasn't the number

23  one person I was reacting to.

24  Q.    What about 2016?

25  A.    2016 they left the market, so they didn't bring any more

1  products back in.  They were actually purchased by another

2  company called FMC and so they sold off the rest of their

3  inventory late '15, to best of my recollection, and that was

4  the end of, you know, that I saw from Cheminova.

5  Q.    Is FMC a customer of Syngenta's?

6  A.    Yes.  We have a supply -- a global supply agreement with

7  FMC.

8  Q.    Is Syngenta supplying azoxystrobin technical to FMC?

9  A.    Yes.

10  Q.    Do you know if that azoxystrobin technical would be

11  manufactured using Syngenta's processes?

12  A.    I guess it would be out of our plant, so we would have a

13  process.

14  Q.    Mr. Fisher, turning ahead to a different topic, are you

15  familiar with a company by the name of Loveland or Crop

16  Protection (sic) Services?

17  A.    Yes.

18  Q.    Who are they?

19  A.    They're one of our largest customers.  They're one of the

20  large customers in the United States.  They have a distributor

21  arm, but they also own retail branches.  Actually, if you're

22  familiar -- Brown Summit there's a store.  There's a Crop

23  Production Services right up in Brown Summit up here if you've

24  ever been up that way.

25  Q.    Does Syngenta sell azoxystrobin technical to Loveland?

```
 1  A.    Yes.
 2  Q.    Do you know whether Syngenta has a supply arrangement or
 3  agreement with Loveland or -- slash, CPS?
 4  A.    Yes, I do.
 5  Q.    Are you familiar with the supply agreement?
 6  A.    Yes, I've seen it.
 7  Q.    If you could turn to the binder in front of you.  There
 8  should be a second tab in that binder.  Confirm for us that
 9  within that tab you've got there Plaintiff's Trial Exhibits
10  259, 276, and 277.
11  A.    Yes.
12  Q.    Now, Mr. Fisher, again, without getting into the substance
13  of these documents, can you tell us whether you recognize them?
14  A.    Yes, I recognize these.
15  Q.    Without getting into the substance, can you tell us what
16  these documents are?
17  A.    Well, this is our agreement to supply -- it might make it
18  simpler if I just say who Loveland and CPS is.
19  Q.    Yes, please.
20  A.    Sorry.  Because Crop Production Services, which is their
21  store front, but then they have a proprietary arm where they
22  sell proprietary products that they produce called Loveland.
23              THE COURT:  Called what?
24              THE WITNESS:  Loveland.
25              THE COURT:  Okay.
```

```
 1            THE WITNESS:  Loveland, just like -- yeah.  And they
 2   are out in Colorado, Loveland, Colorado, which is why I think
 3   they have that name.  So that's who Loveland is.
 4            So this agreement is our Azoxystrobin Millbase Supply
 5   Agreement with the CPS/Loveland company.
 6            THE COURT:  That's 259?
 7   Q.   Tell us what 259 is.
 8   A.   259 is the second amendment to the Azoxystrobin Millbase
 9   Supply Agreement, so it's an amendment to it.
10            THE WITNESS:  Sorry, Your Honor.
11            BY THE COURT:  That's okay.
12   BY MR. SANTHANAM:
13   Q.   Can you tell us what 276 is?
14   A.   276 is the first amendment to the Azoxystrobin Millbase
15   Supply Agreement.
16   Q.   And then finally can you tell us what 277 is?
17            MR. SANTHANAM:  And we're referring to Plaintiff's
18   trial exhibits, for the record.
19   A.   This is just the Azoxystrobin Millbase Supply Agreement.
20   Q.   Are these all signed copies of the agreements?
21   A.   They should be.  Yes, they are.
22   Q.   Are they fair and accurate copies of these agreements, to
23   the best of your knowledge and recollection?
24   A.   To the best of my knowledge, yes.
25            MR. SANTHANAM:  Your Honor, we offer into evidence
```

1   and move for the admission of Plaintiff's Trial Exhibits 259,

2   276, and 277.

3           MR. TILLER:  No objection.

4           THE COURT:  They'll will be admitted.

5   BY MR. SANTHANAM:

6   Q.   Mr. Fisher, if you could go to Plaintiff's Trial Exhibit

7   277.

8           MR. SANTHANAM:  And, David, if you could go to the

9   first page of that document and zoom in on the top paragraph,

10  the title.

11  BY MR. SANTHANAM:

12  Q.   Mr. Fisher, can you read for us what the title of this

13  agreement is?

14  A.   Azoxystrobin Millbase Supply Agreement.

15  Q.   Now, we've heard of the term "technical" so far in this

16  case.  Can you tell us what the millbase is?

17  A.   Millbase would be one step in the -- when you take the

18  technical.  It's just one step in the production cycle where

19  you mill it down.

20  Q.   And who is this agreement -- can you tell us who this

21  agreement is with?

22  A.   That Loveland Products so -- right here, Loveland

23  Products, Incorporated.

24  Q.   And if we could turn to the last page of this agreement --

25          MR. SANTHANAM:  For the record, this page is

1  SYN-284237.

2  BY MR. SANTHANAM:

3  Q.    Does this page reflect the price at which Syngenta was

4  offering azoxystrobin millbase to Loveland?

5  A.    Yes, it does.

6  Q.    And, you know, can you tell for -- you know, tell us,

7  before we get to the price, when was this agreement dated?

8  A.    This agreement was dated -- it was November 14th of 2011.

9  Q.    Now, Mr. Fisher, can you tell us what the price of

10  azoxystrobin millbase was that Syngenta was providing to

11  Loveland in November of 2011?

12  A.    It says it's per kilogram and it's $114.20 per kilogram,

13  per kg.

14  Q.    I would like you to turn to Plaintiff's Trial Exhibit 259.

15          MR. SANTHANAM:    David, if you can pull up the first

16  page.

17  BY MR. SANTHANAM:

18  Q.    And can you tell us what this is, Mr. Fisher?

19  A.    This is a second amendment to the Azoxystrobin Millbase

20  Supply Agreement.

21  Q.    Can you tell us when this is dated?

22  A.    It says it's the 15th day of December in 2015.

23  Q.    When is that in relation to when Willowood came into the

24  market, to your recollection?

25  A.    It would be about 12 months later from when I first knew

1  they were coming.

2  Q.   Can you tell us the price at which Syngenta was selling

3  azoxystrobin millbase to Loveland in December of 2015?

4  A.   It says the price of the product shall be $50.35 per kg,

5  the first line.

6  Q.   Fifty dollars and what?

7  A.   Thirty-five cents.

8  Q.   This is an agreement with Loveland?

9  A.   Yes.

10        MR. SANTHANAM:  We'll mark this as Plaintiff's

11  Demonstrative Exhibit 22.

12  Q.   Now, Mr. Fisher, did the price decrease with respect to

13  azoxystrobin millbase from 2011 to 2015?

14  A.   Yes.

15  Q.   And, again, without getting into the specific reason, are

16  you aware of the reason for which that price decreased?

17  A.   Yes.

18  Q.   Can you tell us approximately how much it decreased?

19  A.   It was -- that's over 50, 60 percent down.

20  Q.   Tell us, Mr. Fisher, why did the price decrease?

21  A.   So in the agreement, when they -- when CPS or Loveland

22  gets another offer or finds another offer from a generic party,

23  we had to be within -- I think it was within 10 percent of that

24  price.  We had to be within a certain percentage of that price.

25  They had a price point here -- one of the price points they

1  were -- the cheapest one I remember was $38 per kilogram and

2  that was for Willowood.

3  Q.   To the best of your knowledge, to whom were you reacting

4  to or was Syngenta reacting to in lowering its prices from

5  $114.20 in November of 2011 down to $50.35 per kilogram in

6  December of 2015?

7  A.   That lowest offer would have been Willowood.

8            THE COURT:  Say again.

9            THE WITNESS:  The lowest offer would have been

10 Willowood.

11 Q.   Now, Mr. Fisher, again I'm going to switch topics here a

12 little bit.  Earlier today we heard about the budgeting process

13 from Mr. Cecil.  I would like to get your perspective of the

14 budgeting process.  I'll ask you to go a little bit quickly

15 because we've heard a lot about the budgeting process.

16 A.   Okay.

17 Q.   Are you involved in creating Syngenta's budgets?

18 A.   Yes, I am.

19 Q.   Does Syngenta have an established budgeting process by

20 which it sets its budgets?

21 A.   Yes, we do.

22 Q.   Is this process unique to azoxystrobin?

23 A.   No, it's not.

24 Q.   What do you mean by that?

25 A.   So we use the same process for our insecticides or

1  herbicides or fungicides.  It's all in the same sequence of

2  events to get our budgets established.

3  Q.   As a product lead or a brand manager for azoxystrobin,

4  have you been involved in the budgetary process for

5  azoxystrobin?

6  A.   Yes.

7  Q.   Have you been involved in the budgetary process with

8  respect to other products?

9  A.   Yes, I have.

10  Q.   How about herbicides, such as mesotrione?

11  A.   Yes.

12  Q.   And what was your involvement with respect to the

13  budgetary process as to mesotrione?

14  A.   We set up every year a two- to three-day peer review.  All

15  of the product leads will sit in a room and hear of the

16  five-year strategy budget proposals; and then we will -- from

17  peer review, we'll challenge assumptions to try to get a better

18  product, a better budget.  Excuse me.

19  Q.   Quickly, at a high level -- I didn't mean to interrupt.

20  A.   I'm sorry.  I just got finished eating lunch.  Sorry.

21  Q.   At a high level, can you describe for us this budgetary

22  process from your perspective?

23  A.   It's a rigorous process.  I mean, we start with our

24  five-year strategy, which is a full year ahead; and through the

25  second half of the year, we're, you know, peer reviewing and

1  getting the five-year strategy set forth on -- by brand.  We're
2  not doing by month yet.

3          Then about March/April time frame, of, you know, the
4  next year, we'll start to refine those assumptions.  You,
5  obviously, learn a lot more about the agricultural market and
6  the competitors, et cetera, and so you update those
7  assumptions.

8          Following that, May/June I'll set a proposal for
9  price and volume by brand and even break it down by customer
10 unit.  So a customer unit -- we have four regions.  We're
11 spread -- across the United States that have, you know,
12 marketing and commercial managers and then sales reps that --
13 by four different regions.  We will meet with them and do peer
14 reviews with each of those CUs on those budgets for their CU so
15 they can build that together.
16 Q.   Mr. Fisher, if I may interrupt.  I think you indicated
17 you're initially looking at the market and you said -- you used
18 the term "we."  Who is "we"?
19 A.   Well, when I say "we," it's the entire marketing
20 department all the way to all our product leads, et cetera.
21 Q.   What kind of background would these individuals have in
22 terms of education and experience?
23 A.   Everyone in our department that I'm aware of has at least
24 ten years experience within agriculture.
25 Q.   I think you took us through what you mentioned were peer

1  reviews?

2  A.  Yes.

3  Q.  What are peer reviews and what is the purpose of them?

4  A.  So peer reviews, again, is to make sure your budget and

5  your assumptions are set up as good as possible.  So what we

6  have is we'll all review each others and challenge each other

7  really and say "Hey, are you sure?" and "Why are you proposing

8  this?" and so forth.  So that's what we're doing at the

9  peer-review session.

10 Q.  Just so we're all on the same page, would a brand manager

11 or product lead such as yourself for azoxystrobin participate

12 in the budgetary process for, say, mesotrione?

13 A.  Yes.

14 Q.  What about the other way around?  Would a brand manager or

15 product lead for herbicides or mesotrione participate in the

16 budgetary review process for azoxystrobin?

17 A.  Yes.

18 Q.  Why is that?

19 A.  Well, because, again -- this is a great example.

20 Mesotrione and azoxystrobin, the number one crop those two are

21 used on is corn, which happens to be the biggest crop in the

22 United States.  You know, the way we look at that crop from

23 planting to assumptions around, you know, everything that goes

24 into that crop, you know, it's -- we need to align our

25 assumptions and make sure -- because we're both selling this

1  product in that same crop and we're both selling it in that

2  crop to maximize the yield, so that's --

3  Q.   Are there incentives to meeting a budget?

4  A.   Absolutely.  Yeah.  The -- our personal incentives are all

5  off of the budget.  If we come in 90 percent of budget, then I

6  get to take home a little bit of a bonus; and then if,

7  obviously, we establish 100 or 105 percent, your bonus is a

8  little bigger.  So, yeah, personal -- all the employees, to my

9  knowledge, are incentivized if we can make -- have a good year

10  and meet our budget.

11  Q.   You were talking about the peer-review process during the

12  budgetary process.  Can you take us all the way to when the

13  budgets are finalized?

14  A.   Yeah.  So it's that June/July time we're meeting back with

15  those CUs individually, and then after that I have to present

16  the budget to our Regional Operating Committee, which would be

17  Jeff Cecil and some of his managers.  From there, they will

18  take it and get global sign-off and the budget is set in stone

19  the end of October, first week in November, right in that

20  stage, the year before.  So if it was a '15 budget, then it

21  would have been set and locked in stone by end of October,

22  first week in November, right in that time frame.

23  Q.   Mr. Fisher, have you heard the term "last plan" or "latest

24  plan" or "LP"?

25  A.   Yes, yes.

1  Q.   Can you tell us how that -- you know, is that similar to a

2  budget or what is it?

3  A.   No, it's not similar to the budget.  The LP, latest plan,

4  is a forecast.  These four CUs I mentioned, what they're doing

5  is every month they are giving a forecast and it rolls up on

6  how they are performing against the budget that we had all

7  agreed upon.  So then they -- it's not just for that month, but

8  it's for the full year.  So how are they doing and what is --

9  are they going to make their budget or not, and they are

10 updating that every month.

11 Q.   What is it that Syngenta may base its decisions on?  On

12 the budget for the year or the LPs?

13 A.   No.  You know, we adjust -- obviously, you don't know

14 everything when you are setting the budget, so you are

15 adjusting throughout the year to the forecast.  If you have to

16 self-correct -- if the LPs -- forecast is saying "Hey, this is

17 broke, we need to -- we're going to have do something or we're

18 going to lose a whole lot of business, a whole lot of market

19 share," then you have to come up with something, come up with a

20 proposal and react.

21 Q.   What do you react based on?

22 A.   More times than not it's price.  I mean, you know, it's

23 your quickest thing.  But programs.  You can look at programs,

24 which obviously affect price.

25 Q.   We talked about the budgetary process.  Mr. Fisher, can

1  you explain for us why Syngenta has this budgetary progress?

2  A.   Yeah.  You know, it -- well, you know, for one, it's our

3  commitment -- you know, it sets our sales a goal, but it's our

4  commitment to the entire organization on how much business

5  we're going to deliver.

6         It drives our spend as well.  So if, you know, we're

7  saying we're going to meet our budget and we set this forward,

8  it gives us -- our advertising promotion budgets result from

9  this.  Hiring additional employees or market research, all that

10 is driven off of that.  I think most importantly it drives our

11 supply, so it tells -- you have to work -- a lot of these

12 active ingredients, you know, they come from a ways off; and so

13 to get all the active ingredients in one place, the packaging,

14 it takes a while to get all of those arrangements made and so

15 is also drives your supply.

16 Q.   Mr. Fisher, we heard the term "gross-to-net reports"

17 before.  Have you heard that term?

18 A.   Yes, I have.

19 Q.   Can you briefly tell us what that is from your

20 perspective?

21 A.   The gross-to-net report is from finance, summarized by

22 finance; and what you'll see is the past years' -- certain

23 amount of years' sales by brand.  You'll -- when I say "sales,"

24 I mean the quantity, the gross price, the net price, discounts,

25 total gross sales, obviously just the calculation of gross

1   price by the quantity, net price by the quantity.  It has cost

2   of goods, so what it costs to make and so forth.  It also has

3   the budget for whichever year you're operating in and it has --

4   monthly it's updated with that LP, that latest forecast or

5   latest plan, in the spreadsheet.

6   Q.   I'm going to ask you to turn to in your binder what has

7   already been entered into evidence as Plaintiff's Trial Exhibit

8   110A.

9   A.   Okay.

10          MR. SANTHANAM:  If you could pull that up.

11  BY MR. SANTHANAM:

12  Q.   Let's go to the Quadris portion of this.

13  A.   All right.

14  Q.   First of all, do you recognize this as a gross-to-net

15  report?

16  A.   Yes, this is a gross-to-net report.

17          MR. SANTHANAM:  Let's zoom in on the Quadris portion

18  of it.

19  BY MR. SANTHANAM:

20  Q.   I would like you to, first of all, kind of walk me through

21  some of these line items so that the jury can understand.

22  There's a line item for SAP sales quantity.  Can you tell us

23  what that is?

24  A.   That's our -- that's the quantity, in this case it's

25  gallons, that we're selling to one of our big distributors --

1  distributor customers.

2  Q.   At the bottom there, there is something called COGS per

3  unit.  Can you tell us what that is?

4  A.   That's what it's costing us to make the product so -- all

5  the way down to how much water and electricity the plant uses.

6  That goes into that calculation.  So it's just what it costs

7  Syngenta to make it.

8  Q.   Can you tell us what that stands for?  C-O-G-S or COGS,

9  what does that stand for?

10 A.   Cost of goods sold.

11 Q.   There's a line item for gross profit in there in the

12 middle.  Can you tell us what that means?

13 A.   Yeah.  Your gross profit would be -- you know, all --

14 after all discounts come off, all the cost of goods come off,

15 that's the actual profit that you made on that brand.

16 Q.   And, finally, there is line item there for net price.

17 It's the second to last.  Can you tell us what that is?

18 A.   Yeah.  The net price is -- so you have a gross price that

19 you sell to the distributor, but then you have all of these

20 programs in the marketplace, so volume, discounts, different

21 things by the distributor, at a grower and at a retail level as

22 well.  So this would be the net price after all those discounts

23 come off the gross price.

24 Q.   It looks like here that it's got actual information for

25 2012 and 2013.  Can you tell us what "actual" means?

1  A.   Yeah, actual would be the year -- in net price, it would
2  be the average of the year.  So when we close our books, what
3  was the overall average price for the full year.
4  Q.   Does that come out of a computer system for Syngenta like
5  SAP?
6  A.   Yes, it would come out of a computer-generated system.
7  Q.   Finally, the last column here on this cull out says "2014
8  Budget."
9  A.   Yes.
10  Q.   Was that prepared according to the budgetary process that
11  you just discussed?
12  A.   Yes.
13  Q.   And were you involved in the preparation of this 2014
14  budget?
15  A.   Yes, I was.
16  Q.   Now, Mr. Fisher, can you tell us approximately when this
17  2014 budget was finalized?
18  A.   It would have been towards the end of October, beginning
19  of November in 2013.
20  Q.   Now, earlier you had mentioned that you had what was
21  called market intelligence -- and I'm referring now to
22  Plaintiff's Demonstrative Exhibit PDX-19 -- that you had
23  received market intelligence in December of 2013, January of
24  2014.  Would that market intelligence have been captured in the
25  2014 budget as finalized in October, November of 2013?

1  A.    No.  That market intelligence came after.

2  Q.    Okay.  Is there something that would have captured market

3  intelligence that Syngenta obtained December 2013 and

4  January 2014 and onward?

5  A.    Well, the forecast -- I mean, that's why the forecast is

6  updated every month, so you know a lot more as you get through

7  the year, so the forecast would have had that market

8  intelligence information.

9  Q.    And can you tell us, Mr. Fisher, what was the last budget

10  that you prepared that did not take into account market

11  intelligence regarding Willowood's activities?

12  A.    It would have been this 2014 budget.

13  Q.    Now, I'd like you to turn to, in your binder, what's been

14  marked and entered into evidence as Plaintiff's Trial Exhibit

15  148A.  Can you tell us what -- what this generally is.

16  A.    This is a gross-to-net report that was -- looks like the

17  last forecast was 2016, June -- June of 2016, so that's what

18  this is.

19  Q.    Would this be called a June 2016 LP?

20  A.    Yes, that's what that would have been.

21  Q.    Does it have budget information in there as well for 2016?

22  A.    Yes, it has 2016 budget.

23  Q.    Now, does it have actual sales information like we

24  discussed on the last gross-to-net report?

25  A.    Yes, it does.

1  Q.   And does it include Syngenta's average net price?

2  A.   Yes, it does.

3  Q.   And just so we're all clear, when we say average net

4  price, is that referring to a specific time in the year or an

5  average for the whole year?

6  A.   This would be a calendar whole year average, so January

7  through December, what's our overall average.

8  Q.   And, Mr. Fisher, can you tell us at this time what were

9  Syngenta's two biggest selling azoxystrobin products?

10 A.   At this time it would have been Quadris and Quilt Xcel.

11 Q.   I'd like to cull out, first of all, the Quadris portion of

12 it.  David, can we do that?

13        And, Mr. Fisher, does this have the price for Quadris

14 as for 2013 and 2014?

15 A.   Yes, it does.

16 Q.   Can you tell us -- so let's start with Quadris.

17 A.   Okay.

18 Q.   For 2013, what was Syngenta's average net price for

19 Quadris?

20 A.   For 2013 it was $199.87 and this would be per gallon,

21 gives us gallon increments.

22 Q.   199.87?

23 A.   $199.87 per gallon.

24 Q.   And in 2014, the year that Willowood entered, can you tell

25 us what the price was for Quadris?

```
 1  A.    The average price for 2014 was $191.80.

 2  Q.    Eighty cents?

 3  A.    Yes.  Eighty, 8-0.

 4  Q.    And then the year after Willowood entered the market, can

 5  you tell us what the price was for Quadris, average net price

 6  for that year?

 7  A.    $118.68.

 8  Q.    Sixty-eight?

 9  A.    Uh-huh, yes.

10  Q.    Let's try Quilt Xcel.  David, can you pull up Quilt Xcel?

11         Can you read us the average net price that Syngenta

12  was selling azoxy for that year, the Quilt Xcel, 2013?

13  A.    $119.93.

14         THE COURT:  Which exhibit are you working off of?

15         MR. SANTHANAM:  This is 148A.

16         THE COURT:  All right.  Go ahead.

17  BY MR. SANTHANAM:

18  Q.    And, Mr. Fisher, can you tell us what the average net

19  price was for Quilt Xcel in 2014, the year that Willowood

20  entered?

21  A.    $115.93.

22  Q.    And then the year after Willowood entered, what was the

23  average net price?

24  A.    $96.99.

25         MR. SANTHANAM:  I'm going to mark this as Plaintiff's
```

1  Demonstrative Exhibit 23.

2  BY MR. SANTHANAM:

3  Q.    And, Mr. Fisher, between 2013 and 2014, did Syngenta -- to

4  what extent did Syngenta reduce its prices on Quadris and Quilt

5  Xcel?

6  A.    It was the first year, we were trying to hold price, so we

7  were trying our best to hold price.  I mentioned earlier we had

8  some loyalty agreements that we put in place with customers,

9  and that's -- that's what this 2 to 3 percent, that's where

10  that -- that's where that price decrease came from.

11  Q.    Let me try to break that down a little bit.  You used some

12  terminology.  What do you mean by "hold price?"

13  A.    Well, we tried to maintain our price, maintain the market

14  value in 2014 the best we could.

15  Q.    And you said distributor agreements and 3 percent.  Can

16  you explain what you mean by that.

17  A.    Yeah, so we had loyalty agreements that we added in with

18  our distributors where we would give them an additional

19  percentage at the end of the year if they maintained a certain

20  percentage of their business with our azoxystrobin products.

21  Q.    And what about, in terms of volume or the amount of

22  azoxystrobin products, can you explain what happened between

23  2013 and 2014?

24  A.    Well, you can see -- yeah, we were -- we held price pretty

25  good, but you'll see 2013 actual sales of 775,000 gallons and

1   2014 actual of 707,000 gallons so, what is that, 15 percent, I

2   don't -- something like that.

3   Q.   And can you explain what, you know, what is your

4   understanding of that reduction in sales quantity, volume?

5   A.   This will be Quilt Xcel.

6            THE COURT:  I'm sorry, what did you say?  Apparently

7   neither of us could hear.

8            THE WITNESS:  I said this was -- this would have been

9   for Quilt Xcel, I'm sorry.

10           THE COURT:  I still couldn't -- maybe you can repeat

11  your question.

12  BY MR. SANTHANAM:

13  Q.   I'll repeat the question.  So you indicated there was a

14  volume reduction.  What is your understanding of the reason for

15  that volume reduction?

16  A.   In 2014, if you put yourself in our distributors' shoes,

17  they were -- you know, later I found out the sales to growers

18  was pretty good.  They used the product.  They used fungicide.

19  They used products on their farm, but we had a fair bit of --

20           MR. TILLER:  Objection, Your Honor, we're getting

21  into hearsay.

22           THE COURT:  Okay.  He's explaining his -- the volume

23  reduction?

24           MR. SANTHANAM:  Correct.

25           THE COURT:  From his understanding at the time, is

 1  that --

 2          MR. SANTHANAM:  That's right.

 3          THE COURT:  Yeah, okay.  Go ahead.  You can answer.

 4          THE WITNESS:  Okay.  So in 2013 -- in 2014 when --

 5  they were selling, but the inventories -- if you think about

 6  it, they weren't repurchasing.  There was too much uncertainty,

 7  if you will, around what the price was going to do, so they

 8  weren't -- they weren't rebuying from Syngenta throughout that

 9  year.

10  BY MR. SANTHANAM:

11  Q.   So let me stop you there.  You said inventory.  What do

12  you mean by inventory?

13  A.   Okay.  So a distributor on average, with these products,

14  will finish the year with about somewhere 50 percent inventory.

15  Q.   What does that mean?

16  A.   So what I mean by that is, they will have about half of

17  next year's sales in inventory, but it all goes out to farms,

18  to retailers and then to farms, and so at the end of the year,

19  when that product starts to come back in to the distributors'

20  warehouse, they'll typically end up with around 50 percent

21  channel inventory we call it.

22  Q.   And how did that play into the volume reduction from 2013

23  to 2014?

24  A.   Well, there was so much uncertainty on price, you don't

25  want to be holding a whole lot of inventory.  You can see it's

1  a good thing they didn't because in this case they would have

2  been sitting on a whole lot of inventory at $115.93 and trying

3  to sell that in the next year at $96.99, so that's -- that

4  was -- that was some of the uncertainty, to my knowledge, that,

5  you know, that they were --

6  Q.   Okay.  And I think you -- earlier you mentioned something

7  about calming distributors down.  What did you mean by that?

8  A.   Well, calming distributors down, they're worried about the

9  market, the entire value of the market collapsing, so when

10 generics come in they, you know, it -- often, you know, the

11 price will come down.  They were -- they were very nervous

12 about how quick that market price came down.  You know, they

13 were nervous of that.  So when I went out and was calming them

14 down with the overall strategy and, you know, what we were

15 trying to accomplish.

16         The reason they care so much is because as the value

17 of a market collapses, it affects their business, too.

18 Whatever margin they're making, they're no longer making it on

19 this much business, they're making it on this much business or

20 whatever, and so they have to cut people and head count and

21 locations, et cetera, so it affects everybody.

22 Q.   Mr. Fisher, we talked about the price from 2013 to 2014.

23 What happened when we went from 2014, the year that Willowood

24 entered, to 2015, the year after?

25 A.   Price.  I just -- it continued to drop price.

1 Q.  Approximately, you know, what kind of price drop did you

2 see for Quadris?

3 A.  Well, you'll -- you see there, what was that, around $80

4 price drop on that particular --

5 Q.  And what kind of price drop did you see for Quilt Xcel?

6 A.  About $20 a gallon, so it was 115.93 and by the end of the

7 year it averaged out to $96.99.

8 Q.  And to whom were you reacting in lowering prices from 2014

9 to 2015?

10 A.  It was Willowood.

11 Q.  And, Mr. Fisher, has Syngenta been able to raise its

12 prices back up to the levels it was at in 2013 or 2014?

13 A.  No, they're lower than that now.

14          MR. SANTHANAM:  That's all I have for now, Your

15 Honor.

16          THE COURT:  All right.  Questions for Willowood.

17                    CROSS-EXAMINATION

18 BY MR. TILLER:

19 Q.  Yes.  Good afternoon, Mr. Fisher.

20 A.  Hello.

21 Q.  You are -- you are the product lead for azoxystrobin

22 propiconazole and one other fungicide, right?

23 A.  Cyproconazole.

24 Q.  And, as I understand it, your -- I'll call him your

25 boss -- is that a fair, your boss --

```
 1   A.   Well, who?
 2   Q.   Not Jeff Cecil, the one in between.
 3   A.   Oh, yes, okay.  That'd be my boss.
 4   Q.   The one in between you and Mr. Cecil?
 5   A.   Okay.
 6   Q.   Is the head of insecticides and fungicides?
 7   A.   Yes.
 8   Q.   Okay.  So herbicides have their own manager or leader,
 9   correct?
10   A.   Yeah.  He sits in the office right down from my boss.
11   Q.   Okay.  So the fungicide and insecticide manager sits next
12   to the herbicide manager?
13   A.   Uh-huh.
14   Q.   Okay.
15            THE COURT:  If you could just say yes or no.
16            THE WITNESS:  Yes, I'm sorry.  Yes.  I tried to get
17   this right in the deposition, too.
18            MR. TILLER:  We did have that same issue.
19            Bonnie, if I could get you to bring up Plaintiff
20   Demonstrative 8, I'll just go ahead and use that.
21   BY MR. TILLER:
22   Q.   You're familiar with the Syngenta azoxystrobin brand
23   ladder?
24   A.   Yes.
25   Q.   Quadris Top, Quadris Top SB and Quadris Top SBX what are
```

1  the active ingredients in that -- in those products?

2  A.    So it's -- those are azoxystrobin plus difenoconazole.

3  Q.    Okay.  And Willowood does not sell a product that has

4  azoxystrobin and difenoconazole, does it?

5  A.    No.

6  Q.    Okay.  Looking at Quilt Xcel plus Endigo.

7  A.    Yes.

8  Q.    The -- I guess the combination brand.

9  A.    Yes.

10 Q.    What is Endigo?

11 A.    Endigo is an insecticide.

12 Q.    Okay.  And Willowood does not sell an

13 azoxystrobin -- well, Quilt Xcel is azoxystrobin and

14 propiconazole?

15 A.    Yeah, that would be -- yes, that's AzoxyProp Xtra, same,

16 yes.

17 Q.    Right.  But Willowood does not sell anything related -- or

18 anything that is equivalent of Endigo, does it?

19 A.    I don't --

20 Q.    In combination -- in combination like this?

21 A.    Well, what this is saying, you see that plus sign, it's

22 saying you can tank mix it.

23 Q.    Okay.

24 A.    So I don't know if -- I don't know all of Willowood's

25 insecticides.  I know they have some.

1  Q.   Okay.

2  A.   So they could take their AzoxyProp Xtra and some of their

3  insecticides and tank mix them together.  This is -- what

4  I -- you know, the reason this is on here, if you want me to

5  get into it.

6  Q.   No.  I don't think we need to.

7  A.   Oh, okay.  Okay.

8  Q.   I don't want to slow things down.

9  A.   Okay.

10  Q.   The top ladder, or rail, those are products, azoxystrobin

11  plus Solatenol, right?

12  A.   Yes.

13  Q.   And Solatenol is a patented active ingredient that

14  Syngenta sells, correct?

15  A.   Yes.

16  Q.   And so these are mixtures between azoxystrobin and

17  Solatenol of which Solatenol is a patented product, correct?

18  A.   Yes.

19  Q.   Willowood does not sell anything that has Solatenol in it?

20  A.   That's correct.

21  Q.   Okay.  These -- now Aframe and Aframe Plus, what you call

22  the fighting brands, that does not come with any type of

23  service that Syngenta provides to the farmer or to the grower

24  when they purchase that, correct?

25  A.   Correct.

1  Q.    Okay.  When a grower purchases further up the brand

2  ladder, they do get some services, correct?

3  A.    Yes.

4  Q.    Okay.  You talked about the LPs?

5  A.    Yes.

6  Q.    Actually before we talk about the LPs, let me ask you, you

7  said that you participated -- as the product lead you

8  participate in not only the azoxystrobin budgeting process but

9  also the mesotrione budgeting process, correct?

10 A.    Yes.

11 Q.    Now, while the same process takes place, does the two

12 groups or the groups analyzing azoxystrobin, and when they're

13 analyzing mesotrione, do they look at the exact same data?

14 A.    A lot of the -- a lot of similar data.

15 Q.    Like what?

16 A.    Well, corn acres.  They will look at corn price.  We'll

17 look at competitors, so competitors in the marketplace.

18 Q.    The competitors for mesotrione and the competitors for

19 azoxystrobin are different, correct?

20 A.    The -- no.

21 Q.    They're not?

22 A.    No.  If you think about it, we're looking at competitors

23 from generic standpoint, generic companies.  You're looking at

24 branded companies that are competitors, so Monsanto, BSF.

25 We're looking at seed, the programs that they have out there.

1    Sometimes it's tied in together, all -- there's all the --

2    Q.    But the --

3    A.    -- different kinds of things.

4    Q.    I'm sorry.

5    A.    Okay.

6    Q.    The products that those competitors sell, they're

7    different products that compete with each of azoxystrobin and

8    mesotrione, right?

9    A.    The products --

10   Q.    Herbicides compete against herbicides; fungicides compete

11   against fungicide, right?

12   A.    Yes, unless there's a bundled discount --

13   Q.    Understood.

14   A.    -- and then they kind of roll into together.

15   Q.    Okay.  And what they treat are different, correct?

16   A.    The crops are the same a lot of times; but, yes, one --

17   herbicide is used for obviously weeds, grass, broad leaves, and

18   the fungicides are used for disease and obviously the crop

19   enhancement or plant performance I was talking about earlier.

20           A lot of times the way they get bought or purchased

21   from a farmer will come back to what's the yield response, so

22   what's the return on investment.  So if I'm going to buy this

23   herbicide, what -- how much yield can I -- can the data prove

24   to me; and if I'm going to buy this fungicide, how much yield

25   can I expect.

1  Q.   And the data that goes into that yield analysis is

2  different depending on the two products, correct?

3  A.   Well, you'll have yields -- you'll have yield results from

4  a certain -- yeah, this brand, and you'll have yield responses

5  from this brand.

6  Q.   And you'll have yield responses from this active

7  ingredient and yield responses from that active ingredient?

8  A.   Yes.

9  Q.   Okay.  The herbicide market generally is much larger than

10  the fungicide market, correct?

11  A.   The entire herbicide market?

12  Q.   Yes.

13  A.   Yes.

14  Q.   Okay.  And that is because weeds are more prevalent than

15  diseases.

16  A.   That would depend on the crop, but ultimately -- here's

17  the real reason:  The herbicides are often 35 to $45 an acre,

18  and our fungicides are $15 an acre, so that just right there

19  makes a big difference in the market size.

20  Q.   So you're saying it's actually based on volume or based on

21  price?

22  A.   Well, what the farmers spend per acres, yes.

23  Q.   Okay.  We'll look at some of those analyses in a minute.

24  Are you aware -- in 2014, the LPs, the LP in January was

25  reduced from the budget in -- the 2014 budget was prepared in

1  October of 2013, correct?  That's typical?

2  A.    Yes.

3  Q.    Okay.  The 2014 LP, the top line sales revenue number was

4  lowered from the budget, you're aware of that, in January?

5  A.    Yes.

6  Q.    Okay.  It was lowered pretty significantly, by several

7  million dollars?

8  A.    Which brand?

9  Q.    I'm talking about azoxystrobin in general.

10  A.    Oh, total?

11  Q.    I'm sorry, yes.  My fault.

12  A.    I need to go --

13  Q.    Azoxystrobin generally.  Sorry.

14        THE COURT:  What's your question?

15  BY MR. TILLER:

16  Q.    You are aware that the January LP for azoxystrobin was

17  reduced, the top revenue number, was reduced by several million

18  dollars as compared to the budget which was prepared in

19  October?

20  A.    I don't -- I don't recall it right now sitting here.  I

21  need -- I mean, do you have it?

22  Q.    You're not aware that it was reduced?

23  A.    Do you have it?

24  Q.    I do, but I'm trying to kind of keep things moving.

25  A.    Oh.  I --

1 Q.   Do you know what factors went into account to prepare the

2 January 2014 LP?

3 A.   Well, it would have been the CUs looking at the overall --

4 Q.   What Willowood factors --

5         THE COURT:  Okay.  Stop.  All right.  Now, you let

6 him finish his answer before you start asking another question,

7 and you let him finish his question before you start answering.

8 Okay.  It's gotten a little out of control.  Now, start over

9 again with your question.

10         MR. TILLER:  We're both guilty of it.  I apologize.

11         THE COURT:  Yes.

12 BY MR. TILLER:

13 Q.   What factors with regard to Willowood went into the

14 January 2014 LP?

15 A.   The factors for the January forecast would have -- from

16 Willowood, they would have seen -- we would have seen the EPA

17 submission.  We would have also had market intelligence from

18 customers saying that Willowood has -- was going to have

19 product and be in the market.  The best I can remember at that

20 point, they were saying actually even as early as April or May.

21 Q.   What specifically did you hear about Willowood in

22 January 2014?

23 A.   That they were stockpiling product in Washington, and

24 procurement managers at some of these very large distributors

25 were saying, hey, we have -- Willowood is going to have product

1  and be in the market, they've already told us.

2  Q.   As it turned out, you know that Willowood was not

3  stockpiling inventory in Washington, correct?

4  A.   I do not know that.

5  Q.   Okay.  What different did you hear in February as opposed

6  to January with regard to Willowood and its potential sales of

7  azoxystrobin?

8  A.   Of which year?

9  Q.   2014.

10 A.   Okay.  I mean, I wouldn't -- the forecast?  I mean, I

11 wouldn't have been involved as far as the forecast as to CUs.

12 I'm involved -- they were coming forward.  They're telling me

13 the market intelligence.  They're saying customers are nervous

14 and they're looking at that and putting that into context as

15 they're putting their forecast in.

16 Q.   Fair enough.  So if I asked you for each month, you

17 wouldn't know what different intel you were hearing about

18 Willowood in each of the first six months of the year of 2014?

19 A.   I mean, it was all back to, again, the market intelligence

20 around the customer visits.  When I was going to these

21 distributors, that would be what I have.

22 Q.   Okay.  But can you recall anything specifically right now?

23 A.   They said challenge me on volume.  We can get as much --

24 Q.   "They" said, who's that?

25 A.   Willowood -- distributors were telling me Willowood had

```
 1  said we can get as much volume as you need.  You can challenge
 2  us on volume and so forth.  So that was the kind of things that
 3  I was getting from these distributors.
 4  Q.   Did you hear that in January 2014?
 5  A.   I was hearing -- it started in that December-January time
 6  frame from the market intelligence.
 7  Q.   Did you hear anything different in February of 2014?
 8  A.   It was just a continual discussion.
 9  Q.   Now, let's take a look at Defendant's 111.
10            MR. TILLER:  May I show it?
11            THE COURT:  You may.
12            MR. TILLER:  Move for admission Defendant's 111,
13  please.
14            MR. SANTHANAM:  No objection, Your Honor.
15            THE COURT:  It will be admitted.
16            MR. TILLER:  Thank you.
17  BY MR. TILLER:
18  Q.   Mr. Fisher, I would like -- this is a series of three
19  e-mails, and as is often the case, they go from the top up.  So
20  I would like to go to the first one in --
21            THE COURT:  The top up?
22            MR. TILLER:  The bottom up.
23            THE COURT:  I thought the laws of physics had
24  changed.  Go ahead.
25
```

1  BY MR. TILLER:

2  Q.    The bottom up.  So I would like to go to the one in

3  chronological sequence, which is at the bottom.  Do you have

4  that?

5  A.    Yes.

6  Q.    Okay.  So looking at the one at the bottom, that's an

7  e-mail from you to Mr. Lackey, dated August 20th, 2014.  Do you

8  see that?

9  A.    Yes, I do.

10 Q.    Who is Mr. Lackey?

11 A.    Mr. Lackey at this time was a customer marketing manager

12 in California.

13 Q.    Okay.

14 A.    Managing the western CU, that CU that I mentioned earlier.

15 Q.    And do you see where you are asking him, "I am trying to

16 assess the damages from Willowood entry to our business this

17 year.  Can you resend me the MOT case that was approved as well

18 as any comment on any lost sales or further value decline from

19 Willowood being in the market this year?"

20 A.    Yes.

21 Q.    First of all, what is the MOT case?

22 A.    The MOT case would have been -- at this time we had --

23 before you went to a CSC with a request for more discount or a

24 price decrease from a customer marketing manager, it had to go

25 through MOT approval, and that was done on a Thursday -- I

1  think it was the Thursday before -- CSC is on Monday, the

2  managers, and it had to go before all the customer marketing

3  managers and all the different CUs on Thursday before you can

4  -- and get approved there.

5  Q.   And this is multiple CU managers discussing the issue?

6  A.   Correct.

7  Q.   And the C -- the CU managers are the ones that are head of

8  each of the -- I think at this point it was five geographical

9  areas that Syngenta broke down into?

10  A.   So there's a CU head.

11  Q.   Okay.

12  A.   He's the head that sits on actually the CSC Management

13  Group, and then there's the customer marketing manager, who

14  would report to that CU head.

15  Q.   And the MOT is the meeting of those customer marketing

16  managers?

17  A.   Yes.

18  Q.   Okay.  In response to your e-mail, it looks like about an

19  hour later, Mr. Lackey sends you an e-mail.  Do you see that?

20  A.   Yes.

21  Q.   Let's go through the main paragraph of that e-mail.  If

22  you could highlight that, Bonnie.

23         Do you see -- do you have that there, Mr. Fisher?

24  A.   Yes.

25  Q.   Mr. Lackey says, Attached is the business case -- would

1  you agree with me -- or biz case, would you -- do you agree

2  that that's business case?

3  A.    Yes, sir.

4  Q.    "Attached is the biz case approved by the MOT along with

5  the populated financial template."  So he's reporting on

6  basically what came out of the MOT committee, correct?

7  A.    What he submitted for his CU to the MOT committee.

8  Q.    Okay.  And he says, "No further value decline in the

9  market.  This season they offered it," talking about Quadris --

10  "This season they offered it at 225 gallons."  Do you see that?

11  A.    Yes.

12  Q.    He then says, In spite of this, Helena was able to sell at

13  235 and WECO -- what does WECO stand for?

14  A.    It's Wilbur-Ellis Company.

15  Q.    -- at 245 --

16  A.    Yes.

17  Q.    -- very good outcome while acreage was down 27 percent.

18           What would the fact that acreage would be down have

19  to do with potential sales?

20  A.    In this CU, it's -- Quadris is sold just on rice, which

21  only has about 700,000 acres or so total, and so it's a very

22  small portion of our total business.

23  Q.    Okay.  Mr. Lackey says, "We grew share because our price

24  move eliminated their broker market."

25           So what does that refer to?

1  A.    So my understanding of this would be, you know, a sideways

2  movement of product; old product that was in the market had

3  maybe cheaper prices.  After he made his price move here, he

4  was probably at the same price as the older product that was

5  flowing from people's inventories, et cetera.

6  Q.    What does the broker market have to do with it?

7  A.    Well, the broker market -- often, if a grower has leftover

8  product and it's old, they may sell it to a -- we call them

9  brokers.  It's kind of an internet supplier.  Amazon or

10 Wal-Mart.com, you can go there and find stuff like that.

11         You know, the other day I was shopping for cologne,

12 and at Macy's, it was --

13         THE COURT:  Okay.

14 BY MR. TILLER:

15 Q.    I think we've got it.

16 A.    I'm sorry.

17         THE COURT:  That's all right.  Go ahead.

18         THE WITNESS:  It depends on how old it is and all

19 that is my point.

20 BY MR. TILLER:

21 Q.    Mr. Lackey further says, "We believe Willowood ended up

22 selling less than 3,000 gallons."  Do you see that?

23 A.    Yes.

24 Q.    And this was for the late-season rice market, correct?

25 A.    This would have been, yeah, for the rice market in

1  California.

2  Q.   Right.  And the rice market in California tends to have a

3  later season, correct?

4  A.   Yeah, I'm not real sure when that -- it's such a small

5  portion, I don't even know.

6  Q.   Okay.  Then at the end of this, the last sentence says,

7  last sentence, "Generics did end up netting to 165 a gallon."

8  So is there an implication there that there was more than one

9  generic in the late-season rice market?

10  A.   Yeah, he has an S behind it, so -- but --

11  Q.   Are you aware of who any other generics that were selling

12  in this market were?

13  A.   You could -- this rice market, yeah, it could have been

14  some of that Equation from Cheminova or Azoxystrobin 2SC.  It

15  could have been that.  It doesn't say.  I'm just guessing.

16  Q.   Okay.  He said, "Generics did end up netting the 165 a

17  gallon but essentially got no play."  Do you see that?

18  A.   Yes.

19  Q.   Are you aware of any sales by -- strike that.  This e-mail

20  is sent August 21, 2014.  So the growing season for corn is

21  done, correct?

22  A.   No.  You still have some applications in corn going August

23  the 21st.  You don't have any corn in this CU.

24  Q.   Understood.  When you were asking -- your counsel was

25  asking you a question -- or Syngenta's counsel was asking you

1  question, he asked you whether, for example, you would be

2  spraying azoxystrobin today --

3  A.    Right.

4  Q.    -- was the question, on September 7th?

5  A.    Right.

6  Q.    So you believe that there might be potentially some

7  application between August 21st and September 7th in a typical

8  year?

9  A.    Well, I think by August the 21st, you can still have some

10  applications.  It's starting to tail off, but you can have some

11  applications.  I know we had some sales this year at the end of

12  August, but by September, it's pretty well all -- the stages of

13  the crop, it's getting too late.

14  Q.    Are you aware of -- strike that.  Let me ask you a

15  different way.

16        You're not aware of any sales to the corn market by

17  Willowood in the 2014 growing season before September of 2014,

18  are you?

19  A.    Well, I'm aware of retailers, you know, reacting to

20  growers buying, you know, Willowood product in the Midwest.

21  Q.    But you're not -- do you have any intelligence that tells

22  you that Willowood sold any azoxystrobin product to the corn

23  market in 2014 -- in the 2014 growing season?

24  A.    I'm aware they sold to distributors that cover corn,

25  soybeans, wheat, the entire market.

1  Q.   Okay.  Let's take a look at DX-21.  This has already been

2  admitted.

3              THE COURT:  All right.  Defendant's 21 did you say?

4              MR. TILLER:  Defendant's 21.

5              THE WITNESS:  Oh, my gosh.

6  BY MR. TILLER:

7  Q.   I realize it is large, but we only need to look at the

8  first page -- well, it's actually the second page, the

9  spreadsheet.

10             Do you have the spreadsheet that at the top is

11  labeled "2011 to 2015 Year-to-Date Azoxystrobin Non-Premix

12  Imports Through February 2016"?

13  A.   Yes.

14  Q.   Okay.  This is the shipping data -- I forget which

15  demonstrative that Mr. Santhanam wrote it on, but you get

16  markets -- Syngenta gets market intelligence with regards to

17  imports, correct?

18  A.   Correct.

19  Q.   And this is a spreadsheet that is tracking that market

20  intelligence, correct?

21  A.   Correct.

22  Q.   And you'll see at the top that the figures set forth are

23  in pounds of AI, correct?

24  A.   Correct.

25  Q.   And, in fact, in yellow, which I think is part of the

1  exhibit, it actually says sum of pounds AI again, correct?

2  A.   Correct.

3  Q.   So in 2014 -- because we were looking at some charts

4  earlier, but this is the actual data, correct?

5  A.   Yes.

6  Q.   Okay.  So in 2014, in June, Cheminova imported what looks

7  like about 33,000 pounds of azoxystrobin in June of that year,

8  correct?

9  A.   I can't say correct on that.  You see how, under

10  formulation, they don't say tech; it says Equation and Azaka?

11  Q.   Okay.

12  A.   That may mean that -- the way I read this is that would be

13  gallons of Equation and gallons of Azaka.

14  Q.   So despite the fact that the chart -- and this chart is

15  sent by the market intelligence research company that sent

16  it -- this is not a Syngenta-generated spreadsheet, is it?

17  A.   I'm not sure if the department summarizes this or if this

18  comes directly from them.

19  Q.   It's my understanding this comes from Sentinel.

20  A.   Okay.

21       MR. SANTHANAM:  Your Honor, I'm going object to

22  counsel testifying.

23       THE COURT:  Sustained.  Counsel can't testify.  So

24  the jury will disregard that.

25

```
 1   BY MR. TILLER:
 2   Q.   So despite the fact that it says "pounds of AI," you
 3   believe this might be gallons, correct?
 4   A.   Yes, because of the formulation where it says those brand
 5   names.  I mean, that's why I would say that.
 6   Q.   But you're not sure?
 7   A.   I'm not sure.
 8   Q.   If it is gallons, you would divide that number by 2.08 to
 9   get to the pounds, correct?
10   A.   If -- you would -- no.  So if those are gallons, yeah, you
11   would divide by 2.08.
12   Q.   Yeah.
13   A.   I think that's right.
14   Q.   Yes.  Azoxy 2SC has 2.08 pounds per gallon, correct?
15   A.   Yes.
16   Q.   So if that was, in fact, the case, this 33,000 gallons
17   would still equate to some 15- to 16,000 pounds, correct?
18   A.   Correct.
19   Q.   Okay.  I've got it backwards.  It's multiply.
20   A.   Yeah, that's where I was at, too.  I was surprised --
21   Q.   You and I have --
22            THE COURT:  Okay.  What's your question?
23   BY MR. TILLER:
24   Q.   Anyway, the fact is Cheminova imported first, correct?
25   A.   Yes.  In what year?
```

1  Q.    2014?

2  A.    Yes.   In '14, they brought in first in June, yes.

3  Q.    So in July, Willowood imported 42,000 pounds, correct?

4  A.    In July, yes, 42,000 pounds and then another almost

5  88,000 pounds in December.

6  Q.    And the poundage that -- to go back to Cheminova, they

7  imported 33,000 gallons, which we've now figured out, between

8  you and me, translates to actually about 66- or 67,000 pounds,

9  right?

10  A.    Right.

11          MR. SANTHANAM:   Objection, foundation.

12          THE COURT:   Overruled.

13  BY MR. TILLER:

14  Q.    And then Cheminova imported -- so strike that.   In the

15  June/July time frame, so for the summer of 2014, Cheminova

16  imported more azoxystrobin than Willowood?

17  A.    On which month?

18  Q.    In June and July together, Cheminova imported more

19  azoxystrobin than Willowood?

20  A.    If -- assuming that those are gallons, it would be yes.

21  Q.    Yes.   Okay.   And then in December, Cheminova imported

22  another 20,800 gallons?

23  A.    Yes.

24  Q.    Which would equate to roughly 41,000 pounds, correct?

25  A.    Yes.

1  Q.    Okay.  And Willowood imported 87, almost 88,000 pounds,

2  correct?

3  A.    Yes.

4  Q.    Okay.  Let's look at 2015, please.  So looking at 2015 for

5  the year, Cheminova imported 61,000 gallons, correct?

6  A.    Yes.

7  Q.    Okay.  And, again, you say that because it's in Equation,

8  which --

9  A.    Yeah, I'm assuming, because it says Equation there, that

10  it means that if it is in pounds AI, we'd have to do a

11  different math calculation.

12  Q.    Right.  And that 61,000 gallons would equate to roughly

13  122, 123 pounds, correct -- 123,000 pounds?

14  A.    The -- which month?

15  Q.    Cheminova for the whole year, I'm sorry, 2015.

16  A.    Sixty -- yeah, somewhere in the 120,000 pounds.

17  Q.    Okay.  And that same year, Willowood imported 138,000

18  pounds?

19  A.    Pounds, yes.

20  Q.    Okay.  Thank you.

21  A.    And then we want to talk -- okay.

22  Q.    And then on -- well, actually, let me ask you that one

23  question.  Albaugh imported 78,000 pounds that year, correct?

24  A.    What --

25  Q.    2015.

1  A.    It's hard to keep track.

2  Q.    It is up on the sheet in front of you.

3  A.    I'm trying.  Yeah, 78,000.

4  Q.    78,000?

5  A.    Yeah, and then the next year --

6            THE COURT:  Okay.  Hold on.  Just answer his

7  questions.

8  BY MR. TILLER:

9  Q.    I'm focusing on 14 and 15.

10  A.    I can see.

11  Q.    So between Albaugh at 78,000, Cheminova at about 123,000,

12  that was more than what Willowood imported in 2015, correct?

13  A.    If you added both of those together.

14  Q.    Yes.

15  A.    Yes.

16  Q.    And by 2015, Albaugh had corn on its label, correct?

17  A.    They did, yeah.  2015.

18  Q.    Yeah, and they always had -- in fact, Albaugh always had

19  corn on its label, right?

20  A.    Albaugh always had corn on their label.  It's just market

21  intelligence was just all around seed treatment and lawn and

22  garden use.

23  Q.    And Cheminova by 2015 had corn on its label, correct?

24  A.    Yes.  They now only had a straight product.  They didn't

25  have any mixtures.

1  Q.   And that's what Equation is, isn't it?

2  A.   It's a straight product.

3  Q.   Right.

4  A.   Azaka is, too.

5  Q.   Could we look at Plaintiff's 235.  This is in your book,

6  sir.  I'm sorry.

7  A.   Okay.

8  Q.   I think it's already been admitted.  Do you have 235, sir?

9  Or we can put it on the screen for you if that's easier.

10  A.   I was just looking at the screen.

11  Q.   Okay.  Just a very quick question.  Down in the lower

12  right-hand corner, there's a chart that talks about

13  azoxystrobin -- well, is that talking about azoxystrobin?

14  A.   Yes, it is azoxystrobin mixtures.

15  Q.   Right.  So this is identifying the prices for each of the

16  relevant products that are identified here, correct?

17  A.   Correct.

18  Q.   AzoxyStar is an Albaugh product, correct?

19  A.   Yes.

20  Q.   So in this document, which is dated February 8, 2016,

21  Syngenta is tracking what Albaugh is doing?

22  A.   Well, we're trying to track everybody on price points.

23  Q.   Understood.

24  A.   You can see the arrows represent the high and the low of

25  each of the prices.

```
 1   Q.    Yup.
 2   A.    So that's -- you know, you can see that as well, and you
 3   see the average.
 4   Q.    Yup.
 5              MR. TILLER:  Could I get Defendant's 107, please?
 6   Move for admission of Defendant's 107.
 7              MR. SANTHANAM:  No objection, Your Honor.
 8              THE COURT:  It will be admitted.
 9   BY MR. TILLER:
10   Q.    What is this document, sir?
11   A.    This looks to be the -- what I would call product
12   marketing plan or brand plan.
13   Q.    And this was done by you, correct?
14   A.    Correct.
15   Q.    And this was -- you had mentioned the brand plans earlier
16   when you were testifying.  This is what's involved -- this is
17   part of the budgeting process?
18   A.    It's -- yeah, this is the five-year strategy.
19   Q.    And that's done pretty early on as one of the major
20   factors that goes into this year-plus process?
21   A.    It's one of the early, early steps.  It's the first step,
22   if you will.
23   Q.    So let's take a look at 283528.  You know what I'm
24   referring to when I say those numbers, Mr. Fisher?
25   A.    Yes, I'm trying to find it now.
```

1  Q.   Or you can look at it up on the screen.  Do you have it,

2  sir?

3  A.   Yes.

4  Q.   This is -- you've titled this Azoxystrobin US Product

5  Marketing Plan DNA Market Size.

6  A.   Yes.

7  Q.   What do you mean by DNA market size?

8  A.   It is kind of what we think the market -- things that

9  could impact the market, not necessarily -- it's just

10 assumptions, if you will, of what could impact the market.

11 Q.   Under grower profitability --

12          THE COURT:  Grower what?

13          MR. TILLER:  Profitability on the upper left.

14 BY MR. TILLER:

15 Q.   "The baseline assumption is that farm income is stressed

16 near breakeven for growers with land rent through 2017."  Do

17 you see that?

18 A.   Yes.

19 Q.   And that is being tracked because the income that a farm

20 is making may have some effect on how much fungicide or how

21 much azoxystrobin is purchased, correct?

22 A.   Yeah.  When you think about farm income, the cheapest

23 inputs they have are fungicides, herbicides, insecticides.  So

24 if your farm income is compressed, they don't buy new John

25 Deere tractors.  Those are expensive.  You know, they

1  won't -- they may buy cheaper seed.  They may buy cheaper

2  products.  But, you know, one thing important here is they're

3  going to look at that return on investment.  Does this help our

4  market in fungicides?  No.  Or herbicides.  But what I would

5  say, they're going to look and say, okay, if I've been getting

6  14 bushels more corn every time I use Quilt Xcel, and even at

7  $4.00 that's a three-to-one return on investment, and that's

8  where the market becomes a lot more stable, if you will, and

9  less elastic.

10 Q.    Mr. Fisher, you say right here, "Fungicides are the last

11 dollar spent."

12 A.    Yeah, they are, that and insecticides.

13 Q.    And you put that in there because that was a concern that

14 that could have a downward effect on the market for

15 azoxystrobin in a time when farm income is being stressed,

16 correct?

17 A.    That's one factor.

18 Q.    Okay.  You're right.  That is one factor.

19 A.    There's a bunch --

20 Q.    There's also another factor here, that fungicides -- and,

21 again, we're speaking specifically of azoxystrobin -- is only

22 used in disease epidemic in low commodity price.  Do you see

23 that?

24 A.    Yeah.  In particular, that -- not on all crops --

25          THE COURT:  Okay.  Wait for his question.

1    THE WITNESS:  Oh, I thought that was his question.

2  BY MR. TILLER:

3  Q.   And commodity prices were low in 2015 and, in fact, have

4  remained low since that time, correct?

5  A.   They are not at $7 where they were, but I've always -- you

6  know, you think about $10 soybeans.  I've always said

7  double-digit bean prices?  Fungicide is a no-brainer.  Same

8  with $4 corn.  So does it have an impact?  Yeah.  And it says

9  rights here, only used, you know, in disease epidemic in low

10  commodity price.  I'm not really saying -- you've got to

11  challenge whether those are low or not.  I mean, corn price can

12  get down to $3.

13  Q.   Right.  The prices are continuing to go down, aren't they?

14  A.   I haven't looked recently.  There's spikes.  You know,

15  there's opportunities to sell your crop all throughout the

16  year.  You could have plenty of opportunities for $4 corn this

17  year or even 4.50 corn.

18  Q.   In 2013, the price was as high as $7 a bushel, correct?

19  A.   There probably was a point where they could have locked

20  that in.

21  Q.   And in 2014, the prices went down pretty dramatically,

22  correct?

23  A.   I would need to go back and look.  I know they did go down

24  eventually.  I don't know exactly when they dropped.

25  Q.   Under "Land availability," you'll see the implications on

1  the product plan that high rent stress -- high rent stresses --

2  I think that is high rent stresses farm ROI.  Do you see that?

3  A.    Yes.

4  Q.    And that is with high rent costs for land, that makes the

5  return on investment for the farmer lower, correct?

6  A.    Yeah.  When -- if -- like I said earlier, those John Deere

7  tractors and farm ground rent costs, there's a lot of factors.

8  Q.    This document is not talking about whether farmers are

9  buying John Deere tractors, is it?

10  A.    Well, no, this is talking about rent.

11  Q.    This is talking about azoxystrobin's plan, correct?

12  A.    It's talking about things that have impact on the farm's

13  DNA, the economics of that farm, and that could impact, yeah,

14  fungicides.  Do you know which -- do you know when this was

15  produced, sir?

16          THE COURT:  Okay.  Well, he doesn't get to testify.

17          THE WITNESS:  I just notice that it's not the final

18  version.  So I didn't know if these had been through our brand

19  plan session and been cross-examined.  I was just trying to

20  figure out when this was.

21          THE COURT:  Okay.  Well, just answer his questions.

22          THE WITNESS:  Okay.  Yes.  Yes, Your Honor.

23  BY MR. TILLER:

24  Q.    Under "High Rent Stress Farm ROI," the next point you make

25  is that that could decrease inputs.  Inputs are the amount of

1  things, and in this case, fungicide, that the farmer is buying,

2  correct?

3  A.    It says, "Decrease inputs."

4  Q.    And this is talking about azoxystrobin.  So I presume

5  you're talking about the input of azoxystrobin.

6  A.    It can decrease fungicides, herbicides, seed.

7  Q.    This document's not talking about herbicides or seeds,

8  though, correct?

9  A.    This is around land availability and implications on the

10  product plan.  So, yeah, this would be decrease on inputs

11  overall and with -- yeah, azoxystrobin would be one of those.

12  Q.    Let's go to 283533.  And, again, we're going to have it on

13  the screen for you, sir.  This is another view of the brand

14  ladder on left-hand side under brands.  Do you see that?

15  A.    Yes.

16  Q.    And under -- in the fourth column -- and this is for 2015.

17  Under the fourth column, you've identified the key competitors

18  for each brand, correct?

19  A.    Yes.

20  Q.    And, the key competitors for Trivapro are Priaxor,

21  Priaxor D, and Luna.  Those are sold by BASF?

22  A.    No.  Two of them are sold by BASF; Luna is sold by Bayer.

23  Q.    Okay.  And looking at Quadris Top SB and Quilt Xcel, the

24  key competitors are here, none of those are sold by Willowood,

25  are they?

1  A.    No.

2  Q.    And looking at Quilt and Quadris, the key competitors are

3  two products that are not sold by Willowood, correct?

4  A.    In this, yes.

5  Q.    And under Aframe and Aframe Plus, the key competitors are

6  a product sold by Willowood, which is Azoxy 2SC, correct?

7  A.    Yes.

8  Q.    And Azaka and Equation are sold by Cheminova?

9  A.    Yes.

10 Q.    And what's Affiance?

11 A.    Affiance would be gallons, and that's actually our

12 product.

13 Q.    Okay.

14 A.    You want to know how I used this slide?

15 Q.    And then let's look at 283552.

16 A.    Three?

17 Q.    283552.  Do you have that page, sir?

18 A.    Yes.

19 Q.    Okay.  That is the Quadris Asset Marketing Plan

20 Positioning page.  Do you agree with that?

21 A.    Yes.

22 Q.    So under Quadris's competitor products, you've identified

23 first, "Untreated acre is the biggest competitor," correct?

24 A.    Yes.  Now, it's important to know when this was created,

25 because these are the original product message maps that were

1  done when these products were launched, so that would have been

2  12 years ago for Quadris or so.

3  Q.    You're putting it in a document that's identifying the

4  2015 to 2019 Asset US Product Marketing Plan.  It was used for

5  budgeting, correct?

6  A.    This is for the ad agency on what they say about the

7  brands when they're building advertisements --

8  Q.    So, presumably, it's accurate?

9  A.    When they're building advertisements.

10 Q.    It's accurate, right?

11 A.    No, this is not accurate.

12 Q.    That's not accurate, okay.

13 A.    Because -- I'll give you the first example.  You see the

14 "Quadris X Factor"?

15 Q.    Mr. Fisher, I'm really trying to get this done before the

16 break.

17        THE COURT:  Just listen to his questions and answer

18 his questions.

19        THE WITNESS:  Okay.

20 BY MR. TILLER:

21 Q.    Competitor products, we've already looked at that.  Let's

22 look at 283554.  And, again, this is the "Quilt Xcel Asset

23 Marketing Plan," and once again under competitor products it

24 has listed that "untreated acres is the biggest competitor,"

25 correct?

1  A.    It is listed that way, yes.

2  Q.    And let's look at 283570.  Do you have that page, sir?

3  A.    Yes.

4  Q.    At the top under the -- let's highlight the bullets,

5  please.  This bullet, do you see where it says "Corn price

6  decrease of 4.50 to 3.50 results in 18 percent fungicide market

7  decline."  Do you see that?

8  A.    Yes, this was --

9  Q.    And do you see --

10         THE COURT:  Okay.  Just answer his question.

11         THE WITNESS:  Yes, I see that.

12 BY MR. TILLER:

13 Q.    Do you see where it says, "Soy price decrease of $12 to

14 $10 results in 18 percent fungicide market decline"?

15 A.    Yes, I see that.

16         MR. TILLER:  Judge, I have one other thing to do, but

17 I think this could be a good time.

18         THE COURT:  Nope, too early.

19         MR. TILLER:  Then I've got to raise an issue with you

20 offline.

21         THE COURT:  Okay.  Well, let's step over here.

22         (Bench conference as follows:)

23         MR. TILLER:  There was -- I said I would -- you said

24 I should come to you if there was a data compensation question

25 that may arise.

```
 1              THE COURT:  Yes.

 2              MR. TILLER:  In this contract, there was entered --

 3   Exhibit 227, there was talk about how Willowood made an offer

 4   to this company to CPS in Loveland.  There's an e-mail in here

 5   that I was going to show him that talks about how Willow --

 6   they could not buy from Willowood.  The reason they could not

 7   buy from Willowood is because Willowood had not paid Syngenta

 8   any data compensation.  So the inference that was raised was

 9   that it was the Willowood offer of sale at $38.50 that caused

10   the amendment to be repriced.  There was also an offer --

11              THE COURT:  Okay.

12              MR. TILLER:  There was also an offer from Albaugh at

13   $48.50.

14              THE COURT:  Okay.  Just a second.  So I don't

15   understand -- I mean, can't you just say -- why do you have to

16   get into the --

17              MR. TILLER:  That's why I just wanted to ask the

18   question.  There's an e-mail that I'm going to show him --

19              THE COURT:  Yes.

20              MR. TILLER:  -- where one of the Syngenta people says

21   they cannot buy from Willowood pursuant to this contract.  The

22   reason that they couldn't buy from Willowood pursuant to this

23   contract is because Willowood had not paid Syngenta in full or

24   data compensation.

25              MR. LEVINE:  Why does he have to ask the second
```

1  question?

2          THE COURT:  Why do you have to use the second part?

3          MR. TILLER:  I think it gives context to the e-mail.

4          THE COURT:  I don't see any reason for you to do

5  that.  You can certainly go in -- unless something happens.

6          (Bench conference concluded.)

7  BY MR. TILLER:

8  Q.   Mr. Fisher, there is, and I now need to find it, a

9  document in your folder -- document in your folder to make this

10 quicker, Plaintiff's 265.

11 A.   Okay.  That's in this folder?

12         THE COURT:  In the notebook.  Plaintiff's 265?

13         MR. TILLER:  Plaintiff's 265, yes.

14         THE COURT:  Go ahead.

15         MR. TILLER:  I move for its admission.

16         MR. SANTHANAM:  No objection, Your Honor.

17         THE COURT:  It will be admitted.

18 BY MR. TILLER:

19 Q.   This are some e-mails between Mr. Cecil and Mr. Langkamp

20 that were -- ultimately, you come into the e-mail chain pretty

21 late on the e-mail trail, correct?

22 A.   Yeah, well I'm down the food chain.

23 Q.   And let's just look at the first page of that.  And if you

24 need to take a second, but it looks like all the e-mails on

25 page 134642 and 134641 were all discussion about the amendment

1  to the Loveland millbase contract that you testified to

2  earlier, right?

3  A.    Yeah, looking for a clean copy of the agreement to sign.

4  Q.    Right.  And then in the e-mail dated November 18th, 2015,

5  at 1:13 p.m., from Mr. Langkamp -- who's Mr. Langkamp?

6  A.    They never --

7          THE COURT:  Okay.  Answer -- his question is --

8          MR. TILLER:  Do you know who Mr. Langkamp is?

9          THE WITNESS:  I'm still reading --

10          THE COURT:  Okay.  Well, if he needs another minute

11  to read before he can answer your questions, just read it to

12  yourself.

13          THE WITNESS:  Okay.  Mr. Langkamp?

14  BY MR. TILLER:

15  Q.    That's the question.

16  A.    He's head of our key account management group, yes.

17  Q.    Okay.  That's what I needed to know.  And, again, the

18  emails leading up were about signing this document, correct?

19  A.    That's what I was reading.  It hadn't -- there was still

20  negotiations --

21  Q.    Okay.  Go ahead.

22  A.    That's all I was saying.

23  Q.    Do you need to read it?

24  A.    No.  They haven't signed yet.

25  Q.    In the e-mail below, Mr. Cecil says, "This copy is dated

1  February 2015.  Still has some redlines in it.  I have asked
2  Ken B. to clean it up and bring it up-to-date.  Should have it
3  tomorrow.  Does that work?"  Do you see that?
4  A.    Yes, I do.
5  Q.    And then Mr. Langkamp responds:  "That's fine.  FYI,
6  Albaugh quoted CPS 48.50 per kilogram on azoxystrobin technical
7  for their VAP."  What is VAP?
8  A.    That's another acronym for value-added product.
9  Q.    Okay.  "Willowood quoted 38 kilograms, but per this
10 agreement they can't buy from them."  Do you see that?
11 A.    Yes.
12 Q.    So this amendment was responding to the Albaugh quotation
13 of $48.50 per kilogram, correct?
14 A.    Correct.
15 Q.    Okay.  And Loveland was buying this to make its own -- you
16 said its millbase.  So were they making their own product?
17 A.    Yes.  They make their own formulated product, and we
18 supply them that technical millbase, and, you know, you can get
19 48.50 from Albaugh, $38 from Willowood, and all they have to do
20 is, you know, break the agreement, and they can buy from
21 whomever.
22 Q.    But they couldn't buy from Willowood pursuant to whatever
23 Mr. Langkamp is referring to here, correct?
24 A.    That's what he's saying here.
25 Q.    Right.  So at least according to this, in November of --

1   November 2015, Albaugh was attempting to make sales to one of

2   your customers, correct?

3   A.    On tech.

4   Q.    On tech?

5   A.    Yes.

6          MR. TILLER:  Okay.  I have nothing further, Your

7   Honor.

8          THE COURT:  Any redirect?

9          MR. SANTHANAM:  Yes, Your Honor.

10                  REDIRECT EXAMINATION

11  BY MR. SANTHANAM:

12  Q.    Mr. Fisher, there was some questioning about Defendant's

13  Exhibit 21 with respect to imports.  Let me go back to that for

14  a second.  And in Defendant's Exhibit 21, if we go down to

15  2014, and if we can zoom in there, for the month of June from

16  Cheminova.  Now, do you see -- there was discussion there about

17  Cheminova selling -- there was Equation and Azaka.  Do you

18  remember the questions asked about that?

19  A.    Yes, I do.

20  Q.    And there was some questions about whether that was

21  gallons versus pounds, and I'd like to make sure we're all

22  clarified here.  There in June of 2014, it says, around 16,000,

23  whatever the unit is, for Equation and Azaka.  Do you see that?

24  A.    Yes.

25  Q.    If we scroll over -- actually, if we go down to Willowood,

1  on the next month it says 42,329.  Do you see that?

2  A.    Yes.

3  Q.    And if we could bring up Plaintiff's Trial Exhibit 213,

4  and if we can go to the second page and zoom into the chart on

5  the top right, it looks like you've done -- well, tells us what

6  kind of conversion you've done, Mr. Fisher, where it says

7  generic azoxystrobin import AZ 2.08 pound-gallon equivalent.

8  A.    Yeah.  So this is where it takes -- so it takes

9  2.08 pounds of active to make 1 gallon of Quadris or straight

10  azoxystrobin Quadris-type product.  And so what I've done here

11  is looked at all of the imports by month, put the calculation

12  against it, and looked and come up with how many gallons they

13  could produce because we don't use metrics here much.  So I'm

14  putting it into gallons so I know how many gallons I've got to

15  compete against in the market.

16  Q.    So you take the pounds of AI, and you divide it by 2.08,

17  is that right?

18  A.    Yes.

19  Q.    And here if you go to June of 2014, can you tell us

20  roughly about what we have here for Cheminova?

21  A.    It's about 15, 16,000 gallons.

22  Q.    And if you go to Willowood, what do we have for July of

23  '14?

24  A.    Roughly 18, 19,000 gallons.

25  Q.    If we could go back to Plaintiff's or Defendant's trial

```
 1  Exhibit 21, and we go to Cheminova with -- in June, does that
 2  help you understand whether we're talking about pounds?
 3  A.    Yeah.
 4  Q.    Can you explain?
 5  A.    Well, yes, because if you look, if you take 16,900 pounds
 6  plus the 16,640 pounds, add those together, and you divide that
 7  by 2.08, that's the math I'm using to get to that other
 8  documentation.
 9  Q.    So when we have 16,904 for Equation and 16,640 for Azaka,
10  you're not multiplying that by 2.08?
11  A.    No, it would have been -- this would have been pounds of
12  active ingredient.
13  Q.    And if we scroll over to December, can you tell us how
14  much Willowood imported in December in terms of pounds of AI,
15  that is, azoxystrobin technical?
16  A.    87,832.
17  Q.    And so for the month -- for the year of 2014, can you tell
18  us who you were responding to in terms of imports?
19  A.    It would be Willowood.  We had 130,171 pounds of AI here
20  total.
21  Q.    And looking ahead to 2015 and the December imports, who
22  were you responding to?
23  A.    It would have been the largest importer, which would have
24  been Willowood.
25  Q.    Now, I'd like to turn briefly to Plaintiff's Trial
```

 1   Exhibit -- excuse me -- yeah, Plaintiff's Trial Exhibit 107.

 2   David, if you can go to 283533.

 3          THE COURT:  Since we're having a little technical

 4   problem, we'll stop there for the break.  It's been an hour and

 5   a half, a little more.

 6          So, ladies and gentlemen, let me excuse you for your

 7   afternoon recess.  Please remember not to talk about the case

 8   among yourselves or with anyone else.  Don't have any contact

 9   with the lawyers, parties, or witnesses, and keep an open mind.

10   Come back in 15 minutes, so that's 3:35.

11          (At 3:19 p.m., jury excused.)

12          THE COURT:  About how long for your redirect?

13          MR. SANTHANAM:  About another ten minutes.

14          THE COURT:  All right.  And anything else we need to

15   take up before we take our break?  No.  15-minute recess.

16          (At 3:19 p.m., break taken.)

17          (At 3:35 p.m., break concluded.)

18          THE COURT:  Anything we need to take up before the

19   jury comes in?

20          MR. SANTHANAM:  No, Your Honor.

21          THE COURT:  All right.  You can bring the jury in.

22          (Jury panel is present.)

23          THE COURT:  I think we're ready to continue with the

24   redirect of Mr. Fisher, so you may proceed.

25          MR. SANTHANAM:  Thank you, Your Honor.

1    If we could pull up Defendant's Trial Exhibit 21

2  again.

3  BY MR. SANTHANAM:

4  Q.   This was the spreadsheet that we were looking at,

5  Mr. Fisher.  It's on the screen.

6  A.   Yes.

7  Q.   And, again, we were talking about imports from Cheminova

8  in June of 2014.  To your knowledge, was any of that -- any of

9  those products, were any of them labeled for corn at that time?

10 A.   In 20 -- no, they were not labeled for corn.

11 Q.   From your perspective as a brand manager and product lead,

12 were those products competing with Syngenta for corn?

13 A.   No, they were not.

14    MR. SANTHANAM:  I would like to now turn to

15 Defendant's Trial Exhibit 107.  If we could go to page 283533.

16 BY MR. SANTHANAM:

17 Q.   Mr. Fisher, you recall being asked questions about this

18 slide?

19 A.   Yes, I do.

20 Q.   And counsel for Willowood went through the list of

21 competitors.  I would like to ask you does this slide have any

22 relationship to the brand-ladder concept that you discussed

23 earlier?

24 A.   Yes.

25 Q.   Can you explain for us -- where it says Aframe and Aframe

1 Plus, those are fighting brands of Syngenta?

2 A.    Yes.

3 Q.    If fighting brands are introduced and prices are lower,

4 how does that impact, for example, products on the higher ones

5 like Trivapro, Quadris Top, and Quadris Xcel?

6 A.    Yeah.   And my own fighting brands will hurt the sales

7 branded, you know, up and down the ladder as well.   The other

8 thing is this is used with my sales reps to say -- you know, to

9 identify to them "When you're in this premium sector, Trivapro,

10 your key competitor will be the premium brands from other

11 companies."   So what I don't want them to do is take the

12 Trivapro price and try to react to Azoxy 2SC, with my premium

13 brand.   So that's really what I'm trying to -- that's how this

14 is supposed to be used and what it's meant to, to direct my

15 sales force.

16         And when you -- you know, does -- does the bottom row

17 affect the top row?   Yes, but that's just loss of --

18 opportunity loss of that acre, if you will.   I don't want the

19 sales force coming off of that $17 price point on a brand-new

20 product just to try to get competition with this.   This is when

21 they need to use the fighting brands.

22 Q.    When Aframe prices are dropped, what impact does that have

23 on your prices for Trivapro and Quadris Top?

24 A.    Well, it's all in relation.   So if the bottom gets too

25 cheap, then you've got to take the next middle and whittle the

1  top down to some extent because they're not going to pay

2  double, triple for it.  It's all got a value proposition to it

3  and that's just how it works.

4          MR. SANTHANAM:  Can we turn to page 283552?

5  BY MR. SANTHANAM:

6  Q.  Again, Mr. Fisher, you were asked questions about the box

7  on the top right labeled number 3, Competitor Products.  I

8  think you were beginning to explain what that is and what the

9  slide is.  Can you explain for us what it is?

10  A.  Yes.  These are competitor products, but back when Quadris

11  was first introduced, and so we're trying to build a fungicide

12  market up.  You'll even see down -- I don't update this.  This

13  is just the brand asset positioning messages.

14          So we'll meet with the ad agency and we'll go through

15  "What do you want the brand to do?  What are the competitors at

16  that time?"  Well, I don't go by -- this is one of my oldest

17  brands.  I'm not spending a whole lot of time updating.  I'm

18  not advertising as much.  You know, you're just not spending as

19  much time updating these slides.  So that's really it.

20  Q.  If you were to update it today, Mr. Fisher, what would be

21  there in the competitor box?

22  A.  Well, I would have updated -- if I had known -- you know,

23  I should have updated it to be Azoxy -- Quadris the main

24  competitor is Azoxy 2SC and you would have other generic, like

25  AzoxyProp Xtra.  You would have products -- you know, there

1  would be more products, Vortex.  Evito would be in here, things

2  like that.

3         MR. SANTHANAM:  Let's go to slide 570 -- page 570.

4  Excuse me.  Actually, it's -- if you could go to 553.  I

5  apologize.  One more.  554.  Third time is a charm.

6  BY MR. SANTHANAM:

7  Q.   There is a similar slide here, Mr. Fisher, relating to

8  Quilt Xcel.  Can you explain what this slide is about?

9  A.   This would be that original positioning that we put on

10  Quilt Xcel when we first brought it to market.  So it would

11  have been -- I don't know.  I was a sales rep.  Twelve, 15

12  years ago is when we would have come up with the majority of

13  this positioning?

14  Q.   If you were to update this, what would you put in the

15  competitor box in three -- Box 3?

16  A.   In 2015, you would have brought generic products in like

17  AzoxyProp Xtra.  You would have brought Priaxor in because even

18  the premium brands have an impact from -- competitors has an

19  impact on the middle of your brand ladder, too, because they

20  can pull those farmers up to use their premium products, but

21  that would have been some of the competitor product updates.

22  Q.   With respect to Quadris and Quilt Xcel, what was the

23  single largest factor driving your sales strategies and pricing

24  in 2014 and onward?

25  A.   2014 and onward it was Willowood and the Azoxy 2SC and

1 AzoxyProp Xtra, two brands in particular.

2          MR. SANTHANAM:  If we can go to Plaintiff's Trial

3 Exhibit 235.

4 BY MR. SANTHANAM:

5 Q.   You were asked some questions about this slide,

6 Mr. Fisher.  There was one bullet point I wanted to get your

7 input on.  If you can look at the top, there is a second bullet

8 and it says:  Generic imports tracking 87 percent of last year.

9 Willowood only importer.

10          Can you explain for us what you mean by that?

11 A.   Well, this was a summary of the import reports and from --

12 again, it showed it in the graph I went through earlier, but

13 from August to February of 2016, the -- 87 percent of last

14 year's total generic imports had been brought in already by

15 February and the only importer who had done it all was

16 Willowood.  They were the only one importing.

17          MR. SANTHANAM:  Can we go down to Plaintiff's Trial

18 Exhibit 265 and if we can zoom in on that middle paragraph at

19 the top.

20 BY MR. SANTHANAM:

21 Q.   You were asked some questions by Willowood's counsel about

22 what was the driving factor for the amendment -- second

23 amendment to the Loveland agreement, and I think you mentioned

24 that there were two price points offered.  What was Willowood's

25 price point, Mr. Fisher?

```
1  A.   Willowood's price point was -- it's in the -- actually
2  the --
3           MR. SANTHANAM:  If you can go down to the bottom,
4  FYI.
5  A.   It's down below.  So here you'll see Willowood's price was
6  $38 per kg was the quote that they had given CPS.
7  Q.   When you say "kg," what do you mean?
8  A.   I'm sorry.  Kilograms.
9  Q.   It was suggested that there was some sort of restriction
10 on purchasing from Willowood in the agreement with Loveland.
11 Do you recall that?
12 A.   Yes.  I can read that.
13 Q.   What -- in terms of customer dynamics and interactions
14 with customers, what impact does a lower price point from
15 Willowood at $38 per kilogram have on that customer
16 relationship as you are negotiating an amendment?
17 A.   Well, they are saying, obviously, "If they can get to $38
18 per kg, you should be able to get to $38 per kg, you know, and
19 that's the price that, you know, we think you should take a
20 look at."
21           So there is no -- in this agreement -- I've always
22 said there is no penalty for walking away, so an agreement
23 that's -- you are not penalized for leaving for the best offer,
24 you know, is a -- you know, is pretty -- it's like you're not
25 paying your car payment or something and you get to keep the
```

1   car.

2   Q.   We'll turn now to Plaintiff's Demonstrative Exhibit 22.

3   When the price went from $114.20 cents to $50.35 per kilogram,

4   Mr. Fisher, can you explain for us as precisely as possible,

5   based on your knowledge and recollection, who were you

6   responding to?

7   A.   We were responding to that $38 price point from Willowood.

8              MR. SANTHANAM:  No further questions, Your Honor.

9              THE COURT:  Anything else on the topics covered in

10  redirect?

11             MR. TILLER:  Just a couple, Your Honor.

12             Can we look at Defendant's 21, Bonnie?

13                       RECROSS-EXAMINATION

14  BY MR. TILLER:

15  Q.   We're going to look at that spreadsheet again, Mr. Fisher.

16  A.   Okay.

17  Q.   If we could look at the 2014 data.  Now, Mr. Fisher, when

18  we were looking at this data before and I asked you is

19  everything there in pounds --

20  A.   Yes.

21  Q.   -- you were pretty quick to say you didn't think the

22  Cheminova numbers were in pounds because in the second column

23  it refers to finished products, correct?

24  A.   It -- yeah, the names -- instead of tech, the name said

25  Equation and Azaka.

1  Q.   So that led you to believe that those were in gallons,

2  right?

3  A.   Yeah, it confused me to think they were in gallons.

4  Q.   So do you still think they are in gallons?

5  A.   No, I don't.  It had been a few years since I've --

6  Q.   Okay.  So you do think that everything there is in pounds?

7  A.   Yeah, because it says -- it did say some in pounds, and

8  then now I see how I had summarized it back when this data was

9  fresh and I was going through all of this process.

10 Q.   Okay.  And then very briefly looking at what was

11 Plaintiff's 265, this e-mail.  Had Willowood not offered at $38

12 per kilogram, Syngenta would have still been responding to

13 Albaugh's price at $48.50 per kilogram, correct?

14 A.   Yes.

15          MR. TILLER:  Thank you.  I have nothing else.

16          THE COURT:  Anything else?

17          MR. SANTHANAM:  Nothing from us, Your Honor.

18          THE COURT:  All right.  Thank you.  You can step

19 down.

20          (Witness excused at 3:47 p.m.)

21          THE COURT:  Okay.  You can call your next witness.

22          MR. SANTHANAM:  Your Honor, we call Dr. Rex Weichert.

23                     DR. REX WICHERT,

24       PLAINTIFF'S WITNESS, SWORN AT 3:48 P.M.

25                   DIRECT EXAMINATION

BY MR. SANTHANAM:

Q.   Dr. Wichert, would you please state your full name for the Court?

A.   My name is Rex Allen Wichert.

Q.   Who you do work for?

A.   I work for Syngenta.

Q.   How long have you been with Syngenta?

A.   I've been with Syngenta approximately 23 years.  That includes legacy companies.

Q.   What is your current role within Syngenta?

A.   Currently I'm customer marketing manager of our South and East Coast commercial unit.

Q.   We'll get into your responsibilities within the company, but I would like to talk about your educational background.  Do you have an undergraduate degree?

A.   I do.  I graduated from Oklahoma State University.

Q.   What was your degree in?

A.   I got a degree in agronomy.

Q.   In layman's terms, can you tell us what that is?

A.   Basically how to raise crops or husbandry crops.

Q.   Husbandry crops?

A.   Yes.

Q.   And do you have any graduate degrees?

A.   I do.  I got a master's and a Ph.D. from the University of Arkansas.

1  Q.    What was your -- what was the focus of your Ph.D.?

2  A.    Both degrees are in weed science, so I studied the

3  interaction of weeds on crop plants, also herbicides, their

4  impact on the environment and impact on crops.

5  Q.    Did you have a thesis or dissertation that you worked on

6  as part of your graduate work?

7  A.    I did.  From my dissertation I studied the impact of a

8  couple of products, chlorimuron, ALS inhibitors.  I did some

9  soil tests, looked at the impact of their degradation on

10 efficacy and the environment.

11 Q.    Dr. Wichert, just for the court reporter's benefit, I'm

12 going to ask you to slow down just a little bit with some of

13 the technical words.

14 A.    All right.

15 Q.    Again, I'll ask the question.  Can you tell us what your

16 thesis or dissertation's about.

17 A.    Yes.  I studied a couple of products.  They were ALS

18 products.  That was their mode of action.  I looked at the soil

19 degradation rates, their impact on crops and how they impacted

20 the environment and their degradation time line.

21 Q.    Was there a particular product or chemical you were

22 studying?

23 A.    The main one was chlorimuron.

24         THE COURT:  Was what?

25         THE WITNESS:  Chlorimuron.  It's -- I can try to

1  spell it.  C-H-L-O-R-I-M-U-R-O-N.

2  BY MR. SANTHANAM:

3  Q.   I think you mentioned the acronym ALS.  Can you explain

4  what that is.

5  A.   That's just an abbreviation for its mode of action, how it

6  kills weeds.  It's an acetolactate synthase inhibitor.

7  Q.   Now, Dr. Wichert, have you ever worked on a farm?

8  A.   Yes, I have.  I was raised on a farm in Oklahoma.

9  Q.   And how long -- and in connection with that, have you ever

10  used azoxystrobin products before?

11  A.   We still have the family farm, a small one in Oklahoma,

12  and we raise wheat, and we do use Trivapro and Quilt Xcel on

13  our crops.

14  Q.   Getting back to your role at Syngenta, you mentioned that

15  you are currently a customer marketing manager for the South

16  and East Coast units.  First of all, what do you mean by South

17  and East Coast units?

18  A.    In the US we divide the US up into four geographies.

19  That's how we manage it.  The South and East Coast commercial

20  unit's the one I manage, or are marketing manager for;

21  basically starts in New Mexico, goes up across Oklahoma,

22  Kentucky, all the way up to Maine, so we cover the South and

23  East Coast rim, if you will.

24  Q.   How long have you had this position?

25  A.   I started April 1st a year ago.

1  Q.   What are your responsibilities as a customer marketing

2  manager?

3  A.   Myself and my team is responsible for the 18-month

4  campaign, as I call it, so we're responsible for the sales plan

5  for the current year and the next year, so we're working on '18

6  now.  So it's the positioning of products in our crops, in our

7  market because they're a bit different in some of the other

8  geographies.  Also deploying what we call CU discounts or

9  marketing programs to help achieve our sales goals.

10  Q.   Now, Dr. Wichert, as a customer marketing manager, do you

11  have any responsibility for azoxystrobin products?

12  A.   Azoxystrobin products are a key part of the products we

13  market and sell in our commercial unit, yes.

14  Q.   Do you have any responsibility for herbicide products?

15  A.   Yes.  We -- it's a fundamental part of our sales plan as

16  well.

17  Q.   Are you involved in any way in the preparation of budgets

18  or forecasts?

19  A.   Yes.  I lead the budgeting process for our commercial unit

20  from basically start to finish.  We're in the process now of

21  finalizing our 2018 budget.

22  Q.   What was your position before you became a customer

23  marketing manager?

24  A.   Before I became customer marketing manager, I lived here

25  in Greensboro.  I worked in the product life cycle management

1  group.  My role was post-patent strategy manager.

2  Q.   And when you say "product life cycle," what do you mean by

3  that?

4  A.   We use that term in Syngenta.  Every product has a life

5  cycle where you develop it, you know, the initial startup phase

6  or sales stage, and then you differentiate it and you grow your

7  market share, and at some point it either declines or plateaus

8  and then you manage the later ends of the life cycle.  I spend

9  a bit of my focus area in that latter part of the life cycle

10  coaching or mentoring some of the other product or brand

11  managers.  Oh, I'm sorry.

12            THE COURT:  Yes, if you could slow down.

13            THE WITNESS:  I'm a little nervous.

14            Yeah, so I focused on the later part of the life

15  cycle, and part of my role was coaching brand managers in

16  Syngenta based on my experience what to expect and some of the

17  tactics that we would plan and likely deploy in the case we had

18  generic competition in the marketplace.

19  BY MR. SANTHANAM:

20  Q.   How long were you on the product life cycle management

21  team?

22  A.   I was in that team approximately two years.

23  Q.   Where was this position?

24  A.   It was here in Greensboro.

25  Q.   What were your -- you talked generally about what that is,

 1  what product life cycle management is.  Can you tell us what
 2  your responsibilities were as part of the life cycle management
 3  team?
 4  A.   Really did two things.  So one was I coached product
 5  managers in the post-patent era and how to, you know, run
 6  tactics and planning for generic competition.
 7            Also led what we call data compensation, so it was my
 8  responsibility to collect for data compensation.
 9            And then the third thing I did is I managed a couple
10  of accounts that we did technology and out licensing, so our
11  team was responsible for working with accounts in terms of
12  bringing in new technology or licensing out our technology.
13  Q.   As part of life cycle management --
14            THE COURT:  Wait a second.  I didn't hear the last
15  either, and I don't think the court reporter did either.
16  Licensing what?
17            THE WITNESS:  Part of our role was to license
18  technology, so we would license our products to other
19  companies, and we would also license in technology, so I had a
20  couple of accounts that I managed with regard to that licensing
21  activity.
22  BY MR. SANTHANAM:
23  Q.   And, Dr. Wichert, as part of the life cycle management
24  team, were you involved in the life cycle management of
25  azoxystrobin products?

A.    Yes.  Azoxystrobin was a key focus during that period.  I
worked with the product manager frequently on that product.

Q.    Were you involved in the life cycle management of
herbicide products?

A.    Yes, I was.  We -- I covered all products at Syngenta.

Q.    Were you involved in the preparation of budgets and
forecasts?

A.    In that role I would coach the brand manager in terms of
guidance and experience and give them input.  For the accounts
I managed and the products I licensed, did the full budgeting
process for those.

Q.    Have you had -- you mentioned you were at Syngenta for --
have been at Syngenta for 23 years.  Have you had other
positions at Syngenta?

A.    I've had the good fortune to have a number of positions at
Syngenta over my 23 years, so have a lot of opportunity.

Q.    In the interest of time, can you give us a high level
summary or list of all the positions you've had at Syngenta?

A.    Okay.  I'll start at the beginning.  When I got out of
graduate school, went to work as a field research and
development manager or person, so I covered a couple of
territories in that role.

        From that role I went to the West Coast and actually
had a global role.  It was my job to work with bench chemists
and build up products over the world.

1          From there I moved into marketing.  I had some food,
2 feed, fiber, new solutions roles, and moved into brand
3 management around 2007.
4 Q.    And, Dr. Wichert, over these roles, did you have any
5 responsibility for azoxystrobin products?
6 A.    When I was in brand management, I had azoxystrobin
7 products as brand manager.
8 Q.    How about herbicide products?
9 A.    I also had herbicide products when I first went into brand
10 management.  I managed a number of corn and soybean herbicide
11 products.
12 Q.    To put what you do and have done in context, we heard
13 earlier today from Mr. Jeff Cecil and Mr. Andrew Fisher, can
14 you describe where your role falls in connection with theirs.
15 A.    I was a brand manager, I'd have been in the same position
16 as Andrew Fisher, so I actually had azoxystrobin brands before
17 he did.
18 Q.    And where did -- where does your role as a -- or current
19 role fall in connection with Mr. Cecil?
20 A.    So Jeff Cecil would be in central marking, and my team
21 would interact with him on budgets and positioning of our
22 products and pricing of our products.  We would basically work
23 with him to get agreement on how to deploy those in the South
24 and East Coast commercial unit.
25 Q.    Now, Dr. Wichert, as part of the life cycle management

1  team, are you aware of the patents that Syngenta has related to

2  azoxystrobin?

3  A.    Yes.

4  Q.    Are you aware of the patents that Syngenta has asserted in

5  this case?

6  A.    Yes, I am.

7  Q.    Did you consider them as part of the post-patent strategy

8  or life cycle management work that you performed?

9  A.    Yes, the patent portfolio of products is a key

10  consideration in our plans.

11          MR. SANTHANAM:  Your Honor, if I may use the flip

12  chart again.

13          THE COURT:  All right.

14  BY MR. SANTHANAM:

15  Q.    Dr. Wichert, can you list for us the patents that are

16  asserted in this case, and I'd like to go through them.

17  A.    All right.  Start with the compound patents.

18  Q.    Are there other patents?

19  A.    Yes.  We have what we refer to as our '138 process

20  patents.

21  Q.    Anything else?

22  A.    The last one in the case would be what we refer to as our

23  '761 DABCO patent.

24  Q.    Can you tell us what -- based on your work in life cycle

25  management, can you tell us what the compound patents are.

1  A.   At a high level, the compound patents describe how to make

2  azoxystrobin, at least initially, and then also the use of

3  azoxystrobin as a fungicide.

4  Q.   And do you know when the compound patents expired?

5  A.   I believe they expired in February of 2014.

6  Q.   And can you tell us about the '138 process patent.

7  A.   Well, having a compound patent a lot of times there's

8  still a lot of development and research that needs to be done

9  in terms to manufacture the product or the active ingredient,

10 or as I call it azoxystrobin, efficiently.  And the '138

11 process patent was how we manufactured azoxystrobin so we could

12 turn it into a commercial product.

13 Q.   When -- do you know what the expiration date of or when

14 the '138 process patent expired?

15 A.   I believe that's December 2015.

16 Q.   Can you tell us about the '761 DABCO patent.

17 A.   We continue to invest in products that we develop and the

18 '761 DABCO patent was a reflection of that investment.  We

19 continued to improve the ways we manufacture, and it was

20 essentially an improvement in the way we manufacture

21 azoxystrobin.

22 Q.   And do you know if the '761 DABCO patent is expired?

23 A.   I believe it goes to 2029.

24       MR. SANTHANAM:  I'm going to mark this as Plaintiff's

25 Demonstrative Exhibit 24.

BY MR. SANTHANAM:

Q.   Now, Dr. Wichert, can you explain for us why it is that Syngenta applies for and obtains patents.

A.   At a high level, Syngenta invests a tremendous amount of money.  It can take $100 million, 10 years to get a product like this to market, and the patent gives us some protection to recoup that innovation and investment.

Q.   What kind of protection does it provide?

A.   It's 20 years from the date of filing.  It provides you the opportunity to exclude others from basically practicing those patents.

Q.   Now, Dr. Wichert, I'd like to now talk about -- you know, you mentioned that there were compound patents that expired in February of 2014.  Was Syngenta expecting a significant amount of generic competition in 2014?

A.   We were not.

Q.   Can you tell us why that -- why not?

A.   Couple of reasons.  One is we had the process patent and we believed it was the most efficient way to manufacture.  The other is it normally takes a couple of years for people to get to market once they start to process.

Q.   And what impact did the process -- well, first of all, let's break that down.  So what impact did the process patents have?

A.   Well, for somebody to enter after 2014, but before 2015,

1  it would have had to find a way to manufacture the product in a

2  commercial way.

3  Q.    And what impact did the process of getting into the market

4  and registration have?

5  A.    Registration time lines can take a couple of years in most

6  situations to get through.

7  Q.    Now, Dr. Wichert, based on your work on the life cycle

8  management team, and the other roles that you've had at

9  Syngenta, do you have an understanding of the path that a

10 generic company takes to come into the market with a product

11 that competes with Syngenta?

12 A.    Yes.

13 Q.    Did you apply that understanding in developing Syngenta's

14 life cycle management strategy?

15 A.    We do use that understanding and the history of other

16 products that we've managed over their life cycle.

17 Q.    And, Dr. Wichert, would you be able to walk us through the

18 steps to generic entry?

19 A.    Yeah.  I can walk-through some steps.

20 Q.    What would be the first of those steps?

21 A.    The first you'd have to develop a way to manufacture the

22 product or find a way to manufacture the product or source it.

23 Q.    Why would you need to develop a way to manufacture the

24 product?

25 A.    Well, in this instance we had the process patent, so it

1  likely required some activity around that area.

2  Q.    What's the next step?

3  A.    Once you have a way to manufacture it or secure it, you

4  need to formulate it.  Just having the AI doesn't really mean

5  it's -- you really can't just use the AI as a product.  You

6  have to turn it into a product.  We call that developing a

7  formulation.

8  Q.    Is there a process for developing the formulation?

9  A.    Developing a formulation usually requires some research.

10 There's all sort of stability and efficacy things that need to

11 be taken into consideration, so it usually requires some time

12 and effort in terms of research and development to do it.

13 Q.    So you have a formulation that you researched and

14 developed.  What's the next step?

15 A.    The next step is you'd have to manufacture at least some

16 small quantities of that formulation.

17 Q.    What's the next step?

18 A.    Well, the small quantities are needed because you need to

19 do some tests and generate a fair amount of data to actually

20 get what we call registration, so you can sell it.

21 Q.    Why do you need to do testing?

22 A.    The testing, you need the data to make an application to

23 the EPA for registration.  You not only have to in this

24 situation get a technical registration, but you'd have to get

25 an end-use registration if the technical wasn't already

1  registered.

2  Q.   When you say get an application, what would you need to do

3  physically?

4  A.   Physically, you'd take all the testing and data from No. 4

5  and you'd assemble it into an application, and then you'd

6  submit that application to the EPA.

7  Q.   Dr. Wichert, I think you were saying in there something

8  about technical and end-use.  Can you explain what you mean in

9  terms of that with respect to applying to EPA.

10 A.   Yes.  For any product you need the technical to be

11 registered, which would be the AI or azoxystrobin in this

12 situation.  And then the formulated product, they call that an

13 end-use registration.

14 Q.   The technical is for the AI.  What do you mean by that?

15 A.   The AI would be azoxystrobin in this situation.

16 Q.   And can you give us an example of the end-use products.

17 A.   The end-use products, the ones we sell for azoxystrobin,

18 would be Quadris or Quilt Xcel would be end-use products.  It's

19 things that the farmers apply to their crops.

20 Q.   So you've applied for EPA registration.  Assuming you get

21 it, what's the next step?

22 A.   The next step, once you have EPA registration, you're not

23 quite done with the process.  You have to actually label it in

24 all the states that you plan to sell in.

25 Q.   Does that mean registering in the states?

1  A.    Yes.   Each state has a registration process that you have

2  to go through.

3  Q.    Why do you need a state registration?

4  A.    The states just want to make sure that the product is fit

5  and safe for their local conditions and how it's going to be

6  used in their crops and states.

7  Q.    Can you sell a product in a state without having a state

8  registration?

9  A.    No.

10  Q.    What would happen if you did it?

11  A.    There would be fines and potential other ramifications.

12  Q.    Okay.  So let's assume you've got a state registration.

13  What else would you need to do?

14  A.    Once you have the state registration, then you would need

15  to start to manufacture, build up some inventory and move on

16  into sales and marketing of the product.

17  Q.    Why do you need to build up inventory?

18  A.    You have to have something to sell and for people to use.

19  Q.    These you believe are steps that you've experienced as

20  a -- I mean the life cycle management role that you performed

21  for generics to come into the market?

22  A.    Yeah, this would represent what we see in our experience.

23         MR. SANTHANAM:   I'm going to mark this as Plaintiff's

24  Demonstrative Exhibit 25, PDX-25.

25  BY MR. SANTHANAM:

1  Q.    Now, Dr. Wichert, you mentioned the EPA registration

2  process.   Have you heard of the term formulator's exemption

3  before?

4  A.    Yes, I have.

5  Q.    And at a high level can you explain for us what that is.

6  A.    My understanding of formulator's exemption, it can save a

7  little bit of time in getting an end-use product registered,

8  but it requires sourcing an already registered technical from

9  somebody in the market.

10 Q.    Now, Dr. Wichert, we've gone through and discussed the

11 steps, you know, you've seen for generic entry.  Can you tell

12 us in your -- in Syngenta's historical experience, and your

13 experience, how long does it normally take for a generic

14 company to come into market with a product after patent fall?

15 A.    Our experience, it usually takes around two years for that

16 whole process to evolve and somebody to get into the market in

17 a insignificant way.

18 Q.    When did you first see -- we talked about the compound

19 patents expiring in February of 2014.  When did you first see

20 Willowood?

21 A.    Willowood entered in mid '14 into the market.

22 Q.    Were you surprised to see Willowood in the market with --

23 with any significant sales in 2014?

24 A.    We were, just given our normal experience of this process

25 and then also the process patent that we still had in place.

1  Q.    Now, Dr. Wichert, are generic companies allowed to compete

2  in the marketplace?

3  A.    Absolutely.

4  Q.    Does Syngenta -- what is Syngenta's approach to generic

5  companies?

6  A.    We respect good competition.  We just want everybody to

7  follow the same rules and industry standards that we do.

8  Q.    Now, does Syngenta generally have a life cycle management

9  approach or strategy in responding to generic competition?

10  A.    We do.  We do it for all of our major products.

11  Q.    And why does Syngenta develop a strategy for managing its

12  life cycle?

13  A.    The life cycle is important.  It goes back just to the

14  cost that it takes to get a product on the marketplace.  It's

15  not easy to recoup $100 million of investment on average, or it

16  can be that, and it takes up to ten years to get it there.  So

17  you need a plan of how to get that return on investment.

18  Q.    When does Syngenta ideally try to implement this strategy?

19  A.    In terms of product life cycle management, we start it

20  actually in the development phase.  So we start planning that

21  out from day one.

22  Q.    Do you know if Syngenta has a -- or had a life cycle

23  management strategy for azoxystrobin?

24  A.    We did.

25  Q.    And can you give us some examples of other products

1  that -- for which, you know, Syngenta has had a life cycle

2  management strategy?

3  A.   I can.  I'll use the main trade names Warrior or Karate,

4  same product, would be an example.  Ridomill would be an

5  example.  Agri-Mek would be another example.  Callisto is a

6  good example as well.

7  Q.   And when you say Warrior, is there an active ingredient

8  that relates to that?

9  A.   That would be lambda-cyhalothrin.

10 Q.   Was Syngenta able to effectively implement its post-patent

11 strategy with respect to azoxystrobin?

12 A.   With the early entry, we were not as timely on some of the

13 activities as we plan or want to be in normal situations.

14 Q.   Now, Dr. Wichert, there's a binder in front of you, and it

15 has several documents, one of which has already been entered

16 into evidence.  I would like to substitute it for you so that

17 you have the right document.

18         MR. SANTHANAM:  Your Honor, permission to approach?

19         THE COURT:  You may.

20         MR. SANTHANAM:  I'm handing the witness what has been

21 marked and admitted into evidence as Defendant's Trial Exhibit

22 211.

23 BY MR. SANTHANAM:

24 Q.   Dr. Wichert, do you recognize this document?

25 A.   Yes, I do.

1    MR. SANTHANAM:  And if we could flip the switch so

2  that we can show that document to the jury.  I would like to go

3  to Slide 7, which, for the record, is SYN-283395.

4    THE COURT:  Somebody just remind me of the time --

5  date of this.  I can't remember things.

6  BY MR. SANTHANAM:

7  Q.   Dr. Wichert, can you tell us approximately when this was

8  generated?

9  A.   On the first page, it has a date of November 2015.

10 Q.   Can you tell us what the purpose of this presentation was?

11 A.   This presentation -- looks like it was a presentation to

12 an organization or a potential customer just reinforcing the

13 investment we make in our products and how we plan to manage

14 the life cycle of those products.

15 Q.   What we have here on the screen -- I would like you to

16 turn to Slide 7, SYN-283395 and at the top, it reads, "Quadris/

17 Quilt/Quadris Top/Quilt Xcel/Abound:  Post-Patent Pillars."  Do

18 you see that?

19 A.   Yes.

20 Q.   Are you familiar with the concept of post-patent pillars

21 at Syngenta?

22 A.   Yes, I am.

23 Q.   Can you explain for us what that generally means?

24 A.   It's a method we use to communicate the major emphasis of

25 our post-patent strategies on products.  We group them into the

1   pillars, and these would be the key ones for azoxystrobin.

2   Q.   Can you briefly list for us the five pillars, and we'll go

3   through them.

4   A.   All right.  Number one would be innovation, number two

5   would be brand ladder, three would be market growth, four,

6   generic challenges, and number five is channel profit.

7   Q.   And let's start with innovation.  Can you tell us how

8   innovation plays a role in life cycle management?

9   A.   Yes.  Innovation is a key component of our life-cycle

10  process plan.  In this situation, we were planning to introduce

11  a new active ingredient called Solatenol and elevate, or

12  create, a new tier to the brand ladder to help sustain value

13  and bring new tools to our customers.

14  Q.   And does Syngenta purely innovate for purposes of life

15  cycle management?

16  A.   That's an important aspect of it, but Syngenta is an

17  innovation company, and we innovate to help secure the food

18  supply and help our customers.

19  Q.   You mentioned this concept of a brand ladder.  So let's go

20  to the second pillar.  What is a brand ladder?

21  A.   A brand ladder is just a way that -- or a phrase that we

22  use to manage the brands in a portfolio product.  So with

23  azoxystrobin, that's the AI, and we have a number of products

24  and brands that we market which azoxystrobin is a key

25  component.

Q.   Would it help for you have a diagram to be able to explain

that concept?

A.   Yes, I could walk through how we use it.

          MR. SANTHANAM:  David, can we pull up Plaintiff's

Demonstrative exhibit 8.

BY MR. SANTHANAM:

Q.   Now, Dr. Wichert, we did have a chance to look at this

earlier today, but I would like your perspective and can you

explain how the brand ladder plays into Syngenta's life cycle

management.

A.   All right.  I'll start at the beginning of when we

introduce -- and it's actually not the first rung.  It would be

the second rung on the ladder.  I think it's established

brands.  So when we launched azoxystrobin into the marketplace,

it was under the brand names of Quilt and Abound.  We

established those.

          Once we get those established and the brand

recognition and have it positioned, then we move into

differentiating the product and applying it in new and other

marketplaces and making it a better fit.  We call those

enhanced brands or mixtures.

          Quilt Xcel and Quilt were originally enhanced brands.

As the life cyle matures, they drop down to be established.

Q.   Dr. Wichert, can you slow down just a little bit.

A.   Yeah, so our current enhanced brands would be Quadris Top,

1    our Quadris Top lineup, and we've made new mixtures --

2              THE COURT:  You made what?

3              THE WITNESS:  New mixtures with those more recently

4    to address new problems that growers face.

5    BY MR. SANTHANAM:

6    Q.    And what about combinations of brands?

7    A.    Combination of brands just to show that we also sell all

8    of our brands in combination with other products.  They're not

9    premixtures, but growers, customers, we recommend them with

10   other products in the field.  So, for example, Quilt Xcel is

11   used in this situation with Endigo as just an example of one of

12   the mixes that people might use with that product.

13   Q.    What is Endigo?

14   A.    Endigo is actually an insecticide product.

15   Q.    And this is an insecticide, but are there combinations

16   with other types of product.

17   A.    There are.  Another frequent one for Quilt Xcel is in

18   corn, and it's applied a lot with Halex GT, which is a

19   herbicide.  It saves the grower a trip across the field.

20   Q.    And can you explain for us at the top, Trivapro, Elatus,

21   as next generation premium brands in the context of life cycle

22   management?

23   A.    Yes.  We talked about innovation in terms of the brand

24   fillers, and innovation is a key component.  Solatenol, as I

25   mentioned, that is an innovation product.  We've created new

1  products of azoxystrobin, and Solatenol and Trivapro and the
2  latest are two examples of that that we've recently introduced
3  into the marketplace.
4  Q.    And at the bottom, there's fighting brands.  How does
5  that -- first of all, are you familiar with fighting brands?
6  A.    Yes, I am.
7  Q.    And what are they, and can you explain in connection with
8  the life cycle management strategy role you play?
9  A.    Yes.  When we get generic competition, we roll out what we
10 call fighting brands, and it's brands with less service.  They
11 mimic some of the other brands on the established rung, but
12 they have less service than other components, and it allows us
13 to compete in that lower segment of market without reacting.
14 Q.    When you talked about the next generation brands at the
15 top, did Willowood's entry in the market impact Syngenta's
16 strategy with respect to its next generation premium brands?
17 A.    Any change in brand ladder does.  The frame that keeps the
18 rungs together -- all the rungs move up and down together.  So
19 anything that puts pressure on the ladder will move it down.
20 So you can only charge us a premium per given rung based on the
21 value to the customer.  So anything that affects the overall
22 brand ladder will impact the price of every rung.
23 Q.    And does that similarly apply to the introduction of
24 fighting brands?
25 A.    It does.

1    Q.    Going back to Defendant's Trial Exhibit 211, the next

2    pillar is market growth.   Can you explain what you mean by

3    that?

4    A.    Market growth is a key component of product life cycle

5    management from the beginning.   So every time we introduce a

6    new product, we strive to grow the market.   Growing the new

7    segments better address customer needs, and that's just a

8    component of the whole life cycle.

9    Q.    The next is pillar generic challenges.   Can you explain

10   what you mean by that?

11   A.    Generic challenges, the easiest way to explain it is why

12   we're here today.   We had patents in place, and we want to

13   protect those patents.

14   Q.    And, finally, Dr. Wichert, there is a -- one of the

15   pillars is channel profit.   Can you explain what that is?

16   A.    Channel profit, we sell to distributors or retailers, and

17   it's important that they be able to have a profit in their

18   business so that they can service their customers; and as we go

19   generic, or as generics enter and pressure the marketplace,

20   we'll generally increase the programs.   We call them discounts,

21   the amount of money given to a retailer to help them support

22   our product line and make sure they can service their customers

23   with our products.

24   Q.    And just so we have all of the terminology straight and

25   we're all on the same page, what do you mean by channel?

1  A.   Channel would be a retailer that sells to a grower.  There
2  may or may not be a distributor between us and the retailer.
3  Some distributers have their own retail.  We call them
4  integrated accounts, and then others are independent retailers
5  that buy from wholesalers.
6  Q.   So the product goes from Syngenta to a distributor to a
7  retailer and ultimately goes to the grower or farmer?
8  A.   Correct.
9  Q.   And, Dr. Wichert, when you say offering channel
10 incentives, are those discounts?
11 A.   They are discounts.  We're essentially lowering our price
12 in the form of discounts to our channel partners.
13 Q.   To whom do you offer these discounts?  Is it to the
14 distributor or the retailer itself?
15 A.   It's a combination of both.
16 Q.   And how does offering these incentives or discounts
17 through the channel affect Syngenta's profitability?
18 A.   It comes right off the bottom line.  It essentially
19 reduces the -- we call it net price that we get paid for the
20 product.
21 Q.   Did Willowood, to your knowledge and based on your role at
22 the company, have an impact on the channel incentives that
23 Syngenta offered to distributors and retailers?
24 A.   It did.  We increased our discounts, effectively lowering
25 our price in response.

```
1   Q.   Dr. Wichert, I'd like to turn to a different topic.
2             THE WITNESS:  Can I, by chance, get a cup of water?
3             THE COURT:  Yes, you can.  Your lawyer will bring it
4   to you, Syngenta's lawyer.
5             MR. SANTHANAM:  If I may approach?
6             THE COURT:  You may.  You talk that fast you need
7   some water, right?
8   BY MR. SANTHANAM:
9   Q.   Are you ready, Dr. Wichert?
10  A.   Yes, thank you.
11  Q.   Now, are you familiar with a company by the name of
12  Albaugh?
13  A.   Yes, I am.
14  Q.   And are you familiar with whether Albaugh offers
15  azoxystrobin products?
16  A.   They do.
17  Q.   You know, Dr. Wichert, based on your role in the product
18  life cycle management team, do you know if Albaugh had an
19  impact on Syngenta's azoxystrobin sales strategies and pricing
20  strategies?
21  A.   Well, it depends on the year.  Minimal impact probably
22  until '17.
23  Q.   Can you explain why you say minimal impact?
24  A.   We tried to monitor -- well, we monitor them closely.  We
25  monitor all competitors in the marketplace, and we didn't hear
```

1  a lot of information or see a lot of activity from them.  We
2  did catch a little bit of activity in what we call our Seedcare
3  business.  It's when you put chemicals on a seed so it emerges
4  better and they are protected.
5          We actually tried to buy product on the marketplace
6  as part of a monitoring thing, and the only Albaugh product we
7  managed to purchase was actually a product they had sold to
8  another company that was selling it in lawn and garden markets.
9  Q.   Let's break that down.  So you actually went out and tried
10 to buy an Albaugh product?
11 A.   We do try to buy competitor products.
12 Q.   Did you have difficulty in finding an Albaugh product?
13 A.   We did.  It took us quite a while.  As I say, the place we
14 finally found it was actually in a lawn and garden segment that
15 sold it to somebody else, and we purchased it through them.
16 Q.   How big is Syngenta's lawn and garden segment with respect
17 to its azoxystrobin products?
18 A.   Lawn and garden to us is pretty small when it comes to
19 azoxystrobin.  The row crop market would be well over
20 90 percent.  Lawn and garden is probably less than 5 percent.
21 Q.   And, Dr. Wichert, just to put this in context, were
22 you -- did you go out and try to find Willowood product on the
23 marketplace?
24 A.   We did.
25 Q.   Did you have difficulty finding Willowood product on the

1   marketplace?

2   A.   We found it rapidly.

3   Q.   Are you familiar with Albaugh's imports?

4   A.   Yes, I am.

5   Q.   And can you describe for us the level of imports you saw

6   from Albaugh?

7   A.   We weren't very concerned about Albaugh's imports.  I

8   don't recall the exact numbers.

9   Q.   Dr. Wichert, are you familiar with a company called

10  Cheminova?

11  A.   Yes, I am.

12  Q.   Again, are you aware of whether Cheminova sells or offers

13  azoxystrobin products?

14  A.   Well, they don't anymore.  They've been purchased by

15  another company, but they do sell azoxystrobin products.

16  Q.   Do you know if Cheminova had any impact, if any, on

17  Syngenta's azoxystrobin sales strategy and pricing strategy?

18  A.   We didn't have a lot of competition from FMC.  There's a

19  couple of things they did in their launch that impacted --

20  Q.   Let me stop you right there just so we're all on the same

21  page.  We were talking about Cheminova.  Now you mentioned FMC.

22  What's the relationship?

23  A.   Cheminova was purchased by FMC.  So now they're FMC at

24  this point essentially.

25  Q.   And I believe you were telling us why -- whether Cheminova

1 had an impact on your sales strategies and pricing strategy.
2 Can you explain?
3 A. They did a couple of things when they launched that
4 limited the impact they had in the marketplace.
5 Q. And what were those things?
6 A. The main thing was -- corn is a tremendous market for
7 azoxystrobin products, and they did not register corn as part
8 of their product offering, and without the registration for
9 corn, it's illegal for somebody to use it on corn. They
10 actually left a number of other crops off. It's high risk for
11 our customers to recommend a product off label and even a
12 grower. It's usually not worth the risk in that situation. So
13 that impacted their sales efforts.
14 Q. I want to make sure we're all clear on this point. So you
15 mentioned that Cheminova didn't have corn registration. Do you
16 have to actually go through a registration process to get a
17 crop on your label?
18 A. Yes. We talked about it earlier. You have to get the --
19 when you submit to the EPA, you submit on what crops you want
20 to apply on, and you register for those crops. So it is
21 an -- it's a regulated piece. They want to ensure crop safety,
22 and you register by crop and by use essentially.
23 Q. Dr. Wichert, was the level of imports that you saw from
24 Cheminova -- what -- how did you take that into account?
25 A. We noticed some imports. Then they tailed off fairly

1  quickly.  We didn't have much feedback from customers or much
2  pressure from customers with respect to Cheminova.  We did a
3  good job repositioning them as well, given their challenges on
4  their label not being on the biggest crops, and there were some
5  other crops missing as well.
6  Q.    And you said that Cheminova went out of the market.  Can
7  you explain what you mean by that?  Cheminova left the market.
8  Can you explain what you mean by that?
9  A.    Well, Cheminova was purchased by FMC, and during that
10 process, their imports tailed off, and they're customers today,
11 so they actually -- the azoxystrobin they sell comes from
12 Syngenta.
13 Q.    Okay.  It comes from Syngenta?
14 A.    Correct.
15 Q.    Is FMC/Cheminova now a customer of Syngenta?
16 A.    That's correct, yes.
17 Q.    Now, are there other fungicide products -- and we've been
18 talking about azoxystrobin and generics of azoxystrobin.  Are
19 there other fungicides offered by other branded companies?
20 A.    Yes, there are.
21 Q.    And do you know if -- and based on your role on life cycle
22 management and your earlier roles at the company, do you know
23 if other branded companies had an impact on Syngenta's sales
24 strategies and pricing strategies going through 2014 onward?
25 A.    Competitors always have an impact, but we had been

1  competing against essentially Bayer and BSF for a number of
2  years, and we knew how each other participated in the
3  marketplace in terms of leading and following; and what we saw
4  in 2014 was beyond any reaction that we had experienced in the
5  past with those organizations.
6  Q.   Dr. Wichert, again, I would like to switch to a different
7  topic.  You mentioned in your role, a previous role, you were
8  looking at life cycle management of products, including
9  herbicide products.  Are you familiar with any products that
10 Syngenta has that are similar to azoxystrobin in life cycle?
11 A.   Yes, I am.
12 Q.   What -- can you give us an example?
13 A.   The best example I can give you would be mesotrione.
14 Q.   What is mesotrione?
15 A.   Mesotrione is actually a herbicide.
16 Q.   And how is -- how, if at all, is mesotrione similar to
17 azoxystrobin?
18 A.   Just to start with, both of them were similar time lines,
19 few years difference, but both had a similar development
20 strategy in terms of how we went from introduction on
21 established brands up through the brand ladder and how we've
22 managed the life cycle of those products.  Azoxystrobin's our
23 biggest fungicide AI as well as meso's our biggest herbicide
24 AI.
25 Q.   And in terms of life cycle, would it be helpful for you to

1  have a brand ladder for both azoxystrobin and mesotrione to

2  look at?

3  A.   Yes.   I could show you the comparisons of how they match

4  up.

5         MR. SANTHANAM:   Can we put up Plaintiff's

6  Demonstrative Exhibit 9.

7  BY MR. SANTHANAM:

8  Q.   And, Dr. Wichert, can you use this to help us understand

9  what the life cycle similarities are between azoxystrobin on

10  one hand and mesotrione on the other hand?

11  A.   All right.   I'll start where I did with azoxystrobin on

12  established brands.   When we launched azoxystrobin, we launched

13  Quadris and Abound as solo products into the marketplace.   Same

14  for mesotrione, we launched with Callisto.   It was a solo

15  product.   Those were the base products we established the brand

16  ladder with in those markets.

17         THE COURT:   Excuse me just one second.   You okay?

18         A JUROR:   Yes.

19         THE COURT:   All right.   Good.   The juror was looking

20  down.   I just wanted to be sure he felt okay.

21         Go ahead.

22         THE WITNESS:   From there we moved into enhanced

23  brands so we started differentiating, premixing those products

24  so multiple AIs in one container.   All of those were with other

25  products that Syngenta had in our portfolio.   So on the azoxy

side it would have originally been our Quilt/Quilt Xcel brands.
Now the enhanced brands in our ladders are the Quadris Top
portfolio.

For mesotrione it would be the Halex, Lumax, Lexar,
and Callisto Xtra on the enhanced brand ladder rung.

BY MR. SANTHANAM:

Q.    What about combinations of brands?

A.    On combinations, same way.  Quilt Xcel is applied with
Endigo and actually it's applied with Halex GT.  Halex GT and
those other products are applied with other things.  AAtrex is
on that rung as an example.

Q.    Now, Dr. Wichert, are you indicating that sometimes -- so
we have an example of Quilt Xcel and Endigo that we discussed
earlier.  Does Syngenta combine azoxy products with meso
products?

A.    Yes.  A common practice in corn would actually be to apply
Quilt Xcel and Halex GT together on corn early.

Q.    And then let's talk about the bottom rung, fighting
brands.  What are the similarities between the azoxystrobin
brand ladder and the meso brand ladder?

A.    When generics enter, or right before they enter
preferably, we launch fighting brands.  That was Aframe, Aframe
Plus, so Aframe would essentially be a Quadris Abound mimic and
Aframe Plus would be Quilt Xcel.

On the mesotrione side Explorer would be a mimic of

1  Callisto that we launched right before generic entry.

2  Q.    What about the premium brands?  Can you explain what --

3  you know, what the comparison is between azoxy and meso.

4  A.    Yes, on premium brands had a very close mirror in terms of

5  situation.  So on azoxystrobin we talked about the new active

6  ingredient Solatenol and how that was in combination with

7  azoxystrobin in Trivapro and Elatus to elevate the performance

8  of those products.

9          Same thing was the situation on the mesotrione side,

10  so Acuron, Acuron Flexi have a new active ingredient called

11  bicyclopyrone, we call it BIR or B-I-R for short, and that also

12  elevated the performance of the mesotrione brand ladder in

13  terms of its spectrum and control of weeds.

14  Q.    We've talked about the brand ladders.  You can put this

15  away for now.  Dr. Wichert, is there -- to your knowledge, is

16  there any similarities or comparisons between azoxystrobin and

17  mesotrione in terms of the budgeting process?

18  A.    The process for budgeting in Syngenta for all products is

19  similar.  It's the same.

20  Q.    Are there any similarities in terms of the factors that

21  are considered as part of putting together an azoxystrobin

22  budget versus a mesotrione budget?

23  A.    Yeah, the budgeting process starts out the same for

24  everything.  We look at the macroeconomic factors, just the

25  economy, then we go to crop factors, crop price and how those

1  impact the brands, and we go down the rung in terms of macro to

2  microfactors on all products.

3  Q.   And is there an overlap between mesotrione and

4  azoxystrobin in terms of crops?

5  A.   Yes.  Corn is the major crop for both products.  They're

6  both used on other crops, but corn would be the significant

7  impact in both brand ladders in terms of use and opportunity.

8  Q.   And does the fact that mesotrione and azoxystrobin are

9  used on corn impact the budgetary process in any way?

10 A.   Corn's an important crop in the US, and it gets a lot of

11 focus in the budget process, just because of the acre and the

12 opportunity and investment that's made in corn.

13 Q.   Now, I'd like to get back to this concept of life cycle

14 management and going back to 2014.  Dr. Wichert, are you aware

15 of any life cycle events that occurred in 2014 with respect to

16 azoxystrobin and mesotrione?

17 A.   The two similar things, we talked about azoxystrobin

18 compound patents expiring in February of 2014.  I believe it

19 was June 2014 that mesotrione generic entry came up and it was

20 by a different method.  We call it data protection, exclusive

21 data protection expired for mesotrione.

22 Q.   And in terms of -- well, let's step back.  So what is

23 the -- let's -- can you explain what data protection is --

24 A.   Yes.  There's two things.

25 Q.   -- or data exclusivity, I'm sorry.

1    A.    Two things that give companies the opportunity to recoup

2    their investment.  One of those is patents.  In the situation

3    of mesotrione, the development time line was so long that the

4    patents had expired before the data protection expired, so when

5    you apply to the EPA, they give you 10 years of exclusive use

6    of all the data you submit for registration of that active

7    ingredient.

8    Q.    And if I may interrupt you, Dr. Wichert, so when you --

9    what do you mean when you submit to the EPA?  What is this data

10   that is being submitted to the EPA?

11   A.    We talked early on that you have to make application to

12   the EPA.  The technical registration you get for an active

13   ingredient, which basically goes to show that it's -- proves to

14   the EPA that it's safe for the environment, safe to use on

15   crops and there's not a concern from that aspect.  It's that

16   data that's protected for a period.

17   Q.    And at some point, a would-be generic could use that data

18   for its own application to the EPA, is that right?

19   A.    The common situation is for a generic to cite the main

20   manufacturer, the main inventor's data at the EPA when it's

21   available to be cited.

22   Q.    And then what is this concept of exclusivity, this period

23   of exclusivity?

24   A.    That exclusivity period prevents anybody from being able

25   to cite that data what they register their technical with the

1  EPA or use that data.  They would have to generate their own.

2  Q.    Why can't a generic company just go out and submit its own

3  application with its own data?

4  A.    They could go out and generate all their data, but it's an

5  extreme amount of risk, and it's a -- it's a tremendous

6  undertaking in terms of cost and expense, so it's generally

7  resource prohibitive to do that.

8  Q.    And so what did the loss of data exclusivity for

9  mesotrione imply for mesotrione, the product that Syngenta

10  offers?

11  A.    That basically opened the door for mesotrione for generics

12  to enter the marketplace and go after registration of their own

13  mesotrione-based products.

14  Q.    Now, you know, when did mesotrione go off of data

15  exclusivity?

16  A.    That was middle of 2014.

17  Q.    And when did -- we heard earlier about the compound

18  patents expiring also in 2014.  Can you explain for us, from

19  your perspective, what the loss of data exclusivity, how it

20  compares to the loss of patent protection in terms of generic

21  entry?

22  A.    Well, once your -- once your compound patent expires, it

23  opens the door for some generic entrance into the marketplace

24  so they can start marketing and selling if they don't infringe

25  any of the other patents that you might have on those products.

1   We have a large number of patents on most of our products.

2           Same way as data exclusivity.  It opened the door for

3   them to then access the data, so essentially it was same impact

4   in the marketplace from those two events.

5   Q.   Now, earlier, if you recall, we were talking about the

6   post-patent pillars for azoxystrobin.  David, if you could go

7   back to Defendant's Trial Exhibit 211.  If you go to slide 7.

8           We were on this slide, do you recall that

9   Dr. Wichert?

10  A.   Yes.

11  Q.   I'd like to go back to the previous slide, slide 6, which

12  is SYN-283394, and it reads Callisto franchise post-patent

13  pillars.  What is Callisto?

14  A.   Callisto is the trade name for the solo mesotrione product

15  that we sell.

16  Q.   And why does -- why do you have post-patent pillars for

17  Callisto?

18  A.   Same as for all of our major products we have a life cycle

19  strategy and the pillars in this one are the same five pillars

20  that we have for azoxystrobin.

21  Q.   Why are the pillars the same for two products?

22  A.   The pillars mirror each other from a life cycle strategy

23  perspective in terms of how we went from solo products to

24  mixtures, and then most importantly the innovation step

25  provided a new rung for both product lineups.

1  Q.    Now, Dr. Wichert, we've talked about now azoxystrobin and

2  mesotrione in terms of similarities.  Can you explain for us

3  whether there are any differences?

4  A.    The obvious difference would be one's a fungicide and

5  one's a herbicide.

6  Q.    What about in terms of the level of competition that

7  Syngenta faced with respect to azoxystrobin and mesotrione?

8  A.    From a generic perspective it was quite different.

9  Q.    Well, both -- you said mesotrione went off data

10 exclusivity in 2014.  Azoxystrobin had the compound patents

11 expire in 2014.  Can you provide us more detail in the generic

12 activity you saw.

13 A.    Our experience with mesotrione was more typical but we saw

14 it took a couple of years.  We had a little bit of pressure

15 toward the middle end of '16, and it was '17 before we had much

16 generic pressure in the marketplace with mesotrione.  With

17 azoxystrobin, we had it immediately in 2014 with Willowood's

18 early entry.

19 Q.    Now, Dr. Wichert, you mentioned earlier from historical

20 experience that it takes about one to two years as you've seen

21 for generic companies to have an impact.  Was that what

22 Syngenta experienced when Willowood entered into the market in

23 2014?

24 A.    No.  We experienced significant pressure in the

25 marketplace in '14 from customers and others requiring us to

1  meet competition.

2          MR. SANTHANAM:  No further questions, Your Honor.

3          THE COURT:  All right.

4          MR. TILLER:  Your Honor, I have to ask for a sidebar.

5  I'm sorry.

6          THE COURT:  Okay.  If you all need to stand up, feel

7  free.  Just don't talk, because the court reporter has to hear

8  us.

9          (Bench conference as follows:)

10         MR. TILLER:  Your Honor, you just heard Dr. Wichert

11  talk about data compensation and data compensation exclusivity.

12         THE COURT:  Uh-huh.

13         MR. TILLER:  And the key point is that when that

14  exclusivity ends, in order to copy or rely on the data, the

15  generic has to pay money, so I'd like to ask him about that

16  obligation to pay money by generics.

17         MR. SANTHANAM:  I mean, in terms of similarities for

18  how it affects exclusivity, has nothing to do with whether a

19  company pays data comp or offers data comp.  It's just the

20  market impact.  There's absolutely no reason to go into whether

21  Willowood offered data comp or --

22         THE COURT:  You don't want to ask about Willowood

23  offering it?  You just want to ask general questions about the

24  process?  Is that what you're saying?

25         MR. TILLER:  Well, I'd like to be able to ask about

1 Willowood but -- and he did, he also did say -- this is what we

2 previewed in our opposition to the motion in limine on

3 number -- motion in limine No. 5.  He said --

4          THE COURT:  Do you have other questions to ask him?

5          MR. TILLER:  Other than that issue?  Yes, I do.

6          THE COURT:  Do that, and let's talk at five.

7          MR. TILLER:  Okay.  I don't have much though, to be

8 honest.

9          THE COURT:  All right.

10         (Bench conference concluded.)

11         THE COURT:  Go ahead.

12         MR. TILLER:  Yes, sorry, Your Honor.

13                        CROSS-EXAMINATION

14 BY MR. TILLER:

15 Q.   Good afternoon, Dr. Wichert.  How are you?

16 A.   Hello.

17 Q.   Had Willowood not entered the market, Syngenta still would

18 have executed its post-patent strategy for azoxystrobin,

19 correct?

20 A.   Yes.  We would have executed it a bit more timely.

21 Q.   There was some discussion about fighting brands.

22 Willowood limits the amount of fighting brands -- Syngenta, I'm

23 sorry.  Syngenta limits the amount of fighting brands that it

24 puts into the market, correct?

25 A.   Yes.  We try to manage the ratio of fighting brands to our

1  other brand ladders and products.

2  Q.   And generally speaking, a distributor can't get more than

3  5 percent of its azoxystrobin in fighting brands from Syngenta,

4  correct?

5  A.   Depends on the year and the market pressure we experience.

6  We try to manage that ratio.

7  Q.   Is 5 percent, though, generally the number?

8  A.   Not for fighting brands.  I wouldn't say that was an

9  appropriate number.  It varies considerably, based on market

10 pressure and product.

11 Q.   Are you aware that Albaugh made an offer to sell

12 azoxystrobin technical to Syngenta's customer Loveland for

13 $48.50 per kilogram?

14 A.   Yes.  Loveland shared a couple of offers that they had

15 with us.

16 Q.   Okay.  And that -- and Loveland uses the azoxystrobin to

17 make its own end-use products that are in the crop protection

18 area, correct?

19 A.   Correct.  We were a supplier of those, and they shared two

20 estimates; one from Albaugh and one from Willowood.

21 Q.   You mentioned factors that go into the budgeting.  You

22 said there's macroeconomic factors, and what are those again?

23 A.   Just general ag economy and the economy overall is a good

24 example of a macrofactor.

25 Q.   Then there's crop factors, correct?

1  A.   Correct.

2  Q.   And what are those again?

3  A.   Crop factors would be the acres, crop price, those type of

4  things that impact.

5  Q.   And then you mentioned microfactors, do you recall that?

6  A.   Yes.  Crop price, where they planted, those start to get

7  in from macro to micro.

8  Q.   Are there factors with regards to an analysis of the

9  differences in the products?

10  A.   Yes.  We look at our position versus competitive or

11  alternative products.

12  Q.   And that is, I presume, different from mesotrione as

13  opposed to azoxystrobin?

14  A.   One class would be a herbicide, one would be a fungicide,

15  but they both had alternative products in the marketplace

16  within the same chemistry family.

17  Q.   They are sold to address very different issues, correct?

18  A.   One kills weeds and one kills fungicides, yes.

19  Q.   Fungicides -- kills fungal disease?

20  A.   Kills disease, sorry, yes.

21  Q.   Yeah, that's what I thought.

22  A.   Thank you.

23  Q.   Are there any other -- what are the microfactors for

24  mesotrione?

25  A.   Well, I was thinking about crops and competition, so for

1  fungicides we talked about Bayer and BSF having a similar

2  family.  Bayer also had a lineup of a similar chemistry of

3  products to mesotrione.  BSF has some as well now, too.

4  Q.   The herbicide market in general is much, much larger than

5  the fungicide market, correct?

6  A.   In corn.  Depends on the crop.

7  Q.   How about just overall?

8  A.   Yes.  I believe that's correct.

9  Q.   So would you agree since herbicide -- the herbicide market

10 is much larger, there are different factors that go into the

11 farmers' decision as to why he or she might purchase fungicide

12 or why he or she might purchase herbicides?

13 A.   I can just share the experience on my farm.  We consider

14 similar things.  We need performance and crop yield, and that

15 drives our decision for all of our inputs in our crops.

16 Q.   When azoxystrobin came off patent in 2014, were there

17 still, nonetheless, patents that covered 88 percent of

18 azoxystrobin's mixture sales?

19 A.   I don't recall the portfolio on azoxystrobin mixture

20 sales.  We had the process patent and the DABCO patent that

21 we've talked about for azoxystrobin.

22 Q.   Are you aware that a significant portion of azoxystrobin's

23 mixture sales in 2014 were still, nonetheless, covered by some

24 type of compound patent?

25 A.   I'd have to -- I can't recall.  I'm not familiar with

```
 1   mixture patents.  The three I'm familiar with are the three we
 2   talked about today or the reasons we're here.
 3            MR. TILLER:  Okay.  Your Honor, with the issue I
 4   raised up there still pending --
 5            THE COURT:  Okay.  Ladies and gentlemen I'm going to
 6   let you go a little bit early today so you don't have to sit
 7   through and listen to us whisper.  We'll start tomorrow
 8   morning, you'll remember, a little early.  We're going to start
 9   at 9:15 so you can leave at 4:00.
10            Please remember, in addition to not talking about the
11   case among yourselves or with anyone else, don't read or listen
12   to any news reports, don't look anything up on the Internet or
13   conduct any independent investigation, no Tweeting, no posting,
14   no communication at all about the case.  As always, you've
15   heard a lot more evidence, but there is still more to come, so
16   keep an open mind and don't form an opinion.
17            Leave your notes in your chair and I'll see you
18   tomorrow morning at 9:15.  The jury is excused.
19            (Jury excused at 4:51 p.m.)
20            THE COURT:  You can step down.  Thank you.
21            (Witness left the stand at 4:52 p.m.)
22            THE COURT:  All right.  I'll hear from you.
23            MR. TILLER:  Yes, Your Honor.  As I mentioned, in
24   your order in motion in limine number five where we agreed that
25   the data compensation issue was irrelevant, you said, if
```

Willowood believes that Syngenta has opened the door and it
wishes to offer such evidence, it shall bring the matter to the
Court's attention.

As you heard -- there's two issues -- there's two
things that Dr. Wichert testified to.  First, he talked about
how they invested a hundred million dollars in bringing this to
market.  Of that hundred million dollars, a significant
portion, in fact, what Syngenta has argued is $10 million, is
in the studies that are submitted to the EPA.

THE COURT:  There is no evidence of that in front of
the jury so far from what I've heard.

MR. TILLER:  I understand that.

THE COURT:  I mean, so you don't need to rebut
evidence that's not been presented.

MR. TILLER:  Well, I think -- I think the inference
in what he testified to was that generics essentially become
free-riders and that's exactly the issue we previewed when we
opposed the motion in limine.  What we don't want to have the
jury imply is that there's some type of free ride going on
because of the reliance on data.

THE COURT:  Let me just talk to Syngenta about this.

I don't understand the harm in letting him ask four
or five questions to indicate that people who rely on this data
once the exclusivity expires have to pay for it.  What's the
harm about that?

 1          MR. SANTHANAM:  The harm comes down to damages, Your

 2     Honor.  This case is about patent infringement and we're going

 3     to put on -- we put on evidence about the damages that

 4     Willowood has caused.  We don't want any confusion or

 5     prejudice, you know, that would result from the jury thinking,

 6     well, maybe this data compensation has already accounted for

 7     the damages.

 8          THE COURT:  Well, why would they think that?  I mean,

 9     if the -- if there's just a few questions that make it clear

10     what it -- you know, you're the one who's been talking about

11     the formulator's exemption and you're the one who's put this

12     evidence in here about this data exclusivity.  I don't

13     understand why a few questions about that generally are not

14     appropriate.

15          MR. SANTHANAM:  Well, they're separate issues.

16          THE COURT:  Because they're right that, you know, the

17     jury could think that, in addition to your lost profits, you're

18     somehow entitled to be paid for your data or your studies or

19     your investment.

20          MR. SANTHANAM:  And, Your Honor, there shouldn't be

21     any confusion.  As Dr. Wichert testified, he said that after a

22     ten-year period expires, these companies can come into the

23     market and market their products and use Syngenta's data.

24     There has been no implication up to this point that anybody is

25     a free-rider if they wait for that ten-year period; and to now

1  bring in evidence to suggest that Willowood has offered

2  compensation or any --

3          THE COURT:  I'm not talking about that.  I'm asking

4  you about why he can't ask a few general questions about the

5  process; that if a party -- a generic relies on the data, they

6  have to pay for it.  What is the problem with that?

7          MR. SANTHANAM:  The problem is the data and the IP

8  rights are separate.  They're two separate -- data and the

9  patent rights are two separate intellectual property rights.

10 The data comp -- as FIFRA protects, it protects the

11 intellectual property and data we submit to the EPA.

12         THE COURT:  Okay.  That's exactly right.  And so you

13 don't want the jury thinking it's not, but -- so what I'm going

14 to let you do is ask some general questions, but I don't see

15 any reason to get into how much Willowood paid -- at this

16 point, paid for data exclusivity.  I mean, that just seems like

17 that would overly complicate things, but I -- you know, we've

18 had a lot of testimony today about the process and it seems to

19 me you can ask a few questions about how that works in order to

20 tell the jury that companies who do this pay whatever you call

21 it for the data.

22         MR. TILLER:  Data comp.

23         MR. SANTHANAM:  One other point I would like to bring

24 to the Court's attention is that, as we're aware, Willowood has

25 made an offer for data compensation.  There has been no

payment. So there may be a suggestion that Willowood has

actually made a payment in this case and that also is -- it

would be prejudicial to Syngenta, Your Honor. So that's an

additional consideration we offer.

THE COURT: Well, it's just a totally different

thing, which is I think what both of you all are trying to

establish. I mean, it sounds to me like you all both agree it

is a totally different thing. You just have a different view

of how this is. So for that reason, it seems to me like you

ought to be able to ask a few questions about it and then I

assume nobody is going to be arguing this in any inappropriate

way and the jury will have what they need to understand it.

MR. SANTHANAM: Will we be able to get a limiting

instruction saying that these are two separate intellectual

property rights?

THE COURT: We can talk about whether or not

something like that is appropriate in the final instructions if

you think it's important, but I don't -- you know, you all

asked a whole bunch of questions. I don't see why the

Defendant shouldn't be able to ask a few questions generally.

MR. TILLER: And that's why -- I just want to make

sure that I understand the ground rules so -- and Mr. Santhanam

is right. There has been an offer to pay. There has not been

payment. That payment is still owed. I cannot get into what

has happened in the Willowood-Syngenta dynamic, but I can get

```
 1  into the fact that generics have to make the payment, correct?
 2          THE COURT:  Yeah.  He said a generic can't cite --
 3  this is what I wrote down.  I don't know exactly what he said.
 4  A generic can't cite that data for ten years.  They have to
 5  generate their own and they don't do it because it's expensive,
 6  but when data exclusivity ends, generics can use the data and
 7  enter.
 8          So you can just say when you reach that point:  But
 9  the generic company has to pay for the data, right?
10          MR. TILLER:  Yup.
11          THE COURT:  One question, maybe two.
12          MR. TILLER:  I think you're right.
13          THE COURT:  As long you do something like that, I
14  have no problem with that.  I think that's appropriate.
15          MR. TILLER:  Yes, Your Honor.
16          THE COURT:  To the extent Syngenta is objecting to
17  that limited question, I'll overrule it.  To the extent
18  Willowood is asking to get into what Syngenta and Willowood
19  did, which I'm not sure I really hear you -- beyond saying you
20  want to say they offered to pay --
21          MR. TILLER:  I would like to say that.
22          THE COURT:  Well, I'm going to sustain that at this
23  time.
24          MR. TILLER:  Okay.
25          MR. SANTHANAM:  Yes, Your Honor.
```

         1              THE COURT:  Is that reasonably clear?  Okay.  So you

         2   just have a very few questions in the morning?

         3              MR. TILLER:  Probably those two or three?

         4              THE COURT:  Okay.  And a little bit of redirect

         5   maybe?

         6              MR. SANTHANAM:  Perhaps, Your Honor.  It depends.

         7              THE COURT:  And then we've got a couple of

         8   depositions, right?

         9              MR. LEVINE:  Yes.  One of them is by video clip and

        10   is roughly 10 minutes.  The second is one for which there is no

        11   video, so we will have actually -- Mr. Pierce will take the

        12   witness stand and read the transcript based on questions from

        13   Mr. Coughlin.

        14              THE COURT:  Who is he going to be?  He is Mr. Wu?

        15              MR. LEVINE:  No, Brad Reichman of Reichman Sales.

        16              THE COURT:  That's going to be interesting.

        17              MR. LEVINE:  Third-party distributor.

        18              THE COURT:  I remember Mr. Reichman's deposition.  He

        19   was very interesting.

        20              MR. LEVINE:  If you look at the transcript, it's,

        21   let's say, 25 minutes, but you know the way things are with the

        22   reading.  Roughly those two deps should take no more than about

        23   45 minutes and then the last witness will be called,

        24   Dr. Wilner.

        25              THE COURT:  All right.  So possibly the Defendants

```
 1   will call a witness tomorrow.

 2            MR. TILLER:  We have some folks ready.

 3            THE COURT:  Okay.  And then I think we might be able

 4   tomorrow, after the jury leaves, to talk a little bit about the

 5   verdict sheet.  Because it's so preliminary, we might could

 6   just do that in chambers, if everybody is agreeable.  I just

 7   kind of like to bounce some things off of you all as I work on

 8   my -- so the way I do my jury instructions, generally speaking,

 9   is I focus on the issues because that seems to me to make

10   sense.

11            You know, Issue No. 1 is, you know, whatever it is

12   and then I say:  On this issue, the burden of proof is on the

13   Plaintiff, Syngenta.  This means that Syngenta must prove by

14   the greater weight of the evidence three things, if I can list

15   them like that, one, two, and three.  If Syngenta proves those

16   things by the greater weight of evidence, then you answer the

17   issue "yes" in favor of Syngenta; and if Syngenta does not

18   prove it by the greater weight of the evidence or you cannot

19   say, evenly balanced, you answer it "no" in favor of Willowood.

20   Then we talk about the law that applies on that particular

21   issue and then I kind of repeat it at the end.  If Syngenta has

22   proven by the greater weight of the evidence that A, B, C, you

23   answer "yes" in favor of Syngenta.  If they haven't proven it

24   or you're unable to say, you answer "no" in favor of Willowood.

25   And then we move on to Issue 2.
```

1    You know, if we end up with three wilfulness issues

2  in this case, I'm not going to repeat the law on wilfulness

3  three times obviously.  I'll incorporate what I said to them

4  earlier, but I would like to focus on the issues because I

5  think that's the most helpful way for the jury.  They have to

6  answer the issues, so I tend to give them their legal

7  instructions in context with an issue.  Mr. Coughlin and

8  Mr. Duncan can tell you that that's how we do it in state court

9  in North Carolina, and I think it works extremely well and

10 helps jury comprehension.  So if you all want to hang around a

11 little bit, I can give you an example from, like, an employment

12 case that I tried, you know, if you want one, but your local

13 counsel can tell you.

14    So -- you know, because of that the issues tend to

15 drive my work on my instructions and so that's why I want to

16 have a preliminary talk with you about where we might -- what

17 we might do with the verdict sheet.  You all were largely in

18 agreement on the issues.  So, you know, it's really just, I

19 think, a question of what order we will put them in and

20 fiddling around maybe with the words.  I would just like to

21 talk with you all about that yesterday -- tomorrow, not

22 yesterday, tomorrow.

23    Anything else you all want to talk about with me?

24 No.  All right.  Good.  I'll see you at 9:15 in the morning.

25    (Court adjourned at 5 p.m.)