1            THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2
SYNGENTA CROP PROTECTION, LLC.,    )
3                                  )
              Plaintiff,           )   Civil Action
4                                  )   No. 15CV274
                                   )
5    vs.                           )
                                   )
6  WILLOWOOD, LLC, WILLOWOOD       )   September 8, 2017
   USA, LLC., WILLOWOOD            )
7  AZOXYSTROBIN, LLC, and          )
   WILLOWOOD LIMITED,              )
8                                  )
       Defendants.                 )
9  _____  )

10
                  TRANSCRIPT OF JURY TRIAL
11        BEFORE THE HONORABLE CATHERINE C. EAGLES
                UNITED STATES DISTRICT JUDGE
12
APPEARANCES:
13
For the Plaintiff:    HARI SANTHANAM, ESQUIRE
14                    RUSSELL E. LEVINE, ESQUIRE
                      KOURTNEY BALTZER, ESQUIRE
15                    Kirkland & Ellis, LLP

16                    RICHARD A. COUGHLIN, ESQUIRE
                      Smith Moore, LLP
17

18  For the Defendants:   STEVEN E. TILLER, ESQUIRE
                      BARRY S. NEUMAN, ESQUIRE
19                    PETER J. DAVIS, ESQUIRE
                      Whitefield Taylor & Preston
20
                      ALAN W. DUNCAN, ESQUIRE
21                    Mullins Duncan Harrell & Russell

22

23

24

25

1                    I N D E X

2   WITNESSES FOR THE PLAINTIFF:                        PAGE

3   JOSEPH MEDDIONE (BY DEPOSITION)                       18

4   BRAD REICHMAN (BY DEPOSITION)                         21

5   DR. REX WICHERT (Continued)

6       Cross-Examination By Mr. Tiller                    6
        Redirect Examination By Mr. Santhanam             12
7
    BENJAMIN WILNER
8       Direct Examination By Mr. Santhanam               37
        Cross-Examination By Mr. Neuman                   93
9       Redirect Examination By Mr. Santhanam            154
        Recross-Examination By Mr. Neuman                168
10      Redirect Examination By Mr. Santhanam            171

11   Plaintiff rests                                     172

12   WITNESSES FOR THE DEFENDANT:

13   JANELLE KAY

14      Direct Examination By Mr. Neuman                 176
        Cross-Examination By Mr. Coughlin                193
15
    EXHIBITS:                                           RCVD
16
     PX-40    Email from J. Middione to B. Heinze         19
17   PX-42    Email from A. Tillman to C. Hayden         193
     PX-44    Email from A. Tillman to B. Heinze         193
18   DX-71    Outline of Syngenta's National Retail       6
              Program
19   DX-92    July 2015 PPS -- Product Management          4
              Meeting
20   DX-120   May 2015 email string between Willowood     21
              and Reichman
21   DX-123   Willowood sales information to Reichman     21
     DX-128   2016 Azoxystrobin Pricing Presentation     151
22   PX-171   Email from B. Heinze to A. King             21
     PX-181   Email from J. Middione B. Heinze            19
23   PX-187   Email from B. Heinze J. Middione            19

24

25

```
 1              P R O C E E D I N G S

 2          (Proceedings commenced at 9:15 a.m.)

 3          THE COURT:  Good morning.  Anything we need to take

 4 up before the jury comes in?

 5          MR. TILLER:  Two very quick matters, Your Honor.

 6 First of all, Defendant's Exhibit 92, which had been proffered,

 7 I believe, two days ago.  The parties have agreed to remove

 8 Bates page SYN-162713.

 9          MR. SANTHANAM:  Yes, Your Honor.

10          THE COURT:  All right.  With that deletion,

11 Defendant's 92 will be admitted.

12          MR. TILLER:  Yes.

13          THE COURT:  And you'll substitute a copy?

14          MR. TILLER:  We will do that.  Absolutely.

15          THE COURT:  All right.

16          MR. TILLER:  And, Your Honor, just sort of a

17 scheduling favor to ask of the Court.  We presume that the case

18 will be handed to us today.  At that time we'll want to make

19 some motions, but we have multiple witnesses that are hoping to

20 get on flights tonight or tomorrow.  One in particular has to

21 fly to China.  So I was hoping that we could maybe put those

22 arguments on the motions until the end of the day.

23          THE COURT:  That's all right with me.  Is that okay

24 with --

25          MR. LEVINE:  Yes.  We have motions, too, and we were
```

1 just going to orally state what motion we are filing and then

2 file the actual papers at the end of the day today on ECF.  I

3 didn't even think you would want to hear argument today so we

4 can just keep moving everything forward.

5          THE COURT:  That makes sense.  I'll be glad to hear

6 whatever you all want to say today after the jury leaves.

7          MR. TILLER:  It will save us a couple minutes.

8          THE COURT:  That sounds like a good idea.

9          All right.  You can bring the jury in.

10          I might excuse the jury briefly when the Plaintiff

11 rests just to let everybody say "We move for" whatever and then

12 we'll defer the arguments and bring them right back in if it

13 doesn't happen at a normal break time.

14          (Jury panel is present.)

15          THE COURT:  Good morning.  It looks like this

16 hurricane, if it gets here, will not be until Tuesday, so I

17 think we're safe to just proceed or assume we'll proceed as

18 normal on Monday.  If anything happens with the weather that

19 makes that not the case, you'll get an e-mail or a phone call

20 from the Court with some -- you know, with a revision to the

21 schedule.  I think Ms. Sanders did give you her number

22 yesterday, so if you, you know, get flooded out or something

23 horrible, which, of course, we hope doesn't happen, but any

24 sort of emergency, you can let her know.  But it looks -- of

25 course, I know we all hope we just avoid it completely, that it

spins out over the ocean and does no further harm; but if it
does come this way, it looks like it will be Tuesday, so we'll
deal with that if and when it happens.

All right. I think we're ready to proceed and we
were in cross-examination of Dr. Wichert, correct?

MR. TILLER: Thank you, Your Honor.

THE COURT: Go ahead, Mr. Tiller.

**REX WICHERT**

**CONTINUED CROSS-EXAMINATION**

BY MR. TILLER:

Q.   Good morning, Dr. Wichert.

A.   Good morning.

MR. TILLER: Your Honor, I would like to show the
witness Defendant's 71.

THE COURT: Go ahead.

MR. TILLER: I would like to move for its admission.

MR. SANTHANAM: No objection, Your Honor.

THE COURT: It will be admitted.

BY MR. TILLER:

Q.   Dr. Wichert, what is Defendant's 71?

A.   This is Syngenta's national retail program. It's a
document that we provide to our retail customers, outlines our
programs.

Q.   What kind of programs?

A.   Discounts or payments we make to them for selling,

1  managing our products to their customers.

2  Q.   I would like you to take a look at the fourth page, which

3  is SYN-035479.  Do you have that page, sir?

4  A.   I do.

5  Q.   That chart at the top, what is that?

6  A.   It's -- we call it our Key Active Ingredient Support

7  Program.

8  Q.   And you see in the second line where it says:  Reward

9  retailer's for their support of Syngenta products where a

10 generic alternative exists?

11 A.   Correct.

12 Q.   In the body of the chart, in the third column, it is --

13 the third column is entitled "Retailer Support Threshold."

14 What does that mean?

15 A.   That's the level of Syngenta AI or molecular shares, we

16 call it, that they have to maintain in order to earn the

17 incentive on the right side.  It's part of the increased

18 discounts we pay to the channel when we come under competition.

19 Q.   So just to make sure this is what I understand -- tell me

20 if I'm wrong -- if the retailer -- for example, with

21 mesotrione, if the retailer sells 99 percent of its mesotrione

22 for the year, it is entitled to a 5 percent rebate at the end

23 of the year?

24 A.   Yes.  So for azoxystrobin if they sell -- if the --

25 Q.   Can you just focus on mesotrione?

1  A.   If the mesotrione that the retailer sells, 99 percent of

2  it is Syngenta molecule or AI, then, yes, they would earn that

3  incentive.

4  Q.   Okay.  And it would -- it gets that 5 percent

5  discount -- what is that discount of?  What's the denominator?

6  A.   They get paid 5 percent on the list price of the Syngenta

7  products.

8  Q.   Of the mesotrione products?

9  A.   Yes.

10  Q.   So similarly for azoxystrobin, is it true that if the

11  retailer sells 94 percent of its azoxystrobin AI during the

12  year, its Syngenta AI, that it would then earn a 10 percent

13  incentive at the end of the year?

14  A.   That would be correct for the 2016 cropping season.

15  That's the year that this document is for.

16  Q.   Why is there a difference in the retailer support

17  threshold between mesotrione and azoxystrobin?

18  A.   We manage that with the life cycle of the product and just

19  the competition in the marketplace.  You can see that the older

20  products were -- there is more generics in the market, like

21  Gramoxone or Paraquat at the bottom, the threshold continues to

22  decline.

23  Q.   With age?

24  A.   Correct.

25  Q.   Why is there a difference in the incentive?

1  A.   The incentives differ just due to the pressure and the

2  profit that we try to help our retailers make on those products

3  and the amount of effort -- it has do with the amount of effort

4  that is required to sell those products.

5  Q.   Do -- I'm done with that document, Doctor.

6        Do all market conditions affect the sales of

7  azoxystrobin and mesotrione in the same way?

8  A.   I don't know if I would say all, but I would say the

9  majority or most.

10 Q.   Which ones don't?

11 A.   I actually can't think of any that would have a difference

12 right now.

13 Q.   What about disease proliferation?  If there is a large

14 amount of fungal disease in the South in a particular growing

15 season, would that condition affect sales of azoxystrobin in

16 the same way it affects sales of mesotrione?

17 A.   No.  Disease proliferation would have an impact on

18 azoxystrobin, whereas weed proliferation would have an impact

19 on mesotrione.

20 Q.   Would disease proliferation have the same effect -- strike

21 that.  Would disease proliferation have the same extent of the

22 effect on azoxystrobin as weed proliferation has on mesotrione?

23 A.   I believe they are similar.  Resistant weeds, for example,

24 have driven usage in herbicides and disease proliferation

25 drives the use in fungicides.  We've also worked hard over the

1  years, starting when we launched azoxystrobin, to make it a

2  planned application in crops, and we've marketed and invested a

3  lot in doing that, and we've been pretty successful.  Growers

4  now plan to use it; so as they plan to use herbicides, it's

5  a -- that was our intent.  It's similar.

6  Q.    Still a large percentage of row crop acres in the United

7  States are not treated with any fungicides, correct?

8  A.    Correct.

9  Q.    You spoke yesterday about the data.  I think you called it

10  data exclusivity for mesotrione.  Do you recall that?

11  A.    Yes.

12  Q.    And you said that -- and correct me if I'm wrong.  I just

13  want to make sure that you and I are on the same page.  I

14  believe you said for ten years generics may not rely on

15  Syngenta's data to apply for a generic application, is that

16  correct?

17  A.    Yes, that's correct.

18  Q.    After that ten-year period, isn't it true that any generic

19  can rely on that data, but that the generic applicant must pay

20  compensation to the data owner, so here Syngenta, for the

21  expenses related to generation of that data?

22  A.    Yes.  When they cite our data, they have to send Syngenta

23  a letter that basically says:  We offer to pay you for use of

24  this data.

25  Q.    And Willowood did that, didn't it?

1          MR. SANTHANAM:  Objection, Your Honor.

2          THE COURT:  Sustained.  So, ladies and gentlemen,

3  this data exclusivity payment is not at issue in the case in

4  terms of Syngenta and Willowood.  It's out there, but it pays

5  for a different thing than intellectual property rights, so you

6  don't need to consider any specifics about that here because

7  the case is not about data compensation.

8          MR. SANTHANAM:  Move to strike, Your Honor.

9          THE COURT:  Well, he didn't answer the question, so

10 there is nothing to strike.

11         You can ask your next question.

12 BY MR. TILLER:

13 Q.   The data owner, so in this case Syngenta, or any data

14 owner -- let's just talk data owners in general -- can initiate

15 a proceeding to enforce that right for payment?

16         MR. SANTHANAM:  I'm going to object to relevance,

17 Your Honor.  I do request a sidebar.

18         THE COURT:  Okay.  Well, he can answer that question

19 and then we'll move on.  Overruled.

20 A.   Yes.  So the offer to pay -- the data owner has to --

21 really has the burden to go collect.  The only way to force

22 payment is to undertake a significant cost and go to

23 arbitration.

24 Q.   When the azoxystrobin compound patents expired in February

25 of 2014, did 88 percent of Syngenta's sales of azoxystrobin

1  come from the sale of mixtures with other active ingredients

2  that were still under patent protection?

3  A.   For azoxystrobin?

4  Q.   For azoxystrobin, yes, sir.

5  A.   I don't know the -- I don't know the exact percentage

6  without looking at the data; but if I just think through the

7  market dynamics, the biggest product would have been our Quilt

8  brands and the Tilt patents which it's mixed with would have

9  expired long before.  The only mixture I can think of that had

10  a patent on it would have been the top brands, so it would have

11  been -- I would have to say it was way less than 88 percent.

12  Q.   That would have been the Solatenol mixtures?

13  A.   No.  The Solatenol mixtures weren't introduced until last

14  year.

15          MR. TILLER:  Thank you.  Nothing further, Your Honor.

16          THE COURT:  Redirect?

17          MR. SANTHANAM:  Briefly, Your Honor.

18                     REDIRECT EXAMINATION

19  BY MR. SANTHANAM:

20  Q.   Dr. Wichert, you were asked some questions just now about

21  patent protection with respect to mixtures.  Now, if we could

22  turn back to Defendant's Trial Exhibit 92 and specifically I

23  would like to go to page 8, which is SYN-162696.

24          MR. SANTHANAM:  If we could put that up on the

25  screen, David.

1              Can we switch over?

2              If we can zoom in on the box in the lower right.

3    BY MR. SANTHANAM:

4    Q.    Now, Dr. Wichert, you were asked questions about patent

5    protection with respect to mesotrione products yesterday.  Do

6    you recall that?

7    A.    I believe so, yes.

8    Q.    You know, it was indicated to you or you were questioned

9    about patents that Syngenta may have with respect to mixture

10   products, is that right?

11   A.    Correct.

12   Q.    Now, you mentioned yesterday -- and I'm going to put up

13   Plaintiff's Trial Exhibit -- Demonstrative Exhibit 24.  Now,

14   Dr. Wichert, were there any patents that Syngenta had after the

15   compound patents expired relating to azoxystrobin?

16   A.    Yes.  We had the '138 and the '761 patents.

17   Q.    With respect to mesotrione, if you could look at

18   Defendant's Trial Exhibit 92, did the fact that Syngenta had

19   patents relating to mixture products prevent generics from

20   entering at some point?

21   A.    No, it didn't.

22   Q.    What -- generics did enter, is that right?

23   A.    They entered much the same way we started with solo

24   products, what we call our established brands.

25   Q.    Can you explain what a solo product is?

A.    A solo product would be like Quadris.  It's only
azoxystrobin.  Where when we talk about enhanced brands, it
would be like a mixture of azoxystrobin and propiconazole.
What you see is basically -- you know, when you create a market
with those mixtures, it's a bit different; but when somebody
follows in on those markets, it's fairly easy for them to
recommend or bundle a propiconazole-containing product -- solo
product with their azoxy solo product and just make the tank
mixture in the fields, so it effects --
Q.    If you could slow down, Dr. Wichert.
A.    When somebody enters with a solo product like that, it
will impact the whole brand ladder.  They'll just make the
mixtures in the field.
Q.    We heard the term "straight azoxy" yesterday.  Would this
be straight mesotrione?
A.    Yeah, straight solo, so it would be a product with only
that active ingredient in the formulation.
Q.    How is it that the introduction of generic, straight or
solo mesotrione products affect mixture products on Syngenta's
brand ladder?
A.    For mesotrione, for example, we have a lot of people using
generic mesotrione that then mix it with metolachlor products
on the market or acetochlor products -- they're in the same
family -- and they in essence, create a mix in their spray tank
that's equivalent to the established brands we sell, the Lumax

1  and Lexar, in the marketplace.

2  Q.   Dr. Wichert, did the -- I guess the introduction of a solo

3  meso product, when did that happen?

4  A.   The first instance we had, we had a little bit of activity

5  in 2016.  We had fair amount of activity in 2017.

6  Q.   On Plaintiff's Trial Exhibit 92, there are references to

7  some patents relating to mixtures.  Did those patents prevent

8  generics from coming in with solo products with meso?

9  A.   No, they did not.

10  Q.   Yesterday you discussed similarities between the life

11  cycle of meso products and azoxy products up until 2014.  Was

12  there a divergence in 2014 in any way?

13  A.   The biggest divergence in how they paralleled each other

14  was we had immediate pressure in 2014 on azoxystrobin and it

15  was really 2017 before we had significant pressure with

16  mesotrione from a generic standpoint.

17  Q.   Can we go to Defendant's Trial Exhibit 71?  I believe that

18  was before you, Dr. Wichert.

19          MR. SANTHANAM:  David, if you could go to the page

20  ending in 79.  If you can zoom in the top two.

21  BY MR. SANTHANAM:

22  Q.   You recall being questioned about the incentives and

23  difference in incentives between mesotrione and azoxystrobin.

24  Do you recall that, Dr. Wichert?

25  A.   Correct.

Q.    I think you mentioned something about the date of this

document.   When was this document dated?

A.    This program -- our program year for customers runs from

October 1st to basically the end of September the following

year, so this program would have started in October of 2015 and

ended at the end of September in 2016.   It's basically for the

2016 growing season, as we call it.

Q.    Dr. Wichert, it was pointed out to you that for

azoxystrobin there was a 10 percent incentive offered to

distributors or retailers, whereas for mesotrione there was a

5 percent discount.   Do you recall that?

A.    Correct.

Q.    As of this growing season, was Willowood in the market

selling azoxystrobin products?

A.    Yes, they were.

Q.    As of this growing season, was Willowood in the market

selling mesotrione products?

A.    I don't recall exactly when they entered, but the only

company I recall selling in 2016 was a product called Bellum

and I believe it was from Rotam.

Q.    Dr. Wichert, I think this term "untreated acres" came up

that was used during cross-examination.   I would like to ask

you about a different term, "distributor inventory."   Are you

familiar with that term?

A.    Yes.

1  Q.   Can you tell us how, if at all, going from 2014 onward,

2  Willowood impacted distributor inventory?

3  A.   When a generic enters the marketplace, the first -- the

4  distributor inventory -- we run our plants a lot of times

5  year-round for efficiency, and the market happens extremely

6  fast in most situations.  So, for example, corn planting used

7  to take months.  Now the country can be planted with corn in

8  just a couple of weeks.  So you have to have a lot of products

9  staged in the market ready to go because there's just not

10  enough trucks, tanks, to get it into market as fast as it

11  moves.  So the distributors hold significant amount of

12  inventory of products at the field level to help with that

13  market space.

14         When generics enter, there becomes a price risk, and

15  they will start to squeeze that inventory down, which

16  impacts -- right?  So you -- as long as the inventory's flat,

17  your sales mirror the market.  But when the inventory squeezes,

18  it has sort of a compounding impact on your sales because

19  they're selling inventory, and they are not replacing.

20  Q.   That was my going to be my next question, Dr. Wichert.

21  When distributor inventories decrease, what happens to

22  Syngenta's profitability?

23  A.   Our sales go down considerably.  Then we start reacting,

24  and we put more money in the market.

25  Q.   Based on your work in life cycle management as a customer

1   marketing manager and your various roles, did Willowood impact

2   distributor inventory with respect to azoxystrobin?

3   A.    Yes.

4              MR. SANTHANAM:  No further questions, Your Honor.

5              THE COURT:  Anything else on the limited topics

6   covered in redirect?

7              MR. TILLER:  Nothing further, Your Honor.

8              THE COURT:  No?  All right.  Thank you.  You can step

9   down.

10             (At 9:39 a.m, witness excused.)

11             MR. LEVINE:  Your Honor, we're going to play video

12  clips of the deposition of Mr. Jeff Meddione, who is the

13  chief operating officer of Willowood USA.

14             THE COURT:  All right.  Ladies and gentlemen, you'll

15  remember, I think it was, Wednesday you saw some depositions.

16  This is taken under oath.  Everybody is present.  Everybody has

17  a chance to ask questions.  So you should consider this

18  testimony just as if the witness was present in the courtroom.

19             MR. LEVINE:  Okay.  Your Honor, we move to admit

20  Plaintiff's Trial Exhibits 40, 181 and 187, which will be shown

21  during this video clip.

22             THE COURT:  40, 181 and --

23             MR. LEVINE:  And 187.

24             THE COURT:  I'll give the Defendants a moment to

25  look.

1      MR. TILLER:  No objection.

2      THE COURT:  It will be admitted.

3      MR. LEVINE:  David, you can play the video.

4      THE COURT:  That was so loud, I couldn't even hear

5  it.  Start it over with the volume reduced.  That woke us all

6  up, didn't it?

7      (Video deposition of Joseph Meddione played.)

8      MR. LEVINE:  Your Honor, for clarity on the record,

9  Plaintiff's Trial Exhibit 40 corresponds to what was in the

10 video testimony as Deposition Exhibit 34, Plaintiff's Trial

11 Exhibit 181 corresponds to what was referred to in the video

12 testimony as Deposition Exhibit 22, and Plaintiff's Trial

13 Exhibit 187 corresponds to Deposition Exhibit 30.

14     THE COURT:  Okay.  There was some discussion of 33,

15 but that wasn't shown, right?

16     MR. LEVINE:  Right.

17     THE COURT:  Okay.  Go ahead.

18     MR. COUGHLIN:  Your Honor, the next witness will be

19 Brad Reichman also by deposition.  This is not by video.  It

20 will be read.

21     THE COURT:  All right.

22     MR. COUGHLIN:  If I may approach, Your Honor, we have

23 binders with the exhibits.

24     THE COURT:  While he's doing that, ladies and

25 gentlemen, they're going to present this testimony not by

video, but with somebody who is not Mr. Reichman sitting up
here -- I think it's Mr. Pierce, is that right?  Yeah,
Mr. Pierce is going to come up here and be Mr. Reichman and
read Mr. Reichman's answers, and the lawyers will read the
questions that were asked of him at that deposition, so you
should consider this just like the video deposition.  Even
though, you know, you don't have his face before you, you
should still consider the testimony the same way as if the
witness were here.  You can come on up to stand.  Of course,
Mr. Reichman was under oath.

          Mr. Coughlin, are you going to read all the
questions?

          MR. COUGHLIN:  I am.

          THE COURT:  All right.  This includes what each side
wants you all to consider from Mr. Reichman's testimony.  Go
ahead.

          MR. COUGHLIN:  And, your Honor, if I may, for the
record, there are three exhibits that we will refer to.  It
will be Defendant's Exhibit 120, which on the video is referred
to as REI-13.  The second exhibit is Defendant's --

          THE COURT:  Plaintiff's?

          MR. COUGHLIN:  Defendant's.  Defendant's 123, which
is referred to as REI-61.  And the final exhibit is Plaintiff's
Trial Exhibit 171, which on the video is referred to as REI-36.

          THE COURT:  All right.

 1          MR. COUGHLIN:  I'm sorry, in the transcript, not the

 2   video, of course.

 3          THE COURT:  Transcript, all right.  Have those

 4   already been admitted?

 5          MR. COUGHLIN:  No, we are moving for their admission

 6   now.

 7          MR. NEUMAN:  Did you say D-123, Defendant's 123?

 8          MR. COUGHLIN:  Yes, sir.

 9          MR. NEUMAN:  And what pages did you say that respond

10   to?

11          MR. COUGHLIN:  REI -- it's page 68, but REI-61 on the

12   transcript.

13          MR. NEUMAN:  Just REI-61?

14          MR. COUGHLIN:  Yes, sir.

15          MR. NEUMAN:  No objection.

16          THE COURT:  They'll be admitted.  You may proceed.

17          MR. DAVIS:  Just a moment.  So far the -- counsel,

18   it's is my understanding that the designations that you guys

19   have been presenting so far have been Syngenta designations

20   together with Willowood's cross-designations.  I heard you say,

21   if I understood you correctly, that -- when you told the jury

22   that this includes all of the information from Mr. Reichman's

23   testimony that both parties want to present, my understanding

24   is that it's Syngenta's designations and Willowood's

25   cross-designations; and to the extent that there's additional

 1  testimony that Willowood would like to present in its direct,

 2  that will be presented.

 3          THE COURT:  Oh, all right.  I thought it was

 4  everything.  But -- so I'm mistaken.  It's cross-designations

 5  as to the --

 6          MR. DAVIS:  Portions that were designated by

 7  Syngenta --

 8          THE COURT:  -- portions that were there.  All right.

 9  I'm sorry.  Go ahead.  I'm sorry about that, ladies and

10  gentlemen.  Thank you for correcting me.

11          MR. COUGHLIN:  Thank you, Your Honor.

12          (Deposition of Brad Reichman read into the record as

13  follows:)

14  BY MR. COUGHLIN:

15  Q.   Could you state your name, please?

16  A.   Brad Reichman.

17  Q.   And what is your occupation?

18  A.   Chemical sales.

19  Q.   By whom are you employed?

20  A.   Today, Wilbur-Ellis owns Reichman Sales.

21  Q.   What is Reichman Sales?

22  A.   A chemical company.  We sell chemicals.

23  Q.   What's is your position within Reichman Sales?

24  A.   I'm the general manager now.  I used to be the president,

25  but now that Wilbur-Ellis owns us, I'm the general manager.

1  Q.   I want to ask you a couple of questions about Reichman

2  Sales & Service.   What exactly is the business of Reichman

3  Sales & Service?

4  A.   We are a retailer/distributor of ag chemicals all over the

5  country.

6  Q.   Could you describe generally the type of customers you

7  sell to?  Do you sell to retailers or growers or other

8  distributors?

9  A.   We will sell to farmers.  We sell to other dealers.  So a

10  little bit of the everything.

11  Q.   And while you were president of Reichman Sales & Service,

12  what were your responsibilities?  What did you do in that

13  position?

14  A.   Purchasing and sales.  Everything.  I mean, it was a small

15  company.  Relative to the ag business, it's small.  You know,

16  70, $80 million company, but it's small.

17  Q.   Were you directly involved in purchasing and selling

18  agrichemical products?

19  A.   Yes.

20  Q.   And in that capacity, did you regularly interact with your

21  suppliers and your customers?

22  A.   Yes.

23  Q.   Okay.  And did you regularly negotiate pricing with your

24  suppliers at which your suppliers would sell you agrichemical

25  products?

1  A.    Yes.

2  Q.    And did you regularly discuss and negotiate with your

3  customers the price at which you would sell agrichemical

4  products?

5  A.    Yes.

6  Q.    At some point, did Reichman Sales & Service begin to

7  purchase and sell agrichemical products containing

8  azoxystrobin?

9  A.    Yes.

10  Q.    Do you recall from whom Reichman first began to purchase

11  azoxystrobin products?

12  A.    Well, it would have been a Syngenta product because there

13  was no generic for years.  So I don't know what year, but, yes,

14  we had sold Syngenta's azoxy product in the past.

15  Q.    You purchased azoxy product from Syngenta?

16  A.    Not directly.  It is all through distributors or other

17  dealers, yes.

18  Q.    Who was the first generic from whom Reichman Sales &

19  Service purchased azoxystrobin products?

20  A.    Willowood.

21  Q.    Willowood.  Are you sure about that?

22  A.    No.  Maybe Cheminova first and then Willowood.  Yeah.  I

23  think that was the order of things.  Cheminova first and then

24  Willowood.

25  Q.    Now, I'd like you to turn, please, to REI -- it's the

1  third page of the document, which is Bates stamped page REI 13.

2  Do you have that in front of you?

3  A.    Yes.

4  Q.    Now, I'd like you to look about halfway down.  It says, On

5  May 19, 2015, at 7:23 p.m., Andy King wrote, and it says, Brad,

6  take a look at this.

7         Do you see that?

8  A.    Yes.

9  Q.    Now, I'd like you to just keep going down through his

10  e-mail to the next page, and he's got some information.  This

11  is how it printed out from what you sent.  There's various

12  information, and then I would like you to go all the way down

13  to page what's Bates stamped 17, which is still his e-mail.

14         Do you have that in front of you?

15  A.    Yes.

16  Q.    And right above his identification line, he says,

17  Cheminova only brought enough Azoxy Tech in last December and

18  this February to make two TL's of Equation.  They can't have

19  much left.

20         Do you see that?

21  A.    Yes.

22  Q.    What is an TL?

23  A.    Truckload.

24  Q.    Do you recall seeing they e-mail from Mr. King?

25  A.    Yes.

1   Q.   What do you understand he was trying to tell you there?

2   A.   He was trying to tell me that there was no product

3   available.

4   Q.   From Cheminova?

5   A.   From Cheminova.

6   Q.   And was he trying to tell you that in order to persuade

7   you to buy it from Willowood?

8   A.   I would assume so, yes.

9   Q.   All right.  And then if you turn back to the third page of

10  this document, REI 13, do you have that in front of you?

11  A.   Yes.

12  Q.   So right above his e-mail in the middle of that page,

13  there's an e-mail from you to him nine minutes -- 11 minutes

14  later at 11:34 p.m. (sic) on May 19, 2015, and you say, He said

15  today he thought there was 15,000 gallons in stock in Equation

16  SC label, but he was not quite sure because there was two more

17  categories of inventory with Equation and Azaka and did not

18  know if that inventory had been converted to all Equation SC.

19          Do you see that?

20  A.   Yes.

21  Q.   Who is he in that e-mail that you're sending to Andy King?

22  A.   I do not recall.

23  Q.   Was it somebody at Cheminova?  Would you assume that?

24  A.   I would assume it was someone at Cheminova, yes.

25  Q.   Okay.  So this e-mail from you to Mr. King is dated

1  May 19, 2015.  Would it be accurate then to say that by May 19,
2  2015, you were having conversations with someone at Cheminova
3  about possibly supplying azoxystrobin product to Reichman Sales
4  & Service again?
5  A.    Yeah.  I would assume that, yes.
6  Q.    Okay.  Could you please look at the first page of this
7  document, Exhibit 5, which is Bates stamped REI 11.  It's the
8  beginning of this e-mail chain, towards the top, in any event.
9           Almost near the top, there is an e-mail from you to
10  Andy King dated June 1, 2015, at 10:43 a.m., and you are saying
11  to Mr. King, I don't think I need to wait any longer for my
12  money.  You have to remember with FMC I don't have to pay
13  anything up front and I get terms.
14           In fact, by the time FMC shipped you product in July
15  of 2015, you were done with Willowood, were you not?
16  A.    We were able to buy azoxy from competing companies cheaper
17  than Willowood would sell us directly.
18  Q.    Were you done with Willowood?
19  A.    We were buying product on the outside because Willowood
20  was selling it much cheaper.
21  Q.    To whom?
22  A.    Out of a plant through other dealers.  So we were able to
23  buy Willowood stuff cheaper on the outside, which I did not
24  like.  They were selling products very cheaply in the
25  marketplace to other people.

1  Q.   And at some point, did FMC offer to sell you product --

2  azoxystrobin product at a price less than $90?

3  A.   They did.

4  Q.   In fact, they offered to sell it to you at $80, did they

5  not?

6  A.   They did.  They were getting out of the business

7  completely.

8  Q.   And did you purchase more product at $80 from them?

9  A.   I did not.  The seeding was over.

10 Q.   So this was by the fall?

11 A.   I do not remember when he offered, but it was after the

12 seeding was over.

13 Q.   But before I start, Mr. Neuman had mentioned that you had

14 a couple of calls with him prior to this deposition; is that

15 right?

16 A.   That's correct.

17 Q.   How many of these calls did you have?

18 A.   I think Mr. Neuman called me three times.

19 Q.   Okay.

20 A.   I'm not -- I don't know for sure, but two to three times.

21 Q.   Do you remember when those calls were?

22 A.   They've been over three weeks ago, three, four weeks ago.

23 Q.   Do you remember what was generally discussed on those

24 calls?

25 A.   Basically everything to do with these documents.

1  Q.   Now, Mr. Reichman (sic), is that a distributor or a
2  retailer?  Or excuse me.
3          Now, Reichman, is that a distributor or a retailer?
4  A.   We are both.  We sell to farmers and dealer.
5  Q.   When you say "dealers," do you mean wholesalers?
6  A.   Yes, other small wholesale outlets.
7  Q.   Now, Mr. Neuman asked you a little bit earlier how you
8  first became engaged with Willowood.  Do you recall whether it
9  was you that reached out to Willowood regarding azoxystrobin
10  products, or was it Willowood that reached out to you?
11  A.   We already had a relationship buying other product from
12  Willowood, so it was just kind of a natural -- they just
13  brought the product to us as another offering.
14  Q.   Okay.  So Willowood came to you with a new product?
15  A.   Yes.
16  Q.   Okay.  How -- can you describe -- can you describe how
17  Willowood priced its products?  Was there a method by which
18  they priced their products?
19  A.   Willowood is just notorious just to -- everything they
20  bring in is that product usually goes way down in value when
21  Willowood brings it.  So how they price it, I don't know, but
22  it -- usually, when Willowood comes in with a product, you know
23  that product is going to the basement floor on pricing.
24  Q.   What's your basis for that?
25  A.   It is just their track record.  You could probably ask

1  anybody in the business and you'll get the same answer.

2  Q.    What is Willowood's reputation in the industry?

3  A.    Just like that.  It's -- it's a -- it's a company that

4  when -- like I said, when they bring a product, you know we're

5  going to the floor.  We're going to the basement.  They

6  are -- it's --

7  Q.    Does Willowood have a reputation in terms of the quality

8  of their products?

9  A.    The quality is good.  There's no problem with that.

10  Q.    So the actual net price that Willowood had offered you on

11  REI 61 was $25 minus 25 --

12            THE COURT:  I think you misspoke there.  $125, didn't

13  it say?

14  BY MR. COUGHLIN:

15  Q.    $125 minus $25 resulting in $100 net price; is that right?

16  A.    That is correct.

17  Q.    That was the net price you were purchasing -- or,

18  Willowood was proposing that you purchase Azoxy 2SC as of

19  October 17, 2014; is that right?

20  A.    That's correct.

21  Q.    If you can, take a look at that same page, REI 61, where

22  it says 21,600 gallons, Willowood AzoxyProp, unit price 90.

23            Do you see that?

24  A.    Yes.

25  Q.    Willowood was proposing as of October 14 (sic) that

1 Reichman purchase 21,600 gallons at unit price of $90 per

2 gallon; is that correct?

3 A.   That's what they were proposing, yes.

4 Q.   Do you recall if there were any rebates to that $90?

5 A.   I do not believe at that time there was anything -- there

6 was any rebates to that product at that point.

7 Q.   Was there a rebate later that Willowood offered for

8 AzoxyProp?

9 A.   I believe they gave me something off the product.  I do

10 not recall the details, but we broke down and, you know, ended

11 up splitting ways, and I was actually buying the product from

12 another source cheaper than what Willowood was selling me

13 directly.

14 Q.   Okay.  So you were able to buy AzoxyProp Xtra for cheaper

15 than $90 from another source to whom Willowood had sold

16 AzoxyProp?

17 A.   That's correct.

18 Q.   Do you recall when you were able to buy cheaper than --

19 AzoxyProp cheaper than $90?

20 A.   Yeah.  It was in the summer of 2015.

21 Q.   As of February 15, 2015, Willowood was offering AzoxyProp

22 Xtra, along with other offers, to lower your net price to

23 $79.58 based on an invoice price of $78.33 based on a retail

24 price; is that right?

25 A.   Yes.

Q.    Understood.  If you turn to REI 36, there's an e-mail
there at the top from Brian Heinze of Willowood USA to you and
Andy King.

          Do you see that?

A.    Yes.

Q.    And that's dated October 20, 2014.

          Do you see that?

A.    Yep.

Q.    And then below there there's another -- there's an e-mail
from Andy King to you copying Joe Meddione and Brian Heinze
also dated October 20, 2014.

          Do you see that?

A.    Yes.

Q.    Do you know who Joe Meddione is?

A.    He's also an owner of Willowood.

Q.    Okay.  Do you understand Brian Heinze is the -- is the CEO
or president of Willowood USA?

A.    Yes.

Q.    In his e-mail to you on page REI 36, Mr. King states, All
we can do is continue to tell everyone that these fighting
brands would not exist if it weren't for generics.

          Do you see that?

A.    Yes.

Q.    Your understanding is that when he says "fighting brands"
he's referring to Syngenta's Aframe product, right?

1  A.    Right.

2  Q.    Do you know what he means by "all we can do is continue to

3  tell every one that these fighting brands would not exist if it

4  weren't for generics"?

5  A.    I believe he's just saying that, you know, Syngenta would

6  never come up with a brown box label if it wasn't for them

7  putting out their product.

8  Q.    Was it your understanding that Syngenta came out with a

9  fighting brand called Aframe because of Willowood in the

10 marketplace?

11 A.    I believe, yes, Syngenta and every other company usually

12 comes out with a fighting brand when there's a generic.  Not

13 always, but it happens.

14 Q.    When Mr. Neuman asked you about the active ingredients,

15 you had indicated that it's the same active ingredient in

16 Equation and Azaka?

17 A.    That's correct.

18 Q.    Do you know why Cheminova would have two products with the

19 same active ingredient?

20 A.    They made two products because that's what Syngenta had.

21 Syngenta had Quadris, and they had Abound.  Quadris was a

22 higher priced product for a different market, and Abound was a

23 cheaper version of the same thing for a different market, but

24 they did not have the same labels.  So that's what Cheminova

25 did.  They followed the practice of Syngenta.  Now, Willowood

1  destroyed it by making one label.  So instead of having a $200

2  product and a $120 product, they made one, and you know where

3  it goes; it goes to the lowest price.

4  Q.    It was a race to the bottom in price?

5  A.    Exactly.

6  Q.    Now, are you aware that Equation -- the label for

7  Cheminova's Equation product did not have corn or tobacco on

8  the label?

9  A.    To begin with, it didn't.

10 Q.    Okay.

11 A.    But then it did a receive a corn label.

12 Q.    But as of 2014 when Cheminova was reaching out to --

13 A.    You're correct.  It did not have a corn label that year.

14 Q.    Azaka you indicated was comparable to Syngenta's Abound

15 product?

16 A.    Abound, yes.

17 Q.    Do you have a sense of which crops that Azaka was directed

18 to?

19 A.    I don't have -- I'm not hugely familiar with it, but I

20 think it was more like in the tobacco and -- it was a

21 southern-based product, so it was something that we really

22 didn't have a lot of need for, but I did sell some of the Azaka

23 in the southern market.

24 Q.    Okay.  Is it your understanding that the growers need to

25 follow the labels on pesticides products?

1    A.    Yes, they need to follow the label.

2    Q.    What's your understanding as to the consequences of not

3    following the labels?

4    A.    You know, you can be fined pretty heavily if you're not

5    following labels.

6    Q.    And Reichman wasn't in the practice of selling Equation

7    and Azaka for off-label use, correct?

8    A.    Say that again.

9    Q.    Reichman was not telling growers and wholesalers to use

10   Equation and Azaka for off-label use?

11   A.    No.   No.

12   Q.    And the lowest price that Willowood offered or at least

13   one price that Willowood offered in 2014 was $100?

14   A.    I believe that's correct, yes.

15   Q.    You would agree that Willowood offered a price for its

16   Azoxy 2SC that was at least 50, if not $55 cheaper than what

17   Cheminova was offering in 2014?

18   A.    Yes.   They were offering it at a cheaper price.

19   Q.    Mr. Reichman, Mr. Neuman tried to suggest to you that the

20   net price of a $100 that Willowood was offering Azoxy 2SC in

21   2014 might have been in response to something prompted by

22   FMC-Cheminova.

23           Do you recall that question?

24   A.    In 2014, it was not to do with FMC.   I mean, as I talked

25   to him on the phone earlier, FMC kind of did fall off the radar

1  a little bit -- or, Cheminova before their merger, and so

2  basically my -- to get $100, I negotiated that, basically.

3  Q.    The $100 that you negotiated was -- had nothing do with

4  prices that Cheminova was offering the marketplace?

5  A.    Cheminova really wasn't offering anything at the moment.

6  Q.    The only documents that you -- Reichman has produced

7  regarding Cheminova from 2014 reflect a net price of 150 to

8  $155; is that right?

9  A.    Yes.  When they were Cheminova, I believe it was 150 and

10  155 both, correct?

11  Q.    Correct.

12  A.    Yeah.

13  Q.    There were no documents that you found or were able to

14  locate at Reichman that reflect a lower net price from

15  Cheminova from 2014, correct?

16  A.    Not -- no, not on that product, no.

17  Q.    And in 2015 I were negotiating with Willowood as you were

18  disengaging from them, correct?

19  A.    That's correct.

20  Q.    And that's when you were telling Willowood that you could

21  get $100 a gallon from FMC on better terms, correct?

22  A.    That was later than 2015 in the summer, correct.

23            (Deposition of Brad Reichman concluded.)

24            MR. COUGHLIN:  That's all, Your Honor.

25            THE COURT:  All right.  Please step down.

1          You can call your next witness.

2          MR. SANTHANAM:  Yes, Your Honor.  We call

3   Dr. Benjamin Wilner to the stand.

4          (Witness sworn by the clerk.)

5          MR. SANTHANAM:  Your Honor, we have courtesy binders

6   prepared as well for Dr. Wilner.

7          THE COURT:  Okay.  You can proceed when you are

8   ready.

9                    BENJAMIN S. WILNER,

10             PLAINTIFF'S WITNESS, SWORN AT 10:15 A.M.

11                    DIRECT EXAMINATION

12   BY MR. SANTHANAM:

13   Q.   Good morning, Dr. Wilner.  Would you --

14   A.   Good morning.

15   Q.   Would you please state your full name for the jury.

16   A.   Dr. Benjamin Stuart Wilner.  Stuart is S-T-U-A-R-T, and

17   Wilner is W-I-L-N-E-R.  And I want to apologize that as

18   Dr. Wichert and Dr. Whitton have testified before me, I'm the

19   third Dr. W that you've heard in this case.

20   Q.   Who do you work for?

21   A.   I'm employed by the international consulting firm of

22   Alvarez & Marsal.

23   Q.   What do you do for Alvarez and Marsal?

24   A.   So I'm a Ph.D. economist with roughly 20 plus years of

25   experience doing economic, financial, and statistical

1  consulting.

2  Q.    Without getting into the details, would you tells us

3  generally why you are here today?

4  A.    I was retained to calculate the damages that Syngenta

5  suffered because of Willowood's actions and calculate the

6  amount of money that should be owed to adequately compensate

7  Syngenta for such actions.

8  Q.    Are you being compensated for your work on this case?

9  A.    My firm is being compensated for my work; and as a partner

10 in the firm, I receive some of that money.

11 Q.    And what is the rate that your firm charges?

12 A.    My firm receives $595 an hour, irrespective of the results

13 this case.

14 Q.    Dr. Wilner, I'd like to start by talking about your

15 background and qualifications.  Can you tell us a little bit

16 about your education?

17 A.    Sure.  So I actually have two undergraduate degrees.  I

18 have a general course degree in mathematics and statistics from

19 the London School of Economics in London, England.  I have a

20 bachelor of arts degree, magna cum laude with distinction, and

21 a major in mathematics and economics from the University of

22 Pennsylvania in Philadelphia.  And then I have a Ph.D., or

23 doctorate, which means I've completed a bunch of course work

24 and then wrote a dissertation of unique research that was

25 accepted by a committee of professors at the Kellogg Graduate

1  Schools of Management and Northwestern University and that --

2  my field of study was something called managerial economics and

3  decision science.

4  Q.    Dr. Wilner, have you had any teaching engagements?

5  A.    I have.  I was a professor of finance and a professor of

6  statistics at the University of Iowa.  I was a visiting

7  assistant professor of finance at the University of Michigan.

8  I was an instructor in decision science and a visiting

9  professor of finance at Northwestern University.  And then I

10  taught overseas for a little bit where I was a visiting

11  professor of economics at the Helsinki School of Economics in

12  Finland.

13  Q.    Now, Dr. Wilner, have you had any mentors over the course

14  of your education and background?

15  A.    I have.  I've been very lucky to have several great

16  mentors, and in particular I'd like to highlight four of them.

17  First, I spent three years working for a gentleman who won the

18  Nobel Prize in economics for statistical modeling and

19  statistical forecasting in economics.

20        Secondly, I work -- I studied under another Nobel

21  Prize winner who won for his study of labor markets, how people

22  are employed and how companies interact with their employees.

23        Thirdly, I studied under a third Nobel Prize winning

24  economist who won the Nobel Prize for his study of how markets

25  work.

1          Then the president of the University of Chicago, he

2    read my senior thesis that I wrote in college, and he used that

3    as a theoretical basis behind one of his research papers.

4    Q.   Over the course of your education and in your career, have

5    you received any awards?

6    A.   I have.  I've received both academic awards, as well as

7    professional awards.

8    Q.   Can you tell us about your academic awards.

9    A.   Sure.  So it's -- in addition to teaching awards and

10   research grants from various universities, I received a grant

11   from the US Government's National Science Foundation for my

12   study of how prices are set in various markets.

13   Q.   Can you tell us about your professional awards?

14   A.   Sure.  So it's -- last year I received a special

15   commendation from the commissioner of US Customs and Border

16   Protection for helping them redesign a $2.5 billion a year

17   tariff, that's billion with a B.  And in -- and what that

18   tariff covered is all products that are imported into the

19   United States, including some of the imports that you've heard

20   about here in this case.

21          In addition, in another project for Customs and

22   Border Protection, I helped Customs and Border Protection

23   economically analyze speeding up the process to bring in

24   agricultural goods into the United States.

25          MR. SANTHANAM:  Your Honor, at this time we'd tender

1  Dr. Benjamin Wilner as an expert in economics.

2           THE COURT:  Does the Defendant have questions about

3  his qualifications?

4           MR. NEUMAN:  No objection; not at this time, Your

5  Honor.

6           THE COURT:  All right.  He may so testify.

7  BY MR. SANTHANAM:

8  Q.    Dr. Wilner, in connection with this case, have you reached

9  any opinions?

10 A.    I have.

11 Q.    And in preparing to testify in this case, did you prepare

12 any materials to help you explain your opinions?

13 A.    I did.

14 Q.    In the binder before you, would you turn to the first tab

15 in that binder?

16 A.    Actually I apologize.  I do not have a binder.

17           MR. SANTHANAM:  Permission to approach, Your Honor?

18           THE COURT:  You may.

19 BY MR. SANTHANAM:

20 Q.    Dr. Wilner, will you turn to the first tab in that binder?

21 A.    Yes.

22 Q.    And does this tab contain what -- this tab contains what

23 has been marked as Plaintiff's Demonstrative Exhibit 10.  Are

24 these materials that you prepared?

25 A.    Yes, they are.

1  Q.   What was the process by which you prepared these

2  materials?

3  A.   So I have a staff of about three or four people that

4  assisted me on this project, and working in concert with them,

5  we summarized the opinions I generated from the research I did

6  in this case, and we condensed it into the slide presentation

7  shown behind Tab 1.

8  Q.   Do these demonstrative slides fairly and accurately

9  summarize the work that you've done on this case and your

10 opinions?

11 A.   They do.

12 Q.   Do you believe that they will help you in explaining your

13 opinions to the jury clearly and efficiently?

14 A.   As I'm dealing with damages, and there are lots of

15 numbers, yes, I do.

16        MR. SANTHANAM:  Your Honor, permission to show

17 Plaintiff's Demonstrative Exhibit 10 to the jury.

18        MR. NEUMAN:  No objection.

19        THE COURT:  All right.  You may proceed.

20        MR. SANTHANAM:  Your Honor, since this is a slide

21 deck that Dr. Wilner has prepared, I'm hoping to give him a

22 clicker so that he can advance through the slides.  Is that

23 appropriate?

24        THE COURT:  All right.  As long as you're asking him

25 questions.

1        MR. SANTHANAM:  Correct.  Permission to approach?

2        THE COURT:  Yes.

3        THE WITNESS:  Thank you.

4   BY MR. SANTHANAM:

5   Q.    Dr. Wilner, you mentioned that you reached an opinion in

6   this case.  What is that opinion?

7   A.    So it is my conclusion that Syngenta suffered damages in

8   the form of lost profits of at least $75.6 million.

9   Q.    Briefly, Dr. Wilner, would you describe for us the

10  materials that you considered in reaching this opinion.

11  A.    Yes, I can.  There's several types of documents that I

12  looked at.  I first started by looking at Syngenta's actual and

13  budgeted sales and profits, so these are financial documents;

14  some of which you have seen before, and this presents how much

15  Syngenta sold, how much it cost them to make those sales;

16  profits, prices, et cetera.

17  Q.    What else did you consider?

18  A.    So it's -- those are just numbers, and while I deal with a

19  lot of numbers, I also want to understand the context behind

20  those numbers, so I looked at internal business presentations

21  and correspondence that Syngenta had which gave color to those

22  financial numbers, and then I supplemented those Syngenta

23  documents with similar documents from Willowood.

24  Q.    Did you speak with anyone?

25  A.    I did.  So it's both the profit financial data as well as

1  the presentations or correspondence, those are just documents,

2  but I had some questions about the documents so I discussed

3  things with Syngenta personnel.  I talked to people throughout

4  the organization.  People who made azoxystrobin as well as

5  other products.

6         I talked to people in sales and marketing of

7  azoxystrobin as well as other products, and I talked to people

8  in finance, people who compiled all of the numbers to get an

9  understanding of things.  And from those questions that I asked

10  of them, additional documents and data and presentations and

11  correspondence were sent to me, which further enhanced my

12  knowledge of the market and the products at issue.

13  Q.    You know, Dr. Wilner, you said that you have a small team

14  that you work with, and when you say you spoke with people, did

15  you personally speak with the individuals in Syngenta?

16  A.    I did.

17  Q.    Did you conduct any independent research of your own?

18  A.    I did.  So in addition to these documents and discussions

19  that I had, I looked at many depositions.  You've seen many

20  deposition transcripts and many videos.  We read all of the

21  depositions where people knowledgeable about this case provided

22  information, so I reviewed that.

23         And but I -- while all of those documents were

24  provided as part of the case, we went and we did our own

25  independent research, going out and furthering studying the

1  azoxystrobin agrochemical market and obtained more information

2  to round out what was in the documents and discussions with

3  Syngenta and other information.

4  Q.    Now, Dr. Wilner, we've been hearing testimony from various

5  witnesses since Tuesday.  Have you been in the courtroom

6  observing that testimony?

7  A.    Been sitting right back there.

8  Q.    Now, you talked about the materials you've considered.

9  Can you tell us the method by which you reviewed these

10 materials and came to your opinions.

11 A.    Sure.  So what I did was a three-step process.  First, I

12 analyzed background information on the products and the

13 industry to understand what's going on.  And then once I

14 understood the products and the industry, I then calculated

15 damages, but I didn't stop after I calculated damages.  I

16 performed additional steps to insure that my calculations made

17 sense, so I validated them.

18 Q.    Let's start with the background that you reviewed.  What

19 did you review and rely on in terms of background information?

20 A.    So obviously the first thing I had to learn about was

21 azoxystrobin.  I'm sure that's a new word that you all heard

22 earlier this week, so I'll admit it was a new word to me, so I

23 had to learn about it.  And one of the things that I learned is

24 that azoxy's a fungicide that prevents major fungi from harming

25 plants, and it's used in a wide variety of crops, most

1  particularly, corn, but other products as well, such as soy,

2  wheat, tobacco, et cetera.

3  Q.   Are there other benefits to azoxy that you observed?

4  A.   Yes.  And so it's as you have heard a lot about first

5  introduced by Mr. Cecil, that not only is azoxy a fungicide,

6  but it's a crop-enhancement product.  And what that

7  crop-enhancement product does is it strengthens the plant.  It

8  makes the plant stronger so that it can grow longer and not dry

9  out as the season ends, and because it doesn't dry out, it

10  allows the crop to grow longer and the yield increases.

11          I think Mr. Cecil testified that you can get, I think

12  he used the example of 16 bushels per acre more by using that.

13  So that benefit occurs even if there's no disease in the field,

14  and that additional benefit of getting, in his example,

15  16 bushels per acre, causes great benefit to the farmer.  I saw

16  evidence that there's up to three -- two to three times return

17  on investment from putting azoxy on.  The cost of azoxy is

18  outweighed by two or three times the additional yield.

19  Q.   Dr. Wilner, in terms of Syngenta's business, how did you

20  assess Syngenta's azoxystrobin products compared to its

21  business?

22  A.   So it's -- I found that azoxy is Syngenta's largest

23  selling product worldwide, and so this is a major product for

24  Syngenta, and that's one of the reasons why we're here is

25  because they care about it a lot.

1          THE COURT:  Okay.  Next question.

2    BY MR. SANTHANAM:

3    Q.    Now, Dr. Wilner, what azoxystrobin products from Syngenta

4    did you look at?

5    A.    Sure.  So azoxystrobin has four different major uses.

6          THE COURT:  What was your question?

7    BY MR. SANTHANAM:

8    Q.    What azoxystrobin products from Syngenta did you look at?

9          THE COURT:  Okay.  Answer that question.

10         THE WITNESS:  So it's -- I looked at products that

11   are particularly defined for different markets.  You have

12   product that are defined for the crop protection market, so

13   this is where the product is applied by the farmer after

14   planting.

15         You have seed care, and seed care is where the

16   product is put on the seed before planting.  Also, you've heard

17   testimony that some products are used specifically for the lawn

18   and garden market by -- and used by golf courses and growers,

19   and then this azoxystrobin can control mildew, so people who

20   manufacture paper and wallboards also find benefit from putting

21   azoxy in their paper.

22   Q.    Now, you've listed for us four different types of

23   azoxystrobin uses or products.  Did you focus on any particular

24   use as part of your analysis in this case?

25   A.    Yes, I did.  My analysis primary focuses on the

1  crop-protection market, so where I looked -- primarily looked

2  at only the products that are applied by the farmer after

3  planting.

4  Q.   Did you look at Syngenta's brand ladder and the types of

5  products it uses -- offers for crop protection?

6  A.   Yes, I did.  And so the slide has been presented before in

7  different forms, and so as of 2014, Syngenta had three

8  different steps and three different rungs on the brand ladder.

9  And they have various brands which are there to attract

10  different types of farmers who want different kinds of uses.

11         An analogy that I like to give is if you think about

12  General Motors.  General Motors have multiple brands of cars.

13  For example, they have Chevrolet, they have Cadillac and they

14  have GMC as examples.  If someone -- Chevrolet is primarily

15  going after customers who want a good quality but standard car.

16  Cadillac is there for people who want a more luxury product,

17  and GMC is there for people who want generally a truck.  So

18  that similarly to how General Motors goes and builds products

19  and brands to provide benefits to people who want different

20  things, Syngenta does the same thing.

21  Q.   Can you explain how.

22  A.   So it's that -- for example, some -- just some farmers

23  want kind of just like Chevrolet, a good quality standard

24  product.  Some want more luxury or enhanced products, such as

25  Quadris Top, Quadris Top SB, or Quadris SBX, and some want

combinations where you can take an azoxystrobin product, like
Quilt Xcel, and mix it with something else. You've heard about
mixtures with mesotrione before, and here we have an example of
a mixture with Endigo, which is an insecticide.

Q. Now, Dr. Wilner, you've got three rungs of a ladder here.
Did you look at whether Syngenta introduced other products?

A. Yes, I did. As you heard the testimony before, Quilt and
Quadris used to be at the top of the ladder, but as time has
evolved, and as these products have become more known in the
market, they've fallen down on the ladder. So it's -- in order
for Syngenta to have a full range of products to provide needs
for the variety of farmers, they oftentimes expand their brand
ladder.

Q. Can you explain how.

A. So it's whereas this here shows Syngenta's azoxy products
as of 2014, that Syngenta regularly improves and that in 2016,
they introduced Trivapro and Elatus, which are the next rung up
on the ladder.

Q. How did that fit into your analysis of Syngenta's
products?

A. So it's that -- this is like an -- this brand ladder is
kind of like a ladder you might have at home, in that Syngenta
spends a lot of time figuring out where the rungs on the ladder
need to be. And if the rungs of the ladder are too far apart,
just like your ladder at home, you can't climb it, and it's not

1   that useful.  The rungs need to be properly placed and moved
2   together.  You can't just move one rung, because just like your
3   ladder at home, it won't work.
4   Q.   Dr. Wilner, you've talked about brand ladder.  Can you
5   tell us if you've examined the patents that Syngenta asserts in
6   this case?
7   A.   Yes, I have.  And since we've heard a lot about patents,
8   and there are four patents that are at issue in this case, and
9   I have the patent numbers listed in the left column.  And while
10  these numbers are in the 5 million, 8 million, as you have
11  heard, that in general, patents are referred to by the last
12  three numbers, so -- of the patents, which I've highlighted.
13  So we have the '076, and '256 compound patents, the '138
14  process patent, and the '761 DABCO patent.
15  Q.   What is the significance, if any, of the expiration dates
16  of these patents?
17  A.   So it's that you can see I have the expiration dates for
18  these patents in the far right column, and let me talk about
19  expiration as an economist.  And so as an economist, a patent
20  gives the patent holder an exclusivity, so that the patent
21  holder can sell the product or utilize a process exclusively.
22  And so as you might think about it, just economically, if
23  someone has an exclusive, in general prices are higher for an
24  exclusive than for a product that everyone might have.
25  Q.   And what is the impact of a patent expiration?

A.   So it's that, as you can see from this chart, the '076 and

'256 compound patents expired in February of 2014, which means

Syngenta had an exclusive over the products through 2014.

          After February 2014, generics and other companies

could legally sell the products so there's no longer an

exclusive.  Similarly, Syngenta had an exclusive over the

process specified in the '138 patent through December of 2015,

22 months later, and then 25 years later, they -- Syngenta had

the exclusive over using the '761 DABCO patent.

Q.   Now, Dr. Wilner, we've talked about, you know, looking at

the Syngenta products and the patents.  Did you examine how

Syngenta manages its product life cycle?

A.   I did.

Q.   Can you explain how.

A.   So it's just -- well, the live person before me was

Dr. Wichert, and one of the things that you might recall is

that one of his prior positions was he was -- again, I forget

the title, but he was in charge of post-patent strategy.  So

it's that as we talked about, patent -- when patents come

expire, that other companies can come in with similar products

or processes, so Syngenta has a whole team that is set up to

just deal with this -- a product life cycle time where patents

expire and after they expire.

Q.   Now, Dr. Wilner, in terms of -- I'd like to jump ahead and

talk a little bit about the analysis that you performed in this

1  case.  Can you describe how you went about calculating damages
2  and the approach that you took.
3  A.    Sure.  So it's -- how I calculated damages, I'm sorry?
4  Q.    Yes.
5  A.    Okay.  So what I did is, I calculated the damages that
6  were adequate to compensate Syngenta for the infringement that
7  Willowood did, and so I focused in this case on lost profit
8  damages, and in order to calculate lost profit damages, you
9  need to calculate the additional profits that Syngenta would
10 have earned had Willowood not infringed.
11             In economic terms, we call this the but-for economic
12 scenario.  So but-for Willowood's infringement and alleged
13 infringement, what profits would Syngenta have made?
14 Q.    How did you go about calculating lost profits?
15 A.    So it's -- what I did is I used a simple, straightforward
16 formula.  In order to calculate the additional profits Syngenta
17 would have made but-for Willowood's infringement, I calculated
18 the but-for profits, how much Syngenta would have made had the
19 infringement not occurred minus the actual profits.  And that
20 difference and that subtraction gets you to lost profits.
21 Q.    And you've told us about the formula, but what was the
22 method you used with this formula to calculate lost profits?
23 A.    So it's because the but-for economic scenario didn't
24 happen, you need to build an economic model to calculate what
25 those but-for profits would be and what reasonably would have

1  happened had Willowood not infringed or entered early.  And so,

2  in particular, I use what is called the Benchmark Method.

3  Q.    Can you tell us what the Benchmark Method is?

4  A.    So what the Benchmark Method is, is where you utilize

5  something similar to value the thing that you want to do.  As

6  an example, you might think about a home appraisal.  So you

7  might have to have your home valued for some reason.  And so

8  what that appraiser does is it uses potentially two different

9  benchmarks to value your home.

10           First, they go and they look at well, what do other

11  homes in your neighborhood sell for?  And they say, okay, this

12  home is comparable to your home, and so they can value it like

13  that.

14           But one thing that might happen is you might have an

15  additional bathroom or a finished basement, which makes your

16  house maybe a little bit different than your neighbor's house.

17  So it's -- the house appraiser uses a benchmark to say, well,

18  how much is an additional bathroom worth, how much is a

19  finished basement worth.  And through that two, maybe

20  three-step process, the home appraiser comes up with the value

21  of a home.  And so I used a similar process for -- in this

22  case.

23  Q.    Can you tell us what the purpose of using a benchmark in

24  this case is?

25  A.    Sure.  So it's -- what you want to do is you want to use

1   the benchmarks to reasonably -- to reflect what reasonably
2   would have happened in the but-for scenario without Will -- in
3   essence, what would happen without Willowood's infringement or
4   entering early.
5           As you have heard before, Willowood's infringement
6   and entering early caused Syngenta to lose sales, and also,
7   caused them to drop price.  And economically, we call it a
8   price drop, price erosion.
9   Q.   Now, Dr. Wilner, what makes a good benchmark?
10  A.   So what you want to do is you want to have a benchmark be
11  sufficiently similar to the product at issue.  So just like in
12  the home appraisal.  The home appraiser picks homes that are
13  similar to the home that you might have, but because I am using
14  this to measure the but-for scenario, what would have happened
15  without Willowood's infringement, I need to use a benchmark
16  that doesn't have Willowood's infringement baked into it now.
17  Q.   What were the benchmarks that you used to calculate lost
18  profits?
19  A.   So it's just like the home appraiser.  I utilized two
20  benchmarks to estimate Syngenta's but-for -- what Syngenta's
21  but-for profits would have been had Willowood not infringed or
22  entered early.  And those two -- first, I used Syngenta's
23  azoxystrobin budget, and then secondly, I used the differences
24  between budgeted and actual mesotrione, or meso, profits.
25  Q.   Let's talk about that first benchmark, azoxy budget.  Can

1  you tell us about it?

2  A.   Yes.  So it's -- I started with 2014 azoxystrobin budgets.

3  And, as Mr. Cecil testified earlier, these 2014 budgets were

4  created just before Syngenta learned about Willowood's

5  infringement.

6  Q.   And did you take into account the budgetary process?

7  A.   Yes.  So it's that -- as Mr. Cecil and as Dr. Wichert and

8  Mr. Fisher testified earlier, in that Syngenta has a very

9  exacting budgeting process.  It's an 18-month process to

10  determine what the budgets will be for a given year.  There's

11  peer reviews.  There's multiple levels of people who will

12  review it.  There are -- and those people who review it have 10

13  plus years of experience in the industry, so they know about

14  what is going on.

15           And that because you have the peer-review process

16  where the azoxy product lead talks to the meso product lead,

17  that they insure that there's consistency between the various

18  budgets.

19  Q.   Can you tell us about the azoxy budgets that you did use?

20  A.   Sure.  So it's -- again, I started with -- so I used

21  budgets for each year that I calculated damages.  I calculated

22  damages for 2014, 2015, 2016, and 2017.  And I started with the

23  2014 budgets, which, as I said before, were which were the last

24  budgets or forecasts Syngenta created prior to their knowledge

25  about Willowood's planned entry.

```
1   Q.    What does the azoxy budget as a benchmark accomplish?
2   What was the purpose of using it?
3   A.    So it's that because of these -- and starting with the
4   2014 budget, this was created before the knowledge of
5   Willowood's infringement.  This isolates the impact of
6   Willowood's infringement.
7           Furthermore, as you have heard about the detailed
8   process behind the budget, this isolates the economic market
9   factors affecting the agriculture industry.  And also, it
10  accounts for the standard product life cycle.  It's known that
11  azoxystrobin was going come off patent with regards to the
12  compound patents in 2014, and so Dr. Wichert and his
13  post-patent strategy team got involved and used their standard
14  playbook, used the pillars of the post-patent strategy to --
15  and incorporated them in the budgets.
16  Q.    Let's talk about the second benchmark.
17          THE COURT:  I think, before we do that, we'll take
18  our morning recess.  Might be a good point here.
19          So, ladies and gentlemen, I'll excuse you for 15
20  minutes.  Please remember not to talk about the case among
21  yourselves or with anyone else.  Don't have any contact with
22  the lawyers, parties, or witnesses.
23          Leave your notes in your chair and come back at
24  11:00.  The jury is excused.  If everyone will remain seated
25  while they step out.
```

```
 1            (Jury panel excused.)
 2            THE COURT:  Okay.  Anything we need to take up before
 3  the jury comes in?  I know when -- this was very first thing
 4  this morning when Dr. Wichert was on the stand, Syngenta asked
 5  for a bench conference, but I felt like I had already heard
 6  from you, and I was going to rule in your favor, so I didn't
 7  feel like I needed the bench conference.  I'll just say that's
 8  why I wouldn't do it.
 9            Is there anything anybody wants to say or do or ask
10  or raise?  No?  All right.  We'll take a 15-minute recess.
11            (At 10:47 a.m., break taken.)
12            (At 11:00 a.m., break concluded.)
13            THE COURT:  Anything we need to take up before the
14  jury comes in?
15            MR. TILLER:  No, Your Honor.
16            MR. LEVINE:  No, Your Honor.
17            THE COURT:  No?  Okay.  You can bring the jury in.
18  It's gotten kind of cold in here again, hasn't it?
19            MR. TILLER:  Better than the alternative.
20            (Discussion held off the record.)
21            (At 11:02 a.m., jury returned.)
22            THE COURT:  Okay.  I believe we're ready to continue.
23  So, Mr. Santhanam, you can continue with Dr. Wilner.
24  BY MR. SANTHANAM:
25  Q.  Dr. Wilner, where we left off before the break was you
```

1  were discussing the first benchmark, the azoxy budgets, that

2  you used.  I'd like to now talk about the second benchmark that

3  you used with respect to meso.  Can you tell us, first of all,

4  what mesotrione is?

5  A.   Sure.  So, as you heard before, mesotrione, or meso, is

6  one of Syngenta's best-selling herbicides.

7  Q.   And how did you use mesotrione as a benchmark in this

8  case?

9  A.   So it's -- that one of the important things about

10 mesotrione is that it contemporaneously came off of exclusivity

11 around the same time as azoxystrobin -- the azoxystrobin

12 compound patents in the mid to early 2014 time frame.

13 Q.   And why is that relevant?

14 A.   So it's that Dr. Wichert's post-patent strategy team was

15 involved in establishing the budgets for both azoxystrobin and

16 mesotrione.  And as he talked about, you have the various

17 pillars behind that strategy, and they were incorporated into

18 both budgets.

19 Q.   Did you look at the markets in which mesotrione and

20 azoxystrobin are offered in?

21 A.   Yes.  So both products are offered on a variety of crops,

22 both, primarily corn; and also, as was testified before by

23 Dr. Wichert and others is that these products are oftentimes

24 mixed in a -- while sold separately, they're functionally

25 similar as -- they have a functional relationship as farmers

1  mix them together in a tank and spray them simultaneously.

2  Q.   Now, you said that meso and azoxy had some similarities up

3  until 2014.

4            THE COURT:  Up until what?

5            MR. SANTHANAM:   2014.

6  BY MR. SANTHANAM:

7  Q.   Was there a point in which they diverged?

8  A.   Yes.  So it's that -- one of the things that happened with

9  azoxystrobin is that Syngenta alleges that there was

10 infringement of various patents by Willowood.  As Dr. Wichert

11 just testified, there was not such similar infringement on

12 mesotrione.  That meso -- that generic competition for

13 mesotrione did not come in till about a year or two later as

14 they standardly see when patents roll off of exclusivity.

15 Q.   And were you using mesotrione as a product, itself, as a

16 benchmark, or were you using some other comparison which

17 related to meso?

18 A.   Sure.  So what I was doing was I was not directly

19 comparing the mesotrione budgets to these azoxystrobin budgets.

20 Instead, what I recognized is that the budgets that were

21 created for azoxystrobin were Syngenta's best understanding of

22 the market at the time.  But as we all know, not all budgets

23 are met.

24            So I used the mesotrione budget to take into account

25 the fact that, sometimes, budgets are exceeded; sometimes,

1  budgets are met; sometimes, there's underperformance relative
2  to a budget.
3  Q.  Were there other rationales or purposes behind using the
4  mesotrione comparison as a benchmark?
5  A.  So, again, what the mesotrione budget did -- and the
6  difference between what actually happened and what was budgeted
7  had for allows for a comparison of what would have happened
8  without the infringement.  So, it isolates the impact of
9  Willowood's infringement.
10        And this technique is one of the techniques that when
11  I was working with the Nobel Prize-winning professor for
12  statistical modeling, this is one of the major steps that we
13  employed is using additional benchmarks to supplement our
14  original calculations.
15  Q.  Did using mesotrione or the difference between the budgets
16  and actual for mesotrione help account for product life cycle?
17  A.  Exactly.  Because what it did is that both mesotrione and
18  azoxystrobin were in the same part of the life cycle, so they
19  were dealing with the same post-patent strategy issues in
20  Dr. Wichert's team.  And because of that, the -- I analyzed how
21  much to the extent mesotrione either made or did not -- made,
22  exceeded, or underperformed mesotrione's budgets.
23  Q.  Did you use the azoxystrobin budget and then adjust your
24  analysis based on the mesotrione budget?
25  A.  Exactly.  Because the azoxystrobin budget was set up based

 1  upon the best knowledge that Syngenta had based upon its 18

 2  months of planning, but, as we all know, unexpected things can

 3  happen during the year.  So this mesotrione budget takes into

 4  account unanticipated future economic changes.

 5          So just like what I did with Nobel Prize winner and

 6  also with the housing example of that sometimes you need to use

 7  an extra benchmark to value what a bathroom is worth.

 8  Q.   Dr. Wilner, we heard earlier about gross-to-net reports?

 9  A.   Yes.

10  Q.   Have you heard that before?

11  A.   I have.

12  Q.   I'd like you to turn to your binder in the second -- there

13  are a number of different tabs in your binder.  If you turn to

14  the third tab, there should be what's in there and it's already

15  been admitted into evidence Plaintiff's Trial 110A, 123A, 140A,

16  and 148A.  Do you see those?

17  A.   I do.

18  Q.   Do you recognize those?

19  A.   Yes.  These are gross-to-net reports that previously have

20  been discussed in the testimony.

21          MR. NEUMAN:  I'm sorry, Counsel, which tabs?  I

22  didn't hear you.

23          MR. SANTHANAM:  This is Tab 3.

24          MR. NEUMAN:  Thank you.  I beg your pardon.

25          THE COURT:  Go ahead.

BY MR. SANTHANAM:

Q.   Did the -- how did you take into account these gross-to-net reports?

A.   So it's as I talked about, the budget -- you see, the benchmarks that I utilized, I have the Syngenta budgets, and then I also looked at mesotrione budgets and actual performance.  And so all of that information is captured within these gross-to-net reports.

Q.   Now, Dr. Wilner, we heard earlier today about -- or not today -- yesterday about variations in Syngenta's budgets.  And I'd like to talk to you about that.

A.   Okay.

Q.   I'd like to put up what has been entered into evidence by Defendants as Defendants' Trial Exhibit 252.

        MR. SANTHANAM:   David, can you put that up?

BY MR. SANTHANAM:

Q.   Now, Dr. Wilner, have you taken a look at the -- Syngenta's gross profits and budgeted gross profits, year on year, as reflected here in Defendants' Trial Exhibit 252?

A.   Yes.  As well as the budgeted and actual sales.

Q.   And to be very clear, did you use the budgets from 2009 to 2013 as benchmarks in your analysis?

A.   No.  My analysis solely utilized the 2014, 2015, 2016, and then part of the 2017 budgets.

Q.   But did you take into account or at least look at the

1  budgets from 2009 through 2013?

2  A.    I did.

3  Q.    And can you tell us, did you observe any variations in the

4  actuals and budgets in Syngenta's financial records?

5  A.    I did.  So this is for azoxystrobin, and yes, I do see

6  that.

7  Q.    Okay.  Now, did you take that into account as part of your

8  analysis?

9  A.    I did.

10 Q.    How did you do that?

11 A.    So it's -- one of the things that I saw is if you look at

12 lines 10 and 11 of this chart, is this is the difference

13 between budgets and actual.  And you can see that there are

14 differences, one might say, potentially, sizable differences in

15 the tens of millions of dollars in 2009, 2011 -- 2009, 2010,

16 2011, and 2013.

17 Q.    And, Dr. Wilner, did you reach any economic conclusions as

18 to whether the budget variations from 2009, 2010 and 2011 --

19 let's start with those years.  Did you reach any economic

20 conclusions as to whether that impacts your use of benchmarks

21 from 2014 onward?

22 A.    I did do such analysis.

23 Q.    Can you explain?

24 A.    Sure.  So it's -- I looked at these variances, and said,

25 why are they happening.  And one of the things that I needed to

1    assure myself was that -- and question, was this a systematic

2    problem with Syngenta's budgeting process, or could this have

3    been just the result of a one-time event.  And I concluded for

4    various reasons that it was the latter; that the reasons for

5    the deviations you see in 2009, 2010, 2011 are because of a

6    one-time event.

7    Q.   And what was that one-time event from your economic

8    perspective?

9    A.   From my economic perspective, this is what we have known

10   in the public as the Great Recession that was occurring during

11   this time frame.

12   Q.   And how would that impact the budgets?

13   A.   So it's -- there are three different things that I looked

14   at to go and analyze the -- how the Great Recession affected

15   budgets and actuals during this time frame.

16   Q.   You mentioned three things.  Let's start first with the

17   first item.  What is that?

18   A.   Sure.  So it's -- first thing is that, as Mr. Cecil

19   testified earlier, that Syngenta, like many companies, had

20   problems doing budgets during the Great Recession because there

21   was just great uncertainty about what was going on.  So that

22   was the first thing.

23   Q.   What was the second?

24   A.   The second thing is, I looked at the research, the papers,

25   and speeches given by a woman named Dr. Christina Romer.

1  Q.    Who is Dr. Romer?

2  A.    So Dr. Romer, she's currently a professor of, I think,

3  economics -- yes, economics at the University of California

4  Berkeley.    But not only does she hold a chair professorship

5  there, but she was a chair of the Council of Economic Advisors

6  in the Obama administration during the time of this recession.

7  So she, in essence, was in charge of the economy.

8  Q.    And what role -- what did you look at in terms of

9  Dr. Romer's work?

10  A.    So it's -- what Dr. Romer did is she did various analyses

11  of recession and economic downturns.    And she found that,

12  overall, budget -- it was very hard to do forecasting during

13  this time frame.    And she specifically did analyses of when

14  economic downturns, and she -- during certain economic

15  downturns, it's relatively easy to budget, and in others, it's

16  harder to budget.

17          And based upon the characteristics of the Great

18  Recession that was occurring during this time frame, she

19  concluded that it was very hard to do budgeting in the United

20  States during that time frame.

21  Q.    What was the third analysis that you performed?

22  A.    So it's -- I am -- as I said, I do various economic

23  consulting.    And one bit of economic consulting I do is I serve

24  as an economist for the crop insurance industry.    So there's

25  something called crop insurance, which is comparable to your

1  car insurance.  So if a bad event happens with your car, an
2  insurance will pay you money.
3  Q.   And how does the -- how does insurance play into a role of
4  figuring out whether Syngenta met its budgets?
5  A.   Sure.  So it's -- there are prices to buy insurance.  And
6  these prices are set by the US Department of Agriculture for
7  how much crop insurance costs.
8          And if you look at how the US Department of
9  Agriculture calculated the prices for insurance during this
10 time frame, there was lots of uncertainty baked into these
11 prices.  And that meant that even the US Government had trouble
12 forecasting the agricultural economy during this 2009, 2010,
13 2011 time frame.
14 Q.   Dr. Wilner, taking all of this into account, what is your
15 economic assessment of Syngenta's budget performance for 2009
16 to 2011?
17 A.   So it's -- during this time frame, I, again, go back --
18 went back to my original question.  Was the deviations that
19 existed in 2009 to 2011 due to asystematic problem, or was it
20 due to a one-time event.  And based upon these three analyses
21 that I performed, I concluded that it was based upon a one-time
22 event as to why this deviation occurred.
23 Q.   Let's talk about 2012.  Did Syngenta meet its budgets for
24 azoxystrobin in 2012?
25 A.   It didn't make the budgets, but as you can see, it was

1  really close.  There really was not that much difference.

2  Q.   What about 2013?

3  A.   2013, it missed its budgets.

4  Q.   And did you -- do you have -- did you make any economic

5  assessment regarding the budget variation in 2013?

6  A.   I did.

7  Q.   What is that assessment?

8  A.   So it's -- to understand what went on in 2013, you

9  actually have to look at 2012 and what happened in 2012.  2012

10 was known as the Great Midwest Drought.  I don't know if you

11 even can recall that in the news.  And that this drought peaked

12 in July and August of 2012.  And literally, just -- crops just

13 died because there wasn't enough water, and so that had various

14 implications which affected why the 2013 budget was missed.

15 Q.   Did the timing at which the drought peaked have any

16 impact -- based on your economic analysis, does the timing at

17 which the drought peaked have any significance?

18 A.   It does.

19         MR. NEUMAN:  Your Honor, may we have a sidebar?

20         THE COURT:  Okay.

21         (Bench conference as follows:)

22         MR. NEUMAN:  We have heard nothing about the Great

23 Midwestern Drought from Dr. Wilner in his expert report or his

24 deposition.  This is all new.

25         MR. SANTHANAM:  Your Honor, he's responding to

1  criticisms that are being made of his analysis in his report.

2  Didn't put on -- you know, he based his analysis on budgets,

3  and he presented his opinions in his report.  They've offered

4  criticism, so he's responding to those criticisms.

5          MR. DAVIS:  I don't know what criticisms it's

6  response to, but this is all new.

7          THE COURT:  Well, he means the criticism that he

8  shouldn't be relying on budgets.  I assume that's what you're

9  talking about?

10          MR. SANTHANAM:  Yes.

11          THE COURT:  Okay.  You could move along a little

12  faster, but I'll overrule it.

13          (Bench conference concluded.)

14          THE COURT:  Go ahead.

15  BY MR. SANTHANAM:

16  Q.   Dr. Wilner, can you explain for us the significance of the

17  timing of this drought?

18  A.   So, if you remember before Mr. Cecil testified, and he

19  testified and Mr. Fisher also stated that the main time in

20  which farmers apply their azoxystrobin is in July and August of

21  the growth year, and this was right exactly around the time of

22  the peak time in the drought.

23  Q.   What did that imply?

24  A.   So it's that this -- so if you were a farmer and you were

25  facing a situation, you might not have -- you might have bought

1  azoxystrobin to put on your crops, but because the crops were
2  dead, you didn't.  And so as Dr. Whitton -- and you didn't.
3  Q.   And did you observe that for a significant portion of
4  azoxystrobin or what extent?
5  A.   So it's -- I don't know what happened and Syngenta was
6  unable to tell how many farmers actually applied the
7  azoxystrobin in 2012 and how many farmers didn't because the
8  crops were dead or dying.
9  Q.   How did that impact 2013?
10 A.   Sure.  So as Dr. Whitton testified on the first day, his
11 azoxystrobin is a very stable chemical.  You can just put it on
12 the shelf.  So that what farmers did is farmers who did not
13 apply the azoxystrobin they purchased in 2012, they just put it
14 on the shelf and then used it the next year in 2013.
15 Q.   Did that impact the budgetary -- did that impact the
16 actual sales?
17 A.   It did, because Syngenta was unable to measure how many
18 farmers actually just had the bottle on their shelf, so that
19 they had trouble budgeting in 2013 because of that uncertainty.
20 Q.   I want to move ahead to 2014 and 2015.
21       Did you make any economic assessments as to
22 budgets -- Syngenta's budgets and the extent to which it made
23 its budgets in 2014 and 2015?
24 A.   Yes.  As I looked at 2014 and 2015, yes, there was some
25 economic decline.  Prices went down for crops during that time

```
 1  frame, which I captured in my benchmark analysis, but can see

 2  that in 2014 there's a big decline, a big variance from budgets

 3  versus actual, and as I concluded, that was due to Willowood's

 4  actions.

 5  Q.    What about 2015?

 6  A.    So in 2015, Syngenta had great knowledge about Willowood's

 7  activities and planned activities, and it was able to utilize

 8  the efforts of Dr. Wichert's post-patent strategy team; and one

 9  thing you can see is once they knew what the ground rules were,

10  Syngenta budgeted well.

11          MR. SANTHANAM:   David, we can put that away.

12  BY MR. SANTHANAM:

13  Q.    Dr. Wilner, I would like to get down to the brass of your

14  calculations and specifically for the calculations you did with

15  respect to the compound patents.  Can you jump ahead and tell

16  us how you went about calculating Syngenta's damages with

17  respect to the compound patents?

18  A.    Sure.  So I calculated damages for the two compound

19  patents together, and I calculated damages by year.  First I

20  calculated for 2014 and then for '15, 2016, 2017, and I

21  conservatively stopped there.

22  Q.    Let's talk specifically about 2014.  What did you do for

23  2014?

24  A.    So as I started with my first benchmark, which was the

25  final 2014 azoxystrobin gross profit budget --
```

1  Q.    Why did you start with that budget?

2  A.    Because this budget -- as Mr. Cecil testified, this was a

3  budget that was created two to three months before Syngenta

4  garnered knowledge about Willowood's planned infringement.  So

5  this budget was created assuming Willowood would not have

6  infringed.

7  Q.    Did you make any adjustments to this budget?

8  A.    Sure.  So the budget started out saying that they expected

9  Syngenta to make $166.6 million in 2014; but, as we talked

10  about before, some budgets are met, some budgets are exceeded,

11  sometimes you underperform a budget.

12  Q.    And what was the adjustment that you made?

13  A.    So, here, I utilized a second benchmark where I said,

14  okay, let's look at what happened to meso.  Let's compare the

15  actual performance of meso versus a budget, and you know what?

16  Because there was weakness in the agriculture economy in 2014,

17  crop prices fell, farm income fell.  Mesotrione missed its 2014

18  budget by roughly 15 percent.

19  Q.    And what was the adjustment that you made?

20  A.    So it's that I assumed that because meso missed its budget

21  by 15, 16 percent, that azoxystrobin would have missed its

22  budget by 15, 16 percent.  So, in particular, I took out

23  roughly $26 million from the budget.

24  Q.    Dr. Wilner, if you did not make this adjustment to your

25  analysis, how would that have impacted your overall damages

1  calculation?

2  A.    My damages would have been higher if I did not do this

3  adjustment.

4  Q.    What does the blue bar on the right of $140.9 million

5  reflect?

6  A.    So this roughly $141 million, this is the amount of money

7  I conclude that Syngenta would have made had Willowood not

8  infringed.

9  Q.    Is that what you called the "butt-for profits"?

10  A.    Yes, exactly, but-for profits.

11  Q.    How did you go from there, the 140.9 million, to

12  calculating what Syngenta's lost profits were?

13  A.    So if you remember my lost profits formula, but-for

14  profits minus actual profits equals lost profits, so that's

15  what I did.  I concluded that had Willowood not infringed, the

16  but-for profits would have been $141.  I then went to the

17  gross-to-net reports that were in here and saw that Syngenta

18  actually made roughly $121 million in 2014.

19  Q.    And where did that take you?

20  A.    So then using the formula but-for profits minus actual

21  profits equals lost profits, I concluded that Syngenta lost

22  $20 million in 2014 because of Willowood's actions.

23  Q.    Dr. Wilner, we've been talking about how you've applied

24  the benchmarks you used to get to this 20-million-dollar

25  figure.  Is there a different way that you can look at this

1  analysis?

2  A.   Yes, you can.  So the first thing is you can say

3  Syngenta's actual profits were $121 million, and they should

4  have made -- and their profits would have been 16.6 percent

5  higher in 2014 had Willowood not infringed.

6  Q.   Can you show us how you did that?

7  A.   So that's the calculation here that's shown here where I

8  just did 20 million divided by 121 million.

9  Q.   Did you do any other analyses?

10  A.   I did.  So if you remember, we started off with the

11  $166.6 million.  That was the final budget, and then the actual

12  was $120.9 million.  So there was a roughly 46-million-dollar

13  shortfall in 2014.

14  Q.   Did you attribute that $45.7 million shortfall to

15  Willowood?

16  A.   No, I did not.  What I did is I broke up this

17  45-million-dollar shortfall into two components.  As you can

18  see, 45 breaks up into two things.  So the yellow bar is the

19  shortfall due to forces unrelated to Willowood, and the red bar

20  is the amount of damages due to Willowood.

21  Q.   And what type of factors does the $25.7 million that you

22  say was unrelated to Willowood -- what types of factors does

23  that take into account?

24  A.   So the $25 million relates to additional unanticipated

25  market factors.  So, therefore, I conclude that over half of

1    the shortfall that Willowood -- excuse me -- that Syngenta
2    incurred were due to factors unrelated to Willowood and less
3    than half of that shortfall, or $20 million, was due to
4    Willowood's activities.
5    Q.   If you didn't make this adjustment, how would that have
6    impacted your analysis?
7    A.   If I didn't make this adjustment, the damages would have
8    been higher.
9    Q.   Now, you've taken us through 2014, Dr. Wilner.  I'd like
10   to jump ahead to 2015.  Can you tell us about the process you
11   went about in calculating damages for 2015?
12   A.   Sure.  So, again, I utilized a very similar process.  I
13   started with the 2015 budgets, which were created in October
14   and November of 2014, and Syngenta budgeted and forecast that
15   they would have made $99 million in 2015.
16   Q.   And where did you go from there?
17   A.   So it's important to realize that there is a difference
18   between the 2015 budget and the 2014 budget.
19           MR. SANTHANAM:  Your Honor, we'd like to make a
20   correction on the record.
21           THE COURT:  Is that right?
22           MR. SANTHANAM:  It should say 2015 at the top.
23           THE COURT:  Okay.  I mean, you might need to ask the
24   witness about that.
25

1  BY MR. SANTHANAM:

2  Q.   Is that right?

3  A.   No, so this should be 2015 but-for azoxystrobin gross

4  profits.   I'm sorry.

5  Q.   Dr. Wilner, can you tell us how you went from the budget

6  from 2015 and any adjustments that you made?

7  A.   Sure.  As I just said, there's a difference between the

8  2014 budgets and the 2015 budgets.   In 2014, this was created

9  two to three months before Syngenta knew about Willowood's

10  activities and planned activities.   This budget -- the 2015

11  budget was created after Syngenta had knowledge about

12  Willowood's activities and planned activities.   So this budget

13  was reduced because it had that knowledge.

14  Q.   Did you make any adjustments for that?

15  A.   I did.  Because what I want to do and what I need to do in

16  deriving this but-for world is determine what the profits would

17  have been had Willowood not infringed.   So I need to just add

18  back in the amount of reduction in the budget because of

19  Syngenta's knowledge about Willowood's activities.

20  Q.   What was that adjustment?

21  A.   So if you recall, I determined that Syngenta would have

22  made 16.6 percent more money in 2014 had Willowood not

23  infringed.   So because these 2015 budgets were created with a

24  lot of knowledge about 2014, I conclude that had Willowood not

25  infringed, Syngenta's budgets would have been 16.6 percent

1  higher.

2  Q.   Where does that take you?

3  A.   So then I need to add back in, which is roughly

4  $16.4 million -- that I conclude that had Willowood not

5  infringed, Syngenta would have had a budget of $115.4 million

6  in 2015.

7  Q.   Did you make any further adjustments?

8  A.   Sure.  And then I apologize.  There's an error in the top

9  header as well.  It should be calculations from the 2015

10 but-for budgets.  Sorry about that.

11          So that then this is what the budget -- the budget

12 was 2015 -- I'm sorry, was $115 million, and as I previously

13 discussed, sometimes budgets are met, sometimes they're

14 exceeded, and sometimes there is underperformance; and while

15 there is underperformance in 2014, there's actually

16 overperformance in 2015.

17 Q.   Can you show the adjustment that you made?

18 A.   Sure.  So I looked at the meso actual and budgeted

19 profits, and I found that meso beat its budget by 2.7 percent.

20 So, therefore, I just added in another 2.7 percent, which was

21 $3.1 million, to come up with the bar on the far right.

22 Q.   What does that blue bar of 118.6 million reflect?

23 A.   So what that bar reflects is the amount of profits

24 Syngenta would have earned in 2015 had Willowood not done its

25 infringement or alleged infringement.

1 Q.   Now, taking that $118.6 million figure, how did you go

2 from there to calculating lost profits for 2015?

3 A.   Again, what I did was I utilized my lost profits formula.

4 Lost profit formula:  But-for profits minus actual profits

5 equals lost profits.  But for the infringement, I concluded

6 that Syngenta would have made $118.6 million.  These

7 gross-to-net reports say that Syngenta actually made

8 $93.6 million.  So, therefore, there was roughly a

9 25-million-dollar shortfall in 2015, which was on top of the

10 20-million-dollar loss in 2014.

11 Q.   Now, Dr. Wilner, in reaching this, you mentioned that you

12 had applied the benchmarks.  Can you explain what those

13 benchmarks accounted for in your 2015 calculation?

14 A.   Sure.  So it's these accounted for -- and these benchmarks

15 were sufficiently similar to what azoxystrobin was doing --

16 actually did or would have done.

17        So I used one benchmark to look at what -- taking the

18 budgets and all the other economic factors, and then I used the

19 mesotrione deviations from budgets to figure out how in general

20 crops -- the chemicals that were subject to the same budgeting

21 process performed.

22 Q.   Now, you've gotten us through 2015.  Can you briefly tell

23 us what you did for 2016 and 2017?

24 A.   So I utilized the very similar method for 2016 and 2017,

25 but I didn't created graphs with it.  I'm happy to if you want

1  to, but I just used a very similar calculation method of using

2  the two benchmarks.

3  Q.   Did you do anything else?

4  A.   I did.  So the important thing to understand is that

5  what -- when I need to calculate the damages that are

6  sufficient to compensate Syngenta for Willowood's actions,

7  that's lost profits.  It's not lost sales.  What you need to do

8  is you need to figure out what the lost sales are and then

9  subtract out relevant costs; and using the calculation

10 methodology that I did, I was able to mostly do that in one

11 step, but then I had to do something a little bit else.

12 Q.   Let's talk about that first.  How did you account for

13 costs?

14 A.   So if you recall back, when I did the calculations of

15 budgets versus actual, I did not do it on sales.  What I did is

16 I did it based upon gross profits; and as Mr. Fisher testified,

17 gross profits take out most of the relevant costs, almost all

18 of the relevant costs for making azoxystrobin.

19 Q.   Did you look at additional costs?

20 A.   I did.  I didn't just stop there.  I worked with

21 Syngenta's controller to get additional information about

22 costs, and I found that there was just only a slightly amount

23 of additional costs, really small, that I additionally had to

24 subtract to properly calculate damages.  So I went and I did

25 that.

1  Q.   Taking into account the costs that you looked at, did you

2  reach an opinion as to the lost profits that Syngenta suffered

3  with respect to the compound patents?

4  A.   I did.  So as shown in the table here on Slide 39, I

5  calculated profits first for 2014 and then for 2015, then for

6  2016, then for 2017, and I showed the numbers in each year on

7  this chart; and in total, it comprised $75.6 million.

8  Q.   Dr. Wilner, with respect to your calculations, did you

9  look at lost profits after 2017?

10 A.   No, I conservatively stopped at 2017.  As you can see,

11 there was $15 million in losses in 2017, which likely means

12 that there were going to be losses in 2018, 2019, 2020, but I

13 conservatively stopped in 2017.

14 Q.   Let's talk now about the other patents that you were

15 looking at.

16         So you've gone through compound patents.  Did you

17 look at Syngenta's damages with respect to the '138 process

18 patent and the '761 DABCO patent?

19 A.   I did.

20 Q.   How did you take that into account?

21 A.   So, again, I want to go back to just economically talking

22 about what patents are.  Patents give a company an exclusive

23 over a product or a process, and as we talked about, having an

24 exclusive allows you to charge higher prices and make more

25 profits.  So the longer that you have an exclusive, the more

1  money the company is going to make.

2          And as you can see here, that under the process

3  patent, Syngenta had an exclusive for another 22 months.  Under

4  the DABCO patent, they had an exclusive for another 15 years.

5  So by economic definitions, because Syngenta would have made

6  more money because of the longer exclusivity, the damages for

7  the other two patents must be higher than what I calculated for

8  the compound patents.

9  Q.   And, Dr. Wilner, what did you calculate in terms of

10  damages?

11  A.   So because of that economic rationale, I concluded that if

12  Willowood infringed on the '138 process patent and/or the '761

13  DABCO patent, I conservatively conclude that Syngenta lost at

14  least $75.6 million during this four-year time frame, 2014 to

15  2017.

16  Q.   And if you could go back a couple of slides to where you

17  broke down the lost profits, the next slide.

18  A.   This here?

19  Q.   Right there.  I would like you to go through year by year.

20  This was for the compound patents.  What did you specifically

21  calculate with respect to 2014 as to the lost profits?

22  A.   So as shown in the charts before, I concluded that

23  Syngenta lost $20 million in 2014.

24  Q.   What did you specifically calculate with respect to

25  Syngenta's lost profits in 2015?

1  A.    I concluded that Syngenta lost an additional

2  $24.9 million.

3  Q.    What did you specifically calculate with respect to

4  Syngenta's lost profits in 2016?

5  A.    I calculated that Syngenta lost $15.4 million in --

6  additional in 2016.

7  Q.    Can you tell us what you specifically calculated for

8  Syngenta's lost profits in 2017?

9  A.    In 2017, there was an additional $15.3 million in losses.

10 Q.    What was the sum of this, Dr. Wilner?

11 A.    If you sum up all of those numbers, you get $75.6 million.

12 Q.    You said this was your opinion with respect to the

13 compound patents?

14 A.    Correct.

15 Q.    And let's go forward, just so that we're all clear on the

16 record, one more slide.  Can you tell us what your opinion was

17 with respect to the '138 and '761 patents?

18 A.    So it's that I just listed out numbers for each year for

19 2014 through 2017.  Those numbers would remain the same for

20 those years, but there would be additional damages in the later

21 years.  Actually, no.  Actually, I apologize.  Those numbers

22 would go up because there was long -- especially, like, for

23 2017, et cetera.

24 Q.    You've gone through your --

25 A.    2015.  Sorry.

1  Q.   You've gone through the calculations that you've done.   I
2  would like to talk about anything further that you did.   Have
3  you tried to validate your calculations?
4  A.   I did.   I did not just do the calculations, stop and say,
5  "Here's what the number is."   I want to validate them to ensure
6  that my calculations made sense.
7  Q.   How did you go about trying to validate your calculations?
8  A.   So I used three different things.   I did three --
9  subjected my analysis to three different tests to validate
10  their accuracy.
11  Q.   What were those?
12  A.   First, I said could these damages -- could these losses be
13  accounted for by other factors and I did an analysis and it
14  concluded the answer is no.
15  Q.   Did you do anything else?
16  A.   Yes.   The second thing I did is I wanted to confirm that
17  the damage numbers I calculated were conservative.
18  Q.   Finally what did you do?
19  A.   Then I did three different independent analyses to
20  corroborate my damages calculations.
21  Q.   What -- tell us how you tried to account for additional
22  factors.
23  A.   So it's -- one of the things that I did is I asked the
24  question could these losses be caused by other competitors,
25  because there are other competitors in the market, and I

1  concluded through two different methods that the answer was no.

2  Q.    What was the first method?

3  A.    So first I recognized that my two benchmarks take into

4  account competition.  The budgets and Dr. Wichert's team take

5  into account that there is going to be lawful branded and

6  generic competition in the post-patent world for both

7  azoxystrobin and mesotrione.

8  Q.    What was the second approach that you took?

9  A.    So I said, Even though I know my benchmarks, control for

10  these -- these competitors, I did an additional step of doing a

11  competitor-by-competitor analysis looking at all of the market

12  participants to determine could they have caused Syngenta's

13  losses.

14  Q.    What types of competitors did you look at?

15  A.    So the first thing that I did is I looked at branded

16  companies.  As Dr. Whitton testified, azoxystrobin is part of

17  the strobilurin family and that other branded companies like

18  BASF, Bayer, and DuPont make similar fungicides in that family,

19  but use other chemicals.

20  Q.    How did you take that into account?

21  A.    So as Dr. Wichert, Mr. Cecil, and Mr. Fisher testified,

22  they found, based upon their own experience in the industry,

23  that these other branded products did not cause azoxy's

24  decline, but I didn't just stop there.

25  Q.    What did you do?

1 A.    So I did my own independent research looking at market

2 shares and prices of these other branded products and derived a

3 similar conclusion.

4 Q.    Did you look at other types of competitors?

5 A.    I did.  So in addition to branded competitors, you could

6 have generic competition, and so I looked at all the generic

7 companies, in particular Cheminova and Albaugh.

8 Q.    Let's talk about Albaugh.  Based on your review and your

9 analysis, did you find that Albaugh had an impact on Syngenta's

10 business, azoxystrobin sales and pricing?

11 A.    No.  Because as was talked about and testified to

12 yesterday and this morning, Albaugh was not really a meaningful

13 competitor in the market.  Syngenta could not find Albaugh's

14 products in the market and also Albaugh was primarily selling

15 seed care products.

16 Q.    Why is that important?

17 A.    So if you remember back to one of my slides at the

18 beginning of the presentation, which I've reprinted here at

19 bottom of the slide, is that there are four different types of

20 products that service four different markets that Syngenta

21 makes.

22 Q.    And which one did you pick?

23 A.    So my -- all my calculations, my $75.6 million in losses,

24 solely relate to the crop-protection market.

25 Q.    So to the extent that Albaugh had seed care products, how

1  did that impact your analysis?

2  A.   So it's that any impact Albaugh might have had on

3  Syngenta's Seedcare business is not in my calculation because I

4  only looked at crop-protection products.

5  Q.   Dr. Wilner, I would like to talk about Cheminova.  Did you

6  take into account whether Cheminova had an impact on Syngenta's

7  azoxystrobin sales and pricing?

8  A.   I did.  And so as was testified before, Cheminova did sell

9  generic azoxy, but it had limited market effects.  Cheminova

10  did not have corn on their label.  They didn't import a lot.

11  They were -- and they were later -- they soon exited the

12  market.  And so for all of these reasons, I conclude that

13  really Cheminova was -- had limited market impacts.

14  Q.   Did you do any calculations with respect to Cheminova?

15  A.   I did.  So I agreed that Cheminova did sell some generic

16  azoxystrobin.  I did a separate calculation where what I did is

17  I allocated Syngenta's losses between Cheminova and Willowood

18  based upon import records; and as you can see from this chart

19  here, by doing that I concluded in 2014 Syngenta lost

20  $14.1 million.

21  Q.   What about 2015?

22  A.   In 2015, I conclude that they lost $13.8 million.

23  Q.   In 2016?

24  A.   In 2016, they lost $3.7 million.

25  Q.   How about 2017?

1  A.   In 2017, they lost $2.8 million.

2  Q.   And to clarify, these losses that you're calculating, it

3  was your economic opinion it was due to Willowood?

4  A.   So these are the losses due to Willowood.  So that if I

5  do -- allocating some of the losses to Willowood and some to

6  Syngenta, these numbers that I just read are the losses which I

7  allocated -- which were due to Willowood's actions and

8  activities.

9  Q.   Now, Dr. Wilner, what was the total that you came to?

10  A.   So the total that I arrived at was $34.4 million.

11  Q.   Do you believe that this is an appropriate measure of

12  Syngenta's lost profits damages?

13  A.   No, I do not.

14  Q.   Well, if you don't believe it's an appropriate measure,

15  why did you perform this calculation?

16  A.   So what this calculation does is it assumes Cheminova is

17  bigger than it actually was, it had more market impact, so

18  that -- because the testimony showed that Cheminova really had

19  limited market impacts, I think this calculation overallocates

20  losses to Cheminova and underallocates losses to Willowood.

21  Q.   What is your opinion, Dr. Wilner, with respect to the

22  appropriate level of lost profits damages that Syngenta

23  suffered?

24  A.   So this creates -- this $34 million creates an

25  unreasonable floor in my mind, but I still maintain my

1  conclusion that Syngenta lost at least $75.6 million because of
2  Willowood's actions.
3  Q.   You've talked about the analyses of looking at other
4  competitors.  I would like to see -- you know, talk to you
5  about what you tried to do on top in terms of determining
6  whether your analyses were conservative.  Can you explain?
7  A.   Sure.  So if you remember, there are four different
8  markets in which Syngenta's azoxystrobin products compete:
9  Crop protection, seed care, lawn and garden, and paper and
10  wallboard.  Even though Mr. Heinze tested that Willowood
11  participated in the seed care and lawn and garden markets, I
12  conservatively excluded damages relating to Willowood's impact
13  on those two markets in my analysis.
14  Q.   If you had taken into account Syngenta's lost profits with
15  respect to seed care, lawn and garden, paper and wallboard, how
16  would that have impacted your analysis?
17  A.   My damages would have gone up.
18  Q.   Is there anything else that you did to try to look at
19  whether your analysis was conservative?
20  A.   I did.  So as we talked about, I determined that there was
21  roughly $15 million in damages in 2017, which means that there
22  likely would be losses in later years, 2018, 2019, and beyond,
23  but I conservatively excluded them.
24  Q.   What about the combinations of products in terms of
25  products that Syngenta sells with respect to azoxystrobin in

1  combination with other categories of products?

2  A.   So if you remember the brand ladder, and I put the brand

3  ladder up here for azoxystrobin, I'm going to talk about the

4  second wrung from the top, combination of brands.  What happens

5  with these combinations is that a farmer might buy a fungicide

6  like Quilt Xcel, which has azoxystrobin in it, and combine it

7  with another chemical, an insecticide or a herbicide.  In this

8  example, it shows Quilt Xcel combined with Endigo.  So that

9  farmers often buy these products together and they have a

10  functional relationship because they are able to spray

11  together.

12  Q.   Did you take into account or, you know, include within

13  your calculations these other products that are combined, such

14  as Endigo and herbicides or other products?

15  A.   No, I did not.  My damages solely focused on azoxystrobin

16  product.  So to the extent that Willowood's actions caused

17  someone not to buy a product like Quilt Xcel and they bought

18  someone else's fungicide, that farmer might have bought someone

19  else's insecticide or herbicide.  Syngenta would have lost

20  sales of insecticides and herbicides, but I conservatively

21  excludes those losses in insecticides and herbicides from my

22  calculations.

23  Q.   Did you do anything on top to actually go in and try to

24  corroborate your calculations?

25  A.   I did.  So it's -- I have young kids who are taking math

1  class now and I don't know if you remember back in your math

2  book from when you were in school that there were questions

3  that you had to answer and then sometimes in the back of the

4  book they'd have answers to sample questions.  So what I did is

5  I used a process similar to that.  I did a bunch of

6  calculations that I've talked about, but then I checked the

7  answer key.  I used additional analysis to test did my

8  calculations make sense, do they match the answer key.

9  Q.   What is that answer key grounded in?

10 A.   I'm sorry.

11 Q.   What is the answer key grounded in?

12 A.   Grounded in.  So it's -- it's grounded in reality, so what

13 actually -- actually does it match economic reality.

14 Q.   What did you look at in terms of corroborating your

15 calculations?

16 A.   So as I walked through my calculations, my calculations

17 were solely based upon the budgets of azoxystrobin and

18 mesotrione; and as was testified to yesterday, Syngenta also

19 had what are called last plans, latest plans or LPs, which I

20 didn't include in my analysis, but contain a lot of value.

21 Q.   How did the last plans or latest projections contain

22 value?

23 A.   So if you remember the testimony of Mr. Cecil and

24 Mr. Fisher is that as 2014 was evolving Syngenta learned more

25 and more about Willowood's activities and planned activities,

1  and so that learning process showed up in the LP forecasts.

2  Q.   And how did you -- how does that help you validate or

3  corroborate your analysis?

4  A.   So it's -- what those LPs showed is that, as Syngenta

5  garnered more and more information about Willowood's activities

6  and planned activities, these revised forecasts showed lower

7  profits -- lower forecast of profits; and if you look at the

8  mid-2014 updated forecast, the last plans, they show that these

9  latest plans fully -- almost fully captured the effect of

10 Willowood's activities.

11 Q.   So how does that confirm your analysis?

12 A.   So it's -- the first thing is that the reduction in these

13 LPs show a 75.6 million -- roughly a $75.6 million loss.  So

14 through an independent method of looking at these LPs, this

15 confirms my calculations.  It's my calculations match the

16 answer key, they match reality.

17 Q.   How did that reflect Syngenta's budgetary process?

18 A.   So that gave me even more comfort in Syngenta's budgeting

19 process because they were able to take the information of

20 Willowood's entrance into the market and have it properly

21 reflected within their budgets and forecasts.

22 Q.   Dr. Wilner, did you do anything else to corroborate your

23 analysis?

24 A.   I did.  So as we talked about before, in talking about

25 patents in general, that after a patent expires, the company

1    loses exclusivity and because -- and when they lose

2    exclusivity, that profits and sales prices could decline.  So

3    I -- and it's not just a one-step drop.  It's a gradual drop as

4    customers get more and more comfortable with the new entrance.

5    So I went and I tested does my model show this economic

6    principle that when a company -- when the compound patents came

7    off patent do you see a decline in Syngenta's profits.

8    Q.    What did you see?

9    A.    And that's what I did.  So it's -- what I show here is the

10   decline in Syngenta's but-for profits with these red bars.  So

11   these red bars are assuming Willowood did not infringe in the

12   but-for world; and you can see that in 2015, 2016, 2017, after

13   the compound patents expired, Syngenta's profits declined.  So

14   that even if Willowood had not infringed, I fully agree that

15   the additional competition from losing exclusivity would have

16   caused Syngenta's profits to decline.  So this graph, again,

17   shows that my calculations match the answer key, they match

18   reality.

19   Q.    When you say that the -- based on your analysis that the

20   profits went down as the patents expired, which set of patents

21   are you referring to?

22   A.    These are just the compound patents.

23   Q.    If Syngenta's profits were going to go down anyway in this

24   but-for world, what impact did Willowood have?

25   A.    So what Willowood did is Willowood accelerated or sped up

1  that decline.

2  Q.    Can you explain?

3  A.    Sure.  So if you look at this graph here, I have in red

4  bars Syngenta's but-for profits, what would happen without

5  Willowood's infringement.  So I did the same graph and I added

6  in a yellow line.  These are Syngenta's actual profits.

7  Q.    Can you tell us what those reflect?

8  A.    Sure.  And so this is the amount that -- the yellow bars

9  show what Syngenta actually earned in each year.  In

10  particular, I would like to call your attention to the

11  two -- the yellow bar and the red bar in the middle to which I

12  have arrows pointed.

13  Q.    So in 2014, you're pointing to the yellow bar, which was

14  the actual profits that Syngenta had in 2014?

15  A.    That is correct.

16  Q.    And in 2015, you're pointing to the red bar, which is what

17  you predicted, based on your model, that Syngenta would have

18  earned without Willowood?

19  A.    Yes.

20  Q.    How does that corroborate your analysis?

21  A.    So that if you remember back to one of the things that was

22  testified to by Mr. Cecil, Mr. Fisher, and Dr. Wichert is that

23  Syngenta -- excuse me -- that Willowood received roughly a 12-

24  to 15-month head start because of their actions and that's what

25  shows up on this graph.  Willowood got into the market 12 to 15

months early, so therefore they had an impact on Syngenta 12 to

15 months early.  So you can see here that the profits that

Syngenta should have made and the decline that should have

happened in 2015 actually occurred in 2014.  So the decline was

accelerated by roughly a year, 12 to 15 months, because of

Willowood's actions.

Q.    Now, Dr. Wilner, based on your analysis, have you

determined by a reasonable degree of economic certainty the

lost profits that Syngenta has suffered as a result of

infringement of the compound patents, the process patent, the

DABCO patent?

A.    Yes.  After investigating the background of the products

and industry, after doing the calculation, and after performing

my multiple validation steps, I conclude to a reasonable degree

of economic certainty that Syngenta's lost profits were at

least $75.6 million between 2014 and 2017, of which 20 million

was in 2014, 24.9 million was in 2015, 15.4 was in 2016, and

15.3 was in 2017.

                MR. SANTHANAM:  No further questions, Your Honor.

                THE COURT:  All right.  Questions for Willowood?

                MR. NEUMAN:  Thank you, Your Honor.

                            CROSS-EXAMINATION

BY MR. NEUMAN:

Q.    Good morning.

A.    So all right.

1  Q.    Nice to see you again.

2  A.    Good to see you, sir.

3  Q.    Now, if I just heard you correctly in response to one of

4  the last questions that counsel asked, you agree that in order

5  to present your case and proposed damages to the panel, you

6  need to conclude that as a matter of reasonable economic

7  certainty that the damages that you have concluded Syngenta

8  suffered, namely, the $75 million, are more likely than not to

9  have been sustained as a result of Willowood's actions, is that

10  correct?

11  A.    To a reasonable degree of economic certainty, yes, I

12  conclude that the damages that I calculated were due to

13  Willowood's actions.

14  Q.    You agree that in conducting any such analysis, it's

15  important to establish causation between Defendant's alleged

16  actions and the damages suffered by Willowood -- by Syngenta,

17  correct?

18  A.    It's -- yes, and causation could be put forth by mult --

19  through multiple methods.

20  Q.    Yes.  And if we turn to Slide 20 in your demonstrative.

21       THE COURT:  Do you all have it on your screen?

22       MR. NEUMAN:  Bonnie, can you bring up Slide 20 on the

23  demonstrative.  Slide 20, please.

24  BY MR. NEUMAN:

25  Q.    Now, in the first bullet in that demonstrative, you say,

1  "Calculating but-for profits requires complex economic

2  modeling."  Right?

3  A.    I do.

4  Q.    And you've created here a complex economic model, have you

5  not?

6  A.    It is model.  There are multiple steps in it.  Different

7  people have different views about what "complex" is.

8  Q.    Well, you say that calculating but-for profits requires

9  complex economic modeling.  So did you do what you say is

10  required or not?

11  A.    Again, yes, the model in this case had some complexities

12  because I utilized two benchmarks.

13  Q.    Do you or do you not view your model as a complex economic

14  model?

15  A.    There were multiple steps in it, yes.

16  Q.    Do you or do you not view your model as a complex economic

17  model, the type required to support a but-for profits analysis?

18  A.    I believe what I did is complex enough to calculate

19  but-for profits, yes.

20  Q.    Do you believe that it is always necessary in calculating

21  but-for profits to create a complex economic model?

22  A.    Again, I went and I said "complex" because it is beyond

23  kind of a lay calculation.

24  Q.    Could you answer my question, please, Dr. Wilner.

25  A.    Well, it's -- one of the things I want do is I just want

1  to make sure that we're on the same page defining what the word

2  "complex" is.

3  Q.    Well, as you use it in that demonstrative.

4  A.    Right.  And so what I'm saying is that -- what I'm trying

5  to show in this demonstrative is that it is complex beyond the

6  general knowledge of laypeople; but to someone who's an

7  economist, the calculation might not be complex.

8  Q.    Now, I take it that you would agree with me that a lost

9  profits analysis must calculate what we call the but-for

10  profits, is that right?

11  A.    Using this methodology, yes.

12  Q.    And that essentially means the profits that you believe

13  Syngenta would have suffered in the absence of or but-for

14  Willowood's alleged infringement, correct?

15  A.    I'm sorry.  Can you repeat the question?  I think you have

16  a wrong word in there.

17  Q.    If I understand correctly, the but-for analysis means that

18  you need to calculate the damages that Syngenta would have

19  suffered in the absence -- or the profits that Syngenta would

20  have made in the absence of Willowood's alleged infringement,

21  correct?

22  A.    I'm sorry.  You had multiple words.  You stopped and

23  started.  Could you repeat it again, because I think you're

24  missing something.

25  Q.    What do you think I'm missing, sir?

1  A.   So it's -- if you remember what I -- there's two -- three

2  terminologies that I used in my formula.  You have lost profits

3  equals but-for profits minus actual profits; and lost profits,

4  this is the amount of damages that Syngenta suffered.  That's

5  the losses that they suffered.  The but-for is what Syngenta

6  would have earned but for or without Willowood's infringement.

7  Q.   All right.  Thank you.  And in order to determine the lost

8  profits, one of the steps in that is you must determine the

9  but-for profits or the profits that would have been earned

10 absent the infringement, correct?

11 A.   Using this methodology, yes.

12 Q.   And, generally, as I understand it, lost profits are

13 comprised of two components, lost sales and what you refer to

14 as price erosion, correct?

15 A.   Those are two potential elements, in general, in

16 calculating lost profits, yes.

17 Q.   And I believe you testified on direct that, in your

18 opinion, Syngenta has suffered both lost sales and price

19 erosion as a result of Willowood's infringing activities,

20 correct?

21 A.   I did.

22 Q.   And of the $75 million in lost profits that Syngenta

23 suffered as a result of Willowood's action, how much of that

24 was due to lost sales?

25 A.   I did not disaggregate between the two.

1  Q.   Your complex model -- you don't know from your complex

2  model how much of that $75 million is lost sales and how much

3  is price erosion, correct?

4  A.   That disaggregation was irrelevant, so I don't know.

5  Q.   And about how many products containing azoxystrobin did

6  Syngenta sell in 2014?

7  A.   I don't recall the exact number.  If you want, I can look

8  through the gross-to-net reports and count.

9  Q.   Of the number of products that it sold, and not counting

10  the combination products that you say you disregarded in your

11  analysis --

12  A.   Well, I didn't disregard the combination products.  I

13  disregarded part of the combination products.

14  Q.   Of the products that you consider in your analysis, how

15  much profits did Syngenta lose on the sale of each of those

16  products in 2014 due to Willowood's alleged infringement?

17  A.   I did not disaggregate between the various azoxystrobin

18  products.

19  Q.   So you don't know how much lost profits Syngenta suffered

20  with respect to each of its products on account of Willowood,

21  correct?

22  A.   Because it was irrelevant to my calculations, I did not,

23  and --

24  Q.   And it would also be true --

25          THE COURT:  Let him finish his answer before you

1   start asking the next question.

2           MR. NEUMAN:  I beg your pardon.

3           THE WITNESS:  Because it was irrelevant to my

4   analysis, I did not do such calculations.

5   BY MR. NEUMAN:

6   Q.    And that would be true of 2015, 2016, and 2017 as well,

7   correct?

8   A.    That's correct.

9   Q.    Now, according to your model, Syngenta lost $20 million in

10  profits on account of Willowood's infringement of the compound

11  patents.  Just in the year 2014 --

12  A.    Correct.

13  Q.    -- correct?

14  A.    At least that amount.  When you get into -- it's the

15  process and the DABCO patent, but for the compound patent, yes,

16  20 million.

17  Q.    And you attribute those damages, as I understand it, to

18  what you describe as Willowood's early entry into the market,

19  is that right?

20  A.    Yes.

21  Q.    And that earlier entry into the market, you say, was made

22  possible by virtue of the fact that Willowood imported

23  5 kilograms of infringing material into the United States in

24  2013 for purposes of formulation and testing, is that right?

25  A.    Along with other steps, yes.

Q.   And so in a but-for analysis, in order for Syngenta to
have suffered any damages on account of Willowood's infringing
in that respect, you have to assume that Willowood could not
have entered the market in July 2014 without importing that
5 kilograms, correct?

A.   I did not have to make such an assumption.

Q.   Had Willowood been able to enter the market in 2014
without importing the 5 kilograms in 2013, in the but-for world
there would be -- in a but-for analysis, there would be no lost
profits, correct?

A.   I'm sorry.  Could you repeat the question?

Q.   Yes.  Had Willowood been able to enter the market in July
2014 without importing the 5 kilograms into the United States
before the patents expired, there would be no damages in a
but-for analysis, would there?

A.   If they did not have the importation plus the other steps,
yes, I agree that -- and they could have done your
hypothetical, I agree.

Q.   And the other steps being the testing and the formulation,
is that correct?

A.   It's testing, formulation.  I think there was some offers
for sale.

Q.   Now, did you investigate whether there were any
laboratories available overseas that Willowood could have used
in 2013 to carry out its formulation and development work?

1   A.   I do know that there are labs overseas, yes.

2   Q.   So -- withdrawn.

3   A.   But whether they were available, I don't know.

4   Q.   Let's talk about -- a little bit about the sales landscape

5   in 2014.  Now, Syngenta sales of azoxystrobin had declined from

6   2012 to 2013 before Willowood ever entered the market, isn't

7   that right?

8   A.   And as I talked about, that decline was due to the 2012

9   drought effect, yes.

10  Q.   Am I correct that they declined?

11  A.   Yes, they declined.

12  Q.   And, in fact, total acres treated with Syngenta fungicides

13  in the US had declined as well from 2012 to '13, correct?

14  A.   I believe that's correct, yes.

15  Q.   And the --

16  A.   Actually, it's -- if I can check one second?

17  Q.   Sure.

18  A.   Yes, there was a decline between 2012 and 2013.

19  Q.   And the first generic competition for azoxy products came

20  in 2014, correct?

21  A.   The first --

22  Q.   Generic competition for azoxystrobin products occurred in

23  2014, correct?

24  A.   The first generics that were offered for sale were in

25  2014, yes.

1  Q.   And, in fact, Syngenta was expecting generic competition

2  in 2014, was it not?

3  A.   There were some documents which used that date as an

4  outside chance possibility, yes.

5  Q.   Didn't you conclude -- you prepared an expert report in

6  this case, did you not?

7  A.   I did.

8  Q.   At that time you had reached the conclusions you've

9  expressed here today, correct?

10 A.   Correct.

11 Q.   And that report was completed last summer, correct?

12 A.   The report was finished October 19th, 2016.

13 Q.   Pardon?

14 A.   The report was completed on October 19th, 2016.

15 Q.   And you were deposed last year, September of 2016 --

16 A.   Yes.

17 Q.   -- on that report, correct?

18 A.   Yes.

19        MR. NEUMAN:  Your Honor, may I approach the witness?

20        THE COURT:  All right.

21 BY MR. NEUMAN:

22 Q.   Dr. Wilner, you've been handed a copy of your entire

23 deposition transcript from last year.  Now, you recall, of

24 course, when you were deposed, that was in Chicago at

25 Syngenta's counsel's offices, correct?

1  A.    Correct.

2  Q.    And you were represented by Syngenta's counsel at that

3  deposition, and both I and Syngenta's counsel were present,

4  correct?

5  A.    I don't know if technically I was represented by

6  Syngenta's counsel.

7  Q.    Fair enough.  Syngenta's counsel was there?

8  A.    They were there, yes.

9  Q.    And you recall you were under oath -- placed under oath?

10  A.    Yes.

11  Q.    And you told the truth at that deposition?

12  A.    I did.

13  Q.    All right.  Could you please turn to page 138 of your

14  deposition transcript?

15  A.    I'm sorry, 138?

16  Q.    138.

17  A.    Yes.  Could you please -- did I not ask you the following

18  question and you provided the following answer:  "Question:

19  Well, by March of 2014, Syngenta was anticipating a number

20  of -- withdrawn.

21          THE COURT:  I'm sorry, I couldn't hear you.

22          MR. NEUMAN:  Withdrawn.

23          THE COURT:  Okay.

24  BY MR. NEUMAN:

25  Q.    Cheminova was the first generic azoxy entrant into the

1  market in 2014, was it not?

2  A.   I believe they had the first sale, yes.

3  Q.   And Willowood came into the market a little later, but in

4  the second half of 2014, correct?

5  A.   Close in timeframe, yes.

6  Q.   And Willowood's first sales were in July of 2014, correct?

7  A.   Willowood's first commercial sales of end-use products

8  were in July of 2014, yes.

9  Q.   And in July of 2014, Willowood only sold its straight

10  azoxy product, this Azoxy 2SC, correct?

11  A.   That is my understanding yes.

12  Q.   There were no sales of AzoxyProp Xtra, the combination

13  product, until December of 2014, correct?

14  A.   I do not recall the exact date, but that sounds

15  reasonable.

16  Q.   And do you recall what Willowood's share of the market was

17  in 2014?

18          THE COURT:  Which market are you talking about?

19  BY MR. NEUMAN:

20  Q.   Of the azoxystrobin market?

21  A.   I don't recall.

22  Q.   You recall it was single digits, don't you?

23  A.   Sounds about right, yes.

24  Q.   Okay.  Did you look that the in preparing your report?

25  A.   I did.

1  Q.    Did investigate that issue?

2  A.    I did.

3  Q.    Does 4.3 percent sound about right?

4  A.    Sounds in the ballpark, but I can't say for certain.

5  Q.    And what was the total percent of sales by Albaugh and

6  Cheminova in 2014?

7  A.    I don't recall that number.

8  Q.    Would 3 percent sound about right to you?

9  A.    I don't know.

10  Q.    And for 2014 and 2015, Syngenta's share of azoxystrobin

11  market was greater than 50 percent, was it not?

12  A.    As is standard with a product on patent, yes.

13  Q.    Okay.  So, in fact, Syngenta's share of the market was at

14  least ten times as much as Willowood's share of the

15  azoxystrobin market in 2014 and 2015, was it not?

16  A.    Doing the math, yes, that basic math, yes.

17  Q.    I need to do basic math, sir.

18  A.    Well, as you said, there's different complexity.

19  Q.    You're right.  And there are, in fact, two peek sales

20  seasons for azoxystrobin, are there not?

21  A.    Yes.

22  Q.    And, in fact, Willowood entirely missed the spring peek

23  sales season, did not?

24  A.    No, I think Mr. Heinze testified that he got in at the

25  tail end of 2014 season.

1  Q.   Right, but there's a spring sales season, and I'm asking

2  you if Willowood did not entirely miss the spring sales season?

3  A.   They missed the spring sales season in 2014.

4  Q.   And even though there were these generics in the market,

5  in -- by mid 2014, Syngenta did not lower its prices on

6  azoxystrobin at all in 2014, isn't that right?

7  A.   No, there was some price decline.

8  Q.   Do you have a copy of your expert report, or do you need

9  it?

10 A.   I have it.

11 Q.   Okay.  This is -- I'm referring to what was marked as

12 Defendant's Exhibit 48 for identification.  And, Dr. Wilner, if

13 you could please turn to page 14 of that report.  Do you have

14 that in front of you?

15 A.   Yes.

16 Q.   Could you please look at the last sentence of the first

17 paragraph?

18 A.   Yes, I see that.

19 Q.   Does it say, "As a result, Syngenta maintained its 2013

20 prices in 2014.  AGRI-TRAC data demonstrates the consistency of

21 Syngenta's fungicides sales per acre in 2013 --

22          THE COURT:  Slow down.  I can't hear you.

23          MR. NEUMAN:  I beg your pardon.

24 BY MR. NEUMAN:

25 Q.   "AGRI-TRAC data demonstrates the consistency of Syngenta's

1    fungicide sales per acre in 2013 and 2014.  Prices were $14.14

2    per acre in 2013 and $14.11 per acre in 2014."  Is that

3    correct?

4    A.   I do see that.  So as you can see that I showed the

5    decline from 2013 to 2014 in this last line.

6    Q.   Of 3 cents per acre?

7    A.   Right.  I said it was a small decline.

8    Q.   Wouldn't you regard that as holding relatively steady?

9    A.   It's -- it's a -- you can look at it both ways.

10   Q.   And, in fact, Syngenta raised its azoxystrobin price in

11   the fall of 2014, isn't that right?

12   A.   It is my understanding, from the previous testimony, that

13   they raised their list price at that time frame, not the net

14   price, not necessarily the net price.

15   Q.   Well, can you -- withdrawn.

16             So in 2014, Willowood missed the spring selling

17   season, one of the peak selling seasons, right?

18   A.   Yes.

19   Q.   It sold no AzoxyProp Xtra until the fall of 2014, correct?

20             MR. SANTHANAM:  Objection, foundation.

21             THE WITNESS:  Actually, it's -- I'm taking that on

22   your statement because I don't recall when exactly that product

23   was sold.

24   BY MR. NEUMAN:

25   Q.   Syngenta's azoxystrobin prices held pretty steady during

1  2014, correct?

2  A.    Again, it's relatively stable, slight decline, however you

3  want to describe it, yes.

4  Q.    Do you regard a 3 percent -- 3-cent per acre difference as

5  potentially significant for purposes of calculating damages?

6  A.    It could be, it couldn't be, it depends upon the context.

7  Q.    Cheminova got into the market and started selling product

8  before Willowood, correct?

9  A.    Correct.

10 Q.    Albaugh was in the market in 2014, correct?

11 A.    It's my understanding they were not in the market for

12 crop-protection products at that time.

13 Q.    And despite -- in light of all of that -- or despite all

14 of that, you say that Willowood cost Syngenta $20 million in

15 profits in 2014 alone, correct?

16 A.    I did, mostly based on the testimony from Dr. Wichert

17 earlier today.

18 Q.    And that neither Cheminova or Albaugh had any effect,

19 correct?

20 A.    I did not say that.

21 Q.    Did Cheminova have an effect on Syngenta's profits on

22 azoxystrobin sales in 2014?

23 A.    I conclude that they did not have a meaningful effect, no.

24 Q.    What is a meaningful effect, sir?

25 A.    Again, based upon the testimony of Mr. Cecil, Mr. Fisher

1  and Dr. Wichert, in that Syngenta was primarily setting its

2  prices and the market activity was based upon Willowood's

3  activities, not Cheminova's activities.

4  Q.   So let's examine your complex model.  Let's start with the

5  use of budgeting, which I understand is a key building block or

6  benchmark in your calculations, is that fair?

7  A.   Which budget are you talking about?

8  Q.   Well, are either one of them not an important foundation

9  in your analysis?

10  A.   Once again, you said your benchmarks, I just want to be

11  clear about what we're talking about.

12  Q.   Okay.  Will you agree that the azoxystrobin budgeting is

13  an important foundation in your analysis?

14  A.   It is -- as it is an input in my model, yes.

15  Q.   It's an important input, would you not agree?

16  A.   Everything, including the model, is important.

17  Q.   And your -- and the mesotrione budgeting is also an

18  important input into your calculations, am I correct?

19  A.   Same answer, yes.

20  Q.   And as I understand it, for 2014, you look at Syngenta's

21  budget for azoxystrobin sales that was created in October of --

22  or November of 2013 as the first building -- as the first

23  component, correct?

24  A.   That's where I started, yes.

25  Q.   And then you adjust that based on a mesotrione benchmark,

1  is that right?

2  A.   It's based upon how much mesotrione either made, missed or

3  exceeded its budget, yes.

4  Q.   And then after that adjustment you compare that adjusted

5  projection against actual azoxystrobin sales, correct?

6  A.   You can call it adjusted projection.  I call it the

7  but-for economic scenario, yes.

8  Q.   And the adjustments you made using the mesotrione data

9  were based on using Syngenta's budgets of mesotrione sales

10 versus their actual sales, correct?

11 A.   That is correct, for 2014.

12 Q.   For 2014.  Thank you.  So would you agree with me that for

13 your calculations to be accurate and reliable, it's important

14 that those budgets, and the -- the budgeting that Syngenta did

15 for both azoxystrobin and mesotrione, be accurate and reliable?

16 A.   Yes.

17 Q.   All else being equal, to the extent that Syngenta's sales

18 forecast budgeting are not credible, accurate and reliable,

19 your analysis and conclusions would not be credible, accurate

20 or reliable, correct?

21 A.   If the bases of my model have inaccuracies, yes, my model

22 would be inaccurate.  That's why I spent a lot of time

23 confirming the accuracy of the bases.

24 Q.   And would you agree with me that even a small percentage

25 difference in the accuracy of Syngenta's budgeting versus

1  actuals for azoxystrobin could lead to very large changes in

2  your damage calculations?

3  A.    I don't know.

4  Q.    You haven't examined that?

5  A.    Again, I got comfort in the accuracy, but then one of the

6  things that I did not do is I did not say if budgets are off by

7  this amount, what is the effect; if budgets are off by that

8  amount -- I didn't do that calculation, because I was

9  comfortable in the accuracy of the budgets and the budgeting

10  process.

11  Q.    And as I understand it, Dr. Wilner, the first thing you

12  did to get comfortable with Syngenta's budgeting process was to

13  talk to Syngenta employees about how they did their budgeting,

14  correct?

15  A.    Again, I don't know if chronologically that's how it

16  worked, but that was something that I did early on.

17  Q.    Well, you recall in your expert -- your report, you

18  stated, and in your deposition you stated, that everything you

19  learned about the process, and how exacting that process was,

20  came from your discussions with Syngenta employees.  Do you

21  recall that?

22  A.    It sounds right; but, again, if you put the quote in front

23  of me, I'll be happy to confirm, but I don't recall that exact

24  statement.

25  Q.    And basically, as I understand it, you came to the

1   conclusion that Syngenta's budgeting process was an exacting

2   process, correct?

3   A.    Correct.

4   Q.    And you came to that conclusion based upon -- what you

5   learned about that process essentially is what we've heard from

6   Mr. Cecil, Mr. Fisher and Dr. Wichert here in this courtroom,

7   correct?

8   A.    Plus the confirmatory steps that I did to insure the

9   accuracy of those -- of that testimony.

10  Q.    We'll get to that.  Now, when you set out to determine

11  whether or not Syngenta's budgeting process was sufficiently

12  reliable for you to use to come up with a damages figure of

13  $75 million, did you review any written policies, procedures or

14  protocols that Syngenta might have governing how they do their

15  budgets?

16  A.    I did not look at any such documents, no.

17  Q.    Did you ask to see any?

18  A.    I didn't think it was necessary.

19  Q.    Do you know whether there are any written policies,

20  protocols or procedures that lay out the criteria by which

21  Syngenta is to formulate its budgets?

22  A.    I believe that there were documents and we heard testimony

23  to that effect earlier this week.

24  Q.    No.  I'm talking about documents that actually set forth

25  here is what one must consider in setting a budget for a

particular product, here's what weight to give it, or here's a

formula for coming up with the budget.  Anything of that sort?

A.    I think the testimony was that it is not a formulaic

process, that what the people do is they utilize their years of

experience and adjust on a product-by-product basis, a

market-by-market basis but using overall consistent

assumptions.

Q.    What are those assumptions?

A.    Well, I think there was testimony about making assumptions

about what crop prices were going to do, about acreage, about

the allocation of that acreage between corn, wheat, soybeans,

et cetera, competition.  There was lots of factors that have

been talked about over the last couple of days.

Q.    Before you prepared your expert report and formed your

opinions last year, did you sit down and determine and make a

list of exactly what factors Syngenta must consider or

typically considers in formulating its budgets?

A.    I did not create such a list, no.

Q.    Have you ever seen any document, or heard any discussion,

either in preparing your report last year or sitting in this

courtroom the last several days, setting out any particular

formula or mathematical quantitative criteria for how those

factors are to be considered in the formulation of Syngenta's

budgets.

A.    Dr. Wichert talked about the post-patent pillars, the five

```
 1   pillars that hold up the strategy, but there was no
 2   quantitative analysis or formula that I saw in combination with
 3   that.
 4           MR. NEUMAN:  Your Honor, this might be a good place
 5   to break.
 6           THE COURT:  A good time?  All right.  Ladies and
 7   gentlemen, I'm going to excuse you for lunch.  You'll remember
 8   that we're going to compress our lunch hour a little bit to
 9   account for leaving a little early.  So it's 12:30, I'll ask
10   you to come back at 1:30.  Keep an open mind, don't talk about
11   the case, have no contact with anyone and no independent
12   investigation, and leave your notes in your chair.  I'll see
13   you in an hour at 1:30.
14           (At 12:31 p.m., jury leaves.)
15           THE COURT:  All right.  Anything that we need to take
16   up before we break for lunch?
17           MR. LEVINE:  No.
18           THE COURT:  No?  All right.  I'll see you all at
19   1:30.
20           (At 12:31 p.m., break taken.)
21           (At 1:30 p.m., break concluded.)
22           THE COURT:  Good afternoon.  Anything we need to take
23   up before the jury comes in?  No?
24           MR. SANTHANAM:  No, Your Honor.
25           THE COURT:  All right.  You can bring the jury in.
```

1  I'll tell you, this jury has been very prompt.  We have not had

2  to wait on them at all, and that is not always the case.

3              (At 1:33 p.m., jury arrives.)

4              THE COURT:  Good afternoon.  I believe we are ready

5  to continue with examination so, Mr. Neuman, you may proceed.

6              MR. NEUMAN:  Thank you, Your Honor.

7  BY MR. NEUMAN:

8  Q.    Good afternoon, Dr. Wilner.

9  A.    Good afternoon.

10 Q.    Now, you acknowledge, do you not, that an exacting budget

11 process does not necessarily yield exactly accurate and

12 reliable particular -- and predictable results, do you not?

13 A.    It might or might not.

14 Q.    Did you attempt in this case to replicate any of the

15 budget forecast, the annual budget forecast, that Syngenta came

16 up with, that is actually replicate the process and the

17 criteria by which they came up with their budgets for any

18 particular year?

19 A.    I did not.

20 Q.    So did you attempt, for example, to deconstruct exactly

21 how they came up with a particular number for a particular year

22 and then reproduce that number?

23 A.    No, I did not.

24 Q.    You are an economist, correct?

25 A.    I am.

1  Q.  And you spend a lot of time doing statistical analyses, do

2  you not?

3  A.  I spend a fair bit of time, yes.

4  Q.  And you didn't think to try to do that in this case?

5  A.  I didn't think it was necessary, no.

6  Q.  Now, in response to questions by Syngenta's counsel, you

7  indicated that the Syngenta budgets for the years 2009 through

8  2013 were not actually what you used as the benchmark, correct?

9  A.  Correct.  I utilized benchmarks for 2014 to 2017.

10 Q.  But you had budget results for years 2009 to 2013 as well,

11 correct?

12 A.  I had that information, yes.

13 Q.  And you looked at those budgets, right?

14 A.  I did.

15 Q.  And, in fact, Syngenta has been selling azoxytrione [sic]

16 since before the turn of the last century, correct?

17 A.  I'm sorry, what product?

18         THE COURT:  Did you combine your products?

19         MR. NEUMAN:  I'm trying to cut through things.

20         THE COURT:  That's all right.  Go ahead.

21 BY MR. NEUMAN:

22 Q.  In fact, Syngenta has been selling azoxystrobin since

23 before 2000, correct?

24 A.  Yes.  I think that's what the testimony was.

25 Q.  And you heard the testimony from Syngenta's witnesses that

1  they've been doing budgeting, annual budgeting, for

2  azoxystrobin since they began selling azoxystrobin products,

3  right?

4  A.   Yes.

5  Q.   Did you look at any of those budgets from years prior to

6  2009?

7  A.   I did not.

8  Q.   Did you ask to look at them?

9  A.   I didn't think it was necessary, so I didn't ask for them.

10 Q.   As an economist attempting to insure that their budgeting

11 process yielded sufficiently accurate results, wouldn't you

12 want to look at how those forecasts performed against actual

13 results over as many years as possible?

14 A.   Not necessarily.  I got sufficient number of years, which

15 were corroborated by the conversations that I had.

16 Q.   And they were all wrong, isn't that right?

17 A.   There were deviations that I testified to, yes, for

18 various one-time reasons.

19 Q.   And you've managed to find a various one-time reason to

20 explain the substantial variations for every year from 2009 to

21 2013, right?

22 A.   No.  It's -- 2012 was pretty accurate.

23 Q.   2009 -- and 2013 was pretty inaccurate, wasn't it?

24 A.   There were some deviations, yes.

25          MR. NEUMAN:  Could we put up Defendant's 252, please.

BY MR. NEUMAN:

Q.   So based on results for each year from 2009 through the time you looked at these budgets, you didn't think, as an economist who likes to have as much data as would be useful, maybe you should look back historically and see how things were going before the great recession started?

A.   No, because the economy was very different, just generally, before the great recession, so it's -- I felt that after the great recession, and the other factors that we talked about during the relevant time frame, that was the most important data to look at.

Q.   Well, exactly what did Syngenta consider?  What criteria did Syngenta consider in doing its 2009 budget?

A.   I don't know specifically about the 2009 time frame.  I believe Syngenta's witnesses have talked about various factors that they take into account when they create budgets generally.

Q.   Right.  I'm asking --

A.    Whether those factors exist in 2009, I don't know.

Q.   Right.  But I'm asking you, as the expert who is sponsoring a $75 million damage calculation, based on Syngenta's budgeting, whether you can tell us what specific factors Syngenta considered and how they considered them in preparing the 2009 budget?

A.   I do not know the formulating process that they utilized to generate the 2009 numbers.

1  Q.    And that's true for 2010 as well?

2  A.    Correct.

3  Q.    And 2011?

4  A.    Correct.  I don't know the formulated process.

5  Q.    2012?

6  A.    Correct.

7  Q.    And 2013?

8  A.    Yes.

9  Q.    And for that matter, 2014?

10  A.    Yes.

11  Q.    Okay.  But, somehow, you've managed to conclude that for

12  2009 to 2011, every dollar in deviation between the budget and

13  the actuals for each of those years was due to the Great

14  Recession?

15  A.    No.

16  Q.    What else is it due to?

17  A.    Well, it's -- one of things that you can see, for example,

18  if you look at 2015, 2015, I would say that the budgets versus

19  actuals are very close, but they're not to the dollar.

20  Q.    Right.  But I asked you about 2009 to 2011.  In shrugging

21  off the variations in those budgets earlier, you said, well,

22  a-ha, I found the reason for that, and it's the Great

23  Recession.  Are you telling the jury that you have concluded

24  that every dollar in the deviations for 2009 to 2011 you have

25  determined to be attributable to the Great Recession?

A.   Well, first, I don't know if I -- you could say I shrugged
it off.  What I did is I said that it is very likely that the
majority of -- actually, that most, if not all, of that
deviation is due to the Great Recession.

        It's very unlikely and I will admit that forecasting
is almost never going to be to the dollar, to the penny, but it
can be close enough.  And, for example, you can see that it was
not to the dollar, to the penny in 2015, but the deviation was
relatively small.

Q.   Did you do any statistical analysis or inquiries, any
regression analyses to try to determine exactly what accounted
for the disparities between Syngenta's budgets and actuals for
the years 2009 to 2011?

A.   I did not perform any such regressions.

Q.   Do you think it might be useful to do that as an economist
attempting to determine why Syngenta's budgets were so off in
those years?

A.   I don't think it was necessary, no.

Q.   By the way, when did the Great Recession end?

A.   Well, it varied depending upon the sector of the economy.
Different sectors had different time frames than others.

Q.   Was it over by 2013?

A.   For certain sectors, yes; for certain sectors, maybe not.

Q.   And then you also indicated that you read Dr. Romer of UC
Berkeley --

1  A.    I did.

2  Q.    -- who provided you with the reason why Syngenta's budgets

3  were off in which year?

4  A.    Again, she was one of the sources, and she talked about

5  the problems of the forecasting during the time frame.  I don't

6  recall the exact years.

7  Q.    Did you do any statistical analysis, any regression

8  analysis to try to confirm whether Dr. Romer's reasons

9  accounted for all the disparities, in whatever years it was

10  that you now can't remember, you relied on her for?

11  A.    I did statistical analyses based upon my work as an

12  economist in the crop insurance industry, looking at crop

13  insurance prices, but I did not do a confirmation of the

14  methodology that Dr. Romer utilized.

15  Q.    And then, in 2013, you decided that that disparity between

16  the actuals and the budget was due to the drought?

17  A.    I didn't decide that; that's what the facts told me.

18  Q.    And did the -- how much of that disparity did the facts

19  tell you -- how much of that disparity did the facts tell you

20  were attributable to the drought?

21  A.    Again, I did not do such a disaggregation.  However, based

22  upon the analysis that I performed, I concluded that most of

23  that deviation was due to the prior year drought.

24  Q.    Now, when you set out to perform your analysis in this

25  case and decided to use this benchmark approach, did you have

1  in mind any particular criteria in terms of the threshold at

2  which budget -- variances between budgets and actuals would

3  indicate that a budget -- that the use of that benchmark was

4  not sufficiently reliable?

5  A.   So it's -- first thing is, when I approach this problem,

6  there are multiple methods that I utilize.  After doing

7  particular analyses, I decided the Benchmark Method was the

8  most appropriate after I found out certain facts.  But I did

9  not do any analysis to say, hey, look, if budget deviations are

10 more than X, it's unreliable.

11 Q.   Are there any criteria in the profession that would have

12 guided you in that regard when you set out to do this analysis?

13 A.   I think that the only thing that is necessary from various

14 treatises that I have read and I have on my bookshelf is that

15 it needs to be sufficiently similar, but it doesn't define what

16 "sufficiently similar" is.

17 Q.   What is "sufficiently similar" in your mind?  What

18 criteria did you use?

19 A.   Just like Syngenta's budgeting process, it varies from

20 situation to situation.

21 Q.   And you think that the variations depicted on Defendant's

22 252 are within the range of variation that you would regard as

23 acceptable to perform a damages analysis that leads to a

24 calculation of at least $75 million in damages, is that right?

25 A.   I do, because, for example, if you look at 2015, when

1  Syngenta knew what was going on, the variation was less than

2  1 percent.  That's pretty good.

3  Q.   That was one year, it was pretty good, right?

4  A.   Yeah.  But if you look at, for example, 2012, another

5  year, the variation was, what, maybe 2 percent, 4 percent,

6  something like that.

7  Q.   How much was it off in 2013 -- '12, rather?  I beg your

8  pardon.

9         THE COURT:  In what?

10 BY MR. NEUMAN:

11 Q.   In the year you just mentioned, which is 2012, how much

12 were sales off from budget?

13 A.   In 2012?

14 Q.   Yes.

15 A.   2012, it was off by 14 million, which is, what, maybe

16 6 percent, something like that.

17 Q.   My question was, though --

18 A.   Sorry.

19 Q.   -- when you -- not before you set out to do your analysis,

20 but when you did your analysis, did you have any numerical

21 criteria in mind in terms of what an acceptable percentage

22 variation would be that would be -- that would allow you to use

23 a method that resulted in a $75 million damage claim?

24 A.   I did not have a numerical criteria.  I just had the

25 criteria that I talked about from the texts.

1  Q.   Now, as I understand your testimony, you used the

2  October-November 2014 budget because it's your opinion that it

3  was at that time -- that it was after that that Syngenta

4  obtained sufficient information about Willowood to adjust its

5  budgets, is that right?

6  A.   I believe that was what -- the testimony from Mr. Cecil,

7  for example.

8  Q.   So you rely on Mr. Cecil for that, correct?

9  A.   It's amongst other things, yes.

10 Q.   Now, can you tell me, please, what exactly Syngenta

11 learned after it prepared the fall 2014 budget and the first LP

12 revision in January of 2014?

13 A.   Sure.  So it's -- first, there was market intelligence

14 from various sources.  Secondly, in early January 2014,

15 Syngenta had a press -- I'm sorry, Willowood had a press

16 release announcing that they were coming to market.

17        Furthermore, I believe when Mr. Heinze was

18 testifying, he testified about a letter that Mr. Levine, one of

19 Syngenta's attorneys, sent to Willowood asking about more

20 information about what Willowood's activities were, and

21 Mr. Heinze respond.  So those are just three examples that I

22 can think of off the top of my head.

23 Q.   I'd like to know what specific market intelligence you

24 rely on to determine that you should not have used one of the

25 later LPs in your damages analysis.

A.   So if you want something specific, I'll talk about -- I
think it was January 9th, 2014, press release.  I might have
the date wrong, but it was somewhere in that range.

Q.   Isn't it true that Cheminova had also issued a press
release announcing its intent to get into the market in 2014?

A.   I don't recall.

Q.   Did you look that the issue?

A.   I might have, but I don't recall.

Q.   Okay.  So how much -- by how much did Syngenta's budget
decrease from the time it prepared the initial budget in the
fall of 2013 to the first LP in 2014?

A.   I have that information somewhere.  I don't know if it's
in -- if I have the January LPs here.  So it's -- the January
LPs are here.  However, unfortunately, these LPs list the
products by -- I'm sorry, list budgets and prices by product,
for instance, Abound, Quadris, Quadris Top, et cetera.  I would
need to add them all up.  If you want, I can add them up.

Q.   Well, it's millions of dollars, right?

A.   Most likely, yeah.

Q.   And is it your testimony that the letter that Mr. Levine
wrote to Willowood and the Willowood press release and the
market intelligence that you just described accounted for every
dollar in the decrease of Syngenta's budget to the first LP in
January of 2014?

A.   Well, first, again, I'm never going to say "every dollar,"

1   because budgets and forecasts are never to any dollar.

2   Secondly, Mr. Fisher testified that he got on an airplane very

3   quickly in January because the customers were panicked, and he

4   had to go and calm them down.

5   Q.   But I want to know what -- how, specifically, that

6   translated to any specific dollar reduction in the budget.  Do

7   you know how that was done?

8   A.   Again, just like how the budgets were created, I don't

9   know the process that was quantitatively utilized to do that

10  that reduction.

11  Q.   And then, the LP decreased again from January to February

12  of 2014, correct?

13  A.   It did.

14  Q.   And do you attribute that entire decrease to additional

15  information concerning Willowood?

16  A.   Again, I'm never going to say the entire thing, but, for

17  example, if you recall from Mr. Heinze's testimony, he said

18  that certain facts that Syngenta thought were true in

19  Mr. Levine's letter were not true, such as products being in

20  the warehouse in Pasco, Washington.  And so, there was more

21  information garnered as a result of that and other things.

22          In addition, there were results that Mr. Fisher

23  received from his contact with the customers, which likely also

24  caused forecasts to be altered.

25  Q.   In that window, from January to February 2014, what

1  conversations did Mr. Fisher have with customers that led to a

2  reduction in the LP?

3  A.    I do not know specific conversations.

4  Q.    You referred to Mr. Heinze's response to Mr. Levine.  You

5  believe that was sent in February 2014?

6  A.    I believe it was sent in late January, but I could be

7  wrong.  I don't recall the exact dates.

8  Q.    And in that letter, Mr. Heinze said:  Contrary to your

9  assertion, we are not storing product in Washington State, he

10 did not?

11 A.    Yes, he did.

12 Q.    So how would that assertion, contradicting Syngenta's

13 prior belief that Willowood had already imported material and

14 was storing it in Washington State, how would learning that

15 that wasn't true cause a further concern about Willowood's

16 activity and a decrease in the LP?

17 A.    What I believe that it shows is that Syngenta did not have

18 full information about Willowood's activities and planned

19 activities in -- at that time.  And so, as 2014 evolved,

20 they've garnered more information and overcame some of -- and

21 learned more about what those activities and planned activities

22 were.

23 Q.    And then, from February to March 2015, what exactly -- the

24 budget -- the LP further decreased in the next month, from

25 February to March --

1  A.    I believe it did, yes.

2  Q.    -- correct?

3  A.    Yes.

4  Q.    What, exactly, did Syngenta learn about Willowood's

5  activities in that month that it had not previously known that

6  led it to decrease its LP?

7  A.    I do not have -- know the specific information that they

8  learned.

9  Q.    And then, the LP decreased again from March to April,

10  correct?

11  A.    Correct.

12  Q.    What specific information about Willowood, if anything,

13  did Syngenta obtain that led -- that would have led it to

14  decrease its budget -- its LP?

15  A.    I don't -- I don't have that specific information.

16  Q.    And the same answer would apply with respect to the

17  decreases in the LPs from April to May and May to June?

18  A.    Actually, it's -- I think there was an increase from May

19  to June.

20  Q.    Was that attributable to anything that they learned about

21  Willowood?

22  A.    I don't know.

23  Q.    Now, for you to derive your $75 million figure, it would

24  also be important that Syngenta's mesotrione budgeting process

25  yielded accurate results, isn't that correct?

1  A.    Yes.

2  Q.    How many years of Syngenta budget forecasting for

3  mesotrione did you look at?

4  A.    So it's -- I utilized the 2014, 2015, 2016 forecasts in --

5  and budgets in my calculations.

6  Q.    And mesotrione had been on the market for many years prior

7  to that time, right?

8  A.    It had.

9  Q.    And Syngenta prepared annual budgets going back to when it

10  first started -- for mesotrione going back to when it first

11  started selling that product, correct?

12  A.    Correct.

13  Q.    And you didn't think to look at those earlier year budgets

14  to determine the accuracy of its forecasting for mesotrione?

15  A.    I didn't think it was necessary to do my analysis, no.

16  Q.    Now, you say on -- if we could bring up demonstrative

17  slide 23, Bonnie.  Thank you.

18        So here, you're talking about the azoxy budget

19  benchmarks.  And the first bullet under the -- the third bullet

20  down, I'm sorry, "Azoxy Budget Benchmark," and then the

21  first -- you can leave it there.  Thank you.  You say that the

22  azoxy budget benchmark isolates the impact of Willowood's

23  infringement?

24  A.    I do.

25  Q.    And by that, you're referring to the fact that, again, by

1    November of 2014, you think that Syngenta -- after that time,

2    Syngenta learned about Willowood?

3    A.    Got sufficient information about it, yes.

4    Q.    In 2014 -- 2013, 2014?

5    A.    At the end of 2013, beginning of 2014.

6    Q.    So when you say the benchmark isolates the impact of

7    Willowood's infringement, is it your testimony that that --

8    that the difference between that benchmark -- that that budget

9    in the fall of 2013 and all the decreases later are

10   attributable to Willowood?

11   A.    No.  As I think I showed in my chart, that I attributed

12   less than half of the 2014 shortfall to Willowood.

13   Q.    That 2014 budget that was prepared in the fall of 2014,

14   would only isolate the impact of Willowood's infringement if

15   Syngenta's budget process was 100 percent accurate, isn't that

16   right?

17   A.    First, I think you said -- I think you had a missed year

18   in there somewhere.

19   Q.    The budget for 2014 that Syngenta prepared in the fall of

20   2013 would only isolate the impact of Willowood's infringement

21   if Syngenta's budgeting process were 100 percent accurate,

22   isn't that right?

23   A.    No.  I'm saying that, again, it isolates it to a

24   reasonable degree of economic certainty.  And, again, you keep

25   asking me questions about to the dollar, and I can't say

1  forecasting is to the dollar.

2  Q.    Let's go to Slide 24.

3        Now, you say in that second bullet -- dark bullet

4  down at the bottom, "Mesotrione benchmark accounts for the

5  following."  You say it accounts -- it isolates the impact of

6  Willowood's infringement.  Do you see that?

7  A.    I do.

8  Q.    So how does that -- if the azoxystrobin budget isolates

9  the impact of Willowood's infringement, what's the mesotrione

10  benchmark also isolating the impact of Willowood's

11  infringement?

12  A.    One of the things that we heard testimony about from

13  Dr. Wichert earlier today is that there was not any early-entry

14  infringement with mesotrione like there was with azoxystrobin.

15  So that what happened with the mesotrione, it -- those budgets

16  and actual profits were not affected by any company doing any

17  early-entry infringement.

18  Q.    And you say then that the mesotrione budget accounts for

19  economic market factors affecting the agriculture industry?

20  A.    They do.

21  Q.    Do those economic market factors that you say are

22  accounted for in the mesotrione budgeting process affect

23  fungicides and herbicides exactly the same?

24  A.    Again, not exactly the same, probably not.

25  Q.    So you would agree with me, wouldn't you, that the

1    mesotrione benchmark accounts for economic market factors that
2    are relevant to azoxystrobin only to the extent that those
3    factors affect azoxystrobin and mesotrione sales exactly the
4    same, isn't that right?
5    A.   Again, I'm having trouble with "exact."  They control
6    things to -- in a sufficient way, in a sufficiently comparable
7    manner.
8    Q.   Now, let's take a look -- take a little deeper dive at
9    your method of calculation.
10           As I understand it, after your mesotrione adjustment
11   was made for 2014, you calculated a percentage variation for
12   2014 that you thought should apply based on mesotrione, and you
13   calculated your damages number for 2014, and then you adjusted
14   Syngenta's 2015 budget by that difference that you determined
15   should have been budgeted by Syngenta, correct?
16   A.   So, first, I don't think it was a mesotrione budget --
17   percentage calculation.  It was a combination of calculations
18   resulting from the lost profits, but I went and knew that the
19   budgets for 2015 had been reduced and so that was, I believe, a
20   sufficient benchmark to determine what the budgets would have
21   been had Willowood not done its early entry.
22   Q.   So if we turn to Slide 35 in the demonstratives, please,
23   here we see that for 2015, you adjusted what was Syngenta's
24   final budget for 2015 of $99 million by the additional budget
25   using mesotrione to conclude that Syngenta should have used the

1  $115.4 million as the basis for its 2015 budget, correct?

2  A.   Again, I increased it, but it was not based upon

3  mesotrione.  It was based upon the profit differential

4  calculation I had calculated.

5  Q.   Using mesotrione as the benchmark?

6  A.   As one of the benchmarks, yes.

7  Q.   And then using what you thought would have resulted -- or

8  should have resulted in Syngenta's budgeting process --

9  A.   Correct.

10 Q.   -- based on what happened the year before?

11 A.   Correct.

12 Q.   But that's not -- and, again, that's your number; that's

13 not the number that Syngenta used, right?

14 A.   Again, this gets back to coming up with the but-for --

15 Q.   First of all, am I right?

16 A.   Correct.  It is right because the but-for world never

17 happened.

18 Q.   And let me talk about the 2016 and 2017 damages

19 calculation.  Now, you say in your slide presentation that you

20 used a similar method to calculate 2016 lost profits and 2017

21 lost profits as you did for 2014 and 2015, right?

22 A.   A similar process, yes.

23 Q.   It's not really that similar, is it, Dr. Wilner?

24 A.   I think it is.

25 Q.   Dr. Wilner, you prepared your budget calculations -- I'm

1  sorry -- your damage calculations in the summer of 2016,

2  correct?

3  A.    Correct.

4  Q.    And for 2014 and 2015, you used budgeted numbers for those

5  years against actual sales numbers for those years, correct?

6  A.    Correct.

7  Q.    What's your claimed damages for the year 2016?

8  A.    For 2016, as my report was written in August of 2016, so

9  at that time, I did not --

10  Q.    What was your damages number for 2016?

11  A.    It's -- the number, I believe, was about $15 million for

12  2016.

13  Q.    And to calculate that number in the middle of 2016, you

14  did not have actual 2016 sales figures, did you?

15  A.    I had year-to-date figures.  I did not have full-year

16  actual figures.

17  Q.    So to calculate that $15 million for 2016, you had to make

18  assumptions about where Syngenta's actual sales would end up,

19  and you used a midyear LP for that calculation, correct?

20  A.    That is correct.

21  Q.    And you also calculated, in the middle of 2016, damages

22  for the year 2017, right?

23  A.    Correct.

24  Q.    And you say that your damages analysis is conservative

25  because you stopped at 2017, right?

1  A.    Correct.

2  Q.    So let's see how we calculated the damages figure for

3  2017, Dr. Wilner.

4         In the summer of 2016, when you calculated that

5  number for 2017, Syngenta had not even prepared its final

6  budget for 2017, had it?

7  A.    The final budget had not been prepared, no.

8  Q.    In fact, this was six months before 2017, so Syngenta was

9  still in the middle of that early planning process for the 2017

10 budget, right?

11 A.    No, I think they were towards the end of the process.

12 Q.    And each month, as they go through another step in their

13 exacting budgeting process where they get people with knowledge

14 in a room to talk and hash things out, they refine those

15 budgets each month, right?

16 A.    They could, yes.

17 Q.    So that one would expect that the final budget prepared

18 for 2017 in the fall of 2016 would contain the result of more

19 robust internal conversations at Syngenta and more current

20 information, correct?

21 A.    I use the best information available at the end

22 of -- which was through June 2016.  Obviously, the more

23 information that you have as you go on later, you can be more

24 exacting.

25 Q.    But to determine that Syngenta is owed $15 million for the

1  year 2017, you started with a June 2016 forecast of 2017 sales,

2  correct?

3  A.    Correct, because it was very close to the end of that

4  18-month budgeting process.

5  Q.    And then, as I understand your method for 2014 and 2015,

6  you compare budgeted sales to actual annual sales, correct?

7  A.    For mesotrione, yes.

8  Q.    And in June or July or August of 2016, there were no data

9  for any mesotrione sales for any month in 2017, right?

10 A.    Correct.

11 Q.    So in order to compare budget versus actual for purposes

12 of your calculations, what did you use as actual 2017 sales?

13 A.    So it's -- what I did is, as you can see from -- for

14 example, the process that you see here in 2015, the first three

15 parts of the slide in that, I determined that had Willowood not

16 infringed, the budgets for 2015 would have been different; and

17 I go and do other steps and I compare, in essence, something

18 relating to the budget to actuals.

19          What I did for 2017 is I've continued this process of

20 determining what the budget would have been in 2017 had

21 Willowood not infringed and compared it to the budget that was

22 going to be used in 2017 because that was the best information

23 that was available.  That was the best forecast and the best

24 information.

25 Q.    As a professional economist and statistician, sir, do you

1  always just use the best information available as good enough?

2  A.    Not necessarily, but, again, because I had reviewed the

3  exacting nature of the budgeting process, I felt comfortable

4  that the budget for 2017 that was in existence in June of 2016,

5  the last time period I could gain information, was a

6  sufficiently reliable information -- was a sufficiently

7  reliable statistic about what would have happened in 2017.

8  Q.    Even though we've just been discussing the fact that the

9  budget is prepared towards the end of the year for the next

10  year, change each month thereafter, sometimes by millions of

11  dollars, based on new information that comes in, right?

12  A.    In other months, the LPs did not change as dramatically as

13  the time frame you are talking about because there was no -- I

14  don't want to use the word "cataclysmic," but no major change

15  like a major generic early entry like what happened in early

16  2014.

17  Q.    You used mesotrione as a benchmark because you believe

18  that it is sufficiently similar to the patented products at

19  issue to be used as a benchmark to create reliable and credible

20  results, correct?

21  A.    For the purpose I used it for, yes.

22  Q.    And you would agree with me that to do an analysis like

23  this, one must take care to ensure that the patented product is

24  sufficiently comparable to the benchmark that you're using,

25  right?

1  A.    For the purpose you're using it for, yes.

2  Q.    And if the benchmark is not sufficiently similar to the

3  patented product, the benchmark analysis that you did in this

4  case for this particular purpose would not be reliable,

5  correct?

6  A.    Well, but -- the thing I'm saying -- why I answer for the

7  purpose I'm using it for is that I used each benchmark -- the

8  mesotrione benchmark, the azoxystrobin budget benchmark -- in

9  different ways.  So that for the way in which I used the

10 mesotrione benchmark, comparing budget to actual in this case,

11 that is why I say for the particular purpose, and if that

12 particular -- and so, again, to answer your question, if the

13 particular purpose is -- has some deviation, yes, I agree, you

14 can't use the benchmark.

15 Q.    And to determine the accuracy of the mesotrione budgeting,

16 as we discussed, you look at two years of budgeting versus

17 actuals, right?

18 A.    No.  I said I applied, again, I think two to -- I think

19 four years of budgeting.  Plus I looked at additional

20 forecasts.

21 Q.    But you didn't go back to look at budgets earlier than

22 what year for mesotrione?

23 A.    I don't recall the exact date, how early I went for

24 mesotrione.

25 Q.    Did you consider any other benchmarks besides mesotrione?

A.    I don't know if I considered another one for mesotrione.

I know I considered a different one for budgets, and if I used

those other benchmarks, which I don't think were as applicable,

but if I had used those benchmarks for azoxystrobin -- instead

of the azoxystrobin budget, I think my damages would have been

higher.

Q.    Did the Syngenta people suggest that you use the

mesotrione numbers as a benchmark?

A.    No, it was a collaborative effort, and I talked -- I

believe I talked to them about wanting to use a benchmark, and

because I was not familiar with every product that Syngenta

had, when I described what I wanted, they said mesotrione.  So

I think it was a collaborative process.  It wasn't that I

walked in and said tell me about mesotrione and it wasn't that

they said use mesotrione.

Q.    And as I understand it, you think that mesotrione is

sufficiently similar to azoxystrobin for the purposes of your

analysis for three basic reasons.  One, both products were

well-established in the market by 2014, is that correct?

A.    That's one reason, yes.

Q.    Two, the two products are approved for use on some of the

same crops?

A.    That's another reason.

Q.    And, three, Syngenta lost exclusivity over both products

within several months of each other in 2014, correct?

1  A.    Correct.

2  Q.    Those were the basic reasons that you concluded mesotrione

3  is sufficiently similar to azoxystrobin?

4  A.    I don't know if that list is exhaustive, but those were

5  some of the major reasons, yes.

6          THE COURT:  Can we just pause for a second and all

7  stand up for a minute.  Take a little pause right after lunch

8  here.

9  BY MR. NEUMAN:

10 Q.    So as I understand it, you concluded that mesotrione is

11 sufficiently similar to azoxystrobin in terms of market

12 conditions, market forces, everything that would affect supply,

13 demand, and price to use as a control to account for everything

14 happening in the market other than Willowood, is that right?

15 A.    No.

16 Q.    How is that incorrect?

17 A.    So it's what -- the purpose that I used the mesotrione

18 budget for is with the recognition that Syngenta's azoxystrobin

19 budgets could be off because budgets are sometimes off and that

20 sometimes people -- it's product actually overperform budgets,

21 sometimes they meet budgets, sometimes they underperform

22 budgets.  So the sole purpose that I used the mesotrione budget

23 for was to go and analyze how much a similar product met

24 budget, exceeded budget, or underperformed budget.

25 Q.    And as I understand it, your conclusion was that the

1  mesotrione budget analysis would give you a basis to determine

2  how to adjust the azoxystrobin variations to account for

3  factors other than Willowood, is that not correct?

4  A.   It's to account for the deviations from budget -- from the

5  azoxystrobin budget other than Willowood, yes.

6  Q.   So in order to use the mesotrione budgets for that

7  purpose, you have concluded that all of those other factors

8  that could affect supply, demand, and price would have very

9  similar effects on both mesotrione and azoxystrobin, correct?

10 A.   Potentially, yes.  Potentially, no.  But those other

11 factors were controlled for by my azoxystrobin budget

12 benchmark.

13 Q.   All right.  Let's talk about the three main factors that

14 led you to conclude that the mesotrione was a sufficiently

15 similar product to azoxystrobin.

16         First, you said that they're both well-established

17 products, correct?

18 A.   Yes.

19 Q.   Now, that in itself is not a sufficient basis to use one

20 as a benchmark for the other, right?

21 A.   Not by itself, no.

22 Q.   I mean, an iPhone and a Chevy are both well-established

23 products, but that doesn't mean they're benchmarks, right?

24 A.   Correct.

25 Q.   And you say that they're both used on similar crops,

1  right?

2  A.    Yes.

3  Q.    They're not used on the same crops, are they?

4  A.    I think the testimony was that both are primarily

5  used -- that the main product for both is corn.

6  Q.    You've heard testimony that wheat is an important

7  application for azoxystrobin?

8  A.    Yes.

9  Q.    Mesotrione is not registered for use on wheat, is it?

10 A.    No.

11 Q.    Azoxystrobin can be applied through irrigation systems,

12 can't it?

13 A.    I do not know that.

14 Q.    Azoxystrobin is a fungicide, right?

15 A.    Correct.

16 Q.    It kills weeds?  I'm sorry.  It kills fungus and diseases?

17 A.    Yes.

18 Q.    And mesotrione is a herbicide, kills weeds?

19 A.    Yes.

20 Q.    So farmers use these products for different purposes,

21 correct?

22 A.    Correct.

23 Q.    You agree that every product faces different market

24 conditions, do you not?

25 A.    Again, I hate to using the word "every," but most things

1  have some differences, yes.

2  Q.   So let's look at market conditions.  As a general matter,

3  would you agree that the price of a product can affect

4  consumers' demand for that product?

5  A.   It could.

6  Q.   I'm not an economist.  Even I understand that, Dr. Wilner.

7  But the demand for some products is more price sensitive than

8  others, correct?

9  A.   Correct.

10 Q.   Some products are more a matter of choice and discretion,

11 so that if a price goes up, you're more likely not to buy one

12 product than the other, right?

13 A.   Makes sense.

14 Q.   And when things get tight economically, when you start to

15 feel a financial pinch, that's particularly true, correct?

16 A.   It could be.

17 Q.   I still have to buy food, but I might decide to give up

18 that movie if times are tough, right?

19 A.   It's possible.

20 Q.   Do economists have a name for how sensitive consumer

21 demand is to price?

22 A.   They have several names, yeah.

23 Q.   Is price elasticity one of them?

24 A.   It is one of them, yeah.

25 Q.   The more price elastic a product, the more sensitive the

1  consumer is going to be to the price?

2  A.    Yes.

3  Q.    Greater price elasticity means you lose more sales if the

4  price goes up?

5  A.    Yes.

6  Q.    And the greater the elasticity, the more sales of a

7  product will increase if the price comes down?

8  A.    Correct.

9  Q.    Now, fungicides --

10  A.    All else equal.

11  Q.    All else being equal.

12  A.    All else equal.

13  Q.    Have you performed -- I'm sorry.  Fungicides are more

14  price elastic than herbicides, aren't they?

15          THE COURT:  If you could just say it a little slower.

16          MR. NEUMAN:  I beg your pardon.

17  BY MR. NEUMAN:

18  Q.    Fungicides are more price elastic than herbicides, are

19  they not?

20  A.    Are you talking about in general?

21  Q.    In general.

22  A.    Right.  In general, fungicides that don't have crop

23  enhancement features, yes, I think I've seen information to

24  suggest that they are more elastic.

25  Q.    Is azoxystrobin not more price elastic than mesotrione?

1  A.    I have not done such an analysis.

2  Q.    You have not performed any statistical analysis on the

3  relative price elasticity of mesotrione compared to

4  azoxystrobin, is that correct?

5  A.    I have not done my own analysis.

6  Q.    Thank you.

7  A.    However --

8  Q.    Isn't it true that, all else being equal, in tougher times

9  farmers will reduce their purchase of fungicides before they

10  reduce their purchase of herbicides in order to save costs?

11  A.    I do not know that to be true.

12  Q.    You've heard the phrase "untreated acre"?

13  A.    I have.

14  Q.    What does it mean to you?

15  A.    It my understanding that an untreated acre is a piece of

16  land that does not have some chemical, be it herbicide,

17  fungicide, pesticide or whatever, being applied to it.

18  Q.    It refers to the fact that there are acres of farmland out

19  there that could benefit from the application of, for example,

20  azoxystrobin, but farmers are not buying that product because

21  the price is too high, right?

22  A.    Again, not necessarily.  And that's -- there could be no

23  benefit from putting on a fungicide.  I don't know.  It's an

24  individual decision.  It's not -- there are multiple items that

25  affect a purchase decision more than just price.

1  Q.   Is it your testimony that every sale that Willowood made

2  of azoxystrobin in 2014 would have been made by Syngenta had

3  Willowood not been in the market?

4  A.   No, that's not my testimony.

5  Q.   And some of that might be due to the concept of untreated

6  acres.  Do you agree with me?

7  A.   It could be.  I've not done any analysis and so I don't

8  know.

9  Q.   Now, in fact, Dr. Wilner, from 2013 right through 2014,

10 the price farmers could get for corn, wheat, and soybean

11 dropped substantially, didn't they?

12 A.   I think it dropped more for corn than for the others, but

13 yes.

14 Q.   And it -- I'm sorry.

15 A.   I'm complete.

16 Q.   And that happened again, a further decline -- prices for

17 those commodities further declined from 2014 to 2015, correct?

18 A.   I believe so, yes.

19 Q.   And, in fact, those commodity prices hit a ten-year low in

20 2014 and 2015, did they not?

21 A.   I think they did, but I don't recall the comparison of

22 2015 to prior years.

23 Q.   Now, the third factor that you identified as the basis for

24 concluding that mesotrione is sufficiently similar to

25 azoxystrobin is that they both came off exclusivity roughly the

1  same time in 2014, is that right?

2  A.    Yes.

3  Q.    As I understand your opinion, that is because -- the

4  reason that that's important or relevant is because that means

5  that both -- for both products generic companies face

6  significant barriers to entry until the first half of 2014, is

7  that right?

8  A.    Again, I think you're just talking about the compound

9  patents because I think the --

10 Q.    Yes, I'm talking about the compound patents.

11 A.    Okay.  Yeah, because there were other process patents for

12 both products that took the -- took exclusivity for longer.

13          THE COURT:  That what?

14 Q.    Thank you for that clarification.

15          THE WITNESS:  That took exclusivity longer.

16          THE COURT:  Okay.

17          THE WITNESS:  Not for that sentence, but I think you

18 understand my point.

19          Sorry, Your Honor.

20          THE COURT:  That's okay.  You just talked a little

21 fast.

22          THE WITNESS:  Okay.

23          THE COURT:  Go ahead.

24 BY MR. NEUMAN:

25 Q.    Thank you for that clarification.  And this is a key

1  factor in your conclusion that mesotrione is a sufficiently

2  similar benchmark to azoxystrobin, isn't it?

3  A.   It's -- all information I utilize is important or key.

4  Q.   Well, the fact that they are both well-established

5  products won't do it alone, right?

6  A.   Again, probably not, no.

7  Q.   Now, that would mean that, in order for mesotrione to be

8  sufficiently similar to azoxystrobin as a benchmark, the

9  opportunities for generics to compete after both products came

10 off exclusive use would need to be very similar for the two

11 products, correct?

12 A.   Not necessarily.

13 Q.   No?

14 A.   Because, again, remember the purpose that I am using it.

15 I'm using mesotrione just for the budget -- budget versus

16 actual difference.

17 Q.   If you're citing as a factor that both came off

18 exclusivity at about the same time, what would the relevance of

19 that possibly be if not that it meant the generics who had

20 faced significant barriers of entry through the first half of

21 2014 then have the same opportunity to compete starting in the

22 second half of 2014?

23 A.   Because at that time both products became under Rex

24 Wichert's group at the time the post-patent strategy grew.  If

25 you remember, there were five pillars that were involved in the

1  post-patent strategy, only one of which was generic

2  competition.

3  Q.    So is it your testimony that if generics did not have the

4  same opportunity to compete when both products lost exclusivity

5  that would not matter at all to whether mesotrione is a

6  sufficient benchmark?

7  A.    I'm not saying it wouldn't matter at all.  I'm just saying

8  that there are multiple factors, five pillars.

9  Q.    Now, are you aware that also in 2015 BASF had a product

10  that competed with azoxystrobin that contained a different

11  strobilurin molecule?

12  A.    Yes.

13  Q.    One of those was Headline, correct, one of the products

14  that BASF sold?

15  A.    I believe so, yes.

16  Q.    And you're aware that patent, the patent for BASF's

17  product, came off patent in 2015?

18  A.    I understand that, yes.

19  Q.    And you understand that in anticipation of that event BASF

20  dumped a large quantity of its product into the market?

21  A.    I don't know if it's dumped.  It's because, in looking at

22  statistics about treated acres for BASF products in 2015,

23  their -- the number of treated acres for BASF actually

24  decreased in 2015.

25  Q.    So, in your opinion, the fact that BASF introduced

1 additional quantities in anticipation of its patent expiring

2 had no impact on pricing?

3 A.    I'm not saying that.  I don't know.  Actually, I should

4 say I don't know about BASF's product.  I believe Mr. Cecil and

5 others testified it did not have any impact on Syngenta's

6 pricing.

7 Q.    Dr. Wilner, isn't it true that Syngenta's 2014 budget for

8 mesotrione overpredicted actual sales by that year for about

9 25 percent?

10 A.    I think so, yes.

11 Q.    What would Syngenta's price for Quadris Top have been in

12 2014 but for Willowood's generic entry?

13 A.    I don't know.

14 Q.    2015?

15 A.    That was not necessary for my analysis, so I don't know.

16 Q.    2016?

17 A.    I don't know.

18 Q.    What would Syngenta's price for Elatus, Aprovia, or

19 Trivapro have been when it came into the market had it not been

20 for Willowood?

21 A.    Same answer.  I don't know.

22 Q.    For that matter, what would Syngenta's price for Quilt

23 Xcel or Quadris have been in 2014 had Willowood not entered the

24 market?

25 A.    Same answer.  I don't know.

1    Q.   How much more volume would Syngenta have sold of any

2    specific product on its azoxystrobin brand ladder --

3    A.   As I did not do any --

4    Q.   -- had Willowood not entered the market?

5    A.   As I did not do any analysis on a particular product

6    brand-by-brand analysis, I don't know.

7    Q.   And isn't it true that in 2015 after Willowood and others

8    were selling generic azoxystrobin products, Syngenta estimated

9    that generic volumes for 2016 would only be between 4 and

10   6 percent of all azoxystrobin sales?

11   A.   It sounds like something that could have been made, but I

12   don't recall that exact number.

13            MR. NEUMAN:  Your Honor, may I approach the witness?

14            THE COURT:  All right.  What's the exhibit?

15            MR. NEUMAN:  Defendant's 128.  Your Honor, I move for

16   admission of Defendant's 128.

17            MR. SANTHANAM:  No objection, Your Honor.

18            THE COURT:  It will be admitted.

19   BY MR. NEUMAN:

20   Q.   Please turn to what is Bates stamped as 061685.

21   A.   685?

22   Q.   Yes.

23   A.   Thank you.

24            MR. NEUMAN:  685, please.  Thank you.

25

1  BY MR. NEUMAN:

2  Q.   Do you have that in front of you, sir?

3  A.   I do.

4  Q.   So the title of this exhibit is -- of this page is "2016

5  Top-Down Assumptions Syngenta Fungicide Treated Acres."  Do you

6  see that?

7  A.   I do.

8  Q.   And then if you look at the third bullet, what does

9  Syngenta say there?

10         MR. NEUMAN:  Can you blow that up?

11  A.   It's 4 to 6 percent of strobilurin market and strobilurin

12  is a mixture product, which is part of the azoxystrobin brand

13  ladder.

14  Q.   You think that strobilurin is a mixture product?

15  A.   It's -- actually, I apologize.  I'm sorry.  I was getting

16  confused because it's on azoxystrobin and strobilurin.  I'm

17  sorry.  Let me take a step back.  Yes, I see this that generics

18  are 4 to 6 percent of strobilurin, which is the overall

19  products that generics and brands such as BASF, et cetera,

20  sell.

21  Q.   And Syngenta?

22  A.   And Syngenta, yes.

23  Q.   So, Dr. Wilner, as I understand your testimony, Willowood

24  itself was under 5 percent of the market -- of the azoxystrobin

25  market in 2014 and 2015.

```
1   A.   I believe we talked about that, yes.

2   Q.   It was only selling one azoxystrobin product until at

3   least late 2014.  It was only selling Azoxy 2SC until at least

4   late 2014, correct?

5   A.   Yes.

6   Q.   It -- Syngenta had a whole brand ladder designed to

7   anticipate and combat generic activity, correct?

8   A.   Correct.

9   Q.   There were other generics selling azoxystrobin in 2014,

10  correct?

11  A.   Yes.

12  Q.   And their combined sales roughly equaled or exceeded

13  Syngenta's azoxystrobin sales in 2014, correct?

14           THE COURT:  I'm sorry.  What?

15  Q.   Roughly equaled or exceeded Willowood's azoxystrobin sales

16  in 2014 and 2015, correct?

17  A.   I don't recall the exact numbers, no.

18  Q.   And despite all that, your testimony is that Willowood's

19  entry into the market and participation in the market in 2014,

20  virtually by itself, fundamentally transformed the entire

21  azoxystrobin market?

22  A.   Yes.

23           MR. NEUMAN:  No further questions, Your Honor.

24           THE COURT:  All right.  How long is your redirect?

25           MR. SANTHANAM:  Probably about ten minutes.
```

1          THE COURT:  Okay.  Why don't you go ahead.

2                    REDIRECT EXAMINATION

3    BY MR. SANTHANAM:

4    Q.   Dr. Wilner, you were asked questions about price versus

5    volume.  Do you recall those questions?

6    A.   I do.

7    Q.   And as part of your damages calculations, were they based

8    on price volume or was it separately related to another

9    quantitative element?

10   A.   It was related to a separate measure.

11   Q.   What was that measure?

12   A.   So I did my analysis on gross profits.

13   Q.   And does gross profits take into account price and volume

14   in any way?

15   A.   It does.  In -- what -- there's a formula for gross

16   profits that I think was testified to earlier.  Gross profits

17   are sales minus relevant costs, but then if you dig into sales,

18   sales are price times quantity.  So I agree that I did not

19   separately analyze price and volume, but what I did is I used a

20   measure that combined it all together and also it subtracted

21   costs.

22   Q.   Now, we've heard some testimony about price elasticity,

23   and you were being asked a question about whether you took into

24   account price elasticity, and you said "not my own analysis,

25   but..." and you got cut off.  Can you explain how you took into

1  account price elasticity?

2  A.   Yes.   So it's my understanding that as the -- that there's

3  testimony and analysis that, in general, fungicides are more

4  elastic.   That means they change -- that quantity changes more

5  as price changes than herbicides.   However, because

6  azoxystrobin has the crop enhancement feature, it is more --

7  it's, again, the opposite of elastic.   It's called "inelastic"

8  in economic parlance.   So it's less elastic, or more inelastic,

9  than general fungicides.

10         But still, I agree that it is possible that even

11  azoxystrobin is more elastic than herbicides.   But still, even

12  if it's more elastic, it shows that my damage calculations are

13  conservative.

14  Q.   Dr. Wilner, let me see if we can break that down into

15  layman's terms.

16  A.   Sure.

17  Q.   So you mentioned plant performance and crop enhancement.

18  How does that translate to whether or not a farmer buys

19  azoxystrobin products?

20  A.   So as Mr. Fisher, Mr. Cecil, and Dr. Wichert testified

21  before, that because of the crop enhancement feature, which

22  azoxystrobin is the only fungicide that has this feature, that

23  it is becoming more of a planned purchase, which means that it

24  doesn't change at -- sales do not change as much as when prices

25  change.

1  Q.   Now, Dr. Wilner, I think you were asked some questions

2  about Defendant's Trial Exhibit 252, and I want to make a

3  clarification.  If we can pull that up.  Now if you go

4  to -- you've seen this chart, correct?

5  A.   I have.

6  Q.   If you go to the column for 2012, you pulled out -- you

7  know, at the bottom where it's highlighted, "Sales about

8  14,000,249?"  Do you recall that?

9  A.   It's the variation 14,000,249, yes.

10  Q.   Did you base your analysis on sales or gross profits?

11  A.   Gross profits.

12  Q.   What were the -- what was the variation in gross profits

13  in 2012?

14  A.   Just over $4 million.

15  Q.   And what percentage of Syngenta's budgeted gross profits

16  does that account for?

17  A.   Just trying -- eyeballing, it's probably about 2 and a

18  half, 3 percent, something like that.

19  Q.   So Syngenta met its budgeted gross profits in 2012 within

20  about 2 to 3 percent?

21  A.   Correct.

22  Q.   Now, I'd like to talk about in terms of -- this concept of

23  head start, and I want to clarify between the various patents,

24  so compound patents, '138 patent, and the '761 DABCO patent.

25  If the jury finds that there is infringement of the '138

1  process patent, how does that relate to the head start that

2  Willowood would have obtained?

3  A.   So it's -- when I previously stated that Willowood got at

4  least a 12- to 15-month head start, that 12 to 15 months --

5           MR. NEUMAN:  Objection, Your Honor.  May we have a

6  sidebar?

7           THE COURT:  Okay.  Well, I'll tell you what.  Let's

8  just let the jury take their afternoon break.  That will be

9  easier.  So, ladies and gentlemen, I'll excuse you for 15

10  minutes.  Come back at 3:00.  Don't talk about the case or form

11  an opinion.  Have no contact with anyone.  We'll see you in 15

12  minutes.

13           (At 2:43 p.m., jury excused.)

14           THE COURT:  Okay.  Your objection?

15           MR. NEUMAN:  Your Honor, as we understand the Court's

16  ruling in response to our motion to exclude Dr. Wilner's

17  testimony --

18           THE COURT:  You need to speak up just a little.

19           MR. NEUMAN:  As we understand Your Honor's ruling

20  concerning our motion to exclude Dr. Wilner's testimony, you

21  indicated that he was allowed to testify that in his opinion

22  Syngenta's damages on account of the two process patents would

23  be at least as much as the damages incurred in connection with

24  the compound patents, period.  That's our understanding of your

25  order.  There's nothing further in the opinion that indicated

that he can then expand on or explain any reasoning beyond what
he has testified to about the compound patents.

     THE COURT:  Okay.

     MR. SANTHANAM:  Your Honor, the testimony I'm trying
to elicit is merely to show and clarify for the record, okay,
there's a separate head start for the compound patents,
separate head start for the DABCO patent and the '138 patent.
We're not going to get into additional benchmarks as Your Honor
addressed in the order with respect to the motion in limine.

     THE COURT:  You're not seeking 75 million times
three.

     MR. SANTHANAM:  No.

     THE COURT:  So you're clarifying --

     MR. SANTHANAM:  We're clarifying what the head start
is with respect to each of these patents, so that would come
out through the testimony.

     THE COURT:  Okay.  I don't understand the problem
with that, Mr. Neuman.

     MR. NEUMAN:  Well, we defer to Your Honor as to the
Court's opinion.  Our understanding was that the witness was
allowed to opine that the damages would be at least as much,
period, but the reasoning and the rationale could go no further
than what he testified to support his damages with respect to
the compound patents.

     THE COURT:  Well, right, but, I mean, he can still

```
 1  say why he thinks those damages apply to the process patents
 2  which is what I'm understanding --
 3          MR. SANTHANAM:  That is exactly right, Your Honor.
 4          THE COURT:  Okay.  All right.  So he can do that.  If
 5  it's any different from that, you know, you can object after we
 6  get the jury back in here.
 7          MR. NEUMAN:  May I have one point of clarification?
 8  I'm sorry.
 9          THE COURT:  Yes, uh-huh.
10          MR. NEUMAN:  I just want to understand.  Is the
11  witness allowed to testify that this two-year head start is a
12  reason for finding more than $75 million?
13          THE COURT:  No, that's not what you're offering,
14  right?
15          MR. SANTHANAM:  No, Your Honor.
16          THE COURT:  No, okay.
17          MR. NEUMAN:  Okay.
18          THE COURT:  I didn't think so.  I mean, if you need
19  to clarify it on recross, you can do that.  So you've got a few
20  more minutes on redirect, maybe a little bit of recross.
21          MR. SANTHANAM:  Yes, Your Honor.
22          THE COURT:  And subject to any exhibits -- stray
23  exhibits that might not have gotten moved into evidence, is
24  this going to be your --
25          MR. SANTHANAM:  This will be our final witness.
```

```
 1              THE COURT:  All right.  And then you all have a

 2    witness you want to get on and off today if you can, is that

 3    right?

 4              MR. TILLER:  Well, here's the problem, Your Honor, on

 5    that one.  The translator that came from the service that was

 6    recommended by the Court isn't much better at speaking English

 7    than the witness.

 8              THE COURT:  Okay.

 9              MR. TILLER:  And we're very concerned that it's going

10    to be hyper-confusing for the jury.  So as much as he doesn't

11    want to stay --

12              THE COURT:  He's going to stay.

13              MR. TILLER:  He's going to stay.  So we have somebody

14    else that I'm hoping -- that's why I was checking my phone.

15    I'm hoping he's sitting out there.

16              THE COURT:  Okay.  So you do have a witness --

17              MR. TILLER:  Or we'll have our video deposition.

18              THE COURT:  -- or something.  Let's take -- anything

19    else before we take a short break?

20              MR. SANTHANAM:  No, Your Honor.

21              THE COURT:  We'll be in recess until 3:00.

22              (At 2:47 p.m., break taken.)

23              (At 3:01 p.m., break concluded.)

24              THE COURT:  All right.  Anything before the jury

25    comes in?
```

1          MR. SANTHANAM:  Yes, Your Honor.  Just one

2     clarification now, before the break Mr. Neuman had said

3     Syngenta should not be allowed to ask for anything more than

4     75 million.  The opinion that Dr. Wilner has offered is that

5     the damages are at least 75.6, and we intend to use the "at

6     least".

7          THE COURT:  Right.  But, I mean, you're not trying to

8     go 75 times three or times two or something like that.

9          MR. SANTHANAM:  Correct, correct.

10          THE COURT:  We'll talk about closing argument later.

11     All right.  Let's get the jury home for the day, so anything

12     else before they come in?

13          MR. SANTHANAM:  No, Your Honor.

14          (At 3:02 p.m., jury arrives.)

15          THE COURT:  All right.  Good afternoon again.  I

16     believe we were on redirect, so you may proceed.

17     BY MR. SANTHANAM:

18     Q.   Dr. Wilner, before we left for the break, I was asking you

19     questions about head start.  Now, you mentioned --

20          THE COURT:  About what?

21          MR. SANTHANAM:  Head start.

22     BY MR. SANTHANAM:

23     Q.   You mentioned that there was a potentially 12 -- at least

24     a 12 to 15-month head start.

25     A.   Correct.

Q.   For which patents are you referring to?

A.   So it's the 12 to 15-month head start relates solely to the two compound patents.

Q.   And if -- if the com -- even if setting aside infringement of the compound patents, do you believe that Willowood received a head start based on your economic analysis?

A.   I do.

Q.   Why is that?

A.   So it's what they -- what Willowood did is Willowood entered early, before the compound patents expired, as well as the other patents expired, and that allowed them to do certain things, which allowed them to make sales before they would have had they waited until the patents expired; and, additionally, it went -- their entry created an impact, which reduced -- which caused Syngenta's sales and prices to be reduced.

Q.   If the jury finds that there was infringement of the '138 process patent, would the head start be longer?

A.   It would.

Q.   If the jury finds that there's infringement of the '761 DABCO patent, would the head start be longer?

A.   Even longer, yes.

Q.   And how does that translate to the damages that you calculated?

A.   So it's -- if you remember back to my testimony, that what a patent does is patents give you an exclusive for a period of

time.  The longer the exclusive, the more profit, additional

profits that one would have made, so that if one cuts -- the

more one cuts off the exclusive period, the more losses that

exist.

Q.    Now, we've heard a lot about budget variations and

accuracy.  Do the budgets that you relied on need to be 100

percent accurate in order for your calculations to be within a

reasonable degree of economic certainty?

A.    They do not need to be 100 percent accurate.

Q.    Did you account for variations in budgets in your

analysis?

A.    I did.

Q.    And what were the methods that you used?

A.    So it's -- for example, I used the mesotrione additional

benchmarks, which accounted for variations that -- and economic

events that occurred after the budgets were created.

Q.    Now, Dr. Wilner, Mr. Neuman had asked you questions about

the price decline in 2014.  Do you recall that?

A.    I do.

        MR. SANTHANAM:  I'd like to put up -- David, if you

could put up Plaintiff's Demonstrative Exhibit 10, if we could

go to Slide 16.

BY MR. SANTHANAM:

Q.    And I think there's some confusion about the price drop

from 2013 to 2014.  Can you explain for us what we have here,

1  Dr. Wilner.

2  A.    Sure.  So what this does is this has two graphs which show

3  that Willowood's prices and Syngenta's prices for Syngenta's

4  main products of Quadris and Quilt Xcel as well as comparable

5  Willowood products.

6  Q.    And which is Syngenta, which is Willowood?

7  A.    So it's that the blue line is Syngenta and Syngenta's

8  prices; the red line is Willowood's prices.  On the left I have

9  Syngenta's Quadris and the equivalent Willowood product; on the

10 right I have Syngenta's Quilt Xcel and the relevant comparable

11 Willowood product.

12 Q.    And, Dr. Wilner, was there a price decline from 2013 to

13 2014 for these products?

14 A.    Yes, there was, based upon that price, yes.

15 Q.    Was -- and was there a price decline from 2014 to 2015?

16 A.    Yes, there was.

17 Q.    Was the price decline from 2013 to 2014 as significant as

18 the price decline from 2014 to 2015?

19 A.    Not as significant, no.

20 Q.    Based on your economic analysis, was there a volume loss

21 that Syngenta experienced from 2013 to 2014?

22 A.    Yes, there was.

23 Q.    And can you explain that volume loss.

24 A.    Sure.  So it's that as Dr. Wichert testified earlier

25 today -- let me take a step back.  So it's if you go back to

1   what Mr. Fisher testified to yesterday, he said that after

2   Willowood made its announcement, and this information was known

3   in the market, that Mr. Fisher testified his customers were

4   panicked.  They didn't know what to do.  And so, as a result,

5   what Dr. Wichert testified to was that because of this

6   uncertainty, the -- Syngenta's customers decided I'm not going

7   to buy that much additional product.  Instead, what I'm going

8   to do is I'm going to sell off my inventory.

9   Q.   And how does the concept of inventory affect Syngenta's

10  lost profits?

11  A.   So it's that these distributors, Syngenta's customers,

12  were still able to service their customers because they had

13  enough product, but they got the product out of inventory,

14  rather than buying from Syngenta; so, as a result, Syngenta's

15  sales declined in 2014.

16  Q.   And when distributor inventory shrunk, did that inventory

17  have to go to Willowood in order for Syngenta to lose profits?

18  A.   No.

19  Q.   Now, Dr. Wilner, in terms of the -- you know, we were

20  talking about the process patent and the DABCO patent.  If the

21  jury decides or determines that Willowood infringed the process

22  patent, would your damages calculation apply even if Willowood

23  could have registered its product without infringing the

24  compound patents by, say, importing it and using azoxy before

25  the compound patents expired?

```
 1           THE COURT:  I'm sorry, that was an awfully long
 2  question, so would you ask it --
 3           MR. SANTHANAM:  I'll repeat it.  I'll repeat or
 4  rephrase it.
 5           THE COURT:  Okay.
 6  BY MR. SANTHANAM:
 7  Q.   If the jury decides that Willowood infringed the process
 8  patent, would your damages calculation apply even if Willowood
 9  could have registered its products without infringing the
10  compound patents?
11  A.   If the jury finds that the compound patents were not
12  infringed, but the -- or were not infringed, or that they could
13  have used some other method to get around the compound patents,
14  then -- but there was still infringement of the process patent,
15  my damage calculations would still hold.
16  Q.   Mr. Neuman mentioned something along the lines of three
17  main reasons why you believe the meso -- mesotrione or the meso
18  benchmark is similar to azoxy.  Do you recall those questions?
19  A.   I do.
20  Q.   Now, one of those, I think, was they were both best
21  selling products.  Can you explain that?
22  A.   Sure.  So it's these were top selling products of
23  Syngenta, both the mesotrione as well as the azoxystrobin, and
24  so because of that, there was a lot of emphasis on those
25  products and that they were prominent within the whole product
```

1   portfolio that Syngenta had.

2   Q.   And were there similarities in the budgetary process?

3   A.   Yes.  So it's as both Mr. Cecil and Mr. Fisher testified

4   to, that there are peer reviews that first you have each

5   product lead for azoxystrobin and for mesotrione, which, again,

6   I want to remind is that Mr. Fisher is the product lead for

7   azoxystrobin overall, not for -- they don't have a separate

8   product lead for Quadris versus Quilt Xcel.  It's just one big

9   azoxystrobin.  So they go through it, then it goes up to other

10  people.  You have peer reviews where the meso people talk to

11  the azoxystrobin people, so it's a similar process, yes.

12  Q.   That was the general process.  Were there similarities in

13  the market factors that are considered in the process for azoxy

14  and meso, as far as you found?

15  A.   Yes, because both products are primarily used on corn.

16  What both the meso budget as well as the azoxy budgets had to

17  do was they had to take into account factors that affect corn.

18  What's the price of corn?  How many acres of corn are being

19  planted, and things like that.

20  Q.   And Mr. Neuman mentioned, you know, the loss of

21  exclusivity in 2014, you know data exclusivity for meso versus

22  loss of the compound patents in 2014.  Were there other life

23  cycle similarities between azoxy and meso that you took into

24  account?

25  A.   Sure.  So it's both were, again, well established

1  products.  Both were -- had higher rungs of the brand ladder,

2  with the premium products.  Premium products were both

3  introduced for azoxystrobin and for mesotrione as well as

4  fighting brands were introduced for both.

5  Q.    Did mesotrione and azoxy both have established brands?

6  A.    They did.

7  Q.    Did they both have enhanced brands?

8  A.    They did.

9  Q.    What about combinations of products?

10 A.    They did, because sometimes they were combined with each

11 other.

12         MR. SANTHANAM:  No further questions, Your Honor.

13         THE COURT:  Any questions on the matters covered in

14 redirect?

15         MR. NEUMAN:  A few very short questions, Your Honor.

16         THE COURT:  All right.

17                        RECROSS-EXAMINATION

18 BY MR. NEUMAN:

19 Q.    Dr. Wilner, you're talking about your view as to damages

20 as to the --

21 A.    I'm sorry, I couldn't hear you.

22 Q.    You were talking about your opinions concerning the

23 infringement or alleged infringement of the process patents,

24 the '138 and the '761.  Now, do you have -- you don't have an

25 opinion as to whether Willowood infringed the '761 or '138

1  patents, correct?

2  A.   My calculations are all based upon the assumption that the

3  finder of fact determines that there was infringement.

4  Q.   You don't have an opinion as to whether those patents were

5  infringed, correct?

6  A.   I do not have an opinion, no.

7  Q.   Now, again, lost profits calculation requires, among other

8  things, the determination of what would have happened in the

9  but-for world, that is had the infringement not taken place,

10 correct?

11 A.   In the methodology I used, yes.

12 Q.   So with respect to the '761 patent, the DABCO patent, in

13 order for Syngenta to have suffered lost profits as a result of

14 allegedly infringing the '761 patent, you would have to find

15 that there was no feasible way for Willowood to have made

16 azoxystrobin without the DABCO patent, correct?

17 A.   In that what you would have to do is you would have to

18 investigate the but-for world so, yes.

19 Q.   And if there were a way in the but-for world for Willowood

20 to have feasibly manufactured and sold azoxystrobin without

21 infringing the '761 patent, there would be no lost profits

22 damages associated with the infringement of the '761 patent,

23 correct?

24 A.   If there is a way to design around, yes.

25 Q.   One last question, sir -- perhaps two questions, but one

1  topic.  Tell me again what year it was that you concluded that

2  will the wide budget variation in the azoxystrobin budget

3  compared to actuals was due to drought conditions?

4  A.   I'm sorry, say that again.

5  Q.   Yes.  You concluded that for one of the years, it was 2012

6  or 2013 -- it was 2013, I believe?

7  A.   Correct.

8  Q.   The disparity between the azoxystrobin budget versus

9  actuals was due to drought conditions.  Do you recall that?

10  A.   I do.

11  Q.   Now, you've also testified that one -- that your

12  understanding is one of the great benefits of azoxystrobin is

13  that it provides crop enhancement, correct?

14  A.   Correct.

15  Q.   If azoxystrobin had that sort of crop enhancement feature,

16  why, nonetheless, would sales have gone down so much in a

17  drought year?

18  A.   Well, sales did not go down in the drought year; sales

19  went down in the year subsequent to the drought year.

20  Q.   Was the drought in '12 or '13?

21  A.   The drought was in '12.

22  Q.   You still had the crop-enhancement features in 2012 as it

23  did in 2013, correct?

24  A.   It did, yes.

25          MR. NEUMAN:  No further questions.

1      THE COURT:  Anything else?

2      MR. SANTHANAM:  Well, Your Honor, just a couple of

3 brief questions.

4                      REDIRECT EXAMINATION

5 BY MR. SANTHANAM:

6 Q.  Dr. Wilner, you were asked about in calculating the

7 but-for world looking at alternatives.

8 A.  Yes.

9 Q.  As part of your economic analysis, do you have to consider

10 whether those alternatives are economically feasible or

11 available?

12 A.  You have to consider whether or not it's feasible, not

13 just that it -- does it exist.

14 Q.  And have you seen any alternatives presented to you that

15 make it clear that there were economically available

16 alternatives for the '138 patent?

17      MR. NEUMAN:  Objection, outside the scope.  I didn't

18 ask about the '138 patent.

19      THE COURT:  Well, sustained.

20      MR. SANTHANAM:  No further questions, Your Honor.

21      THE COURT:  All right.  Thank you.  You may step

22 down.

23      THE WITNESS:  Thank you.

24      THE COURT:  Further evidence for the plaintiff?

25      MR. LEVINE:  No, Your Honor.  The plaintiff,

1  Syngenta, rests its case.  We do have some motions to make but

2  we rest our case.  The evidence is in.

3       THE COURT:  All right.  Ladies and gentlemen, let me

4  excuse you to the jury room just for a few minutes.  In between

5  who gets -- who's putting evidence on, I always excuse the jury

6  for a minute.  You just had a break, and I don't think we'll be

7  talking for very long, so don't get too comfortable, but I'll

8  excuse you to the jury room.  Don't talk about the case.

9       (At 3:18 p.m., jury leaves.)

10      THE COURT:  Further evidence for the Plaintiff?

11      MR. LEVINE:  No, Your Honor.  The Plaintiff,

12 Syngenta, rests its case.

13      We do have some motions to make, but we rest our

14 case.  I think the evidence is in.

15      THE COURT:  All right.  Ladies and gentlemen, let me

16 excuse you to the jury room just for a few minutes.  In between

17 who gets -- who's putting evidence on, I always excuse the jury

18 for a minute.  You just had a break, and I don't think we'll be

19 talking for very long, so don't get too comfortable.  But I'll

20 excuse you into the jury room.  Don't talk about the case.

21      (At 3:18 p.m., jury excused.)

22      THE COURT:  Okay.

23      MR. LEVINE:  Thank you, Your Honor.  Syngenta moves

24 under Rule 50(a) for judgment as a matter of law with respect

25 to the infringement issue on the compound patent; namely, that

1 Willowood, Limited, made a sale, import, or otherwise

2 infringing activity in the United States. We move under Rule

3 50(a) for judgment as a matter of law with respect to

4 willfulness with respect to the compound patent. And we move

5 under Rule 50(a) for a judgment as matter of law with respect

6 to infringement of the '138 patent.

7        THE COURT: All right.

8        MR. LEVINE: And we'll be filing the motion itself

9 with ECF later today.

10        THE COURT: All right. I'll just take that under

11 advisement and hear from you all later. Does Willowood want to

12 be heard at the close of the Plaintiff's evidence?

13        MR. TILLER: Yes, Your Honor. We would be moving for

14 judgment as matter of law as well on the '761 patent --

15        THE COURT: Say again.

16        MR.TILLER: -- on the '761 patent claim and on the

17 damages claims -- or on the claims for damages. I guess

18 that's --

19        THE COURT: As to all of them? You're nodding yes?

20        MR. TILLER: Yes. I'm sorry, Your Honor.

21        THE COURT: Okay. Well, I think since I shifted the

22 burden of proof on the '761 --

23        MR. TILLER: We realized that issue, Your Honor. We

24 just want to make sure because of, you know, all those rules

25 about preserving the record.

     1          THE COURT:  That's fine.  All right.  I'll hear from
     2   you all later to the extent you want to be heard on any of
     3   those issues, and I'll just take it under advisement for the
     4   time being.  And Willowood's ready to call a witness?
     5          MR. NEUMAN:  Yes, we are.
     6          THE COURT:  All right.  Yes?
     7          MR. COUGHLIN:  May I -- as I understand, Ms. Kay is
     8   going to testify.
     9          THE COURT:  Who?
    10          MR. COUGHLIN:  Ms. Kay, Janelle Kay.
    11          MR. NEUMAN:  That's correct.
    12          THE COURT:  All right.
    13          MR. COUGHLIN:  And before we started that, before the
    14   jury came in, if we could revisit -- the Court may remember
    15   there was a motion to exclude Ms. Kay's testimony, and the
    16   Court entered an order on that.  And I believe the Court's
    17   order allows her to testify but constrains her to be a fact
    18   witness.
    19          THE COURT:  Right.
    20          MR. COUGHLIN:  And says that if she had -- was to
    21   offer hypotheticals or stray into expert opinion, we could
    22   object.
    23          THE COURT:  Yes.
    24          MR. COUGHLIN:  Two parts to this.  One is, I assume,
    25   like every witness, there will be some measure of background to

1   introduce Ms. Kay as to who she is. But we have declarations

2   with all kinds of experience to lay a foundation for her expert

3   testimony in the record. And it would seem to me inappropriate

4   for her to go on like she's going to testify as a witness -- as

5   an expert witness, and, in fact, it's fact testimony.

6           I wouldn't want to object in front of the jury on

7   that issue unnecessarily. I do raise the issue with the Court.

8           THE COURT: Well, you went into a right fair amount

9   with all your fact witnesses. So, assuming that it doesn't go

10  in any different from that.

11          MR. COUGHLIN: And that's fine. She has a

12  declaration about testifying for the Court and in arbitrations

13  and the like.

14          THE COURT: Okay. Well, you can object in front of

15  the jury, that is -- or ask for a sidebar, but I assume they'll

16  stick to the basics. But you're certainly allowed to go over

17  her background. Everybody's been doing that.

18          MR. COUGHLIN: I wasn't suggesting to the contrary.

19          The second issue would be to the extent that they did

20  stray into opinion or expert opinion testimony, I would simply

21  object on the basis of the Court's prior order, without

22  necessarily trying to articulate the basis for the jury.

23          THE COURT: That's fine. I'll take that to mean

24  undisclosed expert testimony --

25          MR. COUGHLIN: Or hypotheticals.

 1            THE COURT:  -- or hypotheticals.  Okay.  All right.

 2   That's fine.  All right.  Bring the jury in if they're ready.

 3            (Jury returns.)

 4            THE COURT:  All right.  Ladies and gentlemen, since

 5   Syngenta's presented its evidence on the -- and it's now

 6   Willowood's turn.  So we will proceed, and Willowood can call

 7   their first witness.

 8            MR. NEUMAN:  Thank you, Your Honor.  The defendants

 9   call Janelle Kay.

10            THE COURT:  Come up.  Go ahead.

11            MR. NEUMAN:  Thank you, Your Honor.

12                          **JANELLE KAY,**

13            **DEFENDANT'S WITNESS, SWORN AT 3:24 P.M.**

14                      **DIRECT EXAMINATION**

15   BY MR. NEUMAN:

16   Q.   Good afternoon, Ms. Kay.

17   A.   Good afternoon.

18   Q.   Can you tell the jury how you're employed, please.

19   A.   I am president and CEO of Pyxis Regulatory Consulting.

20   Q.   And what is Pyxis?

21   A.   Pyxis is a consulting firm that helps companies register

22   and maintain pesticide registrations in the United States.

23   Q.   And how many -- how many employees does Pyxis have?

24   A.   We have 10 employees including myself.

25   Q.   And how many of them are professionals?

```
 1  A.    Eight professionals.

 2  Q.    When was Pyxis formed?

 3  A.    1999.

 4  Q.    And you formed it?

 5  A.    Yes.

 6  Q.    Could you describe briefly your educational background?

 7  A.    I have double majors in biology and chemistry, and I have

 8  a masters in business, specializing in technology and

 9  innovation management.

10  Q.    And when did you graduate with your masters?

11  A.    My masters was 2000.

12  Q.    And how were you first employed after graduating with your

13  bachelors?

14  A.    With my bachelor's degrees, I was originally with the

15  United States Geological Survey in the Water Resources

16  Division.  And I was helping monitor dioxin contamination and

17  nitrate contamination in groundwater.

18  Q.    When did you leave that -- when did you leave that -- was

19  that a full-time position?

20  A.    Technically, it was part-time position.  It was during

21  another recession, so there was -- it was a part-time position.

22  I left in 1993 and went to work for another company called

23  Compliance Services International.

24  Q.    Do you we refer to that as CSI?

25  A.    Yes.
```

1  Q.    What is the business of CSI?

2  A.    They also do regulatory consulting to companies in the

3  pesticide industry, helping them register pesticide products.

4  Q.    What did you do at CSI?

5  A.    I had a variety of roles.  I worked in the analytical

6  laboratory doing analytical determinations.  I did residue

7  chemistry, physical-chemical characteristic testing.  I was in

8  the quality control, Quality Assurance Department, so auditing

9  studies for compliance for EPA registrations, and, eventually,

10 was promoted to Manager of Regulatory Affairs, where I managed

11 registration programs and helped design registration programs

12 for pesticide registrants.

13 Q.    And I'm sorry.  What year did you form Pyxis?

14 A.    1999.

15 Q.    And can you summarize the categories of types of work that

16 Pyxis does for its clients?

17 A.    We are a wide-ranging consulting firm that we help

18 companies maintain and obtain pesticide registrations.  Some of

19 our clients are larger, and so they only use us when they

20 have -- when they need the extra capacity, that we're helping

21 them on a certain area.

22         For other clients, we are the entire regulatory

23 department.  So we design the registration programs, we place

24 the required studies, we prepare the application for

25 registration, submit that to the Environmental Protection

1   Agency, or EPA, work with EPA on getting the registration.  And
2   once we obtain the registration, we would submit the
3   applications to each of the states, because before you can sell
4   product or distribute product in the states, you also have to
5   get a state registration.
6           Then, once the registration has been approved, it can
7   go through a re-evaluation process with EPA.  And so we would
8   help them through that process and monitor and manage the
9   process, and place the required studies, and do whatever is
10  necessary to make sure that they are in compliance.
11  Q.   In your experience, after an applicant obtains an end-use
12  registration from EPA, how long does it typically, then, take
13  to obtain state registrations?
14  A.   It depends on the state.  Some states take a little bit
15  longer.  But I would say the majority -- the vast majority,
16  95 percent, is usually about one to two months.
17  Q.   And about how many registration applications has Pyxis
18  submitted to EPA on behalf of its clients?
19  A.   I'd estimate we've submitted over 1,000 registrations.
20  Q.   And are those for generic companies or original branded
21  products, or some mix?
22  A.   It's a mix.  We've done both.  The vast majority have
23  certainly been the generic or me-too registrations.
24  Q.   What role have you personally played in those
25  applications?

1  A.    I've personally obtained several hundred registrations,

2  and now, given the size of our company, I'm mostly managing our

3  employees that are doing that process.  I'm still designing the

4  registration programs for our clients, but I'm having my

5  employees do the actual applications.

6  Q.    What type of pesticides does Pyxis register?

7  A.    We've registered fungicides, herbicides, insecticides,

8  rodenticides, plant growth regulators.

9  Q.    And, to your knowledge, are there any other firms who have

10  handled as many generic registrations under FIFRA as Pyxis has?

11  A.    No, not to my knowledge.

12  Q.    I'm sorry.  I referred to FIFRA.  That -- you understand

13  that to be the statute that regulates the registration of

14  pesticides in the United States?

15  A.    Yes.

16  Q.    Does the EPA consider azoxystrobin a fungicide?

17  A.    Yes, it does.

18  Q.    And does it regulate it accordingly?

19  A.    Yes.

20  Q.    So, have you become knowledgeable about the EPA's review

21  process for pesticide registrations including fungicide

22  registrations?

23  A.    Yes.

24  Q.    Do you interact and communicate with EPA personnel during

25  that process on a regular basis?

1   A.    Yes, of course.

2   Q.    Did Pyxis have any involvement in the applications filed

3   by Willowood in this case for EPA registrations of any products

4   containing azoxystrobin?

5   A.    Yes.  Pyxis prepared the applications for registration.

6   Q.    Which applications did Pyxis prepare?

7   A.    For Willowood, we prepared Azoxy 2SC and AzoxyProp

8   applications for registration, so two.

9   Q.    Did you prepare a technical registration for azoxystrobin

10  in connection with Willowood?

11  A.    That was submitted under Greenfields.

12  Q.    Were you involved -- was Pyxis involved in the submission

13  of that application?

14  A.    Yes.  We also prepared that application for registration.

15  Q.    And was that work at Pyxis done by you or under your

16  supervision and oversight?

17  A.    It was done by my oversight.  I did not actually conduct

18  the work.

19  Q.    But you supervised and oversaw that?

20  A.    Yes, I did.

21  Q.    Now, in your experience, when an application for a generic

22  pesticide is filed, does a description of the process for

23  making that product have to be filed with EPA as part of the

24  application?

25  A.    Yes.  That is required.

1   Q.   What kind of description is required?

2   A.   It's a detailed step-by-step description of the

3   manufacturing process that needs to have enough detail that EPA

4   can review it and potentially recreate that process on their

5   own.

6   Q.   Does the manufacturing process, in your experience,

7   usually entail just one step or more than one step?

8   A.   Almost always, it's multiple steps.

9   Q.   And in those cases, in your experience, does the written

10  process descriptions submitted to EPA typically identify every

11  company and each facility that carries out every step in the

12  process that makes each intermediate product in the process?

13  A.   No.  Generally, we just identify the very last company to

14  do the -- that does the last manufacturing step that we have.

15  We don't provide each and every step of who's doing each step

16  of the manufacturing process.

17  Q.   And when that's the way it's submitted, have you ever had

18  EPA come back and say, we need to know the identity of every

19  facility that carries out each step in the process and makes

20  each intermediate product in the process?

21  A.   No, I've never seen EPA come back and ask that question.

22  Q.   Now, you're familiar with the process description for

23  azoxystrobin technical that was filed by Pyxis on behalf of --

24  under Greenfields' name?

25  A.   Yes.

1  Q.    And you're aware that that application actually identified
2  specific companies and facilities for each step in the process?
3  A.    Yes, I am aware of that.
4  Q.    Why was it done -- why was that done if it's not gen -- in
5  this case when it's not generally done that way?
6  A.    We were provided that information by the sponsor, and so
7  we -- it just included that as part of the manufacturing
8  process.
9  Q.    Does Pyxis ever file revisions to the original application
10  materials due to some mistake in the original application?
11  A.    Yes.
12  Q.    And how would the need to do that, to revise an
13  application, typically come to Pyxis's attention?
14  A.    That's typically when the registrant notifies us that a
15  change needs to be made or a mistake was made in the original
16  application, and so they ask us to make a revision.
17  Q.    In the case of azoxystrobin, did Pyxis ever file a revised
18  process description after the initial description was submitted
19  to the EPA?
20  A.    Yes, it did.
21  Q.    And that was a revision of the description of the
22  manufacturing process?
23  A.    It was -- there were minor changes to the process.  But
24  I'd say the primary change was a change in the facility that
25  was doing the etherification step.

1    And it was notified to us by one of Willowood's

2  employees, SSJ, he went to a site visit and notified that --

3  identified that it was actually being done by a facility called

4  Guosheng, not Tai He.  And I apologize for my mispronunciation,

5  if at all.

6    And we also had a deposition transcript from somebody

7  called Mr. Wu that I reviewed as well that identified that

8  Guosheng actually conducted the etherification step.  And that

9  was the major change that warranted the notification to EPA.

10 Q.   And that corrected process description is now on file with

11 the EPA?

12 A.   Yes, it is.

13 Q.   Now, you're familiar with chemical testing that was done

14 by ARC Labs to support the application -- Willowood's

15 application for its azoxystrobin end-use products in this case?

16 A.   Yes, I am.

17 Q.   And what type of tests did ARC Labs perform?

18 A.   I would say these are probably the most basic tests that

19 are required for an EPA registration.  They're called

20 physical-chemical characteristics tests, so they look at things

21 such as color, odor, is it a solid, is it a liquid, what's the

22 pH.

23 Q.   Do those tests go by any common name or slang or

24 abbreviation?

25 A.   Those are called physical-chemical characteristics.

1  Q.   Also known as phys-chem?

2  A.   Yes.

3  Q.   Now, in the course of assisting its clients to obtain

4  pesticide registrations from EPA, does Pyxis often play a role

5  in connection with those tests?

6  A.   For many of our clients, they ask us to place the studies

7  on their behalf and monitor them at the laboratories.  So our

8  role is acting on behalf of our clients to make sure that the

9  studies are conducted in accordance to EPA guidelines and will

10  meet their requirements.

11  Q.   So have you become familiar with the laboratories that are

12  capable of doing these kinds of tests to EPA satisfaction?

13  A.   Yes.

14  Q.   In your experience, can these phys-chem tests only be done

15  by laboratories in the United States?

16          MR. COUGHLIN:  Objection, based on the Court's prior

17  order.

18          THE COURT:  Well, overruled.  You can answer.

19          THE WITNESS:  No.  They can be conducted anywhere in

20  the world as long the studies comply with EPA data

21  requirements, EPA formatting requirements.  And a component of

22  the requirement's called the good laboratory practices.  So as

23  long as those studies are conducted in compliance with all of

24  those, EPA will review and could accept those data.

25

1  BY MR. NEUMAN:

2  Q.   And have Pyxis clients used laboratories outside of the

3  United States for these types of phys-chem tests?

4  A.   Yes.  We've used laboratories such as Jai Research

5  Foundation, which is based in India, Agrifor Scientific Limited

6  based in Australia.  Those are a few examples of some

7  laboratories that we've used to do some phys-chem work.

8  Q.   And in your experience, does EPA accept these tests

9  conducted by these overseas laboratories for purposes of

10 applications and registrations of pesticides?

11 A.   Yes.  Again, provided that they're conducted in accordance

12 with EPA guidelines and are in accordance with good laboratory

13 practices, EPA will accept those data.

14 Q.   In your experience, does the time that the EPA takes to

15 review these kinds of tests vary depending on whether they're

16 done overseas or in the United States?

17 A.   No, the timing would be the same.  EPA has a very mandated

18 policy.  The categories of applications for registration

19 doesn't change depending on where the laboratory is located

20 that did the studies.

21 Q.   In your experience, does it cost your clients any more to

22 have these phys-chem tests done outside the United States

23 rather than inside the United States?

24        MR. COUGHLIN:  Objection, Your Honor.

25        THE COURT:  Well, I mean, no.  Overruled.  You can

1    answer.  Go ahead.

2              THE WITNESS:  No, the costs are nominal in the big

3    scheme of things for companies.  They're about 10- to $15,000,

4    and because there are a number of laboratories, it's fairly

5    competitive and so the costs are pretty much the same.

6    BY MR. NEUMAN:

7    Q.    In your experience, have your clients ever had difficulty

8    getting those tests done by overseas labs in the time frame

9    that they requested?

10   A.    No, not in my experience.  Oftentimes, the laboratories

11   even will allow you to pay a premium to have it done faster,

12   but they are usually pretty quick studies anyway.

13   Q.    What kind of a premium are we talking about?

14   A.    It depends on the laboratory, but 25 to 50 percent.  Also,

15   it depends on how fast you want it to be conducted.

16   Q.    And that's 10 to 25 percent on the cost that otherwise

17   would have been incurred?

18   A.    And it's actually 25 to 50 percent is usually what I've

19   seen, but, yes, 25 to 50 percent of additional on top of the

20   10- to 15,000.  So you would be looking at anywhere from 12,500

21   to 23,000, in that neighborhood for the expedited.

22   Q.    So that premium would be pretty nominal in the scheme of

23   things?

24   A.    In the scheme of things, that's correct.

25   Q.    Now, let me talk to you about product formulation for a

1  moment.

2         You're aware that the product formulation work done

3  on Azoxy 2SC and AzoxyProp Xtra for Willowood was performed by

4  a facility in the United States?

5  A.    Yes.

6  Q.    Does Willowood ever play a role in that type of product

7  development, the formulation work?  I'm sorry.  Pyxis ever play

8  a role in that type of product formulation work?

9  A.    I'm sorry.  We don't actually do the formulation work, but

10  sometimes companies will approach us, our clients will approach

11  us, and ask us to find a facility to do the formulation work

12  and develop a formulation for pesticide registration.

13  Q.    And are those facilities that do that type of formulation

14  work only available in United States?

15  A.    No.

16  Q.    They're available outside the United States --

17  A.    Of course.

18  Q.    -- as well?

19  A.    Yes.

20  Q.    And does that include for fungicide products?

21  A.    Irrespective of the type of pesticides, so fungicides,

22  herbicides, that's correct.  It can be done outside of the

23  United States.

24  Q.    And in your experience, is there a significant difference

25  in the prices charged by overseas labs compared to United

1    States labs to conduct this type of product formulation?

2    A.    No, those are typical -- excuse me.  Let me restart.

3    That's -- they're very comparable between the US and foreign

4    laboratories.

5    Q.    In your experience, does it matter to EPA whether the

6    product formulation work is done in the US or outside the

7    United States?

8    A.    No.  EPA doesn't require the submission of that

9    information.  So EPA would never see it and never know, and so

10   they don't care about it.

11   Q.    Let me talk to you for a moment, Ms. Kay, about labels.

12   Did you and Pyxis play any role in the writing of the labels

13   for Willowood's azoxystrobin products?

14   A.    Yes, Pyxis prepared those labels.

15   Q.    Is it common for Pyxis to submit labels for its generic

16   clients?

17   A.    Well, yes, it is common.  That's part of the application

18   for registration process.  EPA carefully reviews and ultimately

19   approves the label that's been submitted, and that's part of

20   the registration.  So the label is a requirement for the

21   registration.

22   Q.    And is it common for Pyxis to copy large portions of a

23   branded label or a previously submitted label when it submits a

24   label for its generic client?

25   A.    Yes, it's common to use the same language for preparation

1  of a label of a "me-too" product.

2  Q.   And why does Pyxis do that?  Why is it common?

3  A.   Well, EPA has strongly encouraged that the labels be

4  substantially similar, if not identical.  So the statute

5  actually has that language that the labeling needs to be

6  identical or substantially similar.

7           MR. COUGHLIN:  Objection, Your Honor, in terms of the

8  law.

9           THE COURT:  Well, she can explain how the process

10 works and her experience, what she did in this case.  So to

11 that extent, her understanding is relevant.  Go ahead.

12          THE WITNESS:  So for substantially similar products,

13 which is azoxystrobin products, the Willowood Azoxystrobin

14 products are substantially similar to Syngenta's products; and

15 in order to be substantially similar, they need to be

16 substantially similar in the labeling as well, and EPA strongly

17 recommends that that language be very, very close.  There's

18 even portions that EPA mandates the language and that there's

19 no option on that, that it's in the regulations; this is what

20 you need to put on your label.

21 BY MR. NEUMAN:

22 Q.   In your experience, has EPA ever rejected a proposed

23 generic label because it is too similar to the previously

24 approved label?

25 A.   Because it's too similar, no.  We've had EPA actually come

1  back to us and ask us to change the language when they felt

2  that we've revised it too far away from the original language.

3  They've asked to us change it back to be more similar.

4  Q.   In your experience, does the time that it takes EPA to

5  review a proposed label for generic differ based on whether

6  that label is worded substantially the same as a previously

7  submitted label, approved label?

8  A.   No, the time frames at EPA would be the same.

9  Q.   Now, did Willowood -- you testified that Pyxis prepared

10 the azoxystrobin end-use product labels for Willowood that are

11 at issue in this case.  Did Willowood personnel personally

12 review the label language before Pyxis submitted it to EPA?

13 A.   No.

14 Q.   Is that common for your clients not to review the specific

15 label language throughout the label that Pyxis drafts?

16 A.   Yes, that's fairly common, yeah.

17 Q.   Now, in this case, you're aware that the label initially

18 submitted to EPA drafted by Pyxis for Willowood's end-use

19 product contained the word "Syngenta" rather than Willowood in

20 one line on one page of the label?

21 A.   Yes, I am aware of that.  We--

22 Q.   How did that happen?

23 A.   It was a mistake.  It was a multiple-page label.  I can't

24 remember the number of pages.  I want to say in the 50 range,

25 and we had somebody prepare the label.  It was peer-reviewed

1    internally, and it had a second peer review, and it was missed,

2    and it was in the middle of the text on I think page 6; and EPA

3    reviewed it as well and didn't catch it either.  So it was a

4    mistake.

5    Q.    Was this error ever corrected?

6    A.    Yes.

7    Q.    When?

8    A.    As soon as we were notified by Willowood, we made the

9    correction.

10   Q.    And making the correction, what does that mean?  What's

11   that process?

12   A.    We went into the Word document.  We use Word to prepare

13   the labels that EPA approves, and we just modified it on that

14   version, and then Willowood also modified it on the printed

15   version, and so they just modified it and printed a new label.

16   Q.    And then after you revised it, where does it go?

17   A.    On the jug.  There's -- it doesn't have to go to EPA.  It

18   was a mistake.

19   Q.    EPA doesn't require resubmission?

20   A.    No.  A mistake -- the EPA would consider that a

21   typographical error, so they say just fix it.  There's a

22   notification that allows you to do that.

23   Q.    In the course of preparing either of Willowood's end-use

24   azoxystrobin labels, did Willowood ever tell you to hurry it up

25   or move quicker than you were?

1  A.    No.

2  Q.    Did it ever give you a deadline and say get it done by

3  this date and you're not meeting it?

4  A.    No.  I don't remember.  I don't --

5            MR. NEUMAN:  Nothing further, Your Honor.

6            THE COURT:  All right.  Questions?

7            MR. COUGHLIN:  Yes, Your Honor.  We have a binder.

8            THE COURT:  Okay.

9            MR. COUGHLIN:  May I approach the witness, Your

10 Honor?

11           THE COURT:  You may.

12           MR. COUGHLIN:  Your Honor, this binder has four

13 exhibits, two of which are already into evidence, Plaintiff's

14 Trial Exhibit 9 and Plaintiff's Trial Exhibit 41.  It also

15 contains Plaintiff's Trial Exhibit 42 and Plaintiff's Trial

16 Exhibit 44, and we would move the admission of those exhibits.

17           MR. NEUMAN:  No objection.

18           THE COURT:  They'll be admitted.

19                       CROSS-EXAMINATION

20 BY MR. COUGHLIN:

21 Q.    Good afternoon, Ms. Kay.

22 A.    Good afternoon.

23 Q.    In connection with your work -- or in connection with

24 Pyxis' work on behalf of Willowood, did it understand that

25 there was a current patent covering the compound for

1  azoxystrobin that was still active in the United States?

2          Do you want me to rephrase that? I didn't say it

3  very well.

4  A.   Could I ask you a clarifying question? You said "it."

5  Are you referring to Pyxis or Willowood?

6  Q.   Did Pyxis know when it was doing its work to submit a

7  registration application to the US EPA that Syngenta had two

8  patents in the United States covering the compound of

9  azoxystrobin that were still alive and well?

10 A.   I believe Willowood informed us that there was a patent,

11 but we don't get involved in patent stuff, and so I -- as far

12 as exactly what those patents are, I have no knowledge.

13 Q.   So you indicated earlier -- is Pyxis' business limited to

14 assisting its customers or clients to apply for and obtain

15 registrations for pesticides in the US, the US EPA?

16 A.   We do US EPA work, state work, and we also do some

17 Canadian work.

18 Q.   In terms of your experience with having clients do tests

19 outside of the United States for -- to help support or to

20 support an application, are those for tests for clients who are

21 trying to get a registration for a compound which is actually

22 under patent in the United States?

23 A.   We have had work done outside the United States when the

24 compound is under patent, but there are also a number of

25 companies that routinely use foreign laboratories regardless of

1  the patent status.

2  Q.    Well, in this particular case, Pyxis knew, did it not,

3  that, in fact, azoxystrobin had been imported into the United

4  States for purposes of formulation and testing to support the

5  application?

6  A.    Yes.

7  Q.    Okay.  And you said that at some point you believe

8  Willowood indicated that there was a patent that covered the

9  compound for azoxystrobin?

10 A.    I can't remember exactly what Willowood told Pyxis and who

11 at Pyxis might have been told, but I believe that we were

12 informed that there was some patent.  I don't know exactly what

13 the patent was.

14 Q.    Did Mr. Heinze ever call and say to Pyxis, we've imported

15 azoxystrobin into the United States, we've form -- we've used

16 the azoxystrobin in the United States, can we -- what should we

17 do?  Did Willowood ever bring that to Pyxis' attention?

18 A.    If it did -- and I don't think that Willowood would have

19 asked that question, but if it did, I would have said, I am not

20 a patent expert, so you'll have to speak to a patent attorney.

21 Q.    Are there other occasions in which Pyxis has assisted

22 clients in seeking registrations with the EPA in which the

23 clients have infringed US patents in connection with the

24 application of EPA registrations?

25 A.    I don't know if a client might be infringing on a patent

1  because I don't get involved in patents.

2  Q.    Well, you're involved in the EPA registrations, correct?

3  A.    That's correct.

4  Q.    And you represent a lot of generic manufacturers or

5  suppliers, correct?

6  A.    Yes.

7  Q.    And this is a heavily regulated industry, correct?

8  A.    Yes, it is.

9  Q.    And there's also a lot of patents in the industry, isn't

10 that right?

11 A.    That's right.

12 Q.    Is -- do I understand that Pyxis doesn't care whether

13 there's a patent or not a patent?  Does it give clients advice

14 about how to try and go through a registration even though

15 there's a patent in the United States that would be infringed

16 if the products were imported into the United States?

17 A.    Well, again, we're not patent experts, and we don't get

18 involved in patent issues or advice, so certainly not patent

19 attorneys, but in my experience with EPA, that EPA

20 doesn't -- it's not involved in patent issues either.  So EPA

21 will review and process an application for registration

22 regardless of the patent status.

23 Q.    Well, Pyxis does deal with clients who are dealing with

24 patent issues and does interact with patent attorneys on a

25 regular basis, doesn't it?

1  A.   Our clients may, but we have very little involvement with

2  any patent attorney.

3  Q.   If you could get the binder that I handed you.  If you

4  could open it up, please, and look at Exhibit 41.  Just let me

5  know when you are ready.

6         Do you know Ms. Ann Tillman?

7  A.   Dr. Ann Tillman, yes, I do.

8  Q.   Dr. Tillman.  She works for Pyxis, correct?

9  A.   Yes, she does.

10  Q.   Is this the person you supervised in connection with

11  Pyxis' work assisting Willowood in connection with the EPA

12  registration applications?

13  A.   It is one of my employees that worked on the azoxystrobin

14  products.

15  Q.   Was Ms. Tillman -- or Dr. Tillman, excuse me, the lead

16  Pyxis employee who worked on this matter?

17  A.   She was the lead for the technical product.  Mr. Mike

18  Kellogg, Michael Kellogg, was the lead for the end-use

19  products.

20  Q.   So in terms of the EPA registration for the technical, the

21  active ingredient, Dr. Tillman was the -- at point with

22  Willowood for its application?

23  A.   Yes.

24  Q.   I think you -- and I may have just -- well, I didn't

25  misspeak, but in terms of Willowood, the actual application for

 1  the azoxystrobin technical was not submitted on behalf of

 2  Willowood, was it?

 3  A.   Oh, it was submitted under Greenfield, that's correct.

 4  Q.   As Greenfield Marketing?

 5  A.   Yes.

 6  Q.   An entity in Dubai, is that correct?

 7  A.   I believe so.

 8  Q.   Do you know why the testing and formulation in this matter

 9  wasn't done in Dubai?

10  A.   No.

11  Q.   Turning to this Exhibit 41, as it relates to -- this an

12  e-mail string involving work leading up to the application for

13  an EPA registration for azoxy technical, is that right?

14  A.   Yes.

15  Q.   And do you see, if you go to the earliest e-mail in this

16  string, which is PYX-6401, there is an e-mail from Brian Heinze

17  to Rajesh?  Is that correct?

18  A.   Yes.

19  Q.   And do you see -- the e-mail starts off with the statement

20  from Mr. Heinze:  There is one step in the manufacturing

21  process for azoxystrobin that our patent attorney is concerned

22  about being in violation of existing patents.  Do you see that?

23  A.   Yes.

24  Q.   And if you go two e-mails up -- first of all, that first

25  e-mail is dated May 23rd, 2013, is that right?

1  A.   Yes.

2  Q.   Do you know when Pyxis submitted the application to the

3  EPA on behalf of Greenfield's marketing for azoxy technical?

4  A.   I don't recall.

5  Q.   If you go two e-mails up, do you see that there's another

6  e-mail on Friday, the following day, from Brian Heinze in which

7  there is a CC showing Ann Tillman being involved or being

8  copied on the e-mail?  Is that right?

9  A.   Yes.

10 Q.   And do you also see that Vijay Mundhra is copied on that

11 e-mail?

12 A.   Yes.

13 Q.   Do you know who Mr. Mundhra is?

14 A.   I don't -- yes, I do.

15 Q.   Who is Mr. Mundhra?

16 A.   He is an employee of Willowood, I think.  I don't remember

17 his title.

18 Q.   All right.  Do you see SSJ also listed?

19 A.   Yes.

20 Q.   SSJ is person who you said submitted some deposition

21 testimony that led to a petition to correct or some sort of

22 filing with the EPA to correct portions of or make changes to,

23 let me say, the Willowood azoxy technical registration?

24 A.   No.  SSJ did a site visit.  It was Mr. Wu's deposition.

25 Q.   Do you know SSJ?

1  A.    I have e-mailed with him over a number of years, but I had

2  not met him until today.

3  Q.    You did meet him today?

4  A.    Just in the witness room, yes.

5  Q.    So in connection with this, Dr. Tillman is being copied on

6  correspondence that relates to concerns in this case as it

7  relates to patent rights, is that right?

8  A.    Yes.

9  Q.    And do you see that there are questions being asked or

10 comments from Willowood's patent lawyer about the manufacturing

11 process and whether certain changes can be made in the process

12 that would circumvent the process patented by Syngenta?  Do you

13 see that?

14 A.    Yes.

15 Q.    And do you see the response to that e-mail immediately

16 above it from Willowood?

17 A.    Yes.

18 Q.    And in that response, Rajesh says:  Hi, Brian.  It seems

19 like all of the manufacturers in China for this product are

20 using the same process and steps for etherification,

21 condensation.  These steps -- these step has to be used in a

22 sequence and is very difficult to avoid.  Do you see that?

23 A.    Yes.

24 Q.    Ms. Tillman's reported on this or is copied on this

25 e-mail, is that right?

1  A.    She is copied on this, yes.

2  Q.    And it continues and says:  That's the reason that the MNC

3  patented this step.  Do you see that?

4  A.    I do.

5  Q.    And then at the end it says:  SSJ is in touch with the

6  factory guys to find some way out of this, but it seems very

7  difficult to avoid this step.  Is that correct?

8  A.    That's what the e-mail says, yes.

9  Q.    So Pyxis knew all of this information before it submitted

10  the application to the US EPA to register azoxy technical here

11  in the United States, is that right?

12  A.    As I said earlier, I don't remember the date when we

13  actually submitted.

14  Q.    Well, I'll represent to you that it was July 31st, 2013, a

15  month and a half after this e-mail exchange, but we'll look at

16  some other documents, but assume that for purposes of this

17  question.

18  A.    Okay.

19  Q.    At the time that Pyxis submitted to the US EPA an

20  application on behalf of Greenfield's marketing, it was aware

21  that there were issues with regard to a patent owned by

22  Syngenta, correct?

23  A.    Yes.

24        THE COURT:  Okay.  It's after 4:00, so I think maybe

25  we need to stop there, even though you are kind of in the

 1  middle of the exhibit.

 2          All right.  Ladies and gentlemen, I'm going to excuse

 3  you for the day and for the weekend.  I think we're making

 4  pretty good progress, but just in view of the uncertainty over

 5  the weather, I would like to start on Monday at 9:15 if that

 6  was -- anybody have any trouble with that?  No.  Okay.  Let's

 7  start Monday morning then and at 9:15.

 8          Over the weekend, do not have any contact with any of

 9  these folks, lawyers, parties or witnesses.  Don't talk about

10  the case among yourselves or with anyone else.  So, you know,

11  you'll be home a little longer over the weekend.  Don't answer

12  any questions from any family members or neighbors.  Don't post

13  or tweet about it.  Don't conduct any independent

14  investigation.  Don't look anything up on the Internet.  Don't

15  read or listen to any news records.  Don't talk to your buddy

16  who has a garden about any of these products.  You know, just

17  don't do any of that because, as I told you at the beginning of

18  case, it's not fair for you to base your verdict on something

19  that someone tells you outside the courtroom and these folks

20  don't have a chance to question that or draw your attention to,

21  perhaps, some inadequacies or inaccuracies in it.  Keep an open

22  mind.  I encourage you to just put the case out of your mind

23  over the weekend and enjoy the weather before things get rainy

24  again next week.

25          Leave your notes in your chair.  I'll see you Monday

 1  morning at 9:15.

 2          (The jury was excused at 4:05 p.m.)

 3          THE COURT:  The witness can step down.

 4          (The witness left the stand.)

 5          THE COURT:  So what can we productively do?  Do you

 6  all want to put off any arguments on the motions until the

 7  close of all the evidence?  Plaintiffs indicated they are going

 8  to file something.  What about the Defendants?

 9          MR. TILLER:  Whatever Your Honor wants to do.

10          THE COURT:  You know, certainly without hearing from

11  anybody, my tentative inclination is to just let everything go

12  to the jury since, you know, the evidence that's come in is

13  pretty consistent with summary judgment, but I'm certainly glad

14  to hear from anybody at any point, that that seems like it

15  would be a good idea so long as the jury is not waiting.

16  Otherwise, I think I'll just put it off to the close of all the

17  evidence.

18          MR. LEVINE:  I'll make one suggestion and if you

19  don't want to do it, that's fine.  As I said, we're going to be

20  filing something later today that really just lays it out.

21  It's not all that long.  Perhaps if we came in at 8:45 on

22  Monday and if you had any questions, you know, we could do

23  whatever argument you wanted then; but I think when you read

24  it, it will be fairly clear and straightforward and give us an

25  opportunity to address it before we start up again.

1          THE COURT:  So is that okay?

2          MR. TILLER:  I can tell you that we will not be

3    filing anything.  We can handle it orally.

4          THE COURT:  All right.  Well, we can do that.  I'm

5    agreeable.

6          After this witness is finished, you anticipate who

7    being your next witnesses?

8          MR. TILLER:  Shen Shaojun, otherwise known as SSJ;

9    Andy King.  We will be playing a video deposition of Mr. Wu and

10   then likely our two experts.

11         THE COURT:  Dr. Lipton and --

12         MR. TILLER:  Dr. Lipton and Mr. Jarosz.

13         THE COURT:  Okay.  So -- all right.  We ought to be

14   able to finish that up on Tuesday sometime.

15         MR. TILLER:  That's the goal, depending on the

16   weather.

17         THE COURT:  Yeah, depending on the weather.  It is

18   looking like at the moment it is going west, but who knows.

19   I'm sure we'll get some rain or I'm not the -- it looks like

20   we'll get some rain.

21         All right.  I would like to just have a very brief

22   conversation with the four of you all on each side, up to three

23   or four or fewer, about the verdict sheet, just an informal

24   conversation, preliminary, so -- to facilitate my work on the

25   jury instructions over the weekend.  If you all can join me in

1  chambers in a few minute.

2          Is there anything else you want to do on the record

3  before we adjourn for the weekend?

4          MR. COUGHLIN:  Your Honor, just for clarification,

5  since we're in the middle of testimony, I assume, even though

6  she's not a party to this case, there won't be any

7  consultation.

8          THE COURT:  I assume not.

9          MR. TILLER:  We are well aware of our ethical

10 obligation.

11         THE COURT:  Yes.  All right.  Well, we will then come

12 back at 8:45 on Monday morning for a brief time of argument on

13 motions and then we'll start with the witness at 9:15.

14         All right.  We'll be in recess until Monday morning

15 at 8:45.

16         (Proceedings concluded at 4:09 p.m.)

17

18

19

20

21

22

23

24

25