```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2
    SYNGENTA CROP PROTECTION, LLC.,   )
 3                                    )
         Plaintiff,                   ) Civil Action
 4                                    ) No. 15CV274
      vs.                             )
 5                                    )
    WILLOWOOD, LLC, WILLOWOOD         ) September 11, 2017
 6  USA, LLC., WILLOWOOD              )
    AZOXYSTROBIN, LLC, and            )
 7  WILLOWOOD LIMITED,                )
                                      )
 8       Defendants.                  )
    ──────────────────────────────────)
 9

10                 TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE CATHERINE C. EAGLES
11                UNITED STATES DISTRICT JUDGE

12  APPEARANCES:

13  For the Plaintiff:    HARI SANTHANAM, ESQUIRE
                          RUSSELL E. LEVINE, ESQUIRE
14                        KOURTNEY BALTZER, ESQUIRE
                          Kirkland & Ellis, LLP
15
                          RICHARD A. COUGHLIN, ESQUIRE
16                        Smith Moore, LLP

17  For the Defendants:   STEVEN E. TILLER, ESQUIRE
                          Whitefield Taylor & Preston
18
                          BARRY S. NEUMAN, ESQUIRE
19                        PETER J. DAVIS, ESQUIRE
                          Whitefield Taylor & Preston
20
                          ALAN W. DUNCAN, ESQUIRE
21                        Mullins Duncan Harrell & Russell

22
    Court Reporter:       J. Calhoun, RPR
23                        Room 122, U.S. Courthouse Building
                          324 West Market Street
24                        Greensboro, North Carolina 27401
                          (336) 332-6033
25
```

```
 1                        I N D E X

 2   WITNESSES FOR THE DEFENDANT:

 3   JANELLE KAY
          Cross-Examination By Mr. Coughlin             19
 4

 5   BRAD REICHMAN (BY DEPOSITION)                       27

 6   WU XIALONG (BY DEPOSITION)                          66

 7   ANDY KING
          Direct Examination By Mr. Neuman              46
 8        Cross-Examination By Mr. Levine               64
          Redirect Examination By Mr. Neuman            65
 9
     SHEN SHAOJUN
10        Direct Examination By Mr. Davis              108
          Cross-Examination By Ms. Baltzer             149
11        Redirect Examination By Mr. Davis            157

12   DR. MARK LIPTON
          Direct Examination                           158
13        Cross-Examination By Mr. Santhanam           213
          Redirect Examination By Mr. Tiller           235
14

15   EXHIBITS:                                        RCVD

16    DX-5    US Patent '761 Prosecution History       194
      DX-64   April 26, 2015 Email from S.Wang re:      122
17            Azoxystrobin Manufacturing process
      DX-116  Azoxy Manufacturing Method                73
18    DX-120  May 2015 Emails between Willowood and      29
              Reichman
19    DX-123  Willowood Sales Information to Reichman     29
      DX-171  Application Amendment, EPA Form 8570-1      29
20    PX-502  Middione Deposition                         17
      PX-503  Reichman Deposition                         17
21    PX-504  Heinze Video Deposition Clip                17

22

23

24

25
```

1              P R O C E E D I N G S

2         (Proceedings commenced at 8:45 a.m.)

3              THE COURT:  Good morning.  Before we get going, if I

4    can -- the jury is not present the record will reflect.

5              If I can ask Ms. Sanders, how much time has Syngenta

6    used of their 15 hours?

7              THE CLERK:  Eleven hours and 24 minutes.

8              THE COURT:  And Willowood?

9              THE CLERK:  Seven hours and 53 minutes.

10             MR. LEVINE:  Seven what?

11             THE CLERK:  Fifty-three.

12             THE COURT:  So we should finish the evidence tomorrow

13   because you all are going to run out of time.

14             MR. LEVINE:  Your Honor, we have calculations that we

15   can provide as well, but I think that includes the opening

16   statements because we have our time just under 11 hours.

17             THE COURT:  I don't think so.  I told her not to

18   include the opening statements so -- this is about 19 1/2

19   hours, which is consistent with 3 1/2 days of trial time

20   because we started the evidence Tuesday afternoon, right?

21             MR. LEVINE:  Right.

22             THE COURT:  Anyway, that's why I wanted to put it on

23   the record.  You all can look at your notes.  If you want to

24   discuss that, we can talk about it, but everybody -- we should

25   finish tomorrow because everybody is going to run out of time

1  even if they're wrong 15 minutes either way.

2          MR. TILLER:  In that regard, Your Honor, I just want

3  to -- before we start arguing, a couple things we are going to

4  do today which we think significantly speeds things along.

5          THE COURT:  All right.

6          MR. TILLER:  One, the deposition of Mr. Wu, there

7  was -- as I'm sure you've heard now, he does not speak English.

8  There was a translator there.  We plan on reading the

9  deposition to avoid the 45 minutes of translation that's going to

10  back and worth, which -- since nobody, I presume, is going to

11  be understanding what's happening in Chinese anyway.

12          THE COURT:  I assume not.

13          MR. TILLER:  I presume that that will make things

14  faster.

15          Two, with Mr. Shaojun, who we have all been referring

16  to as SSJ, we would like to notify the Court he is -- for what

17  I'll call simple questions and answers, he's going to testify

18  in English and where needed -- I think you'll see where needed

19  he'll go to the translator.

20          THE COURT:  All right.  So you have an interpreter

21  present if needed.

22          MR. TILLER:  We do.  And it will be needed when we

23  get to sort of longer, open-ended questions.

24          THE COURT:  Well, I have a fair amount of experience

25  with interpreters in criminal cases, unfortunately, so I do --

1 even when an interpreter is used, my experience is it works

2 better if the questions are not compound and do not have a lot

3 of clauses and -- you know, if you can go -- I'm talking to

4 both sides. Just, you know, it really increases clarity for

5 everybody's sakes.

6 MR. TILLER: We've done our best to do exactly that.

7 THE COURT: Great. Thank you.

8 So we have about 15 minutes to deal with any

9 arguments on the motions. I did read Syngenta's brief over the

10 weekend. Usually the Plaintiff doesn't get a directed verdict

11 at the close of the Plaintiff's evidence. Usually the

12 Defendant gets a chance to respond. I'm a little flummoxed, I

13 have to say, but if somebody wants to address the propriety of

14 that, go ahead.

15 MS. BALTZER: Well, Your Honor, we think the state of

16 the evidence now is very different compared to when we filed

17 our motion for summary judgment this past winter and when Your

18 Honor was -- particularly for Willowood Limited's infringement

19 of the compound patents, which is a motion I would like to

20 address today. I think the papers stand on their own with

21 respect to the other grounds.

22 THE COURT: Can you just address the -- why does

23 Willowood not get a chance to rebut your evidence?

24 MS. BALTZER: We think the evidence shows no

25 reasonable jury at this point could find --

1    THE COURT:  Of course, but they haven't presented

2    their evidence.  I mean, why do they not get to present their

3    evidence.  That's what I am trying to ask you.  That has

4    nothing to do with this case.  Just in general, doesn't the

5    Defendant get to rebut your evidence?  Why do you get to win

6    without them getting a chance?

7        MS. BALTZER:  At this point we think the evidence

8    shows, even if they can rebut and show that Willowood Limited's

9    sale of azoxystrobin technical to Willowood USA occurred in

10   China or some other place as well, that doesn't limit the -- it

11   doesn't need to occur in one location.  It can occur in two.

12   We don't think any evidence that they can present at this point

13   or rebut could actually show that the sale didn't occur within

14   the United States.  Whatever evidence that they can present, it

15   can't rebut what we've already presented.

16       THE COURT:  Okay.  Well, I don't understand that.  I

17   mean, they may or may not rebut it, but I don't -- I'm

18   unfamiliar with giving the Plaintiff a directed verdict without

19   giving a chance to the Defendant.  Did you -- are there cases

20   where you've seen that done before?

21       MS. BALTZER:  Yes.  I don't know if I have any at

22   hand at the moment.

23       THE COURT:  I mean, isn't just the mere fact that it

24   says FOB China enough to rebut it?

25       MS. BALTZER:  Well, even if they could show that it's

1  FOB China and occurs in a different location, the case law

2  shows that a sale -- that it can't be limited to one location.

3  It can occur in two locations.  The evidence we presented shows

4  that it occurs in the United States regardless and we're

5  relying on Mr. Heinze's testimony to show this.  Mr. Heinze has

6  already testified.  He's not going to be testifying again in

7  Willowood's case in chief.

8          THE COURT:  Okay.  I don't want to cut you off in

9  making your argument with my procedural question -- not

10  procedural, but larger question -- so go ahead.

11          MS. BALTZER:  So in particular, I would like to focus

12  on Willowood Limited's sale of azoxystrobin technical to

13  Willowood USA in 2013.  We have a vastly different record, as I

14  mentioned, compared to when we moved for summary judgment on

15  this issue this past March.

16          As we saw this past week, there is an agreement

17  between Willowood Limited and Tai He showing that in -- that

18  in 2013 when they entered into this agreement Willowood Limited

19  specifically stated that it will apply for a registration with

20  the US EPA, and Willowood Limited also stated and represented

21  --

22          THE COURT:  It just says "Willowood."

23          MS. BALTZER:  The agreement at the top is entered

24  into between Tai He and Willowood Limited.  That's the only

25  party with Tai He to that agreement.  At the end of the

1   agreement, the only signature block that exists, in addition to

2   Tai He, is Willowood Limited signed by Vijay Mundhra, who's the

3   managing director of Willowood Limited.  That's the only

4   Willowood entity that entered into that agreement, and in that

5   Willowood Limited states that it's desirous of developing

6   demand for and selling azoxystrobin in the United States.

7   Willowood Limited was the only party who entered into that

8   agreement.

9           When Willowood Limited shipped that azoxystrobin

10  technical to Willowood USA in 2013, it knew what was going to

11  happen with that azoxystrobin technical.  It had an intention

12  to do the formulation testing, do the testing with ARC, to

13  build the EPA registrations.

14          And when we look at the case law on this issue,

15  particularly SEB v. Montgomery Ward, the Federal Circuit said:

16  When factors indicate an intention to sell product -- their

17  shipped product within the United States, having a shipment be

18  FOB abroad does not limit or preclude liability under 271(a).

19  Here we have a clear intention of Willowood Limited wanting to

20  sell and bring infringing product into the United States.

21          In addition, we also heard testimony from Mr. Heinze

22  last week, who is the only -- who is not going to be testifying

23  during Willowood's case in chief this week, that Willowood --

24  there is an agreement between Willowood Limited and Willowood

25  USA in which Willowood USA designates the place that

1  azoxystrobin technical will be shipped and that Willowood
2  Limited ships this into the US.  Mr. Heinze testified that this
3  agreement was in place in 2013.  The same terms govern the
4  shipment of azoxystrobin technical in 2013 as when that
5  agreement was entered into in November 2014, and Mr. Heinze
6  specifically testified that Willowood Limited controls and does
7  all of the coordinating of the shipment of that azoxystrobin
8  technical into the US, and that in 2013 Willowood Limited
9  shipped the azoxystrobin technical to Willowood USA here in the
10 United States.  This qualifies as an infringement under 35
11 U.S.C. 271(a) as it's an importation of azoxystrobin technical
12 from Willowood Limited into the United States.
13            THE COURT:  All right.  Thank you.
14            For Willowood.
15            MR. TILLER:  Does Your Honor want me to address that
16 issue?
17            THE COURT:  You can address it if you want or you can
18 address your own motion.  We've got 10 minutes.
19            MR. TILLER:  I'll briefly address that issue, Your
20 Honor.  I don't think that the status of where we are today is
21 any different than where we were on summary judgment.  I think
22 the documents very clearly --
23            THE COURT:  Say again.
24            MR. TILLER:  I'm sorry.  Let me move this.
25            THE COURT:  Thank you.

1    MR. TILLER:  I think the invoices very clearly say

2  that the delivery was FOB China.  I think Mr. Heinze testified

3  that it is Willowood USA that handles everything in the US.  It

4  is Willowood USA that directs Willowood Limited to -- where to

5  send it, how to send it, when to send it, for -- how much to

6  send.  Thereafter, Willowood Limited delivers to the port and

7  at that point Willowood USA takes over and that -- I -- we

8  argue, does not constitute a sale in the United States.

9          THE COURT:  All right.

10         MR. TILLER:  As to our motions, again, I realize the

11  burden of proof shifts, Your Honor, but because of some

12  uncertainty about the procedural issues, we just want to make

13  sure that we put on the record our motion for judgment as a

14  matter of law as to the '761 patent.  Second --

15         THE COURT:  Well, I don't think they tried to prove

16  infringement of that given the shift of the burden of proof.  I

17  assume -- in fact, I asked about Dr. Fortunak and, you know,

18  they basically said -- so I understand your argument.  For the

19  record, that's denied.

20         MR. TILLER:  Thank you, Your Honor.

21         THE COURT:  That's okay.

22         MR. TILLER:  As to the damages issue, specifically

23  Dr. Wilner's testimony, as Your Honor is well aware, under

24  Federal Rule of Evidence 702 experts may offer opinions only if

25  they are based on sufficient facts or data and are products of

1  reliable principles and methods; and as Your Honor knows from

2  cases that we put into our motion to exclude -- Sunlight

3  Saunas, 427 F. Supp. 2d 1022; Celebrity Cruises, 434 F. Supp.

4  2d 169; Silicon Knights, 2011 WL 67448518, and others -- that

5  data must be reliable and simply relying on historically

6  inaccurate budgets does not suffice.

7         THE COURT:  Can I just -- I just want to be sure I

8  understand your argument.  Your argument is that you are asking

9  me to remove the issue of lost profit damages from the jury

10  because Dr. Wilner's testimony is insufficient to support it.

11         MR. TILLER:  Correct.  And that is the only evidence

12  of lost profits that was put in by Syngenta, so that is part of

13  the argument, as you saw, in the five years leading up to 2014

14  when the allegedly infringing activity occurred.

15         First of all, Dr. Wilner did not look at all of the

16  available budgets available to him.  There is clear and

17  uncontradicted testimony that budgets were made for

18  azoxystrobin going back to 1997, budgets going back to

19  mesotrione to 2000 or 2001 Mr. Cecil testified; and none of

20  that information was reviewed or even presented for Willowood

21  to view.  For the data that was admitted, with regards to the

22  historical accuracy or, I would argue, inaccuracy of Syngenta's

23  budgeting process, it is very clear that those budgets just

24  were not accurate; and while Dr. Wilner provided excuses for

25  those budgets, that does not change the fact that the budgeting

1    process was historically wildly inaccurate.

2         In addition to that issue, Your Honor -- and I think

3    we are in a different position now from where we were in the

4    motion to exclude back in June, which is now we know exactly

5    what Dr. Wilner did and, in fact, didn't do with regard to

6    verifying Syngenta's budgets.  There is a great deal of case

7    law that says when an expert relies on information provided to

8    him or her by a party or counsel, he or she must independently

9    verify that information before utilizing it in his or her

10   calculations.  That is from State Farm Fire & Casualty, 980 F.

11   Supp. 2d 1031; Victory Records, 2011 WL 382743; Park versus

12   El Paso Board of Realtors, 764 F.2d 1053, as well as many

13   others.

14        In addition, though, I would like to draw the Court's

15   attention to a case in particular, TK-7 Corporation versus The

16   Estate of Barbouti, B-A-R-B-O-U-T-I.  It is a Tenth Circuit

17   case, 993 F.2d 722.  Your Honor, Willowood contends that this

18   case is really on all fours with what we have here.

19        In that particular case, the expert -- the damages

20   expert relied on projections prepared by someone else and the

21   Court said that that opinion must be excluded because the

22   expert did not examine the methods and the data underlying

23   those projections, and the Court held that the rationale of

24   Rule 703 was not satisfied because the expert failed to

25   demonstrate any basis for concluding that the other person's

projections of a subjective financial prediction -- or that the

projections were reliable because the expert only --

essentially only said that they are reliable because they were

the opinion of someone he believed to be an expert in the field

who had a financial interest in making sure that those

predictions were accurate.  The expert's lack of familiarity

with the methods and the reasons underlying the projections

precluded any assessment of the validity of those projections.

       As you heard, while Dr. Wilner did find out and

examined the allegedly exacting process of Syngenta, what we

heard about that process was the product lead comes up with a

budget.  The product lead then goes to the Regional Operating

Committee; and those 15 to 20 people, allegedly with 10-plus

years of experience each, vet that information, test it, and

question, and then that -- whatever comes out of that committee

goes to the Central Steering Committee.

       THE COURT:  You need to wrap it up just because we'll

have the jury here soon.  I'm not -- I apologize.  We just

don't have very much time.

       MR. TILLER:  I understand, Your Honor, and I have got

about 60 seconds.

       THE COURT:  All right.

       MR. TILLER:  But what was important -- and I think

you heard it very clearly -- is Dr. Wilner did not know, does

not know what data was evaluated by these committees in each

1   year or how that data was weighted.  What if, for example, the

2   project lead came out with one budget, the Regional Operating

3   Committee said, "No, we think that's wrong," came up with

4   another budget, and the Central Steering Committee came up with

5   yet another budget?

6           Dr. Wilner has an obligation to evaluate that

7   information:  Why were budgets rejected, why were budgets

8   changed, what was done.  And we should have the opportunity --

9   Willowood should have the opportunity to question that.  We

10  have no way of challenging the accuracy, veracity or

11  credibility of any of those projections; and for those reasons,

12  we believe those opinions should be excluded.

13          Thank you.

14          THE COURT:  All right.  Any -- you've got a couple of

15  minutes.

16          MR. SANTHANAM:  Yes, briefly, Your Honor.  I'll keep

17  it very brief.

18          So Mr. Tiller said that -- you know, that there were

19  variations in the budgets that Dr. Wilner did not address.  In

20  fact, he did address it.  He went year by year explaining from

21  his own experience as an economist working in the agricultural

22  field, particularly as an economist that's worked with crop

23  insurance, has told us year-by-year explanations for why there

24  were budget variations.  If they had questions that they had

25  and wanted to pose to Dr. Wilner, they had the opportunity.

1    They also had the opportunity to pose those questions to

2    Mr. Cecil, Mr. Fisher, and Dr. Wichert.  If they chose not to

3    do that, that's not a reason for granting judgment as a matter

4    of law.

5          We also except to the application of the Barbouti

6    case.  That case, as according to rule with counsel, in their

7    view, suggests that the expert in that case did not verify the

8    budgets.  That's not what happened here.  We heard extensive

9    testimony about the budgetary process, and it's not just a

10   process that -- where project leads prepare numbers and it's

11   approved.  We heard testimony that it's a 14-month process and

12   Dr. Wilner didn't just take that budget or those budgets.  He

13   actually independently verified it, as he testified.  He said

14   that he did analyzes to corroborate his analysis.  He looked at

15   reality.  He said he had the answer key looking backwards in

16   time and explained that there was a 12- to 15-month head start,

17   just as the reality shows.  He also looked at the but-for world

18   and how profits decrease, just as he would expect, and he

19   performed all of these corroborative analyses that are not

20   found in the Barbouti case that Willowood provides.

21          Beyond that, Your Honor -- just for those reasons, we

22   would except to the application of judgment as a matter of law.

23          THE COURT:  All right.  Well, you all can renew it at

24   the close of all of the evidence, but I'm going to deny it at

25   this point.  I'll go back and -- I can't remember this Barbouti

1   case, if it was cited before or not, so I'll have to go back

2   and look at it again, which I will do between now and the close

3   of all the evidence just to be sure I still feel comfortable

4   with letting the jury decide it, but at the moment it seems to

5   me that the budgets can't be looked at in a vacuum because the

6   witness didn't look at them in a vacuum.  Willowood made a

7   number of pretty good points in cross-examination of the

8   expert, some of which you've repeated here, but those seem to

9   me, at the moment at least, to be for the jury to resolve.

10          All right.  We'll start at 9:15.  It looks like the

11  rain from Irma is going to start this afternoon, but maybe the

12  winds won't get too bad.  We won't -- I hope we won't have to

13  stop early, but if -- you know, I'm going to keep an eye on the

14  forecast because if it does get really, really windy, I -- you

15  know, I may let the jury go home.  They do have to travel, some

16  of them, quite a distance.  I don't think any of them are real

17  far way on this jury, but I know one of them lives in King.  So

18  you know, they do have 45, 50 minutes, some of them, to drive.

19  If it's really, really windy or if it's about to be, I may let

20  them go on home a little bit early, but hopefully we won't have

21  to do that.

22          Any other logistics before we take a short recess in

23  anticipation of the jury's arrival?

24          MR. LEVINE:  Yes, Your Honor.  We have the transcript

25  for purposes of the record of the Middione deposition video

1 that was played.  We've marked it as Plaintiff's Exhibit 502

2 and move for the admission of it for purposes of the record.

3         THE COURT:  All right.  Plaintiff's Exhibit 502, the

4 Middione deposition will be -- I'm admitting it into evidence

5 just for making the record complete.  It will not go back to

6 the jury during deliberations.

7         MR. LEVINE:  Similarly, the Brad Reichman deposition

8 that was read has been read as Plaintiff's Exhibit 503 and we

9 move for its admission similarly.

10         THE COURT:  All right.  That will be admitted under

11 the same terms.

12         MR. LEVINE:  Lastly, for the record, there was a

13 video clip impeachment during Mr. Heinze's testimony.  The

14 question and answer that were shown during the video clip we

15 have marked as Plaintiff's Exhibit 504.  Similarly for purposes

16 of the record, not going back to the jury, we move for its

17 admission.

18         THE COURT:  It will be admitted under those same

19 terms.  Thank you.

20         MR. LEVINE:  Thank you.

21         THE COURT:  You checked with the clerk?  All of your

22 exhibits got admitted that you --

23         MR. LEVINE:  Yes.

24         THE COURT:  Okay.  I'm usually pretty understanding

25 about housekeeping oversights on exhibits, but we do need to

1    get all of that cleared up before the case gets to the jury.

2            All right.  Good.  Anything else for the Plaintiff?

3    No.  For the Defendant?

4            MR. TILLER:  No, Your Honor.

5            THE COURT:  We'll be in recess for five minutes.

6            (At 9:10 a.m., break taken.)

7            (At 9:15 a.m., break  concluded.)

8            THE COURT:  All right.  Do we have all the jurors

9    here?

10           THE CLERK:  Yes, Ma'am.

11           THE COURT:  Are we ready for them?  You can bring

12   them in.  I believe we were on cross-examination, right?

13           MR. COUGHLIN:  Yes, Your Honor.

14           (Jury is present at 9:19 a.m.)

15           THE COURT:  Good morning.  I hope everybody enjoyed

16   the great weather this weekend, since it's about to change.

17   I'll be keeping a watch on the weather today.  If it looks like

18   the winds are going to get up pretty high late this afternoon,

19   you know, I'll let you all go in time to avoid that, if it's

20   going to happen before we get done, or if it's going to be

21   particularly bad.  But we're all hoping to get through the

22   evidence here today, probably tomorrow or early Wednesday so,

23   you know, I don't want to do that unless we have to.  But I

24   will be watching it for you.  And if anybody has anything

25   happen, you know, at home about the weather, just, as I say,

1   let Ms. Sanders know.

2           I believe we were in cross-examination of Ms. Kay.

3   So, Mr. Coughlin, you may continue.

4           MR. COUGHLIN:  Thank you, Your Honor.  Good morning,

5   Ms. Kay.

6           THE WITNESS:  Good morning.

7                       JANELLE KAY,

8           DEFENDANT'S WITNESS, PREVIOUSLY SWORN,

9               CROSS-EXAMINATION (CONT'D)

10  BY MR. COUGHLIN:

11  Q.   Ms. Kay, when we recessed your testimony on Friday

12  afternoon, we were discussing, I believe, Exhibit 41 in your

13  binder, that -- in which there was communications involving

14  Willowood and Dr. Tillman with regard to concerns about

15  Syngenta's process patents.  Do you recall that?

16  A.   I do.  May I --

17  Q.   Yes, please.

18  A.   -- get that?  Thank you.

19  Q.   And do you recall that, in fact, after some inquiry,

20  Willowood reported back that all the manufacturers in China

21  with regard to azoxystrobin use the same process, and that it

22  was a very difficult process to avoid?

23  A.   Yes.

24  Q.   If you could turn -- I'm going to go through a couple more

25  e-mail strings related to this.  If you could turn to Exhibit

1  42, which is the next tab in your binder.  And if you look at

2  the end of Exhibit 42, which is the beginning of the string, do

3  you see that --

4  THE COURT:  Mr. Coughlin?

5  MR. COUGHLIN:  Yes, Your Honor.

6  THE COURT:  If you could just slow down just a little

7  bit.  It's early in the morning.  I'm hearing a little bit

8  slowly, so start over again with your question.

9  MR. COUGHLIN:  Yes, Your Honor.

10  BY MR. COUGHLIN:

11  Q.  With regard to Exhibit 42, do you see that this an e-mail

12  string that starts trying to introduce Mr. Hayden, Willowood's

13  patent counsel, and Dr. Tillman to have discussions with regard

14  to Syngenta's process patents?

15  A.  Yes, I see that.

16  Q.  And if you could look at the second e-mail in the --

17  excuse me, the third e-mail in the string, do you see where

18  Mr. Hayden sends Dr. Tillman an e-mail in which he sets forth

19  three potential options with regard to altering the process for

20  manufacturing azoxystrobin?

21  A.  Yes.  I see that.

22  Q.  And do you see that are three options laid out below that?

23  A.  Yes.

24  Q.  And at the end, do you see where it states that Mr. Hayden

25  says that the goal is to modify the process without changing

1   the impurity profile.  Correct?

2   A.   Yes, I see that.

3   Q.   And that's because if an impurity profile is modified or

4   changed, that would result, perhaps, in not meeting the EPA's

5   requirement for substantial similarity to qualify for a prior

6   registration, is that correct?

7   A.   It could, but it's not necessary that that would happen.

8   Q.   Well, if you go back to the top of the e-mail, or if you

9   turn to the front of the exhibit, do you see where Dr. Tillman

10  responds to a followup inquiry from Mr. Hayden with regard to

11  whether -- what the response from the manufacturer was?

12  A.   Which e-mail are you referring to, please?

13  Q.   So I'm referring to -- at the top, correct.

14       THE COURT:  Plaintiff's, which one?

15  BY MR. COUGHLIN:

16  Q.   This is Plaintiff's 42.  And the e-mail that's at the top

17  of the string, Dr. Tillman to Mr. Hayden.

18  A.   Yes.  June 17, 2:38?

19  Q.   Correct.

20  A.   Yes.  I see that.

21  Q.   And do you see, after reciting the response that she

22  received from the manufacturer, I want to focus on the last

23  paragraph.  Do you see where Dr. Tillman says:  I'm sure that

24  proposing any change to a manufacturing process might be easy

25  to agree on paper, but in reality, I would think that the

1  manufacturer would want to verify any change by running
2  experiments first on small scale, and then on a large scale to
3  see if the changes actually work and to give the desired
4  product.  Is that correct?
5  A.   Yes.  That's what's written, yes.
6  Q.   And so, if a manufacturer did change the process, they
7  would have to go through and test it, not only to figure out
8  whether they could manufacture it in a way to produce the
9  azoxystrobin, but they'd also have to determine whether or not
10 any changes in that process resulted in changes in the impurity
11 profile, correct?
12 A.   Well, they would have see if there was any changes to the
13 impurity profile, definitely.
14 Q.   And the only way you could do that would be through a
15 5-Batch analysis testing, correct?
16 A.   The only way to do that from an EPA perspective is through
17 a 5-Batch analysis, but you could certainly to do non-GLP and
18 you can just test --
19         THE COURT:  I'm sorry, what?
20         THE WITNESS:  I'm sorry, non-GLP, non-good laboratory
21 practices.  So it's just a test that is verifying that you have
22 what impurities that you're looking for.
23 BY MR. COUGHLIN:
24 Q.   But for the EPA registrations, you'd have to do a 5-Batch
25 analysis, correct?

1   A.   Yes.   That's correct.

2   Q.   Okay.   And I believe you testified on Friday that Pyxis

3   submitted an application to amend Willowood's azoxystrobin

4   technical registration to change -- well, strike that.

5          The -- all of these e-mails were dated, and all of

6   these conversations that we've been discussing about concerns

7   with Syngenta's process patent were -- occurred before Pyxis

8   submitted to the EPA an application to register azoxystrobin

9   technical manufactured for Willowood by Tai He, correct?

10  A.   Well, the filing was by Greenfield, and I did not look at

11  the date of when they submitted.   But I think you represented

12  it was --

13  Q.   July.   In July -- is that correct?

14  A.   I don't know.   I don't remember.

15          MR. COUGHLIN:   Your Honor, may I approach the

16  witness, please?

17          THE COURT:   You may.

18          MR. COUGHLIN:   For the record, I'm not going

19  introduce this into evidence, but this is Defendant's Exhibit

20  7.

21  BY MR. COUGHLIN:

22  Q.   And Dr. Tillman [sic], I just want to -- if you can look

23  at the front of that and confirm that that is the application

24  or the cover letter to -- by which Pyxis submitted the

25  application on behalf of Greenfield for azoxystrobin technical?

1   A.   No.  This is actually the azoxystrobin 2.08 SC.

2   Q.   What is the date of that?

3   A.   August 13th, 2013.

4   Q.   I'll take it back.  We'll address that separately so I

5   don't take up your time.  But for purposes of this question,

6   assume that at the end of July 2013 is when the application for

7   technical registration was submitted.  All of these

8   conversations about Syngenta's process patent occurred before

9   that was submitted, correct?

10   A.   Yes.

11   Q.   And, so, and in that submission, it identifies Tai He as

12   performing the etherification and condensation reaction steps

13   in the process to make azoxystrobin, correct?

14   A.   I think that was correct.  I would want to refresh my

15   memory on that.

16   Q.   Well, you testified on Friday that there was a -- that

17   Pyxis submitted an application to amend that registration to

18   change the identification of the entities that performed steps

19   in the manufacturing process, correct?

20   A.   Yes.

21   Q.   And Pyxis submitted that on behalf of the registrant, is

22   that right?

23   A.   We did, yes.

24   Q.   And Pyxis, it didn't do anything to confirm the accuracy

25   of that information, did it?

1  A.    No.  We take the information that's provided to us by the

2  sponsor, and in this case, we were given Mr. Wu's deposition

3  testimony.  And SSJ did a site visit of where the different

4  steps were being conducted.

5  Q.    But you didn't -- Pyxis didn't -- isn't vouching for

6  itself, didn't do anything to verify that information, correct?

7  A.    That's correct, we did not verify.

8  Q.    And I don't believe you testified when that application

9  was submitted.  Isn't it true that that application to amend

10 the registration was filed in July of 2017, less than two

11 months ago?

12 A.    I think that's correct, yes.

13 Q.    And all of the azoxystrobin that Willowood has imported

14 into the United States has been under a registration that

15 identifies Tai He as conducting both the condensation and the

16 etherification steps, isn't that right?

17 A.    I don't know what Willowood has imported or what they're

18 using.  I'm not aware of that.

19 Q.    Well, that's what the registration was based on, correct,

20 that Pyxis submitted?

21 A.    The registration for Greenfield's for the technical

22 product identified Tai He as the manufacturer.

23 Q.    And that's all I'm asking about is for the technical

24 product.

25 A.    Yes.  That's correct.

1          MR. COUGHLIN:  No further questions, Your Honor.

2          THE COURT:  Redirect?

3          MR. NEUMAN:  No.  Thank you.

4          THE COURT:  No.  All right.  Thank you.  You may step

5   down.

6          (Witness excused.)

7          THE COURT:  Willowood can call its next witness.

8          MR. NEUMAN:  Your Honor, Willowood, at this point,

9   would call Brad Reichman by deposition.

10          THE COURT:  All right.  Ladies and gentlemen, you'll

11  remember that Mr. Reichman testified by deposition earlier.

12  This is where I made my one mistake in the trial, you'll

13  remember, and I told you that this was all of Mr. Reichman's

14  testimony.  Not so.  The defendant has some of his testimony

15  that they want to put into evidence as well.  You're going to

16  read it?

17          MR. TILLER:  I am playing the part of Mr. Reichman.

18          THE COURT:  All right.  Go ahead.

19          MR. NEUMAN:  And, Your Honor, this also includes some

20  counter-designations.

21          THE COURT:  Some counter-designations from the

22  plaintiff for completeness.

23          MR. TILLER:  I'm not used to being in this chair.

24          THE COURT:  And just as with the other deposition,

25  ladies and gentlemen, you are to take this testimony as if the

1    witness was present in the courtroom to the extent that you

2    can.  Go ahead.

3              MR. NEUMAN:  May I approach the witness and give him

4    a binder?

5              THE COURT:  You may.

6              MR. NEUMAN:  Your Honor, we will move into evidence

7    Defendant's 120, 123, and 171, with the following caveat:  As a

8    result of the discussion I've had with counsel, we will be

9    moving -- with respect to 123, we will be moving into evidence

10   only certain pages of Exhibit 123, and they would be what are

11   Bates stamped as REI with the last two digits being 47, 49, 51,

12   53, and 56 through 62.

13             THE COURT:  Okay.

14             MR. COUGHLIN:  I believe that some of these exhibits

15   are hearsay, Your Honor.

16             THE COURT:  Are these all exhibits talked about by

17   Mr. Reichman?

18             MR. NEUMAN:  Yes, they are.  Yes.

19             THE COURT:  Well, we'll just have to get to it,

20   because I don't remember without getting to it.  So just object

21   whenever you get to it.

22             MR. COUGHLIN:  Yes, Your Honor.

23             THE COURT:  Go ahead.

24             (Deposition of Brad Reichman read into the record as

25   follows:)

```
 1  BY MR. NEUMAN:

 2  Q.   Could you state your name, please.

 3          THE COURT:  Well, wait a second.  I'm sorry.  Can you

 4  all approach just briefly.

 5          (Bench conference as follows:)

 6          THE COURT:  So the objections that I ruled on as to

 7  Mr. Reichman, whose objections were those, both?

 8          MR. SANTHANAM:  Both.

 9          THE COURT:  Okay.  So --

10          MR. COUGHLIN:  As I understand, there are invoices in

11  here from Cheminova.

12          MR. SANTHANAM:  And e-mails from Cheminova employees

13  to Mr. Reichman.  There's invoices from Cheminova employees

14  to --

15          THE COURT:  Okay.  That's overruled.  He established

16  that.

17          (Bench conference concluded.)

18          THE COURT:  All right.  Ladies and gentlemen, I'm

19  sorry.  I remembered something, and just wanted to get it

20  straight so that the testimony would go more smoothly.

21  Mr. Tiller?

22          MR. TILLER:  I'm sorry, I was just he asked a

23  question I didn't have the answer to.

24          THE COURT:  All right.  So Defendant's 120, the pages

25  identified from 123 and 171, those three exhibits will be
```

1    admitted.

2              (Reading of deposition continued.)

3    BY MR. NEUMAN:

4    Q.    Mr. Reichman, good morning.

5    A.    Hello.

6    Q.    You need to speak for the record so that your answers --

7    A.    I said hello.  Did you not hear me?

8    Q.    I did not.  Could you state your name, please.

9    A.    Brad Reichman.

10   Q.    And what's your occupation?

11   A.    Chemical sales.

12   Q.    By whom are you employed?

13   A.    Today, Wilbur-Ellis owns Reichman Sales.

14   Q.    What is Reichman Sales?

15   A.    A chemical company.  We sell chemicals.

16   Q.    What's your position within Reichman Sales?

17   A.    I'm the general manager now.  I used to be president, but

18   now that Wilbur-Ellis owns us, I'm the general manager.

19   Q.    Thanks.  Just a couple of things I want to go over as a

20   preliminary matter with you, Mr. Reichman.  This is a

21   deposition.  You understand you're under oath?

22   A.    Yes.

23   Q.    Okay.  So you will do your best to answer questions I ask

24   you truthfully and completely?

25   A.    Yes.

1    Q.    I can't hear you.

2    A.    Yes.

3    Q.    It might help if you put your cell phone down, actually,

4    and listen to the questions.  I'm sorry.  What was that?

5    A.    I didn't say anything.

6    Q.    Okay.  Well, you made some gesture.  I'm curious what that

7    is.

8    A.    I'm not putting my cell phone down was the gesture.

9    Q.    I want to ask you a couple of questions about Reichman

10   Sales & Service.  What exactly is the business of Reichman

11   Sales & Service?

12   A.    We are a -- we are a retailer distributor of ag chemicals

13   all over the country.

14   Q.    Could you describe generally the type of customers you

15   sell to?  Do you sell to retailers or growers or other

16   distributors?

17   A.    We will sell to farmers, we sell to other dealers, so a

18   little bit of everything.

19   Q.    Were you directly involved in purchasing and selling

20   agrichemical products?

21   A.    Yes.

22   Q.    And in that capacity, did you regularly interact with your

23   suppliers and your customers?

24   A.    Yes.

25   Q.    Okay.  Did you regularly negotiate pricing with your

1  suppliers at which your suppliers would sell you agrichemical

2  products?

3  A.    Yes.

4  Q.    And did you regularly discuss and negotiate with your

5  customers the price at which you would sell agrichemical

6  products?

7  A.    Yes.

8  Q.    Did I understand you correctly to say that you bought

9  Syngenta's azoxystrobin products until generics came into the

10  market?

11  A.    Yes.

12  Q.    Who was the first generic from whom Reichman Sales &

13  Services purchased azoxystrobin products?

14  A.    Willowood.

15  Q.    Willowood?  Are you sure about that?

16  A.    No.  Maybe Cheminova first and then Willowood.  Yeah, I

17  think that was the order of things.  Cheminova first and then

18  Willowood.

19  Q.    Mr. Reichman, you've been handed by the court reporter

20  what's been marked as Exhibit 3, which consists of several

21  consecutive pages of documents you produced in response to the

22  subpoena, which we have designated at the bottom as REI pages 6

23  through 9.  Do you have that in front of you?

24  A.    Yes.

25  Q.    Have you seen these e-mails before?  Do they look

1  familiar?

2  A.   Yes.

3  Q.   Did you obtain these e-mails from Reichman Sales &

4  Service's e-mail file in response to the subpoena that we sent

5  you?

6  A.   Yes.

7  Q.   Do you see that on the very first page -- that on the

8  first -- very first page of the document from Mitch Clan to

9  Brad Reichman dated June 9, 2014?

10 A.   Yup.  Yes.

11 Q.   Who is Mitch Clan?

12 A.   He was the sales rep from Cheminova.

13 Q.   And what is he sending you in the e-mail?

14 A.   It just look likes an introduction to the azoxystrobin

15 product coming out as a generic.

16 Q.   And this was dated June 9, 2014, he's sending you this

17 price sheet.  Do you believe you would have had a conversation

18 of some sort or some sort of communications with Mr. Clan prior

19 to this date concerning azoxystrobin?

20 A.   We talked on a weekly basis.

21 Q.   Mr. Reichman, you've been handed by the court reporter

22 what's been marked for identification as Exhibit 4 in this

23 deposition, which consists of a series of pages that were

24 produced by Reichman Sales & Service in response to the

25 subpoena, and they're Bates stamped consecutively REI 63

1  through 80.  Do you have that in front of you?

2  A.    Yes.

3  Q.    I'd like you to look, please, at the first page of the

4  document, which is Bates stamped REI 63.  Do you recognize this

5  document?

6  A.    Yes.

7  Q.    What is it?

8  A.    An invoice from Cheminova.

9  Q.    For what?

10  A.    Equation.

11  Q.    And the date of the invoice is July 22nd, 2014 at the top

12  right?

13  A.    That's correct, yes.

14  Q.    And what's the total volume of quantity of product of

15  Equation that's invoiced on this document?

16  A.    540 gallons.

17  Q.    And what is the net price that this document indicates

18  Reichman was to pay Cheminova for that quantity of Equation?

19  A.    It's billed at 175 with a $25 discount.

20  Q.    Which would make it a net price of $150?

21  A.    150, yes.

22  Q.    And is $150 the price that you negotiated with, that you

23  agreed upon with Cheminova?

24  A.    Yes, it must have been at that time.

25  Q.    Do you recall how much Equation Reichman Sales & Service

1  purchased from Cheminova in 2014?

2  A.    I do not recall.

3  Q.    Do you have an approximate estimate?

4  A.    I do not, no.

5  Q.    Looking at Exhibit 4, could you look through the invoices,

6  purchase orders and add them up and tell me what quantity you

7  come to?

8  A.    Several thousand gallons it looks like.

9  Q.    Could you add it up for me.

10  A.    No.  I'm not going add it up for you.  You have the

11  documents.

12  Q.    Actually, sir, I'm asking you to add it up, and it's your

13  obligation --

14  A.    I'm not adding it up.  I'm not adding it up.

15  Q.    It's your obligation to do so, sir?

16  A.    I'm not adding it up.

17  Q.    Did Reichman pay $150 per gallon for all the product it

18  purchased from Cheminova in 2014?

19  A.    Is that what it says?  Then what's what we paid.

20  Q.    Sir, I'm asking you if that's what the documents reflect.

21  A.    If that's what the documents say, then that's what we

22  paid.

23  Q.    What happened in -- at some point in 2014, you stopped

24  purchasing azoxystrobin product from Cheminova, correct?

25  A.    Because Willowood came in cheaper.

1   Q.   At some point you stopped buying from Cheminova, correct?

2   A.   Because Willowood came in cheaper.

3   Q.   Okay.  So this e-mail from you to Mr. King is dated

4 May 19th, 2015.  Would it be accurate, then, to say that by

5 May 19th, 2015, you were having conversations with someone at

6 Cheminova about possibly supplying azoxystrobin product to

7 Reichman Sales & Services again?

8   A.   Yeah, I would assume that.  Yes.

9   Q.   Now, is it accurate to say that at some point in 2015,

10 after these e-mail exchanges, that you switched from Willowood

11 to FMC for azoxystrobin products?  Do you recall whether that

12 is the case?

13   A.   I started buying from FMC.

14   Q.   And do you recall when?

15   A.   No.

16   Q.   Are there documents that would refresh your recollection?

17   A.   Yes, you have the documents.

18   Q.   You've been handed by the court reporter what is marked

19 for identification as Exhibit 6 to your deposition, which is a

20 series of documents that Reichman Sales & Service produced in

21 response to the subpoena.  And they are Bates REI 81 through

22 122.  Do you have that in front of you?

23   A.   Yes.

24   Q.   Okay.  I'd like you to take a look, please, at the first

25 page of this document, which is Bates stamped 81.  Do you

1  recognize this document?

2  A.    Yes.

3  Q.    What is it?

4  A.    Its an invoice from FMC.

5  Q.    And it's dated June 12th, 2015 up in the right --

6  A.    6/12, yeah.

7  Q.    How much Equation does it reflect that Reichman Sales &

8  Service was purchasing from FMC?

9  A.    This one says 360 gallons.

10  Q.    So what was the actual amount paid for this quantity of

11  material?

12  A.    I would assume if you did the math it's probably $100 then

13  per gallon.

14  Q.    So is it fair to say that Reichman Sales & Service paid

15  $100 a gallon for this product?

16  A.    Yes.

17  Q.    Okay.  I'd like you to turn to the third page of the

18  document, which is REI 83.  Do you have that in front of you?

19  A.    Yes.

20  Q.    And this is a different invoice number, correct?

21  A.    Yes.

22  Q.    And what's the amount of product of the Equation that

23  you're purchasing as reflected in this invoice?

24  A.    360 gallons.

25  Q.    And what is the price that Reichman Sales & Service

1    actually paid for this product?

2    A.    Well, the invoice shows 125, and the next page shows a

3    rebate, so it equates down to $100 a gallon again.

4    Q.    Let's look at the next page which is Bates 86 and this is

5    another invoice.  How much Equation SC does this invoice

6    reflect Reichman Sales & Service purchasing from FMC?

7    A.    720 gallons.

8    Q.    And what is the purchase price ultimately paid by Reichman

9    Sales & Service for this 720 gallons?

10   A.    Well, the same scenario as the last; 125 on the list with

11   a credit brings it down to $100 a gallon.

12   Q.    I'd like you to turn to the next page, please.  It's a

13   copy of FMC Invoice 90468552, it's REI 89.  Do you have that in

14   front of you?

15   A.    Yes.

16   Q.    How much product does this reflect that Reichman Sales &

17   Service purchased?

18   A.    720 gallons.

19   Q.    At $100 a gallon?

20   A.    The invoice shows 125 plus the credit on the next page.

21   Q.    I'm going to ask you to take that calculator and look at

22   the document that's in front of you, and add up and tell me how

23   much --

24   A.    I'm not going to do it.

25   Q.    Let me finish the question, and then you can put on the

1  record that you refuse to do it as you turn your back on me.

2  I'm going to ask you how much Equation these documents reflect

3  Reichman Sales & Service purchased from FMC in 2015.  Will you

4  do that, please?

5  A.    No.

6  Q.    Now these -- we've been discussing invoices here in

7  Exhibit 6, which reflect the purchase price from FMC of $100 a

8  gallon.  Do you recall whether, in fact, any of the product

9  sold to Reichman Sales & Service in 2015 by FMC was sold to

10 Reichman Sales & Service at lower than $100 a gallon?

11 A.    Yes.

12 Q.    What do you recall?

13 A.    I bought some for under $100 a gallon.

14 Q.    From FMC?

15 A.    Yes.

16 Q.    What price did you pay?

17 A.    I believe 90.

18 Q.    And how much product did you pay $90 a gallon, do you

19 recall?

20 A.    I think a load.  I don't recall how many gallons total.

21 Q.    Was it 20 pallets?

22 A.    I do not remember.

23 Q.    How much is in a pallet?

24 A.    180 gallons.

25 Q.    Please take a look at Exhibit 7 for identification.  Who

1   is Robert West?

2   A.    He is an employee of FMC.

3   Q.    And was he someone whom you discussed azoxystrobin product

4   pricing with on behalf of Reichman Sales & Service?

5   A.    Yes.

6   Q.    I'd like you to take a look at his e-mail dated July 15,

7   2015 at the top.  It says, "I will agree to this one time

8   exception for a single order of 20 pallets of Equation

9   delivered to a single location for a net price of $90."  Do you

10  see that?

11  A.    Yes.

12  Q.    So does that refresh your memory as to how much you

13  purchased at a price of $90?

14  A.    Yes.

15  Q.    And was it 20 pallets?

16  A.    Yes.

17  Q.    And how much product would 20 pallets be?

18  A.    Twenty times 180.

19  Q.    And by this time you had severed your relationship with

20  Willowood with respect to its azoxystrobin, is that correct?

21  A.    I believe so.

22  Q.    Does Willowood have a reputation in terms of the quality

23  of their products?

24  A.    The quality is good.  There's no problem with that.

25  Q.    Okay.  Have you ever heard of companies not wanting to

1   associate themselves with Willowood?

2   A.   Oh, yeah.  Most of the major distributors do not have

3   anything to do with Willowood.

4   Q.   And can you name a couple of the distributors?

5   A.   No.  I don't know which ones, but most of them do not have

6   an association with them.

7   Q.   Is that based on your experience in the industry selling

8   crop products?

9   A.   Yes.

10  Q.   Now, if you could turn -- if you could, turn to REI 76.

11  This was a document that's contained in Exhibit 4 that

12  Mr. Neuman gave you, but I wanted to point you to this

13  document.  This is an invoice from Cheminova.  It's dated with

14  a reference date of July 2nd, 2014, is that right?

15  A.   Yes.

16  Q.   Now, Mr. Neuman suggested that all of the invoices from

17  Cheminova were at a net price of $150.  I'd like you to take a

18  look at the unit price here.  That's $175, is that right?

19  A.   That's correct.

20  Q.   The discount that was being offered, was $20 per gallon,

21  is that correct?

22  A.   That is correct.

23  Q.   So the net price Cheminova was providing was actually

24  $155, is that right?

25  A.   At that time, you are correct.

1 Q. Okay. That same net price is also on REI 78, is that

2 right, if you can go there and confirm for me?

3 A. That is correct.

4 Q. Okay. If you could -- so as of early July 2014, through

5 at least July 7th, 2014, Cheminova was offering a net price of

6 $155 per gallon for Equation, is that right?

7 A. Yes.

8 Q. If you go to REI 63 a little bit earlier, as Mr. Neuman

9 had indicated, there's a unit price here of $175 and a discount

10 price of $25, resulting in a net price of $150. Is that right?

11 A. Yup, that is correct.

12 Q. So in the year of 2014, the lowest net price that

13 Cheminova offered for Equation was $150 net price, is that

14 right?

15 A. That's what it looks like, right.

16 Q. I'm going to hand you Exhibit 8, and I'd like you to turn

17 to page 10 of the exhibit, which counsel discussed with you.

18 Now, counsel assumed in his question to you that REI 10, this

19 competitive response agreement, was the attachment to

20 Mr. King's e-mail dated June 1, 2015, which is the next page,

21 REI 11. Do you think that's right, that the competitive

22 response agreement that is reflected on page 10 was sent to you

23 by Mr. King on or about June 1, 2015?

24 A. I believe it has to be in that time frame, yeah.

25 Q. Now he calls this document a competitive response

1  agreement, right?

2  A.    That's what he says here, yes.

3  Q.    And the e-mail chain of REI 11 going back reflects some of

4  those communications that you and I went over this morning

5  between you and Mr. King, right?

6  A.    Okay.

7  Q.    Is that correct?

8          Nodding head up and down.

9          And in those emails, we discussed earlier this

10  morning, you were telling Mr. King that Cheminova FMC, and it

11  says you were telling Mr. King about Cheminova FMC and its

12  azoxystrobin, right?

13  A.    Yes.

14  Q.    And in the e-mails we discussed earlier this morning,

15  Mr. King was trying to convince you that Cheminova didn't have

16  enough product to sell you, and you were telling Mr. King how

17  much FMC had told you they thought they had, right?

18  A.    That's what this e-mail says, yes.

19  Q.    So during this period, you were negotiating with Willowood

20  for possible reduction in price or terms concerning future

21  purchase of azoxystrobin, right?

22  A.    It looks like I was negotiating pricing, yes.

23  Q.    So on REI 10, where it says competitive response

24  agreement, what do you take competitive response to mean?

25  A.    He was lowering his price to compete with somebody.

1  Q.    Compete with FMC, right?

2  A.    It doesn't say that on here.

3  Q.    Well, you testified earlier that this sheet was attached

4  to Mr. King's June 1, 2015 e-mail, right?

5  A.    I didn't.  I don't know what this was attached to, to be

6  honest with you.  I don't know.  It was obviously an e-mail

7  from Andy King, but I don't know where it was, which one it

8  came from.  I really don't know.

9  Q.    Leading up to June 1, 2015, you were reporting to Mr. King

10  that you could get azoxystrobin from Cheminova at a certain

11  price, correct, and under certain terms, right?

12  A.    I'm not sure pricing here, but I don't see a price in

13  here.

14  Q.    But shortly after these e-mails, Reichman began to

15  purchase azoxystrobin product from FMC for $100 net per gallon,

16  isn't that right?

17  A.    That's correct.

18  Q.    Wouldn't it be fair to say that by June 1, 2015 you were

19  in that ballpark in discussions for price in your discussions

20  with Cheminova?

21  A.    I must have been talking to FMC already, yes.

22  Q.    And is that the price that you were telling Willowood you

23  could purchase azoxystrobin for from Cheminova in 2015?

24  A.    I do not remember.

25  Q.    Okay.  Now, in the competitive response sheet that's

1    reflected in REI 10, he's offering you a price for a specified

2    number of gallons at $125 per gallon, correct?

3    A.    Yes.

4    Q.    And you ultimately did not enter into an agreement in 2015

5    to purchase azoxystrobin products from Willowood, correct?

6    A.    I had already bought product from Willowood in 2015.

7    Q.    No.  You bought in 2014, correct?

8    A.    I think, yes.  I think it was bought in December of 2014

9    for the 2014 season, so I guess technically when I'm talking

10   about it, it was for the 2015 season.

11   Q.    I think there was a misreading there.

12            THE COURT:  If you could repeat that answer.

13            THE WITNESS:  I'm sorry.

14            (Reading of depo continued.)

15            THE WITNESS:  I think, yes, I think it was bought in

16   December of 2014 for the 2015 season.  So I guess technically,

17   when I'm talking about it, it was for the 2015 season.

18   BY MR. NEUMAN:

19   Q.    But in calendar year 2015, you did not enter into any

20   agreement to purchase azoxystrobin from Willowood, is that

21   correct?

22   A.    I believe I did buy some in -- I had to buy some in 2015,

23   AzoxyProp or azoxy.  If it all came in before the year-end it

24   might have.  I don't -- our sales were in 2015 calendar year.

25   Q.    And in 2015, you were negotiating with Willowood as you

1 were disengaging from them, correct?

2 A.   That's correct.

3 Q.   And that's when you were telling Willowood that you could

4 get $100 a gallon from FMC on better terms, correct?

5 A.   That was later in 2015 in the summer, correct."

6        MR. NEUMAN:  That completes the examination.

7        THE COURT:  All right.  You may step down.

8        You can call your next witness.

9        MR. NEUMAN:  Yes.  The defendants call Andy King.

10       THE COURT:  He's outside the courtroom?  All right.

11 Anybody need to stand up while they're getting the witness?

12 Everybody's good?

13        (ANDY KING, DEFENDANT'S WITNESS, WAS SWORN.)

14       MR. NEUMAN:  Your Honor, may I approach the witness?

15       THE COURT:  You may.

16       MR. NEUMAN:  And binder includes Defendant's 120 and

17 123, and I'll be examining Mr. King on the same pages from

18 Exhibit Defendant's 123 that we discussed previously --

19       THE COURT:  All right.  Go ahead.

20       MR. NEUMAN:  -- and move those into evidence.

21       THE COURT:  Didn't I already admit them; 120 and 123?

22 Yes, I did.  Go ahead.

23                 ANDY KING,

24       DEFENDANT'S WITNESS, SWORN AT 9:54 A.M.

25                 DIRECT EXAMINATION

BY MR. NEUMAN:

Q.   Mr. King, good morning.

A.   Good morning.

Q.   How are you employed?

A.   At Willowood USA.

Q.   And what's your position there?

A.   Business development manager.

Q.   And can you tell the jury, do you have any post-high

school education?

A.   Yes, sir.  I graduated from Southeast Missouri State

University in Cape Girardeau, Missouri, with degrees in

agriculture and marketing in 1992.

Q.   And why did you become interested in that particular field

of agriculture?

A.   I was raised on a family farm in Southeast Missouri, so

I -- I've loved farming since the day that I was old enough to

ride with my father on a combine or a tractor.

Q.   And was that a commercial farm?

A.   Yes, sir, it was.

Q.   What kind of crops did you grow in that farm?

A.   It was all row crops; corn, soybeans, some rice and

cotton, as well.

Q.   Did the farm use pesticides?

A.   Yes, sir, we did.  We used fungicides, insecticides and

herbicides on those crops.

1  Q.    And did you become familiar with pesticides and fungicides

2  working on that farm?

3  A.    Yes, sir, I did.

4  Q.    Now, could you summarize, please, after you graduated

5  college -- that was in 1992, did you say?

6  A.    That's correct.

7  Q.    So where did you work first and what did you do?

8  A.    I began an internship with a large agricultural chemical

9  company named Rhone-Poulenc.  That internship began in the

10  state of Louisiana.  There I worked with large rice growers

11  with fungicide recommendations.

12          From there the internship continued into the State of

13  Florida where I worked with large citrus growers and

14  insecticide recommendations.

15  Q.    And did you have other positions with Rhone-Poulenc?

16  A.    I was then offered a sales territory, manager position

17  with the company full time back in Southern Missouri.

18  Q.    And what did you sell?

19  A.    The full portfolio of Rhone-Poulenc, which was, again,

20  herbicides, insecticides and fungicides.

21  Q.    And how long did you stay with Rhone-Poulenc?

22  A.    Through different mergers and acquisitions, Rhone-Poulenc

23  became eventually Bayer Crop Science, so I stayed there as

24  territory sales manager through 2008, and then my last eight

25  months or so at Bayer Crop Science I served as business --

1  southern region business director out of our regional office in
2  Memphis, Tennessee.
3  Q.   And what kinds of things did you do as regional business
4  director?
5  A.   I reported directly to the southern regional manager, and
6  I was heavily involved in customer program fulfillment, rebate
7  fulfillment.
8  Q.   I'm sorry, what?
9  A.   Customer rebate and program fulfillment.
10  Q.   This was for Bayer?
11  A.   Yes, sir.
12  Q.   And then after you -- you said 2008 you left
13  Rhone-Poulenc?
14  A.   2009 I would have left Bayer Crop Science.
15  Q.   And where did you go next?
16  A.   I then went to a large international generic company named
17  Cheminova, and I worked there as a territory sales manager for
18  the states of Arkansas and Missouri.
19  Q.   What did you sell?
20  A.   Again, insecticide, fungicides, herbicides.
21  Q.   For what types of crops?
22  A.   Mostly row crops in that geography.  Pretty heavy in rice
23  and cotton and certainly soybeans and corn.
24  Q.   And how long did you stay at Cheminova?
25  A.   A little over a year.

1  Q.   What did you do then?

2  A.   I went to work for Willowood USA.

3  Q.   And how did you -- what prompted you to go work for

4  Willowood?

5  A.   I became familiar or met Brian Heinze in our early years

6  at Rhone-Poulenc, and we became acquainted, and we kept up with

7  each other's accomplishments over the years.  And in fall of

8  2009 when he was starting Willowood, he contacted me and

9  recruited me over the next few months to come to work at

10 Willowood.

11 Q.   And you said you were national sales manager when you came

12 on board.  What do you do as national sales manager at

13 Willowood?

14 A.   I was responsible for all of the sales east of the Rocky

15 Mountains as well as management of our national sales team.

16 Q.   And did you take a different position at some point at

17 Willowood?

18 A.   Just over a year ago, I became business development

19 manager.

20 Q.   Now, are you familiar with Brad Reichman and Reichman

21 Sales & Service?

22 A.   Yes, sir, I am.

23 Q.   How so?

24 A.   Mr. Reichman had been a customer of Willowood USA.

25 Q.   Was Reichman your account at Willowood?

1  A.    Yes, sir, he was.

2  Q.    At some point did you approach Mr. Reichman about the

3  possibility of selling him Willowood's generic azoxystrobin

4  products?

5  A.    Yes, sir.  That would have been after we received our

6  registrations in the fall of 2014.

7  Q.    And did Willowood ultimately reach an agreement to sell

8  Reichman Sales & Services' azoxystrobin products?

9  A.    Yes, sir, we did in October of 2014.

10 Q.    And were the terms of that agreement memorialized in

11 writing?

12 A.    Yes, sir.  They would have been memorialized in an initial

13 sales order and followed up by shipping or purchase orders from

14 Reichman Sales & Service to Willowood USA.

15 Q.    Mr. King, if you could take the binder that's been handed

16 you, and there's a tab there that says D-123.  And, Bonnie, if

17 you could pull up REI 61.  It will be the next to the last page

18 in this exhibit binder.  Do you have that in front of you?

19 A.    Yes, sir, I do.

20 Q.    Do you recognize this documents?

21 A.    Yes, sir.  This is the initial sales order to Reichman

22 Sales & Service.

23 Q.    And when was that negotiated?  What's the date?

24 A.    October 17 of 2014.

25 Q.    Who prepared this document?

1  A.    I did.

2  Q.    And Mr. Reichman approved the terms?

3  A.    Yes, sir, he did.

4  Q.    Now, this sales order identifies a number of products.

5  Could you just point the panel to the azoxystrobin products

6  that Willowood agreed to sell Mr. Reichman in the fall of 2014

7  under this sales order?

8  A.    Yes, sir.  It's Willowood Azoxy 2SC and Willowood

9  AzoxyProp Xtra, or EW.

10 Q.    What is reference to AzoxyProp EW?  What is that?

11 A.    That was the initial name of the product based upon the

12 formulation that it was an emulsion in water formulation.  We

13 changed that shortly after for marketing reasons to AzoxyProp

14 Xtra.

15 Q.    And does this exhibit accurately reflect the price --

16 prices at which Willowood and Reichman agreed would apply in

17 October 2014 to Azoxy 2SC and AzoxyProp Xtra?

18 A.    Yes, sir, it does.  It's $125 per gallon on the Willowood

19 Azoxy 2SC.

20 Q.    And what about on the AzoxyProp?

21 A.    $90 per gallon on the AzoxyProp Xtra.

22 Q.    Now at this time, were there any side deals with

23 Mr. Reichman to sell these products at some price cheaper than

24 what's -- or less expensive than what's shown on the sales

25 order, like rebates or discounts?

1    A.    No, sir, there weren't.

2    Q.    How did you arrive at the prices for these azoxy products

3    with Mr. Reichman?

4    A.    Well, we certainly didn't want to start this low.  Our

5    initial discussions began in the $150 range on the azoxy

6    product; but at that time, the negotiation -- Mr. Reichman said

7    that he was being offered Cheminova Equation, which is their

8    Azoxy 2SC product at $130 per gallon.

9    Q.    And was that consistent with other information you had?

10   A.    It was.  We were getting other information from other

11   retailers in the midwest that were claiming the same offers.

12   Q.    Were there any other sources that you were hearing prices

13   being offered by Cheminova around that price?

14   A.    Any other sources?

15   Q.    Yes.  Any other -- besides distributors in the midwest,

16   were you hearing prices around $130 being offered by Cheminova

17   by anyone else?

18   A.    No, sir.

19   Q.    Do you know Mitch Clan?

20   A.    Yes, I do.

21         THE COURT:  Say again.

22   Q.    Do you know Mitch Clan?

23   A.    Yes, I do.

24   Q.    And who is Mitch Clan?

25   A.    Mitch Clan is the gentleman that hired me at Cheminova?

1   He's their national sales manager.

2   Q.   And were you talking to him around this time about

3   Cheminova's pricing?

4   A.   Yes, sir.   We did stay in contact after I left Cheminova,

5   and he -- we talked on an every-other-week basis, but he kept

6   me updated on what they were seeing throughout 2014 when they

7   entered the market and then late 2015 or early 2015.   So he was

8   also telling me what they were seeing in the field on pricing.

9   Q.   And what was he saying?   What was he telling you?

10  A.   He was telling us 125 in the southeast and the 130 range

11  in the midwest.

12  Q.   125 and 130 for what product sold by whom?

13  A.   So it would have been the Cheminova products.   So the 125

14  would have been their Azaka product, and 130 would've been the

15  Equation.

16  Q.   That's what he was telling you Cheminova was selling those

17  products for in the summer of 2014?

18  A.   That's what he says saying on the Azaka product.   I'm not

19  sure on the Equation.

20  Q.   Now, why didn't you -- if Mr. Reichman was telling you he

21  could buy azoxystrobin products from Cheminova at $130 a

22  gallon, why do you agree to sell him at $125 a gallon as

23  reflected on the sales order we looked at?

24  A.   We had to be at a slight discount to get him to switch

25  brands.

1  Q.    And how did you come to arrive at $90 a gallon as the

2  price to sell AzoxyProp Xtra to Mr. Reichman in the fall of

3  2014?

4  A.    He claimed at that time that his price on Quilt Xcel,

5  which was Syngenta's product, was at $90 per gallon -- I'm

6  sorry -- $110 per gallon.

7  Q.    He was telling you that he could buy Syngenta's Quilt Xcel

8  at that time for $110 per gallon?

9  A.    That is correct.

10 Q.    And before this time in October 2014 when you were talking

11 to Mr. Reichman about the possibility of selling your

12 equivalent of Quilt Xcel, that is, AzoxyProp Xtra, up to this

13 time had Willowood sold any AzoxyProp Xtra in 2014?

14 A.    No, sir, we had not.

15 Q.    Your sales to Mr. Reichman in the fall were the first

16 sales of AzoxyProp Xtra by Willowood?

17 A.    That is correct.

18 Q.    Now, this agreement that we looked at, the sales order of

19 October 2014, was made in October 2014, for what growing season

20 would Mr. Reichman have sold the azoxystrobin product that he

21 was agreeing to buy from you?

22 A.    This would have been for the 2015 season.

23 Q.    And when was product first shipped to Mr. Reichman under

24 the sales order?

25 A.    The first shipment would've been in December of 2014.

1  Q.   Now, when Mr. Reichman wanted to ship specific amounts of

2  product -- wanted Willowood to ship specific amounts of product

3  against that October 2014 sales order, were those requests

4  reflected in any documents?

5  A.   Yes, sir.  He would submit purchase orders to our office

6  that we would ship against.

7  Q.   All right.  I'd like you to look again at Defendant's 123

8  in your binder.  And, Bonnie, if you could pull up what's Bates

9  stamped REI 47.  Do you have that in front of you?

10  A.   Yes, sir, I do.

11  Q.   Do you recognize the document?

12  A.   Yes, sir.  This is -- this would be a purchase order for

13  Willowood 2SC at a price of $125 per gallon, which was the

14  original contract price.

15  Q.   This is from a purchase order issued by -- sent to you by

16  whom?

17  A.   Mr. Reichman.

18  Q.   And this was against the original October 2014 sales

19  order?

20  A.   Yes, sir, it is.

21  Q.   And, again, the price reflected here for Azoxy 2SC is

22  under rate?

23  A.   That's correct.

24          THE COURT:  Under what?

25  BY MR. NEUMAN:

1    Q.    Under the column marked "rate," what is the price?

2    A.    $125 per gallon.

3    Q.    Now -- and is this typical of the standard purchase order

4 that Mr. Reichman sent to you when he wanted an order -- to

5 place an order of Azoxy 2SC against the October 2014 sales

6 agreement that we looked at?

7    A.    Yes, sir, it is.

8    Q.    Okay. Thank you, Bonnie. Mr. king, I'd like you to look

9 a few pages further back in this exhibit at what's Bates

10 stamped REI, the last two digits, 51, at the bottom. Could you

11 bring that up, Bonnie?

12    A.    Yes, sir.

13    Q.    Do you recognize this?

14    A.    Yes. This is a purchase order from Reichman Sales &

15 Service to Willowood USA for AzoxyProp Xtra at a price of $90

16 per gallon.

17    Q.    And that's the price consistent with the price that was

18 agreed to back in October?

19    A.    Yes, sir, that's correct.

20    Q.    And is this standard form purchase order that Mr. Reichman

21 would issue to Willowood when he wanted Willowood to fill some

22 specific quantity against that 2014 sales agreement?

23    A.    Yes, it is.

24    Q.    Now, I'd like you to look, please -- and, Bonnie, you

25 don't have to put it up on the screen -- but I'd like you

1  quickly to look at what you've got in the binder as REI 49, 53,
2  56, 57, 59, and 60.
3  A.    Yes, sir.
4  Q.    Are these all additional purchase orders that Mr. Reichman
5  placed for specific quantities of AzoxyProp Xtra or Azoxy 2SC
6  against the 2014 sales order?
7  A.    Yes, sir.  These are continuing purchase orders towards
8  the initial sales order.
9  Q.    And are all of the prices what we've already seen, $90 for
10 AzoxyProp Xtra and $125 for Azoxy 2SC?
11 A.    That's correct.
12 Q.    Now, did -- I gather that at some point Willowood did
13 begin making azoxy product for Reichman pursuant to these sales
14 orders and purchase orders, correct?
15 A.    Yes, sir.
16 Q.    Did Reichman make any payments to Willowood?
17 A.    He did.  The terms of this agreement were a third due
18 December 1st, 2014; a third due March 1st of 2015; and a third
19 due June 1st of 2015.  He made --
20 Q.    And what payments did he make?
21 A.    He made the first two payments.
22 Q.    Meaning the December 2014 payment and the March 2015
23 payment?
24 A.    Yes, sir.
25 Q.    Now, at some point after you started filling orders for

1  Mr. Reichman, did he come to you with any complaints?

2  A.    He did.  In February of 2015, he came to us -- or

3  contacted us and said that he was able to purchase Syngenta's

4  Quilt Xcel product on the open market at $87 per gallon.

5  Q.    From whom did he say he could buy Syngenta's Quilt Xcel on

6  the open market for $87 a gallon?

7  A.    He stated CPS, which is Crop Production Services.

8  Q.    And that's one of Syngenta's major distributors, is that

9  right?

10  A.    Yes, sir.  It's one of the largest distributors in the

11  nation.

12  Q.    So what did he say to you about that?

13  A.    He asked us to lower the price of our product.

14  Q.    Which product?

15  A.    AzoxyProp Xtra.

16  Q.    And what did Willowood do in response?

17  A.    We agreed to lower his prior to $80 per gallon, but we did

18  it not with a price adjustment, we did it by using free

19  product.  So we sent him 1,080 gallons of Azoxy 2SC, which

20  essentially would lower his price on all the AzoxyProp Xtra

21  that he purchased to $80 per gallon.

22  Q.    And when was this?

23  A.    This would would've been March of 2015.

24  Q.    Now, if Mr. Reichman was telling you he had to pay $87 a

25  gallon for the branded product Quilt Xcel, why did you go to

1  $80 on your -- an effective price of AzoxyProp Xtra?

2  A.   Yes, well, Quilt Xcel is the brand, and we are a generic,

3  so there needs to be a spread there.

4  Q.   And this all occurred in the first quarter of 2015?

5  A.   Yes, sir, it did.

6  Q.   After that incident, at some point during 2015 did you

7  hear again from Mr. Reichman concerning Willowood's pricing?

8  A.   We did.  In May of 2015, he contacted us again to say that

9  he was being offered Cheminova's Equation product at $100 per

10  gallon.

11  Q.   And what did he want you do about that?

12  A.   He wanted us to meet that price with our product.

13  Q.   And remind the jury, at that point your contract with

14  Mr. Reichman -- under that contract, you were selling Azoxy 2SC

15  at what price?

16  A.   $125 per gallon.

17  Q.   Which was $25 more than he was saying he could get it from

18  FMC?

19  A.   That's correct.

20  Q.   And remind the jury now who is FMC in relation to

21  Cheminova?

22  A.   FMC purchased Cheminova in April of 2015.  And one thing I

23  left out, I'm sorry, is that he also was offered 90-day terms

24  with that price of $100 per gallon.

25  Q.   What does 90-day terms mean?

1  A.   It means he could take their product and sell it and not

2  have to pay for it for 90 days.

3  Q.   And did Willowood -- what did Willowood do in response to

4  his request that you drop your price for product down to $100?

5  A.   We met his demand and dropped -- we didn't drop the price.

6  We offered him a rebate of $25 a gallon that would be paid in

7  December of 2015 at the end of season.

8  Q.   Now, during this period, did Mr. Reichman also complain

9  about any other pricing of Willowood's for azoxy products?

10 A.   Yes, sir.  Shortly thereafter, he claimed that he was able

11 to purchase our Willowood AzoxyProp Xtra from a local retailer

12 or competitor down the road named Ottawa Plant Food at $80 per

13 gallon.

14 Q.   Now, remind the jury what was your sales price to

15 Mr. Reichman for that product under the contract?

16 A.   He was then at $80 per gallon.

17 Q.   As a result of the free goods that -- is that right?

18 A.   Yes, sir, that's correct.

19 Q.   So what did Mr. Reichman complain about?

20 A.   Well, his conclusion was that if he could buy our product

21 from Ottawa Plant Food at $80 a gallon, we were selling them at

22 a cheaper price than we were selling to him?

23 Q.   Was that the case?

24 A.   No, sir, it's not.  Were.

25 Q.   You selling to Ottawa Plant Foods in 2015?

1  A.    We were.

2  Q.    At what price were you selling AzoxyProp Xtra to Ottawa

3  Plant Foods?

4  A.    Every sales orders was at $100 per gallon.

5  Q.    That was more than you were selling the price to

6  Mr. Reichman at that time, is that correct?

7  A.    Yes, sir, that's correct.

8  Q.    Did Mr. Reichman ask for any specific price adjustment for

9  the AzoxyProp Xtra that he had previously agreed to buy from

10 you at $90 a gallon and then after the free goods $80 a gallon?

11 A.    Yes, sir.  At that point he demanded that we go to $65 per

12 gallon on our AzoxyProp Xtra.

13 Q.    And when did those conversations take place?  Remind the

14 jury, please.

15 A.    It was the first week in June of 2015.

16 Q.    And what did Willowood say in response to that demand?

17 A.    We declined that offer.

18 Q.    Let's be clear.  What did you decline to do?

19 A.    We were not going to lower the price any further than what

20 we already had with him.

21 Q.    Price on which?

22 A.    On AzoxyProp Xtra.

23 Q.    So you would not agree to go down to $65?

24 A.    No, sir.

25 Q.    Why not?

1  A.    Because we could take the product back from him and sell

2  it at that price or higher prices to other customers.

3  Q.    Now, during this period in May/June 2015, did you

4  ultimately reach an agreement with Mr. Reichman to resolve

5  these disputes and concerns he had over Willowood's pricing?

6  A.    Yes, sir.  Essentially, negotiations fell apart, and the

7  deal fell apart, and we agreed to go in and pick up our

8  remaining product and cancel his remaining orders that he had.

9  Q.    If you could look again, please, was that agreement

10 memorialized in writing?

11 A.    Yes, sir.

12 Q.    And if you could look again, please, at Defendant's 123.

13 And, Bonnie, if you could pull up the last page of that

14 exhibit, which is Bates stamped the last two digits 62.  Do you

15 recognize this document?

16 A.    Yes, sir.  This is the product return detail that I

17 prepared, a spreadsheet that I prepared for Mr. Reichman and

18 that he agreed to.

19 Q.    And a spreadsheet for what?  What does it show?  What are

20 these terms?

21 A.    It shows the product that he was returning as well as the

22 product orders that we were canceling.  It backed out his

23 rebates, and then at the bottom was a total number that we

24 actually owed him since he had already made his first two

25 payments.

1 Q. So at a high level, could you just explain what the

2 agreement was with Mr. Reichman to resolve all these disputes?

3 A. Yes, sir. Well, the first section is the product, again,

4 that we -- he was returning or either canceling that he had on

5 order or he had in stock, and then we -- below that, we

6 substracted his rebate, the 25-dollar-per-gallon rebate that we

7 offered him on the azoxy. Again, we subtracted out the free

8 goods that we had already given him to do that, and then what's

9 left -- against his account balance and then at the end of

10 the -- or the bottom is the total owed to Mr. Reichman.

11 Q. Why did you owe money back to Mr. Reichman?

12 A. Because he had already made his first two payments, and

13 they were greater than what the account balance was.

14 Q. And was this agreement ultimately implemented with

15 Mr. Reichman?

16 A. Yes, sir, it was.

17 Q. He agreed to these terms?

18 A. Yes, sir, he did.

19 Q. And at that point, after this agreement was reached and

20 implemented, did Willowood sell any additional azoxystrobin

21 products to Reichman Sales & Service in 2015 or 2016?

22 A. No, sir, we did not.

23         MR. NEUMAN: Thank you, Mr. King. I have no further

24 questions.

25         THE COURT: Questions for Syngenta?

```
1            MR. LEVINE:  Yes, Your Honor.  May I approach?
2            THE COURT:  You may.
3                      CROSS-EXAMINATION
4  BY MR. LEVINE:
5  Q.    Good morning, Mr. King.
6  A.    Good morning.
7  Q.    Let's talk about what was happening in 2015 with respect
8  to pricing of Willowood's AzoxyProp Xtra product.  If you'll
9  please turn in the notebook I just gave you to Plaintiff's
10 Exhibit 181.  This is an e-mail chain, is it not, between you
11 and Mr. Heinze, among others, in July 2015, is that correct?
12 A.    That's correct.
13 Q.    And that's about a year after Willowood first started
14 selling its azoxy end-use products, correct?
15 A.    That is correct.  Well, about nine months, yes, sir.
16 Q.    Nine months after AzoxyProp Xtra was sold but about a year
17 after Azoxy 2SC was sold, correct?
18 A.    I'm not certain when the first Azoxy 2SC was sold.
19 Q.    If you'll look at the second page of Plaintiff's Exhibit
20 181.  And, David, if you could please pull that up on the
21 screen.  At the bottom of the second page, there is an e-mail
22 from you dated July 6, 2015, to Mr. Heinze, and underneath
23 that, we see the question that Mr. Heinze's asked.  So let's
24 look at the question first and then the answer.
25            The question was:  "Andy," you were able -- "were you
```

1  able to do any additional due diligence on the azoxy pricing?"

2  That's the question you were asked by Mr. Heinze, correct?

3  A.   Correct.

4  Q.   And then looking above, the answer, you stated:  "I'm

5  working on orders with Titan Pro and Harbrand," correct?

6  A.   Correct.

7  Q.   And you then said, "Prices are going down daily."  That's

8  what you told Mr. Heinze, correct?

9  A.   Correct.

10         MR. LEVINE:  No further questions, Your Honor.

11         THE COURT:  Redirect?

12                     REDIRECT EXAMINATION

13  BY MR. NEUMAN:

14  Q.   Mr. King, do you know why prices were going down?

15  A.   It was due to competition.

16         MR. NEUMAN:  No further questions.

17         THE COURT:  All right.  Thank you.  You can step

18  down.

19         You can call your next witness.

20         MR. TILLER:  Your Honor, we're going to be offering

21  deposition testimony from Mr. Wu.

22         THE COURT:  All right.  Ladies and gentlemen, here is

23  another witness testifying by deposition.  I think you all are

24  going to read it, correct?

25         MR. TILLER:  We are.

1                    THE COURT:  Go ahead.

2                    MR. TILLER:  Thank you.

3                    (Deposition of Wu was read into record as follows:)

4    Q.    "Mr. Wu, good morning.

5                    Could you please state your full name for the record.

6    A.    My name is Wu Xiaolong, W-U for my surname,

7    X-I-A-O-L-O-N-G for my given name.

8    Q.    And what is your current business address?

9    A.    It is in Yancheng City, Jiangsu Province.

10   Q.    By whom are you employed?

11   A.    I'm not employed by anybody.  I invested and created my

12   own company.

13   Q.    What is the name of that company?

14   A.    Yangcheng Tai He Chemicals.

15   Q.    If I refer during the course of this deposition to that

16   company as "Tai He," will you understand that to be the company

17   which you formed?

18   A.    Yes."

19                   THE COURT:  We need the mic for you, especially when

20   you're looking down.

21                   MR. TILLER:  I'm sorry.

22                   (Reading of deposition of Mr. Wu continued as

23   follows:)

24   Q.    "And who owns Tai He?

25   A.    I own the company Tai He.

```
1    Q.    Entirely?

2    A.    Yes.

3    Q.    And what is your title, if any, at Tai He?

4    A.    Chairman of the board.

5    Q.    What is the business of Tai He?

6    A.    Chemicals and pesticides.

7    Q.    Can you tell me, please, what products does Tai He sell?

8    A.    Mainly pesticides.

9    Q.    And can you identify the pesticides, please?

10   A.    Azoxystrobin, isoxaflutole, as well as fludioxonil.

11   Q.    Azoxystrobin, fludioxonil, and what was the third?

12   A.    Isoxaflutole.

13   Q.    Does Tai He manufacture any of those products?

14   A.    Yes, we do.

15   Q.    Where does Tai He manufacture azoxystrobin?

16   A.    It is in Guangda.

17   Q.    And what is Guangda?

18   A.    It is called Guangda Chemicals, Lianyungang Guangda

19   Chemicals.

20   Q.    If I refer to that company as 'Guangda,' will you

21   understand me to be referring to the place where products are

22   manufactured for Tai He?

23   A.    Yes, I understand.

24   Q.    Where is Guangda located?

25   A.    It is located in Guannan Chemical Industrial Park of
```

1  Lianyungang City.

2  Q.    Is that near Tai He's location?

3  A.    Yes.

4  Q.    How close?

5  A.    10 kilometers.

6  Q.    Do you have any ownership in Guangda?

7  A.    No.

8  Q.    Does anyone at Guangda have any ownership interest in Tai

9  He?

10  A.    No.

11  Q.    What is the business arrangement -- withdrawn.

12          What products did Guangda make that Tai He sells?

13  A.    It is azoxystrobin as well as isoxaflutole and some

14  fludioxonil.

15  Q.    And how would you characterize the business arrangement

16  between Tai He and Guangda concerning Guangda's manufacture of

17  product for Tai He?  What is the nature of the business

18  relationship?

19  A.    We cooperate with each other in production.

20  Q.    What are your responsibilities as chairman of Tai He?

21  A.    I am responsible for the operations and the production of

22  the entire company.

23  Q.    How many professional employees does Tai He have,

24  approximately?

25  A.    Over 20.

1  Q.    Are any of those employees trained in the field of

2  chemistry?

3  A.    Yes.

4  Q.    How many?

5  A.    Over 10.

6  Q.    And what do they do; what are their job responsibilities?

7  A.    There are two parts.  One part is for the preparation of

8  the Tai He company.  The other part is for the production of

9  our products.

10  Q.    In the course of your job, do you customarily talk with

11  those chemists about the production of product for Tai He?

12  A.    Yes.

13  Q.    When was Tai He formed?

14  A.    2010.

15  Q.    When did Tai He first start to sell azoxystrobin to any

16  customers?

17  A.    It was in the season of 2011 to 2012.  As for which month,

18  I can't remember.

19  Q.    Can you name some of the customers whom were you

20  selling -- whom Tai He was selling azoxystrobin to at the

21  beginning in 2011?

22  A.    They were Yi Tong from Shanghai, Sino Agri from Beijing,

23  as well as Yi Pu Le from Shenzhen.

24  Q.    To approximately how many customers has Tai He sold

25  azoxystrobin since 2011?

1  A.    Accumulatively, about 30 of them.

2  Q.    At some point, did -- are you familiar with a company

3  called Willowood Limited?

4  A.    Yes, I know.

5  Q.    At some point, did Tai He have discussions with Willowood

6  Limited about azoxystrobin?

7  A.    Yes.

8  Q.    Do you recall when those discussions first began?

9  A.    At the beginning of 2013.

10 Q.    And did you participate in those discussions on behalf of

11 Tai He?

12 A.    Yes.

13 Q.    And who at Willowood Limited did you have those

14 discussions with?

15 A.    It was Mr. Shen, Shen Shaojun.

16 Q.    And can you tell me, please, what those -- can you

17 describe those discussions; what did Mr. Shen say to you?

18 A.    It was at a trade show for pesticides.  I met Mr. Shen and

19 he knew that we were producing azoxystrobin, and he suggested

20 that he was planning to register in a foreign country about

21 azoxystrobin, and he asked me to provide some material for the

22 registration so that in the future we could cooperate with each

23 other.

24 Q.    And in response to Mr. Shen's request, did Tai He provide

25 Mr. Shen with any information?

1    A.    Yes.

2    Q.    What did Tai He provide Mr. Shen at that time in response

3    to his request?

4    A.    We provided two documents:  One, the JLP report; two, the

5    processing description.

6    Q.    The process description for what?

7    A.    Ti was for azoxystrobin.

8    Q.    Who prepared that process description?

9    A.    Specifically, I arranged Mr. Chiu Zhenghong to do it.

10   Q.    And who is he?

11   A.    He was an employee in my company.

12   Q.    Does he have a background in chemistry?

13   A.    Yes.

14   Q.    He is one of the people at Tai He involved in the process,

15   processes, manufacturing processes?

16   A.    Yes.

17   Q.    And, at your request, did Mr. Chiu prepare a process

18   description for Mr. Shen?

19   A.    Yes.

20   Q.    And have you seen that process description?

21   A.    Yes.

22          MR. NEUMAN:  If you could please mark this document

23   as 1 and this as 1A.

24   Q.    Mr. Wu, you have been handed what's been marked as Exhibit

25   1.  You've been handed what's been marked Exhibit 1.  Do you

1  have that in front of you?

2  A.    Yes.

3  Q.    Do you recognize Exhibit 1?

4  A.    Yes.

5  Q.    What is it?

6  A.    It is the processing description that we provided to

7  Willowood.

8  Q.    Is this the process description that you asked Mr. Chiu

9  prepare in response to Mr. Shen's request in 2013.

10  Q.    When was this document -- when was Exhibit 1 provided to

11  Willowood?

12  A.    It should be in the first half of 2013.

13  Q.    Who prepared this document?

14  A.    Chiu Zhenghong.

15  Q.    Did he prepare it at your request?

16  A.    Yes.

17  Q.    Did you see this -- when was the first time you saw this

18  document?

19  A.    It was in the first half of 2013.  I can't recall

20  specifically when.

21  Q.    You see that on this -- on Exhibit 1 -- withdrawn.

22       MR. NEUMAN:  At this time, I will move for admission

23  of Exhibits 1 and 1A into evidence."

24       MR. TILLER:  Which, Your Honor, is succumbed DX-116.

25       MR. SANTHANAM:  Your Honor, we object based on

1  authentication and hearsay.

2          THE COURT:  Well, overruled.  It will be admitted.

3          MR. TILLER:  Thank you, Your Honor.

4          (Reading of deposition of Mr. Wu continued as

5  follows:)

6  Q.   "Mr. Wu, if you look at Exhibit 1, do you see there are

7  descriptions of steps set out in this document?

8  A.   Yes.

9  Q.   Who provided the descriptions" --

10         MR. TILLER:  Bonnie, why don't we go to 1A since I

11 think that's the English one.

12         (Reading of deposition of Mr. Wu continued as

13 follows:)

14 Q.   "Who provided the descriptions of the processes that are

15 shown for steps 1 through 6?

16 A.   The content was provided from our relevant suppliers.

17 Q.   Who provided the process description for the condensation

18 step, step number 7?

19 A.   It was Chiu Zhenghong.

20 Q.   I'd like you to look, please, at Exhibit 1 at -- do you

21 know that this was the document provided to Willowood in

22 response to its request in 2013?

23 A.   Yes.

24 Q.   If you could please look at the page at the bottom that's

25 marked 26708.

1        At the end of step -- please look in Exhibit 1 at the
2  very end of what is shown as step 5, 'Etherification.'
3        Mr. Wu, if you look at Exhibit 1, do you see that
4  there were descriptions of steps set out in this document?
5  A.   Yes.
6  Q.   Who provided the descriptions of the processes that are
7  shown for steps 1 through 6?
8  A.   The content was provided from our relevant suppliers.
9  Q.   Who provided the process description for the condensation
10 step, step number 7?
11 A.   It was Chiu Zhenghong."
12        MR. TILLER:  Your Honor, I have to apologize.  There
13 is a little repetition in this.  So we'll go down to page 17,
14 line 2, Alan.
15        (Reading of deposition of Mr. Wu continued as
16 follows:)
17 Q.   "Do you see the name of the company, Lianyungang Guoshang
18 Chemical company?
19 A.   Yes.
20 Q.   Are you personally familiar -- if I refer to this company
21 as 'Guoshang,' will you understand it to be this company
22 Lianyungang Guoshang Chemical?
23 A.   Yes, I know.
24 Q.   Are you personally familiar with a company called
25 Guoshang -- with Guoshang?

```
 1  A.    Yes, I know them.

 2  Q.    How do you know them?

 3  A.    Because this company is located in Gannan Industrial Park,

 4  which very close to Chen Jia Gang Industrial Park, where my

 5  company is located.  It's easy for us to know each other.

 6  Q.    And what does Guoshang do?

 7  A.    The business is mainly in producing intermediates for

 8  pesticides.

 9  Q.    Do they provide intermediates for azoxystrobin?

10  A.    Yes.

11  Q.    Can you name some of the pesticides for which Guoshang

12  provides intermediate products?

13  A.    They were azoxystrobin, bispyribac sodium, as well as

14  imazapyr acid.

15  Q.    Do you personally play any role in deciding the source or

16  sources of intermediate products for the manufacture of

17  azoxystrobin?

18  A.    Yes.

19  Q.    What role do you play?

20  A.    I am the decision-maker.

21  Q.    Let me return for a moment to Willowood.  After Tai He

22  provided the requested documents to Mr. Shen concerning

23  azoxystrobin, were there further discussions or dealings

24  between Tai He and Willowood with respect to azoxystrobin?

25  A.    Yes.
```

1  Q.    What happened?

2  A.    Well, we just asked each other about the most updates.

3  For example, they will ask me about the production status.

4  Q.    Did there come a time when Tai He supplied Willowood with

5  azoxystrobin?

6  A.    Yes.

7  Q.    When did that begin?

8  A.    In 2014.  It was -- it should be in the first half of

9  2014.

10 Q.    I'm sorry, let me return to Guoshang.  Has Guoshang played

11 any role in the manufacture of azoxystrobin for Willowood

12 Limited?

13 A.    What do you mean by 'play a role'?

14 Q.    Has Guoshang manufactured any -- conducted any portion of

15 the manufacturing process for azoxystrobin for Willowood

16 Limited?

17 A.    Yes.

18 Q.    And what role is that?  What has Guoshang done in

19 connection with the manufacture of azoxystrobin for Willowood?

20 A.    We bought intermediates from them.

21 Q.    What intermediate have you bought from Guoshang for the

22 manufacture of azoxystrobin?

23 A.    It was the etherification that was mentioned in this

24 material.

25 Q.    And how did you decide to use Guoshang as a supplier of

1  that intermediate product for the manufacture of azoxystrobin?

2  A.   It was mainly because of quality, cost -- no price.

3  Q.   Do you know whether Guoshang sells" --

4        MR. TILLER:  I'm sorry.  Let me start again.

5        (Reading of deposition of Mr. Wu continued as

6  follows:)

7  Q.   "Do you know whether Guoshang sells that intermediate

8  product to others in the market?

9  A.   Yes.

10  Q.   Are there other suppliers of that intermediate product?

11  A.   Yes.

12  Q.   When the purchase of that intermediate product that

13  results from the etherification step is made from Guoshang,

14  customarily, can you describe the nature -- how that business

15  transaction works between Tai He and Guoshang?

16  A.   Well, the transactions are usually like this.  Because

17  pesticides are very seasonal products, first of all we will

18  talk to the suppliers, ask them about their production, and

19  then well look at our own demand.  Then they will provide a

20  quotation about their supply for three to six months.

21  Q.   A quotation, did you say?

22  A.   Yes.

23  Q.   And if the decision is made to purchase from a particular

24  supplier, such as Guoshang," who makes the business -- "who

25  makes the business transaction with Guoshang and how is that

1  transaction carried out?

2  A.   The transactions are like this.  They will provide a

3  quotation to me and then I will decide.

4  Q.   And if you decide to purchase from Guoshang, how is that

5  decision communicated to Guoshang and then what communications

6  are there back and forth?

7  A.   We are very close to each other, our offices.

8  Particularly, their office is very close to Guangda, where our

9  production happens.  It is only 100 -- no, 100 to 200 -- about

10 200 meters away from Guangda.

11 Q.   When you purchase -- when you decide to purchase that

12 intermediate from Guoshang, what -- do any documents -- are

13 there any documents exchanged?  How are the communications

14 conducted?

15 A.   No, no document.  We just go to their office and we

16 negotiated, and then it is decided.

17 Q.   Has Guoshang supplied all of the intermediate product

18 resulting from the etherification step for the manufacture of

19 azoxystrobin for Willowood Limited?

20 A.   Yes.  It should be most of it.

21 Q.   On those occasions when Guoshang does not provide the

22 intermediate resulting from the etherification step, where does

23 Tai He obtain that intermediate product?

24 A.   Then we will purchase from Jiangxi, Fujian, and Jiangsu

25 Provinces.

1  Q.   And why would a decision be made to purchase that

2  intermediate product from another company, rather than from

3  Guoshang?

4  A.   There are two reasons.  The first reason is about the

5  availability, the product availability; because Guoshang has

6  many other customers, sometimes they don't have any stock

7  available for us.

8          The other reason is price.  During the peak season,

9  their price is higher.  If we can find another supplier whose

10 price is more suitable for us, then we will buy from other

11 suppliers.

12 Q.   On those occasions when Guoshang either does not have a

13 supply or its price is too high, its price for that

14 intermediate product is too high, has Tai He or Guangda itself

15 ever carried out the etherification step for Willowood, for the

16 production of azoxystrobin product for Willowood?

17 A.   No.

18 Q.   On those occasions where Guoshang either does not have the

19 intermediate available or its price is too high, where is the

20 etherification step done and by whom is it done?

21 A.   Usually, we will turn to a company in Jiangxi to purchase.

22 Q.   Has Guoshang ever provided -- withdrawn.

23         Has Guoshang ever conducted the condensation step in

24 the manufacturing process of azoxystrobin for Willowood?

25 A.   No.  They are not familiar with it.

1  Q.    To your knowledge, who carries out -- who has carried out

2  the condensation step for the manufacture of azoxystrobin

3  product for Willowood Limited?

4  A.    It is Guangda.  It was us.

5  Q.    How do you know that?

6  A.    Because I am responsible for the management.

7  Q.    Has anybody other than Guoshang carried out of the

8  condensation step for the manufacture of azoxystrobin product

9  for Willowood?

10 A.    I don't know.  For me, I only carry out condensation in

11 Guangda; at no other company at all, only Guangda.  As for

12 whether Willowood has other suppliers for condensation, I don't

13 know.

14 Q.    Okay.  Fair enough.

15        I'm talking about the azoxystrobin product that Tai

16 He supplies to Willowood Limited.  With respect to that

17 product, with respect to that product, has anybody other than

18 Guangda carried out the condensation step for Willowood's --

19 for the manufacture of Willowood's product?

20 A.    No.

21 Q.    Mr. Wu, could you describe in a little more detail the

22 roles of Tai He and Guangda in the manufacture of azoxystrobin?

23 A.    Well, it is a partnered production relationship.  We are

24 responsible for quality, technology, as well as procurement,

25 and they provide facilities; they also participate in the daily

1  management of the operations.

2  Q.    And so in that connection, have you visited the Guangda

3  plant?

4  A.    Yes.

5  Q.    And have you observed the steps that are carried out at

6  the Guangda plant to make azoxystrobin for Willowood?

7  A.    Yes.

8  Q.    And have you discussed those steps with Mr. Chiu of your

9  staff?

10  Q.    Do you know whether anyone from Willowood has ever visited

11  the Guangda facility to observe production of azoxystrobin --

12  withdrawn.

13          Do you know whether anyone from Willowood has ever

14  visited the Guangda manufacturing facility?

15  A.    Yes, I know.

16  Q.    Who from Willowood has visited that facility?

17  A.    Mr. Shen and VG.

18  Q.    Is that second name Vijay, Vijay Mundhra?

19  A.    Yes.

20  Q.    Has Mr. Shen visited that facility more than once?

21  Q.    How many times has Mr. Shen visited the Guangda plant?

22  A.    Twice.

23  Q.    When was the first time?

24  A.    It was in the first half of 2014, and both visits were in

25  the first half of 2014.  Not long after the first visit, the

1  second visit happened."

2  Q.    Do you accompany Mr. Shen to the Guangda plant?

3           MR. TILLER:  I'm sorry.  I read that wrong, Your

4  Honor.

5           (Reading of the deposition of Mr. Wu continued as

6  follows:)

7  Q.    "Did you accompany Mr. Shen to the Guangda plant on his

8  first visit?

9  A.    Yes.

10  Q.    On that occasion, was anyone else from Willowood present?

11  A.    Only Mr. Shen alone.

12  Q.    What did Mr. Shen do at the plant on that visit?

13  A.    He went to see the factory and he also went to the

14  production floor.

15  Q.    And do you know what he looked at on the production floor?

16  A.    He went to have a look of the overall facility in the

17  production area.  He also looked at the equipment and not

18  particularly on the processing.

19  Q.    Did he talk with anybody at the Guangda plant while he was

20  there?

21  A.    Yes.

22  Q.    Did he talk to them in your presence?

23  A.    Yes.

24  Q.    Whom did he talk to?

25  A.    Mr. Li as well as Mr. Sun from Guangda.

1  Q.   So the first person is Mr. Li?

2  A.   Yes.

3  Q.   And who is Mr. Li?

4  A.   He was responsible for production in Guangda.

5  Q.   And you said the name of the second person was Mr. Shen?

6  A.   Sun.

7  Q.   Mr. Sun?

8  Q.   And who is Mr. Sun?

9  A.   Mr. Sun was responsible for azoxystrobin workshop.

10 Q.   What do you mean by 'workshop'?

11 A.   Because in Guangda factory there were a couple of

12 workshops, and one workshop was for the production of

13 azoxystrobin.

14 Q.   And do you recall anything that Mr. Shen from Willowood

15 discussed with Mr. Li or Mr. sun in your presence?

16 A.   Mainly he asked about the manufacturing of azoxystrobin

17 the status, as well as the steps.

18 Q.   Do you recall any specific questions he had about the

19 steps in the azoxystrobin manufacturing process?

20 A.   He asked us which step do we perform in the production of

21 azoxystrobin.

22 Q.   And when you say 'He asked us,' whom did he ask?

23 A.   Because we were all present.

24 Q.   And do you recall what Mr. Shen was told in response to

25 his question about what steps were carried out at the plant?

1  A.   Because if you look at the equipment, the equipment was

2  for the last step.

3  Q.   'The last step' being --

4  A.   Condensation.   Condensation.

5  Q.   Did he ask whether any other steps were carried out?   Was

6  there a discussion as to whether any other steps were carried

7  out at the Guangda plant?

8  A.   Yes, he did.

9  Q.   What did he ask?

10  A.   He asked about the steps we performed at Guangda and

11  whether we perform condensation only.

12  Q.   And what was he told in response to that question?

13  A.   We said yes, we only performed condensation.

14  Q.   At the time that Mr. Shen visited the plant on the first

15  occasion, was the Guangda facility equipped to carry out the

16  etherification step?

17  A.   No.

18  Q.   When was the second time that Mr. Shen visited the Guangda

19  facility, to your recollection?

20  A.   It was in the first half of 2014.

21  Q.   And on that occasion, did you accompany Mr. Shen?

22  A.   Yes.

23  Q.   And on that occasion, Mr. Mundhra also was present; is

24  that right?

25  A.   Yes.

1  Q.   On that occasion, what did Mr. Mundhra do at the Guangda

2  facility?

3  A.   He had a look of the factory.  He also asked us some

4  questions.

5  Q.   And whom did he talk to at the facility?

6  A.   The same group of people:  Mr. Li and Mr. Sun."

7          MR. TILLER:  I think you missed a word there, Alan.

8  Sorry.

9          (Reading of deposition of Mr. Wu continued as

10 follows:)

11 A.   "Me, Mr. Li and Mr. sun.

12 Q.   And did you recall anything that Mr. Mundhra talked to

13 them about?

14 A.   He asked about the production, what products do we

15 manufacture in the factory, and he focused mainly on the

16 production of azoxystrobin.

17 Q.   Do you recall any specific questions that he asked about

18 the manufacture of azoxystrobin?

19 A.   He asked about the production steps as well as the quality

20 control.

21 Q.   What did he ask about the production steps?

22 A.   He asked about which step do we perform in the production.

23 Q.   What was he told?

24 A.   The last step.

25 Q.   Which is?

1  A.   Condensation.

2  Q.   Was there a discussion as to whether Guangda carried out

3  any other steps?

4  A.   I don't recall.

5  Q.   At the time that Mr. Mundhra visited the Guangda facility,

6  did that facility's equipment have the capability to carry out

7  the etherification step -- withdrawn.

8       At the time that Mr. Mundhra visited the Guangda

9  facility, what steps in the manufacture of azoxystrobin did

10 Guangda have the capability to carry out?

11 A.   Only the last step, condensation.

12 Q.   Does Tai He instruct Gousheng how to make the intermediate

13 product that results from the etherification step?

14 A.   No.

15 Q.   Does Guangda?

16 A.   No.

17 Q.   Does Tai He instruct any of its suppliers of raw materials

18 or intermediate products how to make those products?

19 A.   No.

20 Q.   And does Guangda instruct any of the suppliers of

21 intermediate product or raw materials for the manufacture of

22 azoxystrobin how to make those intermediate products or raw

23 materials?

24 A.   No.

25 Q.   Do you personally have any ownership interest in Guoshang?

1  A.   No.

2  Q.   Do you sit on the board of Guoshang?

3  A.   No.

4  Q.   Are you an officer of Guoshang?

5  A.   No.

6  Q.   Does anyone associated with Guoshang have any ownership

7  interest in Tai He?

8  A.   No.

9  Q.   Does anyone associated with Guoshang sit on the board of

10 Tai He?

11 A.   No.

12 Q.   Is anyone associated with Guoshang involved in the

13 operations or management of Tai He?

14 A.   No.

15 Q.   Is anyone associated Tai He involved in the operations or

16 management of Guoshang?

17 A.   No.

18 Q.   Are you familiar with a company called Lianyungang Jinyang

19 Chemical Company.

20 A.   Yes.

21 Q.   If I refer to this company as 'Jinyang,' will you

22 understand it to be that company?

23 A.   Yes, I know.

24 Q.   Do you have any ownership interest in Jinyang?

25 A.   No.

1  Q.   Do you sit on the board of Jinyang?

2  A.   No.

3  Q.   Are you an officer of Jinyang?

4  A.   No.

5  Q.   Does anyone associated with Jinyang have an ownership

6  interest in Tai He?

7  A.   No.

8  Q.   Is anyone associated with Jinyang -- withdrawn.  Is anyone

9  associated with Jinyang involved in the operations or

10  management of Tai He?

11  A.   No.

12  Q.   Is anyone associated with Tai He involved in the

13  operations or management of Jinyang?

14  A.   No.

15  Q.   Are you familiar with the company Jiangsu Yongkai Chemical

16  Company Limited?

17  A.   Yes, I know.

18  Q.   If I refer to that company as 'Yongkai,' will you

19  understand it to be that company?

20  A.   Yes, I know.

21  Q.   Do you have any ownership interest in Yongkai?

22  A.   No.

23  Q.   Do you sit on the board of Yongkai?

24  A.   No.

25  Q.   Are you an officer of Yongkai?

1    A.    No.

2    Q.    Does anyone associated with Yongkai have any ownership

3    interest in Tai He?

4    A.    No.

5    Q.    Does anyone associated with Yongkai sit on the board of

6    Tai He?

7    A.    No.

8    Q.    Is anyone associated with Yongkai involved in the

9    operations or management of Tai He?

10   A.    No.

11   Q.    Is anyone associated with Tai He involved in the

12   operations or management of Yongkai?

13   A.    No."

14           THE COURT:  Stop.  Stop.  I think that might be a

15   good place for us to take the morning break, as you're about to

16   move into a new topic, and we've been sitting here for while.

17           Ladies and gentlemen, I'm going to excuse you for the

18   morning recess.  Please remember not to discuss the case among

19   yourselves or with anyone else.  Don't have any contact with

20   the lawyers, parties, or witnesses.  Keep an open mind and come

21   back in 15 minutes, five minutes after eleven.  The jury is

22   excused.  If everyone else will remain seated while they step

23   out.

24           (Jury panel departed the courtroom.)

25           THE COURT:  It didn't look like we were going to

1   finish in the next few minutes with that, so I thought that was

2   a good point before you moved into the next topic.

3           Anything -- and I know, you know, you all are very

4   familiar with all of these words.  I'm sort of familiar with

5   them.  Just remember to not go hugely fast.

6           MR. TILLER:  I'm trying my best, Your Honor.

7           THE COURT:  You're doing all right.  I just want to

8   remind everybody.

9           Anything else?  No.  Fifteen-minute recess then.

10          (Break taken at 10:50 a.m.)

11          (Break concluded at 11:05 a.m.)

12          THE COURT:  Anything we need to take up before the

13  jury comes in?

14          MR. TILLER:  No, Your Honor.

15          THE COURT:  Would you bring the jury in.

16          (Jury returned.)

17          THE COURT:  All right.  I believe we are ready to

18  continue with Mr. Wu's testimony, so you may proceed.

19          MR. TILLER:  Thank you, Your Honor.

20          (Reading of deposition continued.)

21  BY MR. TILLER:

22  Q.   "Have you ever heard of DABCO?

23  A.   Yes, I did.

24  Q.   When did you first hear of DABCO?

25  A.   April or May last year, April or May 2015.

1   Q.    How did you hear about it?

2   A.    It was Mr. Shen who came to me and asked me about DABCO.

3   Q.    Mr. Shen of Willowood Limited?

4   A.    Yes.

5   Q.    What did he say?

6   A.    He asked us whether we used DABCO in our production.

7   Q.    And in response to that inquiry, what did you do?

8   A.    I told him we didn't use it.

9   Q.    How did you know that?

10   A.    Because I participated in the raw material purchase.  I

11 had never heard of it before.  And then I asked the factory

12 whether they used it in the production, and the answer was no.

13   Q.    Did you communicate that to Mr. Shen?

14   A.    Yes, I did.

15   Q.    Following Mr. Shen's inquiry, did anyone else from

16 Willowood ever raise DABCO with you?

17   A.    Yes.

18   Q.    When was that?

19   A.    October 2015.

20   Q.    And who from Willowood raised DABCO with you at that time?

21   A.    Well, Vijay as well as a very fatty guy from the United

22 States.  I don't know his name.

23   Q.    You say the first person was Mr. Mundhra, is that right?

24   A.    Yes.

25   Q.    And the other person, you say, was from the United States?

1  A.    Yes.

2  Q.    Did he identify his affiliation?

3  A.    Yes.

4  Q.    Did he identify who he worked with?

5  A.    Willowood.

6  Q.    What did they -- they met you together?

7  A.    I can't recall whether I met them -- both of them at the

8  same time.  But anyway, I met both of them during that period

9  because it was a trade show.

10 Q.    And which one of them or both of them discussed DABCO with

11 you at that trade show?

12 A.    Yes.

13 Q.    Both of them?

14 A.    Both of them.

15 Q.    What did they say to you about DABCO?

16 A.    They asked me again whether we use DABCO.  I told him we

17 don't use it.

18 Q.    And did they then ask you anything further?

19 A.    They hoped that I could ask all the intermediate suppliers

20 whether they used DABCO or not.

21 Q.    Did they say why they were concerned about this?

22 A.    They said that a certain company holds the patent of this

23 catalyst.

24 Q.    Anything else?

25 A.    Nothing else.  They just said that there is another

1  company which holds the patent for this catalyst and said that

2  our azoxystrobin contains such catalyst.

3  Q.    And were they concerned about that?

4  A.    Yes.

5  Q.    So what did you do in response to that discussion, if

6  anything?

7  A.    When I came back to my company, I asked the suppliers,

8  including suppliers of intermediates, whether they used the

9  DABCO or not.

10  Q.    Which suppliers did you ask, if you recall?

11  A.    Almost all suppliers of intermediates.

12  Q.    And what did they tell you?

13  A.    They said they didn't use it; they had never heard of it.

14  Q.    And when did you make those inquiries of your suppliers?

15  A.    It should be in the summer -- the summer of 2015.  I

16  started asking my suppliers in the summer of 2015, and after

17  October of 2015, I asked them once again.

18  Q.    You asked them --

19  A.    Once again.

20  Q.    Mr. Wu, has any Willowood entity ever purchased any

21  product from Tai He or Guanda besides azoxystrobin product?

22  A.    No.

23  Q.    I'm sorry to hear about that and I will try to keep this

24  very brief.  Can you explain what situation your father has

25  been undergoing?

1  A.   He's stabilized.

2  Q.   Can you explain what situation he had been undergoing

3  before he stabilized?

4  A.   He's got disease on his gall bladder.

5  Q.   And I understand that he might have had surgery, is that

6  right?

7  A.   Yes.

8  Q.   When was that surgery?

9  A.   It was last month.  So today is 31st, am I right?  So it

10 was the end of last month, so one month.

11 Q.   So your father had surgery at the end of July 2016?

12 A.   Yes.

13 Q.   Is it fair to say that this has been a difficult time for

14 you?

15 A.   Well, it is.  It should be better because he is already

16 stabilized.

17 Q.   And you are here testifying today, you know, in light of

18 all the -- what's happened to your father, is that right?  You

19 are here testifying today despite all that's happened to your

20 father?

21 A.   Yes.

22 Q.   In fact, the situation with your father was so difficult

23 that did you not want to come Hong Kong, correct?

24 A.   Well, at that time, I was asked to come on 7 or 8 August,

25 but at that time, I could not leave.  And now he is stabilized

1    and I'm already back to my usual work, so I can leave now.

2    Q.   Before today, have you met with any of Willowood's

3    lawyers?

4    A.   Before today, yesterday, I met them.

5    Q.   So you met with Mr. Neuman and Mr. Davis, who are

6    Willowood's lawyers, yesterday, is that right?

7    A.   Yes.

8    Q.   How long did you meet with Mr. Neuman and Mr. Davis

9    yesterday?

10   A.   A little more than half a day.

11   Q.   And did Mr. Neuman and Mr. Davis reach out to you to set

12   up the meeting before yesterday?

13   A.   Not by them.  Mr. Shen told me.

14   Q.   You -- or Mr. Shen reached out to you to set up a meeting

15   between Willowood's lawyers and yourself yesterday, is that

16   right?

17   A.   Yes.

18   Q.   When did Mr. Shen reach out to you?

19   A.   You mean fixing the time or --

20   Q.   Correct.

21   A.   Fixing time, let me think.  It was mid-August.

22   Q.   So you and Mr. Davis and Mr. Neuman have known that you'd

23   be meeting in Hong Kong on August 30 for several weeks now, is

24   that right?

25   A.   Within two weeks.  Well, similar.  About 10 days or so.

1  Q.    I'm handing a document to be marked by the court reporter

2  as Exhibit 3 -- no, 2.

3          For the record, Exhibit 2 is a letter from me dated

4  August 26 to Mr. Wu.  The first page is an English version, the

5  second page is a Chinese translation.

6          Mr. Wu, if you could read either the English version

7  or the Chinese version, I'd like to ask you some questions

8  about this letter.

9  A.    Do I read the whole letter?

10  Q.    Just to yourself.

11  A.    'Dear Mr. Wu:  I represent' -- I don't know how to read

12  it -- 'in the above-referenced litigation against' -- I think

13  is Willowood, I guess -- 'the Willowood.  In connection with

14  this litigation, I understand you have spoken with Willowood

15  and its counsel and have agreed to sit for an oral deposition

16  in Hong Kong on August 31, 2016.  To the extent that you plan

17  to speak or meet with' -- I think this is Willowood -- 'or its

18  counsel in preparation for this deposition requests that you

19  identify the time and place of the meeting or the details of

20  any telephone conference so that counsel may participate.

21  Q.    Mr. Wu, were you aware that --"

22          MR. SANTHANAM:  Your Honor, may we have a sidebar?

23          THE COURT:  Okay.

24          (Bench conference as follows:)

25          MR. SANTHANAM:  Both sides had designated portions of

1  Mr. Wu's transcript --

2          THE COURT:  Yes.

3          MR. SANTHANAM:  We'd indicated that we would rely on

4  it either on our rebuttal case, et cetera.  It looks as though

5  they've combined all of them.  I mean, so portions of what

6  they're reading --

7          THE COURT:  Uh-huh.

8          MR. SANTHANAM:  -- are Syngenta's designations.

9          MR. COUGHLIN:  That they had not designated.

10         MR. TILLER:  Right.  We're just reading -- we thought

11  the understanding was we were to put everything in.

12         THE COURT:  Is there some problem with that?

13         MR. SANTHANAM:  Well, to the extent that we put it

14  on, we would like to have the video and show the documents and

15  have them admitted.  This is going through and we're not seeing

16  the documents at all.

17         MR. COUGHLIN:  We have the video set up for our

18  designations.

19         THE COURT:  Well, I don't know.

20         MR. TILLER:  All right.  I'm not sure where --

21         MR. SANTHANAM:  I mean, it's fine, we could go

22  forward.  But we would like the opportunity at least to put on

23  the portions that we say --

24         THE COURT:  We may have to talk about that, then, at

25  lunch or before your rebuttal, just to --

1          MR. TILLER:  Should I keep reading?

2          THE COURT:  I don't know.

3          MR. COUGHLIN:  We're surprised.  We didn't know they

4   were doing our dep.

5          MR. SANTHANAM:  Because with Mr. Reichman, it was set

6   out --

7          THE COURT:  Keep your voice down.  Well, I don't know

8   what to tell you what to do because I don't know -- I don't

9   have it in front of me.  So --

10         MR. TILLER:  Let me see if it's the portion that's

11  just ours.  And then I'll --

12         THE COURT:  Okay.  Then we have to do the

13  counter-designations for the surrounding part.  We certainly

14  had some repetition with Mr. Reichman, so -- which everybody

15  noticed.  So just do the best you can.

16         (Bench conference concluded.)

17         THE COURT:  All right.  I think, ladies and

18  gentlemen, we've had a little confusion about the thing I made

19  the mistake about earlier, whose -- who wants to put which part

20  of the witness's testimony before you at what time.  So, I'm

21  going to give them a minute to just get that straightened out.

22         MR. TILLER:  Okay.  And I apologize, Your Honor.

23         THE COURT:  That's all right.

24         MR. TILLER:  I don't think I helped with the

25  confusion.  So we -- I'll have to find where we are right now,

1    Alan.  Give me a second.

2            THE COURT:  All right.  I think you can start on page

3    68, it looks like.

4            MR. TILLER:  Yup.  Got it.  Are you there, Alan?

5            MR. DUNCAN:  Yes.

6            (Reading of deposition continued.)

7    BY MR. TILLER:

8    Q.    Okay.  "And do you understand that Tai He has a

9    contractual relationship with Willowood Limited, is that right?

10   A.    What contract?

11   Q.    Tai He has a supply agreement with Willowood, is that

12   right?

13   A.    Yes.

14   Q.    What is your understanding of that supply agreement?

15   A.    This supply agreement means that we sell azoxystrobin to

16   them.

17   Q.    Now, setting aside who performs the manufacturing process,

18   is it your understanding that the azoxystrobin that Tai He

19   supplies to Willowood is manufactured according to the process

20   in Exhibit 3?

21   A.    Which is Exhibit 3?  This is Exhibit 1.

22   Q.    I'm referring to Exhibit 3, which is a stamped copy.  The

23   first page is marked as WW17."

24           MR. TILLER:  And Your Honor, just to clarify the

25   record, Exhibit 3 in the deposition is Defendant's Exhibit 17.

1    THE COURT:  All right.  Go ahead.

2    (Reading of deposition continued.)

3    THE WITNESS:  "Please repeat your question.

4  BY MR. TILLER:

5  Q.   Is it your understanding that the azoxystrobin that Tai He

6  supplies to Willowood is manufactured according to the process

7  set forth in Exhibit 3?

8  A.   Yes.

9  Q.   For the azoxystrobin that Tai He supplies to Willowood,

10  that azoxystrobin is manufactured using the etherification

11  process set forth in Exhibit 3, is that right?

12  A.   As for the specific situation, I don't know very well

13  because the etherification, all those steps are performed by

14  other companies, other factories, and we just purchase

15  intermediates from them, according to this exhibit.

16  Q.   When you buy the etherification intermediate from

17  Guosheng, they know that you're buying it to make azoxystrobin,

18  correct?

19  A.   Yes.

20  Q.   I'm only asking you generally about Exhibit 3.  This

21  document is on Tai He letterhead.  Do you see that?

22  A.   Yes.

23  Q.   It has a Tai He stamp?

24  A.   Yes.

25  Q.   So this document was provided by Tai He, is that right?

1 A.   Yes.

2 Q.   Mr. Shen and Mr. Mundhra instructed Tai He to have

3 the -- let me start again, Your Honor.  Mr. Shen and

4 Mr. Mundhra instructed Tai He to have the manufacturing process

5 split up amongst the different factories, correct?"

6        MR. DUNCAN:  Could you please refer me to a line,

7 page and line?

8        MR. TILLER:  Yeah.  We're on 88, line 20 --

9        MR. DUNCAN:  Thank you.

10       MR. TILLER:  Okay.  So let me read that again.  Do

11 you have it?

12       MR. DUNCAN:  Yes.

13       (Reading of deposition continued.)

14 BY MR. TILLER:

15 Q.   "Mr. Shen and Mr. Mundhra instructed Tai He to have the

16 manufacturing process split up amongst the different factories,

17 correct?

18 A.   No."

19       MR. TILLER:  Do you have it now, Alan?  I'm sorry.

20       MR. DUNCAN:  If you could give me a -- is this --

21       THE COURT:  I think he's reading off -- not the

22 notebook now, right?  You're using --

23       MR. TILLER:  Correct.  The new one that I gave you.

24 I'm sorry.

25       MR. DUNCAN:  All right.  And if you wouldn't mind

1  giving me page and line one more time, please.

2          THE COURT:  Page 88.

3          MR. TILLER:  Page 88, line 21.

4          MR. DUNCAN:  Thank you.  I have it.

5          MR. TILLER:  Let me start there again.  Sorry.

6          (Reading of deposition continued.)

7  BY MR. TILLER:

8  Q.    Mr. Shen and Mr. Mundhra instructed Tai He to have the

9  manufacturing process split up amongst the different factories,

10 correct?

11 A.    No.

12 Q.    When they first came in the first half of 2014, they

13 wanted to confirm that the manufacturing process had been split

14 up amongst different factories, correct?

15 A.    I don't think they had any purpose of their visit.  They

16 just went there and had a look.  And even if they had a

17 purpose, they didn't tell us, and we don't know, and we just

18 told him how the production was going in the factory.

19 Q.    You took Mr. Shen to each of the different factory

20 locations, is that right?

21 A.    Not all of them.

22 Q.    You took Mr. Shen to at least three different factory

23 locations, correct?

24 A.    Yes.

25 Q.    Mr. Shen asked you to take him to three different factory

1  locations, isn't that right?

2  A.    Yes.

3  Q.    And Mr. Shen wanted to confirm that the manufacturing

4  process had at least three different factories, correct?

5  A.    Yes.

6  Q.    And you've testified that it's your belief that DABCO is

7  not used in the manufacturing process for azoxystrobin, is that

8  right?

9  A.    Yes.  Not at our facility.

10  Q.    When you say "our facility," are you referring to Guanda?

11  A.    Guanda, yes.

12  Q.    And if we can go back to Exhibit 1 that you were

13  discussing with Mr. Neuman at the beginning of this deposition.

14  Can you take it out?  Does Exhibit 1 say that Tai He performs

15  the condensation step?

16  A.    It is not indicated at the end of the paragraph, however,

17  this document was prepared by Tai He.  We just approved all of

18  these outsource intermediates from third parties there, so for

19  the rest, it is our own step.

20  Q.    So Exhibit 1 does not indicate who performs the

21  condensation step?

22          THE COURT:  I'm sorry.  Can you slow down and speak

23  up just a little.  I can't hear you.

24          MR. TILLER:  I'm sorry.  Too far away from the mike.

25  BY MR. TILLER:

1  Q.   So, Exhibit 1 does not indicate who performs the

2  condensation step?

3  A.   It is not written at the last paragraph there but it is

4  meant to say that this is our own document and that we perform

5  it.

6  Q.   Is it Guanda that performs the condensation step?

7  A.   It is the cooperation between Tai He and Guanda in

8  production.

9  Q.   You testified that Guanda is a separate entity from Tai

10 He, correct?

11 A.   Yes.

12 Q.   So it's not Tai He who supplies the azoxystrobin to

13 Willowood?

14 A.   It is by Tai He.

15 Q.   How can Tai He and Guanda be separate, but at the same

16 time, Tai He is the one that supplies and manufactures

17 azoxystrobin?

18 A.   Well, the cooperation is like this between Guanda and Tai

19 He.  We provide the processing description, we conduct quality

20 control, and we are responsible for technical issues.  Guanda

21 provides the plant, the factory, the equipment, as well as the

22 workers.  So it is our cooperation for production.

23 Q.   Mr. Wu, let me ask you this way.  So you understand that

24 in registering azoxystrobin in the United States, Tai He was

25 provided an establishment registration.  You understand that

1  Tai He was provided an establishment registration by the United

2  States Government for the manufacture of azoxystrobin, correct?

3  A.   Yes.

4  Q.   Are you saying that it's now a completely different entity

5  that manufactures the azoxystrobin technical?

6  A.   It is not entirely independent entity for Guanda because

7  it is entrusted production cooperation.  We provide the

8  conditions that are needed for the production of azoxystrobin,

9  and they provide venue, equipment, as well assistance for the

10 production.

11 Q.   Mr. Wu, I will represent to you that in applying for and

12 obtaining Tai He's establishment registration, the EPA in the

13 United States was told that location of manufacture was Tai He.

14 Was that wrong?

15 A.   I don't know.

16 Q.   Tai He closely oversees the condensation step, but the

17 location of the condensation step is not Tai He, correct?

18 A.   Yes.

19 Q.   Mr. Wu, I'd like you to turn back to Exhibit 1.  In

20 Exhibit 1, the manufacturing process for azoxystrobin includes

21 an etherification step --"

22           THE COURT:  If you could slow down and keep your

23 voice up.

24           MR. TILLER:  Sorry.  116A.

25           THE COURT:  Go ahead.

 1          MR. TILLER:  I'm just waiting for the document to

 2     come up.  Sorry, Your Honor.

 3          Please go to "etherification."

 4          (Reading of deposition continued.)

 5     BY MR. TILLER:

 6     Q.   "Mr. Wu, I'd like you to turn back to Exhibit 1.  In

 7     Exhibit 1, the manufacturing process for azoxystrobin includes

 8     an etherification step and a condensation step, is that right?

 9     A.   Yes.

10     Q.   Did Tai He ever investigate a process for manufacturing

11     azoxystrobin that didn't include -- when you told Syngenta's

12     counsel earlier that to your knowledge the submissions to the

13     United States Environmental Protection Agency to support the

14     azoxystrobin registrations were accurate, what documents were

15     you referring to?

16     A.   This one.

17     Q.   What exhibit number?

18     A.   One -- Exhibit 1."

19          (Reading of deposition concluded.)

20          MR. TILLER:  That's it, Your Honor.

21          THE COURT:  All right.  You can call your next

22     witness as soon as Mr. Duncan gets down from the stand.

23          MR. TILLER:  I'm going to go get him.

24          THE COURT:  All right.

25          MR. SANTHANAM:  Your Honor, we understand that there

1  may be an interpreter used with respect to this witness.

2          THE COURT:  Well, we'll see how -- let them get

3  going.

4          MR. DAVIS:  Our next witness is Shen Shaojun.

5          (Witness sworn by the clerk.)

6          THE COURT:  Did you answer out loud?

7          THE WITNESS:  Do I have to restate again?

8          THE COURT:  No, just yes or no.

9          THE WITNESS:  Yes.

10          THE COURT:  Okay.  We need to swear the interpreter

11  as well.

12          (Interpreter sworn by the clerk.)

13          THE COURT:  Come on around.  The witness will take

14  the witness stand, and the interpreter can stand kind of on the

15  other side of him.  Just don't block my view of the jury.

16          So, ladies and gentlemen, I think this witness may

17  testify to some extent in English.  Is that right, Mr. Davis?

18          MR. DAVIS:  That's correct.

19          THE COURT:  But the interpreter is available here as

20  English is not, as I understand it, his first language.  And

21  so -- I assume none of you speak Mandarin?  Okay.  Obviously,

22  the interpreter is here.  He is under oath to interpret

23  questions and answers exactly, and you'll take the testimony

24  through the interpreter when it's offered that way just as if

25  it was coming out of the witness's mouth in English to the

1  extent that you can.  So all right.  Go ahead.

2          MR. DAVIS:  May I distribute witness binders, please?

3          THE COURT:  You may go ahead.

4                      SHEN SHAOJUN,

5          DEFENDANT'S WITNESS, SWORN AT 11:30 A.M.

6                    DIRECT EXAMINATION

7  BY MR. DAVIS:

8  Q.  Please state your name.

9  A.  My name is Shen Shaojun.

10 Q.  Are you often referred to as SSJ?

11 A.  Yes.

12 Q.  What is your primary language?

13 A.  Chinese Mandarin.

14 Q.  Okay.  Do you understand English?

15 A.  A little.

16 Q.  Okay.  Do you speak English?

17 A.  A little.

18 Q.  And can you read English?

19 A.  Yes.

20 Q.  How often do you communicate in English?

21 A.  I like to English (unintelligible) but speaking is a few

22 times per week.

23 Q.  Do you have a college degree?

24 A.  Yes.

25 Q.  What is the major or the subject of your college degree?

1  A.   My major in university is -- I was in electrical

2  chemistry.

3  Q.   And what year did you receive that?

4  A.   In 1998.

5  Q.   And after receiving your degree, with whom were you

6  employed?

7  A.   I worked for (unintelligible) Chemical Quality Inspection

8  Station in -- for chemicals.

9  Q.   So Quality Inspection Station, was that a government

10  agency in China?

11  A.   It is government.

12  Q.   And what were your responsibilities at the quality

13  inspection station for the Chinese government?

14  A.   We do the quality control and the inspection over there,

15  pesticide quality produced by the pesticide manufacturer in

16  (unintelligible).

17       THE COURT:  Just a second.  Sometimes, ladies and

18  gentlemen, so -- I've been a judge a long time, so I've heard

19  people speak when with English is not their first language.  It

20  can take a little bit, just like with the Scottish witness, to

21  get used to the accent.

22       THE WITNESS:  Sorry.

23       THE COURT:  That's okay.  No, no.  I barely speak

24  English.  So if you need anything repeated, as you're getting

25  used to it, it's okay.  It's no reflection on the witness.  We

1  all need to adjust to different accents.  So just, you know, I

2  think we'll all settle in and get used to it fairly quickly;

3  but if you do need something repeated, just, you know, say can

4  you repeat that, and he can do that.

5         I think the court reporter needed the last answer,

6  which was about the work he did for the government.  If you

7  could just repeat and tell us again.

8         THE WITNESS:  I can speak it in Chinese?

9         THE COURT:  Say again?

10        THE WITNESS:  May I ask the translator to help?

11        THE COURT:  Yes, absolutely.

12        THE WITNESS:  (By Interpreter.)  I was responsible

13 for supervising and inspecting agrichemical pesticides produced

14 in (unintelligible) Province.

15 BY MR. DAVIS:

16 Q.   And how long were you a quality inspection officer in the

17 Say Jing Province?

18 A.   Four years.

19 Q.   Okay.  And who did you work for next after leaving the

20 quality inspection office?

21 A.   Willowood Limited.

22 Q.   What is the business of Willowood Limited?

23 A.   Trading in agrichemicals.

24 Q.   Trading?  Was that the word you said?

25 A.   Trading, sale of agrichemical.

1    Q.    And when did you start at Willowood Limited?

2    A.    2002.

3    Q.    And what was your first title at Willowood Limited?

4    A.    First title was registration manager.

5              THE COURT:  What kind of manager?

6              THE WITNESS:  Registration.

7              THE COURT:  Registration?

8              THE WITNESS:  Yes.

9              THE COURT:  Thank you.

10   BY MR. DAVIS:

11   Q.    And how long did you have the position of registration

12   manager?

13   A.    Five years.

14   Q.    Until about 2007 then?

15   A.    Up to 2007.

16   Q.    What is your position today, your title?

17   A.    General manager.

18   Q.    Okay.  Where is your -- where do you work for Willowood

19   Limited?  What state?

20   A.    I work for Willowood Hangzhou office.

21   Q.    Hangzhou office.  And when did you take that position as

22   the general manager of the Hangzhou office of Willowood

23   Limited?

24   A.    Pardon?

25   Q.    When did you start the position as the general manager of

1  Willowood Hangzhou office?

2  A.    2007.

3  Q.    What were your responsibilities as registration manager

4  from 2002 to 2007 at Willowood Limited?

5  A.    I collecting -- I coordinated with the pesticide

6  manufacturer in China and collecting documents which the

7  customer need to do the registration and send it to Hong Kong

8  office.

9  Q.    What are your duties and responsibilities today as the

10 general manager of the Hangzhou office?

11 A.    I take responsibility for the company -- may I ask help?

12            THE COURT:  Yes.

13            THE WITNESS:  (By interpreter) I'm responsible for

14 day-to-day operation of the company.

15 BY MR. DAVIS:

16 Q.    To whom do you report as the general manager of the

17 Hangzhou office?

18 A.    I respond to Mr. Vijay Mundhra.  He's the boss.

19 Q.    He's the boss?

20 A.    Yes.

21 Q.    Now that you're no longer the registration manager, are

22 there any people at Willowood Limited who perform those

23 responsibilities?

24 A.    Yes.  In Hangzhou office is Sophia is now the manager of

25 registration.

1    Q.    Is there anyone in the Hong Kong office that performs

2    that --

3    A.    Hong Kong office is Rajesh Kumar.

4    Q.    Rajesh?

5    A.    Yes.

6    Q.    What's his last name?

7    A.    Kumar.

8    Q.    Can you spell that for the court reporter?

9    A.    K-U-M-A-R, as I remember.

10    Q.    Thank you.  How many customers, approximately, does

11    Willowood have -- Willowood Limited?

12    A.    Willowood Limited is more that 40 countries.

13    Q.    Different -- 40 countries?

14    A.    Yes, 40.  More than 40.

15    Q.    Do you know how many customers it has in those 40

16    countries?

17    A.    I'm sure it would be more than 50.

18    Q.    And how many different agrichemicals does Willowood

19    Limited sell to its customers?

20    A.    If including technical and formulation, then it should be

21    more than 100.

22    Q.    Okay.  Is azoxystrobin one of those chemicals that

23    Willowood Limited sells to its customers?

24    A.    Yes.

25    Q.    In either of your positions at Willowood Limited as

1  registration manager or general manager, have you ever directly

2  communicated with the United States Environmental Protection

3  Agency?

4  A.    No.

5  Q.    Are you familiar with the process for seeking approval

6  from the United States Environmental Protection Agency to sell

7  an agrichemical in the US.

8            (Interpreter repeating question.)

9  A.    No.

10  Q.    What do you know about the requirements for registration

11  of an agrichemical at the EPA?

12  A.    We should provide the manufacturing process.

13  Q.    Do you review applications submitted on behalf of

14  Willowood USA to the United States EPA, Environmental

15  Protection Agency?

16  A.    No.

17  Q.    Have you ever reviewed an application submitted to the

18  Environmental Protection Agency?

19  A.    No.

20  Q.    Do you review applications submitted on behalf of other

21  customers to the agencies of other Governments for

22  registration?

23  A.    No.

24  Q.    When Willowood applies for registration at the EPA, how

25  does the process information concerning the manufacture of the

1  product find its way to the EPA?

2          (Interpreter repeating question.)

3          THE INTERPRETER:  The company provided information to

4  us.  We then translate it into English.  We will submit the

5  information to the consultant with Willowood.

6          THE COURT:  With what?  Can you just say again?

7          THE WITNESS:  (By interpreter) The company provided

8  the information.  We then translate into English.  We will

9  provide a translated version to Willowood Hong Kong, and the

10  Willowood Hong Kong will then provide it information to

11  consultant to Willowood USA.

12  BY MR. DAVIS:

13  Q.   So the first part of your answer you referred to "the"

14  company.  What company are you referring to that provides the

15  information initially?

16  A.   Manufacturer.

17  Q.   And now you refer to a consultant.  What's the

18  consultant -- or who is a consultant that you're referring to?

19  A.   Consultant is (unintelligible) to registration in EPA.

20  Q.   So you're referring to regulatory consultants that help

21  Willowood USA make applications to the EPA?

22  A.   Yes.

23  Q.   So just to confirm my understanding of your answer, the

24  manufacturing companies provide information to Willowood

25  Limited.  That's translated by Willowood Limited and then

1  provided to Willowood Hong Kong who then provides it to the

2  regulatory consultants.  Is that correct?

3  A.    Yes.

4  Q.    And who in Willowood Hong Kong takes care of that

5  transition, that transfer of information?

6  A.    Registration manager Sophia.

7  Q.    Who in Hong Kong -- Sophia is --

8  A.    Hong Kong is Rajesh Kumar.

9  Q.    Are you aware of a company by the name of Yancheng Tai He

10 Chemicals Company?

11 A.    Yes.

12 Q.    And is that company sometimes referred to as Tai He or Tai

13 He?

14 A.    Yes.

15 Q.    What is the relationship between Willowood Limited and Tai

16 He?

17 A.    Willowood buy agrichemical from Tai He.

18 Q.    And is azoxystrobin among the chemicals that Willowood

19 Limited purchases from Tai He?

20 A.    Yes.

21 Q.    Okay.  When did Willowood Limited first purchase

22 azoxystrobin from Tai He for sale to Willowood USA?

23 A.    In 2014.

24 Q.    Okay.  Does Willowood Limited sell azoxystrobin in the US?

25 A.    No.  Willowood Limited only buy from Tai He and supply to

1  Willowood USA.  Then Willowood USA will sell in the market.

2  Q.   When you say the market, are you referring to the US

3  market?

4  A.   US market.

5  Q.   Does Willowood Limited sell azoxystrobin to customers in

6  any other countries other than the US?

7  A.   Yes.

8  Q.   Okay.  And, approximately, how many other countries does

9  Willowood Limited have customers for azoxystrobin?

10  A.   I don't remember exactly.  It should be more than ten.

11  Q.   What decisions does Willowood Limited make about shipment

12  method or destinations of azoxystrobin that Willowood Limited

13  sells to Willowood USA?

14  A.   Willowood Limited will not make any decision.  The

15  decision was made by Willowood USA only.

16  Q.   Do you know the president of Tai He?

17  A.   Yes.

18  Q.   And what is his name?

19  A.   His name is Wu Xiaolong.

20          THE COURT:  His name is what?

21          THE WITNESS:  Wu Xialong.

22  BY MR. DAVIS:

23  Q.   Is he sometimes referred to as Mr. Wu?

24  A.   Yes.

25  Q.   How did you first come to meet Mr. Wu?

1 A.    I meet Mr. Wu several years before when we take part in

2 the agrichemical exhibition in Shanghai, and he was introduced

3 by some friend.

4 Q.    Do you remember approximately what year that agrichemical

5 exhibition in Shanghai took place?

6 A.    Should be 2010.

7 Q.    Okay.  And when you first met Mr. Wu in or around 2010,

8 did he tell you what chemicals he manufactured?

9 A.    Yes, we talked what particular he produced including

10 azoxystrobin and some other pesticide product.

11 Q.    So Mr. Wu was already producing azoxystrobin in 2010?

12 A.    Yes.

13 Q.    Did there come a time when Willowood Limited began to

14 purchase azoxystrobin from Tai He for resale to Willowood USA?

15 A.    Pardon?

16 Q.    Did there come a time when Willowood Limited purchased

17 product from Tai He, azoxystrobin product, for sale to

18 Willowood USA?

19 A.    Yes.

20 Q.    Okay.  When did that -- tell me how that came about.

21 A.    Should be in 2013, Mr. Brian from Willowood USA --

22             THE COURT:  Mr. Brian?

23             THE WITNESS:  Yeah, Brian.

24             THE COURT:  Okay.  Go ahead.

25             THE WITNESS:  Brian asked me -- asked us to check if

1    I could get some manufacturer of azoxystrobin in China, and we

2    talked to some manufacturers in China, including Suli or

3    NutriChem, which already producing azoxystrobin by that time,

4    and also including Tai He.  But by that time, Suli and

5    NutriChem, these factory, they have already -- they are partner

6    in U.S.A. market but Tai He didn't have.  So, finally, we

7    decided we go with Tai He, and we signed an exclusive agreement

8    with them.

9    Q.    When did you sign that exclusive agreement with Tai He?

10   A.    2013.

11   Q.    Okay.  And that exclusive supply agreement was for the

12   production of what -- or the supply of what chemical?

13   A.    Only for azoxystrobin.

14   Q.    Who is the primary person at Willowood Limited that has

15   contact with Tai He?

16   A.    It is me.

17   Q.    Okay.  And who is your primary contact at Tai He?

18   A.    Mr. Wu Xiaolong.

19            THE COURT:  So I think that's Mr. Wu.

20            THE WITNESS:  Mr. Wu.

21   BY MR. DAVIS:

22   Q.    Is there anyone else at Tai He that you speak with?

23   A.    Pardon?

24   Q.    Is there anyone else at Tai He that you communicate with?

25   A.    Mostly only with Mr. Wu for me.

1  Q.   Does anyone else affiliated with Willowood Limited

2  interact with anyone at Tai He regarding Tai He's manufacture

3  of azoxystrobin for Willowood Limited?

4  A.   Yes, there's another two person in Hangzhou office contact

5  with them.  First is our registration manager, Sophia.  He's

6  contacting with Tai He's production and technical manager to

7  collect the manufacturing process from them; and, secondly, our

8  logistic manager, Ms. Fei Wang.  She contact with them for the

9  shipment of azoxystrobin to US -- Willowood USA.

10         THE COURT:  And I did not follow the name of the

11  person who deals with the shipping, so if you'll just cover

12  that.

13  BY MR. DAVIS:

14  Q.   So the person doing the shipping was Fei Wang.

15  A.   Fei Wang, yes.

16  Q.   That's a woman?

17  A.   Woman, lady.

18  Q.   And the first person was Sophia Wang, correct, who deals

19  with --

20  A.   Sophia.

21  Q.   And what are her responsibilities?

22  A.   Registration manager.

23  Q.   Is she the one that collects the information from the

24  factory?

25  A.   Yes.

1   Q.   After Willowood Limited had signed the exclusive supply

2   agreement with Tai He for the supply of its azoxystrobin, what

3   happened next in terms of Willowood Limited being able to buy

4   azoxystrobin from Tai He and sell it to Willowood USA?

5   A.   The next step, then we ask Tai He to provide the

6   manufacturing process of azoxy to us, and also we ask a sample

7   from them.

8   Q.   A sample of azoxystrobin product?

9   A.   Yes.

10   Q.   Okay.  And why did you ask for a sample of the product and

11   a description of the manufacturing process?

12   A.   It is required by EPA.

13   Q.   Okay.  Is it required by any other agencies of other

14   governments?

15   A.   Mostly, yes.

16   Q.   Did Tai He, in fact, give Willowood Limited a sample and a

17   description of manufacturing process?

18   A.   Yes.

19   Q.   Who at Willowood Limited did Tai He give the process

20   description to?

21   A.   Sophia.

22   Q.   What does Sophia do with that process description?

23   A.   Sophia -- because Tai He provided in Chinese documents to

24   us, and Sophia would translate into English, then it was sent

25   to me, and she will keep it in file, company file.

1   Q.   Okay.  Please turn to the binder in front of you to the

2   tab marked DTX 64.  You'll see an e-mail from Sophia to Vijay

3   with -- and to you with the attachment entitled "Tai He

4   Manufacturing Azoxystrobin.doc."  Do you see that document?

5   A.   Yes.

6   Q.   Please turn to the attachment, which begins on the next

7   page and continues to the end of the exhibit.  Is this the

8   translation that Sophia did of the manufacturing process that

9   Tai He first provided to Willowood Limited after it signed the

10  exclusive supply agreement with Tai He?

11  A.   Yes.

12  Q.   Has this translation of the azoxystrobin manufacturing

13  process by Tai He been maintained by Willowood Limited in the

14  ordinary course of its business?

15  A.   Pardon?

16  Q.   Has this translation, this document, been kept by

17  Willowood Limited in its files in the ordinary course of its

18  business?

19  A.   Yes.

20          MR. DAVIS:  Your Honor, I move to admit defendant's

21  Exhibit 64.

22          MS. BALTZER:  No objection.

23          THE COURT:  It'll be admitted.

24  BY MR. DAVIS:

25  Q.   Mr. Shen, I'd like to direct your attention to the top of

1   the second page of Exhibit 64 that's entitled Azoxystrobin

2   Manufacturing Process.  What company is identified in this

3   document as performing the hydrolysis step?

4   A.   It's the Lianyungang Jinyang Chemical.

5   Q.   Is this company sometimes referred to as Jinyang for

6   short?

7   A.   Yes.

8   Q.   Is there any company identified as carrying out the

9   cyclization process in this document?

10  A.   No.

11  Q.   Is there any company identified in this document as

12  carrying out the Methylene step?

13  A.   No.

14  Q.   What company is identified in this document as carrying

15  out the chlorination step?

16  A.   It is Lianyungang Jinyang.

17  Q.   And is this company sometimes referred to as Guosheng?

18  A.   Yes.

19  Q.   Is there any company identified in this document as

20  carrying out the etherification process step?

21  A.   No.

22  Q.   Turning to the next page, is there any -- what company is

23  identified as carrying out the dehydration step?

24  A.   Jiangsu Yongkai Chemical.

25  Q.   And is this company sometimes referred to as Yongkai?

1  A.    Yes.

2  Q.    Is there any -- and is there any company that's identified

3  in this document as carrying out the condensation step?

4  A.    No.

5  Q.    Does this document identify any steps that are conducted

6  by Tai He?

7  A.    No.

8  Q.    Are you familiar with a company called Pyxis?

9  A.    Yes.

10  Q.    And what is the business of Pyxis?

11  A.    As I know, Pyxis is registration consultant of Willowood

12  USA.

13  Q.    And this is for registration with the EPA?

14  A.    Yes.

15  Q.    What information did you provide to Pyxis in connection

16  with the work that Pyxis was doing for the EPA registration of

17  azoxystrobin?

18  A.    We provide them for the manufacturing process of

19  azoxystrobin.

20  Q.    Okay.  And they use that information for the EPA

21  application.  Is that your understanding?

22  A.    Yes.

23  Q.    Okay.  Please turn in your binder to the tab marked PX-9

24  and previously entered into evidence and identified as the EPA

25  application filed by Pyxis relating to azoxystrobin technical.

1  Take a moment to flip through this document.  Mr. Shen, have
2  you ever seen this document before?
3  A.   No.
4  Q.   Please turn to -- go ahead and let's publish this as well.
5  Please turn to pages -- page 13 of the exhibit.  This is Bates
6  No. WW019074.  And at the top, Mr. Shen, you'll see it says
7  description of the production process.  Tell me when you're
8  there.  Do you see it?
9  A.   Yes.
10 Q.   Okay.  If you look through the following pages, you'll see
11 that it identifies each of the steps that were identified on
12 the process document we just looked at.  And I'd like you to
13 turn to page 22 of the document, which is identified by Bates
14 No. WW019083.  And you'll see at the top it says
15 "etherification."  Tell me when you're there.
16 A.   Yes.
17 Q.   If you look at the bottom of the first paragraph, at that
18 page, the last sentence you'll see says, "This step is carried
19 out at Yancheng Tai He Chemical Company?  Do you see that?
20 A.   Yes.
21        THE COURT:  Where is that, I'm sorry?
22        MR. DAVIS:  Bottom of the -- first paragraph, last
23 sentence.
24 BY MR. DAVIS:
25 Q.   Mr. Shen, do you know how Pyxis acquired the information

1  in this document that says that Tai He performed the

2  etherification step?

3  A.   Should it be sent by us.

4  Q.   From Willowood Limited?

5  A.   Yes.

6  Q.   Do you know who at Willowood Limited sent her that

7  information?

8  A.   Sophia or me, maybe.

9  Q.   Did anyone from Tai He tell you that Tai He performed the

10  etherification step?

11  A.   No.

12  Q.   Did Sophia tell you that Tai He performed the

13  etherification?

14  A.   No.

15  Q.   Then why did you tell Pyxis that Tai He performed the

16  etherification step?

17            THE WITNESS:  May I ask help?

18            THE COURT:  Yes, from the interpreter?

19            THE WITNESS:  Yes.

20            THE COURT:  Yes, you can.

21            THE INTERPRETER:  In the document that we just --

22            THE COURT:  Wait one second.  We need a mic for the

23  interpreter or if I can just ask you to speak loud.

24            THE INTERPRETER:  I speak louder.

25            THE COURT:  Okay.  Thank you.

1           THE INTERPRETER:  In the document that we just

2   covered, that is Document 64, it specified Jinyang would do the

3   dehydration process, Guosheng would do the chlorination and

4   Yongkai would do the hydrolysis for -- I'm sorry.  The

5   hydrolysis for Jinyang, and Guosheng would perform

6   chlorination, Yongkai would perform dehydration, and I assume

7   the rest of the steps will be performed by Tai He.

8   BY MR. DAVIS:

9   Q.   Did you -- and you were referring to Defendant's Exhibit

10  64 when you said that document?

11  A.   Yes.

12  Q.   Did you learn at some later time that your assumption that

13  Tai He performed all of the remaining steps was incorrect?

14  A.   Yes.

15  Q.   Can you explain how you learned that those assumptions

16  about who performed what, the remaining steps, were incorrect?

17  A.   May I ask help?

18          THE COURT:  Yes.

19          THE INTERPRETER:  We asked Tai He to provide the

20  final version --

21          THE COURT:  I'm sorry, could you start over again and

22  speak up a little.

23          THE INTERPRETER:  We asked Tai He to provide a final

24  version and specify each step performed by who and provided the

25  information using the company letterhead and stamped the final

1  document to us, that's when I realized.

2  BY MR. DAVIS:

3  Q.   Please turn, Mr. Shen, in your binder to Defendant's

4  Exhibit 17.  This has been admitted.  If you can publish that,

5  please.

6        Mr. Shen, do you recognize Defendant's Exhibit 17?

7  A.   Yes.

8  Q.   What is this document?

9  A.   This is a final documents which Tai He provide to us.

10 Q.   And why did Tai He provide a second process document on

11 letterhead with a Tai He stamp?

12 A.   It is required by registration process.

13 Q.   By Willowood Limited's registration process?

14 A.   Yes, also for some customer country requirement.

15        THE COURT:  As the country's requirement?

16        THE WITNESS:  I mean, not only for USA, also

17 including other countries.

18 BY MR. DAVIS:

19 Q.   And do you know when Willowood Limited obtained the

20 document at -- identified at Defendant's Exhibit 17?

21 A.   It should be by end of 2013.

22 Q.   What did you do with this document once it was received

23 from Tai He?

24 A.   We send it to Brian, Willowood USA, and also Rajesh in

25 Hong Kong.

1  Q.    Okay.  Why didn't you send it to Pyxis?

2  A.    No.  Normally this contacting this registration with Pyxis

3  is normally by Rajesh.  It's not -- I mean Rajesh in Hong Kong

4  office.

5  Q.    So why did you provide the original process information to

6  Pyxis instead of Rajesh?

7  A.    Sometimes if US requires documents urgent or maybe Rajesh

8  was not in Hong Kong office or he's on trip, he's on a trip,

9  then we will contact with the consultant directly.

10  Q.    Directly?

11  A.    Yes.

12        THE COURT:  So just to be sure I understood; you said

13  if it was urgent or if Rajesh was on a trip --

14        THE WITNESS:  Yes.

15        THE COURT:  -- you might do it directly?

16        THE WITNESS:  Yeah, we have contact with consultant

17  direct.

18        THE COURT:  Okay.

19  BY MR. DAVIS:

20  Q.    Mr. Shen, do you recall giving a deposition in Washington,

21  D.C. in connection with this case?

22  A.    Yes.

23  Q.    During your deposition, you testified that you went to

24  Guosheng and to Tai He to confirm that the manufacturing was

25  being done consistent with the declaration in the EPA

1  application.  Do you recall that testimony?

2  A.    Yes.

3  Q.    When you said that, when you testified that you went to

4  those plants to confirm that the process was consistent with

5  the description in the EPA declaration, did you have the EPA

6  application in front of you?

7  A.    No.

8  Q.    Did you have any documents in front of you when you made

9  that statement in your deposition?

10  A.    No.

11  Q.    Mr. Shen, I'd like you to turn -- if you could look at

12  DX-9, I'm sorry, Plaintiff's Exhibit 9, as well as to

13  Defendant's Exhibit 17, both of which you've seen today.

14          When you testified in your deposition that you went

15  to Guosheng and to Tai He to confirm that the manufacturing

16  process was consistent with the description in the EPA

17  application, were you referring to either one of these

18  documents?

19  A.    Yes.  DX -- DTX-17 document.

20  Q.    And that's the stamped process document on Yangeheng Tai

21  He letterhead?

22  A.    Yes.

23  Q.    And Mr. Shen, if you could turn to the third page in this

24  document.

25          THE COURT:  Seventeen?

BY MR. DAVIS:

Q.   Excuse me, I'm sorry, I'm sorry, yeah, PX-17.

        I'm sorry, I got that screwed up, DX-17 -- can I say that word in court -- Willowood 000019 and Willowood -- sorry, WW000020, who is identified in this document as carrying out the etherification step?

A.   Guosheng Chemical.

Q.   That's Guosheng?

A.   Yes.

Q.   Mr. Shen, did you ever instruct Mr. Wu, or anyone at Tai He, how to manufacture azoxystrobin?

A.   No.

Q.   Did you ever instruct Mr. Wu, or anyone else at Tai He, to purchase intermediates from third parties for the manufacture of azoxystrobin?

A.   No.

Q.   Why not?

A.   May I help it because -- may I help?

        THE COURT:  Yes.

        THE INTERPRETER:  Because Tai He then had already customers.  They been in production for azoxystrobin for many years.  Their technology is a mature one.  They had their supplier for the intermediates and there were not -- would not be possible for them to make any changes.

BY MR. DAVIS:

1  Q.   Mr. Shen, please turn in your binder to the tab marked

2  PTX-44.  It's toward the back.  Now, if you would, please turn

3  to the e-mail that starts at the bottom of the second page.

4           MR. DAVIS:  We're on a different exhibit now.  You

5  can pull that down.  Go to PTX-44 and to the e-mail at the

6  bottom of the second page.

7  BY MR. DAVIS:

8  Q.   Mr. Shen, do you see the e-mail I'm referring to that --

9  from Rajesh to Brian Heinze and a copy to Ann Tillman, Vijay

10 and you dated May 27, 2013?  Do you see that?

11 A.   Yes.

12 Q.   Rajesh writes to Brian in this e-mail, quote, it seems all

13 the manufacturers in China for this product are using the same

14 process and steps for the etherification/condensation.  These

15 step has to be used in sequence and is very difficult to avoid.

16           Do you see that?

17 A.   Yes.

18 Q.   Did you ever ask Mr. Wu, or anyone else at Tai He, whether

19 there was a different way to make azoxystrobin?

20 A.   Yes.

21 Q.   And when was that?

22 A.   Shortly after this e-mail.

23 Q.   What did you learn from those discussions?

24 A.   May I ask help?

25           THE COURT:  Yes.

1      THE INTERPRETER:  I went to communicated with them

2 and -- for the possibility of changing the steps.  They replied

3 that there are several problems.  It is possible, but there are

4 several problems.  No. 1 being the -- adapting to new steps,

5 they would have to obtain the permit.  And for the

6 intermediate, if they adopt to do this process, they have no

7 capability for the treatment of waste water and waste fumes,

8 and for that reason they, even though it's possible, they do

9 not want to change.

10 BY MR. DAVIS:

11 Q.   Mr. Shen, I'd like to refer you back to the first sentence

12 of the e-mail from Rajesh to Brian in which it says, "All the

13 manufacturers in China for this product are using the same

14 process and steps for etherification/condensation.  These step

15 has to be used in sequence and is very difficult to avoid."  Do

16 you see that sentence?

17 A.   Yes.

18 Q.   Do you understand that sentence to mean that the same

19 company has to perform both the etherification and the

20 condensation step?

21      MS. BALTZER:  Objection, leading, Your Honor.

22      THE COURT:  Overruled.  You may answer.

23      THE WITNESS:  As I know, since two step is a separate

24 step, it can be performed by different manufacturer.

25 BY MR. DAVIS:

1  Q.   And what's your understanding concerning the manufacturer

2  steps for Tai He for azoxystrobin as to whether these steps are

3  conducted by separate parties, companies?

4       THE INTERPRETER:  They use separate steps.

5  BY MR. DAVIS:

6  Q.   And is that -- is there a document that you received from

7  Tai He that confirms that those are performed by separate

8  companies?

9  A.   Yes.

10  Q.   And which document is that?

11  A.   DTX-17.

12       THE INTERPRETER:  It is specified in DTX-17.

13  Q.   And that's the Yancheng Tai He Chemical Company

14  manufacturing process on company letterhead with the stamp,

15  right?

16  A.   Yes.

17  Q.   At some point in 2014, did you visit the Tai He plant to

18  confirm that the process being used to manufacture azoxystrobin

19  was consistent with the document at DX-17?

20  A.   Yes.

21  Q.   Okay.  Where did you go for this visit?

22  A.   Guanda.

23  Q.   What is Guanda?

24  A.   Guanda is a production facility of Tai He for

25  azoxystrobin.

1  Q.   And when did you make this visit to Guanda?

2  A.   2014, before we first purchase from Tai He.

3          THE COURT:  Before what?

4          THE WITNESS:  Before our first purchase of

5  azoxystrobin from Tai He.

6          THE COURT:  Oh, before you first purchased

7  azoxystrobin.  I'm sorry.  I apologize.

8          THE WITNESS:  Sorry.

9  BY MR. DAVIS:

10 Q.   And why did you make this visit in 2014 before you first

11 purchased product from Tai He -- azoxystrobin from Tai He?

12 A.   It is necessary for us, because for each product, we get

13 registration, and before we first purchase, we will do the

14 audits for the manufacturer.

15          THE COURT:  Audit?

16          THE WITNESS:  Audit, yes.

17          THE COURT:  For the manufacturer?

18          THE WITNESS:  Yes.

19          THE COURT:  All right.  Thank you.

20 BY MR. DAVIS:

21 Q.   How did you confirm that the azoxystrobin Willowood

22 Limited was going to purchase from Tai He was made consistent

23 with the stamped manufacturing process during your audit visit?

24 A.   May I ask help?

25          THE COURT:  Yes.

1          THE INTERPRETER:  At that time, I brought document

2     No. 17 that we have here and to the company.  I was with the

3     production manager on the production line, and I observed them

4     pouring the materials -- the raw materials into the reactor.

5     That include the raw material intermediates.  And I also

6     observed the equipment, everything conformed to what's

7     described in the document.

8     BY MR. DAVIS:

9     Q.    Did Mr. Wu accompany you through your entire visit at Tai

10    He Guanda?

11    A.    Yes.

12    Q.    Did you visit any other plants during your audit visits in

13    2014?

14    A.    Yes.

15    Q.    What other plants did you visit for your audit visit for

16    2014 for azoxystrobin manufacturing process?

17    A.    I visited all the factory to the manufacture of

18    azoxystrobin in the document, including Yongkai, Gousheng, and

19    Jinyang.

20    Q.    Yongkai, Gousheng, and Jinyang?

21    A.    Yes.

22    Q.    And did you watch the production process of the

23    intermediates when you visited each of those plants?

24    A.    Yes.

25    Q.    And were you able to confirm that the production process

1  that took place at each of those plants was consistent with the

2  manufacturing steps described in the stamped process document

3  at DTX-17?

4  A.   Yes.

5  Q.   Mr. Shen, if you visited the plants before Willowood

6  Limited had actually purchased azoxystrobin from Tai He, how is

7  it that you were able to observe the manufacture of

8  azoxystrobin and the intermediates at Tai He and the other

9  plants?

10 A.   Yes.

11         THE INTERPRETER:   I was able to observe the

12 production on the production line because Tai He then -- had

13 already had many customers, and they had been producing

14 azoxystrobin for many years, therefore, I was able to.

15 BY MR. DAVIS:

16 Q.   During your site visits for the audit in 2014 for the

17 manufacture of azoxystrobin, did you tell anyone at Tai He or

18 Guosheng how to manufacture azoxystrobin or any intermediates?

19 A.   No.

20 Q.   During this site visit in 2014, did you tell anyone at Tai

21 He that any of the intermediates used in the condensation step

22 had to be acquired from third parties?

23 A.   No.

24 Q.   Have you ever heard a chemical known as DABCO?

25 A.   Yes.

1  Q.   What is your understanding of DABCO?

2  A.   As I know, it is a catalyst.

3  Q.   And can you tell the jury briefly what a catalyst is, your

4  understanding of a catalyst?

5  A.   Catalyst is helping for the reaction.  To get more --

6       THE INTERPRETER:  Catalyst is used in production to

7  help with increasing the productivity.

8  BY MR. DAVIS:

9  Q.   Mr. Shen, what observations did you make during your audit

10  visit in 2014, concerning the use of catalysts in the

11  condensation reaction that was carried out by Tai He?

12       THE INTERPRETER:  As I said before, I observed the

13  production in their pouring material into the reactor.  All raw

14  material including intermediates, they did not use catalyst.

15  BY MR. DAVIS:

16  Q.   And "they," you're referring to Tai He, correct?

17  A.   Yes.

18  Q.   And this was during your observation of condensation?

19  A.   Condensation step.

20  Q.   During your audit visits in 2014, did you develop an

21  understanding of the relationship between Guosheng and Tai He?

22  A.   Yes.

23  Q.   And what was your understanding of that relationship?

24  A.   Guosheng and Tai He, they are independent company.  And

25  Tai He buy the intermediate for condensation from Guosheng.

1  Q.   Do you have an understanding as to how long that

2  relationship -- how long Tai He has been acquiring

3  intermediates from Guosheng?

4  A.   Mr. Wu told me several years, but I don't know exactly.

5  Q.   I'd like you to turn to the tab in your binder marked by

6  DTX-13.  And you'll see my name at the top of that document.

7  But I'd like you to look to the bottom of the first page.

8  You'll see e-mail from Sophia dated Wednesday, April 1, 2015,

9  to Brian, to you, and to Vijay.  Do you see that e-mail?

10  A.   Yes.

11  Q.   Okay.  And you'll see that she writes:  Tai He manufacture

12  below steps:  Cyclization, methylene -- then turning to the

13  next page -- etherification, and condensation.  Do you see

14  that?

15  A.   Yes.

16  Q.   Based on your 2014 audit visit to the plant, do you

17  believe that that information provided by Sophia in that e-mail

18  is correct?

19  A.   No.

20  Q.   And how do you know that it's not correct?

21  A.   Because I just mentioned, when I go to audit Tai He, I

22  believe the document is No. 17.  And the application process is

23  consistent with No. 17, so this No. 17 should be incorrect.

24  Q.   And did you respond to this e-mail that Sophia wrote?

25  A.   No.

1  Q.   Why not?

2  A.   I don't remember.  Maybe I even have -- did not pay

3  attention for this e-mail.

4  Q.   Mr. Shen, at some point after this e-mail, were you asked

5  to go again to Tai He to confirm that the stamped process

6  document at DTX-17 was accurate?

7  A.   Yes.

8  Q.   Can you describe the circumstances of that visit?

9  A.   The second time, I go with both Mr. Vijay together to the

10 factory.

11        THE COURT:  With Mr. Vijay?

12        THE WITNESS:  Yes.

13        THE COURT:  Uh-huh.

14        THE WITNESS:  We go together and went to the jobs

15 again like the first time.

16 BY MR. DAVIS:

17 Q.   Okay.  And can you describe that second visit?  What did

18 you do during that second visit at Tai He?

19 A.   We go to the manufacturer and checking the -- come from

20 the manufacturing process we saw at Tai He and Guosheng and as

21 a tour again, and all they are in consistence with

22 manufacturing process in No. 17 document.

23        THE COURT:  They are consistent or inconsistent?

24        THE WITNESS:  They are consistent.

25        THE COURT:  Consistent.

1  BY MR. DAVIS:

2  Q.    Did you actually watch the condensation step being carried

3  out by Tai He during the second visit?

4  A.    Yes.  We go to the production line again.

5  Q.    Okay.  And you watched the process being carried out on

6  the production line?

7  A.    Yes.

8  Q.    And when was that, approximately, if you recall?

9  A.    Pardon?

10  Q.    Do you remember when that second visit was that you've

11  just referred to, to Tai He?

12  A.    Condensation.

13  Q.    What year?  Date?

14  A.    2017.

15  Q.    Okay.  It was after this e-mail that we just referred to

16  as DTX-13?

17  A.    Yes.

18  Q.    Now, Mr. Shen, Mr. Wu -- let me back up.

19          Did you visit any other plants during the second

20  visit, the one that occurred in 2015?

21  A.    Yes.  Including Guosheng and Jinyang and Yongkai.

22  Q.    Okay.  And what did you confirm, if anything, when you

23  visited Guosheng?

24  A.    We confirmed with the process, which I watch as -- go

25  through the production line again of the three factory again

1    and confirm with them.

2            THE COURT:  And confirm what?

3            THE WITNESS:  The manufacturing process.

4            THE COURT:  It wasn't you.  Mr. Davis started

5    speaking.

6            MR. DAVIS:  It was my fault.  I'm sorry.

7    BY MR. DAVIS:

8    Q.   What step were you -- did you confirm was performed by

9    Guosheng?

10   A.   They carried a two-step assemblies on this document,

11   including etherification.

12   Q.   And what's the other step that was carried out at

13   Guosheng?

14   A.   It is chlorination.

15   Q.   Mr. Shen, Mr. Wu testified in his deposition, which was

16   read today, that you made two visits to his plant to watch the

17   manufacturing process for azoxystrobin.  But he also testified

18   that both of your visits were in 2014.  How do you respond to

19   that?

20           THE COURT:  Well, ask a different question.

21   BY MR. DAVIS:

22   Q.   Is that true, that you made two visits in 2014?

23   A.   No.  I did visit Tai He two times, once in 2014 before we

24   first purchase from Tai He.

25           THE COURT:  Before what?

1          THE WITNESS:  First purchased.

2          THE COURT:  First purchased.  Okay.

3          THE WITNESS:  And the second time -- and that is for

4   the audits for the factory.  And the second time is Mr. Brian

5   Vijay asked me go there again to check.  That is in 2015.

6   BY MR. DAVIS:

7   Q.   Mr. Brian and Vijay asked you to go and check again in

8   2015?

9   A.   Yes.  But possible, because in that area, there's a lot

10  of -- a lot of pesticide plant.  Maybe I visited some as

11  factory at same time as I stop there one time, possible.

12  Q.   So you think -- so if I understand you correctly, you --

13  there's a lot of plants in that manufacturing area that you

14  visit?

15  A.   Yes.

16  Q.   And you might have, during a visit to one of those other

17  plants, stopped by to see Mr. Wu?

18  A.   Yes.

19  Q.   Which would -- would that have been a different visit than

20  the audit -- 2014 audit visit and the 2015 visit that was

21  requested by Vijay and Brian?

22  A.   Yes.  Yes.

23  Q.   During your second visit to Tai He, the one that occurred

24  in 2015, did you observe the use of any catalyst in the

25  production in the condensation step?

1  A.   No.

2  Q.   During this second visit to Tai He in 2015, did you have

3  any discussions with Tai He about the use of DABCO in the

4  condensation step?

5  A.   Yes, I talked with them.

6  Q.   And what did you learn as a result of those conversations?

7  A.   Mr. Wu confirmed they never use DABCO, and at that time,

8  they even don't know this is the chemical name.

9  Q.   Mr. Wu didn't know --

10  A.   He didn't know.

11          THE COURT:  Did not know?

12          THE WITNESS:  Yes.  Did not know.

13  BY MR. DAVIS:

14  Q.   Do you believe that Mr. Heinze, Mr. King, Mr. Middione, or

15  Mr. Mundhra ever instructed Tai He on how to conduct the

16  manufacturing of azoxystrobin that it sells to Willowood

17  Limited?

18  A.   No.

19  Q.   How do you know that?

20  A.   Because Brian, Vijay, and Joe, Andy, they don't speak

21  Chinese, and people from Tai He, including Mr. Wu, they cannot

22  speak English.  So most -- all the things is communicate by me

23  between both sides.

24  Q.   At any time, did you instruct Tai He how to manufacture

25  azoxystrobin?

1  A.    No.

2  Q.    And, at any time, did you instruct Tai He to acquire the

3  etherification intermediate from Guosheng or anyone else?

4  A.    No.

5  Q.    Are you aware of anyone else at Willowood instructing Tai

6  He how to manufacture azoxystrobin?

7  A.    No.

8            THE COURT:  Just for planning, are you almost done?

9            MR. DAVIS:  I am almost done.

10           THE COURT:  All right.

11           MR. DAVIS:  In fact, I may be done, done.  Let me

12  just check with my colleagues.  I have one other thing.

13  BY MR. DAVIS:

14  Q.    You mentioned, if I heard you correctly, that you met with

15  the production manager at Tai He during at least one of your

16  visits to Tai He.  Did I understand you correctly?

17  A.    Yes.

18  Q.    What is his name?

19  A.    All I remember Mr. Chen.

20  Q.    Chen?

21  A.    Yes, C-H-E-N.

22  Q.    And did you discuss the manufacturing process for

23  condensation step with Mr. Chen during your audit visit and

24  your confirmatory visit in 2015?

25  A.    Yes.  I come from the -- to discuss it with him and

1  confirm that they only perform the condensation step and they

2  buy the intermediate at the factory.

3  Q    And did Mr. Chen accompany you on the visit to the

4  production line when you watched the intermediates and other

5  reagents go into the production -- into the reaction mix?

6  A.    Yes.  We together.

7            MR. DAVIS:  Together.  Okay.  No more questions, Your

8  Honor.

9            THE COURT:  I assume you have more than five minutes.

10            MS. BALTZER:  Yes, Your Honor.

11            THE COURT:  We'll go to lunch then.

12            Ladies and gentlemen, let me excuse you for the lunch

13  break.  Please don't talk about the case among yourselves or

14  with anyone else, no independent investigation.  Avoid contact

15  with the lawyers, parties or witnesses.  Keep an open mind and

16  come back about ten minutes till 2:00.

17            All right.  And if I can ask the interpreter just to

18  move on back there so that the jury can get by because they'll

19  walk right where you're standing.

20            The jury is excused until ten minutes till 2:00.

21            (The jury left the courtroom at 12:35 p.m.)

22            THE COURT:  All right.  Thank you.

23            Anything we need to talk about before we go to lunch?

24  No.  We'll be in recess until 1:50.

25            (At 12:38 p.m., break taken.)

1          (At 1:50 p.m., break concluded.)

2          THE COURT:  Anything before the jury comes in?

3          MR. TILLER:  A couple issues, Your Honor.

4          THE COURT:  Yes.

5          MR. TILLER:  A couple I'll handle and then I know

6    Mr. Neuman has one.

7          First of all, we're going to be filing -- it's

8    nothing that the Court has to address, but we're going to be

9    filing a notice today just to put on notice our objection to

10   Your Honor's ruling with regard to DX-192 --

11         THE COURT:  I'm sorry.  I can't hear you.

12         MR. TILLER:  I'm sorry.  We're going to be filing a

13   notice this afternoon noting for the record our objection to

14   Your Honor's ruling with regard to DX-192 to 252.  It's just

15   making sure that all the exhibits will be on the record.

16         THE COURT:  Well, yeah.  I mean, if you want to offer

17   them on the record, I'll --

18         MR. TILLER:  We're just going to do it that way.

19   That way we're not taking up any of your time.

20         THE COURT:  Okay.

21         MR. TILLER:  The second issue I have to admit is

22   something I don't know that I've ever said in a trial, which is

23   today is going much, much faster than I was expecting.

24         THE COURT:  Well, we haven't hit cross-examination

25   yet.

1    MR. TILLER:  Well, we haven't yet and obviously --

2  but I just wanted to make Your Honor aware after Mr. Shaojun we

3  have Dr. Lipton ready to go and then we do have one more

4  witness, our damages witness, but he's not -- I mean, we

5  haven't exchanged -- we don't have witness binders.  We haven't

6  exchanged demonstratives yet.  He'll be our last witness.

7    THE COURT:  Okay.  Good.  Well, that's fine.  I don't

8  expect that to -- you've got -- we have cross of this witness

9  and then you have Dr. Lipton.

10    MR. TILLER:  Correct.  Just letting you know today is

11  going a little faster than expected.

12    THE COURT:  Well, that's good.

13    MR. TILLER:  I know Mr. Neuman needs to raise

14  something.

15    THE COURT:  Yes.

16    MR. NEUMAN:  Thank you, Your Honor.  One issue.  I'd

17  just like to read into the record the correlation between the

18  deposition exhibit numbers that were identified in

19  Mr. Reichman's deposition correlated to the trial exhibit

20  numbers.

21    THE COURT:  Okay.

22    MR. NEUMAN:  This is with respect to Mr. Reichman's

23  deposition.  Deposition Exhibit 3 is DTX-118.  Deposition

24  Exhibit 4 is DTX-119.  Deposition Exhibit 6 is DTX-121.

25  Deposition Exhibit 7 is DTX-122.

1          THE COURT:  Okay.  Thank you.

2          Anything else?  No.

3          You can bring the jury in.

4          (The jury panel is present.)

5          THE COURT:  I believe we had finished with direct

6    examination, so the witness is with Syngenta.

7          MS. BALTZER:  Your Honor, we have witness binders

8    prepared.  May I approach?

9          THE COURT:  Okay.

10         (Binders handed to the witness.)

11         THE COURT:  Go ahead.

12                        CROSS-EXAMINATION

13   BY MS. BALTZER:

14   Q.   Mr. Shaojun, I would like you to turn in your binder to

15   what's been marked as PX-31.  On the bottom of this page, the

16   first page of this e-mail, there's an e-mail sent from you to

17   Vijay Mundhra, CC-ing Brian Heinze, correct?

18   A.   Yes.

19   Q.   And this e-mail is sent on Friday, May 30, 2014, correct?

20   A.   Yes.

21   Q.   And Friday, May 30, 2014, was before Syngenta filed this

22   lawsuit on March 27, 2015, correct?

23   A.   Pardon?

24         (Interpreter repeating question.)

25   A.   Well, to be frankly, I don't know what time Syngenta

1  started the case.

2  Q.   Mr. Shaojun, I'll represent to you that Syngenta filed

3  this lawsuit on March 27, 2015.  This e-mail is dated on

4  May 30, 2014, which is before March 27th, 2015, correct?

5  A.   Okay.

6         THE COURT:  Okay.  You don't really even need to ask

7  the witness that -- I mean, go ahead.

8  BY MS. BALTZER:

9  Q.   In this e-mail dated before Syngenta filed the lawsuit in

10  March 2015, you stated:  For azoxystrobin, they really divided

11  different steps into four factories as the manufacturing

12  process we submitted.  Correct?

13  A.   Yes.

14  Q.   And below that you list three steps of the azoxystrobin

15  manufacturing process, correct?

16  A.   Yes.

17  Q.   And those three steps are hydrolysis, chlorination, and

18  dehydration, correct?

19  A.   Yes.

20  Q.   And you list the three factories that perform each of

21  those steps, correct?

22         THE WITNESS:  May I ask help?

23         THE COURT:  Yes.

24         (Interpreter repeating question.)

25  A.   Yes.

1  Q.   And the three steps you list here, none of those three

2  steps are etherification or condensation, correct?

3  A.   Yes.

4  Q.   And continuing in this e-mail that you wrote on May 30th,

5  2014, before Syngenta filed this lawsuit --

6          THE COURT:  Okay.  You can argue the case to the jury

7  later.  If you would please ask shorter questions.

8  BY MS. BALTZER:

9  Q.   You say, continuing in this e-mail:  But for last two

10  steps for their own plants, they are just synthesizing in their

11  neighbor plant.  Correct?

12  A.   Yes.

13  Q.   Mr. Shaojun, I would like you to turn to DX-13 in your

14  binder.

15  A.   Yes.

16  Q.   I would like you to turn to the second page of that e-mail

17  chain.  We see toward the bottom there's an e-mail that Brian

18  Heinze sent to Sophia, you, and Vijay Mundhra, correct?

19  A.   Yes.

20  Q.   And Brian Heinze sent this on April 2nd, 2015, correct?

21  A.   Yes.

22  Q.   In this e-mail, Brian Heinze says:  Sophia, where does

23  Zenith play a role here?  Correct?

24  A.   Yes.

25  Q.   And Zenith is Tai He, correct?

1  A.    No.   Zenith is another company owned by Mr. Wu.   It's not

2  the same.   It's not the same both sides.

3  Q.    In Willowood, Willowood refers to -- commonly refers to

4  Tai He as Zenith, correct?

5  A.    Yes.

6  Q.    Looking up at the e-mail that Sophia sent right after

7  that, at the bottom of the page before that --

8  A.    Yes.

9  Q.    -- Sophia e-mails Brian Heinze, you, and Vijay Mundhra,

10  correct?

11  A.    Yes.

12  Q.    And this e-mail is sent on April 1st, 2015, correct?

13  A.    Yes.

14  Q.    And in this e-mail, Sophia responds to Brian Heinze's

15  question and says:  Tai He manufacture below steps.  Correct?

16  A.    Yes.

17  Q.    And Sophia lists below that the steps of cyclization,

18  methylene, etherification, and condensation to yield

19  azoxystrobin, correct?

20  A.    Yes.

21  Q.    In the next e-mail on the first page, Brian Heinze e-mails

22  Christopher Hayden, correct?

23  A.    Yes.

24  Q.    This was sent on April 2nd, 2015?

25  A.    Yes.

1  Q.    And in this e-mail, he says:  Chris, I think this is the

2  missing piece you've been looking for.  Please let me know your

3  thoughts.  Correct?

4  A.    Yes.

5  Q.    I would like you to look at the e-mail above that now on

6  the top of the page.  This is an e-mail from Chris Hayden to

7  Brian Heinze and Peter Davis, who was asking you some questions

8  a little earlier, correct?

9  A.    Yes.

10 Q.    And this e-mail was sent on April 2nd, 2015, correct?

11 A.    Yes.

12 Q.    And in this e-mail, Chris Hayden says:  Brian, we need to

13 conference call.  Correct?

14 A.    Yes.

15 Q.    And this was in response to Sophia listing that Tai He

16 performs the etherification and condensation steps, correct?

17           (Interpreter repeating question.)

18 A.    I don't know what is they talking about for the call.

19 Q.    Chris Hayden says "We need to conference call" in the same

20 e-mail chain in which Sophia says that Tai He does the

21 etherification and condensation steps, correct?

22 A.    I don't know -- for this conference call, I don't know

23 what it is talking about.

24 Q.    Mr. Shaojun, I would like you to turn to the other binder

25 that you have in front of you that Mr. Davis handed you

1   earlier.  I would like you to turn to what's been marked as

2   DTX-64.

3   A.   Can you talk a little slower because my --

4   Q.   It's DTX-64.

5          THE COURT:  I think he's asking you to speak more

6   slowly.

7          MS. BALTZER:  I'll try, Your Honor.

8          THE WITNESS:  Yes.

9   BY MS. BALTZER:

10  Q.   You discussed this e-mail or this document a little

11  earlier with Mr. Davis, right?

12  A.   Yes.

13  Q.   And this document contains a translation of Tai He's

14  manufacturing process that you testified was the original

15  translation given by Tai He, correct?

16  A.   Yes.

17  Q.   And this translation doesn't list who performs the

18  etherification or condensation steps, correct?

19  A.   Yes.

20  Q.   And I would like you to turn to the very first page of

21  this document.

22          MS. BALTZER:  If we zoom in, David, on the top of

23  this e-mail chain.

24  BY MS. BALTZER:

25  Q.   This was attached to an e-mail from Sophia sent to Vijay

1  Mundhra and you, correct?

2  A.    Yes.

3  Q.    And this e-mail is dated April 6, 2015, correct?

4  A.    Yes.

5  Q.    And this translation was attached to this e-mail on April

6  6, 2015?

7  A.    Yes.

8  Q.    You testified a little earlier.  You said that Guosheng --

9  you saw Guosheng performing the etherification step --

10          THE COURT:  I'm sorry.  I actually needed you to slow

11  down on that one.  Could you say it again?

12          MS. BALTZER:  Sorry.

13  BY MS. BALTZER:

14  Q.    You testified earlier that you saw Guosheng perform the

15  etherification step of the azoxystrobin process?

16  A.    Yes.

17  Q.    And you also testified that you saw Guangda perform the

18  condensation step of the process, correct?

19  A.    Yes.

20  Q.    Guosheng and Guangda, they are approximately 100 to

21  200 meters from each other, correct?

22  A.    I don't know, but they are very near.

23  Q.    They are very near each other?

24  A.    Yes.

25  Q.    Did you walk from Guosheng to Guangda when you visited

1  them?

2  A.    Yeah, we can walk there.

3  Q.    How long did it take you to walk between the two?

4          (Interpreter repeating question.)

5  A.    Guanda is -- I don't know exact number, but along the 10

6  to 15 minutes.

7  Q.    When you visited these factories, did you see how the end

8  product of the etherification step is transferred to -- from

9  Guosheng to Guangda?

10          (Interpreter repeating question.)

11  A.    No.  For that, I don't -- I have not seen transfer.

12  Q.    You never saw the end product of the etherification step

13  transferred --

14  A.    Yes, yes.

15  Q.    You -- sorry.  I just want to make sure we're clear.  You

16  never saw the end product of the etherification step

17  transferred from Guosheng to Guangda, did you?

18  A.    Yes, because I didn't saw the transfer.

19  Q.    Sorry.  Could you say that again?

20  A.    (By Interpreter)  When I did the site visit, I did not see

21  the transfer of the final products from one company to the

22  other.

23  Q.    And, Mr. Shaojun, when you were at Guosheng, how long were

24  you there?

25  A.    I don't remember exactly, but a few hours there.

1    Q.    Just a few hours, is that correct?

2    A.    Yes.  I stayed there half afternoon and a few of us there.

3    Q.    And at Guangda?  How long were you at Guangda when you

4    visited?

5    A.    Guangda is almost a afternoon.

6    Q.    So you were there about approximately an afternoon's worth

7    of time, correct?

8    A.    Yes, about.

9              MS. BALTZER:  No further questions, Your Honor.

10             THE COURT:  Redirect?

11                       REDIRECT EXAMINATION

12   BY MR. DAVIS:

13   Q.    Mr. Shaojun, I would like to take you to DX-13, which is

14   in the white binder that counsel for Syngenta provided you.

15   A.    Thirteen?

16   Q.    DX-13.

17   A.    Yes.

18   Q.    And you -- you testified earlier that you believed that

19   this e-mail from Sophia is incorrect, is that right?

20   A.    Yes.

21   Q.    And why do you believe that that's incorrect?

22   A.    Because I have been there for -- 2014 for audit and I

23   bring the documents over there for the -- Document No. 17.

24   Under all the manufacturing process, I have been -- confirmed

25   with the manufacturers and it was inconsistent with the

1  manufacturing process, so this is not same so is not correct.

2  Q.   So the e-mail from Sophia on April 1, 2015, is

3  inconsistent with the manufacturing document at DX-17, correct?

4  A.   Yes.

5  Q.   Did you go to Tai He again after the e-mail of April 1,

6  2015, at the request of Vijay and Brian to again reconfirm the

7  manufacturing steps?

8  A.   Yes.

9  Q.   What was your conclusion as a result of that visit?

10  A.   The same.

11  Q.   Could you state it again, please, that -- was the --

12  withdrawn.

13          MR. DAVIS:  No further questions, Your Honor.

14          THE COURT:  Anything else?

15          MS. BALTZER:  No further questions, Your Honor.

16          THE COURT:  Okay.  Thank you.  You may step down.

17  Just leave the notebooks there.

18          (The witness left the stand.)

19          THE COURT:  You can call your next witness.

20          MR. TILLER:  Call Dr. Mark Lipton.

21                  DR. MARK LIPTON

22          DEFENDANT'S WITNESS, SWORN AT 2:07 P.M.

23                  DIRECT EXAMINATION

24  BY MR. TILLER:

25          THE WITNESS:  Your Honor, could I get a glass of

1    water?

2             THE COURT:  Yes.

3             You may hand him some water, Mr. Tiller.

4             (Mr. Tiller complied with the request.)

5    Q.    Sir, could you please state your name?

6    A.    My name is Mark Lipton.

7    Q.    Could you please go over your educational background,

8    please?

9             THE COURT:  Just a second.  Can you adjust the mic

10   and either stand in front of the mic or --

11            MR. TILLER:  Yes.

12            THE COURT:  I think he asked you about your

13   educational background.

14   A.    I received my bachelor's degree in chemistry from Harvey

15   Mudd College in 1981.  I then received my Ph.D. degree, along

16   with two master's degrees, from Columbia University in the city

17   of New York in 1988, also in chemistry.

18   Q.    And what was your Ph.D. thesis?

19   A.    My Ph.D. thesis was a two-part thesis.  The first part was

20   on the development of software that would compute the

21   three-dimensional structure of organic molecules, which was

22   important for the purposes of predicting chemical properties

23   and reactivity.

24            The second part of my thesis was concerning the

25   synthesis of a variety of derivatives of the antibiotic

1  Vancomyocin.  Vancomycin is an antibiotic used in the treatment

2  of drug-resistant bacterial infections and I made about 30

3  different derivatives of Vancomyocin and tested them.

4  Q.   Did you do any post-doctoral research after getting your

5  Ph.D.?

6  A.   Yes, I did.  I did my post-doctoral research at the

7  University of California, Berkeley.  There I worked on the

8  computer-aided design and synthesis of a series of enzyme

9  inhibitors.

10            THE COURT:  Enzymes inhibitors?

11            THE WITNESS:  Yes.

12            THE COURT:  Okay.

13  BY MR. TILLER:

14  Q.   Do you have any experience in the agrichemical industry?

15  A.   Yes.  Between 1981 and 1983, I was employed by Shell

16  Development Company in Modesto, California, and there I worked

17  as a computational chemist studying the behavior of pesticides,

18  insecticides, herbicides, and fungicides.

19  Q.   And what specifically did you do while at Shell?

20  A.   I had two different projects while at Shell.  The first

21  was to develop methods for studying soil diffusion of

22  pesticides; and this is a important in order for farmers to be

23  able to properly apply pesticides to their fields to avoid

24  runoff and contamination, but also to get complete coverage.

25            And then in a second part of my research, I looked at

1  the possible mechanisms for the degradation of a promising
2  insecticide candidate, which turned out to be unstable in
3  light, and so I developed an understanding of why it was
4  unstable to light.
5  Q.   Now, after your post-doctoral research at Cal Berkeley,
6  where were you next employed?
7  A.   After my post-doc, I took a position at Purdue University
8  in the Department of Chemistry and that was in 1990 and there I
9  remain today.
10 Q.   Are you a professor at Purdue?
11 A.   I am.
12 Q.   As a professor at Purdue, what do you do?
13 A.   I, first of all, teach organic chemistry both at the
14 undergraduate and graduate level.  I also run a research group
15 that conducts research in organic synthesis.
16 Q.   Have you had any Ph.D. candidates come out of your lab
17 while at Purdue?
18 A.   While I've been at Purdue, I have had 23 students receive
19 a Ph.D degree under my guidance, as well as 14 master's
20 candidates have also received a degree under my guidance.
21 Q.   Do you have undergraduates work in your lab?
22 A.   I have had roughly between 20 to 25 undergraduates working
23 in my lab over the years.
24 Q.   And what has been the research focus in your lab while at
25 Purdue?

1  A.    In the beginning of my career, I was concerned with

2  developing a new catalyst for an organic transformation, as

3  well as studying the behavior of some industrially used

4  catalysts.  For the last 20 years, I've been primarily focused

5  on the synthesis and evaluation of biologically active

6  molecules.

7  Q.    Are those organic molecules?

8  A.    These are all organic molecules.

9  Q.    So just how many years did your research focus on

10 catalytic reactions?

11 A.    About seven years.

12 Q.    And since then your research has focused on the synthesis

13 of certain organic molecules?

14 A.    Yes.

15 Q.    Okay.  Have you published any papers?

16 A.    I've published around 50 peer-reviewed papers, almost all

17 in the area of organic synthesis.

18 Q.    Can you name some of the journals?

19 A.    Yes.  I've published them in journals such as the Journal

20 of the American Chemical Society, the Journal of Organic

21 Chemistry, Organic Letters and by Organic and Medicinal

22 Chemistry letters, just to name a few.

23 Q.    What does it mean for a journal -- what does it mean for a

24 paper to be peer reviewed?

25 A.    Peer review means that before your paper appears in print

1   it is -- it undergoes a thorough scientific review by two or
2   more fellow scientists usually conversant in your area; and
3   they will review your paper for both scientific errors, as well
4   as typographical errors; and you then submit your paper -- a
5   revised version of your paper for publication.
6   Q.   Have you ever served as a peer reviewer for any journals?
7   A.   Yes, I have.  I would estimate somewhere upwards of a
8   hundred times I have reviewed other papers for publication.
9   Q.   How are you selected as a peer reviewer?
10  A.   That choice is up to the editor of the journal, who will
11  typically try to find experts in the field that the paper is
12  concerned with.
13  Q.   Have you ever given any lectures on organic molecules and
14  their synthesis?
15  A.   Yes.  I've given about 70 lectures worldwide on my
16  research.
17  Q.   Can you name some of the places where you've given these
18  lectures?
19  A.   Some of the institutions where I delivered lectures:
20  Cambridge university; Imperial College London; the university
21  of Kyoto in Japan; University of California, Irvine; the
22  Scripps Research Institute, to name a few.
23  Q.   Have you ever given any lectures to any corporate
24  entities?
25  A.   Yes.  I've delivered lectures to a number of different

1    companies, mostly pharmaceutical companies, as well as Dow

2    AgroSciences.

3    Q.    And what is Dow AgroSciences?

4    A.    Dow AgroSciences is the agrichemical arm of Dow, which I

5    haven't followed current news, but I think it's still in

6    existence.

7    Q.    Have you ever been retained as a consultant by any

8    corporate entities?

9    A.    Yes.  I have served as a consultant for a number of

10   different companies:  Eli Lilly and Company, Merck, Upjohn, as

11   well as Dow AgroSciences.

12   Q.    Without divulging too many specifics, because I'm sure

13   there are issues with that, generally speaking, what has your

14   consultation with these companies been involved in?

15   A.    My consultation has usually been with the process

16   development groups at these corporations where I'm brought in

17   specifically to offer insight into particular chemical

18   reactions that are of concern to them.

19   Q.    What was -- generally speaking, at a high level, what was

20   the consultation you did with Dow AgroSciences?

21   A.    As best as I remember it, it was a particular reaction in

22   the synthesis of an insecticide that they were working on.

23   Q.    Have you ever applied for and been granted a grant?

24   A.    Yes, I have.  I have had, throughout my career, probably

25   15 to 20 different research grants.

1  Q.    And, generally speaking, what were these grants related

2  to?

3  A.    They were related to my research in the area of organic

4  synthesis.

5  Q.    Okay.  So all of your research has been in the area of

6  organic synthesis?

7  A.    Virtually all of it.

8  Q.    Okay.  Can you just identify some of the granting

9  entities?

10  A.    Yes.  I have received grants from the National Institutes

11  of Health, from the National Science Foundation and the

12  Petroleum Research Fund.

13  Q.    Have you served as a reviewer on grant applications

14  submitted by others?

15  A.    Yes.  I have to date served on four different NIH study

16  sections, as well as twice serving as a reviewer for NSF

17  proposals.

18          MR. TILLER:  Your Honor, I would move to have

19  Dr. Lipton qualified as an expert in the synthesis of organic

20  molecules.

21          THE COURT:  And your hand was in front of your mouth.

22          MR. TILLER:  I'm sorry.  I would move to qualify Dr.

23  Lipton as an expert in the synthesis of organic molecules.

24          THE COURT:  Any questions about his qualifications?

25          MR. SANTHANAM:  We do object, Your Honor, but we'll

1    cover it in cross-examination.

2              THE COURT:  All right.  Go ahead.  He may so testify.

3    BY MR. TILLER:

4    Q.   Dr. Lipton, are you familiar with what's been called the

5    '761 patent?

6    A.   Yes, I am.

7    Q.   Can you generally explain -- Ms. Sanders, could we get the

8    screen.  Thank you.

9              Could you generally explain your understanding of the

10   '761 patent.

11   A.   The '761 patent concerns the synthesis of azoxystrobin and

12   specifically concerns the use of DABCO as a catalyst in the

13   so-called condensation step.

14   Q.   Can we take a look at, for example, Claim 1 of the '761

15   patent, and maybe you can explain briefly what is set forth in

16   Claim 1.

17             THE COURT:  We're looking at the patent on the

18   screen, I take it?

19             MR. TILLER:  Yes, the Claim 1 patent on the screen.

20             THE WITNESS:  In Claim 1 they claim a process for

21   preparing a compound which they give as formula (I), and this

22   is a generic -- well, it is a generalized formula for the

23   compound azoxystrobin where W represents the methoxyacrylate

24   sidearm of azoxystrobin.  And they are claiming to be able to

25   prepare it by reacting a compound of formula (II); formula (II)

1  being this chloro-pyrimidin intermediate with the
2  methoxyacrylate side chain of azoxystrobin with two hydroxy --
3  or two cyanophenyl in the presence of between .1 and 2 mol
4  percent of DABCO.
5          MR. TILLER:  Okay.  Can we -- Bonnie, can you go top
6  of column 20, please.  There you go.
7  BY MR. TILLER:
8  Q.    So, again, here's the reaction with two cyanophenyl in the
9  presence of what?
10 A.    Between .1 and 2 molar percent of DABCO.
11 Q.    Okay.  What is your understanding of what it takes for a
12 patent to be found to be invalid?
13 A.    My understanding is that according to Section 103 of
14 patent law, a patent can be regarded as invalid if it is viewed
15 as obvious to a person of ordinary skill in the art in light of
16 prior art at the time that the patent -- or at the time of the
17 invention.
18 Q.    Okay.  So, first of all, what's your understanding of what
19 is prior art?
20 A.    Prior art in this context would mean any publication, any
21 patent, patent disclosure, really any prior disclosure that
22 occurs before the initial discovery is made.
23 Q.    What is your understanding of the priority date for the
24 '761 patent?  What's the earliest date at which there is a
25 filing with this application?

1  A.    The priority date for the '761 patent is April 13th, 2006.

2  Q.    Actually, I think if you go down to foreign application

3  priority date.

4  A.    Oh, I'm terribly sorry, yes.  April 25th -- or 26th, 2005.

5  Q.    Okay.  Now, are you familiar with the '138 patent?

6  A.    Yes, I am.

7  Q.    And, generally speaking, what is claimed in the '138

8  patent?

9  A.    The '138 patent discloses a process for making

10  azoxystrobin by a two-step sequence; an etherification reaction

11  followed by a condensation reaction.

12  Q.    What is your understanding of the difference between the

13  '138 patent and the '761 patent?

14          MR. SANTHANAM:  Your Honor, we object, and if we

15  could have a sidebar for just a moment.

16          THE COURT:  Okay.

17          (Bench conference held as follows:)

18          MR. SANTHANAM:  They're trying to combine multiple

19  references with Weintritt.  There's been no disclosure of that

20  in his report.  The only disclosure in his report, if Your

21  Honor recalls, was in a claim chart supplied by counsel, and

22  you reserved your ruling on that claim chart.

23          In addition to that, under 35 USC 282, it is the

24  burden of the defendant in a patent infringement litigation to

25  put us on notice of all of the prior art of which they're going

1   to rely on.

2          THE COURT:  Okay.  Well, I want -- I don't -- so far

3   I haven't heard anything inconsistent with that, so I don't

4   know --

5          MR. SANTHANAM:  Well, he's asking for the difference

6   between (unintelligible) and trying to say that the '138 patent

7   is prior art and relying on it.  We object to that.

8          THE COURT:  Okay.  Are you going to be doing that?

9          MR. TILLER:  We believe that -- yes.  We believe that

10  very clearly we disclosed that the '138 patent -- we're

11  making -- to be very candid, Your Honor, we're making the exact

12  same argument that was made at the patent office.  They are

13  aware of that.  They've made a big deal about saying you're

14  just making the same argument that was made at the patent

15  office, and we are.  We're not disputing that point.

16         THE COURT:  Okay.  They're saying you didn't disclose

17  that in discovery.

18         MR. TILLER:  It was disclosed in -- you said we

19  couldn't use the claim chart.  You didn't say we couldn't use

20  the substance of what was in that claim chart.  The claim chart

21  very clearly talks about the '138 patent and the line --

22         MR. SANTHANAM:  That is the only place in his report

23  that the '138 patent is mentioned in connection with the DABCO

24  patent, and on top of that, we would add under Section 282, 35

25  USC 282.

1          THE COURT:  Okay.  Let's stop.

2          (Bench conference concluded.)

3          THE COURT:  Ladies and gentlemen, excuse you to the

4    jury room for a few minutes.  Please don't talk about the case.

5          (At 2:38 p.m., jury leaves.)

6          THE COURT:  All right.  So does somebody want to hand

7    me up what the disclosure -- somebody for Syngenta, the

8    disclosure where you're saying this was not disclosed.

9          MR. SANTHANAM:  Yes, Your Honor.  In fact, the -- we

10   would point -- direct Your Honor to -- it's in the binder

11   that's before you, DX-30.

12         MR. TILLER:  This isn't the whole thing.

13         MR. SANTHANAM:  That's Dr. Lipton's report.

14         MR. TILLER:  No, this is not it.

15         MR. SANTHANAM:  We can put it up.  We have a copy,

16   Your Honor.

17         THE COURT:  All right.  I've gotten it in front of me

18   now.

19         MR. SANTHANAM:  If Your Honor would turn -- first of

20   all, the argument I was making -- the first part of the

21   argument is under 35 USC 282.  It's the defendant's burden in a

22   patent infringement case to identify the prior art on which

23   they're going to rely, and they filed no such notice

24   whatsoever.

25         All we're relying on is the report that Dr. Lipton

1   submitted in this case, and if Your Honor would turn to the

2   back end of this report, starting on page 14, that's where he

3   discusses the '761 patent, and the only discussion of combining

4   Weintritt with any other patent, including the '138 patent, is

5   in the claim chart that Your Honor, if you would recall, we

6   filed a Daubert motion on, and you reserved your ruling with

7   respect to whether or not that they could raise the arguments

8   within that claim chart.

9           THE COURT:  Okay.  But if it's in the claim chart,

10  clearly they gave you notice of it.

11          MR. SANTHANAM:  Well, that's a -- that's the

12  question, Your Honor.  So the ruling was reserved on the claim

13  chart, and we moved to exclude all of those opinions, and to

14  the extent that they're now relying on that same claim chart,

15  we raise that same question because --

16          THE COURT:  It's two different questions.  The claim

17  chart is one question.  Is it -- does it come into evidence.

18  But you're make -- your first argument was a notice argument.

19          MR. SANTHANAM:  Yes.

20          THE COURT:  So I do not understand how you can make a

21  notice argument, if you got notice in the chart.

22          MR. SANTHANAM:  Well, the argument is based on

23  Section 282, Your Honor.  They're supposed to file a notice, an

24  actual filing, 30 days before the trial.

25          THE COURT:  15 USC 282?

```
 1              MR. SANTHANAM:  35 USC --

 2              THE COURT:  35, I knew it was a 5, sorry.  It's

 3   well-established I'm not a patent lawyer.  Would you go get the

 4   statute for me.  That will be interesting since I sent her to

 5   get a book and young lawyers --

 6              MR. SANTHANAM:  It's 35 USC 282, Subsection C, Your

 7   Honor, and I can read it for the record.

 8              THE COURT:  I mean, it says what it says.  I'd just

 9   like to look at it.

10              MR. SANTHANAM:  Would Your Honor like a copy of it?

11   We have it here.

12              THE COURT:  Well, she's bringing it to me.

13              This says the party asserting invalidity shall give

14   notice in the pleadings or otherwise in writing.  That's what

15   you're saying requires them to file a notice, specifically 30

16   days before the trial starts?

17              MR. SANTHANAM:  That's correct, Your Honor.

18   Typically a notice, a 282 notice, is filed, and we received no

19   such notice.

20              THE COURT:  But you got notice in writing through his

21   report.  I'm just having trouble understanding this.  Maybe

22   it's because I don't know anything about patent litigation, but

23   as I read it, it says you have to get notice in writing, and

24   they gave you his report, which seem to give notice in writing,

25   so what's the problem?
```

 1          MR. SANTHANAM:  Well, it's a two-part problem.
 2   It's -- one, they didn't file a 282 notice, and to the extent
 3   that that's -- you know, to the extent the report is sufficient
 4   notice, we object to the use of a --
 5          THE COURT:  Okay.  Do you have a case that says that
 6   282 requires a specific notice filed like you're suggesting as
 7   opposed to some other kind of writing?
 8          I assume you agree, Mr. Tiller, that you did not file
 9   a specific thing entitled 282(c) notice?
10          MR. TILLER:  We did not.
11          THE COURT:  Okay.
12          MR. SANTHANAM:  We don't have that research before
13   us, Your Honor.
14          THE COURT:  Okay.  All right.  Now, what's -- that's
15   overruled.  What's your second argument.
16          MR. SANTHANAM:  The second objection or argument is
17   that the sole basis that they have for combining the '138
18   patent with the '761 is part of this claim chart, and we
19   objected to that claim chart as part of our Daubert motion, and
20   Your Honor reserved your ruling on that until later.
21          THE COURT:  Well, you're just going to have to remind
22   me of your argument because --
23          MR. SANTHANAM:  The argument, Your Honor -- and the
24   witness is on the stand, so I'll note that for the record, but
25   the argument is that counsel for Willowood provided the witness

1    a claim chart even before he began on this litigation.

2            THE COURT:  Right, I remember that part, yep.

3            MR. SANTHANAM:  That's the claim chart -- that's the

4    sole place in his report where he combines the '138 patent with

5    the '761 -- with Weintritt.

6            THE COURT:  I'm sorry, let me just find my order so I

7    can be sure that I have it in front of me.

8            What I -- I covered a lot of ground in here.

9            Okay.  What I said, this is what I recalled.  I said,

10   the Court does not decide here whether this chart will be

11   admissible at trial.

12           MR. SANTHANAM:  Correct.  And if the chart is not

13   admissible, Your Honor, I mean, that's the sole -- if that's

14   not part of his report, there's absolutely nothing in the

15   record.

16           THE COURT:  You are -- expert reports often aren't

17   admitted into evidence.  I mean, you all didn't offer Dr.

18   Wilner's report into evidence.  I mean, actually we were just

19   discussing that in the office this morning.  You know, the

20   reports usually, in my experience, don't come into evidence.

21           MR. SANTHANAM:  I will absolutely agree.

22           THE COURT:  So I don't understand what you're -- I

23   don't understand your argument.  I mean, the fact that the

24   chart is or is not admissible has nothing to do with the

25   information in the report.

1      MR. SANTHANAM:  And our Daubert motion had nothing to
2  do with the admissibility of the chart, Your Honor.  It was the
3  fact that they were making an argument that was formulated by
4  counsel, even before Dr. Lipton became involved in this case
5  and was provided to him.  That was the basis of our objection.
6      And the way we understood Your Honor's ruling -- if
7  we misunderstood, we apologize -- but the way we understood it,
8  is that Your Honor reserved the ruling as to whether or not
9  that argument, those arguments within that claim chart, can
10  come in until later.
11      THE COURT:  Well, I don't believe that's what I
12  meant.  I said -- I'm sorry it was not clear.  You all argued
13  about -- often argued about a lot of things that were not the
14  exact focus of the motion, and so I'm sorry if that wasn't
15  clear.  But I don't want to cut you off in making your record,
16  so anything else you want to say to me about it.
17      MR. SANTHANAM:  That's it.  Those are the two
18  arguments, Your Honor.
19      THE COURT:  What does the defendant want to say?
20      MR. TILLER:  Your Honor, we have no intention --
21  first of all, as to the 282 issue, we believe that this --
22      THE COURT:  As to the what?
23      MR. TILLER:  As to the 282 issue, we believe that
24  this is sufficient notice, since 282 says "or otherwise."
25      Two, we have no intention of admitting this claim

1    chart, but -- and any insinuation that counsel -- that

2    Dr. Lipton is just regurgitating what counsel told him is

3    obviously strongly objected to.  Dr. Lipton has formed his own

4    opinions in this regard by the --

5           THE COURT:  I rejected that argument as a basis

6    explicitly, did I not, in summary judgment?

7           MR. TILLER:  I'm --

8           THE COURT:  I rejected Syngenta's argument.

9           MR. TILLER:  Yes, I wanted to make sure I understood

10   what you were saying.

11          THE COURT:  I apologize.  Yeah, I'm sorry that wasn't

12   very clear.

13          MR. TILLER:  I thought you were saying our argument.

14          THE COURT:  No, no.  I rejected -- I mean, I guess

15   I'm agreeing with you, so I may not have sounded like it.

16          MR. TILLER:  Then I will sit down.

17          THE COURT:  All right.  That objection's overruled,

18   and I'll allow him to testify.  Anything else before we bring

19   the jury back in?

20          MR. SANTHANAM:  One other argument, Your Honor,

21   unrelated to this, that I do want to bring to Your Honor's

22   attention --

23          THE COURT:  Yes.

24          MR. SANTHANAM:  -- which is, if Your Honor recalls

25   from the June 2nd conference, we did address a second motion to

```
 1   exclude with respect to commercial reasonableness.  Rather than
 2   making that full-blown objection during -- while the jury's
 3   here, if I do object, I'll make note of it by saying "subject
 4   to the Court's prior order."
 5          THE COURT:  What did I say about that?  Commercial
 6   reasonableness.
 7          MR. TILLER:  I don't believe Dr. Lipton's going to go
 8   into that anyway so --
 9          THE COURT:  Good.  Then I don't have to remember
10   it --
11          MR. TILLER:  Maybe I'm wrong, but --
12          THE COURT:  -- he needs -- can you get the witness
13   some more.
14          MR. TILLER:  Yes, I will get him some water.
15          THE WITNESS:  Thirsty business.
16          THE COURT:  Okay.  All right.  You can bring the jury
17   back in.
18          (At 2:38 p.m., jury arrives.)
19          THE COURT:  All right.  We're ready to proceed, and I
20   can't remember if there was a question pending or not, so just
21   ask another question.
22          MR. TILLER:  I don't remember, either, Your Honor,
23   but thank you.
24   BY MR. TILLER:
25   Q.   Dr. Lipton, what's your understanding of the disclosure
```

1  date of the '138 patent?

2  A.   Could we have the '138 patent?

3  Q.   Can we have the '138 patent, please?  It's probably the

4  second page.

5           THE COURT:  I'm sorry.  Keep your voice up.

6           MR. TILLER:  It is probably the second page, Bonnie.

7  The date of the patent?

8           THE WITNESS:  Is December 8th, 1998.

9           THE COURT:  This is the '138 patent we're looking at

10 now?

11          MR. TILLER:  That's the '138 patent.

12          THE WITNESS:  This is the '138 patent.

13 BY MR. TILLER:

14 Q.   And again, the earliest date of the '761 patent was

15 April 26, 2005, correct?

16 A.   That is correct.

17 Q.   Okay.  So is it your understanding that the '138 patent is

18 prior art to the '761 patent?

19 A.   Yes.

20 Q.   What is the difference -- very simply, what is the

21 difference between the '138 patent and the '761 patent?

22 A.   The only substantive difference between the two patents is

23 the use of catalytic quantities of DABCO in the condensation

24 step in the '761 patent.

25 Q.   Let me break that down a little bit.  First of all, you

testified earlier that the '138 covered etherification followed
by condensation to make azoxystrobin, is that correct?

A.    That is correct.

Q.    Does the '761 patent cover or claim etherification in any
way?

A.    No, it does not.

Q.    Okay.  So that's one difference.

A.    Yes.

Q.    And then, explain what you meant by a catalytic amount of
DABCO.

A.    So the '761 patent describes --

        THE COURT:  Can you -- I'm getting a little feedback
on his mike, so I'm just going ask her to adjust that a little
bit so I can hear you better.

        THE WITNESS:  Is this better?

        THE COURT:  Yes.

        THE WITNESS:  The '761 patent describes a
condensation step in which between .1 and 2 molar percent of
DABCO is introduced to catalyze the condensation step.

BY MR. TILLER:

Q.    And what does it mean to catalyze?

A.    Catalysis means that a substance, a catalyst, is
introduced into a reaction which will make the reaction go
faster, and the catalyst itself is not consumed in the
reaction.

1    MR. TILLER:  And just for the record, I think I'm
2  right about this, but does '761 patent and the '138 patent have
3  already been admitted into evidence as Plaintiff's 3 and 4,
4  correct?
5    THE COURT:  The clerk says yes.
6    MR. TILLER:  Okay.  I'd like to show what has been
7  marked as DX-6.  Could you go the first page, please, Bonnie.
8  Do you recognize -- could you just go ahead and call that out,
9  Bonnie, that first whole page.
10 BY MR. TILLER:
11 Q.   And what is this, Dr. Lipton?
12 A.   This is what's been referred to as the Weintritt patent.
13 Q.   Now this is the application that led to --
14 A.   This is the application, correct.
15 Q.   And what is the publication date?
16 A.   The publication date is May 15th, 2003.
17 Q.   So is it your understanding that this is also prior art to
18 the application that led to the '761 patent?
19 A.   Yes, it is my understanding.
20 Q.   What is your understanding -- or how about this?  Can you
21 briefly describe what is covered in the Weintritt publication
22 or application?
23 A.   The Weintritt application discloses a process for making
24 asymmetrically substituted 2,6-di-bis(aryloxy)pyrimidines, of
25 which azoxystrobin would be a member, using a catalytic amount

1   of DABCO in a condensation step.  But the quantity of DABCO in

2   this Weintritt patent is between 2 and 40 molar percent.

3   Q.   All right.  Let me first ask -- I missed a question

4   earlier, but then we're going come back to that.

5            In '138, you said '138 does not deal with a catalytic

6   amount of DABCO, correct?

7   A.   That's correct.

8   Q.   Does the '138 patent disclose use of a catalyst?

9   A.   Yes, it does.  The catalyst disclosed in the '138 patent

10  is copper chloride.

11  Q.   And is copper chloride and DABCO similar to each other?

12  A.   Beyond the fact they both catalyze this condensation step,

13  there are really no chemical similarities between the two.

14  Q.   Okay.  So the only similarity is that they act as a

15  catalyst?

16  A.   Correct.

17  Q.   Okay.  Now, in talking about Weintritt, would you agree

18  that the Weintritt application covers the synthesis of many

19  molecules?

20  A.   Yes.

21  Q.   Okay.  You assert that one of them -- strike that.

22           Do you assert that one of those molecules that is

23  disclosed in Weintritt is azoxystrobin?

24  A.   Yes.

25  Q.   I'd like to show you what's on the screen right now as

1  Defendant's Demonstrative 1.  Can you please explain what's on
2  this first page?
3  A.   On this first page is Structure 1 from the Weintritt
4  patent.  This is the structure that the Weintritt patent says
5  they are concerned with making.  And it's a generic structure,
6  so it has a number of groups, such as A-R superscript 1X, and
7  L1 through L5.  All of these are generics that describe a broad
8  class of substituents at those positions.
9  Q.   So let's look at those positions.  Bonnie, could you go to
10 the next page.  So let's, first, talk about these substituents
11 that are described here.
12 A.   In paragraph 17 of Weintritt, Weintritt explains that the
13 AR-1 substituent can be a substituted or unsubstituted aryl or
14 heterocycl -- and the 2-cyanophenyl group of azoxystrobin is,
15 in fact, a substituted aryl group.
16             THE COURT:  A substituted what?
17             THE WITNESS:  Aryl group.
18             THE COURT:  A-R-Y-L?
19             THE WITNESS:  A-R-Y-L, yes.
20             MR. TILLER:  And can you -- where is the -- Bonnie,
21 can you not -- and then -- where is the -- leave that there,
22 please.  Thank you.
23 BY MR. TILLER:
24 Q.   Where is the substituted aryl 2-cyanophenyl group?
25 A.   It's highlighted in orange on this screen.

1  Q.   Okay.  That is orange.  I had it as red for a second.

2  Bonnie, could you go to the next page, please.  Could you

3  explain this, Doctor?

4  A.   In Paragraph 18 of the Weintritt application, the

5  statement is made that the X-substituent represents a variety

6  of different things, hydrogen, fluorine, chlorine, or bromine.

7  And in azoxystrobin, that substituent would be hydrogen, and

8  that's highlighted in green.

9       MR. TILLER:  Bonnie, could you go to the next slide,

10 please.  Thank you.

11      THE WITNESS:  In paragraph 20 of the Weintritt

12 application, it is stated that L1, L2, L3, and L4 are identical

13 or different and independently of one another represent a

14 variety of things, first of which is hydrogen.  In

15 azoxystrobin, all four of those groups are hydrogen.  They are

16 highlighted in purple.

17      MR. TILLER:  Bonnie, could you go to the next page,

18 please.

19      THE WITNESS:  In paragraph 21 in the Weintritt

20 application, it states that L5 represents one of the groups

21 below.  There is a list of groups, the first of which is the

22 methoxyacrylate side chain of azoxystrobin, which I have

23 highlighted in blue.

24 BY MR. TILLER:

25 Q.   So just to make sure we're all saying the same thing here,

1  the orange group is the 2-cyanophenyl group?

2  A.    Yes.

3  Q.    And the blue group is the methoxyacrylate group?

4  A.    That is correct.

5          MR. TILLER:  Okay.  Bonnie, can you go to the next

6  page.

7  BY MR. TILLER:

8  Q.    And what are we looking at there?

9  A.    That is the structure of azoxystrobin.

10 Q.    So based on that description in paragraphs 15 through 20

11 of the Weintritt publication, do you believe that a person of

12 ordinary skill in -- actually, I have to ask a question first

13 that I forgot about.

14          What is a -- do you know what a person of ordinary

15 skill in the art is?

16 A.    Yes.  I have defined a person --

17 Q.    Let me ask you generally.  You stated that your

18 understanding of invalidity -- a patent invalidity is if it

19 would have been obvious to a person of ordinary skill in the

20 art, correct?

21 A.    Yes.

22 Q.    What is your belief or who is your belief is the person of

23 ordinary skill in the art in this particular matter?

24 A.    For this matter, I would say a person of ordinary skill in

25 the art is someone with a bachelors or a masters level

1  education in chemistry or chemical engineering with experience

2  in organic synthesis, and between two to five years experience

3  in the agriculture chemical industry.

4  Q.   Okay.  Using that as your frame of reference, do you

5  believe that person of ordinary skill in the art would have

6  known that Weintritt -- and this would be looking at Weintritt

7  in 2003 or 2004 -- that would have known that Weintritt would

8  have disclosed the synthesis of azoxystrobin?

9  A.   Yes.

10  Q.   Okay.  Now, does Weintritt disclose a condensation

11  reaction?

12  A.   Yes, it does.

13  Q.   Could you -- we can bring it up if you want, but could you

14  just generally explain the condensation reaction in Weintritt?

15  A.   In Weintritt, the condensation reaction involves the

16  reaction of 2-cyanophenyl with the cyanoacrylate-substituted

17  chloropyrimidine intermediate that is the product of the

18  etherification reaction in the presence of between 2 and 40 mol

19  percent DABCO and also in the presence of an acid acceptor.

20  Q.   Okay.  Let's take that apart a little bit.  How does the

21  condensation reaction disclosed in Weintritt compare to the

22  condensation reaction disclosed in the '138 patent?

23  A.   The condensation reaction is the same with the addition of

24  the catalytic DABCO.

25  Q.   I understand.  I was going to get to that.  But the

1  reaction itself, the reactants, excluding DABCO, are the same?

2  A.    Yes, they are.

3  Q.    Okay.  So then, again, Weintritt discloses use of DABCO.

4  How much DABCO is disclosed in Weintritt?

5  A.    In Weintritt, they used between 2 and 40 mol percent of

6  DABCO.

7  Q.    Okay.  Now, is there anything in the disclosure in

8  Weintritt that you saw that would suggest to a person of

9  ordinary skill in the art that the 2 molar percent, the bottom

10 of what's claimed in Weintritt, is there anything to suggest

11 that 2 molar percent DABCO is a hard floor below which DABCO

12 would not catalyze the reaction?

13 A.    No.  There certainly is nothing to indicate that 2 mol

14 percent represents a hard limit.  And, you know, quite the

15 contrary.  The language in the Weintritt application says, in

16 general, between 2 and 40 mol percent, which makes it sound,

17 you know, quite a bit less certain that 2 mol percent

18 represents some limit to reactivity.

19        MR. TILLER:  Bonnie, can you please bring up

20 paragraph 127 of Weintritt.  Go up, please, 127 and 128.

21 BY MR. TILLER:

22 Q.    Is this what you're referring to in Weintritt?

23 A.    Yes -- yes, it is.

24 Q.    Okay.  And you're specifically referring to -- for

25 carrying out the process according to the invention, in

```
 1  general, from 2 to 40 molar percent, preferably from 2 to 20
 2  molar percent of DABCO is employed --
 3  A.   Yes.
 4  Q.   -- that's what you're referring to?  Okay.
 5            THE COURT:  And so just -- that diazabicyclo
 6  octane --
 7            THE WITNESS:  Diazabicyclo 2.2.2 octane is the
 8  official name of DABCO, and you can see why we call it DABCO.
 9            THE COURT:  I knew I butchered it.  I'm so sorry.
10  Okay.  Go ahead.
11            MR. TILLER:  Doesn't quite roll off the tongue, does
12  it?
13            THE COURT:  No.
14  BY MR. TILLER:
15  Q.   So while Weintritt discloses the use of from 2 to 40 molar
16  percent in general, would you still, nonetheless, concede that
17  Weintritt claims 2 to 40 molar percent, correct?
18            MR. SANTHANAM:  Objection, leading.
19            THE COURT:  Well, sustained.
20  BY MR. TILLER:
21  Q.   How much DABCO is claimed by Weintritt?
22  A.   From 2 to 40 mol percent.
23  Q.   Okay.  Now, Dr. Lipton, let me take you to paragraph 109,
24  please.
25            THE COURT:  And you're still looking at the Weintritt
```

1  patent?

2          MR. TILLER:  At Weintritt, yes, I am.

3  BY MR. TILLER:

4  Q.    Why don't you take a second to read that paragraph.

5  A.    Okay.

6  Q.    Now, would you agree with me or do you see where it says:

7  It is extremely surprising -- and I'll cut to the chase -- it's

8  extremely surprising that from 2 to 40 molar percent works.  Do

9  you see that?

10 A.    Yes, I do.

11 Q.    Does that statement in Weintritt lead you to believe or do

12 you believe that that statement in Weintritt would have led a

13 person of ordinary skill in the art to believe that using less

14 than 2 molar percent would not have worked?

15 A.    No, I don't.

16 Q.    Why not?

17 A.    Well, it was surprising to Weintritt because prior art had

18 always used more than one equivalent, more than 100 mol

19 percent, so it was surprising to them that less would work.

20 But there was nothing intrinsic to 2 to 40 mol percent that

21 would indicate that that would be the limit.

22 Q.    What do you mean by molar equivalent -- or what is meant

23 by "molar equivalent"?

24 A.    So "mol percent" in this case means for every molecule of

25 a reactant, how many molecules of a second reactant are

1 present. And so, 2 to 40 mol percent means for 100 molecules

2 of reactant, would you have 2 to 40 molecules of the catalyst

3 present.

4 Q. So what does "molar equivalent" mean?

5 A. Well, one equivalent would be a one-to-one ratio.

6 Q. So 100 percent?

7 A. 100 mol percent.

8 Q. Okay. So it was surprising to Weintritt -- so the prior

9 art, as you say, disclosed use of a molar equivalent, or 100

10 molar percent DABCO, correct?

11 A. Yes, I think at least one equivalent.

12 Q. And Weintritt, then, disclosed that 2 -- as low as 2 molar

13 percent could be used?

14        MR. SANTHANAM: Objection, leading.

15        THE COURT: Well, overruled as to that question.

16        THE WITNESS: Yes. That is what Weintritt discloses.

17 BY MR. TILLER:

18 Q. Based on those disclosures in the '138 patent and

19 Weintritt, do you believe that the invention disclosed in the

20 '761 patent would have been obvious to a person of ordinary

21 skill in the art in 2004 in light of the '138 patent and the

22 Weintritt disclosure?

23 A. Yes, I do.

24 Q. Please explain.

25 A. Well, because nothing within the Weintritt patent

1    categorically states that 2 mol percent is the lower limit,

2    it's quite common in the business of catalysis to try to

3    minimize catalyst loading by going to lower and lower levels of

4    catalyst in a reaction.  And so, one would naturally, I think,

5    want to explore just how low one could go and still get

6    sufficient catalysis for your reaction.

7    Q.    Why does one want to explore as low as one can go?

8    A.    Well, there's several reasons why you would want to do

9    this.  The first reason is, in some cases, catalysts are quite

10   expensive, and so you want to minimize costs by using the

11   lowest amount of catalyst needed.

12          A second reason why you would want to do this is

13   because catalysts aren't consumed in reactions.  They are

14   necessarily present as an impurity in your product, and

15   purification is usually easier with lower levels of impurity,

16   so lowering the amount of catalyst could, in fact, make

17   purification substantially easier.

18          A third reason is that some catalysts could be toxic,

19   and to minimize toxicity, one might want to use lower levels of

20   catalyst.  So any of these reasons could be a reason to go

21   lower than the published amount.

22   Q.    And do you believe that that would have been true for the

23   person of ordinary skill in the art in 2003 after the Weintritt

24   publication was published?

25   A.    Yes, I do.

1  Q.   And do you believe that a person of ordinary skill in the

2  art in 2003 or 2004 would have attempted to find an even lower

3  level of DABCO that would have provided sufficient catalytic

4  effect below 2 molar percent given the disclosures in the '138

5  patent and Weintritt applications?

6  A.   Yes, I do.

7  Q.   Do you believe that that person of ordinary skill in the

8  art would have reasonably believed that lower levels of DABCO

9  would have led -- or strike that.

10         Do you believe that a person of ordinary skill in the

11  art would have reasonably --

12         THE COURT:  Slow down.

13         MR. TILLER:  I'm sorry, Your Honor.

14  BY MR. TILLER:

15  Q.   Do you believe that a person of ordinarily skill in the

16  art would have reasonably believed that using lower levels of

17  DABCO below 2 percent would have worked?

18  A.   Given what's available in the Weintritt patent, there is

19  no reason to believe that going to 1.9 mol percent, 1.5 mole

20  percent wouldn't offer some amount of catalytic benefit as

21  well.  So, there would be every expectation that you could go

22  lower and still see some amount of catalysis.

23         THE COURT:  And still see what?

24         THE WITNESS:  Some amount of catalysis.

25  BY MR. TILLER:

1    Q.    And again, what is catalysis?

2    A.    Catalysis is the property of speeding up a reaction.

3    Q.    I'd like to have you take a look at Defendant's Exhibit

4    35.  I think that's -- at least some portion of that is in your

5    binder.

6              MR. SANTHANAM:  Your Honor, again, we object to this,

7    and if we may have a quick sidebar on this.

8              THE COURT:  All right.

9              (Bench conference as follows:)

10             THE LAW CLERK:  I'm sorry.  I just wanted to clarify

11   whether Defendant's Exhibit 35 has been admitted.

12             THE COURT:  All right.

13             MR. SANTHANAM:  There's absolutely no disclosure in

14   any of his reports about this document or opinions related to

15   it.

16             MR. TILLER:  This -- we're not relying on this as

17   prior art.

18             THE COURT:  Okay.

19             MR. TILLER:  This is just support.  This is just

20   essentially anecdotal support for what -- I mean, Dr. Lipton

21   has already testified to this, the exact same issue.

22             MR. SANTHANAM:  He's offered no opinions in any of

23   his reports.  We've had no notice about any opinions that he

24   has.

25             MR. TILLER:  This is not prior art.

1          THE COURT:  You're saying it wasn't disclosed as

2    something he looked at?

3          MR. SANTHANAM:  Exactly.  There was no disclosure of

4    opinions related to this document.

5          MR. TILLER:  I'll withdraw.

6          THE COURT:  Okay.

7          MR. TILLER:  It's just easier.

8          THE COURT:  Go ahead.

9    BY MR. TILLER:

10   Q.    So let me just make sure, Doctor, that we've kind of

11   dotted all the I's and crossed all the T's.

12          Is it your opinion to a reasonable degree of

13   scientific probability that the invention claimed in Claim 1 of

14   the '761 patent would have been obvious to a person of ordinary

15   skill in the art at the time that the invention was made in

16   light of the '138 patent and Weintritt application?

17   A.    I do.

18   Q.    Now, are you aware that the patent examiner at the patent

19   office -- let me ask you this first.

20          What does it mean for -- what is a prosecution

21   history of a patent application?

22   A.    A prosecution history is the patent application, the

23   filing, as well as the response of the patent examiner and any

24   back and forth communications that may have taken place with

25   the patent applicant.

Q.   Okay.  Are you aware that the patent application -- or

that the patent examiner, during prosecution of the application

that led to the '761 patent, initially rejected the application

based on the exact same argument that you're raising here

today?

A.   Yes, I do.

Q.   Okay.  Now, I'd like you to take a look at Defendant 5,

which should be in your binder.

          MR. TILLER:  And, Judge, I would move, and I need a

quick clarification here.  What's in the binder is a portion of

the prosecution history, because the prosecution history was

about 500 pages, and I didn't want to --

          THE COURT:  Okay.

          MR. TILLER:  -- make too many copies of it when we

were only going to be looking at one or two pages.  So while

what is in here is a portion of the prosecution history, we

would move for admission of the entire prosecution history and

we will make sure that's included in the record.

          MR. SANTHANAM:  We don't have any objection, Your

Honor.

          THE COURT:  All right.  Defendant's 5 will be

admitted.  And this is part of Defendant's 5 that's here in the

notebook.

          MR. TILLER:  This is a small portion.

          THE COURT:  Okay.

BY MR. TILLER:

Q.    So let me first take you, Doctor -- you've already

testified that the examiner raised this exact same issue,

correct?  You're aware of that?

A.    Yes, I am.

Q.    And then the applicant made an argument, correct?

A.    Yes, they did.

Q.    And, in fact, that argument, I believe, is on -- and

unfortunately, these are not numbered because this was taken

straight off the patent trademark office website.

          THE COURT:  Okay.  Just --

          MR. TILLER:  I'm trying to find the page, Your Honor.

It's right around 12 or 13, it's the response.  What page is

that, Bonnie?  Keep going, please.  Keep going.  Keep going.

Keep going.  There it is.  If you go to the next page, Bonnie.

BY MR. TILLER:

Q.    Have you had a chance to review the response to the

rejection that was made by the patent examiner?

A.    I have.

Q.    Okay.  Looking at the last two paragraphs, please, Bonnie,

you will see that the -- do you see where it says:  The

applicant notes the present claims recites the presence of

0.1 -- of between 0.1 and 2 molar percent of DABCO, a

percentage lower than that described in Weintritt.  Do you see

that?

1  A.   Yes, I do.

2  Q.   The applicant goes on to say:  In Weintritt, DABCO is used

3  in less than molar amounts, that is, from 2 molar percent to 40

4  molar percent.  Do you see that?

5  A.   Yes.

6  Q.   Later on, the applicant says:  In view of Weintritt, a

7  person of ordinary skill in the art would be directed to use

8  the amount of DABCO recommended by Weintritt, i.e., from 2

9  molar percent to 40 molar percent.  Do you see that?

10  A.   Yes.

11  Q.   And then, the applicant goes on to say:  In doing so, he

12  would not arrive at the invention presently claimed, which

13  recites between 0.1 and 2 molar percent.  And, as indicated on

14  page 5, the term "between" is defined as more than 0.1 and less

15  than 2.  Do you see that?

16  A.   I do.

17  Q.   And is it your understanding that after this document was

18  filed, that the examiner issued the patent?

19  A.   I do.

20  Q.   Okay.

21           THE COURT:  And if I could just clarify.  The

22  applicant being referred to here is Syngenta, is that right --

23           MR. TILLER:  It's technically --

24           THE COURT:  -- or their predecessor?

25           MR. TILLER:  It's actually technically Dr. Whitton

1   and the inventors.

2           THE COURT:  Okay.  That's the inventor?

3           MR. TILLER:  Yeah.

4           THE COURT:  Thank you.  I just don't know who the

5   applicant is.

6           MR. TILLER:  I'm sorry.

7   BY MR. TILLER:

8   Q.   So you understand that the examiner ultimately issued the

9   patent, notwithstanding the argument that you're raising here?

10  A.   I do.

11  Q.   Okay.  So would you agree with me that in order for you to

12  be correct, the examiner would have had to have been incorrect?

13  A.   Yes, I disagree with the examiner's conclusion.

14  Q.   Okay.  So you believe the examiner was incorrect?

15  A.   I do.

16  Q.   Okay.  Let's look at the remaining claims that are being

17  asserted in this case.

18          MR. TILLER:  Bonnie, if you could bring up the '761

19  patent, Claims 3, 4, and 5.

20  BY MR. TILLER:

21  Q.   Dr. Lipton, could you explain what is being claimed in 3,

22  4, and 5?

23  A.   In 3, 4, and 5, the claims are that the reaction that they

24  claim in Claim 1, that is to say, the DABCO catalyzed

25  condensation, should be carried out in an inert solvent, that's

1   Claim 3.  And then, moreover, in Claim 4, that the inert

2   solvent should be one of a short list, including isobutyl

3   ketone, cyclohexanone, DMF, isopropyl acetate, or diisopropyl

4   ethylamine.

5   Q.   Okay.  You mentioned DMF.  I don't see DMF.  Which one is

6   DMF?

7   A.   DMF is shorthand for N,N-Dimethyl formamide, which is the

8   last one in the list.

9   Q.   Can you highlight that in Claim 4, Bonnie.  That's the

10  wrong one, please.

11          THE WITNESS:  It is the other N, N.

12          MR. TILLER:  It's the other N, N.

13          THE COURT:  What's the abbreviation you're using for

14  that?

15          THE WITNESS:  It commonly abbreviated DMF.

16  BY MR. TILLER:

17  Q.   So Claim 3 is claiming the reaction in an inert solvent,

18  is that right?

19  A.   Yes, that is correct.  Claim 4 lists a short list of inert

20  solvents to be used.  And Claim 5 narrows it down to DMF.

21  Q.   Do you believe that the use of DMF is disclosed in the

22  '138 patent?

23  A.   Yes, I do.

24          MR. TILLER:  Okay.  Bonnie, could we quickly bring up

25  the '138 patent.  Please go to where DMF is identified.

1   BY MR. TILLER:

2   Q.   Do you see DMF in there being used, Doctor?

3   A.   Yes, I do.

4   Q.   Do you believe that DMF is disclosed as being used in the

5   Weintritt application?

6   A.   Yes, I do.

7            MR. TILLER:  Bonnie, could we please go to Weintritt.

8   I think it's in paragraph 115.  It might have been in 114, too.

9            MR. SANTHANAM:  I'm going to object this as leading,

10  Your Honor.

11           THE COURT:  Okay.  Well, what's the question?

12           MR. TILLER:  We're trying to just show --

13           THE COURT:  Okay.  Ask him the question.

14  BY MR. TILLER:

15  Q.   Where is DMF shown in the Weintritt application?

16           MR. SANTHANAM:  Your Honor, we object to leading.

17           THE COURT:  He's asking him where, so he can answer

18  where.  He already said it was in there, so he can answer that

19  question.  Go ahead.

20           MR. SANTHANAM:  The paragraph is right in front of

21  him, Your Honor.

22           THE COURT:  I'm sorry?

23           MR. SANTHANAM:  The paragraph is right in front of

24  him.  At this point, it's leading.

25           THE COURT:  Overruled.

1    THE WITNESS:  Well, DMF appears in several places in

2 the Weintritt patent.  But in this paragraph, it's found about

3 three-quarters of the way down on the right.

4    MR. TILLER:  Okay.  Could we go back to the '761

5 patent, Bonnie, and could we please take a look at Claims 9 and

6 10, which are the remaining claims being asserted in this case.

7 BY MR. TILLER:

8 Q.   Could you please explain what is being claimed in Claims 9

9 and 10, Doctor?

10 A.   In 9, the claim is that the condensation reaction should

11 be carried out in the presence of an acid acceptor.  Claim 10,

12 then, narrows the focus down to two particular bases, potassium

13 carbonate and sodium carbonate.

14 Q.   You've changed words on there so let me ask --

15 A.   Yes, I did.

16 Q.   So, first of all, what's an acid acceptor?

17 A.   And acid acceptor is another term for a base.

18 Q.   So when you use the term "base" referring to Claim 10,

19 that meant what?

20 A.   An acid acceptor.

21 Q.   Okay.  So is it your understanding -- if we could look at

22 '138 again.

23    Is it your understanding that '138 patent discloses

24 the use of sodium or potassium carbonate as an acid acceptor?

25 A.   Yes, it does.

1  Q.   If you could take a moment to read that.  Do you see the

2  use of sodium or potassium carbonate?

3            THE COURT:  I'm sorry.  I don't think --

4            MR. TILLER:  Do you see the use of --

5            THE COURT:  I don't know what we're looking at.

6            MR. TILLER:  This is '138, I'm sorry.

7            THE COURT:  Ask the witness.

8  BY MR. TILLER:

9  Q.   Do you know what we're looking at here?

10 A.   Yes.

11 Q.   And what is it?

12 A.   This is a section of the '138 patent.

13 Q.   And do you see in the '138 patent the disclosure of the

14 use of sodium or potassium carbonate?

15 A.   Yes, I do.

16           MR. SANTHANAM:  I'm going to continue to object to

17 this as leading, Your Honor.  He's basically pointing the

18 witness to portions of the patent, telling the witness what is

19 there.

20           MR. TILLER:  I'm happy to have him read the whole

21 thing, Your Honor.

22           THE COURT:  Okay.  We'll just sit here while he reads

23 the whole thing if that's what we need do.

24           MR. TILLER:  I'm hoping we can avoid that.

25           THE COURT:  Yeah.  Go ahead.

1  BY MR. TILLER:

2  Q.    Let's take a look at Weintritt.

3  A.    Okay.

4  Q.    Do you believe that Weintritt discloses the use of a

5  sodium or potassium carbonate?

6  A.    Yes, I do.

7  Q.    Could you please identify where that is?

8  A.    Can somebody -- oh, no, never mind.  I found it.

9  Q.    And where is it?

10 A.    It is the DTX-6 tab in my folder.

11 Q.    And where -- so you just found Weintritt, right?

12 A.    Yeah, I just found Weintritt.

13 Q.    You haven't found sodium or potassium carbonate yet?

14 Let's -- you believe it's in there, correct?

15 A.    Yes, I do.

16 Q.    Okay.  Let's move on.  So is it your opinion based on the

17 disclosures that we just looked at, that Claims 1, 3, 4, 5, 9,

18 and 10 are to a reasonable degree of scientific probability

19 invalid in light of the '138 patent and Weintritt applications?

20 A.    Yes, I do.

21       MR. TILLER:  Okay.  Now moving, on to a different

22 subject, Your Honor.  I don't know -- I don't have that much

23 more.  I don't know if you want to take --

24       THE COURT:  Do you have about five minutes or is it

25 longer than that?

1     MR. TILLER:  It might be a little more than that.

2          THE COURT:  All right.  We'll take our afternoon

3  break at this point, then.  Ladies and gentlemen, please

4  remember not to discuss the case among yourselves during the

5  break, and avoid contact with anyone.  And come back at 3:30.

6  Leave your notes in your chair.

7          (Jury excused.)

8          THE COURT:  Okay.  Anything before -- that anybody

9  wants to put on the record or bring my attention towards before

10 we take our break?  No?  All right.  We'll be in recess till

11 3:30.

12         (At 3:14 p.m. break taken.)

13         (At 3:30 p.m., break concluded.)

14         THE COURT:  Okay.  Are we ready?  Yes.

15         You can bring the jury in.

16         (Jury panel is present.)

17         THE COURT:  All right.  Mr. Tiller, you may continue.

18         MR. TILLER:  Thank you, Your Honor.

19 BY MR. TILLER:

20 Q.   Dr. Lipton, are you aware of a laboratory known as JDM?

21 A.   Yes, I am.

22 Q.   And what is your understanding of JDM?

23 A.   I understand that it's an analytical laboratory which was

24 established by Mr. Mundhra of Willowood Limited.

25 Q.   Are you aware that in 2015 JDM tested certain samples of

1    the azoxystrobin technical manufactured by Tai He?

2              MR. SANTHANAM:  Objection.  Foundation.

3              MR. TILLER:  That's the question I'm asking, are you

4    aware.

5              THE COURT:  Okay.  Well, he can answer that question.

6              THE WITNESS:  Yes, I am aware.

7    BY MR. TILLER:

8    Q.   And have you had an opportunity to review the results of

9    the JDM testing?

10   A.   I have.

11   Q.   What did the JDM testing reveal?

12             MR. SANTHANAM:  Objection.  Hearsay.

13             THE COURT:  Well, ladies and gentlemen, I'm so sorry

14   to make you just go right back into the jury room, but if

15   you'll step back into the jury room for a moment.

16             (The jury panel left the courtroom.)

17             THE COURT:  I was afraid I would not remember

18   correctly, so I just am trying to remember and lay my hands on

19   what I said about JDM -- the JDM testing, if anything.

20             MR. SANTHANAM:  Your Honor, the ruling you made was

21   on separate testing by CAC, but the -- it was Willowood that

22   objected to evidence of CAC's testing coming in before the

23   jury.  They made a hearsay objection, and to the extent that

24   the CAC test results are hearsay, those exact same arguments

25   apply to the JDM.  So our position would be either all of it

1  comes in or none of it comes in.

2       THE COURT:  What does Willowood say?

3       MR. TILLER:  Your Honor, first of all, as you are

4  well aware, experts can rely on hearsay to form an opinion and

5  that's what we're going to be asking him to do is to form an

6  opinion based on, in part, the JDM testing.  What I'm going to

7  ask him about are the actual chromatograms and the actual test

8  results that came out of the machines.

9       If you remember, there was a distinction and Syngenta

10 argued with regards to the CAC testing that if the data or if

11 the alleged hearsay statement is what literally comes out of

12 the machine, that that is not hearsay; and indeed, they are

13 right about that.  But that's not what was in the CAC e-mail.

14 The CAC e-mail was sort of a human analysis of the results of

15 something, which we didn't even know what it was.  This -- I'm

16 going to ask Dr. Lipton:  Have you had a chance to look at the

17 data?  What do you -- what is your opinion as a result?

18      MR. SANTHANAM:  Your Honor, there is no distinction

19 between the two.  The witness is talking about what tests were

20 performed, what samples -- again, he's going to have to lay

21 foundation for what samples were tested.  All of that is

22 hearsay.  To the extent that the CAC testing doesn't come in, I

23 mean, those exact same arguments apply to JDM and other testing

24 that Willowood might try to put in.

25      THE COURT:  Okay.  What opinion are you going to be

1  asking him?  I don't --

2        MR. TILLER:  JDM did not find DABCO.  PSL did not

3  find DABCO.  Based on that, what is your opinion about whether

4  DABCO existed?

5        MR. SANTHANAM:  And, Your Honor, our objection would

6  be how does he even know what was tested?  How does he know

7  what sample was tested?  All of that comes from hearsay and the

8  basis of their objection to having the CAC results come in is,

9  well, we don't know how that --

10        THE COURT:  Didn't I say that somebody could talk

11  about the CAC test, they just couldn't come in substantively?

12  Do I not remember that correctly?

13        MR. SANTHANAM:  You indicated that we could rely --

14  an expert could rely on it, Your Honor.  There needs to be a

15  little bit of clarification in the sense that if they bring in

16  JDM's testing and PSL's testing we would ask for the same

17  instruction that this testing should not be taken for the truth

18  of the matter asserted.  Furthermore, under Rule 703, you know,

19  to the extent that they do want to bring in this information,

20  they have to show that the probative value substantially

21  outweighs the prejudicial effect.  The comprise we would offer

22  is, you know, if some of it comes in, all of it comes in.

23        THE COURT:  Well, I'm -- at this point you've got to

24  do more.  He can't just testify to the results as if offering

25  them for the truth -- I'm looking at the Defendant -- because

1  they would be hearsay, nothing else appearing, if offered for

2  the truth.  If you're trying to get the results in through this

3  witness, I can't think, at least in terms of the question you

4  just asked him -- and that's all that really I have in front of

5  me right this second is that one question that you just asked

6  him.  So, you know, experts can rely on stuff, but you've got

7  to go through all the steps.

8         MR. TILLER:  And the steps being:  Have you looked at

9  the actual data?

10        THE COURT:  I'm not going to tell you how to did it.

11        MR. TILLER:  Well, I don't want to do it in front the

12 jury, I guess is my point.  Shall we go through it here now?

13 Should I ask the questions?

14        THE COURT:  I'm just the judge.  I don't -- I don't

15 know what you are asking me.  There was an objection to this

16 one question and I'll sustain it as to that one question

17 because that's not -- that's hearsay.

18        Now, that said, I don't mean that you can't show him

19 stuff and ask for opinions on things, you know, and then

20 Syngenta can show him other tests.  I don't know.  You

21 all -- if this is how you all want to use your time, that's

22 okay with me.  We'll get to limiting instructions if and when

23 it ever gets to that point, but, I mean, I don't have any

24 problem with you doing that, just like I don't have any

25 problem -- I'm remembering correctly, right, that I said that

1   Syngenta could rely on an expert?

2           MR. SANTHANAM:  Yes, Your Honor.  And the question --

3   I mean, the clarification we would want is if we put on an

4   expert, then we should be allowed to show the CAC testing in as

5   much as they're allowed to show the JDM testing or any other

6   testing that they want to put in front of the jury.

7           THE COURT:  Well, we'll cross that bridge when we

8   come to it.  I don't know what they are going to do and how --

9   but, you know, generally speaking, inadmissible evidence that

10  is the basis for an opinion -- what does the rule say?  Let me

11  just -- okay.  I'm remembering it correctly.  If the facts or

12  data would otherwise be inadmissible, the proponent, whichever

13  one of you it is, may disclose them to the jury only if their

14  probative value outweighs their prejudicial effect.

15          That's what you were saying, right?

16          MR. SANTHANAM:  I believe it is substantially

17  outweighs, but I may have that wrong.

18          THE COURT:  Substantially outweighs.  You are

19  correct.  Substantially outweighs.  So, you know, we're going

20  to do it the same way, I would think, each way.  It's the same

21  rule that's going to apply, isn't it?  Right?

22          MR. TILLER:  Your Honor, I'll just withdraw the

23  questions.

24          THE COURT:  Okay.  What are you going to ask next so

25  I can just be sure there are no objections before I bring the

1    jury back in?

2             MR. TILLER:  I am going to ask about the stamped

3    document that's already in evidence and just ask him to look at

4    a few points of that.

5             THE COURT:  The --

6             MR. TILLER:  DX 17.

7             THE COURT:  Okay.

8             MR. TILLER:  And I'm going to ask him about whether

9    he believes the condensation reaction, as described in that

10   document, can actually be done without DABCO and then I will be

11   done.

12            MR. SANTHANAM:  This may lead into the Daubert motion

13   that we -- excuse me, the motion in limine that we made, Your

14   Honor, that we discussed at the June 2nd conference about

15   commercial reasonableness.

16            MR. TILLER:  Your Honor, I'll tell you exactly what

17   he is going to do.

18            THE COURT:  Well, just a second.  Let me remember

19   what I did on commercial reasonableness and Dr. Lipton.  This

20   is why I write things down.  So is it in the order I entered on

21   July 28th?  Cannot testify, Doc 201.  I just have to lay my

22   hands on that.  This is the order that I entered signed

23   June 16th.  I don't understand how that doesn't -- Mr. Tiller,

24   I say here Willowood may not offer expert testimony on

25   commercial reasonableness at trial.

1          MR. TILLER:  Your Honor, I can point you directly to

2    what Dr. Lipton -- what I propose to ask of him.  It's in his

3    expert report.  I can hand you a page of it.

4          THE COURT:  Okay.

5          MR. TILLER:  Or I can hand it to you.  It is in his

6    expert report dated September 12th, 2016.  It is specifically

7    Part 10.  Again --

8          THE COURT:  Just hand it to me and let me look at it.

9          MR. TILLER:  It's just a few paragraphs, Your Honor.

10          (Document handed to the Court.)

11          THE COURT:  Okay.  So I apologize.  Can you back up

12    and tell me what you said you were going do again?

13          MR. TILLER:  I'm going to have him testify as to what

14    is set forth in paragraphs 38 through 43 of this report and he

15    is not testifying to the commercial reasonableness.  What he is

16    doing is just doing some -- actually, just doing some basic

17    math calculations to show that what is described in the stamped

18    document is possible.

19          THE COURT:  Okay.  And your objection to that is

20    what?

21          MR. SANTHANAM:  Your Honor, to the extent that he's

22    commenting or is going to opine on whether this can be done

23    commercially to manufacture azoxystrobin, that goes to

24    commercial reasonableness.  That's the only relevance that this

25    could possible have.

1          THE COURT:  Well --

2          MR. SANTHANAM:  At commercial scale.

3          THE COURT:  I'm not sure that that's really true,

4    that it's only relevant to that.

5          What are you offering it for?

6          MR. TILLER:  I'm offering it to show that what is

7    described in --

8          THE COURT:  Yeah, I know.

9          MR. TILLER:  -- what is described can actually happen

10   within --

11         THE COURT:  Why is that relevant?

12         MR. TILLER:  -- to show that it can happen within two

13   hours without DABCO.  It's relevant to show we're not just

14   making -- Tai He is not just making something up that doesn't

15   work.

16         THE COURT:  Uh-huh.

17         MR. TILLER:  That is it possible.

18         THE COURT:  So you are offering it to corroborate the

19   testimony that this is the actual process that was used?

20         MR. TILLER:  Yes.

21         THE COURT:  Okay.  I guess that seems reasonable to

22   me.

23         MR. SANTHANAM:  Well, to the extent that he's going

24   to opine that this can be done at commercial scale and that Tai

25   He can commercially do this --

         1          THE COURT:  Well, he's not an expert in that, so he's
         2    not going to be testifying about that.
         3          MR. SANTHANAM:  If that's the case, then we withdraw
         4    our objection.
         5          MR. TILLER:  I'm going to ask -- okay.
         6          THE COURT:  I mean, his expertise is in chemistry,
         7    not in commercial production, right?
         8          MR. TILLER:  He is not a process chemist.  Yes, I
         9    agree with that.  He said that.
        10          THE COURT:  Okay.  Well, you know, I'll just rule --
        11    if there's problems during his testimony, I'll just rule on
        12    them, but now that you all have explained it to me and I have
        13    it in the front of my mind, I think we're ready to go forward.
        14          Okay.  You can bring the jury back in.
        15          I'm going to charge each of you all with half of that
        16    time since I kind of split the baby.  She's been charging the
        17    time to the loser on these evidentiary objections.
        18          (Jury panel is present.)
        19          THE COURT:  All right.  I'm sorry about that, ladies
        20    and gentlemen.  I think we worked through everything for this
        21    witness, at least for the direction examination.
        22          Mr. Tiller, you can go ahead.
        23          MR. TILLER:  Nothing further, Your Honor.
        24          THE COURT:  Nothing further.  All right.
        25          Cross-examination.

1     MR. SANTHANAM: Yes, Your Honor.

2       CROSS-EXAMINATION

3 BY MR. SANTHANAM:

4 Q. Good afternoon, Dr. Lipton.

5 A. Good afternoon.

6 Q. Now, you mentioned that you're a chemist.  I would like to

7 talk a little bit about your background.  Now, throughout your

8 career, you would agree you've never worked on commercializing

9 any agricultural chemicals?

10 A. That's correct.

11 Q. And you've never been involved in the sale or marketing of

12 any agriculture chemicals?

13 A. No.

14 Q. You wouldn't call yourself an expert in the sale or

15 marketing of agricultural chemicals?

16 A. No.

17 Q. You wouldn't call yourself an expert in the market for

18 pesticides, right?

19 A. No.

20 Q. And you've never been involved in applying for or

21 obtaining EPA registrations for agricultural chemicals,

22 correct?

23 A. That is true.

24 Q. And you wouldn't consider yourself an expert in EPA

25 procedures and policies and practices, correct?

1  A.    That is also true.

2  Q.    Now, you talked a little bit about processes for making

3  azoxystrobin and I want to make sure we've got the terminology

4  straight.  When you make a chemical compound, that process is

5  called synthesis right?

6  A.    That is true.

7  Q.    You sometimes call that a synthetic procedure, is that

8  right?

9  A.    That's true.

10 Q.    The term "scaling up" applies to when you take a process

11 that might work on a laboratory scale for a beaker or a test

12 tube full of material and taking it to a commercial scale to

13 make large quantities of it, right?

14 A.    Yes.

15 Q.    And, for example, if you want to take a process for making

16 azoxystrobin and making -- and it works on small scale or on

17 paper and you want to make commercial quantities of it, you're

18 going to have to scale it up, right?

19 A.    That is true.

20 Q.    And to be very precise, when you're making metric tons of

21 azoxystrobin, you're going to need a commercial scale process,

22 isn't that right?

23 A.    Yes.

24 Q.    And the reason you need do the scale-up is because

25 sometimes when processes work on small scale, on the bench top

1  in a test tube, they don't always work as well as you want at

2  large scale, isn't that right?

3  A.   That is certainly one possibility.

4  Q.   And the --

5           MR. TILLER:  Your Honor, I'm sorry.  Can we approach?

6           THE COURT:  Okay.

7           (Bench conference as follows:)

8           MR. TILLER:  Your Honor, the sole -- all Dr. Lipton

9  testified to was to the validity or the obviousness of the '761

10 patent.

11          THE COURT:  If he's going to ask him about commercial

12 scale stuff, you can ask him about it.  I mean, all I was -- I

13 was not going to let you do it, but now he's doing it, so --

14          MR. TILLER:  But I didn't do it.

15          THE COURT:  Well, that's true.

16          MR. TILLER:  I mean, that's the point is I didn't do

17 it, and so it would be on the --

18          MR. SANTHANAM:  The point is he doesn't have the

19 experience.

20          THE COURT:  How can he testify about it?

21          MR. SANTHANAM:  Well, he testified about being able

22 to take a patent related to commercial manufacturing and saying

23 I'm applying it, this is obvious, et cetera.

24          MR. TILLER:  Your Honor, whether a patent method --

25 whether a method that is patented is commercially reasonable or

1  can be scaled up is absolutely irrelevant to the issue of

2  validity and obviousness.  That has nothing to do with it.  All

3  you do is you look at what's in prior art and determine whether

4  a --

5          THE COURT:  Isn't that right?

6          MR. SANTHANAM:  Well, no, not necessarily because

7  he's saying -- well, you know, the use of the catalyst, he's

8  saying, you know, you're going to want to make your

9  manufacturing process as efficient as possible.  You're going

10 to want to make it as least expensive as possible.  He went

11 through factors about why he wouldn't want to use too much

12 catalyst.  Well, I'm entitled to ask questions about his lack

13 of expertise in --

14         THE COURT:  Okay.  Well, focus your questions on his

15 testimony because I don't feel, you know -- to the extent you

16 focused on what the Defendant presented, I'll let you

17 cross-examine him, but let's -- you know, you all are running

18 out of the time.  I'm not running out of time, but you all are

19 running out of time.  Every single one of these conferences is

20 taking time off of your time.  I just want to make sure that

21 you all understand that.

22         (Bench conference concluded.)

23         THE COURT:  Go ahead.

24 BY MR. SANTHANAM:

25 Q.   Dr. Lipton, before I ask you some questions about the

1  azoxystrobin compound that you addressed, you would agree

2  you're not a process chemist?

3  A.   That is correct.

4  Q.   Now, you mentioned that you were looking at, for example,

5  the '761 patent and you were looking at the azoxystrobin

6  compound, and I would like to talk a little bit about the

7  azoxystrobin compound.

8            MR. SANTHANAM:  Now, if we could put up --

9  BY MR. SANTHANAM:

10  Q.   Well, first of all, before we get there, your opinion is

11  that you believe that the '761 DABCO patent -- the claims of

12  the '761 DABCO patent are invalid as obvious based on the

13  Weintritt reference, is that right?

14  A.   Yes, it is.

15  Q.   Now, Dr. Lipton, you were retained by Willowood's counsel

16  in this case, is that right?

17  A.   That is correct.

18  Q.   You were retained approximately June -- May or June of

19  last year, 2016, is that right?

20  A.   I would have to go and check.  That may be correct, yes.

21  Q.   To best of your recollection, you were retained May or

22  June of last year?

23  A.   It is consistent with what I recall, yeah.

24  Q.   And, Dr. Lipton, at the time you were retained, you were

25  provided by Willowood's counsel with a claim chart relating to

1  the invalidity of the '761 patent, is that right?

2  A.    I believe I was provided that sometime after I was

3  retained.

4  Q.    Sometime after you were retained.  But you would agree

5  with me that you did not prepare that chart?

6  A.    I did not prepare the whole of the chart.  I don't

7  remember if I made modifications to it.

8  Q.    Well, the chart that counsel provided you at beginning of

9  your retention, you did not author that chart, correct?

10  A.    No, I did not.

11  Q.    Just so that we're all clear as to what was in this chart,

12  that chart had one column that had the '761 patent claims.  Do

13  you recall that?

14  A.    Yes, I do.

15  Q.    And then the other column, it had what was called bases

16  for invalidity.  Do you recall that?

17  A.    Yes, I do.

18  Q.    And the bases for invalidity set forth -- and this is the

19  chart that counsel provided you.  You would agree it set forth

20  bases for invalidity based on the Weintritt reference, correct?

21  A.    Yes.

22  Q.    And you adopted this claim chart that Willowood's counsel

23  provided to you and was created before you even became involved

24  in this case, isn't that right?

25  A.    No.  I don't know that is correct.  I don't know the

1  timing precisely.  I may have used the chart sometime after I

2  was retained.

3  Q.  Dr. Lipton, you adopted a claim chart setting forth

4  invalidity bases that counsel had prepared before you were even

5  retained in this matter, is that right?

6  A.  I believe they did prepare the chart before I was

7  retained, but I don't really know.

8  Q.  Well, let me refresh your recollection and if you turn --

9         MR. SANTHANAM:  Your Honor, we have binders prepared.

10 If I may approach.

11         THE COURT:  All right.

12         MR. SANTHANAM:  I'm handing the witness a trial

13 binder.

14 BY MR. SANTHANAM:

15 Q.  Dr. Lipton, if you could flip over to the last tab in that

16 binder.  It should contain your deposition transcript.  You did

17 testify at a deposition in this case, correct?

18 A.  Yes.

19 Q.  At that deposition you were under oath?

20 A.  Yes, that's correct.

21 Q.  And you were asked questions by me?

22 A.  That is correct.

23 Q.  Your counsel, Mr. Davis and Mr. Tiller, were present

24 there?

25 A.  That is correct.

1  Q.   Now, if I could direct you in this deposition transcript

2  all the way to page 39.

3  A.   Are you referring to the page number at the bottom or the

4  page number in the --

5  Q.   In the boxes, please.

6  A.   In the boxes.  Okay.

7  Q.   I direct you to the top portion of page 39.

8  A.   All right.

9  Q.   Dr. Lipton, you adopted a claim chart setting forth

10  invalidity bases that counsel had prepared before you were even

11  retained in this matter, correct?

12       THE COURT:  What are you asking him?  Are you asking

13  him that question independently?

14       MR. SANTHANAM:  Yes, yes.  I'm just refreshing his

15  recollection because he said he didn't remember.

16       THE COURT:  Okay.

17  A.   Well, based on this transcript, it appeared I agreed with

18  you at that time.

19  Q.   Now, Dr. Lipton, the chart that counsel provided to you

20  set forth the bases for invalidity based on the Weintritt

21  reference, correct?

22  A.   Yes.

23  Q.   And you're here today testifying that the claims of the

24  '761 DABCO patent are invalid based on the '761 Weintritt

25  reference, correct?

1    A.    That is correct.

2    Q.    You're being compensated in this matter?

3    A.    Yes, I am.

4    Q.    You're being compensated in this matter at a rate of $400

5    an hour, is that right?

6    A.    That is correct.

7    Q.    That includes the time you're spending testifying here

8    today, correct?

9    A.    That is also correct.

10   Q.    Let's talk a little bit about the Weintritt reference and,

11   you know, in particular you said that -- I believe the

12   testimony you gave was that Weintritt disclosed the synthesis

13   of azoxystrobin, is that right?

14   A.    That is correct.

15   Q.    Now, you understand that Weintritt has a number of

16   examples in it, correct?

17   A.    Yes.

18   Q.    There are five examples?

19   A.    I believe there is more than that.

20   Q.    Well, why don't we walk through those examples.  If you

21   could turn to the binder in front of you, the white binder, the

22   very first tab is the Weintritt reference, DX-6.  I believe

23   that was already entered into evidence.  And if I could direct

24   you to Example 1.  It's on page 8.

25   A.    Yes.

1    Q.   And on page 8 --

2              MR. SANTHANAM:  And, David, if you could blow up

3    there on paragraph 138.

4    BY MR. SANTHANAM:

5    Q.   Now, that's the compound that's being discussed in Example

6    1?

7    A.   Yes, that is.

8    Q.   And that's not azoxystrobin, is it, Dr. Lipton?

9    A.   No, it's not.

10   Q.   Let's go on to Example 2.  David, if you could go to page

11   9, and we can blow up the figure on paragraph 145.

12             And, Dr. Lipton, that's the compound that's being

13   discussed in Example 2, correct?

14   A.   That is correct.

15   Q.   And you'd agree with me that that's not azoxystrobin?

16   A.   That is also true.

17   Q.   Let's go to Example 3.  It's on the second column there.

18   If you could blow up, David, paragraph 152.

19             That's what's being discussed in Example 3, correct?

20   A.   That is correct.

21   Q.   You would agree with me that that is not azoxystrobin?

22   A.   That is also true.

23   Q.   Let's go to Example 4.  David, if you could blow up

24   paragraph 159.  That's the compound in paragraph 159 that's

25   being addressed in Example 4, right?

```
1   A.    That is correct.

2   Q.    That's not azoxystrobin, is it?

3   A.    No, it's not.

4   Q.    And then Example 5, same page -- David, if you could blow

5   up paragraph 163.

6              And Dr. Lipton, that's what's being addressed in

7   Example 5, isn't that right?

8   A.    That is correct.

9   Q.    That's not azoxystrobin?

10  A.    That is also true.

11  Q.    And you'd agree with me that those are the only five

12  examples that are found in the Weintritt reference?

13  A.    Those are the only five examples in the specifications;

14  but, of course, the claims are broader than the specifications.

15  Q.    We'll get to the claims.  But the only five examples are

16  the five that we went through, correct?

17  A.    Yes.

18  Q.    None of those examples even describe azoxystrobin,

19  correct?

20  A.    No.

21  Q.    None of them describe syntheses or processes for making

22  azoxystrobin, isn't that right?

23  A.    That is true.

24  Q.    All right.  Well, let's talk a little bit about the claim

25  that you addressed.
```

```
 1           MR. SANTHANAM:  David, if we could pull up the
 2   demonstrative that Dr. Lipton used.  I believe it was
 3   Defendant's Demonstrative Exhibit 1.
 4   BY MR. SANTHANAM:
 5   Q.    And, Dr. Lipton, you recall talking about those before,
 6   correct?
 7   A.    Yes.
 8   Q.    And I believe the statement that you made was, this could
 9   represent many molecules?
10   A.    Yes.
11   Q.    And that this is a generic structure?
12   A.    Yes.
13   Q.    And you walked us through -- if you can flip through the
14   slides a little bit.  You walked us through and you said, well,
15   one of those molecules is azoxystrobin.  Do you recall that?
16   A.    I do, yes.
17   Q.    Okay.  Well, let's go back to that first slide of this
18   demonstrative.  Now, you'd agree with me that in this generic
19   structure, all of these different variables, L1, L2, L3, L4, L5
20   X and Ar1, that all of those could be substituted for a number
21   of different groups, correct?
22   A.    That is the intent, yes.
23   Q.    All right.  Well, let's talk about that.
24           MR. SANTHANAM:  Your Honor, permission to use the
25   flip chart?
```

```
 1              THE COURT:  Okay.
 2   BY MR. SANTHANAM:
 3   Q.   Let's talk about L1.  Now, you selected one particular
 4   option for L1, but if you take a look at the Weintritt
 5   reference in front of you, Dr. Lipton, I'd direct you to page
 6   11.
 7              MR. SANTHANAM:  And David, if we could go to page 11
 8   of Weintritt just briefly.  If we could blow up the fourth full
 9   paragraph from the top on the left-hand side.
10   BY MR. SANTHANAM:
11   Q.   And, Dr. Lipton, on that paragraph that says, you know,
12   L1, L2, L3 and L4 are identical or different, do you see that?
13   A.   Yes, I do.
14   Q.   And it says that they can be any number of different
15   options, correct?
16   A.   That is correct.
17   Q.   And so let's count these out, just for the benefit of the
18   jury.  There's hydrogen.  Do you see that, that's No. 1?
19   A.   Yes.
20   Q.   No. 2 is halogen.  Do you see that, that's No. 2?
21   A.   Yes.
22   Q.   Cyano is No. 3?
23   A.   Yes.
24   Q.   Nitro's No. 4?
25   A.   Yes.
```

1  Q.   Alkyl carbonyl is No. 5?

2  A.   Yes.

3  Q.   Formyl is No. 6?

4  A.   Yes.

5  Q.   Alkoxy carbonyl, that's No. 7?

6  A.   Yes.

7  Q.   Aminocarbonyl, that's No. 8?

8  A.   Yes, indeed.

9  Q.   Alkyl aminocarbonyl is No. 9?

10  A.   Yes.

11  Q.   And dialkyl aminocarbonyl is No. 10.  Do you see that?

12  A.   Yes, I do.

13  Q.   There are at least 10 different substituents or groups for

14  this -- for these four; L1, L2, L3 and L4, correct?

15  A.   That's correct.

16  Q.   It doesn't stop there, right?  It also says that each of

17  these groups can be optionally substituted, right?

18  A.   Yes, it does.

19  Q.   And, in fact, it gives you an alkyl, that's No. 1,

20  correct?

21  A.   A halogen-substituted alkyl.

22  Q.   Okay.  And it could be a halogen-substituted alkoxy;

23  that's No. 2, correct?

24  A.   It's not -- I guess -- I guess that's the proper reading,

25  although it's not clear if halogen-substituted modifies only

1   the first member or the whole list.

2   Q.    Okay.  What is your understanding?

3   A.    Honestly it's not at all clear from the way it's written.

4   Q.    Well, it mentions alkyl, alkoxy, alkylthio, alkylsulphinyl

5   and alkylsulphonyl.  There's five different options that are

6   mentioned, correct?

7   A.    That's correct.

8   Q.    And each of those could be a potential substitution for

9   the 10 that we talked about, right?

10  A.    Well, the way this is written, I think what they're saying

11  is that the alkyl groups in the various names can be optionally

12  one of those items.

13  Q.    Correct.  And so there are five different options, isn't

14  that right?

15  A.    Yes.  But those five different options -- for instance,

16  there is no substitution possible in hydrogen or on a halogen,

17  so clearly that doesn't apply to them.

18  Q.    Well, there's at least five, correct?

19  A.    Yeah.

20  Q.    And so conservatively speaking, you can say that, given

21  that there are other substitutions you can make, L1 could be at

22  least 50 different groups, isn't that right?

23  A.    That's true.

24  Q.    And that applies to L2, correct?

25  A.    Certainly.

1  Q.   That applies to L3, correct?

2  A.   Yes.

3  Q.   That applies to L4, correct?

4  A.   That is true.

5  Q.   And then there's this other group in here.

6        MR. SANTHANAM:  David, if we go -- flip back to

7  Demonstrative Exhibit 1, Defendant's.

8  BY MR. SANTHANAM:

9  Q.   You've got this group X.  Do you see that?

10 A.   I do.

11 Q.   And in the Weintritt patent, that refers to four different

12 possibilities, isn't that right?

13 A.   I believe that's the case, yes.

14 Q.   And then there's also L5, isn't there, Dr. Lipton?

15 A.   Yes, there is.

16 Q.   And in the Weintritt reference, there are -- you can count

17 them, but there are 13 different possibilities, isn't that

18 right?

19 A.   That looks right.

20 Q.   And we haven't even gotten to the Ar superscript 1 yet,

21 correct?

22 A.   That's true.

23 Q.   Now, in order to figure out just the number of

24 possibilities that we've got, you multiplied 50, times 50,

25 times 50, times 50, times 13, times 4, correct?

1  A.    That looks correct, yeah.

2          MR. SANTHANAM:  I do have a calculator and, Your

3  Honor, if I may approach?

4          THE COURT:  You may.

5  BY MR. SANTHANAM:

6  Q.    And hand you a calculator, Dr. Lipton.  Would you multiply

7  those numbers out for us.

8  A.    The number I get is 325 million.

9  Q.    325 million.  That doesn't include the aryloxy group?

10 A.    That's correct.

11 Q.    If you look at Ar1 superscript on page 11, I'll direct you

12 to page 11 -- let me know when you're there.

13 A.    I'm there.

14 Q.    The Ar1 group -- and, David, if we can blow this up,

15 that -- the Weintritt reference.

16          The Ar1 group represents in each case substituted or

17 unsubstituted aryl or heterocycl?  Do you see that?

18 A.    I do.

19 Q.    Approximately how many substituted or unsubstituted aryl

20 or heterocycl groups do you think there are?

21 A.    It's literally uncountable.

22 Q.    Uncountable?  Billions?

23 A.    Possibly.

24 Q.    Quadrillions?

25 A.    Well, not all of them have ever been made so, you know, we

1   do have a finite limit, but it's a large number.

2   Q.   Whatever that number is, if you want to figure out what

3   the possibilities are, you'd have to multiply 325 million by

4   that, right?

5   A.   Yes, indeed.

6   Q.   Do you think the calculator in front of you would be able

7   to register all of those digits?

8   A.   Probably not; probably have to revert to scientific

9   notation.

10  Q.   And out of all -- if we can flip back to Plaintiff's

11  Demonstrative Exhibit 1.  And out of all of those quadruplings,

12  quintillions of possibilities, you picked -- go to the last

13  line, azoxystrobin?

14  A.   Yes.   It's not a hard thing do, since the azoxystrobin

15  side chain is, in fact, the first one listed, and all the

16  others are variations on the azoxystrobin side chain.

17  Q.   The azoxystrobin that you picked, Dr. Lipton, was among

18  billions, quadrillions or quintillions of possibilities, isn't

19  that right?

20  A.   Yes.   They wrote a very broad patent and got away with it.

21  Q.   And, Dr. Lipton, is it your -- is it your opinion that the

22  use of DABCO in manufacturing any one of these billions and

23  quadrillions and quintillions of compounds would have the same

24  effect?

25  A.   I think it would likely have a very similar effect in

1  almost all cases.

2  Q.    Now, Dr. Lipton, you mentioned earlier that you had looked

3  at the prosecution history of the Weintritt reference, is that

4  right?

5  A.    Yes.

6          MR. SANTHANAM:    And before I move on, I'm going to

7  mark this as Plaintiff's Demonstrative 26.

8          THE COURT:    What was the number?

9          MR. SANTHANAM:    Twenty-six.

10 BY MR. SANTHANAM:

11 Q.    You had indicated you're familiar with the prosecution

12 process, is that right?

13 A.    Yes.

14 Q.    And as part of that prosecution process, Dr. Lipton, the

15 patent applicant, such as Dr. Alan Whitton sitting here, would

16 submit an application to the patent office, correct?

17 A.    Yes.

18 Q.    And the patent office typically doesn't allow a patent,

19 isn't that right?

20 A.    That is true.

21 Q.    It goes through a back-and-forth process before it's

22 ultimately issued, isn't that right?

23 A.    That is correct.

24 Q.    And you noted that in this instance, the patent office

25 considered the Weintritt reference, is that right?

1  A.    That's true.

2  Q.    And that's because the inventors of this '761 DABCO

3  patent, Dr. Whitton sitting here, submitted the Weintritt

4  reference to the patent office, isn't that right?

5  A.    That is true.

6  Q.    And, in fact, the patent office you said substantively

7  considered the Weintritt reference, is that right?

8  A.    In their initial objection, they cited it.

9  Q.    Okay.  And we went through a number of different papers in

10 the file history, specifically one of them that you pointed

11 out.  I'd like to direct you to some additional papers in that

12 same exhibit, and I'm referring now to Defendant's Trial

13 Exhibit No. 5, which was in evidence.

14        THE COURT:  It's in the black notebook?

15        MR. SANTHANAM:  In the black notebook, Your Honor.

16 BY MR. SANTHANAM:

17 Q.    And if we can turn to -- this is the 10th page of this

18 document.  You're familiar with what's called a notice of

19 allowability, is that right, Dr. Whitton -- excuse me, Dr.

20 Lipton?

21 A.    Yes, I am.

22 Q.    If we can go the top of the statement and blow that up.  A

23 notice of allowability indicates that the patent office has

24 considered whatever prior art was before it and has decided to

25 allow a patent, isn't that right?

1    A.    Well, they have allowed the patent, yes.

2    Q.    Okay.  And after this notice of allowability, if we go to

3    two pages -- or several pages before, there's something called

4    a notice of allowance.  Do you see that?

5    A.    I do.

6    Q.    And the notice of allowance is the indication by the

7    patent office that they're formally going to allow the claims

8    of the DABCO patent, correct?

9    A.    That's true.

10   Q.    And the very first page of this document that you looked

11   at says issue notification.  Do you see that?

12   A.    I do.

13   Q.    And that -- what that means is that the patent office

14   ultimately issued this patent, correct?

15   A.    That's correct.

16   Q.    And you've received patents before, correct?

17   A.    I have.

18   Q.    So you're aware of what the front cover of a patent looks

19   like?

20   A.    Yes.

21   Q.    And for the record, I'm holding up Plaintiff's Exhibit 4B,

22   and on the front cover of that patent, you're familiar with the

23   language, correct?

24   A.    Yes.

25   Q.    It says, "Grants to persons having title to this patent

1  the right to exclude others from making, using, offering for
2  sale or selling the invention throughout the United States of
3  America or importing the invention into the United States of
4  America."  Do you recall that language in patents?
5  A.    Yes.
6  Q.    Now, Dr. Lipton, one comment that you made at the end of
7  your direction examination was, you had -- in order for this
8  DABCO patent to be invalid, you would have to be right,
9  correct?
10 A.    That's true.
11 Q.    And not only that, but Dr. Alan Whitton, and the named
12 inventors of the DABCO patent, would have to be wrong that they
13 invented something, correct?
14 A.    No.
15 Q.    Do you believe that they invented something?
16 A.    Well, they developed a process; whether it was not obvious
17 is another question entirely.
18 Q.    And you believe that the named inventors, Dr. Alan Whitton
19 and the other named inventors, were wrong that they had come up
20 with a non obvious invention, correct?
21 A.    Well, I don't know what he believed, so I can't really
22 comment on that.
23 Q.    And you testified that the patent office would have to be
24 wrong in its issuance of the '761 DABCO patent?
25 A.    Yes, I believe the patent examiner's decision was wrong.

```
 1            MR. SANTHANAM:  No further questions, Your Honor.
 2            THE COURT:  Redirect?
 3                      REDIRECT EXAMINATION
 4  BY MR. TILLER:
 5  Q.   Of the 325 million potential compounds that is covered by
 6  the Weintritt application, one of them is most certainly
 7  azoxystrobin, correct?
 8  A.   That is true.
 9  Q.   Now, looking at the '138 patent, which I believe, if
10  I -- or at least the publication -- I think it's DX-6.
11            THE COURT:  Well, sustained.
12            MR. SANTHANAM:  Your Honor, objection, beyond the
13  scope.
14            THE COURT:  He didn't ask any questions about the
15  '138 patent.
16            MR. TILLER:  Well -- let me -- may I approach then?
17            THE COURT:  Well, you can just ask different
18  questions if you -- if there's some other way to get to it, but
19  you can't --
20            MR. TILLER:  No, Your Honor, there isn't.  There's a
21  specific reason and we're --
22            THE COURT:  Okay.  Come on up.
23            MR. TILLER:  -- I'm sorry.
24            (Bench conference held as follows:)
25            MR. TILLER:  The implications of the questions with
```

```
 1  regard to Weintritt where there -- there's so many compounds
 2  that a person of ordinary skill in the art wouldn't have found
 3  azoxystrobin, but part of his opinion is that one would start
 4  with the '138 patent and then look at Weintritt in light of
 5  that, so I need to show that he -- that you can look at the
 6  '138 patent and one of the claims is directly azoxystrobin.
 7           THE COURT:  Which I think he said, right; didn't he
 8  mention that on cross?
 9           MR. TILLER:  I think he did.
10           MR. SANTHANAM:  I don't recall that.
11           THE COURT:  Well, okay.  He said something about it
12  being directly listed.  All right.  You can do that.
13           MR. TILLER:  Thank you.
14           (Bench conference concluded.)
15           THE COURT:  Go ahead.
16  BY MR. TILLER:
17  Q.  Could we take a look at the '138 patent, Dr. Lipton, which
18  I believe again is PX-3.
19  A.  Yes.
20  Q.  And I want you to specifically -- could we get the toggle
21  of it --
22           THE COURT:  I'm sorry, what?
23           MR. TILLER:  We needed the toggle, so we could show
24  the '138 patent.  Could we go to, Bonnie, Claim 6.  I believe
25  it's Claim 6, which is on column 28.  Specifically Claim 6.
```

1  It's about halfway down.

2  BY MR. TILLER:

3  Q.   Dr. Lipton, does that claim cover the preparation of

4  azoxystrobin.

5  A.   Yes, it does.

6           THE COURT:  Has she highlighted the right part?

7           MR. TILLER:  Yes.

8           THE COURT:  I'm asking the witness.

9           THE WITNESS:  Yes, she has.

10           THE COURT:  All right.  Go ahead.

11  BY MR. TILLER:

12  Q.   And, in fact, is it -- what is your understanding of the

13  point made by the patent examiner with regard to the '138

14  patent and Weintritt?

15  A.   What I understand the patent examiner initially stated was

16  that in light of the combination of the two, the '761 patent

17  was considered invalid.

18  Q.   Is one of your positions -- is it your position that a

19  person of ordinary skill in the art looking at starting with

20  the '138 patent would have known about Weintritt?

21           THE COURT:  I'm sorry, can you start over again.

22           MR. TILLER:  Yes.

23  BY MR. TILLER:

24  Q.   '138 covers the synthesis of azoxystrobin, correct?

25  A.   That's correct.

1  Q.    And is Weintritt disclosing the synthesis of similar
2  compounds?
3  A.    Yes, it is.
4  Q.    Okay.  So is Weintritt analogous art to what is disclosed
5  in the '138 patent?
6  A.    It is with the caveat that it introduces the concept of
7  catalysis by DABCO in the condensation step.
8  Q.    Understood.  And '138, in fact, has the concept of
9  catalysis in it, correct?
10 A.    That's correct.
11 Q.    Okay.  And -- strike that.  There was some discussion
12 about an invalidity chart.  Do you remember that when
13 Mr. Santhanam was asking you questions?
14 A.    Yes, I do.
15 Q.    Is the opinion that you offered here today your opinion?
16 A.    Yes, it is.
17 Q.    Did you review the '138 patent in forming your opinion?
18 A.    Yes, I did.
19 Q.    Did you review the Weintritt application in forming your
20 opinion?
21 A.    Yes, I did.
22 Q.    Did you do additional research in forming your opinion?
23 A.    Yes, I did.
24 Q.    Did you rely on your 30-plus years of organic chemistry
25 experience in forming your opinion?

1  A.    Yes.

2  Q.    Is your opinion based solely on the invalidity chart that

3  was provided to you by counsel?

4  A.    No.

5  Q.    Would a person of ordinary skill in the art charged with

6  improving the process that is disclosed in the '138 patent,

7  would it have been -- would that person have looked to

8  Weintritt for guidance?

9  A.    After the publication of Weintritt, yes, I think so.

10 Q.    Going back to the claim chart that was provided to you by

11 counsel, is your opinion based at all on that claim chart?

12 A.    No, it's not.

13          MR. TILLER:  Thank you.  Nothing further, Your Honor.

14          THE COURT:  Anything else on the topics covered in

15 redirect?

16          MR. SANTHANAM:  No, Your Honor.

17          THE COURT:  Thank you.  You may step down.

18          (At 4:20 p.m., witness excused.)

19          THE COURT:  Let me just whisper with counsel about

20 scheduling for a minute here at the bench.

21          (Bench conference as follows:)

22          THE COURT:  Mr. Tiller, you said you have -- the only

23 other witness you have is Mr. Jarosz?

24          MR. TILLER:  Yes.

25          THE COURT:  And we're going to get to him in the

1  morning?

2       MR. TILLER:  He's here, but he hasn't -- like, we

3  haven't -- we don't have all the witness binders put

4  together -- because we didn't think we were going go this fast.

5  I apologize for that.  So the witness binders aren't together.

6  We haven't sent -- the agreement between counsel has been to

7  send demonstratives by 7:00 the night before, and we intend on

8  doing that obviously --

9       MR. LEVINE:  We can waive that and have him get

10 started --

11      THE COURT:  Well, is there any reason not to do his

12 background, at least that?

13      MR. TILLER:  (Inaudible.)

14      THE COURT:  All right.  Well, I'm going to take the

15 40 minutes off your time.

16      MR. TILLER:  What are we at right now?

17      THE COURT:  I don't know.

18      THE LAW CLERK:  Eleven hours and 20 minutes.

19      MR. TILLER:  I guess there's nothing we can do about

20 that.

21      THE COURT:  Okay.

22      (Bench conference concluded.)

23      THE COURT:  Okay.  Ladies and gentlemen, there's --

24 Willowood has one more witness, and we're going to do that in

25 the morning, and I do expect that we will either finish the

1 evidence tomorrow or come extremely close. So we're moving

2 along, I think, at the schedule that is expected.

3       Even though you have heard a lot of the evidence, you

4 have not heard it all, so you do need to keep an open mind, and

5 continue not to talk about the case among yourselves or with

6 anyone else. Don't have any contact with the lawyers, parties,

7 or witnesses. And I keep repeating it, but it is really

8 important. Don't look anything up on the internet, okay. The

9 internet is not right about a lot of stuff. So please don't

10 look anything up there or conduct any independent investigation

11 otherwise.

12       And given that we are supposed to get a lot of rain

13 and some wind, we're going to start at 9:30 in the morning.

14 I'm just going to give you a little bit of extra time to get

15 here rather than starting at 9:15, and I don't think that will

16 hold us up too much tomorrow. So I will see you all tomorrow

17 at 9:30. You are excused. Leave your notes in your chair.

18       (Jury excused.)

19       THE COURT: All right. So we'll count the time,

20 Ms. Sanders, in case you did not hear, between now and 5:00

21 against Willowood's time. We'll do Mr. Jarosz in the morning.

22 After that, what does Syngenta expect?

23       MR. LEVINE: We will have a couple of rebuttal

24 witnesses, Your Honor, but we do have limited time, and we

25 should be able to get them all on tomorrow.

1          THE COURT:  Okay.  Good.  It would be nice just from

2     a logistical standpoint to have a little time tomorrow

3     afternoon to talk about the charge conference.  But, you know,

4     you all are entitled to all your time.  So I'm not trying to

5     make you use less.  I think we'll check with the clerk at the

6     end of day about the time, but I think we should be able to

7     finish tomorrow, even if you use every single minute, okay.

8          Any other housekeeping matters we can take care of?

9          MR. LEVINE:  Just to make sure we're on the same page

10    then.  So once the evidence is in, you're going to have an

11    informal conference with us regarding the instructions, and

12    then you'll provide us with the so-called final set by e-mail.

13    We'll have the evening and come in -- is it Wednesday morning

14    for closings, or do you want to do closings tomorrow afternoon?

15         THE COURT:  Well, I guess it kind of depends on when

16    you all rest, when everybody finishes all of the evidence, but

17    I'm -- I expect the charge conference is going take us some

18    time, it usually does in a civil case, and we have -- assuming

19    I leave all the issues in the case, we've got ten, so it's kind

20    of hard for me to imagine that you would get to closing

21    arguments tomorrow.  How long do you think Mr. Jarosz is going

22    to take?

23         MR. NEUMAN:  I expect no longer than an hour and 15

24    minutes.

25         THE COURT:  Is that your direct?

1          MR. NEUMAN:  Direct.

2          THE COURT:  Okay.  I mean, I guess, you know -- I

3    will say, I don't usually give the jury the written

4    instructions right off the bat.  I only send them back there if

5    they ask for them.  So they -- you know, they really don't have

6    to be perfect at the time of your closing arguments in terms of

7    no typos.  But, you know, I do like to have them pretty much

8    worked through, and I guess how long it takes really kind of

9    depends on you all's objection, but there were a number of

10   areas of disagreement.  It's very hard for me to imagine we get

11   to closings tomorrow.  But if Syngenta didn't put on any

12   rebuttal evidence, I suppose that could happen.

13         MR. LEVINE:  We will, though.

14         THE COURT:  So, you know, my expectation is we'll be

15   here first thing Wednesday morning with the closings, unless

16   something very unexpected happens tomorrow.

17         And, you know, what you have laid out is certainly

18   what I expect to happen.  But, you know, if we go until 5:00

19   with the evidence, we're not going to have time for that

20   process necessarily.  So we might have to modify it a little

21   bit.  So, you know, we just have to be flexible about the

22   charge conference.  I'll give you a full charge conference,

23   whether we do it in two stages or one.

24         Okay.  What else can we do productively today?

25   Nothing.  All right.  We will be in recess then until 9:30

1   tomorrow morning.

2           (At 4:25 p.m., proceedings adjourned.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   C E R T I F I C A T E

2

3          I, J. CALHOUN, RPR, United States District Court

4    Reporter for the Middle District of North Carolina, DO HEREBY

5    CERTIFY:

6

7          That the foregoing is a true and correct transcript of

8    the proceedings had in the above-entitled matter.

9

10

11

12   Date:    9-11-17            J. Calhoun, RPR
                                 United States Court Reporter
13                               324 W. Market Street
                                 Greensboro, NC  27401
14

15

16

17

18

19

20

21

22

23

24

25