<pre>
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  SYNGENTA CROP PROTECTION, LLC.,    ) Civil Action
                                       ) No. 1:15CV274
 4       Plaintiff,                    )
                                       )
 5     vs.                             )
                                       ) September 13, 2017
 6  WILLOWOOD, LLC, WILLOWOOD          )
    USA, LLC., WILLOWOOD               )
 7  AZOXYSTROBIN, LLC, and            )
    WILLOWOOD LIMITED,                 )
 8                                     )
         Defendants.                   )
 9  _____      )

10
                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11         BEFORE THE HONORABLE CATHERINE C. EAGLES
                 UNITED STATES DISTRICT JUDGE
12
    APPEARANCES:
13
    For the Plaintiff:    HARI SANTHANAM, ESQUIRE
14                        RUSSELL E. LEVINE, ESQUIRE
                          KOURTNEY BALTZER, ESQUIRE
15                        Kirkland & Ellis, LLP

16                        RICHARD A. COUGHLIN, ESQUIRE
                          Smith Moore, LLP
17
    For the Defendants:   STEVEN E. TILLER, ESQUIRE
18                        BARRY S. NEUMAN, ESQUIRE
                          PETER J. DAVIS, ESQUIRE
19                        Whitefield Taylor & Preston

20                        ALAN W. DUNCAN, ESQUIRE
                          Mullins Duncan Harrell & Russell
21

22  Court Reporter:       J. Calhoun, RPR
                          Room 122, U.S. Courthouse Building
23                        324 West Market Street
                          Greensboro, North Carolina 27401
24                        (336) 332-6033

25
</pre>

1    <u>**PROCEEDINGS**</u>

2        **THE COURT:**  So last night, after we talked and worked

3    through some of the things, we e-mailed you the final draft of

4    the jury instructions and the final draft of the verdict sheet,

5    and that's what we'll work off of.  I'll have the clerk mark a

6    copy of the final draft as Court Exhibit 1, because otherwise

7    the charge conference won't make any sense to the appellate

8    court.

9        So first, just looking at the verdict sheet, we did

10   go back, based on our discussions, to say defendants instead of

11   Willowood, so that's been changed by agreement.

12       Anybody have any last minute typos or mistakes on the

13   verdict sheet that we need change?

14       **MR. DAVIS:**  Your Honor, in connection with some

15   proposed objections and changes to the jury instructions,

16   Willowood proposes that the instruction related to willfulness

17   on the compound patent be separate between Willowood, Limited

18   on the one hand, and the other remaining Willowood defendants,

19   because the jury could potentially find willfulness on behalf

20   of Willowood defendants and not find willfulness on behalf of

21   Willowood, Limited.

22       **THE COURT:**  What does the plaintiff say about that?

23       **MR. SANTHANAM:**  Well, Your Honor, in terms of the

24   willfulness question on the verdict form and the instructions,

25   the willfulness issue is intertwined.  These parties, as the

 1  evidence has shown, they all have Been engaged in --

 2         **THE COURT:**  I'm sorry.

 3         **MR. SANTHANAM:**  These parties have been engaged in

 4  collective actions, so the willfulness question is combined, so

 5  you have to consider all of them together, that's why it is

 6  listed as Willowood.

 7         **THE COURT:**  Well, we certainly treated them all

 8  together for all purposes except this infringement of the

 9  compound patent question.

10         **MR. DAVIS:**  That's correct, and the evidence directed

11  to willfulness is really focused on statements of activities of

12  Willowood USA with respect to the willfulness issue on the

13  compound patents.

14         **THE COURT:**  Well, I think we could fix that pretty

15  easily, just by changing the verdict sheet to say yes, as to

16  Willowood Limited; yes, as to Willowood USA, and Willowood,

17  LLC.  Yes, as to Willowood, Limited and, no, and then they

18  could mark both yeses, one or the other yes or no.  Is that

19  clear?

20         **MR. SANTHANAM:**  Would you be splitting up the

21  willfulness question?

22         **THE COURT:**  I mean, I would have to modify it a

23  little bit, but it still would just be one issue.

24         **MR. SANTHANAM:**  If it's still one issue, that's okay.

25         **THE COURT:**  It is still issue three, and I don't

think I need to add another issue.  I think I can do it just
with -- if I can ask the clerk -- it will say yes, as to
Willowood USA and Willowood, LLC, yes as to Willowood Limited,
and no.  Hopefully that will not move the instructions over on
to the next page.  If I can ask her.  She is fixing it.

Anything else about the verdict sheet?

**MR. SANTHANAM:**  No, Your Honor.

**THE COURT:**  All right.  If you could just print one
of those out and let me look at it now.  All right.  Turning to
the jury instructions and working off of this final draft,
beginning with the introduction part on pages one through four,
does anybody have any corrections, objections, additions to
those pages?

For the plaintiff?

**MR. SANTHANAM:**  No, Your Honor.

**THE COURT:**  For the defendant?

**MR. DAVIS:**  No, Your Honor.

**THE COURT:**  All right.  Beginning on page five with
the introductory paragraph on the issues and the introductory
paragraphs on compound patents, does the plaintiff have any
objections to those instructions; page five through the middle
of page six?

**MR. SANTHANAM:**  Not for the introductory portion,
Your Honor.

**THE COURT:**  What about the defendant?

1      **MR. DAVIS:**  No, Your Honor.

2      **THE COURT:**  Turning to Issue 1, instructions on Issue

3  1 which begin there in the middle of page six and go through --

4  well, there is one line on the top of page eight.  Does the

5  plaintiff have any objections to those instructions?

6      **MR. SANTHANAM:**  Yes, Your Honor.  On page seven, the

7  second paragraph from the bottom, starting with, "You heard

8  some evidence that the parties, that is Willowood Limited and

9  Willowood USA, agreed on delivery of the azoxystrobin technical

10  FOB China."  Our objection is, that that gives the false

11  impression that that is how the arrangement was done.  We would

12  be okay with simply FOB China or FOB meaning X, Y, Z, but the

13  actual suggestion that there has been evidence that Willowood

14  Limited and Willowood USA agreed on those terms, we believe is

15  prejudicial.

16      **THE COURT:**  Okay.  I'll overrule that.  There has

17  been such evidence.  I mean, this specifically says in the last

18  sentence that it is not determinative, and of course it is up

19  to them whether they believe it or not.  So I think that's -- I

20  assume the defendant wants me to give that paragraph, right?

21      **MR. DAVIS:**  Pardon me, Your Honor.

22      **THE COURT:**  You want me to give that paragraph?

23      **MR. DAVIS:**  Yes, Your Honor.

24      **THE COURT:**  I'll overrule that objection.

25      Anything else from the plaintiff on Issue 1?

 1          **MR. SANTHANAM:**  No, Your Honor.

 2          **THE COURT:**  Objections for defendant as to Issue 1?

 3          **MR. DAVIS:**  Yes, Your Honor.  Last night the parties

 4  agreed to adding, "offered for sale," in instruction one, as

 5  well as throughout the instructions.  On additional reflection,

 6  it seems to defendants, that that should be clarified to some

 7  extent.  Offer for sale under the patent statute is analyzed

 8  under traditional contract principles.  We propose that an

 9  instruction to that effect be added.  That's under *Trans Ocean*

10  *Offshore Deep Water*.

11          **THE COURT:**  Where do you want me to put it and what

12  do you want me to say?

13          **MR. DAVIS:**  Right after the end of the first

14  paragraph.

15          **THE COURT:**  Yes.

16          **MR. DAVIS:**  An offer for sale is one which the other

17  party could make into a binding contract by simply accepting

18  the offer, as distinguished from merely marketing the product.

19          **THE COURT:**  An offer for sale is something --

20          **MR. DAVIS:**  Is one that the other party could make

21  into a binding contract by simply accepting the offer.

22          **THE COURT:**  Does the plaintiff have any objection to

23  adding that?

24          **MR. SANTHANAM:**  Well, Your Honor, we believe that the

25  instruction is clear in and of itself, and there is no need to

1    have a separate instruction on what offer for sale is.

2              THE COURT:  Well, you did make some comments last

3    night -- I can understand why they want this instruction,

4    because of some of the things that we talked about last night

5    about the marketing efforts, just to make it clear that it is

6    not enough to just say we're going to put stuff out into the

7    market.  That's not an offer, right?

8              MR. SANTHANAM:  Well, Your Honor, if the Court is

9    inclined to include it --

10             THE COURT:  Well, is it wrong?  Let me ask it that

11   way.  Is that definition that he provided wrong?

12             MR. SANTHANAM:  Well, we need to have a little bit of

13   time to consider it, but at this moment, we won't object to the

14   actual definition, but just to the insertion of that into the

15   jury instruction.

16             THE COURT:  I'm going to put it -- instead of where

17   you suggested, Mr. Davis, I'm going to put it on page seven in

18   the middle of the page.  So the first full paragraph tells them

19   how to define the location of the sale.  The second talks about

20   what importation means, and I'll add it in there, an offer for

21   sale is one that the other party could make into a binding

22   contract by simply accepting the offer.

23             MR. DAVIS:  Part of our proposal -- and I apologize,

24   Your Honor, was not simply marketing.

25             THE COURT:  I missed that.  Not simply marketing the

1   product.  Well, then, I have to define what marketing means.  I

2   think this is sufficient.

3           **MR. DAVIS:**  Thank you, Your Honor.

4           **THE COURT:**  Any other objections or corrections to

5   Issue 1?

6           **MR. DAVIS:**  Yes, Your Honor.  In the first paragraph

7   on page seven, the language, "whether there was an intention to

8   sell to customers in the United States," appears to be a little

9   bit somewhat potentially confusing, and we would propose that

10  that be amended to read, whether there was an intention by

11  Willowood Limited to sell to Willowood USA in the United

12  States.  In the absence of that instruction, it does not

13  identify the entity whose intention it is describing, and also,

14  it is unclear without that change, whether in the United

15  States, the descriptor of the location of the customers or the

16  descriptor of the location of the sale.

17          **THE COURT:**  Okay.  Well, that intention language

18  comes from a case.  I don't have any problem with saying

19  whether there was an intention by Willowood, Limited, that

20  seems reasonable, just to clarify whose intention is at issue.

21          **MR. SANTHANAM:**  That's fine, Your Honor, but we would

22  note back to the Court's summary judgment order, the cases

23  cited therein.  It is --

24          **THE COURT:**  That's all right.  I'll add by Willowood

25  Limited, whether there was an intention by Willowood Limited to

1  sell to customers, but I'm not going to give the rest of it

2  that you've asked for.  Anything else as to Issue 1?

3          **MR. SANTHANAM:**  No, Your Honor.

4          **THE COURT:**  All right.  Turning to Issue 2, damages.

5  Beginning at the top of page eight, let's just talk about lost

6  profits, which goes through about the middle of page 12.  Any

7  objections for the plaintiff as to those instructions?

8          **MR. SANTHANAM:**  No, Your Honor.

9          **THE COURT:**  What about the defendant?

10         **MR. DAVIS:**  Your Honor, Willowood objects to these

11 instructions concerning lost profits and damages in general, to

12 the extent that it allows the jury to consider Syngenta's

13 evidence related to mesotrione, which Willowood contends has

14 not been established as an appropriate benchmark and should not

15 have been allowed as an aspect of plaintiff's damages case.

16         **THE COURT:**  I'll overrule that.  You don't have any

17 objections to the specific wording?  I'm not asking you to

18 waive your objection to the total instruction, but any --

19         **MR. DAVIS:**  No objection to the specific wording,

20 Your Honor.

21         **THE COURT:**  Turning to the reasonable royalty

22 instruction, which begins somewhere around the middle of page

23 12 and goes through to the top of page four.  In the middle of

24 the paragraph on page 13 where I'm telling them about the

25 factors to consider in determining the royalty, third line from

1   the bottom, which starts, "commercial embodiment." everybody

2   with me?

3           **MR. SANTHANAM:** Yes, Your Honor.

4           **THE COURT:** It says, "commercial embodiment of it,"

5   and I'm just going to say, "of the invention," just because it

6   is a little obscure, so I'm going to make that change myself,

7   subject to you all correcting me that I have incorrectly

8   identified the "it."

9           **MR. SANTHANAM:** We have no objection to that.

10          **THE COURT:** Any other corrections or objections for

11   the plaintiff as to the reasonable royalty instructions?

12          **MR. SANTHANAM:** Not to that instruction, Your Honor.

13          **THE COURT:** Mr. Davis, for the defendant?

14          **MR. DAVIS:** No, Your Honor.

15          **THE COURT:** Page 14, Issue 3, so here is the

16   willfulness one. Is it all right if I just say there are

17   separate boxes for you to mark as to Willowood USA and

18   Willowood Limited and another one for -- excuse me, Willowood

19   USA and Willowood, LLC, and then a separate place for you to

20   mark as to Willowood Limited, and you must make a separate

21   decision as to each of those?

22          **MR. SANTHANAM:** That's appropriate.

23          **MR. DAVIS:** Yes, that works for us. Thank you, Your

24   Honor.

25          **THE COURT:** I'll add that in at the second paragraph

 1   of those instructions.  I suspect my clerk didn't get that, so
 2   I'll say something like I just said, without repeating the
 3   exact wording here.
 4           Any other objections to the willfulness instruction?
 5           **MR. SANTHANAM:**  No, Your Honor.
 6           **THE COURT:**  For the defendant?
 7           **MR. DAVIS:**  I'm sorry.  No, Your Honor.
 8           **THE COURT:**  I'll also modify it in the very last
 9   paragraph to reflect the three boxes for them to check so
10   that -- I'll say it at the beginning and then I'll repeat it at
11   the end, even though they are not very far apart.
12           Now we're turning to the process patent instructions.
13   Any problems with the general introduction there at the bottom
14   of page 15 and the top of page 16?
15           **MR. SANTHANAM:**  Not to the introduction, Your Honor.
16           **THE COURT:**  Turning to Issue 4 the etherification and
17   condensation issue.  Does the plaintiff have objections or
18   corrections to that, to the instructions on that issue?
19           **MR. SANTHANAM:**  Yes, Your Honor.  A couple of
20   objections.  One, as an abundance of caution, we have filed,
21   obviously, summary judgment papers contesting the
22   interpretation of 35 U.S.C. Section 271(g), as requiring a
23   single entity.  This entire instruction number four is,
24   predicated on that interpretation, so in an abundance of
25   caution, we object to that.

1      **THE COURT:**  That's overruled.

2      **MR. SANTHANAM:**  In addition, there is a reference to

3  Tai He throughout instruction number four as the single entity.

4  We believe it should be up to the jury to determine who or what

5  that entity is, so we object to that reference.

6      Then finally, on page 18 where there is a description

7  of what directing and controlling means, we would object and

8  would propose the inclusion of the entirety of the standard

9  from *Akamai versus Limelight, 797 F 3d. 1020* at page 1022.

10 This is Federal Circuit 2015.  It sets forth the standard for

11 directing and controlling, and says among which one of the ways

12 in which you can direct or control an entity is for

13 conditioning another entity's receipt of some other benefit

14 based on that entity's performance, and in this case it would

15 be the etherification and condensation reactions.

16     **THE COURT:**  Okay.  So first, as to the objection to

17 the inclusion of Tai He, I think that is what the evidence

18 supports, and I'm going to include that just for clarification

19 and context for the jury.

20     Defendant wanted me to do that, correct?

21     **MR. DAVIS:**  I'm not sure I understand what you just

22 said.

23     **THE COURT:**  I said, I'm going to leave Tai He in as

24 the single entity.

25     **MR. DAVIS:**  Yes, that's correct.

1    **THE COURT:**  And now turning to the instruction on

2  directing control.  So if I added what I think is the point of

3  that language from the case that you just cited -- too many

4  vowels, I'm afraid I'll get it all mixed up, but that case that

5  you just cited that I specifically did read and I did put in

6  the last sentence of that paragraph, the first full paragraph

7  on page 18, "you should consider whether Willowood conditioned

8  the purchase of the azoxystrobin technical on performance of

9  the two steps and established the manner and timing of the

10  performance."  To me, that says what you are asking me to say,

11  but in a way that makes sense in this case.  So I appreciate

12  your argument.  To the extent you're asking me to say it some

13  different way, I'll overrule it, but I believe I've covered the

14  substance of what you are asking me to do.  The Federal Circuit

15  can tell me I'm wrong and that will be okay.

16    **MR. SANTHANAM:**  The only thing we will note on the

17  record and, again, just to preserve the record, that in the

18  *Akamai* decision, it does outline two new ways after remand from

19  the Supreme Court of controlling or directing another entity's

20  activities, and one was conditioning that other entity's

21  participation in the activity, which is captured by Your

22  Honor's addition.  The second half of that is also conditioning

23  the other entity's receipt of some other benefit that is not

24  captured in this to our view, so what's what we would object

25  to.

 1          THE COURT:  Okay.  I don't know what evidence there

 2   is beyond just the contract of that, so I think this is

 3   sufficient.

 4          Any objections by the defendant to the instructions

 5   on Issue 4?

 6          MR. DAVIS:  No, Your Honor.

 7          THE COURT:  Turning to Issue 5, the damages begin in

 8   the middle of page 19 and going through page 22.  This is a

 9   shortened version modified a bit for the particular

10   circumstances.  Does the plaintiff have objections to the

11   instructions on Issue 5?

12          MR. SANTHANAM:  No, Your Honor.

13          THE COURT:  What about the defendant?

14          MR. DAVIS:  No, Your Honor, just not outside the

15   mesotrione objection that we have --

16          THE COURT:  Your overall general objection to any

17   instruction on lost profits, that's overruled.

18          Issue 6, willfulness.  Any objections as to the '138

19   Patent?  Any objections from the plaintiff?

20          MR. SANTHANAM:  No, Your Honor.

21          THE COURT:  For the defendant?

22          MR. DAVIS:  No, Your Honor.

23          THE COURT:  Turning to the DABCO Patent, the

24   instructions start there at the bottom of page 23.  Any

25   objections to the introduction in those two paragraphs?

 1          **MR. SANTHANAM:**  Yes, Your Honor.  Just to preserve

 2     the record, both to the introduction and instruction number

 3     seven.  Throughout this case, Willowood's only defense has been

 4     that their azoxystrobin technical has not been manufactured

 5     with any DABCO at all, and so both the introduction and

 6     instruction number seven make reference to the specific range

 7     that is claimed within the patent.  We believe that's

 8     unnecessary and might confuse the jury in light of the evidence

 9     that's been presented.

10          **THE COURT:**  All right.  I'll overrule that.

11          Any objections from the defendant to those

12     introductory paragraphs?  I was just directing your attention.

13          **MR. DAVIS:**  Yes, Your Honor, just to preserve the

14     record, Willowood objects to the burden of proof instruction

15     that the burden of proof on this issue belongs to Willowood.

16          **THE COURT:**  Overruled.  Issue 7.

17          **MR. SANTHANAM:**  We have the same objection, Your

18     Honor.  We understand --

19          **THE COURT:**  That's right.  I appreciate throughout

20     the instructions on the DABCO Patent, you don't want me to talk

21     about the, "in the presence of between a certain amount."

22          **MR. SANTHANAM:**  Correct, Your Honor.  At least on the

23     infringement issues, not to the validity issues.

24          **THE COURT:**  That's overruled.  Any other objections

25     to the instruction on Issue 7 for the plaintiff?

1          **MR. SANTHANAM:**  No, Your Honor.

2          **THE COURT:**  Mr. Davis, you said, no?

3          **MR. DAVIS:**  No, Your Honor.  That's correct.

4          **THE COURT:**  What about Issue 8, that's the damages

5   for the plaintiff?

6          **MR. SANTHANAM:**  Yes, Your Honor.  We do have -- I

7   guess we want to make one clarification, and we have objection

8   as well.  This is all on pages 26 to 27.  On 27, the top

9   paragraph about four lines down, the sentence starts, "in

10  addition to considering whether there was a demand for

11  Syngenta's azoxystrobin crop-protection products made by the

12  '761 Patent's method, whether there was an available acceptable

13  non-infringing substitute, we believe it should say available

14  or, and commercially acceptable.  Just some clarity there,

15  whether a comma is appropriate, just a clarification there, or

16  available and acceptable.

17         **THE COURT:**  Okay.  I don't have any problem saying,

18  "whether there was an available and acceptable."  Does the

19  defendant have any problem with that?

20         **MR. DAVIS:**  No, Your Honor.

21         **THE COURT:**  I don't know about needing to add the

22  word commercially.  Then I have to define commercially.  I

23  think these are relatively clear, but I'll add "and" in there,

24  so it will say whether it was an available and acceptable

25  non-infringing substitute.  That's fine.

**MR. SANTHANAM:** The commercially acceptable language comes from the Wind Surfing case. We would object to its exclusion from these instructions, but we understand Your Honor's ruling.

**THE COURT:** I just don't know that it really is helpful or an issue in a way that is needed in this case. I'll overrule that.

**MR. SANTHANAM:** We object to the entire inclusion of the bottom paragraph on page 27. That paragraph, you know, presumes that there is a non-infringing alternative which is the '138 Patent and it also presumes that that method was both available and commercially acceptable, which we believe is prejudicial, and so we would propose removing that entire paragraph altogether. And, it is for the jury to decide whether there is a non-infringing alternative, whether it was available and whether it was acceptable, and the cases we would cite are *Minnesota Mining versus Johnson*, which is *976 F 2d 1559*, and of course the *Panduit versus Stahlin Brothers Febre Works* --

**THE COURT:** Wait one second. I'm not sure I'm following you. I've got in the previous paragraph that we were just talking about, whether there was an acceptable non-infringing substitute.

**MR. SANTHANAM:** Correct.

**THE COURT:** But you don't want me to tell them what

1 that means and how that affects this case in the next

2 paragraph?  You just want me to delete that and not say

3 anything?

4            **MR. SANTHANAM:**  In our view, it is for the jury to

5 determine in the first instance whether there is a

6 non-infringing substitute.  This presumes that it is and that

7 it is not only available, but it is commercially acceptable.

8 So that in our view is prejudicial, and we would point to the

9 Minnesota Mining case as well as the *Panduit* case.

10            **THE COURT:**  Well, if I had done that, I would agree

11 with you that it specifically says what we are talking about is

12 whether this would have happened, and if you find that would

13 have happened, so I don't -- it doesn't seem to me to tell them

14 that it happened, but I appreciate your argument.

15            You don't have any objection to the way the second

16 sentence or the third sentence there deciding whether there was

17 a non-infringing alternative?

18            **MR. SANTHANAM:**  Well, we suggest that if at a

19 minimum, throwing into that last paragraph on page 27, the

20 first sentence, "essentially what we are talking about is

21 whether or not Willowood or someone else would have used the

22 '138 Patent."  We would suggest saying, would have found the

23 method of the '138 Patent to be acceptable and available.  Some

24 sort of language that denotes that so that the jury understands

25 it is not already established.

1          **THE COURT:**  Okay.  Well, I think that's sort of

2     implicit in "used."  If it's not usable, you can't use it.  I

3     note your objection and overrule it.

4          Any other objections from the plaintiff to the

5     instructions on Issue 8?

6          **MR. SANTHANAM:**  No, Your Honor.

7          **THE COURT:**  What about for the defendant?

8          **MR. DAVIS:**  No, Your Honor.

9          **THE COURT:**  Okay.  Turning to Issue 9, invalidity by

10    obviousness.  Those start on page 29 and go through the top of

11    page 32.  Objections for the plaintiff?

12         **MR. SANTHANAM:**  Yes, Your Honor.  Out of an abundance

13    of caution, we object to instruction number nine, to the extent

14    it references the '138 Patent as part of a combination to show

15    invalidity or obviousness.  We made our objection on the

16    record.  We don't need to repeat that here, but to summarize

17    very quickly, there was no Section 35 U.S.C. 282 notice that

18    was filed.  The only reference to the '138 Patent being

19    combined came through Dr. Lipton's testimony, and the only

20    place that was found in his report was in a claim chart

21    supplied by Willowood's counsel.

22         **THE COURT:**  I'll note that objection and overrule it.

23    You are sitting down, so I assume there is no other objections

24    to that instruction.

25         **MR. SANTHANAM:**  No, Your Honor.

1    **THE COURT:**  What about for the defendant?

2         **MR. DAVIS:**  Your Honor, in the last full paragraph on

3    page 30, the last clause has the last statement, "and whether

4    the inventor proceeded contrary to accepted wisdom in the

5    field."  Willowood would note that there is no testimony that

6    the inventors of the '761 Patent proceeded contrary to accepted

7    wisdom in the field.  There is testimony by Dr. Whitton, that

8    Weintritt proceeded contrary to the accepted wisdom in the

9    field, that is, what was considered necessary prior to

10   Weintritt was, the one molar equivalent of DABCO, and Weintritt

11   obtained its patent by going against that accepted wisdom and

12   showing that two to 40 mol percent worked well.  The inventors

13   of the '761 Patent were just following the pattern and path

14   established by Weintritt, that is, let's see if lower amounts

15   work.

16        **THE COURT:**  Okay.

17        **MR. DAVIS:**  So we would request the deletion of that

18   last portion of the instruction as not being supported by any

19   evidence of record.

20        **THE COURT:**  The plaintiff wants me to give that

21   instruction?

22        **MR. SANTHANAM:**  Yes, Your Honor.

23        **THE COURT:**  I think understood broadly, Dr. Whitton's

24   testimony supports that.  I'll ask the clerk to fix that

25   spacing issue there in the word "whether."  Do you see it,

1   Ms. Thornton?  In the paragraph at the bottom of page 30,

2   saying you should also consider.  There is no extra space.  It

3   printed out on mine.  I assume that's a glitch on the printed

4   copy.  Okay.

5          Now that takes us to the general evidentiary

6   instructions beginning on page 32, and going through the

7   cautions beginning on page 37.  Any objections for the

8   plaintiff to those instructions?

9          **MR. SANTHANAM:**  No, Your Honor.

10         **THE COURT:**  What about the defendant?

11         **MR. DAVIS:**  No, Your Honor.

12         **THE COURT:**  The cautions and the deliberations and

13   verdict instructions beginning on page 37 and going until the

14   end, any objections to those for the plaintiff?

15          **MR. SANTHANAM:**  No, Your Honor.

16         **THE COURT:**  What about the defendant?

17         **MR. DAVIS:**  No, Your Honor.

18         **THE COURT:**  All right, good.  If you all will step up

19   to Ms. Sanders and take a look at the change to the verdict

20   sheet that we made on Issue 3 before I kill anymore trees.

21         **MR. COUGHLIN:**  Can I write on this?

22         **THE COURT:**  Yes.  You can write on it.  Don't change

23   it yet.  Do you want four boxes instead of three?

24         **MR. DAVIS:**  No.  Just two lines but with two boxes

25   yes and no, and yes and no.

1          THE COURT:  Okay.  I think I understand.  Okay.  Hand
2     it to me and let me see what you marked up.  Any problems with
3     doing yes, no; yes, no, for the defendant?
4          MR. DAVIS:  No, Your Honor.
5          THE COURT:  Okay.  I'm going to leave yes at the
6     beginning so it will say yes as to Willowood USA and Willowood
7     LLC; blank space for Syngenta and then add, no, blank space for
8     Willowood on that same line.
9          MR. DAVIS:  Yes, Ma'am.
10         THE COURT:  And then the second line will just stay
11    the same.  It will be yes or no for Willowood Limited.  That's
12    probably better.  Thank you, for that improvement.  Did you get
13    that?
14         MR. DAVIS:  Yes.  I'm sorry.
15         THE LAW CLERK:  You want the yes blank and yes as to
16    these guys and then a space for the checkmark for Syngenta?
17         THE COURT:  Yes as to, and the Willowood and then the
18    blank.
19         THE LAW CLERK:  I think I've got it.  It is just
20    going to take a formatting change.
21         THE COURT:  Okay.  We'll print that out so the jury
22    will have the verdict sheet that looks like this that says
23    copy, as will you all.  We'll get you clean copies, if we can
24    ever get it finalized.  They'll have that in front of them when
25    you begin your closing arguments, and then I'll send the

1    original one back to them when they start deliberating.

2           Have you all gotten the exhibits organized and a set

3    of exhibits -- Ms. Sanders is saying yes.  Excellent, because I

4    forgot to remind you all of that yesterday, but you all are on

5    the ball.

6           Is there anything else we need to talk about before

7    we take a break and wait on the jury to all arrive by 9:30?

8           **MR. LEVINE:**  I just want to advise the Court -- or

9    see how you want me to do it.  I will reserve time for rebuttal

10   closing.  I'm not going to tag any particular time, but I will

11   use some time at the start and some time during rebuttal,

12   whether it turns up being equal --

13          **THE COURT:**  That's fine.  I'll tell the jury you get

14   to open and close.

15          **MR. NEUMAN:**  Your Honor, with the Court's permission,

16   during our closing, we would like to have Ms. Sanders, turn her

17   monitor around so we can -- I'm sorry, the court reporter, so I

18   can see the exhibits we're going to be showing.

19          **THE COURT:**  Okay.

20          **MR. LEVINE:**  We have --

21          **THE COURT:**  Is that screen right there going to show

22   the exhibits?

23          **MR. NEUMAN:**  Are you leaving that up?

24          **MR. LEVINE:**  We'll leave that up and Ms. Sanders can

25   just flip it like we've been doing during the whole trial.

1          **THE COURT:**  That monitor will be there.  Any other

2 housekeeping or logistical issues?

3          She's going to print off another copy and we'll sit

4 here and I'll look at it, until we're all satisfied.  While

5 she's doing that, I think we went through these instructions.

6 If anybody did see any typos that you did not mention while we

7 were talking, after the arguments and after I instruct the

8 jury, just please let Ms. Thornton know, because I do want to

9 have them ready in case they ask for the instructions in

10 writing to be sent back.

11          Do you all want to step up and look at this?  At this

12 point, even if there is a better way to do it, as long as this

13 way is acceptable, let's just go with it.  Can you see,

14 Mr. Davis?

15          **MR. DAVIS:**  Yes, that's fine.

16          **THE COURT:**  All right.  We'll get copies of the

17 verdict sheet printed for everybody, including the jurors, and

18 we will take a recess until -- might take us to about 9:35 or

19 so.  Let's take a ten minute recess.

20          (Recess taken.)

21          **THE COURT:**  Okay.  Everybody got their copy of the

22 verdict sheet?  They've been distributed to the jurors.

23 Anything we need to take up before they come in?  No.  All

24 right.  Bring the jury in.

25          I do anticipate taking a break after your closing

1   arguments before I instruct the jury.

2           Mr. Neuman, you and Mr. Tiller are going to split

3   your argument?

4           **MR. NEUMAN:**  That's correct, Your Honor.

5           **THE COURT:**  I'll kind of give you heads-up, five

6   minutes before your time is up, make sure you're following --

7           **MR. LEVINE:**  But my time for the opening portion --

8           **THE COURT:**  I won't give you a heads-up unless you

9   get to 40 minutes on your initial argument.

10          **MR. TILLER:**  Can you give me a heads-up at 15?  If

11  you can?  If not -- I'll probably remember some time around in

12  there.

13          (Jury panel is present.)

14          **THE COURT:**  Good morning.  You see you have in your

15  chair there along with your notes a copy of the verdict sheet

16  in this case.  So I'm just going to give you a minute to take a

17  look at it.  You don't need to study on it.  We're going to

18  talk about it a good bit this morning, but just so you have a

19  little familiarity with it.

20          So as you see, ladies and gentlemen, you've got a two

21  page verdict sheet here.  It has nine issues on it.  You will

22  need to answer at least six of them, possibly as many as all

23  nine, and that will depend on your answers to some of the

24  initial questions.

25          Before you begin your deliberations, you will hear

```
 1   the closing arguments of the attorneys, and then we'll take a
 2   recess and then I'll instruct you on the law.
 3           The lawyers are allowed in their closing arguments,
 4   to go over the evidence with you and to attempt to persuade you
 5   to answer these issues in a particular way favorable to their
 6   clients.  If their recollection of the evidence differs from
 7   your's, you should be guided by your memory of the evidence.
 8   You are the finders of facts in this case, not me, not the
 9   lawyers, and it is your recollection that governs.  I know none
10   of these folks would misstate the evidence to you, but people
11   do hear things differently and remember things differently, and
12   so it is your memory that governs, but you should give their
13   arguments and contentions your full attention, to assist you in
14   your deliberations.
15           So under our rules, the Plaintiff Syngenta gets to go
16   first.  Then you will hear from Willowood's lawyers and then
17   Syngenta gets to wrap things up with closing arguments.
18           Mr.  Levine, you may proceed.
19           **MR. LEVINE:**  Thank you, Your Honor.  May it please
20   the Court, counsel, ladies and gentlemen of the jury, as I did
21   at the beginning of my opening statement, I want to begin my
22   closing argument by thanking each of you for serving as jurors
23   in this case.
24           You've heard the evidence.  Now it is time to decide
25   the issues and to provide us with your decisions.  You provide
```

those decisions to us by using the verdict form.  It contains
the specific questions that you will have to answer in order to
decide the issues in this case.  You have a copy of it in front
of you.  Let's refer to it.

As you can see, it has three sections.  One for the
Compound Patents, one for the '138 Patent and one for the DABCO
Patent.  Each section has a few questions.  What I'm going to
do now is talk to you about those questions, talk a little bit
about the law that applies to those questions, review with you
the evidence that you saw and heard with respect to those
questions.  From all of that the answers to these questions
will become clear.

I'm going to organize my argument by talking first
about infringement, which are questions one, four and seven.
I'll then talk about the validity question of the DABCO Patent,
which is question number nine.  I'll then talk about
willfulness, which are questions three and six.  And then I'll
talk about damages, which are questions two and eight.

So let's look at question one on the verdict form.
To decide this question, Judge Eagles will tell you that there
are a number of factors that you can consider, including the
agreement between the parties and whether there was an intent
to sell to customers in the United States.

There were a number of exhibits containing evidence
relating to this question, including Plaintiff's Exhibits 14,

15, 17, 18, and Defendant's Exhibit 16.  In the various screen
shots that we saw from Willowood Limited's website and
Willowood, USA's website in PX, Plaintiff's Exhibit, PX 17, we
saw that Willowood Limited wanted to, and did launch Willowood
USA.  They set up Willowood USA as their US office and they
linked their website to Willowood USA's website and Willowood
USA's website was linked back to Willowood, Limited's website.

        Mr. Heinze testified that the intent in launching
Willowood USA and having Willowood USA as its affiliate office,
the affiliate office of Willowood Limited in the US, was to
sell products to customers in the United States, including the
crop-protection products like azoxystrobin.

        Vijay Mundhra, the managing director of Willowood
Limited, is listed in the, "Meet the Team" section on the
Willowood USA website, and you saw in Plaintiff's Exhibit 18,
that Vijay Mundhra stated, that we are -- when he launched
Willowood USA, that "we are very excited about this new
opportunity to grow and expand our business, grow and expand
our company in the United States."

        Plaintiff's Exhibit 15 is the supply agreement
between Willowood Limited and Tai He.  In Section 1.05 of that
agreement, Willowood Limited represented that it is desirous of
developing demand for and selling such product on an exclusive
basis in the U.S.A. and Canada.

        In Section 2.01, Willowood Limited agreed that it

shall be the exclusive seller of Tai He's azoxystrobin
technical in the USA and Canada.

Section 3.06 of Plaintiff's Exhibit 15 states that
title from Tai He to Willowood Limited shall pass to Willowood
upon delivery to Willowood's designated port in the USA.

In Section 8 of Plaintiff's Exhibit 14, we saw that
Willowood Limited agreed to deliver all products FOB to the
place of destination designated by Willowood USA and in
Defendant's Exhibit 16, we saw the place of designation was
Memphis, Tennessee.

Mr. Heinze said that shipment is FOB Hong Kong, but
shipment FOB, doesn't preclude the sale from taking place in
the United States. FOB is just a factor to consider, and Judge
Eagles will tell you that it's not determinative of the
question that you will have to decide.

When all of the factors and all of the evidence is
considered, Willowood, Limited's intent was to, and they in
fact did import into and sell in the United States. With
respect to this issue, there was some very important testimony
that you heard. When SSJ testified last Wednesday by video, he
told you that a Willowood Limited employee, a person by the
name of Sophia, has a job title of manager of registrations,
and one of her responsibilities at Willowood Limited is to
manage Willowood Limited's US EPA registrations. If Willowood
Limited doesn't import into the US and have an intent to do so,

why then does it have an employee whose responsibilities
include managing US EPA registrations?  Syngenta has proven
that Willowood Limited imported azoxystrobin technical into the
US and otherwise sold or offered for sale azoxystrobin
technical in the US.

Let's look now at question four, relating to
infringement of the '138 Patent.  To decide this question,
Judge Eagles will tell you that you need to decide whether a
single entity carried out both the etherification and
condensation reactions used to manufacture Willowood's
azoxystrobin or whether Willowood directed or controlled the
entities that do carry out those reactions.

Here again, there were numerous documents, numerous
e-mails and other evidence relating to this very issue.  These
included Plaintiff's Exhibits 9, 24, 25, 26, 31, 32, 42, 41,
and 44.  The analysis could start and stop with Plaintiff's
Exhibit 9, the process description submitted to the EPA before
this lawsuit was filed.  The EPA was told that both the
etherification and condensation steps were carried out by a
single entity, Tai He.  Here are the pages from that process
description, clearly stating that Tai He performs -- carries
out both steps.  Four years later in July 2017, right before
stepping into this courtroom, right before judgment day,
Willowood says PX 9 is a mistake, and they tell Pyxis to file a
correction at the EPA.

1          The timing of this correction isn't a coincidence.

2    The documents and the witness testimony that you heard also

3    proved that Willowood directs and controls the entities

4    carrying out the process.  Mr. Heinze admitted that Willowood

5    asked Tai He to divide the steps up of the manufacturing

6    process between the factories according to Willowood's

7    instructions.  Why?  He explained in PX 25, where he said, "I

8    know this is very cumbersome, but we cannot afford to get

9    caught up in a lawsuit that we would potentially lose because

10   of patent infringement."

11          Shortly after this lawsuit was filed, Mr. Heinze, in

12   PX 26, told senior executives at Willowood Limited and

13   Willowood USA, that the first thing we need to do is to confirm

14   that our manufacturer is making the product the way we have

15   instructed them to do so.

16          Mr. Heinze testified that Mr. Wu said that Tai He

17   only carries out the condensation step and that he buys the

18   intermediate from another company called Guosheng.  Where is

19   the contract between Guosheng and Tai He?  Where are the

20   purchase orders from Tai He to Guosheng.  Where are the

21   invoices from Guosheng back to Tai He?

22          Dr. Whitton, when he was testifying, explained the

23   benefits of using the '138 process to manufacture azoxy.  Those

24   benefits included being able to make azoxy at a commercial

25   scale, better yield and the production of a higher quality

1    product.  The benefits were summarized for you on Plaintiff's
2    Demonstrative Exhibit 13.
3            Given all of the benefits of the '138 process, it is
4    no wonder why Rajesh told Mr. Heinze in Plaintiff's Exhibit 41,
5    that all manufacturers in China are using the same process for
6    etherification/condensation.  Syngenta has proven that
7    Willowood infringes the '138 Patent.
8            Let's look now at question seven on the verdict form
9    relating to infringement of the DABCO Patent.  To decide this
10   question, Judge Eagles will tell you that Willowood has to
11   prove that its azoxystrobin technical was not manufactured
12   according to the process claimed by the DABCO Patent.
13   Willowood has to prove that the process used to manufacture
14   it's azoxy technical does not use DABCO within the range, so
15   the starting point for this question is, that Syngenta does not
16   have to prove that Willowood is using DABCO.  Willowood has to
17   prove that it is not using DABCO, and the only evidence that
18   was presented to you, the only evidence they have is, that
19   Mr. Wu is saying he doesn't use DABCO.  That's supposedly what
20   he sold SSJ and Mr. Heinze.
21           What you heard last week from Mr. Heinze, and then
22   this week from Mr. Wu, demonstrates that neither of them
23   provided credible testimony.  Last week Mr. Heinze said he had
24   spoken with Mr. Wu eight or more times about whether Tai He was
25   using DABCO.  Mr. Heinze sat in that witness box and said that

1  in 2013, Mr. Wu told him that he wasn't using DABCO, because

2  the DABCO Patent in China was still in force, that's why he

3  wasn't using DABCO.  But this week you heard from Mr. Wu.  You

4  heard the deposition testimony and when asked about DABCO, he

5  said he hadn't even heard about DABCO, first heard about it in

6  2015.  Mr. Wu didn't say one word about a DABCO Patent in

7  China.

8          Mr. Wu also has a vested interest in saying he

9  doesn't use DABCO.  He is earning millions of US dollars from

10 selling azoxy to Willowood.  He came out of China to be deposed

11 at Willowood's request, and he met with Willowood's lawyers

12 before he was asked any questions.  Syngenta asked -- you saw

13 the letter, Syngenta asked him to bring documents to the

14 deposition and to allow Syngenta to meet with him when he met

15 with Willowood's lawyers.  He didn't do either.  Mr. Wu's

16 testimony is also contradicted by the documents and other

17 testimony that you heard.

18         Mr. Mundhra couldn't remember any source of azoxy

19 technical that has no DABCO.  Dr. Whitton explained that the

20 tests Syngenta conducted and used to look for the telltale

21 signs of DABCO.  Dr. Fortunak explained to you why in his

22 opinion, after reviewing all of the test results, he's

23 completely convinced that Willowood is using DABCO.  He found

24 the DABCO fingerprints on Willowood's azoxy 2SC.  That's the

25 only testing, the only evidence that you saw, and it showed the

1  DABCO fingerprints.

2          Willowood has to prove that its azoxy isn't made with

3  DABCO in the claimed range.  Willowood flat-out denied that

4  they were using DABCO.  The forensic evidence doesn't lie.  The

5  DABCO fingerprints were all over Willowood's azoxy 2SC, as

6  shown in Plaintiff's Exhibit 6B.

7          It is Willowood's burden to prove to you that the

8  condensation reaction used to manufacture its azoxy technical

9  is not performed in the presence of DABCO in the claimed range.

10 Willowood has not proven its azoxystrobin is not manufactured

11 in a non-infringing manner.

12         Let's look now at question number nine on the verdict

13 form relating to the validity of the DABCO Patent.  To decide

14 this question, Judge Eagles will tell you that Willowood has to

15 prove invalidity by clear and convincing evidence.  She'll also

16 tell you that you may take into account the fact that Weintritt

17 was previously considered by the Patent Office when it examined

18 and allowed the claims of the DABCO Patent.  She'll also tell

19 you that when the Patent Office previously considered a prior

20 art reference, you may assign less weight to an argument based

21 on that prior art.

22         You heard that the Weintritt reference was before the

23 United States Patent and Trademark Office.  Dr. Whitton gave it

24 to them and he discussed it on the very first page of his

25 patent application.  He explained why using DABCO to make azoxy

and using it at concentrations lower than what was in Weintritt
wasn't obvious.  You heard him talk about how using a lower
concentration provided unexpectedly more azoxy being produced
at a faster rate and a lot of other benefits, too, all of which
were summarized for you in Plaintiff's Demonstrative Exhibit
15.

The Patent Office examined Dr. Whitton -- or
Dr. Whitton's invention, determined it to be patentable and
awarded him this United States Patent, the DABCO Patent.

Willowood is arguing that the Patent Office got it
wrong.  Dr. Lipton admitted he's not a process chemist, but
nonetheless, he thinks Dr. Whitton's invention would have been
obvious.  He admitted, though, that Weintritt discloses
trillions of possibilities and, yet, he picked azoxystrobin
from those trillions of possibilities based on a document
called the claim chart that was provided to him by counsel even
before he was retained in the case.  It is clear he was being
led by counsel and was using hindsight as a map to take him
where he wanted to go.  Hindsight changes everything.  It gives
you that roadmap that you need to look back, that's why Judge
Eagles will tell you that you should not use hindsight when
evaluating whether the claimed invention would have been
obvious in light of the prior art.

Dr. Fortunak explained to you why Dr. Whitton's
invention wasn't obvious.  He told you that Weintritt doesn't

even describe making azoxy. It has examples, but none of them
have azoxy. Weintritt gives you no reason to use, and in fact
discourages someone of ordinary skill in the field of the
invention, from using DABCO at .1 to 2 mol percent. He further
told you that Weintritt's condensation reaction is different
from the condensation reaction in the '138 Patent being used to
make azoxy.

The Patent Office didn't get it wrong. The Patent
Office got it right. Willowood has not proven by clear and
convincing evidence that Dr. Whitton's DABCO Patent is invalid.

Let's talk now about the willfulness questions. To
answer these questions, Judge Eagles will tell you that to
prove willful infringement, it is not enough for Syngenta to
prove that Willowood knew of the patents and infringed. We've
got to show more, and we have. We've shown a lot more.

Willowood admitted that it was aware of Syngenta's
compound patents before they expired, knew about the patents
when it was doing its importing and formulating and testing.
It didn't matter. Willowood imported the azoxy technical into
the United States before the compound patents expired.
Willowood then used that to develop formulations to make
samples, to have those samples tested, conduct that Mr. Heinze
called gross negligence. Calling it gross negligence is just
another in the long list of excuses that Willowood has made
during this trial.

1    Mr. Heinze tried to explain it away.  He testified

2  that picking up and sending the 5-kilograms out of the country,

3  supposedly wouldn't change a thing, but packing up and shipping

4  it out would have prevented Willowood from continuing its

5  infringing activity or engaging in further infringing activity,

6  like using it in order to prepare formulations, conduct testing

7  and have samples made.

8    If it was so easy to do the formulations and testing

9  outside the US as Mr. Heinze and Ms. Kay said that it was, why

10 didn't they do that in the first instance?  Why didn't they do

11 that after they found out -- after Mr. Heinze said he realized

12 he made a mistake?  Why didn't he then withdraw his EPA

13 application, go do the formulation and the testing outside of

14 the US, and then resubmit his EPA application.

15    The reason is, because Mr. Heinze and Willowood

16 wanted to move quickly.  He had an established relationships

17 with the Adjuvants and ARC.  He was in such a rush, that he

18 didn't even take the time to check to see if all of the

19 references to Syngenta had been changed on the label for the

20 Azoxy 2SC product that he told the EPA he would be using.

21    Now with respect to the willfulness questions, Judge

22 Eagles will also tell you that a factor you can consider in

23 deciding whether Willowood's infringement was willful is,

24 whether or not Willowood tried to cover up its infringement.

25 The evidence showed that's exactly what Willowood did.  You saw

Plaintiff's Exhibits 45 and 46.  Plaintiff's Exhibit 45 was
Syngenta's letter to Willowood in January 2014, after hearing
rumors in the market that Mr. Fisher had talked about it.
Syngenta asked Mr. Heinze to confirm that he hadn't already and
wasn't planning on engaging in infringing activity.  Mr. Heinze
didn't confirm anything.  He hid the ball.  He didn't say that
Willowood had already imported azoxy technical.  He didn't say
and tell Syngenta that Willowood had already used the azoxy
technical to develop formulations for end-use products.  He
didn't tell Syngenta that Willowood had already made and tested
samples.  He didn't tell Syngenta that Willowood had just filed
an EPA application to register its AzoxyProp Xtra.  He didn't
admit infringement.  He didn't disclose the relationship
between Willowood and Greenfields.

        I mentioned Greenfields, because Greenfields --
Willowood's use of Greenfields is another example of
Willowood's game plan to hide and cover up its infringement.
Greenfields was the holding company that Mr. Heinze and
Mr. Mundhra set up in Dubai and it was Greenfields who was
listed as the sponsor of the EPA application for the azoxy
technical used to make Willowood's end-use products.

        Why would you create and use an offshore company in
Dubai to hold US registrations?  I'll tell you why.  Willowood
knew it was going to be entering the market in 2014.  We saw
the emails from Matt Heinze in March and April 2013,

1   Plaintiff's Exhibits 167 and 168, telling distributors that

2   Willowood would have azoxy products in 2014.  Willowood knew it

3   was going to disrupt the market in 2014 and create all the

4   turmoil that Mr. Cecil and Mr. Fisher told you about.

5           Willowood didn't want to give Syngenta heads-up.

6   Willowood didn't want Syngenta to have the time to implement

7   its postpatent strategy, including introducing premium brands

8   before Willowood entered the market, and fighting brands when

9   Willowood entered the market.  They hid behind Greenfields.

10  What happened after Willowood started selling its azoxy end-use

11  products?  Mr. Heinze told us, Willowood acquired all of the

12  assets of Greenfields and moved it here to the United States.

13          With respect to the '138 Patent, Willowood is saying

14  it is relying on the advice of Mr. Hayden, and it's true that

15  advice of counsel is a factor to be considered, but here,

16  Willowood didn't even follow the advice that Mr. Hayden gave

17  him.  He told him, don't direct and control, and that's exactly

18  what Willowood did by providing instructions to Tai He.

19          There was further evidence regarding willfulness with

20  respect to the '138 Patent.  Recall that in Plaintiff's Exhibit

21  41, Mr. Heinze told Rajesh at Willowood Limited, that

22  Mr. Hayden wanted to know if one step could be changed in the

23  manufacturing process that would circumvent the process patent

24  by Syngenta.  Rajesh responded on May 27th, '13, and told

25  Mr. Heinze that all manufacturers in China were using the same

process and steps for the etherification and condensation
reaction and these steps had to be used in sequence and were
difficult to avoid.  Even with that knowledge, Willowood
proceeded forward anyway, and PX 9 was submitted to the EPA.
That was a deliberate and conscious decision.

Willowood wasn't trying to avoid infringement.
Willowood was trying to avoid being held accountable for its
infringement, avoid being held responsible for its
infringement.  Syngenta has proven that Willowood willfully
infringed.

Let's look now at the damages questions.  Syngenta is
seeking lost profits. Judge Eagles will tell you that any
damages you award must be adequate to compensate Syngenta for
its infringement.  Your damages award should put Syngenta back
in the position that it would have been in had Willowood not
infringed.  Judge Eagles also will tell you that Syngenta isn't
required to prove the amount of its damages with mathematical
precision, but has to do so to a reasonable probability that it
would have made those profits, and we have.

You heard from Mr. Cecil and Mr. Fisher about the
turmoil Willowood caused with its early market entry.  You
heard from Dr. Wichert that because of Willowood's early entry,
Syngenta could not effectively implement its post-patent
strategy.  All of this resulted in price erosion and lost
profits.  Dr. Wilner calculated Syngenta's lost profits to a

reasonable probability, and he verified his calculations. He
calculated that Syngenta's lost profits were at least
$75.6 million.

We've now gone through all nine questions on the
verdict form. As you listen to Willowood's closing argument,
see if they explain why what Willowood's witnesses said from
the witness box was different from what they said in documents
and different from what they told each other. See if they
explain why Mr. Heinze said that it was in early 2013 when
Mr. Wu told him Tai He wasn't using DABCO, but Mr. Wu testified
he hadn't even heard of DABCO until 2015.

Keep in mind, too, the instructions that Judge Eagles
will give you on the law, because it is the law that you have
to follow and apply in this case. If you follow the law, you
will find that Willowood infringed. If you follow the law, you
will find that Willowood's infringement was willful. If you
follow the law, you will find that the DABCO Patent is not
invalid, and if you follow the law, you will find that at least
75.6 million are the damages that will put Syngenta back in the
position it would have been in, but for Willowood's
infringement.

Thank you again, and I will look forward to talking
with you after Willowood's closing argument.

**THE COURT:** All right. The jury is with Willowood.

**MR. TILLER:** Thank you, Your Honor. May it please

the Court, counsel. Ladies and gentlemen, as I said about a
little over a week ago, thank you. Thank you, for the time.
It is not easy leaving your family, your life, it is hard, and
we thank you. Luckily for you, you're only going to hear from
me for a few minutes, then I'm going to ask Mr. Neuman to talk
to you for a little bit, but I wanted to address some of the
issues that Mr. Levine went to.

First of all, let's talk about Willowood, Limited.
Willowood, Limited was in business well before any of this
started. It is a separate company. It operates in separate
countries. It has a different ownership structure and it has
its own customers. It has 50 customers in approximately 40
countries. This is not an arrangement that was contrived to
sell stuff in the United States.

Mr. Levine pointed out that Willowood Limited has a
registration manager. Now, a registration manager does work
for all of their customers in all countries and as you heard
SSJ testify, that registration manager essentially acts as the
conduit between the manufacturers and the regulatory
consultants of each of their customers. The fact that Sophia
or SSJ acted as that conduit doesn't change the fact that what
was going on here was exactly how SSJ and Mr. Heinze testified.
Willowood USA says, we need azoxystrobin technical. It tells
Willowood Limited, here is where we want it to go. Willowood
Limited makes arrangements with the Chinese office of the

1  shipping company, and delivers it FOB China or FOB Hong Kong.

2  That's what is going on here.  That's what the invoices talk

3  about, that's what the purchase orders talk about.

4         Once delivered to the port in China or Hong Kong,

5  then it is Willowood USA's problem.  Willowood USA pays for the

6  shipping costs.  Willowood USA makes all of -- provides all the

7  instructions on where it is to be shipped.  Willowood USA makes

8  all the arrangements with U.S. customs and the EPA.  Willowood

9  USA handles all arrangements in the United States, including

10 selling azoxystrobin and these products.

11        Now, did Willowood Limited make statements on its

12 website that it had a relationship in the USA?  Absolutely.

13 Did it want Willowood USA to succeed?  Absolutely.  But the

14 mere fact that there are statements on a website, doesn't

15 change the fact that what Willowood, Limited was doing, was

16 acting in Hong Kong and China and, therefore, it did not engage

17 in any acts in the United States and, therefore, as to question

18 one, which asks that question, we would ask that you answer no.

19        Now, let's talk about the compound patents.  I told

20 you a week ago that Mr. Heinze was going to get up on the stand

21 and say he messed up.  That's exactly what he said.  He said, I

22 made a gross mistake or I engaged in gross negligence.  He

23 admitted, I was aware of the patents.  He admitted that selling

24 in the United States before the patents expired could lead to

25 allegations of infringement.

1          The simple fact was, he wasn't thinking.  We've all

2    done it.  This was a big mess-up, but it was a mistake.  You

3    know why it was a mistake?  Because there was a way around it.

4    There was an easy way around the problem.  This is not a

5    situation where he said, whoa, man, getting our azoxystrobin

6    into the market in 2014 is going to be really, really

7    difficult, I'm going to have to jump through a thousand

8    different hoops, you know, I'm just going to infringe, let's

9    see if they sue me.

10          This was not that type of a situation.  There was an

11   easy out, and he didn't take advantage of it, but that is

12   indicative of a mistake, not of what Judge Eagles will tell you

13   is malicious or consciously wrongful or activities engaged in

14   bad faith.  That's what you would have to find, to find

15   Willowood USA to have willfully infringed the compound patents.

16   The fact that there was an easy way, is indicative of the fact

17   that it was a mistake.

18          Now, Mr. Levine told you, well, they were engaged in

19   all sorts of haste, and the haste that they point to is that in

20   the label that was submitted to the EPA, there was one

21   reference to the word Syngenta.  You heard that -- you also

22   heard Janelle Kay, who is not with Willowood USA, but is hired

23   by Willowood USA saying, you know, my company, my bad.  That's

24   what she said.  She said that was our mistake.  Mr. Heinze

25   said, I don't read those labels.  SSJ says, I don't read those

labels.  Nobody reads those labels.  They are 70 pages long.

They read to make sure that the right crops are identified,

that the right diseases are identified, but they don't read the

labels and, again, she said, I wasn't pressured to get anything

done fast.  That's not what was going on here, but it is, my

bad.

So the fact that they may have wanted to get into the

business, they clearly did.  That in and of itself, does not

lead to a finding of willful infringement.  This was a mistake,

a bad mistake, but a mistake, but it was not malicious,

consciously wrongful or done in bad faith.

Now let's talk about the '138 Patent.  I told you a

week ago, you were going to see some emails, you were going to

see some confusing documents, and I think I told you when I

first got involved in this case, I was like, you gotta be

kidding me, clearly it was done in one place.  Clearly

etherification/condensation was done in one place.  It says it

on the EPA document.  What's going on here?  But then when you

peel it apart, you understand that Tai He, the company that

actually knows what is going on, was consistent in what it has

been telling us.

First, DX 17, what I've been calling the stamped

document or the process description document, you are looking

at a portion of it right now.  This is a statement from Tai He,

and you'll see here that they very clearly say that the

1  etherification step was done at Guosheng.  Mr. Wu, the owner of

2  that company, was in front of you via deposition, and told you

3  that we've never done etherification.

4          Now, again, just to make sure, because this has had

5  me confused for a little while, too, there is a company called

6  Guanda, that's Tai He's partner.  That's the plant where Tai He

7  does the condensation step.  Guosheng is separate from that and

8  what he told you was, Tai He, at the Guanda plant, only does

9  condensation and, in fact, he told you that the Guanda plant

10 doesn't have the capability to do the condensation step.  So

11 Tai He, through documents, through Mr. Wu's testimony, has

12 consistently said, we do condensation, Guosheng does

13 etherification, and this was not a situation where this was a

14 manipulated or contrived situation.  This arrangement has been

15 going on for a while.  Guosheng makes the intermediate of the

16 etherification step for many customers.  Tai He makes

17 azoxystrobin for at least three customers that Mr. Wu told you

18 about.  This was not a contrived situation just to get around

19 the patent.  This is the way they always did it.

20         Then you heard from SSJ.  SSJ went to the plant not

21 once, but twice, went to both plants.  He sat there with this

22 document in his hand and watched everything being done

23 consistent with this document.  He went to both plants.  He saw

24 it happen.

25         Now, again, is there some confusion about what was

going on?  Yes.  Was this as a result of some language

barriers?  Potentially.  Was this as a result of people writing

emails quickly?  Potentially.

Mr. Levine showed you an email from Raj, basically

saying that everybody uses an etherification and condensation

step, and that may be true, everybody may use an etherification

step followed by a condensation step.  We don't deny that the

azoxystrobin that we purchased uses an -- is made via an

etherification step followed by a condensation step, but the

law requires that one company perform both steps, or that both

actions, the actions of two companies can be attributed to one

company, and here, that is not the case.  That's not what Raj's

email was talking about.  Raj's email is talking about, you

have to do an etherification and condensation.  We don't deny

that.  But the simple point is, consistently Tai He has told

you that it is done in two different steps and that this

arrangement is simply because Guosheng has the best supply and

the best price and simply buying something from somebody else

does not lead to control or direction as required by the law.

Now, let's talk about the '761 Patent.  Yes, it is

our burden of proof.  So let's look at the evidence.  Syngenta

tested one sample.  Syngenta tested one sample, not an

independent lab, not their expert, Syngenta tested one sample.

What they found, allegedly, was the clearcut fingerprint of

DABCO being used.  What they didn't tell you was, well, that

1  means that it was being used within the range.

2       Now, Syngenta will argue, well, wait a minute, you've

3  been saying you don't use DABCO at all, so the mere fact that

4  we found DABCO, ends the discussion.  But there still has to be

5  evidence that we -- that it was used -- the DABCO was used in

6  the range and Dr. Fortunak told you and Dr. Whitton told you,

7  they can't make that determination from the testing, so here is

8  the evidence right now.

9       Willowood has given you evidence from people who have

10  actually seen the process and remember, Dr. Fortunak admitted

11  that the best way to figure this out is to actually go see the

12  process.  That's the best way to do it.  Two people who

13  actually have seen the process came and testified, Mr. Wu, who

14  owns the company, SSJ who watched it being done on at least two

15  occasions.

16       Now, Mr. Levine argues they are in bed together.

17  Well, of course essentially saying, of course Mr. Wu is going

18  to lie on behalf of his customer.  You saw Mr. Wu.  You heard

19  Mr. Wu.  Mr. Wu has other customers.  Mr. Wu's probably making

20  good money.  There is no evidence that he is blatantly lying

21  and, again, what he testified to is consistent with the process

22  description document.  There is no evidence in that document.

23  There is nothing in that document to suggest that DABCO is

24  used.

25       Now, even if you want to believe, even if you want to

believe that DABCO is used, again, there is no -- all of the
best evidence, even according to Dr. Fortunak, the best
evidence is of people actually watching the process, they have
told you it is not used, but even if you want to believe it is
used, again, the only evidence is, that it was used, there is
no evidence that it was used within the claimed range, and
there is significant evidence in the '761 Patent itself, that
if you use .1 and again, .1 is outside of the range, or let's
even go to .099999, the evidence is, that it can still be done,
it still has a catalytic effect.  Again, look at table one in
the '761 Patent.  It tells you that that effect is still there,
even at .1.

My time is running out.  Let me talk to you very
briefly about the validity of the '761 Patent.  Dr. Fortunak
conceded that the '138 Patent discloses the same condensation
reaction that is claimed in the '761 Patent.  He also conceded
claims that the '138 discloses use of a catalyst, cooper
chloride.  Dr. Fortunak conceded that the Weintritt application
disclose a very similar condensation reaction, but that instead
of copper chloride, it uses two to 40 percent DABCO.
Dr. Fortunak conceded that a person of ordinary skill in the
industry would have found the Weintritt application, if
analyzing and studying the manufacture of azoxystrobin, and
would have understood the catalytic effects of DABCO.
Dr. Fortunak even conceded that notwithstanding the fact that

1  Weintritt covers the synthesis of many, many compounds, it

2  discloses and claims the synthesis of azoxystrobin using two

3  molar percent DABCO.  That's what he said.

4        Judge Eagles will tell you that in determining the

5  validity of the patent, you may consider whether the claimed

6  invention was merely the predictable result of using prior art

7  elements, according to their known functions.  Look at the lab

8  notebook that's in front of you right now.  Mr. Wallace, who

9  worked in the lab at Syngenta, while studying this issue

10  exactly, says subsequent to this work, five molar percent DABCO

11  infringes the Bayer Patent and cannot be used, hence we need to

12  report experiments at one molar percent.  Mr. Wallace, a person

13  of ordinary skill, figured out that Weintritt covers this and

14  then he immediately said, let's just go below that number.  You

15  don't see any case here that he didn't expect it to work.  He

16  didn't say, oh, boy, this is going to be hard.  He said we, got

17  to try 1-percent.

18        Based on all of that, we believe and we hope you find

19  that the '761 Patent is obvious.  I would like to turn it over

20  to my colleague, Mr. Neuman.  Thank you.

21        **MR. NEUMAN:**  May it please the Court, counsel,

22  members of the jury.  Mr. Tiller has been speaking to you about

23  why Willowood contends that we've not infringed the two process

24  patents and that the '761 Patent is invalid due to obviousness.

25  Of course if you find for us on those issues, there are no

damages to discuss with respect to those alleged infringements.
Of course, you get to decide that issue, and so in the event
that you conclude otherwise, I'm here to talk to you about what
Syngenta's claim for damages -- and of course we have also
conceded infringement of compound patents, and so I want to
talk to you as well about their damages claim with respect to
that infringement.

Now, there have been some pretty complicated issues
and facts presented to you during the course of this case. I
know that you have been focused and attentive in trying to
figure it out the best way you could. Anybody that's observed
you over the past couple of weeks can see that. It's obvious.

There is one issue in this case that they had to make
complicated, and that is their alleged damages claim. They had
to come in here with a complex model that you heard Dr. Wilner
say he created because only by creating a complex model could
they get to that $75 million figure. Only by creating that
complex model can they divert you from the facts and from the
exercise of your own common sense.

Now, the Court is going to instruct you on the law to
guide your deliberations when you go back to that jury room.
One of the things you will not hear, ladies and gentlemen, is
that you need to check your commonsense with the Marshal when
you walk into this courtroom. You can and should exercise your
commonsense in deliberating over the facts.

The Court will also tell you that Syngenta has the burden of proof with respect to damages. They must prove it more likely than not that it was Willowood, and solely Willowood, who caused $75 million in damages. They must prove that to a reasonable degree of certainty. Guesswork, you will hear from the Judge, guesswork, speculation, the mere fact that $75 million might be possible, is not sufficient. They must carry their burden of proof to prove $75 million, and if they don't prove that, then they haven't proven $75 million or any other number that is their number that they put to you. If you can't find 75 million, they haven't proven the first nickel of lost profits.

Now, let's talk for a moment about some of the facts which Dr. Wilner's analysis just sweeps aside, before we talk about his model and how he managed to do that. We know that times have been very tough for the American farmer over the last decade. We know that commodity prices were declining before Willowood entered the market, and continued to plummet and hit their ten year low in 2015. We know that.

We know that Syngenta's sales of azoxystrobin were declining before Willowood entered the market. We know that Cheminova was in the market selling azoxystrobin before Willowood. We heard that from Andy King of Willowood, and we heard it, albeit reluctantly, from Brad Reichman, who had to acknowledge that he was buying from Cheminova before Willowood

1   sold to him.

2          They say, well, Cheminova did not have corn on its

3   label in 2014.  You heard Mr. Heinze say that Willowood wasn't

4   selling in the corn market in the summer of 2014 either.  They

5   were selling to the rice market.  That factor is really

6   irrelevant in attempting to sweep away Cheminova.  You know

7   that Albaugh started selling azoxystrobin in 2014, and we'll

8   talk a little bit later about their contention that Albaugh was

9   only selling, marketing in the seed care sector.  That's not

10  true.

11         We know that Willowood only had 4 percent of the

12  azoxystrobin market in 2014.  We know that Syngenta had a

13  robust, well-developed and well-tested post-patent strategy

14  that they would have implemented with or without Willowood, and

15  they did implement.

16         Syngenta had a brand ladder about which you heard

17  much.  The purpose of that brand ladder was to drive purchases

18  to higher tiers, premium tier, premium products on that ladder

19  to differentiate products by prices, the levels of support, and

20  by the quality of those products, different mixtures and so on.

21         At the same time, Willowood, we know, only had two

22  products, and one of those, AzoxyProp Xtra, it did not sell

23  until the fall of 2014.  You heard Mr. King say when they sold

24  some to Brad Reichman.

25         We know Syngenta did not lower its prices more than a

few pennies a gallon as Dr. Wilner conceded throughout 2014
and, in fact, they raised their azoxystrobin price in
November 2014. By the way, they did that, notwithstanding that
they tell you that in January of 2014, or the end of 2014, they
suddenly were hearing such clamor in the market about
Willowood, that there was panic and angst among your
distributors and they were flying around the country. They
knew that, they say in January of 2014, and yet, they didn't
react. They didn't cut their prices at all on azoxystrobin
throughout 2014, and raised them at the end of that year.

You've heard, and you will hear about the components
of lost profits, price erosion and lost sales, and yet, for all
of Dr. Wilner's complex modeling, he told you that he can't
tell you out of that $75 million figure how much is
attributable to lost sales and how much is attributable to
price erosion. He can't tell you what price Syngenta would
have sold any of its azoxystrobin products, in the absence of
Willowood or the volume of product that would have been sold in
the absence of Willowood. They're seeking $75 million, and he
can't even tell you that information, that basic information
about their alleged lost profits. His analysis, ladies and
gentlemen, is a house of cards. It crumbles under scrutiny.
It is guesswork. It is speculation.

Now, in this regard, I would note that Mr. Levine, he
spent about two minutes in his closing on damages, and with

good reason, because there is no foundation for Dr. Wilner's
$75 million damage claim.  Every single underpinning and
foundation for that analysis is unsupported, speculative and
guesswork.

Let's look at those assumptions and foundations.
First, spend a moment on the compound patents.  You heard
Dr. Wilner admit that if Willowood had an alternative to
importing that 5 kilograms to do the testing and formulation
here in the United States, there would be no lost profits on
account of that infringement.  Why?  Because in the but for
world, Willowood could have done that testing overseas and
wound up in the same place at the same time in the market as it
did.  Dr. Wilner said he didn't even investigate that issue,
and you've heard testimony that his assumption is flat wrong,
from Ms. Kay from Pyxis Consulting, an independent consulting
firm, probably the biggest consulting from generics in this
country, told you oversees testing was available, as did
Mr. Heinze.

The azoxystrobin budget.  There we go.  You've seen
this chart.  It shows the variations from year-to-year in
Syngenta's budget forecasting and I ask you, what can one say,
what can one make of an analysis that gets -- that wants you to
reach $75 million based upon budget forecasts that demonstrate
such wild inaccuracies from year-to-year; 39 percent off,
12 percent off, 16 percent off, and in different directions.

1    Sometimes they overestimate, sometimes they underestimate.

2           Now, Dr. Wilner gave you some post hoc, after the

3    fact, one off explanations for each of these variances that he

4    came up with.  For example, he said, well, there was a great

5    recession, and that accounts for several years of these

6    variances.  Why wouldn't Dr. Wilner, as a social scientist,

7    have looked at their budget projections pre the great

8    recession?  They had these budget projections going back to the

9    time they started to market this product.  Dr. Wilner didn't

10   even think to test his after the fact hypothesis against data

11   that he had in hand to see whether, really, one could attribute

12   these inaccuracies to the great recession or the drought that

13   he talked about.

14          Now, Dr. Wilner acknowledged that azoxystrobin

15   budgets are not reliable, his results are not reliable.  The

16   key here is what Mr. Jarosz told you, and what Dr. Wilner said

17   he didn't even attempt to do, which is to look at how sensitive

18   Dr. Wilner's damage results are to small changes in the

19   accuracy of these budget forecasts and what Mr. Jarosz told

20   you, uncontested, is that, for example, a 10 percent inaccuracy

21   in Syngenta's budget forecast for any year would lead to a

22   45 million-dollar swing in Dr. Wilner's damage calculation.  A

23   20 percent inaccuracy in the budget forecast would lead to a

24   95 million-dollar swing in Dr. Wilner's budget analysis.  That

25   more than wipes out the damages they seek, and we have seen

evidence, instances in some cases, where their budgets are off
by at least 20 percent.

Dr. Wilner also said it was appropriate to use the
fall 2014 -- fall 2013 annual budget for 2014 because Syngenta
started hearing things about Willowood in the market that
created this enormous panic. What you haven't heard is,
exactly what they were hearing or how any specific thing that
they heard in any particular month caused them to adjust their
budgets month-to-month, virtually every month in January 2014
through June 2014, before we ever entered the market.

Now, you've heard Mr. Fisher say, well, it was havoc,
chaos, panic, we had to get on planes and run around the
country to talk to our distributors. If it was that bad, if
rumors about Willowood entering the market six months later
could cause that kind of impact, that kind of chaos, there
would have been emails internally among Syngenta personnel
talking about this. There would have been communication with
their distributors; hey, you got to come talk to us, Willowood
is getting in the market in six months, you got to deal with
this. You have not seen one such document. It is all vague.
It is all anecdotal. It's after the fact, and it's all
unreliable.

Dr. Wilner cannot tell you what factors Syngenta
considered in any -- performing its budgets for any particular
year, how those factors were considered, how they were weighed

against each other.  He can't do that with respect to these
monthly latest projections that he's talked about.  It is all a
black box.  His exacting process we know nothing about except
that it leads to wildly inaccurate results.

Let's talk for a moment about the next fundamental
underpinning of his $75 million analysis, and that is the
mesotrione benchmark.  Dr. Wilner said that if mesotrione is
not sufficiently similar to azoxystrobin, then it is not a good
benchmark, because if they are not sufficiently similar, then
mesotrione can't be the constant, the control for everything
that's happened in the market to azoxystrobin can't be
accounted for by Willowood.  You have heard, ladies and
gentlemen, ample evidence, ample evidence that those two
products are not sufficiently similar.

Start with the obvious fact, one kills weeds, it is a
herbicide; and one deals with disease, it is a fungicide.  The
markets are different.  Mesotrione -- I'm sorry, weeds are much
more predictable and much more of a constant problem, and so
they are planned for by farmers earlier in the process, and
sales are more predictable.  That's why the market for
herbicides is so much larger than the market for fungicides,
and it stands to reason that factors that affect the market,
marketing conditions that affect the sales of these products
are not going to affect it necessarily in the same way.  We
heard for ample evidence in this case, that that is so, that

1  is, that there are distinctions and farmers react differently
2  and market conditions don't affect both products the same way.
3       So, for example, Defendant's 88, the market remains
4  extremely price elastic, and this is for fungicide.  Farm
5  economics are stressed, high land inputs, rent inputs, low
6  commodity prices.  This is a factor affecting fungicides.
7  Cereal market remains disease dependent.  Well, diseases are
8  unrelated to the sale of azoxystrobin, ladies and gentlemen --
9  I'm sorry, mesotrione, that affects the market for fungicides.
10 Soy market is challenged due to decreased commodity prices.
11 This, again, relates to fungicides, not herbicides.
12      What does all this mean in a stressed market,
13 stressed commodity prices?  Growers willing to try decreased
14 fungicide rates and different application timings to save
15 costs.
16      Retail seed herbicides are a higher retail priority
17 than other pesticides such as herbicides, so mesotrione is a
18 higher priority, as we discussed.
19      Defendant's Exhibit 94, herbicide use intensity is
20 less elastic, and you heard what elasticity means in
21 fungicides.  It is less sensitive to commodity prices and the
22 price of the product itself than are fungicides.  Fungicides,
23 as a result, are the last dollar spent, only used in disease
24 epidemics and low commodity prices.  So farmers, particularly
25 in tough economic times, will spend first on herbicides rather

1   than fungicides.

2          Finally, an untreated acre -- from DX 107 and 108,

3   these slides, the untreated acre is the biggest competitor in

4   the fungicide market, and that's because as you've heard, it

5   ties in the price elasticity issue.  It means that Syngenta

6   wasn't selling azoxystrobin to the vast majority of acreage in

7   this country that could have benefited from azoxystrobin

8   because its price was too high, and so they remained untreated,

9   and that means that when companies like Willowood and other

10  generics enter the market, they are not taking sales away from

11  Syngenta that it otherwise would have had, they are selling

12  largely, to that untreated acre because their price has come

13  down.

14         Let me talk to you for a moment about Syngenta's

15  brand ladder.  Now, Dr. Wilner assumed that Willowood's entry

16  into the market affected -- adversely affected sales, up and

17  down this brand ladder.  To assume that, one has to assume that

18  brand ladder -- that the pricing in the brand ladder moves

19  roughly the same and respond to each other.  As you heard

20  Mr. Cecil say, if the price at the bottom falls, the entire

21  ladder will collapse.

22         We have heard from Mr. Jarosz, who actually tested

23  that proposition, that that is not the case.  If we take a look

24  at Jarosz slide 17 -- I seem to be unable to pull it up with

25  this clicker.  He showed you that, in fact, prices on that

ladder do not move in the same direction. They are all over
the place. When Quadris and Quilt Xcel are decreasing in price
to a certain level, it doesn't mean that any other products are
moving in the same direction. The red bars here are the
direction of the price movements on Quadris and Quilt Xcel and
you can see that the other products and that ladder are moving
in all different directions.

Finally, the final pillar in Dr. Wilner's model is
that he overstates the importance of Willowood, and assumes
away the other generics. I talked to you earlier about
Cheminova and how the fact that they didn't have corn on their
label doesn't really matter, because Willowood wasn't selling
in the corn market in 2014.

With respect to Albaugh, and this is Plaintiff's 265,
this email internally in November of 2015, notes that Albaugh
was quoting to CPS a price on its azoxystrobin that Willowood
quoted lower but couldn't sell to CPS because of the agreement
that was in place between CPS and Syngenta. The author of this
Syngenta email says, "It is going to hurt," referring to
CPS -- referring to Albaugh. Now, they're not offering
products to CPS, azoxy products to CPS for the seed care
sector. They are offering CPS, who was a major distributor of
Syngenta for crop protection.

Ladies and gentlemen, if any one pillar of Dr.
Wilner's analysis is unsupportable, then the whole analysis

fails, but here, every pillar of that analysis is flawed.  It's
based on guesswork.  It's based on speculation, and it is
contrary to the facts, careful analysis and your commonsense.

Now, Dr. Wilner apparently recognizes this, because
he put in front of you as an afterthought, a $34 million number
and he said, Well, I don't believe that Cheminova was really a
factor in the market, but if you do, then damages are
$34 million.  He provided no analysis for that.

As Mr. Jarosz pointed out, that 50 percent reduction
suffers from the same flaws we just discussed concerning the
$75 million number, because it starts with the $75 million
number and then it just lops half off of it, and he hasn't told
you why.

**THE COURT:**  You have about five minutes left.

**MR. NEUMAN:**  So at the end of the day, they have not
carried their burden to show you by a preponderance of the
evidence, that it is more likely than not, that Syngenta has
suffered lost profits in the amount of $75 million, $34 million
or $10, so they haven't shown it.

Now, we could stop there, simply say they haven't
proven it, you must find zero.  That would be entirely
appropriate.  You'll see on the verdict sheet that you have
questions five and eight that ask you what damages, if any,
Syngenta has suffered as a result of Willowood's actions.  So
you can find zero on those amounts.

 1          Now the alternative method for calculating damages,

 2    they didn't even attempt to prove, which is royalty, reasonable

 3    royalty payments.  They presented you with no evidence that

 4    they -- that any specific royalty would be reasonable and

 5    appropriate.  So they haven't carried their burden of proof to

 6    show you an alternative way to calculate damages, either.

 7          We went ahead and did so.  Mr. Jarosz gave you a

 8    reasonable royalty number, $1.4 million for the '138 Patent

 9    infringement, $900,000 for the '761.  Nominal damages for the

10    compound patents because of the availability of the overseas

11    method which would cost about $20,000.

12          Ladies and gentlemen, that unsupportable $75 million

13    number shows you that Syngenta did not come in here seeking to

14    be put in the same position that it would have been absent

15    Willowood.  That is not what this is about.  Willowood did not

16    cause $75 million in damages.

17          They came in here with $75 million number because

18    they want to deter generics.  That's the only way that that $75

19    million number can be explained.  They had the azoxy market all

20    to themselves for 20 years, and they were entitled to that.

21    The law allows that, and that's great, but, you know, you can

22    get used to a good thing after 20 years.  They don't want to

23    admit to themselves, or to you, what is absolutely obvious, and

24    that is, the chart that Mr. Jarosz showed you.  It is obvious

25    to all of us, that what caused their decline in profits was the

crash of the commodity prices in that blue line, followed
shortly thereafter by the crash in their pricing.  They want
you to blame Willowood for all of that and, in fact, they
haven't proven that Willowood is responsible for any of it.
There are lots of factors affecting the market.  I have
discussed many them.

       So if you do find infringement on the '138 and '761
Patents, ladies and gentlemen, despite our position on those
issues, we respectfully submit to you that on this evidence,
you cannot find $75 million.  I think you know it.  You simply
cannot find that they've carried their burden to prove
75 million, 34 million or any other amount of lost profits.
They haven't done it.

       So at the end of the day, we ask you to find that
they're entitled to no lost profits and at most, a reasonable
royalty.

       Now if I may just say this in closing.  You know, the
word awesome was thrown around quite a bit when my kids were
growing up, and I heard awesome so much in the house that
everything was awesome.  Every time I step into a place like
this, every time I participate in a process like this, I'm
reminded that there are some things that remain truly deserving
of law, and this process is one of them, and I just want to
close by saying again, as counsel before me have done, that we
thank you deeply and sincerely for your commitment, your

1    attention, your service, and your contribution to this process.
2          Thank you, very much.
3          **THE COURT:**  Mr. Levine has 12 or 13 minutes.  Is
4    everybody okay?
5          **MR. LEVINE:**  Thank you, Your Honor.
6          **THE COURT:**  I'm sorry.  Another notepad.  Anybody
7    else need more?
8          **MR. LEVINE:**  Thank you.  Two of the critical
9    infringement issues in this case, and have been from the very
10   beginning are:  First, whether a single entity is carrying out
11   both the etherification and condensation reactions.
12         Second, whether in the condensation reaction Tai He
13   is using DABCO in the claimed range.  The only people they
14   brought in to testify about those two critical issues were
15   interested biased witnesses, Mr. Wu and SSJ.  Why didn't they
16   bring in a third-party, an independent expert to verify that
17   two different companies were actually carrying out the
18   etherification and condensation reactions, and to verify that
19   Tai He isn't using DABCO?
20         The burden is on Willowood to show that they don't
21   use DABCO within the claimed range.  Mr. Tiller said, well, we
22   saw evidence that there is DABCO, but Syngenta didn't show you
23   that it was within the claimed range.  It is not our burden.
24   It is their burden to show that it is not within the range, and
25   if they don't meet their burden, they infringe.

1       If Mr. Wu and SSJ were really telling the truth,

2  don't you think they would have hired an independent

3  third-party expert, told them to go to China, go see the

4  process, the entire process, not just an afternoon, take a

5  video of the intermediate being transferred from Guosheng to

6  Tai He, get concrete evidence, prepare a report and then come

7  and testify before you.  This would have been easy for them to

8  do, unless they didn't want you to know what was really going

9  on at Tai He.  It would have cost them a few thousand dollars

10  to send someone over there to China to verify what was really

11  going on and what they were doing.  Don't you think that with

12  at least $75.6 million at stake, it would have justified

13  spending a few more thousand dollars to send someone over there

14  to verify?  You heard that they've spent about 150 to $200,000

15  on Mr. Jarosz, but they didn't spend a few thousand dollars to

16  send someone over to actually verify independently what was

17  going on in connection with the manufacture of their

18  azoxystrobin technical.  So why didn't they?  Well, the

19  inference that you can draw is, that Mr. Wu and SSJ's testimony

20  simply isn't true, they're hiding the truth, just like

21  Willowood hid who was behind Greenfields and just like

22  Mr. Heinze hid when Syngenta asked, are you getting ready to

23  engage, have you already engaged in infringing activity.

24       Now the witnesses that Willowood did bring to testify

25  about things explained everything away as mistakes or someone

else's fault.  We heard again today that the label that was on
the Azoxy 2SC product was Pyxis' fault.  Willowood said that
the original process subscription to the EPA was a mistake, but
SSJ testified that Sophia, who translated that document, was a
good translator and understood English well.

Mr. Heinze also said that between the time of his
deposition and last week when he testified, he came to learn
differently about the JDM tests, JDM being the company owned by
Mr. Mundhra that conducted testing, and he initially believed
and thought and was his understanding, that those tests showed
the presence of DABCO.

Willowood's witnesses told you time and time again,
that things were mistakes.  Statements and documents didn't
mean what they said.  Mr. Meddione said in Plaintiff's Exhibit
181, that Mr. Heinze's logic regarding the pricing decision,
didn't hold water.  Willowood's explanation for all of these
mistakes didn't hold water, either.  You know what else didn't
hold water?  It's SSJ's testimony that Defendant's Exhibit 64
is the way that azoxystrobin is really made, and a time line is
the easiest way to show you why DX 64 isn't credible or
accurate.

In Plaintiff's Exhibit 41, dated May 27, 2013, Rajesh
says, all manufacturers in China are using the same process.
In Plaintiff's Exhibit 9, dated July 24th, 2013, the process
description says Tai He does both steps.  In Plaintiff's

1  Exhibit 31, SSJ confirms the process was divided up, consistent

2  with Plaintiff's Exhibit 9, and what was told to the EPA.

3          On March 27th, 2015, Syngenta files this lawsuit.

4  That same day, Plaintiff's Exhibit 26, Mr. Heinze emails and

5  says, "the first thing we need to do is to confirm that our

6  manufacturers are doing things the way we have instructed them

7  to do."  A few days letter, Sophia responds in Defendant's

8  Exhibit 13 and says, "Tai Hi is doing both etherification and

9  condensation."  The next day, Mr. Hayden says, "we need a

10 conference call."  Less than a week later, Defendant's Exhibit

11 64 is sent, rewriting the process description to no longer say

12 Tai He does both steps.

13         Two years later, July 2017, Janelle Kay says she was

14 asked to file the correction at the EPA, and then,

15 September 5th, 2017, this trial began.  DX 64 isn't accurate

16 and credible, nor are Willowood's criticism of Dr. Wilner's

17 calculations.  Mr. Jarosz was critical of Dr. Wilner's lost

18 profits calculations and called Syngenta's budgets inaccurate,

19 but Mr. Jarosz agreed that Dr. Wilner set forth his calculation

20 in a step-by-step and detailed fashion; yet, Mr. Jarosz cooks

21 up this reasonable royalty amount of just over 2 million, but

22 didn't even explain how he came up with the number.  What were

23 his bases?  What were the calculations that he performed?  Why

24 did he manipulate the axis on the chart that Mr. Neuman showed

25 you right before he finished his closing?  We don't know.  Just

like he said, "I don't recall," to virtually every question he
was asked in his deposition.

      What we do know is, that Judge Eagles will instruct
you that a reasonable royalty is the amount of money that
Syngenta and Willowood would have agreed upon as a fee to allow
Willowood to practice Syngenta's patents at a time before
infringement began based on a hypothetical negotiation, that
negotiation taking place before the infringement began.

      Mr. Jarosz testified that he believed Syngenta would
want -- would require more than $100,000 to agree to allow
Willowood to practice Syngenta's patents, and that's because
Mr. Jarosz knows that Syngenta understood what damages
Willowood would do by entering the market early before
Syngenta's patents expired.  Indeed, the issue isn't what
Willowood's volume of imports were or what market share
Willowood had.  This case is about what they did to the market
by jumping the gun and entering early, the turmoil they created
and the damage that they caused to Syngenta.

      Mr. Reichman said -- testified that Willowood is just
notorious, and when Willowood comes in with a product, you know
the pricing on that product is going to the basement floor.
Mr. Middione testified, we're impacting their business.
Willowood was telling customers they could meet whatever volume
requirements those customers had and that's not a rumor, that's
what Mr. Fisher told him people were telling him.  Mr. Fisher

told you that when Syngenta was lowering prices, he was
reacting to what Willowood was doing.

Mr. Heinze told us in Plaintiff's Exhibit 175, that
Syngenta is losing market share. Mr. Cecil, Mr. Fisher,
Dr. Wichert and Dr. Wilner all explained that Willowood's early
entry changed the market and damaged Syngenta.

You see what happened to prices when Willowood
entered the market. And even if we say that the 5 kilograms,
they did all of that stuff offshore, the '138 process patent
was still in force, and but for that infringement, they
wouldn't have been in the market until 2016, because the '138
Patent didn't expire until December of 2015.

The evidence established, too, that Albaugh and
Cheminova have little, if any, impact on Syngenta's azoxy sales
and pricing. Cheminova's product wasn't even initially
approved for corn. Willowood told Mr. Reichman that Cheminova
didn't even have products in the market available and Cheminova
was getting out of the business, which they did. Albaugh
focused on seed care and lawn and garden. There is no evidence
that Albaugh or Cheminova was making their products using a
non-infringing process for either the '138 Patent or the DABCO
Patent.

Mr. Wu was even surprised when he got asked, can you
make azoxy without using the '138 process. And, Dr. Wilner did
explain that even if you assume contrary to all of the evidence

1  that you heard that Cheminova had some impact to Syngenta's

2  damages, its lost profits were still $34 million.

3          I said in my opening statement that patents are an

4  important part of our society.  There is a provision in the

5  United States Constitution regarding patents.  It is Article I,

6  Section 8.  "Congress has the power to promote the progress of

7  science and useful arts by securing for limited times to

8  authors and inventors the exclusive right to their respective

9  writings and discoveries."  As you've heard, the limited time

10 is 20 years, not 19 and a half, not 19, not 18, it is 20 years,

11 right up to the last day.  As you saw on the original DABCO

12 Patent, PX 4B, the fundamental right to exclude is printed on

13 the cover of all United States Patents.  This 20 year right to

14 exclude gives patent owners like Syngenta the time to recoup

15 some of the investment that it takes to research, develop,

16 commercialize and automatically bring new products to market.

17         I also said in my opening statement that jury service

18 is an important part of our legal system.  Jurors like you,

19 preventing the infringement of patent rights.  Jurors like you,

20 awarding damages adequate to compensate patent owners when

21 their rights have been infringed.  Jurors like you, doling out

22 justice.  That's what our legal system is supposed to do.  It

23 is supposed to do justice, and we do justice with the verdict

24 form.  That is how you dole out justice.  That's how you speak

25 to infringers like Willowood.  Speak to them loudly and

clearly.  Tell Willowood Limited it infringed the compound
patents.  Tell Willowood they infringed the '138 Patent.  Tell
Willowood they infringed the DABCO Patent.  Tell them that
their infringement of the '138 Patent and the DABCO Patent was
willful.  Tell them that the DABCO Patent isn't invalid, and
then, tell them that 75 -- at least 75.6 million is the amount
that it takes to put Syngenta back in the position that it
would have been in if Willowood hadn't jumped the gun by
admittedly infringing the compound patents to get an early
start and head start in the market if they hadn't jumped the
gun by selling and offering for sale end-use azoxy products
before the '138 Patent expired in December of '15, and before
the DABCO Patent, which is still in force today.

      **THE COURT:**  Your time is really up.  Wrap up in a few
seconds.

      **MR. LEVINE:**  Thank you, Your Honor.

      I am confident that you will do justice in this case,
and I thank you for your service, and I thank you, counsel, and
the Court for your consideration.  Thank you.

      **THE COURT:**  Ladies and gentlemen, I'm going to give
you the morning break so you can stretch your legs and then
when we come back, we'll go over the law that applies on these
various issues.  Please leave your notes and your copy of the
verdict sheet in the chair.  Don't talk about the case.  Keep
an open mind since I haven't talked to you about the law yet

1  and come back in 15 minutes.

2              The jury is excused until 11:25.

3              (Jury panel was excused for a recess at 11:09 a.m.)

4        **THE COURT:**  All right.  Anything we need to take up

5  before we take our recess?  No.  Fifteen minute break then.

6              (Court was in recess from 11:09 a.m. to 11:25 a.m.)

7        **THE COURT:**  Anything we need to take up before the

8  jury comes in for their instructions?  No?  All right.  You can

9  bring the jury in.

10             (Jury panel is present at 11:26 a.m.)

11       **THE COURT:**  All right.  Good morning again, ladies

12 and gentlemen.  You have heard all of the evidence, and it will

13 soon be your job to decide from this evidence what the facts of

14 the case are, and then to apply the law that I'm about to give

15 you to those facts.  Once I've instructed you on the law, you

16 will go to the jury room and begin your deliberations.  I don't

17 know how long it is going to take me to talk to you, so we'll

18 just figure out when lunch is after I've finished.  But in any

19 event, you'll begin your deliberations soon.

20             You will have the duty to decide at least six, and

21 perhaps as many as nine issues, all arising out of Willowood's

22 sale of azoxystrobin fungicide.  If I start talking too fast,

23 it is your turn to say, slow down.  I got to say that during

24 the trial, and I will try not to talk too fast, but if I do,

25 you know, just give me the sign.  Okay?

1      You must make your decision only on the basis of the

2 testimony and other evidence presented here in this courtroom

3 during the trial.  You should not be influenced in any way by

4 bias, sympathy, or prejudice for or against any of the parties,

5 and you must not consider anything that happened outside the

6 courtroom or that you learned outside the courtroom in

7 considering your verdict.

8      You must follow the law as I explain it to you,

9 whether you agree with it or not, and follow all of my

10 instructions as a whole.  Do not single out or disregard any of

11 the instructions on the law.  If I did not specifically define

12 a word or a term, you should apply the ordinary, everyday

13 meaning.

14      So as you know, the Plaintiff, Syngenta Crop

15 Protection, LLC, filed suit against the Defendants, Willowood

16 LLC, Willowood USA, LLC, and Willowood Limited.  Let's see, I

17 missed one.  Willowood LLC, USA, Willowood Azoxystrobin, LLC

18 and Willowood, Limited, alleging patent infringement.  Syngenta

19 has developed, manufactured and marketed products containing

20 azoxystrobin technical, a compound that is effective in

21 treating fungal growth in a variety of plants.  The Patent and

22 Trademark Office granted Syngenta a number of patents directed

23 to the azoxystrobin technical compound, as well as patents

24 directed to the process for manufacturing azoxystrobin

25 technical.  Four of these patents are at issue in the lawsuit.

U.S. Patent Number 5,602,076, and 5,633,256 are directed to the
azoxystrobin technical compound.  We've been talking about
those as the Compound Patents.

U.S. Patent Number 5,847,138 is directed to a method
of making azoxystrobin technical compound that contains an
etherification step, followed by a condensation step.  We've
been talking about that as the Process Patent or the '138
Patent.

Finally, U.S. Patent Number 8124761 is directed to a
method of making the azoxystrobin technical that performs the
condensation step in the presence of between 0.1 and 2 mol
percent DABCO, and that's been referred to as the DABCO Patent.

Now, Syngenta seeks money damages from Willowood for
the infringement of the compound patents and the alleged
infringement of the process patents.  Two of the Willowood
defendants have been found to have infringed and admitted
infringement today of the compound patents, but dispute the
amount of damages owed.  Willowood Limited disputes that it
infringed the compound patent.  All the Willowood defendants
deny that they infringed the '138 Process Patent, and the '761
DABCO Patent, and they also dispute the damages that Syngenta
seeks.  Willowood also contends that the DABCO Patent is
invalid and, finally, there are issues about willfulness of the
infringement of the compound patents and the '138 Patent.

There are a number of things in this case that were

1    resolved before the trial started, and that -- I know it

2    doesn't feel like it is simple to you, but we have simplified

3    the case and a lot of the issues have been simplified.  So for

4    the most part, these are things where the evidence is not in

5    dispute or has already been decided and so there is no need to

6    ask you to make a decision about them.  I mentioned many of

7    these at the beginning of the trial, and you heard some of them

8    during the trial.  If I say something like this has already

9    been decided, then you should accept that for purposes of the

10   case, even though there wasn't any evidence on it.

11          There do remain these disputed issues.  As for each

12   issue, one of the parties has the burden of proof, and it

13   differs from issue to issue.  We'll discuss that as we go

14   along.  For all of issues but one, the person with the burden

15   of proof must prove the facts necessary to support a favorable

16   answer to the issue by a preponderance of the evidence.

17          To prove something by a preponderance of the evidence

18   means, to prove that the necessary facts are more likely than

19   not to exist.  A preponderance of the evidence refers to the

20   persuasiveness of the evidence, not the number of witnesses who

21   testified or the number of documents or exhibits.  In other

22   words, a preponderance of the evidence means such evidence that

23   when compared to the evidence opposed to it, has more

24   convincing force, and produces in your minds the belief that

25   what is sought to be proved is more likely true than not.  This

standard does not require proof to an absolute certainty, since
proof to an absolute certainty is seldom possible in any., and
if you find that the scales of justice tip, however slightly,
in favor of the party with the burden of proof, then you should
find in that party's favor.  If, however, the party with the
burden of proof fails to establish any essential fact by a
preponderance of the evidence, then you find against that
party.

        I may, from time to time say, the "greater weight of
the evidence, or more likely than not."  That means the same
thing as "the preponderance of the evidence."

        There is one issue with a different burden of proof,
and that is the invalidity issue in question nine, the
obviousness issue.  On that, Willowood bears the burden to
prove that the patent is invalid and must do so by clear and
convincing evidence.  Clear and convincing evidence means that
it is highly likely that the fact at issue is true.  While this
standard is higher than the preponderance of the evidence, it
is not as high as the standard in criminal law, which is beyond
a reasonable doubt.  To prove that the DABCO Patent is invalid,
Willowood must provide clear and convincing evidence that
leaves you with a clear conviction or firm belief that the
claim is invalid.

        As we discuss the issues, we'll talk about the burden
of proof in specific context, but I wanted you to have that

1   background.

2           You have in front of you a copy of the verdict sheet.

3   You'll get the original one when you go back to deliberate and

4   it will not say "copy," it will say, "original," so you won't

5   get it mixed up with your copy, which you can certainly write

6   on, if you need to.

7           As you will see, the issues are divided into three

8   groups:  The Compound Patents, the '138 Patent, and the DABCO

9   Patent.  For each group we'll go over a bit of the background

10  law for patent cases, and then we'll go through each of the

11  issues one by one.  For each issue, I will tell you who has the

12  burden of proof and what things the party with the burden of

13  proof has to show before you can answer the issue in that

14  party's favor.

15          For the compound patent questions, you need to answer

16  all three issues.  For the process patent and the DABCO Patent,

17  whether you answer all of the questions depends on your answer

18  to the first issue in that group, and I'll go over that as we

19  talk.

20          So on the compound patents, as background and a

21  reminder, you will remember that there is no dispute over the

22  validity of these two compound patents, the '076 and '256

23  Patents.  They are valid.

24          You will also remember that anyone who makes, uses,

25  offers to sell, or sells any patented invention within the

1  United States or imports into the United States any patented

2  invention without the patent-holder's permission, has infringed

3  the patent.  It has already been decided that in 2013,

4  Willowood USA infringed the '076 and '256 Patents by importing

5  5-kilograms of azoxystrobin technical into the United States

6  before the expiration of the two compound patents.  It also

7  constitutes infringement to actively encourage or induce

8  another to infringe the patent, and it has already been decided

9  that Willowood LLC infringed by hiring Adjuvants and Analytical

10 Regulatory Chemistry, ARC, to formulate and analyze

11 azoxystrobin technical which required Adjuvants and ARC to use

12 azoxystrobin technical in violation of Syngenta's patent

13 rights.  So that's the infringement here.

14            The parties disagree on the amount of damages

15 Syngenta is entitled to recover for this infringement, and

16 that's one of the issues you'll be required to decide.

17            The parties also disagree as to whether Willowood

18 Limited infringed the patent.  The first issue related to the

19 compound patent is specific to Willowood Limited, and asks you

20 to decide whether the sale, offered for sale, or importation of

21 the azoxystrobin technical from Willowood Limited to Willowood

22 USA, occurred in the United States or not.  A sale of

23 azoxystrobin technical outside the United States does not

24 infringe the patent, even if the azoxystrobin technical

25 contains compounds disclosed in the patent.

1          Finally, the parties disagree about whether this

2    infringement was willful.  So you'll need to decide that issue.

3          So let's start with Issue 1:  Did Willowood Limited

4    import the azoxystrobin technical into the United States or

5    otherwise sell or offer it for sale in the United States?  I

6    didn't read every single world, but you've got the verdict

7    sheet in front of you.  This issue is an infringement issue,

8    and we were talking here about the 5-kilograms of azoxystrobin

9    technical that came into the United States in 2013.  Anyone who

10   sells, offers to sell, or imports any patented invention within

11   the United States without permission, has infringed.  If

12   Willowood Limited sold azoxystrobin outside the United States

13   and did not import it into the United States, it did not

14   infringe.

15         On this issue, the burden of proof is on the

16   Plaintiff, Syngenta.  This means in order for you to answer

17   this issue yes, in favor of Syngenta, Syngenta must prove to

18   you by the preponderance of the evidence, that Willowood

19   Limited either imported the azoxystrobin technical into the

20   United States or that Willowood Limited sold or offered it for

21   sale to Willowood USA in the United States.

22         To determine the location of the sale, you should

23   consider all of the circumstances, including the location of

24   the buyer and seller, where the products were shipped from and

25   where the products were shipped to, where the physical transfer

of tangible property occurred, whether there was an intention
by Willowood Limited to sell to customers in the United States,
and the agreement between the parties by which the transfer
took place.

An offer for sale is one that the other party could
make into a binding contract by simply accepting the offer.

In determining whether Willowood Limited imported the
azoxystrobin into the United States, you should consider the
same thing.  Importation consists of bringing an article into a
country from the outside.

You heard some evidence that Willowood Limited and
Willowood USA, agreed on delivery of the azoxystrobin technical
"FOB China," and I just remind that you FOB means, "Free on
Board."  That's a legal term that means that the parties agree
that ownership of goods transfer from the buyer to the seller
at the location designated.  If you find that the party so
agreed, you may consider this, though it is not determinative
of the question.  You should consider all of the terms of the
agreement that you find and any other circumstances as well.

So if you find by the greater weight of the evidence
that Willowood Limited imported the 5 kilograms of azoxystrobin
technical into the United States, or that Willowood Limited
sold the azoxystrobin technical to Willowood USA in the United
States, then you would answer this issue yes, in favor of
Syngenta.  If you do not so find or are unable to say, then you

would answer the issue no, in favor of Willowood.

Now we'll turn to Issue 2: What damages has Syngenta proven it is entitled to recover for infringement of the compound patents?

On this issue, the burden of proof is again on Syngenta. This means that Syngenta has the burden to prove to you by the greater weight of the evidence the amount of damages that it is entitled to recover for Willowood's infringement of the compound patents when it imported and used the 5 kilograms of azoxystrobin technical in 2013. As I already said, we talked about that Willowood USA and Willowood, LLC infringed these patents by importing and encouraging Adjuvants and ARC to use azoxystrobin, so you should answer this issue even if you find that Willowood Limited did not infringe. So you do need to answer this either way as whatever your answer is to Issue 1.

An award of damages for patent infringement must be adequate to compensate for the infringement. Any damages you award, should not, however, be meant to punish Willowood. Your damages award should put Syngenta in approximately the same financial position that it would have been in had the infringement not occurred, but in any event, it should not be less than a reasonable royalty.

Syngenta can recover for lost profits, if it proves to a reasonable probability that it would have made those

profits but for the infringement.  In deciding whether Syngenta

lost profits as a result of the importation and use of the

5 kilograms of azoxystrobin in 2013, you can consider whether

Syngenta lost sales and whether there was price erosion as a

result of this infringement.

As to price erosion, you should consider whether

Syngenta would have been able to sell its products at a higher

price, but for the infringement and, if so, the amount of the

product it would have sold at the higher price.  You should

consider the nature of the market for azoxystrobin fungicides,

similarities between the azoxystrobin market and the market for

mesotrione products, which Syngenta contends is an appropriate

benchmark to consider in combination with the azoxystrobin

budget benchmark, and the effect of the hypothetically

increased price on the likely number of sales at that higher

price in the market.  The price erosion damages are based on

the difference between the amount of profits that Syngenta

would have made by selling its product at the higher prices and

the amount of profit Syngenta actually made by selling its

product at the lower prices that Syngenta charged for its

product, to the extent the price erosion was caused by

Willowood's infringement.

If there was another product on the market which

caused the price erosion or contributed to it, you should take

that into account.  Syngenta is entitled to recover damages

only for lost profits caused by Willowood's infringement, and
you should not include as damages any lost profits which
resulted from price competition by other fungicide products.

As to lost sales, you should evaluate whether there
was a demand for the patented product, whether there was an
absence of acceptable non-infringing substitutes or significant
limitations on the amount of acceptable non-infringing
substitutes, whether Syngenta had the manufacturing and
marketing capacity to exploit that demand, and how many sales,
if any, Syngenta lost as a result of the infringement.  You
should also consider what it would have cost Syngenta to
manufacture and sell the additional products.

If there was an acceptable non-infringing substitute
on the market which customers could have bought and likely
would have bought instead of the Syngenta end-use products,
even in the absence of a Willowood azoxystrobin product on the
market, then those lost sales cannot be attributable to
Willowood.  In evaluating whether there was an acceptable
substitute on the market, you should consider whether the
product was available in the marketplace and acceptable to
customers as a substitute; in other words, whether it was
available for sales and had the same advantages as the Syngenta
product.

In evaluating lost profits based on lost sales, you
should also take into account what it would have cost Syngenta

85

to produce additional product, and subtract that from any
profits from Syngenta's lost sales. These would include things
like additional costs or expenses incurred in making those
sales such as cost of the goods sold, packaging and shipping.

Syngenta's damages for lost profits are not
necessarily limited to the period before the patent expiration.
To recover lost profits occurring after the patent expired,
Syngenta must prove that but for the infringement, while the
patent was valid, Syngenta would have made the profits.

Syngenta has offered evidence of its lost profits by
comparing the actual performance of and profits from its
azoxystrobin end-products in the crop protection market
affected by the infringement with the anticipated performance
of and profits from those patented products if the market had
not been affected by infringement. These comparisons are
sometimes referred to as the "benchmark" method, because they
use the anticipated performance of the patented product as a
benchmark to determine the profits Syngenta would have made if
the infringement had not occurred. Syngenta offered evidence
of its budgets for azoxystrobin crop-protection products,
modified to the same extent that the mesotrione product met
their budget projections.

Now in deciding whether to accept and believe this
evidence as helpful benchmarks, you should consider Syngenta's
budgeting process, its past degree of accuracy or inaccuracy,

whether mesotrione's performance against its budget offers a
reasonable method for correcting inaccuracies in the
azoxystrobin budgets and whether other credible evidence
supports or undermines the benchmarks. You should consider the
degree to which and the ways in which the patented azoxystrobin
products and their markets are similar to and different from
the mesotrione products and market. The comparison of the
azoxystrobin and mesotrione budgets and profits did not have to
be perfect in order to be helpful to you in determining
damages.

So as to lost profits, you are essentially evaluating
what Syngenta's profits would have been in a hypothetical world
in which Willowood did not infringe the Compound Patents.
Syngenta has the burden to establish the amount of its damages
by a preponderance of the evidence, that is by the greater
weight of the evidence. In other words, you should award only
those damages that Syngenta establishes that it more likely
than not suffered. While Syngenta is not required to prove the
amount of its damages with mathematical precision, it must
prove them with reasonable certainty you may not award damages
that are speculative, damages that are only possible or based
on guesswork.

You heard some evidence about the EPA registration
process and use of another company's data and data compensation
along the way. That is an entirely different system and

1    compensation for the use of data is not at issue here.  This

2    case only concerns patents and you should only award damages

3    for patent infringement.

4            So if you are not satisfied by the greater weight of

5    the evidence as to the amount of lost profits, then you should

6    consider whether Syngenta has proven the amount of a reasonable

7    royalty.  If you are satisfied about the lost profits, you

8    don't need to consider the royalty.  So Syngenta is entitled to

9    recover a reasonable royalty for any infringing sales in an

10   amount it establishes by a preponderance of the evidence.  A

11   royalty is a payment made to a patent holder in exchange for

12   the right to make, use, sell, or import a claimed invention.  A

13   reasonable royalty is the amount of money that a patent holder

14   and the alleged infringer, here Syngenta and Willowood, would

15   have agreed upon as a fee for use of the invention at the time

16   before the infringement began.

17           In considering this hypothetical negotiation, you

18   should focus on the expectations of the parties as they entered

19   into an agreement at that time and had they acted reasonably in

20   their negotiations.

21           In considering this, you must assume that both

22   parties believe the patent was valid and both parties were

23   willing to enter into an agreement.  A reasonable royalty is a

24   royalty that would have resulted from this hypothetical

25   negotiation, and not simply a royalty that either party would

1    have preferred.  Evidence of things that happened after the

2    infringement first began can be considered in evaluating the

3    reasonable royalty, but only to the extent that this evidence

4    aids in assessing what royalty would have resulted from the

5    hypothetical negotiations.  Although evidence of the actual

6    profits Willowood made may be considered to determine the

7    anticipated profits at the time of the hypothetical

8    negotiation, the royalty should not be limited or increased

9    based on Willowood's actual profits.

10             Now in determining the reasonable royalty, you should

11   consider all of the facts known and available to the parties at

12   the time the infringement began.  Some of the factors you may

13   consider are the value that the claimed invention contributes

14   to Willowood's azoxystrobin products; the commercial

15   relationship between Willowood and Syngenta, such as whether

16   they are competitors in the same line of business; the existing

17   value of the invention to Syngenta as a generator of sales of

18   other products; the duration of the patent, the established

19   profitability of the products made under the patents, their

20   commercial success, and current popularity; the utility and

21   advantages of the patented invention, the nature of the

22   patented invention, the character of the commercial embodiment

23   of the invention as owned and produced by Syngenta, and the

24   benefits to those who used the invention, as well as the extent

25   to which Willowood has made use of the inventions, and any

evidence probative of the value of that use.  There is a lot of
things you can consider there.

No one factor is dispositive, and you can and should
consider the evidence that has been presented to you on each
factor.  You may also consider any other factors, which in your
mind would have increased or decreased the royalty Willowood,
would have been willing to pay, and Syngenta would have been
willing to accept, acting as normally prudent business people.

So, on this issue, Issue 2, you should write the
amount of profits, if any, you find Syngenta has proven by the
preponderance of the evidence that it suffered as a result of
the infringement of the Compound Patents.  If Syngenta has not
proven lost profits by the greater weight of the evidence, then
you should write in this space the amount you find by the
greater weight of the evidence to be a reasonable royalty.
That's Issue 2.

All right.  Issue 3.  This is the willfulness issue.
On this issue, the burden of proof is on Syngenta.  This means
Syngenta must prove by the greater weight of the evidence, that
the infringement is especially worthy of punishment.  It is not
enough for Syngenta to prove that Willowood knew of the patents
and infringed.  Instead, willful infringement is reserved for
only the most egregious behavior, such as where infringement is
malicious, deliberate, consciously wrongful, or done in bad
faith.

Now in this case, Syngenta argues both that Willowood infringed the asserted patents and that Willowood infringed those patents willfully. We already know that Willowood USA and Willowood, LLC infringed, so you must address the initial issue of willfulness, even if you say Willowood, Limited did not infringe. You'll see that the willfulness issue is broken out separately. Willowood USA and Willowood, LLC, yes or no, you must answer that, and then yes after Willowood, Limited, or no as to Willowood, Limited, and you only answer that if you found that Willowood, Limited infringed, if you answer Issue 1 yes. You must make a separate decision for each one, if you did answer Issue 1 yes, of course if Issue 1 is no, you don't have to decide willfulness as to Willowood, Limited.

Now to determine whether the particular Willowood defendant acted willfully, you should consider only what that defendant knew and did at the time it infringed, not what it may have learned afterwards. You should consider all of the facts, including whether or not the particular Willowood defendant intentionally copied a product that is covered by Syngenta's patent, whether or not it reasonably believed it did not infringe or that a patent was invalid; whether it sought legal advice concerning these issues, whether or not it tried to cover up its infringement and whether or not it made a good faith effort to avoid infringing the patent.

Now your decision on willfulness does not affect your

decision on damages.  Damages are compensatory only and so you

should not take willfulness or lack of willfulness into account

in determining compensatory damages in Issue 2.  Willfulness or

lack of willfulness is something the Court considers, and other

decisions I have to make down the road, so don't let it affect

your damages decision.  It will help me in other ways.

So if you find by the greater weight of the evidence

that the infringement of the compound patents by Willowood USA

and Willowood LLC in the first decision, and Willowood Limited

if you found that they infringed, is especially worthy of

punishment, that it is especially egregious, then you would

answer this issue yes, in favor of Syngenta.  If you do not so

find or are unable to say, then you would answer the issue no,

in favor of the Willowood defendant.  All right, again, making

a separate decision for those two groups.

Now let's turn to the process patents, '138 -- well,

we'll start generally with the two process patents.  The

infringement claims for the compound patents had to do with

importation, sale, offer for sale, and use of the 5 kilograms

of azoxystrobin technical back in 2013 before the compound

patents expired.

The infringement claims for the process patents, the

'138 and '761 Patents, have to do with that same conduct, as

well as with the importation, sale, offer for sale, and use of

larger amounts of azoxystrobin technical used to manufacture

the azoxystrobin end-products sold by Willowood.  So we'll go over the issues now for each of those patents.

As to the '138 Patent, it has already been established that this patent is valid.  It has also been established that the azoxystrobin technical which Willowood imported and used before the '138 Patent expired in December of 2015, was made by the process set forth in the claims in the '138 Patent.

To determine whether Willowood infringes, your job as to the '138 Patent will be to decide whether both steps of the '138 Patent, specifically the etherification and condensation steps, are performed by a single entity, or are attributable to a single entity.  If so, you will then need to decide whether that infringement was willful and if there are additional money damages to be awarded to Syngenta to compensate for that infringement.  If you find no infringement, then you do not need to evaluate willfulness or damages.

So Issue 4:  Did Syngenta prove that the same entity carried out these reactions and if not, did the defendants direct and control the entities that carried out the reaction?

On this issue, the burden of proof is on Syngenta. This means that Syngenta must prove by the greater weight of the evidence one of two things.  One, that a single entity, Tai He, performed both the etherification and condensation steps of the process used to manufacture the azoxystrobin technical

imported by Willowood into the United States; or two, in the

alternative, if two separate entities performed these steps,

that is if Tai He conducted the condensation step and another

entity conducted the etherification step, the acts of one are

attributable to a single entity.  Syngenta does not have to

prove both of these things, and indeed, they are inconsistent

with each other, but Syngenta does have to prove one or the

other of them to prevail on this issue.

          So as a reminder, it is an act of infringement for a

person or company to import into the United States or to offer

to sell, or to sell, or use within the United States a product

made by a process patented in the United States, that is, where

each step of the claimed method is performed.  A person or

company only fringes if it performs or is responsible for all

steps of a claimed method.  In other words, all the steps must

be performed by or attributable to a single entity.  Not

surprisingly, this is called the single entity rule, okay.

          There are two ways that Syngenta can prove that the

single entity rule is satisfied here.  First, the single entity

rule applies and Willowood infringed the patent if you find by

the greater weight of the evidence that a single entity, Tai

He, performed both the etherification and condensation step of

the process used to manufacture the azoxystrobin imported by

Willowood into the U.S.  You should consider the exhibits and

testimony you heard in deciding this question.  Straight up

1  question of fact for you.

2          If you find that Tai He did not perform both steps,

3  which necessarily means that the steps were performed by

4  different entities, then you would consider the second way the

5  single entity rule can apply, when one party directs or

6  controls the entities that carried out the two steps.

7          A defendant cannot avoid liability for direct

8  infringement by having someone else carry out some of the

9  claimed steps on its behalf.  Thus, where the actions of

10 multiple parties combined to perform every step of a claimed

11 method, the claim is infringed if, but only if, one party

12 exercises control or direction over the entire process such

13 that every step is attributable to the controlling party which

14 acted as the mastermind.  On the other end of this multi-party

15 spectrum, where mere arm's-length cooperation between different

16 parties does not give rise to direct infringement by any party,

17 so here this means if you find by the greater weight of the

18 evidence that Tai He performed the condensation step and that

19 another company performed the etherification step, and that

20 Willowood directed or controlled the performance of these

21 steps, then Willowood infringed the patent.

22          In deciding whether Willowood directed or controlled

23 the acts of entity that conducted the etherification and

24 condensation steps, you should consider any agreement, written

25 or oral, between and among Willowood, Tai He and the suppliers

1  of the intermediate product that resulted from the

2  etherification step as well as their course of conduct.  You

3  should consider whether the companies that made the

4  intermediate by performing the etherification step had other

5  customers and whether Tai He had other customers as well as

6  whether Tai He or the companies that make the intermediate did

7  or did not make any changes to their usual process at the

8  request or direction of Willowood.  Finally, you should

9  consider whether Willowood conditioned the purchase of the

10  azoxystrobin technical on performance of the two steps and

11  established the manner and timing of the performance of the

12  steps.

13         It is not enough to prove direction and control for

14  Willowood to have asked about Tai He's method or to have

15  confirmed that Tai He used a supplier for some of the steps.

16  Willowood must have directed and controlled the process.

17         So if you find by the greater weight of the evidence

18  that a single entity, Tai He, performed both the etherification

19  and condensation steps of the process used to manufacture the

20  azoxystrobin imported by Willowood into the U.S., then you

21  would answer this issue, yes in favor of Syngenta.  If you find

22  by the greater weight of the evidence that Willowood directed

23  or controlled others in the manner and performance of the

24  conduct of the etherification and condensation reaction steps,

25  then you would answer it yes, in favor of Syngenta.  If you

1  find neither of these things, or are unable to say, then you

2  would answer the issue no, in favor of Willowood.

3         Now let's turn to Issue 5 which is the damages issue

4  for the '138 Patent.  You will answer this only if you answer

5  Issue 4 yes, so if you answer Issue 4 no, you don't answer the

6  damages issue.  Since I don't know what your answer is, I'm

7  going to tell you what the law is that applies on Issue 5.

8         What amount of additional damages, if any, has

9  Syngenta proven it is entitled to recover for any infringement

10 of the '138 Patent.

11        The burden of proof again is on Syngenta.  Syngenta

12 must prove by the greater weight of the evidence the amount of

13 damages it is entitled to recover for Willowood's infringement

14 of the '138 Patent by this single entity rule that we just

15 talked about.  You should only award damages caused by

16 Willowood's infringement, which means damages caused by

17 Willowood's use of the patented process before the '138 Patent

18 expired in December of 2015.

19        By instructing you on damages as to this issue, I am

20 not suggesting which party should win on this issue.  If you

21 find that Willowood has not infringed, Syngenta is not entitled

22 to any damages.

23        If, however, you find that Willowood did infringe the

24 '138 Patent, you need to answer this, and you will apply the

25 same law on this issue as I gave you in connection with Issue

1   2, the damages issue for the Compound Patents.  I'm not going

2   to repeat all of that here, because I already told it all to

3   you, but I'll go over the big picture items.

4         An award of damages for patent infringement must be

5   adequate to compensate for the infringement.  Any damages you

6   award should not punish Willowood, they should put Syngenta in

7   approximately the same financial position it would have been in

8   had the infringement not occurred, but in any event, not less

9   than a reasonable royalty.

10        Syngenta can recover lost profits if it proves to a

11  reasonable probability that it would have made those profits

12  but for the infringement of the '138 Patent.  In deciding

13  whether Syngenta lost profits as a result of the infringement,

14  you can consider both whether Syngenta lost sales and whether

15  there was price erosion as a result of the infringement.

16        As to price erosion, you should consider whether

17  Syngenta would have been able to sell its products at a higher

18  price but for the infringement, and if so, the amount of

19  product it would have sold at that higher price.  As to lost

20  sales, you should consider how many sales, if any, Syngenta

21  lost because of the infringement, less its cost incurred in

22  making those sales.  In evaluating Syngenta's evidence about

23  lost profits based on anticipated profits as set forth in its

24  budget, you should evaluate the benchmarks of the azoxystrobin

25  budgets, the mesotrione budgets and profits, how accurate they

tended to be, how well they match up with each other, and any other credible evidence that supports or undermines the use of these things as benchmarks.  As to all of these things, you should take into the account the nature of the azoxystrobin market and what it would have looked like and what would have happened to Syngenta's sales, prices, and profits, had Willowood not infringed.  I explained all that to you in more detail back on the Compound Patents.  The law is the same here.

Just as with the compound patents, Syngenta's damages for lost profits are not necessarily limited to the period before the patent expired, but Syngenta must prove that but for the infringement while the patent was valid and in force, Syngenta would have made the profits.  After December 2015, Syngenta no longer had exclusive rights to the '138 process, so you should not award any lost profits caused by Willowood's use of that process after December 2015.

Now, Syngenta has the burden to establish the amount of its damages by a preponderance of the evidence, that is, by the greater weight of the evidence.  You should award only those damages that Syngenta establishes that it more likely than not suffered.  Again, they are not required to prove damages with mathematical precision, but they do have to prove them with reasonable certainty, and you can't award speculative or guesswork damages.

You should not include as damages for infringement of

the '138 Patent any damages you award for infringement of the
Compound Patents.  So this is additional damages.  You should
only include any damages caused by the infringement of the '138
Patent that are not covered by the loses you found from the
Compound Patents.  To the extent you awarded Syngenta damages
for lost profits caused by infringement of the compound
patents, and the damages for lost profits caused by
infringement of the '138 Patent are the same, don't award them
again, because Syngenta isn't allowed to recover them twice for
the same lost profits.

            Now if you are satisfied as to lost profits, you
write that amount in.  If you're not satisfied by the greater
weight of the evidence as to the amount of lost profits, then
Syngenta is entitled to recover a reasonable royalty for any
infringing sales in an amount proven by the greater weight of
the evidence.  You will remember that the royalty is a
payment -- is a payment made to the patent holder in exchange
for the right to make, use, sell, or import the claimed
invention.  A reasonable royalty is the amount of money that a
patent holder and the alleged infringer, here Syngenta and
Willowood, would have agreed upon as a fee for use of the
invention at a time before the infringement began, based on a
hypothetical good faith negotiation undertaken by reasonable
business people, and taking into account all of the factors
that likely would have affected that negotiation, and the value

1  of the royalty.  I listed a lot of those factors for you

2  earlier.  I'm not going to repeat them here.

3       So, as to this issue, you should write the amount of

4  additional lost profits, if any, you find Syngenta has proven

5  by the preponderance of the evidence that it suffered as a

6  result of the infringement of the '138 Patent.  If Syngenta has

7  not proven lost profits by the greater weight of the evidence,

8  you should write in this space the amount you find by the

9  greater weight of the evidence to be a reasonable royalty, if

10  any, for use of that '138 Patent.

11       Now we'll turn to Issue 6, which is the willfulness

12  issue.  Again, if you find that Willowood infringed the '138

13  Patent, you will need to determine if that infringement was

14  willful.  You don't answer it if you found there is no

15  infringement.  On this issue the burden proof is on Syngenta to

16  prove by the greater weight of the evidence that the

17  infringement of the '138 Patent by Willowood is especially

18  worthy of punishment, meaning its infringement was malicious,

19  deliberate, consciously wrongful, or done in bad faith, and

20  this is the same thing I told you about earlier, it just

21  shorter, so I'm going to go over it again.

22       To determine whether Willowood acted wilfully, you

23  should consider what Willowood knew and did at the time it

24  infringed, not what it may have learn afterwards.  You should

25  consider all of the facts, including whether or not Willowood

1    intentionally copied the process that is covered by Syngenta's

2    patents, whether or not Willowood reasonably believed it did

3    not infringe, whether it sought and followed legal advice

4    concerning these issues, whether or not Willowood tried to

5    cover up its infringement, and whether or not Willowood made a

6    good faith effort to avoid infringing the patent.

7            You will remember that your damages award for

8    infringement of the '138 Patent is not affected by the

9    willfulness issue.  Damages are compensatory only, and I use

10   willfulness for other purposes down the road.

11           So if you find by the greater weight of the evidence

12   that Willowood willfully infringed and is especially guilty of

13   punishment as to the '138 Patent, then you would answer this

14   issue yes, in favor of Syngenta.  If you do not so find or are

15   unable to say, you would answer the issue no, in favor of

16   Willowood.

17           Now let's turn to the DABCO Patent.  As to the '761

18   DABCO Patent, you will be asked and are asked to decide whether

19   Willowood infringed that patent and whether the patent is

20   valid.  Infringement here means, was the '761 process used to

21   make the azoxystrobin technical that Willowood imported, sold,

22   offered for sale, or used.  Unlike the other liability issues,

23   the burden of proof as to infringement and validity is on

24   Willowood, not on Syngenta.  Willowood has to prove by the

25   greater weight of the evidence, that Willowood's azoxystrobin

1  technical was not manufactured according to the process claimed

2  by the '761 DABCO Patent, that is, that the process used to

3  manufacture its azoxystrobin technical does not use DABCO

4  within the range set forth in the patent.  As to validity,

5  Willowood has to prove that the patent was invalid by clear and

6  convincing evidence.

7          Now during the trial, you have heard the lawyers and

8  witnesses use the word "claim" or "claimed," a good bit, so I

9  just want to make sure you understand the particular meaning of

10  that word under patent law.  The patent claims are the numbered

11  sentences at the end of each patent, and if you look at the

12  patent during your deliberations, you'll see those.  Those are

13  important, because it is the words of the claims that define

14  what a patent covers.  The figures, specifications, and text in

15  the rest of the patent provide a description and/or examples of

16  the invention and provide a context for the claims, but it is

17  the claims themselves that define the breadth of the patents

18  coverage.  At issue as to the '761 Patent is Claim 1, which

19  claims performing a condensation reaction in the manufacture of

20  azoxystrobin technical in the presence of between 0.1 and 2.0

21  mol percent DABCO.

22          Turning specifically to Issue 7.  This is the

23  infringement issue.  On this issue, the burden of proof is on

24  Willowood.  Willowood must prove by the greater weight of the

25  evidence, that the azoxystrobin technical it imported into the

United States and that was sold and used by them in the United
States was not manufactured in a manner that infringes the '761
Patent.  So specifically, this means that Willowood must show
that the condensation reaction used to manufacture its
azoxystrobin technical is not performed in the presence of
between 0.1 and 2.0 mol percent DABCO.

This is a factual issue, and you should evaluate it
in light of the testimony and exhibits showing and discussing
how the Willowood azoxystrobin is made.  You may also consider
the absence or lack of evidence.

So if you find by the greater weight of the evidence
that the condensation reaction used to manufacture Willowood's
azoxystrobin technical is not performed in the presence of
between 0.1 and 2.0 mol percent DABCO, then you would answer
this issue yes, in favor of Willowood; and if you do not so
find or are unable to say, you answer no, in favor of Syngenta.

If you answer yes, then you skip the damages question
and go to the invalidity issue.  If you answer no, which means
you have found infringement, then you do need to answer the
damages issue as well as the obviousness issues.

Issue 8, if you reach this issue, it is the damages
issue.  The burden of proof is back on Syngenta, and this means
that Syngenta must prove by the greater weight of the evidence
the amount of damages it is entitled to recover for Willowood's
infringement of the '761 Patent by using DABCO within the

claimed range in making the azoxystrobin technical. This patent is still in force, so Syngenta is entitled to recover all damages to date which it proves were caused by the use of the DABCO process within the claimed range.

By instructing you on damages as to this patent, I'm not suggesting which party should win. If you find that Willowood has not infringed or is not infringing the '761 Patent, then Syngenta is not entitled to any damages and you do not need to answer this question.

If however, you found that Willowood infringed and is infringing the '761 patent, then you do need to answer this issue. You will apply the same law on damages I gave you in connection with Issue 2, the damages issue for the Compound Patents, and summarized again with Issue 5, the '138 process patent. I'm not going to repeat those here in full, but I will remind you of the big picture and how they may apply specifically to this patent.

Syngenta is entitled to recover damages adequate to compensate for the infringement, but not to punish, with the goal of putting Syngenta in approximately the same financial position it would have been had the infringement not occurred. Syngenta can recover lost profits if it proves them. If it hasn't satisfied you as to lost profits, you should consider a reasonable royalty which Syngenta is entitled to recover in an amount it proves by the greater weight of the evidence.

1          In evaluating lost profits, you can consider both

2   whether Syngenta lost sales and whether there was price erosion

3   as a result of the infringement.  You can consider Syngenta's

4   benchmark evidence.

5          If you find it helpful, you will remember way back on

6   Issue 2, I talked with you about the factors to consider in

7   evaluating lost profits, and I mentioned to you that you are

8   essentially evaluating what Syngenta's profits would have been

9   in a hypothetical world in which Willowood had not infringed

10  the Compound Patents.  Here, that hypothetical world is one in

11  which Willowood did not infringe the '761 Patent.  So in

12  addition to considering whether there was a demand for

13  Syngenta's azoxystrobin crop protection products made by the

14  '761 Patent method, whether there was an available and

15  acceptable non-infringing substitute for those products,

16  whether Syngenta had the capacity to make more products to meet

17  the demand, and the amount of profit it would have made had

18  Willowood not infringed, you will also need to consider whether

19  there was a non-infringing alternative method to the '761

20  Patent which was available to be used and if so, whether

21  Willowood or some other company would have used that method in

22  the hypothetical world where Willowood did not infringe that

23  '761 Patent.

24          Essentially what we are talking about here is whether

25  Willowood or someone else would have used the 138 Patent's

method after that patent expired in 2015.  If you find that would have happened, you should not award any damages for lost profits caused after the time you find that such products would have entered the market, as those lost profits would be caused by non-infringing alternatives.  In deciding whether there was a non-infringing alternative to the '761 Patent, you should consider whether the material, experience, and know-how for developing and carrying out the alleged non-infringing substitute were available at the time of the infringement, whether the cost of the alternative would have been so high as to render the alternative unavailable, and whether Willowood would have had to design or invent around the '761 Patent's process to develop a substitute.

I remind you, that Syngenta has the burden to establish the amount of its damages by a preponderance of the evidence, while mathematical precision is not required, reasonable certainty is.

Also, you should not include as damages for infringement of the '761 Patent, any damages you already awarded for infringement of the compound patents or the '138 Patent for those lost profits.  You should only include the damages caused by the infringement of the '761 Patent that are not covered by Syngenta's losses covered by infringement of the compound patents or the '138 Patent.  To the extent you already awarded those lost profit damages, don't include them again

here because they don't get -- they can't recover twice.

If you are not satisfied by the greater weight of the evidence as to the amount of lost profits, then, at a minimum, Syngenta is entitled to recover reasonable royalty for any infringing sales.  You'll remember that a royalty is payment made to a patent-holder in exchange for the right to make, use, sell, or import the claimed invention.  A reasonable royalty is the amount of money that a patent holder and alleged infringer - here Willowood and Syngenta - would have agreed upon as a fee for use of the invention at a time before the infringement began, based on a hypothetical good faith negotiation undertaken by reasonable business people and taking into account all of the factors that likely would have affected that negotiation and the value of a royalty.

So, as to this issue, you should write the amount -- if you reach it, you should write the amount of additional lost profits, if any, you find Syngenta has proven by a preponderance of the evidence that it suffered as a result of the infringement of the '761 Patent.  If Syngenta has not proven lost profits by the greater weight of the evidence, then you should write in the space the amount you find by the greater weight of the evidence to be a reasonable royalty, if any.

Finally, Issue 9:  Did the defendants prove that the '761 DABCO Patent is invalid?  So, the Patent Act provides that

a patent for a claimed invention may not be obtained or
enforced if the differences between the claimed invention and
the prior art are such that the claimed invention as a whole
would have been obvious to a person of ordinary skill in the
field of technology of the invention at the time the invention
was made. Willowood contends that the invention, the use of
DABCO within the range claimed in the '761 Patent in the
manufacture of azoxystrobin, was obvious because of the prior
art, here the Weintritt Patent, in combination with the '138
Patent.

On this issue, because patents issued by the Patent
Office are presumed to be valid, the burden of proof is on
Willowood. This means Willowood must prove by clear and
convincing evidence, that the manufacture of azoxystrobin using
a condensation reaction in the presence of between 0.1 and 2.0
mol percent DABCO would have been obvious to a person of
ordinary skill in the field of the technology of the patent at
the time the invention was made. In other words, you must be
left with a clear conviction that the claim is invalid, because
it is obvious under those standards.

In deciding what the level of ordinary skill in the
field of the invention is, you should consider all of the
evidence introduced at trial, including but not limited to:
The level of education and experience of the inventor and other
persons actively working in the field; the types of problems

encountered in the field; prior art solutions to those
problems; the rapidity with which innovations are made; and
sophistication of the technology.

In determining whether a claimed invention is
obvious, you must consider the level of ordinary skill in the
field of the invention that someone would have had at the time
the invention was made, the scope and content of the prior art,
and any differences between the prior art and the claimed
invention. Prior art is previously known subject matter in the
field of a claimed invention for which a patent is sought.

In considering whether a claimed invention is
obvious, you should consider whether the claimed invention was
merely the predictable result of using prior art elements
according to their known functions; whether the claimed
invention provides an obvious solution to a known problem in
the relevant field; whether the prior art teaches or suggests
that the desirability of the claimed invention or of combining
elements claimed in the invention; whether the prior art
teaches away from the claimed invention or the combining of
elements; and whether it would have been obvious to try the
claimed invention or combination of elements such as when there
is a design need or market pressure to solve a problem and
there are a finite number of identified, predictable solutions.

You should also consider any objective evidence that
may shed light on the obviousness or non-obviousness of the

claimed invention, such as whether the invention achieved

unexpected results and whether the inventor proceeded contrary

to accepted wisdom in the field.

       To find that prior art rendered the invention

obvious, you must also find that the prior art provided a

reasonable expectation of success.  You should remember that

most --

       **JUROR:**  Your Honor, can I get you to repeat the

finite part.

       **THE COURT:**  Yes.  Finite.  Okay.  That was one of the

things to consider, whether it would have been obvious to try

the claimed invention or the combination of elements such as

when there is a design need or market pressure to solve a

problem and there are a finite number of identified predictable

solutions.

       Then again, consider objective evidence about whether

the invention achieved unexpected results or whether the

invention proceeded contrary to accepted wisdom in the field.

       To find that prior art rendered the invention

obvious, you must also find that the prior art provided a

reasonable expectation of success.  You should remember that

most, if not all inventions, rely on building blocks of prior

art, and that alone, does not make them obvious.  Also, you

should not use hindsight in evaluating whether a claimed

invention is obvious in light of the prior art.  Whether a

patent claim is invalid as obvious, must be determined by
considering whether a person of ordinary skill in the field
would have been motivated to combine the references with a
reasonable expectation of success at the time of the claimed
invention, not now or later, after everyone knows that the
claimed invention works.

In deciding the issue of invalidity, you may take
into account the fact that the Weintritt prior art reference
was previously considered by the Patent Office when it examined
and allowed the claims of the DABCO Patent. When the Patent
Office previously considers a piece of prior art, you may
assign less weight to an argument based on that prior art. You
not bound by the Patent Office decision and, indeed, you must
make your own decision on the matter with due regard to the
presumption of validity and Willowood's burden to prove
obviousness by clear and convincing evidence.

You will remember that that standard is higher than
the greater weight of the evidence, but it is something less
than beyond a reasonable doubt. Clear and convincing evidence
means it is highly likely that the fact is true. To prove that
the DABCO Patent is invalid, Willowood must provide clear and
convincing evidence that leaves you with a clear conviction or
firm belief that the '761 Patent is invalid.

If you find by clear and convincing evidence that
Claim 1 in the '761 Patent to use DABCO between the range of

1  0.1 and 2.0 mol percent in the manufacture of azoxystrobin is

2  invalid due to obviousness, then you would answer yes, in favor

3  of Willowood.  If you do not so find or are unable to say, you

4  would answer the issue no, in favor of Syngenta.

5          All right.  We've covered the issues.  Now I have

6  some additional instructions to you that are more general, but

7  before we do that, let's just stop, stand up for a second, kind

8  of clear your head for a minute.  The rest of the instructions

9  are shorter, but I've been talking a long time.  All right.

10          In reaching your verdict generally, you must consider

11  only the evidence admitted in the case.  The term "evidence"

12  includes the sworn testimony of witnesses and admitted

13  exhibits.  Remember that nothing the lawyers say is evidence.

14  A question to a witness is not evidence, rather it is the

15  witness's answer that is the evidence.  Objections are not

16  evidence.  While the lawyers are allowed to go over their

17  evidence with you in their closing arguments, if their

18  recollection differs from your's, you should be guided by your

19  memory and your recollection, which control.  If I have

20  excluded any evidence or sustained an objection to evidence or

21  told you to disregard any evidence, you should not consider it.

22  If I overruled an objection, then you may consider that

23  evidence, but it is not more important just because an

24  objection was made.  Similarly, the fact that I had a bench

25  conference with the lawyers about evidence or sent you out of

1  the courtroom for a minute, does not mean that the evidence is

2  more or less important, and it should not affect your

3  evaluation of that evidence.

4        Also, nothing that I have said is evidence.  You

5  should take what I say about the law and follow that, but you

6  are the sole judges of the facts.  The law, as indeed it

7  should, requires the presiding judge to be impartial.  You

8  should not draw any inference from any ruling I have made,

9  expression on my face, inflection in my voice, or anything that

10  I have said or done that I have any opinion about what your

11  answers should be to any of these issues.  It is your exclusive

12  province to find the facts of this case and to render a verdict

13  reflecting the truth as you find it.

14        In considering the evidence, you should apply your

15  reason and commonsense.  You can consider direct evidence and

16  circumstantial evidence.  "Direct evidence" is the testimony of

17  one who asserts actual knowledge of a fact, such as an

18  eyewitness.  "Circumstantial evidence" is proof of a chain of

19  facts and circumstances indicating that a fact has or has not

20  been proved.  The classic example is, you look out the window,

21  everything is clear, you go to bed, you wake up in the morning

22  and there is snow on the ground.  You can conclude that it is

23  snow.  You didn't see it, but you infer that it snowed.  That's

24  a very obvious example of circumstantial evidence.  The law

25  does not make any distinction between the weight you may give

1  to direct or circumstantial evidence.  Both can be important

2  and either is sufficient as a basis for your decision, if you

3  find it persuasive.

4         Similarly, you are allowed to draw reasonable

5  inferences from the facts that you find.  Inferences are

6  deductions or conclusions that reason and commonsense lead you

7  to draw from the facts established by the evidence.

8         Now, in saying that you must consider all of the

9  evidence, this does not mean that you must accept all of the

10  evidence as true or accurate.  You are the judges of the

11  credibility of witnesses, the trustworthiness of the exhibits

12  and the weight to be given the evidence.

13         Indeed, you are the sole judges of the credibility of

14  each witness.  You must decide for yourselves, whether to

15  believe the testimony of any witness and how much importance to

16  give to that testimony.  In making those decisions, you may

17  believe what a witness says, in whole or in part or not at all.

18         In deciding whether to believe a witness, you should

19  use the same test of the truthfulness you apply in your

20  everyday affairs.  These tests may include the opportunity of

21  the witness to see, hear, know or remember the facts or

22  occurrences about which he or she testified; the manner and

23  appearance of the witness; any interest, bias, or partiality

24  the witness may have; the apparent understanding and fairness

25  of the witness; whether the testimony is sensible and

reasonable; whether it is consistent with other believable
evidence in the case. You might ask yourselves if the witness
had a particular reason not to tell the truth or has a personal
interest in the outcome of the case. Did the witness seem to
have a good memory? Did the witness have the opportunity and
ability to observe accurately the things he or she testified
about? Did the witness appear to understand the questions and
answer them directly? Did the witness's testimony differ from
the testimony of other witnesses?

You may also consider whether a witness gave
different or inconsistent testimony before trial or made
inconsistent statements in documents created before trial in
evaluating whether the witness's testimony at trial is credible
and how much weight you will give it. Prior inconsistent
statements or testimony bear on credibility, and you should
consider that. Similarly, if a witness said the same thing at
trial as the witness said in documents created before the
dispute arose or before trial, that also bears on credibility
and you should take that into account.

The number of witnesses testifying about any
particular matter and the number of documents is not
controlling. You're the sole judges of the weight to be given
the evidence, so even if you decide that certain evidence is
credible and believable, you still have to decide how important
it is, in light of all of the other believable evidence in the

1  case.

2          One of the witnesses -- well, two of the witnesses

3  actually testified in part in a language other than English.

4  Each witness has the right to testify in his or her native

5  language.  The fact that an interpreter was used should not

6  affect the weight of that evidence or your evaluation of

7  credibility.  You're not to make any assumptions about

8  intelligence or credibility of a witness based on the use of an

9  interpreter.

10         Now, in addition to the testimony, you should

11 consider the exhibits admitted into evidence.  Just because

12 evidence comes in the form of a document, does not necessarily

13 make it more important or worthy of belief, and it is up to you

14 to decide whether to accept the evidence in any particular

15 exhibits and how important that evidence is.

16         There were exhibits called demonstrative exhibits

17 which both parties used.  They were created or shown in order

18 to illustrate or explain the testimony of a witness.  These are

19 not themselves evidence or proof of any facts in the case.

20 They are only as good as the underlying evidence that supports

21 them.  I think in most cases they were testimony.  You should

22 consider these demonstrative exhibits only to the extent they

23 help illustrate or explain the witness's testimony.

24         In this case you have heard evidence from expert

25 witnesses.  These experts witnesses were permitted to testify

in the form of opinions, and the reasons for those opinions

because of their education or experience in a field where they

have specialized skill or knowledge.

As I have said, you are the sole judges of

credibility of each witness and the weight to be given the

testimony of each witness.  This includes expert testimony.  In

deciding the weight and credibility of the testimony of an

expert witness, you should consider the same tests that you

apply as to any other witness, and in addition, you should

consider the evidence about the witness's training,

qualifications and experience, or lack thereof; the reasons, if

any, given for the opinion; whether or not the opinion is

supported by facts that you find from the evidence; whether the

testimony is reasonable, and whether or not it is consistent

with other believable evidence in the case.

You should consider the opinions of the expert

witnesses, but you are not bound by any of their opinions.  In

other words, you are not required to accept an expert witness's

opinion to the exclusion of the facts and circumstances

disclosed by other testimony.

During the trial certain testimony was presented by

way of deposition.  These questions and answers were recorded,

sometimes only in writing, sometimes by video.  They were under

oath.  All the lawyers were present.  You're to consider the

credibility and weight of this testimony insofar as it is

possible, in the same way as if the witness had been present
and testified from the witness stand.  If the testimony was
read, rather than played back from a recording, do not place
any significance on the behavior or tone of the voice of the
person who read the questions and answers.

You have heard or viewed only parts of those
depositions.  You shouldn't worry about the other parts.  The
parties got to designate what they wanted you to consider that
was most important to this case, and you can assume that the
parts of the depositions you did not hear would not have added
anything.  So don't worry about the parts that you I didn't
hear.

Additionally, the depositions were taken under oath
and if in the deposition the witness made a contradictory
statement or any statements in conflict with his or her
testimony here in court, you can consider those conflicts and
explanations for those conflicts in deciding the witness's
credibility, just as if the testimony in the deposition had
been given at trial.

Now, your deliberations are based only on the
evidence.  Do not look anything up online or in dictionaries or
other reference materials, and do not conduct any independent
investigation.  That is not fair to the parties or to the
process, and it can result in serious mistake on your part,
because here everybody gets to test the evidence and that helps

1    you evaluate whether it is true or not, and there is stuff out

2    there in the world, that doesn't happen with that stuff all the

3    time, so only consider what is here.

4            If after consulting with each other about the

5    evidence as a group you remain confused or uncertain about

6    something, you should also evaluate whether it is important;

7    and if it is important, I remind you that one of the parties

8    has the burden of proof on each issue, and the party with the

9    burden of proof has to satisfy you about the facts necessary to

10   receive a favorable answer.

11           If you have questions about the meaning of any of the

12   word I have used in these instructions, you can ask me.  I've

13   defined some of the words and terms and you should apply those

14   definitions, otherwise, as I say, words are used in their

15   ordinary English meaning.  If you need any further guidance on

16   the law, don't look it up elsewhere, just ask me.  I can repeat

17   any of this if you need me to or even send some or all of the

18   instructions back to you in writing, if you need that.  I

19   encourage you to give it a shot without the written

20   instructions because it is a lot of pages, but obviously

21   anything that you need about the law, anything you need

22   repeated, I will be glad to repeat it to you or give it to you

23   in writing, or if you're not clear on what it means, to try to

24   help you with that, if I can.  I cannot help you with the

25   facts, that's your job, but I can help you with the law.

1    During your deliberations you can use your notes.

2  You will remember, however, your notes are not evidence, and

3  you should not give undue reliance to any one juror's notes, or

4  for that matter, any one juror's memory, though the memory of a

5  juror who did not take notes is entitled to the same

6  consideration as the memory or the notes of another juror.

7    During the trial various items were admitted into

8  evidence as exhibits.  They are going to be sent back with you.

9  It might be after lunch when you get those exhibits.  Don't

10 wait until you have the exhibits to start your deliberations.

11 As soon as you get the original verdict sheet, which is the one

12 that doesn't say "copy" on it, you'll be able to start your

13 deliberations.

14    You should use the exhibits in a way that's helpful

15 to your deliberations, but they are not more important than the

16 testimony, and you are not obligated to examine each exhibit in

17 any particular way.  Use them however is helpful to you in your

18 deliberations.

19    Now, a verdict is not a verdict until all nine of you

20 agree unanimously as to each question.  No majority vote here.

21 You need to all agree unanimously, and you cannot return a

22 verdict until you agree unanimously.

23    During your deliberations, you may not talk about the

24 case with anyone other than your fellow jurors.  No tweeting,

25 no social media posting.  Don't talk about it at home, should

1  the deliberations go over into tomorrow, or at lunch.  I'm sure

2  we'll take a lunch break.  Continue to avoid contact with the

3  lawyers, parties, or witnesses.  In other words, all of the

4  instructions I've been giving you repeatedly, still apply,

5  except you can talk to each other.  However, you can only talk

6  to each other in the jury room and while all nine of you are

7  present, so don't, when you go to lunch and maybe are talking

8  with one other, don't talk about the case.  You want all of

9  your deliberations to be in the jury room, while all of you are

10 present.

11         These instructions are important to a fair trial, and

12 I remind you, that violation can result in a contempt finding.

13         When you go to the jury room, the first thing you

14 should do is select one of your members to act as your

15 foreperson.  That foreperson will preside over your

16 deliberations and speak for you here in court, to the extent

17 that is necessary.

18         We'll send the original verdict sheet in in a minute.

19 When you have reached a unanimous verdict, your foreperson

20 needs to mark the appropriate place as to each question that

21 you need to answer.  Be sure to use a pen, not a pencil, and

22 date and sign it.  Today is the 13th of September, if you reach

23 a verdict today.

24         If you need to communicate with me or you have a

25 question, send me a note.  You'll have your notepads, just

write your question down, knock on the door and the security

offer will say, you know, what's up, and you just say, I have a

note, and Ms. Sanders will get the note.  She'll bring it to me

and I'll see if it is something I can help you with.  Do not,

however, in any message or question you send me, tell me

anything about your numerical division; you are at a particular

point in your deliberations, don't tell me it's eight to one or

four to four or whatever.  Don't tell me that.

            If you would like to take a break at any time during

your deliberations, I will be glad to let you do that.  In

fact, in a minute I'm going to send you into the jury room and

your first job is to select your foreperson.  Your second job

is to decide when you want to go to lunch.  If you want to

deliberate for a few minutes, talk for a bit, fine.  We can

stay until 1:00 o'clock or so and take a lunch break or go

ahead and go to lunch right away, that's obviously fine as

well, but I'm going to let -- you all need to make that

decision.  We will need to take a lunch break no later than

1:00 o'clock.

            I'm going to thank you for your patience,

attentiveness and continuing service.  You will now retire and

select your foreperson.  We'll send the verdict sheet back.

Eventually we'll send the exhibits back.  Whenever you get

ready to go to lunch, just send a note in that says, we're

ready to go to lunch.  I'll bring you back into the courtroom.

1          When you come in and out of the courtroom, you can
2    leave all of your notes and stuff in the jury room.  There is
3    no need to bring that with you as you come in and out of the
4    courtroom.
5          Thank you, for your service.  You may retire and
6    select your foreperson, and when you receive the verdict sheet,
7    you may start your deliberations.
8          (At 12:37 p.m. the jury retired to deliberate.)
9          **THE COURT:**  You need not repeat any objections you
10   previously made, but if I made any mistakes in delivering the
11   instructions, I'm happy to hear any objections, corrections.
12         For the plaintiff.
13         **MR. SANTHANAM:**  None, Your Honor.
14         **THE COURT:**  For the defendant?
15         **MR. DAVIS:**  None, Your Honor.
16         **THE COURT:**  I'll direct the clerk to send the
17   original verdict sheet in.  I think we'll just wait until -- do
18   you have the exhibits all ready?  I think we'll wait a minute.
19   My suspicion is, they'll want to go to lunch relatively
20   quickly.  I think we'll take the exhibits in there during the
21   lunch break, unless they don't come back right away.
22         I do want to thank counsel for a very well tried case
23   and the professionalism that you all have displayed, and the
24   excellent work you have each done on behalf of your respective
25   clients.  It is a pleasure to be in court with prepared, good

1   lawyers.  So I say that to all of you.

2           The clerk is taking in the verdict sheet.  Is there

3   anything we need to do while we wait?  No.  I will ask at least

4   one lawyer for each side to be in the courtroom at all times

5   that the jury is deliberating, and if you want to be here when

6   they have a question or come back with a verdict, you need to

7   be very close by, because I'm not waiting on anybody.

8           All right.  They didn't give you a note?

9           **THE MARSHALL:**  No note.

10          **THE COURT:**  I did make a few technical corrections to

11  the instructions as I went on.  I read it five times, but I

12  still found some mistakes in it this time.  I'll get those

13  fixed up, because I suspect they may want them in writing.

14          Did they say anything about lunch?

15          **THE CLERK:**  Not yet.

16          **THE COURT:**  All right.  We'll be at ease.

17          (Court stood at ease from 12:40 p.m. to 12:45 p.m.)

18          **THE COURT:**  Okay.  The jury wants to go to lunch at 1

19  o'clock they say.  The foreman has been selected.  So we'll be

20  at ease until 1 o'clock and, you know, I think I may have

21  forgotten to tell them not to leave, so I may have Ms. Sanders

22  say, we'll come and get you at 1:00 o'clock so I can bring them

23  back into the courtroom, make sure they know -- even though I

24  just told them, repeat to them not to talk about it over the

25  lunch break.

1          So we'll be at ease until 1 o'clock, unless the jury

2     sends us a note before that.  All right.

3               (Court in session at 1 o'clock p.m.)

4          **THE COURT:**  Okay.  Anything we need to take up before

5     I bring the jury in and send them to lunch?  I'm going to let

6     them tell me how long they want to take for a lunch break.

7     Sometimes at this point they say 30 minutes is enough, so we'll

8     see what they say.

9               All right, you can bring the jury in.

10              (Jury panel is present.)

11         **THE COURT:**  All right.  Are you ready to go to lunch?

12    Who is your foreperson?  Ms. Pettit, how long do you want?  45

13    minutes, an hour, hour and 15 minutes?

14              **THE FOREPERSON:**  We can do an hour.

15         **THE COURT:**  An hour, all right.  I'm glad to excuse

16    you for your lunch recess.  During the break, do not talk to

17    each other in small groups or even if by chance you should be

18    walking down the street, all nine of you, really just only in

19    the jury room, and remember, of course, to avoid contact with

20    anyone.  Don't communicate about it or look anything up over

21    the recess.

22              I'll ask your foreperson to put that verdict sheet in

23    that folder.  Ms. Sanders can keep it.  We won't look at it

24    when you are out to lunch.  Then when all nine of you are back,

25    just let the security officer or somebody know.  She'll hand

1 the verdict sheet back in and we'll have the exhibits for you

2 in the jury room when you get back from lunch.

3          Any time you want a break, just send a note in,

4 otherwise, I'm just going to leave you back there until you

5 tell me you want a break, so you all are kind of in control.  I

6 will check on you about 5:00 o'clock, because that would

7 ordinarily be around the time that we would leave.  If you do

8 want to stay a little later than that, we can do that tonight,

9 but there is no obligation to do that.  Everybody is prepared

10 to come back tomorrow.  So I'll just let you all be kind of in

11 control of your schedule from here on out.

12          You're excused for one hour for lunch.  Be back in

13 the jury room by two.

14          Ms. Pettit, just don't leave before you give the

15 verdict sheet to Ms. Sanders.

16          (Jury panel was excused for a luncheon recess.)

17          **THE COURT:**  I will not bring them back into the

18 courtroom at 2:00 o'clock.  When they all get there we'll hand

19 the verdict sheet into them and they can resume deliberations.

20          Anything we need to do before we go to lunch?  That

21 was the foreperson handing the verdict sheet.

22          Mr. Levine.

23          **MR. LEVINE:**  We'll have an attorney in the conference

24 room that is assigned to us at all times, so if there is any

25 reason, that's where you can find us.

1          **THE COURT:**  Same for you all.  Okay.  Good.  You

2    might give the jurors a minute or two to get down the elevator

3    before you go out into the hallway.

4          I will see you back here at 2 o'clock.

5          (At 2:20 p.m. the Court received a note from the

6    jury.)

7          **THE COURT:**  So to prove that the jury is paying

8    attention, they have asked a pretty good question.  The

9    question is:  "If the jury says Yes to number nine, does this

10   invalidate seven and possibly eight?" So I think they have

11   figured out that if it's not a valid patent, whether or not you

12   infringe, you know, may not matter.  We had talked about that

13   the other way.  So I think it might be best to have them answer

14   that question -- answer seven any way, out of an abundance of

15   caution, since there was a motion at the close of the evidence

16   about that, and I always think I'm right, but sometimes I'm

17   wrong, so maybe I should ask them to go ahead and answer it any

18   way, just out of an abundance of caution.

19          **MR. LEVINE:**  Yes, Your Honor, for the plaintiffs.

20          **THE COURT:**  I think what I will tell them is, that

21   they should go ahead and answer Issue 7, and for purposes of

22   that, they should -- you know -- well, I don't know.  I don't

23   want to tell them they should assume it is valid, but that

24   it's -- let me think how exactly to say this, given what

25   they've told me.  I don't want to say I want an advisory

 1   verdict, just in case I'm wrong on this.

 2            **MR. LEVINE:**  Just say yes.

 3            **THE COURT:**  I'll just tell them they need to go ahead

 4   and answer it and not necessarily explain it.  Does somebody

 5   have a specific way they would have me answer that question,

 6   other than please go ahead and answer seven?  All right.  I'll

 7   tell them that.  Bring the jury in.  I think the clerk noted,

 8   they did resume their deliberations right around 2 o'clock.

 9            (Jury panel is present at 2:23 p.m.)

10            **THE COURT:**  I have your question:  If you say yes to

11   number nine, which is the invalidity obviousness issue, does

12   this invalidate seven or possibly eight.  Regardless of your

13   answer to Issue 9, I do need you to answer Issue 7.  I'll be

14   glad to talk to you about that after the trial is over, and

15   I'll explain why, but I do need you to answer Issue 7,

16   regardless of your answer as to Issue 9.

17            As to Issue 8, you only answer it if Issue 7 is no.

18   I got that right.  So if you answer Issue 7 no, you do need to

19   answer Issue 8, but if you answer seven Yes, then you don't

20   need to answer the damages issue, but I do need you to answer

21   Issue 7, regardless of your answer to Issue 9.  All right.

22            Thank you.  You can resume your deliberations.

23            (Jury retired to deliberate at 2:24 p.m.)

24            **THE COURT:**  Any correction to that or objection to

25   what I said to them?  No.  All right.  We will be at ease while

```
 1  the jury resumes their deliberations.
 2            (The Court received a question from the jury at
 3  3:22 p.m.)
 4            THE COURT:  The jury has sent this question in:
 5  "Concerning number three, please provide written instructions
 6  from judge to jury."  So I have to pull out the instructions on
 7  number three, and the clerk will hand you a couple of copies,
 8  if you all just want to proofread behind me.  I'll give you a
 9  few minutes to do that.  I know everybody has already seen
10  these, but before I send them in, you all are welcome to come
11  up and look at the notes any time that you want to.
12            Anybody see any typos or anything like that for the
13  plaintiff?
14            MR. LEVINE:  You said we could see the note?
15            THE COURT:  Yes, if you want.
16            MR. LEVINE:  Do I have the first note?
17            THE COURT:  It is over there.  You can look at that,
18  but I need you to address if there is any typos, any problems
19  in this first.
20            MR. SANTHANAM:  We don't have any issues with
21  instruction number three.
22            THE COURT:  Anything for the defendant?
23            MR. DAVIS:  No, Your Honor.
24            THE COURT:  Did you want so see the note before I
25  send it back?  I read it to you but --
```

1    **MR. TILLER:**  We're good.

2    **MR. LEVINE:**  Yes.

3    **THE COURT:**  All right.  I'll direct the clerk to mark

4    that copy right there as Court Exhibit 2, and make that part of

5    the record.  Court Exhibit 2 is a duplicate of what I am going

6    to send into the jury.  They may want to write on this one, so

7    you just make that one part of the record, Ms. Sanders, and you

8    can send this one back into the jury.  I don't think I need to

9    bring them back in the courtroom.

10   **MR. COUGHLIN:**  Since the last break and this one --

11   this doesn't have anything to do with this instruction --

12   **THE COURT:**  Can we go ahead and hand that back?

13   **MR. COUGHLIN:**  Yes.

14   **THE COURT:**  We'll pause a moment while the door is

15   open.

16   **MR. COUGHLIN:**  So as to the first -- or I guess

17   second question, the note that was passed the last time, we've

18   discussed it.

19   **THE COURT:**  One second.

20   **MR. COUGHLIN:**  There may have been some ambiguity in

21   the question that was asked and the answer that was given,

22   which obviously we discussed.  We didn't identify this as a

23   potential ambiguity, but the jury asked the question, "If the

24   jury says yes to number nine, does this invalidate seven or

25   possibly eight?"  That was the question, and I think we

1 interpreted that as, do we have to answer seven and eight.

2 **THE COURT:** Right.

3 **MR. COUGHLIN:** It may be a more direct question is:

4 Does it invalidate or nullify seven or eight, in terms of if we

5 answer seven, yes, infringement and eight -- or I guess if the

6 DABCO is infringed and they award damages, are they asking the

7 question, if we say it is invalid, does that mean that our

8 answers don't matter, and that's a slightly different question

9 than --

10 **THE COURT:** But I still -- I mean, what do you want

11 me to do? I think I still answered it. They still have to

12 answer the question.

13 **MR. COUGHLIN:** That's correct. One, we wanted to

14 identify the issue for the Court, but --

15 **MR. LEVINE:** If I may, Your Honor. The ambiguity may

16 be that they were asking you what is the consequence of saying

17 Yes to number nine, does it --

18 **THE COURT:** Well, they could have been, but I'm not

19 going to tell them the consequence. I mean, even if that is

20 what they were asking, ordinarily I say on consequence kinds of

21 questions, well, you're just to answer the question and the

22 consequences are for another day.

23 **MR. LEVINE:** But that may be what they were asking.

24 **THE COURT:** Well, they appeared -- I mean, I guess

25 they could have been, but when I was talking to them, it

132 of 137

1   appeared to me that I was answering their question.

2           **MR. LEVINE:**  We just wanted to raise it, just so that

3   the -- and they certainly know how to send notes out and ask

4   questions.

5           **THE COURT:**  If they are still confused, they will let

6   me know.  You are not asking me to do anything different at

7   this point?

8           **MR. COUGHLIN:**  No, Your Honor.

9           **THE COURT:**  All right.  And the clerk has handed the

10   written instructions in on Issue 3, Court Exhibit 2.  Anything

11   else we need to do while we're waiting?

12           **MR. COUGHLIN:**  Not for the plaintiff, Your Honor.

13           **THE COURT:**  No.  We'll be at ease.

14           (Court was at ease from 3:27 p.m. to 4:48 p.m.)

15           **THE COURT:**  The jury tells the clerk they have a

16   verdict.  Anything we need to do before they come in?

17           **MR. LEVINE:**  No, Your Honor.

18           **THE COURT:**  Bring the jury in.

19           (Jury panel is present at 4:49 p.m.)

20           **THE COURT:**  All right.  Good afternoon again.

21   Ms. Pettit, would you stand as the foreperson.  Has the jury

22   reached a unanimous verdict?

23           **JURY FOREPERSON:**  Yes, Ma'am.

24           **THE COURT:**  I'll ask the clerk to hand me the verdict

25   sheet, and you can be seated.

1          Ladies and gentlemen, you have returned this verdict,

2    your answer to question one:

3          "Did Syngenta prove that Willowood Limited had

4    imported azoxystrobin technical into the United States or

5    otherwise sold or offered for sale azoxystrobin technical in

6    the United States?"  And your answer is, No.

7          Is that your verdict?  Everybody is nodding.

8          Issue 2:  "What damages has Syngenta proven it is

9    entitled to recover for infringement of the Compound Patents by

10   the Defendants?"  I think it looks like your answer is $75,600;

11   is that right?  Yes, I'm reading that correctly.

12         Answer three:  "Has Syngenta proven that the

13   infringement of the Compound Patents by the defendants was

14   willful?"  And you have answered, No, as to all of the

15   defendants.

16         Is that your verdict?  Everybody is nodding yes.

17         Issue 4:  "Did Syngenta prove that the same entity

18   carried out both the etherification and condensation reactions

19   used to manufacture the defendants' azoxystrobin technical, or,

20   if not, that the defendants' directed or controlled the

21   entities that carried out the etherification and condensation

22   reactions used to manufacture the defendants' azoxystrobin

23   technical?"

24         Your answer to this issue is marked No.

25         Is that your verdict?  Everybody is nodding yes.

1        Number seven:  "Did the defendants prove that the

2  condensation reaction used to manufacture its azoxystrobin

3  technical is not performed in the presence between 0.1 and 2.0

4  mol percent DABCO?"

5        Your answer is in in favor of Syngenta.  Is that your

6  verdict?  Everybody is nodding yes.

7        Your answer for Issue 8:  "What amount of additional

8  damages, if any, has Syngenta proven it is entitled to recover

9  for any infringement of the '761 DABCO Patent by the

10  defendants?"

11        Your answer is written here as $900,000.  Is that

12  your verdict?  You are nodding yes.

13        Issue 9:  "Did the defendants prove that the '761

14  DABCO Patent is invalid?

15        And your answer is, No, in favor of Syngenta.  Is

16  that your verdict?  All right.

17        Ms. Pettitt, did I accurately read all of your

18  answers?

19        **JURY FOREPERSON:**  (Nodding.)

20        **THE COURT:**  Is there anything further for the jury?

21        **MR. TILLER:**  No, Your Honor.

22        **MR. LEVINE:**  No, Your Honor.

23        **THE COURT:**  Ladies and gentlemen, I want to thank you

24  for your time and your service in this case.  Jury service is

25  always inconvenient and this was a longer trial than many.

1  Lots of trials get done in two or three days, and this one took

2  a good bit longer than that, and took well into the second

3  week, and I know it was inconvenient.

4          Everybody during the trial commented on how closely

5  you all were paying attention.  We appreciate that.  I don't

6  know what the best way is to resolve disputes like this, but I

7  do believe that we have the best way that people have come up

8  with.  All you have to do is look at how people resolve

9  disputes like this in other parts of the world and they aren't

10 nearly as peaceful and aren't nearly as fair.  So you play an

11 important role in that process, and I want to thank you for

12 that.

13         In just a second, I'll send you back to the jury

14 room, and Ms. Sanders will join you a moment to take care of

15 any housekeeping matters.  As soon as those are finished up,

16 you'll be free to leave.  At that point you are free to talk

17 about the case.  You can explain what you have been doing to

18 your family members and coworkers and friends, if you want to.

19 You are also free not to talk about the case.  Some people

20 don't like to talk about jury service and it is completely up

21 to you, whether you talk about this matter and with whom.

22         Thank you, for your service, and you are discharged.

23 You can go back to the jury room and if you'll wait there,

24 Ms. Sanders will be there shortly.

25         (Jury panel was excused.)

1          **THE COURT:**  All right.  I'll direct the clerk to file

2   the verdict.   Is there anything else that we need to take care

3   of today?

4          **MR. LEVINE:**  No, Your Honor.

5          **MR. TILLER:**  No.

6          **THE COURT:**  It has been a pleasure to try the case

7   with you.  The clerk will file the verdict and at some point

8   I'll need to enter a judgment.  I'll give you a little time to

9   talk to each other, and somebody can let me know when you're

10  ready to do that, or if I get ready and I haven't heard from

11  you, I'll have Ms. Sanders consult.

12          All right.  Court is adjourned.

13          (This matter was concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, J. CALHOUN, RPR, United States District Court

4  Reporter for the Middle District of North Carolina, DO HEREBY

5  CERTIFY:

6

7        That the foregoing is a true and correct transcript of

8  the proceedings had in the above-entitled matter.

9

10

11

12  Date:   10-30-17          J. Calhoun, RPR
                             United States Court Reporter
13                           324 W. Market Street
                             Greensboro, NC  27401
14

15

16

17

18

19

20

21

22

23

24

25